IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PIPEFITTERS LOCAL 537 ANNUITY FUND, On Behalf Of Themselves And All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WILMINGTON TRUST CORPORATION, TED T. CECALA, DONALD E. FOLEY, DAVID R. GIBSON, ROBERT V.A. HARRA JR., and KEVYN N. RAKOWSKI,<br><br>Defendants. | ) | Civil Action No. |

**<u>CLASS ACTION COMPLAINT</u>**

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Wilmington Trust Corporation ("Wilmington" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of purchasers of Wilmington common stock between October 23, 2009 and November 1, 2010, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

3. This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and 1337.

4. Venue is properly laid in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District, and the Offering was marketed in this District.

5. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## PARTIES

6. Plaintiff Pipefitters Local 537 Annuity Fund, as set forth in the accompanying certification attached hereto and incorporated herein by reference, purchased the common stock of Wilmington at artificially inflated prices during the Class Period and has been damaged thereby.

7. Defendant Wilmington is a financial holding company that is incorporated in the State of Delaware. The Company describes itself as a relationship management company that helps clients increase and preserve their wealth through a variety of deposit-taking, lending, fiduciary, trustee, financial planning, investment consulting, asset management, insurance, broker-dealer, and administrative services.

8. Defendant Ted T. Cecala ("Cecala") served as the Company's Chief Executive Officer ("CEO") and Board Chairman until he retired from such positions on June 3, 2010 and July 19, 2010, respectively.

9. Defendant Donald E. Foley ("Foley ") served as the Company's CEO and Board Chairman effective June 3, 2010 and July 21, 2010, respectively.

10. Defendant David R. Gibson ("Gibson") has served as a Wilmington executive officer since 1992. In 2002, Defendant Gibson became Executive Vice President and Chief Financial Officer of the Company.

11. Defendant Robert V.A. Harra Jr. ("Harra") has been employed with the Company in numerous capacities since 1971 and has served as a Director, President, and Chief Operating Officer of Wilmington since 1996.

12. Defendant Kevyn N. Rakowski ("Rakowski") has served as an executive officer of Wilmington since 2006 and became Senior Vice President and Controller of the Company in 2006.

13. Defendants Cecala, Foley, Gibson, Harra and Rakowski are collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

14. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons or entities who purchased common stock of Wilmington between October 23, 2009 and November 1, 2010, inclusive (the "Class"). Excluded from the Class are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest, or

which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

15. The members of the Class are so numerous that joinder of all members is impracticable. Wilmington stock is actively traded on the NYSE with more than 91 million shares outstanding. The precise number of Class members is unknown to Plaintiff at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of Wilmington or its transfer agent or the underwriters to the Offering. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

16. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

17. Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

18. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiff

knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

19. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Wilmington;

(c) whether the price of Wilmington common stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

**BACKGROUND**

20. Defendant Wilmington is a financial services holding company headquartered in Wilmington, Delaware with more than $10 billion in assets. The Company is composed of four operating segments: Regional Banking ("RB"), Wealth Advisory Services ("WAS"), Corporate Client Services ("CCS"), and Affiliate Money Managers ("AMM").

21. The Company's RB segment is principally focused on providing services to privately owned businesses with annual sales of less than $200 million in the Mid-Atlantic region of the U.S., primarily from Princeton, New Jersey to Baltimore, Maryland.

22. The Company's WAS segment offers asset management and trust services to clients with greater than $10 million in liquid assets. Wilmington's CCS segment offers

401K plans and various corporate trust services to companies in bankruptcy, and its AMM business segment includes the ownership positions in two money managers engaged in active management of funds focused on value and growth investing strategies. Historically, the Company's earnings have primarily been tied to its RB segment.

23. During the third quarter of 2008, Wilmington attempted to sell $150 million in common securities and was able to raise only $44.5 million before the balance of such offering was cancelled. In desperate need of capital, Wilmington, in December 2008, issued $330 million of preferred stock to the U.S. Treasury under the U.S. Department of the Treasury Troubled Asset Relief Program ("TARP").

24. Prior to and during the Class Period, the quality of Wilmington's loan portfolio continually declined. In an attempt to facilitate the procurement of much needed equity capital, including capital to absorb growing credit-related losses and the repayment of $330 million outstanding TARP funds, Defendants caused Wilmington to understate its provision for loan losses in the face of its consistently deteriorating loan portfolio. In so doing, Defendants artificially inflated the Company's earnings and stock price during the Class Period.

25. In this way, Defendants, in violation of Generally Accepted Accounting Principles ("GAAP"), caused Wilmington to knowingly or recklessly delay the recognition of losses on the Company's loan portfolio and understate its income tax expense so that Wilmington could raise much needed capital by selling its common stock at an artificially inflated price to unsuspecting investors.

26. Wilmington purports to perform an internal risk-rating analysis that classifies its loan portfolio into one of four primary categories of risk:

- Pass: Loans with no current or potential problems;

- Watchlist: Interest accruing loans that are potentially problematic;
- Substandard: Both interest accruing and non interest accruing loans with identified weaknesses and some probability of loss; and
- Doubtful/loss: Non interest accruing loans with a high probability of loss, or which Wilmington has charged off.

27. Accordingly, "Non Pass" loans include those that are among the watchlist, substandard or doubtful/loss rated loans. Prior to and during the Class Period, the quality of Wilmington's loan portfolio significantly deteriorated, as illustrated by the sharp percentage increase in non pass loans in the chart below:




28. In fact, ***in just a short five quarter span***, Wilmington's reported Non Pass loans, or loans with "current or potential problems," increased by approximately 125%, ***from just over 9% to almost 21%*** of the Company's total loan portfolio.

