**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PIPEFITTERS LOCAL 357 ANNUITY FUND, on Behalf Of Themselves And All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WILMINGTON TRUST CORPORATION, TED T. CECALA, DONALD E. FOLEY, DAVID R. GIBSON, ROBERT V.A. HARRA, JR. and KEVYN N. RAKOWSKI,<br><br>Defendants. | Civil Action No. 10-00990 (LPS) |

[Captions Continued On Next Page]

**KORNITZER CAPITAL MANAGEMENT, INC.'S BRIEF IN RESPONSE TO THE COMPETING MOTION FOR APPOINTMENT AS LEAD PLAINTIFF AND FOR APPROVAL OF SELECTION OF COUNSEL**

Joseph J. Farnan, III (Bar No. 3945)
Brian E. Farnan (Bar No. 4089)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: jjfarnan@farnanlaw.com
bfarnan@farnanlaw.com

Counsel for Movant

Dated: February 4, 2011

[Additional counsel listed on signature block]

| | | |
|---|---|---|
| TIMOTHY ROONEY, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WILMINGTON TRUST CORPORATION, TED T. CECALA, DONALD E. FOLEY, DAVID REED GIBSON and ROBERT V.A. HARRA, JR.,<br><br>Defendants. | ) | Civil Action No. 10-00995 (LPS) |
| MOHAMMED ELZAGHA, Individually and On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WILMINGTON TRUST CORPORATION, TED T. CECALA, ROBERT V.A. HARRA, JR., DAVID R. GIBSON, KEVYN N. RAKOWSKI, DONALD E. FOLEY, CAROLYN S. BURGER, R. KEITH ELLIOTT, LOUIS J. FREEH, GAILEN KRUG, REX L. MEARS, STACEY J. MOBLEY, MICHELE M. ROLLINS, OLIVER R. SOCKWELL, ROBERT W. TUNNELL, JR., SUSAN D. WHITING, J.P. MORGAN SECURITIES and KEEFE, BRUYETTE & WOODS, INC.,<br><br>Defendants. | ) | Civil Action No. 10-01020 (LPS) |

| | |
|---|---|
| VINCENT LYNCH, On Behalf Of Himself And All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WILMINGTON TRUST CORPORATION, TED T. CECALA, DONALD E. FOLEY, DAVID R. GIBSON, KEVYN N. RAKOWSKI, and ROBERT V.A. HARRA, JR.,<br><br>Defendants. | Civil Action No. 10-01086 (LPS) |

# TABLE OF CONTENTS


Page

I. ARGUMENT .......... 1

A. Calculation Of The "Largest Financial Interest" Demonstrates That KCM Should Be The Presumptive Lead Plaintiff .......... 1

B. KCM Is The Largest Individual Movant For Lead Plaintiff .......... 5

1. The Institutional Investors Group Is Unsuitable For Appointment As Lead Plaintiff .......... 7

II. CONCLUSION .......... 12

# TABLE OF AUTHORITIES

Page

**Cases**

*Blake Partners, Inc. v. Orbcomm, Inc.*, No. CIV. A. 07-4517 (WHW) 2008 WL 2277117 (D.N.J. June 2, 2008) . . . . . 6, 8

*City of Monroe Employees' Retirement System v. Hartford Financial Services Group, Inc.*, 269 F.R.D. 291 (S.D.N.Y. 2010) . . . . . 3, 4

*City of Roseville Employees' Retirement System v. Horizon Lines Inc.*, No. CIV. A. 08-969, 2009 WL 1811067 (D. Del. June 18, 2009) . . . . . 2

*Foley v. Transocean Ltd.*, No. 10 Civ. 5233 NRB, 2011 WL 103960 (S.D.N.Y. Jan. 3, 2011) . . . . . 4

*In re Able Laboratories Sec. Litig.*, 425 F.Supp.2d 562 (D.N.J. 2006) . . . . . 6, 8, 11

*In re Cable & Wireless, PLC Sec. Litig.*, 217 F.R.D. 372 (E.D. Va. 2003) . . . . . 5

*In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298 (S.D. Ohio 2005) . . . . . 11

