**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| **IN RE WILMINGTON TRUST SECURITIES LITIGATION** | Master File No. 10-cv-00990-LPS |
| | (Securities Class Action) |
| | Hon. Leonard P. Stark |
| This document relates to: ALL ACTIONS | ELECTRONICALLY FILED |
| | **JURY TRIAL DEMANDED** |

# CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ........................................ 1

A. Overview Of The Case ........................................ 1

B. The Claims Asserted In This Complaint ........................................ 5

II. PARTIES ........................................ 5

A. Lead Plaintiffs ........................................ 5

B. Defendants ........................................ 7

1. The Officer And Controller Defendants ........................................ 8

2. The Audit Committee Defendants ........................................ 10

III. FACTUAL BACKGROUND ........................................ 12

A. Wilmington's History As A Highly Conservative Bank ........................................ 12

B. Senior Management Failed To Develop Appropriate Risk Management Practices ........................................ 14

C. Wilmington Originated High-Risk Loans Because It Lacked Adequate Underwriting ........................................ 17

D. The Officer Defendants Rendered Wilmington's Credit Risk Management Ineffective ........................................ 27

E. Wilmington Operated With Significantly Outdated Appraisals ........................................ 39

F. In 2009, Federal Regulators Issued A Memorandum Of Understanding Identifying Serious Failings In The Bank's Credit Risk Management, Lending, And Accounting Functions ........................................ 42

G. Wilmington's Financial Statements Violated GAAP And SEC Regulations Prohibiting False And Misleading Public Filings ........................................ 46

1. The Officer Defendants Knowingly Or Recklessly Under Reserved For The Declining Credit Quality Of The Bank's Loans ........................................ 47

a. GAAP and Other Governing Accounting Standards Established Clear Rules Concerning How Wilmington Should Have Reserved for Loan Losses ........................................ 48

b. The Bank And Officer Defendants Under Reserved For Loan Losses Throughout The Class Period ........................................ 53

2. Wilmington Misstated The Fair Value Of The Bank's Loan Portfolio .......... 65

3. Defendants Inflated Their Earnings Through Manipulating Wilmington's Deferred Tax Asset .......... 68

4. During the Class Period, the Bank's Internal Controls Over Financial Reporting Were Ineffective .......... 72

IV. SUMMARY OF SCIENTER ALLEGATIONS .......... 74

A. Defendants Cecala, Gibson, Harra, & North Were Personally Responsible For The Bank's Failures In Risk Management .......... 75

B. The Federal Regulators Informed Defendants Cecala, Foley, Gibson, Harra, And North Repeatedly That The Bank's Risk Management Was Dangerously Deficient .......... 76

C. KPMG Warned Defendants Cecala, Foley, Harra, Gibson, And North That The Bank's Asset Review Was Deficient .......... 78

D. Wilmington's Internal Audit Function Reported Criticisms Of The Bank's Asset Review Group To Defendants Cecala, Foley, Gibson, Harra, And North .......... 78

E. Due To The Bank's Size And Organization, Defendants Cecala, Foley, Gibson, Harra, And North Were Fully Aware Of The Policies And Practices That Led To The Bank's Downfall .......... 79

F. Additional Scienter Facts .......... 80

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS .......... 82

A. False And Misleading Statements And Omissions Concerning 2007 Year-End Results .......... 83

B. False And Misleading Statements And Omissions Concerning First Quarter 2008 Results .......... 87

C. False And Misleading Statements And Omissions Concerning Second Quarter 2008 Results .......... 89

D. False And Misleading Statements And Omissions Concerning Third Quarter 2008 Results .......... 93

E. False And Misleading Statements And Omissions Concerning Year-End 2008 Results .......... 96

F. False And Misleading Statements And Omissions At The March 5, 2009 Keefe, Bruyette & Woods, Inc. Investor Conference .......... 101

G. False And Misleading Statements And Omissions Concerning First Quarter 2009 Results ........ 102

H. False And Misleading Statements And Omissions Concerning Second Quarter 2009 Results ........ 105

I. False And Misleading Statements And Omissions Concerning Third Quarter 2009 Results ........ 108

VI. THE TRUTH BEGINS TO EMERGE ........ 112

A. The Bank Announces The Take-Under And M&T Bank's Review Of Wilmington's Loan Portfolio Is Made Public ........ 129

B. Post Class Period Events ........ 132

VII. LOSS CAUSATION ........ 134

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ........ 136

IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR ........ 137

X. CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT ........ 138

FIRST CLAIM FOR RELIEF ........ 138

For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 (Against Defendants Wilmington Trust, Cecala, Foley, Gibson, Harra, and North) .. 138

Defendant Cecala ........ 141

Defendant Foley ........ 142

Defendant Gibson ........ 142

Defendant Harra ........ 143

Defendant North ........ 144

SECOND CLAIM FOR RELIEF ........ 145

For Violations of Section 20(a) of the Exchange Act (Against Defendants Cecala, Foley, Gibson, Harra, North, and Rakowski) ........ 145

THIRD CLAIM FOR RELIEF ........ 148

For Violations of Section 20(a) of the Exchange Act (Against Audit Committee Defendants) ........ 148

The Audit Committee ........ 150

XI. SECURITIES ACT CLAIMS ........ 152

A. Securities Act Defendants ........ 153

1. The Wilmington Defendants ........ 154

2. The Outside Auditor Defendant ........ 154

3. The Underwriter Defendants ........ 155

B. The Offering Documents Misstated The Bank's Underwriting Practices ........ 156

C. The Offering Documents Misstated The Bank's Asset Review And Appraisal Practices ........ 158

D. The Offering Documents Contained Untrue Financial Results ........ 161

E. The Offering Documents Contained Untrue Statements Regarding the Effectiveness of Wilmington's Internal Controls ........ 167

FOURTH CLAIM FOR RELIEF ........ 169

For Violations of Section 11 of the Securities Act In Connection With The Offering Against Defendants Wilmington; Foley; Cecala; Gibson; Harra; Rakowski; Burger; DuPont; Elliot; Freeh; Krug; Mears; Mobley; Rollins; Roselle; Sockwell; Tunnell; Whiting; KPMG; J.P. Morgan; and KBW ........ 169

FIFTH CLAIM FOR RELIEF ........ 172

For Violations of Section 12(a)(2) of the Securities Act In Connection With The Offerings Against Defendants Wilmington; J.P. Morgan; and KBW ........ 172

SIXTH CLAIM FOR RELIEF ........ 174

For Violations of Section 15 of the Securities Act In Connection With The Offerings Against Defendants Foley; Cecala; Gibson; Harra; Rakowski; Burger; DuPont; Elliot; Freeh; Krug; Mears; Mobley; Rollins; Roselle; Sockwell; Tunnell; and Whiting ........ 174

XII. CLASS ACTION ALLEGATIONS ........ 176

XIII. JURISDICTION AND VENUE ........ 178

XIV. PRAYER FOR RELIEF ........ 178

XV. JURY DEMAND ........ 179

Lead Plaintiffs, the Merced County Employees' Retirement Association, the Coral Springs Police Pension Fund, the St. Petersburg Firefighters' Retirement System, the Pompano Beach General Employees Retirement System, and the Automotive Industries Pension Trust Fund, on behalf of themselves and all others similarly situated, by their undersigned attorneys, allege the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based upon the ongoing investigation of their counsel. Many of the facts related to Lead Plaintiffs' allegations are known only by the Defendants named herein, or are exclusively within their custody or control. The investigation of counsel is predicated upon, among other things, a review of public filings by Defendant Wilmington Trust Corporation ("Wilmington" or the "Bank") with the United States Securities and Exchange Commission ("SEC"), including, among other things, Forms 10-K (annual reports), 10-Q (quarterly reports), and 8-K (periodic reports), press releases issued by the Bank, media reports about the Bank, publicly-available data relating to the prices and trading volumes of Wilmington common stock, reports by securities analysts who followed Wilmington, and interviews with former employees. Lead Plaintiffs believe that substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

### A. Overview Of The Case

1. This case arises from a massive securities fraud perpetrated by Wilmington's senior-most officers: Ted Cecala, Wilmington's Chief Executive Officer ("CEO") and Chairman of the Board; Donald E. Foley, Cecala's successor as CEO and Chairman; Robert Harra, the Bank's President and Chief Operating Officer; David Gibson, the Bank's Chief Financial Officer; and Bill North, the Bank's Chief Credit Officer (the "Officer Defendants"). For years,

Wilmington worked assiduously to build its reputation as a stable, conservative regional lender and trust company. Throughout the Class Period, the Bank and its officers repeatedly reinforced this view by describing Wilmington's "conservative management," "stable credit quality," and "rigorous underwriting." Indeed, the Officer Defendants reassured investors that Wilmington had placed its loan portfolio "under the microscope" and intimately knew the credit risk in the Bank's loan portfolio. These statements were critical to assure investors that Wilmington – unlike its competitor banks – was not exposed to high-risk loans and had a sound portfolio that would withstand the credit crisis. Indeed, on the first day of the Class Period, when analysts questioned why Wilmington was not reporting loan losses on the scale of its peers, Defendant Cecala summarily dismissed these comparisons, touting "the quality of [Wilmington's commercial] loan portfolio and underwriting and evaluation process" and explaining that Wilmington is "much more focused on the financial health of the borrower" than other commercial lenders.

2. Such statements presented Wilmington as a safe harbor in otherwise turbulent financial waters and propelled the Company's stock price to a Class Period high of nearly $36 per share in September 2008, even as other Bank stocks were collapsing.

3. In reality, Wilmington's Class Period claims about the superiority of its "loan portfolio and underwriting and evaluation process" were false. Wilmington's actual lending and accounting practices were so egregiously deficient and risky that the Federal Reserve Board, Wilmington's primary regulator, placed the Bank under a Memorandum of Understanding in late 2009 (the "Federal Reserve MOU") that forced the Bank to entirely restructure the way it originated, monitored, and accounted for its loans. For example, the Federal Reserve MOU required Wilmington to fundamentally change its loan review, credit policy, credit analysis and

lending functions, recognizing that the Bank lacked "an appropriate organization structure"; "a process to monitor compliance with policies and procedures"; and "appropriate management and staffing levels" for each of these functions. The Federal Reserve MOU further recognized that Wilmington required a "board-approved loan review policy that specifically defines, identifies and categorizes problem assets and sufficiently assesses the overall quality of the loan portfolio," as the then-current policies were entirely insufficient.

4. These deficiencies and others that triggered the Federal Reserve MOU are corroborated by former Bank employees who reported that;

- The Officer Defendants undermined the Bank's Credit Risk Management Division by interfering with the Division's attempts to downgrade loan risk ratings, recognize impaired loans, and record losses for worthless loans;
- The Officer Defendants caused the Bank to operate with outdated, and effectively meaningless, appraisals for the Bank's loans, despite repeated warnings from Federal Regulators. When those appraisals were finally updated to take into account market deterioration, the Bank was forced to take massive writedowns of its loans;
- The Bank's underwriting was controlled and led by the sales-side lending staff, who were compensated for the volume of business they brought to the Bank, not the amount of risk they avoided; and
- Loan officers repeatedly exceeded their approved lending authority to extend an extra 10% of loan principal to borrowers without credit committee approval.

Because of these and other risk management failings, several former Wilmington employees summarized the Bank's high-risk environment as a "sales culture, not a credit culture."

5. Indeed, the Officer Defendants were repeatedly warned about their reckless disregard for prudent risk management by KPMG (the Bank's outside audit firm), Wilmington's Internal Audit, and Federal Regulators, who sharply criticized the Bank's risk management procedures and internal controls dating back to at least 2007. In a review that year, bank examiners identified the Bank's failings in asset review as "weaknesses in [Wilmington's] control structure." In late 2009, these concerns came to a head in the Federal Reserve MOU,

which effectively took Wilmington's lending function out of the hands of the Officer Defendants and sought to institute some rigor in the Bank's asset review function.

6. As a result, in 2010, as the Bank began to implement the MOU, Wilmington belatedly began to record "catch up" loan loss reserves – decreasing the Bank's reported net income by hundreds of millions of dollars – and significant loan rating downgrades, just as other banks were recovering from the recent credit crisis. In June 2010, following several of these disastrous announcements, Defendant Cecala announced his abrupt resignation. Analysts were dismayed by Cecala's unexpected departure and by Wilmington's sudden disclosures that the Bank's long-standing appearance of conservatism and judicious credit management was an illusion. However, the Officer Defendants continued to mislead the market, claiming to investors that any financial difficulties Wilmington encountered were the result of late deterioration in the market, rather than the Bank's improper lending and asset review practices. In fact, in June 2010, the Officer Defendants told the market that Cecala's departure did not indicate that the Bank had a "credit problem that hadn't been reported."

7. Thus, while the market now had some indication that the Bank faced more significant credit concerns than the Officer Defendants had previously acknowledged, investors could never have predicted Wilmington's announcement on November 1, 2010. On that date, Wilmington announced that it was going to be purchased by M&T Bank – one of Wilmington's primary competitors that Defendant Cecala had previously dismissed as being less "focused" on the health of its borrowers than Wilmington – at a fire sale price: half the trading value of Wilmington's shares just one trading day before. The transaction was later described by *The New York Times* as "one of the biggest so-called take-unders in recent Wall Street memory." Moreover, the day the deal was announced, M&T revealed that its own review of Wilmington's

commercial loan portfolio resulted in a loan loss assumption of ***$1 billion, or over $500 million more*** than the losses Wilmington had belatedly disclosed. The conduct of Wilmington and the Officer Defendants has also sparked a broad SEC inquiry into Wilmington's lending and accounting practices. On the news of the merger, the price of Wilmington's stock price collapsed 46%, causing investors massive losses.

### B. The Claims Asserted In This Complaint

8. Lead Plaintiffs assert two sets of claims. The first set of claims asserts causes of action for fraud under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") against the Bank and the Officer Defendants, each of whom made materially false and misleading statements that artificially inflated the prices of Wilmington's common stock during the Class Period, January 18, 2008 up to November 1, 2010. Lead Plaintiffs also assert control-person claims under Section 20(a) of the Exchange Act against the Officer Defendants.

9. The second set of claims asserts a series of strict liability and negligence causes of action under the Securities Act of 1933 ("Securities Act") against those Defendants who are statutorily responsible under Sections 11 and 12(a)(2) of the Securities Act for materially untrue statements and misleading omissions made in connection with Wilmington's public offering of equity securities on February 23, 2010. Lead Plaintiffs also assert control-person claims under Section 15 of the Securities Act. The claims arising under the Securities Act are addressed in Section XI of this Complaint. These claims do not require scienter, and Lead Plaintiffs specifically disavow any allegations of fraud or recklessness with respect to the Securities Act claims.

## II. PARTIES

### A. Lead Plaintiffs

10. Lead Plaintiff Merced County Employees' Retirement Association ("Merced") is

a multiple-employer defined benefit plan established in 1950. Merced administers retirement, death, disability, and survivor benefits for eligible employees. As of June 30, 2010, Merced held $419.7 million in net assets.

11. Lead Plaintiff Coral Springs Police Pension Fund ("Coral Springs") is a pension plan established in 1979 that provides defined benefit pension and disability benefits for the police officers of the city of Coral Springs, Florida. As of May 16, 2011, Coral Springs held approximately $125 million in net assets.

12. Lead Plaintiff St. Petersburg Firefighters' Retirement System ("St. Petersburg") is a benefit plan for the firefighters of the city of St. Petersburg, Florida. St. Petersburg serves approximately 700 members and manages over $175 million in net assets.

13. Lead Plaintiff Pompano Beach General Employees Retirement System ("Pompano GERS"), headquartered in Pompano Beach, Florida, is a single-employer defined benefit plan that has provided retirement benefits for Pompano Beach's city employees since 1972. Pompano GERS currently manages over $100 million in net assets and serves over 800 retirees.

14. Lead Plaintiff Automotive Industries Pension Trust Fund ("Automotive Industries") is a defined benefit plan for individuals working in various trades surrounding automobile manufacturing, maintenance, and delivery industries throughout the Northern California area. As of May 10, 2011, Automotive Industries held approximately $1.2 billion in net assets.

15. Lead Plaintiffs purchased Wilmington common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws herein. As set forth in the schedule attached as Exhibit A to this Complaint, Lead Plaintiffs purchased or acquired over

199,825 shares of Wilmington common stock during the Class Period, including 8,750 shares purchased in the February 2010 secondary offering.

**B. Defendants**

16. Defendant Wilmington is a Delaware corporation, with its executive headquarters located at 1100 North Market Street, Wilmington, Delaware 19890. At all relevant times, Wilmington was a bank holding company, a thrift holding company, and a financial holding company with several subsidiaries, including Wilmington Trust Company ("WTC"), a Delaware-chartered bank and trust company founded in 1903.[1] As a holding company, Wilmington and WTC were regulated by the Delaware Department of Banking and the Federal Reserve Board (the "Federal Reserve"). Wilmington's subsidiary banks were also subject to the rules and regulations of the Federal Deposit Insurance Corporation ("FDIC") and the Office of Thrift Supervision ("OTS") (collectively, the "Federal Regulators").

17. Wilmington has four business segments: Regional Banking, Corporate Client Services, Wealth Advisory Services, and Affiliate Money Managers. The Bank's Regional Banking segment, whose predominant business was the origination of commercial loans, is the primary focus of this Complaint. As explained herein, commercial loans comprised a significant portion of the Bank's assets. According to the Bank's 2008 Form 10-K, as of December 31, 2008, the loan balance for commercial loans totaled over $6.7 billion, 70% of the Bank's total loan portfolio (which also included consumer loans, residential loans, and loans secured with investments). Further, at December 31, 2008, the loan portfolio comprised 78% of the Bank's

---

[1] Consistent with the Bank's Forms 10-K for the years 2007 through 2009, the definition of Wilmington includes its subsidiaries. For example, in its Form 10-K for the year ended December 31, 2009, Wilmington specifically defined itself to include its subsidiaries, stating: "Wilmington Trust Corporation is a Delaware corporation and financial holding company under the Bank Holding Company Act. In this report, the terms "we," "us," "our," "the company," or "Wilmington Trust" include subsidiaries, unless the context indicates otherwise."

assets. Wilmington's commercial loans – all of which were originated by the Bank – consisted of three types of loans: (1) commercial real estate construction, including primarily single-family housing developments, as well as warehouses, industrial properties, low-rise office buildings, and community shopping centers; (2) commercial, financial, and agricultural loans to various clients who used the loans for working capital, equipment purchases, inventory, and other needs; and (3) commercial mortgages, such as professional offices and retail properties.

18. At all relevant times, Wilmington was listed on the New York Stock Exchange ("NYSE"), where its stock was publicly traded under the symbol "WL." As of September 30, 2010, there were over 91 million shares of Wilmington common stock outstanding.

19. On November 1, 2010 Wilmington announced that it was being acquired by M&T Bank. M&T Bank, a bank holding company, is headquartered in Buffalo, New York and is listed on the NYSE under the symbol "MTB." According to the Agreement and Plan of Merger between Wilmington and M&T Bank, filed on Form 8-K with the SEC on November 2, 2010, all of Wilmington's "claims, obligations, liabilities, debts and duties" shall become the "claims, obligations, liabilities, debts and duties" of the surviving bank. Accordingly, M&T Bank is a successor in interest to Wilmington. Based on its successor status, M&T Bank is, along with Wilmington, collectively defined herein as Wilmington or the Bank.

**1. The Officer And Controller Defendants**

20. Defendant Ted T. Cecala ("Cecala") served as Wilmington's CEO from July 1996 until June 3, 2010 and as Chairman of the Board from 1996 through July 19, 2010. Cecala joined Wilmington as Controller in 1979 and served in various positions at the Bank since that time, including Vice President of the Corporate Development Department, Executive Vice President, and Chief Financial Officer, and Vice Chairman and Chief Operating Officer. He also served as a member of the Senior Management Committee since 1985. From 2007 through

2010, Cecala received over $10.7 million in total compensation, including at least $1 million in bonus compensation.

21. Defendant Donald E. Foley ("Foley") served as the CEO and Chairman of the Board for Wilmington. Foley replaced Defendant Cecala as CEO in June 2010 and as Chairman of the Board in July 2010. Prior to becoming CEO, Foley served as a Director of the Bank starting in July of 2006, during which time he served as a member of the Audit and Compensation Committees, chairing the Audit Committee from 2008 to 2010. Foley served as Senior Vice President and Treasurer of iTT Corporation from 2003 to 2010 and as its Director of Taxes until 2008. For 2010, Foley received over $1 million in total compensation, including at least $371,700 in bonus compensation.

22. Defendant David R. Gibson ("Gibson") served as Wilmington's Chief Financial Officer ("CFO") since 1997 and as Wilmington's Chief Operating Officer since November 2010. He served as a Wilmington executive officer since 1992 and a member of the Senior Management Committee since 1995. From 2007 through 2010, Gibson received over $5 million in total compensation, including at least $866,500 in bonus compensation.

23. Defendant Robert V.A. Harra Jr. ("Harra") served as Executive Vice President since 1992 and as President since 1996. Harra also served as Chief Operating Officer from 1996 to 2010 and as a Director since 1996. Harra joined Wilmington in 1971 and until his appointment as President in 1996, Harra held numerous positions, including Vice President and Commercial Loan Division Manager and member of the Senior Management Committee. From 2007 through 2009, Harra received over $4.7 million in total compensation, including at least $361,024 in bonus compensation.

24. Defendant William North ("North") served as the Chief Credit Officer for

Wilmington from 2004 to July 2010. North joined the Bank in 1997. Prior to that, he spent eighteen years in various lending and credit positions at CoreStates Bank.

25. Defendants Cecala, Foley, Gibson, Harra, and North are referred to herein collectively as the "Officer Defendants."

26. Defendant Kevyn N. Rakowski ("Rakowski") served as Senior Vice President and Controller of the Bank since 2006. Prior to joining Wilmington, she served as Vice President and Controller of Marlin Leasing Corporation from June 2004 to April 2006 and as Director of Accounting and Reporting for Infrasource, Inc. from 2000 to 2004.

**2. The Audit Committee Defendants**

27. Defendant Carolyn S. Burger ("Burger") served as a director of the Bank since 1991. During her tenure as a director, Burger served on several committees, including the Audit Committee (at least 2001-2004 and 2008-present, Chair 2001-2004 and 2010-present); the Risk Management Committee (2010-present); the Compensation Committee (at least 2007); and the Nominating and Corporate Governance Committee (at least 2007-2008, Chair 2007-2008).

28. Defendant R. Keith Elliott ("Elliott") served as a director of the Bank from 1997 until October 2010. During his tenure as a director, Elliot served on several committees, including the Audit Committee (at least 2007-2008, Chair 2007); the Compensation Committee (at least 2009, Chair 2009); and the Nominating and Corporate Governance Committee (at least 2008-2009).

29. Defendant Gailen Krug ("Krug") has served as a director of the Bank since 2004. During her tenure as a director, Krug has served on several committees, including the Audit Committee (at least 2007-present); the Risk Management Committee (2010–present); the Compensation Committee (at least 2007-2009); and the Nominating and Corporate Governance Committee (at least 2009-present; Chair 2009-present).

30. Defendant Stacey J. Mobley ("Mobley") served as a director of the Bank from 1991 to April 2010. During his tenure as a director, Mobley served on several committees, including the Audit Committee (at least during 2009); the Compensation Committee (at least 2008–2009, Chair 2008); and the Nominating and Corporate Governance Committee (at least 2007-2008).

31. Defendant Michele M. Rollins ("Rollins") served as a director of the Bank from 2007 to May 2010. During her tenure as a director, Rollins served on several committees, including the Audit Committee (2009-2010) and the Nominating and Corporate Governance Committee (2008-2009).

32. Defendant David P. Roselle ("Roselle") served as a director of the Bank from 1991 to April 2009. During his tenure as a director, Roselle served on several committees, including the Audit Committee (at least 2007-2009); the Compensation Committee (at least 2007, Chair 2007); and the Nominating and Corporate Governance Committee (at least 2007).

33. Defendant Oliver R. Sockwell ("Sockwell") served as a director of the Bank from 2007 to April 2010. During his tenure as a director, Sockwell served on the Audit Committee (2008-2010) and the Nominating and Corporate Governance Committee (2009).

34. Defendant Robert W. Tunnell, Jr. ("Tunnell") has served as a director of the Bank since 1992. During his tenure as a director, Tunnell has served on several committees, including the Audit Committee (at least 2007-2008 and 2010-present); the Compensation Committee (2009-present); and the Nominating and Corporate Governance Committee (at least 2008 and 2010-present).

35. Defendant Susan D. Whiting ("Whiting") has served as a director of the Bank since 2005. During her tenure as a director, she has served on several committees, including the

Audit Committee (2010-present); the Compensation Committee (at least during 2007-present, Chair 2010-present); and the Nominating and Corporate Governance Committee (at least 2007-2008).

36. Defendants Burger, Elliott, Krug, Mobley, Rollins, Roselle, Sockwell, Tunnell, and Whiting are collectively referred to hereinafter as the "Audit Committee Defendants."

## III. FACTUAL BACKGROUND

### A. Wilmington's History As A Highly Conservative Bank

37. Since its founding in 1903, Wilmington enjoyed a reputation for conservatism and quality that distinguished it from other financial institutions. The Bank, initially founded by members of the DuPont family to help manage the family's fortune, grew to become one of the nation's largest trust companies. For decades, high net worth clients relied upon Wilmington to "increase and preserve" their wealth. Since the start of the housing crisis in 2007 and throughout the recent financial downturn, Wilmington assured investors that it remained committed to the conservative practices on which it had built its reputation, contending in its 2008 Annual Report that its "reputation as a stable, relationship-focused company has helped us attract and retain clients throughout the vagaries of economic cycles." The Bank claimed in that same report that it had "succeeded across 105 years of economic cycles" because it "manage[d] risk conservatively." Indeed, Wilmington distinguished itself from financial institutions whose risky practices gave rise to the financial crisis, claiming in its 2009 Annual Report to Investors, for example, that "[o]ur strong capital position, 107 years of stability, and focus on client relationships stand in stark contrast to the struggles and distractions that many other financial institutions are facing."

38. Although historically Wilmington's primary focus was on wealth advisory services for high net worth clients, the Bank derived a majority of its revenue from its Regional

Banking Services, including its commercial and construction lending in the mid-Atlantic region. The growth in Wilmington's loan portfolio from 2005-2009 was driven by commercial real estate construction. In fact, as the Bank's other loan categories held steady or shrank as a percentage of the loan portfolio, Wilmington's commercial real estate construction loans increased by over half a billion dollars. Throughout the Class Period, Wilmington touted its purportedly conservative lending practices for commercial lending. For example, in 2008 as banks nationwide were reeling from loan losses and the worsening credit crisis, Wilmington repeatedly assured investors in its public filings that due to its "***rigorous underwriting***" and "***regular review***" of the portfolio, ***"[o]n the credit quality front, conditions remain stable***."[2] Indeed, the Bank emphasized the quality of its growing loan portfolio stating in March 2009 that, because Wilmington had not engaged in acquisitions, "all of the loans that we have on our books . . . have gone through ***our*** underwriting process, which gives us great comfort." Wilmington repeatedly assured investors that its loan portfolio was stable, emphasizing that its real estate investments were not in "high-rise office buildings" or "speculative projects."

39. Thus, as other banks that had engaged in high-risk lending were devastated during the financial crisis, the Bank encouraged investors to view the purportedly conservative and steady Wilmington as a safer investment for their funds during troubled times for the financial sector. Leonard Quill, former chairman of the Wilmington Board, called the Bank the "Rock of Gibraltar." As *The News Journal* would later report on November 2, 2010, investors believed Wilmington was "stodgy, conservative and risk-averse." In reality, Wilmington managed its multi-billion dollar loan portfolio with only the most rudimentary of controls over underwriting and loan credit risk review. Quarter after quarter, until the Federal Regulators forced the Bank to

[2] Throughout this document, emphasis is added unless otherwise noted.

confront its true state of affairs in 2010, Defendants emphasized Wilmington's reputation as a conservative lender with tight credit controls despite the fact that the Bank engaged in many of the same high-risk practices that it denigrated in competing institutions. Wilmington's high-risk practices directly caused the massive losses that ultimately destroyed the Bank.

### B. Senior Management Failed To Develop Appropriate Risk Management Practices

40. More than any other large mid-Atlantic bank, Wilmington was extraordinarily concentrated in Delaware commercial lending, with over 60% of its loan portfolio invested in the state. Over a year before the Class Period began, Federal Regulators became so concerned about heavy and unbalanced loan concentrations in regulated banks – which they deemed to have "substantial risks" – that they formulated and issued guidance specifically addressing the risk management concerns inherent in these types of concentrations. In December 2006, after months of public comment and debate, including thousands of comment letters from regulated financial institutions like Wilmington, the Department of the Treasury, the Federal Reserve, the FDIC, and the Office of the Comptroller of the Currency (the "Regulatory Agencies") issued the *Interagency Guidance on Concentrations in Commercial Real Estate ["CRE"] Lending, Sound Risk Management Practices* (the "CRE Interagency Guidance"). The Regulatory Agencies issued the CRE Interagency Guidance because of their observation that "CRE concentrations have been rising over the past several years and have reached levels that could create safety and soundness concerns in the event of a significant economic downturn." As the Federal Reserve relayed to its regulated banks (including Wilmington) on a March 2007 telephonic conference titled "Supervisory Expectations for Sound Risk Management Practices," the Regulatory Agencies' concerns specifically included:

- ***Historically CRE has been highly cyclical and volatile, which led to big losses for highly concentrated banks***

- ***CRE market fundamentals could change quickly and affect credit quality***

- Risk management and strategic planning has not always kept pace with rapid growth in CRE lending

41. The CRE Interagency Guidance emphasized the critical nature of tight underwriting and thorough ongoing credit risk reviews of commercial real estate portfolios, stating clearly that:

> **Credit Underwriting Standards** An institution's lending policies should reflect the level of risk that is acceptable to its board of directors and should provide clear and measurable underwriting standards that enable the institution's lending staff to evaluate all relevant credit factors. ***When an institution has a CRE concentration, the establishment of sound lending policies becomes even more critical.*** In establishing its policies, an institution should consider both internal and external factors, such as its market position, historical experience, present and prospective trade area, probable future loan and funding trends, staff capabilities, and technology resources.
>
> * * *
>
> **Credit Risk Review Function**. A strong credit risk review function is ***critical*** for an institution's self-assessment of emerging risks. An effective, accurate, and timely risk-rating system provides a foundation for the institution's credit risk review function to assess credit quality and, ultimately, to identify problem loans. Risk ratings should be risk sensitive, objective, and appropriate for the types of CRE loans underwritten by the institution. Further, ***risk ratings should be reviewed regularly for appropriateness***.

42. There is no question that Wilmington's loan portfolio contained dangerous concentrations in commercial real estate that concerned the Regulatory Agencies and gave rise to the CRE Interagency Guidance. According to the CRE Interagency Guidance, the Regulatory Agencies were particularly concerned with CRE concentrations that exceeded 300% or more of total capital – Wilmington was one of only 35 similarly-sized institutions regulated by the Federal Reserve that ***surpassed*** this dangerous threshold. Not only did Wilmington exceed this percentage concentration at the time of the CRE Interagency Guidance publication, but – unlike its peers, which immediately scaled back their heavy investments in CRE lending following the

issuance of the Guidance – Wilmington actually doubled down and escalated its concentration between 2007 and 2010. In fact, beginning in 2004 and continuing through the recent housing downturn, Wilmington's investments in commercial real estate far exceeded that of its peers:




*Source*: FDIC Reports of Income and Condition; Wilmington Size Peers are FDIC-insured depository institutions regulated either by the FDIC and/or the Federal Reserve with the value of total assets between $5 billion and $15 billion.

43. Despite that lending concentration, in violation of Wilmington's obligations as a federally-regulated bank and contrary to public statements by the Bank and the Officer Defendants touting Wilmington's rigorous underwriting and effective credit risk management, the Officer Defendants underfunded, understaffed, and largely ignored the Bank's credit risk department so as not to interfere with their plans for Wilmington's continued growth. As discussed below in Section III.C, the underwriting for Wilmington's loans was performed in a check-the-box manner, with exceptions to underwriting guidelines and errors papered over and

purposefully or recklessly ignored. Further, as discussed below in Section III.D, rather than enforcing regular and thorough reviews of the loan portfolio as Wilmington publicly claimed – a "critical" function according to Wilmington's regulators – Wilmington's Asset Review Group (described herein) was rendered ineffective as the group's loan assessments were constantly superseded by the Officer Defendants, who overrode the credit quality assessments conducted by the Bank's credit risk review professionals.

44. In fact, Wilmington's credit risk review fell so far short of even the most basic standards of managing the Bank's risk – particularly given the Bank's extraordinary concentrations in real estate construction and the Regulatory Agencies' clear warnings regarding the need for tight credit risk controls – that in September 2009, after years of criticisms by Federal Regulators regarding the Bank's credit risk function, the Federal Reserve finally imposed the Federal Reserve MOU, which required significant top-to-bottom changes to the Bank's risk management and loan review functions.

### C. Wilmington Originated High-Risk Loans Because It Lacked Adequate Underwriting

45. Although the Officer Defendants repeatedly and falsely boasted about the strength of Wilmington's loan portfolio and the "consistent" and "rigorous" underwriting standards the Bank purportedly used to originate new loans, in reality the Bank flouted these standards and routinely made loans to favored clients based on personal relationships and business development interests rather than impartial and risk-focused underwriting criteria. According to Confidential Witness ("CW") 1, who worked in commercial and regional banking at Wilmington for 21 years between 1990 and 2010, the Company's lending practices were aggressive to the point that the Officer Defendants "took the Company to the race track." Indeed, senior management, including Defendants Cecala, Harra, and Gibson, instituted policies that favored

granting credit to those customers with whom the Bank had an ongoing relationship or hoped to in the future, rather than implementing policies supporting the "stability" of the Bank's credit and the "consistency" of its underwriting. The Bank's systemic failures in the front lines of its credit risk management were identified in the Federal Reserve MOU, which recognized that the Bank lacked fundamental underwriting policies and procedures, including controls over documentation and exceptions to Wilmington's underwriting standards.

46. According to CW 2, a Vice President of Wilmington's Credit Risk Management Division who left the Bank in March 2010 after thirteen years with Wilmington, the Bank operated with an internal annual goal of 10% growth throughout CW 2's tenure. This ambitious growth goal required a constant Bank-wide focus on sales and business development, leading several former Wilmington employees, including CW 2 and CW 3, a Vice President in Wilmington's loan workout group from January 2008 through June 2010, to describe Wilmington as being "more of a sales culture than a credit culture." In fact, in an effort to generate new loans and drive revenues, loan officers or "lenders" (the sales side of Wilmington) frequently ignored even the few established underwriting processes that existed and originated loans based on informal exceptions to the Bank's standards. For example, according to CW 2, a review by the Bank's credit risk department revealed that Employee A, formerly one of the Bank's top lenders who maintained a $500 million loan portfolio (7% of the Bank's total commercial loan portfolio), issued "dozens and dozens" of loans in 2007 without the required approvals. These loans were recorded on the Bank's 2007 balance sheet and, due to their multi-year payment structure, many of these faulty loans remained on the books into and throughout the Class Period. Although CW 2 raised concerns about Employee A and his deficient loan origination practices directly to Defendant Harra, Employee A remained with the Bank well into

2010. Moreover, according to CW 2, when the credit risk department raised concerns about the missing documentation in Employee A's loans, the missing data and approvals were often later papered over with management's approval. CW 2 also confirmed that the credit risk department identified similar patterns of problems with loans initiated by Employee B, a former vice president and marketing manager. Ultimately, as discussed below, both Employee A and Employee B were only terminated when the Bank began to tighten underwriting controls in 2010 in response to the Federal Reserve MOU.

