**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| **IN RE WILMINGTON TRUST SECURITIES LITIGATION** | Master File No. 10-cv-00990-SLR<br>(Securities Class Action)<br>Hon. Sue L. Robinson |
| This document relates to: ALL ACTIONS | ELECTRONICALLY FILED |

# LEAD PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Blair Nicholas
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (858) 793-0070
Fax: (858) 793-0323

-and-

Hannah Ross
Sean K. O'Dowd
Katherine M. Sinderson
1285 Avenue of the Americas
New York, NY 10019
Phone: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*

**CHIMICLES & TIKELLIS LLP**
Pamela S. Tikellis (Bar No. 2172)
A. Zachary Naylor (Bar No. 4439)
222 Delaware Avenue, 11th Floor
P.O. Box 1035
Wilmington, DE 19899
Phone: (302) 656-2500
Fax: (302) 656-9053

*Liaison Counsel for the Class*

**SAXENA WHITE P.A.**
Maya S. Saxena
Joseph E. White III
Lester Hooker
Brandon Grzandziel
2424 North Federal Highway
Boca Raton, FL 33431
Phone: (561) 394-3399
Fax: (561) 394-3382
*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*

Dated: September 12, 2011

**TABLE OF CONTENTS**


I. PRELIMINARY STATEMENT ....................1

II. SUMMARY OF THE ARGUMENT ....................4

III. FACTUAL BACKGROUND ....................5

A. Wilmington Falsely Portrayed Itself As A Conservative Bank, Even After The Federal Reserve Imposed An MOU On The Bank ....................5

B. Wilmington's Deficient Loan Origination And Risk Management Practices Created And Maintained A High Risk Loan Portfolio ....................8

1. Wilmington Originated High Risk Loans Because It Lacked Adequate Underwriting ....................8

2. Wilmington Failed To Monitor The Risks In Its Loan Portfolio ....................10

C. Wilmington's Reported Financial Statements Were Materially Misstated ....................13

D. In 2010, Defendants Could No Longer Conceal The Truth ....................16

IV. PLAINTIFFS HAVE ADEQUATELY ALLEGED VIOLATIONS OF THE EXCHANGE ACT ....................18

A. The Complaint Meets The Standards Of The PSLRA And Rule 9(b) ....................18

B. Plaintiffs Allege Materially False and Misleading Statements and Omissions ....................19

1. Actionable Misstatements Regarding Loan Origination And Accounting Practices ....................19

i. Defendants Misrepresented The Quality Of The Bank's Underwriting And The Credit Quality Of The Bank's Loans ....................19

ii. Defendants Misrepresented The Effectiveness Of The Bank's Portfolio Review And Risk Management ....................24

iii. Defendants Misrepresented Their Appraisal Process ....................27

iv. Defendants Misrepresented Their Accounting Policies ....................28

v. Defendants' Statements Were Not Puffery ....................30

2. Wilmington's Financial Statements Were Materially Misstated ..............33

i. Wilmington Reserve Calculations Were Not In Compliance With GAAP And Were Thus Materially False .............................33

ii. Wilmington's GAAP Arguments Are Inappropriate To Resolve On A Motion To Dismiss And Are Irrelevant ................36

iii. A Restatement Is Not Required To Allege Falsity ........................40

iv. Wilmington Overvalued Its Loan Portfolio ..................................41

3. Defendants' Material Misrepresentations And Omissions Regarding Wilmington's Internal Controls .............................................42

4. Wilmington Improperly Accounted For Its Deferred Tax Asset ..............43

5. The Complaint's Factual Allegations Are Based On Extraordinary Evidence Of Defendants' Wrongdoing....................................................44

C. The Wilmington Defendants Acted With Scienter In Misrepresenting The Company's Risk Management, Lending, And Accounting Practices...................50

1. Standard For Evaluating Scienter ..........................................................50

2. The Complaint Alleges Compelling Facts Evidencing The Officer Defendants' Knowledge And Recklessness.............................................51

i. The Officer Defendants Personally Dictated The Policies and Practices That Contradicted Their Public Statements .............51

ii. The Officer Defendants Knew Of Or Recklessly Disregarded Policies That Institutionalized Their Desire To Maintain Loan Volume And Avoid Downgrading Poor Quality Loans...................................................................53

iii. Defendants Had Access To And Reviewed Reports That Belied Their Public Statements....................................................54

iv. Federal Investigations Further Suggest Scienter...........................56

v. Additional Evidence Offers Strong Circumstantial Support For The Officer Defendant's Scienter..........................................58

3. Defendants' Competing Inferences Are Easily Rejected..........................60

D. Defendants' Statements Are Not Subject To The Protection Of The Bespeaks Caution Doctrine Or The PSLRA Safe Harbor ....................................64

V. PLAINTIFFS HAVE ADEQUATELY ALLEGED VIOLATIONS OF THE SECURITIES ACT OF 1933 .....67

A. The Securities Act Sets Forth A Strict Standard of Liability .....67

B. Plaintiffs Have Alleged That Wilmington's Offering Documents Contained False Statements .....68

1. Plaintiffs Have Pled Wilmington's Reserves Were False .....69

i. Plaintiffs Need Not Plead That Wilmington "Subjectively" Disbelieved That Their Reserves Complied with GAAP .....69

ii. Even If "Subjective Disbelief" Is Necessary, Plaintiffs Have Pled It .....73

2. Plaintiffs Have Pled Wilmington's Internal Control Statements Were False .....74

C. KPMG Is Liable For Its False Certifications and Statements .....74

1. KPMG Falsely Represented its Compliance With Auditing Standards .....75

2. Plaintiffs Need Not Demonstrate Subjective Falsity .....75

i. The Plain Text Of Section 11 Makes KPMG Liable For The Financial Statements It Certifies .....75

ii. KPMG's Certifications, And Its Representations Of GAAS Compliance, Are Not Opinions .....78

D. duPont Is Liable For False Statements In The Offering Documents .....80

VI. PLAINTIFFS HAVE ADEQUATELY ALLEGED LOSS CAUSATION .....81

VII. PLAINTIFFS HAVE ADEQUATELY ALLEGED CONTROL PERSON CLAIMS .....82

VIII. CONCLUSION .....84

## TABLE OF AUTHORITIES

**Cases**

*ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46 (1st Cir. 2008)....................50

*Adams v. Kinder-Morgan, Inc*., 340 F.3d 1083 (10th Cir. 2003) ....................41, 75

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002)....................40

*Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142 (S.D. Cal. 2008).................... passim

*Bachow v. Swank Energy Income Advisers, LP*, 2010 WL 70520 (N.D. Tex. Jan. 6, 2010)....................43

*Belmont v. MB Inv. Partners, Inc*., 2010 WL 2348703 (E.D. Pa. June 10, 2010)....................83

*Berson v. Applied Signal Tech*., 527 F.3d 982 (9th Cir. 2008)....................47

*Bldg. Trades United Pension Trust Fund v. Kenexa Corp.*, 2010 WL 3749459 (E.D. Pa. Sept. 27, 2010)....................65

*Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398 (S.D.N.Y. 2007)....................72

*Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004).................... passim

*Campo v. Sears Holding Corp*., 371 Fed. Appx. 212 (2d Cir. 2010) ....................49

*Casella v. Webb*, 883 F.2d 805 (9th Cir. 1989) ....................31

*Christidis v. First Pennsylvania Mortg. Trust*, 717 F.2d 96 (3d Cir. 1983) ....................36, 70

*City of Austin Police Retirement System v. ITT Educational Services, Inc*., 388 F. Supp. 2d 932 (S.D. Ind. 2005)....................48

*City of Hialeah Emples. Ret. Sys. & Laborers Pension Trust Funds for N. Cal. v. Toll Bros.*, 2008 WL 4058690 (E.D. Pa. Aug. 29, 2008)....................65, 66

*City of St. Clair Shores Gen. Emples. Ret. Sys. v. Inland*, 635 F. Supp. 2d 783 (N.D. Ill. 2009)....................78

*Collins & Aikman Corp. v. Stockman*, 2009 WL 1530120 (D. Del. May 20, 2009) ....................43

*Collins & Aikman Corp. v. Stockman*, 2009 WL 3153633 (D. Del. Sept. 30, 2009) ....................43

*Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1 (D. Mass. 2004)....................42

*Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168 (10th Cir. 2006)....................77, 78, 80

*Eastwood Enters. LLC v. Farha,* 2009 WL 3157668 (M.D. Fla. Sept. 28, 2009)....................57

*Eisenberg v. Gagnon*, 766 F.2d 770 (3d Cir. 1985)....................78

*EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865 (3d Cir. 2000) ....................30, 65, 66, 82

*Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976)....................71

*Fait v. Regions Financial Corp.*, 2011 WL 3667784 (2d. Cir. 2011) ....................71, 72, 73

*Fitzer v. Security Dynamics Techs.*, 119 F. Supp. 2d 12 (D. Mass. 2000) ....................................47

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645 (8th Cir. 2001)..................54, 60

*Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010) ........................ passim

*Gen. Elec. Co. v. Cathcart*, 980 F.2d 927 (3d Cir. 1992)............................................................43

*Glover v. DeLuca*, 2006 WL 2850448 (W.D. Pa. Sept. 29, 2006) ...............................................82

*Graham v. Taylor Capital Group, Inc. (In re Reliance Sec. Litig.)*, 91 F. Supp. 2d 706 (D. Del. 2000)..............................................................................................................56, 59

*Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363 (M.D. Fla. 2008)................................49, 56

*Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212 (S.D.N.Y. 2008) .......................58

*Harden v. Raffensperger*, 65 F.3d 1392, 1405-06 (7th Cir. 1995) ...............................................33

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) .....................................................67, 76

*Hess v. Am. Physicians Capital, Inc.*, 2005 WL 459638 (W.D. Mich. Jan. 11, 2005)...........................................................................................................................44

*Hoff v. Popular, Inc.*, 727 F. Supp. 2d 77 (D.P.R. 2010)......................................................43, 44

*Holmes v. Baker*, 166 F. Supp. 2d 1362 (S.D. Fla. 2001).......................................................76, 78

*Howard v. Everex Systems,* 228 F.3d 1057 (9th Cir. 2000)...................................................41, 75

*Hunt v. Alliance North Am. Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998) ....................33

*In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267 (3d Cir. 2004)...................................................65

*In re Adaptive Broadband Sec. Litig*., 2002 WL 989478 (N.D. Cal. Apr. 2, 2002).........................58

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999) .......................................................32

*In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272 (3d Cir. 2010) ............................................................32

*In re AIG*, 741 F. Supp. 2d 511 (S.D.N.Y. 2010) .........................................................................76

*In re Ambac Fin. Group, Inc.*, 693 F. Supp. 2d 241 (S.D.N.Y. 2010)..............................29, 32, 62

*In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192 (S.D.N.Y. 2004)...........................................................................................................................77

*In re ATI Technologies, Inc. Sec. Litig.*, 216 F. Supp. 2d 418 (E.D. Pa. 2002).......................38, 46

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474 (S.D.N.Y. 2004) ..............................................................................................................56, 73

*In re Bankers Trust Co.*, 61 F.3d 465 (6th Cir. 1995)...................................................................25

*In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004) ............................72

*In re Burlington Coat Factory*, 114 F.3d 110 (3d Cir. 1997) .............................................. passim

*In re Burlington Coat Factory*, 114 F.3d 110, 1418 (3d Cir. 1997) ..............................................26

*In re Cabletron Sys.*, 311 F.3d 11 (1st Cir. 2002)...........................................................38, 46, 49

*In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574 (D.N.J. 2001) ..............................50, 83

*In re Career Educ. Corp. Sec. Litig.*, 2006 WL 999988 (N.D. Ill. Mar. 28, 2006) .......................48

*In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354 (D.N.J. 1999) .........................................19, 55, 76

*In re Ceridian Corp. Secs. Litig.*, 542 F.3d 240 (8th Cir. 2008)...................................................72

*In re CIT Group, Inc.*, 349 F. Supp. 2d 685 (S.D.N.Y. 2004) .....................................................70

*In re CIT Grp. Inc. Sec. Litig.*, 2010 WL 2365846 (S.D.N.Y. 2010) ..........................................32

*In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206 (S.D.N.Y. 2010) .......................................56

*In re CNL Hotels & Resorts Secs. Litig., Inc.*, 2005 WL 1126561 (M.D. Fla. May 9, 2005)...........................................................................................................................72

*In re Countrywide Financial Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008)............................................................................................................21, 42, 61

*In re Credit Suisse First Boston*, 431 F.3d 36 (1st Cir. 2005) ......................................................77

*In re Dell Inc., Securities Litig.*, 591 F. Supp. 2d 877 (W.D. Tex. 2008)....................................72

*In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888 (M.D. Tenn. 2005) ..............................76

*In re Donald J. Trump Casino Sec. Litig. – Taj Mahal Litig.*, 7 F.3d 357 (3d Cir. 1993)............................................................................................................36, 70, 77

*In re Downey Sec. Litig.*, 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009).....................................49

*In re DVI Sec. Litig.*, 2010 WL 3522086 (Sept. 3, 2010 E.D. Pa.).........................................53, 58

*In re Eaton Vance Corp. Securities Litigation,* 206 F. Supp. 2d 142 (D. Mass. 2002).......................................................................................................................62

*In re EVCI Colleges Holding Corp. Secs. Litig.*, 469 F. Supp. 2d 88 (S.D.N.Y. 2006)............................................................................................................49, 57, 66

*In re Faro Tech. Sec. Litig.*, 534 F. Supp. 2d 1248 (M.D. Fla. 2007) ..........................................42

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429 (S.D.N.Y. 2005).......................................................................................................................54

*In re Galileo Corp. Shareholders Litigation*, 127 F. Supp. 2d 251 (D. Mass. 2001) ....................72

*In re Globalstar Sec. Litig.*, 2003 WL 22953163 (S.D.N.Y. Dec. 15, 2003) ..........................30, 56

*In re Goodyear Tire & Rubber Co. Secs. Litig.*, 436 F. Supp. 2d 873 (N.D. Ohio 2006).......................................................................................................................72

*In re Hamilton Bankcorp, Inc. Sec. Litig.*, 194 F. Supp. 2d 1353 (S.D. Fla. 2002)................42, 73

*In re HealthSouth Corp. Sec. Litig.*, 2000 WL 34211319 (N.D. Ala. 2000) ................................48

*In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968 (S.D. Ohio 2008) .........................................43

*In re InterBank Funding Corp. Sees. Litig.,* 629 F.3d 213 (D.C. Cir. 2010)................................77

*In re Lehman Bros. Sec. and ERISA Litig.*, 2011 WL 3211364 (S.D.N.Y. 2011).........................81

*In re Majesco Secs. Litig.*, 2006 WL 2846281 (D.N.J. Sept. 29, 2006) ................................36, 75

*In re McKesson HBOC Inc. Sec. Litig.*, 126 F. Supp. 2d 1248 (N.D. Cal. 2000).............53, 77, 79

*In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192 (D. Ariz. 2009) ....72

*In re Merck & Co. Sec. Litig.*, 432 F.3d 261 (3d Cir. 2005) ....48, 55

*In re Merck & Co., Sec., Derivative & "ERISA" Litig.*, 2011 WL 3444199 (D.N.J. Aug. 8, 2011) ....26

*In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901 (D.N.J. 1998) ....82

*In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493 (S.D.N.Y. 2009) ....29

*In re New Century*, 588 F. Supp. 2d 1206 (C.D. Cal. 2008) .... passim

*In re NUI Sec. Litig.*, 314 F. Supp. 2d 388 (D.N.J. 2004) ....34

*In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1 (D. Mass. 1999) ....33

*In re OCA, Inc. Sec. and Deriv. Litig.*, 2006 WL 3747560 (E.D. La. Dec. 14, 2006) ....42

*In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133 (S.D.N.Y. 1999) ....26, 34, 80

*In re Par Pharm. Sec. Litig.*, 2009 WL 3234273 (D.N.J. Sept. 30, 2009) ....58

*In re PMA Capital Corp. Sec. Litig.*, 2005 WL 1806503 (E.D. Pa. July 27, 2005) .... passim

*In re Providian Fin. Corp.*, 152 F. Supp. 2d 814 (E.D. Pa. 2001) ....49

*In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68 (S.D.N.Y. 1996) ....66

*In re RAIT Financial Trust Sec. Litig.*, 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) .... passim

*In re Reliance Secs. Litig.*, 135 F. Supp. 2d 480 (D. Del. 2001) ....83

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) .... passim

*In re SLM Corp., Sec. Litig.*, 740 F. Supp. 2d 542 (S.D.N.Y. 2010) ....67

*In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187 (1st Cir. 2005) ....58, 65, 78

*In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326 (S.D. Fla. 1999) ....54

*In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308 (M.D. Fla. 2002) ....78

*In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) ....18, 67, 68

*In re Thornburg Mortg. Secs. Litig.*, 695 F. Supp. 2d 1165 (D.N.M. 2010) ....63

*In re Tyco Int'l, Ltd. Multidistrict Litig.*, 2004 WL 2348315 (D.N.H. Oct. 14, 2004) ....78

*In re Tyson Foods, Inc. Sec. Litig.*, 2004 WL 1396269 (D. Del. June 17, 2004) ....81

*In re Veritas Software Corp. Sec. Litig.*, 2006 WL 1431209 (D. Del. May 23, 2006) ....18, 35, 66, 70

*In re Wash. Mut. Sec., Deriv. & ERISA Litig.*, 259 F.R.D. 490 (W.D. Wash. 2009) ....72

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192 (W.D. Wash. 2009) .... passim

*In re Wells Fargo Sec. Litig.*, 12 F.3d 922 (9th Cir. 1993) ....................37, 62, 70

*In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472 (S.D.N.Y. 2005) ....................76

*Ind. State Dist. Council of Laborers v. Omnicare, Inc.,* 583 F.3d 935 (6th Cir. 2009)....................77

*Inst'l Investors Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009) .................... passim

*Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014 (N.D. Ill. 2010)....................56, 59, 64, 70

*Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 645 (D.N.J. 2003) ....................83

*JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005) ....................32

*Kinney v. Metro Global Media, Inc.*, 170 F. Supp. 2d 173 (D.R.I. 2001) ....................78

*Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435 (5th Cir. 1993) ....................71

*Lewis v. Straka*, 2006 WL 2927658 (E.D. Wis. Oct. 12, 2006)....................21

*Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129 (W.D. Wash. 2006) ....................44

*Local 703, I B of T. Grocery & Food Emples. Welfare Fund v. Regions Fin. Corp.*, 2011 U.S. Dist. LEXIS 60761 (N.D. Ala. June 7, 2011) ....................37, 57, 60

*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) ....................53, 66

*Maiman v. Talbott*, 2010 U.S. Dist. LEXIS 142712 (C.D. Cal. Aug. 9, 2010) ....................56, 59

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008)....................59

*Marra v. Tel-Save Holdings,* 1999 WL 317103 (E.D. Pa. May 18, 1999) ....................62

*Marsden v. Select Med. Corp.*, 2006 WL 891445 (E.D. Pa. Apr. 6, 2006) ....................33

*Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011) ....................30

*McCabe v. Ernst &Young, LLP,* 494 F.3d 418 (3d Cir. 2007) ....................77

*Medtronic Ave, Inc. v. Boston Scientific Corp.*, 2001 WL 652016 (D. Del. Mar. 30, 2001)....................19, 42

*Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75 (1st Cir. 2008) ....................36

*N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089 (9th Cir. 2011) ....................63

*New Jersey Carpenters Health Fund, et al. v. Residential Capital, LLC*, 2010 WL 5222127 (S.D.N.Y. 2010) ....................73

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,* 320 F.3d 920 (9th Cir. 2003)....................56

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ....................22, 30

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86 (2d Cir. 2010) ....................26

*Palladin Partners v. Gaon*, 2006 WL 2460650 (D.N.J. Aug. 22, 2006) ....................83

*Patrick v. Patrick*, 2010 WL 569740 (W.D. Pa. Feb. 12, 2010)....................70

*Plotkin v. IP Axess Inc., Etc.*, 407 F.3d 690 (5th Cir. 2005)........................................................35

*Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco Inc.*, 2011 WL 1198712 (S.D.N.Y. Mar. 30, 2011) ........................................................................72

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011) ......................................................................................70, 77

*Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146 (S.D.N.Y. 2004)................................77

*PR Diamonds, Inc. v. Chandler*, 364 F.3d 671 (6th Cir. 2004) ....................................................72

*Reina v. Tropical Sportswear Intern.*, 2005 WL 846170 (M.D. Fla. 2005) .................................73

*Resource Ventures, Inc. v. Resources Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423 (D. Del 1999)..........................................................................................................................19

*Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*, 2005 WL 1366025 (D.N.J. June 8, 2005)...............................................................................................78

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000).............................................................................60

*Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156 (9th Cir. 2009)...................................................77

*S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008).......................................................58

*Scritchfield v. Paolo*, 274 F. Supp. 2d 163 (D.R.I. 2003)........................................................31, 33

*SEC v. Okin*, 137 F.2d 862 (2d Cir. 1943).......................................................................................80

*Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000) ...................................................23, 81

*Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357 (1st Cir. 1994) .................................25, 30

*Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992) ...............................................30, 36, 71

*Steiner v. Southmark Corp.*, 734 F. Supp. 269 (N.D. Tex. 1990)..................................................76

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) .........................................50, 60

*Tricontinental Industries Ltd. v. Anixter*, 215 F. Supp. 2d 942 (N.D. Ill. 2002) ..........................23

*United States v. Bradstreet*, 135 F.3d 46 (1st Cir. 1998)...............................................................72

*Urbach v. Sayles*, 779 F. Supp. 351 (D.N.J. 1991)................................................................37, 70

*Virginia Bankshares v. Sandberg*, 501 U.S. 1083 (1991)...............................................30, 73, 77

*Waterford Twp. Gen. Employees Ret. Sys. v. BankUnited Fin. Corp.*, 2010 WL 1332574 (S.D. Fla. Mar. 30, 2010) ..........................................................................................64

*White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982 (E.D. Wis. 2002)..........................................................................................................................76

*Winslow v. BancorpSouth, Inc.*, 2011 U.S. Dist. LEXIS 45559 (M.D. Tenn. Apr. 26, 2011).......................................................................................................................67

**Statutes**

15 U.S.C. § 7262............................................................................................................................80

15 U.S.C. § 77k(a)(4).......................................................................................................................74

15 U.S.C. § 77o....................82
15 U.S.C. § 77u-2(b)(2)(A)....................67
15 U.S.C. § 78t(a)....................82
15 U.S.C. § 78u-5(b)(2)(A)....................67
15 U.S.C. § 78u-5(c)(1)....................65
15 U.S.C. §77k(a)(4)....................76, 77
15 U.S.C. §77k(b)(3)(B)(i)....................80
15 U.S.C. §78u-4(b)(1)....................18
15 U.S.C. §78u-4(b)(2)....................18
17 C.F.R. § 229.512(a)(i-iii)(B)....................81
17 C.F.R. §10b-5(b)....................18

**Other Authorities**

BLACK'S LAW DICTIONARY 138 (8th ed. 2004)....................80
Stephen M. Davidoff, *Fairness Opinions*, 55 Am. U. L. Rev. 1557, 1616 (2006)....................79

**Regulations**

17 C.F.R. § 210.4-01(a)(1)....................33
AICPA Professional Standards AU § 9711.08....................52
S. Rep. No. 107-205....................43
SEC Release No. 33.8810....................74
SEC Release No. 33-8238....................43
SEC Release No. 33-8591....................81
SEC Release No. 34-47986....................43

## I. PRELIMINARY STATEMENT

From 2008 until November 2010, amidst an unprecedented economic crisis that saw banks nationwide succumb to the consequences of years of aggressive lending practices, investors saw regional bank Wilmington Trust Corporation ("Wilmington" or the "Bank") as a shelter in the storm. ¶¶2, 97, 175.[1] Indeed, this impression was fostered by the Bank's most senior officers[2] who repeatedly distinguished Wilmington from their reckless competitors, assuring investors that the business "environment, while challenging, has not produced the same stresses at Wilmington Trust that exist at other companies" and that the Bank regularly placed its loan portfolio "under the microscope." ¶¶201, 238. These reassurances presented Wilmington as a safe harbor, propelling the Company's stock price to a Class Period high of nearly $36 per share in September 2008, even as other Bank stocks were collapsing. ¶2.

