# APPENDIX A

| Officer Defendant | Key Allegations Supporting A Strong Inference of Scienter |
|---|---|
| **Ted Cecala** <br><br> *CEO and Chairman of the Board* | • Interjected himself into monthly Asset Review Group meetings, routinely blocking downgrade determinations on loans of all sizes, from $9,000 to $79 million, because the borrowers had personal relationships with the Bank. ¶¶70-74, 78-81, 162, 377. <br><br> • Reviewed and approved Loan Loss Reserves each quarter, and was aware that the calculation was based entirely on the loan risk rating decisions that were distorted by his (and the other Officer Defendants') interference and refusal to recognize loan downgrades, even as loan quality was deteriorating. ¶94. <br><br> • Restricted reports to Board of Directors by requiring that all Board reports from the Vice President of Wilmington's Credit Risk Management Division (CW 2) be reviewed and "sanitized" by Defendant Harra. ¶¶75, 163. <br><br> • Served as an *ex officio* member of the Loan Committee, which performed credit reviews of all loans over $5 million, making him aware of the Bank's lending policies and the quality of the Bank's loan origination and loan portfolio. ¶¶53-54. <br><br> • Received Wilmington's Internal Audit Group report in the Fall of 2007 highlighting the dangerous understaffing in the Asset Review Group and the insufficiency of the percentage of the portfolio reviewed, and knowingly left the critical position of Director of Asset Review Group vacant until mid-2008. ¶¶68, 169. <br><br> • Received the 2007 and 2008 annual Reports of Examination from the Federal Reserve identifying material deficiencies in Wilmington's underwriting, loan review, and accounting functions. ¶¶165-67. <br><br> • Received the MOU from the Federal Reserve and was involved in the fundamental restructuring the Bank was forced to pursue, as set forth in Wilmington's MOU Compliance Plan and Report. ¶¶165-67. <br><br> • Received warnings from KPMG in connection with their 2007 and 2008 audits about concerns with Wilmington's inadequate asset review, but dismissed these concerns. ¶¶66, 168-69. <br><br> • Attended quarterly Credit Strategy meetings, which were scheduled around his availability and focused on (i) discussions of impaired loans in the Bank's portfolio, and (ii) the urgently outdated nature of the Bank's appraisals. ¶¶88, 162. Also, received quarterly "Delinquency List" from Defendant North detailing past-due loans. ¶¶79, 162. <br><br> • Resigned in July 2010 under suspicious circumstances. ¶172. |

| Officer Defendant | Key Allegations Supporting A Strong Inference of Scienter |
|---|---|
| **Robert Harra**<br><br>*President and Chief Operating Officer* | • Interjected himself into monthly Asset Review Group meetings, routinely blocking downgrade determinations on loans of all sizes, from $9,000 to $79 million, because the borrowers had personal relationships with the Bank.  ¶¶70-74, 78-81, 162, 377.<br><br>• Restricted and "sanitized" all reports from the Vice President of Wilmington's Credit Risk Management Division (CW 2), to prevent CW 2 from raising "red flags" to Board of Directors.  ¶¶75, 163.<br><br>• Served as an *ex officio* member of the Loan Committee, which performed credit reviews of all loans over $5 million, making him aware of the Bank's lending policies and the quality of the Bank's loan origination and loan portfolio. ¶¶53-54.<br><br>• Received reports from CW 2 regarding a Wilmington loan originator with a $500 million portfolio who had issued "dozens and dozens" of loans without required approvals.  Ignored the problem and permitted problems to be "papered over."  ¶46.<br><br>• Received Wilmington's Internal Audit Group report in the Fall of 2007 highlighting the dangerous understaffing in the Asset Review Group and the insufficiency of the percentage of the portfolio reviewed, and knowingly left the critical position of Director of Asset Review Group vacant until mid-2008.  ¶¶68, 169.<br><br>• Attended quarterly Credit Strategy meetings, which were scheduled around his availability and focused on (i) discussions of impaired loans in the Bank's portfolio, and (ii) the urgently outdated nature of the Bank's appraisals. ¶¶88, 162.  Also, received quarterly "Delinquency List" from Defendant North detailing past-due loans.  ¶¶79, 162.<br><br>• Received annual written Reports of Examination from the Federal Reserve dating back to 2007 identifying material deficiencies in Wilmington's underwriting, loan review, and accounting functions. ¶¶165-67.<br><br>• Received the MOU from the Federal Reserve and was involved in the fundamental restructuring the Bank was forced to pursue, as set forth in Wilmington's MOU Compliance Plan and Report.  ¶¶165-67.<br><br>• Received warnings from KPMG in connection with their 2007 and 2008 audits about concerns with Wilmington's inadequate asset review, but dismissed these concerns.  ¶¶66, 168-69. |

