# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

IN RE WILMINGTON TRUST
SECURITIES LITIGATION

)
)
)
)

Master Civ. No. 10-990

(Consolidated Securities Class Action)

Pamela S. Tikellis, Esquire and A. Zachary Naylor, Esquire of Chimicles & Tikellis LLP, Wilmington, Delaware. Liaison Counsel for the Class. Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class: Blair Nicholas, Esquire, Hannah Ross, Esquire, Sean K. O'Dowd, Esquire and Katherine M. Sinderson, Esquire of Bernstein Litowitz Berger & Grossmann LLP and Maya S. Saxena, Esquire, Joseph E. White III, Esquire, Lester Hooker, Esquire, and Brandon Grzandziel, Esquire of Saxena White P.A.

Virginia A. Gibson, Esquire of Hogan Lovells US LLP, Philadelphia, Pennsylvania. Counsel for Defendant KMPG LLP. Of Counsel: George A. Salter, Esquire of Hogan Lovells US LLP.

Laura Davis Jones, Esquire and Curtis A. Hehn, Esquire of Pachulski Stang Ziehl & Jones LLP of Wilmington Delaware. Counsel for 1Defendant Thomas DuPont. Of Counsel: J. Douglass Baldridge, Esquire and George Kostolampros, Esquire of Venable LLP.

Stephen C. Norman, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Defendants J.P. Morgan Securities LLC and Keefe Bruyette & Woods, Inc. Of Counsel: Thomas C. Rice, Esquire and David F. E. Tejtel, Esquire of Simpson Thacher & Bartlett LLP.

Thomas J. Allingham II, Esquire and Robert S. Saunders, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware. Counsel for Defendants Wilmington Trust Corporation, Ted Cecala, Donald Foley, David Gibson, Robert Harra, Jr., Kevyn Rakowski, Carolyn Burger, R. Keith Elliott, Gailen Krug, Stacey Mobley, Michelle Rollins, David Roselle, Oliver Sockwell, Robert Tunnell, Jr., Susan Whiting, Rex Mears and Louis Freeh.

David E. Wiks, Esquire, Andrea S. Brooks, Esquire and Andrew H. Sauder, Esquire of Wilks, Lukoff & Bracegridle, LLC of Wilmington, Delaware. Counsel for Defendant William North.

**MEMORANDUM OPINION**



Dated: March 29, 2012
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

By an order dated March 7, 2011, the court consolidated a series of securities fraud class action lawsuits filed against the Wilmington Trust Corporation ("WTC") and related defendants. (D.I. 26) A consolidated class action complaint was filed on May 16, 2011. (D.I. 39) The complaint contains six counts, three under the Securities Act of 1933, 15 U.S.C. § 77a ("the Securities Act"), and three under the Securities Exchange Act of 1934, 15 U.S.C. § 78a ("the Exchange Act"). In response to plaintiffs' complaint, five separate motions to dismiss were filed by the various defendants. (D.I. 49, 50, 52, 58 and 61) Responses have been filed and the motions are ripe for disposition. The court has jurisdiction pursuant to 28 U.S.C. § 1331. For the following reasons, the court grants defendants' motions to dismiss.

## II. BACKGROUND[1]

### A. The Exchange Act Claims

#### 1. The Parties

Lead plaintiffs in this suit ("plaintiffs") are institutional investors that purchased WTC common stock between January 18, 2008 and November 1, 2010 ("the class period"). (D.I. 39 at ¶¶ 8-15) Defendant WTC was a bank headquartered in Wilmington, Delaware during the class period.[2] (*Id.* at ¶ 16) Aside from WTC, the

---

[1] Plaintiffs' consolidated amended complaint is one hundred eighty pages in length and contains four hundred thirty-nine separately enumerated paragraphs. The court has done its best to succinctly summarize the allegations.

[2] WTC became a part of M&T Bank Corporation ("M&T") in 2011 and is no longer doing business as "Wilmington Trust Company," as discussed *infra*.

complaint lists several other defendants, including: 1) officer defendants; and 2) board of director audit committee defendants.

### a. Officer defendants

Ted T. Cecala ("Cecala") served as WTC's chief executive officer ("CEO") from July 1996 until June 3, 2010; he was also the chairman of the board from 1996 until July 19, 2010. (*Id.* at ¶ 20) David E. Foley ("Foley") replaced Cecala as CEO and chairman of the board after Cecala's 2010 departure. (*Id.* at ¶ 21) David R. Gibson ("Gibson") served as WTC's chief financial officer from 1997 until November of 2010. (*Id.* at ¶ 22) Robert V. A. Harra served as the executive vice president of WTC from 1992 until 1996 and as president from 1996 through the class period; he also served as the chief operating officer from 1996 until 2010. (*Id.* at ¶ 23) William North ("North) served as the chief credit officer at WTC from 2004 until July 2010. (*Id.* at ¶ 24) Kevyn N. Rakowski ("Rakowski") was a senior vice president and the controller of WTC from 2006 through the class period. (*Id.* at ¶ 26) These defendants are collectively referred to as "the officer defendants."

