**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

**IN RE WILMINGTON TRUST SECURITIES LITIGATION**

This document relates to: ALL ACTIONS

Master File No. 10-cv-00990-SLR

(Securities Class Action)

Hon. Sue L. Robinson

ELECTRONICALLY FILED

**LEAD PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Blair Nicholas
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (858) 793-0070
Fax: (858) 793-0323

-and-

Hannah Ross (*pro hac vice*)
Sean K. O'Dowd (*pro hac vice*)
Katherine M. Sinderson (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Phone: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*

**CHIMICLES & TIKELLIS LLP**

Pamela S. Tikellis (Bar No. 2172)
A. Zachary Naylor (Bar No. 4439)
222 Delaware Avenue, 11th Floor
P.O. Box 1035
Wilmington, DE 19899
Phone: (302) 656-2500
Fax: (302) 656-9053
*Liaison Counsel for the Class*

**SAXENA WHITE P.A.**

Maya S. Saxena (*pro hac vice*)
Joseph E. White III (*pro hac vice*)
Lester Hooker (*pro hac vice*)
Brandon Grzandziel (*pro hac vice*)
2424 North Federal Highway
Boca Raton, FL 33431
Phone: (561) 394-3399
Fax: (561) 394-3382
*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*

October 1, 2012

# TABLE OF CONTENTS

**Page**


Table Of Authorities ..... i

I. Preliminary Statement ..... 1

II. Summary Of The Argument ..... 5

III. Factual Background ..... 5

A. Wilmington's Underwriting Was "Nonexistent" ..... 6

B. Wilmington Deliberately Ignored The Risks In Its Loan Portfolio ..... 8

C. The Bank Inflated Its Net Income Throughout The Class Period ..... 11

D. The MOU Identified Fundamental Flaws In The Bank's Lending And Accounting Functions ..... 13

E. The MOU Forced The Bank To Gradually Reveal The True Condition Of Its Loan Portfolio, But Defendants Continued To Mislead Investors ..... 13

IV. The Second Amended Complaint Fully Complies With The Court's Order Of March 29, 2012 ..... 16

V. Plaintiffs Adequately Allege Exchange Act Violations ..... 18

A. The SAC Meets The Standards Of The PSLRA And Rule 9(b) ..... 18

B. Plaintiffs Allege Materially False and Misleading Statements and Omissions ..... 20

1. Wilmington's Financial Statements Were Materially Misstated ..... 20

a. Wilmington's Accounting For Loan Loss Reserves And Net Income Did Not Comply With GAAP ..... 20

b. Defendants' GAAP Arguments Are Premature And Meritless ..... 23

c. A Restatement Is Not Required To Allege Falsity ..... 28

2. False and Misleading Statements Regarding Underwriting ..... 29

3. False and Misleading Statements Regarding Asset Review ..... 31

4. False And Misleading Statements Regarding Internal Controls ..... 35

5. Defendants' Additional False And Misleading Statements ...................... 35

6. Defendants' False Statements Were Not Immaterial Puffery ................... 38

C. The SAC Raises A Strong Inference Of The Officer Defendants' Scienter ......... 41

1. Standard For Evaluating Scienter .......................................................... 41

2. The SAC Alleges Compelling Facts Evidencing The Officer Defendants' Knowledge And Recklessness ............................................. 44

a. The Magnitude And Timing Of Wilmington's Credit Losses Support A Strong Inference Of Scienter ........................... 44

b. The Numerous Warnings From Regulators And Other Gatekeepers Supports The Officer Defendants' Scienter ............. 48

c. The Officer Defendants Knew, Or Should Have Known, Of The Facts That Belied Their Public Statements ............................ 50

d. Additional Circumstantial Evidence Of Defendants' Scienter .......................................................................... 56

3. Defendants' Competing Inferences Should Be Rejected .......................... 58

D. Defendants' Statements Are Not Protected By The PSLRA Safe Harbor ............ 61

E. Plaintiffs Have Pled Loss Causation .................................................................. 63

VI. Plaintiffs Adequately Allege Securities Act Violations ................................................. 67

A. Wilmington's Financial Results and Reserve Methodology Are Not Opinions ................................................................................................ 68

B. Wilmington's Statements Regarding Underwriting Are Actionable .................... 73

C. Wilmington's Statements Regarding Asset Review Are Actionable ................... 75

D. Wilmington's Internal Controls Misrepresentations Are Actionable ................... 76

E. KPMG Is Liable For Its False Certifications and Statements .............................. 77

F. duPont Is Liable for False Statements In The Offering Documents ..................... 83

VII. The SAC States Control Person Claims ........................................................................ 84

VIII. Conclusion ...................................................................................................................... 85

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*60223 Trust v. Goldman Sachs & Co.*,
540 F. Supp. 2d 449 (S.D.N.Y. 2007)....66

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008)....42

*Adams v. Kinder-Morgan*
340 F.3d 1083 (10th Cir. 2003)....29

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009)....67

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)....28, 49

*Atlas v. Accredited Home Lenders Holding Co.*,
556 F. Supp. 2d 1142 (S.D. Cal. 2008)....22, 28, 38, 72

*Bastian v. Petren Res. Corp.*,
892 F.2d 680 (7th Cir. 1990)....66

*Berson v. Applied Signal Tech.*,
527 F.3d 982 (9th Cir. 2008)....30

*Buttonwood Tree Value Ptrs, LP v. Sweeney*,
No. 10-cv-00537, 2012 WL 2086607 (C.D. Cal. June 7, 2012)....81

*Cal. Employees' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004)....18,19, 20

*Cole v. Fed. Home Loan Mortg. Corp.*,
No. 90-cv-2812, 1991 WL 180295 (D.D.C. Aug. 27, 1991)....66

*Conley v. Gibson*,
355 U.S. 41 (1957)....63

*CraftMatic Sec. Litig.*, *v. Kraftsow*,
890 F.2d 628 (3d Cir. 1989)....31

*Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*
454 F.3d 1168 (10th Cir. 2006)....81, 83

*Denny v. Barber*,
576 F.2d 465 (2d Cir. 1978)....83

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ....60, 83

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)....63, 66

*Dutton v. Harris Stratex Networks*,
270 F.R.D. 171 (D. Del. 2010) ....83

*Eastwood Enters. LLC v. Farha,*
No. 07-cv-1940, 2009 WL 3157668 (M.D. Fla. Sept. 28, 2009)....56

*EP Medsystems, Inc. v. EchoCath, Inc.,*
235 F.3d 865 (3d Cir. 2000)....62, 64

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)....71

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011).... *passim*

*FindWhat Investor Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ....67

*First Nationwide Bank v. Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994)....66

*Fitzer v. Security Dynamics Techs.*,
119 F. Supp. 2d 12 (D. Mass. 2000) ....19

*Fla. State Bd. Of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) ....44, 50

*Freed v. Universal Health Services, Inc.*,
No. 04-cv-1233, 2005 WL 1030195 (E.D. Pa. May 3, 2005)....85

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010).... *passim*

*George v. China Automotive Sys. Inc.*,
No. 11-cv-7533, 2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012)....65

*Glover v. DeLuca*,
No. 03-cv-0288, 2006 WL 2850448 (W.D. Pa. Sept. 29, 2006)....66

*Grand Lodge of Pa. v. Peters*,
550 F. Supp. 2d 1363 (M.D. Fla. 2008) ....................48

*Hall v. Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008)....................53

*Harrell v. Primedia, Inc.*,
No. 02-cv-2893, 2003 WL 21804840 (S.D.N.Y. Aug. 6, 2003)....................66

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)....................68, 78

*Hinerfeld v. United Auto Grp.*,
No. 97-cv-3533, 1998 WL 397852 (S.D.N.Y. July 15, 1998)....................28

*Holmes v. Baker*,
166 F. Supp. 2d 1362 (S.D. Fla. 2001) ....................80

*Howard v. Everex Systems, Inc.*,
228 F.3d 1057 (9th Cir. 2000) ....................29

*In re Adams Golf, Inc.*,
618 F. Supp. 2d 343 (D. Del. 2009)....................38, 61

*In re Adaptive Broadband Sec. Litig*.,
No. 01-cv-1092, 2002 WL 989478 (N.D. Cal. Apr. 2, 2002)....................53

*In re Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3d Cir. 1999)....................40, 41, 42

*In re Aetna, Inc. Sec. Litig.*,
617 F.3d 272 (3d Cir. 2010)....................41

*In re Ambac Financial Group, Inc. Sec. Litig.*
693 F. Supp. 2d 241 (S.D.N.Y. 2010)....................59, 65

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*,
No.05-cv-232, 2007 WL 81937 (E.D. Pa. Jan. 9, 2007)....................41, 77, 84, 85

*In re Am. Int'l Grp. Inc. 2008 Sec. Litig.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010)....................65

*In re AOL Time Warner Sec. & "ERISA" Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004)....................82

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)....................51

*In re Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011)....48, 58, 65

*In re Burlington Coat Factory*,
114 F.3d 1410 (3d Cir. 1997).... *passim*

*In re Cabletron Sys. Inc.*,
311 F.3d 11 (1st Cir. 2002)....19, 32

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001)....18, 42

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010)....58, 65

*In re CNL Hotels & Resorts Sec. Litig., Inc.*,
No. 04-cv-1231, 2005 WL 1126561 (M.D. Fla. May 9, 2005)....72

*In re Converium Holding AG Sec. Litig.*,
No. 04-cv-7897, 2007 WL 2684069 (S.D.N.Y. Sept. 14, 2007)....47

*In re Countrywide Fin. Corp. Sec. Litig.*,
No. 07-cv-05295, 2009 WL 943271 (C.D. Cal. Apr. 6, 2009).... *passim*

*In re Daou Systems Inc.,*
411 F.3d 1006 (9th Cir. 2005)....56

*In re Donald J. Trump Casino Sec. Litig.*,
7 F.3d 357 (3d Cir. 1993)....39, 72

*In re Downey Sec. Litig.*,
No. 08-cv-3261, 2009 WL 2767670 (C.D. Cal. 2009)....50

*In re DVI, Inc. Sec. Litig.*
No. 03-cv-5336, 2005 WL 1307959 (E.D.Pa. May 31, 2005)....47

*In re DVI, Inc. Sec. Litig.*
No. 03-cv-05336, 2010 WL 3522086 (E.D.Pa. Sept.3, 2010)....51, 54, 57

*In re Eaton Vance Corp. Sec. Litig.*,
206 F. Supp. 2d 142 (D. Mass. 2002)....31

*In re Empl. Sol. Sec. Litig.,*
No. 97-cv-545, 1998 WL 1031506 (D. Ariz. Sept. 29, 1998)....45

*In re Enron Corp. Sec., Deriv., & ERISA Litig.*,
258 F. Supp. 2d 576 (S.D. Tex. 2003)....84

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
469 F. Supp. 2d 88 (S.D.N.Y. 2006)....................56, 62

*In re Fannie Mae 2008 Sec. Litig.*,
742 F. Supp. 2d 382 (S.D.N.Y. 2010)....................65

*In re Faro Tech. Sec. Litig.*,
534 F. Supp. 2d 1248 (M.D. Fla. 2007)....................35

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
352 F. Supp. 2d 429 (S.D.N.Y. 2005)....................51

*In re* Globalstar *Sec. Litig.*,
No. 01-cv-1748, 2003 WL 22953163 (S.D.N.Y. 2003) ....................51

*In re Hamilton Bankcorp, Inc. Sec. Litig.*,
194 F. Supp. 2d 1353 (S.D. Fla. 2002) ....................35

*In re Harley Davidson, Inc. Sec. Litig.*,
660 F. Supp. 2d 969 (E.D. Wisc. 2009)....................41

*In re HealthSouth Corp. Sec. Litig.*,
No. 98-cv-2634, 2000 WL 34211319 (N.D. Ala. 2000)....................19

*In re Homebanc Sec. Litig.*,
706 F. Supp. 2d 1336 (N.D. Ga. 2010) ....................66

*In re InterBank Funding Corp. Sec. Litig.*,
629 F.3d 213 (D.C. Cir. 2010)....................80

*In re JP Morgan Chase Sec. Litig.*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005)....................41

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) ....................28, 47

*In re Lehman Bros. Sec. & ERISA Litig.*,
799 F. Supp. 2d 258 (S.D.N.Y. 2011)....................81, 84

*In re Majesco Sec. Litig.*,
No. 05-cv-3557, 2006 WL 2846281 (D.N.J. Sept. 29, 2006)....................24, 79

*See In re McKesson HBOC*, *Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ....................82

*In re Merck & Co., Inc. Sec. Deriv. & ERISA Litig.*,
543 F.3d 150 (3d Cir. 2008)....................72

*In re Merck & Co., Sec, Deriv. & "ERISA" Litig.*,
No. 05-cv-1151, 2011 WL 3444199 (D.N.J. Aug. 8, 2011) ....................................31, 33, 34

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
568 F. Supp.2d 349 (S.D.N.Y. 2008)........................................................................66

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) .......................................................................44

*In re Midlantic S'holders Litig.,*
758 F. Supp. 226 (D.N.J. 1990) ..............................................................................27

*In re Moody's Corp. Sec. Litig.*,
599 F. Supp. 2d 493 (S.D.N.Y. 2009)........................................................................65

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ................................................................ *passim*

*In re NextCard, Inc. Sec. Litig.*,
No. 01-cv-21029, 2006 WL 708663 (N.D. Cal. March 20, 2006)..........................................47

*In re NUI Sec. Litig.*,
314 F. Supp. 2d 388 (D.N.J 2004) .....................................................................23, 24

*In re OCA, Inc. Sec. Litig.*,
No. 05-cv-2165, 2006 WL 3747560 (E.D. La. Dec. 14, 2006) .............................................35

*In re Oxford Health Plans, Inc.*,
187 F.R.D. 133 (S.D.N.Y. 1999) ...........................................................................23

*In re Par Pharm. Sec. Litig.*,
No. 06-cv-3226, 2009 WL 3234273 (D.N.J. Sept. 30, 2009)................................................53

*In re PMA Capital Corp. Sec. Litig.*,
No. 03-cv-6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005) ...................................... *passim*

*In re Prudential Sec. Inc. P'ships. Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) ...........................................................................62

*In re RAIT Fin. Trust Sec. Litig.*,
No. 07-cv-03148, 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008).................................... *passim*

*In re Ravisent Techs., Inc. Sec. Litig.,*
No. 00-cv-1014, 2004 WL 1563024 (E.D. Pa. July 13, 2004) ...............................................74

*In re Reliance Sec. Litig.*,
91 F. Supp. 2d 706. (D. Del. 2000)...........................................................22, 43, 50, 57

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)....................23, 28, 51

*In re Sec. Cap. Ass. Ltd. Sec. Litig.*,
729 F. Supp. 2d 569 (S.D.N.Y. 2010)....................65

*In re SLM Corp. Sec. Litig.*,
740 F. Supp. 2d 542 (S.D.N.Y. 2010)....................21, 22, 23, 63

*In re Stone & Webster, Inc., Sec. Litig.,*
414 F.3d 187 (1st Cir. 2005)....................80

*In re Sunbeam Sec. Litig.*,
89 F. Supp. 2d 1326 (S.D. Fla. 1999)....................51

*In re Sunterra Corp. Sec. Litig.*,
199 F. Supp. 2d 1308 (M.D. Fla. 2002)....................80

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006)....................18, 68

*In re Thornburg Mortg. Sec. Litig.*,
695 F. Supp. 2d 1165 (D.N.M. 2010)....................61

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
MDL No. 02-cv-1335, 2004 WL 2348315 (D.N.H. Oct. 14, 2004)....................80

*In re Tyson Foods, Inc. Sec. Litig.*,
No. 01-cv-425, 2004 WL 1396269 (D. Del. June 17, 2004)....................64, 65

*In re Veritas Software Corp. Sec. Litig.*,
No. 04-cv-831, 2006 WL 1431209 (D. Del. May 23, 2006)....................18, 62, 63

*In re Wash. Mut. Inc., Sec. Litig.*,
694 F. Supp. 2d 1192 (W.D. Wash. 2009).................... *passim*

*In re Westinghouse Sec. Litig.*,
90 F.3d 696 (3d Cir. 1996)....................24, 47

*In re WorldCom, Inc. Sec. Litig.*,
352 F. Supp. 2d 472 (S.D.N.Y. 2005)....................78

*Ind. State Dist. Council of Laborers v. Omnicare, Inc.*,
583 F.3d 935 (6th Cir. 2009)....................80

*Inst'l Investors Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009).................... *passim*

*Jones v. Corus Bankshares, Inc.*,
701 F. Supp. 2d 1014 (N.D. Ill. 2010) .......... *passim*

*King Cty. V. IKB Deutsche Industriebank AG*,
708 F. Supp. 2d 334 (S.D.N.Y. 2010).......... 65

*Kinney v. Metro Global Media, Inc.*,
170 F. Supp. 2d 173 (D.R.I. 2001).......... 80

*Kuriakose v. Federal Home Loan Mortgage Company*,
No. 08-cv-7281, 2011 WL 1158028 (S.D.N.Y. Mar. 30, 2011).......... 66

*Lerch v. Citizens First Bancorp., Inc.*,
805 F. Supp. 1142 (D.N.J. 1992) .......... 60

*Lewis v. Straka*,
No. 05-cv-1008, 2006 WL 2927658 (E.D. Wis. Oct. 12, 2006).......... 33, 48

*Local 703, I.B. of T. Grocery & Food Emples. v. Regions Fin. Corp.*,
No. 10-cv-2847, 2011 U.S. Dist. LEXIS 60761 (N.D. Ala. June 7, 2011).......... 38, 44, 58, 60

*Local 731 I.B. of T. v. Swanson*,
No. 09-cv-799, 2011 WL 2444675 (D. Del. Jun. 14, 2011) .......... 39

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) .......... 56, 62

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
437 F.3d 588 (7th Cir. 2006) .......... 40

*Malin v. XL Capital Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007).......... 41

*Matrixx Initiatives, Inc. v. Siracusano*,
131 S. Ct. 1309 (2011).......... 39

*McCabe v. Ernst & Young, LLP*,
494 F.3d 418 (3d Cir. 2007).......... 67, 80

*McGann v. Ernst & Young*,
102 F.3d 390 (9th Cir. 1996) .......... 61

*Medtronic Ave, Inc. v. Boston Scientific Corp.*,
No. 98-cv-478, 2001 WL 652016 (D. Del. Mar. 30, 2001) .......... 18

*Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*,
523 F. 3d 75 (1st Cir. 2008).......... 23

*N.Y.S. Teachers' Ret. Sys. v. Fremont Gen. Corp.*,
No. 07-cv-5756, 2009 WL 3112574 (C.D. Cal. Sept. 25, 2009) ....................50

*Nat'l Jr. Baseball League v. PharmaNet Dev. Group., Ind.*,
720 F. Supp. 2d 517 (D.N.J. 2010) ....................32

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
--- F.3d ---, No. 11-cv-2762, 2012 WL 3854431 (2d Cir. Sept. 6, 2012) ....................72

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am West Holding Corp.,*
320 F.3d 920 (9th Cir. 2003) ....................61

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
595 F.3d 86 (2d Cir. 2010) ....................31

*Phillips v. County of Allegheny*,
515 F.3d 224 (3d Cir. 2008) ....................36, 46

*Plotkin v. IP Axess Inc.*,
407 F.3d 690 (5th Cir. 2005) ....................23

*Richman v. Goldman Sachs Group, Inc.*,
No. 10-cv-3461, 2012 WL 2362539 (S.D.N.Y. June 21, 2012) ....................41

*Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*,
No. 00-cv-5965, 2005 WL 1366025 (D.N.J. June 8, 2005) ....................80

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000) ....................44

*Santa Fe Industries, Inc. v. Green*,
430 U.S. 462 (1977) ....................31

*Schleicher v. Wendt*,
618 F.3d 679 (7th Cir. 2010) ....................67

*Schoenhaut v. American Sensors, Inc.*,
986 F. Supp. 785 (S.D.N.Y. 1997) ....................77

*SEC v. Okin*,
137 F.2d 862 (2d Cir. 1943) ....................80

*Semerenko v. Cendant Corp.*,
223 F.3d 165 (3d Cir. 2000) ....................64, 80

*Serabian v. Amoskeag Bank Shares, Inc.,*
24 F.3d 357 (1st Cir. 1994) ....................32

*Shapiro v. UJB Fin. Corp.*,
964 F.2d 272 (3d Cir. 1992)........................................................................................ *passim*

*Snyder v. Pascack Valley Hospital*,
303 F.3d 271 (3d Cir. 2002)..............................................................................................79

*Sonnenberg v. Prospect Park Fin. Corp.*,
No. 91-cv-435, 1991 WL 329755 (D.N.J. Aug. 20, 1991) .....................................................27

*Stratte-McClure v. Morgan Stanley*,
784 F. Supp. 2d 373 (S.D.N.Y. 2011)...........................................................................48, 49

*TAAM Assocs., Inc. v. Housecall Med. Res., Inc.*,
No. 96-cv-2214, 1998 WL 1745361 (N.D. Ga. Mar. 30, 1998) ..............................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..................................................................................................... *passim*

*The Winer Family Trust v. Queen*,
2004 WL 2203709 (E.D. Pa. Sept. 27, 2004) .......................................................................16

*Underland v. Alter*,
No. 10-cv-3621, 2011 WL 4017908 (E.D. Pa. Sept. 09, 2011)...................................24, 69, 70

*Underland v. Alter*,
No. 10-cv-3621, 2012 WL 2912330 (E.D. Pa. July 16, 2012) ....................................... *passim*

*Underland v. Alter*,
No. 10-cv-3621, 2012 WL 4108998 (E.D. Pa. Sept. 18, 2012).........................................70, 72

*Virginia Bankshares v. Sandberg*,
501 U.S. 1083 (1991)..............................................................................................39, 72, 73

*Virtual Countries, Inc. v. Rep. of S. Afr.*,
148 F. Supp. 2d 256 (S.D.N.Y. 2001)..................................................................................66

*Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*,
No. 08-cv-22572, 2010 WL 1332574 (S.D. Fla. Mar. 30, 2010) ......................................50, 60

*Wilkof v. Caraco Pharm. Labs., Ltd.*,
No. 09-cv-12830, 2010 WL 4184465 (E.D. Mich. Oct. 21, 2010)..........................................61

*Winslow v. Bancorp South, Inc.,*
No. 10-cv-00463, 2011 WL 7090820 (D. Tenn. Apr. 26, 2011).......................................44, 63

**STATUTES**

15 U.S.C. §77k(a) ................................................................................................... *passim*

15 U.S.C. §77k(a)(4) ..... 77, 81

15 U.S.C. §77k(b)(1)(B) ..... 84

15 U.S.C. §77k(b)(3)(B)(i) ..... 83

15 U.S.C. §77u-2(b)(2)(A) ..... 63

15 U.S.C. §78a ..... 5

15 U.S.C. §78u-4 ..... 18, 20, 61, 63

15 U.S.C. §78u-4(b)(1) ..... 18

15 U.S.C. §78u-5(b)(2)(A) ..... 63

15 U.S.C. §78u-5(c)(1) ..... 61

15 U.S.C. §7262 ..... 79

**OTHER AUTHORITIES**

17 C.F.R. § 229.512(a)(i-iii)(B) ..... 83

Federal Rule of Civil Procedure 8(a) ..... 5, 68, 79

Federal Rule of Civil Procedure 9(b) ..... 18

Federal Rule of Civil Procedure 15(a) ..... 85

## I. PRELIMINARY STATEMENT

Wilmington Trust ("Wilmington" or the "Bank") engaged in a widespread fraud that misrepresented to investors every aspect of the Bank's commercial lending practices. Throughout the Class Period, from January 2008 through November 2010, the Officer Defendants assured investors that Wilmington applied "rigorous" lending standards and "consistently" managed credit risk, and the Bank falsely reported steady financial results consistent with these assurances.[1] Wilmington convinced the market that – unlike its competitors, many of which were failing – the Bank had cultivated a sound loan portfolio that could withstand the credit crisis.

