**UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**

|  |  |
|---|---|
| **IN RE WILMINGTON TRUST SECURITIES LITIGATION** | Master File No. 10-cv-00990-SLR |
|  | (Securities Class Action) |
|  | Hon. Sue L. Robinson |
| This document relates to: ALL ACTIONS | ELECTRONICALLY FILED |

**LEAD PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION TO SUPPLEMENT
AND AMEND THE SECOND AMENDED CONSOLIDATED
SECURITIES CLASS ACTION COMPLAINT**

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Blair Nicholas
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323

-and-

Hannah Ross (*pro hac vice*)
Sean K. O'Dowd (*pro hac vice*)
Katherine M. Sinderson (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Phone: (212) 554-1400
Fax: (212) 554-1444
*Counsel for Lead Plaintiffs and Co-Lead
Counsel for the Class*

**CHIMICLES & TIKELLIS LLP**

Pamela S. Tikellis (Bar No. 2172)
A. Zachary Naylor (Bar No. 4439)
222 Delaware Avenue, 11th Floor
P.O. Box 1035
Wilmington, DE 19899
Phone: (302) 656-2500
Fax: (302) 656-9053
*Liaison Counsel for the Class*

**SAXENA WHITE P.A.**

Maya S. Saxena (*pro hac vice*)
Joseph E. White III (*pro hac vice*)
Lester Hooker (*pro hac vice*)
Brandon T. Grzandziel (*pro hac vice*)
2424 North Federal Highway
Boca Raton, FL 33431
Phone: (561) 394-3399
Fax: (561) 394-3382
*Counsel for Lead Plaintiffs and Co-Lead
Counsel for the Class*

December 7, 2012

# TABLE OF CONTENTS

**Page**

I.      Preliminary Statement ................................................................................................ 1

II.     Nature And Stage Of The Proceedings ...................................................................... 5

III.    Summary Of The Argument ....................................................................................... 5

IV.     Statement Of Facts ..................................................................................................... 6

V.      Argument .................................................................................................................. 11

        A.      The Court Should Grant Lead Plaintiffs Leave To Supplement The SAC .......... 11

        B.      Supplementing The SAC Would Promote The Just Disposition Of The
                Case ......................................................................................................................... 12

        C.      Supplementing The SAC Poses No Undue Prejudice To Defendants .................. 14

        D.      Supplementing The SAC Will Not Cause Undue Delay ...................................... 16

        E.      The Court Should Permit Lead Plaintiffs To Amend The Complaint To
                Clarify Its Existing Allegations ........................................................................... 17

VI.     Conclusion ................................................................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Gould, Inc.*,
   739 F.2d 858 (3d Cir. 1984)...........................................................................................16

*Bechtel v. Robinson*,
   886 F.2d 644 (3d Cir. 1989)...........................................................................................11

*Boileau v. Bethlehem Steel Corp.*,
   730 F.2d 929 (3d Cir. 1984)...........................................................................................11

*Carl Zeiss Meditec, Inc. v. Xoft, Inc.*,
   2011 WL 1326053 (D. Del. Apr. 5, 2011)...........................................................11, 12, 14, 16

*Cellectis S.A. v. Precision Biosciences, Inc.*,
   2012 WL 3195092 (D. Del. Aug. 6, 2012) ....................................................................12

*Cornell and Co., Inc. v. Occupational Safety & Health Review Comm'n*,
   573 F. 2d 820 (3d Cir. 1978)..........................................................................................16

*Dole v. Arco Chem. Co.*,
   921 F.2d 484 (3d Cir. 1990).....................................................................................12, 14

*Foman v. Davis*,
   371 U.S. 178 (1962).......................................................................................................11

*In the Matter of the Search of the Second Floor of 144 Kings Hwy., SW, Dover, Delaware 19901*,
   No. 12-MJ-00167 (D. Del. 2012).................................................................................5, 6

*In re Cabletron Sys. Inc.*,
   311 F.3d 11 (1st Cir. 2002)............................................................................................14

*In re Wellbutrin XL Antitrust Litig.*,
   756 F. Supp. 2d 670 (E.D. Pa. 2010) ...........................................................................14

*Lorenz v. CSX Corp.*,
   1 F.3d 1406 (3d Cir. 1993).....................................................................................12, 14

*Medeva Pharma Ltd. v. Am. Home Prods. Corp.*,
   201 F.R.D. 103 (Del. 2011) ..........................................................................................12

*Parkell v. Danberg*,
   2012 WL 760621 (D. Del. Mar. 6, 2012) .....................................................................12

*Romero v. Allstate Ins. Co.*,
    2010 WL 2996963 (E.D. Pa. Jul. 28, 2010) .................................................................... 15, 16