29. During this same time frame, however, Wilmington's provision for loan losses remained relatively stable. Then, after Wilmington sold stock in an Offering, when

regulators commenced an examination of Wilmington's books and records beginning in June 2010, Defendants were forced to begin truing up Wilmington's loan loss reserves, which caused the Company's provision for loan losses to explode in the June 2010 and September 2010 quarters:




30. In fact, these increases in Wilmington's provisions for loan losses, which it reported as charges during the June 2010 and September 2010 quarters, were 125% greater than the provisions Wilmington reported in the prior two years, ***combined***.

31. The marketplace had no reason to believe that Defendants had masked the problems associated Wilmington's loan portfolio until June 23, 2010 when SunTrust Robinson Humphrey issued a research report downgrading the Company's stock following a field trip with the Company's management whereby SunTrust Robinson Humphrey learned that the quality of Wilmington's loan portfolio, after having undergone a third party review, was worse than previously disclosed. The SunTrust Robinson Humphrey report stated, in part:

> WL recently hired a third party firm to perform a detailed loan review in preparation for the company's upcoming regulatory exam. It appears the

> review will result in deteriorating credit metrics as the company attempts to more aggressively deal with its credit challenges. We also expect NCOs [net charge offs] to pick up materially in the near term. While we applaud a more aggressive credit stance, the results were likely not incorporated in our or Street estimates.

32. Following the issuance of this research report, the price of Wilmington stock declined approximately 11%, on very heavy trading volume, as a portion of the artificial inflation came out of Wilmington's stock price.

33. One month later, on July 23, 2010, while its regulatory examination was on-going, Wilmington announced it lost $116.4 million in the second quarter of 2010, the quarter ended June 30, 2010. The loss was primarily the result of a $205.2 million loan loss provision that the Company reported as being associated with its non-performing loans and loans with unfavorable credit risk ratings.

34. As a result of such disclosure, the price of Wilmington common stock declined by more than 9%, on very heavy trading volume.

35. Then, on November 1, 2010, with its regulatory examination substantially complete, Defendants were forced to report that Wilmington incurred an additional $281.5 million in loan losses and revealed that the Company's non-performing loans had almost ***doubled*** from the amount it had reported at the end of the prior quarter. In addition, the Defendants were forced to recognize a $100 million charge associated with a valuation allowance against the Company's net deferred tax assets and announced that the "best available option for [Wilmington's] stockholders" was to merge the Company with M&T Bank Corporation ("M&T") at a value of $3.84 per common share, more than 40% ***less*** than its then-currently inflated market value.

**Materially False and Misleading Statements**
**Issued During the Class Period**

36. The Class Period begins on October 23, 2009. On that date, Wilmington issued a press release announcing its operating results for the quarter ended September 30, 2009, which stated, in pertinent part:

> Wilmington, Del., October 23, 2009 - Wilmington Trust Corporation (NYSE: WL) reported a loss of $5.9 million, or $0.15 per diluted common share, for the third quarter of 2009. Earnings for the quarter were offset by $38.1 million of losses on securities in the company's investment portfolio. On an aftertax basis, these securities losses reduced net income by approximately $23.6 million and earnings by approximately $0.34 per diluted common share.

Defendant Cecala commented on the results, stating, in pertinent part, as follows:

> The Corporate Client Services business recorded impressive revenue growth, ***the provision for loan losses declined***, the net interest margin improved, and there were numerous other positive developments during the third quarter. Unfortunately, recessionary pressures reduced the value of some of our investment securities and triggered accounting rules that require us to write them down. [Emphasis added.]

37. On November 9, 2009, Wilmington filed with the SEC its Form 10-Q for the quarter ended September 30, 2009 (the "2009 Q3 Form 10-Q"), which was signed by Defendants Cecala and Gibson. The 2009 Q3 Form 10-Q included Wilmington's financial statements for the quarter and nine months ended September 30, 2009, which were represented to have been presented in conformity with GAAP. In addition, the 2009 Q3 Form 10-Q represented that:

> We maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles (GAAP) and reporting practices prescribed for the banking industry.
>
> * * *
>
> We have applied our critical accounting policies and estimation methods consistently in all periods presented in this report and we have discussed these policies with our Audit Committee. The information in this report has not been audited. It includes all adjustments of a normal recurring nature that we believe are necessary for fair presentation.

38. The 2009 Q3 Form 10-Q also represented:

**ASSET QUALITY, LOAN LOSS RESERVE, AND LOAN LOSS PROVISION**

At September 30, 2009:

- Loans accounted for 83% of our assets, and most of our asset quality remained tied to loan, or credit, quality.

- Investment securities accounted for 6% of our assets. For more information about the quality of these assets, read the investment portfolio discussion and Note 10, "Investment securities," in this report.

**CREDIT RISK**

Lending money entails certain risks. When we make a loan, we make subjective judgments about the borrower's ability to repay the loan. No matter how financially sound a client or lending decision may seem, a borrower's ability to repay can be affected adversely by economic changes and other external factors.

We believe the most relevant measure of credit quality is the net charge-off ratio, because:

- Dollar amounts do not measure loan losses against increases or decreases in loan balances, or in the context of our lending activities overall.

- Other measures of credit quality do not convey the nature of our client relationships, our efforts to help clients resolve problems, and our pursuit of repayment even after we classify a loan as nonaccruing or charge it off.

Compared to many other banks, our nonperforming asset levels tend to be higher, but our net charge-offs tend to be lower. This reflects our focus on client relationships and our desire to work with borrowers to resolve repayment problems, instead of automatically charging off unpaid amounts.

For more information about credit and other risks inherent in our business, read the risk discussion in our *2008 Annual Report to Shareholders* and Item 1A in our Form 10-K for 2008.