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) . . . . . 2, 6, 7, 8

*In re Clearly Canadian Sec. Litig.*, No. C-93-1037-VRW, 1999 WL 707737 (N.D. Cal. Sept. 3, 1999) . . . . . 3

*In re Comdisco Sec. Litig.*, 150 F.Supp.2d 943 (N.D. Ill. 2001) . . . . . 3

*In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196 (E.D. Pa. 2008) . . . . . 10

*In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95 (S.D.N.Y. 2005) . . . . . 3

*In re Molson Coors Brewing Co. Sec. Litig.*, 233 F.R.D. 147 (D. Del. 2005) . . . . . 9

*In re Razorfish, Inc. Sec. Litig.*, 143 F.Supp.2d 304 (S.D.N.Y.2001) . . . . . 6

*In re Vicuron Pharmaceuticals, Inc. Sec. Litig.*, 225 F.R.D. 508 (E.D. Pa. 2004) . . . . . 2

*Landry v. Price Waterhouse Chartered Accountants*,
123 F.R.D. 474 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lax v. First Merchants Acceptance Corp.*, No. 97 Civ. 2715,
1997 WL 461036 (N.D. Ill. Aug.11, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
256 F.R.D. 586 (N.D. Ill. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4

*Newman v. Eagle Bldg. Tech.*, 209 F.R.D. 499 (S.D. Fla. 2002) . . . . . . . . . . . . . . . . . . . . 2, 11

*Thompson v. Shaw Group*, No. Civ. A.04-1685,
2004 WL 2988503 (E.D. La. Dec.14, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Varghese v. China Shenghuo Pharmaceutical Holdings, Inc.*,
589 F.Supp.2d 388 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Statutes**

15 U.S.C. §§78u-4(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5-6, 9

Movant Kornitzer Capital Management, Inc. ("KCM" or "Kornitzer") respectfully submits this Brief (the "Brief") in further support of its January 18, 2011 Motion for Consolidation, for Appointment as Lead Plaintiff, and for Approval of its Selection of Lead and Liaison Counsel [D.I. 8] (the "Motion"), and in opposition to the Motion of the Institutional Investor Group for Appointment as Lead Plaintiff, Approval of its Selection of Co-Lead Counsel, and Consolidation of all Related Actions [D.I. 12] (the "Institutional Investors' Motion").[1] As explained fully below, when the movants for lead plaintiff are considered ***individually***, KCM has the largest loss and, as a result, the greatest financial interest in the outcome of these consolidated actions alleging securities fraud against Defendant, Wilmington Trust Corporation ("Wilmington Trust") and certain of its senior officers (collectively, "Defendants"). Moreover, appointment of KCM – an institutional investor – furthers the objectives of the Private Securities Litigation Reform Act ("PSLRA"). For these reasons, and because KCM otherwise meets all the requirements of the PSLRA, its Motion should be granted.

# I. ARGUMENT

## A. Calculation Of The "Largest Financial Interest" Demonstrates That KCM Should Be The Presumptive Lead Plaintiff

The PSLRA sets forth the procedure this Court is to follow in determining which movant should be appointed lead plaintiff, *see* 15 U.S.C. §§78u-4(a)(3), which has been described as a

[1]Initially, there were two other competing motions for lead plaintiff: the Motion of the Public Pension Funds for Consolidation, Appointment as Lead Plaintiff and Approval of its Selection of Co-Lead Counsel [D.I. 5] (the "Pension Funds' Motion"); and the Motion of FMA Advisory, Inc. and Keith Cordrey for Consolidation of Related Actions, Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel [D.I. 3] (the "FMA/Cordrey Motion"). However, the Pension Funds' Response [D.I. 16] acknowledges that it does not possess the greatest loss, and the FMA/Cordrey Motion has been withdrawn [D.I. 17].

"two-step process." *City of Roseville Employees' Retirement System v. Horizon Lines Inc.*, No. CIV. A. 08-969, 2009 WL 1811067, at *1 (D. Del. June 18, 2009); *In re Cendant Corp. Litig.*, 264 F.3d 201, 262 (3d Cir. 2001). Initially, the Court must identify a presumptive lead plaintiff, and then it must determine whether the presumption has been rebutted. *See Horizon Lines*, 2009 WL 1811067, at *1; *Cendant*, 264 F.3d at 262-268.