47. Wilmington and the Officer Defendants facilitated this lax adherence to underwriting by not only placing credit analysts, who were theoretically responsible for underwriting, in the same department as the lenders, but by making the analysts junior to the lenders whom they were charged with scrutinizing. According to CW 2, the credit analysis function was chronically understaffed – the Bank incrementally added additional credit analysts over the years but never had more than ***twelve*** analysts in total (out of roughly 3,000 employees), for all of the Bank's commercial lending, which amounted to a portfolio of over $6.5 billion in 2008 and 2009. This handful of credit analysts was nominally responsible for underwriting hundreds of millions of dollars in loans every year. As a result and according to CW 2, the real loan analysis was functionally done by the lenders themselves.

48. Moreover, the credit analysts reported to regional lending managers who were in charge of business development – the Bank's primary focus – as opposed to non-sales, credit-focused supervisors. According to CW 2, rather than being an independent voice for credit risk management, the position of credit analyst at Wilmington was considered to be a stepping stone to attaining the much more highly regarded – and more lucrative – position of loan officer. CW 2 further explained that the credit analysts who worked in underwriting the Bank's Delaware

loans, or 60% of the Bank's commercial portfolio, were "home grown" analysts who lacked sufficient risk management training. Accordingly, the credit analysts – whose path to promotion required them to become lenders – did not have the motivation, experience, and reporting structure to properly supervise the credit quality of the loans Wilmington originated. As discussed further below, this reporting hierarchy was a major source of concern for Federal Regulators and was one of the fundamental changes required by the Federal Regulators in the Federal Reserve MOU in late 2009.

49. In addition to this sales-biased organizational structure, Wilmington had in place several policies that encouraged high-risk underwriting and credit extension at the lender's unilateral discretion. For example, the Bank crafted its policies to exempt a large percentage of the Bank's loan portfolio from any subsequent review beyond that done by the credit analysts. Specifically, only large loans exceeding $5 million were submitted to the "Loan Committee" for review after a credit analyst had perfunctorily signed off on the loan. According to CW 2, Defendant North as Chief Credit Officer chaired the Loan Committee, and its members included CW 2 and senior lending management, including Rich Conway, Chief Operations Officer, Mid-Atlantic market; Katie Wilkinson, Vice President and Division Manager of Delaware Commercial Banking; Terry Brewer, Head of real estate lending in Wilmington Trust's banking markets outside of Delaware; Jeff Culp, Chief Operating Officer of the Pennsylvania market; and Employee B, the relationship manager mentioned above. Defendants Cecala and Harra acted as *ex officio* members of the Committee who could and did weigh in on lending decisions, according to CW 2. According to the Bank's quarterly SEC filings throughout the Class Period, roughly 50% of the Bank's loan portfolio was below $5 million and was thus exempted from any further review beyond the decision made by the Bank's credit analysts.

50. Wilmington employed another mechanism to circumvent underwriting guidelines during the Class Period, termed the "10% rule authority" (the "10% Rule"). Under the 10% Rule, according to CW 2, after obtaining approval for a large loan from the Loan Committee, loan officers could then approve, by their own "signature authority," an additional loan of up to 10% of the original loan amount without seeking any further approval by the Loan Committee. This meant that lenders could extend loans that exceeded the amount approved by the Loan Committee and did not conform to the Bank's purported underwriting standards as disclosed in the Bank's SEC filings by first proposing the loan as a conforming loan and then, after obtaining Loan Committee approval, unilaterally increasing the loan amount by 10% (with no increase in collateral), even if such a loan would then be outside the Bank's stated guidelines. The existence and widespread abuse of the 10% Rule was confirmed during the deposition testimony of Defendant North in connection with the bankruptcy of Christopher Tigani, an owner and operator of Wilmington client N.K.S. Distributors, Inc. ("N.K.S."). Wilmington issued Mr. Tigani a $4.1 million home loan in 2008. Defendant North testified that an additional $1 million home equity line was "purported to be a 10 percent rule approval and, as such, didn't necessarily go to loan committee." According to that testimony, "given the fact that the 10 percent of the rule box is checked . . . my deduction would be that it did not go to loan committee." This example highlights the exploitation of the 10% Rule, in that the additional $1 million Wilmington loaned to Tigani was actually ***25%*** of the original $4.1 million loan approval.

51. The Delaware real estate group, and in particular Employee A and Employee B, frequently relied on the 10% Rule when granting loans. For example, according to CW 2, a number of Wilmington loans to prominent Delaware developer Preston Schell relied on the 10% Rule. According to CW 2, in addition to the lack of credit analysis, these additional credit lines

were issued with minimal documentation. Later in 2009, when Federal Regulators reviewed several of Wilmington's large loans and saw that they were originated using the 10% Rule without any further credit approvals, the Regulators concluded that this practice further demonstrated the Bank's inadequate controls over lending.

52. These credit policies were consistent with Wilmington's overall approach to lending – making lending decisions based on personal relationships between Wilmington employees and potential borrowers, rather than on a review of the prospective borrowers' ability to pay. Indeed, according to former Bank employees, the Bank routinely ignored or violated prudent underwriting standards – including those disclosed in its SEC filings – by issuing loans to borrowers who had relationships with the Bank, regardless of whether or not those borrowers were actually qualified loan recipients. In fact, the Officer Defendants stressed the importance of relationship-based lending and, as set forth below, routinely placed the Bank's relationship with the borrower over credit concerns. For instance, CW 4, who worked at the Bank as a commercial banking associate from 2005 to 2007 and as an investor relations associate from 2007 to 2009, stated that loans to favored clients "were not really looked at with scrutiny." Similarly, according to CW 5, a former Wilmington paralegal from May 2007 to April 2009, Wilmington "went to great lengths to get loans through" for favored clients and would "often re-write a loan that a client didn't qualify for" based on the Bank's relationship with the client. Likewise, CW 6, who was responsible for credit and risk assessment of commercial loan portfolios from November 2002 to April 2007 and sat on the credit review committee, described how Wilmington operated on a "friends and family plan" where the "same cast of characters" with "longstanding ties to the bank," including certain developers from Kent and Sussex Counties, would receive a significant portion of the Bank's loans regardless of whether they had

the "wherewithal to make the loans current." CW 6 further confirmed that the Bank engaged in "aggressive," high-risk lending dating back to at least 2007. Wilmington's practice of lending based on relationships rather than the "rigorous" underwriting touted to investors resulted in numerous instances of loans being extended to unqualified borrowers; those loans remained on the Bank's books through the Class Period and caused losses to Wilmington as these "friends and family" defaulted.

53. A prime example of personal relationships trumping objective lending criteria was the issuance of a highly unorthodox loan for the purchase of a 24,000 square foot mansion to Mr. Tigani. Mr. Tigani's bankruptcy filings reveal the details of Wilmington's dysfunctional, highly risky and ultimately financially disastrous lending relationships with its clients. According to a June 11, 2008 Intra-Office Memorandum to Wilmington's Loan Committee, which was attached to Mr. Tigani's filings, the $4.1 million, interest-only, one-year loan was issued with a down payment from Mr. Tigani of only $120,000 (3% of the loan amount), despite the fact that Mr. Tigani was already personally guaranteeing more than $30 million in loans that Wilmington had extended to N.K.S. As noted above, Defendant North headed the Loan Committee and Defendants Cecala and Harra acted as *ex officio* members. According to that June 2008 memorandum, the Bank specifically recognized and documented a number of serious problems with Mr. Tigani's "highly leveraged" financial situation and concluded that "[d]ue to the high loan to purchase price ratio and his existing debt level, conventional residential mortgage financing is not available to Mr. Tigani."

54. However, the Bank noted in the memorandum that N.K.S. was "a substantial and well known client of the Bank" and that Wilmington would "have the opportunity to bid on his company's (NKS) 401K plan." As a result, Wilmington structured a highly unusual one-year

loan with the understanding that the loan would be reassessed in a year for possible conversion to a standard thirty-year mortgage. According to deposition testimony from Defendant North, the one-year financing arrangement was "***an accommodation to the client*** to allow him to complete a transaction that had a short time frame." Despite Mr. Tigani's highly leveraged financial position and low level of liquidity, the Bank's internal documents show that Wilmington viewed the eventual extension of the loan to a full thirty-year mortgage as a foregone conclusion. For example, the Bank stated that, "[s]ince the loan will eventually be placed in a 30 year permanent mortgage, this request will be placed on a 30 year amortizing basis." The Bank ultimately was forced to take possession of Mr. Tigani's home in a sheriff's sale in January 2011 after extensive litigation with Mr. Tigani and suffered a significant loss on the multi-million dollar loan.

55. In 2009, Mr. Tigani was fired from N.K.S. That same year, Wilmington learned that N.K.S. was not submitting timely financial statements, had suffered a $5.6 million loss in 2008, had "significant overdrafts," was unable to obtain a going concern representation from its auditors, and was generally having liquidity problems that gave Wilmington's "lending relationship managers concern[s] about [N.K.S.'s] viability." Nevertheless, according to testimony by Anthony D'Imperio, vice president and head of Wilmington's workout group, Wilmington still extended a $3.2 million commercial loan to N.K.S. and was "serious[ly] consider[ing]" an additional re-financing at the end of 2009 in the interests of continuing the relationship with N.K.S. Moreover, Wilmington extended additional credit to N.K.S. despite knowing about Mr. Tigani's personal financial condition, the litigation regarding his mansion, and the fact that tens of millions of dollars of loans to N.K.S. were already supported by Mr. Tigani's personal guarantees.

56. Former Bank employees gave more examples of personal favoritism trumping

conservative lending policies. For instance, CW 4 described how a former vice president and loan officer in the commercial banking group, Employee C – who was terminated in 2010 as a result of the Federal Reserve MOU – originated a "ton of loans" to a specific client who consistently obtained additional loans from the Bank despite the fact that the client was frequently in overdraft and was so financially unstable he had to "run[] around to put money in his account." According to CW 4, the Bank would "shuffle things around" for this preferred client. Similarly, CW 2 described how Defendant Cecala intervened in a loan request by his personal friend, a car dealer who obtained a loan from Wilmington with a "very liberal" structure.

57. In addition, as shown in the N.K.S./Tigani litigation, the Officer Defendants improperly relied on personal guarantees to approve high-risk loans that were not justified by the Bank's underwriting policies. According to CW 2, the Officer Defendants placed a heavy reliance on separate guarantee agreements and often made lending decisions based on the supposed strength of the guarantor, rather than the strength of the primary borrower. Compounding this error, the Bank did not typically perform adequate due diligence on the guarantor's willingness and ability to pay the loan. As a result, due diligence on loans backed by personal guarantors was superficial and less diligent than loans without personal guarantors, according to CW 2.

58. Even more troubling, CW 2 indicated that the Bank continued to overly rely on guarantors even after Federal Regulators "most definitely warned Wilmington Trust" that, while guarantors can help mitigate the risk of a given loan, ***they do not determine the overall credit quality of the loan or the soundness of a lending decision***. Indeed, according to CW 2, Federal Regulators became increasingly skeptical of Wilmington's use of personal guarantors to justify

the origination of loans. This skepticism was particularly justified because, as shown in the case of the loans of Mr. Tigani, the Bank did not actually determine that the guarantor was able and willing to step into the shoes of the primary borrower if needed. Specifically, Wilmington accepted Mr. Tigani's personal guarantee for over $30 million in Wilmington loans to N.K.S. despite having access to liquid assets of less than $400,000.

59. A series of loans Wilmington extended to the prominent Sussex County real estate developer, Preston Schell, provides a further example of Wilmington's inappropriate reliance on personal guarantees to the detriment of underwriting the creditworthiness of the primary borrower. CW 2 explained that Wilmington relied upon personal guarantees from Mr. Schell to justify loans the Bank extended to a variety of different parties, despite the fact that Mr. Schell did not have a great deal of liquidity and was already the guarantor on numerous other Wilmington loans. In fact, in a November 29, 2010 *Wall Street Journal* article, "How Loyalty to Customers Led to Storied Bank's Fall," Mr. Schell acknowledged that, while a number of his real estate projects were "underperforming," Wilmington had "always been good to me. They have always told me that they are a relationship bank and that they stick with their customers through thick and thin – and that's what they have done." Ultimately, as reported in a November 21, 2010 *Philadelphia Inquirer* article, Wilmington was forced to sell the loans Mr. Schell had guaranteed to outside investors, "settling for a portion of what [was] owed." Wilmington's overreliance on guarantors epitomized the Bank's disastrous dependence on personal relationships to the exclusion of prudent credit underwriting.

60. As discussed below, the Bank began to change its loan origination and underwriting process only after the Federal Reserve instituted the MOU in September 2009. Indeed, the very need for that MOU and the extent of the sweeping changes to the Bank's

underwriting and other operations the MOU implemented establishes that Wilmington's underwriting procedures were, at best, materially flawed and, for all practical purposes, nonexistent. According to CW 2, CW 4, and CW 12 (an Administrative Assistant/Loan Documentation Preparation Specialist from 1999-2009), the changes required by the MOU included firing several major lenders and relationship managers who had exposed the Bank to significant credit risk, including Employees A, B, and C (each discussed above) and two additional loan officers, Employees D and E. According to CW 7, a former legal assistant in the Commercial Banking group from 2005 to September 2007, these dismissals were a "shock[ing]" development, because some of these same lenders and relationship managers had previously been "praised" by Wilmington's management, in particular Employee C, who was management's "right hand man."

### D. The Officer Defendants Rendered Wilmington's Credit Risk Management Ineffective

61. The CRE Interagency Guidance issued by Wilmington's regulators emphasized that one of the Bank's "critical" functions was to monitor the credit risk of the borrowers over the life of the loan. During the Class Period, the Bank claimed to "monitor the portfolio to identify potential problems and to avoid disproportionately high concentrations in any single industry sector or to any one borrower." Such statements were materially false and misleading. Indeed, the fact that Wilmington did not adequately monitor the quality of its portfolio during the Class Period is established by the Federal Reserve MOU, which required Wilmington to establish a "board-approved loan review policy that specifically defines, identifies and categorizes problem assets and sufficiently assesses the overall quality of the loan portfolio."

62. The Bank maintained an Asset Review Group (part of the Credit Risk Management Division) that was supposed to conduct quarterly reviews of the Bank's portfolio to

assess increasing risk from market shifts and changes in borrowers' credit and to determine appropriate reserves for loan losses. According to the Bank's SEC filings, the Bank's internal risk rating system classified the commercial loan portfolio into four categories of risk:

- **Pass**: Loans with no current or potential problems;
- **Watchlisted**: Accruing loans that are potentially problematic;
- **Substandard**: Accruing or nonaccruing loans with some probability of loss; and
- **Doubtful**: Nonaccruing loans with a high probability of loss.

63. The purpose of the risk ratings was purportedly to assign a rating to each loan that correlated to the amount of loan loss reserves set aside for potential losses on the loan, as well as the likelihood that some portion of the loan amount would be "charged off" because the Bank could not expect to receive the full amount of the loan's principal.[3] In reality, the Officer Defendants prevented the Assert Review Group from scrutinizing the Bank's portfolio and manipulated risk ratings to conceal the Bank's exposure to high-risk loans.

64. Beginning well before the start of the Class Period, Wilmington's Credit Risk Management Division – and the Asset Review Group in particular – failed to meet even the most basic standards of loan review, much less the "rigorous" and "under[a] microscope" level of review that the Bank touted to investors. In fact, until mid-2008, the Asset Review Group lacked a dedicated manager. According to CW 2 and CW 8 (a former Director of Internal Audit who left in June 2008), the manager of the Asset Review Group left in 2006 and the Bank – including Defendants Cecala and Gibson – knowingly left that critical risk management position vacant until mid-2008 when CW 2 assumed that position, despite repeated warnings from Federal Regulators, KPMG, and Internal Audit that the Bank's asset review function was inadequate.

[3] The inadequacy of the Bank's loan loss reserves is discussed in Section III.G.1, *infra*.

65. The Officer Defendants also undermined the Bank's risk management objectives by providing minimal staffing for its Asset Review Group, which prevented the Group from performing regular thorough reviews of the portfolio. According to CW 2, Federal Regulators criticized the lack of staff in the Asset Review Group and, in the Federal Reserve MOU, demanded appropriate staffing and management levels be dedicated to the review of Wilmington's portfolio. According to CW 6, the "lack of manpower" in the Asset Review Group "had been an ongoing issue forever," and it was a running joke at Wilmington that the Bank stated it would increase the staff for the Group, but never did. In fact, according to CW 2, although Wilmington's commercial loan portfolio averaged ***$6.4 billion*** in 2008, Wilmington's Asset Review Group only had 4-5 employees (out of roughly 3,000 Bank employees) to review the entire portfolio and determine the appropriate loan loss reserves. Stated differently, the Bank effectively had ***0.17%*** of its employees reviewing the Bank's operations that produced over ***70%*** of the Bank's revenue. As a result, according to CW 2 and CW 8, Wilmington annually reviewed only a small percentage of its portfolio for credit risk, contrary to the Bank's claims in its SEC filings that it "regularly reviewed" its loan portfolio, Defendant Cecala's statement that Wilmington "evaluate[d] [its] portfolio each quarter through an independent review function," and Defendant North's statement that Wilmington's loans were "put under a microscope." According to CW 6, the larger the Bank's portfolio grew, "the tougher and tougher it was to get deeper and deeper" into a review of the portfolio. Many of the smaller loans in Wilmington's portfolio were never reviewed at all, which CW 6 described as a "crime" because those small loans constituted a significant portion of the Bank's portfolio such that, "if a lot of smaller loans go bad, it adds up." CW 8 corroborated the fact that Wilmington failed to review smaller loans in its portfolio because Wilmington only reviewed the larger credits in the portfolio, which left a

large portion of the portfolio uninspected.

66. In fact, in 2007 and 2008, KPMG (Wilmington's outside audit firm), Federal Regulators, and Wilmington's Internal Audit criticized the Bank's failure to review its loan portfolio. Specifically, according to CW 2, in connection with its 2007 audit of the Bank, KPMG sent a "Management Letter" to the Officer Defendants and other senior management to address the lack of coverage and review of the Bank's loan portfolio. Management letters communicate internal control deficiencies identified by independent auditors during their audit procedures. The Officer Defendants ignored KPMG's warnings in the 2007 Management Letter and, in connection with its audit for the 2008 fiscal year, KPMG determined that Wilmington still had not addressed its dangerously inadequate portfolio review coverage and forced the Bank to delve deeper into the portfolio to update loan ratings. Despite KPMG's instruction to expand the portfolio review, even the review conducted in response to KPMG's 2008 finding of deficiency reached just 30% of Wilmington's total portfolio. According to CW 2, KPMG's audit manager, Romina McMahon, "led the charge" into KPMG's 30% review of Wilmington's portfolio, demonstrating that forces outside Wilmington had to take the lead for even a partial portfolio review to be conducted.

67. Further, CW 2 reported that the 2007 and 2008 reviews by Federal Regulators concluded that Wilmington's Asset Review Group was understaffed and inadequate to provide a reasonable assessment of portfolio risk. At the end of 2007, Federal Regulators highlighted these problems as "***weaknesses in the control structure***" at Wilmington.

68. Finally, according to CW 8, by no later than the Fall of 2007, Wilmington's Internal Audit group issued a report highlighting that the Bank's Asset Review Group was understaffed and that the percentage of the portfolio reviewed (roughly 10-15% of the total

portfolio) was insufficient. This report, like all Internal Audit reports, was transmitted to Defendants Cecala, Gibson, Harra, and North, as well as the Audit Committee of the Board of Directors. However, recognizing the futility of such warnings to the Officer Defendants, CW 8 described the Internal Audit function at Wilmington as futile "barking in the wind."

69. Even the steps that the Officer Defendants took to give the appearance of strengthening the Asset Review Group were undermined by the Officer Defendants' active obstruction of the Group's function. For example, as the housing market decline deepened in 2008, CW 2 proposed to the Officer Defendants that Wilmington implement internal controls over credit risk management to better assess the Bank's risk exposure in an increasingly risky lending environment. CW 2's proposed measures included appointing CW 2 as a manager over the Credit Risk Management Division (encompassing the Asset Review Group) and increasing the percentage of the portfolio reviewed for credit risk. Even though CW 2 was ultimately placed in charge of the Credit Risk Management Division and the other proposed changes were nominally implemented, the Officer Defendants interfered in the operations of the Asset Review Group to ensure that the relationships they had built with Bank clients would not be sacrificed in the name of risk management.

70. Specifically, according to CW 2, despite the fact that the changes proposed by CW 2 documented the heightened risks in Wilmington's loan portfolio, the Officer Defendants prevented the Asset Review Group from downgrading loans to reflect those risks. Indeed, notwithstanding CW 2's nominal control over the Group, all changes to loan ratings – and, in particular, all loan rating downgrades – still had to be approved by Defendants Cecala and Harra, who were increasingly combative in rejecting proposals to downgrade loan ratings, as well as Defendant Gibson, to whom the Credit Risk Management Division reported. Even before the

Class Period, CW 6 confirmed that the Asset Review Group had had ratings overturned "by somebody higher than us" and felt there was pressure from management to be "quick to upgrade, slow to downgrade." After CW 2 took over the Credit Risk Management Division and the Asset Review Group, Defendants Cecala and Harra became much more involved in the work of that Division to maintain their control (and veto power) over which loans, if any, were downgraded or charged off. Under CW 2's management, the Asset Review Group met during the last two weeks of each month to discuss loan rating changes, charge off decisions, credit risk review, and to make recommendations for the loan loss reserves. Defendant Gibson and CW 2 had always attended these meetings. According to CW 2, Defendants Cecala and Harra "interjected themselves physically" into these meetings to "challenge the conclusions that were made" by members of the Asset Review Group.

71. Indeed, Cecala's and Harra's approach for dealing with Wilmington's borrowers followed the Bank's "friends and family" model of assuming long-time clients would make good, regardless of the actual credit risk. For example, CW 2 explained that in response to proposals to downgrade problem loans, Cecala and Harra would routinely object on the grounds that "these are good guys" or "we are not going to get hurt by this client" regardless of the specific credit risks identified by the Asset Review Group. Defendants Cecala and Harra would demand that the Group not make any downgrades to these loans but "just make it better." The Asset Review Group was forced to pick its battles with the Officer Defendants to fight for a loan downgrade or charge off – battles that were generally won by the Officer Defendants. According to CW 2, because of the participation of Cecala and Harra, the Asset Review Group meetings often got "very heated."

72. The Officer Defendants' obstruction of the work of the Asset Review Group

directly contravened the Bank's SEC filings, which stated that once a loan was ninety-days delinquent in payments, it would be recorded as a non-accrual loan. Non-accrual loans are those loans that are so delinquent that the Bank stops recording interest from the loan. Nonetheless, as the below examples demonstrate, Defendants Cecala and Harra repeatedly refused to allow the Asset Review Group to recognize the non-accrual status of even the most delinquent loan – regardless of the size of the loan. CW 2 recounted a monthly Asset Review Group meeting in 2009 when CW 2 recommended downgrading a $9,000 loan on which the borrower was 150 days delinquent. According to CW 2, the proposed rating downgrade on this relatively insignificant loan triggered a twenty-minute debate with Defendant Harra, who emphatically rejected attempts to downgrade the loan.

73. Similarly, and with a much more dramatic impact on Wilmington's portfolio and loan loss reserves, CW 2 recounted a meeting in the second quarter of 2009 that addressed a group of loans totaling $79 million to a prominent residential real estate developer in southern Delaware. At that meeting, Defendant Cecala refused to allow the Asset Review Group to place the majority of those loans on non-accrual status. The Asset Review Group determined that the loans requiring downgrade were based on outdated appraisals – an ongoing and systemic problem at Wilmington – and that 80% of the loans should be placed on non-accruing status. After an "hour-plus" discussion with Defendant Cecala, and with Defendants Harra and North in attendance, Cecala insisted that the loan rating not be changed. CW 2 said that there was no choice but to "stand down" and acquiesce to Defendant Cecala's demands. Although Defendant Gibson was not present for this debate, CW 2 stated that the decision was conveyed to him later and the decision remained intact.

74. The policy employed by the Officer Defendants – refusing to downgrade past-due

loans in the hope that borrowers, if given more time, would be able to repay their obligations – is known derisively in the banking industry as "extend-and-pretend." As CW 8, who served as Director of Internal Audit for eleven years ending in June 2008, reported, "I saw time and time again where they would ride with a customer longer than they should have." According to CW 8, there were "numerous loans" Wilmington lost money on because they waited too long "before they pulled the trigger."

75. Defendants Cecala, Gibson, and Harra further undermined the Asset Review Group by restricting the information that could be reported to the Board of Directors and to investors regarding the credit quality of Wilmington's loan portfolio. According to CW 2, all reports CW 2 made to the Board had to be reviewed by Defendant Harra and would invariably be "sanitized" before the Board received it, to prevent CW 2 from raising red flags to the Board. CW 8 reported that, before CW 8's departure in June 2008, Internal Audit repeatedly raised concerns to the Officer Defendants regarding the reporting hierarchy of the Credit Risk Management Division because the Division reported directly to Gibson, who was focused on generating sales and profits rather than managing credit risk. CW 8 stated that, when Internal Audit raised these concerns to Defendant Gibson, he merely responded, "that's how it's always been," and refused to change the reporting structure.

76. Throughout the Class Period, rather than adequately staffing an independent asset review department to accurately and thoroughly assess and address the risks in Wilmington's portfolio, the Bank instead relied upon the lending personnel who originated the loans to monitor the borrowers' performance and bring any concerns to senior management's attention. Accordingly, the responsibility for managing credit risk fell upon many of the same major relationship managers who, as discussed above, disregarded prudent underwriting standards in

order to close more loans and maintain relationships. The Bank's reliance on loan officers to manage credit risk was akin to asking a fox to guard the henhouse.

77. According to CW 2, the Bank's incentive compensation system actually ***disincentivized*** loan staff from downgrading loan status to substandard because, if a loan was designated "substandard," then the bonus compensation for the loan officer responsible for originating that loan would be similarly downgraded. CW 2 could not recall a loan officer ***ever*** voluntarily or independently downgrading a loan.

78. Wilmington and the Officer Defendants continued to subordinate its bare-bones Asset Review Group to sales concerns even in the face of growing alarms regarding the repayment potential of some of the Bank's largest borrowers. By 2008, according to CW 2, there were definitely "signs of strain" in the portfolio. CW 6 recalled that even before the financial crisis heated up in 2007 and 2008, Wilmington internally recognized that business was slowing down, projections were not being met, and customers were increasingly asking for more time to pay (for example, for a moratorium for six months during which time the borrower would only pay the interest on the loan).

79. Although the Officer Defendants ensured that the formal portfolio review process was hobbled so that no downgrades that might imperil their client relationships, the troubles of Wilmington's borrowers were widely known within the Bank. In fact, CW 9, a Vice President in commercial lending who left in October 2010 after thirty-four years with the Bank, explained that prior to the close of each quarter during the Class Period, Defendant North circulated a "Delinquency List" that listed loans past due, the number of days past due and the lending officer for the loan. Defendants Cecala, Harra, and Gibson all received this list each quarter, as did Wilmington's General Counsel. Similarly, CW 10, who served as a Corporate Development

Officer for Wilmington from March 2006 through 2008, recalled internal discussions regarding developers "in trouble" and that many of the big construction builders holding loans from Wilmington were beginning to go into default. CW 9 was "astounded" at the "magnitude of the loans that were bad" during the Class Period. CW 6 said that, internally, employees were instructed not to worry about loan defaults from these major borrowers because many of them were "old time borrowers" and Wilmington was going to give them a moratorium and wait to see if they could turn around their companies.

80. The statements of these witnesses are corroborated by the Officer Defendants' own admissions. When Defendant Foley announced that Wilmington had agreed to a "take under" by M&T Bank on November 1, 2010 – at half of the Bank's stock price the last trading day before the announcement – he admitted that, with respect to single family residential builders, ***beginning in 2008*** "***the Delaware market for that particular type of housing dried up completely***." Moreover, the contemporaneous data corroborates Defendant Foley's conclusion. For example, the number of workers employed in construction in Delaware – a key factor for evaluating the strength of the customers who took construction loans from Wilmington – began a steady decline in late 2007 that dramatically accelerated in 2008 and continued through 2010:




*Source*: United States Bureau of Labor Statistics

81. Contrary to the Officer Defendants' repeated statements that Delaware was not suffering the same housing price declines as the rest of the nation, Delaware in fact generally tracked national housing price movement. The declines in housing prices in Delaware significantly and negatively affected the value of the underlying collateral of the single family residential developments that were the Bank's primary focus:




*Source*: United States Federal Housing Finance Board quarterly data on sales of new and existing homes for the State of Delaware and the United States; cumulative growth since 2001

82. In light of these and other clear indicators of a dramatically declining market, the decision by the Bank and the Officer Defendants to minimize the role of the Asset Review Group was, at a minimum, reckless.

83. In fact, an internal Bank document dated October 9, 2009 and entitled the "Wilmington Trust Compliance Plan and Report" (the "MOU Compliance Plan and Report") details fundamental flaws in the Bank's asset review function that existed throughout the Class Period. Specifically, the Federal Reserve MOU sought to revamp all loan review policies and to ensure all of the loans were reclassified in accordance with those policies and that the Board of Directors received reports on what portion of the loan portfolio was in distress. According to the MOU Compliance Plan and Report, Wilmington was required to impose a "***board-approved loan review policy that specifically defines, identifies and categorizes problem assets and sufficiently assesses the overall quality of the loan portfolio***," as well as to "***reclassify loan***

***relationships in accordance with revised loan review policy*.” The need for this remedy demonstrates that Wilmington lacked basic loan review policies during the Class Period. Moreover, a “credit review coverage analysis” was to be reviewed every quarter with the Board, as well as “Asset Improvement Plans” for each lending relationship that was greater than 90 days past due, and which included a thorough description of the borrower and the possibilities of repayment. These changes were needed to prevent the Officer Defendants from personally interfering in loan rating and charge off decisions – conduct that helped trigger the Federal Reserve MOU.

**E. Wilmington Operated With Significantly Outdated Appraisals**

84. Accurate appraisal values are critical to commercial real estate credit review, especially those that are entirely collateral dependent, as declines in collateral value have an immediate impact on the possibility of repayment of the loan and the recoverability of amounts loaned. According to the Interagency Appraisal and Evaluation Guidelines, regulated institutions such as Wilmington “should monitor collateral risk on a portfolio and on an individual credit basis.” The Bank’s outdated appraisals affected both the risk rating Wilmington assigned to collateral-dependent loans and the amount and timing of write-downs on the balance sheet – as the market deteriorated, these write downs were required in earlier quarters, but the Bank delayed taking them until the third quarter of 2010.

85. According to Wilmington’s SEC filings in the second half of 2009 and throughout 2010, the Bank purportedly “obtain[ed] updated valuations, regardless of loan size, any time [its lenders] believe[d] there ha[d] been an obvious and material deterioration in market conditions, project performance, or physical aspects of the property itself that could jeopardize [the Bank’s] collateral position.” As market prices deteriorated during this period, and all factors pointed to a decline in real estate values, Wilmington should have obtained timely updated appraisals to

accurately assess the collateral risk in its portfolio. The Bank and the Officer Defendants knowingly failed to do so.

86. Indeed, even as the economy took a nose dive, housing values declined, and construction dried up in Delaware, the Officer Defendants refused to update the appraisals for Wilmington's portfolio of real estate construction loans. When the Bank finally updated its appraisals in 2010, it was forced to take a write-down of hundreds of millions of dollars. Chick Pinto, Senior Vice President of Corporate Marketing and Communications at Wilmington, admitted to the *News Journal* in an April 17, 2011 article that going back to the borrower to ask for "more recent appraisals" ***was not the Bank's "preferred way of doing things . . . . it wasn't the nature of how we did things."*** Once again, Wilmington's choice to value the "relationship" above portfolio quality exposed the Bank to excessive risk. Specifically, according to CW 2, because the appraisals were paid for by the client, they were thought of as an unnecessary burden to place on Wilmington's "friends and family."

87. The issue was so severe that, according to CW 2, the Federal Regulators regularly raised concerns regarding the out-of-date appraisals for Wilmington's loan portfolio. According to CW 2, Wilmington's appraisals were "almost always outdated" – a widely known and "common issue" identified by the Asset Review Group during their meetings. As noted above, Defendants Cecala, Harra, Gibson, and North each typically attended and actively participated in the Asset Review Group's monthly working group meetings where the issue of outdated appraisals was frequently discussed. The appraisal problem was also confirmed by CW 6, who stated that it was "always a battle" to get current financial information about loans, that difficulty obtaining up-to-date appraisals was a "wide-spread phenomenon" at Wilmington, and that, because Wilmington's appraisals (and other financial documents) were outdated, reviewing the

documents that Wilmington maintained was "worthless."

88. In fact, outdated appraisals were such an issue for the Asset Review Group that, according to CW 2, one of the other members of the Asset Review Group actually maintained a lengthy list of the outdated appraisals and would remind Wilmington's appraisal staff on a quarterly basis that updated appraisals were needed. At quarterly meetings to discuss large credit exposures and emerging problems called "Credit Strategy Meetings," risk management staff repeatedly raised the urgent need for updated appraisals on a loan by loan basis. These meetings were attended by Defendants Cecala, Harra, Gibson, and North and, indeed, were scheduled to accommodate Defendants Cecala's and Harra's availability. That Senior management was aware during the Class Period that the value of the Bank's loan portfolio was plummeting, is also demonstrated by the fact that, when pushed by the head of Wilmington's workout group to sell problem loans in the marketplace, the Bank declined, recognizing that the loans would only sell at "fire sale" prices, according to CW 2. However, risk management staff's urgings were ignored and Wilmington did not begin to update its appraisals until 2010.

89. According to CW 2, when Wilmington obtained updated appraisals for its impaired loans, this often triggered large write-downs on those loans. In fact, as discussed further below, when Wilmington brought in a third party in the second quarter of 2010 to help review the portfolio and update collateral values, these updated appraisals triggered massive write-downs. According to a November 2010 *Wall Street Journal* article, over the summer of 2010 "examiners from the Federal Reserve Bank of Philadelphia discovered that the [Bank] wasn't writing down the value of loans made to borrowers whose real-estate projects had stumbled . . . ***Regulators ordered new appraisals on the properties and began evaluating how much they were worth. The results devastated the bank's balance sheet, forcing it into the fire***

***sale to M&T Bank Corp*.”**

### F. In 2009, Federal Regulators Issued A Memorandum Of Understanding Identifying Serious Failings In The Bank’s Credit Risk Management, Lending, And Accounting Functions

90. In 2009, after discovering that the serious systemic flaws in Wilmington’s risk management function had not been corrected despite the Federal Regulators’ warnings in 2007 and 2008 and KPMG’s Management Letter and deep dive review in 2008, the Federal Reserve issued a Memorandum of Understanding to Wilmington in September 2009 (defined above as the “Federal Reserve MOU”). According to the Federal Reserve’s Commercial Bank Examination Manual, an MOU is “generally used when a bank has multiple deficiencies that the Reserve Bank believes can be corrected by the present management.” That Manual also provides that MOUs are one of the most serious weapons in the regulators’ arsenal and are typically issued only when “other more routine measures such as formal discussions with a bank’s principals or directors, and normal follow-up procedures, have failed to resolve supervisory concerns.” Although the Federal Regulators had issued regular and escalating criticisms of Wilmington in the 2007-2008 exams, according to CW 2, Federal Regulators finally issued the Federal Reserve MOU because of “a significant volume of risk rating changes and process weakness in general.” Implementation of the Federal Reserve MOU forced the Bank to change the way it did business and fundamentally restructure its risk management, lending, and accounting functions.