In reality, contrary to Defendants' repeated claims, the Officer Defendants implemented an unsafe disregard for prudent lending, risk management, and accounting practices. The Complaint provides extensive evidence, including the accounts of numerous senior-level former Wilmington employees; information from internal, non-public Wilmington documents; and the results of detailed expert and statistical analyses, to demonstrate how the Officer Defendants, through their "friends and family" method of lending (¶¶52, 71), knowingly and recklessly exposed the Bank to dangerous levels of risk, which eventually led to its demise as an independent entity in November 2010. ¶¶7, 288. The former employees cited in the Complaint,

---

[1] All "¶" citations refer to paragraphs in the Consolidated Securities Class Action Complaint (the "Complaint"), D.I. 39. All emphasis is added unless otherwise stated.

[2] The Bank's senior officers include Ted Cecala, Chief Executive Officer ("CEO") and Chairman of the Board; Donald E. Foley, Cecala's successor as CEO and Chairman; Robert Harra, President and Chief Operating Officer; David Gibson, Chief Financial Officer; and Bill North, Chief Credit Officer (the "Officer Defendants").

while employed in different positions and at different times, consistently recounted the same story: the goal at Wilmington, established by the Officer Defendants, was to do whatever was necessary to initiate and maintain lending relationships – regardless of whether the borrower was likely to repay all of their loans.

These improper practices continued even as the Bank's Internal Audit function, the Bank's outside auditor KPMG LLP ("KPMG"), and regulators from the Federal Reserve ("Federal Regulators") repeatedly warned the Officer Defendants throughout the Class Period that these specific practices were unsound and dangerous. ¶¶66, 68, 166-67. The Officer Defendants ignored and ridiculed these warnings until the Federal Reserve – Wilmington's primary regulator – finally forced them to act. In late 2009, unbeknownst to investors, the Federal Reserve issued a comprehensive Memorandum of Understanding (the "MOU") that sought to completely restructure the way the Bank originated, monitored, and accounted for its loans. ¶¶90-97. In particular, the MOU forced Wilmington to finally (i) impose standards and policies for its credit risk management, after years of operating in largely an *ad hoc* fashion; (ii) grant independence to the Bank's credit assessment personnel, rather than continue to subject them to the goals of sales executives – a reporting structure that Internal Audit had repeatedly criticized; and, (iii) fully fund Wilmington's loan loss reserves, after years of the Bank failing to recognize the deteriorating quality of its loans on its financial statements. ¶¶91-95.

The years of improper lending and accounting practices ultimately led to the abrupt resignations of Defendants Cecala and North (¶¶6, 172), as well as the devastating announcement on November 1, 2010 that Wilmington had agreed to sell itself to M&T Bank ("M&T") for a "historic discount" of ***half*** of the Bank's closing stock price the prior trading day, in what *The New York Times* described as "one of the biggest so-called take-unders in recent

Wall Street memory." ¶¶288, 297. As news of the announcement spread, Wilmington's stock price plummeted instantly, causing hundreds of millions of dollars in losses to investors. ¶298.

Despite the overwhelming evidence of unlawful conduct that Plaintiffs have alleged, Defendants have moved to dismiss the Complaint. In so doing, Defendants attempt to evade responsibility by mischaracterizing the applicable law, ignoring the vast bulk of the Complaint's detailed allegations, and asserting numerous factual contentions that are both unpersuasive and inappropriate at the pleading stage. For example, Defendants casually dismiss Wilmington's downfall as the simple result of unforeseen economic circumstances, commenting that "lending money always involves risk." Similarly, Defendants claim that nearly all of their statements to investors throughout the Class Period were mere "opinions" for which they cannot be held responsible.

In effect, they claim that the management of a publicly-traded bank is entirely guesswork, and if Defendants guessed wrong they cannot be held liable. However, Defendants are not liable for missing on a reasonable financial estimate; they are liable for misleading investors about the fundamental nature and practices of the Bank itself. As the Third Circuit has made clear, when management chooses to speak on a subject – as the Officer Defendants did, specifically and repeatedly throughout the Class Period – they are obliged to speak fully and accurately regarding that subject, whether or not they later choose to characterize those statements as "opinions." Defendants did not.

The Officer Defendants and the Bank also contend that Plaintiffs fail to allege that they acted with scienter. In making this argument, these Defendants again disregard the Complaint's well-pled allegations. In particular, the Complaint alleges that each of these Defendants was intimately involved in Wilmington's lending operations and, in fact, directed Wilmington's

abandonment of prudent lending standards in order to maximize loan volume. ¶¶160-61, 166, 173-74.

As explained below, the Complaint satisfies the pleading requirements under both the Securities Exchange Act of 1934 and the Securities Act of 1933. Plaintiffs respectfully submit that the Court should therefore deny Defendants' motions to dismiss.

## II. SUMMARY OF THE ARGUMENT

1. Plaintiffs' allegations under the Exchange Act are particularized under Rule 9(b), the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and the standards articulated by this Court and others in this Circuit.

2. The Complaint adequately identifies Defendants' materially false and misleading statements and omissions concerning, among other things: (1) Wilmington's practices for originating loans, monitoring credit quality, and accounting for loan losses; (2) the Bank's failure to comply with Generally Accepted Accounting Principles ("GAAP"), including for its loan loss reserves and fair value; (3) Wilmington's claims to maintain adequate internal controls; and (4) the Bank's recording of a "deferred tax asset."

3. The Complaint adequately establishes a strong inference of scienter by alleging that Defendants knew, or were reckless in not knowing, that their portrayal of the Bank as conservative and risk-averse, as well as the Bank's financial statements, were false. Plaintiffs' scienter allegations are bolstered by corroborating sources identified through Plaintiffs' extensive investigation, including statements from twelve confidential witnesses who were intimately familiar with Defendants' fraud; information contained in Wilmington's publicly-filed documents; and information from government and regulatory investigations of the Bank, including the Federal Reserve's MOU.

4. Defendants' false statements are not protected by the PSLRA's safe harbor provision or the "bespeaks caution" doctrine as (1) Defendants' statements were not "forward-looking" but were statements of present or historical fact; (2) any purported cautionary language was not "meaningful" since any risks Defendants may have warned against had already materialized; (3) Defendants' statements appeared in documents that purported to comply with GAAP; and (4) Defendants' statements were made with actual knowledge of their falsity and lacked a reasonable basis when made.

5. The Complaint also adequately pleads violations under the Securities Act, which imposes a stringent standard of liability and places a Rule 8(a) burden on a plaintiff. Plaintiffs meet this standard since they allege that they purchased Wilmington's securities pursuant to the Offering Documents issued in connection with the Bank's February 2010 Offering of common stock, which contained materially false and misleading statements about Wilmington's loan loss reserves and internal controls.

6. Contrary to their assertions, the Underwriters are liable under the Securities Act for the false statements in the Offering Documents, since these statements concerned material aspects of the Bank's policies and financial results. Similarly, KPMG is liable for certifying the misleading statements and failing to comply with auditing standards. Likewise, Director Defendant duPont is liable for material misstatements in the Offering Documents he signed.

## III. FACTUAL BACKGROUND

### A. Wilmington Falsely Portrayed Itself As A Conservative Bank, Even After The Federal Reserve Imposed An MOU On The Bank

Since its founding in 1903, Wilmington carefully cultivated a reputation as a stable, conservative regional bank. ¶¶1, 16. 37. From the beginning of the 2007 housing crisis, and throughout the subsequent financial downturn, Wilmington assured investors that it retained its

focus on "stability" and loan quality and remained committed to the "conservative" practices on which it had built its reputation. ¶37. Even as Wilmington dramatically increased its commercial real estate exposure between 2007 and 2010, at the precise time that the housing and real estate markets were experiencing a crisis (¶47), Wilmington touted its conservative commercial lending practices and boasted of its "rigorous" underwriting," "regular [portfolio] review," and "stable…credit quality." ¶38. Wilmington distinguished itself from other financial institutions whose risky practices gave rise to the financial crisis, stating that unlike its peers, "we are much more focused on the financial health of our borrowers" (¶¶177-78), and that the Bank's success and stability stood "in stark contrast" to many of Wilmington's competitors. ¶37. During the third quarter of 2008, which saw a fundamental upheaval in the financial landscape that included the demise of Lehman Brothers, Merrill Lynch, and Washington Mutual, Wilmington comforted investors that the business environment, "while challenging, ***has not produced the same stresses at Wilmington Trust that exist at other companies***." ¶200.

These statements were false, as demonstrated by the Federal Reserve MOU imposed upon Wilmington in late 2009 (and which the Bank knew about as early as July 2009, ¶166). The MOU – which was not disclosed to investors until 2010 – is one of the most serious weapons in the Federal Reserve's enforcement arsenal. ¶90. The MOU, the numerous issues that necessitated its implementation, and the dramatic losses Wilmington was forced to recognize once it realigned its business practices as a result of the Federal Regulators' action, demonstrate that the Bank was suffering significant and severe loan deterioration. The Officer Defendants managed to conceal these problems for years by: (i) pressuring and overriding decisions made by the risk management staff to recognize and record loan quality deterioration (¶¶70-74); (ii) failing to obtain updated appraisals that would demonstrate declines in collateral value (¶¶84-

89); and (iii) not appropriately reserving for bad loans on the Bank's financial statements (¶¶119-23). The MOU identified each of these practices as serious and material failings – mirroring the multiple warnings that the Officer Defendants had previously received from the Federal Reserve as well as from the Bank's Internal Audit, KPMG, and the Bank's credit specialists during the Class Period. ¶¶66, 68, 166-67.

Specifically, according to former employees and the internal Wilmington document titled the "MOU Compliance Plan and Report," the MOU mandated that Wilmington create and codify coherent policies governing risk management, underwriting standards, loan exceptions, and asset review. ¶¶92-93. That mandate demonstrates the absence of such critical policies during the Class Period. In fact, according to the MOU Compliance Plan and Report, Wilmington was required to impose a "***board-approved loan review policy that specifically defines, identifies and categorizes problem assets and sufficiently assesses the overall quality of the loan portfolio***," as well as to "***reclassify loan relationships in accordance with revised loan review policy***." ¶83. The MOU also demanded the segregation of credit analysts from lenders and that the Bank's Asset Review Group report directly to the independent Board of Directors instead of to the profit-conscious Defendant Gibson – recognizing the conflict inherent in the prior reporting hierarchy which had the risk management function reporting to the lending side. ¶¶92, 94. Moreover, the MOU required Wilmington to maintain adequate loan loss reserves consistent with GAAP, thereby spotlighting the Bank's failure to accurately fund its reserves during the Class Period. ¶94. Finally, the MOU required Wilmington to draft a "capital plan," giving specific consideration to "credit concentration," i.e., overexposure specifically to commercial real estate loans, and the Loan Loss Reserve. ¶94.

However, none of the changes implemented in response to the MOU were sufficient to save Wilmington. Despite the fundamental and far-reaching nature of the required changes, they were simply not enough to counteract the Officer Defendants' knowing or reckless disregard for prudent lending, risk management, and accounting practices and their knowing or reckless failure to heed the numerous warnings from employees and third parties over a multi-year period – all facts the Officer Defendants concealed from the investing public ¶294.

### B. Wilmington's Deficient Loan Origination And Risk Management Practices Created And Maintained A High Risk Loan Portfolio

#### 1. Wilmington Originated High Risk Loans Because It Lacked Adequate Underwriting

Despite Wilmington's claims of "conservative" and "rigorous" underwriting, Wilmington originated millions of dollars of high-risk loans in complete violation of its underwriting guidelines, or with no underwriting at all. ¶¶45-47. According to former Wilmington employees, loan underwriting fell victim to the Bank's focus on meeting aggressive growth goals because Wilmington adopted "more of a sales culture than a credit culture." ¶46 (citing reports of Confidential Witness ("CW") 2, a long-standing employee and Vice President of Wilmington's Credit Risk Management Division, and CW 3, Vice President in Wilmington's loan workout group). The Bank's reckless lending was done with the Officer Defendants' knowledge and approval. *See* ¶¶160-74.

For example, Wilmington routinely made exceptions to its underwriting policies based on personal relationships rather than on borrowers' ability to pay, particularly for the purpose of extending loans to "friends" of the bank. ¶¶52, 56. Loans to favored clients were not scrutinized, and Wilmington "went to great lengths" to issue them, "often re-writ[ing] a loan that a client didn't qualify for." ¶52. Several former employees described how Wilmington operated on a "friends and family plan" where the "same cast of characters" with "longstanding ties to the

bank" and the Officer Defendants would receive repeated loans regardless of whether they could repay them. ¶52.

The Officer Defendants encouraged the Bank's loan officers ("lenders") to make large and high-risk loans, by rewarding such lenders with bonus compensation and turning a blind eye to departures from underwriting guidelines and deficient paperwork. ¶¶46-48, 76-77. For example, one lender with a $500 million loan portfolio issued "dozens and dozens" of loans in 2007 without the required approvals, many of which remained on the Bank's books throughout the Class Period. ¶46. CW 2 reported the lender's deficient practices to Defendant Harra, only to be ignored and see the problems "papered over." ¶46. Wilmington's management also disregarded complaints from its credit risk department about a second high-volume lender with similar deficiencies in his portfolio. *Id.* Both of these prominent employees were dismissed in 2010 after the Federal Reserve ordered the Bank to establish firm underwriting controls. *Id.*

Wilmington, and the Officer Defendants, compounded this problem by granting unprecedented authority to lenders with minimal oversight. For example, only loans exceeding $5 million required approval by Wilmington's senior credit review staff on its "Loan Committee." ¶49. Because such loans comprised only about half of the Bank's portfolio, this left half the Bank's portfolio to the discretion of the lenders themselves. ¶49. Even for loans exceeding $5 million, it was the official policy of the Bank to give lenders authority to increase the amount of a loan that had been approved by the Loan Committee by up to 10%, without seeking a second approval. ¶50. These additional extensions of credit were made with no additional underwriting and limited documentation, thus leaving Wilmington without even a paper trail to assess its own exposure. ¶51. The only purported check on the lenders' extensions of credit was through the Bank's credit analysts – an illusory and ineffective gatekeeper function,

as the position was subordinate to and considered a stepping stone to the more lucrative job of lender, and drastically understaffed considering 12 analysts were required to review hundreds of millions of dollars of loans a year. ¶¶43, 47-48. Ultimately, the MOU forced the Bank to make this position meaningful – requiring separation of the credit analyst and lending functions and sufficient staffing levels. ¶¶48, 91.

The Bank, with the awareness of the Officer Defendants, also eschewed professional analysis of its borrowers' credit and instead relied upon personal "guarantors" – who themselves were not subject to any serious credit scrutiny – to justify the commercial loans they extended, despite specific warnings from regulators that guarantors could not ensure credit quality or the soundness of a lending decision. ¶¶57-59. For example, the Bank permitted Christopher Tigani – a "friend" of the Bank with only $400,000 in liquid assets – to serve as a personal guarantor on over $30 million in commercial loans to his company. Then, even after learning that Mr. Tigani and his company each had serious liquidity problems, Wilmington lent him and his company millions more, based on their ongoing relationship. ¶¶53-57. The Bank was ultimately forced to repossess Mr. Tigani's home at a significant loss. ¶54.

### 2. Wilmington Failed To Monitor The Risks In Its Loan Portfolio

After originating its loans, Wilmington was required to keep a careful eye on its portfolio to ensure that that its customers remained creditworthy and that it had set aside sufficient resources to address loans that could not be repaid – and the Officer Defendants told the public that Wilmington performed these tasks diligently. In truth, the Officer Defendants actively undermined this credit review function and knew their assurances were false. ¶69.

Wilmington's Credit Risk Management division, and in particular its sub-division the Asset Review Group (the "ARG"), was charged with these critical tasks. ¶62. To perform this function, Wilmington's ARG was (at least nominally) responsible for classifying the Bank's loan

portfolio into four risk categories (Pass, Watchlisted, Substandard, and Doubtful) that were supposedly used to assess the general level of likely losses and to determine which loans would be eventually "charged off" (written off as a loss). *Id.* Thus, the ARG's work was critical to accurate determinations of the Bank's loan loss reserves and to the soundness of its financial statements. ¶63. As detailed in the remarkable reports by CW 2, who supervised the ARG in her role as head of Wilmington's Credit Risk Management division, the Officer Defendants dangerously and knowingly understaffed the ARG, with only 4-5 employees responsible for reviewing the entire $6.4 billion commercial loan portfolio, which constituted over 70% of the Bank's revenue. ¶65. The ARG thus did not review the smaller loans in the portfolio – and because, as described above, the smaller loans (constituting over 50% of the portfolio) were not reviewed by the Loan Committee, this failure meant that the Bank's smaller loans did not receive ***any*** oversight at all. ¶65. In the Fall of 2007, only 10-15% of loans were reviewed by the ARG. ¶¶65-66, 169.

For the small percentage of Wilmington's loans that the ARG was able to review and propose downgrading, the Officer Defendants required that Cecala, Harra, and Gibson approve all changes to loan ratings, who then actively prevented the ARG from downgrading loans as the housing market declined. ¶¶46, 69-70. Indeed, after CW 2 became manager in 2008, Cecala and Harra began "interject[ing] themselves physically" into meetings to challenge downgrade recommendations and block non-accrual status for even the most delinquent loans. ¶¶70-73. Cecala and Harra routinely blocked downgrades when specific credit risks were identified by the ARG because the borrowers were "friends and family" (¶¶70-71, 74, 78-81), and employees were instructed not to worry about loan defaults from "old time borrowers." ¶79.

Wilmington and the Officer Defendants also sabotaged the ARG function by failing to obtain current appraisals on the properties securing its loans. ¶73. These property values were a critical mechanism for determining the likely ability of the Bank to recover on its loans in the event of foreclosure. Nonetheless, even as real estate prices plummeted in 2009 and 2010, Wilmington's appraisals "were almost always outdated," according to CW 2. ¶¶84-87. The "wide-spread" problem of significantly outdated appraisals – which was widely known at the Bank – affected the risk rating of Wilmington's loans, impacted write-down determinations, and made reviewing the loan documents "worthless," according to CW 6, a former employee who was responsible for credit and risk assessment of commercial loan portfolios and sat on the credit review committee. ¶¶85-88, 161. Despite the serious risks posed by this problem, Wilmington's Senior Vice President of Corporate Marketing and Communications recently acknowledged that seeking "more recent appraisals" from borrowers was not the Bank's "preferred way of doing things." ¶86. Ultimately, when Wilmington finally brought in a third-party to update its appraisals in the second quarter of 2010 as a result of the MOU, it was forced to take hundreds of millions of dollars of belated write-downs that "devastated" the Bank's balance sheet, and (coupled with the other MOU changes) forced Wilmington into a fire-sale to M&T. ¶86.

The Officer Defendants were well aware of the importance of risk management, as Federal Regulators stressed its significance in the CRE Interagency Guidance. ¶61. The Officer Defendants were also well aware of the dangers of the Bank's ineffective risk management as they received repeated warnings from KPMG, Wilmington's Internal Audit, and Federal Regulators – all of whom, beginning directly before the Class Period, sharply criticized the Bank's inadequate asset review. ¶¶66-68, 169. Specifically, KPMG criticized Wilmington's failure to adequately review its loan portfolio in a "Management Letter" it sent to the Officer

Defendants in connection with its 2007 audit (¶66) – which the Bank ignored and then was again identified by KPMG as a serious problem in connection with its 2008 audit. *Id*. Similarly, in the fall of 2007, Wilmington's Internal Audit group issued a report – which was transmitted to Defendants Cecala, Gibson, Harra, and North, as well as the Audit Committee of the Board of Directors – highlighting that the Bank's ARG was understaffed and that the percentage of the loan portfolio reviewed was entirely insufficient. ¶68.

Like KPMG's warnings, Internal Audit's warnings were also ignored, with one former employee describing the Internal Audit function at the Bank as "barking in the wind." ¶68. Internal Audit also repeatedly raised concerns regarding the reporting structure of the ARG, which reported to Defendant Gibson. Since Gibson shared the Bank's overall focus on sales rather than credit, when Internal Audit raised this problem with the Officer Defendants, Gibson responded "that's how it's always been." ¶¶75, 169. Recognizing the danger of this reporting structure, the MOU ultimately required the credit risk department to report directly to the Board's Audit Committee. ¶92. Similarly, in both 2007 and 2008, Federal Regulators warned the Bank about its asset review failings as "weaknesses in [Wilmington's] control structure." ¶67.

**C. Wilmington's Reported Financial Statements Were Materially Misstated**

GAAP requires that lenders set aside certain amounts, called Loan Loss Reserves, for loans that are unlikely to be repaid in full. ¶102. The amounts set aside for Loan Loss Reserves are calculated based on statistical models that take into account such basic facts as the credit-worthiness of the borrower and the adequacy of any collateral securing the loan. ¶¶104-16. Establishing Loan Loss Reserves decreases the lender's net income on a dollar-for-dollar basis; thus, the larger the reserves, the lower the reported net income. ¶107. Accordingly, the failure to establish adequate reserves will cause reported net income to be overstated. *Id*. Moreover, if a

lender fails to create sufficient reserves, it will be forced to report losses at a later date as its loans fail. Thus, investors view the size of reserves as a critical measure of a lender's health and the strength of its portfolio. ¶104. At Wilmington, Defendants Cecala and Gibson reviewed and approved the Bank's Loan Loss Reserves each quarter. ¶94.