| Officer Defendant | Key Allegations Supporting A Strong Inference of Scienter |
|---|---|
| **David Gibson**<br><br>*Chief Financial Officer* | • Repeatedly received criticisms from Wilmington's Internal Audit group regarding that fact that Credit Risk Management reported to him, a sales-focused executive, rather than to an independent authority, but dismissed these concerns by saying "that's how it's always been."  ¶75.<br><br>• Participated in monthly Asset Review Group meetings, routinely blocking downgrade determinations on loans of all sizes, from $9,000 to $79 million, because the borrowers had personal relationships with the Bank.  ¶¶70-74, 78-81, 162, 377.<br>• Reviewed and approved Loan Loss Reserves each quarter, and was aware that the calculation was based entirely on the loan risk rating decisions that were distorted by his (and the other Officer Defendants') interference and refusal to recognize loan downgrades, even as loan quality was deteriorating.  ¶94<br>• Restricted reports to Board of Directors by requiring that all Board reports from the Vice President of Wilmington's Credit Risk Management Division (CW 2) be reviewed and "sanitized" by Defendant Harra.  ¶¶75, 163.<br>• Attended quarterly Credit Strategy meetings, which focused on (i) discussions of impaired loans in the Bank's portfolio, and (ii) the urgently outdated nature of the Bank's appraisals. ¶¶88, 162.  Also, received quarterly "Delinquency List" from Defendant North detailing past-due loans.  ¶¶79, 162.<br>• Received Wilmington's Internal Audit Group report in the Fall of 2007 highlighting the dangerous understaffing in the Asset Review Group and the insufficiency of the percentage of the portfolio reviewed, and knowingly left the critical position of Director of Asset Review Group vacant until mid-2008.  ¶¶68, 169.<br>• Received the 2007 and 2008 annual Reports of Examination from the Federal Reserve identifying material deficiencies in Wilmington's underwriting, loan review, and accounting functions.  ¶¶165-67.<br>• Received the MOU from the Federal Reserve and was involved in the fundamental restructuring the Bank was forced to pursue, as set forth in Wilmington's MOU Compliance Plan and Report.  ¶¶165-67.<br>• Received warnings from KPMG in connection with their 2007 and 2008 audits about concerns with Wilmington's inadequate asset review, but dismissed these concerns.  ¶¶66, 168-69. |

| Officer Defendant | Key Allegations Supporting A Strong Inference of Scienter |
|---|---|
| **Bill North**<br><br>*Chief Credit Officer* | • Presided over monthly Asset Review Group meetings at which Cecala, Harra, and Gibson interjected themselves to routinely block downgrade determinations on loans of all sizes, from $9,000 to $79 million, because the borrowers had personal relationships with the Bank.  ¶¶70-74, 78-81, 162, 377.<br><br>• Served as head of the Loan Committee, which performed credit reviews of all loans over $5 million, making him aware of the Bank's lending policies and the quality of the Bank's loan origination and loan portfolio. ¶¶49, 171.<br><br>• Attended quarterly Credit Strategy meetings, which focused on (i) discussions of impaired loans in the Bank's portfolio, and (ii) the urgently outdated nature of the appraisals. ¶¶88, 162.<br><br>• Received Wilmington's Internal Audit Group report in the Fall of 2007 highlighting the dangerous understaffing in the Asset Review Group and the insufficiency of the percentage of the portfolio reviewed.  ¶¶68, 169.<br><br>• Aware of the 2007 and 2008 annual Reports of Examination from the Federal Reserve identifying material deficiencies in Wilmington's underwriting, loan review, and accounting functions.  ¶¶165-67.<br><br>• Received the MOU from the Federal Reserve and was involved in the fundamental restructuring the Bank was forced to pursue, as set forth in Wilmington's MOU Compliance Plan and Report.  ¶¶165-67.<br><br>• Aware of warnings from KPMG in connection with their 2007 and 2008 audits about concerns with Wilmington's inadequate asset review, but dismissed these concerns.  ¶¶66, 168-69.<br><br>• Had contemporaneous knowledge of the 10% Rule.  ¶¶53-54.<br><br>• Circulated a quarterly "Delinquency List" detailing past-due loans.  ¶¶79, 171.<br><br>• Departed the Bank in Summer 2010 under suspicious circumstances.  ¶172. |

| Officer Defendant | Key Allegations Supporting A Strong Inference of Scienter |
|---|---|
| **Donald Foley**<br><br>*Chairman of the Board's Audit Committee, later CEO and Chairman of the Board* | • Received Wilmington's Internal Audit Group report in the Fall of 2007 highlighting the dangerous understaffing in the Asset Review Group and the insufficiency of the percentage of the portfolio reviewed. ¶¶68, 169.<br><br>• Received the 2007 and 2008 annual Reports of Examination from the Federal Reserve identifying material deficiencies in Wilmington's underwriting, loan review, and accounting functions. ¶¶165-67.<br>• Received MOU from Federal Reserve and, as Chairman of the Audit Committee before replacing Defendant Cecala as CEO, was directly responsible for overseeing Wilmington's response to the MOU, as set forth in Wilmington's MOU Compliance Plan and Report. ¶¶165-67.<br><br>• Received warnings from KPMG in connection with their 2007 and 2008 audits about concerns with Wilmington's inadequate asset review. ¶¶66, 168-69. |