### b. Audit committee defendants

Carolyn S. Burger ("Burger") served as a director on WTC's board from 1991 through the class period. (*Id.* at ¶ 27) Burger served on the audit committee from 2001-2004 and 2008 through the class period (chair from 2001-2004 and 2010). (*Id.*) R. Keith Elliott ("Elliott") was a director from 1997 until 2010 and he served on the audit committee during 2007 and 2008 (2007 chair). (*Id.* at ¶ 28) Gailen Krug ("Krug") was a director from 2004 through the class period and served on the audit committee from

2

2007 until 2010. (*Id.* at ¶ 29) Stacey Mobley ("Mobley") served as a director from 1991-2010 and was on the audit committee in 2009. (*Id.* at ¶ 30) Michelle Rollins ("Rollins") served as a director from 2007 until May of 2010; she was a member of the audit committee from 2007-2009. (*Id.* at ¶ 31) David P. Roselle ("Roselle") was a director from 1991-2009 and worked on the audit committee from 2007-2009. (*Id.* at ¶ 32) Oliver R. Sockwell ("Sockwell") was a director from 2007-2010 and served on the audit committee from 2008-2010. (*Id.* at ¶ 33) Robert W. Tunnell, Jr. ("Tunnell") was a director from 1992 through the class period and was a member of the audit committee from 2007-2008 and in 2010. (*Id.* at ¶ 34) Susan D. Whiting ("Whiting") was a director from 2005 through the class period and a member of the audit committee in 2010. (*Id.* at ¶ 35) These defendants are collectively referred to as "the audit committee defendants."

### 2. Background on WTC

WTC had four primary business segments: 1) regional banking; 2) corporate client services; 3) wealth advisory services; and 4) affiliate money managers. (*Id.* at ¶ 17) WTC's regional banking segment, whose predominant business was the origination of commercial loans, is the focus of plaintiffs' complaint. (*Id.*) WTC's commercial loans fell into three categories: "(1) commercial real estate construction [loans] . . . ; (2) commercial, financial and agricultural loans to various clients who use[d] the loans for working capital, equipment purchases, inventory [etc.]; and (3) commercial mortgages." (*Id.*) These loans comprised approximately 70-80% of WTC's assets and commercial mortgage lending is where a significant portion of the bank's

3

revenue was generated. (*Id.* at ¶¶ 17; 38)

According to plaintiffs' complaint, "since its founding in 1903," WTC "worked assiduously" to build its reputation as a "stable" and "conservative" regional lender. (*Id.* at ¶¶ 1; 37) With the emergence of the financial crisis in 2008, WTC continued to highlight its conservatism, allegedly billing itself as "a safe harbor in otherwise turbulent financial waters." (*Id.*) WTC did this by emphasizing its "conservative management" style, "rigorous underwriting" procedures and risk adverse nature. (*Id.* at ¶¶ 37-39) While this may have been the public persona WTC created and attempted to maintain, plaintiffs claim that WTC's lending practices were actually "egregiously deficient and risky" during the class period. (*Id.* at ¶ 3)

### 3. WTC's allegedly deficient lending practices

WTC's alleged deficiencies were evidenced in a variety of ways. First, the bank's loan portfolio supposedly "contained a dangerous concentration [of] commercial real estate," in the sense that it "could create safety and soundness concerns in the event of a significant economic downturn." (*Id.* at ¶¶ 39-44) Second, WTC allegedly made loans to clients "based upon personal relationships and business development rather than impartial risk-focused underwriting criteria." (*Id.* at ¶ 45) According to plaintiffs' complaint, the underwriters, a group ordinarily designated as an independent voice for credit risk management, reported to regional lending managers, a group of business developers incentivized to generate more loans and lend more money. (*Id.* at ¶¶ 47-48) In general, the complaint claims that WTC was more of a sales culture than a credit culture, where loans were frequently issued without regard for established