Defendants' statements were false. Throughout the Class Period, Wilmington secretly pursued a business model based on "nonexistent" loan underwriting, with "no real standards" for reviewing the credit risk of its loans, and a fundamentally flawed accounting function. As a result, during the Class Period the Bank maintained a woefully inadequate reserve for loan losses (the "Loan Loss Reserve"), which overstated the Bank's net income. As M&T Bank ("M&T") discovered in November 2010 when it rescued Wilmington from the brink of collapse due to the catastrophic state of the Bank's loan portfolio, nearly 20% of the Bank's Class Period loan portfolio was <u>worthless</u>, including <u>40%</u> of its construction loans.

The quality of Wilmington's loans did not suddenly degrade in late 2010, or as a result of the financial crisis. Indeed, substantial evidence developed by Plaintiffs (without the benefit of discovery) demonstrates that Wilmington and the Officer Defendants misrepresented the supposedly rigorous nature of the Bank's underwriting and loan review functions. The

---

[1] The Officer Defendants are: Ted Cecala, Chief Executive Officer ("CEO") and Chairman of the Board; Donald E. Foley, Cecala's successor as CEO and Chairman; Robert Harra, President and Chief Operating Officer ("COO"); David Gibson, Chief Financial Officer ("CFO"); and Bill North, Chief Credit Officer.

extraordinary first-hand accounts of former high-level Bank employees establish that, among other things:

- Defendant Cecala, Wilmington's former CEO, ordered the Bank's top lenders to ignore underwriting standards and ordered employees not to update property appraisals in order to avoid charge offs (¶47[2]);

- 85-90% of Wilmington's loan portfolio received no review by the Bank's credit specialists in the Asset Review Group ("ARG"), who were supposedly responsible for monitoring the performance of the Bank's loans and ensuring the Bank accounted for its credit losses on those loans (¶¶59-60, 63); and

- Defendants Cecala and Harra regularly vetoed the ARG's decisions to downgrade internal loan risk ratings (a key factor in establishing the Loan Loss Reserve), recognize impaired loans, and record losses for worthless loans (¶¶66-73).

The Bank's failure to address the condition of its high-risk loan portfolio was so egregious that, starting in 2007 and continuing throughout the Class Period, the Bank's Internal Audit Group, the Bank's outside auditor KPMG LLP ("KPMG"), and the Federal Reserve repeatedly warned the Officer Defendants that the Bank's asset review practices were entirely inadequate to evaluate its true credit risk. ¶¶63-65. Wilmington's refusal to address that credit risk despite those repeated warnings led the Federal Reserve to force the Bank into a Memorandum of Understanding (the "MOU") in September 2009, which required Wilmington to entirely restructure the way it originated, monitored, and accounted for its loans. ¶¶97-101. The breadth of the deficiencies identified in the MOU establishes that, during the Class Period, Wilmington lacked appropriate policies, processes, organization, and staffing in all of the Bank's core lending and accounting functions. ¶98.

The implementation of the MOU forced the Bank to begin to recognize credit losses in late 2009 and 2010 and, as a result, to start reporting massive increases to its Loan Loss Reserve

---

[2] All "¶" citations refer to paragraphs in the Second Amended Consolidated Securities Class Action Complaint (the "SAC"), D.I. 88. All emphasis is added unless otherwise stated.

(through "provisions"). From January 2010 through July 2010, the Bank reported unprecedented provisions to the Loan Loss Reserve totaling over $360 million – an amount that far exceeded the total provisions the Bank had taken for the prior two years. Significantly, the Officer Defendants denied that these provisions related to the quality of the Bank's loans. ¶105.

On November 1, 2010, the last day of the Class Period, the Bank shocked investors by increasing the Loan Loss Reserve by an additional $280 million – almost double the then-existing Reserve. ¶¶124-125. As a result, the Bank reported a third quarter 2010 loss of $365 million – 90 times greater than the $4 million loss the Bank reported for all of 2009. ¶124. That same day, investors learned that M&T would acquire the Bank at a fire sale price of $3.84 per share – just half the market price of Wilmington's shares. ¶123. Remarkably, M&T's review of the Bank's loan portfolio determined that the Bank's $280 million reserve increase was vastly insufficient given the catastrophic condition of the Bank's loan portfolio, and that the Bank had already incurred – but had not publicly disclosed – additional losses of $500 million. ¶128.

Thus, in a single day, investors learned that Wilmington faced losses of nearly $800 million more than had been previously disclosed – wiping out all of the profits the Bank had reported since 2002. ¶130. The Bank was also forced to admit that it faced "significant regulatory actions in the near term." ¶135. On the news of what *The New York Times* termed "one of the biggest so-called take-unders in recent Wall Street memory," Wilmington's stock price collapsed by 46%. ¶¶133-134. Wilmington's and the Officer Defendants' conduct has since sparked a broad SEC inquiry and a federal grand jury has been empaneled to hear evidence from an FBI criminal probe into Wilmington's commercial lending practices. ¶¶137-138.

The SAC sets forth Defendants' misrepresentations to investors during the Class Period, and through detailed allegations based on extensive non-public evidence shows that those

statements were false and that the Officer Defendants knew, or recklessly disregarded, that they were false. In response, Defendants ask this Court to find, as a matter of law, that the SAC's particularized allegations do not state a claim against any Defendant, claiming that Plaintiffs fail to adequately allege the falsity and materiality of Defendants' statements, as well as the Officer Defendants' scienter. Contrary to the Supreme Court's directive in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) that a district court "accept all factual allegations in the [C]omplaint as true" (*id.* at 322), Defendants ask this Court to ignore the SAC's allegations and instead accept as true their "spin" on the facts. These arguments have no place on a motion to dismiss and, in any event, are meritless. For example, Defendants claim that "lending money always involves risks." But what Plaintiffs allege is that Wilmington and the Officer Defendants knowingly or recklessly misrepresented those risks, which the Bank's lending policies and practices exacerbated rather than mitigated. The Third Circuit and courts nationwide have made clear that, to the extent bank executives make statements describing their efforts to mitigate credit risk and estimate losses in their loan portfolio – as the Officer Defendants did, specifically and repeatedly throughout the Class Period – they are obliged to speak fully and accurately regarding those subjects. Defendants did not do so.

Defendants' remaining arguments amount to claims that they were innocent victims of an unprecedented industry downturn. For example, Defendants claim that the SAC's allegations amount to an accusation that the Bank failed to increase its Loan Loss Reserve enough – but the SAC does not allege that Defendants simply failed to accurately predict the full extent of Wilmington's losses as a result of the market turmoil. To the contrary, the SAC alleges in specific detail that Defendants misrepresented and/or failed to inform Wilmington investors of known material facts that posed a risk to the Bank's very survival.

As discussed in more detail below, the SAC adequately pleads claims against each Defendant, and their arguments to the contrary should be rejected.

## II. SUMMARY OF THE ARGUMENT

1. Plaintiffs' allegations under the Securities Exchange Act of 1934 ("Exchange Act") are particularized under Rule 9(b), the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and this Circuit's law. The SAC also complies with the Court's March 29 Order.

2. The SAC adequately pleads the falsity and materiality of Defendants' statements and omissions concerning financial results, underwriting, asset review, and internal controls.

3. The SAC establishes a strong inference of scienter by alleging that the Officer Defendants knew, or were reckless in not knowing, that statements were false and misleading.

4. Neither the PSLRA's safe harbor provision nor the "bespeaks caution" doctrine protect Defendants' false statements because they were not "forward-looking," were made with knowledge of their falsity, and any purported cautionary language was not "meaningful."

5. The SAC adequately pleads violations under the Securities Act of 1933 (the "Securities Act"), which imposes a stringent liability standard and a minimal Rule 8(a) pleading burden, since it alleges that the Offering Documents contained materially false and misleading statements about Wilmington's financial results, internal controls, underwriting and asset review.

6. The SAC adequately pleads loss causation because it alleges that Wilmington's belated disclosures at the end of the Class Period caused a steep decline in its stock price.

## III. FACTUAL BACKGROUND

Throughout the Class Period, the Officer Defendants misrepresented the true state of the Bank's commercial lending, one of the Bank's primary business operations, which comprised 70% of the Bank's total loans and 80% of the Bank's total assets. ¶21. As set forth below, contrary to its repeated claims of conservative risk management practices, the Bank engaged in

systemic misconduct at every phase of the commercial lending process, from origination of loans, to the subsequent review and accounting for its loan portfolio. The undisclosed massive losses in that portfolio caused by these practices ultimately led to the Bank's collapse and sale.

### A. Wilmington's Underwriting Was "Nonexistent"

Loan underwriting refers to the due diligence process that banks perform prior to extending a loan to verify a borrower's creditworthiness. ¶43. Throughout the Class Period, Wilmington and the Officer Defendants repeatedly represented that they "mitigate[d] credit risk" through the use of "rigorous" underwriting, and that they "consistently" applied the Bank's underwriting standards. ¶¶148-150. In reality, according to the Bank's former employees, the Bank's loan origination policies and practices were so "lax" that its underwriting was effectively "nonexistent." ¶43 (citing a witness who served as Vice President in Wilmington's Workout Group from March 2007 through July 2011, CW 1). In fact, the Bank operated on a "friends and family plan" to lend money to favored clients without scrutiny, often granting loans solely on the basis that the borrower would be a "good referral" for the Bank's wealth advisory division. ¶50. Wilmington compounded this problem by incentivizing the Bank's salespeople (or "lenders") to make high-risk loans by paying them bonuses tied to loan volume to meet annual internal growth targets. ¶¶49, 51. Wilmington's underwriting deficiencies were so severe that the Federal Reserve became concerned about the "future ability of the bank to survive, based on what they saw in the credit underwriting." *Id.*

In fact, Wilmington's lenders frequently ignored the most basic aspect of underwriting and originated loans without necessary documentation of the borrowers' ability to repay. Former employees reported that the Bank was "woefully deficient on loan documentation" and that it was common to have no underwriting documentation in loan files. ¶46. On many occasions, the Bank's loan documentation review unit found that a loan's promissory note was signed and dated

before the loan was actually approved, meaning that the Bank had booked the loan without waiting for the appropriate approvals. Wilmington's Sarbanes-Oxley Act ("SOX") compliance team internally identified that practice as a violation of the Bank's SOX obligations. ¶¶44-45. Remarkably, Defendant Cecala also instructed Wilmington's top lenders "not to keep files" on the numerous loans they originated, causing their loan files – to the extent they existed at all – to be riddled with errors and exceptions, and resulting in a large percentage of the Bank's portfolio being originated without documentation. ¶¶47-48.

In addition, the Bank's "10% Rule" gave its lenders authority to unilaterally extend, millions of dollars in additional credit to borrowers, without any further underwriting. ¶54. These credit extensions resulted in loans that far exceeded the Bank's purported underwriting limitations. Abuse of the 10% Rule was so prevalent that "almost every loan" seen by the Bank's Workout group (which worked with troubled borrowers) had one or more 10% Rule loans attached to it, a practice that, according to a former Wilmington Vice President with twenty years of banking experience, "any normal bank wouldn't allow." ¶55.

Even when the Bank's lenders obtained authorization from underwriters to originate a loan, the Officer Defendants undermined Wilmington's underwriting by making its loan underwriters subordinate to Wilmington's lenders – the very people whose work they were purportedly examining. In reality, the lenders controlled and directed the underwriting process. ¶51. As several witnesses reported, "whatever the lenders said, [the underwriters] did" and "[i]f the lender said jump, they'd say how high." ¶51. The underwriters' inadequacy was particularly risky because the Bank's policies did not provide for any subsequent review of loans of less than $5 million, essentially giving lenders sole discretion over half the Bank's loan portfolio. ¶53.

### B. Wilmington Deliberately Ignored The Risks In Its Loan Portfolio

After originating its loans, it was critical for Wilmington to monitor its loan portfolio to ensure that its customers remained creditworthy and that the Bank's reserves were adequate to cover loans that would not be repaid. ¶56. The Bank repeatedly represented that it did just that, stating that Wilmington "mitigate[d] credit risk" by "monitor[ing] the portfolio to identify potential problems" and "regularly review[ing]" the Bank's loans. ¶153. Wilmington represented that its loan "risk ratings" – which were supposedly used to assess likely losses – were "appl[ied] these [] consistently" and that they had "helped us develop adequate reserves for loan losses over the years." ¶¶56, 155. In reality, the Officer Defendants actively undermined the Bank's asset review function, causing "credit review [to be] in name only." ¶¶57, 154.

Indeed, the Bank's asset review function suffered from multiple fundamental failings that rendered its statements false and misleading. Contrary to Defendants' public statements, the Bank failed to monitor the vast majority of its loans for potential losses. The Bank's ARG, which was charged with performing the credit review function, reviewed only a small percentage of the Bank's loan portfolio, since loans of less than $15 million – which comprised the vast majority of the portfolio – received "essentially no review" after origination, according to a Vice President in the Bank's Workout group (CW 1). ¶¶56-60, 154. Thus, as the head of the Bank's Credit Risk Division (CW 2) explained, on an annual basis, the Bank did not review <u>85-90%</u> of its portfolio. ¶57. Further, until mid-way through the Class Period, the Bank had "no real standards" for how often loans were reviewed, and problems were identified through random samplings, or "review by exception." ¶59. These problems were exacerbated by the ARG's grossly insufficient staffing. *See* ¶¶58-59 (describing dangerous understaffing of the ARG).

Wilmington also erratically applied the Bank's internal loan risk ratings system to the loans that were reviewed. Even though the risk ratings were critical for the Bank's evaluation of

credit risk and reserving for loan losses, the Bank applied these ratings inconsistently, causing them to be "generally inaccurate." ¶156. This is because, rather than relying on credit specialists, the Bank relied almost exclusively on its lenders to monitor 85-90% of its loan portfolio. ¶¶59-62. But those lenders, who had been given financial incentives to originate the problem loans in the first place, were financially penalized for reporting probable losses or rating downgrades on their loans. *Id.* The Bank's inaccurate risk ratings led it to consistently report inflated credit quality for its loan portfolio, understate its probable credit losses, and under-reserve for those losses. *E.g.*, ¶¶ 41, 81, 84, 87-89.

The Bank's loan risk ratings became increasingly inaccurate and inconsistent as the Class Period progressed. Beginning in the third quarter of 2008, the Officer Defendants actively thwarted any changes to loan ratings by "interject[ing] themselves physically" into ARG meetings to veto loan risk rating downgrades for even the most delinquent loans, basing these vetoes on personal relationships rather than any risk management-based justifications, reasoning that "these are good guys." ¶¶67-72. When the Bank, under pressure from regulators in 2010, brought in third-party consultant Treliant Risk Advisors ("Treliant") to update Wilmington's risk ratings, Treliant's risk ratings revealed much higher risk. ¶71. The Bank conceded the inaccuracy of its previous ratings by accepting Treliant's new ratings. *Id.*

Finally, the Officer Defendants sabotaged the ARG function by refusing to update Wilmington's appraisals – a critical aspect of loan review and the risk ratings. ¶74. Incredibly, Cecala directly <u>ordered</u> the Workout group to refrain from obtaining updated appraisals to avoid recognizing charge offs. *Id.* In fact, as the Senior Vice President of Corporate Marketing and Communications later admitted, going back to the borrower to ask for "more recent appraisals" was not the Bank's "preferred way of doing things." ¶74. Furthermore, even the appraisals that

Wilmington did have were not an accurate measure of the underlying loan collateral, reflecting property improvements that did not exist, but were contemplated – rather than standard "at present market value" appraisals. ¶76. These serious problems with Wilmington's appraisals rendered any credit review the Bank did conduct effectively "worthless," as the Bank's appraisals were "almost always outdated," and problems with appraisals were a "wide-spread phenomenon." ¶¶74-79, 154. In fact, Wilmington conducted large-scale collateral studies in 2009 and 2010 that demonstrated that the Bank's appraisals were consistently inflated. ¶78. According to Bank executives, as well as later media reports, when Wilmington did belatedly obtain updated appraisals, this invariably triggered enormous write-downs on those loans. ¶79.

In addition to being personally involved in the efforts to undermine the loan review function detailed above, the Officer Defendants each received specific warnings that the Bank's asset review was inadequate. As part of its 2007 audit, KPMG issued a Management Letter, warning that the Bank's failure to monitor its loan portfolio was a serious control deficiency. ¶64. Similarly, the Bank's Internal Audit group issued a report in late 2007 highlighting that the Bank's asset review was inadequate to assess the Bank's risk of loss. ¶63. The Bank's regulator also repeatedly criticized the Bank's failure to adequately review its loans. ¶65. In its 2007 year-end review, the Federal Reserve identified the ARG's inadequate staffing and loan review as "weaknesses in the [Bank's] control structure." *Id.*

That Wilmington and the Officer Defendants ignored these warnings is evidenced by the fact that they were repeated the following year. Specifically, KPMG repeated its same warning regarding the Bank's failure to monitor the loan portfolio in 2008, reflecting that Wilmington and the Officer Defendants had ignored the 2007 Management Letter. ¶64. Similarly, in 2008, the Federal Reserve repeated its warnings, confirming that these problems were unchanged since

its 2007 review. *Id.* The Federal Reserve again identified these problems in 2009, when it instituted the MOU (discussed further below). ¶¶97-101. The Federal Reserve also expressed concerns about the Bank's outdated appraisals, and, as a result, Wilmington hired Treliant to perform new appraisals. ¶79. As *The Wall Street Journal* reported in November 2010, after the Federal Reserve "discovered that the [Bank] wasn't writing down the value of loans made to borrowers whose real-estate projects had stumbled," they demanded new appraisals, which "devastated the bank's balance sheet, forcing it into the fire sale to M&T Bank Corp." *Id.*

## C. The Bank Inflated Its Net Income Throughout The Class Period

By deliberately understating the Bank's probable credit losses, the Bank inflated its net income for every quarter of the Class Period and avoided reporting the true extent of its credit losses. Generally Accepted Accounting Principles ("GAAP") required Wilmington to fund the Loan Loss Reserve for loans that were unlikely to be repaid in full, taking into account current credit quality trends. ¶82. Wilmington represented that it accounted for its Loan Loss Reserve in accordance with GAAP and that it was "adequate" to address any losses in the Bank's loan portfolio. ¶¶87, 143-44. The amounts Wilmington set aside for its Loan Loss Reserve each quarter – called "provisions" – decreased its quarterly net income on a dollar-for-dollar basis. *Id.* While the Bank incrementally increased its provisions, these increases were woefully inadequate and failed to account for the Bank's true lending and accounting practices. Indeed, the Officer Defendants' refusal to acknowledge Wilmington's deteriorating credit quality violated GAAP, resulting in a massive understatement of the Loan Loss Reserve and a corresponding overstatement of its net income by hundreds of millions of dollars. ¶¶81, 143, 145.

M&T's subsequent extensive analysis of Wilmington's loan portfolio dating back to the beginning of the Class Period revealed that, even with the Bank's belated increases to its Loan Loss Reserve starting in the fourth quarter of 2009 – including a $280 million increase on the last

day of the Class Period – the Bank had understated its Loan Loss Reserve by approximately $500 million. ¶¶83, 93-96, 123-31. Significantly, M&T acknowledged these losses were not caused by a sudden recent downturn in the economy. ¶131. To the contrary, M&T's analysis was based on reviewing Wilmington's loan portfolio as of January 1, 2008 and calculating probable lifetime losses from that date. ¶131. M&T's findings alone demonstrate that Wilmington manipulated its reported Loan Loss Reserve and overstated its net income.

Senior employees' reports corroborate M&T's conclusions and explain how the Bank's Loan Loss Reserve methodology violated basic GAAP and understated probable losses in the Bank's loans. ¶¶84-90. Specifically, former executives, including CW 2, who was responsible for calculating and recommending the Loan Loss Reserve to Cecala and Gibson, explained that the Loan Loss Reserve relied entirely on its risk ratings (which were "generally inaccurate") until late 2008 – not taking into account the factors required by GAAP, including economic trends and borrowers' current and projected ability to pay. For this reason, the methodology was "not compliant" with GAAP (¶¶84-87) and thus, did not adequately assess the possibility of repayment or reflect the losses that the Bank had incurred. ¶143.

In late 2008, the Bank adjusted its reserving methodology to include, in addition to its original risk ratings, a small "qualitative" factor. ¶87. However, this new method remained in violation of GAAP, because it was largely based on the Bank's (i) manipulated loan risk ratings and (ii) loan loss history, which was too unreliable to serve as an adequate basis for calculating the Loan Loss Reserve. ¶¶87-89, 145. As CW 1 and CW 2 explained, the Bank's loan loss history was artificially positive because the Officer Defendants refused to recognize charge-offs on the Bank's delinquent loans and thus failed to timely increase its Loan Loss Reserve. *Id.* Moreover, because its new methodology was based on an improper assumption that "qualitative"

factors should not exceed a certain arbitrary small percentage of the Bank's overall Loan Loss Reserve, the Bank failed to adequately consider the deteriorating state of the economy. *Id.*

The SAC quantifies the impact of the Bank's misstatements due to this under-reserving based on M&T's analysis, showing that in each quarter of the Class Period, the Bank's provision was understated by over 130% and net income was correspondingly overstated. ¶¶94-96.

### D. **The MOU Identified Fundamental Flaws In The Bank's Lending And Accounting Functions**

The Officer Defendants failed to remedy the numerous problems identified by the Federal Reserve, KPMG, and Internal Audit throughout the Class Period, and, in September 2009, the Federal Reserve forced the Bank into the MOU to address these longstanding deficiencies. ¶97. Indeed, the MOU confirmed the existence of fundamental and systemic failings in Wilmington's underwriting, loan review, and reserving functions, and required Wilmington to make extensive changes to these functions to bring them up to even basic standards. ¶¶97-101. The MOU also made clear that the Bank's process for establishing its reserves was materially deficient, and required that Wilmington maintain an adequate Loan Loss Reserve consistent with GAAP, regulatory policies and guidance, and that the Board review the reserve each quarter. ¶101. The MOU further required that the Bank's credit risk management be reorganized, and that the Bank create coherent policies and processes to govern its risk management. ¶¶99-100.

### E. **The MOU Forced The Bank To Gradually Reveal The True Condition Of Its Loan Portfolio, But Defendants Continued To Mislead Investors**

The implementation of the reforms required by the MOU forced Wilmington to report dramatic credit losses, beginning in January 2010 with the release of its fourth quarter 2009 results of a loss of $11.2 million. That quarterly loss was driven by a 114% increase in the Bank's loan loss provision from the previous quarter – more than double the average quarterly provision increase during the Class Period. ¶103. Analysts reacted with dismay, with one

analyst observing that the quarterly provision was "$60.6 million" – or 273% – "higher than expected." ¶¶102-103. The Bank's piecemeal revelations continued with the release of its first quarter 2010 results on April 23, 2010, when the Bank reported a loss of nearly $30 million. ¶104. Even as reports of these growing losses began to reveal the truth about the Bank's financial condition, Wilmington continued to conceal the true extent of its problems from the market, and the Officer Defendants emphatically denied that the Bank's increased reserves were the result of its own lending practices. ¶102. Instead, throughout 2010, Wilmington and the Officer Defendants reassured investors that the Bank's reserve increases were due only to market conditions in Delaware and that the Bank was just "being cautious." ¶¶102, 105.