**STATUTES/RULES**

Fed. R. Civ. P. 15 ........................................................................................................................ 1

Fed. R. Civ. P. 15(a) ........................................................................................................ 3, 6, 12

Fed. R. Civ. P. 15(d) .................................................................................................. 3, 5, 11, 12

Securities Act of 1933 .................................................................................................................. 2

Securities Exchange Act of 1934 .................................................................................................. 2

Fed. R. Civ. P. 15(a)(2) ....................................................................................................... 3, 6

I.      **PRELIMINARY STATEMENT**

Lead Plaintiffs, the Merced County Employees' Retirement Association, the Coral Springs Police Pension Fund, the St. Petersburg Firefighters' Retirement System, the Pompano Beach General Employees Retirement System, and the Automotive Industries Pension Trust Fund, respectfully submit this Brief in support of their motion pursuant to Federal Rule of Civil Procedure 15 for leave to supplement and amend the Second Amended Consolidated Securities Class Action Complaint (D.I. 88, the "SAC") in order to incorporate newly discovered evidence that directly supports the allegations and claims in the SAC.

The newly discovered evidence is found in two sworn affidavits by Special Agents of the Federal Bureau of Investigation ("FBI") who are investigating fraudulent conduct involving Defendant Wilmington Trust ("Wilmington" or the "Bank"). On October 18, 2012, Magistrate Judge Mary Pat Thynge of the United States District Court for the District of Delaware entered an order unsealing those two affidavits, which were executed in connection with the FBI's investigation into the relationship between Wilmington and one of the Bank's largest borrowers, Michael Zimmerman ("Zimmerman"). The "FBI Affidavits" are attached hereto as Exhibits A and B to the Declaration of A. Zachary Naylor ("Naylor Decl."). The FBI Affidavits provide compelling new facts that specifically support Lead Plaintiffs' claims that Wilmington and its senior officers (the "Officer Defendants") knowingly and/or recklessly deceived the Banks' investors.

As set forth in the SAC, Lead Plaintiffs' claims arise out of the materially false and misleading statements and omissions made by Wilmington and the Officer Defendants regarding Wilmington's lending and accounting practices during the period of January 2008 through

November 2010 (the "Class Period").[1]  Throughout the Class Period, Wilmington repeatedly assured investors that it "mitigated credit risk" through the "consistent" use of "rigorous" underwriting standards and that it "monitor[ed]" its loan portfolio for emerging credit problems. SAC ¶¶ 151, 153.  In reality, however, Wilmington's lending practices were reckless and exposed the Bank to excessive, undisclosed financial risk, and (in connection with their Securities Exchange Act claims) that the Officer Defendants knew, or were reckless in not knowing, of the Bank's true lending practices.  SAC ¶¶ 40-101, 171-180.  By misrepresenting and failing to account for its true lending practices, Wilmington also understated its loan loss reserves, thereby inflating its reported net income every quarter during the Class Period.  SAC ¶¶ 141-147.  When the Federal Reserve forced Wilmington to correct its lending practices and properly account for the catastrophic state of its loan portfolio, this correction decimated Wilmington's financial position and forced Wilmington to sell itself at a fire sale price to M&T Bank in November 2010.  SAC ¶¶ 141-147.

Despite the SAC's detailed allegations (including the reports of over a dozen high-level former Wilmington employees), Defendants filed over 150 pages of motion to dismiss briefing, arguing that the SAC is inadequate to state a claim for violations of the securities laws.  D.I. 93, 95, 99, 100, 103.  In particular, Defendants argued that the SAC did not provide sufficient specificity to support the claim that Wilmington and the Officer Defendants knowingly misled investors regarding the Bank's lending practices.   On October 1, 2012, Lead Plaintiffs filed an opposition brief that fully addressed Defendants' arguments.  D.I. 112.

The FBI Affidavits – which were unsealed weeks after Lead Plaintiffs filed their opposition brief – confirm and expand upon the allegations in the SAC.  Specifically, the FBI

---

[1] The SAC alleges claims pursuant to both the Securities Exchange Act of 1934 and the Securities Act of 1933.

Affidavits describe a "comprehensive" review that Wilmington conducted in late 2009/early 2010 of its Delaware Commercial Real Estate Division, which covered the Bank's primary geographic market during the Class Period.  According to the FBI Affidavits, this internal review – which was not previously disclosed – documented "serious concerns with the past management of the Delaware Commercial Real Estate Division and with its loan portfolio," and, as discussed further below, described numerous such "serious concerns" and "questionable [lending] activities."  Naylor Decl. Ex. B at ¶ 39.  The FBI Affidavits further provide myriad examples of these reckless practices in connection with the Bank's relationship with Zimmerman, whose $90 million of loans constituted almost 6% of the Bank's entire commercial construction loan portfolio.  Despite the importance of Zimmerman's loans to Wilmington, the FBI Affidavits make clear that the Bank exercised virtually no oversight over this highly material lending relationship.