**How we mitigate credit risk**

To mitigate credit risk, we:

- Employ rigorous loan underwriting standards and apply them consistently.

- Prefer to grow loan balances ourselves, using our own underwriting standards, instead of purchasing loans or acquiring other banks.

- Make the majority of our loans within Regional Banking's mid-Atlantic geographic footprint, in markets we know well.

- Focus on building long-term relationships with clients, instead of merely increasing transaction volumes.

- Typically obtain collateral and personal guarantees from commercial borrowers.

- Monitor the loan portfolio to identify potential problems.

- Regularly review all past-due loans, loans not being repaid according to contractual terms, and loans we doubt will be paid on a timely basis.

- Perform an internal risk rating analysis that classifies all loans outstanding into one of four categories of risk: pass, watchlist, substandard, or doubtful/loss. We apply these classifications consistently and we analyze migrations within the classifications quarterly.

In addition, we divide credit risk-related responsibilities among different groups of staff members. These groups include lending, credit, loan recovery, and appraisal staff members. We also have a separate credit review group that reports directly to our Board of Directors. We believe this approach gives us a system of checks and balances that enhances our ability to evaluate credit risk.

For more information about the steps we take to mitigate credit risk, read the risk discussion in our *2008 Annual Report to Shareholders* and Item 1A in our Form 10-K for 2008.

**How we identify potential problem loans**

To identify potential problem loans, we:

- Review payment performance on an ongoing basis.

- Analyze account overdrafts.

- Monitor compliance with established loan covenants or collateral formulas.

- Perform targeted reviews and analyses of loans by type, size, and borrower.

We identify problem consumer and residential mortgage loans primarily by reviewing payment performance. We do not assign risk ratings to loans in these portfolios.

For commercial loans and loans secured with investments, the process is more complex, and it involves a high degree of management review and judgment.

Every commercial loan (and loan secured with investments) receives an initial risk rating that is assigned by the client relationship manager. It is the client relationship manager's responsibility to identify deterioration in the quality of a loan, as soon as such conditions are known or suspected, by changing the loan's assigned risk rating. Our independent credit review group examines these risk ratings to ensure that they accurately reflect the risk profile of the portfolio.

For each significant potential problem loan in the commercial and secured with investments portfolios, the client relationship manager prepares a written summary that contains information about the borrower's financial performance, payment history, and collateral position, as well as an action plan for managing the credit. These summaries are reviewed and discussed by lending staff in each of our Regional Banking markets at loan quality meetings that are held quarterly. Regional Banking managers may elect to have loan recovery staff members consult on these credits or assume responsibility for managing them.

Generally, if we downgrade a loan to a rating of substandard or lower, we transfer the client relationship to our loan recovery unit. Exceptions to this policy must be approved by the manager of the division in which the loan resides.

Once we transfer a loan to loan recovery, we perform a thorough review of its documentation to ensure that none of our intended rights or remedies has been compromised. Typically, in-house staff members perform these reviews. For very large and/or complicated workout transactions, we may engage outside counsel. Loan recovery staff also consult with client relationship managers on problem credits, even if those credits have not been transferred officially to the loan recovery unit.

Significant relationships with substandard or lower ratings, or other credits that demonstrate rapid and/or severe deterioration and a high probability of income and/or principal loss, are reviewed at quarterly credit strategies meetings. Typically, our chairman and chief executive officer, our president, chief financial officer, chief credit officer, and other members of senior management attend these meetings. Among the issues analyzed and reviewed at these meetings are collection strategies and levels of available collateral support. We use our loan documentation files to determine the nature of a loan's underlying collateral.

**<u>How we manage problem loans</u>**

When a loan becomes 60 or more days past due, it is included in monthly analyses performed by credit review staff. When a loan becomes 90 or more days past due, or if it has been identified as a potential problem loan, we may take one or more of the following steps:

- Confirm the loan's assigned risk rating.

- Review our collateral position and valuations.
- Allocate an appropriate amount to the reserve for loan losses.
- Transfer all or part of the loan relationship to nonaccruing status.
- Renegotiate all or part of the loan's terms.
- Foreclose on real property or accept a deed to real property in lieu of foreclosure, and record the property's value as other real estate owned (OREO).
- Charge off all or part of the loan.

When we transfer a loan to nonaccruing status, we allocate a specific, associated amount to the reserve for loan losses, in accordance with ASC [Accounting Standards Codification] 310, "Receivables," which incorporates "Accounting by Creditors for Impairment of a Loan." We base most of these allocations on the underlying value of the collateral supporting the loan. We also may consider the net present value of the loan's future cash flows and/or the observed market price of the loan.

We update our reserve allocations quarterly. If necessary, we adjust the reserve by increasing or decreasing the provision for loan losses. For more information on how we establish the reserve, read the separate discussion in this section of this report.

Loan recovery and credit review staff analyze all problem credits on a quarterly basis to determine collection potential and identify collateral deficiencies. If a collateral shortfall exists, we typically revise the loan's structure by requiring additional principal payments, additional collateral, or additional support in the form of other guaranties, to the extent that the loan's documentation permits such remedies. If there is a collateral shortfall on an impaired loan, we set aside an amount in the reserve for loan losses in accordance with ASC 310.

Loan recovery and credit review staff use the quarterly analyses of collection potential and collateral deficiencies as a basis for recommending whether a loan should be charged off partially or fully for that quarter. We record charge-offs when both of the following conditions are present:

- It is probable that we will not be able to collect all of the loan's principal.
- We can measure the amount of loss reliably.

If both of these conditions are not met, we maintain the estimated loss exposure as a specific allocation in the reserve for loan losses.

When we transfer a property to OREO through foreclosure or deed-in-lieu of foreclosure, we analyze the property's value to determine if a charge-off is necessary to bring the loan to the net realizable value of the property at the time we take possession.