Pursuant to the PSLRA, the presumption of "most adequate plaintiff" is conferred on the movant that (i) "has either filed the complaint or made a motion in response to a notice," (ii) "in the determination of the court has the largest financial interest in the relief sought by the class," and (iii) "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *Horizon Lines*, 2009 WL 1811067, at *1 (citing 15 U.S.C. § 78u-4 (a)(3)(B)(iii)(I)). Determination of which movant possesses "the largest financial interest" generally begins this process, *see Cendant*, 264 F.3d at 262, whereby courts consider the following factors: "(1) the number of shares that the movant purchased during the putative class period; (2) the total net funds expended by the plaintiffs during the class period; and (3) the approximate losses suffered by the plaintiffs." *Id.* (citations omitted); *see Horizon Lines*, 2009 WL 1811067, at *2 (same); *see also Lax v. First Merchants Acceptance Corp.*, No. 97 Civ. 2715, 1997 WL 461036, at *5 (N.D. Ill. Aug.11, 1997). Of these factors, courts agree that "[f]inancial loss, the last factor, is the most important element of the test." *Varghese v. China Shenghuo Pharmaceutical Holdings, Inc.*, 589 F.Supp.2d 388, 395 (S.D.N.Y. 2008) (citations omitted); *see, e.g.*, *In re Vicuron Pharmaceuticals, Inc. Sec. Litig.*, 225 F.R.D. 508, 511 (E.D. Pa. 2004) ("[T]he amount of financial loss is the most significant of these elements"); *Newman v. Eagle Bldg. Tech.*, 209 F.R.D. 499, 502 (S.D. Fla. 2002) ("The most important factor in determining the lead plaintiff is

the amount of financial interest claimed").

Here, the Institutional Investor group appears to rely on the "first-in, first-out" ("FIFO") accounting method for calculating losses. *See* Institutional Investors' Motion, Exhibit B. Although the PSLRA does not specify the particular methodology for calculating the "largest financial interest," many courts have specifically rejected the FIFO method because it ignores "gains that might have accrued to plaintiffs during the class period due to the inflation of the stock price," *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 101 (S.D.N.Y. 2005), and thereby tends to "exaggerate losses." *City of Monroe Employees' Retirement System v. Hartford Financial Services Group, Inc.*, 269 F.R.D. 291, 295 (S.D.N.Y. 2010) (citation and internal quotations omitted); *In re Comdisco Sec. Litig.*, 150 F.Supp.2d 943, 945-946 (N.D. Ill. 2001) ("There are a host of cases ... that reject the kind of artificial 'loss' that is manufactured by [an] attempted FIFO construct in favor of a calculation that properly nets out purchases and sales *during* the class period and determines gains or losses in those terms"); *In re Clearly Canadian Sec. Litig.*, No. C-93-1037-VRW, 1999 WL 707737, at *4 (N.D. Cal. Sept. 3, 1999) ("use of the 'first in, first out' method of pairing purchases and sales of shares will identify damages where in reality there may be none; the 'FIFO' assumption is in no way based on actual trading practices in general, let alone the trades of actual claimants").

Instead, the preferred method of calculating losses for lead plaintiff purposes is the "last-in, first-out" method ("LIFO"), which "assumes that the last stocks to be sold are the stocks purchased most recently prior to that sale" and, unlike FIFO, "takes into account gains that might have accrued to plaintiffs during the class period due the inflation of the stock price." *City of Monroe*, 269 F.R.D. at 295 (internal quotations and citation omitted); *see, e.g.*, *Makor Issues &*

*Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 599 (N.D. Ill. 2009) (observing that "[n]umerous courts [] have held that LIFO analysis is the appropriate method for determining loss due to securities fraud"); *Thompson v. Shaw Group*, No. Civ. A.04-1685, 2004 WL 2988503, at *4 (E.D. La. Dec.14, 2004) ("Under the LIFO approach, a plaintiff's sales of the defendant's stock during the class period are matched against the last shares purchased, resulting in an off-set of class-period gains from a plaintiff's ultimate losses").