91. The MOU Compliance Plan and Report details the sweeping changes required by the Federal Regulators in the Federal Reserve MOU concerning, among other subjects, the Bank’s “Loan Review, Credit Policy, Credit Analysis and Lending,” “Capital Plan,” “Asset Improvement,” and “Allowance for Loan and Lease Losses” (*i.e.*, Loan Loss Reserves), as well as the Bank’s proposed response(s) for each. For each of these major areas, the Federal Reserve

identified serious and systemic failings. Therefore, the Federal Reserve required that for each of these areas, Wilmington "establish [an] appropriate organization structure;" "identify appropriate management and staffing levels;" "describe responsibilities" of the respective function; and "ensure staff training." The extensive changes that the Federal Regulators demanded to bring Wilmington's lending risk management and accounting functions up to even basic standards – including, for example, requiring Wilmington to "***establish*** a process to monitor compliance with [credit] policies and procedures" – demonstrates that each of these functions were at best materially deficient and at worst effectively non-existent during the Class Period.

92. Further, the Federal Reserve MOU demanded dramatic changes to the Bank's credit risk management organization. According to CW 2, echoing Internal Audit's criticisms from two years before, the Federal Regulators objected to the fact that Wilmington's credit risk department reported to the CFO, Defendant Gibson, because they felt he was too tied into the profitability of the company. Thus, the Federal Regulators required that the Asset Review Group report directly to the Audit Committee of the Board of Directors. Similarly, the Federal Regulators demanded that credit analysts – who, as discussed above, reported to lenders on the sales side of Wilmington – be segregated from the Bank's loan origination function. As a result, the Bank eventually changed the reporting structure for credit analysts to report directly to Rich Conway, the COO for the mid-Atlantic market, rather than to sales-side regional sales managers. The need for this change cited in the MOU highlights the critical risk inherent in having loan officers supervise credit analysts, and in that regard the MOU corroborates the statements of the witnesses cited herein.

93. The Federal Reserve MOU also called for the Bank to create coherent policies to govern the Bank's risk management process going forward, and thus demonstrates the absence of

such important policies during the Class Period. Indeed, according to CW 2, the Bank's practices had been a "mishmash" of information and there was no "codification of the roles of credit risk management." According to the MOU Compliance Plan and Report, the revised credit policies were to include such items as: "underwriting standards, guidelines and quantifiable limits for commercial real estate, commercial and industrial"; "standards for documentation exception tracking and monitoring system"; "lending authorities reflective of staff experience and commensurate with risk of the credit extension"; and "uniform standards for presenting loans to the loan committee."

94. Under the Federal Reserve MOU, Wilmington was also charged with ensuring that the Loan Loss Reserve (discussed in detail below) was fully funded and that the provision recommendations were directly reported to the Audit Committee of the Board of Directors. Again, the fact that the Federal Reserve was forced to impose an MOU to ensure that this essential, fundamental function was achieved demonstrates that Wilmington lacked an adequate reserving function during the Class Period. This is confirmed by CW 2, who explained that, before implementation of the Federal Reserve MOU, the Asset Review Group calculated loan loss reserves which were then approved by Defendants Cecala and Gibson before being presented to the Board of Directors. According to the MOU Compliance Plan and Report, going forward, Wilmington would be required to "***maintain an adequate [Loan Loss Reserve] consistent with GAAP and regulatory policy and regulatory policies and guidance***" and to "***[f]ully fund [the Loan Loss Reserve] considering additional adversely classified credits from the updated internal loan rating system***." The adequacy of the Loan Loss Reserve and its compliance with GAAP was to be reviewed each quarter going forward with the Board. In addition, Wilmington was required to draft a "capital plan" with a focus on adequacy of capital

considering "credit concentration" and the Loan Loss Reserve.

95. Finally, the Federal Reserve MOU called for an appointment of a compliance committee to oversee the Federal Reserve MOU, to which the Board of Directors appointed itself.

96. Although the Bank was attempting to implement the terms of the Federal Reserve MOU in March 2010, according to CW 2, its belated attempts to create an effective risk management structure were "too late" to solve the serious issues buried in the Bank's portfolio. In fact, according to CW 2, the standard duration of an MOU is to be in place until the problems are addressed, and the Federal Reserve told Wilmington that it would be under the Federal Reserve MOU for two years. Tellingly, even these dramatic changes were not sufficient to satisfy the Federal Regulators that the Bank would be able to meet its safety and soundness requirements without even more "increased regulatory oversight." According to the Bank's proxy issued to shareholders in connection with the vote on the merger with M&T Bank, following the 2010 regulatory exam, in August 2010, Federal Regulators instituted a series of additional measures that further removed control from the Officer Defendants over the Bank's internal affairs. This "increased oversight" included a prohibition on Wilmington appointing any directors or senior executive officers, or making any severance payments to former directors or staff members without prior approval from its regulators. Subsequently, in October 2010, the Federal Regulators forbade Wilmington from issuing a dividend in the third quarter of 2010.

97. In sum, the Federal Regulators in the Federal Reserve MOU established the existence of fundamental and systemic infirmities in Wilmington's risk controls, including related to underwriting, credit review, and accounting for loan losses. The very existence of these infirmities in the Bank's primary risk management functions demonstrates that the Officer

Defendants lacked any basis for the misstatements addressed herein. Moreover, when the Bank, at the Federal Reserve's direction and under their increasing supervision, finally attempted to correct these issues in 2010, it exposed the true risk in the Bank's portfolio. As discussed below, this led to massive writedowns in the second and third quarters of 2010 and drove the Bank to agree to be sold at a fire sale price to M&T Bank in November 2010. By concealing the Bank's problems and deferring the writedowns throughout the Class Period, the Officer Defendants artificially maintained the price of Wilmington's stock even as scores of other banks around the nation collapsed, thereby defrauding Lead Plaintiffs and the Class.

### G. Wilmington's Financial Statements Violated GAAP And SEC Regulations Prohibiting False And Misleading Public Filings

98. Wilmington, in reporting its financial results during the Class Period, made numerous false statements of material fact and omitted to state material facts necessary to make its reported financial position and results not misleading. As set forth below, Wilmington published financial statements and information that violated generally accepted accounting principles ("GAAP") and SEC Regulations.

99. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices. The SEC has the statutory authority to promulgate GAAP for public companies, and has delegated that authority to the Financial Standards Accounting Board ("FASB").

100. The SEC requires public companies to prepare their financial statements in accordance with GAAP. In fact, as set forth in SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)), financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures. SEC Regulation S-X (17 C.F.R. § 210.10-01(a)(5)) also requires that interim financial statements

comply with GAAP and "shall include disclosures either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim information presented not misleading."[4]

101. During the Class Period, Wilmington's accounting violated fundamental principles of GAAP and SEC regulations. Specifically, in furtherance of their efforts to disguise the negative impact that the deteriorating credit quality of the Bank's commercial loans was having on the Bank's financial condition, Wilmington and the Officer Defendants (i) improperly accounted for probable losses and impairment present within Wilmington's loan portfolio by materially understating Wilmington's reserve for loan losses, and thereby overstated Wilmington's total assets, net income, and earnings per share; (ii) materially misstated the fair value of its loan portfolio; and (iii) improperly delayed the recognition of a necessary valuation allowance that would have offset (and thereby reduced) a significant deferred tax asset and reduced earnings. These GAAP violations were made possible through the Bank's lack of adequate and effective internal controls relating to underwriting, measuring credit risk, and accounting for known and/or probable losses in Wilmington's loan portfolio.

### 1. The Officer Defendants Knowingly Or Recklessly Under Reserved For The Declining Credit Quality Of The Bank's Loans

102. Longstanding and fundamental GAAP precepts required Wilmington and the Officer Defendants to establish a reserve (the "Loan Loss Reserve"), sometimes called an

[4] In June 2009, the FASB issued SFAS No. 168, "The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles" ("SFAS No. 168"), which was incorporated into ASC 105, "Generally Accepted Accounting Principles." SFAS No. 168 established the FASB Accounting Standards Codification as the single source of authoritative United States accounting and reporting standards, excluding the requirements and guidance issued by the SEC, which were unaffected by the Codification. SFAS No. 168 did not change current GAAP principles or rules. It only changed the manner in which accounting literature is organized and referenced. Both the originally issued standards and the new codification are referenced throughout this section.

"allowance for loan and lease losses," for probable and estimable credit losses resulting from the Bank's borrowers defaulting on their obligations.

103. As a lender, Wilmington was charged with ensuring that its Loan Loss Reserve was, at all times and especially as reported in quarterly and annual financial statements, adequate to reflect probable losses present in the loan portfolio, and reflective of historical experience with the portfolio, current economic factors, and/or adverse changes in risk ratings. However, Wilmington did not adequately address or account for known and/or probable loan losses in its portfolio during the Class Period. This failure manifested itself in two ways: (a) surprise "catch up" charges in 2010 to increase the Loan Loss Reserve once Federal Regulators forced Wilmington to record and recognize the probable losses in its portfolio, and (b) Wilmington's desperate sale to M&T Bank at a substantial discount in a deal that valued the losses in the Bank's loan portfolio at $500 million dollars more than the Bank acknowledged.

**a. GAAP and Other Governing Accounting Standards Established Clear Rules Concerning How Wilmington Should Have Reserved for Loan Losses**

104. Wilmington's Loan Loss Reserve was a critical metric for investors, for which management was directly responsible. As described in a December 2006 "Interagency Policy Statement on the Allowance for Loan and Lease Losses," issued jointly by the Regulatory Agencies (defined above as including Wilmington's regulators the Federal Reserve System and the FDIC) and the OTS, and which was in effect throughout the Class Period:

> The [Loan Loss Reserve] represents ***one of the most significant estimates*** in an institution's financial statements and regulatory reports. Because of its significance, each institution has a responsibility for developing, maintaining, and documenting a comprehensive, systematic, and consistently applied process for determining the amounts of the [Loan Loss Reserve] and the provision for loan and lease losses (PLLL). To fulfill this responsibility, each institution should ensure controls are in place to consistently determine the [Loan Loss Reserve] in accordance with GAAP, the institution's stated policies and procedures, management's best judgment and relevant supervisory guidance.

105. The Bank's Loan Loss Reserve was reported on the Bank's balance sheet as a reduction to assets. The Loan Loss Reserve was meant to reflect, at any point in time, the expected (*i.e.*, probable) and estimable losses in the Bank's portfolio of loans and, therefore, to serve as a current estimate of those losses. As the Bank determined that loans were not recoverable and charged them off, the amount of those loans was removed from the balance sheet and absorbed by the Loan Loss Reserve. As such, the Loan Loss Reserve needed to be sufficient at all times to cover probable and estimable losses. In order to properly account for the worsening credit quality and deficient loan origination practices of its loan portfolio, Wilmington was required under GAAP to record periodic increases to the Loan Loss Reserve (which Wilmington referred to as its "provision for loan losses") to reflect its current estimate of probable credit losses.

106. The provision for loan losses was not meant to correlate with loans that were charged off in the present quarter. Rather, GAAP recognizes that lenders are able to identify signs of impairment well before a loan is actually charged off, whether through the bank's knowledge of the borrower's future cash flows, or through economic trends that are likely to negatively affect the borrower's ability to pay the loan in accordance with the terms of the loan, including declining values for the collateral underlying the loan.

107. Thus, the governing accounting literature speaks to "accounting for a loss contingency" rather than the actual charge off of the loan. Under GAAP, a provision for loan losses (*i.e.*, an increase of the Loan Loss Reserve) is recorded as an expense, which reduces pre-tax earnings on a dollar-for-dollar basis. However, a provision for loan losses is not an irreversible admission of a loss. If a bank records a provision for losses that were probable at the time, but a change in circumstances render the loss unlikely and, as a result, the Loan Loss

Reserve is overstated, the bank will then record an increase in income. Thus, adjustments to the Loan Loss Reserve are directly linked to net income and a bank's earnings per share.

108. Wilmington repeatedly represented that it accounted for its Loan Loss Reserve for its loan portfolio in accordance with longstanding GAAP. Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies" ("FAS 5," under SFAS No. 168 "ASC Topic 450"), which was enacted in July 1978, requires that estimated losses from loss contingencies, such as losses from uncollectible loans, should be recorded in the provision for loan losses and accrued by charges to income (*i.e.*, expenses) when two criteria are met: (1) based on information available prior to the issuance of the financial statements, it is probable ("likely to occur") that the loans were impaired (or liabilities have been incurred) at the date of the financial statements, and (2) the amount of the losses can be reasonably estimated.

109. Statement of Financial Accounting Standards No. 114, "Accounting By Creditors for Impairment of a Loan" ("FAS 114," under SFAS No. 168, ASC Topic 310), was issued in May 1993 to clarify that it is probable that a loan has been impaired (the first prong of FAS 5) when, based on current information and events, it is probable that the entity will be unable to collect all amounts due (including both interest and principal payments) according to the contractual terms of the loan agreement (other than immaterial delays or shortfalls). FAS 5 provides that these conditions may be considered in relation to individual loans or to groups of similar types of loans, and that a provision to the Loan Loss Reserve should be made even if particular loans that are uncollectible are not individually identifiable.

110. Additionally, Financial Accounting Standards Board ("FASB") Interpretation No. 14, "Reasonable Estimation of the Amount of a Loss" ("FIN 14," under SFAS No. 168, ASC Topic 450), was issued to clarify that a loss can be reasonably estimated (the second prong of

FAS 5) when information available indicates that the estimated amount of loss is within a range of amounts. In other words, Wilmington was not allowed to delay accrual of a loss until only a single amount could be reasonably estimated.

111. If there was at least a reasonable possibility that a loss would be incurred but one or both of the two conditions of FAS 5 was not met (*i.e.*, if it is not probable that the loan has been impaired and/or the amount of such impairment cannot be reasonably estimated), or if the Bank was exposed to losses in excess of the amount already accrued, then FAS 5 required Wilmington to disclose this additional loss contingency in the footnotes to its financial statements. Such disclosure should have indicated the nature of the contingency and given an estimate of the possible loss or range of loss, or stated that an estimate of loss could not be made. Wilmington failed to make any such disclosure during the Class Period related to the hundreds of millions of dollars in losses that were resident in its portfolio during this period.

112. FAS 114 and FASB's Emerging Issues Task Force Appendix D – Other Technical Matters, No. 80, "Application of FASB Statements No. 5 and No. 114 to a Loan Portfolio" ("EITF D-80," under SFAS No. 168, ASC Topic 310) provide that all available evidence reflecting past events and current conditions should be considered when calculating the Loan Loss Reserve and related provisions, including (1) credit quality, (2) current trends (*i.e.*, economic or in customer behavior), and (3) existing "environmental" factors such as industry, geographical, economic, and political factors that are relevant to the collectability of loans and indicate that it is probable loans are impaired at the date of the financial statements.

113. The SEC also provides direct guidance on the proper accounting for loan losses. SEC Staff Accounting Bulletin ("SAB") No. 102, "Selected Loan Loss Allowance Methodology and Documentation Issues" ("SAB 102"), which was issued in July 2001, several years before

the Officer Defendants' improper activities at issue here, states in pertinent part: "It is ***critical*** that loan loss allowance methodologies incorporate management's ***current*** judgments about the credit quality of the loan portfolio through a ***disciplined and consistently applied process***." Therefore, pursuant to SAB 102, a loan loss allowance methodology generally should "***[c]onsider all known relevant internal and external factors that may affect loan collect[i]bility*** . . . [and] be based on current and reliable data[.]" SAB 102 expressly provides that "[f]actors that should be considered in developing loss measurements" include:

1. Levels of and trends in delinquencies and impaired loans;
2. Levels of and trends in charge-offs and recoveries;
3. Trends in volume and terms of loans;
4. Effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices;
5. Experience, ability, and depth of lending management and other relevant staff;
6. National and local economic conditions;
7. Industry conditions; and
8. Effect of changes in credit concentrations.

All of the foregoing measures were at issue with respect to Wilmington during the Class Period.

114. SAB 102 also approvingly references SEC Financial Reporting Release 28 §401.9 ("FRR 28"), "Accounting for Loan Losses by Registrants Engaged in Lending Activities" ("FRR 28") which was issued in December 1986 – over twenty years ago (and approximately 15 years before SAB 102 was issued). This longstanding principle states that "because the allowance for loan and lease losses and the related provision are ***key elements of financial statements of registrants engaged in lending activities, it is critical that those judgment[s] be exercised in a disciplined manner that is based on and reflective of adequate detailed analysis of the loan***

***portfolio***."

115. Further, it is not only events emerging subsequent to the origination of a loan that should be taken into account when determining the Loan Loss Reserve. Instead, as the American Institute of Certified Public Accountants' Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies" (the "AICPA Guide"), which was originally issued in 2004, instructs: "***if a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive . . . the loss should be recognized at the <u>date of loan origination</u>***." Therefore, because the quality of underwriting and internal controls surrounding the underwriting, credit granting, and other loan origination processes directly impact the quality of loans in a portfolio, they ***must*** be considered when determining the Loan Loss Reserve.

116. As discussed below, the Officer Defendants failed to appropriately consider the above factors in determining the provision for the Bank's Loan Loss Reserve, either when its loans were originated through faulty underwriting practices or as events emerged that rendered full repayment of the loans unlikely. Throughout the Class Period, Wilmington and the Officer Defendants knowingly or recklessly failed to disclose that they were deviating significantly from the requirements of the foregoing accounting standards. Instead, the Officer Defendants made materially false and misleading statements about the Bank's Loan Loss Reserve and the methodologies used to establish the Loan Loss Reserve.

**b. The Bank And Officer Defendants Under Reserved For Loan Losses Throughout The Class Period**

117. Rather than follow appropriate accounting standards for its Loan Loss Reserve, the Bank failed to apply even the most rudimentary of GAAP provisions (as reiterated by the Regulatory Agencies through their guidance) or to follow the SEC's guidance (as explained in

SAB 102). During the Class Period, Wilmington employed two distinct methodologies to calculate its Loan Loss Reserve, both of which violated GAAP and regulatory guidance. The Bank abandoned the first method in late 2008 as it was patently not in compliance with regulatory guidance. The later method, used for the remainder of the Class Period, was slightly more sophisticated on its face, but, as discussed herein, still violated fundamental GAAP principles. Indeed, under both methodologies, the Bank and Officer Defendants repeatedly failed to adequately increase its Loan Loss Reserve in light of the changing macroeconomic environment and its deficient loan origination practices and the related inability and unwillingness of its borrowers to repay their loans, as it was required to do.

118. During the Class Period, the Bank consistently claimed to account for shifting trends in economic factors in its primary markets and to account for the creditworthiness of its borrowers, as required by GAAP, when determining and recording its Loan Loss Reserve and, therefore, in valuing its loan portfolios. The Bank claimed from the beginning of the Class Period, as reported in its 2007 and 2008 Forms 10-K, to take into account "current micro- and macro-economic factors, historical net loss experience, current delinquency trends, movements within our internal risk rating classifications, and other factors."

119. These statements were false and misleading. Until late 2008, according to CW 2, the Bank and Officer Defendants calculated its Loan Loss Reserve in a manner that was not compliant with GAAP and/or regulators' standards. Rather than taking into account the factors surrounding the probability of loans being repaid – including economic trends and borrowers' present and future ability to repay loans – the Officer Defendants merely assigned percentage values to risk ratings in the Bank's loan portfolio, despite knowing or recklessly disregarding that assigned risk ratings were not always reflective of analysts' credit risk assessments, but

rather were imposed by senior management including Defendants Cecala, Harra, Gibson, and North to perpetuate Wilmington's false appearance as a "stable" and "conservative" institution. Thus, for those loans with "Pass" ratings, Wilmington assigned 1% of the value of those loans to the Loan Loss Reserve; loans on the "Watchlist" received 2% of their value; for "Substandard" loans that were still rated "accruing," the Bank assigned 15% of their value; and, finally, for those loans that the Bank viewed as "Doubtful" that they would be repaid, the Bank assigned 50% of their value to the Loan Loss Reserve.

120. This method was in direct violation of GAAP, especially in light of the volatile environment facing the real estate industry and associated lenders during the Class Period. As discussed above, FAS 114 and EITF D-80 – which were issued well before the beginning of the Class Period – provided that all available evidence reflecting past events and current conditions should be considered in developing the Bank's Loan Loss Reserve, including current trends and all existing "environmental" factors relevant to the collectability of the loan. Particularly where the Officer Defendants knew or should have known that the Bank was not actually thoroughly reviewing its loan portfolio (which was originated through extremely lax underwriting standards), thereby rendering its risk ratings dated, if not highly suspect, and concomitantly directly impacting the risk ratings assigned to particular loans in question, the Bank's crude arithmetic did not adequately assess the possibility of repayment of the loans. Moreover, the Bank was well aware of the changing economic trends that would dramatically affect the ability of its borrowers to repay their loans, including those factors discussed above at ¶¶80-82. The Bank's rudimentary method of provisioning did not account for any of the drivers of default in the loan portfolio – including the Bank's deficient underwriting, the declining values of the collateral attached to Wilmington's loans, and the manipulated risk ratings – and caused the

Bank to under-provision for loan losses.

121. In fact, in late 2008, in light of growing stresses in the housing market and scrutiny from investors regarding the adequacy of the Loan Loss Reserve, the Bank adjusted its methodology, presumably due to pressure from its outside auditor, KPMG, and in recognition of the clear inadequacy of its prior method for determining the Loan Loss Reserve. However, the new method was also in violation of GAAP as it again suffered from several basic flaws. First, like the old method, it over-relied on loan risk ratings that were manipulated by senior management and were not reflective of the actual risks in the portfolio. Second, the adjusted methodology over-relied on the Bank's minimal loss history, instead of on then-current factors and trends. According to CW 2, under the new method, the Bank relied almost entirely on its own loan loss history to dictate whether increased reserves were necessary. This was problematic because, due to the interference by senior management, including Defendants Cecala, Harra, and Gibson, interfering in charge off and loan rating decisions to delay the inevitable loss to the Bank, Wilmington's loss history was an inadequate and unreliable measure of probable losses resident in the loan portfolio and resulting from the Bank's loan origination practices.

122. In addition, the new method also failed to adequately consider environmental factors existing at the time and continuing throughout the Class Period, because it was based on an improper assumption that "qualitative" factors should not exceed a certain arbitrary and small percentage of the Bank's overall Loan Loss Reserve. Thus, in violation of GAAP, this approach failed to adequately consider – and build into the Bank's Loan Loss Reserve – the dynamic and rapidly-deteriorating state of the economy and the real estate markets, in particular.

123. While the Bank represented that it considered these factors in its annual report on

Form 10-K for 2009, it did not disclose that its application of these factors to its Loan Loss Reserve was limited. Specifically, the Bank stated that, for purposes of its Loan Loss Reserve methodology, it "analyze[d] the historical loss experience" "over the prior eight quarters to derive an average historical loss rate," and, after doing so, made adjustments to these quantitative measurements based on:

- Historical gross and net loss experience.
- General economic trends and conditions in the United States and mid-Atlantic region.
- Micro- and macro-economic trends and conditions in specific industry sectors.
- Changes in the pace of loan growth and the size of the portfolio.
- Loan concentration trends.
- Migrations within the internal risk rating classification system.
- Delinquent and nonperforming loan amounts and trends.
- Trends in loan valuations and collateral composition.
- The quality of portfolio risk management, including policy trends and adherence, experience, stability and depth of lending staff and management, and adequacy of loan review coverage.
- Other factors.

124. The Bank never disclosed that its purported consideration of these numerous qualitative factors – which were critical considerations given the Bank's limited and manipulated loss history and the clear economic trends indicating that Wilmington's borrowers were increasingly unable to repay their loans – was arbitrarily limited and therefore inadequately evaluated for purposes of determining its Loan Loss Reserve. In addition, the Bank continued to ignore the effects of the Bank's "extend and pretend" policy, discussed above at ¶¶69-74, thereby refusing to publicly recognize its borrowers' decreasing ability and willingness to pay their loans, and the related decreased values of the underlying collateral of such loans. This

ostrich-like attitude allowed the Bank to continue to report inflated net income and capital ratios (resulting from understated loss provisions and loss reserves) at a time when many other financial institutions were recognizing dramatic losses on their loan portfolios causing their stock prices to suffer.

125. Further, according to the internal Bank document discussed above, the MOU Trust Compliance Plan and Report, Federal Regulators recognized the inadequacy of the Bank's reserve methodology when they issued the Federal Reserve MOU to the Bank, and therefore required Wilmington to "fully fund [the Loan Loss Reserve] considering additional adversely classified credits from the updated internal loan rating system" and to "maintain an adequate ALLL consistent with GAAP and regulatory policies and guidance." According to the MOU Compliance Plan and Report, to comply with the Federal Regulators' mandate, the Bank had to provide reports to the Board of Directors, to be reviewed quarterly, regarding the Bank's "[Loan Loss Reserve] adequacy and delinquency/charge-off/provision results."

126. Moreover, GAAP and regulatory guidance provided that a lender's loan loss reserve should be "directionally consistent" with changes in the risk factors discussed above at ¶¶112-113, so that if the risk factors – such as delinquencies, falling collateral values, and negative regional economic trends – increase, the Loan Loss Reserve should increase as well. According to the Interagency Guidance on the Allowance for Loan and Lease Losses referenced above at ¶104,

> [C]hanges in the level of the [Loan Loss Reserve] should be directionally consistent with changes in the factors, taken as a whole, that evidence credit losses, keeping in mind the characteristics of an institution's loan portfolio. ***For example, if declining credit quality trends relevant to the types of loans in an institution's portfolio are evident, the [Loan Loss Reserve] level as a percentage of the portfolio should generally increase, barring unusual charge-off activity.*** Similarly, if improving credit quality trends are evident, the ALLL level as a percentage of the portfolio should generally decrease.

127. Here, Wilmington and the Officer Defendants violated the notion of "directional consistency" when they dramatically decreased the Loan Loss Reserve as a percentage of "nonaccruing" and troubled restructured loans from 2007 to 2009. Nonaccruing loans are those loans where the Bank stops recording interest as income on the loans because it doubts that it will be able to collect interest or principal. In fact, in its Form 10-K for 2008, the Bank emphasized that "We generally place loans . . . on nonaccrual status after they have become 90 days past due." During the Class Period, the Officer Defendants decreased the Bank's Loan Loss Reserve as a percentage of the foregoing measures, despite all known available information indicating that internal and external risk factors relating to collectability of loans had dramatically increased. First, the Officer Defendants were aware of the Bank's lax underwriting standards, minimal asset review, and outdated appraisals in a climate of declining real estate values. Second, the Officer Defendants had access to and reviewed the underlying data and statistics regarding the Delaware economic climate affecting the Bank's borrowers' ability to pay.

128. The chart below demonstrates the damning inconsistency between Wilmington's ratio of Loan Loss Reserve to nonaccruing loans and the amount of the Bank's total nonaccruing loans:




129. The Officer Defendants' refusal to adequately reflect the deterioration in its loan portfolio rendered the Bank's financial statements in violation of GAAP and, thereby, materially false and misleading throughout the Class Period. The inadequacy of Wilmington's methodology for determining its Loan Loss Reserve and its failure to adhere to GAAP throughout the Class period was finally revealed to the market on November 1, 2010. While the Officer Defendants repeatedly represented that the Bank's level of nonaccrual loans was not a relevant metric for the market to consider – in the face of analysts' concerns regarding the above disparity – and, instead, analysts should consider the Bank's level of net charge offs (which were manipulated by the Officer Defendants and would be realized at a much later time), this was merely a red herring and a delaying tactic. The Bank's rising level of nonaccrual loans and the accompanying decline in the ratio of the Loan Loss Reserve was in reality a critical indicator that the Bank's Loan Loss Reserve was inadequate. In fact, on November 1, 2010, when M&T boasted of its own strong credit performance that would allow it to absorb Wilmington's credit problems, it specifically highlighted its own "Best-In-Class" "credit ratios," including the fact

that it had an extremely low ratio of non-performing assets relative to its loan loss reserve.

130. On that date, for the first time, an independent party, M&T Bank, disclosed its analysis of Wilmington's portfolio from the beginning of 2008 and concluded that Wilmington's Loan Loss Reserve was understated by ***over $500 million*** at the end of the Class Period. M&T's analysis was based on the work of an M&T team that reviewed 50% of Wilmington's commercial portfolio (including 64% of Wilmington's real estate construction portfolio). Critically, this devastating assessment occurred ***after***, under scrutiny and a mandate by Federal Regulators, Wilmington had recorded several quarters of mounting provisions in an apparent attempt to catch up its Loan Loss Reserve to the level that would have been appropriate quarters earlier. The material deficiency of the Bank's Loan Loss Reserve – even after two quarters of substantial provisions dictated by Federal Regulators – is highlighted below:




131. There is no question that the Officer Defendants were aware of the declining ability of their borrowers to repay their loans in 2008. In fact, Defendant Foley admitted as much on November 1, 2010, stating that "***in the 2008, 2009 time frame, the Delaware market***

***for that particular type of housing dried up completely***." As discussed above at ¶¶80-82, 120, this information was contemporaneously available to, but knowingly or recklessly disregarded by, the Officer Defendants throughout 2008 and 2009. In fact, when analysts specifically inquired about the impact of the declining market in their geographic concentration, Officer Defendants Cecala and Gibson dismissed the question, saying that Wilmington had "a different set of builders" and that the Bank was "much more focused on the financial health of our borrowers" than its competitors. Further, Defendant Foley conceded that the Officer Defendants knew that many of their borrowers were running into difficulties with cash flow and that many borrowers were remaining current on their payments only by "working off" prior cash flows. However, the Officer Defendants delayed recognizing these known and/or probable losses, apparently in hopes that, as Defendant Foley put it during the November 1, 2010 conference call, they would see "sparks" in the Delaware market and that they would not be forced to record provisions for these losses.

132. Consistent with the Officer Defendants' knowledge or reckless disregard for the losses inherent in the Bank's portfolio dating back to at least 2008, M&T Bank made it clear that its calculation of expected losses dated back to January 1, 2008, and that these issues were not just limited to the third quarter of 2010. Indeed, M&T's entire analysis was based on reviewing Wilmington's loan portfolio as of January 1, 2008 – days before the beginning of the Class Period – and calculating probable lifetime losses from that date.

133. M&T calculated that the expected and probable lifetime losses as of the beginning of the Class Period for Wilmington's loan portfolio were ***$1.48 billion*** – of which Wilmington had only recognized losses to date of ***$471 million***, or 31.8%, resulting in remaining probable losses of $1.02 billion. Wilmington's Loan Loss Reserve, however, was only $510 million,

reflecting a ***shortfall*** of the Loan Loss Reserve of ***$506 million***, or almost 50%. M&T based its calculation on its "extensive experience in southern Delaware markets to assess credit marks" – experience that Wilmington praised in recommending that its shareholders approve the merger, stating that M&T Bank's "superior earnings and credit performance across economic cycles" would be a benefit to Wilmington shareholders in approving the merger. CW 3, a former Vice President in Wilmington's workout group from January 2008 to June 2010 who had previously worked at M&T, confirmed that M&T had much more of a "credit culture" as compared with Wilmington's "sales culture."

134. In the end, Defendants Foley and Gibson accepted M&T's analysis of Wilmington's loan portfolio, and the inadequacy of its Loan Loss Reserve, in its entirety. Indeed, on February 14, 2011, in the preliminary proxy statement issued in connection with the shareholder vote on the merger with M&T Bank, Wilmington's Board of Directors – of which Foley was a member – unanimously recommended that shareholders approve the merger, citing principally "the credit deterioration in Wilmington Trust's loan portfolio."

135. Wilmington's massive $486 million increase of the Loan Loss Reserve in the second and third quarters in 2010 – which was nearly $100 million more than that recorded during the rest of the ten (10) quarters in the Class Period combined – shows that, during the Class Period, the Bank's provisions for loan losses were inadequate by at least 50.62% for each quarter between the first quarter of 2008 and the second quarter of 2010. This percentage is derived from the assumption that Wilmington's provision for loan losses, for the second and third quarters of 2010, at a minimum, should have been proportionate to the provision recorded for prior quarters during the Class Period. In other words, had Wilmington recorded 50.62% higher provisions for loan losses throughout the Class Period, its provision for loan losses taken

in the second and third quarters of 2010 should have been $285 million to have been proportionately comparable to the provision in the prior quarters, rather than the massive $487 million provision that was actually recorded in the second and third quarters of 2010.

136. This estimate is conservative because it assumes that, during each quarter of the Class Period, the Officer Defendants accurately recorded the ***trends*** in its incurred losses from quarter to quarter, but did not accurately reflect the ***magnitude*** of those losses for each quarter. This is not supported by the facts – for example, the Bank's provision inexplicably took a nose-dive in the first quarter of 2009 after increasing slightly in the fourth quarter 2008 (no doubt reflecting the 30% review of the portfolio by Wilmington's auditor KPMG, as discussed above). However, there was no information during this quarter to indicate that the strength of Wilmington's borrowers or the local economy was improving to justify such a sunny outlook on the Bank's losses.

137. This estimate is further conservative because the charges for increased loan loss provisions Wilmington took in the second and third quarters of 2010 were themselves insufficient. As noted above, M&T Bank performed its own contemporaneous analysis and discovered that losses in Wilmington's portfolio were actually understated by over $500 million. Applying the same conservative methodology described above in ¶135, Wilmington actually understated its provision by over ***130%*** each quarter of the Class Period. The effects of this understatement, compared to Wilmington's recorded provisions, are demonstrated in the chart below:




138. Since the provision for loan losses affected Wilmington's net income on a dollar-for-dollar basis, the effect of more accurate assessments of the Bank's probable and estimable losses is dramatic. As demonstrated by the chart below, had Wilmington performed sound assessments of its loan loss provision during the Class Period, its reported net income would have materially decreased:

| | Reported Net Income | Corrected Assessment Using WT's 3Q10 Figures | Corrected Assessment Using M&T's 3Q10 Figures |
|---|---|---|---|
| 1Q 2008 | $41.4 | $36.3 | $28.1 |
| 2Q 2008 | ($19.5) | ($28.9) | ($44.0) |
| 3Q 2008 | $22.9 | $13.0 | ($3.1) |
| 4Q 2008 | ($68.5) | ($102.6) | ($157.9) |
| 1Q 2009 | $21.8 | $6.9 | ($17.3) |
| 2Q 2009 | ($9.1) | ($36.4) | ($80.8) |
| 3Q 2009 | ($5.9) | ($25.5) | ($57.3) |
| 4Q 2009 | ($11.2) | ($53.1) | ($121.1) |

**2. Wilmington Misstated The Fair Value Of The Bank's Loan Portfolio**

139. Wilmington and the Officer Defendants continued to deceive investors regarding

the worth of its loan portfolio by misstating the "fair value" of its loans in the footnotes to its financial statements. GAAP, specifically Statement of Financial Accounting Standards No. 107, "Disclosures about Fair Values of financial Instruments" ("FAS 107," under SFAS No. 168 "ASC Topic 825"), requires that lending institutions "disclose, either in the body of the financial statements or in the accompanying notes, the fair value of financial instruments for which it is practicable to estimate that value." Statement of Financial Accounting Standards No. 157, "Fair Value Measurements" (FAS 157," under SFAS No. 168 "ASC Topic 820") defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction (not a forced liquidation or distressed sale) between market participants at the measurement date. According to the Bank's Class Period SEC filings, the Bank determined the fair value of loans "us[ing] a variety of techniques to measure fair value, such as using the current appraised value of the collateral, discounting the contractual cash flows, and analyzing market data that we may adjust due to the specific characteristics of the loan or collateral." For many of the same reasons discussed above, however, in connection with Wilmington's misstated Loan Loss Reserve – including aggressive underwriting, outdated appraisals, and a refusal to timely recognize impairments and charge-offs – Wilmington also misled the market by overstating the disclosed fair value of its loans. In fact, the same assumptions and factors are generally used in determining the fair value of a loan portfolio as are used in determining the carrying value of loans recorded on the balance sheet (by way of recording the Loan Loss Reserve to reflect probable losses in the portfolio and to offset, therefore, the gross carrying value of the loans).