Throughout the Class Period, Wilmington represented that its Loan Loss Reserves were "adequate" to address any losses inherent in the Bank's loan portfolio and that the Bank's financial statements had been prepared in accordance with GAAP. ¶¶101, 108, 184. In reality, the Bank failed to create appropriate reserves against probable losses because of its fundamental unwillingness to recognize deterioration in its loan portfolio. ¶¶102-138. Through the MOU, the Federal Reserve recognized that the Bank had failed to appropriately create sufficient reserves for its dangerous lending practices and the decline in the value of the collateral underlying its loans. ¶94. Until late 2008, the Bank used mechanical formulas to set its reserves, based on risk ratings that the ARG had assigned to each loan. ¶¶118-119, 217-218. These formulas were patently inadequate because, as discussed above, the Officer Defendants simply refused to recognize that its loans should be recognized as lower quality. ¶¶122, 387-388, 390.

In late 2008, apparently in response to heavy criticism from its auditor, KPMG (¶¶121, 217), the Bank altered its formula, causing an immediate increase in the Loan Loss Reserve to $157.1 million from $122.2 million the previous quarter. ¶¶200, 209. Nonetheless, the new methodology remained deeply flawed. ¶¶121. Though the Bank purportedly changed its methods to account for "qualitative" factors such as the external environment, in truth, it only allowed such factors to play a small role in the setting of its reserves, and thus failed to adequately consider the rapidly deteriorating state of the real estate markets and the broader economy. ¶122. As a result, the Bank continued to rely heavily on inaccurate risk ratings, as

well as on its loss history – which was also manipulated as part of the Bank's and Officer Defendants' practice of ignoring the financial problems of favored borrowers. ¶¶121, 123. In an ominous warning sign, the loan loss reserve ***decreased*** between 2007 and 2009 as a percentage of its riskiest loans. ¶¶127-29.

The Complaint quantifies the Bank's misstatements due to this underreserving, alleging based on the Bank's own disclosures that the Loan Loss Reserve was understated by just over 50% throughout the Class Period and, based on M&T's analysis as of January 2008 (discussed below), that its provision was understated by over ***130%*** each quarter of the Class Period. ¶¶136-37. These understatements allowed Wilmington and the Officer Defendants to overstate the Bank's income. In addition, Wilmington overstated the "fair value" of its loans because, as the Bank would later admit, it was not accounting for the risk that some loans would never be repaid, but rather assuming that all loans would be repaid in full and valuing its portfolio based on this assumption. ¶¶140-41.

Finally, during the last several quarters of the Class Period, the Bank overstated its income by failing to reserve for losses associated with a "deferred tax asset" (DTA). Wilmington had recorded a $194.6 million asset that reflected the value of an expected carryover tax benefit. ¶¶143-52. Under GAAP, however, the Bank was required to create a reserve, known as a valuation allowance, if it became clear that the asset would be useless because the Bank would not earn taxable profits. ¶250. By the fourth quarter of 2009, due to the fundamental restructuring of the Bank's lending, risk management and accounting practices ordered by the Federal Reserve – which would maintain oversight for two years – it was apparent that Wilmington would not benefit from the DTA and would need to record a valuation allowance.

¶¶250-51. Nonetheless, the Bank failed to create an allowance, causing it to overstate its net income by almost $200 million.

**D. In 2010, Defendants Could No Longer Conceal The Truth**

After criticizing Wilmington for years, the Federal Reserve finally imposed the MOU in late 2009, which confirmed the existence of the fundamental deficiencies in Wilmington's risk management, underwriting, loan review, and loan loss reserving functions and required the Bank to implement profound changes to address these deficiencies. ¶¶44, 90, 97. As Wilmington began to implement these changes, the truth about the Bank's troubled loan portfolio was slowly revealed to the market, with Wilmington reporting dramatic losses just as the Bank's peers were experiencing stronger credit and financial results. ¶247. However, Wilmington continued to conceal its true financial condition from the market, continuing to misstate its Loan Loss Reserve and recording the massive and, by this time, unjustifiable, DTA. ¶250.

On February 22, 2010, the Bank held a stock offering in which it sold over $270 million in common stock. ¶255. Strikingly, in the Offering Documents, Wilmington incorporated its audited financial statements for year-end 2007 and 2009 and unaudited quarterly statements for 2008, ***but not its audited year-end 2008 financial statements***. ¶355. The only reasonable inference from this highly unusual step is that the Bank's auditor, KPMG, which, as noted above, had sharply criticized Wilmington's 2008 review of its loan portfolio, would not permit the Bank to incorporate its audited 2008 financials by reference.

After releasing its first quarter 2010 results on April 23, 2010 with additional piecemeal revelations about its troubled loan portfolio, on June 3, 2010, the Bank shocked the market by announcing that Defendant Cecala was immediately retiring and that Board Member Defendant Foley, who had no prior banking experience, would take over as CEO. ¶261. Cecala assured investors that his resignation did not indicate "a mounting capital problem or credit problem that

hadn't been reported" and Foley stated that the Bank had the right people "to make sure that there aren't any surprises this year where credit – there is a blowup somehow." ¶263. Thereafter, Defendant North left his position as Chief Credit Officer. ¶172. On July 23, 2010, contrary to its previous assurances, the Bank disclosed that it had engaged a third-party to conduct an independent credit review of its portfolio and, as a result, the Bank's net charge-offs increased 352% from the prior quarter, its reserve for loan losses increased 25%, and loans with substandard risk ratings increased 33%, dropping the Bank's stock price by 9%. ¶¶272, 275.

The problems at Wilmington were so severe that even the MOU was not sufficient to address them, and, as revealed in a post-Class Period SEC filing, in August 2010 regulators took additional action, including prohibiting Wilmington from appointing directors or senior executives. ¶96. Then, on Monday, November 1, 2010, Wilmington shocked the market by announcing it had entered into an agreement to sell itself to M&T for just 50% of the prior day's closing price. ¶288. That same day, the Bank released its third quarter 2010 results, reporting an enormous quarterly loss of $365.3 million and a Loan Loss Reserve of $510.4 million. ¶¶289-91. In addition, Wilmington announced that it was recording a $189.4 million valuation allowance against its DTA and admitted that "it is more likely than not that we will not realize a portion of our deferred tax asset because negative evidence associated with our ***cumulative GAAP net operating loss and continued uncertainty in the credit quality of our loan portfolio*** outweighs other positive evidence." ¶148.

During the earnings call that day, M&T's CFO explained that as part of M&T's due diligence, it examined significant portions of Wilmington's loan portfolio. ¶293. Based on this analysis, M&T developed an independent estimate of credit losses of ***over $500 million in still undisclosed losses***. ¶¶294-95. The market reacted swiftly and negatively to this news, driving

down the Bank's stock price over 40%. ¶296. In total, from January 2010 to November 1, 2010, Wilmington's stock price declined over 70%. ¶298.

## IV. PLAINTIFFS HAVE ADEQUATELY ALLEGED VIOLATIONS OF THE EXCHANGE ACT

### A. The Complaint Meets The Standards Of The PSLRA And Rule 9(b)

Section 10(b) of the Securities Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, make it unlawful for any person to make "any untrue statement of a material fact, or to omit to state a material fact necessary to make the statements made[,] in light of the circumstances under which they were made, not misleading … in connection with the purchase or sale of any security." 17 C.F.R. §10b-5(b); *see In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006).

The PSLRA requires Section 10(b) fraud claims to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1). These requirements are comparable to those that exist under Federal Rule of Civil Procedure 9(b), and "require plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." *Inst'l Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) (quotations omitted). Plaintiffs must also "state with particularity facts giving rise to a strong inference" that the defendants acted with scienter. 15 U.S.C. §78u-4(b)(2).

Particularity rules are "relaxed in situations where the factual information is peculiarly within a defendant's knowledge or control." *In re Veritas Software Corp. Sec. Litig.*, 2006 WL 1431209, at *6 (D. Del. May 23, 2006) (Robinson, J.) (*citing In re Burlington Coat Factory*, 114 F.3d 110, 1418 (3d Cir. 1997)). "[C]ourts should apply the rule with 'some flexibility and

should not require plaintiffs to plead issues that may have been concealed by the defendants.'" *Id.* (*citing In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 368-69 (D.N.J. 1999)). Moreover, the particularity requirement does not call for an "exhaustive cataloging of facts," but only specific allegations that "provide assurance that plaintiff has investigated the alleged fraud and reasonably believes that a wrong has occurred." *Medtronic Ave, Inc. v. Boston Scientific Corp.*, 2001 WL 652016, *2 (D. Del. Mar. 30, 2001) (Robinson, J.) (*citing Resource Ventures, Inc. v. Resources Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423, 441 (D. Del 1999)).

**B. Plaintiffs Allege Materially False and Misleading Statements and Omissions**[3]

Under the PSLRA, a complaint need only allege facts "sufficient to support a ***reasonable belief*** as to the misleading nature of the statement or omission." *Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004) (emphasis added). Here, the Complaint adequately alleges that Defendants made false and misleading statements regarding Wilmington's (i) accounting, lending, and underwriting policies and practices; (ii) accounting for loan portfolio; (iii) accounting for its deferred tax asset; and (iv) internal controls.

**1. Actionable Misstatements Regarding Loan Origination And Accounting Practices**

**i. Defendants Misrepresented The Quality Of The Bank's Underwriting And The Credit Quality Of The Bank's Loans**

Throughout the Class Period, Defendants emphasized the "consisten[cy]" and "rigor[]" of their underwriting (¶190), assuring investors that the Bank would weather the downturn because they had been "very, very selective" about borrowers (¶211), that credit quality remained "stable" (¶177) and "very good" (¶187), and that any downgrades in the fair value of the

[3] For the convenience of the Court, Plaintiffs address all of Defendants' falsity challenges in this portion of their brief. However, arguments raised by the Underwriters and KPMG are limited to Plaintiffs' Section 11 claims, and thus must be evaluated under Section 11 pleading standards, which are more liberal than those that apply to Plaintiffs' Section 10(b) claims. *See infra* §V(A).

portfolio were due to the economy and not the creditworthiness of Wilmington's borrowers. ¶¶210-11, 215. Defendants assured investors in October 2008 that "the environment, while challenging, has not produced the same stresses at Wilmington Trust that exist at other companies" (¶201), and that Wilmington was unlikely to experience the financial troubles that had afflicted its peers because the Bank was "much more focused on the financial health of our borrowers" than its competitors. ¶177; *see also* ¶¶183; 194; 196; 200; 205; 209; 220; 223; 227; 234; 243.

According to former Wilmington employees, and findings by Wilmington's internal auditors, outside auditor, and Federal Regulators, these statements were materially false and misleading when made. Credit quality was fast deteriorating (¶79), accompanied by internal discussions about the number of delinquent loans and how the Bank's borrowers were "in trouble." *Id.* Far from offering "consistent" underwriting, Defendants: regularly made exceptions for "friends and family" to the few underwriting standards that the Bank had (¶52); institutionalized significant underwriting exceptions with the 10% Rule (¶¶50, 52, 56); punished lenders for downgrading their loans (¶¶77); and "papered over" gaps and inconsistencies in the paperwork. ¶46. Defendants also sought to compensate for their poor initial underwriting by relying on personal guarantees – but, leaving aside the Federal Reserve's repeated criticism of such practices, Defendants did not vet the guarantors and often permitted them to guarantee multiple loans, even after Defendants became aware that they were financially unstable. ¶¶57-59. Further, Wilmington's regulators identified systemic and serious failings in Wilmington's underwriting practices. ¶¶90-91. This is more than sufficient to plead that Defendants' statements were false. *See In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192, 1208, 1211 (W.D. Wash. 2009) (widespread departures from underwriting guidelines

rendered defendants' claims to be "disciplined and vigilant in [its] underwriting standards" false); *In re New Century*, 588 F. Supp. 2d 1206, 1226 (C.D. Cal. 2008) ("Plaintiffs offer New Century's statements that it observed standards of high-quality credit and underwriting, and set those statements against detailed allegations of practices that utterly failed to meet those standards. That is sufficient to plead false and misleading statements."); *In re Countrywide Financial Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1153 (C.D. Cal. 2008) (widespread loosening of underwriting standards renders false lender's claims to adhere to a "quality control process" and to adopt "consisten[t]" standards); *Lewis v. Straka*, 2006 WL 2927658, *4 (E.D. Wis. Oct. 12, 2006) (falsity alleged where regulators had investigated the bank's operations and criticized the quality of its portfolio, and its lending and auditing procedures).

In the face of these allegations, Wilmington claims that its policies were not inconsistent with "rigorous," "consistent," and "very, very selective" underwriting and that nothing in these allegations renders its representations of "stable" and "very good" credit quality false. WT Br. 31-32, 36.[4] These arguments are self-refuting. There is simply no interpretation of the words "consistent," "rigorous" and "stable" that can be reconciled with Wilmington's actual practice of constant exceptions to underwriting standards, failure to collect basic documentation, and disregard of "astound[ing]" delinquency levels.[5] ¶79. Similarly, the Underwriters contend that

---

[4] As used herein, the following are reference abbreviations for the docket entry numbers of the various Defendants' briefs in support of their respective motions to dismiss the Complaint: "WT Br. __" refers to the Wilmington Trust Defendants' brief (D.I. 59); "UW Br. __" refers to the Underwriter Defendants' brief (D.I. 56); "KPMG Br. __" refers to Defendant KPMG's brief (D.I. 51); "duPont Br. __" refers to Defendant duPont's brief (D.I. 52-1); "North Br. __" refers to Defendant North's brief (D.I. 62).

[5] Notably, Wilmington can only advance these arguments by ignoring many of the Complaint's allegations. For example, Wilmington claims that Plaintiffs do not allege that Employee A's loans were particularly risky (WT Br. 32); however, the Complaint alleges that Employee A was *(cont'd)*

Wilmington's reference to "underwriting standards" referred only to the specific underwriting criteria identified in the Bank's Annual Reports on Form 10-K (UW Br. 3, 7) (a flawed contention, given that those criteria are explicitly described as ***additional*** underwriting requirements the Bank applied to ***construction*** loans, rather than an exhaustive list of ***all*** underwriting standards for ***all*** Wilmington loans).[6] Even assuming the Underwriters are correct, these statements are still false because of Wilmington's tolerance of unconstrained underwriting exceptions.[7] Thus, whatever "standards" Wilmington may have formally had, Wilmington's actual practice rendered those standards irrelevant. *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (by violating company's stated policies, defendants "caused [its public filings] to be materially misleading in that the disclosed policy no longer reflected actual practice").

Second, Wilmington argues that there was nothing false in its claim to mitigate credit risk by "obtain[ing] collateral and personal guarantees from commercial loan clients," WT Br. 31. In fact, Plaintiffs allege that such efforts did ***not*** mitigate the risk because Wilmington relied on personal guarantees ***in lieu of*** adequate underwriting, and failed to perform adequate due diligence on the guarantors' ability or willingness to pay. ¶¶57-58.

---

***fired*** as a result of the Federal Reserve MOU – after Defendants ignored repeated complaints about his practices. ¶¶46, 60.

[6] The Bank's 2010 10-K describes a small number of underwriting criteria for "commercial construction" loans that are applied ***"[i]n addition to*** the mitigation activities listed above." Available at http://www.sec.gov/Archives/edgar/data/872821/000095012311020427/ w80859e 10vk.htm#W80859tocpage (emphasis added). Indeed, if the Underwriter Defendants are correct, it would mean that the Bank employed ***no*** underwriting standards for its non-construction loans, which included general commercial, commercial mortgage, consumer, and residential loans.

[7] As discussed below, Wilmington also failed to ***gather accurate data*** about the value of the collateral securing its loans, making it impossible for them to accurately assess limits on loan-to-value ratios (the principle specified criteria in the Bank's SEC filings). *Cf. Wash. Mut.*, 694 F. Supp. 2d at 1210 (use of inaccurate appraisals rendered representations about LTVs false).

Third, Wilmington contends that the Complaint's CWs did not describe particular instances of underwriting exceptions in sufficient detail. WT Br. 32-33. However, Plaintiffs are not required to plead "each single specific transaction in detail," *Tricontinental Industries Ltd. v. Anixter*, 215 F. Supp. 2d 942, 947 (N.D. Ill. 2002), so long as they allege facts that support a "reasonable belief" of falsity. *Chubb*, 394 F.3d at 147. Here, the CWs – all of whom are experienced bank employees – provide detailed accounts of exceptions to underwriting criteria, which taken together with the many other allegations of deficient underwriting, do just that.

Finally, Wilmington faults Plaintiffs for not alleging that Wilmington's poor underwriting, rather than the economy, was the ***sole*** source of the Bank's losses. WT Br. 36. Not only does this argument concern an entirely distinct element of a claim – loss causation, discussed at § VI below – but Plaintiffs need not demonstrate that a fraud was the ***sole*** source of a loss in order to state a claim, and certainly not on the pleadings. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 186-87 (3d Cir. 2000). In any event, the essence of the fraud alleged is that, at a time when investors were concerned about the effects of the economy on the lending business, Wilmington ***falsely*** claimed that its policies enabled it to weather the storm. ¶175.[8]

[8] The Underwriters, whose arguments are made solely in the context of Plaintiffs' Section 11 claims concerning the February 2010 Offering, additionally argue that the Complaint fails to demonstrate the deficient practices existed at the time of the Offering. UW Br. 3, 8-9, 11, 12, 14. First, the Underwriters' challenges to the knowledge of the confidential witnesses are addressed in § IV(B)(5). Second, the Underwriters ignore that Wilmington incorporated several years of SEC filings into the Offering Documents that misstated their underwriting practices (¶¶320, 355), and that Wilmington's poor underwriting earlier in the Class Period tainted the entire portfolio, as many of the same loans remained on its books at the time of the Offering. *E.g.*, ¶¶46, 54. Thus, the Offering Documents were false even if Wilmington's practices improved later in the Class Period due to the MOU, as the Underwriters argue (UW Br. 11). But this argument is a question of fact not appropriate for resolution on the pleadings, as Plaintiffs specifically allege that the implementation of the MOU took time, and the deficiencies persisted throughout the Class Period. *See* ¶¶6, 55, 96 (the Bank was "attempting to implement" the MOU in March 2010).

#### ii. Defendants Misrepresented The Effectiveness Of The Bank's Portfolio Review And Risk Management

Defendants made numerous false and misleading statements regarding the effectiveness of Wilmington's portfolio review and risk management function. The Officer Defendants insisted that they "consistently" applied Wilmington's loan risk rating system (¶184), made sure that risk ratings "reflect[ed] the current performance aspects of what's going on" (¶223), "spent an awful lot of time" reviewing the portfolio and "exhaustive[ly]" examined the loans (¶211), "extremely actively" reviewed the portfolio to ensure that reserves and risk ratings were appropriate (¶231), and that they put the portfolio "under a microscope" (¶239), conducting "a thorough and exhaustive analysis" every quarter (¶240). Investors were also told that the lending staff and the asset review staff "operate[d] independently of each other" (¶184), that the portfolio was evaluated "through an independent review function" (¶177), that the Bank used an "independent credit review group . . . to ensure that they accurately reflect the risk profile of the portfolio" (¶244), and that "we separate our credit policy and asset review functions. We want to make sure that there are no conflicts there." ¶220; *see also* ¶¶190, 196, 215, 234, 243.

In fact, Defendants: (i) undermined the credit risk analysts by subordinating them to lenders (¶¶47-48); (ii) refused to allow ARG to downgrade loans as they deemed appropriate, overriding ARG determinations to place delinquent loans on nonaccrual status or charge them off (¶¶70-74); and (iii) censored reports from ARG to the Board to omit reference to bad news. ¶75. Further, despite Defendants' claim to do "thorough" portfolio reviews, in fact, only a tiny fraction of the loans were reviewed due to Defendants' deliberate understaffing – a practice that left smaller loans with no review at all, either at their inception or during portfolio reviews. ¶¶47, 65. Defendants' failure to review a sufficient portion of the portfolio received heavy criticism both by KPMG and Wilmington's Internal Audit Group (¶¶66-68), and M&T's much

more thorough review of the loan book as of January 2008 resulted in a loss recognition of $500 million. ¶130. Notably, even *after* Wilmington's regulators identified deficiencies – and after the Bank became aware that the MOU was forthcoming (¶166) – Defendants continued to misrepresent the quality of its review and the independence of its risk management function without disclosing the MOU. ¶¶231, 234, 238, 243.[9]

These allegations demonstrate the falsity of Defendants' statements. *See Serabian v. Amoskeag Bank Shares, Inc*., 24 F.3d 357, 363 (1st Cir. 1994) (fraud alleged where bank claimed to have "strong" "loan review capabilities" when in fact loan staff could not "stay[] on top of problem loans" and was forced to hire an outside consultant to assist with reviews).[10]

In an attempt to escape liability, Defendants argue that their statements were ***literally*** true. For example, Defendants claim that because Plaintiffs have not alleged that Defendants literally failed to review any loans at all, nor have Plaintiffs alleged the exact number of staff hours spent reviewing the portfolio, statements such as Defendants' claim to "spend an awful lot of time" reviewing the portfolio and to "put[] [loans] under the microscope" were not false. WT Br. 21, UW Br. 11, North Br. 10. Defendants also claim that Wilmington did formally separate the ARG from its lenders as promised (WT Br. 34), and that the Bank disclosed both that the Bank only reviewed a percentage of its loan book (WT Br. 21-22; UW Br. 11), and that lenders

[9] Wilmington does not even *address* this point except to state that it disclosed the existence of the MOU (obliquely) in early 2010. WT Br. 38. Such disclosure, nine months after Wilmington became aware of the MOU, was too little, too late. And though Wilmington mentions that it was forbidden to disclose "confidential supervisory information," it does not argue that the mere existence of the MOU constituted such information; indeed, it could not, because the MOU was disclosed (belatedly). *See also In re Bankers Trust Co.*, 61 F.3d 465, 467 (6th Cir. 1995) ("confidential supervisory information" consists of "reports of examination" by regulators and similar documents prepared for the use of the Federal Reserve). If nothing else, the fact that Defendants continued to make such statements *even knowing* the MOU was forthcoming, and after it was received, establishes falsity.