4

underwriting practices. (*Id.* at ¶ 46) When personal connections existed or business could be developed, those concerns trumped sound underwriting policies. (*Id.* at ¶¶ 45-60) Third, the complaint alleges that WTC's asset review group was purposefully understaffed and unable to perform a reasonable assessment of portfolio risk. The asset review group was tasked with determining the amount of risk present in the bank's loan portfolios. The group assigned a loan to one of four categories: 1) pass (no current or potential problems); 2) watchlisted (accruing loans that are potentially problematic); 3) substandard (accruing and non-accruing loan with some probability of loss); 4) doubtful (non-accruing loans with a high probability of loss). (*Id.* at ¶ 62) The purpose of categorizing the loans in this fashion was to help determine the necessary loan loss reserve.[3] However, according to the complaint, the group was only able to review a small fraction of WTC's portfolio and this fraction was not sufficient to provide a clear picture of actual risk. (*Id.* at ¶¶ 65; 68) Moreover, the officer defendants are accused of preventing the asset group from downgrading loans (from pass to something less secure) to appropriately reflect risk. (*Id.* at ¶¶ 70-76) Fourth, WTC allegedly relied on knowingly outdated appraisals during its risk analyses and refused to update these appraisals in the wake of dramatically changing economic conditions. (*Id.* at ¶¶ 84-89)

## 4. WTC's allegedly deficient financial statements

According to plaintiffs' complaint, WTC's deficient lending practices manifested themselves in its financial statements which violated both generally accepted

---

[3] Loan loss reserves are addressed in more detail on page 6, *infra*.

accounting principles ("GAAP") and SEC regulations prohibiting false and misleading statements. Specifically, plaintiffs allege that defendants under-reported loan losses and thus inflated the value of WTC's loan portfolio. A loan loss reserve is a quarterly balance sheet entry that reflects management's best estimate of potential loan losses.[4] (D.I. 39 at ¶ 105-06; D.I. 59 at 4) To account for loss contingency, GAAP requires a loan loss reserve entry to be placed as an expense on a company's balance sheet. (Id.) As a bank determines that loans are not recoverable, it charges them off, and then they are removed from the loan loss reserve. (Id.) According to plaintiffs, WTC estimated loan losses by assigning 1% of the value of pass loans to the loan loss reserves, 2% of the value for watchlist loans, 15% of the value of the substandard loans and 50% of the value of doubtful loans. (D.I. 39 at ¶ 119) In 2008, WTC changed its methodology in an attempt to more accurately estimate potential risk. (Id. at ¶ 212) According to plaintiffs, both methodologies were inadequate and in violation of GAAP; this is because the officer defendants prevented credit analysts' attempts to downgrade loans and the methodologies used focused too much on past trends without adequately considering the current economic crisis. (Id. at ¶¶ 119-122) The complaint states that WTC's "rising level of nonaccrual loans and the accompanying decline in the ratio of the Loan Loss Reserve was in reality a critical indicator that [WTC's] Loan Loss Reserve was inadequate." (Id. at ¶ 129) In 2010, after M&T took over WTC and analyzed its books, M&T issued a report concluding that $759 million dollars worth of loans would

---

[4] Loan loss allowances involve discretion but should be sound estimates based upon management's review of relevant factors, including past experience and trends, national and local market conditions, industry conditions, etc. (D.I. 39 at ¶ 113)

not be recoverable (over $500 million dollars more than WTC had estimated in its loan loss reserve). (*Id.* at ¶ 130) By extension, plaintiffs note that WTC greatly overestimated the value of its loan portfolio. (*Id.* at ¶¶ 139-42)

Plaintiffs also allege that during the fourth quarter of 2009 and the first two quarters of 2010, WTC's officer defendants "fraudulently inflated [WTC's] assets and earnings by nearly $200 million through improper accounting for 'deferred tax assets.'" (*Id.* at ¶ 143) A deferred tax asset is an asset recorded on a company's balance sheet in recognition of anticipated future tax benefits. (*Id.* at ¶144) While this tax deferred asset was placed on WTC's balance sheet in 2009, by November of 2010 the company acknowledged that it would not realize $194.6 million (of the originally anticipated $200 million) in tax deferred savings. (*Id.* at ¶ 148)

## 5. Reported class period financials

While other financial institutions were reporting massive credit-related losses during the class period, WTC publicized strong financials. In 2007 and 2008, the company reported annual net gains and, in 2009, it only reported an annual net loss of $4.4 million. (*Id.* at ¶¶ 176-249) In 2007, WTC informed investors that 96% of its loans received pass ratings and this translated to a loan loss reserve figure of $101.1 million; in 2008, 90.8% of WTC's loans were passing which translated to a $157.1 million loan loss reserve. (*Id.* at 176-210)