Notwithstanding these reassurances, on June 3, 2010, the Bank stunned the market by announcing that 31-year Bank veteran Cecala was immediately resigning and that Foley, a Board member who had no prior banking experience, would take over as CEO. ¶107. Cecala assured investors that his departure did not indicate "a mounting capital problem or credit problem that hadn't been reported" and Foley claimed that the Bank had the right people "to make sure that there aren't any surprises this year where credit – there is a blowup somehow." ¶¶108-109.

Three weeks after falsely assuring the market that there were no "mounting credit problems," Wilmington reversed course and informed analysts that the Bank's credit position was much worse than previously disclosed. ¶112. On June 22, Foley, Gibson, and North met with analysts to inform them that the Bank expected to report "deteriorating credit metrics" and "negative asset quality." *Id.* These analysts reported that "[m]anagement admitted to not being as proactive as they needed to be in the past in dealing with the bank's credit challenges." *Id.*

One month later, on July 23, Wilmington reported its second quarter results, which made clear that Foley and Cecala had misled investors on June 3 when they said there were no

"mounting credit problems" at the Bank. These results included a stunning 165% increase in the Bank's provision for loan losses (to $205.2 million) and a 25% increase in its Loan Loss Reserve (to $373.8 million). ¶¶116-119. Nevertheless, Foley again denied that Wilmington's losses were the result of problems in risk management and instead blamed the weakening Delaware economy. ¶117. Foley instead falsely attributed the Bank's performance to "lingering effects of a weak economy," "the housing market" and "economic pressures." *Id.*

Despite Foley's denials, the undisclosed problems at Wilmington were so severe that even these massive increases to the Bank's Loan Loss Reserve were insufficient. On Monday, November 1, 2010, the last day of the Class Period, Wilmington shocked investors by announcing it had entered into an agreement to sell itself to M&T for just 50% of the price at which Wilmington stock was trading the prior day. ¶123. That same day, the Bank released its third quarter 2010 results, reporting a quarterly loss of <u>$365.3 million</u> and a Loan Loss Reserve of $510.4 million. ¶¶124-25. As noted above, M&T announced that its due diligence had exposed total "through-the-cycle losses" of almost $1.5 billion, or 17% of Wilmington's total loan portfolio. ¶129. M&T estimated that the Bank's loan portfolio contained over $500 million in still undisclosed losses. ¶¶127-29. Notably, M&T concluded that 40% of the Bank's entire portfolio of construction loans was <u>worthless</u> and would have to be written off. The Bank did not dispute M&T's conclusions, and indeed conceded them, as Wilmington's Board of Directors recommended that shareholders approve the merger. ¶131. In total, investors learned in a single day of nearly $800 million in previously undisclosed losses – losses that exceeded the Bank's collective reported net income since 2002. As Wilmington later disclosed, the Bank was forced to accept this deal or face "significant regulatory action." ¶135.

The market reacted swiftly and negatively to this news, driving down the Bank's stock price over 40%. ¶132. In total, from January 2010 to November 1, 2010, Wilmington's stock price declined from $15.26 per share to just $4.21 per share, a decline of over 70%. ¶134.

## IV. THE SECOND AMENDED COMPLAINT FULLY COMPLIES WITH THE COURT'S ORDER OF MARCH 29, 2012

On March 29, 2012, this Court issued an Order dismissing without prejudice Plaintiffs' first consolidated class action complaint (the "FAC") on the grounds that it did not sufficiently identify Defendants' false and misleading statements on which Plaintiffs base their Exchange Act and Securities Act claims, and did not adequately explain why those statements were false and misleading. *See* D.I. 85 at 18-23 (the "Order"). A review of the SAC shows that Plaintiffs have fully complied with the Court's Order in amending their pleading.

To start, in compliance with the Court's Order, the SAC sets forth Defendants' false and misleading statements, the speaker of each particular statement, and the context of each statement, providing the relevant source documents for the Court's review. *See* Order at 18-20; SAC §§V & XII(B) - (E) & Declaration of Hannah Ross (D.I. 89). The SAC organizes each statement by category: financial results (¶¶140-47; 247-56), underwriting (¶¶148-51; 257-62), asset review (¶¶152-57; 263-70), internal controls (¶¶158-59; 271-80), statements regarding underwriting and asset review made by the Officer Defendants during conference calls with investors (¶¶160-66), and statements made in 2010 to conceal the true reasons for the Bank's increased reserves (¶¶167-70). *See* Order at 18 & n.8 (*citing The Winer Family Trust v. Queen*, 2004 WL 2203709, at *6, n.7 (E.D. Pa. Sept. 27, 2004) (citing with approval organization of false and misleading statements by category)). In addition, the SAC specifically identifies the reasons for each statement's falsity, tying each false statement to the well-pled allegations demonstrating why each statement was false and misleading. *See* ¶¶143; 145; 147; 248; 250-53;

255 (financial results); ¶¶151; 259-62 (underwriting); ¶¶154 & 156-57; 164; 166; 265-70 (asset review); and ¶¶159; 274-80 (internal controls).

Defendants do not dispute that the SAC adequately identifies each false statement, the speakers, or the context for each statement. Instead, Defendants argue that the SAC does not adequately allege the falsity of each statement, arguing that the SAC continues to provide a "laundry list" of non-specific reasons why the statements were false or misleading. WT Br. 18-19. Defendants are wrong. Plaintiffs' explanations of falsity – which are specific and tailored to the exact statement at issue – often involve multiple reasons due to the scope of the fraud. Plaintiffs cannot be faulted for identifying numerous bases for Defendants' liability.

For example, contrary to Defendants' claim that the SAC merely provides "catch-all" reasons for why the Bank's post-third quarter 2008 loan loss methodology was false and misleading (*id.* at 19, citing ¶145), the SAC recognizes that the Bank modified its reserving methodology in late 2008 and provides four specific ways in which the Bank failed to comply with GAAP at that specific time. ¶145. Similarly, Defendants' contention that the SAC fails to explain why Defendants' underwriting statements are false (WT Br. 19) ignores the clear allegations in the SAC. The SAC identifies two false and misleading statements the Bank repeatedly made about its underwriting practices (¶¶149-150), and then explains the six specific ways in which the Bank's entire underwriting process was "lax and inconsistent," rendering every underwriting statement false throughout the Class Period. ¶151.

Accordingly, Plaintiffs' allegations in the SAC fully and "sufficiently plead the who, what, where, when and how of the allegedly fraudulent practices and have sufficiently demonstrated that, if true, the practices would have had a material impact on Defendants'

financial statements." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 593 (D.N.J. 2001); *see also Inst'l Investors Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009).

## V. PLAINTIFFS ADEQUATELY ALLEGE EXCHANGE ACT VIOLATIONS

### A. The SAC Meets The Standards Of The PSLRA And Rule 9(b)

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misstatement (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006). The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]" 15 U.S.C. §78u-4(b)(1). Federal Rule of Civil Procedure 9(b)'s particularity requirement does not call for an "exhaustive cataloging of facts," but only allegations that "provide assurance that plaintiff has investigated the alleged fraud and reasonably believes that a wrong has occurred." *Medtronic Ave, Inc. v. Boston Scientific Corp.*, 2001 WL 652016, *2 (D. Del. Mar. 30, 2001) (Robinson, J.) (internal citations omitted). Particularity rules are "relaxed in situations where the factual information is peculiarly within a defendant's knowledge or control." *In re Veritas Software Corp. Sec. Litig.*, 2006 WL 1431209, at *6 (D. Del. May 23, 2006) (Robinson, J.) (*citing In re Burlington Coat Factory*, 114 F.3d 1410, 1418 (3d Cir. 1997)).

In the Third Circuit, a complaint may rely upon unnamed witnesses so long as the witnesses are described with sufficient particularity, a requirement that evaluates the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Avaya*, 564 F.3d at 263 (citing *Cal. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004)). The confidential witnesses cited in the SAC – many of whom were high level, longstanding former employees of

Wilmington who worked directly for the Officer Defendants – are each specifically described by their positions, responsibilities, tenure, and reporting structure (*see* ¶¶43-44, 46, 48-50, 59, 69, 72). For instance, CW 2, the former Vice President of the Credit Risk Management Division who worked at the Bank for thirteen years and resigned in March 2010, confirmed numerous aspects of Defendants' scheme (*e.g.,* ¶¶48-49, 59-61, 64-69, 79-80, 89-90, 99-100) and provided accounts that, while sufficient on their own, are corroborated by the statements of other witnesses and the actions by the Federal Reserve and KPMG. These "consistent accounts reinforce one another and undermine any argument that the complaint relies unduly on the stories of just one or two former employees." *In re Cabletron Sys. Inc.*, 311 F.3d 11, 30 (1st Cir. 2002). The detail in the SAC is more than sufficient for the Court to determine that each witness had personal knowledge of the facts provided.[3]

Notwithstanding the strength of these mutually-reinforcing reports, Defendants launch scattershot attacks on these former employees. As discussed as appropriate below, each of these arguments should be rejected.[4] At bottom, Defendants' arguments amount to a requirement that Plaintiffs base their allegations only on witness reports setting forth the exact date, time, and location where an Officer Defendant actually admits to fraud. This is not the law. *See Avaya*,

---

[3] Defendants' authorities are inapposite. In *Chubb*, the complaint cited to former employees who worked for separate businesses or not for Chubb at all, without suggesting how these employees had access to information. 394 F.3d at 154-155. In *In re HealthSouth Corp. Sec. Litig.*, 2000 WL 34211319, *22, 33 (N.D. Ala. 2000), the plaintiffs said nothing other than that their allegations were based on the investigation of counsel that included, *inter alia*, "discussions with consultants and percipient witnesses," with "no supporting details." Defendants' remaining authorities similarly involved far less detailed than the allegations here, including that plaintiffs failed to provide dates of employment, corroborating allegations, or any connection with defendants. *See* cases cited at WT Br. 17.

[4] Defendants' challenges to the credibility of these witnesses (*e.g.*, WT at 24) is well beyond the scope of a motion to dismiss. *See, e.g., Fitzer v. Security Dynamics Techs*., 119 F. Supp. 2d 12, 21 (D. Mass. 2000) (questions concerning the credibility of unnamed sources "are questions that go to the weight of [the] evidence").

564 F.3d at 263. Moreover, although Wilmington claims – without any citation – that the SAC does not adequately link its allegations to its sources (WT Br. 16), a cursory review of the SAC demonstrates that this is untrue. *See*, *e.g.*, ¶¶ 43-50, 59-80.

### B. Plaintiffs Allege Materially False and Misleading Statements and Omissions

Under the PSLRA, a complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Chubb*, 394 F.3d at 147. Here, the SAC adequately alleges that Defendants made false and misleading statements and omissions[5] regarding Wilmington's (i) financial statements, including its compliance with GAAP and accounting for loan loss reserves and net income, (ii) underwriting, (iii) asset review, and (iv) internal controls.[6]

#### 1. Wilmington's Financial Statements Were Materially Misstated

##### a. Wilmington's Accounting For Loan Loss Reserves And Net Income Did Not Comply With GAAP

Throughout the Class Period, Wilmington represented to investors that its financial statements – including its Loan Loss Reserve and reported net income – complied with GAAP and that its Loan Loss Reserve adequately took into account current information and trends in the Bank's loan portfolio. ¶¶143-145. In reality, Wilmington violated GAAP and failed to comply with its own stated methodology for setting reserves. *Id.* As a result, its Loan Loss Reserve was grossly understated and its net income was substantially inflated, rendering these

---

[5] Contrary to Defendants' claim that the SAC does not allege omissions (WT Br. 18), the SAC clearly sets forth allegations concerning both false statements and statements rendered misleading by the omission of material facts. ¶139.

[6] For the convenience of the Court, Plaintiffs address in this section the overlapping falsity challenges of Wilmington and the Officer Defendants (the Exchange Act Defendants) and the Securities Act arguments by the Underwriters and KPMG, whose arguments should be evaluated under the Rule 8 standard. All non-overlapping arguments raised by the Underwriters and KPMG are addressed in Section VI, *infra*.

publicly reported results and the Bank's representations that it complied with GAAP materially false and misleading. ¶¶140-147; *see also* ¶¶81-96. Indeed, the independent analysis disclosed by M&T at the end of the Class Period demonstrates that the Bank had understated its loan losses by more than $800 million from the beginning of 2008, or by double the amount of the Bank's then-existing reserves. ¶¶8, 93, 128. This analysis shows that, in violation of GAAP, Wilmington understated its reserves by over 130% each quarter of the Class Period and its net income was correspondingly overstated. ¶¶94-96.

GAAP requires that, when setting loss reserves, banks consider "through a disciplined and consistently applied process" current economic and loss trends; external economic factors; and delinquencies and charge-offs in the portfolio. ¶185; *see also In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 550 (S.D.N.Y. 2010) (summarizing these GAAP requirements). Wilmington represented that it considered these factors in setting its Loan Loss Reserve by stating repeatedly that it complied with GAAP and that its reserve adequately took into account "micro- and macro-economic factors, historical net loss experience, current delinquency trends, movements within internal risk rating classifications, and other factors." ¶¶143-145.

However, until late 2008, the Bank's reserving methodology was exclusively based on its inaccurate loan risk ratings, and did not take into account economic trends and borrowers' current and projected ability to pay. ¶143. For these reasons, CW 2 expressly stated that the Bank's reserving methodology was "<u>not compliant</u>" with GAAP – an allegation that Defendants simply ignore. ¶¶48, 84-86.[7] Moreover, after late 2008, the Bank's reserving methodology still

---

[7] While Defendants attempt to minimize CW 2's statements generally by stating that CW 2 "is not alleged to be an accountant" (WT Br. 29), they ignore the fact that CW 2 was in charge of recommending reserve provisions to Defendants Cecala and Gibson and was thus in a position to know of the Bank's GAAP violations. ¶¶84-86.

principally relied on the inaccurate risk ratings and an artificially understated loan loss history. ¶¶87-90, 145.

Courts in this District and elsewhere routinely sustain allegations of understated loss reserves where, as here, defendants fail to comply with GAAP and their own stated methodology. *See, e.g., Underland v. Alter*, 2012 WL 2912330, at *1 (E.D. Pa. July 16, 2012) (*"Underland II"*) (sustaining Securities Act claims against issuer and auditor who failed to follow GAAP and "their own disclosed method for calculating the adequacy of the loan loss reserve, by failing to adjust for changes in customer behavior driven by repricing and/or the economic downturn"); *In re RAIT Fin. Trust Sec. Litig.*, 2008 WL 5378164, at *7 (E.D. Pa. Dec. 22, 2008) (loan loss reserve understated as a result of failure to take appropriate impairment charges) (citing *Burlington*, 114 F.3d at 1421)); *In re PMA Capital Corp. Sec. Litig.*, 2005 WL 1806503, at *10 (E.D. Pa. July 27, 2005) ("[a]n allegation that a company misrepresents whether loss reserves were set in accordance with GAAP is actionable under the Exchange Act"); *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 721-22. (D. Del. 2000) (sustaining claims of GAAP violations based on allegations that defendants understated loan loss reserves).[8]

The falsity of these Defendants' statements is further confirmed by the fact that they were based on unreliable and inaccurate data. Wilmington's former employees confirmed that the Bank could not have complied with GAAP, because the Bank failed to collect the data necessary to adequately assess probable losses in its portfolio as FAS 5 and SAB 102 required. *See, e.g.,* ¶¶44-48 (Bank failed to maintain loan documentation); ¶44 (North ordered employees to alter

---

[8] *See also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 188 (S.D.N.Y. 2010) (sustaining GAAP allegations based on misstated loan loss reserves); (citing *Burlington*, 114 F.3d at 1420-21)); *In re Wash. Mut. Inc., Sec. Litig.*, 694 F. Supp. 2d 1192, 1212, 1220 (W.D. Wash. 2009) (same); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1150-52, 1154-55, 1159 (S.D. Cal. 2008) (same); *SLM*, 740 F. Supp. 2d at 555 (same).

internal reports of underwriting deficiencies without remedying the deficiencies); ¶¶56-57 (Bank reviewed a small fraction of its loans); ¶¶74-79 (Bank failed to update "horribly inflated" appraisals). *See In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (defendants used "inherently unreliable" data in financial statements); *SLM*, 740 F. Supp. 2d at 555 (inaccurate default rates led to inaccurate loan loss reserves); *see also In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 401-02 (D.N.J 2004) (sustaining GAAP allegations where earnings statements were based on distorted data).

Finally, the Bank's dramatic increases in reserves at the end of the Class Period, made only after the Bank put into effect the MOU and brought in a third party to review its risk ratings and update collateral values, strongly supports Plaintiffs' claim that reserves were not properly calculated throughout the Class Period. *See Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005) ("the fact that a business files for bankruptcy on 'Day Two' may, under the right surrounding circumstances, provide grounds for inferring that the business was performing poorly on 'Day One.'"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 68 (2d Cir. 2001) (large losses at end of class period create inference of earlier problems); *Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F. 3d 75, 90 (1st Cir. 2008) ("at the pleadings stage, a bad outcome truly is relevant to the likelihood of fraud") (citations omitted); *PMA*, 2005 WL 1806503, at *15 (evaluating complaint under Rule 8(a); "increase [of] loss reserves by over $300 million . . . is evidence that they may have been understated or incorrect").

**b. <u>Defendants' GAAP Arguments Are Premature And Meritless</u>**

In response, Defendants ask the Court to parse GAAP's requirements and find, as a matter of law, that the Bank's reserving practices complied with GAAP. WT Br. 24-29. Defendants' arguments should be rejected.

As an initial matter, Defendants' arguments are inappropriate at this stage. In the Third Circuit, disputes over the application of GAAP may not be resolved on a motion to dismiss. *See Burlington*, 114 F.3d at 1421 ("it is a factual question whether [the defendant's] accounting practices were consistent with GAAP"); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709, n.9 (3d Cir. 1996) (Alito, J.) (district court "appropriately instructed defendants to raise their GAAP arguments, if at all, on a motion for summary judgment"); *In re Majesco Sec. Litig.*, 2006 WL 2846281, at *5 (D.N.J. Sept. 29, 2006) ("The Third Circuit has held that 'whether a defendants' accounting practices were consistent with GAAP [is] a question of fact, thereby rendering it inappropriate to grant a motion to dismiss a securities fraud claim based on that ground.'") (internal citation omitted).[9]

As a factual matter, Defendants are wrong. Contrary to Defendants' suggestion (WT Br. 20), Plaintiffs are not required to allege a secret, internal record of "true" reserves. *See, e.g.*, *NUI*, 314 F. Supp. 2d at 403 n.8 (rejecting argument that plaintiffs must allege an "allegedly 'true' level of bad debt") (internal citations omitted). Defendants' exclusive reliance on *TAAM Assocs., Inc. v. Housecall Med. Res., Inc.*, 1998 WL 1745361 (N.D. Ga. Mar. 30, 1998) for support fails. The *TAAM* court actually found that statements relating to bad debt reserves <u>were actionable</u> because plaintiffs alleged that the financial statements were not GAAP-compliant. 1998 WL 1745361, at *9 (citing *Westinghouse*, 90 F.3d at 710).

---

[9] Wilmington's contention that loss reserves are statements of opinion that can only be false if "subjectively" disbelieved (WT Br. 21-24) is only relevant to the Securities Act claims, because Plaintiffs have established Wilmington's and the Officer Defendants' scienter for their Section 10(b) claims. *See infra* V.C. As discussed below in Section VI.A, Defendants' claim that loan loss reserves are statements of opinion is contrary to the law of this Circuit and should be rejected. *See, e.g., Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992); *Underland v. Alter*, 2011 WL 4017908, at *9 (E.D. Pa. September 09, 2011) ("*Underland I*"). To the extent that Defendants dispute Plaintiffs' scienter allegations with respect to their accounting allegations (WT Br. 23), those arguments are addressed below in Section V.C.

Next, Defendants contend that the SAC does not allege that Wilmington "violated any particular GAAP provisions." WT Br. 24; KPMG Br. 21-22. Defendants are wrong. The SAC identifies and explains the controlling GAAP and accounting provisions. ¶¶181-187 (explaining, e.g., FAS 5, FAS 114, and SAB 102).[10] The SAC also describes how the Bank's reserving methodology "was not compliant with GAAP" because it "did not take into account the factors required by GAAP, including economic trends and borrowers' current and projected ability to pay" but rather relied almost exclusively on the Bank's inaccurate loss history and loan ratings. ¶¶143, 145. *See also* ¶¶84, 85, 87, 90. These allegations – which identify the accounting principles that are alleged to be violated as well as the relevant GAAP provisions – are far from "conclusory" allegations that the Bank did not comply with GAAP. *See* KPMG Br. 21.[11]

Defendants further attack Plaintiffs' allegations regarding Defendants' noncompliance with the Interagency Guidance on the Allowance for Loan and Lease Losses (¶¶91-92), because the Guidance supposedly does not constitute a GAAP pronouncement or, even if it does, Plaintiffs have purportedly not demonstrated Defendants' violation of the Guidance. WT Br. 25. Defendants are again wrong. First, factual disputes over GAAP's requirements – including what accounting guidance is considered part of GAAP – may not be resolved on a motion to dismiss. *See Burlington*, 114 F.3d at 1421 (rejecting argument as premature that plaintiffs only alleged violations of "accounting concepts" that were not GAAP). Second, Defendants ignore that Plaintiffs' accounting allegations do not depend on violations of the Interagency Guidance, but rather on clear GAAP standards such as FAS 5, FAS 114, and SAB 102. ¶¶143, 145, 181-86.

---

[10] The "Relevant GAAP and Accounting Provisions" section of the SAC applies equally to both the Exchange Act and Securities Act portions of the SAC. ¶¶181-87.

[11] In an attempt to have the Court resolve premature factual disputes, Defendants' summary of GAAP misleadingly cites to the SAC for GAAP interpretations not contained therein. *See* WT Br. 5-6. Defendants' interpretations should be ignored.

Third, Plaintiffs establish that Wilmington violated the Interagency Guidance's requirement of "directional consistency" by demonstrating that Wilmington's ratio of its Loan Loss Reserve to nonaccruing loans plummeted even as total nonaccruing loans skyrocketed. ¶92 (setting forth the comparison in chart form).[12] Defendants' suggestion that the directional consistency requirement only applies to consistency between the reserve and the entire portfolio (WT Br. 25) is belied by the text of the Guidance itself, which makes clear that the reserve should be "directionally consistent" with all factors in the portfolio that "evidence credit losses," including specific loan subgroups. ¶ 187. (quoting Interagency Guidance at 9). Thus, a comparison of the Loan Loss Reserve against the subset of nonaccruing loans – the loan group most clearly indicative of credit quality problems – is necessary to show directional inconsistency.[13] The SAC itself emphasizes that the quoted portion of the Interagency Guidance on which Defendants rely simply provides a comparison with the entire portfolio as an "example" of directional consistency. ¶187. At the very least, the Bank's failure to adhere to the Interagency Guidance is probative of a violation of SAB 102 (a provision that they do not

[12] Defendants' observation that "[a]s nonperforming loans are charged off, the reserve associated with them is removed from the ALLL" is irrelevant. WT Br. 25. Such loans are also dropped from the pool of nonaccruing loans. Thus, because the loans are removed from both subsets – *i.e.*, from both the numerator and the denominator – this has no impact on the ratio of the reserve to nonaccruing loans and, thus, cannot explain the fact that Wilmington's reserve ratio plunged even as nonaccruing loans ballooned. ¶92.