Lead Plaintiffs seek leave to supplement the SAC pursuant to Federal Rule of Procedure 15(d) to incorporate this newly discovered evidence, as well as additional evidence Lead Plaintiffs have developed through their own investigation in light of the facts set forth in the FBI Affidavits.  Leave to supplement should be granted because the new facts contained in the FBI Affidavits are highly probative of key issues in the case and could not have been included in any previous pleading because they were unsealed only after the SAC was filed.  In the event the Court grants leave to supplement, Lead Plaintiffs additionally seek leave to amend the SAC pursuant to Federal Rule of Civil Procedure 15(a)(2) to provide minor technical and stylistic clarifications, primarily as a result of the newly-added information derived from the FBI Affidavits.  Allowing Lead Plaintiffs this limited amendment will facilitate the efficient and complete adjudication of the case by clarifying the issues in dispute.

Lead Plaintiffs' proposed supplemented and amended pleading is filed concurrently as Exhibit A to Lead Plaintiffs' Motion to Supplement and Amend the Second Amended Consolidated Securities Class Action Complaint ("Motion").  The new allegations can primarily be found at the following sections in the proposed pleading: Section 1.A ("Overview of the Case"), ¶¶5-7; Section III.D ("Recently Unsealed FBI Affidavits Confirm Wilmington's Fraud"), ¶¶ 88-112; Section V ("Defendants' False And Misleading Statements"), ¶¶ 171(c) & (e), 174(b) & (c), 178((d) & (e); 186(d) & (e); Section VI ("Summary of Scienter Allegations"), ¶¶ 200-203; and in Lead Plaintiffs' Securities Act allegations, at ¶¶282-83, 290-91, 306, and 316-318.[2]

Lead Plaintiffs respectfully request that the Motion be granted because the proposed amendment will promote the just disposition of this case, and Defendants would suffer no undue prejudice.  Indeed, while this evidence provides further particularized support for Lead Plaintiffs' existing claims and allegations, it does not add any additional claims or name any additional defendants.  There are no discovery deadlines or other case deadlines in place that would be impacted by such an amendment.  Accordingly, Lead Plaintiffs respectfully submit that their motion should be granted and they should be allowed to file a Third Amended Consolidated

---

[2] Lead Plaintiffs have provided the Court with a redline identifying the proposed changes. Motion Ex. B.  This redline reflects all proposed textual edits.  Please note, however, that for ease of review, this redline does not reflect three organizational changes in the proposed amendment.  These organizational changes are: (i) moving SAC Section III.C to the end of Section III; (ii) moving SAC Section V.A to Section V.C; and (iii) moving SAC Section XII.B to Section XII.D.  These organizational changes are reflected in the Table of Contents to the redline.

Further, to avoid burdening the Court with an unnecessary volume of filings in connection with this Motion, Lead Plaintiffs have not attached the numerous SEC filings cited as exhibits in the proposed amended pleading.  These filings, which are the same as those attached to the SAC (D.I. 88), will be filed as attachments to the filed form of the amended pleading if the Court approves that filing.

Securities Class Action Complaint substantially in the form attached hereto as Exhibit A to the Motion.

## II.  NATURE AND STAGE OF THE PROCEEDINGS

On May 16, 2011, Lead Plaintiffs filed the Consolidated Securities Class Action Complaint (D.I. 39) in this Action.  Defendants moved to dismiss and, after full briefing, the Court entered an Order on March 29, 2012 (D.I. 86) dismissing the initial complaint without prejudice on the grounds that it did not sufficiently identify Defendants' false and misleading statements or explain why those statements were false and misleading.

On May 10, 2012, Lead Plaintiffs filed the SAC (D.I. 88).  Defendants moved to dismiss on July 27, 2012 and Lead Plaintiffs filed their omnibus opposition brief on October 1, 2012 (D.I. 112).  Defendants were scheduled to file their reply papers on November 16, 2012 (D.I. 116).

On October 18, 2012, Magistrate Judge Thynge entered an order unsealing the application for a search warrant in *In the Matter of the Search of The Second Floor of 144 Kings Hwy, SW, Dover, Delaware 19901*, No. 12-mj-00167 (D. Del.).  On November 15, 2012, the parties executed a scheduling stipulation (D.I. No. 115), which was entered by the Court the following day.  This stipulation suspended the briefing schedule on the Defendants' motions to dismiss the SAC until after the filing and resolution of the instant Motion.  Pursuant to the stipulation, Defendants are scheduled to file any opposition to this Motion by January 4, 2013 and Lead Plaintiffs are scheduled to reply by January 18, 2013.