**How we determine collateral valuations for problem credits secured with real estate**

Our lenders obtain updated valuations, regardless of loan size, any time they believe there has been an obvious and material deterioration in market conditions, project performance, or physical aspects of the property itself that could jeopardize our collateral position. We assess the need for revaluation when the amount of the loan is $500,000 or more and one or more of the following conditions exists:

- The client relationship manager recommends we renew or extend the loan.
- The loan is downgraded to a risk rating of substandard or lower.
- The loan has had a watchlist rating for 18 months.

Appraisal staff members, who work independently from the loan production function and who have a different management reporting structure, assess the property's existing valuation to determine if we need an updated appraisal. If the existing valuation is older than five years, we require an updated appraisal. If the valuation is less than five years old, appraisal staff assess whether or not the assumptions contained in the valuation are still valid. If the assumptions are no longer valid, we require new valuations.

Appraisal staff use the same standards to determine the sufficiency of a current valuation when the risk rating on a loan secured with real estate is downgraded to substandard. We review the valuations of substandard loans secured with real estate annually. If we determine that the current appraisal no longer represents the minimum value for a property, we obtain a new appraisal or evaluation annually to substantiate the property's value.

Loans secured with real estate that have watchlist ratings undergo a revaluation process every 18 months.

Appraisal staff determine whether revaluations should be performed by staff or third-party appraisers, unless the property secures a loan which has been determined to be impaired under ASC 310, which requires that revaluations be performed by third-party appraisers.

**How we determine the reserve for loan losses**

We establish a reserve for loan losses in accordance with GAAP by charging a provision for loan losses against income. On a quarterly basis, we:

- Charge loans deemed uncollectible against the reserve.
- Credit recoveries, if any, to the reserve.
- Reassess the level of the reserve.
- Have the reserve evaluated by staff members who do not have lending responsibilities.

The reserve reflects our best estimate of known and inherent loan losses, based on subjective judgments about the likelihood that loans will be repaid. The process we use to calculate the reserve has provided an appropriate reserve over an extended period of time, and we believe that our methodology is sound.

To determine the amount of the reserve, we:

- Group losses and outstanding loans with similar characteristics into categories, or pools.
- Group loans within most pools according to their prior quarter risk ratings.
- Make subjective judgments about a variety of quantitative and qualitative factors that may affect the potential for future losses in each pool.
- Assign mathematical values to these factors.

In categorizing loans into pools, we consider project type, whether we have made the loan directly or indirectly, and other factors. For example:

- Among commercial, financial, and agricultural (C&I) loans, we have a separate pool for automobile dealer floorplan (inventory) loans.
- Within the commercial construction portfolio, we have separate pools for land development, residential construction, and other types of projects.
- Within the commercial mortgage portfolio, we have separate pools for owner-occupied properties and non-owner-occupied properties.
- We have separate pools for loans secured with investments, residential mortgage loans, home equity loans, and other types of consumer loans.

The quantitative and qualitative considerations we analyze for each pool include:

- Historical net loss experience.
- General economic trends and conditions in the United States and mid-Atlantic region.

- Micro- and macro-economic trends and conditions in specific industry sectors.

- Changes in the pace of loan growth and the size of the portfolio.

- Loan concentration trends.

- Migrations within the internal risk rating classification system.

- Delinquent and nonperforming loan amounts and trends.

- Trends in loan valuations and collateral composition.

- Quality of portfolio risk management, including policy trends and adherence, experience, stability and depth of lending staff and management, and adequacy of loan review coverage.

- Other factors.

The qualitative adjustments we make reflect our best estimate of how the current loss rate for each pool might differ from our historical loss experience.

We perform two types of calculations: one for loans that are considered impaired under ASC 310, and one for loans that are not considered impaired. The calculation for loans that are not considered impaired is governed by ASC 450, "Contingencies." For loans that are not impaired, we use statistical analyses of historical loss experience in each pool. We then adjust these factors using the mathematical factors we assign to the qualitative factors we consider. For each pool, we:

- Use historical experience over the prior eight quarters to derive an average historical loss rate.

- Apply a double-weighting to the four most recent quarters.

For loans that we have determined to be impaired, we establish reserves that reflect the present value of anticipated cash flows discounted at the loan's effective interest rate at the date the loan is determined to be impaired or, for collateral-dependent loans, the fair value of the collateral. For collateral-dependent loans, we obtain appraisals for all significant properties.

The main factors we use to calculate the reserve for residential mortgage and consumer loans are delinquency rates, loss rates, and the qualitative adjustment factors mentioned above. Loss recognition for these loan types is based in large part on regulatory guidelines.

Various regulatory agencies periodically review the loan loss reserves of our primary banking subsidiaries, Wilmington Trust Company and Wilmington

Trust FSB. These agencies base their judgments on information that is available to them when they conduct their examinations, and they may require us to adjust the reserve.

In accordance with current accounting policies, we also maintain a separate reserve account that is reported on our balance sheet under other liabilities. These reserves are for unfunded loan commitments, mainly letters of credit.

Determining the reserve is an inherently subjective process. Estimates we make, including estimates of the amounts and timing of payments we expect to receive on impaired loans, may be susceptible to significant change. If actual circumstances differ substantially from the assumptions used to determine the reserve, future adjustments to the reserve may be necessary. This could have a material adverse effect on our financial performance and condition.

39. The 2009 Q3 Form 10-Q also represented that:

Our chairman and chief executive officer, as well as our chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2009, pursuant to Securities Exchange Act Rule 13a-15(e). Based on that evaluation, they concluded that our disclosure controls and procedures were effective in alerting them on a timely basis to any material information about our company (including our consolidated subsidiaries) that we are required to include in the periodic filings we make with the Securities and Exchange Commission. There was no change in our internal control over financial reporting during the third quarter of 2009 that materially affected, or is reasonably likely to have a material effect on, our internal control over financial reporting.