Furthermore, the independent calculation of the losses claimed by the members of the Institutional Investors group is hampered by discrepancies between transaction information set forth in the Certifications and similar (but not identical) information reflected in the loss analyses or charts which accompany the Institutional Investors' Motion. For example, the Certification of Pompano Beach General Employees Retirement System ("Pompano Beach") identifies 23,390 shares purchased and 9,975 shares sold, while the loss analysis of Pompano Beach's transactions lists 18,540 shares purchased and 12,850 shares sold during the Class Period.

According to these criteria (*i.e.*, all transactions in Wilmington Trust common shares during the longest Class Period and for 90 days thereafter, and losses calculated pursuant to LIFO), KCM has the largest single loss of any other individual lead plaintiff applicant:

| **Investor (Group)** | **Total shares bought** | **Net shares bought[2]** | **Net funds spent[3]** | **Approximate loss per LIFO** |
|---|---|---|---|---|
| KCM | 113,400 | 113,400 | $ 1,552,856.25 | $ 1,073,174.00 |

[2] "Net shares bought" means the total number of shares purchased less the number of shares sold. *See, e.g.*, *Foley v. Transocean Ltd.*, No. 10 Civ. 5233 NRB, 2011 WL 103960, at *1 (S.D.N.Y. Jan. 3, 2011); *City of Monroe*, 269 F.R.D. at 293.

[3] "Net funds spent" means the difference between the amount expended to purchase the shares and the amount received for the sale of shares. *See, e.g.*, *Foley*, 2011 WL 103960, at *1; *City of Monroe*, 269 F.R.D. at 293.

The Institutional Investor group[4] compares as follows:

| Investor (Group) | Total shares bought | Net shares bought | Net funds spent | Approximate loss per LIFO |
|---|---|---|---|---|
| **Institutional Investors:** | | | | |
| Merced County | 50,000 | 50,000 | $ 513,961.00 | $ 302,460.91 |
| Coral Springs | 43,085 | - 8,400 (net seller)[5] | $ 381,954.30 | $ 381,954.30 |
| St. Petersburg | 27,830 | - 4,525 (net seller) | $ 495,782.60 | $ 249,906.05 |
| Pompano Beach | 18,540 | -11,950 (net seller) | $ 15,884.52 | $ 15,884.52 |
| Automotive Industries | 35,295 | - 7,300 (net seller) | $ 263,732.71 | $ 263,732.71 |
| **Totals** | 174,750 | 17,825 | $ 1,671,315.10 | $ 1,213,938.40 |

Thus, when considered individually and by any of the measures recognized by *Cendant* and other decisions, KCM purchased the largest number of shares during the Class Period, expended the most in connection with those purchases, and has sustained the largest approximate loss. Indeed, absent the assemblage of the Institutional Investors, KCM would be entitled to be considered the presumptive lead plaintiff.

**B. <u>KCM Is The Largest Individual Movant For Lead Plaintiff.</u>**

By its language, the PSLRA recognizes that courts will appoint as lead plaintiff "the member or members of the purported plaintiff class" that otherwise meet the statutory criteria. *See* 15 U.S.C. § 78u-4(a)(3)(B)(I). Indeed, because the PSLRA explicitly requires only that the appointed lead plaintiff "fairly and adequately protect the interests of the class," 15 U.S.C. § 78u-

[4]According to the Public Pension Funds' Response [D.I. 16], it does not possess the "largest financial interest" pursuant to the PSLRA. Therefore, its transactions and estimated losses are omitted from the tables above. Similarly, the FMA/Cordrey Motion has been withdrawn [D.I. 17], so the trading information of its members has not been included here.

[5]"Net seller" refers to an investor which "sold more shares than it purchased" during a given time period. *See, e.g.*, *In re Cable & Wireless, PLC Sec. Litig.*, 217 F.R.D. 372, 379 (E.D. Va. 2003).

4(a)(3)(B)(iii)(II), this Circuit imposes "no requirement mandating that the members of a proper group be 'related' in some manner ..." *Cendant*, 264 F.3d at 266-267 (holding that "relatedness" should not "enter into the calculus of whether" a group should be appointed lead plaintiff).