140. In its Class Period SEC filings, the Bank represented that the fair value amounts it presented did not offer a "full assessment of our consolidated financial condition, our ability to

generate net income, or the value of our company, because the fair value amounts presented here do not consider any value that may accrue from existing client relationships or our ability to create value by making loans, gathering deposits, or providing fee-based services." In other words, the fair value of its loans did not incorporate the value of the Bank's ongoing and future relationships with its clients. Even here, however, where the Bank claimed to recognize the full impairment of its loans absent "relationship" considerations, the Bank refused to recognize that these relationships were increasingly worthless throughout the Class Period.

141. In fact, in connection with the Bank's Third Quarter 2010 Form 10-Q, the Bank disclosed that, for the first time, in determining the fair value of its loans, the Bank "added risk premiums to the discount rates used for loans with watch-list or substandard-accruing ratings ***to reflect the uncertainty of the cash flows within these portfolios***." As discussed above in Sections III.B, III.C, III.D, and III.E, that "uncertainty" had been in place throughout the Class Period; however, for years, in violation of clear GAAP principles, Wilmington and the Officer Defendants knowingly or recklessly failed to adequately reflect that uncertainty in its fair value reporting.

142. Further, as noted above, when M&T Bank made its offer to purchase Wilmington, it valued Wilmington's loan portfolio at a discount of ***more than $500 million*** at September 30, 2010. As noted above, "fair value" measures the price that would be received to sell an asset between market participants – it is hard to imagine a more readily apparent measure of fair value than the acquirer, M&T Bank's, analysis. Yet, Wilmington refused to adequately reflect, during the Class Period, the full extent of the microeconomic and macroeconomic factors and their deficient lending practices that impacted the fair market value (and carrying value) of its loan portfolio. The magnitude of the failure to adequately reflect the fair market value of its loan

portfolio caused Wilmington to overstate such amounts by the almost $450 million it would have taken to reflect M&T Bank's estimate of the value of the portfolio. Even at the conclusion of the Class Period, the Bank and the Officer Defendants knowingly or recklessly refused to fully acknowledge the reality of the poor quality of its loan portfolio in violation of GAAP.

### 3. Defendants Inflated Their Earnings Through Manipulating Wilmington's Deferred Tax Asset

143. For the fourth quarter 2009 and the first two quarters of 2010, Wilmington and the Officer Defendants fraudulently inflated Wilmington's assets and earnings by nearly $200 million through improper accounting for "deferred tax assets." At the time, Defendants knew, or recklessly disregarded, that Wilmington had no legitimate prospects for reporting positive earnings in the coming quarters because the Bank was under the September 2009 Federal Reserve MOU, which fundamentally altered the way the Bank conducted its lending, risk management, and accounting functions such that it was no longer able to conceal the losses inherent in its portfolio and that had led to more than two years' worth of inflated financial results. Nevertheless, the Officer Defendants attempted to prolong their scheme and improperly inflate their balance sheet by reporting, at December 31, 2009, for instance, $194.6 million in net deferred tax assets even though it was "more likely than not" that Wilmington would *not* realize a significant portion of the deferred tax asset. Indeed, less than nine months later, on November 1, 2010, the same day the Bank announced its acquisition by M&T, Wilmington and the Officer Defendants were forced to acknowledge their scheme by recording a "valuation allowance" of $189.5 million, offsetting almost the entire net deferred tax asset that existed at December 31, 2009. Thus, the Bank's net income and assets were overstated by at least $189.5 million for each of the fourth quarter 2009, first quarter 2010 and the second quarter 2010.

144. Under GAAP, a "deferred tax asset" is an asset recorded on an entity's balance

sheet to recognize an anticipated future tax benefit. Applicable accounting guidelines establish clear rules for recording deferred tax assets and subsequently re-assessing and adjusting the carrying value of such as necessary. Specifically, under Statement of Financial Accounting Standard No. 109, "Accounting for Income Taxes" ("FAS 109," under SFAS 168 "ASC Topic 740"), which has been in place since 1992, an entity must record a deferred tax asset in an amount that reflects the entity's "expectation" of the amount of purported benefit the entity will in fact be able to utilize in succeeding years. In other words, the deferred tax asset must reflect the likelihood that the entity will earn enough money, and thus incur sufficient tax obligations, to enable the company to use the deferred tax asset to reduce its tax burden in those future years. If there is no tax obligation in future years – because, for example, like here, there are no earnings – the deferred tax asset will prove worthless.

145. Under ASC Topic 740, a company must record a "valuation allowance" on its balance sheet to offset, or reduce, a deferred tax asset when it is more likely than not (i.e., a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized. The amount of the valuation allowance must be sufficient to reduce the deferred tax asset to the amount that is more likely than not to be realized. Thus, ASC Topic 740 requires that the balance sheet reflect any uncertainty associated with the likelihood of realizing the benefit of the deferred tax asset. It also specifically requires that the valuation allowance account for all available evidence that might impact the realizability of the deferred tax asset, both positive and negative, and ensure that information is updated to reflect changes in circumstances surrounding the realizability of the deferred tax asset.

146. In direct violation of these longstanding and fundamental GAAP principles, Wilmington and the Officer Defendants improperly overstated (i) net deferred tax assets of

$194.6 million in its 2009 Form 10-K, filed with the SEC on February 22, 2010; (ii) net deferred tax assets of $194.6 million in its First Quarter 2010 Form 10-Q, filed with the SEC on May 10, 2010;[5] and (iii) net deferred tax assets of $238.4 million in the Third Quarter 2010 Form 10-Q, filed with the SEC on August 9, 2010, when Wilmington knew, or recklessly disregarded, that it was "more likely than not" that the Bank would not realize a benefit from at least 80% these assets

147. Specifically, as discussed above, by the fourth quarter 2009, Wilmington and the Officer Defendants knew, or recklessly disregarded, that because of the imposition of the Federal Reserve MOU and the heightened scrutiny by the Federal Reserve, amongst other known economic and industry factors, the Bank would no longer be able to conceal the losses inherent in its portfolio. Indeed, the Federal Reserve MOU required the Bank to dramatically restructure its lending, risk management, and accounting functions, such that the Bank would no longer be able to continue to deliberately or recklessly: (i) issue loans without proper underwriting and review by risk management; (ii) fail to downgrade or charge-off troubled and impaired loans; or (iii) understate its Loan Loss Reserve. As a result of these drastic measures, and the losses they would expose, the Officer Defendants knew or recklessly disregarded that it was "more likely than not" that, for the foreseeable future, the Bank would not realize sufficient earnings to enable it to utilize a significant portion of deferred tax assets.

148. Indeed, just a few months later, Defendants were forced to acknowledge this reality. On November 1, 2010, the Bank issued a press release in connection with its third quarter 2010 financial results disclosing that it would not realize $189.5 million of deferred tax

[5] The First Quarter 2010 Form 10-Q did not report Wilmington's net deferred tax asset as of March 31, 2010. For purposes of this allegation, Lead Plaintiffs conservatively assume that the net deferred tax asset figure did not increase but rather remained the same as reported for the fourth quarter 2009.

assets – or at least 97% of the reported net deferred tax asset for the fourth quarter 2009 (and assumed for the first quarter 2010), and at least 80% of the reported net deferred tax asset for the second quarter 2010 – and, thus, recorded an allowance for that amount and faced an additional $100.7 million income tax expense. In its quarterly report for the third quarter of 2010, filed with the SEC on Form 10-Q on or about November 8, 2010, Wilmington explained its reasons for recording the valuation allowance:

> [W]e concluded that it is more likely than not that we will not realize a portion of our deferred tax asset because negative evidence associated with our cumulative GAAP net operating loss and continued uncertainty in the credit quality of our loan portfolio outweighs other positive evidence…. Accordingly, we no longer consider future taxable income in our deferred tax asset valuation analysis.

149. This statement also confirms the relationship between the credit quality of Wilmington's loan portfolio and its overall financial performance and results and, thereby, the realizability of any deferred tax assets.

150. Defendants continued to acknowledge the reality that the Bank would not be able to realize its deferred tax assets when it disclosed in its 2010 Form 10-K filed on March 1, 2011, that it had recorded an allowance of $292.2 million against its deferred tax asset as of December 31, 2010. This represents an increase to the valuation allowance during the fourth quarter 2010 of $102.7 million and additional income tax expense of $98.2 million related to the establishment of that allowance. Wilmington's gross deferred tax assets increased by only $122.9 million during 2010, yet the reserve established against gross deferred tax assets during 2010 was $291.5 million, demonstrating that a significant portion of the valuation allowance that the Company failed to timely record was used to offset deferred tax assets that had been established prior to 2010.

151. By improperly recording and maintaining deferred tax assets in violation of GAAP, Wilmington overstated its net assets and net income for the fourth quarter of 2009 and

the first two quarters of 2010 by at least $189.5 million. Had Wilmington properly recorded the valuation allowance, it would have reported a reduction to net assets for the amount of the unrealizable deferred tax assets (i.e., at least $189.5 million) and recorded net losses (without correcting for the Bank's other GAAP violations discussed above) of at least $205.4 million in the fourth quarter of 2009, $223.3 million in the first quarter of 2010 and $310.4 million in the second quarter 2010, if the valuation allowance had been recorded in each of those periods, respectively.

152. Had Defendants properly and in compliance with GAAP recorded a valuation allowance and Loan Loss Reserve, the Bank would have reported losses of at least $240 million for 4Q 2009 and $250 million for 1Q 2010.

### 4. During the Class Period, the Bank's Internal Controls Over Financial Reporting Were Ineffective

153. The Officer Defendants concealed the inadequacy of Wilmington's internal controls over financial reporting throughout the Class Period by falsely representing to investors that such internal controls were effective. As discussed below in Section V, throughout the Class Period, Defendants Cecala, Foley, and Gibson each repeatedly and falsely certified the design, operation and effectiveness of Wilmington's internal controls over financial reporting in the Bank's annual and quarterly financial statements.

154. However, the Bank's purported control environment failed to ensure that the financial statements issued during the Class Period were reliable or in compliance with applicable laws. Rather, the Officer Defendants focused on maintaining relationships without regard to the creditworthiness of its borrowers and without taking the steps required under GAAP and SEC guidelines to account properly for their activities. The control environment shaped by the Officer Defendants resulted in ineffective internal controls with respect to the

Bank's financial reporting process and allowed the Officer Defendants to materially misstate the Bank's financial statements.

155. The lack of effective internal controls enabled the Officer Defendants to institute underwriting practices that left to the discretion of the lender – who was motivated to close the loan – how rigorous the underwriting process would be and without determining whether and to what extent borrowers could actually repay the loans. Additionally, the lack of effective internal controls over financial reporting allowed the Officer Defendants to influence and manipulate the asset review process such that the Bank delayed recognition of losses inherent in its loan portfolio, either failing to make risk rating downgrades or to charge off uncollectible loans in a timely manner.

156. As discussed above in ¶¶67, 90-97, Federal Regulators identified numerous failings in Wilmington's control environment through, first, repeated criticisms in their 2007 and 2008 annual exams, including the observation of "***weaknesses in [Wilmington's] control structure***" in 2007, and, finally, in the Federal Reserve MOU in 2009. As revealed in Wilmington's MOU Compliance Plan and Report, the Federal Reserve MOU identified that Wilmington was operating with insufficient staff; unclear responsibilities, policies, and practices; inappropriate organizational structures to promote risk management objectives; and inadequate measures to ensure compliance with the Bank's policies and procedures, once they were codified.

157. In addition to inadequate policies and procedures governing Wilmington's asset review and risk management, CW 4, who, as noted above, worked at the Bank as a commercial banking associate from 2005 to 2007 and an investor relations associate from 2007 to 2009, was critical of Bank's financial systems and their ability to accurately reflect the Bank's financial

condition, stating that the Bank did not have a centralized reporting system, and that there was "always a discrepancy, always problems." Similarly, CW 10, who as noted above was a Corporate Development Officer for Wilmington from March 2006 through 2008, reported that there were "substantial errors" within Wilmington's interest rate modeling system. This would have affected the Bank's ability to stress test its portfolio for losses. CW 10 audited the system and estimated that approximately 20% of the loan portfolio had errors.

158. Because of management's failure to maintain effective internal controls over financial reporting, Wilmington and the Officer Defendants were able to conceal the deteriorating condition of Wilmington's loan portfolio from the investing public by not provisioning for its Loan Loss Reserves in a manner appropriate for such a poor-quality loan portfolio and to materially misstate the Bank's assets and earnings.

159. Management's assessment of internal controls over financial reporting was a critical statement for investors because it provided (false) assurance that the Bank's financial statements were reliable and in compliance with applicable laws. However, during the Class Period, Wilmington did not properly assess its internal controls over financial reporting.

## IV. SUMMARY OF SCIENTER ALLEGATIONS

160. As alleged above, numerous facts give rise to the strong inference that, throughout the Class Period, Defendants Wilmington, Cecala, Gibson, Harra, North, and Foley knew or recklessly disregarded that their statements and omissions set forth in Section V below were materially false and misleading when made.[6] Indeed, there is striking evidence that the Officer Defendants knowingly misrepresented and omitted material information in their public statements and ignored the numerous red flags that internal and external gatekeepers raised by

[6] The allegation that these Defendants acted with fraudulent intent is made solely for the purpose of Lead Plaintiffs' Section 10(b) claims.

criticizing the Bank's critical functions during the Class Period. Indeed, Federal Regulators and KPMG hounded the Bank for years to correct the very practices that the Bank and the Officer Defendants repeatedly misrepresented to investors and which ultimately caused the Bank's massive losses.

### A. Defendants Cecala, Gibson, Harra, & North Were Personally Responsible For The Bank's Failures In Risk Management

161. The senior executives of Wilmington, including Defendants Cecala, Harra, Gibson, and North, were intimately involved in the improper conduct that underlies Lead Plaintiffs' claims. Indeed, many times these Defendants were the sole decision makers on issues that directly impacted the quality of the Bank's portfolio and the reviews thereof. These Defendants were a tightly knit group who controlled the decision making at Wilmington. CW 11, a Director of Tax at Wilmington from 2004 to 2009, described them as "one little clan" who are "all friends and go back a long way."

162. As set forth above, the Officer Defendants "interjected themselves physically" into the monthly meetings of the Asset Review Group and repeatedly rejected the Group's decisions to prevent downgrades and charge-offs. Moreover, these Defendants attended quarterly Credit Strategy meetings – which were scheduled around the availability of Defendants Cecala, Harra, and Gibson according to CW 2 – which focused on discussions of the impaired loans in the Bank's portfolio and the outdated nature of the appraisals for the collateral underlying the Bank's loans.

163. Moreover, the fact that the Federal Reserve MOU required the Bank to significantly alter its organizational structure shows that during the Class Period, the Officer Defendants controlled the flow of all significant information within the Bank. Indeed, according to CW 2, prior to reforming the Bank's lines of communication in response to the MOU, all

Board reports had to be approved by senior management, particularly Defendant Harra. CW 2 explained that the original drafts of reports to the Board prepared by other executives would be "sanitized" by the Officer Defendants and would differ dramatically from its original form by the time the Board received them, because Defendant Harra wished to prevent the "negative" information from reaching the Board. As discussed above at ¶75, prior to the implementation of the changes in response to the Federal Reserve MOU, before CW 2 could approach the Board, CW 2 had to obtain approval from Defendants Gibson and Harra, and it was felt that CW 2 was too "negative" in portraying the facts. Further, CW 2's new direct line to the Board caused "consternation" with Defendant Cecala, with whom, as noted above at ¶¶70-73, CW 2 had had confrontations regarding loan downgrades.

164. Thus, the Officer Defendants were each fully aware of – and responsible for – the Bank's deficient underwriting and loan review processes, and chose to misrepresent those processes to investors.

**B. The Federal Regulators Informed Defendants Cecala, Foley, Gibson, Harra, And North Repeatedly That The Bank's Risk Management Was Dangerously Deficient**

165. Wilmington and the Officer Defendants were repeatedly informed by Federal Regulators that their underwriting, loan review, and accounting processes were materially deficient. As discussed further above at ¶¶67, 90-97, supervision and criticism by the Federal Regulators escalated throughout the Class Period. In the Bank's annual exam in 2007, according to CW 2, Federal Regulators criticized Wilmington for insufficient review of its loan portfolio, noting "weaknesses in the control structure" at the Bank as a result of this failure. In 2008, the Federal Regulators made a similar observation, noting that the Asset Review Group continued to be understaffed, raising concerns regarding the inadequacies of loan portfolio review. These annual reports of examination are provided to the Board of Directors, including Defendants

Cecala, Foley, and Harra, and each Director is required to sign an acknowledgement that they have reviewed the report. In 2009, the Federal Regulators finally escalated these criticisms to the level of the Federal Reserve MOU only after identifying serious and widespread failings in the Bank's lending, risk management, and accounting functions that remained unresolved for several consecutive years.

166. There is no question that the Federal Regulators' criticisms were relayed to the Officer Defendants and to the Board of Directors, on which Defendant Foley sat for the entirety of the Class Period as head of the Audit Committee until he was appointed CEO. Before issuing an MOU, Federal Regulators exhaust all other avenues of discussion with senior management and the Board of Directors. According to CW 2, the Officer Defendants were aware no later than July 2009 that an MOU would be issued, although the agreement was not formally issued, and the Bank did not formally implement its remedial plans, until that fall. The Officer Defendants and the Board of Directors were indisputably aware of the terms of the Federal Reserve MOU and the remedial measures the Bank was forced to pursue. Not only did many of the changes required by the MOU directly impact the Officer Defendants and their control over the Bank's lending and risk management functions, the MOU was also "pretty widely discussed internally," including in meetings with Defendants Cecala, Gibson, and Harra, according to CW 2. Moreover, Defendant Foley was unquestionably aware of the Federal Reserve MOU and its terms – Federal Regulators presented the Federal Reserve MOU to the Board of Directors in a session closed to management and the full Board appointed itself as the MOU compliance committee.

167. In short, Defendants Cecala, Gibson, Harra, and North were fully cognizant of the Federal Regulators' concerns – and the causes of those concerns – throughout the Class Period.

By the time Defendant Foley became CEO in June 2010 and began issuing false and misleading statements to the public regarding the strength of the Bank's credit and capital position, he had been fully educated for at least two quarters regarding the weaknesses in the Bank's assets and reserves for asset impairment.

### C. KPMG Warned Defendants Cecala, Foley, Harra, Gibson, And North That The Bank's Asset Review Was Deficient

168. KPMG raised serious concerns regarding the Bank's asset review and reserving process in both 2007 and 2008, which caused a major rift in the relationship between senior management and KPMG. As set forth above, KPMG's Management Letter for 2007 cited the Bank's inadequate loan review. Further, after KPMG's sampling of Wilmington's loan portfolio in the fall of 2008 revealed issues with several of the relationships, the Officer Defendants "blew up the sample" to review additional loans. According to CW 2, Defendants Cecala, Gibson, and Harra knew of KPMG's concerns and responded by calling KPMG "crazy" and saying the Bank was being "picked on."

169. KPMG's criticisms were directed specifically at the inadequate processes and controls that were the subject of the Officer Defendants' false and misleading statements. Not only were these criticisms relayed directly to the Officer Defendants, but also to Defendant Foley, who as chairman of the Audit Committee, received and reviewed KPMG's critiques and management letters.

### D. Wilmington's Internal Audit Function Reported Criticisms Of The Bank's Asset Review Group To Defendants Cecala, Foley, Gibson, Harra, And North

Wilmington's Internal Audit Group viewed the Bank's credit as a "high risk" area and, as such, performed annual audits of the Bank's underwriting, credit risk procedures, regulatory issues, internal controls, and asset review. After each annual audit, Internal Audit issued a report

summarizing its findings to Defendant Cecala and the Audit Committee (including Defendant Foley as Chair), as well as any executive officer responsible for the targeted area – in the case of credit, Defendants Gibson, Harra, and North would also receive a copy of the report.

According to CW 8, in the fall of 2007, Wilmington's Internal Audit group issued a report highlighting concerns that the Bank's Asset Review Group was understaffed and that the percentage of the portfolio reviewed (roughly 10-15% of the total portfolio) was insufficient. This report, like all similar reports from Internal Audit, was transmitted to Defendants Cecala, Gibson, Harra, and North, as well as to the Audit Committee of the Board of Directors. In addition, CW 8 reported that, long before the Federal Reserve forced Wilmington to reorganize its Credit Risk Management Division to report directly to the Audit Committee rather than to Defendant Gibson because Gibson was too involved in the financial performance of the Bank, Internal Audit repeatedly raised the same concern. CW 8 stated that, when these concerns were raised to Defendant Gibson, he merely responded, "that's how it's always been."

### E. Due To The Bank's Size And Organization, Defendants Cecala, Foley, Gibson, Harra, And North Were Fully Aware Of The Policies And Practices That Led To The Bank's Downfall

170. Wilmington's small size and organizational structure throughout the Class Period gives rise to a strong inference of scienter. Wilmington itself was a small bank with a total of roughly 3,000 employees, which included bank tellers and Wilmington's international wealth management and corporate services divisions. As discussed above, Defendant Gibson was responsible for the Asset Review Group, which consisted of 4-5 employees during the Class Period.

171. The size of the Bank – and the relatively small number of loans that made up the Bank's multi-billion dollar portfolio – lent itself to the kind of close involvement by executive management in loan rating and charge off decisions discussed above. It also meant that the

underwriting policies discussed above at ¶¶45-60 were widely known within the Bank. Indeed, Defendant North, who sat on the Loan Committee, spoke casually about the 10% Rule during his testimony in connection with the Tigani bankruptcy. Additionally, "everyone knew" of the understaffing in the credit review department, which according to CW 6 was a "running joke" within the Bank and was known to Defendants Cecala, Gibson, Harra, and North. As a result, CW 6 said of senior executives, "[o]f course they knew... it would be ridiculous to think they did not know." Moreover, reports such as the Delinquency List noted above at ¶79 were circulated within the Bank - including among the Officer Defendants – and kept the Officer Defendants well apprised of the deteriorating status of the Bank's loans.

**F. Additional Scienter Facts**

172. The suspicious timing of Defendant Cecala's and Defendant North's departures supports scienter. In 2010, as the Bank was implementing a number of remedial measures – including, as disclosed during the July 23, 2010 earnings call, making "management changes" to "help us manage and reduce credit risk" – Defendant Cecala abruptly resigned, while Defendant North quietly left his position in the summer of 2010. The suspicious timing and circumstances of their departures in conjunction with their involvement in the precise areas of fraudulent conduct supports an inference that the Bank recognized that it was unable to solve the Bank's serious problems with Defendant Cecala at its head.

173. Further, the Officer Defendants were motivated by a myriad of reasons to conceal the true state of Wilmington's regional banking business. Given the environment in which the Officer Defendants were operating, any disclosure of the weaknesses in Wilmington's controls would have had immediate and dramatic effects on the Bank's stock price and relationships with its Wealth Advisory and Corporate Services clients. As Wilmington disclosed after the Class Period, the Board was concerned that, once the Bank revealed its third quarter 2010 results –

which finally revealed to investors the reality of Wilmington's lending and accounting practices – the Bank would suffer from "a material decline in the value of its common stock, a decline in its credit ratings, a significant loss of clients, the potential termination of business relationships tied to Wilmington Trust's credit rating and capital ratios, and significant regulatory actions." Indeed, the Bank had benefited for years from the Officer Defendants artificially propping up Wilmington's reputation for conservatism and judicious lending, particularly in comparison with other financial institutions at the time. Indeed, the Bank's ultimate fate after its true condition was finally revealed – acquired by a competitor at fire-sale pricing, its stock price decimated, and massive layoffs looming – demonstrates precisely what the Officer Defendants sought to avoid by concealing the Bank's problems.

174. Moreover, each of the Officer Defendants had a tremendous stake in driving the financial results of Wilmington during the Class Period, since each of these Defendants' annual salaries and bonuses were dependent on the financial results of Wilmington. Wilmington set the Officer Defendants' bonuses based on certain "performance factors" that increased the Officer Defendants' motivation to focus on those factors to the exclusion of the Bank's long-term financial health and credit quality. For example, in 2008, Defendant Cecala was rewarded based on, among other income-related factors, the Bank's average growth in earnings per share compared to Wilmington's peers. In 2008, Defendant Harra's bonus was based, in part, on the Bank's "business development in our mid-Atlantic markets." For at least 2008 and 2009, bonus compensation was determined based in part on a comparison to Wilmington's peer banks evaluating performance: (1) 25% based on average return on equity over the most recent three years, (2) 25% based on average return on assets over the most recent three years, (3) 25% based on the growth in earnings per share over the most recent three years, and (4) 25% based on net

income against the Bank's business plan. Beginning December 12, 2008, Wilmington entered into agreements with the U.S. Treasury pursuant to the TARP agreement, which prohibited the payment of any bonus payments to named executive officers except for restricted stock that does not begin to vest until the funds the Bank received in TARP are at least 25% repaid. Thus, the Officer Defendants had an added incentive to drive up the Bank's stock price.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

175. During the Class Period, as the credit market deteriorated and iconic financial institutions like Lehman Brothers, Merrill Lynch, and Washington Mutual collapsed, Wilmington carried out its scheme to conceal the Bank's true financial position from the marketplace. In regular press releases, conference calls and filings with the SEC, Wilmington and the Officer Defendants repeatedly made materially false and misleading statements and omissions about the quality of Wilmington's loan portfolio, its procedures for managing credit risk, its lending and accounting practices and its income, Loan Loss Reserve, and assets. Set forth chronologically below, Defendants' statements and omissions were false and misleading not only because they materially misstated Wilmington's financial results, but also because they assured investors that Wilmington was weathering the economic storm due to its "stable" and "conservative" approach to lending and risk management. These representations were critical to assuring investors that Wilmington – unlike many other financial institutions during the economic crisis – was a safe and "risk-averse" investment. In reality, however, Defendants profoundly understated the Bank's Loan Loss Reserve throughout the Class Period, thereby materially overstating the Bank's income and earnings in those quarters in which the Bank reported positive earnings and dramatically understating its losses in quarters where the Bank reported negative results. The truth about Defendants' false statements finally came to light only in 2010, after Wilmington's regulators forced the Bank to fundamentally change its lending,

credit risk management, and accounting practices when the Bank could no longer conceal its true condition from the investing public.

### A. False And Misleading Statements And Omissions Concerning 2007 Year-End Results

176. On January 18, 2008, the first day of the Class Period, Wilmington issued a press release announcing its 2007 fourth quarter and full year results. The Bank reported quarterly net income of $44.0 million, or $0.65 per share, and annual net income of $182.0 million, or $2.64 per share, exceeding analysts' consensus expectations on both a quarterly and annual basis. The Bank also reported a loan loss provision of $9.2 million, a Loan Loss Reserve of $101.1 million, quarterly net charge-offs of $9.7 million, and annual net charge-offs of $21.3 million. The Bank reported that its loan ratings improved, with loans received a "Pass" rating comprising 96.03% of the loan portfolio; "Watchlisted" loans comprising 2.69%; and "Substandard" loans comprising 1.27%.

177. On that same day, the Bank held a conference call with investors to discuss its 2007 fourth quarter and year-end results and to reassure investors about Wilmington's credit and financial strength by touting "***the quality of the loan portfolio and our underwriting and evaluation process***," as numerous financial institutions were showing weaknesses and the market's confidence in bank securities was wavering. Defendant Cecala, Gibson, and Harra participated in the call. In responding to questions regarding the strength of Wilmington's loan portfolio in light of the fact that the Bank's mid-Atlantic competitors, including M&T Bank, were seeing significant deterioration in similar loan portfolios, Defendants Cecala and Gibson dismissed the notion, stating "***[m]aybe . . . they have a different set of builders***" and that "***we are much more focused on the financial health of our borrowers,***" respectively. Defendant Cecala also boasted that the Bank's "***credit quality remains stable***" with 96% of loans receiving a pass

rating, making Wilmington a "very strong regional bank." He also described the strength of the Bank's asset review function, stating that "***we evaluate our portfolio each quarter through an independent review function***."

178. Similarly, when questioned about the timeliness of its appraisals, Defendant Gibson assured investors that "the appraisal process is a continuous process for us. We view each of our projects on an ongoing basis and we get financial statements from those projects on an ongoing basis."

179. Analysts reacted favorably to the Bank's fourth quarter 2007 earnings announcement. For example, a January 18, 2008 Deutsche Bank report titled, "4Q07 EPS Exceeds Consensus," stated that "Wilmington Trust's key operating areas are performing better than average." Similarly, a January 22, 2008 SunTrust Robinson Humphrey report stated that "we are comforted that 4Q07 did not reveal further credit deterioration" and "we continue to recommend WL for longer-term oriented investors." In response to the earnings announcement, Wilmington's stock price rose from a close of $28.18 on January 17, 2008 to close at $35.20 on February 1, 2008.

180. On or about February 28, 2008, the Bank filed with the SEC its Form 10-K for the year-ended December 31, 2007 (the "2007 Form 10-K"), which was signed by Defendants Cecala and Gibson. The 2007 Form 10-K repeated the financial results and credit disclosures set forth in the January 18, 2008 press release and conference call. The 2007 Form 10-K reported a fair value impairment of the loan portfolio of $61.5 million. The 2007 Form 10-K also stated that "[w]e maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles and reporting practices prescribed for the banking industry."

181. Additionally, in the 2007 Form 10-K, Defendants Cecala and Gibson each stated in pertinent part:

> 1. I have reviewed this annual report on Form 10-K of Wilmington Trust Corporation;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]

182. In signing these attestations, Defendants Cecala and Gibson also certified that they had designed, established, and maintained an effective system of internal controls and procedures over the Bank's financial reporting "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

183. Additionally, in the 2007 Form 10-K the Bank made repeated claims regarding the consistency and rigorousness of its underwriting, which purportedly gave the Bank "confidence" in the integrity of its loan portfolio. For example, in statements that would be repeated in substantially identical form throughout the Class Period, the Bank claimed that it applied its underwriting standards "consistently" and that the Bank "mitigate[d] credit risk" by "[e]mploy[ing] rigorous loan underwriting standards and apply[ing] them consistently."

184. With respect to the Bank's asset review procedures, the 2007 Form 10-K asserted that the Bank's credit review group "appl[ies] [its risk rating] classifications consistently," which "has helped us develop adequate reserves for loan losses over the years." The Bank also claimed that it mitigated credit risk by "[m]onitor[ing] the portfolio to identify potential problems" and

"[r]egularly review[ing] all past-due loans, loans not being repaid according to contractual terms, and loans we doubt will be paid on a timely basis." In addition, the Bank claimed that the asset review staff, which had responsibility for credit review, and the credit policy staff, which had responsibility for underwriting and lending, "operate[d] independently of each other." Moreover, the Bank represented that it was diligent in obtaining appraisals for its commercial loan portfolio, stating that the Bank "obtain[ed] appraisals for all significant properties."

185. The above-referenced statements from the fourth quarter of 2007 were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading because, as set forth above in more detail, at the time these statements were made:

> (i) More than half of the commercial loans extended by Wilmington were not underwritten by independent, credit-focused or trained risk management personnel; loan officers regularly exceeded the authorized amount of loans underwritten and approved by the Loan Committee by use of the 10% Rule; Wilmington's underwriting was rife with documentation errors and exceptions; loan origination was based on personal relationships and insufficiently reviewed personal guarantees; and Wilmington's lenders were motivated by volume-based compensation rather than credit quality (*see* ¶¶45-60);

> (ii) Wilmington's Asset Review Group actually reviewed only a very small percentage of its loan portfolio, which had been the subject of criticisms by Internal Audit and Federal Regulators, KPMG, and Federal Regulators as a weakness in Wilmington's internal controls; the Bank relied on its lenders – who were financially disincentivized to downgrade loans – to report negative loan quality; the Credit Risk Division, including the Asset Review Group, was not an independent voice for credit because it reported to Defendant Gibson, a reporting structure that was criticized by Wilmington's Internal Audit; and Defendant Gibson interfered and overrode loan quality decisions made by the Asset Review Group (*see* ¶¶61-83);

> (iii) Wilmington did not obtain updated appraisals to avoid inconveniencing its clients (*see* ¶¶84-89);

> (iv) Wilmington was seeing strong negative credit trends in its borrowers, but was acting under an "extend and pretend" policy to avoid recognizing impairments on its loans (*see* ¶¶69-74);

> (v) Wilmington's financial statements were not reported in accordance with GAAP, because its reserving methodology did not take into account economic trends or other

factors (*see* ¶¶102-142); and

(vi) Wilmington's internal controls suffered from significant deficiencies because of, *inter alia*, the Bank's failure to address inconsistent underwriting and asset review, understaffing in key areas, interference by senior management, and flaws in its reporting systems (*see* ¶¶153-159).

**B. False And Misleading Statements And Omissions Concerning First Quarter 2008 Results**

186. On April 18, 2008, Wilmington issued its first quarter 2008 earnings press release, announcing quarterly net income of $41.4 million, or $0.62 per share, which exceeded analysts' consensus expectations. The Bank also reported a loan loss provision of $10.0 million, a Loan Loss Reserve of $106.4 million, and net charge-offs of $4.7 million. The Bank also reported internal risk ratings on its loan portfolio, with 95.62% of loans receiving a "Pass" rating, 2.98% of loans receiving a "Watchlist" rating; and 1.29% of loans receiving "Substandard" rating. In the release, Defendant Cecala credited the Bank's "***stable credit quality***" for protecting the company against the market's unfavorable credit environment. The Bank reported that the Board had approved a $0.01 increase in the dividend.

187. On that same day, the Bank held a conference call with investors to discuss its third quarter results, in which Defendants Cecala, Gibson and Harra participated. On the conference call, Defendant Cecala repeatedly emphasized the purportedly "***stable credit quality***" of the Bank's commercial loan investments, adding that "credit quality remained very good."

188. Analysts reacted favorably to the 2008 first quarter earnings results. For example, SunTrust Robinson Humphrey stated in an April 18, 2008 report that Wilmington had a "solid" first quarter with "[g]ood asset quality numbers" that were "a highlight given negative industry trends." SunTrust also said that it would "continue to recommend WL due to our comfort with the bank's credit quality." In response, Wilmington's stock price rose from a close of $30.94 on April 17, 2008 to close at $33.93 on April 28, 2008.

189. On May 12, 2008, the Bank filed with the SEC its Form 10-Q for the first quarter of 2008 (the "First Quarter 2008 Form 10-Q"), which was signed by Defendants Cecala and Gibson. The First Quarter 2008 Form 10-Q repeated the quarterly financial results and the credit disclosures regarding loan risk ratings set forth in the April 18, 2008 press release. The First Quarter 2008 Form 10-Q reported a fair value impairment of the loan portfolio of $2.7 million. The First Quarter 2008 Form 10-Q also asserted that the Bank's financial statements were prepared in accordance with GAAP and regulatory requirements. Defendants Cecala and Gibson signed certifications attesting to the accuracy of the information contained in the filing. These attestations were in substantially the form set forth in ¶181 above. Additionally, the First Quarter 2008 Form 10-Q contained a statement confirming the adequacy of the Bank's internal controls over financial reporting in substantially the form set forth in ¶182 above.

190. In its First Quarter 2008 10-Q, the Bank touted its underwriting standards and asset review procedures. For example, the Bank referenced the credit risk portion of the 2007 Form 10-K, discussed above at ¶¶183-184, in which it described its underwriting as "rigorous," repeated its representations about "confidence in the integrity" of the commercial loan portfolio because "[w]e apply our underwriting standards consistently," and claimed that its practice of originating loans rather than purchasing loans originated by other banks "helps ensure that our underwriting standards are applied consistently throughout the portfolio." Similarly, with respect to asset review, the Bank again represented that it "consistently" applied its loan risk rating system.