[10] Wilmington was similarly forced to hire an outside consultant – twice. ¶¶89, 268.

had some "credit risk-related responsibilities," UW Br. 13. Finally, the Underwriter Defendants argue that Wilmington's claims to have consistently applied risk ratings were not false because the Bank disclosed that it did not automatically charge-off nonaccruing loans. UW Br. 12.[11] These "literal truth" arguments fail.

To start, it is blackletter law that the securities laws forbid misleading statements as well as outright falsehoods. *See Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010); *In re Merck & Co., Sec., Derivative & "ERISA" Litig.*, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011). Here, Wilmington repeatedly claimed to conduct "independent" reviews of the portfolio, to conduct a "thorough and exhaustive analysis" of the loan portfolio every quarter, to "make sure that . . . we're reserving appropriately," and to "consistently" apply its own internal risk ratings. These claims necessarily implied that the Bank was reviewing a sufficient percentage of loans to set appropriate reserves, that the Bank was taking into account relevant factors, and that the "independent review" was not subsequently undermined by a combative management who censored information from the Board and overrode downgrades.

Further, while investors may have understood that only a percentage of loans would be reviewed – even M&T reviewed a "percentage" of Wilmington's loans (50%, far higher than the 30% that Wilmington reviewed by the end of the Class Period) – investors still reasonably would have understood that Wilmington reviewed a ***sufficient*** percentage to accurately assess the

[11] The mere fact that some of Wilmington's representations may have been preceded by the phrase "we believe" does not, as Underwriters contend (UW Br. 11), transform them into representations of opinion. *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999). Underwriters' citation to *Burlington* is inapposite; in that case, the *statement itself* concerned a projection of future performance that was deemed too vague to be actionable; the use of the phrase "I believe" was not the focus of the court's consideration. 114 F.3d at 1427.

portfolio. The Officer Defendants reassured anxious investors in the middle of an economic crisis that "we're looking at the appropriateness of risk ratings on an ongoing basis, and trying to make sure that they reflect the current performance aspects of what's going on" and that they were putting the portfolio "under the microscope." In light of these false assurances, investors were led to believe that the Bank was conducting those reviews necessary to ensure that it accurately reported its financial condition.

### iii. Defendants Misrepresented Their Appraisal Process

With housing and construction a particular concern in the economic climate, Defendants especially emphasized their diligence in monitoring the collateral securing their loans. Defendants told investors that "the appraisal process is a continuous process for us. We view each of our projects on an ongoing basis and we get financial statements from those projects on an ongoing basis" (¶178), "we obtain appraisals for all significant properties" (¶216), collateral values were examined "on a daily basis" (¶239), and that "if it's a real collateral-oriented loan, obviously we're going out and getting a new appraisal." ¶238. But as witnesses confirm, Defendants avoided updating their appraisal values, a fact that was discussed within the Bank and flagged by Federal Regulators. ¶¶84-89. Misstatements related to appraisals are highly material and actionable. *See, e.g., Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 184 (S.D.N.Y. 2010) (failure to update appraisals rendered defendants' statements false); *Wash. Mut.*, 694 F. Supp. 2d at 1210 (false statements regarding appraisals actionable).

Wilmington and the Underwriter Defendants argue that even though one of the Bank's ***own officers*** stated that Wilmington's "preferred way of doing things" was ***not*** to obtain current

appraisals for the properties securing its loans (¶86)[12] – confirming the identical and consistent accounts of witnesses (¶¶87-89) – these statements were not false because the Bank warned investors that for newer loans, it would only obtain updated appraisals when circumstances called old values into doubt. WT Br. 37, UW Br. 10-11, 13-14. It is difficult to imagine what "truth" there could have been to these assurances if a global housing and real estate crisis did not constitute sufficient circumstances to trigger an update.[13]

#### iv. Defendants Misrepresented Their Accounting Policies

In setting the Bank's reserves, Defendants claimed to take into account "current micro- and macro-economic factors, historical net loss experience, current delinquency trends, movements within our internal risk rating classifications, and other factors." ¶118; *see also* ¶123 (same); ¶240 (claiming to consider "current economic conditions"). Wilmington claimed that a decline in provisions for reserves was a "positive development" (¶237), and assured investors

[12] The Underwriters attempt to escape the plain meaning of this admission. UW Br. 14. Contrary to the Underwriters' wishful interpretation, the article confirms that the officer acknowledged that "it wasn't the nature of how we did things" to "go back [to borrowers] and ask for more collateral, more financial statements, more appraisals." Tejtel Decl. at Ex. I.

[13] For this reason, the Underwriters' argument that the Complaint does not allege that the Bank "believe[d] there had been an obvious and material deterioration in market conditions" fails. UW Br. 11, 13. Even assuming the qualification "believe" has any legal significance (*see infra* § V(C)(2)(ii)), if a global real estate crisis did not affect Defendants' "beliefs" about the value of the properties securing its loans, then Defendants' "beliefs" were not rooted in any empirical reality, and their statements were misleading. Indeed, the Complaint includes empirical data showing that Delaware actually experienced ***substantial*** declines in key real estate metrics such as housing prices and construction employment that tracked national trends. ¶¶80-81. Moreover, the Complaint specifically alleges that the Bank was aware that the value of its portfolio was declining and, as a result, refused to sell problem loans in the marketplace because they would only sell at "fire sale" prices. ¶¶88. Wilmington further contends that even though ARG maintained a list of outdated appraisals, there is no specific allegation that the Bank failed to update appraisals for loans marked as impaired. WT Br. 37. Not only is such failure readily inferred from the witness's statements about outdated appraisals that were ignored, but this unfounded claim has no bearing on whether Wilmington's general claim to maintain current appraisal values was false. Importantly, this argument ignores Wilmington's refusal to ***acknowledge*** that loans were impaired in the first place. ¶¶70-74.

that an increase in reserve size in the middle of 2008 was temporary. ¶194. In October 2009, investors were told that there was a "direct correlation" between reserves and collateral and expected cash flows, "based on today's market conditions and the expectations, it's based on those values." ¶238. Wilmington also told investors that they placed loans on non-accrual status when they were 90 days past due. ¶217.

These statements were false. The Bank did not consider economic factors until late 2008; prior to that point, the Bank set reserves according to a mechanical percentage formula based on each loan's risk rating. ¶¶119-20. Even after the Bank changed its methodology, the Bank still failed to consider the economic environment in any meaningful way that would enable it to respond appropriately. ¶¶121-24. Thus, even if it was "literally true" that economic factors were considered in a minor way after the change in methodology, as the Wilmington Defendants argue (WT Br. 22), it was at least misleading to assure investors that they took account of economic factors when, in fact, those factors only minimally influenced the reserves. *In re Ambac Fin. Group, Inc.*, 693 F. Supp. 2d 241, 271 n.32 (S.D.N.Y. 2010) (falsity alleged where bond insurer misrepresented the factors it considered in underwriting process); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 510 (S.D.N.Y. 2009) (falsity alleged where credit rating agency misrepresented the factors it considered in its analysis of mortgage-backed securities).

Similarly, Wilmington misled investors when it claimed to place loans on nonaccruing status after 90 days. ¶217. In fact, Wilmington refused to put even seriously delinquent loans on the nonaccrual list. ¶¶72-73. In the same vein, though Wilmington claimed to use "historical losses" to set reserves (¶¶123, 217), this was misleading because – as Defendants knew but did not disclose – their refusal to recognize losses inherent in the portfolio artificially decreased their "historical loss" rate. Or, to put it another way, Wilmington may have "literally" considered

historical losses (WT Br. 22-23), but investors reasonably believed that when Wilmington claimed to use "historical losses" to set reserves, it meant an ***accurate measure*** of those losses when, in fact, the Bank manipulated its loss history and did not even maintain such a measure.

**v. Defendants' Statements Were Not Puffery**

A fact is material if there is a "substantial likelihood" that it would have been viewed by a reasonable investor as having "significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011). Although certain vague statements are deemed "puffery" and thus immaterial as a matter of law, *EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000), the mere fact that a statement is ***imprecise*** does not render it "puffery." As the Third Circuit has explained,

> where a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play.' . . . By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.

*Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992). Thus, "conclusory" terms like "high" or "fair," when used in a commercial context, are "reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1092-93 (1991); *see also Serabian*, 24 F.3d at 364 (bank's representations that its practice was to "address issues in a timely and conservative manner" and "worked from very conservative assumptions" were actionable); *Novak,* 216 F.3d at 315 (statements such as "in good shape" or "under control" are actionable if false). Like all materiality issues, "puffery" determinations are fact-intensive and can be made on a motion to dismiss only when the statements "are so obviously unimportant" that reasonable minds cannot differ as to their importance. *In re Globalstar Sec. Litig.*, 2003 WL 22953163, at *8 (S.D.N.Y. Dec. 15, 2003).

To determine whether statements are inactionable puffery, they "must not be assessed in a vacuum (*i.e.*, by plucking the statements out of their context to determine whether the words, taken per se, are sufficiently 'vague'). The statements are properly interpreted only by reference to the relevant circumstances that underlie their meaning." *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175-76 (D.R.I. 2003); *see also Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.").

Here, the challenged statements were made as part of Wilmington's discussion of its underwriting standards and risk management – not only the core of Wilmington's business, but also a critical area of investor concern given the state of the economy and the fate that had befallen numerous financial institutions in recent years. It was in that context that Wilmington assured investors that the Bank "avoided many of the problems that other financial institutions encountered in 2008" (¶215) by offering reasons for its purported success, including its "conservative" management, "stable" credit quality, and "rigorous" underwriting. As numerous courts have recognized, under such circumstances, these and similar representations by financial institutions have concrete, definite meanings. *See Freudenberg*, 712 F. Supp. 2d at 190 (in the lending context, "'[q]uality' is not an amorphous concept"); *see also In re RAIT Financial Trust Sec. Litig.*, 2008 WL 5378164, at *5-6 (E.D. Pa. Dec. 22, 2008) ("extensive due diligence process"; "disciplined underwriting process and recurring credit analysis"); *Wash. Mut.*, 694 F. Supp. 2d at 1214 ("appropriate policies, standards and limits designed to maintain risk exposures," "proactively manage our credit risk"; "taking steps now to reduce potential future

exposure").[14] Notably, many of Wilmington's statements were made in response to specific questions by professional market analysts, further illustrating that Defendants and the securities professionals who posed the questions considered these representations to be meaningful. *E.g.*, ¶¶177, 194, 211. "Because the statements Plaintiffs allege were misleading related to the fundamental nature of [the defendant's] most important business sector . . . [they] are actionable and material." *Freudenberg*, 712 F. Supp. 2d at 186.

Defendants' cases do not require a different result. In *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999), for example, the defendants ***accurately*** reported their past successes and, on that basis, expressed optimism for the future. *See id.* at 538. The court, considering the statements in context, found that in light of the ***accurate*** financial reports, the defendant's additional hopeful language did not "significantly alter[] the 'total mix' of information made available." *Id.* at 538-39. In *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272 (3d Cir. 2010), the court similarly concluded that because the company ***truthfully*** described the variables involved in its markets before characterizing its pricing as "disciplined," no reasonable investor would have understood the word "discipline" to mean the use of a "static, across-the board formula for [pricing] all products and services." *Id.*[15]

---

[14] *See also In re CIT Grp. Inc. Sec. Litig.*, 2010 WL 2365846, at *2-3 (S.D.N.Y. 2010) ("disciplined lending standards," "much more conservative" than other lenders, "tightened home lending underwriting"); *Ambac Fin. Grp.*, 693 F. Supp. 2d at 270 ("rigorous" and "conservative"); *New Century*, 588 F. Supp. 2d at 1226 ("strict underwriting and risk management disciplines," "higher credit quality"); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1149-50, 1154 (S.D. Cal. 2008) ("underwriting procedures were better and more conservative" than other lenders; "committed to a disciplined approach that focused on credit quality").

[15] *JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005), cited by Wilmington, is similarly distinguishable. There, the bank was not describing its ***underwriting*** policies, but the general "honor" and "integrity" of the institution. In that context only, the court held that the
*(cont'd)*

Here, by contrast, Wilmington did not offer optimism based on past ***accurate*** reports, but falsely described virtually every aspect of its lending operation. *See Marsden v. Select Med. Corp.*, 2006 WL 891445, at *6 (E.D. Pa. Apr. 6, 2006) (distinguishing *Advanta* on this ground). Nor do Plaintiffs contend that words such as "selective" and "rigor" required Defendants to adhere to a set formula: instead, Plaintiffs contend that such words led investors to believe ***at least*** that Defendants' underwriting and risk management complied with minimum regulatory requirements, and was more careful than that of their peers – exactly as Defendants claimed. ¶¶177, 201. Because Defendants' practices were in fact far ***below*** those of their peers and regulatory requirements, Defendants' statements were false. *See Scritchfield*, 274 F. Supp. 2d at 175-76 (statements comparing oneself favorably to competitors are material); *In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 18-19 (D. Mass. 1999) (same).[16]

### 2. Wilmington's Financial Statements Were Materially Misstated

#### i. Wilmington Reserve Calculations Were Not In Compliance With GAAP And Were Thus Materially False

Financial statements that do not comply with GAAP are presumptively false. *See* 17 C.F.R. § 210.4-01(a)(1); *see also Burlington*, 114 F.3d at 1422 (allegations of specific GAAP violations sufficient to plead falsity). With respect to loan loss reserves, GAAP requires lenders to take into account common-sense factors that affect the ability to collect amounts due on the

---

representations were immaterial. *See Freudenberg*, 712 F. Supp. 2d at 186, 199 (distinguishing *JP Morgan* on this basis).

[16] The Underwriters' contention that Wilmington's recitation of its underwriting standards was "aspirational," and therefore immaterial (UW Br. 6 n.5), is wrong as a matter of law. *See Hunt v. Alliance North Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) (funds' representations regarding what it would ***attempt*** to do misleading: "The prospectuses warned that the Fund's hedging maneuvers might fail, not that the Fund would have no opportunity to use hedging maneuvers."); *Harden v. Raffensperger*, 65 F.3d 1392, 1405-06 (7th Cir. 1995) (representations of "plans" to accomplish certain goals are misleading if no "plans" exist).

loan, such as: the credit quality of the borrower, current economic or borrower trends, external economic factors, current and historical loss trends, delinquencies, charge-offs, and recoveries in the portfolio, the experience and ability of the lending staff, and changes in credit concentrations. ¶¶112-13. Here, despite Wilmington's claims that its financial statements had been prepared in accordance with GAAP (*e.g.*, ¶¶180, 182, 382), and that its reserves were "adequate" and "appropriate" (¶¶184, 240, 277, 373), its reserves were far too low, ultimately resulting in large losses by the end of the Class Period.

As summarized above in § IV.B.1.iv, Defendants misapplied GAAP by (i) actively interfering with attempts to set reserves appropriately by refusing to downgrade loans; (ii) using mechanical formulas based on unreliable loan risk ratings that did not account for external economic events; and (iii) later, as economic conditions deteriorated still further in Delaware in particular, continuing to inadequately consider the external environment. These departures from GAAP rendered Defendants' financial statements false. *See Freudenberg*, 712 F. Supp. 2d at 188 (reserves properly alleged to be false when defendants did not take economic environment into account); *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 402-03, 408 (D.N.J. 2004) (failure to classify bad debt appropriately renders reserves noncompliant with GAAP and financial statements misleading); *In re PMA Capital Corp. Sec. Litig.*, 2005 WL 1806503, at *10 (E.D. Pa. July 27, 2005); *RAIT Fin. Trust,* 2008 WL 5378164, at *5, *7 (Section 11 complaint evaluated under Rule 8(a)); *In re Wash. Mut., Inc. Sec.*, 694 F. Supp. 2d 1192, 1212 (W.D. Wash. 2009) (departures from GAAP render reserve accounting false); *Atlas*, 556 F. Supp. 2d at 1150-52, 1154-55, 1159 (same).

Wilmington failed to even collect much of the raw data necessary to set reserves appropriately, rendering GAAP compliance an actual impossibility. *See Oxford*, 187 F.R.D. at

139 (complaint sustained where defendants used "inherently unreliable" data in formulating financial statements). Defendants permitted uncontrolled exceptions to underwriting standards; reviewed only a small portion of its loans; relied heavily on personal guarantors (whose creditworthiness was not vetted); failed to collect necessary documentation; and failed to obtain updated appraisals (necessary to assess the risk of each loan) despite the real estate crisis. These and other similar deficiencies deprived the Bank of the basic data required to assess probable losses in the portfolio.

Further, these flaws were repeatedly (and often contemporaneously) the subject of criticisms and warnings by the Bank's outside auditor, its Internal Audit Group, the Federal Reserve, and M&T – to the point where the Federal Reserve forced the Bank to take ***fundamental*** steps to maintain an adequate loan loss reserve, including the creation of "standards for documentation exception tracking and monitoring system," and the creation of other basic lending standards, correcting what CW 2 described as a "mishmash." ¶93. Indeed, (i) the Bank's dramatic increases in reserves at the end of the Class Period, especially after receiving KPMG's criticisms and putting into effect the MOU; (ii) the massive write-downs triggered when Wilmington brought in a third party to help review the portfolio and update collateral values; (iii) the fire-sale price at which Wilmington was forced to sell itself to avoid complete collapse; and (iv) M&T's assessment of an additional $500 million deficiency in the portfolio as of January 2008, all support Plaintiffs' claim that reserves were not properly calculated throughout the Class Period. *See Veritas Software*, 2006 WL 1431209, at *9 ("Allegations that defendants participated in the drafting, preparation, and/or approval of the public representations complained of adequately alleges scienter"); *Plotkin v. IP Axess Inc., Etc.*, 407 F.3d 690, 698 (5th Cir. 2005) ("the fact that a business files for bankruptcy on 'Day Two,' may, under the right

surrounding circumstances, provide grounds for inferring that the business was performing poorly on 'Day One.'"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 68 (2d Cir. 2001) (large losses at the end of the class period creates an inference that problems existed earlier); *Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 90 (1st Cir. 2008) ("at the pleadings stage, a bad outcome truly is relevant to the likelihood of fraud") (citations omitted); *PMA Capital*, 2005 WL 1806503, at *15 (evaluating complaint under Rule 8(a); "[t]he fact that PMA had to increase its loss reserves by over $300 million . . . is evidence that they may have been understated or incorrect …").[17]

**ii. Wilmington's GAAP Arguments Are Inappropriate To Resolve On A Motion To Dismiss And Are Irrelevant**

Rather than address the Complaint's allegations, Wilmington quibbles over the minutia of what GAAP requires. First, disputes about GAAP and what GAAP requires may not be resolved on a motion to dismiss. *See Burlington*, 114 F.3d at 1421; *In re Majesco Sec. Litig.*, 2006 WL 2846281, at *5 (D.N.J. Sept. 29, 2006). More importantly, these arguments miss the point: the Bank could ***not*** have reported the proper value of its loans, or properly reserved for them, as its internal policies impeded the accurate assessment of its loan book.

[17] Wilmington, echoing the arguments of other Defendants, argues that loss reserves are statements of opinion and may only be false if they are "subjectively" disbelieved. WT Br. 19. Because §10(b) requires a showing of scienter, this debate is largely academic in the context of Plaintiffs' Exchange Act claims. Wilmington's argument is discussed more fully below in the context of §11, which does not require a showing of scienter. For the purposes of §10(b), however, the Third Circuit has explicitly held that, at ***minimum***, reserves are false – and ***opinions generally*** (which reserves are not) are false – when they are ***objectively*** unreasonable or fail to rest on a legitimate factual basis. *See, e.g.*, *Christidis v. First Pennsylvania Mortg. Trust*, 717 F.2d 96, 100 (3d Cir. 1983); *Shapiro*, 964 F.2d at 282 (reserve figures and characterizations are actionable under §10(b) if the speaker ***recklessly*** omits material facts); *In re Donald J. Trump Casino Sec. Litig. – Taj Mahal Litig.*, 7 F.3d 357, 368 (3d Cir. 1993) (opinions are actionable misstatements if they are not "genuinely ***and reasonably***" believed (emphasis added)).

First, Wilmington argues that the Interagency Guidance does not constitute GAAP. WT Br. 23. This is exactly the sort of dispute that is inappropriate for resolution on the pleadings. *Burlington*, 114 F.3d at 1421. Moreover, the Interagency Guidance warned against overexposure to commercial real estate loans – a point that was ***specifically flagged*** by the Federal Reserve when it demanded that the Bank consider its excessively high "credit concentration" in setting its reserves. ¶45. There can be no argument that the MOU was inconsistent with GAAP because it ***required*** the Bank to comply with GAAP. *Id.* In any event, in their accounting allegations, Plaintiffs have not relied on the Interagency Guidance but on GAAP standards such as FAS 5 and SAB 102. ¶¶108, 113. Thus, Defendants' argument is both wrong and irrelevant.

Second, Wilmington defends its formulaic manner of setting reserves by arguing that FAS 5, and not FAS 114, represents the correct accounting standard. WT Br. 25-26. Wilmington does not even ***address*** Plaintiffs' actual allegations: that the formula depended on risk ratings that were manipulated and failed to consider the economic environment as GAAP requires. No accounting rule permits such practices, and Wilmington does not – indeed, could not – argue that in the face of these practices, their reserves complied with FAS 5 or any other accounting rule. *See, e.g.*, *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 927 (9th Cir. 1993) (reserves are false when they must be increased "based on any plausible and acceptable means of calculation, projection, or forecast") (quoting *Urbach v. Sayles*, 779 F. Supp. 351, 354-55 (D.N.J. 1991)); *Local 703, I B of T. Grocery & Food Emples. Welfare Fund v. Regions Fin. Corp.*, 2011 U.S. Dist. LEXIS 60761, *21-23 (N.D. Ala. June 7, 2011) (mishandling and misclassifying loans results in false reserve accounting).[18] Similarly, Wilmington's related

[18] Wilmington argues that Plaintiffs have failed to allege that reserves were inadequate when it was using its "mechanical" method between 2007 and 2008. WT Br. 25 n.11. Wilmington is wrong. The Complaint provides a ***chart*** of what the correct reserve levels should have been for *(cont'd)*

argument that it acted properly post-2008 by considering historical losses (WT Br. 26) fails because it ignores that Plaintiffs' actual allegation is that the Bank ***manipulated*** its loss history.