## 6. The Federal Reserve's Memorandum of Understanding

In September of 2009, in response to some of WTC's shortcomings, regulators from the Federal Reserve issued a Memorandum of Understanding ("MOU"). (*Id.* at ¶

7

90) The MOU contained a variety of concerns that the Federal Reserve wanted WTC to address. (*Id.*) These included, among other things, lending policies, loan loss reserve determinations, credit risk management analyses and reporting structure. (*Id.* at ¶¶ 90-97)

### 7. WTC's demise and eventual take over

On January 29, 2010, WTC issued a 2009 year-end press release and also held a conference call with investors. (*Id.* at ¶¶ 248-49) WTC reported an annual net loss of $4.4 million (or $0.33 a share) and a loan loss reserve of $251.5 million. (*Id.*) In the last quarter of 2009, 81.29% of its loans received a pass rating, 6.77% were watchlisted and 11.31% were substandard. (*Id.*) On April 23, 2010, WTC issued a first quarter 2010 press release and also held a conference call with investors. (*Id.* at ¶¶ 256-57) WTC reported a quarterly net loss of $29.2 million (or $0.44 a share); it also reported that 79.31% of its loans received a pass rating, 7.71% were watchlisted and 12.5% were substandard and this correlated to a loan loss reserve of $299.8 million. (*Id.*) On June 3, 2010, Cecala announced his retirement. (*Id.* at ¶ 261) In an effort to mitigate concerns about Cecala's "abrupt" departure, officer defendants attempted to soothe investors' worries by assuring them that his departure had nothing to do with a mounting credit problem or capital concerns. (*Id.* at ¶ 263) In a July 23, 2010 press release on its second quarter, WTC reported a net loss of $120.9 million (or $1.33 a share), a loan loss reserve of $373.8 million, and $131.2 million in charge-offs. (*Id.* at ¶ 272) WTC also acknowledged hiring consultants to review its lending and risk management policies and procedures. (*Id.*)

On Monday, November 1, 2010, WTC announced that it had entered into a

merger agreement with M&T. (*Id.* at ¶ 288) That same day, WTC announced its third

quarter results: a net loss of $365 million (or $4.06 a share), a $510 million loan loss

reserve and $144.9 in net charge-offs. (*Id.* at ¶ 289) According to the complaint, credit

quality was responsible for the losses and ultimately the merger. (*Id.* at 288-92) M&T

concluded that WTC had over $500 million worth of loses remaining on its books. (*Id.*

at 294)

### 8. Defendants' allegedly false and misleading statements

Plaintiffs' complaint states that:

During the class period, as the credit market deteriorated and iconic financial
institutions like Lehman Brothers, Merrill Lynch, and Washington Mutual
collapsed, [WTC] carried out its scheme to conceal the Bank's true financial
position from the marketplace. In regular press releases, conference calls
and filings with the SEC, [WTC] and the officer defendants repeatedly made
materially false and misleading statements and omissions about the quality
of [WTC's] loan portfolio, its procedures for managing credit risk, its lending
and accounting practices and its income Loan Loss Reserves, and assets.

(*Id.* at ¶ 175) Specifically, under the heading "Defendants' False and Misleading

Statements," the complaint discusses allegedly false and misleading statements from:

1) a 2007 year-end press release and investor conference call (issued and held on

January 18, 2008), as well as the company's 2007 SEC 10-K filing (issued on February

28, 2008); 2) a press release and conference call regarding first quarter 2008 results

(issued and held on April 18, 2008), as well as the company's first quarter 2008 SEC

10Q filing (issued on May 12, 2008); 3) a press release and conference call regarding

second quarter 2008 results (issued and held on July 18, 2008), as well as the

company's second quarter 2008 SEC 10Q filing (issued on August 11, 2008); 4) a press

9

release and conference call regarding third quarter 2008 results (issued and held on

October 17, 2008), as well as the company's third quarter 2008 SEC 10Q filing (issued

on November 10, 2008); 5) a 2008 year-end press release and investor conference call

(issued and held on January 30, 2009), as well as the company's 2008 SEC 10-K filing

(issued on March 2, 2009); 6) a March 5, 2009 presentation by Cecala at the Keefe,

Bruyette & Woods, Inc. ("KBW") Regional Banking Conference; 7) a press release and

conference call regarding first quarter 2009 results (issued and held on April 24, 2009),

as well as the company's first quarter 2009 SEC 10Q filing (issued on May 11, 2009);

8) a press release and conference call regarding second quarter 2009 results (issued

and held on July 24, 2009), as well as the company's second quarter 2009 SEC 10Q

filing (issued on August 10, 2009); and 9) a press release and conference call regarding

third quarter 2009 results (issued and held on October 23, 2009), as well as the

company's third quarter 2009 SEC 10Q filing (issued on November 9, 2009). (Id. at ¶¶