[13] The Loan Loss Reserve must be compared to the subset of nonaccruing loans, as opposed to the broader portfolio. For example, if the overall portfolio size stayed the same while the number of nonaccruing loans doubled, this would be indicative of underlying credit problems and that the reserve should increase. But if the principle of directional consistency were only considered at the full portfolio level, Defendants could simply maintain the same reserve without violating the Interagency Guidance. This is plainly not the result intended.

dispute is a part of GAAP), which requires that the "[e]ffect of changes in credit concentrations" be "considered in developing loss measurements." ¶¶101, 185.[14]

Finally, Defendants argue that, contrary to the SAC's well-pled facts, its reserve methodology complied with GAAP. WT Br. 27-28, KPMG Br. 23-24. Once again, this is precisely the sort of factual consideration that is inappropriate at this stage, and will be subject to expert reports later in the litigation. *See Burlington*, 114 F.3d at 1421. In any event, Defendants' position boils down to an argument that reserving for loan losses is subject to management judgment and thus cannot provide a basis for liability. Courts in this Circuit reject such claims. *See RAIT*, 2008 WL 5378164, at *8 (rejecting similar "mismanagement" defense); *Sonnenberg v. Prospect Park Fin. Corp.*, 1991 WL 329755, at *13 (D.N.J. Aug. 20, 1991) (same); *In re Midlantic S'holders Litig.,* 758 F. Supp. 226, 234-35 (D.N.J. 1990) (same). This argument also ignores the SAC's allegations that Defendants' methodology depended on risk ratings that were manipulated and failed to consider the economic environment as GAAP requires. While Defendants dispute – incorrectly – that the Bank's use of fixed percentages based on these risk ratings was consistent with FAS 5 (WT Br. 28), in reality, neither FAS 5, FAS 114, SAB 102 or any other accounting rule supports the view that reserves calculated in reliance upon inaccurate and manipulated risk ratings and without consideration of environmental factors conforms with GAAP. *See, e.g., Underland II,* 2012 WL 2912330, at *5 (sustaining allegations that understated

---

[14] This consistency between the Interagency Guidance and SAB 102 belies Defendants' claim of a "tension" between the guidance by banking regulators and under GAAP. WT Br. 25. Indeed, the FASB Accounting Standards Codification – the authoritative source on what constitutes GAAP – specifically provides that "[p]ronouncements of . . . regulatory agencies," such as the Interagency Guidance, fall within the body of accounting practices that "shall" be considered in the event guidance for a transaction or event is not otherwise specified within a source of authoritative GAAP. *See* ASC 105-10-05-2, 105-10-05-3(e).

loan loss reserves violated FAS 5 because they "failed to consider all material factors" and failed to "use[] accurate source data").[15]

Defendants' additional attacks can be swiftly rejected. For example, while Defendants contend that the SAC cites "only one specific instance" of Wilmington's ARG changing a rating (WT Br. 29), this claim fails to address numerous allegations making it clear that manipulation of the loan risk ratings was routine at Wilmington. *See* ¶¶57, 62, 70 (the Bank's risk ratings were "generally inaccurate" and the Workout group "repeatedly" received loans that were rated as much as four grades higher than they should have been); ¶¶67-68 (Cecala and Harra regularly "interjected themselves physically" into ARG meetings to challenge conclusions and veto downgrade attempts); and ¶¶57, 62, 70 (Defendants "avoid[ed] necessary loan risk rating downgrades" and reserve increases by "utterly ignor[ing] the Bank's asset review function.").

**c. A Restatement Is Not Required To Allege Falsity**

Contrary to Defendants' suggestion (WT Br. 11, 47), the absence of a restatement is irrelevant. First, courts do not require a restatement to sustain allegations of accounting fraud. *See, e.g., Scholastic*, 252 F.3d at 73-74; *Atlas*, 556 F. Supp. 2d at 1154-55. To do so "would shift to accountants the responsibility that belongs to the courts. It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1246 (N.D. Cal. 2008) (lack of restatement irrelevant). Second, fraud may be inferred when

[15] Defendants falsely claim that Plaintiffs "merely disagree" with their method for reserving. WT Br. 28. The SAC establishes that the Bank both violated GAAP and misrepresented its specific reserving methods – allegations that go far beyond a mere disagreement. *Contra Hinerfeld v. United Auto Grp.*, 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) (cited at WT Br. 28) (complaint had "no facts alleged" to support the inference that understated reserves were due to "anything but inaccurate forecasting or unforeseen circumstances").

auditors internally disagree with management over accounting policies, as alleged here, even in the absence of a restatement. ¶¶57, 63-64, 66; *see Adams v. Kinder-Morgan*, Inc., 340 F.3d 1083 at 1090 (10th Cir. 2003); *Howard v. Everex Systems, Inc.*, 228 F.3d 1057 at 1064 (9th Cir. 2000). Finally, given that Defendants escaped "significant regulatory action" by agreeing to sell the Bank at half of its trading price, Defendants cannot now argue that the absence of such actions negates the falsity of their statements – certainly not in light of M&T's determination that the Bank's reserves were overstated by nearly $800 million. ¶¶ 130, 135.

**2. False and Misleading Statements Regarding Underwriting**

Every quarter during the Class Period, Wilmington and the Officer Defendants represented to investors that the Bank "mitigate[d] credit risk" through the use of "rigorous" underwriting and that the Bank "consistently" applied the Bank's underwriting standards, thereby giving them confidence in the "integrity" of its loan portfolio. ¶¶148-150. These statements were false and misleading when made. *See* ¶¶43-55, 148-51. In reality, the Bank's underwriting practices were so lax and inconsistent that underwriting was effectively "nonexistent," leading the Federal Reserve to express concerns about the "future ability of the bank to survive, based on what they saw in the credit underwriting." ¶¶43-55, 168.

The SAC details myriad policies and practices at Wilmington that demonstrate the Bank's widespread deficient underwriting, including: (i) loan documentation was "woefully deficient," rife with errors, or "nonexistent" (¶¶44-48, 53, 151); (ii) lenders routinely disregarded the Bank's underwriting policies by extending loans with no scrutiny based on personal relationships (¶¶50-51, 151); (iii) the Bank's rampant use of the 10% Rule, whereby additional funds in the amount of 10% (or more) of the original loan were extended without additional credit underwriting (¶¶54-55); and (iv) only 50% of the Bank's loans were submitted to the Loan Committee – leaving the remainder to be functionally underwritten by the lenders who were

incentivized to close loans (¶¶51, 53). The MOU confirmed these serious problems, identifying material underwriting deficiencies and demanding that the Bank create coherent policies with respect to "underwriting standards, guidelines and quantifiable limits" and establish a process to monitor compliance with [credit] policies and procedures. ¶¶97-100.[16] These and other detailed allegations demonstrate the falsity of Defendants' statements. It is well-established that such statements are actionable. *See WaMu*, 694 F. Supp. 2d at 1208, 1211 (widespread departures from underwriting guidelines rendered defendants' claims to be "disciplined and vigilant in [their] underwriting standards" false).[17]

In response, Defendants argue that the facts alleged are not inconsistent with their statements about "rigorous" and "consistent" underwriting but rather constitute a mere "disagreement" about Wilmington's underwriting methodology. WT Br. 31-32; UW Br. 13-15. They are wrong. There is simply no interpretation of the words "consistent," "rigorous," or "selective" that can be reconciled with Wilmington's actual practice of constant exceptions to underwriting standards, its "woeful[]" failure to collect basic loan documentation, and its generally "nonexistent" underwriting that caused the Bank to approve loans that a normal

---

[16] Defendants incorrectly contend that CWs 1, 2, and 5 were not in a position to comment on the Bank's underwriting deficiencies. WT Br. 17, 34, 53, 55. But as credit personnel who routinely reviewed loan documentation as well as the performance of those loans, these former employees are the ideal witnesses to comment on whether loans regularly lacked full documentation. ¶¶53, 43, 46-52, 54-55; *Berson v. Applied Signal Tech.*, 527 F.3d 982, 985 (9th Cir. 2008) (question is whether the witness "would be in a position to infer" the relevant facts).

[17] *See also In re New Century*, 588 F. Supp. 2d 1206, 1215 (C.D. Cal. 2008) (allegations regarding loosening of underwriting standards and increasing delinquencies rendered statements about "strict," "improving," and "strong" underwriting standards false); *Countrywide*, 588 F. Supp. 2d at 1153 (widespread loosening of underwriting standards renders false lender's claim to adhere to a "quality control process" and to adopt "consisten[t]" standards).

commercial bank would not have even looked at. *See* ¶¶41, 151.[18] Moreover, it is black letter law that the securities laws forbid misleading statements as well as outright falsehoods. *See Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010); *In re Merck & Co., Sec, Deriv. & "ERISA" Litig.*, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011). In making these statements, Wilmington introduced the subject of its underwriting, and then violated its duty to speak fully and truthfully on that subject. *See Shapiro*, 964 F.2d at 282; *Merck*, 2011 WL 3444199, at *9.

### 3. <u>False and Misleading Statements Regarding Asset Review</u>

Wilmington repeatedly stated that the Bank "mitigate[d] credit risk" by "monitor[ing] the portfolio to identify potential problems" and "regularly review[ing]" its loans. ¶¶152-153. These statements were materially false and misleading because the Bank did not monitor the Bank's portfolio or regularly review all troubled loans in order to identify problems or mitigate credit risk. ¶154. For example, the Bank had "no real standards" for how often the ARG reviewed its loans and the overwhelming majority of the portfolio received "essentially no review." ¶¶59-60, 154. Thus, the Bank's asset review practices increased the Bank's credit risk, rather than mitigated it. ¶154.

In addition, Wilmington repeatedly described its internal risk ratings and stated that it "appl[ied] these classifications consistently." ¶155. However, the Bank's description of its

---

[18] Defendants incorrectly contend that these underwriting practices were mere "mismanagement," relying on several inapposite cases. WT Br. 32, UW Br. 14-15. To start, none of these cases involve underwriting. *See Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 479 (1977); *CraftMatic Sec. Litig., v. Kraftsow*, 890 F.2d 628, 638 (3d Cir. 1989); *In re Eaton Vance Corp. Sec. Litig.*, 206 F. Supp. 2d 142, 152 (D. Mass. 2002). Moreover, *Santa Fe* and *Craftmatic* each involved efforts to hold defendants liable under 10b-5 for breaches of fiduciary duty, rather than misrepresentations. *Eaton Vance* found allegations regarding an accounting methodology to be inactionable where plaintiffs rested their falsity allegations merely on "vague allusions" to defendants ignoring the Asian financial crisis and an eroding debt market.

rating system was false and misleading because the risk ratings were applied inconsistently and were "generally inaccurate," leading the Bank to under-reserve for losses. ¶156. These ratings grew more inaccurate as the Officer Defendants "interject[ed] themselves physically" into ARG meetings to veto rating downgrade recommendations. ¶¶66-69, 166. Defendants also undermined the Bank's asset review by refusing to update appraisals, which were "almost always outdated," and were "horribly inflated." ¶74.[19] These problems were repeatedly confirmed throughout the Class Period by the Federal Reserve, KPMG, and Internal Audit, which each found the Bank's loan review inadequate and that these failures constituted weaknesses in its internal controls (¶¶63-65, 97-101, 154), culminating in the MOU. *See* ¶¶70-71, 80, 98-101.

Taken together, these allegations demonstrate the falsity of Defendants' statements. The First Circuit's decision in *Serabian v. Amoskeag Bank Shares, Inc.*, is instructive. 24 F.3d 357, 363 (1st Cir. 1994). There, the court sustained plaintiffs' fraud claims where the defendant bank claimed to have "strong" "loan review capabilities," when in fact the bank's loan staff could not "stay[] on top of problem loans" and was forced to hire an outside consultant to assist with reviews. Here, as in *Serabian*, the Bank was forced by the Federal Reserve in 2010 to bring in an outside consultant, Treliant, to compensate for the Bank's own failures to adequately review its loan portfolio for risk. *See also RAIT*, 2008 WL 5378164, at *5, n.12 (statements about "recurring credit analysis" actionable); *Countrywide*, 588 F. Supp. 2d at 1153 (claims of an "extensive post-funding quality control process" actionable).

[19] Defendants incorrectly imply that the SAC's allegations that Cecala ordered employees not to update appraisals are inadequate. WT Br. 34. CW 1, as Vice President in the Workout group, would have been privy to a direct order from the Bank's CEO to that group ordering them not to obtain updated appraisals, and is very differently situated from the low- or mid-level employees in *Nat'l Jr. Baseball League v. PharmaNet Dev. Group., Ind.*, 720 F. Supp. 2d 517, 538 (D.N.J. 2010) (*cited by* WT Br. 34). This conclusion is supported by this witness's comprehensive, consistent account of Wilmington's internal practices. *See Cabletron*, 311 F.3d at 30 (approving CW allegations where "the accumulated amount of detail provide tends to be self-verifying").

In response, Defendants argue that their statements about asset review were literally true and, thus, they cannot be held liable. *See* WT Br. 33-35; UW Br. 17-20. For example, Defendants contend that because Plaintiffs do not allege that the Bank reviewed no loans, the Bank's statements were literally true. WT Br. 33, UW Br. 18. In essence, Defendants contend that as long as the Bank reviewed a handful of loans each quarter – out of the Bank's $6.4 billion commercial portfolio – their statements are not actionable. This is wrong. Defendants cannot be allowed to consistently reassure investors regarding the quality of their asset review and the adequacy of their reserves, and then claim that investors should have understood the limitations on the Bank's loan review. As noted above, the securities laws forbid misleading statements as well as outright falsehoods. *See In re Merck*, 2011 WL 3444199, at *9. These statements necessarily – and misleadingly – implied that the Bank was reviewing a sufficient percentage of its loans to set appropriate reserves, that the Bank was taking into account relevant factors, and that the Bank's review was not undermined by a combative management. ¶¶154-56.

Defendants next contend that the repeated warnings from the Federal Reserve, KPMG, and Internal Audit do not support falsity. *See* WT Br. 33. However, one cannot reconcile these repeated findings of inadequacy in the asset review function with Defendants' statements. ¶¶63-65, 98-100, 154. These warnings provide independent confirmation that the Bank's review process was fundamentally flawed and, thus rendered the Bank's representations materially false and misleading. *Id*. *See Lewis v. Straka*, 2006 WL 2927658, at *4 (E.D. Wis. Oct. 12, 2006).

Further, Defendants argue that appraisals are only relevant to the extent they impacted the Loan Loss Reserve for loans that had already been determined to be impaired. WT Br. 34. This argument fails. First, the SAC repeatedly alleges that appraisals were used to determine which loans were impaired in the first place. *See*, *e.g.*, ¶69 (ARG relied on appraisals to determine

which loans needed to be downgraded); ¶79 (updated appraisals triggered massive write-downs). Thus, the Bank's inflated appraisals fundamentally affected the Bank's ability to accurately review its portfolio and identify impaired loans. Second, the SAC alleges that appraisals were "almost always outdated" and "horribly inflated" and that "90% of the loans in Workout only had the original appraisal and nothing else." (¶¶74-77). These allegations of pervasive appraisal problems support the conclusion that impaired loans suffered from outdated appraisals, particularly given the fact that nearly all of the loans in Workout – which by its nature only includes problematic loans – were out-of-date.[20]

Finally, Defendants make a series of challenges to the accounts of Wilmington's former employees. WT Br. 34-35; UW Br. 19 nn.12-13. Defendants imply that the allegation from CW 2 – the head of the Bank's Credit Risk Management Division – that in 2007 and 2008 the Bank had "no real standards" for how often loans were reviewed and adhered to a policy of "review by exception" (¶59), is somehow inadequate, but they fail to state a single reason why.[21] Further, Defendants claim that CW 1's account that Cecala ordered the Workout group – in which CW 1 was a vice president – to avoid charging off loans by not updating appraisals is inadequate because it did not identify the "date" of the order and the verbatim language of Cecala's order. WT Br. 34. But Plaintiffs are not required to provide such specific details in order to adequately

[20] Similarly, the Underwriters incorrectly claim that Wilmington Vice-President Chick Pinto's admission that the Bank "preferred" not to obtain updated appraisals is irrelevant. UW Br. 19 n. 13. However, this admission corroborates the SAC by confirming that "it wasn't the nature of how we did things" to "go back [to borrowers] and ask for more collateral, more financial statements, more appraisals." UW Br. 19 n.13. *See* ¶¶74, 164; D.I. 102-1, at 25.

[21] While Defendants note that CW 6 left Wilmington before the start of the Class Period (WT Br. 35), this is irrelevant to the strength of this allegation (which is not based on a statement by CW 6) or to the statements that CW 6 did provide. ¶52. It is well-settled that information from outside the class period may be properly used to draw inferences about conditions during the class period. *Merck*, 432 F.3d at 272 (pre-class period information relevant if it "'sheds light on whether class period statements were false or materially misleading'") (internal citation omitted).

allege Defendants' misconduct, particularly where, as here, CW 1's account is mutually-corroborating with the SAC's other allegations. *See Avaya*, 564 F.3d at 263.

**4. <u>False And Misleading Statements Regarding Internal Controls</u>**

The SAC alleges that, contrary to the repeated SOX certifications signed by Cecala, Foley, and Gibson attesting that Wilmington's internal controls over financial reporting were effective (¶¶158-59), the Bank's controls were inadequate. *See*, *e.g.*, ¶¶3, 64, 66, 159, 229, 269, 275, 277. Misstatements in SOX certifications of internal controls are actionable. *See PMA*, 2005 WL 1806503, at *10.[22] The SAC describes how Wilmington's internal controls suffered from significant deficiencies because of, among other things, the Bank's failure to address inconsistent underwriting and asset review, understaffing in key areas, interference from the Officer Defendants, and significant flaws in its reporting systems. ¶¶44-55, 59-65, 66-80.

Wilmington asserts that the SAC fails to support the inference that Cecala and Gibson were aware of facts inconsistent with these certifications. WT Br. 35. This is wrong. In 2007, 2008 and 2009, the Internal Audit Group, KPMG and the Federal Reserve all provided Cecala and Gibson (among others) numerous warnings detailing Wilmington's inadequate practices and "weaknesses in the control structure." ¶¶ 63-65, 97-101. There can be no question that Cecala and Gibson were informed of facts inconsistent with their SOX certifications.

**5. <u>Defendants' Additional False And Misleading Statements</u>**

The SAC sets forth additional false and misleading statements made by Cecala, North, Foley, and Gibson during investor conference calls. ¶¶160-66. These statements included false

[22] *See also New Century*, 588 F. Supp. 2d at 1226-27; *Countrywide*, 588 F. Supp. 2d at 1178; *In re Faro Tech. Sec. Litig.*, 534 F. Supp. 2d 1248, 1263-34 (M.D. Fla. 2007); *In re Hamilton Bankcorp, Inc. Sec. Litig.*, 194 F. Supp. 2d 1353, 1356 (S.D. Fla. 2002); *In re OCA, Inc. Sec. Litig.*, 2006 WL 3747560, at *22 (E.D. La. Dec. 14, 2006).

and misleading comments reassuring analysts and investors regarding the Bank's underwriting and asset review, such as:

- Cecala touting "the quality of the loan portfolio and our underwriting and evaluation process." ¶161.
- North stating that the Bank had "taken these loans and we're putting them under the microscope." ¶163.
- North stating that "we're obviously being very, very selective" with the Bank's lending. ¶162.[23]
- Cecala stating that the Bank conducted a "rather thorough and exhaustive" analysis of its loans each and every quarter. ¶165.
- In response to an analyst's question regarding the extent of the independent third-party's (Treliant's) review of the Bank's loan portfolio, Foley stating that it found the Bank's credit procedures and policies to be "state of the art." ¶169.

Each of these statements was materially false and misleading because the Bank's underwriting was low-quality, the Bank was not selective at all in its lending, and the Bank's asset review was both superficial and manipulated by the Officer Defendants. ¶¶161-166.

In response, Defendants attack these statements on factual grounds that are inappropriate at this stage. *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). For example, Defendants contend that North's statement that the Bank put its loans "under the microscope" concerned only "troubled" loans, and that the SAC does not demonstrate that the Bank did not thoroughly review its troubled loans.[24] This is false. The language of this question and answer is not limited to troubled loans, and Defendants' after-the-fact characterization cannot be accepted at this stage. Moreover, the Officer Defendants carried out a scheme to

---

[23] North maintains without support that this statement was not false, but in so doing ignores the SAC's extensive allegations relating to underwriting. North Br. 8.

[24] North also claims that his statement could have referred to reviews done by "others" at the Bank, not the ARG. North Br. 9. Such argument is vague conjecture that cannot serve as a basis for dismissal.

prevent the Bank from formally recognizing that many of its loans were impaired, including by preventing credit personnel from obtaining updated appraisals (which North references in his answer). ¶163-164.[25] Although Defendants claim that Cecala's statement that the Bank did a "thorough" and "exhaustive" review could have been true, they base this on the incorrect assertion that the SAC does not "substantiate its assertion that the Officer Defendants interfered with the review process." WT Br. 38. This is not true. ¶66-80, 165-166.

Moreover, while Defendants misleadingly assert that Cecala's statement that there were not "mounting credit problems" was not misleading because it was "made in the context of [the Bank] having just increased its loss reserves," this argument is belied by the actual context of this exchange. ¶108. Specifically, Cecala's statement – which was made in connection with his sudden resignation, not an announcement of increased reserves – responded to questions from analysts regarding whether "as time scrolls forward" his sudden departure meant serious credit problems for the Bank. ¶¶108, 168. His flat denial (and Foley's denial, ¶108) during this conference call was followed three weeks later by the Bank admitting that, in reality, the Bank's credit situation was much worse than previously disclosed. ¶112. Finally, Defendants contend that Gibson's statement that the Bank's credit practices were "state of the art" was actually true at the time, since the Bank had purportedly "just updated" them. Defendants' unsubstantiated claims – which in any event would not absolve Gibson's misleading statement – raise fact issues that cannot be accepted on this record and are contradicted by subsequent events, including by Defendants' admission that it could face "significant regulatory action" absent the merger.

---

[25] Defendants' unfounded assertions that updated appraisals were only relevant to those loans that the Bank had already categorized as "impaired" (WT Br. 37) is addressed *supra* at §V.B.3.

### 6. <u>Defendants' False Statements Were Not Immaterial Puffery</u>

Defendants contend that the aforementioned false statements about underwriting and asset review are "puffery" and thus immaterial as a matter of law. WT Br. 30-31, 32-33, 36, 38-39; UW Br. 12-13, 17; North Br. 9-12; UW Br. 22-23.[26] Defendants are wrong. First, like all materiality issues, puffery determinations are fact-intensive and should only be resolved on a motion to dismiss when "reasonable minds cannot differ on the question of materiality." *Shapiro*, 964 F.2d at 280 n.11; *see also In re Adams Golf, Inc.*, 618 F. Supp. 2d 343, 349 (D. Del. 2009) (denying motion for summary judgment on materiality grounds). Thus, at minimum, there is a fact issue to be decided by the trier of fact as to whether Defendants' repeated statements that the Bank mitigated credit risk through "rigorous" and "consistent" underwriting, the regular review of the Bank's loan portfolio, and the consistent application of its loan rating system are material. *See Shapiro*, 964 F.2d at 280 n.11.

Second, courts routinely reject materiality challenges to statements that positively characterize banks' lending practices and efforts to manage credit risks in loan portfolios like those at issue here. *See, e.g. RAIT*, 2008 WL 5378164, at *5-6, n.12 (finding statements that "underwriting involves extensive due diligence process" and that company has a "disciplined underwriting process and recurring credit analysis" are not mere puffery); *Accredited*, 556 F. Supp. 2d at 1154-55 (representations of underwriting practices "would be among the <u>most important</u> information looked by investors"); *PMA*, 2005 WL 1806503, at *17 (statements regarding "disciplined underwriting" not puffery).[27] As the Third Circuit has explained:

---

[26] While Defendants challenge as puffery nearly all of the statements related to underwriting and asset review, they do not challenge as puffery Cecala's statement that "[w]e do a rather thorough and exhaustive analysis each and every quarter" (¶165).