## III.  SUMMARY OF THE ARGUMENT

1.      Under Federal Rule of Civil Procedure 15(d), the Court should grant leave to supplement the SAC to include new information relating to the recently unsealed FBI Affidavits. Supplementation will facilitate the just resolution of the case and will not cause undue prejudice

or undue delay.  The new evidence, which emerged after the filing of the SAC, is highly relevant to Lead Plaintiffs' claims as it confirms and adds additional particularized support for the SAC's existing allegations.

2.      If the Court allows Lead Plaintiffs to supplement, the Court should also grant leave to amend the SAC under Federal Rule of Civil Procedure 15(a)(2) to clarify Lead Plaintiffs' existing allegations and for style.  These amendments would not increase the burden on the parties but rather would facilitate the just and complete adjudication of the action and minimize the burden on the Court by clarifying disputed issues.

## IV.    STATEMENT OF FACTS

On October 4, 2012, five months after Lead Plaintiffs filed the SAC, FBI Special Agents applied under seal for, and executed, a search warrant in *In the Matter of the Search of the Second Floor of 144 Kings Hwy., SW, Dover, Delaware 19901*, No. 12-MJ-00167 (D. Del. 2012).  The search warrant was in furtherance of a criminal investigation into a bank fraud scheme allegedly engaged in by prominent Delaware real estate developer Michael Zimmerman and certain of his business partners, in connection with loans Wilmington provided to Zimmerman.  In support of the application, the FBI submitted two affidavits: the Affidavit of Special Agent Kevin P. Shannon and the Affidavit of Special Agent Greg S. Mrozek (defined above as the "FBI Affidavits").  The FBI Affidavits are based on these Special Agents' personal knowledge, including, among other things, a review of documents Wilmington provided to the FBI, including internal e-mails and loan documents, as well as multiple witness interviews, including interviews with at least four former Wilmington employees (including Defendant William North) who are identified by title and job description.      Naylor Decl. Ex. A at ¶ 3; Naylor Decl. Ex. B at ¶ 3.

As set forth in the FBI Affidavits, in late 2009/early 2010 the Bank conducted a "comprehensive" analysis of its lending practices in Delaware.  This project, which was known internally at Wilmington as the "Delaware Commercial Real Estate Division Project Status Review" (the "Delaware Status Review"), was concluded in early 2010.  Until the FBI Affidavits were unsealed, there had been no public disclosure of either this internal review or its findings.

The FBI Affidavits further provide that the results of the Delaware Status Review were summarized in a March 12, 2010 memorandum entitled the "Delaware Commercial Real Estate Division Concern" (the "Delaware Review Memorandum"), which was drafted by a senior Bank credit officer (identified in the FBI Affidavits as "W3").  Naylor Decl. Ex. B at ¶ 39.  According to the FBI Affidavits, the Delaware Review Memorandum described "<u>serious concerns with the past management of the Delaware Commercial Real Estate Division and with its loan portfolio</u>." *Id*.  These "concerns" included, according to the FBI Affidavits: (i) the "<u>unethical use of loan approval authority by relationship managers</u>," (ii) the Bank's "<u>limited oversight of relationship managers</u>"; and (iii) "a limited technical knowledge of commercial real estate lending."  The Delaware Review Memorandum further documented additional "questionable activities" in the Bank's lending practices, including the "lack of validation of construction budgets prior to loan closings" and the "<u>frequent</u> use of loan proceeds to provide cash to borrowers or fund partner buyouts prior to construction completion or the property having reached operating stabilization." *Id*.

As set forth in the FBI Affidavits, the Bank's relationship with prominent Delaware developer Michael Zimmerman demonstrated many of the reckless practices described in the Delaware Review Memorandum.  According to the FBI Affidavits, by March 31, 2010, Wilmington had extended over 75 separate loans to Zimmerman for 30 different development

projects worth approximately $90.7 million.  *Id*. at ¶ 26.  Thus, Zimmerman was one of Wilmington's largest borrowers, with loans accounting for almost 6% of Wilmington's commercial construction loans during the Class Period.  In interviews with FBI agents, a former employee in Wilmington's Workout group (identified by the FBI as "W1") – the group responsible for working with troubled borrowers (SAC ¶70) – stated that many of the loans extended to Zimmerman were "poorly managed, had weak administrative controls, and were over budget."  *Id*. at ¶ 27.  This former Wilmington employee also informed the FBI that Wilmington "approved numerous loans which [it] never should have approved" to Zimmerman. *Id*. at ¶ 35.