* * *

I, [Defendants Cecala and Gibson], certify that:

1. I have reviewed this quarterly report on Form 10-Q of Wilmington Trust Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

40. The above representations and Defendants' certifications thereon were repeated in all material respects in the Forms 10-Q and 10-K that Wilmington filed with the SEC during the Class Period.

41. On January 29, 2010, Wilmington issued a press release announcing its operating results for the quarter and year ended December 31, 2009, which stated, in pertinent part:

> Wilmington, Del., January 29, 2010 - Wilmington Trust Corporation (NYSE: WL) reported a loss of $11.2 million for the 2009 fourth quarter and a loss of $4.4 million for the 2009 full year. The net loss available to common shareholders was $15.7 million for the 2009 fourth quarter and $22.7 million for the 2009 full year. On a fully diluted basis, the net loss available to common shareholders was $0.23 per share for the 2009 fourth quarter and $0.33 per share for the 2009 full year.
>
> * * *
>
> The company's capital position remained strong. At December 31, 2009, all regulatory capital ratios exceeded the amounts required by the Federal Reserve Board to be considered well capitalized, both including and excluding the $330 million in Capital Purchase Program funds the company received in December 2008 in exchange for issuing shares of Wilmington Trust Series A preferred stock to the U.S. Department of the Treasury.

Defendant Cecala commented on the results, stating, in pertinent part, as follows:

> While recessionary pressures on our borrowers increased credit costs and reduced net interest income, our Corporate Client Services business recorded its best quarter ever, and our Wealth Advisory Services business continued to do well amid difficult market conditions. Our 2009 financial performance underscores the benefits of our diversified business model, as growth in revenue from our fee-based businesses mitigated the recession's negative effects on our banking business.

42. On February 21, 2010, *The News Journal* reported, in pertinent part:

> Wilmington Trust's stock was punished in the wake of the earnings report, falling 21 percent in six trading days. The report also motivated Standard & Poor's Ratings Services last month to downgrade the credit rating on debt issued by the holding company for Wilmington Trust from "low investment grade" to "junk."
>
> S&P is fearful that the bank still has too many big construction loans near default.

> Fitch Ratings also recently knocked Wilmington Trust's ratings down a notch, though its holding-company debt remains investment grade, and ratings on the entity that includes actual bank operations haven't been downgraded.
>
> Despite the setbacks, though, analysts say they remain mildly bullish on Wilmington Trust, and see its recent fate as symbolic of a larger trend on Wall Street so far this year.

43. On February 22, 2010, Wilmington filed with the SEC its Form 10-K for the year ended December 31, 2009, (the "2009 Form 10-K"), which was signed by each of the Individual Defendants. The 2009 Form 10-K included Wilmington's financial statements for the year ended December 31, 2009. Such financial statements represented, in part:

> We maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles and reporting practices prescribed for the banking industry.

44. The 2009 Form 10-K also repeated in all material respects the disclosures in ¶¶38-39 and disclosed that federal bank regulators ratcheted up their oversight of the Company:

> We are subject to regular examination, supervision, and regulation by various federal and state authorities with regard to compliance with these and other laws and regulations. These and other laws, regulations, and policies, including standards or interpretations, to which we are subject could change at any time. For more information about these restrictions, read the supervision and regulation section of Item 1 in this report.
>
> As a result of this regulatory oversight, ***we have implemented plans at the request of our regulators that are intended to, among other things, enhance the independence and effectiveness of our loan review, credit policy, and credit analysis functions; address liquidity management and current and future capital requirements; improve our position on nonperforming loans; and improve our credit risk management. Our agreement with our regulators does not require us to raise capital. In addition, we have agreed with our regulators that we will not purchase or redeem our common stock, and that we will not incur any debt, subject to certain exceptions, and that Wilmington Trust Company will not incur any debt with an original maturity of greater than one year, in each case without prior written approval from our regulators.***
>
> ***If we are unable to comply with these policies or agreements, we could become subject to supervisory action, possibly including cease and desist***

> ***orders, prompt corrective action directives, or other regulatory enforcement actions. Any such formal enforcement action could limit our ability to develop new business or operate our existing business, or require us to raise additional capital or dispose of certain assets and liabilities within a prescribed time period, or both. Such a regulatory order could have a material negative effect on our business, operating results, and financial condition***. [Emphasis added.]

45. That same day, February 22, 2010, Wilmington issued a press release announcing that it had commenced an Offering of $250 million of its common stock:

> The net proceeds from the offering will qualify as both tangible common equity and regulatory Tier 1 capital and will be used for general corporate purposes, which may include the redemption of preferred stock issued to the U.S. Treasury under the TARP Capital Purchase Program, subject to regulatory approval.
>
> J.P. Morgan Securities Inc. and Keefe, Bruyette & Woods, Inc. are serving as joint book-running managers for the offering.
>
> Wilmington Trust intends to grant the underwriters a 30-day option to purchase up to an additional 15 percent of the shares offered to cover over-allotments, if any.

46. On February 25, 2010, Wilmington filed a Prospectus Supplement (the "Prospectus Supplement") with the SEC offering 18,875,000 of its common shares. The Prospectus Supplement incorporated by reference the Company's 2009 Form 10-K.