Nevertheless, the *Cendant* court did recognize certain limits on the appointment of a previously unaffiliated group. Specifically, it cautioned that where the district court found "that the movant 'group' with the largest losses had been created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel," the district court could rightfully conclude that such a "group" should not be appointed lead plaintiff because, *inter alia*, it "could not be counted on to monitor counsel in a sufficient manner." *Cendant*, 264 F.3d at 267 (citing *In re Razorfish, Inc. Sec. Litig.*, 143 F.Supp.2d 304, 307-308 (S.D.N.Y.2001));[6] *see Blake Partners, Inc. v. Orbcomm, Inc.*, No. CIV. A. 07-4517 (WHW), 2008 WL 2277117, at *7 (D.N.J. June 2, 2008) (reiterating that a "court could disqualify a movant [for lead plaintiff] if 'the way in which a group seeking to become lead plaintiff was formed ... would preclude it from fulfilling the tasks assigned to a lead plaintiff'") (citation omitted); *In re Able Laboratories Sec. Litig.*, 425 F.Supp.2d 562, 568-569 (D.N.J. 2006) ("The Third Circuit has [] expressed concern over groups that were created by counsel rather than class members, and directed that, in those situations, 'the court should disqualify that movant on the grounds that it will not fairly and adequately represent the interests of the class'") (citation omitted).

---

[6]The *Razorfish* court, on which *Cendant* relied, refused to appoint a group consisting of a large institutional investor, two "day-trading" companies and an individual investor as lead plaintiff because it found it was "simply an artifice cobbled together by cooperating counsel for the obvious purpose of creating a large enough grouping of investors to qualify as 'lead plaintiff,' which can then select the equally artificial grouping of counsel as 'lead counsel.'" *In re Razorfish*, 143 F.Supp.2d at 308.

**1. The Institutional Investors Group Is Unsuitable For Appointment As Lead Plaintiff.**

The Institutional Investors group bears all the markings of a lawyer-created assemblage that, pursuant to *Cendant*, should be disqualified as lead plaintiff. First, it is apparent from the Certifications of the Institutional Investors' members that there was no initial intention to work together. The Certifications of Coral Springs Police Pension Fund ("Coral Springs"), St. Petersburg Firefighters' Retirement System ("St. Petersburg") and Pompano Beach specifically authorize Saxena White P.A. to act as their counsel, but make no mention of Bernstein Litowitz Berger & Grossmann LLP, which is seeking to be appointed as co-lead counsel along with the Saxena White firm.[7] The Certifications of the other two members of the Institutional Investors' group, Merced County Employees' Retirement Association ("Merced") and Automotive Industries Pension Trust Fund ("Automotive"), do not specifically mention any firm. *See* Exhibit A to Institutional Investors' Motion. It is also telling that the Institutional Investors group has five members, which the *Cendant* court acknowledged as the maximum number for a lead plaintiff group to be effective. *Id.*, 264 F.3d at 267 (agreeing with the SEC that "courts should generally presume that groups with more than five members are too large to work effectively") (citation omitted). The fact that Coral Springs, St. Petersburg and Pompano Beach are all Florida-based governmental entities, while Merced is based in California and Automotive is not even a governmental entity likewise supports the inference that the Institutional Investors was

[7]These Certifications also indicate the authority conferred on the Saxena White firm is less than absolute. While Coral Springs and Pompano Beach authorize Saxena White to act on their behalf "in applying for Lead Plaintiff or Class Representative status and for all other purposes in connection with this litigation," the grant from St. Petersburg is more limited; it authorizes the Saxena White firm to act on behalf of St. Petersburg only "in applying for Lead Plaintiff status." *See* Exhibit A to Institutional Investors' Motion.

brought together after the fact by its members' respective counsel.