191. The above-referenced statements from the first quarter of 2008 were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading because, because, as set forth above in more detail, at the time

these statements were made:

> (i) More than half of the commercial loans extended by Wilmington were not underwritten by independent, credit-focused or trained risk management personnel; loan officers regularly exceeded the authorized amount of loans underwritten and approved by the Loan Committee by use of the 10% Rule; Wilmington's underwriting was rife with documentation errors and exceptions; loan origination was based on personal relationships and insufficiently reviewed personal guarantees; and Wilmington's lenders were motivated by volume-based compensation rather than credit quality (*see* ¶¶45-60);
>
> (ii) Wilmington's Asset Review Group actually reviewed only a very small percentage of its loan portfolio, which had been the subject of criticisms by Internal Audit, KPMG, and Federal Regulators as a weakness in Wilmington's internal controls; the Bank relied on its lenders – who were financially disincentivized to downgrade loans – to report negative loan quality; the Credit Risk Division, including the Asset Review Group, was not an independent voice for credit because it reported to Defendant Gibson, a reporting structure that was criticized by Wilmington's Internal Audit and Federal Regulators; and Defendant Gibson interfered and overrode loan quality decisions made by the Asset Review Group (*see* ¶¶61-83);
>
> (iii) Wilmington did not obtain updated appraisals to avoid inconveniencing its clients (*see* ¶¶84-89);
>
> (iv) Wilmington was seeing strong negative credit trends in its borrowers, but was acting under an "extend and pretend" policy to avoid recognizing impairments on its loans (*see* ¶¶69-74);
>
> (v) Wilmington's financial statements were not reported in accordance with GAAP, because its reserving and fair value methodology did not take into account economic trends or other factors, resulting in an understatement of the provision for loan losses and an overstatement of net income by at least $5.1 million (*see* ¶¶102-142); and
>
> (vi) Wilmington's internal controls suffered from significant deficiencies because of, *inter alia*, the Bank's failure to address inconsistent underwriting and asset review, understaffing in key areas, interference by senior management, and flaws in its reporting systems (*see* ¶¶153-159).

### C. False And Misleading Statements And Omissions Concerning Second Quarter 2008 Results

192. In the second quarter of 2008, the mounting credit crisis was having a profoundly negative impact on the banking industry. During the quarter, major banking institutions such as Citibank, Barclays, Lehman Brothers, and Washington Mutual reported billions of dollars of credit-related losses, and the International Monetary Fund predicted that writedowns on United

States assets would reach $945 billion.

193. Amidst the general deterioration in the banking sector, on July 18, 2008, Wilmington issued its second quarter 2008 earnings press release, reporting a quarterly net loss of $19.5 million, or $0.29 per share, a loan loss provision of $18.5 million, a Loan Loss Reserve of $113.1 million, and net charge-offs of $11.8 million. In the press release, Wilmington attributed the quarterly loss to one-time charge-offs relating to declining business conditions at an affiliate money manager (Roxbury Capital) and to losses in preferred securities held in other institutions, and stated that, on an operating basis – excluding the two charges – net income was $32.0 million, or $0.47 per share. Defendant Cecala explained that these charges that led to the loss were "a function of extraordinarily unsettled equity markets" – as opposed to Wilmington's lending and risk management practices – and that they "overshadow[ed] very strong commercial and consumer loan growth." In the release, the Bank also reported that internal risk ratings on its loan portfolio had improved from the prior quarter, with loans receiving a "Pass" rising to 96.28% from 95.62%; "Watchlist" loans declining from 2.98% to 2.29%; and "Substandard" loans rising slightly from 1.39% to 1.42%. While the Bank's quarterly loss fell below consensus expectations, as analysts had predicted a gain of $0.45 per share, on an operating basis – which the Bank's earnings release emphasized "present a more relevant measure of ongoing business trends and offer a better basis of comparison with prior periods" – earnings actually ***exceeded*** expectations.

194. On that same day, the Bank held a conference call with investors to discuss its second quarter results, on which Defendants Cecala and Gibson participated. Defendant Cecala again attributed the quarterly loss to the Roxbury Capital and investment securities charge-offs and emphasized that, without the two charges, the Bank would have reported net income of $32

million. In discussing the Bank's credit related metrics, Cecala emphasized that "the few credits the Bank was charging off were "not surprises and are not indicative of anything systemic in the portfolio." In response to a question about the Bank's outlook for future charge-offs in its construction loan portfolio, Cecala warned analysts against using the increased second quarter provision as an estimate going forward, stating that analysts should not "***take that $18.5 million [loan loss provision] figure and move that forward***" for the remainder of the year because

> ***I just don't believe that we would have a provision at that level going forward. As we've said in the past, we think that our charge offs – net charge-offs will be in our historical range… These commercial loans, they just get lumpy and that's what we've experienced this past quarter.***

Cecala stressed that the Bank's "internal credit metrics also improved," and that a "significant amount" of the increase in the provision for loan losses was to account for growth in the loan portfolio.

195. On or about August 11, 2008, the Bank filed with the SEC its Form 10-Q for the second quarter of 2008 (the "Second Quarter 2008 Form 10-Q"), which was signed by Defendants Cecala and Gibson. The Second Quarter 2008 Form 10-Q repeated the quarterly financial results and the credit disclosures regarding loan risk ratings set forth in the July 18, 2008 press release. The Second Quarter 2008 Form 10-Q reported a fair value impairment of the loan portfolio of $11.8 million. The Second Quarter 2008 Form 10-Q also asserted that the Bank's financial statements were prepared in accordance with GAAP and regulatory requirements. In addition, Defendants Cecala and Gibson signed certifications attesting to the accuracy of the information contained in the Second Quarter 2008 Form 10-Q. These attestations were in substantially the form set forth in ¶181 above. Additionally, the Second Quarter 2008 Form 10-Q contained a statement confirming the adequacy of the Bank's internal controls over financial reporting in substantially the form set forth in ¶182 above.

196. In the Second Quarter 2008 Form 10-Q, the Bank also touted the Bank's credit quality, underwriting standards, and asset review procedures. On credit quality, the Company stated that "***[n]o negative systemic credit quality trends emerged during the second quarter***." The Bank also referenced the credit risk portion of the 2007 Form 10-K, discussed above at ¶¶183-184, and reiterated its representation of "***confidence***" in its construction portfolio resulting from "***consistent***" underwriting. With respect to asset review, the Bank again claimed that "***[w]e apply our internal risk rating classifications consistently***."

197. The above-referenced statements from the second quarter of 2008 were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading because, as set forth above in more detail, at the time these statements were made:

> (i) More than half of the commercial loans extended by Wilmington were not underwritten by independent, credit-focused or trained risk management personnel; loan officers regularly exceeded the authorized amount of loans underwritten and approved by the Loan Committee by use of the 10% Rule; Wilmington's underwriting was rife with documentation errors and exceptions; loan origination was based on personal relationships and insufficiently reviewed personal guarantees; and Wilmington's lenders were motivated by volume-based compensation rather than credit quality (*see* ¶¶45-60);
>
> (ii) Wilmington's Asset Review Group actually reviewed only a very small percentage of its loan portfolio, which had been the subject of criticisms by Internal Audit, KPMG, and Federal Regulators as a weakness in Wilmington's internal controls; the Bank relied on its lenders – who were financially disincentivized to downgrade loans – to report negative loan quality; the Credit Risk Division, including the Asset Review Group, was not an independent voice for credit because it reported to Defendant Gibson, a reporting structure that was criticized by Wilmington's Internal Audit and Federal Regulators; and Defendant Gibson interfered and overrode loan quality decisions made by the Asset Review Group (*see* ¶¶61-83);
>
> (iii) Wilmington did not obtain updated appraisals to avoid inconveniencing its clients (*see* ¶¶84-89);
>
> (iv) Wilmington was seeing strong negative credit trends in its borrowers, but was acting under an "extend and pretend" policy to avoid recognizing impairments on its loans (*see* ¶¶69-74);

(iv) Wilmington's financial statements were not reported in accordance with GAAP, because its reserving and fair value methodology did not adequately take into account economic trends or other factors, resulting in an understatement of the provision for loan losses and an overstatement of net income (*see* ¶¶102-142); and

(v) Wilmington's internal controls suffered from significant deficiencies because of, *inter alia*, the Bank's failure to address inconsistent underwriting and asset review, understaffing in key areas, interference by senior management, and flaws in its reporting systems (*see* ¶¶153-159).

198. As discussed above at ¶¶135-137, the Bank's GAAP violations resulted in an understatement of the Loan Loss Reserve in this quarter of at least $14.4 million – if the Bank had reported its financial statements accurately, under this metric the Bank would have reported a net loss of $28.9 million, or more than 40% worse than the loss the Bank actually reported.

**D. False And Misleading Statements And Omissions Concerning Third Quarter 2008 Results**

199. The third quarter of 2008 saw a dramatic financial upheaval that "reshape[d] the landscape of American finance," according to a September 14, 2008 *New York Times* article. During the quarter, Washington Mutual and IndyMac Bank were shuttered by regulators, Fannie Mae and Freddie Mac were placed into conservatorship, and AIG teetered on the edge of collapse. Towards the end of the quarter, in September 2008, century-old Wall Street stalwarts like Merrill Lynch and Lehman Brothers ceased to exist as independent banks due to crippling losses.

200. Against this backdrop, on October 17, 2008, Wilmington released its quarterly results, in which it continued to portray itself as a "***stable***" and "***conservative***" bank with credit quality and charge-offs "***in line***" with historical levels. As a result, Wilmington reported net income of $22.9 million, or $0.34 per share, a loan loss provision of $19.6 million, a Loan Loss Reserve of $122.2 million, and net charge-offs of $10.5 million. Wilmington further stated that, despite the "extraordinary market conditions," on an operating basis – which the earnings release

again emphasized "present a more relevant measure of ongoing trends and offer a better basis of comparison with prior trends" – the Bank's earnings actually ***exceeded*** expectations. In an analyst report issued that day, Deutsche Bank noted this fact approvingly in raising its 2008 expectations for the Bank.

201. On that same day, the Bank held a conference call with investors to discuss its third quarter results, on which Defendants Cecala, Gibson, Harra, and North participated. Defendant Cecala specifically contrasted the Company with the broader economic devastation by stating that the business "***environment, while challenging, has not produced the same stresses at Wilmington Trust that exist at other companies***." Defendant Cecala repeatedly highlighted the Bank's stable credit quality, stating that "***[o]ur internal credit quality metrics remain stable***" and that, despite an increase in net charge-offs, "***[w]e do not expect [charge-offs] to move much beyond the high end of our historic range***." In addition, Defendant Cecala claimed that "***we are conservative in the management of the Company***."

202. In reaction, Wilmington's stock price rose from a close of $27.45 on October 16, 2008 to $27.58 on October 20, 2008. Despite some concerns about the Bank's risk profile, analysts such as RBC Capital Markets, in its October 20, 2008 report, stated that they were comforted by Wilmington's "***conservative***" management team.

203. On or about November 10, 2008 the Bank filed with the SEC its Form 10-Q for the third quarter of 2008 (the "Third Quarter 2008 Form 10-Q"), which was signed by Defendants Cecala and Gibson. The Third Quarter 2008 Form 10-Q repeated the quarterly financial results and the credit disclosures regarding loan risk ratings set forth in the October 17, 2008 press release. The Third Quarter 2008 Form 10-Q reported a fair value impairment of the loan portfolio of $6.2 million.

204. The Third Quarter 2008 Form 10-Q also asserted that the Bank's financial statements were prepared in accordance with GAAP and regulatory requirements. Defendants Cecala and Gibson signed certifications attesting to the accuracy of the information contained in the Third Quarter 2008 Form 10-Q. These attestations were in substantially the form set forth in ¶181 above. Additionally, the Third Quarter 2008 Form 10-Q contained a statement confirming the adequacy of the Bank's internal controls over financial reporting in substantially the form set forth in ¶182 above.

205. In its Third Quarter 2008 Form 10-Q, Wilmington once again pointed out its credit quality, underwriting standards, and asset review procedures. The Bank repeated its representations from the November 10, 2008 press release and conference call that its credit quality was in line with historical experience. Additionally, the Third Quarter 2008 Form 10-Q referenced the 2007 Form 10-K and repeated the credit risk language from previous quarters described above at ¶¶183-184, representing again that the Bank "***mitigate[d]***" credit risk, employed "***rigorous***" underwriting standards, was "***consistent***" in its application of underwriting standards and risk rating classifications, and had a "***high degree of confidence***" in the integrity of its commercial construction portfolio.

206. The above-referenced statements from the third quarter of 2008 were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading because, as set forth above in more detail, at the time these statements were made:

> (i) More than half of the commercial loans extended by Wilmington were not underwritten by independent, credit-focused or trained risk management personnel; loan officers regularly exceeded the authorized amount of loans underwritten and approved by the Loan Committee by use of the 10% Rule; Wilmington's underwriting was rife with documentation errors and exceptions; loan origination was based on personal relationships and insufficiently reviewed personal guarantees; and Wilmington's lenders

were motivated by volume-based compensation rather than credit quality (*see* ¶¶45-60);

(ii) Wilmington's Asset Review Group actually reviewed only a very small percentage of its loan portfolio, which had been the subject of criticisms by Internal Audit, KPMG, and Federal Regulators as a weakness in Wilmington's internal controls; the Bank relied on its lenders – who were financially disincentivized to downgrade loans – to report negative loan quality; the Credit Risk Division, including the Asset Review Group, was not an independent voice for credit because it reported to Defendant Gibson, a reporting structure that was criticized by Wilmington's Internal Audit and Federal Regulators; and Defendant Gibson interfered and overrode loan quality decisions made by the Asset Review Group (*see* ¶¶61-83);

(iii) Wilmington did not obtain updated appraisals to avoid inconveniencing its clients (*see* ¶¶84-89);

(iv) Wilmington was seeing strong negative credit trends in its borrowers, but was acting under an "extend and pretend" policy to avoid recognizing impairments on its loans (*see* ¶¶69-74);

(iv) Wilmington's financial statements were not reported in accordance with GAAP, because its reserving and fair value methodology did not adequately take into account economic trends or other factors, resulting in an understatement of the provision for loan losses and an overstatement of net income (*see* ¶¶102-142); and

(v) Wilmington's internal controls suffered from significant deficiencies because of, *inter alia*, the Bank's failure to address inconsistent underwriting and asset review, understaffing in key areas, interference by senior management, and flaws in its reporting systems (*see* ¶¶153-159).

207. Further, as discussed above at ¶¶135-137, the Bank's GAAP violations resulted in an understatement of the Loan Loss Reserve in this quarter of at least $24.3 million – if the Bank had reported its financial statements accurately, under this metric the Bank would have reported a net income of $13.0 million, or more than 40% worse than the loss the Bank actually reported.

**E. False And Misleading Statements And Omissions Concerning Year-End 2008 Results**

208. During the fourth quarter of 2008, the broader economic market continued to decline dramatically as the National Bureau of Economic Research announced that the United States economy was officially in a recession and the federal government took drastic measures to avoid a full-fledged depression. These steps included the creation of the Troubled Asset Relief

Program ("TARP"), under which the United States Department of the Treasury provided Wilmington with $330.0 million in financing.

209. In the face of the continued market deterioration, on January 30, 2009, Wilmington issued its year-end and fourth quarter 2008 earnings press release, in which the Bank continued to describe itself as "***stable***" and reported a quarterly net loss of $68.5 million, or $1.02 per share, annual net income of $102.8 million, or $1.51 per share, a loan loss provision of $67.5 million, a Loan Loss Reserve of $157.1 million, quarterly net charge-offs of $25.5 million, and annual net charge-offs of $52.4 million.

210. In the press release, the Bank reported downgrades in the internal risk ratings on its loan portfolio as a result of some pressure on its borrowers when, as Defendant Cecala described in the Bank's April 24, 2009 call, "the credit markets just collapsed" in the fourth quarter 2008, with loans receiving a "Pass" comprising 90.80% of the portfolio; "Watchlist" loans comprising 5.20%; and "Substandard" loans rising comprising 3.99%.

211. On that same day, the Bank held a conference call with investors to discuss its year-end and fourth quarter results and reassure investors regarding the Bank's stability, on which Defendants Cecala, Gibson, and North participated. Defendant Cecala stated at the outset of the call that it had been "a difficult quarter for many financial institutions," and that, "while at times it seems impossible to escape the drumbeat of bad news on so many fronts of the economy, that same bad news is providing unprecedented opportunities to grow our business." In response to an analyst question about whether the Bank was taking on excess risk by growing the commercial portfolio in a difficult economic environment, Defendant North emphasized that the Bank had been and would continue to be ***"very, very selective***" about new lending opportunities. Similarly, in response to an analyst question about whether the Bank had tightened underwriting

standards given the poor economic climate, Defendant North dismissed any need on the Bank's part to "retool[] underwriting," stating that ***"[o]n the commercial side … we haven't overhauled anything but we certainly … have some higher expectations. And we certainly are being more selective in particular***." Defendant North further assured investors that the Bank was taking the economic climate seriously, stating that "we spend an awful lot of time on this segment of the portfolio; ***we always have***" and that in the fourth quarter of 2008 the Bank went through the portfolio in an "exhaustive fashion" to make sure that the Bank's Loan Loss Reserve took into account the slower economic climate.

212. In response to the Bank's disclosures, Wilmington's stock price declined from a close of $16.19 on January 29 to $13.69 on January 30. The Bank prevented a truly calamitous decline by not disclosing, among other things, Wilmington's deficient underwriting, minimal credit review and the true extent of the Bank's incurred losses.

213. On or about March 2, 2009, the Bank filed with the SEC its Form 10-K for the year ended 2008 (the "2008 Form 10-K"), which was signed by Defendants Cecala, Gibson, and Harra. The 2008 Form 10-K repeated the financial results and the credit disclosures regarding loan risk ratings and charge-off figures set forth in the January 30, 2009 press release. The 2008 Form 10-K reported a fair value impairment of the loan portfolio of $78 million.

214. The 2008 Form 10-K also asserted that the Bank's financial statements were prepared in accordance with GAAP and regulatory requirements. Defendants Cecala and Gibson signed certifications attesting to the accuracy of the information contained in the 2008 Form 10-K. These attestations were in substantially the form set forth in ¶181 above. Additionally, the 2008 Form 10-K contained a statement confirming the adequacy of the Bank's internal controls over financial reporting in substantially the form set forth in ¶182 above.

215. In the 2008 Form 10-K, the Bank boasted of its superior performance as compared to other financial institutions, bragging that "***[w]e avoided many of the problems that other financial institutions encountered in 2008***" and representing that "***[o]ur business model differentiates us***" from competitors because, among other things, "***we have not participated in the types of financial transactions in which so many of today's problems are rooted***." In its 2008 Form 10-K, the Bank also continued to tout its policies for addressing credit risk with language substantially identical to the language in ¶¶183-184 above, representing that the Bank "***consistently***" applied "***rigorous***" underwriting standards and "***appl[ied] [internal risk rating] classifications consistently***." Although the Bank acknowledged challenges with its credit quality, it specifically represented that "the increase in the number of troubled credits resulted from economic pressures, ***not underwriting inadequacies***." The Bank again boasted of its reputation as a "***stable***" company.

216. In addition to repeating the risk mitigation language from previous quarters in ¶¶183-184 above, the Bank represented that it limited credit risk through the use of personal guarantors: "***[t]o mitigate risk, we … [t]ypically obtain collateral and personal guarantees from commercial loan clients***." The Bank continued to represent that it relied on up-to-date appraisals, stating that "[f]or collateral-dependent loans, we obtain appraisals for all significant properties" and that, "[f]or impaired loans, we use a variety of techniques to measure fair value, such as using the current appraised value of the collateral."

217. The Form 2008 10-K included a variety of representations about the Bank's procedures for accounting for potentially problematic loans and reserving for loans losses. For example, Bank claimed that "***[w]e generally place loans, including those determined impaired under SFAS No. 114, "Accounting by Creditors for Impairment of a Loan," on nonaccrual***

***status after they have become 90 days past due***." Additionally, the Bank represented that "[w]e made several enhancements to our reserve methodology in 2008." These supposed enhancements include "expand[ing] the use of historical losses to determine appropriate reserve levels" and "add[ing] qualitative factors, such as general economic conditions, loan concentrations, and other factors, to the criteria we use to assign reserve levels." Among the various qualitative factors the Bank purported to consider were "current micro- and macro-economic trends, historical net loss experience, current delinquency trends, movements within our internal risk rating classifications, and other factors."

218. The above-referenced statements from the fourth quarter of 2008 were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading because, as set forth above in more detail, at the time these statements were made:

(i) More than half of the commercial loans extended by Wilmington were not underwritten by independent, credit-focused or trained risk management personnel; loan officers regularly exceeded the authorized amount of loans underwritten and approved by the Loan Committee by use of the 10% Rule; Wilmington's underwriting was rife with documentation errors and exceptions; loan origination was based on personal relationships and insufficiently reviewed personal guarantees; and Wilmington's lenders were motivated by volume-based compensation rather than credit quality (*see* ¶¶45-60);

(ii) Wilmington's Asset Review Group actually reviewed only a very small percentage of its loan portfolio, which had been the subject of criticisms by Internal Audit, Federal Regulators, and KPMG as a weakness in Wilmington's internal controls and – even with KPMG's deeper dive for the 2008 audit – only reviewed 30% of the Bank's loan portfolio; the Bank relied on its lenders – who were financially disincentivized to downgrade loans – to report negative loan quality; the Credit Risk Division, including the Asset Review Group, was not an independent voice for credit because it reported to Defendant Gibson, a reporting structure that was criticized by Wilmington's Internal Audit and Federal Regulators; and Defendant Gibson interfered and overrode loan quality decisions made by the Asset Review Group (*see* ¶¶61-83);

(iii) Wilmington did not obtain updated appraisals to avoid inconveniencing its clients (*see* ¶¶84-89);

(iv) Wilmington was seeing strong negative credit trends in its borrowers, but was acting

under an "extend and pretend" policy to avoid recognizing impairments on its loans (*see* ¶¶69-74);

(iv) Wilmington's financial statements were not reported in accordance with GAAP, because its reserving and fair value methodology did not adequately take into account economic trends or other factors such as loss history, resulting in an understatement of the provision for loan losses and an overstatement of net income (*see* ¶¶102-142); and

(v) Wilmington's internal controls suffered from significant deficiencies because of, *inter alia*, the Bank's failure to address inconsistent underwriting and asset review, understaffing in key areas, interference by senior management, and flaws in its reporting systems (*see* ¶¶153-159).

219. Further as discussed above at ¶¶135-137, the Bank's GAAP violations resulted in an understatement of the Loan Loss Reserve in this quarter of at least $58.5 million – if the Bank had reported its financial statements in accordance with GAAP, under this metric the Bank would have reported a net loss of $102.6 million, or nearly 50% worse than the loss the Bank actually reported.

### F. False And Misleading Statements And Omissions At The March 5, 2009 Keefe, Bruyette & Woods, Inc. Investor Conference

220. On March 5, 2009, Defendant Cecala presented at the Keefe, Bruyette & Woods, Inc. Regional Banking Conference, where he highlighted the Bank's underwriting and asset review processes. For example, Defendant Cecala stated that it was important for investors to know that Wilmington had not acquired other financial institutions, so all of the Bank's loans "***have gone through our underwriting process, which gives us great comfort***." With respect to asset review, Defendant Cecala stated: "***[W]e separate our credit policy and asset review functions. We want to make sure that there are no conflicts there. We conducted a very thorough review of our portfolio at the end of the year***."

221. The above-referenced statements from the Keefe, Bruyette & Woods conference were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading because, *inter alia*:

(i) Wilmington's underwriting was rife with documentation errors and exceptions, was based on personal relationships and personal guarantees, was motivated by volume-based compensation rather than tight credit reviews, with less than 50% of the Bank's loan portfolio receiving further Loan Committee review, and was subject to exceptions through the 10% Rule, which allowed loan officers to make massive credit extensions at their own discretion (*see* ¶¶45-60);

(ii) Wilmington's Asset Review Group actually reviewed only a very small percentage of its loan portfolio, which had been the subject of criticisms by Internal Audit, Federal Regulators, and KPMG as a weakness in Wilmington's internal controls and – even with KIPMG's deeper dive for the 2008 audit – only reviewed 30% of the Bank's loan portfolio; the Bank relied on its lenders – who were financially disincentivized to downgrade loans – to report negative loan quality; the Credit Risk Division, including the Asset Review Group, was not an independent voice for credit because it reported to Defendant Gibson, a reporting structure that was criticized by Wilmington's Internal Audit and Federal Regulators; and the Asset Review Group was subject to increased interference by Defendants Cecala, Harra and Gibson, who in 2009 became even more aggressive in overruling credit decisions, including decisions to charge off loans (*see* ¶¶61-83);

(iii) Wilmington did not obtain updated appraisals to avoid inconveniencing its clients (*see* ¶¶84-89); and

(iv) Wilmington was seeing strong negative credit trends in its borrowers, but was acting under an "extend and pretend" policy to avoid recognizing impairments on its loans (*see* ¶¶69-74).

### G. False And Misleading Statements And Omissions Concerning First Quarter 2009 Results

222. The economic crisis and pressure on bank stocks continued in 2009, with the FDIC announcing in May 2009 that there were 21 bank failures in the first quarter of 2009, the largest number of failed institutions in a quarter since 1992. Wilmington, however, reported positive earnings results for the quarter, ***exceeding*** analysts' expectations by more than 20 cents a shares. Specifically, on April 24, 2009 Wilmington issued its first quarter 2009 earnings press release, reporting a positive quarterly net income of $21.8 million, or $0.26 per share, a loan loss provision of $29.5 million, a Loan Loss Reserve of $167 million, and net charge-offs of $21.2 million. On this news, the Bank's stock price leapt more than 30%, from a close of $10.75 on April 23 to $14.17 on April 24.

223. On that same day, the Bank held a conference call with investors to discuss its first quarter results, on which Defendants Cecala, Gibson, and North participated. On the call, Defendant Cecala represented that "[w]hen we look at credit quality, we've not seen the rapid decline experienced in the fourth quarter, although there has been some deterioration." In response to an analyst question as to why the Bank's loan reserves were not higher in proportion to non-performing assets, Defendant Cecala claimed that the Bank's Loan Loss Reserve was proportionally lower than other banks because "we get personal guarantees on the majority of our commercial loans, so that gives us a lot of leverage and ultimately results in lower charge-offs." Defendant North again assured analysts that "we're looking at the appropriateness of risk ratings on an ongoing basis, and trying to make sure that they reflect the current performance aspects of what's going on."

224. Analysts reacted favorably to the Bank's announcement of its loan loss provision for the quarter. For example, an April 24, 2009 Morgan Stanley Research report noted that "[p]rovisions were significantly below our expectations due to both lower NCOs and lower than expected reserve build." Similarly, a April 27, 2009 Janney Capital Markets research report stated "[w]e raise our 2010 earnings per share estimate to a loss of ($0.15), from ($0.25), because the loan loss provision is likely [to] more closely track net loan charge-offs."

225. On or about May 11, 2009, the Bank filed with the SEC its Form 10-Q for the first quarter of 2009 (the "First Quarter 2009 Form 10-Q"), which was signed by Defendants Cecala and Gibson. The First Quarter 2009 Form 10-Q repeated the quarterly financial results and the credit disclosures regarding loan risk ratings and charge-off figures set forth in the April 24, 2009 press release. The First Quarter 2009 Form 10-Q reported a fair value impairment of the loan portfolio of $3.3 million.

226. The First Quarter 2009 Form 10-Q also asserted that the Bank's financial statements were prepared in accordance with GAAP and regulatory requirements. Defendants Cecala and Gibson signed certifications attesting to the accuracy of the information contained in the First Quarter 2009 Form 10-Q. These attestations were in substantially the form set forth in ¶181 above. Additionally, the First Quarter 2009 Form 10-Q contained a statement confirming the adequacy of the Bank's internal controls over financial reporting in substantially the form set forth in ¶182 above.

227. In the First Quarter 2009 Form 10-Q, Defendants also repeated previous statements touting the Bank's underwriting standards and asset review procedures, stating that the Bank's underwriting standards were "***applied consistently throughout the portfolio***." In addition, the Bank again boasted of its "***high degree of confidence in our construction loan underwriting standards***" and repeated the representations referenced in ¶¶183-184, 216 above.

228. The above-referenced statements from the first quarter of 2009 were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading because, as set forth above in more detail, at the time these statements were made:

(i) More than half of the commercial loans extended by Wilmington were not underwritten by independent, credit-focused or trained risk management personnel; loan officers regularly exceeded the authorized amount of loans underwritten and approved by the Loan Committee by use of the 10% Rule; Wilmington's underwriting was rife with documentation errors and exceptions; loan origination was based on personal relationships and insufficiently reviewed personal guarantees; and Wilmington's lenders were motivated by volume-based compensation rather than credit quality (*see* ¶¶45-60);

(ii) Wilmington's Asset Review Group actually reviewed only a very small percentage of its loan portfolio, which had been the subject of criticisms by Internal Audit, Federal Regulators, and KPMG as a weakness in Wilmington's internal controls; the Bank relied on its lenders – who were financially disincentivized to downgrade loans – to report negative loan quality; the Credit Risk Division, including the Asset Review Group, was not an independent voice for credit because it reported to Defendant Gibson, a reporting structure that was criticized by Wilmington's Internal Audit and Federal Regulators; and

was subject to increased interference by Defendants Cecala, Harra and Gibson, who in 2009 became even more aggressive in overruling credit decisions, including decisions to charge off loans (*see* ¶¶61-83);

(iii) Wilmington did not obtain updated appraisals to avoid inconveniencing its clients (*see* ¶¶84-89);

(iv) Wilmington was seeing strong negative credit trends in its borrowers, but was acting under an "extend and pretend" policy to avoid recognizing impairments on its loans (*see* ¶¶69-74);

(iv) Wilmington's financial statements were not reported in accordance with GAAP, because its reserving and fair value methodology did not adequately take into account negative economic trends or other factors such as loss history, resulting in an understatement of the provision for loan losses and an overstatement of net income (*see* ¶¶102-142); and

(v) Wilmington's internal controls suffered from significant deficiencies because of, *inter alia*, the Bank's failure to address inconsistent underwriting and asset review, understaffing in key areas, interference by senior management, and flaws in its reporting systems (*see* ¶¶153-159).

229. As discussed above at ¶¶135-137, the Bank's GAAP violations resulted in an understatement of the Loan Loss Reserve in this quarter of at least $73.4 million – if the Bank had reported its financial statements accurately, under this metric the Bank would have reported a net income of only $6.9 million, nearly 70% less than the Bank reported.

### H. False And Misleading Statements And Omissions Concerning Second Quarter 2009 Results

230. On July 24, 2009, Wilmington issued its second quarter 2009 earnings press release, reporting a quarterly net loss of $9.1 million, or $0.20 per share, a loan loss provision of $54 million, a Loan Loss Reserve of $184.9 million, and net charge-offs of $36.2 million. The Bank had pre-announced its earnings in a July 17, 2009 press release. These results again exceeded analysts' expectations, who were expecting a loss of $0.30 per share. The Bank's earnings release attributed the quarter's loss "primarily" to securities losses on pooled trust-preferred investment securities, which were securities issued by banks, insurance companies, and

other financial institutions that were suffering dramatic losses during this time period. Absent these losses, on an operating basis, the Bank would have reported a profit of $17.8 million. Although Wilmington's stock price declined on the Bank's pre-announcement, as discussed herein, the Officer Defendants prevented an even steeper decline by assuring the market that the Bank had a firm grasp of its credit issues and was disclosing all problems appropriately and in a timely manner.

231. On the same day Wilmington issued its press release, the Bank held a conference call with investors to discuss its second quarter results, in which Defendants Cecala, Gibson, and North participated. On the call, Defendant Cecala represented that "the current conditions in the [mid-Atlantic] region are stable, but fragile." Defendant Cecala attributed the increase in the provision for loan losses for the quarter to a handful of borrowers, and in response to an analyst questioning whether "loss severity has gotten worse," Defendant Gibson replied, "we haven't seen any out-of-pattern behavior there." On the call, Defendant North also assured investors regarding how closely the Bank was monitoring its loan portfolio: "***We look at our [commercial] loan portfolio … actively. And over the past six months, [we] have looked at it extremely actively to make sure that we're identifying the issues, that we're risk rating them appropriately, that we're reserving appropriately as well***."

232. On or about August 10, 2009, the Bank filed with the SEC its Form 10-Q for the second quarter of 2009 (the "Second Quarter 2009 Form 10-Q"), which was signed by Defendants Cecala and Gibson. The Second Quarter 2009 Form 10-Q repeated the quarterly financial results and the credit disclosures regarding loan risk ratings set forth in the July 24, 2009 press release.

233. The Second Quarter 2009 Form 10-Q reported a fair value impairment of the loan

portfolio of $21.7 million. The Second Quarter 2009 Form 10-Q also asserted that the Bank's financial statements were prepared in accordance with GAAP and regulatory requirements. Defendants Cecala and Gibson signed certifications attesting to the accuracy of the information contained in the Second Quarter 2009 Form 10-Q. These attestations were in substantially the form set forth in ¶181 above. Additionally, the Second Quarter 2009 Form 10-Q contained a statement confirming the adequacy of the Bank's internal controls over financial reporting in substantially the form set forth in ¶182 above.

234. In its Second Quarter 2009 Form 10-Q, the Bank also continued to tout the strength of the Bank's underwriting standards and asset review procedures. Defendants referenced the 2008 Form 10-K's risk mitigation discussion and reiterated their statements from previous quarters that the Bank's underwriting standards were applied "consistently" and "rigorous[ly]." Defendants also repeated the statements described in ¶¶183-184 above regarding the mitigation of credit risk and "consistent" application of risk rating analyses.

235. The above-referenced statements from the second quarter of 2009 were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading because, as set forth above in more detail, at the time these statements were made:

> (i) More than half of the commercial loans extended by Wilmington were not underwritten by independent, credit-focused or trained risk management personnel; loan officers regularly exceeded the authorized amount of loans underwritten and approved by the Loan Committee by use of the 10% Rule; Wilmington's underwriting was rife with documentation errors and exceptions; loan origination was based on personal relationships and insufficiently reviewed personal guarantees; and Wilmington's lenders were motivated by volume-based compensation rather than credit quality (*see* ¶¶45-60);
>
> (ii) Wilmington's Asset Review Group actually reviewed only a very small percentage of its loan portfolio, which had been the subject of criticisms by Internal Audit, Federal Regulators, and KPMG as a weakness in Wilmington's internal controls; the Bank relied on its lenders – who were financially disincentivized to downgrade loans – to report negative loan quality; the Credit Risk Division, including the Asset Review Group, was

not an independent voice for credit because it reported to Defendant Gibson, a reporting structure that was criticized by Wilmington's Internal Audit and Federal Regulators; and the Asset Review Group was subject to increased interference by Defendants Cecala, Harra and Gibson, who in 2009 became even more aggressive in overruling credit decisions, including decisions to charge off loans (*see* ¶¶61-83);

(iii) Wilmington did not obtain updated appraisals to avoid inconveniencing its clients (*see* ¶¶84-89);

(iv) Wilmington was seeing strong negative credit trends in its borrowers, but was acting under an "extend and pretend" policy to avoid recognizing impairments on its loans (*see* ¶¶69-74);

(iv) Wilmington's financial statements were not reported in accordance with GAAP, because its reserving and fair value methodology did not adequately take into account economic trends or other factors such as loss history, resulting in an understatement of the provision for loan losses and an overstatement of net income (*see* ¶¶102-142); and

(v) Wilmington's internal controls suffered from significant deficiencies because of, *inter alia*, the Bank's failure to address inconsistent underwriting and asset review, understaffing in key areas, interference by senior management, and flaws in its reporting systems (*see* ¶¶153-159).