Third, Wilmington makes the unfounded claim that, if Plaintiffs' allegations are true and the Bank's lending practices had been ongoing for years, then the losses would have occurred earlier. WT Br. 26-27. However, as the Complaint alleges, the Bank massively ***increased*** its exposure to commercial real estate between 2007 and 2010, thus – as the Interagency Guidance explained – exponentially magnifying its risk of loss (¶¶40-42), during a period of economic decline, using lax underwriting standards. Wilmington's failure to properly underwrite and reserve for these bad loans rendered it unable to weather the storm.[19]

Fourth, Wilmington disputes the Complaint's facts regarding SEC Staff Accounting Bulletin ("SAB") 102, which requires lenders to take certain basic, relevant information into account when setting loss reserves. ¶¶113-14. Wilmington contends that this guidance only provides a list of ***possible*** factors to consider, and does not require consideration of all them. WT Br. 28-29. Wilmington is wrong. To start, it is facially obvious that the SEC did not give lenders carte blanche to ignore such obviously critical factors as trend information about

---

2008. ¶137; *see also Wash. Mut.*, 694 F. Supp. 2d at 1212 ("Plaintiffs also provide expert analysis quantifying, where possible, the amount by which WaMu failed to provision its Allowance. These allegations support Plaintiffs' claim of falsity.").

[19] Wilmington's claim that Plaintiffs' allegations are insufficiently particularized (WT Br. 28) can also be rejected – in light of CW 2's responsibility for setting Wilmington's Loan Loss Reserve, CW 2's representation that the Bank relied almost entirely on its own loan loss history provides an adequate basis for inferring that the Bank did not accord sufficient weight to other factors. ¶121. This is particularly true because of the sheer magnitude of the economic upheaval during this period, rendering it particularly important that the Bank place great weight on this factor. *See Chubb*, 394 F.3d at 147 (complaint need only allege facts to support a "reasonable belief" of falsity); *In re ATI Technologies, Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 432 (E.D. Pa. 2002) ("It is enough that a complaint plead with particularity sufficient facts to support a reasonable belief that a statement is misleading."); *cf. In re Cabletron Sys.*, 311 F.3d 11, 32 (1st Cir. 2002) (complaint need not document "precise amount" of overstatement to allege fraud with particularity).

delinquencies and charge-offs, industry conditions, staff experience, and credit concentrations, which is what Wilmington appears to be arguing. Further, Wilmington's argument is belied by the very text of the standard, which identifies these as "[f]actors that ***should be considered***," and "there are certain common elements that should be included in any [loan loss allowance] methodology for it to be effective." ¶113; Ciarrocki Decl. Ex. 23 at 12, 20; *see also id.* at 23 (instructing lenders to "[c]onsider ***all known relevant*** internal and external factors that may affect loan collectability").

Wilmington's ***sole*** basis for arguing that it was permitted to disregard the items on the list is the fact that a portion of SAB 102 directs lenders to disclose which factors they considered in setting their reserves. WT Br. 29. However, the portion merely provides a ***non-exhaustive*** list of factors to consider; lenders may consider additional factors. Ciarrocki Decl. Ex. 23 p. 20. Moreover, SAB 102 directs lenders to consider environmental factors generally while leaving it to the lender to gauge which environmental factors are most relevant to its business. *Id.* It is for these reasons that the SEC requires disclosure of the particular factors used, not because the SEC intended its core list of important factors to be optional.

Fifth, Wilmington contends that the decline in reserves as a percentage of nonaccruing loans represented nothing more than "charge-offs." WT Br. 29. This is nonsensical. A nonaccruing loan is at ***risk*** of nonpayment due to delinquency. A charge-off, by contrast, represents a conclusion that the loan is unrecoverable, and is booked against reserves. Nonaccrual loans represent the greatest risk to the Bank and, during an economic downturn, there is no valid reason why reserves would decrease as a percentage of nonaccruing, but not-yet-charged-off loans. The Officer Defendants conceded as much: in October 2009, Defendant

Gibson told analysts that "the key to us is ***making sure that we have the appropriate reserves against those [non-performing] loans*** and I think we do." ¶240.

Finally, Wilmington claims that M&T's assessment of a $500 million deficiency – which M&T described as dating back to January 1, 2008 – was based on information available in 2010. WT Br. 48-49. Nothing in the Complaint supports Wilmington's speculation, and M&T's statement that its calculations were ***as of January 1, 2008*** actively refutes it. ¶¶132, 295. At the very least, Plaintiffs' plausible allegation on this point must be accepted as true.[20]

**iii. A Restatement Is Not Required To Allege Falsity**

Courts do not require a restatement to sustain allegations of accounting fraud (*see*, *e.g.*, *Scholastic*, 252 F.3d at 73-74; *Atlas*, 556 F. Supp. 2d. at 1154-55), because to do so "would shift to accountants the responsibility that belongs to the courts. It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002). Significantly, fraud may be inferred when auditors internally disagree with management over accounting policies – exactly as alleged here – even in the absence of a restatement. *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1090 (10th Cir.

[20] Relatedly, in connection with Plaintiffs' Section 11 claims, KPMG contends that Plaintiffs' allegations regarding insufficient reserves are "fraud by hindsight." KPMG Br. 18. "Fraud by hindsight" refers to fraud allegations based ***solely*** on the fact that conditions worsened from previous statements. *Avaya*, 564 F.3d at 269. Here, Plaintiffs base their allegations of falsity on the various contemporary factors and practices at the time the statements were made. Notably, even though Plaintiffs allege that Wilmington's 2007 and 2009 10-Ks were incorporated into the Offering Documents and were false, KPMG limits its "fraud by hindsight" argument to the 2009 financial statements. KPMG Br. 17-18. In any event, with respect to 2009 alone, Plaintiffs base their allegations on conditions that existed at the time the Offering Documents issued, such as the Bank's insufficient review of the portfolio, failure to update appraisals, failure to downgrade risky loans, and failure to account for the external environment. *See RAIT Fin. Trust*, 2008 WL 5378164, at *5 (it is not "fraud by hindsight" to allege that defendants "misrepresented the credit underwriting and monitoring processes that existed at the time of filing").

2003) (fraud inferred where auditor "acquiesced" after management "pressure"); *Howard v. Everex Systems,* 228 F.3d 1057, 1064 (9th Cir. 2000).

**iv. Wilmington Overvalued Its Loan Portfolio**

Wilmington also falsely reported the "fair value" of its loan portfolio on its financial statements. FAS 157, the GAAP standard for fair value accounting, "defines fair value as the price that would be received to sell an asset . . . between market participants." ¶139. Here, for the same reasons that Wilmington understated its reserves, it also overvalued its loan book. In fact, it was not until the third quarter of 2010 that Wilmington stated that ***for the first time***, it would add a "risk premium" to its valuation of the riskier loans on its books. ¶141. In other words, in Wilmington's financial statements prior to that date, Wilmington assumed that every outstanding loan would be paid off in full; it entirely ***failed*** to consider that certain of its loans had a higher risk of not being repaid at all. This is an indisputable error, and, unsurprisingly, once Wilmington added the risk premium, its reported fair value for its loan book was over $400 million ***less*** than it had been in the prior quarter. ¶142. M&T's finding of a $500 million deficiency merely confirms Plaintiffs' allegations.

As it did in the context of Plaintiffs' reserve allegations, Wilmington elides these points and instead chooses to discuss the idiosyncrasies of fair value accounting, arguing that FAS 157 provides the issuer with alternative ways to report fair value. Once again, not only are these arguments inappropriate for resolution on a motion to dismiss, *Burlington*, 114 F.3d at 1421, but they are a red herring. FAS 157's valuation techniques do not – under any circumstances – permit lenders to ignore the risk of nonpayment, fail to review loans for deterioration, or fail to consider collateral appraisal values. Thus, Wilmington's arguments must be rejected.

### 3. Defendants' Material Misrepresentations And Omissions Regarding Wilmington's Internal Controls

Contrary to the repeated SOX certifications signed by Defendants Cecala, Foley, and Gibson attesting that Wilmington's internal controls over financial reporting were effective (¶¶181-82), the Bank's controls were entirely inadequate. *See*, *e.g.*, ¶¶153-159, 185, 191, 197, 206, 218, 221, 228, 235, 245. The Bank failed to address inconsistent underwriting and asset review, understaffing in key areas, interference from the Officer Defendants, and significant flaws in its reporting systems. ¶¶153-159. These allegations were confirmed by numerous sources and the Federal Reserve MOU (¶¶90-97), as well as its subsequent additional controls over Bank management. ¶96. Wilmington selectively argues that CW 10's statement concerning "substantial errors" in the "interest rate modeling system" does not identify exactly what the errors were or whether they were corrected, but the PSLRA and Rule 9(b) do not require this type of exhaustive minutia.[21]

Additionally, misstatements in SOX certifications of internal controls are routinely held to be material and actionable.[22] Indeed, the SEC requires management to publicly file its certifications in order to "consistently enable investors…to more effectively monitor compliance

[21] *Medtronic*, 2001 WL 652016, at *2 (*citing Resource Ventures*, 42 F. Supp. 2d at 441).

[22] *See New Century*, 588 F. Supp. 2d at 1226-27; *Countrywide*, 588 F. Supp. 2d at 1178; *PMA Capital*, 2005 WL 1806503, at *10; *In re Faro Tech. Sec. Litig.*, 534 F. Supp. 2d 1248, 1263-34 (M.D. Fla. 2007); *In re Hamilton Bankcorp, Inc. Sec. Litig.*, 194 F. Supp. 2d 1353, 1356 (S.D. Fla. 2002); *In re OCA, Inc. Sec. and Deriv. Litig.*, 2006 WL 3747560, at *22 (E.D. La. Dec. 14, 2006). Thus, the Underwriters' argument that misstatements in SOX certifications are nothing more than inactionable puffery fails. *See* UW Br. 18. The Underwriters' citation to *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19-20 (D. Mass. 2004) for the proposition that internal controls allegations are frequently dismissed even when they are known to be inadequate is also misplaced. First, the *Crowell* allegations concerned § 10(b) of the Exchange Act, not §§ 11 or 12(a)(2) of the Securities Act, which is the only type of claim advanced against the Underwriters. *Id*. Second, the court actually held that the lack of adequate internal controls added to an inference of scienter. *Id*. at 20.

with this certification requirement." Release Nos. 33-8238; 34-47986, 68 FR 36636-01, at *36638 (2003). That the SEC requires certain disclosures is "persuasive authority" of their materiality. *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 937 (3d Cir. 1992).[23]

### 4. Wilmington Improperly Accounted For Its Deferred Tax Asset

For the last quarter in 2009 and the first two quarters in 2010, Wilmington inflated its earnings by at least $189.5 million by improperly accounting for a "deferred tax asset" (defined above as "DTA"). ¶¶143-52. Under SFAS 109, a company must reduce the value of its DTA with a type of reserve – known as a valuation allowance – if it is "more likely than not" that the company will not earn sufficient income in future years to take advantage of it. Because Wilmington could not expect to record positive earnings given its impending belated recognition of hundreds of millions of dollars in additional loan loss reserves, it was required to record a valuation allowance during these three quarters, further reducing the Bank's bottom line. ¶¶144-45. The Bank's failure to do so violated GAAP and is actionable. *See Hoff v. Popular, Inc.*, 727 F. Supp. 2d 77 (D.P.R. 2010); *Bachow v. Swank Energy Income Advisers, LP*, 2010 WL 70520, at *4-5 (N.D. Tex. Jan. 6, 2010); *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1016-17 (S.D. Ohio 2008); *see also Collins & Aikman Corp. v. Stockman*, 2009 WL 1530120, at *16, 32 (D. Del. May 20, 2009) (Stark, M.J.) (recommending that the Court sustain §10(b) claim for, *inter alia*, "overstat[ing] goodwill and deferred tax assets"); *Collins & Aikman Corp. v. Stockman*, 2009 WL 3153633, at *4-5 (D. Del. Sept. 30, 2009) (Robinson, J.) (adopting report and recommendation in this respect).

[23] Congress enacted the internal control requirement "[i]n order to enhance the quality of reporting ***and increase investor confidence***," S. Rep. No. 107-205 at 31 (Jun. 26, 2002) (emphasis added), further demonstrating that such certifications are material.

Defendants contend that a DTA is "inherently forward-looking" and, thus, that an allegation of an overstated DTA constitutes improper "hindsight" pleading. WT Br. 39. Contrary to Defendants' argument, failure to record a valuation allowance renders financial statements false when information available ***at the time*** demonstrates the need for one. *See, e.g., Popular*, 727 F. Supp. 2d at 90.[24] Indeed, "it is difficult to conclude that a valuation allowance is ***not needed*** 'when there is negative evidence such as ***cumulative losses in recent years***,' or if there is evidence of '***unsettled circumstances'*** that if not resolved would adversely affect operations or profits in the future." *Id*. Here, there were years of cumulative loan losses as well as "unsettled circumstances" arising from the implementation of the MOU.[25] Although Defendants claim that it is "speculation" to conclude that the DTA was unlikely to be realized at the time it was recorded (WT Br. 38-39), they fail to identify "any significant positive evidence to justify tilting the scores ***against*** a valuation allowance." *Id.* Defendants' factual argument is inappropriate for determination at this stage.

### 5. The Complaint's Factual Allegations Are Based On Extraordinary Evidence Of Defendants' Wrongdoing

In addition to relying on the actions of Federal Regulators, the Bank's outside auditor, the Bank's acquirer, and the Bank's own Internal Audit Group, the Complaint also relies on the

---

[24] As *Popular* recognized, in *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129 (W.D. Wash. 2006), cited by Wilmington, the plaintiffs failed to include allegations demonstrating contemporaneous falsity or "systematic" over-reporting. *See Popular*, 727 F. Supp. 2d at 91 n.8.

[25] Defendants maintain that the DTA is not a separately actionable misstatement because it is "derivative" of Plaintiffs' reserve claims, citing an unpublished Western District of Michigan case. *Hess v. Am. Physicians Capital, Inc.*, 2005 WL 459638, at *14 (W.D. Mich. Jan. 11, 2005). This is incorrect. Statements about DTAs are separately actionable misstatements that can independently mislead investors. *See Popular*, 727 F. Supp. 2d at 91 (DTA/valuation allowance "may have further misled investors" in litigation alleging understated loan loss reserves). The Complaint alleges that even "without correcting for the Bank's other GAAP violations," the DTA inflated the Bank's earnings by at least $189.5 million, making clear that the DTA was an independent false statement. ¶151.

remarkable reports of Wilmington's former employees, many of whom were Bank officers or occupied extremely senior positions and had direct contact with the Officer Defendants.[26] In the Third Circuit, a complaint may rely upon unnamed witnesses so long as the witnesses are described with sufficient particularity, a requirement that evaluates the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Avaya*, 564 F.3d at 263 (citing *Chubb*, 394 F.3d at 147).

Here, Plaintiffs describe each witness's position within the Bank and dates of tenure. ¶¶45, 46, 52, 60, 64, 79, and 161. As is evident, virtually all of the confidential witnesses not only had a high degree of expertise in this field, but also had direct, first-hand knowledge of Defendants' understanding of the Bank's lending standards, loan loss reserves, underwriting and appraisal policies, and financial statements. For instance, CW 2, the former Vice President of Wilmington's Credit Risk Management Division who worked at the Bank for thirteen years and resigned in March 2010, confirmed numerous aspects of Defendants' scheme.[27] Although sufficient on their own, CW 2's allegations are corroborated and expanded upon by the statements of other witnesses, not to mention the actions of the Federal Reserve and KPMG. These "consistent accounts reinforce one another and undermine any argument that the complaint relies unduly on the stories of just one or two former employees." *Cabletron*, 311

[26] These former Wilmington employees include the Vice President of Wilmington's Credit Risk Management Division, a Vice President of Wilmington's Workout Group, a Vice President of Wilmington's Commercial Lending, a Director of Internal Audit, a Wilmington Corporate Development Officer, a Director of Tax, a member of the Credit Review Committee, and other banking and lending associates.

[27] *See, e.g,* ¶¶ 46-51, 56-60, 64-67, 69-73, 75, 77-78, 86-90, 92-94, 96, 119, 121, 162-168, 367, 369, 370, 376-79, 387-88.

F.3d at 30. The witnesses, taken with other facts, consistently demonstrate that every independent party to review the Bank's risk management practices warned the Bank in emphatic terms that Defendants practices endangered the Bank and could not continue.

Notwithstanding the strength of these mutually-reinforcing reports, Defendants launch scattershot attacks on these former employees, all of which should be rejected. To begin, Defendants claim that Plaintiffs do not describe certain of the confidential witnesses with sufficient particularity. WT Br. 15, 17. However, all that is required is that plaintiffs plead sufficient detail for the court to evaluate whether it is "probable" that a person in the witness's position would know the information alleged. *See Chubb*, 394 F.3d at 149. For example, in *ATI Tech.*, the court phrased the inquiry as follows: "The question here is whether, if sales of a [computer] chip were a 'disaster,' a Hardware and Software Design Manager would likely know about it." 216 F. Supp. 2d at 436 n.11. Here, the Complaint provides each witness's title, tenure, job responsibilities and reporting structure (*see* ¶¶45, 46, 52, 60, 64, 79, and 161), which is more than sufficient for the court to determine that each witness had personal knowledge of the facts provided.

In particular, Defendants attempt to discredit CW 2 – a senior executive in the most critical and relevant areas of the Bank – with the complaint that out of CW 2's entire comprehensive and consistent account of Wilmington's internal practices, there were two occurrences – the lack of loan documentation provided by Employee A (¶¶46, 370) and Cecala's intervention in approving a loan (¶56) – that were outside what Wilmington contends was CW 2's job description.[28] WT Br. 32. Defendants' attack is misplaced as it misconstrues CW 2's

---

[28] Initially, it should be noted that Defendants' arguments regarding the veracity of these witnesses is well beyond the scope of a motion to dismiss. *See, e.g., Fitzer v. Security Dynamics*
*(cont'd)*

position. As set forth in the Complaint, as one of the senior-most credit personnel at the Bank, CW 2 routinely reviewed the documentation of large loan files and is in fact the ***ideal*** witness to comment on whether loan files regularly lacked full documentation. Defendants' other claim is that CW 2 was a senior ***credit*** executive, rather than a senior lending executive, so CW 2 could not have reliable knowledge of Defendant Cecala's intervention to obtain a loan for a personal friend. ¶56; WT Br. 33. Even assuming that the operations were as distinct as Wilmington claims – and the whole point of Plaintiffs' allegations is that they were not – given CW 2's regular interaction with the Officer Defendants and lending executives, this is simply not true. Moreover, given CW 2's regular interaction with the Officer Defendants and lending executives and her role as a member of the Loan Committee (¶49), CW 2 was well aware of the facts underlying the origination of the Bank's troubled loans. *Berson v. Applied Signal Tech.*, 527 F.3d 982, 985 (9th Cir. 2008) (relevant question is whether the witness "would be in a position to infer" the relevant facts, even if he or she did not "see" the facts "first-hand"). However, even if this were true, it does not discredit the vast bulk of CW 2's comprehensive and stunning testimony regarding the Officer Defendants' actions and knowledge.[29]

---

*Techs*., 119 F. Supp. 2d 12, 21 (D. Mass. 2000) (questions concerning the credibility of unnamed sources "are questions that go to the weight of [the] evidence").

[29] Defendants similarly claim that the Complaint cites CWs 3 and 4 for their opinions on matters outside their area at Wilmington. WT Br. 16-17, 32-33. Defendants are wrong. In fact, CW 3, who was Vice President of the Bank's Loan Workout Group during the Class Period, was in a perfect position to comment regarding the sales-biased "culture" of the Bank's loan operations. ¶¶46-47, 133. CW 4 was a Wilmington commercial banking and an investor relations associate during the Class Period – a position that would allow him to intelligently opine that loans to favored clients "were not really looked at with scrutiny," that the Bank would "shuffle things around" for preferred clients, and that the changes mandated by the Federal Reserve MOU (which was widely discussed at the Bank, ¶166) included the termination of several rogue lenders and relationship managers. ¶¶52, 56, 60.

Furthermore, while Defendants claim that the statements from CWs 6, 7, 8 and 10 can be "disregarded" because these individuals left Wilmington before or during the first year of the Class Period (WT Br. at 16, 32), information from outside the class period may be properly used to draw inferences about conditions ***during*** the class period.[30] *See In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) ("[B]oth post-class-period data and pre-class data could be used to 'confirm what a defendant should have known during the class period'" because "'***[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant***.'") (quoting *Scholastic*, 252 F.3d at 72). In this case, there is simply no reason to believe that Wilmington's practices changed so dramatically between September 2007 (when CW 7 departed), and January 2008 (when the Class Period begins) so as to undermine the witnesses' statements – in fact, the actions of KPMG and the Federal Reserve confirm that Wilmington's internal practices did ***not*** change. Moreover, these witnesses' accounts relate to the origination of loans that ***remained*** in Wilmington's loan portfolio throughout the Class Period. ¶52.[31]

[30] Defendants similarly claim that CWs 4, 10, 11, 12 and 5 left "only partially into" the Class Period and are thus unreliable. Since all of these employees remained with the Bank for at least a year into the Class Period, and the Federal Reserve issued its MOU confirming the substance of their allegations after their departure, this claim is singularly unpersuasive.

[31] Defendants' authorities are inapposite. For example, in *Chubb*, the complaint cited to former employees who worked in other, separate businesses or who did not work for Chubb at all, without suggesting how these employees had access to information. *Chubb*, 394 F.3d at 154-155. In *In re HealthSouth Corp. Sec. Litig.*, 2000 WL 34211319, *22 (N.D. Ala. 2000) (WT Br. 17), the plaintiffs said nothing other than that their allegations were based on the investigation of counsel. Defendants' remaining authorities similarly involved far less detailed allegations than those involved here. *See In re Career Educ. Corp. Sec. Litig.*, 2006 WL 999988, at *6 (N.D. Ill. Mar. 28, 2006) (confidential witness allegations failed "to specify any time period . . . or to explain how these witnesses learned or were in a position to know of the allegations about which they provided statements"); *City of Austin Police Retirement System v. ITT Educational Services, Inc.*, 388 F. Supp. 2d 932, 943 (S.D. Ind. 2005) ("plaintiff provides no dates or facts regarding when the confidential witnesses were employed at any of the ITT institutes . . . or when they
*(cont'd)*

Finally, Wilmington wrongly contends that the anecdotes offered by confidential witnesses do not establish the existence of any widespread practice. WT Br. 35. Leaving aside the fact that the witnesses' accounts were corroborated by KPMG, the Internal Audit Group, and the Federal Reserve, the witnesses described common practices, and offered particular examples to illustrate the point. *E.g.,* ¶¶71-74. This is ***precisely*** how courts recommend that such allegations be pled. *See Cabletron*, 311 F.3d at 30 (approving confidential witness allegations where "the accumulated amount of detail the sources provide tends to be self-verifying"); *In re Providian Fin. Corp.*, 152 F. Supp. 2d 814, 824 (E.D. Pa. 2001) ("making all reasonable inferences in the plaintiffs' favor, it must be inferred that the misconduct was more than isolated and contributed significantly to Providian's financial performance . . . ." ). In any event, this is a question of fact not appropriate for resolution at this stage. *See In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 96 (S.D.N.Y. 2006) ("the issue of whether admissions fraud was 'isolated,' as defendants claim, or was widespread, as plaintiffs allege with the support of the confidential witnesses" is "manifestly unsuited for resolution on a motion to dismiss").