175-244) The complaint's next section, "The Truth Begins to Emerge," discusses

allegedly false and misleading statements made in similar contexts at the end of 2009

and the beginning of 2010; it also touches on statements made in connection with

WTC's eventual merger. (Id. at ¶¶ 248-298)

The allegedly false or misleading statements relate to several issues, including,

but not limited to: 1) the stability and quality of the company's loan portfolio; 2) the

quality, nature and frequency of the loan portfolio's risk reviews; 3) the currentness of

appraisals and their use in assessing risk; 4) compliance with GAAP; 5) the nature and

quality of the company's internal controls; 6) the nature, quality and independence of

underwriting practices; 7) the size and accuracy of the company's loan loss provisions;

10

8) the inflated nature of the company's earnings statements; and 9) the reasons for

Cecala's resignation and the company's financial health in the wake of his departure.

(*Id.*) According to plaintiffs, these statements were false or misleading because:

(i) More than half of the commercial loans extended by [WTC] were not underwritten by independent, credit-focused or trained risk management personnel; loan officers regularly exceeded authorized amount of loans underwritten and approved by the Loan Committee by use of the 10% Rule;[5] [WTC's] underwriting was rife with documentation errors and exceptions; loan origination was based on personal relationships and insufficiently reviewed personal guarantees; and [WTC's] lenders were motivated by volume-based compensation rather than credit quality (see ¶¶ 45-60)

(ii) [WTC's] Asset Review Group actually reviewed only a very small percentage of its loans portfolio, which had been the subject of criticisms by . . . KPMG and Federal Regulators as a weakness in [WTC's] internal controls; [WTC] relied on its lenders - who were financially disincentivized to downgrade loans - to report negative loan quality; the Credit Risk Division, including the Asset Review Group, was not an independent voice for credit because it reported to Defendant Gibson . . .; Defendant Gibson interfered and overrode loan quality decisions made by the Asset Review Group (see ¶¶ 84-89)

(iii) [WTC] did not obtain updated appraisals . . . (see ¶¶ 84-89)

(iv) [WTC] was seeing strong negative trends in its borrowers, but was acting under an "extend and pretend" policy to avoid recognizing impairments (see ¶¶ 69-74)

(v) [WTC's] financial statements were not prepared in accordance with GAAP, because its reserving methodology did not take into account economic trends . . . (see ¶¶ 102-42)

(vi) [WTC's] internal controls suffered from significant deficiencies because of, inter alia, the Bank's failure to address inconsistent underwriting and asset review, understaffing in key area, interference by senior management, and flaws in reporting systems (see ¶¶ 153-59)

---

[5] Under the 10% Rule, a lending officer could unilaterally lend another 10% (or more) of the originally approved loan; this was done **after** the loan went through the underwriting process. (*Id.* at ¶ 50)

(Id. at ¶¶ 185; 245)

### 9. The claims

Based upon these factual circumstances, plaintiffs have brought three claims under the Exchange Act. First, plaintiffs allege violations of Section 10(b) and Rule 10b-5 against WTC, Cecala, Foley, Gibson, Harra and North. Second, plaintiffs allege violations of Section 20(a) against Cecala, Foley, Gibson, Harra, North and Rakowski. Lastly, plaintiffs allege violations of Section 20(a) against the audit committee defendants.

## B. The Securities Act Claims

On February 23, 2010, WTC conducted a securities offering to the public of 18,875,000 shares of common stock; $273.9 million was raised from the sale. (Id. at ¶ 355) In connection with this offering, WTC filed a registration statement and prospectus ("offering documents") with the SEC. (Id.) These offering documents incorporated by reference WTC's 2007 10-K, first, second and third quarter 2008 10-Qs and the 2009 10-K. (Id.)

### 1. The defendants

Aside from WTC, plaintiffs also brought suit against the following defendants: 1) the officer defendants who signed WTC's registration statement as well as documents incorporated into the offering documents (including Cecala, Foley, Harra, Gibson and Rakowski); 2) audit committee defendants who signed WTC's registration statement as well as documents incorporated into the offering documents (including Burger, Elliott,

12

Krug, Mobley, Rollins, Sockwell, Tunnell and Whiting[6]); and 3) non-audit committee board members, including Thomas DuPont ("DuPont") who signed the registration statement and Louis Freeh ("Freeh") who signed the 2009 10-K. (*Id.* at ¶¶ 358-62) KPMG LLP ("KPMG"), WTC's outside auditor since 2003, has also been named, (*Id.* at ¶ 363), as has J.P. Morgan Chase ("JP Morgan") and KBW, joint underwriters for the offering. (*Id.* at ¶¶ 364-65)