[27] *See also Local 703, I.B. of T. Grocery & Food Emples. v. Regions Fin. Corp.*, 2011 U.S. Dist. LEXIS 60761, at *24 (N.D. Ala. June 7, 2011) (statements about prudent management of credit

> [W]here a defendant affirmatively characterizes management practices as "adequate," "conservative," "cautious," and the like, the subject is "in play." For example, if a defendant represents that its lending practices are "conservative" and that its collateralization is "adequate," the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations. . . . By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.

*Shapiro*, 964 F.2d at 282; s*ee also Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1092-93 (1991) ("conclusory" terms like "high" or "fair," when used in a commercial context, are "reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading.").

Here, Defendants' representations regarding the Bank's efforts to manage the credit risks in Wilmington's core commercial loan portfolio were material. ¶21; *see Freudenberg*, 712 F. Supp. 2d at 186 (because misleading statements "related to the fundamental nature of [the defendant's] most important business sector . . . [they] are actionable and material."). Indeed, in the context of what Defendants themselves call the "Great Recession" – with banks like Washington Mutual and Lehman Brothers collapsing due to reckless credit practices – it cannot be said, as a matter of law, that a reasonable investor would not have considered Defendants' representations regarding its "consistent," "rigorous," and "selective" risk management practices important. ¶139; *see Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1312 (2011); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 369 (3d Cir. 1993) ("materiality is a relative concept, so . . . a court must appraise a misrepresentation or omission in the complete context in which the author conveys it"); *Local 731 I.B. of T. v. Swanson*, 2011 WL 2444675, at *10-11 (D. Del. Jun. 14, 2011) (false statements material when analyzed against background of decline in

---

risk not puffery); *WaMu*, 694 F. Supp. 2d at 1211 (statements about "disciplined and vigilant" underwriting standards resulting in mitigation of credit risk not puffery); *Countrywide*, 554 F. Supp. 2d at 1058 (characterization of underwriting as "high quality" not puffery).

the industry). After reassuring investors that Wilmington's credit practices would allow the Bank to weather the financial crisis, Defendants cannot now claim that they were merely "vague sorts of statements" that no reasonable investor would have relied upon. *See* WT Br. 30-32.

Further demonstrating that the market considered this information meaningful, many of Defendants' statements were made in response to specific questions from financial analysts covering Wilmington. ¶¶162-63, 168-69. When a misrepresentation is made in direct response to an analyst's inquiry, such statements go "well beyond puffery." *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597-98 (7th Cir. 2006), *vacated in part on other* grounds, 551 U.S. 308 (2007). For example, in addition to Cecala's false and misleading response to analysts' questions regarding any undisclosed "mounting credit problems" noted above, North's statement that "we're obviously being very, very selective" with the Bank's underwriting was in <u>direct</u> response to an analyst questioning whether the Bank was "taking an excess of risk" by rapidly growing its loan portfolio in the midst of the financial crisis. ¶162. Similarly, North's statement that the Bank had "taken these loans and [was] putting them under the microscope" was made in <u>direct</u> response to an analyst questioning why the Bank's Loan Loss Reserve was lower than it had been historically. ¶163. Accordingly, these statements were solicited and relied upon by the investing community, making it clear that they were material.

The cases relied upon by Defendants do not support a different result. WT Br. 30-32. For example, in *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999) (WT Br. 31; UW BR. 13; North Br. 10-11), the defendants <u>accurately</u> reported their past successes and, on that basis, expressed optimism for the future. *See id.* at 538. The court, considering the statements in context, found that in light of the <u>accurate</u> financial reports, the defendant's additional hopeful language did not "significantly alter[] the 'total mix' of information made available." *Id.* at 538-

39. *See also* in *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 284 (3d Cir. 2010) (where company truthfully described relevant variables involved in "evolving" markets, "discipline" could not mean the use of a "static, across-the board formula . . . for [pricing] all products and services").[28]

In sum, Defendants' contention that these statements are puffery should be rejected. As one court has recently explained in rejecting defendants' "Orwellian" attempt to redefine the clear meaning and materiality of their statements, "[i]f [defendants'] claim of 'honesty' and 'integrity' are simply puffery, the world of finance may be in more trouble than we recognize." *Richman v. Goldman Sachs Group, Inc.*, 2012 WL 2362539, at *9 n.8 (S.D.N.Y. June 21, 2012).

### C. The SAC Raises A Strong Inference Of The Officer Defendants' Scienter

#### 1. Standard For Evaluating Scienter

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud, and requires a knowing or reckless state of mind." *Avaya*, 564 F.3d at 252 (quotations omitted). Plaintiffs are required to allege facts giving rise to a strong inference of either reckless or conscious behavior. *Advanta,* 180 F.3d at 534-35; *Tellabs,* 551 U.S. at 314. Reckless behavior is defined as "an extreme departure from the standards of ordinary care which presents a danger

[28] *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005) (WT Br. 30; UW Br. 12), is also inapplicable because JP Morgan was not describing its actual policies, but on the general "integrity" of the institution. *See Freudenberg*, 712 F. Supp. 2d at 186, 199 (distinguishing *JP Morgan* on this basis). *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 144 (D. Conn. 2007) (WT Br. 30-31), was not decided on puffery grounds at all. *In re Harley Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 975 n.3, 991 (E.D. Wisc. 2009) (WT Br. 31), fails to identify which of the statements identified in thirty single-spaced pages of statements constituted puffery. Finally, general statements about "strong credit culture" and "quality performance loans" in *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 2007 WL 81937, at *8 (E.D. Pa. Jan. 9, 2007) (UW Br. 12), are qualitatively different from Defendants' concrete statements.

of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it." *Advanta*, 180 F.3d at 539.[29]

To determine whether a strong inference of scienter exists, a court must "accept all factual allegations in the complaint as true" and determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis original); *see also Avaya*, 564 F.3d at 272-73 ("It's the composite picture, not the isolated components, that judges must evaluate in the last instance."). The inference "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs,* 551 U.S. at 324 (quotations omitted). Instead, an inference of scienter is "strong" when it is at least as likely as any other inference. *Id.*; *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008) ("where there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff"). Thus, Defendants must show that the SAC's allegations give rise to an inference of innocent behavior that is stronger than the inference of recklessness.

The SAC sets forth powerful facts that raise a strong inference of the Officer Defendants' and Wilmington's scienter.[30] These facts are summarized at ¶¶171-180, with the facts supporting each Officer Defendant's scienter set forth separately. *See* ¶176 (Cecala); ¶177

[29] The Third Circuit does not require the higher burden of "intentional fraud" argued by the Officer Defendants. WT Br. 40; *see Avaya*, 564 F.3d at 269.

[30] The SAC's allegations of the Officer Defendants' scienter are imputed to Wilmington. *See In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 597 (D.N.J. 2001).

(Gibson); ¶178 (Harra); ¶179 (North); ¶180 (Foley).[31] As discussed in further detail below and in the SAC, these facts include:

- The sheer magnitude and timing of the Bank's nearly $800 million in credit losses disclosed at the end of the Class Period (¶¶123-134);
- The Officer Defendants' receipt of repeated warnings throughout the Class Period from the Federal Reserve, Internal Audit and KPMG concerning the Bank's material deficiencies (¶¶3, 44, 48, 63-65, 77-79, 97-101); and
- The Officer Defendants' direct involvement in setting the Bank's reckless policies and in interfering with the Bank's critical lending, credit review, and accounting practices (¶¶43-55, 58-65, 67-80, 81-96).

While any of these facts alone would be sufficient, taken together, they create an overwhelming inference of scienter. *See, e.g., Reliance Sec. Litig.*, 91 F. Supp. 2d at 724 (scienter inferred where defendants repeatedly stated that loan loss reserves were sufficient but allegedly knew of loan portfolio's deteriorating condition); *New Century*, 588 F. Supp. 2d at 1230 ("The allegations are sufficient to infer a deliberately reckless set of statements telling the public one thing when New Century was doing something quite different – the loans were of poor, not great, quality; the underwriting was all but absent, not strict; and the internal controls were slack rather than searching.").

In the face of the SAC's extraordinary allegations, Defendants offer a series of competing inferences that can be swiftly rejected. WT Br. 40; North Br. 16. Each of Defendants' proffered excuses ignores the totality of Plaintiffs' scienter allegations and asks the Court to review selected allegations in isolation, raising credibility and fact questions that are inappropriate for resolution at this stage. Such an approach is inappropriate: "'In assessing the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their eyes to

[31] Accordingly, Defendants' contention that the SAC engages in inadequate "group pleading" is wrong. WT Br. 41-42; North Br. 13. In fact, Defendants' claim is contradicted by their attempt to factually dispute Plaintiffs' Defendant-specific scienter allegations. *See* WT Br. 52-56.

circumstances that are probative of scienter viewed with a practical and common-sense perspective.'" *Avaya*, 564 F.3d at 272-73 (internal quotations omitted).

Viewed "holistically" and from a "common-sense perspective," the inference of scienter far outweighs – or, at minimum, is equally compelling as – any competing inferences.

**2. The SAC Alleges Compelling Facts Evidencing The Officer Defendants' Knowledge And Recklessness**

**a. The Magnitude And Timing Of Wilmington's Credit Losses Support A Strong Inference Of Scienter**

In a single day, investors learned that Wilmington would have required nearly $800 million in additional reserves to stay afloat – an amount that nearly doubled the Bank's entire Loan Loss Reserve at the time and dwarfed its income for the prior decade. The sheer magnitude and abrupt timing of Wilmington's credit losses at the conclusion of the Class Period weighs heavily in favor of establishing the Officer Defendants' scienter. *See Fla. State Bd. Of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001) ("the sheer size of the $390 million write-down adds to the inference that the defendants must have been aware the problem was brewing"); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) ("magnitude of this write-off renders less credible the proposition" that defendants were unaware of problems); *Freudenberg,* 712 F. Supp. 2d at 200 n.10 ("drastic increase in reserves is 'suggestive' of scienter, 'especially given that riskier loans may require greater reserves'").[32] A sudden increase of this magnitude cannot be the innocent result of credit problems that only emerged in the third quarter of 2010.

---

[32] *See Winslow v. Bancorp South, Inc.,* 2011 WL 7090820, at *22 (D. Tenn. Apr. 26, 2011) ("The speed with which Defendants adjusted the reserves based on undisclosed [loan] problems" supports scienter), *adopted by* 2012 WL 214635 (M.D. Tenn. Jan. 24, 2012); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000) ("common sense and logic dictate that the greater the magnitude of . . . [a] violation of GAAP, the more likely it is that such a restatement or violation was made consciously or recklessly"); *Regions Fin.*, 2011 U.S. Dist. LEXIS 60761, at *29-30 ("significant and sudden increase in loan loss reserves . . .

Had Wilmington increased its Loan Loss Reserve proportionately throughout the Class Period to account for these additional necessary reserves, its Loan Loss Reserve would have been at least 130% higher each quarter. ¶96. The magnitude of the Bank's under-reserving had a substantial impact on the Bank's financial statements, particularly its net income. For example, if the Bank had appropriately reserved for loan losses, in the second quarter of 2009 alone, the Bank would have a reported an $80 million loss, rather than a $9 million loss – an over 780% difference. ¶80. This difference strongly supports an inference that the Officer Defendants acted with scienter. *See*, *e.g.*, *Avaya,* 564 F.3d at 271 (magnitude of alleged widespread discounting which was not minor or restricted to a few customers, strengthened inference of scienter).

In response, the Officer Defendants wrongly suggest that the merger with M&T actually undermines scienter. WT Br. 44-47. Defendants are wrong. To start, the Officer Defendants argue that M&T would not have proceeded with the acquisition had it uncovered any evidence of fraud before the acquisition closed. WT Br. 46-47. This is absurd. M&T bought the company at a 50% discount and understood exactly what it was getting for that price. M&T did extensive due diligence of non-public information regarding the Bank's assets. Plaintiffs do not suggest that, like investors, M&T was lied to or that M&T based its valuation on Bank executives' prior public representations. ¶148. M&T clearly believed that the price it offered was worth any litigation risk associated with the Bank's prior misstatements – the only risk M&T took on as a result of the Officer Defendants' fraud. Accordingly, Defendants' suggestion that M&T would have "walked away" from this sweetheart deal is implausible. *See Avaya*, 564 F.3d at 272-73.

---

supports a strong inference of scienter"); *In re Empl. Sol. Sec. Litig.,* 1998 WL 1031506, at *4 (D. Ariz. Sept. 29, 1998) ("[T]he alleged magnitude of defendants' failure to keep adequate reserves arguably shows" scienter).

Next, Defendants dispute M&T's independent analysis of Wilmington's portfolio by speculating that the $500 million in undisclosed losses that M&T specifically identified included future losses that had not yet occurred (in addition to the $280 million additional reserves the Bank announced that day), as opposed to future losses in the portfolio that were probable and estimable but had not yet been recorded by Wilmington. WT Br. 45. Defendants are wrong. First, Defendants ask the Court to reject Plaintiffs' allegations and to accept their interpretation of the facts. This raises fact issues inappropriate for resolution at this stage. *Phillips*, 515 F.3d at 233 (courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff"). Second, this argument is contradicted by M&T's own explanation of the analysis. M&T stated that its analysis "projected remaining losses and net-charge-offs from year-end 2007 through 9/30/10." Z. Naylor Ex. 1, Nov. 1, 2010 M&T Slideshow at 9. If M&T's analysis was forward-looking and M&T was referring to losses that had not yet occurred, this discrete time period would make no sense. *See Avaya*, 564 F.3d at 272-73 (scienter evaluated from a "common sense perspective"). This dire assessment was consistent with M&T's finding that nearly 20% of the Bank's entire loan portfolio would have to be charged off, including 40% of the Bank's construction loan portfolio – facts that the Bank does not dispute. ¶171. In fact, Wilmington concurred that credit deterioration had spiraled out of control by recommending to its shareholders that they accept an offer for only half of the price of their shares. ¶131.

Further, M&T's analysis subtracted Wilmington's Loan Loss Reserve figure from its own estimate of remaining credit losses, indicating that the two figures represented an apples-to-apples comparison. *Id.* In the same November 1, 2010 conference call Defendants cite, M&T executive Rene Jones confirmed this comparison, stating that M&T's analysis incorporated "a review of the losses already taken on the portfolio by Wilmington Trust, looking back to the

beginning of 2008." *See* D.I. 105-5, at 16. Thus, Jones made clear that M&T's calculation of $1.5 billion in "through-the-cycle" losses was 'established on [the same] basis" Wilmington used to assess its loan losses.[33] In other words, M&T performed its reserve analysis in the same manner as Wilmington had, but arrived at a significantly larger reserve figure. *Id.*

Defendants baselessly contend that KPMG's 2010 audit opinion offers "proof" that the M&T figures do not establish that the Bank's reported Loan Loss Reserve were misstated during the Class Period. WT Br. 46. Courts consistently find that clean audit opinions by outside auditors are irrelevant to whether loan loss reserves comply with GAAP. *See Westinghouse*, 90 F.3d at 709-10 (reversing dismissal of the loan loss reserves claims as "improper," notwithstanding unqualified audit opinions by outside auditor); *RAIT*, 2008 WL 5378164, at *7, *13 (sustaining Section 10(b) claims alleging "understatement of loan loss reserves" notwithstanding clean audit opinions); *DVI,* 2005 WL 1307959, at *2-3, *13 (same).[34] Courts also routinely finds that a "clean" audit opinion does not negate a finding of either intentional or reckless disregard of information known to corporate executives. *See LDK Solar*, 584 F. Supp. 2d at 1246 (unqualified audit opinion did not exonerate issuer); *In re Converium Holding AG Sec. Litig.*, 2007 WL 2684069, at *3 (S.D.N.Y. Sept. 14, 2007) (unchallenged audit opinion did not undercut scienter); *In re NextCard, Inc. Sec. Litig.*, 2006 WL 708663, at *5 (N.D. Cal. March 20, 2006) (same).

---

[33] Defendants rely on Jones' discussion of "maturity risks" to suggest that M&T's $500 million figure included not-yet-incurred losses. WT Br. 45 (citing D.I. 105-5 at 17). This is a red herring and, in any event, raises a factual dispute. Jones responded to an analyst's question regarding his confidence in M&T's analysis by emphasizing that large portions of the portfolio would be maturing in the near future (some as soon as 2011) and was thus – because of the limited remaining time period of the loan – subject to minimal additional risk of loss. *Id.*

[34] *See also WaMu*, 259 F.R.D. at 507 (same); *Countrywide*, 588 F. Supp. 2d at 1181-82 (same); *In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 943271, at *3 (C.D. Cal. Apr. 6, 2009) (same).

Finally, the suggestion that Plaintiffs "fabricated" M&T's statements is baseless. WT Br. 46. M&T plainly stated that its estimate for remaining "losses net of allowance" in Wilmington's loan portfolio was $506 million. While the parties dispute whether M&T's figures include not-yet-incurred losses, the SAC accurately represents M&T's figures and alleges that they are consistent with the contemporaneous accounts of Wilmington's former employees.

**b. <u>The Numerous Warnings From Regulators And Other Gatekeepers Supports The Officer Defendants' Scienter</u>**

The numerous direct warnings that the Officer Defendants received before and throughout the Class Period provide a strong inference of scienter because they show that KPMG, the Federal Reserve, and Internal Audit repeatedly told Cecala, Harra, Gibson, North, and Foley that the Bank's asset review function – the primary way the Bank was supposed to monitor its credit risk and set its necessary reserves – and its internal controls were inadequate and therefore exposed the Bank to undue risk. *See* ¶¶63-65, 97. Ultimately, due to these Defendants' failure to implement proper credit risk practices, the Federal Reserve imposed the MOU in 2009 and additional actions in 2010. ¶¶97-101, 135.

These direct and escalating warnings provide additional compelling evidence of scienter. *See*, *e.g.*, *Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363 at 1371 (M.D. Fla. 2008) (knowledge of cease and desist order supported inference of scienter); *Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d 373, 388-89 (S.D.N.Y. 2011) (finding scienter where "SEC raised detailed questions" in a letter that "creat[ed] the inference that [defendant] was aware of regulatory concerns"); *In re Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.*, 763 F. Supp. 2d 423, 503-04 (S.D.N.Y. 2011) (finding scienter where defendants disregarded SEC warnings about risk and valuation models); *Lewis*, 2006 WL 2927658, at *6 (awareness "of the bank

regulators' warnings regarding the problems in [corporation's] loan portfolio and with its lending practices" gave "rise to a strong inference" of scienter).

In response, Defendants make several arguments that can be swiftly rejected. As an initial matter, they have no response to the allegation that the internally-reported findings of the Bank's Internal Audit support an inference of the Officer Defendants' scienter. With respect to KPMG's repeated warnings, Defendants contend that the fact that KPMG did not force the Bank to restate its financials undermines any inference of scienter. WT Br. 47-48. But the absence of a restatement does not detract from scienter, particularly when Wilmington was so suddenly acquired by M&T, obviating the need for further review by its auditors. It is well settled that a lack of restatement does not negate evidence of scienter. *See Aldridge*, 284 F.3d at 83.

Defendants also wrongly argue that the MOU undermines scienter because it is supposedly an "informal" measure. WT Br. 48.[35] First, this argument ignores the ongoing criticisms from federal regulators throughout the Class Period. Second, however the MOU is categorized, this significant regulatory intervention confirmed for each Officer Defendant the material deficiencies in the Bank's credit risk management, lending, inadequate reserves, and accounting functions – the key areas leading to its ultimate demise. ¶¶97-101. Notably, months after the MOU was issued, as regulators discovered the true extent of the deterioration in the Bank's loan portfolio, they issued Defendants an ultimatum: without an acquisition, the Bank

[35] Contrary to Defendants' contention (WT Br. 48), an MOU is one of regulators' "most serious enforcement tools." While regulators have more severe enforcement mechanisms – such as a cease and desist order – regulators have numerous less significant options, including informal oral criticisms and criticisms in annual reports. In fact, courts have found significantly less formal actions are indicative of scienter. *See, e.g., Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d at 388-89 (scienter found from SEC's letter "rais[ing] detailed questions").

"would likely face significant regulatory actions in the near term." ¶135.[36] Accordingly, these warnings all support an inference of the Officer Defendants' scienter.

#### c. **The Officer Defendants Knew, Or Should Have Known, Of The Facts That Belied Their Public Statements**

The SAC also sets forth myriad particularized facts regarding the Officer Defendants' knowledge of and access to facts that contradicted their public statements. Courts routinely find that these types of facts support an inference of scienter. Indeed, "[o]ne of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Green Tree*, 270 F.3d at 665; *RAIT*, 2008 WL 5378164, at *13 (finding scienter where "the Officer Defendants had access to both inside and public information" regarding concealed information as members of RAIT's investment committee); *Reliance*, 91 F. Supp. 2d at 724 (scienter inferred where defendants repeatedly stated that loan loss reserves were sufficient but allegedly knew of loan portfolio's deteriorating condition).[37] Such facts, set forth below with respect to each Officer Defendant, are more than adequate to allege their scienter.

---

[36] The cases on which Defendants rely do not support their argument. Unlike here – where Defendants received repeated regulatory warnings throughout the Class Period, including the MOU over a year before the end of the Class Period – Defendants' cited authorities all concern regulatory actions on the last day of, or long after, the class period. *See Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*, 2010 WL 1332574, at *12 (S.D. Fla. Mar. 30, 2010) (involving "post-class period conclusion"); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *6 n.5 (C.D. Cal. 2009) (same); *N.Y.S. Teachers' Ret. Sys. v. Fremont Gen. Corp.*, 2009 WL 3112574, at *13 (C.D. Cal. Sept. 25, 2009) (defendant's consent to FDIC cease-and-desist order on last day of class period did "not support determination that the challenged statements were false when they were made" during the class period.). Moreover, these cases addressed regulatory actions in the context of falsity (not scienter), finding that end- or post-Class Period criticisms could not support the falsity of statements at the time they were made.

[37] *See also Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1029 (N.D. Ill. 2010) (CEO "deeply involved in every major aspect of the lending process," including underwriting and reserves, "giv[ing] rise to a strong inference that he was aware of the Company's financial troubles" and "his statements about the corporation's financial health would be misleading"); *In*

- First, Cecala, Harra, Gibson, North, and Foley were the primary decision makers behind the Bank's reckless practices. ¶¶44, 47-49, 51-53, 67, 74, 83, 97-101, 176-80. Their direct involvement in the practices that rendered their statements false and misleading is strong evidence of scienter. *See Scholastic*, 252 F.3d at 76-77.

- Second, Cecala, Harra, Gibson, and North attended regular meetings where they were informed that their practices were exposing the Bank to undue risk and directly contradicted their statements. ¶¶59, 62, 67-73, 77, 176-80. *See Freudenberg,* 712 F. Supp. 2d at 198 ("[M]eetings, where the problems at issue were directly discussed with Defendants, evidence scienter."); *DVI*, 2010 WL 3522086, at *7 (scienter where "Defendant's status as a dominant member of the Credit Committee gave him access to information about DVI's loan portfolio and the financial background of DVI's potential customers and largest obligors.").

- Third, Cecala, Harra, Gibson, North, and Foley received regular reports that informed them that their practices were exposing the Bank to undue risk and directly contradicted their public statements. ¶¶44, 59, 72, 97-101, 107-09, 174-78. *See Scholastic*, 252 F.3d at 72-73, 76-77 (scienter alleged by specifying internal reports containing undisclosed information); *PMA*, 2005 WL 1806503, at *11 (report from auditor identifying deficiencies supports scienter).