In detailing the Bank's lending relationship with Zimmerman, the FBI Affidavits describe Wilmington's reckless practices through all phases of the lending process, including the underwriting of the loan, the funding of the loan, and the ongoing credit review of the loan.  For example, the FBI Affidavits detail several instances where, after the Bank's Loan Committee (*see* SAC ¶ 53) approved a loan to Zimmerman, the relationship manager who was in charge of the loan (identified by the FBI as "B1") changed highly material terms imposed by the Loan Committee, excluding those terms from the loan agreement before closing without any further credit review or approval by the Loan Committee.  Naylor Decl. Ex. B at ¶¶ 43-48, 91.  The FBI Affidavits make it clear that Wilmington's credit personnel never confirmed that the final loan terms matched the terms approved by the Loan Committee.

The FBI Affidavits also described repeated instances where Wilmington loaned millions of dollars to Zimmerman despite obvious and serious deficiencies in underwriting documentation and Zimmerman's failure to meet basic terms of his loan agreements with the Bank.  Indeed, in connection with one large development described by the FBI, Wilmington extended millions of

dollars in equity payouts (*i.e.*, personal payments to Zimmerman), despite the fact that Zimmerman did not meet the loan agreement's basic requirement that he secure executed lease agreements from tenants prior to receiving any such equity payouts. Ex. B at ¶¶ 49-57. In one such instance, the only documentation Zimmerman provided to receive the payout was a faxed request stating, "Send $ $1,000,000 ASAP I have to pay my bar tab." Naylor Decl. Ex. B at ¶ 54. Notwithstanding the fact that Zimmerman had not met the required terms or provided any other support for his request, Wilmington promptly provided Zimmerman the funds. Naylor Decl. Ex. B at ¶ 55. In another such instance, B1 (the Bank relationship manager) authorized a $1 million payment, stating by email that, while Zimmerman had not secured the required leases, "not wanting my reputation for reckless abandon to be in jeopardy, I guess we can fund the $1,000,000." Naylor Decl. Ex. B ¶ 50. Remarkably, even after receiving $2 million in equity payouts, the FBI Affidavits make it clear that Zimmerman never obtained the required leases for the property, and that the Bank eventually suffered a significant loss in connection with that loan. Naylor Decl. Ex. B at ¶ 54.

The FBI Affidavits further detail numerous instances where the Bank allowed Zimmerman to "draw" on his loans with the Bank to cover purported construction expenses without requiring any documentation of those expenses (*E.g.,* Naylor Decl. Ex. B at ¶¶ 58-65). In some cases where documents were provided, "[a]lmost all of these same invoices were found to have been included in subsequent draw requests submitted to Wilmington Trust." Naylor Decl. Ex. B at ¶ 66. In each of these instances, Zimmerman or his business partners simply pocketed the money, rather than using them for legitimate business expenses. Naylor Decl. Ex. B at ¶¶ 58-67. In fact, former Wilmington Workout employee W1 told the FBI that, at the time,

Zimmerman's loan draw requests "<u>never made any sense because the related work was never completed</u>." *Id.* at ¶ 36.

The FBI also identified several large-scale Zimmerman projects where Wilmington approved multi-million dollar loans to fund a long-term project without ever verifying that Zimmerman was performing any work on the project. For example, on one project, Wilmington approved a $10 million loan and extended numerous "draws" on the loan over the course of several years during the Class Period without ever verifying that Zimmerman was performing any related construction. After Zimmerman exhausted the entire $10 million loan, "the only progress Zimmerman was able to show on the project was a <u>partially completed parking lot,</u>" yet the Bank extended him an additional $2 million to finish the project. *Id.* at ¶ 36. In another instance, after Zimmerman exhausted an entire $2 million loan, "<u>no significant construction-related work had been completed</u> and some of the required loan paperwork had not been completed" and the property was "not fully acquired." *Id.* at ¶ 35. Former Wilmington Workout employee W1 told the FBI that he "<u>suspected Zimmerman was diverting Wilmington Trust loan funds</u> . . . to other purposes <u>when he compared the funds dispersed by Wilmington Trust against the actual work completed</u>, and the need for additional funds to complete the work required." *Id.* at ¶ 36.