47. On March 11, 2010, Wilmington presented at the Citi Financial Services Conference. At such conference, Defendant Cecala stated, in part:

> ***When you look at our balance sheet, I think that we have a very strong balance sheet***. The assets did change in 2009 as we reduced our investment portfolio, and we reduced the investment portfolio because of a number of things. One is maturities, the other is that with the growth in our deposits we no longer needed collateral to support deposits and we really haven't seen a lot of the attractive investment opportunities. ***So, there has been a shift in the balance sheet but, again, I think it's a very strong one.*** And I'll talk a little bit about how this works with our interest rate risk exposure in a few more slides.
>
> * * *
>
> Let me spend a little bit of time talking about our Loan portfolio. We have a $9.2 billion loan portfolio. It is well diversified. 95% of this portfolio is in

this Mid-Atlantic area. That is that red circle again that I mentioned earlier. The balance is associated with our Wealth Advisory clients that may reside in other parts of the United States. It's, again, we have no exposure to subprime or any of the exotic stuff that others might have had in their mortgage portfolio. In fact, our residential mortgage portfolio is quite small.

When you look at our Construction portfolio, we have about $2 billion in that portfolio. It is predominantly for single family housing developments within the Mid-Atlantic footprint that I spoke of earlier. It's within market builders. We really avoid the national builders. The loans are underwritten based on our underwriting criteria. We have not acquired other financial institutions, so we have not inherited a lot of their underwriting criteria. And this criteria also includes personal guarantees, which have been very important as we have gone through this cycle.

The other exposure for us is the Commercial Mortgage portfolio, and here again the loans are made to established regional business owners. These are middle market businesses. More than 50% of this $2 billion portfolio is for owner-occupied properties, which tend to have very little risk. Another 17% are made for community shopping centers.

I had a question earlier about what's your commercial mortgage portfolio look like, or your commercial construction portfolio look like? And we do not lend to large office buildings. I kind of joke that if it needs a crane to be built, typically we would not lend to it. These are low-rise structures. They are typically strip centers that would have a grocery store or a drugstore as the anchor. They might be a medical office building, low-rise, maybe two stories high. So, these are not large office buildings, they're not malls. So, we really have avoid [sic] that. And most of this has been put in place because of population growth. So it's done to support the growth in the population in our footprint. So, we feel pretty good about our Commercial Mortgage portfolio.

But that is not to say that we haven't had issues in the Mid-Atlantic area, and this slide just highlights some of the things that we've seen over this cycle. For us, the largest exposure in terms of some of the problem ones that we have had have been somewhat isolated in the southern part of Delaware. And this is part of the space or the region that has really experienced a lot of growth, and that growth had been driven by people wanting the advantages of being in a low tax environment. We live surrounded by New Jersey and Pennsylvania and Washington and Maryland, and these are high tax states and high tax areas, and people come to Delaware because of low real estate taxes, because there are no sales tax. So, it's a very attractive location. The value for owning a home in the southern part of the state has become kind of a pre-retirement area. The cost of moving there has been very attractive. Typically, this is priced in the work-force housing area, between $200,000 and $400,000. So, it's very affordable housing. So, we feel pretty good about it, although things have slowed up, obviously.

We have taken a number of steps to work through this. We have separated the credit function, made it independent, made it report directly to me as we work through this. We have boosted our loan loss reserves by 60% in 2009. We have leveraged those relationships with our borrowers. Those personal guarantees have come in very handy. That is our trump card with a lot of folks and it has kept people engaged in working to resolve issues. And we have, as many people do, a dedicated group of individuals to work through some of these issues.

Our charge-off history, as you can see here, has gone up over the last couple of years, and as I said earlier, our Commercial Mortgage area, which tends to be one that is receiving a lot of attention, I don't think we're late stage whatsoever. I think that this represents just the fundamental benefits that we have and the way we've gone about it. The CF&A, that is something that you would expect over the cycle in the construction area. These are, again, residential housing developments. And these are things that, because of appraised values, have changed dramatically. We have seen some losses associated with that portfolio.

Having said that, when we look at how we fair opposite our peers, I think that we hold up very, very well. Again, I think that is a tribute to the region that we're in, as well as our underwriting. ***You can see that our reserve opposite peers is significant, and the fact that we are below them in charge-offs as well.***

* * *

Unidentified Audience Member: Yes. I was just looking at compared to some other banks, your Construction portfolio really hasn't declined very much in 2009. I mean, I think you showed a slide that it might have even increased in 2009. Why is that?

Defendant Cecala: That is going to happen because we continue to have builders that are doing well. They are continuing to do vertical construction, so as they come to us with completed contracts to do new houses, we will go ahead and fund that. So, that is what's happening there. We are not lending to new real estate projects whatsoever. Yes, sir?

* * *

Unidentified Audience Member: I was wondering if you could comment on credit quality quarter to date, and when you expect provisions to be released or at least start to release?

Defendant Cecala: Well, I can't comment on credit quality to date just because we are not releasing any information. So far as the reserves to be released, I think that that's going to be a tricky subject for all financial institutions. Because I don't think anybody is certain as to whether the FASB, the SEC and the federal regulators have had a meeting of the mind as

to are they going to let banks carry higher levels of reserve to protect them from these cycles. If you kind of go back in time, the SEC said, gosh, you guys are manipulating your earnings because you are providing for these disasters in good times, and then you're not reporting the volatility in the bad times. Well, they got what they wished for.

So, I'm not -- I would not be a fan of releasing a lot of excess reserves just because I think banks need to have those reserves in place, because that is what they're for. I remember we used to have this ability to have unallocated reserves, and that was a wonderful thing, and the more I could have the better I liked it. But the accountants just weren't real fans of that, and so it got to be a real problem trying to justify them. Yes, sir?

Unidentified Audience Member: Just on that point, how much longer do you think you'll be building a reserve?