The court's discussion in *In re Able Laboratories Sec. Litig.*, 425 F.Supp.2d at 569, is instructive in this regard. There, in response to arguments from a competitor for lead plaintiff that an opposing group was lawyer-created, the court found evidence that the group was formed by the parties rather than by counsel. Among other things, declarations submitted to the *Able Laboratories* court indicated that officers of the institutional investors "sought each other out after learning that [the competitor] would be the presumptive lead plaintiff [and this] initial contact ... was prompted by their concern over the lack of information available on [the competitor's] background and experience, and the likelihood that [the competitor] would not be able to fulfill the responsibilities of serving as lead plaintiff." *Id.* Based on this testimony, as well as other representations made by counsel, the *Able Laboratories* court concluded that the group was not improperly put together because the parties, and not their counsel, "were the motivating force behind the formation of an alliance between [the two institutional investors]." *Id.*, 425 F.Supp.2d at 571; *see Cendant*, 264 F.3d at 268 (even though court-appointed lead plaintiff was a group comprised of three institutional investors, "there is no indication that [it] was artificially created by its lawyers ..."); *Blake Partners*, 2008 WL 2277117, at *7 (where group seeking appointment as lead plaintiff consisted of financial planner and two of his clients, the court found there was "a logical relationship between the three individuals in the Weichel Group that does not necessarily implicate that the group was formed by their lawyers").

Here, the Institutional Investors group, anticipating the charge that it was created by counsel, has submitted a Joint Declaration in which representatives of each member state that the member "determined to seek appointment as Lead Plaintiff together with the other members of

the Institutional Investors Group prior to moving for Lead Plaintiff appointment." *See* Exhibit E to Institutional Investors' Motion, ¶¶2-6. Assuming *arguendo* that these statements are not contradicted by the dates that the individual Certifications were executed (*i.e.*, Merced's Certification was executed on January 13, 2011, while the others were all executed five days later, indicating that Merced had decided to seek appointment as lead plaintiff independent of what the other members of the Institutional Investors group decided), they still do not negate the likelihood that the members of the Institutional Investors group were brought together by counsel. For example, the members' representatives do not explain how they knew that each was an investor in Wilmington Trust, let alone how they knew that the others were planning to move for appointment as lead plaintiff.

In addition to questions regarding how the Institutional Investors group was brought together, the trading pattern of Merced, one of its members, calls into doubt whether Merced can meet the initial typicality and adequacy thresholds imposed by the PSLRA. As noted, along with the "largest financial interest" comes the presumption of most adequate plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). However, the presumption may be rebutted upon proof that the presumptive lead plaintiff "will not fairly and adequately protect" the proposed class' interests or is "subject to unique defenses." *Id.*, § 78u-4(a)(3)(B)(iii)(II); *see, e.g.*, *In re Molson Coors Brewing Co. Sec. Litig.*, 233 F.R.D. 147, 150 (D. Del. 2005) (the PSLRA's "presumption may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff will not fairly and adequately protect the interests of the class or is subject to unique defenses that render such plaintiff incapable of adequately representing the class") (citation and internal quotations omitted). If rebutted, the Institutional Investors group

could no longer be the presumed lead plaintiff.[8]

At least two of the four complaints filed in the above-captioned actions identify the first partial disclosure regarding the true condition of Wilmington Trust's loan portfolio as the June 23, 2010 SunTrust Robinson Humphrey research report, the release of which caused the Company's stock price to decline approximately 11% on heavy volume. *See*, *e.g.*, Pipefitters' November 18, 2010 Complaint, ¶¶52-53; Lynch's December 10, 2010 Complaint, ¶¶75-76. However, Merced's first purchases of Wilmington Trust shares began a week later, on July 1, 2010. *See* Merced's Certification, submitted as part of Exhibit A to the Institutional Investors' Motion. Thus, Merced began to purchase Wilmington Trust shares only ***after*** the true state of the Company's financial situation began to leak into the market and become reflected in its stock price. As such, Wilmington Trust and other Defendants may be able to show that Merced would have made its purchases regardless of the alleged misstatement or omission, thus rebutting the presumption of reliance afforded by the "fraud on the market" doctrine.