236. Further, as discussed above at ¶¶135-137, the Bank's GAAP violations resulted in an understatement of the Loan Loss Reserve in this quarter of at least $100.7 million – if the Bank had reported its financial statements accurately, under this metric the Bank would have reported a net loss of $36.4 million – over 300% greater than the loss the Bank actually reported.

**I. False And Misleading Statements And Omissions Concerning Third Quarter 2009 Results**

237. As the financial crisis continued, Wilmington bolstered its efforts to reassure the market that it knew its portfolio intimately and that it was being prudent and managing its portfolio actively. On October 23, 2009, Wilmington issued its third quarter 2009 earnings press release, reporting a quarterly loss of $5.9 million, or $0.15 per share, a loan loss provision of $38.7 million, a Loan Loss Reserve of $201.8 million, and net charge-offs of $21.8 million. In the release, Defendant Cecala noted that "the provision for loan losses declined . . . and there were numerous other positive developments." The Bank's earnings release again attributed the

quarter's loss to securities losses on pooled trust-preferred investment securities. Absent these losses, on an operating basis, the Bank would have reported a profit of $8.8 million.

238. On that same day, the Bank held a conference call with investors to discuss its third quarter results, on which Defendants Cecala, Gibson, Harra, and North participated. On the call, Defendant Cecala described the lower provision for loan losses as a highlight for the quarter. In response to analyst questioning regarding the ratio of the Loan Loss Reserve to non-performing loans, Defendant North stated that:

> We do and we are required to do a thorough examination of either the future, the present value of the expected future cash flows or if it's a real collateral-oriented loan, obviously we're going out and getting a new appraisal. And ***obviously what we provisioned and what's in the reserve is a direct correlation to those today based on today's market conditions and the expectations, it's based on those values***.
>
> So I'm not quite sure how that compares to maybe the other periods in different cycles, but today, we're taken these loans and we're putting them under the microscope and we're doing the analysis and assessing the value at today's market and the expected cash flows based on today's performance. And our reserve levels and what we provision every quarter is a result of that.

239. Under further questioning regarding whether the Bank was recording timely Loan Loss Reserve increases, Defendant North responded:

> [I]t's an ongoing process, and not only ***looking at these things on a daily basis in terms of how they're performing, but we're also looking at them relative to the source of payment, the collateral***, et cetera. So it's a ***live and ongoing process***. . . . So I'm not sure what else to say about that other than, these are situations that ***every one is put under the microscope***, if you will, and ***continually evaluated***.

240. Likewise, Defendant Gibson responded to an analyst question regarding shifting loans into the substandard classification by stating that any loan being moved to substandard gets "***very close scrutiny***" and, later, clarifying that during a "recessionary period" "the key to us is making sure that we have the appropriate reserves against those [non-performing] loans and I think we do." Cecala echoed Gibson's remarks on the strength of the Bank's reserving given the

troubled economic climate, stating "we take a look at what kind of reserves that we should have against the portfolio given the current economic conditions," that the Bank applied close "***scrutiny***" to all classified loans, and that "***[w]e do a rather thorough and exhaustive analysis each and every quarter***." While the Bank's stock price declined slightly on this announcement, the Officer Defendants' misleading reassurances had the desired effect of preventing a steep dive in stock price.

241. On or about November 9, 2009, the Bank filed with the SEC its Form 10-Q for the third quarter of 2009 (the "Third Quarter 2009 Form 10-Q"), which was signed by Defendants Cecala and Gibson. The Third Quarter 2009 Form 10-Q repeated the quarterly financial results and the credit disclosures regarding loan risk ratings and charge-off figures set forth in the October 23, 2009 press release. The Third Quarter 2009 Form 10-Q reported a fair value impairment of the loan portfolio of $7.9 million.

242. The Third Quarter 2009 Form 10-Q also asserted that the Bank's financial statements were prepared in accordance with GAAP and regulatory requirements. Defendants Cecala and Gibson signed certifications attesting to the accuracy of the information contained in the Third Quarter 2009 Form 10-Q. These attestations were in substantially the form set forth in ¶181 above. Additionally, the Third Quarter 2009 Form 10-Q contained a statement confirming the adequacy of the Bank's internal controls over financial reporting in substantially the form set forth in ¶182 above.

243. In its Third Quarter 2009 Form 10-Q, the Bank again touted the Bank's underwriting standards and asset review procedure. Defendants referenced the 2008 Form 10-K's discussion of risk mitigation described above at ¶¶183-184, representing that they "***consistently***" applied underwriting standards and internal risk ratings and "***regularly***

***review[ed]*** ” their portfolio for problem loans. In addition, Defendants represented that they "***divide credit risk-related responsibilities among different groups of staff members***" and that they use the "***current appraised value of the collateral***" in calculating the fair value of impaired loans. The Third Quarter 2009 Form 10-Q also repeated the language in ¶183 regarding the various qualitative factors Defendants purportedly considered in reserving for loan losses.

244. In their Third Quarter 2009 Form 10-Q, Defendants added detailed language explaining their purported process for "identify[ing] potential problem loans." Specifically, Defendants represented that each loan was assigned an initial risk rating by the client relationship manager, which was then reviewed by the "***independent credit review group . . . to ensure that they accurately reflect the risk profile of the portfolio***." This explanation was repeated in the Bank's subsequent Forms 10-Q and 10-K.

245. The above-referenced statements from the third quarter of 2008 were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading because, as set forth above in more detail, at the time these statements were made:

> (i) More than half of the commercial loans extended by Wilmington were not underwritten by independent, credit-focused or trained risk management personnel; loan officers regularly exceeded the authorized amount of loans underwritten and approved by the Loan Committee by use of the 10% Rule; Wilmington's underwriting was rife with documentation errors and exceptions; loan origination was based on personal relationships and insufficiently reviewed personal guarantees; and Wilmington's lenders were motivated by volume-based compensation rather than credit quality (*see* ¶¶45-60);

> (ii) Wilmington's Asset Review Group actually reviewed only a very small percentage of its loan portfolio, which had been the subject of criticisms by Internal Audit, Federal Regulators, and KPMG as a weakness in Wilmington's internal controls; the Bank relied on its lenders – who were financially disincentivized to downgrade loans – to report negative loan quality; the Credit Risk Division, including the Asset Review Group, was not an independent voice for credit because it reported to Defendant Gibson, a reporting structure that was criticized by Wilmington's Internal Audit and Federal Regulators; and the Asset Review Group was subject to increased interference by Defendants Cecala, Harra and Gibson, who in 2009 became even more aggressive in overruling credit

decisions, including decisions to charge off loans (*see* ¶¶61-83);

(iii) Wilmington did not obtain updated appraisals to avoid inconveniencing its clients (*see* ¶¶84-89);

(iv) Wilmington was seeing strong negative credit trends in its borrowers, but was acting under an "extend and pretend" policy to avoid recognizing impairments on its loans (*see* ¶¶69-74);

(iv) Wilmington's financial statements were not reported in accordance with GAAP, because its reserving and fair value methodology did not adequately take into account economic trends or other factors such as loss history, resulting in an understatement of the provision for loan losses and an overstatement of net income (*see* ¶¶102-142);

(v) Wilmington's internal controls suffered from significant deficiencies because of, *inter alia*, the Bank's failure to address inconsistent underwriting and asset review, understaffing in key areas, interference by senior management, and flaws in its reporting systems (*see* ¶¶152-159); and

(vi) Wilmington did not disclose that Federal Regulators had heavily criticized the Bank and identified serious and systemic failings in the Bank's core lending, risk management, and accounting practices such that it imposed the Federal Reserve MOU and forced the Bank to dramatically change these practices (which had been in place during the Class Period); or that the Bank still had not recognized the credit quality downgrades and loan losses resulting from policies pre-dating the Federal Reserve MOU. *See* ¶¶90-97.

246. As discussed above at ¶¶135-137, the Bank's GAAP violations resulted in an understatement of the Loan Loss Reserve in this quarter of at least $120.3 million – if the Bank had reported its financial statements accurately, under this metric the Bank would have reported a net loss of $25.5 million – more than 300% greater than the loss the Bank actually reported.

## VI. THE TRUTH BEGINS TO EMERGE

247. In 2010, the market began to recover from the recession and financial crisis. On January 27, 2010, President Obama announced in his State of the Union address that "the markets are now stabilized, and we've recovered most of the money we spent on the banks." However, beginning on January 29 – just two days after the President announced the crisis had passed – Wilmington began to report dramatic and startling losses. These announcements surprised the market because Wilmington's banking peers were reporting stronger credit and

financial results, while the Bank suddenly appeared to be in a free fall.

248. On January 29, 2010, Wilmington issued its year-end and fourth quarter 2009 earnings press release, reporting a surprise quarterly loss of $11.2 million, or $0.23 per share, and an annual loss of $4.4 million, or $0.33 per share. Wilmington also surprised the market by reporting further deterioration in its credit metrics, including a quarterly loan loss provision of $82.8 million, an annual loan loss provision of $205.0 million, a Loan Loss Reserve of $251.5 million, net charge-offs of $33.1 million, and assets of $11.142 billion. In the press release, Defendants noted that the negative results "were associated with commercial construction loans, primarily for residential land and construction projects in Delaware." In the release, the Bank reported declines in the internal risk ratings on its loan portfolio, with loans receiving a "Pass" decreasing from 83.86% in the third quarter to 81.29%; "Watchlist" loans increasing from 6.64% to 6.77%; and "Substandard" loans greatly rising from 9.18% to 11.31%.

249. On that same day, the Bank held a conference call with investors to discuss its year-end and fourth quarter results and to alleviate analyst concerns regarding the Bank's recognition of credit losses. Defendants Cecala, Gibson, Harra, and North participated on the call. Defendant Cecala reported that, while the quarterly loss was primarily due to the $83 million provision for loan losses, the Bank was adequately analyzing its portfolio and timely reporting losses, and claimed that the Bank was being "fairly aggressive" in recognizing impairments.

250. Although the Bank's financial results reflected the partial and belated implementation of adequate risk management practices at the behest of Federal Regulators, the Bank's disclosures only partially revealed the truth regarding Wilmington's and the Officer Defendants' improper lending, asset review, and accounting practices. The Bank also continued

to conceal its true financial condition. As set forth above, the Bank overstated its assets on its balance sheet, because the Bank knew it was more likely than not – given the fundamental restructuring of its lending, risk management, and accounting practices required by the Federal Reserve MOU, which they knew would be in place for at least two years – that it would have to record a valuation allowance against its deferred tax asset. Had the Bank recorded the GAAP–required valuation allowance of $189.5 million, the Bank's loss would have been $200.7. As discussed above at ¶¶135-137, the Bank's GAAP violations also resulted in an understatement of the Loan Loss Reserve in this quarter of at least $162.2 million. Had the Bank reported its loan loss reserve accurately, under this metric the Bank would have reported a net loss of $53.1 million. In total, had the Bank reported its financial statements in accordance with GAAP, the Bank's loss would have exceeded $240 million in this quarter.

251. Even without full disclosure of the truth, however, the Bank's disclosures caused the price of Wilmington's stock price to fall over 14% from a close of $15.26 on January 28 to close at $13.12 on January 29, on heavy reported trading volume of 2,972,975 shares – almost three times greater than the average daily trading volume of Wilmington common stock from January 18, 2008 (the first day of the Class Period) until January 28, 2008 (the day before the first partial disclosure). Analysts were dismayed by the Bank's results, with Boenning & Scattergood reporting on January 29 that the Bank's "provision expense [was] ***$60.6 million*** higher than [the firm] expected" and Morgan Stanley commenting that same day on Wilmington's "weaker than expected credit."

252. On February 22, 2010, the Bank filed with the SEC its Form 10-K for the year-end and fourth quarter of 2009 (the "2009 Form 10-K"), which was signed by Defendants Cecala, Gibson, and Harra. The 2009 Form 10-K repeated the financial results and the credit

disclosures regarding loan risk ratings set forth in the January 29, 2010 press release. The 2009 Form 10-K reported a fair value impairment of the loan portfolio of $136.1 million. The 2009 Form 10-K also asserted that the Bank's financial statements were prepared in accordance with GAAP and regulatory requirements and included signed certifications regarding the filing's accuracy and the Bank's adequacy of internal controls by Defendant Cecala and Gibson, substantially in the forms set forth in ¶¶181-182 above.

253. In the 2009 Form 10-K, the Bank obliquely disclosed the Federal Reserve MOU, stating that "we have implemented plans at the request of our regulators that are intended to, among other things, enhance the independence and effectiveness of our loan review, credit policy, and credit analysis functions…improve our position on nonperforming loans; and improve our credit risk management." Without disclosing that the Federal Reserve had found severe and systemic failings with the Bank's lending, risk management, and accounting practices and demanded that they be fundamentally restructured, the Bank also represented that the credit review team "function[ed] independently," reported to the Audit Committee, and conducted a number of analyses, and therefore the Bank has "a system of checks and balances that enhances our ability to evaluate credit risk."

254. The Bank's disclosures continued to withhold the truth regarding Wilmington's and the Officer Defendants' improper lending, asset review, and accounting practices. Moreover, the Bank overstated its assets on its balance sheet, because the Bank knew it was more likely than not that it would have to record a valuation allowance against its deferred tax asset. Accordingly, Defendants' statements that they "account[ed] for income taxes in accordance with ASC Topic 740, "recognize[d] tax positions in our financial statements when it [was] more likely than not that the position will be sustained by taxing authorities," and

"believe[d] it [was] more likely than not that the results of future operations will generate sufficient taxable income to realize the balance of our deferred tax assets," were false and misleading. In addition, critically, Wilmington did not disclose that its supposedly rigorous credit controls had just been imposed on the Bank by the Federal Reserve because the Federal Regulators had identified severe deficiencies in the Bank's lending, risk management and accounting practices that had been in place for much of the Class Period. The Bank also failed to disclose that it had not recognized the credit quality downgrades and loan losses resulting from policies pre-dating the Federal Reserve MOU. *See* ¶¶90-97.

255. The same day that the Bank issued its 2009 Form 10-K, it held the common stock Offering, discussed below in Section XI, and raised over $270 million. The Offering Documents (defined below) incorporated several Class Period SEC filings, including the 2007 and 2009 Forms 10-K, and for the reasons set forth above at ¶¶176-207, 252-254, these Offering Documents were false and misleading. Analysts reacted favorably to the Offering, with Morgan Stanley reporting on February 22 that it viewed the offering as "positive for the stock" and would allow the Bank to repay its TARP obligations earlier than expected. Janney Capital Markets also announced that it "like[d]" the Bank's capital raise and raised the firm's rating and fair value estimate.

256. On April 23, 2010, just two months after the Bank raised over $270 million from the public in the February 2010 Offering, Wilmington issued its first quarter 2010 earnings press release, reporting a quarterly net loss of $29.2 million, or $0.44 per share, a loan loss provision of $77.4 million, a Loan Loss Reserve of $299.8 million, net charge-offs of $29.1 million, and assets of $11.044 billion. In the press release, the Bank reported that the internal risk rating analysis continued to show downgrades, with loans receiving a "Pass" dropping from 81.29% in

2009 to 79.31%; "Watchlist" loans increasing from 6.77% to 7.71%; and "Substandard" loans increasing from 11.31% to 12.50%.

257. On that same day, the Bank held a conference call with investors to discuss its first quarter results, on which Defendants Cecala, Gibson and North participated. On the call, Defendant Cecala stated that the quarterly loss was "primarily due" to the $77 million provision for loan losses, and expressed the Bank's intent to "purposely reduce our exposure to the real estate sector" and, thus, that investors "could continue to see the balance sheet shrink over the balance of the year." When analysts specifically asked how much of the Loan Loss Reserve was due to updated appraisals, Defendant Cecala represented that the reserve only experienced "***a minor amount of increase due to appraisal***." When analysts expressed some confusion that the Bank's provision was increasing at the same time that its negative loan loss rating trends appeared to be slowing, Defendant Cecala claimed, "***We're just trying to be cautious***."

258. Even without full disclosure of the truth, however, the Bank's disclosures caused the price of Wilmington's stock price to fall over 8% from a close of $20.16 on April 22 to close at $18.48 on April 23, on heavy reported trading volume of 3,112,812 shares – more than three times greater than the average daily trading volume of Wilmington common stock from January 18, 2008 (the first day of the Class Period) until January 28, 2008 (the day before the first partial disclosure). Analysts were disappointed and surprised by the Bank's results, including Morgan Stanley, which commented in a report that same day that the Bank's provision was $18.9 million higher than expected. In an April 26, 2010 report, RBC Capital Markets lowered its 2010 earnings per share estimate for Wilmington over 70%, from $0.60 to $0.17.

259. On or about May 10, 2010, the Bank filed with the SEC its Form 10-Q for the first quarter of 2010 (the "First Quarter 2010 Form 10-Q"), which was signed by Defendants

Cecala and Gibson. The First Quarter 2010 Form 10-Q repeated the quarterly financial results and the credit disclosures regarding loan risk ratings and charge-off figures set forth in the April 23, 2010 press release. The First Quarter 2010 Form 10-Q reported a fair value impairment of the loan portfolio of $21.4 million. The First Quarter 2010 Form 10-Q also asserted that the Bank's financial statements were prepared in accordance with GAAP and regulatory requirements and included signed certifications regarding the filing's accuracy and the Bank's adequacy of internal controls by Defendant Cecala and Gibson, substantially the forms set forth in ¶¶181-182 above.

260. The Bank's disclosures regarding its first quarter 2010 results only partially revealed the truth regarding Wilmington's and the Officer Defendants' improper lending, asset review, and accounting practices. The Bank continued to conceal its true financial condition and the true extent of the losses inherent in the Bank's loan portfolio. As discussed above at ¶¶135-137, the Bank's GAAP violations resulted in an understatement of the Loan Loss Reserve in this quarter of at least $201.4 million – if the Bank had reported its Loan Loss Reserve accurately, under this metric the Bank would have reported a net loss of $68.4 million. The Bank was also required under GAAP to record a valuation allowance of $189.5 million. In total, had the Bank reported its financial statements in accordance with GAAP, the Bank's loss in the first quarter 2010 would have exceeded $250 million in this quarter.

261. After the close of the market on June 3, 2010 and only weeks before the Federal Reserve was scheduled to begin its annual exam, Wilmington shocked the market by announcing that, after 31 years with the Bank, Defendant Cecala was immediately retiring as CEO and that Board member Defendant Foley, who had no prior banking experience, would take over as CEO. Wilmington also announced that Cecala would remain Chairman of the Board for six more

weeks, at which time the Board would elect his replacement.

262. In response, Wilmington's stock price plummeted, dropping almost 10% from a closing price of $14.99 per share on June 3, 2010 to a closing price of $13.52 per share on June 4, 2010, on heavy reported trading volume of 3,917,194 shares – more than three times greater than the average daily trading volume of Wilmington common stock from January 18, 2008 (the first day of the Class Period) until January 28, 2010 (the day before the first partial disclosure).

263. To mitigate the concern that Cecala's abrupt departure caused investors and analysts, the Officer Defendants issued misleading statements to alleviate the market's worries and prevent an even steeper decline in the Bank's stock price. For instance, during a June 4, 2010 investor conference call held to discuss the announcement, Cecala assured analysts that his sudden resignation did not indicate that the Bank had "a mounting capital problem or credit problem that hadn't been reported." To the contrary, Cecala specifically stated that "given the signs that the economy is starting to improve and considering the strength of our financial condition[], all of us agreed that now is the right time to make the transition to new leadership." In response to questions regarding the timing of his departure, Cecala further explained that Wilmington is "a great company. We are just getting through this recessionary period. That is the only blemish that we have right now." Similarly, Defendant Foley assured the market that he "absolutely" had "comfort" and "confidence" that Wilmington had the "right people that can identify problems ***to make sure that there aren't any surprises this year*** where credit – there is a blowup somehow." (Emphasis added.)

264. These statements, however, were materially false and misleading when made. Although Defendant Cecala touted the "financial strength of the Company" and Defendant Foley claimed that there would be no credit surprises to the market, these Defendants were well aware

that the Bank was preparing to issue a disastrous announcement regarding the Bank's second quarter 2010 financial results. Wilmington and the Officer Defendants continued to conceal the Bank's improper lending, risk management, and accounting practices, as well as the true extent of the Bank's loss exposure and true financial condition. By this time, but unbeknownst to the market: (i) the Federal Reserve had forced Wilmington to fundamentally restructure its lending, risk management, and accounting practices because the Federal Reserve had (again) identified serious and systemic deficiencies in these areas; and (ii) Wilmington had brought in a third-party company made up of former bank examiners to review the Bank's loan portfolio and evaluate its credit risk ratings and appraisals. Moreover, Defendants were aware, or should have been aware, that a substantial portion of the Bank's loan portfolio was tied to outdated appraisals and that, once those appraisals were updated, the Bank would be required to reserve at dramatically higher levels to account for the decrease in value of the collateral underlying those loans.

265. Despite those assurances, analysts expressed serious concerns regarding the suddenness of Cecala's resignation. For example, on June 7, 2010, RBC Capital Markets issued a report calling the announcement "a complete surprise" and observing that "the manner in which the recent change in management occurred has raised our concerns as to the factors that brought about that change." RBC's report reflected the market's lack of confidence in Wilmington management, noting that the "unusual" announcement raised the "$100 million question" of whether additional dramatic increases to the Loan Loss Reserve could be coming from the Bank.

266. Nonetheless, Defendants' misleading assurances regarding the stability of the Bank's financial condition, including its credit, had their intended effect. For example, the June 7, 2010, RBC report reiterated its outperform rating and stated, "[w]e still remain hopeful that

the credit tide has finally turned for the Company." Similarly, on June 7, 2010, Macquarie Equities Research issued a report reiterating its neutral rating and noted that "the lack of a search and immediacy of the change of control could lead some to conclude that Mr. Cecala was forced out. While we cannot prove/disprove this, we think it matters less than that Mr. Foley remains committed to the current strategy."

267. Only three weeks after the Bank falsely assured the market that there were no credit surprises on the horizon and successfully concealed the truth about its lending, risk management, and accounting practices and the serious deficiencies that the Federal Reserve identified in these areas, the Bank provided new information to analysts that led them to believe that the Bank's loan quality and credit position were likely worse than previously disclosed. On June 23, 2010, SunTrust Robinson Humphrey issued an analyst report downgrading its rating on Wilmington from Buy to Neutral as a result of being informed of "deteriorating credit metrics" and "negative asset quality" during a June 22 onsite visit with Wilmington management, including with Defendants Foley, Gibson, and North.

268. Specifically, SunTrust reported that Wilmington hired consultants (made up of former bank examiners) in May to perform a detailed loan review in preparation for the Bank's upcoming regulatory exam, and that the review was primarily focused on the Bank's construction portfolio as well as its credit policy and credit administration functions. According to SunTrust, as a result of this review, management expected increased non-performing assets in the second quarter 2010. During the meeting with analysts, management "***admitted to not being as proactive as they needed to be in the past in dealing with the bank's credit challenges***." As it warned investors to expect a material increase in charge-offs in the near term, SunTrust also voiced surprise over management's "negative asset quality commentary . . . given management's

relatively positive/status-quo asset quality statements in its recent conference call on the [Bank's] CEO change."

269. A June 24, 2010 analyst report issued by RBC Capital Market titled "Lowering estimates due to Expected Higher Credit Losses Driven by its Construction Portfolio – 'A Kitchen Sink Quarter'" similarly expressed concerns that as a result of the independent review, the Bank's "credit losses and loan loss provision will soar this quarter." In this regard, the report noted that RBC's previously-discussed "suspicions on credit deterioration following the recent CEO departure [set forth above at ¶265] . . . are expected to come true in 2Q10." While increasing RBC's assumption for the Bank's nonperforming assets, credit losses, and loan loss provisions, the report specifically stated that "we would not expect a repeat 2Q loss after the Federal Reserve completes its exam in the 3Q" and recommended that investors "are better off riding out the storm than bailing out now."

270. In response to these analyst reports predicting greater credit deterioration and negative asset quality, the price of Wilmington's stock dropped 11%, from a closing price of $12.99 per share on June 22, 2010 to close at $11.56 per share on June 23, 2010, on heavy reported trading volume of 5,597,679 shares – more than five times greater than the average daily trading volume of Wilmington common stock from January 18, 2008 (the first day of the Class Period) until January 28, 2010 (the day before the first partial disclosure). The price of Wilmington stock continued to trend downward, declining almost another 4% on June 24, 2010.

271. On July 21, 2010, Wilmington announced that the Board elected Defendant Foley as Chairman of the Board, effective immediately.

272. On July 23, 2010, before the open of the market, Wilmington issued a press release reporting its financial results for the second quarter 2010, which exceeded analysts'

negative predictions for the Bank's second quarter 2010 performance based on the June 4 and June 23 announcements. The Bank's financial results included a net loss of $120.9 million, or $1.33 per share. The Bank also reported that certain of its key credit metrics had deteriorated substantially from the prior quarter, including that its net charge-offs increased 352% to $131.2 million; provision for loan losses increased 165% to $205.2 million; reserve for loan losses increased 25% to $373.8 million; and loans with substandard risk ratings increased 33% to $1,451.5 million. In particular, the Bank explained that "nearly two-thirds of the loans charged off in the second quarter were commercial real estate construction loans" and that "[m]ost of these loans were for projects in southern Delaware, and largely for parcels of land that are in various stages of development." The Bank also confirmed that it had "engaged an independent third-party credit review firm to take an objective look at our policies, procedures, and risk ratings" and reported that "their review and analysis supported our conclusions."

273. In response, numerous analysts downgraded their ratings and/or earnings projections for Wilmington, citing concerns over the Bank's loss exposure and credit problems. For example, on July 23, 2010, Janney Capital Markets issued a report lowering its rating from "Neutral" to "Sell," explaining that "Wilmington Trust's stunning second quarter results showed the company's balance sheet risk." Janney further reported that the "company faces an extended period of working through troubled credits from its construction and commercial loans" and that "future losses are likely to be substantial and reduce capital ratios, which could become problematic when the company reduces non-performing assets and seeks to repay TARP." Similarly, in its July 26, 2010 report titled "Tough Sledding Ahead," Macquarie Equities Research lowered its rating from to "Underperform" to a "Neutral," stating "[w]hile the [Bank] is making efforts to get ahead of credit issues, we expect higher credit costs to drive additional

losses."

274. Boenning & Scattergood issued an analyst report on July 26, 2010, revising its earnings projections downward and stating that, "we are encouraged that the company took a realistic approach to the situation it finds itself in. That said, we have some consternation that problems are extending from the construction portfolio as quickly and as severely as they did in this quarter. Regardless, it is clear that Wilmington Trust is not close to being in the clear with regard to credit issues and, in our opinion, investors should expect further losses."

275. The Bank's disclosures caused the price of Wilmington's stock to drop 9%, from a closing price of $10.88 per share on July 22, 2010 to close at $9.88 per share on July 23, 2010, on heavy reported trading volume of 7,467,963 shares – more than seven times greater than the average daily trading volume of Wilmington common stock from January 18, 2008 (the first day of the Class Period) until January 28, 2008 (the day before the first partial disclosure).

276. Defendants Foley and Gibson prevented an even steeper decline however, by falsely blaming the Bank's performance on the "lingering effects of a weak economy, and the housing market" and emphasizing that the losses were ***not*** the result of the Bank's "methodology for evaluating credit risk." Specifically, during the earnings conference call held that same day, Defendant Foley blamed the increase in Wilmington's loan provision to "economic pressures within our regional banking footprint. Particularly in Southern Delaware." He explained that these economic pressures "manifested themselves in the real estate appraisals that showed severe reductions in collateral valuations. And in the updated financial records that we received from our borrowers, which showed significant weakening in the wake of the prolonged recession."

277. To address concerns regarding the timing of the economic impact on Wilmington's portfolio, Foley explained that "the economic downturn hit Delaware later than it

hit other areas. And it appears that our recovery will likewise lag the improvements seen elsewhere." Even when analysts pointed out that M&T acknowledged this same geographic region being "extremely weak . . . two years ago," Foley maintained that Wilmington's portfolio was impacted "a little later than they were." Defendant Gibson echoed Foley's position, stating "I think again, Delaware-based, there is weakness in the economy, and we're just being very cautious about how we're evaluating those credits given the economic environment. And I think we are reserving appropriately given that risk."

278. At the same time that they blamed the Bank's poor financial results on "weakness in the economy," Defendants Foley and Gibson stressed the propriety of Wilmington's existing "methodology for evaluating credit risk." For example, when pointedly asked whether the increased credit metrics were "due to recent deterioration either in values or your customers balance sheets versus poor credit administration where this should have been a year ago," Gibson firmly stated that he "***would not ascribe this to poor administration***" and that the independent third party credit review firm "found that with very slight tweaking that ***we were in full compliance, and our policies and procedures were state-of-the-art***." Foley similarly explained that it "was ***not*** [the Bank's] methodology," stating:

> I want to be very clear about what happened with credit in the second quarter. ***Our methodology for evaluating credit risk did not change in the second quarter***. What changed were the data points supporting our evaluation. We saw a substantial amount of negative data, like the magnitude of declines in collateral valuation, the negative trends in the financial conditions of some of our borrowers, the lack of widespread economic improvement in Delaware, and the increases in loans past due 90 days or more, and non-accruing loans. ***In other words, the data points changed our conclusion. It was not our methodology.***

279. During the conference call, Defendants Foley and Gibson also assured investors regarding the strength of Wilmington and its commitment to what that day's press release described as "working through our credit issues, relying on robust risk management tools and

analyses." They explained on the call that the Bank had "added staff, made management changes, tightened underwriting standards and taken other actions," including shortening the Bank's appraisal cycle from "a year in duration . . . on average" to six months. Foley further touted the strength of the Bank, stating "[e]ven after absorbing a $205 million provision, we're in very good shape in terms of our capital. We have a good story to tell." Gibson further emphasized this point, stating: "[W]e wanted to make sure that you understood that Wilmington Trust is a fundamentally strong institution at this time, that my top priorities are to return our company to profitability and generate sustained growth. We're dealing aggressively with the lingering effects of a weak economy, and the housing market that is relatively weak."

280. Notwithstanding the partial disclosure of the Bank's true condition, the Bank's July 23, 2010 press release and earnings conference call were materially false and misleading because, contrary to the Officer Defendants' attempts to blame the Bank's poor performance on late-emerging trends in the Delaware market, as discussed more thoroughly above at ¶¶80-82, these trends were actually apparent to the Officer Defendants in 2008. Far from having "state of the art" policies and procedures, Wilmington was operating under the Federal Reserve MOU, because the Federal Reserve identified serious and systemic deficiencies in the Company's lending, risk management, and accounting functions and, as a result, required that the Bank fundamentally restructure these functions. Moreover, Wilmington and the Officer Defendants continued to conceal the Bank's improper lending, risk management, and accounting practices, as well as the true extent of the Bank's loss exposure and true financial condition.

281. The Bank was also required under GAAP to record a valuation allowance of $189.5 million. In total, had the Bank reported its financial statements in accordance with GAAP, the Bank's loss would have exceeded $310.4 million in this quarter.

282. On August 10, 2010, the Bank filed its Form 10-Q for the second quarter of 2010 (the "Second Quarter 2010 Form 10-Q"), which was signed by Defendants Foley and Gibson. The Second Quarter 2010 Form 10-Q repeated the quarterly financial results and the credit disclosures regarding loan risk ratings set forth in the July 23, 2008 press release. The Second Quarter 2010 Form 10-Q reported a fair value impairment of the loan portfolio of $91.3 million. The Second Quarter 2010 Form 10-Q also continued to make the same representations regarding the Bank's asset review policies and appraisals contained in the First Quarter 2010 Form 10-Q, discussed above at ¶¶183-184. Further, the Bank maintained in its Second Quarter 2010 Form 10-Q that it continued to record a deferred tax asset of $238.4 million against which it did not record a valuation allowance because it "believe[d] that it [was] more likely than not that the deferred tax asset [would] be realized in the future." In other words, the Bank purportedly believed that, in the near future, the Bank would turn a profit and would be able to realize the benefits of the deferred tax asset.

283. The Bank's representations regarding its asset review, credit quality, and the deferred tax asset in the Second Quarter 2010 Form 10-Q continued to mislead the market. Moreover, the Bank continued to conceal its true financial condition, the full extent of the losses inherent in its portfolio and overstate its assets on its balance sheet.

284. The same day that the Bank issued its Second Quarter 2010 Form 10-Q, the Bank cancelled at the last minute a meeting with investors in order to "focus on the 2011 budgetary process." This abrupt cancellation "for no apparently meaningful reason" raised concerns among analysts, including RBC Capital Markets in an August 10, 2010 report, that a "second 'shoe' [was] about to drop" and was the firm's "final blow to [their] confidence in retaining an Outperform rating." RBC Capital Markets also opined that the 2010 Federal Reserve exam

would likely result in the Bank being forced to enter into an "agreement" with Federal Regulators – without noting that the Bank was actually already under a regulatory agreement – and lowered its rating on the Bank to "Sector Perform," with a price target that "assume[d] there [was] no significant deterioration in the company's credit quality[.]"

285. On October 5, after the close of the market, Bloomberg reported that, according to sources familiar with the matter, Wilmington was seeking a capital infusion from a private equity firm. According to the article, if Wilmington could not raise the necessary capital, it may be forced to try to sell itself. The next day, October 6, 2010, Boenning & Scattergood issued a report on these rumors, speculating that if the Bank was forced to sell itself, "it is possible that shareholders would experience a take-under rather than a takeover." Similarly, Janney Capital Markets issued a report that same day, opining that it was more likely that the Bank would remain independent, though recognizing that the Bank may have to sell itself if capital raise efforts failed. Janney "guesstimated" that the Bank's capital hole was between $100-200 million.

286. On these rumors, the Bank's stock price dropped almost 12%, from a closing price of $8.73 on October 5, 2010 to close at $7.71 on October 6, 2010, on heavy reported trading volume of 8,079,039 shares – almost eight times greater than the average daily trading volume of Wilmington common stock from January 18, 2008 (the first day of the Class Period) until January 28, 2010 (the day before the first partial disclosure).

287. On October 14, in a letter later disclosed to the press, Delaware State Senator George Bunting asked the Federal Reserve for an investigation into Wilmington's loans to Delaware limited liability corporations. He asked the Federal Reserve to refer any findings of criminal wrongdoing to the Federal Bureau of Investigations.

### A. The Bank Announces The Take-Under And M&T Bank's Review Of Wilmington's Loan Portfolio Is Made Public

288. On Monday, November 1, 2010, Wilmington once again shocked the market. On that day, Wilmington's investors finally learned Wilmington's true financial condition and the full extent of the problems in the Bank's loan portfolio. Before the open of the market, Wilmington announced that, on October 31, it had entered into a definitive merger agreement to sell itself to M&T Bank in an all-stock deal for roughly $3.84 per share – a "historic discount" of approximately 50% of the closing price of $7.92 per share the prior trading day.

289. That same day, also before the open of the market, Wilmington released its third quarter 2010 results, reporting an enormous quarterly net loss of $365.3 million, or $4.06 per share – an over ***200%*** increase from the loss reported in second quarter 2010. The Bank also reported a loan loss provision of $281.5 million, a Loan Loss Reserve of $510.4 million, and net charge-offs of $144.9 million. In the press release, the Bank reported that the "primary causes of the loss" were:

- Continued deterioration in commercial credit quality, which resulted in a loan loss provision of $281.5 million; [and]
- Income tax expenses of $100.7 million, as the company established a valuation allowance on deferred tax assets.