In sum, "the confidential witnesses supply the connection between [the officer defendants] that places them at daily meetings . . . in which the development of the [] scheme was discussed. The allegations of the Complaint establish that the confidential witnesses can place knowledge of the detrimental loan concentration in [the officer defendants]." *Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363, 1370 (M.D. Fla. 2008).

---

acquired the information"); *In re Downey Sec. Litig.*, 2009 WL 2767670, *10 (C.D. Cal. Aug. 21, 2009) (witnesses lacked corroboration and contradicted each other); *Campo v. Sears Holding Corp.*, 371 Fed. Appx. 212, 216-217 (2d Cir. 2010) (witnesses had no direct contact with defendants and their statements did not support plaintiffs' allegations).

### C. The Wilmington Defendants Acted With Scienter In Misrepresenting The Company's Risk Management, Lending, And Accounting Practices

#### 1. Standard For Evaluating Scienter

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud, and requires a knowing or reckless state of mind." *Avaya*, 564 F.3d at 252 (quotations omitted). A complaint alleging securities fraud must give rise to a "strong inference" of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).[32] To determine whether a strong inference exists, a court must "accept all factual allegations in the complaint as true" and determine "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). The inference "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* at 324 (internal quotation makes omitted). Instead, an inference of scienter is "strong" when it is ***at least as likely as*** any other inference. *Id.*; *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008) ("where there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff"). Accordingly, under *Tellabs*, it is the Officer Defendants' burden to show that the Complaint's allegations give rise to an inference of innocent behavior that is ***stronger*** than the inference of recklessness.[33] For the convenience of the Court, a chart setting forth some of the key evidence of scienter for each Officer Defendant is attached as Appendix A.

[32] The Officer Defendants' attempt to impose a higher burden of "intentional fraud" (WT Br. 43) should be rejected. The Third Circuit does not require such a showing. *Avaya,* 564 F.3d at 269.

[33] The Complaint's allegations of scienter with respect to the Officer Defendants are imputed to Wilmington Trust and demonstrate scienter on the part of the Bank. *See In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 597 (D.N.J. 2001) ("scienter sufficiently pled as to a company's agents may be imputed to the company itself.").

### 2. The Complaint Alleges Compelling Facts Evidencing The Officer Defendants' Knowledge And Recklessness

#### i. The Officer Defendants Personally Dictated The Policies and Practices That Contradicted Their Public Statements

Defendants Cecala, Harra, Gibson, North, and Foley were active participants and primary decision makers behind the reckless practices alleged in the Complaint. Given Defendants' personal involvement, the Complaint raises an extremely strong inference of scienter. *See New Century*, 588 F. Supp. 2d at 1230 ("The allegations are sufficient to infer a deliberately reckless set of statements telling the public one thing when New Century was doing something quite different – the loans were of poor, not great, quality; the underwriting was all but absent, not strict; and the internal controls were slack rather than searching."). These facts include:

- As detailed in the behind-the-scenes reports by CW 2 – who reported directly to Defendants North and Gibson and frequently interacted directly with Defendants Cecala and Harra – as the Class Period progressed and borrower loan quality deteriorated, Defendants Cecala and Harra frequently interjected themselves into the monthly Asset Review meetings in which Defendant North presided and Defendant Gibson participated, overriding ARG determinations to downgrade loans of all sizes, from a $9,000 loan to a $79 million group of loans. (¶¶70-74)

- Defendants Cecala and Gibson were directly responsible for approving the Asset Review Group's calculation of the loan loss reserves (¶94) and were well aware that the calculation was based entirely on the loan downgrade decisions that were distorted by their own interference.

- The Officer Defendants further undermined the Asset Review Group by restricting and "sanitizing" CW 2's reports to prevent CW 2 from raising red flags to the Board of Directors. ¶¶75, 163.

- The Officer Defendants attended quarterly Credit Strategy meetings – which were scheduled around the availability of Defendants Cecala, Harra, and Gibson – that focused on discussions of the impaired loans in the Bank's portfolio and the outdated nature of the appraisals for the collateral underlying the Bank's loans. ¶¶88, 162.

- When the Bank's Internal Audit function confronted Gibson regarding the Bank's failure to make its loan underwriting staff independent, he dismissed their concerns, stating "[t]hat's how it's always been." ¶75.

In addition to the emphatic recommendations they received from their own staff, the Officer Defendants also received repeated direct warnings from Federal Regulators and their outside auditor that, for example, their practices of lending based entirely on personal guarantees exposed the Bank to undue risk. ¶¶57-58. The Officer Defendants received written copies of Federal Reserve annual Reports of Examination – dating back to 2007 – informing them that their underwriting, loan review and accounting processes were materially deficient. ¶¶67, 90-97, 165, 167. These concerns were conveyed to the entire Board, including Defendant Foley. ¶166. The escalating warnings by Federal Regulators culminated in the MOU in 2009 and the additional enforcement actions taken by the Federal Reserve when the MOU proved inadequate.

KPMG echoed these concerns regarding Wilmington's inadequate asset review in both its 2007 and 2008 annual audits, which were conveyed directly to the Officer Defendants. ¶¶168-169. These repeated warnings – which the Officer Defendants brushed off, calling the auditors "crazy" (¶168) – further support a strong inference of scienter. Strikingly, when Wilmington conducted the February 2010 Offering, it incorporated by reference the Bank's audited 2007 Annual Report on Form 10-K, and its audited 2009 Annual Report on Form 10-K, as well as the Bank's unaudited quarterly reports on Form 10-Q issued during 2008, but ***not*** the audited full-year financial report for 2008. ¶355. This conspicuous gap is highly unusual, as companies that perform offerings typically incorporate by reference all SEC filings within the relevant period. The most compelling inference to be derived is that KPMG refused to permit Wilmington to incorporate by reference its 2008 audited financial statements.[34]

[34] AICPA Professional Standards AU § 9711.08 requires KPMG to consent to the incorporation by reference of previously audited financial statements into a shelf registration statement.

These facts alone create a strong inference of scienter, and defeat any opposing inferences. *See, e.g., Lormand v. US Unwired, Inc.*, 565 F.3d 228, 252-54 (5th Cir. 2009) (scienter adequately pled where defendants "privately admitted" adverse, undisclosed facts that contradicted their public statements); *New Century*, 588 F. Supp. 2d at 1235 (allegations of "willful failure to consider the opinions of internal specialists when 'red flags' were raised [] suggest more than a simple mistake [and] support a strong inference of scienter."); *In re McKesson HBOC Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1274 (N.D. Cal. 2000) (widespread company knowledge of improper practice and resistance to change is "highly probative of scienter"); *see also Scholastic*, 252 F.3d at 72-73, 76-77 (scienter pled where defendant "was one of the senior officials involved in conversations with market analysts" and was in a position to know facts contrary to those reported to analysts); *In re DVI Sec. Litig.*, 2010 WL 3522086, at *7 (Sept. 3, 2010 E.D. Pa.) (finding scienter where "Defendant's status as a dominant member of the Credit Committee gave him access to information about DVI's loan portfolio and the financial background of DVI's potential customers and largest obligors.").[35]

#### ii. The Officer Defendants Knew Of Or Recklessly Disregarded Policies That Institutionalized Their Desire To Maintain Loan Volume And Avoid Downgrading Poor Quality Loans

In addition to overriding charge-off and downgrade decisions made by credit specialists, the Officer Defendants implemented formal Company policies designed to initiate loans without strict credit checks and to delay recognition of the credit risk posed. These policies included

---

[35] Notwithstanding the evidence placing Defendant North at these critical meetings, particularly as Chair of the Loan Committee (¶¶49, 70-74), his testimony in another action making clear his contemporaneous knowledge of the 10% Rule (¶¶53-54), and the fact that he generated and transmitted these key reports (¶79), Defendant North claims that the Complaint does not allege scienter against him, because it purportedly fails to allege falsity. North Br. 17-18. As discussed above in §IV(B)(1), Defendant North's statements regarding, *inter alia*, the thoroughness of the Bank's review of its loans (¶¶211, 223, 231, 238-39) were false.

chronically understaffing the credit analysis department to the point where it became a "running joke" that "everyone knew" about, and prevented the comprehensive review of the Bank's loan portfolio, despite repeated warnings from Federal Regulators, KPMG, and the Bank's internal auditors. ¶¶64-69. *See Freudenberg,* 712 F. Supp. 2d at 198 ("[M]eetings, where the problems at issue were directly discussed with Defendants, evidence scienter."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 467 (S.D.N.Y. 2005) (scienter inferred where improper practice is "common knowledge"); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) (scienter inferred where improper practice is "common knowledge" and "joked about").

Other reckless policies included lending to the Officer Defendants' "favored clients" and the 10% Rule, which allowed lenders to freely circumvent the Bank's underwriting guidelines.[36] These allegations further support a finding of scienter here. *See New Century,* 588 F. Supp. 2d at 1229 (scienter inferred from common "loan exceptions" for unqualified borrowers).

#### iii. Defendants Had Access To And Reviewed Reports That Belied Their Public Statements

"One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001); *see also Scholastic*, 252 F.3d at 72-73, 76-77 (scienter alleged by specifying internal reports containing undisclosed information); *RAIT Fin. Trust*, 2008 WL 5378164, at *13 (finding scienter where "Defendants were members of RAIT's

---

[36] Defendants fail to explain the significance of the fact that the Complaint does not allege that they made "side deals" with favored customers. WT Br. 48. The existence, or not, of "side deals" is irrelevant – Plaintiffs allege that Defendants' favoritism knowingly or recklessly contradicted their public assertions of conservatism and consistency. Nothing more is required.

membership investment committee . . . . As members of this committee, the Officer Defendants had access to both inside and public information" regarding the concealed information); *Cendant*, 60 F. Supp. 2d at 369-70 (scienter found where "senior officer and director" who was involved in the day-to-day affairs of the company, received reports which "were among the very documents utilized to effectuate the fraud").

Here, the Officer Defendants received regular reports that informed them that their practices were exposing the Bank to undue risk and directly contradicted their public statements. For example, by no later than the fall of 2007, Wilmington's Internal Audit group issued a report to the Officer Defendants, criticizing the Bank for understaffing the ARG and raising the alarm that the percentage of the portfolio regularly reviewed was insufficient. ¶68. The Officer Defendants ignored these warnings. *See Merck,* 432 F.3d at 272 ("pre-class data could be used to confirm what a defendant should have known during the class period" (quotations omitted)). They also ignored myriad other reports highlighting issues that directly contradicted their statements to investors, including the repeated concerns raised to Defendant Gibson that the reporting hierarchy of the Credit Risk Management Division was sales-focused and inappropriate. *See*, *e.g.*, ¶¶75, 79 (Defendant North circulated the "Delinquency List" of past-due loans to Defendants Cecala, Gibson, and Harra prior to the end of each quarter); ¶88 (ARG maintained a list of properties with outdated appraisals on a quarterly basis; Defendants Cecala, Harra, Gibson, and North were informed of the need for appraisals on a loan by loan basis at quarterly meetings); ¶¶83, 90-97 (the "MOU Compliance Plan and Report" detailed the Company-wide changes necessary to effectuate the MOU and avoid harsher penalties).[37]

---

[37] Thus, these particularized allegations go far beyond allegations of what Defendant Foley "must have known" by virtue of his position. *See* WT Br. 56. By the time Defendant Foley made his public statements in mid-2010, he had overseen the Bank's response to the Federal *(cont'd)*

These allegations are more than sufficient to demonstrate that Defendants "knew facts or had access to information" demonstrating their statements were inaccurate. *Globalstar*, 2003 WL 22953163, at *7 (scienter adequately pled where defendants "were updated on a weekly basis" as to adverse information); *Graham v. Taylor Capital Group, Inc. (In re Reliance Sec. Litig.)*, 91 F. Supp. 2d 706, 724 (D. Del. 2000) (scienter found where the company's officers and directors made numerous statements to the press and in its financial disclosure statements reassuring investors that the company's loan loss reserves were sufficient but had knowledge of the deteriorating condition of the company's loan portfolio); *accord PMA Capital*, 2005 WL 1806503, at *11; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("The individual defendants were not entitled to make statements . . . and ignore reasonably available data that would have indicated that those statements were materially false or misleading.").[38]

**iv. Federal Investigations Further Suggest Scienter**

The MOU and the SEC investigation provide additional strong evidence of scienter. ¶¶7, 90-97, 302. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 943 n.21 (9th Cir. 2003) (it would be "absurd to suggest" that boards of directors in addition to management were not aware of regulatory investigations); *Grand Lodge of Pa.*, 550 F. Supp. 2d at 1371 (officers' knowledge of cease and desist order contributes to inference of scienter); *Eastwood Enters. LLC v. Farha,* 2009 WL 3157668, at *4

---

Reserve MOU and was well aware that the market did not have a full picture of the rot hidden within Wilmington's loan portfolio.

[38] *See also In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 239 (S.D.N.Y. 2010) ("That defendants engaged in meetings concerning Citigroup's CDO risks is inconsistent with the company's public statements downplaying or concealing that risk"); *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1021 (N.D. Ill. 2010); *Maiman v. Talbott*, 2010 U.S. Dist. LEXIS 142712, *15 (C.D. Cal. Aug. 9, 2010); *Atlas*, 556 F. Supp. 2d at 1142.

(M.D. Fla. Sept. 28, 2009) ("the pendency of an investigation serves to suggest that a fraud may have occurred"); *EVCI Colleges,* 469 F. Supp. 2d at 97-100 (conclusions of government report bolster plaintiffs' allegations); *Regions Fin.*, 2011 U.S. Dist. LEXIS 60761, at *30 (Federal Reserve investigation is a "factor" that contributes to the inference of scienter). Here, the Federal Reserve consistently had been warning each of the Defendants about systemic flaws in Wilmington's risk management since 2007, and the MOU established the existence of fundamental infirmities in Wilmington's risk controls, including underwriting, credit review, and accounting for loan losses. ¶97.[39] Further, according to the Bank's 2010 Form 10-K, its improper accounting also drew the eye of the SEC, which is currently inquiring about the Bank's lending and accounting practices. ¶302.[40]

Defendants attempt to minimize the importance of the Federal Reserve's MOU, characterizing it as a "less formal action" with no significance to scienter. WT Br. 49-50. Defendants are wrong. First, this argument ignores the ongoing warnings and criticisms from Federal Regulators throughout the Class Period. Second, however the MOU is categorized, this significant regulatory intervention confirmed for each Defendant the material deficiencies in the

---

[39] Even the changes wrought by the MOU were insufficient to cure the problems: Following the 2010 exam in August, regulators instituted a series of additional measures that further removed Defendants' control. *¶97*. This increased oversight included a prohibition on Wilmington from issuing a dividend, appointing any directors or senior executive officers, or making severance payments to former officers without approval. ¶96. Indeed, as Wilmington disclosed after the Class Period, before M&T agreed to purchase the Bank, the Federal Reserve essentially gave Defendants an ultimatum: without a transaction that was acceptable to regulators, Wilmington would face "significant regulatory actions." ¶173.

[40] In addition to the SEC inquiry and the Federal Reserve's scrutiny, Delaware State Senator George Bunting asked the Federal Reserve for an investigation into Wilmington's loans to Delaware limited liability corporations. He asked the Federal Reserve to refer any findings of criminal wrongdoing to the Federal Bureau of Investigations. ¶265.

Bank's credit risk management, lending, inadequate reserves, and accounting functions – the key areas leading to its ultimate demise. ¶¶90-96.

**v. Additional Evidence Offers Strong Circumstantial Support For The Officer Defendant's Scienter.**

***First***, the suspicious timing of Defendants Cecala's and North's departures, coupled with their direct involvement in the alleged fraud, supports the inference that they knew or should have known of the Banks' intensifying loan losses (¶172). *See In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *10 (D.N.J. Sept. 30, 2009) (defendant's sudden resignation before fraud was revealed contributed to inference of scienter); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (same); *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) (same).

***Second***, that the misstatements and omissions at issue here related to Wilmington's core business further supports an inference of scienter. Commercial loans totaled over $6.7 billion, nearly 80% of the Bank's total portfolio. At the same time, a relatively small number of loans made up the loan portfolio, which lent itself to close involvement by executives in loan rating and charge off decisions. ¶¶170-71. "Allegations regarding management's role . . . and the importance of the corporate information . . . may also create a strong inference of scienter . . . in conjunction with detailed and specific allegations about management's exposure to factual information." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008). For example, in *Avaya*, the Third Circuit drew the inference that the company's chief financial officer was "paying close attention" to important measures of corporate financial health. 564 F.3d at 271. As the court explained, "[t]he financial strength of the Company was undoubtedly a matter of principal concern" to the highest level officers. *Id.* (quoting *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 211 (1st Cir. 2005)); *see also DVI*, 2010 WL 3522086, at *6 (defendants'

position "may be considered as circumstantial evidence when the fraud relates to the . . . core business of the company." (internal citations omitted)); *accord Makor Issues & Rights, Ltd. v. Tellabs Inc*., 513 F.3d 702, 709 (7th Cir. 2008); *RAIT Fin. Trust*, 2008 WL 5378164 at *13.

***Third***, scienter may be inferred when a corporate officer is asked repeated, specific, focused questions regarding a particular issue and responds falsely. *Avaya*, 564 F.3d at 270. Analysts repeatedly questioned the Officer Defendants regarding Wilmington's specific practices and experiences in the Delaware market. This questioning intensified during the Class Period, as the financial chaos surrounding the Bank's peers came to a crescendo. The Officer Defendants falsely described key facts, including in response to questions about the Bank's loan portfolio as compared to Wilmington's peers (¶177); the Bank's outlook for future charge-offs (¶194); whether the Bank was taking on excess risk by growing the commercial portfolio in a difficult economic environment (¶211); and whether the Bank had tightened underwriting standards given the poor economic climate. *Id.*[41]

***Fourth***, the sharp increase is reserves in 2010 and the massively discounted sale price to M&T – only weeks after Foley falsely reassured the market that the Bank's internal practices were not to blame for the Bank's financial difficulties and that no further surprises were forthcoming – provides further support for the Officer Defendants' scienter. ¶¶129-137. M&T's own review of Wilmington's commercial loan portfolio going back to 2008 resulted in expected losses for the Bank's loan portfolio ***as of the beginning of the Class Period*** of $1.48 billion – of which Wilmington had only recognized losses of $471 million, or 31.8%, resulting in remaining

[41] *See also Reliance*, 91 F. Supp. 2d at 724 (scienter found where defendants made numerous statements to the press and in financial disclosures reassuring investors that the company's loan loss reserves were sufficient but had knowledge of the deteriorating condition of the company's loan portfolio); *accord PMA Capital,* 2005 WL 1806503, at *11; *Corus,* 701 F. Supp. 2d 1014 at 1021; *Maiman,* 2010 U.S. Dist. LEXIS 142712 at *15.

probable losses of $1.02 billion. This difference is extremely significant. *See*, *e.g.*, *Avaya,* 564 F.3d at 271 (magnitude of alleged widespread discounting which was not minor or restricted to a few customers, strengthened inference of scienter); *Green Tree,* 270 F.3d at 666 ("the sheer size of the $390 million write-down adds to the inference that the defendants must have been aware the problem was brewing"); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) ("magnitude of this write-off renders less credible the proposition" that defendants were unaware of problems); *Freudenberg,* 712 F. Supp. 2d at 200 n.10 ("drastic increase in reserves is 'suggestive' of scienter, 'especially given that riskier loans may require greater reserves'"); *Regions Fin.*, 2011 U.S. Dist. LEXIS 60761, at *29-30 ("[d]efendants' significant and sudden increase in loan loss reserves . . . considered collectively with all of the allegations, supports a strong inference of scienter").

***Finally***, although not necessary (*Tellabs*, 551 U.S. at 325), financial motives to commit fraud contribute to the inference of scienter. *See Avaya*, 564 F.3d at 277. Here, the Officer Defendants possessed strong financial incentives to prop up the Bank's performance. ¶174.

These facts, taken together, make it clear that Wilmington and the Officer Defendants knew, or at a minimum recklessly disregarded, the truth regarding Wilmington's practices that rendered their public statements to investors false and misleading.

### 3. Defendants' Competing Inferences Are Easily Rejected

Critically, neither Wilmington nor the Officer Defendants have disputed Plaintiffs' allegations of their knowledge or reckless disregard of the key facts. Instead, in the face of the

extraordinary facts summarized above evidencing the Officer Defendants' scienter, Defendants offer a series of competing inferences that can be swiftly rejected.[42]

***First***, the Officer Defendants' primary competing inference is that their risk management and reserving practices would have been reasonable but for the fact that the financial crisis took them by surprise. WT Br. 43. Defendants' attempt to portray themselves as innocent victims of a financial catastrophe is easily disproven. By the beginning of the Class Period in January 2008, the financial and housing downturn was well underway, and its effects nationwide should have been appropriately taken into account – yet the Bank ***ignored*** this fact when setting its reserves.[43] Moreover, the Officer Defendants were repeatedly and emphatically warned by numerous sources – including Internal Audit, its outside auditor, Federal Regulators, and the credit review staff – that their own choices and practices were exposing the Bank to undue risk. This is why Defendants' precise argument has been repeatedly rejected by courts evaluating securities fraud complaints in the wake of the financial crisis. *See Countrywide,* 588 F. Supp. 2d at 1144; *New Century*, 588 F. Supp. 2d at 1230 ("The inference of deliberate recklessness as to false statements regarding loan quality and underwriting is at least as compelling as inferring that the Officer Defendants were simply unaware of New Century's practices when the statements

[42] Defendants claim that Plaintiffs improperly rely upon "group pleading" in the Complaint's allegations. WT Br. 14. This is false. While the Complaint states certain allegations against the "Officer Defendants" where such allegations are applicable to all of those Defendants, the Complaint contains numerous facts, summarized herein, that allege in a particularized fashion the scienter of Defendants Cecala, Harra, Gibson, North, and Foley on an individual basis. *See*, *e.g.*, ¶¶ 161-167, 169-72.