## 2. The alleged misstatements

For the reasons discussed more fully above, plaintiffs claim that the offering documents - which incorporated WTC's earlier financial statements - contain the following misstatements: 1) the offering documents misstated WTC's underwriting practices; 2) the offering documents misstated WTC's asset review and appraisal process; 3) the offering documents contained untrue financial results; and 4) the offering documents contain untrue statements about internal controls. (*Id.* at ¶¶ 366-99)

## 3. The claims

Plaintiffs have brought three claims under the Securities Act. First, plaintiffs allege violations of Section 11 against WTC, Cecala, Foley, Gibson, Harra, Rakowski, Burger, DuPont, Elliott, Freeh, Krug, Mobley, Rollins, Roselle, Sockwell, Tunnell, Whiting, KPMG, J.P. Morgan and KBW. Second, plaintiffs allege violations of Section 12(a)(2) against WTC, J.P. Morgan and KBW. Lastly, plaintiffs allege violations of Section 15 against Cecala, Foley, Gibson, Harra, Rakowski, Burger, DuPont, Elliott, Freeh, Krug, Mobley, Rollins, Roselle, Sockwell, Tunnell and Whiting.

---

[6] An individual named "Mears" is mentioned as a defendant in connection with the Section 11 and 15 claims, but no description of this defendant is ever provided.

13

## III. STANDARD OF REVIEW

Five separate motions to dismiss have been filed: J.P. Morgan and KBW have filed a joint motion (D.I. 49); KPMG (D.I. 50), DuPont (D.I. 52) and North (D.I. 61) have filed individual motions; and the remaining defendants have filed a collective motion. (D.I. 58)

In reviewing a motion filed under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). A court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (interpreting Fed.R.Civ.P. 8(a)) (internal quotations omitted). A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 545 (alteration in original) (citation omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.* Furthermore, "[w]hen there are well-ple[d]

14

factual allegations, a court should assume their veracity and then determine whether

they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 129

S.Ct. 1937, 1950 (2009). Such a determination is a context-specific task requiring the

court "to draw on its judicial experience and common sense." *Id.*

## IV. DISCUSSION

### A. Exchange Act Claims

#### 1. Section 10(b) and Rule 10b-5

According to Section 10(b) of the Exchange Act, it is unlawful:

To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C.A. § 78j(b). Rule 10b-5, promulgated by the Securities and Exchange

Commission to implement Section 10(b), makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In order to state a claim for securities fraud under Section 10(b) and Rule 10b-5,

a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant

15

[i.e., falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630-31 (3d. Cir. 2011). A statement or omission is material if there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d. Cir 2010) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "A material misrepresentation or omission is actionable if it significantly altered the total mix of information made available." *Id.* (citations and quotations omitted). Material misstatements are contrasted with subjective analyses and general or vague statements of intention or optimism which constitute no more than mere corporate puffery. *Id; City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 390 (D. Del. 2010). "Scienter is a mental state embracing intent to deceive, manipulate, or defraud, and requires a knowing or reckless state of mind." *Inst. Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (citations and quotations omitted).

## 2. Heightened pleading standard

Shareholders filing a securities fraud lawsuit under the Exchange Act are subject to the significantly heightened pleading standard codified by the Private Securities Litigation Reform Act ("PSLRA"). *Avaya, Inc.*, 564 F.3d at 253; *Horizon Lines*, 686 F. Supp. 2d at 414 ("The PSLRA imposes a dramatically higher standard on a plaintiff drafting a complaint than that of traditional notice pleading."); *Brashears v. 1717 Capital*

*Mgmt., Nationwide Mut. Ins. Co.*, 2004 WL 1196896, at *4 (D. Del. 2004) ("[B]y enacting

the current version of the [PSLRA], Congress expressly intended to substantially

heighten the existing pleading requirements.") (internal quotations omitted).[7] "The

PSLRA provides two distinct pleading requirements, both of which must be met in order

for a complaint to survive a motion to dismiss." *Avaya, Inc.*, 564 F.3d at 252. First, the

complaint must "specify each allegedly misleading statement, the reason or reasons

why the statement is misleading, and, if an allegation is made on information and belief,

all facts supporting that belief with particularity." *Id.* at 259 (citing 15 U.S.C. §

78u–4(b)(1)). This is the falsity requirement. Second, "with respect to each act or

omission alleged to violate [§ 10(b)]," a plaintiff is required to "state with particularity

facts giving rise to a strong inference that the defendant acted with the required state of

mind." *Id.* (citing 15 U.S.C. § 78u–4(b)(2)). This is the scienter requirement.