- Fourth, Wilmington's failure to staff the ARG was such common knowledge that it was a "standing joke" within the Bank. ¶¶58-65; *see In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 467 (S.D.N.Y. 2005) (scienter inferred where improper practice is "common knowledge"); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) (scienter inferred where improper practice is "common knowledge" and "joked about").

As set forth below, the SAC is replete with detailed facts regarding the Officer Defendants' involvement in the Bank's reckless practices, or access to information demonstrating that they either knew, or recklessly disregarded, that their statements were materially false or misleading. In addition to the above:

**Cecala.** The SAC specifically connects Cecala to every aspect of the fraud and demonstrates his knowledge or access to information contradicting his public statements. *E.g.,* ¶176. For example, Cecala was aware or recklessly disregarded that his statements regarding

---

*re Globalstar Sec. Litig.*, 2003 WL 22953163, at *7 (S.D.N.Y. 2003) (scienter where defendants "were updated on a weekly basis" of adverse information); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (defendants "not entitled to ignore reasonably available data" indicating that "statements were materially false or misleading.").

underwriting were false and misleading because, among other facts, he directed the Bank's top lenders not to create or maintain underwriting documentation for their loans, leading to rampant underwriting deficiencies (¶¶47-48); he received quarterly "Delinquency List" reports of problems with the Bank's loan quality and underwriting (¶72); and he knew of and had access to technical deficiency reports detailing underwriting errors and deficiencies (¶44). *See also* ¶176 (approved underwriting policies). Further, Cecala made his statements regarding asset review with scienter because, among other facts, he instructed the Workout group to delay obtaining updated appraisals, rendering risk ratings and reserves based on these appraisals inaccurate (¶74), and he regularly attended ARG meetings and routinely rejected loan risk rating downgrades without any objective analysis or substantive explanation. ¶¶67-73; *see also* ¶¶62, 77 (attended quarterly Credit Strategy Meetings where emerging credit problems were repeatedly discussed, but not corrected). Further, Cecala was responsible for approving the Bank's Loan Loss Reserve recommendation to the Board of Directors. ¶83.[38] Finally, Cecala abruptly resigned from the Bank just as it was reporting deteriorating credit. ¶¶107-110.

In response, Cecala raises boilerplate arguments that the SAC's allegations of scienter amount only to his "membership on certain committees," "receipt of certain reports, and "attendance of certain meetings" that do not call into question the "accuracy" of his public statements. WT Br. 52. Cecala's attempts to cherry pick the SAC's allegations fail. As discussed above, these reports and meetings apprised him of significant underwriting and asset review deficiencies. When coupled with the numerous other indicia of scienter discussed above,

---

[38] Defendants contend that Cecala's and Gibson's personal involvement in reviewing and approving the Loan Loss Reserve does not constitute evidence of scienter. WT Br. 52, 54-55. They are wrong. In part because of this review, Cecala and Gibson knew the principal basis for the Bank's Loan Loss Reserves was the Bank's inaccurate and manipulated loan risk ratings, and that the Bank was not adequately taking into account other vital credit trends.

the SAC more than adequately pleads that Cecala knew or recklessly disregarded that his statements were false, and at a minimum, materially incomplete and misleading.

Cecala further contends, without support, that only a "fevered imagination" could find scienter in his review of the Bank's remedial measures in response to the MOU. WT Br. 53. This is nonsense. The Federal Reserve demanded immediate action to remedy longstanding serious deficiencies at the Bank. The only plausible inference to be drawn from Cecala's forced response to a regulatory action – after years of ignoring these problems – supports scienter.

Cecala next argues that the vigorous opposition from the Bank's credit review personnel (including CW 2) to his direct interference in the Bank's loan risk rating process does not demonstrate scienter.[39] WT Br. 53-54. His claim that these disputes were simple disagreements that were "ventilated fully" is not plausible, given the detailed allegations in the SAC that these disputes were ongoing and unresolved. *See* ¶¶67-69.

Further, contrary to Defendants' contention, Cecala's abrupt and suspicious departures during the course of the Bank's implementation of the MOU, which forced the Bank to start recognizing its true credit losses, supports an inference of scienter. WT Br. 54-55; ¶¶107-111, 176, 179; *see In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *10 (D.N.J. Sept. 30, 2009) (sudden resignation before fraud was revealed contributed to inference of scienter); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (same); *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) (same).

Cecala's remaining attacks on Plaintiffs' allegations each miss the mark. WT Br. 53-54. Contrary to Cecala's claim, his superficial modifications to the Bank's asset review processes do not mitigate scienter, particularly in light of his increased personal interference in asset review,

[39] Cecala's claim that the SAC identifies "only one" instance where the Credit Risk Division manipulated loan risk ratings at Cecala's direction is wrong, as explained above at page 28.

which prevented those improvements from meaningfully affecting risk management. ¶ 66-69, 73-74, 77. Further, his claim that his order to delay charge offs by avoiding updating appraisals "would only have kept that quarter's reserve higher" (WT Br. 54) is wrong. If the Bank accurately accounted for its Loan Loss Reserve, increased charge offs due to widespread collateral deterioration would have caused an increase in its reserves to account for these significant negative credit trends. ¶¶74, 79, 81, 145 (FAS 5 and SAB 102).[40] Cecala's personal complicity in delaying formal recognition that the collateral underlying the Bank's loans had materially deteriorated in value – thus delaying increased reserves and charge offs – is powerful evidence of his scienter.[41]

**Gibson.** The SAC alleges numerous specific allegations evidencing Gibson's scienter. *See* ¶177 (summarizing allegations). For example, Gibson oversaw monthly ARG meetings where Cecala and Harra overrode credit decisions regarding loan rating changes, charge offs, credit risk review, and loan loss reserves. ¶¶67-73. Defendants imply that this fact is irrelevant because CW 2 also attended those meetings. WT Br. 54. In essence, Defendants argue that a defendant's presence at relevant meetings cannot support scienter where there are other people present – which will always be the case with "meetings." This is obviously not the law. Further, Defendants incorrectly claim that Gibson's attendance at regular meetings where the Bank's material deficiencies were discussed is not probative of scienter. WT Br. 54-55. As discussed above, this is contrary to established law. *See DVI*, 2010 WL 3522086, at *7.

---

[40] Defendants imply that Cecala's order is irrelevant because the SAC purportedly fails to allege that the Bank's charge-offs were understated. WT Br. 34. To the contrary, the SAC specifically alleges that Cecala did not allow "necessary" charge-offs to occur. ¶73.

[41] To the extent Defendants apply any of these arguments to negate the scienter of the other Officer Defendants, these responses apply equally to those arguments.

**Harra.** The SAC's multiple particularized allegations of Harra's scienter are summarized at ¶178. These facts include, for example, that Harra acted with Cecala in overriding the Bank's credit personnel and manipulating the Bank's internal loan risk ratings. ¶¶67-73, 178. Defendants do not separately dispute Harra's scienter.

**North.** The SAC's scienter allegations against North include that, as Chief Credit Officer and head of the Loan Committee, he was aware of the Bank's lax underwriting policies and practices, including the use of the 10% Rule (¶53). Moreover, North received the Bank's technical deficiency reports detailing underwriting errors and deficiencies, which he regularly ordered altered to remove deficiencies without any remedial actions taken. ¶44. Along with Cecala, North also abruptly resigned from the Bank in Summer 2010 as the Bank was reporting deteriorating credit in response to the MOU, which as set forth above, supports scienter. ¶111. *See also* ¶179 (summary of North's scienter). In response, North contends, *ipse dixit*, that he believed his statements to be true. North Br. 16. But the Court cannot simply take North's word that he believed his statements were true when made as an acceptable competing inference, particularly in light of the numerous facts to the contrary. *Tellabs*, 551 U.S. at 322.

**Foley.** Defendants incorrectly argue that Plaintiffs' allegations regarding Foley are inadequate "status" pleading based on his position on the Board and what he "must have known." WT Br. 56. They are wrong. Foley was provided with specific information which support his scienter. For example, Foley: (1) approved the Bank's underwriting policies as a member of the Board and therefore knew of, among other lax policies, the Bank's reckless 10% Rule (¶176); (2) after September 2009, served as member of the Board's MOU compliance committee that reviewed the Bank's remedial measures to underwriting, asset review, and accounting policies, and thus would have learned (to the extent he did not already know) of the

full scope and depth of the Bank's deficiencies in those areas (¶¶97-101, 175); and (3) took over as CEO and Chairman of the Board in the summer of 2010 – after three years of being warned about serious asset review deficiencies from the regulators and auditors. ¶¶97-101, 107-109. Thus, by the time Foley made his false statements on June 4 (and failed to correct Cecala), he was well aware that these statements were materially misleading. ¶180.

**d. <u>Additional Circumstantial Evidence Of Defendants' Scienter</u>**

The SAC also sets forth additional evidence of the Officer Defendants' scienter.

First, the MOU, the SEC and FBI investigations, and the empaneling of a grand jury support a strong inference of scienter. ¶¶137-38; *see Eastwood Enters. LLC v. Farha,* 2009 WL 3157668, at *4 (M.D. Fla. Sept. 28, 2009) ("pendency of an investigations . . . suggest[s] that a fraud may have occurred"); *In re EVCI Colleges Holding Corp. Sec. Litig.,* 469 F. Supp. 2d 88, 97-100 (S.D.N.Y. 2006) (scienter where government agencies investigating company's practices).

Second, the Officer Defendants' own admissions support scienter. Specifically, in June 2010, Foley, Gibson, and North "admitted to not being as proactive as they needed to be in the past in dealing with the bank's credit challenges." ¶173. This admission demonstrates that these Defendants knew of, or recklessly disregarded, the significant losses in the Bank's loan portfolio significantly in advance of the November 1, 2010 announcement, despite their steadfast public assurances that Wilmington was impervious to the credit pressures devastating its peers. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 252-54 (5th Cir. 2009) (scienter where defendants "privately admitted" adverse facts contradicting public statements); *In re Daou Systems Inc.,* 411

F.3d 1006, 1022 (9th Cir. 2005) (scienter inferred from "specific admissions from top executives that they monitored portions of the company's database").[42]

Third, the Officer Defendants' repeated false responses to analysts' specific, focused questions regarding Wilmington's underwriting, asset review, and reserving practices demonstrate their scienter. *See Avaya*, 564 F.3d at 270; *see* ¶¶161, 162; 163-165. These Defendants' misrepresentations, when juxtaposed with their involvement in the misconduct at issue, strongly supports scienter. *Id*. at 270. Indeed, in *Avaya*, the Third Circuit found that "the most powerful evidence of scienter is the content and context of [defendant's] statements themselves," especially where the defendant denied the existence of alleged practices in response to repeated questions regarding those same practices. *Id.* at 269. The Court explained that:

> Given the specificity and repetition of the analysts' questions, [defendant's] position as Chief Financial Officer, and the alleged state of Avaya's business at the time the questions were asked, there is a strong inference that [defendant's] behavior reached the threshold of recklessness.

*Id.* at 270-271; *accord Reliance*, 91 F. Supp. 2d at 724; *PMA,* 2005 WL 1806503, at *11; *Corus*, 701 F. Supp. 2d 1014 at 1021.

Finally, the fact that the Bank's commercial lending business was central to its financial health, accounting for nearly 80% of its assets, strongly supports scienter. ¶21. For example, in *Avaya*, the Third Circuit drew the inference that a company's senior officer was "paying close attention" to important measures of corporate financial health, which was "undoubtedly a matter of principal concern." 564 F.3d at 271; *see also DVI*, 2010 WL 3522086, at *6 (defendants' position "may be considered as circumstantial evidence when the fraud relates to the . . . core business of the company") (internal citations omitted); *RAIT*, 2008 WL 5378164 at *13.

---

[42] Defendants contend that this allegation is mere "fraud by hindsight." WT Br. 55. But this admission came months before the end of the Class Period and the ultimate disclosure of the true extent of the fraud at Wilmington.

### 3. <u>Defendants' Competing Inferences Should Be Rejected</u>

In response to the above facts, Defendants offer a series of competing inferences that they claim are more persuasive than the SAC's allegations. They are wrong.

First, Defendants' primary competing inference is that its risk management and reserving practices would have been reasonable, but for the fact that the financial crisis took them by surprise. WT Br. 40; North Br. 16. Defendants' attempt to portray themselves as innocent victims of a financial catastrophe is easily disproven. By the beginning of the Class Period in January 2008, the financial downturn was well underway, and its effects should have been appropriately taken into account – yet the Bank <u>ignored</u> this fact when underwriting, reviewing its loans, and setting its reserves. ¶40-42. Moreover, the fact that the Officer Defendants ignored repeated warnings in the precise areas at issue – including by the Federal Reserve – belies their claim that the increased losses are the result of an unexpected surprise.

Indeed, courts have routinely rejected this precise argument in the wake of the recent financial crisis. *See*, *e.g., In re Bear Stearns*, 763 F. Supp. 2d at 505 (rejecting "competing inference of market implosion"); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 237 (S.D.N.Y. 2010) (rejecting competing inference of the "'severity and speed' of the downturn in the CDO market"); *E*TRADE*, 712 F. Supp. 2d at 192 (rejecting competing inference regarding "'industry-wide' downgrades and 'macro-economic' trends"); *Corus*, 701 F. Supp. 2d at 1019-21 (rejecting competing inference that Corus could not have known the magnitude of its losses following the "worst recession since the Great Depression"); *Regions Fin.*, 2011 U.S. Dist. LEXIS 60761, at *25 (rejecting proposed "global financial crisis inference"); *New Century*, 588 F. Supp. 2d at 1230 ("The inference of deliberate recklessness as to false statements regarding loan quality and underwriting is at least as compelling as inferring that the Officer Defendants

were simply unaware of New Century's practices when the statements were made, or taken by surprise when the market took an unexpected turn for the worse.").

As the court in *In re Ambac Financial Group, Inc. Securities Litigation* stated in rejecting this argument and finding a strong inference of scienter:

> It may be that . . . the defendants were merely negligent in issuing the challenged statements. It is possible that defendants, faced with an unprecedented and uncertain situation, lacked the internal mechanisms to calculate accurately the scale of losses in their CDO portfolio. However, taking the facts in the light most favorable to the plaintiffs, this does not amount to a more compelling inference than that proffered by plaintiffs based on the facts alleged. Viewing the allegations collectively, there is a vast gap between the picture that Ambac presented to investors – of an insurance company that maintained its conservative approach over the years – and the alleged practices within the company, namely the undisclosed lowering of underwriting standards to drive short-term profits.

693 F. Supp. 2d 241, 269-70 (S.D.N.Y. 2010); *see also id.* ("The conduct that plaintiffs allege, if true, would make Ambac an active participant in the collapse of their own business").

Second, Wilmington argues that the Officer Defendants' scienter is negated because Wilmington incrementally increased reserves during the Class Period. WT Br. 42-44. This is wrong. Any increases during the Class Period were completely insufficient to deal with the extent of the Bank's problems, as confirmed by the $800 million reserve deficiency exposed at the end of the Class Period. Wilmington was required to set its reserves in anticipation of probable losses inherent in their existing loans. ¶¶181-187. The fact that it took time for those losses to materialize is hardly surprising, especially given Defendants' manipulation of Wilmington's Loan Loss Reserve and the data upon which it was based. ¶¶81-96.

Indeed, this argument was recently rejected in *Jones v. Corus Bankshares Inc.,* 701 F. Supp. 2d 1014. Defendants in *Corus* argued that any inference of scienter was undermined by its increase in reserves during the class period, and "the frankness of some of some of its statements during the class period." *Id.* at 1024. In rejecting this argument, the Court stated:

> Plaintiff does not contend that Corus sought to pull the wool over the public's eyes by claiming that it would pass the recession entirely unscathed. Instead . . . <u>Corus's fraud consisted largely in concealing the full extent of its financial difficulties</u>. Thus, the fact that Corus disclosed certain of its difficulties during the class period does not necessarily negate an inference of scienter, for Corus's statements may still have been intended to conceal the fact that its condition was substantially worse than its statements suggested.

*Id.* at 1024-25. As in *Corus*, Defendants sought to "conceal . . . that its condition was substantially worse than its statements suggested" and that it could weather the financial crisis.

Further, with respect to the reserve increases at the end of the Class Period, these increases do not exculpate the Bank as they only came about because of adamant demands from the Federal Reserve.[43] In sum, where defendants fail to reveal the extent and magnitude of a company's problems, courts routinely find scienter even with (insufficient) disclosures or (inadequate) increases in reserves.[44]

<u>Third</u>, Defendants' claim that Treliant's failure to "report[] fraud to anyone" undermines scienter is wrong. WT Br. 47-48, 51. In effect, Defendants seek to place responsibility for

---

[43] Defendants' reliance on *Waterford*, 2010 WL 1332574 (WT Br. 43) is misplaced. There, unlike here, the plaintiffs did not allege that defendants were contemporaneously warned of the problems in their portfolio and risk management practices – a point that the court highlighted. See *id.* at *14, *16. Similarly, Defendants' citation to *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990), is inapplicable since Plaintiffs' allegations are "based upon management's characterization of the adequacy of reserves," not "merely a failure to provide for adequate reserves."

[44] *See*, *e.g.*, *Lerch v. Citizens First Bancorp., Inc.*, 805 F. Supp. 1142, 1153 (D.N.J. 1992) (noting "the sudden dramatic escalations of loan loss reserves," in addition to "assurances about [the company's] conservatism and risk-averse policies" could "lead one to believe that fraud has taken place"); *PMA*, 2005 WL 1806503, at *3, *6 (sustaining loan loss reserve claims notwithstanding reserve increases announced halfway through class period); *Regions Fin. Corp.*, 2012 WL 2318105, at *14 (rejecting argument that "increased loan loss reserves" rendered reserve misrepresentations immaterial, because such disclosures were "not tantamount to knowledge that [defendant] was intentionally and falsely overstating its position to appear more financially secure than was in fact true."); *Countrywide*, 2009 WL 943271, at *3 (sustaining loan loss reserve claims against all defendants, including KPMG, despite argument that corporation increased loan loss reserves "each quarter during 2006 to reflect market conditions").

ensuring the accuracy and completeness of the Bank's disclosures on third parties. This contradicts the law and the facts. *Wilkof v. Caraco Pharm. Labs., Ltd.*, 2010 WL 4184465, at *7 (E.D. Mich. Oct. 21, 2010) (noting that "various courts have rejected [the] argument" that the "use of outside consultants negates any inference that they acted with fraudulent intent") (citing, *inter alia*, *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *8, 30 (D.N.J. 2008)). In fact, Treliant's review actually exposed that the Bank's loans had been improperly rated. ¶¶71, 79.

Lastly, the Officer Defendants argue that since they did not sell stock, and because Harra and Cecala acquired some stock during the Class Period, an inference of fraud is negated. WT Br. 51-52. Defendants are wrong. Insider purchases of stock or the absence of any insider selling is not determinative of scienter.[45] *See Tellabs*, 551 U.S. at 325 (motive allegations unnecessary). As one court recognized,

> A lack of motive is not fatal to an allegation of scienter under the PSLRA and, even if it were, there is not a lack of motive in this case. The financial crisis facing the United States around the time of the alleged fraudulent conduct provides the Defendants with another motive that adequately fills the gap left by a lack of suspicious insider-trading activity: survival.

*In re Thornburg Mortg. Sec. Litig.*, 695 F. Supp. 2d 1165, 1194-95 (D.N.M. 2010) (noting that even substantial stock purchases by defendants did not negate an inference of scienter).

### D. Defendants' Statements Are Not Protected By The PSLRA Safe Harbor

The PSLRA and the judicially-created "bespeaks caution" doctrine provide a limited safe harbor for certain "forward-looking" statements if they are accompanied by meaningful cautionary language identifying important factors that could cause actual results to materially differ. 15 U.S.C. § 78u-5(c)(1); *Adams Golf*, 381 F.3d at 280. Courts have held that "the safe

---

[45] *See e.g., McGann v. Ernst & Young,* 102 F.3d 390, 396 (9th Cir. 1996) ("a party that introduced fraudulent information into the securities markets does no less damage to the public because that party did not trade stocks."); *accord No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am West Holding Corp.,* 320 F.3d 920, 944 (9th Cir. 2003).

harbor provision does not afford corporations a free pass to lie to investors." *Veritas*, 2006 WL 1431209, at *7. Further, the doctrine protects only representations regarding the future; it does not protect statements directed toward the company's current financial condition. *See EP Medsystems*, *Inc. v. EchoCath, Inc.,* 235 F.3d 865 at 876 (3d Cir. 2000). Only North and the Underwriters argue that these doctrines protect their statements. North Br. 12-13; UW Br. 10-11. The other Defendants concede that the statements deserve no such protection.

Here, the statements that North identifies fail to quality for the safe harbor protection. First, they are not accompanied by meaningfully cautionary language. Each conference call in which North made false and misleading statements was preceded by generic warnings so vague in nature that they could have applied to any bank.[46] This laundry list of boilerplate language does not warn investors of the risks of the Bank's reckless underwriting, failure to update appraisals, and failure to review and downgrade assets appropriately (among other improper practices). Thus, the "cautionary language" offered was utterly insufficient to offset the false impressions left by its statements, and it is not entitled to protection. There is "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. P'ships. Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996); *see also EVCI Colleges*, 469 F. Supp. 2d at 102-103 ("the disclosures failed to warn investors that the risk factors were not hypothetical – which, of course, dramatically increased the possibility of adverse consequences."); *Lormand*, 565 F.3d at 249 ("defendants continually skewed the mix of

---

[46] *See* Ross Decl. Ex. 23 at 1 (D.I. 89.23) ("Our ability to achieve the results reflected in these statements could be affected adversely by changes in national or regional economic conditions, changes in market interest rates, fluctuations in equity or fixed income markets, higher than expected credit losses . . . " ); Ex. 24 at 1 (D.I. 89.24) (similar).

information by omitting the known severe risks . . . even as they recognized signs that those risks had already materialized.").[47]

The Underwriters contend that Wilmington's Loan Loss Reserve is entitled to protection under that doctrine. UW Br. 10-11. However, statements that appear in financial statements that purport to comply with GAAP do not receive safe harbor protection as a matter of law. *See* 15 U.S.C. § 78u-5(b)(2)(A); 15 U.S.C. § 77u-2(b)(2)(A).[48] Additionally, as numerous cases have recognized, reserves are not forward-looking statements. *See, e.g., PMA*, 2005 WL 180653, at *6; *Winslow*, 2011 WL 7090820, at *18; *SLM*, 740 F. Supp. 2d at 556; *Freudenberg*, 712 F. Supp. 2d at 194. Notably, the Underwriters do not cite a single case in which reserve calculations received protection under the bespeaks caution doctrine.[49] In fact, Wilmington admits that its reserves were based solely on "losses that have already occurred." WT Br. 45.

**E. <u>Plaintiffs Have Pled Loss Causation</u>**

To plead loss causation, a complaint need only provide a "'short and plain statement' [that] provide[s] the defendant with 'fair notice'" of plaintiffs' theory of loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (applying Rule 8(a)) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "[A] plaintiff need not show that a misrepresentation was the sole reason for the investment's decline in value," but only that a "defendant's wrongful conduct

---

[47] North's statements are also not protected because, as described in Section V.D, he knew that the statements were false at the time they were made. *Veritas*, 2006 WL 1431209, at *7.

[48] The Underwriters' arguments that the Offering Documents generally warned of the possibility of losses due to economic slowdown (UW Br. 11), fail for the same reasons as North's arguments: the "cautionary language" Wilmington offered was utterly insufficient to offset the false impressions left by its statements, and it is not entitled to "bespeaks caution" protection.