As set forth in the FBI Affidavits, Wilmington continued to loan Zimmerman money throughout the Class Period despite these apparent and readily identifiable discrepancies. In fact, the FBI Affidavits describe how, even after the Bank internally identified that Zimmerman was having "significant difficulties in making payments" on his loans beginning in 2008, Wilmington continued to extend over $22 million in additional loans to Zimmerman in 2008 and 2009. Naylor Decl. Ex. B at ¶¶ 27. Due to these reckless practices, among many others enumerated in

the FBI Affidavits, the Bank eventually wrote off nearly <u>half</u> of its loans to Zimmerman, costing

the Bank over $43 million.  Naylor Decl. Ex. B at ¶¶ 31-33.

The proposed amendments to the SAC incorporate these and similar facts drawn from the

FBI Affidavits, as well as Lead Counsel's ongoing investigation that was guided by those

Affidavits, to support Lead Plaintiffs' claims that the Bank engaged in lending practices contrary

to those represented to investors, and that Wilmington and the Officer Defendants knowingly or

recklessly misrepresented the Bank's lending practices to investors.

## V.   ARGUMENT

### A.   The Court Should Grant Lead Plaintiffs Leave To Supplement The SAC

Federal Rule of Civil Procedure 15(d) provides that a court may "permit a party to serve a

supplemental pleading setting out any transaction, occurrence, or event that happened after the

date of the pleading to be supplemented."  It is well-established that permission to amend a

pleading under Rule 15 "shall be freely given when justice so requires."  *Foman v. Davis*, 371

U.S. 178, 182 (1962).  Interpreting *Foman*, the Third Circuit has explained that there is a

"general presumption in favor of allowing a party to amend pleadings."  *Boileau v. Bethlehem

Steel Corp.*, 730 F.2d 929, 938 (3d Cir. 1984) (reversing district court's denial of leave to amend

complaint).  Thus, "courts have shown a strong liberality . . . in allowing amendments . . . ."

*Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989) (district court abused discretion in

denying motion to amend complaint).  In the Third Circuit, a court should permit amendment

"[i]n the absence of undue delay, bad faith, or dilatory motive on the part of the movant . . .

undue prejudice to the opposing party . . . , [or] futility of amendment."  *Carl Zeiss Meditec, Inc.

v. Xoft, Inc.*, 2011 WL 1326053, at *1 (D. Del. Apr. 5, 2011).  Thus, leave to supplement

pursuant to Rule 15(d) should be liberally given because "[t]he purpose of Rule 15(d) is to

promote as complete an adjudication of the dispute between the parties as possible by allowing

the addition of claims which arise after the initial pleadings are filed." *Carl Zeiss*, 2011 WL

1326053, at *1. This liberal approach "ensure[s] that a particular claim will be decided on the

merits rather than on technicalities." *Parkell v. Danberg*, 2012 WL 760621, at *2 (D. Del. Mar.

6, 2012) (Robinson, J.) (*quoting Dole v. Arco Chem. Co.,* 921 F.2d 484, 486–87 (3d Cir. 1990)).

Specifically, leave to supplement pursuant to Fed. R. Civ. P. 15(d) should be freely

granted if: (i) it will promote the just disposition of the case; (ii) it will not cause undue prejudice

or delay; and (iii) it will not prejudice the rights of any parties. *Carl Zeiss*, 2011 WL 1326053, at

*1; *Medeva Pharma Ltd. v. Am. Home Prods. Corp.*, 201 F.R.D. 103, 104 (Del. 2011); *see also*

*Lorenz v. CSX Corp.,* 1 F.3d 1406, 1413-14 (3d Cir. 1993). As courts within the Third Circuit

have uniformly recognized, "[t]he standard applicable to motions to amend under Fed. R. Civ. P.

15(d) is essentially the same standard that applies to Fed. R. Civ. P. 15(a)." *Carl Zeiss Meditec*

2011 WL 1326053, at *1; *see also Cellectis S.A. v. Precision Biosciences, Inc.*, 2012 WL

3195092, at *4 (D. Del. Aug. 6, 2012) (Robinson, J.). Given (i) that the FBI Affidavits were

only recently publicly released, (ii) the highly probative nature of the revelations presented in the

Affidavits, and (iii) the procedural posture of this Action, each of these factors supports granting

leave to supplement and amend the SAC.

### B.    Supplementing The SAC Would Promote The Just Disposition Of The Case

Allowing Lead Plaintiffs to supplement the SAC at this stage would facilitate the just

disposition of the case because the new evidence will promote a "complete [] adjudication" of

the dispute. *Carl Zeiss*, at *1. The new material from the FBI Affidavits corroborates the

allegations of the SAC and provides important new facts that amplify the SAC's allegations.