Defendant Cecala: It's just hard to tell. We were talking to a person the other day and towards the end of the -- after the end of the third quarter, I was feeling pretty good about the portfolio and even into late December. And then we got a couple of surprises -- one was a large borrower, about $25 million, walked in late December and said, "I'm done," and had been doing all the things, selling property and all that. So, that was a bit of a surprise. And then we had a couple of appraisals that really came out of the blue and we didn't anticipate that.

So, I'm not going to go out on that limb yet. I think that we're seeing credits behaving much more favorably in terms of, if you ask me this question six months ago, most stuff was just headed in one direction. We're now seeing things that have been in the hospital, in rehab, go back to performing status. So, we're seeing that change, but I can't give you an end date. [Emphasis added.]

48. On April 23, 2010, Wilmington issued a press release announcing its operating results for the quarter ended March 31, 2010, which stated, in pertinent part:

Wilmington, Del., April 23, 2010 - Wilmington Trust Corporation (NYSE: WL) reported a loss of $29.2 million for the 2010 first quarter. After dividends and accretion on preferred stock, the net loss available to common shareholders was $33.8 million. On a fully diluted basis, the net loss available to common shareholders was $0.44 per share.

* * *

Despite these positive trends, economic conditions in Delaware are improving more slowly than elsewhere in the mid-Atlantic region. Due to uncertainty about the pace of Delaware's recovery, as well as credit risk rating downgrades, management added $48.3 million to the reserve for loan losses and recorded a provision for loan losses of $77.4 million. The amount

> of the provision, coupled with $18.0 million of investment securities impairment charges, reduced revenue and resulted in a net loss for the quarter.
>
> * * *
>
> The company's already-strong capital position and regulatory capital ratios improved in the 2010 first quarter, due to the common stock offering that was completed on March 1, 2010. This offering raised $274.0 million (net of commissions and expenses). As of March 31, 2010, all regulatory capital ratios continued to exceed the amounts required by the Federal Reserve to be considered well capitalized.

Defendant Cecala commented on the results, stating, in pertinent part, as follows:

> Compared to the year-ago first quarter, earning assets decreased $1.0 billion, or 9%, but the decrease in our net interest income was only $3.8 million, or 5%. This is just one example of how well we are positioned to benefit when the economy recovers and short-term market interest rates rise.

49. On May 10, 2010, Wilmington filed with the SEC its Form 10-Q for the quarter ended March 31, 2010 (the "2010 Q1 Form 10-Q"), which was signed by Defendants Cecala and Gibson. The 2010 Q1 Form 10-Q included Wilmington's financial statements for the quarter ended March 31, 2010, which were represented to have been presented in conformity with GAAP. In addition, the 2010 Q1 Form 10-Q represented that:

> We maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles (GAAP) and reporting practices prescribed for the banking industry.
>
> * * *
>
> We have applied our critical accounting policies and estimation methods consistently in all periods presented in this report and we have discussed these policies with our Audit Committee. The information in this report has not been audited. It includes all adjustments of a normal recurring nature that we believe are necessary for fair presentation.

50. The 2010 Q1 Form 10-Q repeated, in all material respects, the representations from ¶¶38-39.

51. On June 3, 2010, Wilmington announced that Defendant Cecala retired from his position as CEO. The Company also announced that it expected Defendant Cecala to

remain a Company employee, and continue to serve as a Director and its Board Chairman until July 19, 2010.

52. On June 23, 2010, SunTrust Robinson Humphrey issued a research report downgrading the Company's stock following a field trip with the Company's management whereby SunTrust Robinson Humphrey learned that the quality of Wilmington's loan portfolio, after having undergone a third party review, was worse than previously disclosed:

> WL recently hired a third party firm to perform a detailed loan review in preparation for the company's upcoming regulatory exam. It appears the review will result in deteriorating credit metrics as the company attempts to more aggressively deal with its credit challenges. We also expect NCOs [net charge offs] to pick up materially in the near term. While we applaud a more aggressive credit stance, the results were likely not incorporated in our or Street estimates.

53. Following the issuance of this research report, the price of Wilmington stock declined approximately 11%, on very heavy trading volume, as a portion of the artificial inflation came out of the stock price.

54. On July 21, 2010, Wilmington's Board of Directors announced the election, effective immediately, of Defendant Foley as the Company's Board Chairman and that Defendant Foley became Wilmington's CEO on June 3, 2010, following Defendant Cecala's retirement from such position.

55. On July 23, 2010, Wilmington announced it lost $116.4 million in the second quarter of 2010, primarily as a result of a $205.2 million charge on non-performing loans and loans with unfavorable credit risk ratings:

> Wilmington, Del., July 23, 2010 - Wilmington Trust Corporation (NYSE: WL) reported a loss of $116.4 million for the 2010 second quarter. After dividends and accretion on preferred stock, the net loss available to common shareholders was $120.9 million, or $1.33 per share.
>
> ***The primary cause of the loss was the amount of the provision for loan losses, which rose to $205.2 million, following increases in nonperforming loans, loan charge-offs, and loans with unfavorable risk ratings***. Other

> contributing factors were $18.8 million of credit-related expenses and $7.7 million of securities losses.
>
> The negative trends in credit reflected continuing economic pressures, particularly in southern Delaware, that weakened the financial condition of some borrowers and caused commercial real estate valuations to decline significantly. Management's assessment of these factors and economic conditions overall led to an increase in the reserve for loan losses and other actions to reduce risk in the loan portfolio. [Emphasis added.]

Defendant Foley commented on the results, stating:

> My priority is to return our company to profitability and position our businesses for future growth, but first we must continue to deal with the lingering effects of a weak economy and housing market. Our second quarter results demonstrate we are doing that. We are fully committed to working through our credit issues, relying on robust risk management tools and analyses.
>
> At the same time, we remain focused on our strong relationships with clients, and on capitalizing on opportunities to increase revenue from our advisory businesses. We have the market positions, capital strength, and talented people to accomplish these objectives. While no one can predict when economic conditions will improve, we will manage our credit challenges effectively and, over the coming months, begin to position our company to capitalize fully on its many strengths.