Just the threat that Defendants may be able to mount such an attack is sufficient reason to deny the Institutional Investors' Motion. *In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196, 204, n.13 (E.D. Pa. 2008) (noting that defendants "will exploit the fact that this movant purchased such a large percentage of its . . . shares after this announcement[,] which would require it to defend itself as it tries to establish whether it can rely on a fraud-on-the-market theory"). Indeed, the Court need not find that Defendants' potential argument is a winning one; just the risk that a unique defense could "imperil certification of a class" is enough to warrant denial of a movant's

[8]Moreover, if Merced is removed from the Institutional Investors' group, it would not be entitled to the presumption. The group's combined loss, based on LIFO and without Merced, drops to approximately $911,477.50, leaving KCM with the largest loss of any movant – individually or combined.

lead plaintiff motion. *Newman*, 209 F.R.D. at 504; *see, e.g., Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989) (on class certification, it did not matter that "these defenses will be successful," because the mere "fact that plaintiffs will be subject to such defenses renders their claims atypical of other class members"). Applicants for lead plaintiff have been rejected as lead plaintiff under virtually identical circumstances. *See, e.g., In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 310 (S.D. Ohio 2005) (finding that "[t]he timing of New Jersey's purchases undermines any causal nexus between the Defendants' alleged misrepresentation and the resulting injury [because] [i]t will be difficult to argue that the presumptive Lead Plaintiff incurred the vast bulk of its injury after Cardinal acknowledged that its accounting methodologies were under investigation [and its] trading patterns will make it susceptible to claims that New Jersey did not rely on the Defendants' alleged misrepresentations when purchasing Cardinal stock"). Accordingly, the *Cardinal Health* court found that "the presumption of typicality and adequacy [was] rebutted." *Id.* The same result will likely be found here with respect to Merced.

As indicated, the Institutional Investors group appears to have been created by its counsel, and thus is the antithesis of what the PSLRA envisioned as the appropriate lead plaintiff.[9] Moreover, each of its members has less of a financial interest in the outcome of this litigation than KCM, and at least one member is likely to be found atypical and inadequate. Accordingly,

---

[9]Notwithstanding the foregoing, should the Court determine that a group is preferable to a single Lead Plaintiff (*i.e.*, KCM combined with another institutional investor), the *Able Laboratories* decision supports such an outcome. There, the court concluded that "two movants, each of whom filed a motion and certification within the sixty-day deadline established by 15 U.S.C. § 78u-4(a)(3)(A)(i)(II) [could], based on their own initiative and concerns about the adequacy of the otherwise presumptive lead plaintiff, unite after the expiration of the sixty-day period to form a group" suitable to act as lead plaintiff. *See Able Laboratories*, 425 F.Supp.2d at 568-571.

this Court should not consider the Institutional Investors group, and should instead grant KCM's Motion, appoint it as Lead Plaintiff and approve its selection of counsel.

## II. CONCLUSION

For all of the foregoing reasons, Kornitzer Capital Management, Inc. respectfully requests that the Court: (i) appoint it as Lead Plaintiff in this consolidated action and (ii) approve its selection of the Edgar Law Firm LLC and Shepherd, Finkelman, Miller & Shah, LLP to serve as co-Lead Counsel and Farnan LLP to serve as Liaison Counsel.

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Joseph J. Farnan, III (Del. Bar No. 3945)
Brian E. Farnan (Del. Bar No. 4089)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: jjfarnan@farnanlaw.com
bfarnan@farnanlaw.com

Counsel for Movant

OF COUNSEL:

John M. Edgar
John F. Edgar
EDGAR LAW FIRM, LLC
1032 Pennsylvania Ave.
Kansas City, MO 64105
Telephone: (816) 531-0033
Facsimile: (816) 531-3322
Email: jme@edgarlawfirm.com
jfe@edgarlawfirm.com

James E. Miller
Patrick A. Klingman
Karen M. Leser-Grenon
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
Email: jmiller@sfmslaw.com
pklingman@sfmslaw.com
kleser@sfmslaw.com

Scott R. Shepherd
Natalie Finkelman Bennett
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
35 E. State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883
Email: sshepherd@sfmslaw.com
nfinkelman@sfmslaw.com

Lesley E. Weaver
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
199 Fremont Street, 20th Floor
San Francisco, CA 94105-2255
Telephone: (415) 992-7282
Facsimile: (415) 489-7701
Email: lweaver@sfmslaw.com

Date: February 4, 2011