290. In a press release that same day, Defendant Foley admitted that, notwithstanding the Bank's strong results from its fee-based businesses, "as our third quarter earnings announcement shows, we continue to face difficult financial realities associated with the credit quality of the loan portfolio in our banking business. As a result, our Board examined a range of strategic alternatives . . . the Board, advised by its lead financial advisor Lazard Freres & Co., LLC, concluded that [the] merger with M&T is the best available option for our stockholders."

291. Later that day, representatives from M&T Bank and Defendants Foley and Gibson

held a conference call with analysts to discuss Wilmington's third quarter results and the acquisition. During the call, Defendant Foley admitted that "[c]redit quality clearly remains the big story," and that deteriorating trends in appraisal values and the financial conditions of the Bank's borrowers "gives us little assurance that our loan portfolio will strengthen significantly in the near term, and our capital position will not erode further." Defendant Foley concluded that M&T Bank has "a ***history of superior earnings and credit performance across economic cycles***," and that "the financial strength [M&T Bank] afford[s] us, ***the risk management techniques that they will be bringing, will only strengthen Wilmington Trust*** in the market we serve."

292. Analysts questioned Defendant Foley closely regarding the speed of the Bank's deterioration, asking whether a "specific event" caused the quarter's results including a regulatory exam, and, "if not, what changed so dramatically in the last 90 days?" Defendant Foley was only able to respond that there was an "acceleration" in the deterioration of credit quality over the quarter, and that new appraisals indicated that the "magnitude and velocity of this credit deterioration was – was very significant for us."

293. During the call, Rene Jones, M&T Bank's CFO, described M&T Bank's thorough due diligence on Wilmington's loan portfolio prior to agreeing to purchase Wilmington, explaining that M&T Bank wanted a "clean transaction" without any later credit surprises. The M&T Bank analysis included "a 40-person team of M&T Corp credit line and work out personnel examined the loan documents for some 450 borrowers, with outstandings amounting to some $3 billion, or about 50% of the overall commercial portfolio." The M&T Bank team reexamined 43% of the [commercial and industrial] portfolio, 45% of the commercial mortgage portfolio, and 64% of the commercial construction portfolio." M&T Bank leveraged its own

extensive experience in commercial and construction lending in the Delaware area, noting that "As some of you know, ***we had a few issues of our own on the eastern shore of Delaware and Maryland, and this helped inform our analysis***." Mr. Jones further noted that Wilmington's "***loan experience in [construction lending], in those counties, is not all that different from ours***. Right? ***They just have a lot more of it***."

294. Based on this analysis, M&T developed an independent estimate of credit losses remaining in Wilmington's portfolio, much of which still had not yet been recognized, even including Wilmington's third quarter results. M&T Bank estimated credit losses of 13% in Wilmington's portfolio and, taking into account the Loan Loss Reserve that Wilmington had already recorded, indicated that Wilmington has just ***over $500 million remained in undisclosed losses.***

295. Mr. Jones explained that M&T Bank looked at losses already taken on Wilmington's portfolio, beginning at January 1, 2008. Beginning with Wilmington's portfolio on that date, M&T Bank estimated "through-the-cycle losses" of almost $1.5 billion, or 17% of Wilmington's loans. M&T Bank based these marks on its own experience in the area, noting that "***much of this is behind us***," as M&T Bank had recorded losses on these loans much earlier in the cycle.

296. The market reacted swiftly to this news, driving down Wilmington's stock price ***over 40%*** from $7.11, the closing price on the previous trading day, to $4.21 on November 1, on heavy reported trading volume of 52,664,125 shares – more than ***51 times greater*** than the average daily trading volume of Wilmington common stock from January 18, 2008 (the first day of the Class Period) until January 28, 2010 (the day before the first partial disclosure).

297. Analysts were shocked by news of the merger. Janney Capital Markets observed

in a report later that day that "Wilmington's stunning third quarter loss and forced sale to M&T reflects the substantial deterioration in construction and commercial business loans." Boenning & Scattergood noted that the price paid "points to M&T's uncertainty surrounding the potential for future losses from the credit portfolio." News reports were similarly stunned by this remarkable news, with *The Wall Street Journal* noting that the "historic discount" M&T Bank obtained on Wilmington's trading price made it "one of the largest in the banking industry," only behind deals like JPMorgan's acquisition of Bear Stearns. *The New York Times* agreed, noting that the price paid made it "one of the biggest so-called take-unders in recent Wall Street memory." The *New York Times* article went on to observe that Wilmington "only now, under new leadership and regulatory pressure, recognized that it was worth far less than previously thought[.]"

298. With the Bank's release of its third quarter of 2010 financial results and the announcement of its historic take-under by M&T Bank, the market finally learned the truth about Wilmington's financial condition and loss exposure. As a result, at least in part, of the disclosures set forth above, from January 29, 2010 until November 1, 2010, as the magnitude and severity of the Company's loss exposure caused by its improper lending and accounting practices and deficient risk management was revealed piecemeal to the investing public, the Bank's stock price dropped from $15.26 per share to $4.21 per share, a decline of more than 70%.

**B. Post Class Period Events**

299. Following the announcement of the merger, on December 23, 2010, the Bank disclosed that, in order to comply with regulations governing the TARP investment the federal government made in Wilmington in 2008, the Bank would rescind more than $1.8 million in compensation to Defendant Foley. Market commenters noted that this was likely the first time a top bank official has had to return money under the special bailout regulations.

300. On February 14, 2011, Wilmington and M&T Bank issued a definitive proxy statement to shareholders soliciting their vote in favor of the merger (the "Merger Proxy"). The Merger Proxy provided numerous details regarding Wilmington's search for acquirers, as well as behind-the-scenes details on the deterioration of Wilmington's loan portfolio. The Merger Proxy disclosed that the negative economic trends that emerged nationally in 2008 affected Wilmington equally and, eventually, resulted in its fire sale to M&T Bank. Wilmington's Board of Directors recommended the merger to shareholders because, among other reasons, of "***M&T's superior earnings and credit performance across economic cycles***."

301. During February 2011, Wilmington subsidiary Wilmington Trust Federal Savings entered into a supervisory agreement with federal regulators to boost its capital levels and reduce bad loans on its books. After the Office of Thrift Supervision (defined above as "OTS") found that Wilmington Trust Federal Savings had "engaged in unsafe or unsound practices," the OTS required the company to appoint an independent director and senior executive and to revise its procedures relating to loan losses.

302. On or about March 1, 2011, Wilmington filed with the SEC its annual report for the year-ended December 31, 2010 on Form 10-K (the "2010 Form 10-K"). In the 2010 Form 10-K, the Bank disclosed the existence of an open comment letter from the SEC's staff, in which the SEC "inquired about certain matters regarding our Form 10-K for 2009 and our Forms 10-Q filed during 2010." Specifically, the SEC's inquiry focused on matters "relating to credit review, substandard and nonperforming loans, impaired loans, collateral values, goodwill, and our deferred tax asset valuation allowance." The 2010 Form 10-K noted that the Bank had responded to the SEC's comments and that the matter remained open. As of the filing of this Complaint, the SEC inquiry remains open.

303. On March 22, 2011, Wilmington announced that common stock shareholders had voted in favor of the agreement with M&T Bank by more than 93% of shares voted.

304. On April 18, 2011, representatives from M&T Bank held a conference call with analysts to discuss its first quarter 2011 results. In response to analyst questions, M&T Bank representatives explained that, following the acquisition announcement, an M&T Bank team further reviewed Wilmington's loan portfolio and confirmed their pre-announcement analysis. Accordingly, M&T Bank had not had a "big material change" in their views on Wilmington's portfolio. M&T Bank's valuation of the losses inherent in the Bank's portfolio remained at just over $500 million, as disclosed on November 1, 2010.

305. On April 20, Wilmington announced that it had requested de-listing from the NYSE at the closure of the merger, which was pending regulatory approval. The Bank stated that it expected the regulatory approvals to occur, and the merger to close, in the second quarter of 2011.

306. On May 12, 2011, M&T Bank announced that all regulatory approvals required in connection with its proposed acquisition of Wilmington under the merger agreement had been received. The closing of the acquisition was anticipated at 12:01 a.m. on May 16, 2011.

## VII. LOSS CAUSATION

307. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class. As Lead Plaintiffs will establish by expert opinion, throughout the Class Period the market price of Wilmington common stock was inflated by the false and misleading statements made by Wilmington and the Officer Defendants, as identified above, and, as a result, Lead Plaintiffs and the Class purchased Wilmington common stock at artificially inflated prices during the Class Period. The Bank's ensuing disclosures, as described herein, revealed to the market on a piecemeal basis the fraudulent

nature of these statements and the extent of the misrepresentations contained in Wilmington's financial statements that form the primary basis of this action.

308. When the truth about Wilmington was revealed to the market, the price of Wilmington common stock declined in response, as the artificial inflation caused by Wilmington's and the Officer Defendants' material omissions and false and misleading statements was removed from the price of Wilmington common stock, thereby causing substantial damage to Lead Plaintiffs and other members of the Class.

309. Indeed, during the Class Period, Wilmington common stock traded as high as $35.75 per share on September 19, 2008, and closed at $15.26 per share the day before the Bank's January 29, 2010 conference call and press release, when the first partial disclosures about Wilmington's true condition were made. Over the next nine months, in response to several additional partial disclosures that revealed more about the Bank's true financial condition, the market reacted, and Wilmington's stock price partially corrected as Wilmington's stock price was significantly driven downward. The Bank and the Officer Defendants mitigated the impact of those disclosures and prevented the full truth about Wilmington from being revealed by making contemporaneous false and misleading statements that minimized and denied the facts being revealed to the market. As the market gained a more complete understanding of the magnitude of the loss exposure facing Wilmington and the implications for Wilmington's financial condition, the price of Wilmington's common stock plummeted to $4.21 per share on November 1, 2010. As a result, at least in part, of the truth emerging about the Bank's improper lending practices, poor quality loans, deficient risk management, and loss exposure, the market price of Wilmington common stock fell more than $10 per share, from $15.26 per share on January 28, 2010 to $4.21 per share on November 1, 2010.

310. The specific dates of the adverse disclosures and corresponding declines in the price of Wilmington common stock are set forth above in Section VI.

311. It was entirely foreseeable to the Officer Defendants that concealing the Bank's improper lending and accounting practices and deficient risk management would artificially inflate the price of Wilmington common stock. It was similarly foreseeable to the Officer Defendants that the revelation of that misconduct and the Bank's true financial condition would cause the price of Wilmington common stock to drop significantly as the inflation caused by their misstatements and omissions was corrected. Accordingly, the conduct of the Bank and the Officer Defendants, as alleged herein, proximately caused foreseeable damages to Lead Plaintiffs and members of the Class. Moreover, the fact that the Bank's improper lending practices, deficient risk management, and the inadequate provisioning for loan loss reserves (among the other accounting improprieties discussed above was so ruinous to the Bank's financial condition such that the Bank had to sell itself in a firesale at a 50% discount to M&T Bank was also an entirely foreseeable consequence of the misconduct complained of herein.

312. Thus, the stock price declines detailed herein were directly related to disclosure of the previously issued materially false and misleading statements and omissions, and establish the loss causation element of Lead Plaintiffs' Exchange Act claims.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE- MARKET DOCTRINE

313. At all relevant times, the market for Wilmington was an open, efficient and well-developed market for the following reasons, among others:

a) Wilmington's stock met the requirements for listing and was listed and actively traded on the NYSE under the symbol WL, a highly efficient and automated market;

b) As a public company, Wilmington filed periodic public reports with the SEC;

c) The average daily trading volume for Wilmington common stock during the Class Period was 1.3 million shares. The average weekly turnover as a percentage of shares outstanding was 8.62% (median of 6.86%), well surpassing the higher 2% threshold level of average weekly trading volume necessary for an efficient market;

d) Wilmington regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e) Wilmington filed a registration statement(s) with the SEC on Form S-3 for its common stock as set forth in Section XI;

f) Wilmington was followed by securities analysts employed by major brokerage firms, including Boenning & Scattergood, Inc., Calyon Securities (USA) Inc., Davenport & Company LLC, Keefe, Bruyette & Woods, Macquarie Capital (USA) Inc., Janney Capital Markets, Suntrust Robinson Murphy, RBC Capital Markets, and Morgan Stanley, who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly-available and entered the public marketplace;

g) Institutional investors reported owning a majority of all Wilmington Common Stock during the Class Period. From the quarter end of March 31, 2008 to October 31, 2010, institutional holdings of Wilmington Common Stock ranged from 59% to 86% according to Thomson Reuters. This high level of institutional ownership of Wilmington common stock during the Class Period indicates that the market price was reflective of active trading by extremely sophisticated and knowledgeable investors; and

h) As a result of the foregoing, the market for Wilmington common stock promptly digested current information regarding Wilmington from all publicly-available sources and reflected such information in Wilmington's common stock price. Under these circumstances, all purchasers of Wilmington's common stock during the Class Period suffered similar injury through their purchase of Wilmington securities at artificially inflated prices and a presumption of reliance applies.

## IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR

314. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing

facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Wilmington and the Officer Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Wilmington and the Officer Defendants failed to update those statements which later became inaccurate.

## X. CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### FIRST CLAIM FOR RELIEF

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against Defendants Wilmington Trust, Cecala, Foley, Gibson, Harra, and North)**

315. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

316. During the Class Period, Defendants Wilmington, Cecala, Foley, Harra, Gibson, and North disseminated or approved the false statements specified herein, which they knew or recklessly disregarded were misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and they contained material misrepresentations.

317. These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5

thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Wilmington common stock during the Class Period. As detailed herein, the misrepresentations contained in, or the material facts omitted from, these Defendants' public statements, including SEC filings, concerned, among other things, the Bank's loan quality, risk management policies and practices, underwriting policies and practices, appraisal practices, understatements of the Bank's loan loss provision and Loan Loss Reserve and overstatements of the Bank's net income, earnings per share and assets.

318. These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a severely reckless disregard for the truth; and employed devices, and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, Wilmington's financial results, including but not limited to Wilmington's net income, earnings per share and assets; as well as Wilmington's improper lending and accounting practices, and deficient risk management; (ii) artificially inflate and maintain the market price of Wilmington

securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase Wilmington securities at artificially inflated prices.

319. Defendant Wilmington is liable for all materially false and misleading statements made during the Class Period, as alleged above.

320. Wilmington is also liable for the false and misleading statements made in the Registration Statement filed with the SEC on Form S-3AR on November 29, 2007; the Registration Statement amendments dated September 22, 2008 and January 12, 2009, and the prospectus supplement filed with the SEC on Form 424B5. These filings were materially false and misleading because, among other reasons, they included materially misstated financial results and/or incorporated by reference Forms 10-Q and Forms 10-K that materially misstated Wilmington's financial results.

321. Wilmington is further liable for the false and misleading statements made by Wilmington officers in press releases and during conference calls and at conferences with investors and analysts, as alleged above, as the makers of such statements and under the principle of *respondeat superior*.

322. M&T Bank is liable to the same extent as Wilmington as a successor in interest. As set forth in the Agreement and Plan of Merger between Wilmington and M&T Bank, filed on Form 8-K with the SEC on November 2, 2010, all of Wilmington's "claims, obligations, liabilities, debts and duties" shall become the "claims, obligations, liabilities, debts and duties" of the surviving bank.

323. Defendants Cecala, Foley, Gibson, Harra, and North, as top executive officers of the Bank, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers of the Bank, each of these Defendants was able to

and did control the content of the public statements disseminated by Wilmington. These Defendants had direct involvement in the daily business of the Bank and participated in the preparation and dissemination of the Wilmington's false and misleading statements, as set forth in ¶¶175-287 above.

324. In addition, Defendants Cecala, Foley, Gibson, Harra, and North are liable for, among other material omissions and false and misleading statements, the false and misleading statements they made and/or signed as follows:

Defendant Cecala

i. Defendant Cecala signed Forms 10-K (for the years ended December 31, 2007 through 2009); the Registration Statement filed with the SEC on Form S-3AR on November 29, 2007; and certifications in Forms 10-K and Forms 10-Q (for the quarter ended March 31, 2008 through the quarter ended March 31, 2010, including for the years ended December 31, 2007 through 2009).

ii. Defendant Cecala made statements and was directly responsible for other statements made during numerous conference calls and conferences during the Class Period, including: the 4th Quarter 2007 Wilmington Earnings Conference Call (1/18/2008); the 1st Quarter 2008 Wilmington Earnings Conference Call (4/18/08); the 2nd Quarter 2008 Wilmington Earnings Conference Call (7/18/2008); the 3rd Quarter 2008 Wilmington Earnings Conference Call (10/17/2008); the 4th Quarter 2008 Wilmington Earnings Conference Call (1/30/2009); Keefe, Bruyette & Woods, Inc. Regional Banking Conference (3/5/2009); the 1st Quarter 2009 Wilmington Earnings Conference Call (4/24/2009); the 2nd Quarter 2009 Wilmington Earnings Conference Call (7/24/2009); the 3rd Quarter 2009 Wilmington Earnings Conference Call (10/23/2009); the 4th Quarter 2009 Wilmington Earnings Conference Call (1/29/2010); the Citi

Financial Services Conference (3/11/2010); the 1st Quarter 2010 Wilmington Earnings Conference Call (4/23/2010); and, the Wilmington Investor Conference Call (6/4/2010).

iii. Defendant Cecala made statements in and was directly responsible for other statements made in Wilmington press releases filed with the SEC as Form 8-Ks, including on the following dates among others: 1/18/2008; 4/18/2008; 7/18/2008; 10/17/2008; 1/30/2009; 4/24/2009; 7/24/2009; 10/23/2009; 1/29/2010; 4/23/2010; and, 6/3/2010.

Defendant Foley

i. Defendant Foley signed Forms 10-K (for the years ended December 31, 2007 through 2009); the Registration Statement filed with the SEC on Form S-3AR on November 29, 2007; and certifications in the Form 10-Q (for the quarter ended June 30, 2010).

ii. Defendant Foley made statements and was directly responsible for other statements made during conference calls and conferences during the Class Period, including: the Wilmington Investor Conference Call (6/4/2010); the meeting with a SunTrust Robinson Humphrey analyst (6/22/2010); and, the 2nd Quarter 2010 Wilmington Earnings Conference Call (7/23/2010).

iii. Defendant Foley made statements in and was directly responsible for other statements made in the July 23, 2010 Wilmington press releases filed with the SEC as Form 8-K.

Defendant Gibson

i. Defendant Gibson signed Forms 10-K (for the years ended December 31, 2007 through 2009); the Registration Statement filed with the SEC on Form S-3AR on November 29, 2007; and certifications in Forms 10-K and Forms 10-Q (for the quarter ended March 31, 2008 through the quarter ended June 30, 2010, including for the years ended December 31, 2007 through 2009).

ii. Defendant Gibson made statements and was directly responsible for other statements made during several conference calls during the Class Period, including: the 4th Quarter 2007 Wilmington Earnings Conference Call (1/18/2008); the 1st Quarter 2008 Wilmington Earnings Conference Call (4/18/08); the 2nd Quarter 2008 Wilmington Earnings Conference Call (7/18/2008); the 3rd Quarter 2008 Wilmington Earnings Conference Call (10/17/2008); the 4th Quarter 2008 Wilmington Earnings Conference Call (1/30/2009); the 1st Quarter 2009 Wilmington Earnings Conference Call (4/24/2009); the 2nd Quarter 2009 Wilmington Earnings Conference Call (7/24/2009); the 3rd Quarter 2009 Wilmington Earnings Conference Call (10/23/2009); the 4th Quarter 2009 Wilmington Earnings Conference Call (1/29/2010); the Citi Financial Services Conference (3/11/2010); the 1st Quarter 2010 Wilmington Earnings Conference Call (4/23/2010); the meeting with a SunTrust Robinson Humphrey analyst (6/22/2010); and, the 2nd Quarter 2010 Wilmington Earnings Conference Call (7/23/2010).

Defendant Harra

i. Defendant Harra signed Forms 10-K (for the years ended December 31, 2007 through 2009) and the Registration Statement filed with the SEC on Form S-3AR on November 29, 2007.

ii. Defendant Harra was directly responsible for other statements made during several conference calls during the Class Period, including: the 4th Quarter 2007 Wilmington Earnings Conference Call (1/18/2008); the 1st Quarter 2008 Wilmington Earnings Conference Call (4/18/08); the 3rd Quarter 2008 Wilmington Earnings Conference Call (10/17/2008); the 3rd Quarter 2009 Wilmington Earnings Conference Call (10/23/2009); and, the 4th Quarter 2009 Wilmington Earnings Conference Call (1/29/2010).

Defendant North

i. Defendant North made statements and was directly responsible for other statements made during several conference calls during the Class Period, including: the 3rd Quarter 2008 Wilmington Earnings Conference Call (10/17/2008); the 4th Quarter 2008 Wilmington Earnings Conference Call (1/30/2009); the 1st Quarter 2009 Wilmington Earnings Conference Call (4/24/2009); the 2nd Quarter 2009 Wilmington Earnings Conference Call (7/24/2009); the 3rd Quarter 2009 Wilmington Earnings Conference Call (10/23/2009); the 4th Quarter 2009 Wilmington Earnings Conference Call (1/29/2010); the 1st Quarter 2010 Wilmington Earnings Conference Call (4/23/2010); the meeting with a SunTrust Robinson Humphrey analyst (6/22/2010); and the 3rd Quarter 2009 Wilmington Earnings Conference Call (10/23/2009).

325. As described above, these Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. Specifically, the above allegations establish a strong inference that these Defendants knew or should have known that Wilmington's reported annual financial results for the years 2007 through 2009, as filed with the SEC in Wilmington's Forms 10-K and other SEC filings, and its reported quarterly financial results for the quarters starting with the first quarter 2008 through the third quarter of 2010, and disseminated to the investing public, were materially misstated and were not presented in accordance with GAAP, and that Wilmington did not have adequate internal controls, as represented to the public in, for example, the Forms 10-K issued for the years-ended December 31, 2007, December 31, 2008 and December 31, 2009.

326. The allegations set forth above establish a strong inference that these Defendants

acted with scienter in misrepresenting the quality of the Bank's loans, lending and accounting practices, credit risk management and, consequently, the financial condition of the Bank during the Class Period. The allegations pertaining to the overall extent and widespread nature of the fraud at Wilmington, which resulted in the enormous loss exposure to the Bank and material overstatements of net income, among other key measures, establish a strong inference that Defendants Wilmington, Cecala, Foley, Gibson, Harra, and North acted with scienter in misrepresenting the Bank's financial condition during the Class Period.

327. Lead Plaintiffs and the Class have suffered damages in that they paid artificially inflated prices for Wilmington securities. Lead Plaintiffs and the Class would not have purchased Wilmington securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

328. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Wilmington securities during the Class Period.

## SECOND CLAIM FOR RELIEF

### For Violations of Section 20(a) of the Exchange Act (Against Defendants Cecala, Foley, Gibson, Harra, North, and Rakowski)

329. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

330. This Count is asserted against Defendants Cecala, Foley, Gibson, Harra, North and Rakowski for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

331. As alleged in detail above, Wilmington committed a primary violation of the federal securities laws through its knowing and/or reckless dissemination of materially false and

misleading statements and omissions throughout the Class Period.

332. During their tenures as officers and/or directors of Wilmington, each of these Defendants was a controlling person of Wilmington within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Wilmington, these Defendants had the power and authority to cause Wilmington to engage in the wrongful conduct complained of herein. As set forth in detail, above, the Defendants named in this Count were able to and did control, directly and indirectly, and exert control over Wilmington, including the content of the public statements made by Wilmington during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

333. In their capacities as senior corporate officers of the Bank, and as more fully described above, Defendants Cecala, Foley, Gibson, Harra, North and Rakowski had direct involvement in the day-to-day operations of the Bank and in Wilmington's financial reporting and accounting functions. Each of these Defendants was also directly involved in providing false information and certifying and/or approving the false financial statements disseminated by Wilmington during the Class Period. Further, as detailed above, Defendants Cecala, Foley, Gibson, Harra, North and Rakowski had direct involvement in the presentation and/or manipulation of false financial reports included within the Bank's press releases and filings with the SEC.

334. Defendant Cecala served as Wilmington's Chairman of the Board from 1996 until July 19, 2010. In addition, Defendant Cecala served as Wilmington's CEO from 1996 until June 3, 2010. In this dual capacity as the senior manager of the Bank and as the head of the Board, Defendant Cecala had ultimate control over the actions of Wilmington.

335. Defendant Foley has served as Wilmington's Chairman of the Board since July 19, 2010 and as CEO since June 3, 2010. In addition, Defendant Foley has served as a director of Wilmington since July 2006. In this dual capacity as the senior manager of the Bank and as the head of the Board, Defendant Foley had ultimate control over the actions of Wilmington.

336. Defendants Cecala, Foley, Gibson, and Harra participated as members of the Senior Management Committee during the Class Period. As alleged in detail above, these Defendants controlled and managed Wilmington's policies, practices and overall business.

337. Furthermore, Defendants Cecala, Foley, Gibson, Harra, and North all received various written and oral reports from different divisions of the Bank on a routine basis. The Officer Defendants' knowledge of and participation in the Bank's affairs through the various reports they received and/or had access to are described in Section IV above. Defendant Rakowski has served as Wilmington's Controller since 2006. In the position of Controller, Defendant Rakowski had direct involvement in the day-to-day operations of the Bank, including attending the Credit Strategy Meetings described above at ¶88 and in Wilmington's financial reporting and accounting functions.

338. By reason of their positions as officers of Wilmington, and more specifically as controlling officers – as can be seen by their corresponding ability to influence and control Wilmington – each of these Defendants is a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and activities of the Bank and its employees, and to cause the Bank to engage in the unlawful conduct complained of herein. Because of their positions, these Defendants had access to adverse nonpublic financial information about the Bank and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same. Moreover, each

of the Defendants was also involved in providing false information and certifying and/or approving the false financial statements disseminated by Wilmington during the Class Period. Each of these Defendants was provided with or had access to copies of the Bank's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and the ability to prevent the issuance of the statements or cause the statements to be corrected.

339. As set forth above, Wilmington violated Section 10(b) of the Exchange Act by its acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons of Wilmington and as a result of their own aforementioned conduct, the Defendants named in this Count are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Bank is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class who purchased or otherwise acquired Wilmington securities. Moreover, as detailed above, during the respective times these Defendants served as officers of Wilmington, each of these Defendants is culpable for the material misstatements and omissions made by Wilmington, including such misstatements in the Bank press releases, Forms 10-K, Forms 10-Q, Offering Documents and Registration Statement.

340. As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Wilmington securities.

## THIRD CLAIM FOR RELIEF

**For Violations of Section 20(a) of the Exchange Act**
**(Against Audit Committee Defendants)**

341. Plaintiffs repeat and re-allege each and every allegation contained above as if

fully set forth herein.

342. This Count is asserted against the Audit Committee for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

343. During their tenure as directors of Wilmington, each of these Defendants was a controlling person of Wilmington within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as directors and Audit Committee members of Wilmington, these Defendants had the power and authority to cause Wilmington to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Wilmington during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

344. Wilmington maintains an Audit Committee composed of certain Board members that reports to Wilmington's full Board of Directors. As detailed in Section II.B.2 above, at some time during the Class Period, Defendants Burger, Elliot, Foley, Krug, Mobley, Rollins, Roselle, Sockwell, Tunnell and Whiting (the "Audit Committee Defendants") each participated as a member of the Audit Committee.

345. As set forth below, each of these Defendants had the power to control and/or influence the particular practices and conduct giving rise to the securities violations alleged herein, and exercised the same. In their capacities as directors of Wilmington, during their tenure these Defendants each signed certain of the Bank's filings, including the Bank's Forms 10-K for the years ended December 31, 2007 through December 31, 2009, the Offering Documents (as defined below in ¶355) and/or the Registration Statement (as defined below in ¶355), and therefore had the power and authority to control the statements made in such filings.

As a result, these Defendants, as a group and individually, were controlling persons within the meaning of Section 20(a) of the Exchange Act.

The Audit Committee

346. According to Wilmington's Proxy Statements for 2008 through 2009, the Audit Committee performed the following functions: (1) monitored the quality and integrity of the Bank's accounting policies, financial statements, disclosure practices, and compliance with legal and regulatory requirements, (2) oversaw the independence and performance of the Bank's internal auditor and independent registered public accounting firm, (3) reviewed reports of governmental agencies, (4) prepared a report on audit matters and recommending that that report be filed with the Securities and Exchange Commission (the "SEC").

347. According to the Audit Committee Charter available on the Bank's website, the Audit Committee shall meet with management and the independent auditor to review and discuss the quarterly report on Form 10-Q and the annual report on Form 10K, including: the Bank's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations," the annual financial statements and the report of the independent auditor thereon, any audit problems or difficulties and management's response, and significant financial reporting issues and judgments made in connection with the preparation of the of the Bank's financial statements. The Audit Committee shall also discuss earnings press releases, as well as financial information and earnings guidance provided analysts and ratings agencies.

348. In addition, the Audit Committee Charter states that with regard to risk management, the Committee shall, among other things, meet periodically with management to review the Bank's major financial risk exposure and steps taken to monitor and control such exposure and discuss the Bank's policies with respect to risk assessment and risk management.

349. As a result of their positions as Audit Committee members, over and above their positions as Board members, each of the Audit Committee Defendants is liable as a control person of Wilmington within the meaning of Section 20(a) of the Exchange Act.

350. By reason of their positions as directors of Wilmington, and more specifically as members of the Audit Committee, each of the Audit Committee Defendants is a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and activities of the Bank and its employees, and to cause the Bank to engage in the unlawful conduct complained of herein. Because of their positions, these Defendants had access to adverse nonpublic financial information about the Bank including, among others things, its risk management, and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same. Specifically, the Audit Committee Defendants had access to and acted to conceal, or knowingly or recklessly authorized and approved the concealment of, repeated criticisms by Wilmington's Federal Regulators, Internal Audit function, and outside auditor, KPMG, regarding the Bank's risk management, internal controls, and portfolio review, including Internal Audit's annual reports and KPMG's management letters. Similarly, in the wake of the Federal Reserve MOU and as of at least the fourth quarter of 2009, the Audit Committee received direct reports from the Credit Risk Management division, including in particular reports about the Loan Loss Reserve and loan loss provisioning, and acted to conceal this information, or knowingly or recklessly authorized and approved its concealment. Moreover, as members of the Board and, thus, self-appointed members of the compliance committee charged with enforcing compliance with the Federal Reserve MOU, the Audit Committee Defendants exercised control over the Bank's scheme to conceal the serious deficiencies within the Bank's lending, risk management, and accounting

functions in the aftermath of the Federal Reserve MOU.

351. As set forth above, Wilmington violated Section 10(b) of the Exchange Act by its acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons of Wilmington and as a result of their own aforementioned conduct, the Audit Committee are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Bank is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Wilmington securities. Moreover, as detailed above, during the respective times these Defendants served as directors of Wilmington, each of these Defendants is culpable for the material misstatements and omissions made by Wilmington, including such misstatements in the Bank press releases, Forms 10-K, Forms 10-Q, the Offering Documents and Registration Statement.

352. As a direct and proximate result of these Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Wilmington securities.

## XI. SECURITIES ACT CLAIMS

353. In the allegations and claims set forth in this part of the Complaint, Lead Plaintiffs assert a series of strict liability and negligence claims based on the Securities Act on behalf of the Class (as defined in ¶430 below, except that Lead Plaintiffs explicitly disclaim subpart [d] of ¶432 from these Securities Act allegations). Lead Plaintiffs' Securities Act claims are not based on any allegations of knowing or reckless misconduct on behalf of the Defendants named in the Fourth through Sixth Claims for Relief. Lead Plaintiffs' Securities Act claims do not allege, and do not sound in, fraud, and Lead Plaintiffs specifically disclaim any reference to or reliance upon allegations of fraud in these non-fraud claims under the Securities Act. To avoid an (unfounded)

argument by Defendants that the claims below somehow "sound in fraud," it is necessary to state or summarize facts also stated above.

354. This action was brought within one year after the discovery of the untrue statements and omissions (and within one year after such discovery should have been made in the exercise of reasonable diligence) and within three years after the Offering described herein.

355. On February 23, 2010, the Bank conducted a securities offering to the public of 18,875,000 shares of common stock, raising $273.9 million (the "Offering"). The Offering was conducted pursuant to a prospectus and shelf registration statement, filed with the SEC on Form S-3 on November 29, 2007, along with two subsequent amendments filed on September 22, 2008 and January 12, 2009 (the "Registration Statement), and a prospectus supplement dated February 23, 2010 (the "Prospectus" and together with the Registration Statement, the "Offering Documents"). The Offering Documents explicitly incorporated by reference the Bank's 2007 Form 10-K, the First Quarter 2008 Form 10-Q, the Second Quarter 2008 Form 10-Q, the Third Quarter 2008 Form 10-Q, and the Bank's 2009 Form 10-K.

356. As discussed below, the Offering Documents contained untrue statements of material fact and omitted to state material facts required to make the statements therein not misleading.

**A. Securities Act Defendants**

357. The Securities Act claims are asserted against the Bank as issuer of the stock, all signatories to the Offering Documents, all members of Wilmington's Board of Directors at the time of the filing of the materially untrue Offering Documents, the banks that underwrote the Offering (defined below as the "Underwriter Defendants"), KPMG LLP ("KPMG"), which was Wilmington's outside auditor during the Class Period, and those officers who were controlling persons of Wilmington. Each of these Defendants is statutorily liable under Sections 11, 12

and/or 15 of the Securities Act for the materially untrue statements contained in and incorporated in Wilmington's Offering Documents.

**1. The Wilmington Defendants**

358. Defendant Wilmington (described above at ¶¶16-18) was the issuer of the common stock offered pursuant to the Offering.

359. Defendants Cecala, Foley, Harra, Gibson, and Rakowski (described above at ¶¶20-23, 26) were each officers of Wilmington and signed the Bank's Registration Statement, as well as the 2009 Form 10-K, which were then incorporated into the Offering Documents. Defendants Cecala, Foley, and Harra were also members of the Board at the time of the filing of the Offering Documents.

360. Defendants Burger, Elliot, Krug, Mears, Mobley, Rollins, Sockwell, Tunnell, and Whiting (described above at ¶¶27-31, 33-35) were each Directors of Wilmington at the time of the filing of the Offering Documents and signed the Bank's Registration Statement, as well as the 2009 Form 10-K, which was then incorporated into the Offering Documents.

361. Defendant Thomas DuPont ("DuPont"), who was a Director from 2006 through October 2009, and Roselle (described above at ¶32), former Wilmington Directors, signed the Bank's Registration Statement, which was then incorporated into the Offering Documents.

362. Defendant Louis Freeh ("Freeh") served as a Director of the Company beginning in 2009. Freeh signed the 2009 Form 10-K which was incorporated into the Offering Documents and was also a member of the Board at the time of the filing of the Prospectus.

**2. The Outside Auditor Defendant**

363. KPMG has served as Wilmington's outside auditor since 2003. KPMG issued unqualified opinions on the Bank's financial statements and management's assessment of internal controls throughout the Class Period and, of particular relevance to the Securities Act

claims, for the year 2009. KPMG consented to the incorporation by reference into the Offering Documents of its unqualified auditor's report, dated February 22, 2010, for the year ended December 31, 2009. Specifically, under the caption "Experts" in the Prospectus, Wilmington stated that the Bank's consolidated financial statements as of December 31, 2009 and 2008, and for each of the years in the three-year period ended December 31, 2009, and management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2009, were "incorporated by reference herein in reliance upon the reports of KPMG LLP, an independent registered public accounting firm, and upon the authority of said firm as experts in accounting and auditing." KPMG received $2.78 million for its work on the 2009 year-end audit. KPMG maintains its national headquarters at 345 Park Avenue, New York, New York 10154.