[43] By the beginning of the Class Period, "numerous financial institutions were showing weaknesses and the market's confidence in bank securities was wavering." ¶177. Over the course of the next nine months, "major banking institutions such as Citibank, Barclays, Lehman Brothers, and Washington Mutual reported billions of dollars of credit-related losses" (¶192); "the International Monetary Fund predicted that writedowns on United States assets would reach $945 billion" (*id.*); and a "dramatic financial upheaval" had played out that "reshape[d] the landscape of American finance." ¶199.

were made, or taken by surprise when the market took an unexpected turn for the worse."). As the court in *In re Ambac Finiancial Group, Inc. Securities Litigation* put it:

> It may be that . . . the defendants were merely negligent in issuing the challenged statements. It is possible that defendants, faced with an unprecedented and uncertain situation, lacked the internal mechanisms to calculate accurately the scale of losses in their CDO portfolio. However, taking the facts in the light most favorable to the plaintiffs, ***this does not amount to a more compelling inference*** than that proffered by plaintiffs based on the facts alleged. Viewing the allegations collectively, there is a vast gap between the picture that Ambac presented to investors—of an insurance company that maintained its conservative approach over the years—and the alleged practices within the company, namely the undisclosed lowering of underwriting standards to drive short-term profits.

693 F. Supp. 2d at 269-70; *see also id.* ("The conduct that plaintiffs allege, if true, would make Ambac an active participant in the collapse of their own business").

***Second***, the Officer Defendants attempt to reduce the Complaint's allegations to mere "mismanagement" claims not subject to liability under the federal securities laws. WT Br. 47, 53, 57. However, by now, it is well-established that claims that defendants mischaracterized their reserving practices and violated GAAP are not "mismanagement" claims, but are fraud claims. *See, e.g.*, *Freudenberg*, 712 F. Supp. 2d at 192 ("The mere fact that the conduct . . . arguably constitutes mismanagement will not preclude a claim . . . if the defendant made a statement of material fact wholly inconsistent with known existing mismanagement"); *Wells Fargo*, 12 F.3d at 926 (failure to recognize problems loans constitutes fraud and "cannot be dismissed as a mere matter of internal mismanagement"); *Marra v. Tel-Save Holdings,* 1999 WL 317103, at *7 (E.D. Pa. May 18, 1999) (rejecting argument that allegations regarding understated reserves amount to mismanagement).[44]

---

[44] *In re Eaton Vance Corp. Sec. Litig.,* 206 F. Supp. 2d 142, 152 (D. Mass. 2002) (*cited at* WT Br. 47) is inapposite. Unlike here, the *Eaton* plaintiffs did not describe the contemporaneous information available to defendants demonstrating the inaccuracy of the company's financial
*(cont'd)*

***Third***, Wilmington's argument that all of these protests from inside and outside the Bank were mere good faith disagreements (WT Br. 54-55), rings hollow in light of the magnitude, consistency, and scope of the warnings. Wilmington argues, for example, that the fact that CW 2 acquiesced to Defendants' demands during a particularly contentious meeting rather than resign her position reasonably means that she had been persuaded as to the merit of their argument. WT Br. 54. The fact that in the middle of a recession (with unemployment rates at their worst level since the Great Depression), CW 2 bowed to her bosses' demands rather than quit her job on the spot hardly creates a nonculpable inference that is ***stronger*** than the inference of recklessness. Moreover, despite Wilmington's claims that the Officer Defendants instituted the changes CW 2 requested, in reality, the Complaint alleges that while the Officer Defendants "nominally implemented" these reforms, "the Officer Defendants interfered in the operations of the Asset Review Group to ensure that the relationships they had built with Bank clients would not be sacrificed in the name of risk management." ¶69. These are "in your face facts that cry out, 'how could defendants not have known that the financial statements were false.'" *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1103 (9th Cir. 2011) (quotations and alterations omitted)).[45]

---

statements, and instead rested on "vague allusions" to defendants ignoring the Asian financial crisis and an eroding debt market. *Id*. at 152.

[45] Wilmington additionally argues that the fact that two of the Officer Defendants purchased stock during the Class Period, Ciarrocki Decl. Ex. 32 – one of whom only purchased 1,000 shares, the other of whom (Defendant Cecala) purchased shares just weeks before telling investors, "[W]e separate our credit policy and asset review functions. We want to make sure that there are no conflicts there," ¶220, "negate[s] any inference of scienter." WT Br. 51. In fact, as *In re Thornburg Mortg. Secs. Litig.*, 695 F. Supp. 2d 1165, 1195 (D.N.M. 2010) recognized, "A lack of motive is not fatal to an allegation of scienter under the PSLRA and, even if it were, there is not a lack of motive in this case. The financial crisis facing the United States around the time of the alleged fraudulent conduct provides the Defendants with another motive that adequately fills the gap left by a lack of suspicious insider-trading activity: survival." The court
*(cont'd)*

***Fourth***, Defendants argue that the fact that Wilmington did not record losses in excess of its reserves early in the Class Period (WT Br. 46-47) and incrementally increased its loan reserves later in the Class Period (WT Br. 45-46), negates the inference of scienter. This is incorrect. Any increases were simply insufficient to deal with the extent of the problem, as was eventually confirmed when the Bank was forced to merge with M&T, and M&T found an additional $500 million deficiency. Wilmington was required to set its reserves in anticipation of ***probable*** losses inherent in their existing loans (¶108); the fact that it took time for those losses to materialize is hardly surprising, especially given that the Officer Defendants themselves refused to acknowledge losses even when borrowers ceased to make payments. ¶¶71-74.

Further, Wilmington's belated reserve increases hardly exculpate the Bank when they only came about as a result of increasingly adamant demands from KPMG and the Federal Reserve.[46] *See Corus,* 701 F. Supp. 2d at 1025 (rejecting argument that because Corus increased its reserves regularly there was no fraud because "Corus's statements may still have been intended to conceal the fact that its condition was substantially worse than its statements suggested.").

### D. Defendants' Statements Are Not Subject To The Protection Of The Bespeaks Caution Doctrine Or The PSLRA Safe Harbor

Wilmington argues that certain of its statements are "forward-looking" and are subject to the protection of the PSLRA safe harbor. WT Br. 40 (identifying ¶¶194, 201, 211, 257, 279).

---

held that even substantial stock purchases by defendants under such circumstances could have been geared toward shoring up public confidence in the company on which they had staked their careers, and thus did not negate an inference of scienter. *Id.*

[46] Defendants' reliance on *Waterford Twp. Gen. Employees Ret. Sys. v. BankUnited Fin. Corp.*, 2010 WL 1332574 (S.D. Fla. Mar. 30, 2010) is misplaced. There, unlike here, the plaintiffs did not allege that the defendants were contemporaneously warned of the problems in their portfolio and risk management practices – a point that the court highlighted. *See id.* at *14, *16.

Similarly, in connection with Plaintiffs' Section 11 claims (discussed below), the Underwriters argue that Wilmington's reserves are subject to the protections of the bespeaks caution doctrine and the PSLRA safe harbor. Both of these arguments are meritless.

The PSLRA safe harbor and its judicially-created counterpart, the bespeaks caution doctrine, insulate certain "forward-looking" statements from liability if they are accompanied by sufficient cautionary language warning investors of the risks that may make the prediction turn out to be untrue. 15 U.S.C. § 78u-5(c)(1); *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 280 (3d Cir. 2004). Both doctrines protect ***only*** projections or representations regarding the future; they do not protect statements directed toward the company's ***current*** financial condition. *See EP Medsystems*, 235 F.3d at 876 ("the 'bespeaks caution' doctrine applies only to forward-looking statements"); *Bldg. Trades United Pension Trust Fund v. Kenexa Corp.*, 2010 WL 3749459, at *3 n.4 (E.D. Pa. Sept. 27, 2010); *City of Hialeah Emples. Ret. Sys. & Laborers Pension Trust Funds for N. Cal. v. Toll Bros.*, 2008 WL 4058690, at *2-3 (E.D. Pa. Aug. 29, 2008). If a statement has both a forward-looking and a historical aspect, the historical aspect is not subject to safe harbor protection. *See Stone & Webster*, 414 F.3d at 212-13.

Here, many of the statements Wilmington identifies are not forward looking – such as the Bank's claims that it was being more selective about its loans (¶211), and Gibson's insistence that "Wilmington Trust is a fundamentally strong institution ***at this time***." ¶279. Others were integral parts of representations about the health of Wilmington's portfolio as it existed ***at the time***, and therefore do not qualify for protection, such as Defendants' claim that small increases in provisions for loan loss reserves were not indicative of credit quality problems and only represented attempts to be "cautious." ¶¶194, 257. To the extent these statements characterized the ***current*** health of the portfolio, they were not forward-looking. *See EP Medsystems*, 235

F.3d at 876 (statement that negotiations are "imminent" is a representation of current fact); *New Century*, 588 F. Supp. 2d at 1225 (statements concerning "then-current loan origination, underwriting, and performance, at times in relation to the past" not forward-looking).

In any event, these doctrines only protect forward-looking statements to the extent the cautionary language is so detailed that it renders the false statement immaterial as a matter of law. *See EP Medsystems*, 235 F.3d at 873; *Toll Bros.*, 2008 WL 4058690, at *3. Thus, warnings about hypothetical ***future*** risks will ***not*** protect any statements where the "risk" has already transpired: There is "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996); *see also Veritas Software*, 2006 WL 1431209, at *7 (cautionary language cannot cure forward-looking statement "if it lacks a reasonable basis when made").

Here, Wilmington may have warned of the possibility of losses due to an economic slowdown, but Wilmington does not and cannot argue that it warned investors of the risks of its reckless and unconstrained lending, failure to update appraisals, and failure to review and downgrade assets appropriately (among other improper practices). Thus, the "cautionary language" Wilmington offered was utterly insufficient to offset the false impressions left by its statements, and it is not entitled to protection. *See EVCI Colleges*, 469 F. Supp. 2d at 102-103 ("the disclosures failed to warn investors that the risk factors were not hypothetical – which, of course, dramatically increased the possibility of adverse consequences."); *Lormand*, 565 F.3d at 249 ("defendants continually skewed the mix of information by omitting the known severe risks . . . even as they recognized signs that those risks had already materialized.").

The Underwriters' claim to bespeaks caution and safe harbor protection, argued in connection with Plaintiffs' Securities Act claims, is even more tenuous. They contend that Wilmington's actual loan loss reserves, as reported in its financial statements, are entitled to protection under the safe harbor. UW Br. 17-18. Statements that appear in corporate financial statements that purport to comply with GAAP do not receive safe harbor protection as a matter of law. *See* 15 U.S.C. § 78u-5(b)(2)(A); 15 U.S.C. § 77u-2(b)(2)(A). Additionally, reserves are not forward-looking statements. *See, e.g.*, *PMA Capital*, 2005 WL 1806503, at *6; *Winslow v. BancorpSouth, Inc.*, 2011 U.S. Dist. LEXIS 45559, *53 (M.D. Tenn. Apr. 26, 2011); *In re SLM Corp., Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010); *Freudenberg*, 712 F. Supp. 2d at 194. Notably, the Underwriters do not cite a ***single case*** to support their theory that reserve calculations receive safe harbor protection.

## V. PLAINTIFFS HAVE ADEQUATELY ALLEGED VIOLATIONS OF THE SECURITIES ACT OF 1933

### A. The Securities Act Sets Forth A Strict Standard of Liability

Section 11 imposes a "stringent standard of liability" that "places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). A plaintiff "need only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Suprema*, 438 F.3d at 269. To state a prima facie claim, the plaintiff "must allege the purchase of securities pursuant to a materially false or misleading prospectus or oral communication." *Id.* at 269-70. Where, as here, a plaintiff's Section 11 or Section 12(a)(2) claims are not grounded in allegations of fraud, "the liberal notice pleading requirements of Rule 8 apply." *Id.* at 270.[47]

[47] The Third Circuit provides a "straightforward" approach to determine whether claims sound in fraud, thus triggering the heightened pleading requirements of Rule 9(b): "Securities Act claims *(cont'd)*

Plaintiffs' Securities Act claims arise in connection with Wilmington's Offering of 18,875,000 shares of common stock, raising $273.9 million ($14.51) per share, in February 2010 – just eight months before it announced the M&T merger at a price of $3.84 per share, or less than 50% of where the stock was then trading. The Offering Documents on which the claims are based consist of Wilmington's November 2007 shelf registration statement (along with amendments filed in September 2008 and January 2009); the February 2010 Prospectus; and Wilmington's 2007 Form 10-K, 1Q2008 Form 10-Q, 2Q2008 Form 10-Q, 3Q2008 Form 10-Q, and 2009 Form 10-K, all of which were incorporated by reference. ¶355.

### B. Plaintiffs Have Alleged That Wilmington's Offering Documents Contained False Statements

For the reasons explained in § IV(B), Wilmington made false statements throughout its SEC filings, and thus throughout the Offering Documents. However, if Defendants are to be believed, virtually everything in Wilmington's SEC filings – from its reserve calculations, to its attestations regarding the quality of its internal controls on financial reporting – are statements of opinion and can only be "false" if the speaker did not genuinely believe them, *i.e.*, acted with scienter. Because Defendants' arguments would undermine the strict liability/negligence regime imposed by the Securities Act, and because such arguments are contrary to Third Circuit precedent, they must be rejected.

---

do not sound in fraud if ordinary negligence is ***expressly*** pled in connection with those claims." *Suprema*, 438 F.3d at 272-73 (emphasis added). Like in *Suprema*, the Complaint here explicitly disclaims all allegations of fraud and expressly pleads ordinary negligence in relation to the Securities Act claims. ¶353. Thus, the liberal notice pleading standards of Rule 8(a) apply.

### 1. Plaintiffs Have Pled Wilmington's Reserves Were False

#### i. Plaintiffs Need Not Plead That Wilmington "Subjectively" Disbelieved That Their Reserves Complied with GAAP

Defendants argue that reserve calculations are mere matters of opinion, and can only be false if the speaker falsely described its own beliefs, i.e., acted knowingly WT Br. 19; UW Br. 16; KPMG Br. 12. Defendants are wrong.

First, because financial statements that fail to comply with GAAP are presumptively false, falsity may be pled by detailing specific departures from GAAP, even in the context of reserve calculations. *See, e.g.*, *Wash. Mut.*, 694 F. Supp. 2d at 1212, 1222 (departures from GAAP render reserve accounting false both for Section 11 and Section 10(b) purposes); *Atlas*, 556 F. Supp. 2d at 1150-52, 1154-55, 1159 (same); *RAIT Fin. Trust,* 2008 WL 5378164, at *5, *7 (same in Section 11 complaint evaluated under Rule 8(a)); *PMA Capital*, 2005 WL 1806503, at *10.[48] Plaintiffs did this.

Moreover, the question of whether financial statements complied with GAAP is a ***factual*** one, not an issue of opinion. *Burlington*, 114 F.3d at 1421 ("it is a factual question whether BCF's accounting practices were consistent with GAAP[.]"); *Wash. Mut.*, 694 F. Supp. 2d at 1224 (representation that financial statements are prepared in accordance with GAAP "is an actionable statement of fact," and is not opinion).

Even when GAAP relies on management discretion and judgment, Plaintiffs need not allege that management ***subjectively*** disbelieved their own statements so long as they

---

[48] Underwriters misinterpret *PMA Capital* when they argue that the court in that case held that reserves are matters of opinion. UW Br. 16. In fact, *PMA* expressly determined ***falsity*** by reference to GAAP compliance only. *See* 2005 WL 1806503 at *10 (citing *Burlington*, 114 F.3d at 1420-1421). The portion that Underwriters cite referenced whether reserve statements were actionable under Section 10(b); because Section 10(b) requires a showing of scienter, the court discussed the defendants' state of mind. *See id.* at *6.

demonstrate that the defendants ***objectively*** had no reasonable basis for their accounting – as Wilmington's cases agree. *See Christidis*, 717 F.2d at 100 (reserves are actionable if the defendants "***should have known*** that they were derived in a manner inconsistent with reasonable accounting practices"); *Wells Fargo*, 12 F.3d at 927 ("Although a manager may never 'know' with absolute certainty that a reserve against anticipated losses is inadequate, there will be circumstances where she 'knows,' based on any plausible and acceptable means of calculation, projection, or forecast, that reserves must be increased and yet represents that they need not be.") (quoting *Urbach*, 779 F. Supp. at 354-55).[49]

Even pure statements of opinion are "false" if the defendants could not ***reasonably*** have believed them. *See Donald J. Trump Casino*, 7 F.3d at 368 (opinions are actionable misstatements if they are not "genuinely ***and reasonably***" believed); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, at 775 (1st Cir. 2011) ("An opinion may still be misleading if it . . . lacks any basis or knowingly omits undisclosed facts tending seriously to undermine the accuracy of the statement."); *Veritas Software*, 2006 WL 1431209, at *7 ("Consistent with Third Circuit case law, an opinion about future events is actionable if it lacks a reasonable basis when made." ); *Patrick v. Patrick*, 2010 WL 569740, at *3 (W.D. Pa. Feb. 12, 2010) ("an opinion that has been issued without a … reasonable basis is an 'untrue' statement…."). In other words, the mere fact that management may exercise its discretion when provisioning for reserves does not mean that such discretion is utterly

[49] *See also Corus*, 701 F. Supp. 2d at 1020 (securities fraud complaint sustained when "the complaint alleges numerous facts indicating that [defendants] ***should have known*** ex ante that the level of its reserves was insufficient"); *In re CIT Group, Inc.*, 349 F. Supp. 2d 685, 689 (S.D.N.Y. 2004) (mischaracterization of reserves is actionable if defendants "had no reasonable basis" for their statements).

unbounded.[50] Here, Plaintiffs have demonstrated that Defendants failed to collect necessary information (such as appraisal values and guarantor stability, and updated risk ratings on the majority of the portfolio), ignored external economic events, and rejected recommendations of its own credit risk analysts. This is sufficient to allege that they did not have a reasonable basis for calculating their reserves.

Plaintiffs are aware that the Second Circuit recently decided *Fait v. Regions Financial Corp.*, 2011 WL 3667784 (2d. Cir. 2011), holding that, based on the allegations in that case, the reserve calculations at issue there were "false" only if they were subjectively disbelieved and objectively misleading. *Fait* is currently the subject of a petition for rehearing; even if that petition is denied, however, this Court should decline to apply its reasoning in this action.

First, *Fait*, if applied more generally to ***all*** reserve calculations, contradicts Third Circuit law. As the cases cited above demonstrate, opinions (and reserve calculations) are false if they lack a reasonable basis, regardless of the subjective belief of the speaker.[51] A broad application of *Fait* also contradicts *Burlington*, which squarely holds that compliance with GAAP is a factual question. 114 F.3d at 1421.

Second, *Fait* is contrary to Section 11, which envisions that liability will be imposed for ***negligence***. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 208 (1976). Reserves are an integral part of the entire financial statements, and directly impact net income, the most critical

[50] Nor are the Underwriter Defendants correct to argue in the context of Section 11 that under *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992), reserve calculations are not actionable, UW Br. 16; though mere mismanagement in setting reserves may not constitute fraud for §10(b) purposes without the additional showing of scienter, in the Section 11 context, it is sufficient to show that reserves lacked a reasonable basis. *See Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993) (*cited at* UW Br. 15).

[51] Significantly, *Fait* itself expressly recognizes that there are circumstances where alleged misstatements regarding loan loss reserves would be actionable misstatements and not considered statements of opinion. 2011 WL 3667784, at *7.

measure of the company's health. *See Burlington*, 114 F.3d at 1420 n.9.[52] It is inconceivable that Congress enacted Section 11 with a negligence standard and yet expected that liability for the most critical information in the financial statement would only be imposed for intentionally false statements.

Third, recognizing that GAAP errors may be made negligently as well as intentionally, courts routinely distinguish the ***falsity*** of reserves from the separate issue of scienter.[53]

Finally, *Fait*'s reasoning would apply equally to ***all*** financial statements. The Second Circuit reasoned that the reserves calculations in that action were matters of judgment (*Fait*, 2011 WL 3667784, at *6); however, ***all of GAAP*** is a matter of judgment. *Burlington*, 114 F.3d at 1421 n.10. Even accrual accounting – the foundation of most financial reporting – is subject to management judgment. *See United States v. Bradstreet*, 135 F.3d 46, 49 (1st Cir. 1998); *In re Galileo Corp. Shareholders Litigation*, 127 F. Supp. 2d 251, 265-266 (D. Mass. 2001). If *Fait* is applied to all reserve calculations, all corporate financial statements are matters of opinion. This cannot be what Congress intended.

---

[52] For example, companies often admit errors that affected the entire balance sheet, from reserves to income. *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 679 (6th Cir. 2004); *Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco Inc.*, 2011 WL 1198712, at *16 (S.D.N.Y. Mar. 30, 2011).

[53] *See, e.g., In re Wash. Mut. Sec., Deriv. & ERISA Litig.*, 259 F.R.D. 490, 502, 507 (W.D. Wash. 2009); *In re CNL Hotels & Resorts Secs. Litig., Inc.*, 2005 WL 1126561, at *7-9, *12-13 (M.D. Fla. May 9, 2005) (Section 11 claim based on inadequate reserves sustained, with directions to strike allegations of fraudulent intent); *New Century*, 588 F. Supp. 2d at 1229-32, 1238-39 (similar). Indeed, it is blackletter law that when a company restates its financials – which is a public admission that the financials were false at the time they were made, *see Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 410 (S.D.N.Y. 2007); *In re Goodyear Tire & Rubber Co. Secs. Litig.*, 436 F. Supp. 2d 873, 894 (N.D. Ohio 2006) – this fact alone does not establish scienter, even when the restated financials include reserve calculations. *PR Diamonds*, 364 F.3d at 684; *In re Ceridian Corp. Secs. Litig.*, 542 F.3d 240, 245-46 (8th Cir. 2008); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 569-70 (S.D.N.Y. 2004); *Conseco*, 2011 WL 1198712, at *20; *In re Dell Inc., Securities Litig.*, 591 F. Supp. 2d 877, 893 (W.D. Tex. 2008); *In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192, 1199, 1203-08 (D. Ariz. 2009).