Both of these provisions require that facts be pled "with particularity." With

respect to the falsity requirement,

> the particularity standard echoes Rule 9(b) of the Federal Rule[s] of Civil
> Procedure, which is comparable to and effectively subsumed by the
> requirements of ... the PSLRA. Like Rule 9(b), the PSLRA requires plaintiffs
> to plead the who, what, when, where and how: the first paragraph of any
> newspaper story. Additionally, if an allegation regarding [a] statement or
> omission is made on information and belief, a plaintiff must state with
> particularity all facts on which that belief is formed.

---

[7] "The PSLRA's heightened pleading requirements were constructed in order to
restrict abuses in securities class-action litigation, including: (1) the practice of filing
lawsuits against issuers of securities in response to any significant change in stock
price, regardless of defendants' culpability; (2) the targeting of 'deep pocket'
defendants; (3) the abuse of the discovery process to coerce settlement; and (4)
manipulation of clients by class action attorneys." *Horizon Lines*, 686 F. Supp. 2d at
414.

*Horizon Lines*, 686 F. Supp. 2d at 414 (citing *Avaya, Inc.*, 564 F.3d at 253) (internal quotations and citations omitted). The scienter requirement, on the other hand, "marks a sharp break from Rule 9(b)." *Avaya,* 564 F.3d at 253. "Unlike Rule 9(b), under which a defendant could plead scienter generally, § 78u–4(b)(2) requires any private securities complaint alleging that the defendant made a false or misleading statement ... [to] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Horizon Lines*, 686 F. Supp. 2d at 414 (citations and quotations omitted).

Aside from these two requirements, the PSLRA imposes additional burdens with respect to allegations involving forward-looking statements. The PSLRA's Safe Harbor provision, 15 U.S.C. § 78u–5(c), "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya,* 564 F.3d at 254.

### 3. Analysis

Plaintiffs have failed to identify the defendants' allegedly misleading statements with the requisite degree of particularity contemplated by the PSLRA. While the complaint contains hundreds of quotations in over forty pages dedicated to alleged misstatements, nowhere does the complaint specifically identify those statements upon which plaintiffs base their claims. It is not the court's responsibility to identify them.[8]

---

[8] *See The Winer Family Trust v. Queen*, 2004 WL 2203709, at *6 (E.D. Pa. 2004) (requiring, for clarity and economy's sake, that the plaintiff distill its 97-page complaint into a comprehensive chart of alleged misstatements).

18

In general, the complaint contains a series of quotes that are anything but particular. Most often the complaint contains two or three quoted words or a short quoted phrase without providing the context of the full sentence; alternatively, longer quotes are provided with several ellipses. If the quotation is from a document, the document is not cited to or provided. Occasionally speakers are not identified. In short, the alleged misstatements are provided without sufficient context, and the complaint fails to identify the specific statements on which plaintiffs base each of their claims.

Furthermore, plaintiffs have not specifically identified the reason or reasons why each statement is false or misleading. Instead, the complaint directs the court to a laundry list of reasons why a statement could be untrue. This is not sufficient; the PSLRA requires plaintiffs to address the way in which each individual statement is false or misleading. *In re The Goodyear Tire & Rubber Co. Sec. Litig.,* 436 F. Supp. 2d 873, 904 (N.D. Ohio 2006) ("While the Amended Complaint does specify each statement that was allegedly misleading, it falls short of describing the reason or reasons **why** each statement was misleading. To explain, the Amended Complaint repeatedly refers to a list of alleged improprieties that may or may not have anything to do with the statements. For example, each allegedly false series of statements refers back to [a] section of the Amended Complaint that contains a laundry list of allegations purporting to pertain to each separate statement. It is Plaintiffs' burden to plead fraud on a statement-by-statement basis, and they may not evade that requirement by requiring the Court to try to match the allegedly fraudulent statements to the allegations of wrongdoing that are scattered throughout the seventy-plus page Amended Complaint."); *In re Ferro Corp.*, 2007 WL 1691358, at *19 (N.D. Ohio 2007) ("Here, the

SAC fails to conform to the PSLRA's mandates because Plaintiff merely repeats (almost verbatim) the same list of reasons after each separate series of purportedly false statements. Thus, the SAC is similar to the complaint in *Goodyear* because Plaintiff leaves it up to the Court to match the allegedly false statement(s) with the reason(s) why the statement is false.").