[49] Nor, for that matter, do they cite any cases finding reserves to be forward-looking statements for purposes of the related PSLRA safe harbor. Neither *Shapiro*, 964 F.2d at 281 nor *Fait*, 655 F.3d at 113 (*cited at* UW Br. 10), addresses the bespeaks caution doctrine, and neither case holds reserves to be forward-looking.

was a substantial factor in the market change." *In re Tyson Foods, Inc. Sec. Litig.*, 2004 WL 1396269, *12-13 (D. Del. June 17, 2004) (Robinson, J.) (*citing Semerenko v. Cendant Corp.*, 223 F.3d 165, 187 (3d Cir. 2000)). Establishing loss causation "is a fact intensive inquiry which is best resolved by the trier of fact." *Id.* at *13 (*citing EP Medsystems,* 235 F.3d at 884).

Plaintiffs have surpassed these standards. Throughout the Class Period, Wilmington's stock price was inflated by materially false and misleading statements and omissions that "created the false impression that the Bank was weathering the financial crisis without any of the crippling credit losses suffered by other banks." ¶41. Wilmington's piecemeal corrective statements disclosed over time the extent of Wilmington's misrepresentations and omissions, causing significant stock price declines. ¶¶102-134; 188-192; *see also supra*, §III.E. These partial corrective disclosures included dramatic quarterly increases to the Loan Loss Reserve (¶¶104, 116), Cecala's sudden departure (¶¶107-110), and Defendants' admissions that the Bank's credit position was much worse that the market expected (¶¶112-113), culminating in a final corrective disclosure on November 1, 2010. On that date, Wilmington shocked investors by revealing: (i) that it had entered into an agreement to sell itself to M&T for just 50% of the price at which Wilmington stock was trading the prior day (¶123); (ii) a quarterly loss of $365.3 million (an over 200% increase from the prior quarter) and a Loan Loss Reserve of $510.4 million (¶¶124-25); (iii) M&T's due diligence had exposed total "through-the-cycle losses" of almost $1.5 billion, or 17% of Wilmington's total loan portfolio (¶129); and (iv) M&T estimated that the Bank's loan portfolio contained over $500 million in still undisclosed losses. The market reacted swiftly to this news, driving down the stock price over 40%. ¶132. In total, from January 28 to November 1, Wilmington's stock price declined over 70%, suffering a per share drop from $15.26 to just $4.21. ¶134.

Nonetheless, Defendants contend the SAC does not adequately allege loss causation because macroeconomic events caused investors' losses. They are wrong. First, this is a question of fact inappropriate for resolution at this time. *Tyson Foods*, 2004 WL 1396269, *12. Second, numerous courts have rejected the argument that the "nationwide financial crisis" and "broad macroeconomic factors" caused plaintiffs' losses rather than defendants' corrective disclosures revealing the falsity of its misstated financial statements.[50] For example, in *Countrywide*, the court rejected this precise argument:

> Even as the market began its recent downturn, Countrywide held itself out for a long while as situated differently from other subprime lenders. Thus, the CAC alleges, Countrywide's continued misrepresentations and omissions-made concurrently with some alleged corrective disclosures-extended the class period into early 2008.
>
> * * *
>
> The Court will not be distracted by liquidity versus solvency and other macroeconomic arguments.

588 F. Supp. 2d at 1174.

The cases by Wilmington are inapposite because the complaints at issue failed to adequately plead loss causation on their own, regardless of an economic crisis. *In re Sec. Cap.*

---

[50] *See also, e.g., George v. China Automotive Sys. Inc.*, 2012 WL 3205062, at *11-*12 (S.D.N.Y. Aug. 8, 2012) (rejecting defendants' challenge to plaintiff's loss causation allegations, finding, *inter alia*, that defendants' argument that a contemporaneous marketwide event leading to a downturn in the financial market negates loss causation "would produce an absurd result"); *In re Bear Stearns*, 763 F. Supp. 2d 423, 484, 506-08 (S.D.N.Y. 2011) (rejecting argument that a "market-wide downturn" caused losses, finding that the stock price drop was directly related to disclosure of defendants' misrepresentations, and competing theories would be addressed by trier of fact); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 414 (S.D.N.Y. 2010) (rejecting argument that losses were attributable to the housing market downturn and not the alleged misstatements); *In re Am. Int'l Grp. Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010) (rejecting argument that losses were attributable to "severe economic recession" and not misstatements); *In re Citigroup, Inc. Sec. Litig.*, 753 F. Supp. 2d 206 (S.D.N.Y. 2010) (same); *Ambac*, 693 F. Supp. 2d at 273-74 (same); *King Cty. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 340-44 (S.D.N.Y. 2010) (rejecting argument that losses were attributable to "credit crisis" and not the alleged misstatements); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 513 (S.D.N.Y. 2009) (rejecting argument that losses were attributable to subprime "market crash" and not the alleged misstatements).

*Ass. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 599 (S.D.N.Y. 2010) (finding plaintiffs "fail[ed] even to demonstrate a correlation between 'revealed' facts and a decline in [defendant's] stock price," and noting a rise in the stock price following corrective disclosures); *In re Homebanc Sec. Litig.*, 706 F. Supp. 2d 1336, 1361 (N.D. Ga. 2010) (plaintiffs failed to allege that the corrective disclosures caused a stock drop); *Cole v. Fed. Home Loan Mortg. Corp.*, 1991 WL 180295, at *6 (D.D.C. Aug. 27, 1991) (same); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) (no loss causation in non-class action RICO claim where a five year gap separated misrepresentations and plaintiff's losses).[51]

Moreover, Wilmington's attempt to blame Plaintiffs' losses on the "Great Recession" rather than Defendants' wrongdoing ignores the fact that, by the date of the first corrective disclosure in January 2010, the economy was recovering, and the Bank's peers were "reporting stronger credit and financial results as they emerged from the recession, while the Bank suddenly appeared to be in trouble." ¶102. The losses suffered by the investors simply cannot be tied to the effects of a sudden market downturn.[52] In contrast, investors' losses in *Kuriakose v. Federal*

---

[51] Defendants' reliance on *60223 Trust v. Goldman Sachs & Co.*, 540 F. Supp. 2d 449 (S.D.N.Y. 2007), and *In re Merrill Lynch & Co. Research Reports Sec. Litig*., 568 F. Supp.2d 349 (S.D.N.Y. 2008) is also misplaced. These cases involved claims alleging false and misleading analysts' reports and involved substantial stock declines that predated the alleged corrective disclosures. *See also Glover v. DeLuca*, 2006 WL 2850448, at *33-34 (W.D. Pa. Sept. 29, 2006) (finding no loss causation because the full extent of the fraudulent conduct was not made known to the market until two months after the company's stock price declined).

[52] Defendants' remaining cited authorities can also be swiftly rejected. WT Br. 58. All of these cases pre-date the Supreme Court's pivotal decision in *Dura*, and none address the governing loss causation requirements at issue in this type of securities fraud action. *See Bastian v. Petren Res. Corp.*, 892 F.2d 680, 684 (7th Cir. 1990) (pre-*Dura* dismissal where plaintiffs "suggested no reason why their investment was wiped out") (emphasis original); *Harrell v. Primedia, Inc.*, 2003 WL 21804840 (S.D.N.Y. Aug. 6, 2003) (dismissing RICO claims without any discussion of causation whatsoever); *Virtual Countries, Inc. v. Rep. of S. Afr.*, 148 F. Supp. 2d 256, 264-66 (S.D.N.Y. 2001) (addressing "causal link" and "direct effects" under the Foreign Sovereign Immunities Act in action seeking rights to an Internet domain name).

*Home Loan Mortgage Company*, 2011 WL 1158028 (S.D.N.Y. Mar. 30, 2011) ("Freddie Mac") (*cited at* WT Br. 58), occurred in tandem with the collapse of the credit markets beginning in late 2007 and culminated with Freddie Mac's seizure by the government in September 2009. Unlike in *Freddie Mac*, the "marketwide phenomenon" ended before the corrective disclosures.

Finally, Wilmington's argument that its stock price had declined prior to the alleged corrective disclosures (WT Br. 57-58) has no bearing on loss causation. Whether a particular false statement had a measurable effect on stock prices relates only to the transaction causation element of a Section 10(b) claim, and will be later addressed by experts and the trier of fact. *See McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 430 (3d Cir. 2007) ("We have never suggested that the loss causation inquiry may 'effectively merge' with the transaction causation inquiry."). Moreover, the Third Circuit has held that the relevant inquiry is whether the stock price declined in response to a corrective disclosure, not whether the stock price moved in response to an allegedly false statement. *See Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009); *see also FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1317 (11th Cir. 2011) ("Defendants whose fraud prevents preexisting inflation in a stock price from dissipating are just as liable as defendants whose fraud introduces inflation into the stock price in the first instance.") (emphasis original)); *Schleicher v. Wendt*, 618 F.3d 679, 683-84 (7th Cir. 2010) (loss causation alleged regardless of whether false statements "propel the stock's price upward . . . [or] were designed to slow the rate of fall.").

## VI. PLAINTIFFS ADEQUATELY ALLEGE SECURITIES ACT VIOLATIONS

Plaintiffs' strict liability and negligence-based Securities Act claims arise in connection with Wilmington's February 2010 Offering, which raised $273.9 million through the sale of 18,875,000 shares of common stock at $14.51 per share. This Offering occurred just eight

months before Wilmington announced the M&T merger. The Securities Act Defendants are KPMG, the Underwriter Defendants, the Bank, its Officers, and the Bank's Directors. ¶¶236-46.

Section 11 imposes a "stringent standard of liability" that "places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). A plaintiff "need only show a material misstatement or omission [in a prospectus or oral communication] to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Suprema*, 438 F.3d at 269-70. Defendants do not dispute that Plaintiff's Securities Act claims are not grounded in allegations of fraud and, thus, that "the liberal notice pleading requirements of Rule 8 apply." *Id.* at 270.[53]

To the extent the Securities Act Defendants' arguments as to the falsity and materiality of Wilmington's representations in the Offering Documents overlap with the Exchange Act claims, those arguments are addressed above, but should be viewed through the less stringent prism of Rule 8(a). The Securities Act Defendants' remaining arguments are addressed below.

### A. Wilmington's Financial Results and Reserve Methodology Are Not Opinions

As set forth above in Section V.B.1, Wilmington reported materially misstated financial results and falsely described its reserving methodology in its SEC filings, which were incorporated into the Offering Documents. *See* ¶¶247-253. Defendants challenge the alleged falsity of these statements by claiming that Plaintiffs failed to comply with out-of-circuit precedent. Specifically, Defendants argue that Plaintiffs failed to comply with the Second Circuit's decision in *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011), which holds that allegations regarding misstated reserves are statements of opinion that can only false if the

---

[53] "Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims," like here. *Suprema*, 438 F.3d at 272-73; *see* ¶¶233, 281, 296, 306.

speaker "did not honestly believe that the reserves were accurate." WT Br. 21-24, KPMG Br. 12-17, UW Br. 7-9. Defendants are wrong.

First, *Fait* is contrary to well-established Third Circuit precedent. Third Circuit law makes clear that Plaintiffs' allegations – that the Bank's Loan Loss Reserve was misstated for failing to account for factors required under GAAP and for failing to comply with Defendants' stated methodology for calculating the reserve – are actionable statements of fact, not opinion, that do not need to be "subjectively false" to state a claim under the Securities Act. *See Burlington*, 114 F.3d at 1421 (GAAP compliance is a factual question); *Shapiro*, 964 F.2d at 281 ("[t]here is nothing unique about representations and omissions regarding loan loss reserves that removes them from the purview of the antifraud provisions of the federal securities laws"); *accord WaMu*, 694 F. Supp. 2d at 1224 (GAAP compliance "is an actionable statement of fact," not opinion). In fact, a district court within this Circuit recently made clear that, in the Third Circuit, statements regarding reserves – like those at issue here – are actionable statements of facts, and not, as a matter of law, opinions. *See Underland I*, 2011 WL 4017908, at *9 (Third Circuit law does not provide that "all statements pertaining to loan loss reserves are opinions") (*citing Shapiro*, 964 F.2d at 282); *see also Underland II*, 2012 WL 2912330 at *5 & n.47 (rejecting argument that loan loss reserves are pure subjective measures and noting all loan loss methodologies possess objective elements) (*citing Shapiro*, 964 F.2d at 281).

Indeed, the decisions in *Underland* are instructive. Plaintiffs there alleged that defendants (Advanta Corporation and its auditor KPMG) did not properly follow GAAP or their own disclosed method for calculating the loan loss reserve, and consequently misled investors regarding the adequacy of the company's loan loss reserve and net income. *See Underland II*, at *4. In response, relying on the same authority as Defendants here – the Second Circuit's

decision in *Fait* and this Circuit's opinion in *Shapiro* – Advanta and KPMG contended that all statements concerning loan loss reserves are always opinions, the falsity of which can only be established with allegations that defendants "subjectively disbelieved" their reserve estimates. *Underland I*, 2011 WL 4017308, at *9. The *Underland* court rejected these arguments three times – including when KPMG moved for reconsideration of the Court's *Underland II* decision. *See Underland v. Alter*, 2012 WL 4108998 (E.D. Pa. Sept. 18, 2012) ("*Underland III*"). Each time, the court held that Section 11 claims alleging that defendants "failed to consider all material factors" under GAAP in setting reserves (when their public representations were to the contrary) were actionable false statements, regardless of a defendant's subjective beliefs. *Underland II*, at *5; *see also Underland I*, at *9 ("Unlike a subjective evaluation that a loan reserve is adequate or not, nonconformance to a stated methodology to arrive at a loan loss reserve amount is a measurable objective fact").[54] In fact, the court found that KPMG's certifications were false based on the allegation that it "should have been aware" of Advanta's GAAP violations, regardless of whether its certifications were fact or opinion statements. *Underland III*, 2012 WL 4108998, at *3 (noting that distinction between fact and opinion was not controlling question in *Underland II*). Tellingly, Defendants failed to even mention *Underland*, notwithstanding the fact that these are the only decisions in the Third Circuit addressing the application of Defendants' *Fait* arguments under Third Circuit law.

---

[54] Indeed, *Fait* itself recognizes that reported loan loss reserves may be factual misstatements and not opinions. 655 F.3d at 113 (plaintiffs' claims failed in part because they did not "point to an objective standard for setting loan loss reserves"). Here, the SAC alleges objective standards against which Wilmington's loan loss reserve could be measured, including specific GAAP provisions and the Bank's own stated methodology for calculating loan loss reserves. ¶¶143-145, 181-187; *see supra* at §V.B.1. Thus, even under *Fait*, Defendants' statements would not constitute opinions.

The *Underland* decisions are consistent with the principle adopted by this Circuit that whether financial statements comply with GAAP is a factual question, not opinion. *Burlington*, 114 F.3d at 1421 ("it is a factual question whether [defendant's] accounting practices were consistent with GAAP"). Here, like in *Underland,* Defendants falsely represented that the Bank's reserves were established in accordance with GAAP and their own methodology. ¶¶143-147. Further, as in *Underland*, KPMG certified Wilmington's financial statements "without certifying that [the Bank] had considered all relevant internal and external factors and risks." *Underland II*, 2012 WL 2912330, at *5. Accordingly, these are each actionable statements.[55]

Second, *Fait* is contradictory to Section 11, which envisions that liability will be imposed for negligence. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 (1976). Reserves are a common part of financial statements that directly impact net income, the most critical measure of a company's health (*see Burlington*, 114 F.3d at 1420 n.9), and it is inconceivable that Congress enacted Section 11 with a negligence standard, and yet expected that liability for the most critical information in the financial statement would only be imposed for intentionally false statements. Indeed, *Fait's* reasoning that reserves must be subjectively false because they require "judgment" would apply equally to all financial statements because, like reserves, all of GAAP is a matter of judgment. *Burlington*, 114 F.3d at 1421 n.10. Congress could not have intended this when it enacted Section 11 with a negligence standard.[56] Significantly, the Second Circuit, in an

---

[55] KPMG's statement that *Shapiro* held that all statements on loan loss reserves are pure matters of opinion is false. KPMG Br. 15. As the *Underland* court noted, *Shapiro* supports Plaintiffs' position that Defendants' representations regarding their reserves were verifiable issues of fact. *Underland II*, 2012 WL 2912330, at *5. As *Shapiro* notes, there are known methodological requirements for the proper calculation of loan loss reserves, and compliance with those requirements is a verifiable issue of fact, not opinion. 964 F.2d at 281.

[56] Indeed, courts routinely recognize that reserve misstatements may be made negligently as well as intentionally, and thus distinguish the issue of falsity from the separate issue of scienter. *See, e.g., WaMu*, 259 F.R.D. at 502, 507 (sustaining reserves claim under Section 11 negligence

opinion authored by *Fait*'s author, recently reaffirmed the "minimal burden" imposed by Section 11, placing any higher burden imposed by *Fait* in question. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, --- F.3d ---, 2012 WL 3854431, at *7 (2d Cir. Sept. 6, 2012).[57]

Finally, even if the Court accepts Defendants' contention that their false loan loss reserve statements are "opinions," Plaintiffs have satisfied their burden. In the Third Circuit, even pure statements of opinion are actionable if the defendants could not "reasonably" have believed them. *See, e.g., Burlington*, 114 F.3d at 1428 ("The Supreme Court has held that statements of opinion by top corporate officials may be actionable if they are made without a reasonable basis."); *Trump*, 7 F.3d at 368 (opinions are actionable misstatements if they are not "genuinely and reasonably" believed); *In re Merck & Co., Inc. Sec. Deriv. & ERISA Litig.*, 543 F.3d 150, 166 (3d Cir. 2008) (opinions actionable if made without "a reasonable basis"); *Underland III*, 2012 WL 4108998, at *2, n.10 ("the Third Circuit has held that statements of opinion set forth in registration statements are actionable under §11 if the company lacks a reasonable basis for that statement") (internal citations omitted).[58] Similarly, contrary to Defendants' suggestion that *Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1092-93 (1991), requires Plaintiffs to demonstrate that any opinion misstatements were made "knowingly or recklessly" (UW Br. 8,

---

standard); *New Century*, 588 F. Supp. 2d at 1229-32, 1238-39 (same); *Atlas*, 556 F. Supp. 2d at 1150-52, 1154-55, 1159 (same); *In re CNL Hotels & Resorts Sec. Litig., Inc.*, 2005 WL 1126561, at *7-9, *12-13 (M.D. Fla. May 9, 2005) (same).

[57] The court confirmed that "Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 impose essentially strict liability for material misstatements contained in registered securities offerings" because scienter is not an element of these claims. 2012 WL 3854431 at *1, *7.

[58] Defendants wrongly claim that, to show subjective falsity, Plaintiffs must demonstrate the Securities Act Defendants acted with "scienter." WT Br. 22, KPMG Br. 13. Even *Fait* expressly held that "the standard [of subjective falsity] applied here does not amount to a requirement of scienter," and noted that a plaintiff could demonstrate subjective falsity by showing "'that the favorable opinions were without a basis in fact.'" 655 F.3d at 112 (internal quotations omitted). Accordingly, even if subjective falsity was required, Plaintiffs have not "pled themselves out of a claim" by expressly disclaiming fraud. WT Br. 31.

KPMG Br. 15), the Court in *Virginia Bankshares* concluded no such thing. There, the Supreme Court concluded that plaintiffs' evidence was sufficient to support a jury verdict that the "opinions" were false. *See* 501 U.S. at 1094-98. The Court ignored the defendants' subjective beliefs and instead cited evidence concerning the statements' objective falsity, such as evidence that market prices were unreliable and defendants' access to that information. *Id.* at 1094, 1098. Thus, *Virginia Bankshares* establishes that, however opinion falsity is defined, it can be proved with objective evidence that contradicts the opinion, plus defendants' access to that evidence.

Thus, even assuming that these statements are opinions, Plaintiffs have alleged their falsity by pleading that they lacked a reasonable basis. The mere fact that management may exercise discretion when provisioning for reserves does not excuse them from exercising that discretion reasonably within the confines of GAAP and the company's own stated practices.[59] Likewise, the SAC alleges that KPMG lacked any reasonable basis for accepting the Bank's reserves methodology or results, as demonstrated by, among other things, KPMG's repeated warnings that the Bank's asset review was inadequate, and its failure to verify that the reserves took into account this inadequacy as well as all other credit trends. *See* ¶¶3, 57, 277, 280.

### B. Wilmington's Statements Regarding Underwriting Are Actionable

For the reasons stated *supra* at §V.B.2, Plaintiffs have adequately pled that Wilmington falsely described its underwriting practices in SEC filings incorporated into the Offering Documents by claiming that the Bank "mitigate[d] credit risk" through the use of "rigorous" underwriting, and the "consistent[]" application of the Bank's underwriting standards. *See*

[59] Defendants incorrectly contend that the reserve allegations constitute "hindsight" pleading. WT Br. 21, 55; KPMG Br. 19. "Fraud by hindsight" refers to allegations based solely on the fact that conditions worsened from previous statements. *Avaya*, 564 F.3d at 269. Here, Plaintiffs base their allegations on contemporaneous practices at the time the statements were made. ¶¶81-96; *see RAIT*, 2008 WL 5378164, at *5 (not "fraud by hindsight" to allege that defendants "misrepresented the credit underwriting and monitoring process at the time of filing").

¶¶257-262. In response, the Underwriters contend that these statements were not false because "underwriting standards" refers only to specific underwriting criteria for construction loans identified in the Bank's 2009 Form 10-K (UW Br. 13). This argument is without merit. Accepting this claim would lead to the absurd conclusion that investors understood the Bank to employ no underwriting standards for its non-construction loans, which included general commercial, commercial mortgage, consumer, and residential loans, since the Bank did not provide the standards for those loans in its public filings. In fact, the Bank later specifically clarified that these underwriting criteria were "additional" requirements, rather than an exhaustive list of all standards.[60] Even assuming the Underwriters are correct, however, these statements are still false because of Wilmington's tolerance of failures in loan documentation and unconstrained underwriting exceptions. ¶¶44-55. Thus, whatever "standards" Wilmington may have formally had, its actual practice rendered those standards irrelevant. *See In re Ravisent Techs., Inc. Sec. Litig.,* 2004 WL 1563024, at *6 (E.D. Pa. July 13, 2004) (violation of revenue recognition policy described in registration statement rendered statements about revenue recognition misleading) (citing *Westinghouse*, 90 F.3d at 709-10).

Further, the Underwriters claim that the Bank's underwriting and asset review statements were not false or misleading because the Bank's SEC filings disclosed that lenders played a role in the Bank's credit review. UW Br. 14, 18. Contrary to the Underwriters' suggestion, Plaintiffs do not allege that the Bank's underwriting and asset review statements were false merely because lenders were involved. Rather, Plaintiffs allege that the Bank failed to disclose the true role that lenders played in the Bank's underwriting and risk management, including the facts that lenders were: (i) the Bank's primary risk monitors, as opposed to credit specialists; (ii) financially

[60] *See* 2010 Form 10-K (available at http://www.sec.gov/Archives/edgar/data/872821/000095012311020426 7w80859e10vk.htm#W80859tocpage).

penalized for reporting credit downgrades; (iii) financially rewarded for increasing loan volume; and (iv) instructed to disregard underwriting standards. ¶¶47-51, 60-61.[61]

## C. Wilmington's Statements Regarding Asset Review Are Actionable

For the reasons stated *supra* at §V.B.3, Plaintiffs have adequately pled that Wilmington falsely described its asset review practices in the Offering Documents by stating that Wilmington "mitigate[d] credit risk" by "monitor[ing] the portfolio to identify potential problems" and "regularly review[ing]" the Bank's loans, and that the Bank "consistently" applied it risk rating system. *See* ¶¶260-70. In response, the Underwriters first contend that the Bank's incentive structure for its lenders – which penalized them for loan downgrades (¶¶61, 266) – did not result in any misconduct. UW Br. 18. But both CW 1 and CW 2 confirm that this incentive structure resulted in needed downgrades not being made, with CW 2 unable to recall a lender ever independently downgrading a loan in CW 2's entire fourteen-year tenure, and CW 1 reporting that the Bank's risk ratings were "generally inaccurate." ¶¶70, 266. *Cf. Corus*, 701 F. Supp. 2d at 1023 (allegations that bank's incentive structure encouraged lending without consideration of risks supported securities claims).