Specifically, the FBI Affidavits support Lead Plaintiffs' allegations about the falsity of

Defendants' statements concerning Wilmington's underwriting, asset review, and internal

controls by revealing for the first time the Bank's complete failure to exercise any oversight over

its $90.7 million lending relationship with Zimmerman.  The FBI Affidavits describe remarkable instances where, for example, the Bank wired $1 million to Zimmerman simply on the basis of the developer's request for funds because Zimmerman had "to pay his bar tab."  Naylor Decl. Ex. B at ¶ 54.  The FBI Affidavits further detailed numerous instances where, at Zimmerman's request, the Bank provided millions of dollars in additional funds (so-called "draws" on Zimmerman's existing loans), without any attempt to obtain documentation or other support for the requests, or to confirm that Zimmerman was actually developing the properties for which the loans were obtained.  *Id*. at ¶¶ 58-67.  As a result, after years of supposed construction on many of Wilmington's loans to Zimmerman, the only tangible progress on some of the projects was a "partially completed parking lot," or, even worse, "no significant construction-related work had been completed."  *Id.* at ¶¶ 35, 36.

This new evidence also supports Lead Plaintiffs' scienter allegations.  For example, the FBI Affidavits describe for the first time the "comprehensive" Delaware Status Review, which resulted in the Bank's own credit personnel strongly criticizing the Bank's underwriting, asset review, and internal controls.  *Id.* at ¶ 39.  The Delaware Review Memorandum was drafted by a senior Wilmington official who, shortly thereafter, took over Defendant North's position as Chief Credit Officer, and is precisely the type of document that the Officer Defendants would have received.  *See id.*  Moreover, the size of the Zimmerman relationship, which alone comprised almost 6% of the Bank's construction loan portfolio, further supports scienter.  The Officer Defendants knew, or were reckless in not knowing, that a Bank relationship manager held absolute control over the credit review and administration of the Zimmerman loans, and that the Bank did not exercise any independent credit review in connection with this relationship.

By corroborating and expanding upon the SAC's factual allegations, including those allegations based on confidential witness accounts, the FBI Affidavits provide substantial support for Lead Plaintiffs' claims. *See In re Cabletron Sys. Inc.*, 311 F.3d 11, 30 (1st Cir. 2002) ("consistent accounts reinforce one another and undermine any argument that the complaint relies unduly on the stories of just one or two former employees").

These facts, and others detailed in the FBI Affidavits, are pleaded in detail in the [Proposed] Third Amended Consolidated Securities Class Action Complaint (Motion Exhibit A). *See*, *e.g.,* ¶¶ 88-112; 200-203; ¶¶ 171(c) & (e); 174(b) & (c); 178((d) & (e); 186(d) & (e); 282-83; 290-91; 306; 316-318.   Because these new facts confirm, corroborate, and substantially expand upon the well-founded allegations of the SAC, which has yet to be evaluated by the Court, any suggestion that amendment is futile must fail. *See Carl Zeiss*, 2011 WL 1326053, at \*1.   Thus, Lead Plaintiffs should be granted leave to supplement the SAC to include the new information arising from the FBI Affidavits so the Court may assess the sufficiency of the pleadings on a complete record and assure the just resolution of the case.

### C.     Supplementing The SAC Poses No Undue Prejudice To Defendants

Undue prejudice to the non-moving party "is the touchstone for the denial of an amendment." *Lorenz,* 1 F.3d at 1414.   But the standard for showing undue prejudice is exceedingly strict; the party opposing amendment must "demonstrate that its ability to present its case would be seriously impaired were amendment allowed." *Dole*, 921 F.2d at 488.   One court has described this stringent standard as follows:

> The burden is on the nonmoving party to establish prejudice and the burden is high.   The defendants' ability to present their case must be "seriously impaired." The nonmoving party has a heavier burden than merely claiming prejudice; it must show that an unfair disadvantage or deprivation will result by allowing the amendment.

*In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670, 681 (E.D. Pa. 2010) (internal citations omitted) (allowing addition of a claim and finding insufficient prejudice to defendants, even though additional discovery would be required and plaintiffs' motion for class certification was pending); *see also Romero v. Allstate Ins. Co.*, 2010 WL 2996963, at *13 (E.D. Pa. Jul. 28, 2010) (granting motion to amend complaint made nine years into litigation after appeal to Third Circuit and remand and noting that "the non-moving party bears the burden of demonstrating prejudice").