56. In response to this announcement, shares of the Company's stock fell more than 9%, on very heavy trading volume.

57. On August 9, 2010, Wilmington filed with the SEC its Form 10-Q for the quarter ended June 30, 2010 (the "2010 Q2 Form 10-Q"), which was signed by Defendants Foley and Gibson. The 2010 Q2 Form 10-Q included Wilmington's financial statements for the quarter ended June 30, 2010, which were represented to have been presented in conformity with GAAP. In addition, the 2010 Q2 Form 10-Q represented that:

> We maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles (GAAP) and reporting practices prescribed for the banking industry.
>
> * * *
>
> We have applied our critical accounting policies and estimation methods consistently in all periods presented in this report and we have discussed

> these policies with our Audit Committee. The information in this report has not been audited. It includes all adjustments of a normal recurring nature that we believe are necessary for fair presentation.

58. The 2010 Q2 Form 10-Q repeated, in all material respects, the representations included in ¶¶38-39.

59. On August 16, 2010, Wilmington announced that it hired Robert P. Gehring as Vice President and head of its Credit Management division.

60. On October 12, 2010, Wilmington announced that it hired James D. Naber as Chief Audit Executive.

61. The statements referenced above in ¶¶36-39, 41, 43, 44, 46-50, 55 and 57 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them during the Class Period:

(a) that the Company improperly delayed recording loan charge offs;

(b) that the Company's reported income and asset quality were materially overstated due to Defendants material understatement of Wilmington's loan loss provisions, loan loss reserves and income tax expense;

(c) that as a result of the foregoing, the Company's financial statements were materially false and misleading and not fairly presented in conformity with GAAP;

(d) that the Company's internal and disclosure controls were materially deficient;

(e) that the Company was engaged in unsafe and/or unsound banking practices, and

(f) based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its prospects and growth.

62. On November 1, 2010, Wilmington announced it lost $365.3 million in the third quarter of 2010, the quarter ended September 30, 2010, primarily as a result of a $281.5 million charge to "reflect the increased risk in our loan portfolio" and a $100.7 million income tax charge resulting from the Company's continued losses and the uncertainty about the realizability of Wilmington's deferred tax asset due to the poor credit quality of it loan portfolio. Defendants also announced that after "carefully stud[ying] the company's strategic options" and "review[ing] a wide range of alternatives," Wilmington's Board of Directors determined that "the best option for our shareholders, as well as our clients and the employees" was a merger with M&T at a value of $3.84 per common share, or more than ***40% less*** than its previously inflated market value of $7.11 per share.

63. The market for Wilmington common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Wilmington common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Wilmington common stock relying upon the integrity of the market price of Wilmington common stock and market information relating to Wilmington, and have been damaged thereby.

64. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Wilmington common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

65. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Wilmington's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Wilmington and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

**Additional Scienter Allegations**

66. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Wilmington, their control over, and/or receipt and/or modification of Wilmington's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Wilmington, participated in the fraudulent scheme alleged herein.

67. Defendants were further motivated to engage in this course of conduct in order to raise much needed capital by enabling Wilmington to sell its securities at artificially inflated prices to unsuspecting investors during the Class Period.

**Loss Causation/Economic Loss**

68. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of Wilmington common stock and operated as a fraud or deceit on Class Period purchasers of Wilmington common stock by failing to disclose the improper and deceptive accounting machinations employed by Wilmington's management. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Wilmington common stock fell as the prior artificial inflation came out. As a result of their purchases of Wilmington common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

69. Defendants' false and misleading statements had the intended effect and caused Wilmington common stock to trade at artificially inflated levels throughout the Class Period.

70. As a direct result of the disclosures detailed herein, the price of Wilmington's common stock fell significantly. These declines removed the inflation from the price of Wilmington common stock, causing real economic loss to investors who had purchased Wilmington common stock during the Class Period.

71. The declines in the price of Wilmington common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price

declines in Wilmington common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Wilmington common stock and the subsequent significant decline in the value of Wilmington common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

72. At all relevant times, the market for Wilmington common stock was an efficient market for the following reasons, among others:

(a) Wilmington common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) Wilmington filed periodic public reports with the SEC and the NYSE;

(c) Wilmington regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Wilmington was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

73. As a result of the foregoing, the market for Wilmington common stock promptly digested current information regarding Wilmington from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Wilmington common stock during the Class Period suffered similar injury through their purchase of Wilmington common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

74. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Wilmington who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Wilmington and the Individual Defendants**

75. For the purposes of this count, the term "Defendants" refers only to Defendant Wilmington and the Individual Defendants.

76. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

77. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

78. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

79. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Wilmington common stock. Plaintiff and the Class would not have purchased Wilmington common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

80. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Wilmington common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

81. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

82. The Individual Defendants acted as controlling persons of Wilmington within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Wilmington, and their ownership of Wilmington stock, the Individual Defendants had the power and authority to cause Wilmington to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

ROSENTHAL MONHAIT & GODDESS, P.A.

By:______________________________
Norman M. Monhait (#1040)
P. Bradford deLeeuw (#3569)
919 Market Street, Suite 1401
Wilmington, Delaware 19801
(302) 656-4433
nmonhait@rmgglaw.com
bdeleeuw@rmgglaw.com

***Attorneys for Plaintiff***

OF COUNSEL:

ROBBINS GELLER RUDMAN
& DOWD LLP
Samuel H. Rudman
58 South Service Road, Suite 200
Melville, New York 11747
(631) 367-7100

November 18, 2010