### 3. The Underwriter Defendants

364. J.P. Morgan Securities ("J.P. Morgan") is an investment bank and acted as a joint book-running manager and underwriter for the Offering. Pursuant to the Offering Documents, J.P. Morgan sold and distributed 11,702,500 shares to the investing public and had an option to buy an additional 1,755,375 shares, which it exercised on February 24, 2010. J.P. Morgan was paid at least $8.46 million for its underwriting services in connection with the Offering. J.P. Morgan's headquarters are located at 270 Park Avenue, New York, New York 10017.

365. Keefe, Bruyette & Woods, Inc. ("KBW") is an investment bank and acted as a joint book-running manager and underwriter for the Offering. Pursuant to the Offering Documents, KBW sold and distributed 7,172,500 shares to the investing public and had an option to buy an additional 1,075,875 shares, which it exercised on February 24, 2010. KBW was paid at least $5.1 million for its underwriting services in connection with the Offering. KBW's headquarters are located at 787 Seventh Avenue, New York, New York 10019.

**B. The Offering Documents Misstated The Bank's Underwriting Practices**

366. The Offering Documents misstated the Bank's underwriting practices. Specifically, with regard to the Bank's underwriting of loans, the Bank's 2007 Form 10-K, First Quarter 2008 Form 10-Q, Second Quarter 2008 Form 10-Q and Third Quarter Form 10-Q, and 2009 Form 10-K, all represented that the Bank "mitigated credit risk" by "[e]mploy[ing] rigorous loan underwriting standards and apply[ing] them consistently." For the reasons set forth below, the Bank's statements regarding its underwriting contained untrue statements of material fact and omitted to state material facts necessary to make the statements in the Offering Documents not misleading.

367. First, contrary to the Bank's public statements, its internal policies allowed loans to be extended with minimal to no underwriting by credit specialists. As explained by CW 2, a former Vice President of Wilmington's Credit Risk Management Division, the general underwriting function was performed by sales staff, who were incentivized to grow loan volume and reach the Bank's 10% growth target and were not focused or adequately trained to reduce the Bank's risk exposure. Further, the Bank's policy was that only loans greater than $5 million were required to receive credit approval from the Loan Committee, who included senior risk management personnel. Thus, more than half of the Bank's commercial loan portfolio was exempted from review by credit/risk management specialists, on the Loan Committee. Then, for the loans that were required to have Loan Committee approval, Wilmington's use of the 10% Rule – which was not disclosed in the Offering Documents or the SEC filings incorporated therein – allowed loan officers to increase the amount of the loan by 10% without any additional Loan Committee approval, according to CW 2.

368. Second, the Bank's underwriting standards were regularly loosened or discarded for those clients with personal relationships with the Bank. As CW 4, a Wilmington commercial

banking associate from 2005 to 2007 and an investor relations associate from 2007 to 2009, explained, loans to borrowers with personal relationships with the Bank "were not really looked at with scrutiny." For example, CW 4 described how Employee C had a specific client with whom he had a "ton of loans" who would consistently obtain additional loans despite the fact that the client was frequently in overdraft. Similarly, according to bankruptcy filings in the U.S. Bankruptcy Court for the District of Delaware, the Bank extended a one-year $4.1 million home loan to Christopher Tigani, a co-operator of "substantial" Bank client N.K.S. Distributors, with a down-payment of just $120,000, or approximately 3% of the loan. The Bank granted the loan despite acknowledging that Mr. Tigani – who was already personally guaranteeing more than $30 million in Wilmington loans to N.K.S. Distributors – was "highly leveraged" and ineligible for conventional financing.

369. Third, rather than rely on "rigorous" and "consistent" underwriting of the primary borrower in extending commercial loans, the Bank often relied on the use of personal guarantors. According to CW 2, Defendants often made lending decisions based on the existence of a personal guarantor without (i) performing adequate due diligence on that guarantor; or (ii) considering the loan eligibility of the primary borrower. As a result, the Bank's underwriting on loans nominally backed by personal guarantors was even less stringent than for other loans, according to CW 2.

370. Fourth, numerous commercial loans issued by Wilmington failed to comply with the Bank's own protocols. According to CW 2, an internal review of Wilmington's loans in 2007 demonstrated that substantial numbers of the Bank's loans were not in compliance with the Bank's procedures, including by failing to include proper documentation and the required loan approvals. For example, CW 2 explained that the review revealed that "dozens and dozens" of

loans issued by Employee A, who maintained a half billion dollar loan portfolio constituting almost 10% of the Bank's total commercial loans, were issued without the required approvals in 2007 and were recorded in the Bank's 2007 year-end financial results. CW 2 further explained that once these failures were raised to management, the missing data and approvals as explained by CW 2 were papered over with management's approval.

371. These deficiencies – none of which were disclosed in the Offering Documents and all of which rendered the Bank's claims of "employing rigorous underwriting standards" on a "consistent" basis materially untrue and misleading – were confirmed in the Federal Reserve MOU. Specifically, according to the MOU Compliance Report, the Federal Reserve MOU required Wilmington to fundamentally change its loan review and lending functions (among other functions) because, among other things, the Bank lacked: (i) "underwriting standards, guidelines, and quantifiable limits for commercial real estate;" (ii) "uniform standards for presenting loans to the loan committee;" (iii) "standards for documenting exception tracking and monitoring system;" (iv) and "lending authorities reflective of staff experience and commensurate with risk of credit extension." The Federal Reserve MOU also recognized the problems inherent in having the underwriting function report to the sales-side of the Bank, and required that the reporting structure be changed so that there was independence in the loan origination process.

### C. The Offering Documents Misstated The Bank's Asset Review And Appraisal Practices

372. The Offering Documents misstated the Bank's asset review and appraisal practices. Specifically, with regard to the Bank's asset review function, the Bank's 2007 Form 10-K, First Quarter 2008 Form 10-Q, Second Quarter 2008 Form 10-Q, Third Quarter Form 10-Q, and 2009 Form 10-K represented that the Bank "mitigate[d] credit risk" by "[m]onitor[ing]

the portfolio to identify potential problems"; and "[r]egularly review[ing] all past-due loans, loans not being repaid according to contractual terms, and loans we doubt will be paid on a timely basis." The Bank stated that, to identify market shifts and changes in borrowers' ability to pay and to appropriately determine charge-offs and reserve for loan losses, it "consistently" applied a four-tiered internal risk rating system that classified loans as either "Pass," "Watchlisted," "Substandard," or "Doubtful," as described above in ¶62.

373. In the 2009 Form 10-K, the Bank also provided a description of its credit risk management function, stating that the credit review team "functions independently" and reports to the Audit Committee, and describing a number of analyses that the team provided, concluding, "[w]e believe our approach gives us a system of checks and balances that enhances our ability to evaluate credit risk."

374. With respect to its appraisal process, in these same filings the Bank represented that it "obtain[ed] updated valuations, regardless of loan size, any time [its lenders] believe[d] there ha[d] been obvious and material deterioration in market conditions, project performance, or physical aspects of the property itself that could jeopardize [Wilmington's] collateral position."

375. For the reasons set forth below, these statements regarding the Bank's asset review and appraisal practices contained untrue statements of material fact and omitted to state material facts necessary to make the statements in the Offering Documents not misleading.

376. First, due to the minimal staffing of the Asset Review Group, only a small fraction of the portfolio was reviewed by the Bank. As described by CW 2, the Asset Review Group was comprised of only 4-5 employees – or 0.17% of the Bank's employees – but was tasked with reviewing the Bank's $6.4 billion commercial loan portfolio, which produced more than 70% of the Bank's revenue. As a result, CW 2 and CW 8 (the former Director of Internal

Audit) explained that only a minute percentage of the portfolio was reviewed and evaluated by credit risk specialists. Due to this understaffing, the Bank relied on the same lenders who originated the loans to monitor them. According to CW 2, this was not an effective solution because the Bank's incentive compensation system ***disincentivized*** the loan staff from downgrading loans, as a downgrade would lead to a corresponding decline in the lender's compensation. For this reason, CW 2 could not recall a loan officer ever once independently downgrading a loan during CW 2's entire fourteen year tenure at the Bank.

377. Second, the Bank failed to downgrade and charge-off delinquent and impaired loans. According to CW 2, despite monthly Working Group meetings where the delinquent and impaired loans were identified and discussed, the Bank failed to downgrade and/or charge off the loans as recommended by the credit risk specialists. For example according to CW 2, in the second quarter of 2009, the Bank failed to place a $79 million relationship with a prominent residential real estate developer on non-accrual status,[7] despite the fact that the relationship was based on outdated appraisals and 80% of the relationship was non-accruing. CW 8 confirmed the Bank's failure to take necessary risk management action, stating "I saw time and time again where they would ride with a customer longer than they should have."

378. Third, contrary to representations, Wilmington failed to update the appraisals for its portfolio of commercial loans, even when housing values plummeted and Delaware construction dried up. According to CW 2, Wilmington's appraisals were "almost always outdated," and one of the Asset Review Group members maintained a lengthy list of outdated appraisals. Indeed, Chick Pinto, Senior Vice President of Corporate Marketing and Communications, admitted to the *News Journal* in an April 17, 2011 article that obtaining "more

[7] Placing a loan in "non-accrual status" means, generally, that interest revenue will no longer be recorded, as the recoverability of the loan is in doubt and has become improbable.

recent appraisals…wasn't the nature of how we did things." Ultimately, when the Bank did finally start to update its appraisals in 2010, after the Offering, the new appraisals triggered enormous write-downs.

379. These deficiencies – none of which were disclosed in the Offering Documents and all of which rendered the Bank's statements set forth in ¶¶372-374 above materially untrue and misleading – were recognized by Wilmington's outside auditor, KPMG, in a "management letter" sent in connection with the 2007 annual audit; Wilmington's Internal Audit at the end of 2007; and by the Federal Regulators in their 2007 and 2008 reviews of Wilmington, according to CW 2 and CW 8. In fact, in the 2007 report, the Federal Regulators described these issues as "weaknesses in the control structure" at Wilmington. According to CW 2, Federal Regulators were also concerned by the lack of timely appraisals at Wilmington.

380. These deficiencies were also confirmed in the Federal Reserve MOU. Specifically, according to the MOU Compliance Report, the Federal Reserve MOU required Wilmington to fundamentally change its credit policy, credit analysis and loan review functions because for these functions, the Bank lacked, among other things: "an appropriate organization structure"; "a process to monitor compliance with policies and procedures"; and "appropriate management and staffing levels." The Federal Reserve MOU further recognized that Wilmington lacked, but needed to immediately implement, a "board-approved loan review policy that specifically defines, identifies and categorizes problem assets and sufficiently assesses the overall quality of the loan portfolio."

**D. The Offering Documents Contained Untrue Financial Results**

381. The Offering Documents also contained materially untrue and misstated financial results for Wilmington. These included material understatements of the Bank's Loan Loss Reserve and provision for loan losses and material overstatements of the Bank's net income,

earnings per share and assets that resulted directly from the Bank's undisclosed lending practices and deterioration in the quality of the Wilmington's loans. The SEC filings incorporated by reference into the Offering Documents reported the following metrics:

| **Filing** | **Net Income** | **Provision for loan losses** | **Total Assets** |
|---|---|---|---|
| 2007 Form 10-K* | $182.0 million | $28.2 million | $11.48 billion |
| First Quarter 2008 Form 10-Q | $41.4 million | $10.0 million | $11.7 billion |
| Second Quarter 2008 Form 10-Q | ($19.5 million) | $28.4 million | $12.13 billion |
| Third Quarter 2008 Form 10-Q | $22.9 million | $48.0 million | $12.13 billion |
| 2009 Form 10-K* | ($22.7 million) | $205 million (full year) | $11.09 billion |

* *Full year results*

382. Each of these SEC filings certified that the Bank "maintain[ed] our accounting records and prepare[d] our financial statements in accordance with U.S. generally accepted accounting principles ["GAAP"] and reporting practices prescribed for the banking industry."

383. KMPG, Wilmington's auditor, also issued a materially untrue and misleading report in connection with the Bank's 2009 financial statements, which was incorporated into the 2009 Form 10-K. Specifically, KMPG audited the Bank's year-end 2009 financial statements contained in the 2009 Form 10-K and issued an unqualified auditor's report on Wilmington's consolidated statement of financial condition as of December 31, 2009, and the related consolidated statements of income, stockholders' equity and comprehensive income, and of cash flows for the year ended December 31, 2009.

384. KPMG's auditor's report, dated February 22, 2010, certified that, after conducting an audit "in accordance with the standards of the Public Company Accounting Oversight Board (United States)," it "believe[d] that our audits provide a reasonable basis for our opinion" that:

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Corporation as of December 31, 2009 and 2008, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2009, in conformity with U.S. generally accepted accounting principles.

385. KPMG's unqualified auditor's report, as included in the 2007 and 2009 Form 10-K, was materially untrue and misleading because, as explained above, the Bank's consolidated financial statements did not fairly present the Bank's financial condition and were not prepared in accordance with GAAP. Moreover, in certifying Wilmington's 2009 financial statements, KPMG falsely represented that its audits were conducted in accordance with GAAS.

386. As set forth above at ¶100, financial statements filed with the SEC that are not presented in accordance with GAAP are presumed to be misleading. Further as set forth at ¶¶102-115 above, GAAP and other applicable accounting standards established clear rules governing how Wilmington should have reserved for its loan losses. Throughout the Class Period and in the financial statements incorporated into the Offering Documents, the Securities Act Defendants improperly accounted for probable losses and impairment within Wilmington's loan portfolio by materially understating Wilmington's reserve for loan losses, and thereby overstating Wilmington's total assets, net income, and earnings per share. Further, the Bank materially misstated the fair value of its loan portfolio. This improper accounting delayed the recognition of a necessary valuation allowance that would have offset (and thereby reduced) a significant deferred tax asset.

387. During the Class Period, the Bank repeatedly failed to sufficiently increase its Loan Loss Reserve in light of the deteriorating economic environment and the related decline in

the quality of its loan portfolio. Until late 2008, the Bank operated under a method of calculating its Loan Loss Reserve that was not compliant with regulators' or GAAP standards, according to CW 2. Rather than considering qualitative factors affecting the probability of loan repayments, including economic trends and borrowers' current and projected ability to pay – the Bank assigned percentage values to risk ratings. This method was insufficient to account for the dynamic real estate market during the Class Period, and it failed to comply with GAAP because it did not consider all available evidence reflecting past events and current conditions, including "environmental" factors related to the collectability of the loan, as required by FAS 114 and EITF D-80. In particular, the Bank's method of provisioning did not account for any of the factors likely to drive defaults in the loan portfolio, including the Bank's deficient underwriting and risk management, and the declining values of the collateral, and thus caused the Bank to under-provision for loan losses.

388. In late 2008, the Bank updated its methodology for calculating the Loan Loss Reserve, relying almost exclusively on the Bank's loss history, which was problematic because (i) it failed to adequately consider critical "environmental" and other qualitative factors relating to the declining market and borrower's ability to pay; (ii) the Bank had a minimal and unreliable loss history as it was based on manipulated risk ratings and loan loss recognition. In particular the Bank limited its "qualitative" analysis to a certain percentage of the Bank's overall Loan Loss Reserve and over-relied on inaccurate loan risk ratings and the Bank's minimal loss history. According to CW 2, under the new method, the Bank relied almost entirely on the Bank's minimal loan loss history to dictate whether increased reserves were necessary. As a result, the Bank's Loan Loss Reserve did not take into account critical considerations like downward trends in the real estate market or the ability of Wilmington's customers to repay their loans or the

extent of losses inherent in the loan portfolio.

389. In the MOU Compliance Plan and Report, Wilmington's regulators recognized the inadequacy of the Bank's reserve methodology. Thus, the Federal Reserve MOU required Wilmington to "fully fund [the Loan Loss Reserve] considering additional adversely classified credits from the updated internal loan rating system" and to "maintain an adequate ALLL consistent with GAAP and regulatory policy…and guidance."

390. As noted above at ¶126, the Interagency Guidance on loan loss reserves and GAAP both provide that a loan loss reserve should be "directionally consistent" with changes in the relevant risk factors. As noted at ¶¶127-128, between 2007 and 2009, Wilmington's Loan Loss Reserve dramatically decreased as a percentage of "nonaccruing" and troubled restructured loans. This was directionally inconsistent with the fact that all risk factors, including the Bank's deficient underwriting standards and minimal asset review and economic data regarding the Delaware real estate market, were sharply increasing and, thus, was inconsistent with GAAP. *See* charts at ¶¶80-82.

391. As noted at ¶137 above, M&T Bank's independent analysis of the Loan Loss Reserve demonstrated its inadequacy, concluding that the Bank's Loan Loss Reserve was understated by over $500 million, based on an analysis of the loan portfolio from January 2008 to the present.

392. As discussed above in ¶¶135-137, Wilmington's $486 million increase in the Loan Loss Reserve in the second and third quarters of 2010 revealed that the Bank's provisions for loan losses were inadequate by at least 50.62% for each quarter between the first quarter of 2008 and the second quarter of 2010. In addition, as noted above in ¶138, the understated Loan Loss Reserve directly inflated Wilmington's stated net income during the Class Period by

approximately the following amounts:

| | Reported Net Income | Corrected Assessment Using WT's 3Q10 Figures | Corrected Assessment Using M&T's 3Q10 Figures |
|---|---|---|---|
| 1Q 2008 | $41.4 | $36.3 | $28.1 |
| 2Q 2008 | ($19.5) | ($28.9) | ($44.0) |
| 3Q 2008 | $22.9 | $13.0 | ($3.1) |
| 4Q 2008 | ($68.5) | ($102.6) | ($157.9) |
| 1Q 2009 | $21.8 | $6.9 | ($17.3) |
| 2Q 2009 | ($9.1) | ($36.4) | ($80.8) |
| 3Q 2009 | ($5.9) | ($25.5) | ($57.3) |
| 4Q 2009 | ($11.2) | ($53.1) | ($121.1) |

393. In issuing unqualified audit opinions on Wilmington's financial statements, KPMG failed to comply with the professional standards dictated by GAAS, including GAAS General Standard Nos. 2 and 3, which required KPMG to exercise due professional care in the performance of the audit and to obtain competent sufficient evidentiary matter to form a basis for its opinion.[8] Had KPMG complied with GAAS, the only reasonable professional conclusion it could have drawn was that Wilmington's internal controls over financial reporting were so ineffective that the Bank's financial statements were not fairly present in accordance with GAAS.

394. In addition, Wilmington inaccurately reported the fair value of its loan portfolio in the notes to its financial statements, which, as set forth above at ¶¶139-142, GAAP required the Bank disclose. The same factors that were not adequately taken into consideration in setting Wilmington's reserves also led to an overstatement of the fair value of the Bank's loan portfolio.

[8] The PCAOB, established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that are required to be followed by registered public accounting firms. On April 16, 2003, the PCAOB adopted as its interim standards Generally Accepted Auditing Standards ("GAAS") as described by the American Institute of Certified Public Accountants Auditing Standards Board's Statement of Auditing Standards No. 95, *Generally Accepted Auditing Standards*, and related interpretations in existence on that date. Accordingly, an auditor's reference to "the standards of the Public Company Accounting Oversight Board (United States)" includes a reference to GAAS in existence as of April 16, 2003.

395. Finally, in the 2009 Form 10-K, the Bank overstated its net income by $189.5 million by failing to record a valuation allowance against its deferred tax asset. Because the Bank, operating under the Federal Reserve MOU, was in the process of altering its business practices in a manner that made it much more likely than not that Wilmington would not report a profit for the foreseeable future, the Bank should have recorded a valuation allowance.

**E. The Offering Documents Contained Untrue Statements Regarding the Effectiveness of Wilmington's Internal Controls**

396. The Offering Documents also contained materially untrue and misleading statements regarding the effectiveness of Wilmington's internal controls over financial reporting. Specifically, with regard to the Bank's internal controls over financial reporting, the Bank's 2007 Form 10-K, First Quarter 2008 Form 10-Q, Second Quarter 2008 Form 10-Q, 2008 Third Quarter Form 10-Q, and 2009 Form 10-K, all falsely represented that Wilmington maintained effective internal controls over financial reporting. Specifically, in the 2007 and 2009 Forms 10-K, management certified that the Bank "[m]aintain[ed] a strong internal control environment," "[e]ngag[ed] strong and effective corporate governance," and "[p]resent[ed] financial results that are complete, transparent, and understandable," and thus the Bank maintained effective internal controls over financial reporting. The quarterly SEC filings also represented that the Bank's control environment continued to be effective. Management's attestations regarding the strength of internal controls over financial reporting were critical to investors because they (falsely) assured the public that the Bank's financial statements were reliable and in compliance with applicable laws.

397. In addition, the 2009 Form 10-K also included an unqualified auditor's report by Defendant KPMG opining on the effectiveness of Wilmington's internal control over financial reporting. This report, dated February 22, 2010, stated that KPMG had audited Wilmington's

internal controls "in accordance with the standards of the Public Company Accounting Oversight Board (United States)," and concluded that:

> In our opinion, the Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.

398. Both managements' certifications and KPMG's report on Wilmington's internal controls were materially untrue and misleading. Contrary to these internal control certifications, the Bank was operating without adequate controls in place to ensure compliance with the Bank's underwriting, appraisal, and asset review standards. The Bank's deficient underwriting, its failure to consistently update its appraisal values as collateral values were in decline, and its failure to monitor its loan portfolio for increasing credit risk demonstrate that the Bank's internal controls were materially deficient. Further, Wilmington was operating without policies and appropriate methodology in place to ensure the soundness of its valuation of its assets and its Loan Loss Reserve, which, as set forth above, was materially understated at the time of the Offering and during the Class Period. Finally, the Bank's systems suffered from repeated errors, as CW 4 reported that, with respect to the Bank's financial systems, the Bank did not have a centralized reporting system and there was "always a discrepancy, always problems." CW 10 similarly reported that there were "substantial errors" in the Bank's interest rate modeling system, which was necessary to adequately stress test the loan portfolio. These failures demonstrate serious deficiencies in the Bank's internal controls and contributed to materially distorting the Bank's reporting of financial data.

399. The numerous failings in Wilmington's control environment were confirmed by Federal Regulators in their 2007 and 2008 annual exams and in the Federal Reserve MOU in late 2009. Indeed, in 2007 Federal Regulators specifically described "weaknesses in [Wilmington's]

control structure." As noted in the MOU Compliance Report and Plan, the Federal Reserve MOU identified that Wilmington had been operating with insufficient staff; unclear responsibilities, policies and practices; organizational structures that were inappropriate to promote risk management objectives; and inadequate measures to ensure compliance with the Bank's policies and procedures.

**FOURTH CLAIM FOR RELIEF**

**For Violations of Section 11 of the Securities Act In Connection With The Offering Against Defendants Wilmington; Foley; Cecala; Gibson; Harra; Rakowski; Burger; DuPont; Elliot; Freeh; Krug; Mears; Mobley; Rollins; Roselle; Sockwell; Tunnell; Whiting; KPMG; J.P. Morgan; and KBW**

400. Lead Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein. Defendants' liability under this Claim for Relief is predicated on the participation of each Defendant in conducting the Offering pursuant to the Registration Statement, which contained untrue statements and omissions of material fact. This Claim for Relief does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded. For purposes of asserting this and their other claims under the Securities Act, Lead Plaintiffs do not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent.

401. This claim is brought pursuant to Section 11 of the Securities Act against Defendants Wilmington; Foley; Cecala; Gibson; Harra; Rakowski; Burger; DuPont; Elliot; Freeh; Krug; Mears; Mobley; Rollins; Roselle; Sockwell; Tunnell; Whiting; KPMG; J.P. Morgan; and KBW (collectively, the "Section 11 Defendants"), on behalf of members of the Class who purchased or otherwise acquired the securities issued pursuant and/or traceable to the Offering and were damaged by the acts alleged herein. This claim is based solely in strict liability and negligence. Defendant Wilmington was the issuer, within the meaning of Section

11 of the Securities Act, pursuant to the Offering Documents (defined in ¶355 above) of the registered securities set forth below. M&T Bank is liable to the same extent as Wilmington as a successor in interest. As set forth in the Agreement and Plan of Merger between Wilmington and M&T Bank, filed on Form 8-K with the SEC on November 2, 2010, all of Wilmington's "claims, obligations, liabilities, debts and duties" shall become the "claims, obligations, liabilities, debts and duties" of the surviving bank.

402. As discussed above, in February 2010, Wilmington issued and sold to investors 18,875,00 shares of common stock. Defendants J.P. Morgan and KBW were statutory underwriters for these registered securities, as admitted in the Offering Documents.

403. Defendants Foley; Cecala; Gibson; Harra; Rakowski; Burger; DuPont; Elliot; Krug; Mears; Mobley; Rollins; Sockwell; Roselle; Tunnell; and Whiting each signed the Registration Statement, which was then updated and incorporated into the Offering Documents, as a senior officer and/or director of Wilmington within the meaning of Section 11 of the Securities Act. Defendant Freeh was a director at Wilmington at the time of the filing of the Offering Documents.

404. KPMG consented to the incorporation of its unqualified auditor's report regarding Wilmington's financial statements into the Offering Documents, including the Registration Statement. Specifically, KPMG consented to the incorporation into the Offering Documents of its unqualified auditor's report on Wilmington's financial statements included in the Bank's 2009 Form 10-K. As detailed herein, the misrepresentations contained in, or the material facts omitted from, the Offering Documents included, but were not limited to, the facts that: (i) the financial statements that KPMG certified as being presented in conformity with GAAP were not presented in conformity with GAAP, and (ii) KPMG's audits, which it attested were conducted in

accordance with GAAS, were not conducted in accordance with GAAS.

405. The common stock described in this Count was issued and sold pursuant to the Offering Documents. All purchases of the registered securities after the issuance of the Offering Documents are traceable to the Offering Documents.

406. The Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

407. Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Offering Documents, which misrepresented or failed to disclose the material adverse facts alleged in connection with Lead Plaintiffs' Securities Act claims, as set forth above.

408. In connection with offering the registered securities to the public and the sale of those securities, the Section 11 Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

409. As the issuer of the registered securities, Wilmington is strictly liable for the untrue statements of material fact and material omissions described herein.

410. None of the other Section 11 Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

411. Class members did not know, nor in the exercise of reasonable diligence could

have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the registered securities.

412. As a direct and proximate result of Defendants' acts and omissions in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of the common stock pursuant to the February 2010 Offering Documents. By reason of the conduct alleged herein, each Defendant violated Section 11 of the Securities Act.

413. By reason of the foregoing, the Section 11 Defendants are liable to the members of the Class who acquired registered securities pursuant to or traceable to the Offering Documents.

414. This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the issuance of the Offering Documents.

## FIFTH CLAIM FOR RELIEF

### For Violations of Section 12(a)(2) of the Securities Act In Connection With The Offerings Against Defendants Wilmington; J.P. Morgan; and KBW

415. Lead Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein. For the purposes of this Count, Lead Plaintiffs assert only strict liability and negligence claims, and expressly exclude from this Count any allegations of fraud or reckless or intentional misconduct.

416. This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77k, against Defendants Wilmington and Defendants J.P. Morgan and KBW (defined above as the "Underwriter Defendants") on behalf of members of the Class who purchased or otherwise acquired Wilmington common stock pursuant and/or traceable to the Offering Documents, and were damaged by acts alleged herein.

417. By means of the Offering Documents and by using the means and instruments of transportation and communication in interstate commerce and of the mails, Defendant Wilmington and the Underwriter Defendants, through public offerings, solicited and sold Wilmington securities to members of the Class.

418. The Offering Documents were materially misstated, omitted to state facts necessary to make the statements made not misleading, and concealed or failed to adequately disclose material facts as alleged herein.

419. Neither of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents, including the February 2010 Prospectus, were accurate and complete in all material respects. Had they exercised reasonable care, these Defendants would have known of the material misstatements and omissions alleged herein.

420. Members of the Class purchased Wilmington securities by means of the materially misstated Offering Documents. At the time they purchased shares in the Offerings, no member of the Class knew, or by the reasonable exercise of care could have known, of the material misstatements in and omissions from the Offering Documents, including the February 2010 Prospectus.

421. By virtue of the conduct alleged herein, Wilmington and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.

422. Accordingly, members of the Class who purchased or otherwise acquired Wilmington securities have a right to rescind and recover the consideration paid for their securities and hereby elect to rescind and tender their securities to Wilmington and the Underwriter Defendants. Members of the Class who have sold their Wilmington securities

issued in or traceable to the Offering are entitled to recissory damages.

423. This claim is brought within one year after the discovery of the misstatements and omissions contained in the Offering Documents and within three years after the Offering.

**SIXTH CLAIM FOR RELIEF**

**For Violations of Section 15 of the Securities Act In Connection With The Offerings Against Defendants Foley; Cecala; Gibson; Harra; Rakowski; Burger; DuPont; Elliot; Freeh; Krug; Mears; Mobley; Rollins; Roselle; Sockwell; Tunnell; and Whiting**

424. Lead Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein, and expressly exclude from this Count any allegations of fraud or intentional misconduct.

425. This claim is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against Defendants Foley, Cecala, Gibson, Harra, Rakowski, Burger, DuPont, Elliot, Freeh, Krug, Mears, Mobley, Rollins, Roselle, Sockwell, Tunnell, and Whiting, on behalf of members of the Class who purchased or otherwise acquired Wilmington securities pursuant and/or traceable to the Offering Documents and were damaged by acts alleged herein. For the purposes of this Count, Lead Plaintiffs assert only strict liability and negligence claims and expressly disclaims any allegation of fraud or intentional misconduct.

426. At all relevant times, Defendants Foley, Cecala, Gibson, Harra, Rakowski, Burger, DuPont, Elliot, Freeh, Krug, Mears, Mobley, Rollins, Roselle, Sockwell, Tunnell, and Whiting were controlling persons of the Bank within the meaning of Section 15 of the Securities Act. As set forth herein, because of their positions in the Bank and/or because of their positions on the Wilmington Board, Defendants Foley, Cecala, Gibson, Harra, Rakowski, Burger, DuPont, Elliot, Freeh, Krug, Mears, Mobley, Rollins, Roselle, Sockwell, Tunnell, and Whiting had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the unlawful acts and conduct alleged herein.

427. Specifically, Defendants Foley, Cecala, Gibson, Harra and Rakowski each served as an executive officer of Wilmington. Defendants Foley and Cecala each served as Wilmington's Chief Executive Officer and Chairman of its Board; Defendant Gibson served as its Chief Financial Officer and Chief Operating Officer; Defendant Harra served as its President and Chief Operating Officer; and Defendant Rakowski served as its Senior Vice President and Controller. As such, at all times relevant, Defendants Foley, Cecala, Gibson, Harra and Rakowski each participated in the operation and management of the Bank, conducted and participated, directly and indirectly, in Wilmington's business affairs and mortgage-lending operations. These Defendants also participated in the preparation and dissemination of the Offering Documents, certain of the financial statements incorporated by reference therein and/or otherwise participated in the process necessary to conduct the Offering. Because of their positions of control and authority as senior officers of Wilmington, each of these Defendants were able to, and did, control the contents of certain or all the Offering Documents and the financial statements incorporated by reference therein, which contained materially false financial information.

428. Similarly, Defendants Burger, DuPont, Elliot, Freeh, Krug, Mears, Mobley, Rollins, Roselle, Sockwell, Tunnell, and Whiting, served as Directors on Wilmington's Board at the time the Offering were conducted and/or at the time that the Registration Statement was signed. As directors of a publicly-owned company, these Defendants had a duty to disseminate accurate and truthful information with respect to Wilmington's financial condition and results of operations. These Defendants each signed the Registration Statement; signed the 2009 Form 10-K which was incorporated by reference into the Offering Documents; and/or were Directors at the time the Offering was conducted, the Offering Documents were disseminated to the investing

public and the Registration Statement became effective. Thus, these Defendants controlled the contents and dissemination of the Offering Documents.

429. By reason of the aforementioned conduct and by virtue of their positions as controlling persons of Defendant Wilmington, each of the Defendants named in this Count is liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Bank is liable under Sections 11 and 12(a)(2) of the Securities Act, to members of the Class who purchased or otherwise acquired Wilmington securities pursuant to or traceable to the Offering Documents. As a direct and proximate result of the conduct of these Defendants, members of the Class suffered damages in connection with their purchase or acquisition of the securities.

## XII. CLASS ACTION ALLEGATIONS

430. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Wilmington's common stock during the Class Period, January 18, 2008, up to November 1, 2010 and were damaged thereby (the "Class"). Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of Wilmington, the Auditor Defendant, or any of the Underwriter Defendants during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged herein; and (vi) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any such excluded party.

431. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, Wilmington's common stock was

actively traded on the NYSE, an efficient market. As of September 31, 2010, Wilmington had more than 91 million shares of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds of thousands of members in the Class.

432. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members, including:

a) Whether Defendants violated the federal securities laws;

b) Whether Defendants misrepresented material facts concerning Wilmington;

c) Whether Defendants' statements omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made;

d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e) Whether Defendants engaged in perpetrating a manipulative and deceptive device and/or scheme and/or otherwise engaged in a fraudulent course of conduct;

f) Whether the Offering Materials contained material misstatements or omissions;

g) Whether the Wilmington SEC filings issued during the Class Period which contained financial information (i.e., its Forms 10-K, 10-Q, 8-K, and S-3) contained untrue or materially misleading statements;

h) Whether the prices of Wilmington's common stock were artificially inflated; and

i) The extent of damage sustained by Class members and the appropriate measure of damages.

433. The Claims of Lead Plaintiffs are typical of those of the Class.

434. Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Lead Plaintiffs have no interests that conflict with those of the Class.

435. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XIII. JURISDICTION AND VENUE

436. The claims asserted herein arise under (i) Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), 78t-1), and the rules and regulations promulgated thereunder, including Rule 10b-5 (17 C.F.R. §240.10b-5); and (ii) Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

437. This Court has jurisdiction of the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and Section 22 of the Securities Act (15 U.S.C. § 77v); and 28 U.S.C. § 1331 and 1337.

438. Venue is proper in this District pursuant to Section 27 of the Exchange Act, Section 22 of the Securities Act, and 28 U.S.C. § 1391(b). Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District. In addition, Wilmington maintained its corporate headquarters and principal executive offices in this District throughout the Class Period.

439. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities market.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment individually and on behalf of the Class, as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23, of the Federal Rules of Civil Procedure;

B. Awarding Lead Plaintiffs and the class members damages, including interest;

C. Awarding Lead Plaintiffs reasonable costs, including attorneys' and experts' fees; and

D. Awarding such equitable/injunctive or other relief for the benefit of the Class as the court may deem just and proper.

## XV. JURY DEMAND

Lead Plaintiffs demand a trial by jury for all issues so triable.

Dated: May 16, 2011

**CHIMICLES & TIKELLIS LLP**

*/s/ A. Zachary Naylor*
Pamela S. Tikellis (Bar No. 2172)
A. Zachary Naylor (Bar No. 4439)
222 Delaware Avenue, 11th Floor
P.O. Box 1035
Wilmington, DE 19899
Phone: (302) 656-2500
Fax: (302) 656-9053

*Liaison Counsel for the Class*

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

Blair Nicholas
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (858) 793-0070
Fax: (858) 793-0323

-and-

Hannah Ross (*pro hac vice*)
Sean K. O'Dowd (*pro hac vice*)
Katherine M. Sinderson (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Phone: (212) 554-1400
Fax: (212) 554-1444

SAXENA WHITE P.A.

Maya S. Saxena (*pro hac vice*)
Joseph E. White III (*pro hac vice*)
Lester Hooker (*pro hac vice*)
Brandon Grzandziel (*pro hac vice*)
2424 North Federal Highway
Boca Raton, FL 33431
Phone: (561) 394-3399
Fax: (561) 394-3382

*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*