### ii. Even If "Subjective Disbelief" Is Necessary, Plaintiffs Have Pled It

In *Virginia Bankshares* (on which *Fait* relied, 2011 WL 3667784, at *5), the Supreme Court concluded that the evidence plaintiffs had submitted was sufficient to support a ***jury verdict*** that the defendants' "opinions" were false. *See* 501 U.S. at 1094-98. In so doing, the Court did not cite a single item that bore on the defendants' subjective beliefs; instead, the evidence cited by the Court concerned the opinion's ***objective*** falsity (such as a recalculation of book value, and evidence that certain market prices were unreliable (*see id.* at 1094, 1098), and the defendants' ***access*** to that information (*see id.*)). Thus, *Virginia Bankshares* conclusively establishes that, however opinion falsity is defined, it can be ***proved*** with ***objective*** evidence that contradicts the opinion, plus defendants' ***access*** to that evidence. Because Plaintiffs have pled that here – and cannot be expected to plead ***more*** than would be needed to prove their claims at trial – Plaintiffs have alleged the falsity of Wilmington's reserves.[54]

[54] Contrary to Defendants' argument, a complaint may allege that reserve allegations are false while still not sounding in fraud for Rule 9(b) purposes. *See RAIT Fin. Trust,* 2008 WL 5378164, at *5, *7; *PMA Capital*, 2005 WL 1806503, at *15; *Hamilton Bankcorp*, 194 F. Supp. 2d at 1356 (denying motion to dismiss violations of §§ 11 and 12(a)(2) based on false statements regarding its loan loss reserve and lack of internal controls under Rule 8(a) analysis). Additionally, even when courts determine that a complaint "sounds in fraud" under Rule 9(b), they do not then hold that such a disclaimer requires an automatic dismissal – instead, they examine the entire complaint to determine whether the pleading standards are actually met. *See, e.g.*, *Atlas Air*, 324 F. Supp. 2d at 502-03; *Reina v. Tropical Sportswear Intern.*, 2005 WL 846170, at *2-3 (M.D. Fla. 2005). This is because "[l]itigation in the Federal Court is not a game of 'gotcha' but rather its goal is to try cases on their merits." *New Jersey Carpenters Health Fund, et al. v. Residential Capital, LLC*, 2010 WL 5222127, at *3 (S.D.N.Y. 2010). The relevant question is whether Plaintiffs have alleged sufficient facts to survive dismissal. Under any standard, they have.

### 2. Plaintiffs Have Pled Wilmington's Internal Control Statements Were False

For the reasons stated *supra*, Plaintiffs have also pled that Wilmington falsely described the strength of its internal controls. Contrary to the arguments of Underwriters and KPMG, these are not opinions. These are objectively verifiable representations that the procedures Wilmington employed to generate its financial statements, according to a specific set of criteria, provided reasonable assurance regarding the reliability of financial reporting. *See* SEC Release No. 33.8810, 2007 WL 1791162 (June 20, 2007) (defining internal controls).

## C. KPMG Is Liable For Its False Certifications and Statements

Section 11 imposes liability for false statements or omissions against "every accountant . . . . with respect to the statement in such registration statement, report, or valuation, which purports to have been . . . certified by him." 15 U.S.C. § 77k(a)(4). Here, after identifying several deficiencies in Wilmington's internal controls in 2007 and 2008, and after (undoubtedly) becoming aware of the Federal Reserve's similar criticisms prior to and in the MOU in 2009, KPMG nonetheless certified Wilmington's 2007 and 2009 financial statements as compliant with GAAP, certified that Wilmington's internal controls were effective, and stated that it had conducted its audit in accordance with Generally Accepted Auditing Standards ("GAAS").

All of these statements were incorporated into the Offering Documents. Because Plaintiffs have pled that Wilmington's statements were false and KPMG certified those statements, and have pled that KPMG's audit was not conducted in accordance with GAAS, Plaintiffs have stated a claim against KPMG.[55] Though KPMG insists that its internal criticisms

---

[55] KPMG similarly certified Wilmington's year-end financial statements for 2008, but these were not incorporated by reference in the February 2010 Offering Documents, presumably because KPMG would not grant Wilmington permission to do so.

of Wilmington demonstrate that it acted properly, *e.g.*, KPMG Br. 19 n.14, in fact, such criticisms merely demonstrate that KPMG should never have certified Wilmington's financial statements in the first place.[56]

**1. KPMG Falsely Represented its Compliance With Auditing Standards**

In its 2007 and 2009 audit reports, KPMG stated that it performed its audit "in accordance with the standards of the Public Company Accounting Oversight Board." ¶¶384, 297. This is a factual representation regarding compliance with particular standards "that is material to those relying on its certification." *Wash. Mut.*, 694 F. Supp. 2d at 1224. Specifically, KPMG failed, as required by the PCAOB and GAAS General Standard Nos. 2 and 3, to exercise due professional care in the performance of the audit and to obtain competent sufficient evidentiary matter to form a basis for its opinion. ¶393. Had it exercised due care and obtained competent evidence, it would have concluded (as did M&T and the Federal Reserve), that Wilmington's financial statements did not comply with GAAP and that its internal controls were ineffective. Allegations such as these are more than adequate to allege a violation of Section 11 under Rule 8(a). *See Majesco*, 2006 WL 2846281, at *4 (truth or falsity of statements regarding GAAS compliance cannot be decided on a motion to dismiss).

**2. Plaintiffs Need Not Demonstrate Subjective Falsity**

**i. The Plain Text Of Section 11 Makes KPMG Liable For The Financial Statements It Certifies**

KPMG certified that Wilmington's financial statements were presented in accordance with GAAP, and that Wilmington maintained effective internal controls. Section 11 confers liability on "every accountant … ***with respect to the statement*** … which purports to have been

[56] As the cases cited above show, it is not uncommon for an auditor to raise internal objections to an improper accounting practice and yet acquiesce in its client's demands. *Everex,* 228 F.3d at 1064; *Kinder-Morgan*, 340 F.3d at 1090.

***certified*** by him." 15 U.S.C. §77k(a)(4). Thus, §11 holds auditors directly responsible for the falsity of the underlying statements being certified, rendering irrelevant the question of whether the certifications themselves are true or false. *See Huddleston*, 459 U.S. at 381 n.11 (auditors liable for "matters which purport to have been … certified by them"); *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 492 (S.D.N.Y. 2005) ("an accountant has responsibility under Section 11 for the accuracy of the financial statements she certifies").

KPMG insists that the court must evaluate whether its certifications were true or false, further arguing that these certifications were statements of opinion. KPMG Br. 8. This is incorrect. Auditors' § 11 liability is coextensive with the falsity of the underlying statements certified, without conducting a separate inquiry into whether the certification itself is true or false. *See, e.g.*, *Cendant*, 60 F. Supp. 2d at 364.[57] Indeed, the rule is similar to the longstanding principle that individuals who "adopt or endorse" the statement of another are liable for the underlying statement, rather than the truth or falsity of the adoption or endorsement itself. *See Burlington*, 114 F.3d at 1429 (analyst projections are attributable to company officials if the officials "have, expressly or impliedly, made a representation that the analyst projections are in accordance with their views").

None of the cases cited by KPMG support its view that courts must look to the truth or falsity of the auditor certification itself rather than to the underlying false statement. *Deephaven Private Placement Trading, Ltd., et al. v. Grant Thornton & Co., et al.*, 454 F.3d 1168, 1170 n.1

[57] *See also In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 900 (M.D. Tenn. 2005); *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1373 (S.D. Fla. 2001); *White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982, 984-86 (E.D. Wis. 2002); *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 278 (N.D. Tex. 1990); *In re AIG*, 741 F. Supp. 2d 511, 541 (S.D.N.Y. 2010) ("where a plaintiff has made well-pleaded allegations that an accountant blessed financial statements that violated certain identified GAAP principles and were 'fundamentally misleading to investors,' it is inappropriate to dispose of the claims at the motion to dismiss stage").

(10th Cir. 2006), involved claims against an auditor brought under §18 of the Exchange Act, which imposes liability for a defendant's ***own*** false statements, not for ***certifications*** of false statements by others – a distinction that ***the court itself*** drew. 454 F.3d at 1174 n.6.[58] Likewise, cases involving investment bankers' fairness opinions, equity analysts' "buy" opinions, rating agencies' credit ratings, and issuers' future business prospects[59] do not involve "certifications" of someone else's (false) statement. Instead, these claims were brought under the portion of Section 11 that imposes liability on individuals who ***prepare*** a section of the offering documents. *See* 15 U.S.C. §77k(a)(4) (imposing liability on individuals who "prepare[] or certif[y]" false statements). As the statute makes clear, the truth or falsity of *prepared* statements is evaluated directly. The court in *In re AOL Time Warner Sec. & "ERISA" Litig*., 381 F. Supp. 2d 192, 237 (S.D.N.Y. 2004), recognized this critical distinction by evaluating an investment bank's fairness opinion for falsity (including whether the opinion was subjectively believed) but gauging the auditor's liability under §11 based solely on the falsity of the financial statements it had certified.

---

[58] Although auditor certifications are technically no longer referred to as "certifications" in the accounting literature (and are now called "opinions"), the audit profession's semantic changes obviously cannot confer immunity from 1933 Act liability, and it is thus not surprising that, in the securities law context, courts routinely continue to refer to audit opinions as certifications. *See, e.g., In re InterBank Funding Corp. Sees. Litig.,* 629 F.3d 213, 215, 221 (D.C. Cir. 2010); *Ind. State Dist. Council of Laborers v. Omnicare, Inc.,* 583 F.3d 935, 945 (6th Cir. 2009); *McCabe v. Ernst &Young, LLP,* 494 F.3d 418, 421 (3d Cir. 2007).

[59] *Virginia Bankshares*, 501 U.S. at 2754; *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1159 (9th Cir. 2009); *McKesson*, 126 F. Supp. 2d at 1264-65; *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146 (S.D.N.Y. 2004); *In re Credit Suisse First Boston*, 431 F.3d 36, 48 (1st Cir. 2005); *Nomura*, 632 F.3d at 775; *Donald J. Trump Casino*, 7 F.3d at 368.

### ii. KPMG's Certifications, And Its Representations Of GAAS Compliance, Are Not Opinions

Even assuming that KPMG's certifications are properly evaluated for their truth or falsity, those certifications, and KPMG's claim to have complied with GAAS, are representations of fact, not opinion.

First, certifications of GAAP compliance are factual representations, not opinions. *Wash. Mut.*, 694 F. Supp. 2d at 1223-24. This is because compliance with GAAP itself is a factual question. *See Burlington*, 114 F.3d at 1421; *RAIT Fin. Trust*, 2008 WL 5378164, at *7. Notably, even for claims brought under §§10(b) and 18 of the Exchange Act – which, unlike §11, impose liability for the speaker's own statements and not for certifying the statements of others – courts do not evaluate auditor certifications under opinion-falsity standards but under standards for factual misstatements. *See Stone & Webster*, 414 F.3d at 214; *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1331-32 (M.D. Fla. 2002); *Kinney v. Metro Global Media, Inc.*, 170 F. Supp. 2d 173 (D.R.I. 2001); *Holmes*, 166 F. Supp. 2d at 1375-76; *Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*, 2005 WL 1366025, at *6 (D.N.J. June 8, 2005); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 2004 WL 2348315, at *9 (D.N.H. Oct. 14, 2004); *see also Deephaven*, 454 F.3d at 1175 (under §18(a), an audit opinion is a representation of compliance with GAAP to the extent detectable by GAAS; under Section 18(a)).[60]

---

[60]Other than *City of St. Clair Shores Gen. Emples. Ret. Sys. v. Inland*, 635 F. Supp. 2d 783, 793-94 (N.D. Ill. 2009), which arises under §14(a), KPMG does not cite a case in which an auditor's certification was evaluated as a statement of opinion rather than fact. Notably, *St. Clair* assumed that auditor certifications are opinions without any further analysis, apparently because the court concluded that under any standard, the plaintiffs had properly pled that KPMG had intentionally or recklessly falsely certified corporate financial statements. *Id.* The ***lack*** of case law treating certifications as opinions is striking given that courts have recognized that opinions are subject to special falsity standards for decades. *See Eisenberg v. Gagnon*, 766 F.2d 770, 775-76 (3d Cir. 1985) (citing cases and articles dating back to 1943 regarding the standards for evaluating the
***(cont'd)***

Second, KPMG's representations that it complied with GAAS in conducting its audits (¶¶384-85, 393, 397) and that it determined Wilmington's internal controls to be effective (¶397) are statements of fact, not opinion, because they are representations about specific procedures KPMG followed. GAAS has certain procedural requirements that, as above, Plaintiffs allege KPMG failed to follow. Similarly, with respect to Wilmington's internal controls, KPMG stated that its certification was based on certain established criteria, and represented that, under PCAOB standards, "[o]ur audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk…" ¶397; 2009 10-K, at 135, available at http://www.sec.gov/Archives/edgar/data/872821/000095012310015087/w77404e10vk.htm.

Each of these representations is a factual assertion about the underlying procedures followed by KPMG. *See McKesson*, 126 F. Supp. 2d at 1266 ("any purely factual assertions in [a] fairness opinion, such as [the author's] statements that it reviewed certain materials during its due diligence inquiry, would be held to a negligence standard"); *Wash. Mut*, 694 F. Supp. 2d at 1223 ("Whether or not Deloitte employed the PCAOB standards is a verifiable factual statement.").[61] Indeed, KPMG attested that "[o]ur responsibility is to express an opinion on the Corporation's internal control over financial reporting ***based on our audit***." 2009 10-K, at 135.

---

falsity of opinions). If auditor certifications truly are opinions, one would expect KPMG would have substantially more precedential support.

[61] The detailed procedural requirements for GAAS and PCAOB compliant audits are quite different from the procedures involved in fairness opinions, buy recommendations, credit ratings, and projections of future results of the sort involved in the cases relied upon by Defendants. *See* Stephen M. Davidoff, *Fairness Opinions*, 55 Am. U. L. Rev. 1557, 1616 (2006) (fairness opinions, ***unlike auditing standards***, do not have standardized methodologies and criteria).

Once again, this is a factual assertion that the Bank's internal controls were as good as could be detected by an audit that followed proper procedures. *Deephaven*, 454 F.3d at 1175.[62]

KPMG's blanket disclaimers designating these statements as "opinion" have no legal weight. First, KPMG never characterized its representation of GAAS-compliance as an opinion. Second, with respect to KPMG's GAAP certification, KPMG cannot transform its factual assertions into statements of "belief" simply by designating them as "opinions." *See Oxford Health Plans*, 187 F.R.D. at 141 (it is disingenuous for a defendant to suggest that its factual assertions are "opinions" simply because it later claims to have stated only "that it believes in their truth"); *cf. SEC v. Okin*, 137 F.2d 862, 864-65 (2d Cir. 1943) (inserting "in my opinion" into a statement of fact does not fundamentally alter the statement's factual nature).

Finally, KPMG's argument is inconsistent with §11, which grants experts an affirmative defense if they can show *both* good faith *and* due diligence. 15 U.S.C. §77k(b)(3)(B)(i). Treating auditor statements as "opinions" would reverse the statutory burden of proof.

**D. duPont Is Liable For False Statements In The Offering Documents**

Thomas duPont signed Wilmington's shelf registration statement, which was filed on Form S-3 with the SEC on November 29, 2007. ¶355. DuPont also signed, pursuant to Sections 13 or 15(d) of the Exchange Act, Wilmington's Form 10-K for the period ending December 31, 2007, which Plaintiffs allege was false. The Offering Documents incorporated by reference the 2007 Form 10-K (¶355) in order to satisfy Section 10(a)(3) of the Securities Act, which requires issuers to update a prospectus with current information, including through incorporating SEC

---

[62] The statute requires that both auditors and management ***attest*** to the quality of internal controls. 15 U.S.C. § 7262. To "attest" means "[t]o affirm to be true or genuine." BLACK'S LAW DICTIONARY 138 (8th ed. 2004). The very phrasing suggests a representation regarding a factual assertion, not an opinion.

filings. *See* 17 C.F.R. § 229.512(a)(i-iii)(B). duPont concedes that Wilmington's February 23, 2010 prospectus supplement constituted a new registration statement, separate and distinct from the Bank's prior registration statement. duPont Br. 6. duPont then cites to SEC Release No. 33-8591 (which itself cites Rule 430B) for the proposition that a prospectus supplement does not trigger liability under Section 11 for a director who only signed the original shelf registration statement. duPont Br. 8-9.

However, this Release provides that signatories of SEC filings, such as Forms 10-K, that are incorporated by reference to satisfy Section 10(a)(3) are deemed to subject themselves to liability. Because duPont signed the 2007 Form 10-K, which contained false statements and was later incorporated into the Offering Documents pursuant to Section 10(a)(3), he is liable under Section 11. *See In re Lehman Bros. Sec. and ERISA Litig.*, 2011 WL 3211364, at *39 n.399 (S.D.N.Y. 2011) (Rule 430B(f)(2) "indicates that those who sign documents, like a 10–K, that are incorporated by reference for the purposes of including information required by Section 10(a)(3) or Item 512(a)(1)(ii) ***are*** deemed to be persons who signed the registration statement within the meaning of Section 11") (emphasis original).

## VI. PLAINTIFFS HAVE ADEQUATELY ALLEGED LOSS CAUSATION

In order to allege loss causation, "the law requires only that a plaintiff establish that defendant's wrongful conduct was a substantial factor in the market change." *In re Tyson Foods, Inc. Sec. Litig.*, 2004 WL 1396269, *12 (D. Del. June 17, 2004) (Robinson, J.) (*citing Semerenko*, 223 F.3d at 187). Plaintiffs have met this standard. They allege that they purchased Wilmington shares at artificially inflated prices due to Defendants' misrepresentations, and they suffered a loss when the truth was made known and the price of Wilmington stock plunged to its true value. ¶¶8, 15, 307-312; *Semerenko*, 223 F.3d at 185. "[A] plaintiff need not show that a misrepresentation was the sole reason for the investment's decline in value," *Tyson Foods*, 2004

WL 1396269, at *1, and determinations as to the precise reasons for the plaintiffs' losses are inappropriate on a motion to dismiss. *Id.*, at *13 (*citing EP Medsystems*, 235 F.3d at 884).[63]

## VII. PLAINTIFFS HAVE ADEQUATELY ALLEGED CONTROL PERSON CLAIMS

Section 15 of the Securities Act, 15 U.S.C. § 77o, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), impose liability on persons who "directly or indirectly, control[] any person liable" under Section 11 and 10(b), respectively. To state a claim, Plaintiffs need only allege a violation of Section 11 or Section 10(b) by the controlled entity (Wilmington), and control of the entity by a Section 15 or Section 20(a) defendant. *See In re American Business Financial Services, Inc. Sec. Litig.*, 2007 WL 81937, at *12 (D.N.J. Jun. 30, 2007). "To establish a defendant is [a] control person, a plaintiff must demonstrate the defendant had actual power or influence over the allegedly controlled person." *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 940 (D.N.J. 1998). Control person claims are not subject to the heightened pleading requirements of Rule 9(b). *See American Business*, 2007 WL 81937, at *12.

Because Plaintiffs have pled that Wilmington violated Section 10(b), the first element of a Section 20(a) claim is satisfied. Additionally, it is evident that the Officer Defendants (consisting of two CEOs, the CFO/COO, the President/COO, and the Chief Credit Officer) and Rakowski (the Bank Controller) had control over Wilmington by virtue of their day-to-day responsibilities within the corporation; indeed, these defendants signed, or personally made,

[63] Defendants' only citation to the contrary, *Glover v. DeLuca*, 2006 WL 2850448 (W.D. Pa. Sept. 29, 2006), involved a complaint where loss causation was never mentioned, and the plaintiff did "not even make a generic allegation that Defendants' misrepresentations 'directly or proximately caused, or were a substantial contributing cause of, the damages [he] sustained.'" *Id.* at *32.

many of the statements alleged to be false.[64] Moreover, the Audit Committee monitored the quality and integrity of the Bank's financial statements (¶346), including, pursuant to the MOU, the Bank's loan loss provisions. ¶94. The Audit Committee also received reports from the Asset Review Group (¶¶92, 253), the Internal Audit Group. ¶68. This is sufficient to show that the Audit Committee Defendants are control persons. *See In re Reliance Secs. Litig.*, 135 F. Supp. 2d 480, 518 (D. Del. 2001) (that outside directors "served on subcommittees related to the oversight of [the primary violator corporation's] accounting and reporting practices" is "sufficient to raise genuine issues of material fact" regarding control status).

Defendants argue that Plaintiffs must plead the additional element of "culpable participation" for their §20(a) claims. In fact, "the overwhelming trend in this circuit is that culpable participation" need not be pled. *Belmont v. MB Inv. Partners, Inc.*, 2010 WL 2348703, at *9 (E.D. Pa. June 10, 2010) (quotations omitted).[65] Even assuming that Plaintiffs have this burden, the Complaint describes how the Officer Defendants directly participated in the fraudulent conduct; Rakowski, as Controller, also necessarily was directly involved in the Bank's financial reporting and internal controls. Similarly, the Audit Committee Defendants permitted the Bank to continue to issue false financial statements despite directly receiving reports demonstrating the inadequacy of the Bank's internal controls and the insufficiency of its reserves. This is sufficient to meet whatever pleading requirement exists.

Defendant duPont alone challenges his status as a control person. duPont Br. 9-10. duPont was a Director from 2006 through October 2009 (¶361) and signed the false 2007 Form

[64] *See Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 645 (D.N.J. 2003); *Palladin Partners v. Gaon*, 2006 WL 2460650, *15 (D.N.J. Aug. 22, 2006) ("A corporate officer or director can be liable under Section 20(a) for exercising control over a corporation that has committed securities fraud."); *Campbell Soup*, 145 F. Supp. 2d at 599-600 (high level officers are control persons).

[65] *See also American Business*, 2007 WL 81937, at *11.

10-K that was incorporated into the Offering Documents. ¶¶355, 361. At this stage of the litigation, nothing more is required. *American Business*, 2007 WL 81937, at *12 ("Allegations that a director signed a fraudulent SEC filing and was in a position to exercise control over the primary violator are sufficient to withstand a motion to dismiss.").

## VIII. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully submit that Defendants' Motions to Dismiss the Consolidated Securities Class Action Complaint should be denied in their entirety.[66]

Dated: September 12, 2011

**CHIMICLES & TIKELLIS LLP**

*/s/ A. Zachary Naylor*
Pamela S. Tikellis (Bar No. 2172)
A. Zachary Naylor (Bar No. 4439)
222 Delaware Avenue, 11th Floor
P.O. Box 1035
Wilmington, DE 19899
Phone: (302) 656-2500
Fax: (302) 656-9053

*Liaison Counsel for the Class*

[66] If the Court chooses to grant some or all of Defendants' motions, Plaintiffs request leave to amend the Complaint.

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

Blair Nicholas
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (858) 793-0070
Fax: (858) 793-0323

-and-

Hannah Ross (*pro hac vice*)
Sean K. O'Dowd (*pro hac vice*)
Katherine M. Sinderson (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Phone: (212) 554-1400
Fax: (212) 554-1444

SAXENA WHITE P.A.

Maya S. Saxena (*pro hac vice*)
Joseph E. White III (*pro hac vice*)
Lester Hooker (*pro hac vice*)
Brandon Grzandziel (*pro hac vice*)
2424 North Federal Highway
Boca Raton, FL 33431
Phone: (561) 394-3399
Fax: (561) 394-3382

*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*