Up to this point, the nature of the complaint has forced the parties to speak in generalities when the PSLRA requires specificity. Until plaintiffs specifically identify the statements on which they would like to proceed and the reasons why these statements are false or misleading, neither the defendants nor the court can address these allegations with the degree of particularity required by the PSLRA. Specifically, defendants and the court cannot adequately address issues regarding materiality, scienter and the forward-looking nature of the statements. Accordingly, defendants' motions to dismiss are granted.

### 4. Section 20(a) claims

"Section 20(a) of the Exchange Act imposes joint and several liability upon one who controls a violator of Section 10(b)." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006) (citing 15 U.S.C. § 78t(a)). Because plaintiffs have failed to state a claim under 10(b), the section 20(a) claims must be dismissed as well.

### B. Securities Act Claims

### 1. Standards

Plaintiffs allege violations of sections 11, 12(a)(2) and 15 of the Securities Act. These claims are not subject to the heightened pleading standards set forth in the

PSLRA. *In re Adams Golf, Inc. Sec. Litig.*, 176 F. Supp. 2d 216, 230 (D. Del. 2001).

"To state a claim under section 11, plaintiffs must allege that they purchased securities pursuant to a materially false or misleading registration statement.[9] To state a claim under section 12(a)(2), plaintiffs must allege that they purchased securities pursuant to a materially false or misleading prospectus or oral communication.[10] *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273-74 (3d Cir. 2004) (internal citations and quotations omitted). As previously discussed, material misstatements are contrasted with general or vague statements and corporate puffery. *See supra* page 16. And while materiality is generally an issue reserved for the trier of fact, complaints alleging securities fraud often contain alleged misstatements that are so unimportant or vague that courts can rule them immaterial as a matter of law on a motion to dismiss. *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d. Cir. 2010) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997) ("In order for an omission or misstatement to be actionable . . . it is not enough that plaintiff identify the omission or misstatement. The omission or misstatement must also be material, *i.e.,* something that would alter the

---

[9] Section 11 permits a purchaser to sue when "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C.A. § 77k

[10] Section 12(a)(2) provides that any defendant who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable . . . to the person purchasing such security from him" 15 U.S.C.A. § 77l.

21

total mix of relevant information for a reasonable investor making an investment decision. Although questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact, complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage.")). "Section 15 of the Securities Act provides for joint and several liability on the part of one who controls a violator of Section 11 or Section 12." *Suprema Specialties,*, 438 F.3d at 284 (citing 15 U.S.C. § 77o).[11] Accordingly, a "violation only applies . . . when an underlying section 11 or section 12(a)(2) violation has been found." *Jasin v. Kozlowski*, 2010 WL 4536973, at *10 (M.D. Pa. 2010).

## 2. Analysis

While these claims are not subject to a heightened pleading standard, the court nevertheless finds that plaintiffs have failed to state a claim. Like the Exchange Act section of plaintiffs' complaint, the Securities Act section fails to specifically identify those false and misleading statements on which plaintiffs base their claims. The court will not do this for plaintiffs. Furthermore, the quotations (often two or three words or a short phrase) are provided without full context and no citations have been made to the

---

[11] 15 U.S.C.A. § 77o provides: "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."

22

registration statement or prospectus.[12]  Given the current state of the complaint, the

court cannot analyze the feasability of plaintiffs' claims.[13]  In other words, until plaintiffs

clearly identify those statements they believe to be materially false or misleading and

either provide sufficient context for those statements or cite to the applicable document

and provide it,[14] the court cannot determine whether a statement is materially false or

misleading (as opposed to an inactionable statement on which no reasonable investor

would rely).  Even if the court accepts as true all of the factual allegations contained in

plaintiffs' complaint and interprets them in a light most favorable to the plaintiffs, it

appears as though several of the alleged misstatements would be inactionable.

Accordingly, defendants' motions to dismiss are granted.

## V. CONCLUSION

Consistent with the analysis above, defendants' motions to dismiss are granted

without prejudice, to allow plaintiffs the opportunity to amend their complaint in order to:

1) in connection with the Exchange Act claims, satisfy the heightened pleading

standards of the PSLRA; and 2) in connection with the Securities Act claims, to clearly

identify the misstatements or omissions on which such claims are based and provide

sufficient context for such.  An appropriate order shall issue.

---

[12]  Neither the registration statement nor prospectus were provided by plaintiffs
with the complaint.

[13]  While not every allegation or quote is insufficient, many are and the court
declines to address the case in a piecemeal fashion.

[14]  While the court believes the second option is ideal (i.e., citing to and providing
copies of the registration statement and prospectus), it is not required.