Similarly, the Underwriters criticize CW 8 for failing to cite specific examples in alleging that "time and time again" Wilmington "would ride with a customer longer than they should have." UW Br. 19 n.12. This is wrong. The law does not require Plaintiffs to provide specific examples of bad loans to support a Section 11 claim. *See Corus*, 701 F. Supp. 2d at 1021 (rejecting argument that specific examples of bad loans were necessary to demonstrate falsity even under Rule 9(b)). Moreover, they cannot dispute that CW 8 – former director of Internal

[61] In fact, the information in the SEC filing that the Underwriters highlight reinforces the strength of the CWs' accounts, as it demonstrates that they were in a position to know the information they provided.

Audit until June 2008 (¶59) – was in a position to know of such failures at Wilmington. Nor can they dispute allegations from CW 2 that the Bank's asset review problems grew even worse after CW 8's departure, as Cecala and Harra increasingly interfered with ARG meetings. ¶68.

### D. <u>Wilmington's Internal Controls Misrepresentations Are Actionable</u>

For the reasons stated *supra* at §V.B.4 and ¶¶271-80, Plaintiffs have adequately pled that Wilmington falsely certified the effectiveness of its internal controls in the Offering Documents. Nevertheless, KPMG and the Underwriters – without any support in caselaw – argue that Wilmington's internal control misrepresentations were opinions such that they can be liable only if Wilmington and KPMG subjectively disbelieved the truth of their statements when made. (KPMG Br. 9; UW Br. 22-24) This argument is incorrect. Both Wilmington's certifications and KPMG's report on Wilmington's internal controls are objectively verifiable representations that the procedures Wilmington employed to generate its financial statements provided reasonable assurance regarding the reliability of its financial reporting. *See* ¶¶274-80; *see also* SEC Release No. 33.8810, 2007 WL 1791162 (June 20, 2007) (providing objective guidance for the evaluation and assessment of internal controls); *WaMu*, 259 F.R.D. at 506 (statements about internal controls in offering documents were not opinions).[62]

The Underwriters also argue that Wilmington's statements about internal controls were not misstated at the time of the Offering, because the MOU purportedly immediately corrected all internal control deficiencies. UW Br. 24-25. This argument ignores the SAC's allegations that Wilmington did not immediately correct its credit problems in the fall of 2009 following the MOU, and continued to mislead investors even after the MOU was implemented and throughout

[62] Moreover, even if these were opinions, KPMG's warnings to the Bank about internal control deficiencies in 2007 and 2008 belie any statement from KPMG that it reasonably believed its "opinion." ¶¶159; *see* KPMG Br. 9-11.

the remainder of the Class Period. *See* ¶44 (Federal Reserve effectively took over the Bank's credit operations in the summer of 2010 after the MOU); *see also* ¶¶46, 71.

Further, the Underwriters wrongly contend that the statements regarding internal controls were immaterial puffery. UW Br. 22. For the reasons in Section V.B.6, investors considered Defendants' statements regarding the purported "effectiveness" of Wilmington's internal controls material. *See PMA*, 2005 WL 1806503, at *10 (statements regarding internal controls are material when those internal controls affect the setting of loss reserves).[63]

Finally, the Underwriters incorrectly assert that Plaintiffs' internal control allegations are inactionable because they are "derivative" of Plaintiffs' other claims. UW Br. 23-24. This is not the law. *See WaMu*, 259 F.R.D. at 505 (internal controls certifications actionable when based on failure to reserve appropriate for reckless lending practices). Moreover, it is untrue. Plaintiffs' claims are predicated on the false certifications of internal controls in the Offering Documents, and the SAC is rife with allegations of internal control failings. *See*, *e.g.*, ¶¶229, 269, 275, 277.

**E. <u>KPMG Is Liable For Its False Certifications and Statements</u>**

KPMG is subject to Section 11 liability for false statements or omissions "with respect to the statement in such registration statement . . . which purports to have been . . . certified by [it]." 15 U.S.C. §77k(a)(4). After identifying critical deficiencies in the Bank's asset review function and internal controls in 2007 and 2008, and after the Federal Reserve's similar criticisms during 2007, 2008 and 2009, KPMG nonetheless: (i) certified Wilmington's 2007 and 2009 financial statements as GAAP-compliant; (ii) certified that Wilmington's internal controls were effective;

---

[63] The cases relied on by the Underwriters are inapposite and often do not mention internal controls at all. For example, the statement regarding "continued strong demand" at issue in *Schoenhaut v. American Sensors, Inc.*, 986 F. Supp. 785, 791 (S.D.N.Y. 1997), has nothing to do with internal controls. In *Am. Bus. Fin. Serv.*, 2007 WL 81937 (*cited at* UW Br. 23), the court actually held that the internal controls statements were actionable. *Id.* at *8.

and (iii) stated it had conducted its audit in accordance with Generally Accepted Auditing Standards ("GAAS"). These statements were incorporated into the Offering Documents.

As set forth above, the SAC pleads that Wilmington's financial statements (in particular, its Loan Loss Reserve and net income) were not compliant with GAAP and that its internal controls were not effective, yet KPMG certified that they were. Thus, Plaintiffs have stated a claim against KPMG. *See Huddleston*, 459 U.S. at 381 n.11 (auditors are liable for "matters which purport to have been . . . certified by them"); *Underland II*, at *5 (KPMG's certification of financial statements, including loan loss reserves, violated §11 where issuer's reserving methodology violated GAAP); *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 492 (S.D.N.Y. 2005) ("an accountant has responsibility under Section 11 for the accuracy of the financial statements she certifies").

KPMG also misstated its own compliance with GAAS and other auditing standards. In its 2007 and 2009 audit reports, KPMG stated that it performed its audit "in accordance with the standards of the Public Company Accounting Oversight Board." ¶¶254, 272-273. KPMG's purported compliance with particular auditing standards is a factual representation "that is material to those relying on its certification." *WaMu*, 694 F. Supp. 2d at 1224; *see also Underland II*, 2012 WL 2912330, at *3 (finding KPMG's certification of compliance with PCAOB standards actionable after noting that "[l]iability [under §11]. . . is virtually absolute" for "accountants who are named as having prepared or certified the registration statement"). Specifically, KPMG failed, as required by the PCAOB and GAAS General Standard Nos. 2 and 3, to exercise due professional care in the performance of the audit and to obtain competent sufficient evidentiary matter to form a basis for its opinion. ¶256. Had it exercised due care and obtained competent evidence, it would have concluded (as did M&T and the Federal Reserve),

that Wilmington's financial statements violated GAAP and its internal controls were ineffective. Such allegations such as these are more than adequate to plead a violation of Section 11 under Rule 8(a). *See Majesco*, 2006 WL 2846281, at *4 (truth or falsity of statements regarding GAAS compliance cannot be decided on a motion to dismiss).[64]

In response, KPMG contends that – regardless of whether the Bank's underlying misrepresentations about its Loan Loss Reserves were opinions (which they are not) – KPMG's certifications, audit reports, and statements that its audit complied with GAAS, are themselves opinions that are subject to a higher pleading standard than other misstatements under Section 11. KPMG Br. 9-11. This argument should be rejected.

First, KPMG's repeated characterization of its statements as "opinions" without legal or factual support carries no weight. With respect to the internal controls certifications, the statute requires that both auditors and management "attest to" the quality of a company's internal controls. 15 U.S.C. § 7262. To "attest" means "[t]o affirm to be true or genuine." Black's Law Dictionary 138 (8th ed. 2004). The very phrasing suggests a factual assertion, not an opinion. Further, regarding KPMG's GAAP certification, KPMG cannot transform its factual assertions of compliance with GAAP into statements of "belief" simply by designating them as "opinions." *See Oxford*, 187 F.R.D. at 141 (it is disingenuous for a defendant to suggest that its factual

[64] KPMG incorrectly contends that the allegations against it are an "afterthought." KPMG Br. 1. The fact that the bulk of the SAC's Securities Act allegations focus on Wilmington, rather than KPMG, is a natural result of a statutory scheme that determines auditor liability based on the falsity of the issuer's statements. Likewise, KPMG's suggestion that Plaintiffs seek to "erase" certain allegations in the FAC by omitting them from the SAC is incorrect. KPMG Br. 5-6. The SAC's allegations are entirely consistent with those in the FAC, but Plaintiffs omitted certain contextual allegations to streamline the SAC (by 60 pages) in accordance with the Court's Order. In fact, the FAC's allegations that KPMG conducted a "deep dive review" of Wilmington's portfolio support claims against KPMG by demonstrating that KPMG had contemporaneous knowledge of Wilmington's serious accounting issues. *See*, *e.g.*, FAC ¶¶66, 90. In any event, "[a]n amended complaint supercedes the original version in providing the blueprint for the future course of a lawsuit." *Snyder v. Pascack Valley Hospital*, 303 F.3d 271, 276 (3d Cir. 2002).

assertions are "opinions" simply because it later claims to have stated only "that it believes in their truth"); *cf. SEC v. Okin*, 137 F.2d 862, 864-65 (2d Cir. 1943) (inserting "in my opinion" into a statement of fact does not fundamentally alter the statement's factual nature).[65] Finally, KPMG does not represent that its certification of GAAS compliance was an opinion.

Second, certifications of GAAP compliance are factual representations, not opinions, because compliance with GAAP itself is a factual question. *See Burlington*, 114 F.3d at 1421; *Underland II*, 2012 WL 2912330, at *5; *RAIT*, 2008 WL 5378164, at *7; *WaMu*, 694 F. Supp. 2d at 1223-24. Notably, even for claims brought under Sections 10(b) of the Exchange Act – which, unlike Section 11, imposes liability for the speaker's own statements and not for certifying the statements of others – courts routinely evaluate auditor certifications under standards for factual misstatements, not as opinions.[66] This is consistent with the longstanding principle that auditors' Section 11 liability is coextensive with the falsity of the underlying statements certified, without conducting a separate inquiry into whether the certification itself is false. *See, e.g., Cendant*, 60 F. Supp. 2d at 364 (sustaining §11 claim against auditor based on material misstatement or omission by issuer and that auditor was "within the class" of defendants under §11(a)). This rule is also similar to the principle that individuals who "adopt or endorse"

---

[65] Although auditor certifications are now called "opinions" in the accounting literature (*see* KPMG Br. 10), the audit profession's semantic changes obviously cannot confer immunity, and it is thus not surprising that, in the securities law context, courts routinely continue to refer to audit opinions as "certifications." *See*, *e.g.*, *In re InterBank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215, 221 (D.C. Cir. 2010); *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 945 (6th Cir. 2009); *McCabe,* 494 F.3d at 421.

[66] *See In re Stone & Webster*, *Inc., Sec. Litig.,* 414 F.3d 187 at 214 (1st Cir. 2005); *Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*, 2005 WL 1366025, at *6 (D.N.J. June 8, 2005); *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1331-32 (M.D. Fla. 2002); *Kinney v. Metro Global Media, Inc.*, 170 F. Supp. 2d 173 (D.R.I. 2001); *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1375-76 (S.D. Fla. 2001); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 2004 WL 2348315, at *9 (D.N.H. Oct. 14, 2004).

the statement of another are liable for the underlying statement, rather than the truth or falsity of the adoption or endorsement itself. *See, e.g., Burlington*, 114 F.3d at 1429 (analyst projections attributable to company officials if officials "have, expressly or impliedly, made a representation that the analyst projections are in accordance with their views").

Notably, KPMG fails to cite a single pure Section 11 action against an auditor in which an auditor's certification was evaluated as a statement of opinion, rather than fact.[67] None of the cases cited by KPMG support its argument that courts must look to the subjective falsity of the auditor's certification itself, rather than to the underlying false statement. *See* KPMG Br. 10. *Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.* involved claims against an auditor brought under §18 of the Exchange Act, which imposes liability for a defendant's own false statements, not for certifications of false statements by others – a distinction that the court itself drew. 454 F.3d 1168, 1174 n.6 (10th Cir. 2006). Likewise, Defendants' cases involving investment bankers' fairness opinions, equity analysts' "buy" opinions, rating agencies' credit ratings, and issuers' future business prospects do not involve "certifications" of someone else's (false) statement. *See* WT Br. 10-11. Rather, those claims were brought under the portion of Section 11 that imposes liability on individuals who prepare a section of the offering documents. *See* 15 U.S.C. §77k(a)(4) (imposing liability on individuals who "prepare[] or certify[]" false

[67] KPMG's cited cases are inapposite, as the analysis in each of these cases was subject to the higher Section 10(b) pleading standard. KPMG Br. 10; *see In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 302 (S.D.N.Y. 2011) (citing numerous 10(b) cases against auditors where courts considered claims based on auditor certifications "without regard to the significance of the fact that such statements have been couched as opinions and thus without regard to the fact-opinion distinction") (collecting cases); *Buttonwood Tree Value Ptrs, LP v. Sweeney*, 2012 WL 2086607, at *2 (C.D. Cal. June 7, 2012). Moreover, in *Lehman*, the Court found that an auditor's issuance of a clean audit opinion following the receipt of information showing non-compliance with GAAP – such as the information provided to KPMG that prompted it to criticize the Bank's risk management, procedures and internal controls beginning in 2007 – could be sufficient to demonstrate opinion falsity. *Lehman*, 799 F. Supp. 2d at 302. Even under the 10(b) analysis applied in *Lehman*, KPMG's certifications are actionable.

statements). As the statute makes clear, the truth or falsity of prepared statements is evaluated directly. The court in *In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 237 (S.D.N.Y. 2004), recognized this critical distinction by evaluating an investment bank's fairness opinion for falsity (including whether the opinion was subjectively believed) but evaluating the auditor's liability under §11 based solely on the falsity of the financial statements it had certified.

Third, as stated above, KPMG's representations that its audits complied with GAAS (¶¶256, 272, 285) and that it determined Wilmington's internal controls to be effective (¶¶272-73) are statements of fact, not opinion, because they are representations about specific procedures KPMG followed. GAAS – including GAAS General Standard Nos. 2 and 3 – has verifiable procedural requirements that Plaintiffs allege KPMG failed to follow. ¶256. Moreover, Plaintiffs allege that "KPMG did not have a reasonable basis for its certifications," and had it complied with GAAS, KPMG would have uncovered the nearly $800 million in undisclosed credit losses incurred by the Bank. *Id.* Similarly, with respect to Wilmington's internal controls, KPMG stated that its certification was based on certain established criteria, and represented that, under PCAOB standards, "[o]ur audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk[.]" *See* ¶¶272-73; 2009 10-K at 135 (Ex. 20 to Declaration of H. Ross in Support of the SAC, D.I. 89). Indeed, KPMG attested that "[o]ur responsibility is to express an opinion on the Corporation's internal control over financial reporting <u>based on our audit</u>." *Id.*

These representations are factual assertions about the verifiable procedures KPMG purportedly followed. *See In re McKesson HBOC, Inc. Sec. Litig.,* 126 F. Supp. 2d 1248 at 1266 (N.D.Cal. 2000) ("any purely factual assertions in [a] fairness opinion, such as [the author's]

statements that it reviewed certain materials during its due diligence inquiry, would be held to a negligence standard"); *WaMu*, 694 F. Supp. 2d at 1223 ("Whether or not Deloitte employed the PCAOB standards is a verifiable factual statement.").[68] KPMG's statement was a factual assertion that the Bank's internal controls were as good as could be detected by an audit that followed proper procedures. *Deephaven*, 454 F.3d at 1175.[69]

Finally, KPMG's argument is inconsistent with §11, which grants experts an affirmative defense if they can show both good faith and due diligence. 15 U.S.C. §77k(b)(3)(B)(i). Treating auditor statements as "opinions" would reverse the statutory burden of proof.

### F. <u>duPont Is Liable for False Statements In The Offering Documents</u>

Thomas duPont signed Wilmington's shelf registration statement, which was filed on Form S-3 with the SEC on November 29, 2007. ¶242. duPont also signed, pursuant to Sections 13 or 15(d) of the Exchange Act, Wilmington's Form 10-K for the period ending December 31, 2007, which Plaintiffs allege contained false statements. The Offering Documents incorporated by reference the 2007 Form 10-K (¶234) in order to satisfy Section 10(a)(3) of the Securities

---

[68] The procedural requirements for GAAS and PCAOB-compliant audits are quite different from the procedures involved in fairness opinions, buy recommendations, and projections of future results of the sort involved in the cases relied upon by Defendants. KPMG Br. 12-15; UW Br. 8. *See* Stephen M. Davidoff, *Fairness Opinions*, 55 Am. U. L. Rev. 1557, 1616 (2006) (fairness opinions, <u>unlike auditing standards</u>, do not have standardized methodologies).

[69] The cases cited by KPMG for the proposition that Plaintiffs have failed to allege objective falsity are inapposite. KPMG Br. 18-19. The "threadbare" allegations in *Dutton v. Harris Stratex Networks*, 270 F.R.D. 171, 177-78 (D. Del. 2010), are readily distinguishable from the SAC, in which Plaintiffs identified the specific GAAS standards that KPMG violated, deficiencies in the audit, and the false portions of the audit report. ¶¶255-256 (identifying violations of GAAS General Standards Nos. 2 and 3, that required KPMG to, *inter alia*, obtain competent sufficient evidentiary matter to form a basis for its opinion); *see also* ¶251 (reserving methodology failed to consider all available evidence). Likewise, *DiLeo,* 901 F.2d at 626-27, and *Denny v. Barber*, 576 F.2d 465, 469 (2d Cir. 1978), are inapposite because they applied the standards of Fed. R. Civ. P. 9(b) to claims arising under <u>§10(b)</u>, not §11. Moreover, as discussed above *supra* in §V.B.1, Plaintiffs' GAAP allegations do not arise out of Defendants' failure to "predict the future," but rather from violations of GAAP. KPMG Br. 20.

Act, which requires issuers to update a prospectus with current information. *See* 17 C.F.R. § 229.512(a)(i-iii)(B). Under SEC regulations, signatories of SEC filings that are incorporated by reference to satisfy Section 10(a)(3) are deemed to subject themselves to liability. SEC Release No. 33-8591. Because duPont signed the 2007 Form 10-K, which contained false statements and was later incorporated into the Offering Documents pursuant to Section 10(a)(3), he is liable under Section 11 as if he signed the February 23, 2010 prospectus supplement itself. *See In re Lehman Bros. Sec. and ERISA Litig.*, 799 F. Supp. 2d 258, 317 n.399 (S.D.N.Y. 2011).

While duPont selectively quotes the first clause of §11(b)(1)(a) for the proposition that he should be excused from liability because he resigned before the Offering (duPont Br. 5), he ignores the fact that §11(b)(1)(b) specifically contemplates liability for statements in offering documents issued after a defendant's departure <u>unless</u> that defendant informed the SEC and issuer in writing that "he would not be responsible for such part of the registration statement." 15 U.S.C. § 77k(b)(1)(B). *See In re Enron Corp. Sec., Deriv., & ERISA Litig.*, 258 F. Supp. 2d 576, 596, 642 (S.D. Tex. 2003) (resignation of named defendant before offering did not protect defendant from §11 liability). There is no evidence of any such disavowal here.

## VII. <u>THE SAC STATES CONTROL PERSON CLAIMS</u>

Section 20(a) of the Exchange Act and Section 15 of the Securities Act impose liability on persons who "directly or indirectly, control[] any person liable" under Section 11 and 10(b), respectively. Plaintiffs need only allege a violation of Section 10(b) or Section 11 by the controlled entity (Wilmington) and control of the entity by the defendant. *See In re Am. Bus. Fin'l Servs, Inc. Sec. Litig.*, 2007 WL 81937, at *12 (E.D. Pa. Jun. 30, 2007). Control person claims are not subject to the heightened pleading requirements of Rule 9(b). *See id.* at *12.

Because Plaintiffs have pled Wilmington's primary violations, the first element of a control person claim is satisfied. Additionally, the Officer Defendants and Rakowski (the Bank

Controller) had control over Wilmington by virtue of their day-to-day responsibilities within the corporation; indeed, these Defendants signed, or personally made, many of the statements alleged to be false. ¶¶160-70, 211-214, 222, 268-243, 247, 308. Moreover, the SAC allegations regarding the Audit Committee establish that its members had control over Wilmington. ¶¶63-64, 99, 101, 220-232. Defendant duPont alone challenges his status as a control person. duPont Br. 8-10. duPont was a Director from 2006 through October 2009 (¶242) and signed the Bank's Registration Statement, which was incorporated into the Offering Documents. ¶¶242, 284. At this stage of the litigation, nothing more is required. *Am. Bus.*, 2007 WL 81937, at *12 ("Allegations that a director signed a fraudulent SEC filing and was in a position to exercise control over the primary violator are sufficient to withstand a motion to dismiss.").

Defendants argue that Plaintiffs must plead the additional element of "culpable participation" for their §20(a) claims. WT Br. 59. Even assuming that Plaintiffs have this burden,[70] the SAC describes how the Officer Defendants directly participated in the fraudulent conduct; Rakowski, as Controller, also necessarily was directly involved in the Bank's financial reporting and internal controls. ¶¶58-96, 239, 308. Similarly, the Audit Committee Defendants permitted the Bank to continue to issue false financial statements despite directly receiving reports demonstrating the inadequacy of the Bank's internal controls and the insufficiency of its reserves. ¶¶30, 64, 227, 230. This is sufficient to meet whatever pleading requirement exists.

## VIII. <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully submit that Defendants' Motions to Dismiss the SAC should be denied in their entirety. If the Court dismisses any of Plaintiffs' claims, Plaintiffs request the opportunity to replead. Fed. R. Civ. P. Rule 15(a).

---

[70] In fact, "the overwhelming trend in this circuit is that culpable participation" need not be pled. *Freed v. Universal Health Services, Inc.*, 2005 WL 1030195, at *11 n.6 (E.D. Pa. May 3, 2005).

Dated: October 1, 2012

**CHIMICLES & TIKELLIS LLP**

*/s/ A. Zachary Naylor*
Pamela S. Tikellis (Bar No. 2172)
A. Zachary Naylor (Bar No. 4439)
222 Delaware Avenue, 11th Floor
P.O. Box 1035
Wilmington, DE 19899
Phone: (302) 656-2500
Fax: (302) 656-9053

*Liaison Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Blair Nicholas
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (858) 793-0070
Fax: (858) 793-0323

-and-

Hannah Ross (*pro hac vice*)
Sean K. O'Dowd (*pro hac vice*)
Katherine M. Sinderson (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Phone: (212) 554-1400
Fax: (212) 554-1444

**SAXENA WHITE P.A.**

Maya S. Saxena (*pro hac vice*)
Joseph E. White III (*pro hac vice*)
Lester Hooker (*pro hac vice*)
Brandon T. Grzandziel (*pro hac vice*)
2424 North Federal Highway
Boca Raton, FL 33431
Phone: (561) 394-3399
Fax: (561) 394-3382

*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*