Defendants will not be prejudiced by the supplemental information here, let alone experience such prejudice as to create a "serious" impediment to their ability to present a defense.  Subsequent to the filing of the SAC, Lead Plaintiffs uncovered additional information relating to the FBI investigation already described in the SAC.  ¶¶ 11, 137.  *See Dole*, 921 F.2d at 488 (permitting amendment where "proposed amended complaint is based upon facts and circumstances which do not differ significantly from those underlying the Secretary's original allegations.").  After discovering and reviewing the newly unsealed evidence, Lead Plaintiffs moved quickly to inform Defendants and the Court that they intended to supplement the SAC and proposed a stipulation that would immediately suspend the briefing schedule on the pending motions to dismiss so Defendants would not be forced to file reply briefs before seeing the proposed supplemental pleading.  Defendants are hard pressed to claim prejudice – to the contrary, it is Lead Plaintiffs who would be prejudiced if they were not allowed to bring such information to the Court's attention.  This is particularly the case here where the facts disclosed in the FBI Affidavits were always known to Defendants but could not be readily discovered by Lead Plaintiffs, prior to the commencement of formal discovery.

Moreover, Defendants cannot show that their "ability to present [their] case would be seriously impaired" by allowing Lead Plaintiffs to supplement the SAC at this early stage. The proposed amended pleading does not add any new defendants or new claims.  Lead Plaintiffs have no opposition to Defendants re-filing their motions to dismiss after they review the amended pleading, in which they may choose to address any supplemental information added to the SAC.  Furthermore, at this stage in the litigation discovery has not yet commenced, a scheduling order has not been filed, and trial has not been scheduled.  Nor is there any evidence of "bad faith" or "dilatory motive."  *Carl Zeiss*, 2011 WL 1326053, at *1.  As set forth above, Lead Plaintiffs acted promptly upon the discovery of this new information.

### D.    Supplementing The SAC Will Not Cause Undue Delay

The Third Circuit has held that in order to deny leave to amend on the basis of delay, such delay must be <u>undue</u>.  *Cornell and Co., Inc. v. Occupational Safety & Health Review Comm'n*, 573 F.2d 820, 823 (3d Cir. 1978); *see also Adams v. Gould, Inc.,* 739 F.2d 858, 868 (3d Cir. 1984) (mere passage of time does not support denying leave to amend).

Supplementing the SAC at this stage will not create undue delay.  Discovery has not yet commenced, so no amendments to the pretrial schedule or trial date are necessary.  *See, e.g., Romero*, 2010 WL 2996963, at *13  (granting motion to amend complaint made nine years into litigation after appeal to Third Circuit and remand and noting that "the non-moving party bears the burden of demonstrating prejudice").   Given the parties' prior history on working cooperatively on scheduling orders for motion briefing, Lead Plaintiffs anticipate no difficulties in mutually agreeing to a reasonable schedule regarding the amended pleading for any motion to dismiss briefing that Defendants may wish to file.  Moreover, the additional facts to be alleged on the basis of the FBI Affidavits do not give rise to new claims or defenses; rather, they buttress existing claims that are already the subject of Defendants' pending motion to dismiss the SAC.

16

**E.**     **The Court Should Permit Lead Plaintiffs To Amend The Complaint To Clarify Its Existing Allegations**

Finally, in the event the Court permits the filing of a supplemental pleading to incorporate the new evidence contained in the FBI Affidavits, Lead Plaintiffs also request permission to amend the pleading on limited grounds for the purposes of minor technical and stylistic clarification.  None of these alterations will change the substantive allegations of the Complaint, Lead Plaintiffs' claims, or the named Defendants.  If supplementation is permitted, allowing these additional amendments will not cause any prejudice or additional delay, and will provide the Court with a coherent and comprehensive presentation of Lead Plaintiffs' allegations.

**VI.**     **CONCLUSION**

For the foregoing reasons, Lead Plaintiffs respectfully move the Court for leave to supplement and amend the SAC.


Dated:  December 7, 2012                              **CHIMICLES & TIKELLIS LLP**

                                                     */s/ A. Zachary Naylor*
                                                     Pamela S. Tikellis (Bar No. 2172)
                                                     A. Zachary Naylor (Bar No. 4439)
                                                     222 Delaware Avenue, 11th Floor
                                                     P.O. Box 1035
                                                     Wilmington, DE 19899
                                                     Phone: (302) 656-2500
                                                     Fax: (302) 656-9053

                                                     *Liaison Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Blair Nicholas
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:     (858) 793-0070
Fax:    (858) 793-0323

-and-

Hannah Ross (*pro hac vice*)
Sean K. O'Dowd (*pro hac vice*)
Katherine M. Sinderson (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Phone: (212) 554-1400
Fax: (212) 554-1444

**SAXENA WHITE P.A.**

Maya S. Saxena (*pro hac vice*)
Joseph E. White III (*pro hac vice*)
Lester Hooker (*pro hac vice*)
Brandon T. Grzandziel (*pro hac vice*)
2424 North Federal Highway
Boca Raton, FL 33431
Phone: (561) 394-3399
Fax: (561) 394-3382

*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*