**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| **IN RE WILMINGTON TRUST SECURITIES LITIGATION** | Master File No. 10-cv-00990-SLR |
| | (Securities Class Action) |
| | Hon. Sue L. Robinson |
| This document relates to: ALL ACTIONS | ELECTRONICALLY FILED |
| | **JURY TRIAL DEMANDED** |

**THIRD AMENDED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**


I. NATURE OF THE ACTION ..... 1

A. Overview Of The Case ..... 1

B. The Claims Asserted In This Complaint ..... 8

II. PARTIES ..... 8

A. Lead Plaintiffs ..... 8

B. Exchange Act Defendants ..... 9

1. The Officer Defendants ..... 11

2. The Audit Committee Defendants ..... 11

III. BACKGROUND AND NATURE OF THE FRAUD AT WILMINGTON ..... 12

A. Wilmington Abandoned Prudent Underwriting ..... 14

B. Wilmington's Asset Review Process Was Inadequate And Ineffective ..... 21

1. The Officer Defendants Marginalized And Understaffed The Bank's Asset Review Function ..... 22

2. The Officer Defendants Personally Intervened To Undermine The Bank's Credit Risk Personnel ..... 25

C. In 2009, The Federal Reserve Issued A Memorandum Of Understanding Identifying Serious Failings In The Bank's Lending Practices, Risk Management, And Accounting ..... 32

D. Recently Unsealed FBI Affidavits Confirm Wilmington's Fraud ..... 34

1. The Bank's Deficient Underwriting And Asset Review Caused Wilmington To Pay Out Millions Of Dollars To Borrowers Even When They Did Not Meet The Basic Terms Of The Loan Agreement ..... 38

2. Wilmington Continued To Pay Out Millions Of Dollars In Loan "Draws" Without Any Documentation Or Support ..... 43

E. The Officer Defendants Manipulated Wilmington's Loan Loss Reserve ..... 47

IV. THE TRUTH BEGINS TO EMERGE ..... 53

A. June 3, 2010: Cecala Abruptly Announces His Resignation ..... 54

B. June 23, 2010: The Bank Acknowledges That Its Statements The Prior Month Were Not Accurate ..... 56

C. July 23, 2010: The Bank's Financial Results For The Second Quarter 2010 Stun Investors; Defendant Foley Blames "Weakness In The Economy" ............ 57

D. November 1, 2010: The Bank Announces The Take-Under And Investors Learn About $800 Million In Additional Loan Loss Reserves............................ 60

E. Post Class Period Events ........................................................................ 64

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS .................................. 65

A. False Statements Regarding Underwriting ........................................................ 66

B. False Statements Regarding Asset Review Process........................................... 68

C. False Statements Regarding Financial Results ................................................. 72

D. False Statements Regarding Internal Controls................................................... 77

E. Additional False Statements By The Officer Defendants................................... 78

F. Defendants Attempted To Cover Up The True Reasons For The Bank's Increased Reserves With Additional False And Misleading Statements.............. 82

VI. SUMMARY OF SCIENTER ALLEGATIONS.......................................................... 84

VII. RELEVANT GAAP AND ACCOUNTING PROVISIONS.......................................... 92

VIII. LOSS CAUSATION.......................................................................................... 95

IX. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ..................................................................................... 97

X. INAPPLICABILITY OF STATUTORY SAFE HARBOR ......................................... 98

XI. CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT................................. 98

FIRST CLAIM FOR RELIEF .................................................................................. 98

SECOND CLAIM FOR RELIEF ............................................................................. 103

THIRD CLAIM FOR RELIEF ................................................................................ 105

XII. SECURITIES ACT CLAIMS................................................................................ 109

A. Securities Act Defendants................................................................................ 110

1. The Wilmington Defendants.......................................................................... 110
2. The Outside Auditor Defendant..................................................................... 111

3. The Underwriter Defendants ........ 112

B. The Offering Documents Misstated The Bank's Underwriting Practices ........ 112

C. The Offering Documents Misstated The Bank's Asset Review Practices ........ 116

D. The Offering Documents Contained Untrue Financial Results ........ 120

E. The Offering Documents Contained Untrue Statements Regarding the Effectiveness of Wilmington's Internal Controls ........ 126

FOURTH CLAIM FOR RELIEF ........ 130

FIFTH CLAIM FOR RELIEF ........ 133

SIXTH CLAIM FOR RELIEF ........ 135

XIII. CLASS ACTION ALLEGATIONS ........ 137

XIV. JURISDICTION AND VENUE ........ 139

XV. PRAYER FOR RELIEF ........ 140

XVI. JURY DEMAND ........ 140

Lead Plaintiffs, the Merced County Employees' Retirement Association, the Coral Springs Police Pension Fund, the St. Petersburg Firefighters' Retirement System, the Pompano Beach General Employees Retirement System, and the Automotive Industries Pension Trust Fund, on behalf of themselves and all others similarly situated, allege the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based upon the ongoing investigation of counsel. Many of the facts related to Lead Plaintiffs' allegations are known only by the Defendants, or are exclusively within their custody or control. Lead Counsel's investigation included, among other things, a review of public filings by Defendant Wilmington Trust Corporation ("Wilmington" or the "Bank") with the United States Securities and Exchange Commission ("SEC"), media and analyst reports about the Bank, publicly-available data relating to Wilmington common stock, interviews with former Bank employees, and sworn affidavits by FBI Special Agents Kevin P. Shannon and Greg S. Mrozek, recently filed before Magistrate Judge Mary Pat Thynge of the United States District Court for the District of Delaware under the caption *In the Matter of the Search of The Second Floor of 144 Kings Hwy, SW, Dover, Delaware 19901*, No. 12-mj-00167 (the "FBI Affidavits"). Lead Plaintiffs believe that substantial additional evidentiary support for their allegations will be developed after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

### A. Overview Of The Case

1. This action arises from a securities fraud perpetrated by Wilmington's most senior officers, which caused the demise of the 107-year old Bank as an independent institution. Throughout the Class Period, Wilmington portrayed itself as a conservative regional lender that followed strict loan underwriting and asset review practices in order to mitigate its credit risk. Indeed, in its SEC filings, the Bank repeatedly represented to investors that it "mitigate[d] credit

risk" by "employing rigorous loan underwriting standards and applying them consistently," and by closely "monitoring the [loan] portfolio to identify potential problems." The Bank also repeatedly assured investors that it had "a high degree of confidence in the integrity of our commercial construction portfolio" because the Bank "appl[ied] our underwriting standards consistently." These statements were critical to investors, because they assured the market that Wilmington – unlike its competitors – was not exposed to high-risk loans and had a sound portfolio that would withstand the credit crisis. These representations propelled the Company's stock price to a Class Period high of nearly $36 per share in September 2008, and maintained it at an artificially inflated price even as other bank stocks were collapsing.

2. In reality, Wilmington's most senior officers – including Chief Executive Officer Ted Cecala, Cecala's successor as CEO Donald Foley, Chief Financial Officer David Gibson, President Robert Harra, and Chief Credit Officer William North (the "Officer Defendants") – instituted what witnesses described as a "sales culture, not a credit culture." In order to achieve the Bank's internal goal of annual growth of 10% a year, the Bank incentivized its loan officers ("lenders" or "relationship managers") to close loans, and penalized them for documenting that borrowers were unable to repay loans. To further accomplish this goal, Defendant Cecala (i) ordered the Bank's top loan officers to ignore the Bank's underwriting policies when extending loans; (ii) directed Bank employees to refrain from obtaining updated appraisals in order to avoid charging off loans whose collateral had deteriorated in value; and (iii) personally vetoed decisions by the Bank's Asset Review Group to downgrade internal loan risk ratings, recognize impaired loans, and record losses for worthless loans. In fact, former high-level Bank employees report that the Officer Defendants personally intervened at every stage of the lending process to increase loan volume by undermining the underwriting and asset review process, doing "deals a

normal commercial bank should not have looked at." According to those witnesses, the Bank's underwriting was "nonexistent," its appraisals were "horribly inflated," and its credit risk management existed "in name only" with "no real standards." Indeed, according to these witnesses, almost 75% of the Bank's loans received "essentially no review" by the credit review department, which was supposedly responsible for evaluating the performance of the Bank's loans.

3. Significantly, the Officer Defendants were warned repeatedly throughout the Class Period about critical deficiencies in the Bank's lending and risk management practices by the Federal Reserve Board (the Bank's primary regulator), KPMG LLP (the Bank's outside audit firm), and Wilmington's Internal Audit department. Each of these gatekeepers sharply criticized the Bank's risk management procedures and internal controls dating back to at least 2007. For example, in its 2007 review, the Federal Reserve determined that the Bank's failings in asset review were "weaknesses in [Wilmington's] control structure" that left the Bank unable to assess its credit risk and, thus, the adequacy of its Loan Loss Reserve. This finding was echoed by KPMG and the Bank's Internal Audit in 2007, and again in 2008 by the Federal Reserve and KPMG. Notwithstanding these repeated warnings, the Officer Defendants did nothing to remedy these problems.

4. Wilmington's lending and accounting practices were so deficient that, in late 2009, the Federal Reserve required the Bank to enter into a Memorandum of Understanding (the "MOU"), one of the Federal Reserve's most serious enforcement tools, which forced the Bank to entirely restructure the way it originated, monitored, and accounted for its loans. The MOU identified extensive failings in the Bank's lending, risk management, and accounting functions, including that Wilmington lacked "a process to monitor compliance with [credit] policies and

procedures." As a result of the MOU, Wilmington was required to, among other things, reevaluate the risk of its loan portfolio and obtain updated appraisals.

5. As set forth in the FBI Affidavits, the problems in Wilmington's underwriting and asset review practices were so severe that, in 2009, the Bank initiated a "comprehensive" analysis of its lending practices in Delaware, which comprised more than 50% of the Bank's commercial loan portfolio. This project, which was known internally at Wilmington as the "Delaware Commercial Real Estate Division Project Status Review," (the "Delaware Status Review") entailed a thorough evaluation of the Bank's underwriting and asset review practices in Delaware. As the FBI Affidavits provide, this review, which Wilmington concluded by no later than January/February 2010, documented "serious concerns with the past management of the Delaware Commercial Real Estate Division and with its loan portfolio."

6. Wilmington summarized the results of that review in a March 12, 2010 memorandum entitled the "Delaware Commercial Real Estate Division Concern" (the "Delaware Review Memorandum"). The Delaware Review Memorandum described a litany of "serious concerns" with Wilmington's lending practices, including: (i) the "unethical use of loan approval authority by relationship managers," (ii) the Bank's "limited oversight of relationship managers," and (iii) "a limited technical knowledge of commercial real estate lending" on the part of Wilmington's lenders. The Delaware Review Memorandum also provided numerous specific examples of the gross deficiencies in the Bank's underwriting and asset review practices, including the Bank's repeated "lack of validation of construction budgets prior to loan closings," and the "frequent use of loan proceeds to provide cash to borrowers or fund partner buyouts prior to construction completion or the property having reached operating stabilization." In other words, the Bank's underwriting and asset review practices were so deficient that the Bank

"frequently" made multi-million dollar loans to developers who had demonstrated no intention of actually developing the target projects. Instead, with the Officer Defendants' knowledge or reckless disregard, these borrowers simply pocketed the money.

7. Certain of the egregious practices cited by the Delaware Review Memorandum are illustrated by the Bank's long-standing relationship with Michael Zimmerman, a prominent Delaware developer and one of the Bank's largest borrowers ("Zimmerman"). The Bank's loans to this single developer alone totaled $90 million in March 2010, constituting almost 6% of the Bank's entire commercial construction loan portfolio. Despite the importance of Zimmerman's loans to Wilmington, the FBI Affidavits make clear that the Bank exercised virtually no oversight over this highly material lending relationship. Indeed, according to the FBI Affidavits, Wilmington's lending practices were so inadequate that in January 2008, Zimmerman was able to obtain a $1 million loan from the Bank simply on the basis of a faxed request to "send $$1,000,000 ASAP I have to pay my bar tab." In yet another example, Zimmerman obtained a $1 million equity payout from Joseph Terranova, one of Wilmington's two most significant relationship managers and the division head of its commercial real estate division, without satisfying any of the terms of the underlying loan agreement, which itself excluded material terms required by the Bank's Loan Committee to approve the loan. As Terranova expressly noted in his email to Zimmerman about the loan, "I went back through my notes and I saw executed lease and plan approval as the condition. However not wanting my reputation for reckless abandon to be in jeopardy, I guess we can fund the $1,000,000," even though Zimmerman did not have executed leases for that project The Bank eventually wrote off nearly half of its loans to Zimmerman, costing the Bank over $43 million – or 10 times the Bank's net loss for all of 2009.

8. The Bank's derelict lending practices caused the Bank to accumulate hundreds of millions of dollars' worth of problematic and non-performing loans during the Class Period. However, the Officer Defendants' refusal to recognize (or publicly disclose) the deterioration in the Bank's loan portfolio caused the Bank to understate its Loan Loss Reserve (which is a reserve for probable credit losses) by staggering amounts – about $1 billion – during the Class Period. While the Officer Defendants were able to conceal these massive deficiencies for most of the Class Period, the implementation of the credit review process required by the Federal Reserve forced the Bank to begin to recognize credit losses in the portfolio beginning in late 2009. In the fourth quarter 2009 and first quarter 2010, Wilmington increased its reserves by $82 million and $77 million, respectively, amounts that materially impacted the Bank's earnings but were still vastly insufficient. Significantly, at every opportunity, the Officer Defendants emphatically denied that these increases had anything to do with the quality of the Bank's loan portfolio, and instead blamed the increases on economic conditions in Delaware.

9. In June 2010, Defendant Cecala announced his abrupt resignation after 31 years with the Bank. When analysts asked Cecala about whether his resignation indicated "any mounting credit problems that hadn't been reported," Defendant Cecala dismissed any such concerns, claiming "none whatsoever." These statements were false. One month later, on July 23, 2010, Wilmington disclosed that its provision for loan losses had increased by $140 million, or more than 160% from the prior quarter, leading to a massive loss in the second quarter 2010 of $120 million. Analysts reacted angrily, noting that the prior month, the Bank had misled the market about the true state of the Bank's loans.

10. As investors were soon to learn, the July 23 announcement was just the tip of the iceberg. On November 1, 2010, the Bank shocked investors by announcing that, as a result of

further credit losses, it would have to increase its Loan Loss Reserve by another $280 million – an amount that was almost equal to the entire Loan Loss Reserve the Bank had been maintaining. As a result, the Bank reported a third quarter 2010 loss of $365 million – or more than 90 times greater than the loss of $4 million the Bank reported for all of 2009.

11. That same day, the Bank disclosed that as a result of the catastrophic state of its loan portfolio, it could not survive as an independent bank, and would have to be sold to M&T Bank ("M&T") at a fire sale price equal to only half the price at which Wilmington's shares were trading. Remarkably, as M&T disclosed on November 1, even the $280 million increase in reserves that the Bank had announced was not sufficient to account for the condition of the Bank's loan portfolio. In connection with its due diligence of the Bank, M&T's team reviewed 50% of the Bank's commercial loan portfolio to analyze losses. M&T's analysis determined that the Bank would have to write off almost $1.5 billion – or nearly 20% – of the loan portfolio that existed between January 1, 2008 through September 2010. Similarly, M&T determined that 40% of Wilmington's commercial construction portfolio was utterly worthless and had to be written off. Based on this review, M&T announced that the Bank had incurred, but not publicly reported, additional losses of another $500 million.

12. Faced with such massive reserve increases, the Bank informed investors that it faced "significant regulatory actions in the near term" and that it was not a viable business and could no longer survive as an independent entity. Thus, the Board had no choice but to recommend that shareholders approve the sale to M&T for half the Bank's market capitalization.

13. On the news of the merger – which *The New York Times* termed "one of the biggest so-called take-unders in recent Wall Street memory" – the price of Wilmington's stock collapsed 46%, causing massive losses to investors. The conduct of Wilmington and the Officer

Defendants has since sparked a broad SEC inquiry into Wilmington's lending and accounting practices, and a federal grand jury has been empaneled to hear evidence from the FBI's criminal probe into Wilmington's commercial lending practices. In sum, as a result of the Officer Defendants' misconduct, the Bank that had served Delaware's business community for over one hundred years vanished, causing massive harm to its investors and its community.

### B. The Claims Asserted In This Complaint

14. Lead Plaintiffs assert claims under Sections 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") against the Bank and the Officer Defendants on behalf of purchasers of Wilmington's common stock during the Class Period, January 18, 2008 up to November 1, 2010. Lead Plaintiffs also assert control-person claims under Section 20(a) of the Exchange Act against the Officer Defendants.

15. The second set of claims asserts a series of strict liability and negligence causes of action under the Securities Act of 1933 ("Securities Act") against those Defendants who are statutorily responsible under Sections 11 and 12(a)(2) of the Securities Act for materially untrue statements and misleading omissions made in connection with Wilmington's public offering of common stock on February 23, 2010 (the "Offering"). The Securities Act claims are addressed in Section XII of this Complaint. These claims do not require scienter, and Lead Plaintiffs specifically disavow any allegations of fraud or recklessness with respect to them.

## II. PARTIES

### A. Lead Plaintiffs

16. Lead Plaintiff Merced County Employees' Retirement Association ("Merced") is a multiple-employer defined benefit plan established in 1950. Merced administers retirement, death, disability, and survivor benefits for eligible employees. As of June 30, 2011, Merced held $514 million in net assets.

17. Lead Plaintiff Coral Springs Police Pension Fund ("Coral Springs") is a pension plan established in 1979 that provides defined benefit pension and disability benefits for the police officers of the city of Coral Springs, Florida. As of May 16, 2011, Coral Springs held approximately $125 million in net assets.

18. Lead Plaintiff St. Petersburg Firefighters' Retirement System ("St. Petersburg") is a benefit plan for the firefighters of the city of St. Petersburg, Florida. St. Petersburg serves approximately 700 members and manages over $175 million in net assets.

19. Lead Plaintiff Pompano Beach General Employees Retirement System ("Pompano GERS"), headquartered in Pompano Beach, Florida, is a single-employer defined benefit plan that has provided retirement benefits for Pompano Beach's city employees since 1972. Pompano GERS currently manages over $100 million in net assets and serves over 800 retirees.

20. Lead Plaintiff Automotive Industries Pension Trust Fund ("Automotive Industries") is a defined benefit plan for individuals working in various trades surrounding automobile manufacturing, maintenance, and delivery industries throughout the Northern California area. As of May 10, 2011, Automotive Industries held approximately $1.2 billion in net assets.

21. Lead Plaintiffs purchased Wilmington common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws herein. As set forth in Appendix A, Lead Plaintiffs purchased or acquired over 199,825 shares of Wilmington common stock during the Class Period, including 8,750 shares purchased in the Offering.

**B. Exchange Act Defendants**

22. Defendant Wilmington was a Delaware corporation, with its executive headquarters located at 1100 North Market Street, Wilmington, Delaware 19890. At all relevant

times, Wilmington was a bank holding company, a thrift holding company, and a financial holding company with several subsidiaries, including Wilmington Trust Company ("WTC"). Wilmington was regulated by the Delaware Department of Banking and the Federal Reserve, among others.

23. Wilmington had four business segments: Regional Banking, Corporate Client Services, Wealth Advisory Services, and Affiliate Money Managers. The Bank's Regional Banking segment, whose predominant business was the origination of commercial loans, is the primary focus of this Complaint. Commercial loans comprised a significant portion of the Bank's assets. According to the Bank's 2008 Form 10-K, as of December 31, 2008, the loan balance for commercial loans totaled over $6.4 billion, 70% of the Bank's total loan portfolio (which also included, *inter alia*, consumer loans and residential loans) and 78% of the Bank's assets. Wilmington's commercial loans – all of which were originated by the Bank – consisted of three types of loans: (1) commercial real estate construction; (2) commercial, financial, and agricultural loans; and (3) commercial mortgages. Wilmington was highly concentrated in Delaware commercial lending, with between at least 50% and 60% of its portfolio invested in the state throughout Class Period.

24. At all relevant times, Wilmington was listed on the New York Stock Exchange ("NYSE"), where its stock was publicly traded under the symbol "WL." As of September 30, 2010, there were over 91 million shares of Wilmington common stock outstanding.

25. On November 1, 2010, Wilmington announced that it was being acquired by M&T. M&T, a bank holding company, is listed on the NYSE under the symbol "MTB." According to the Agreement and Plan of Merger between Wilmington and M&T, M&T is the successor-in-interest to Wilmington.

**1. The Officer Defendants**

26. Defendant Ted T. Cecala ("Cecala") served as Wilmington's CEO from July 1996 until his abrupt resignation on June 3, 2010, and as Chairman of the Board from 1996 through July 19, 2010. Cecala joined Wilmington as Controller in 1979 and served in various positions at the Bank, including CFO and Vice Chairman and COO.

27. Defendant Donald E. Foley ("Foley) served as Cecala's successor as CEO and Chairman of the Board for Wilmington. Foley replaced Defendant Cecala as CEO in June 2010 and as Chairman of the Board in July 2010. Before that, Foley served as a Director of the Bank starting in July of 2006, during which time he served as a member of the Audit and Compensation Committees, chairing the Audit Committee from 2008 to 2010.

28. Defendant David R. Gibson ("Gibson") served as Wilmington's CFO since 1997 and as Wilmington's COO since November 2010. He served as a Wilmington executive officer since 1992.

29. Defendant Robert V.A. Harra Jr. ("Harra") served as Executive Vice President since 1992 and as President since 1996. Harra also served as COO from 1996 to 2010 and as a Director since 1996. Harra joined Wilmington in 1971.

30. Defendant William North ("North") served as the Chief Credit Officer for Wilmington from 2004 until his abrupt resignation in July 2010. Before joining the Bank in 1997, North spent eighteen years in various lending and credit positions at CoreStates Bank.

31. Defendants Cecala, Foley, Gibson, Harra, and North are referred to herein collectively as the "Officer Defendants."

**2. The Audit Committee Defendants**

32. The following individuals (collectively referred to as the "Audit Committee Defendants") were Directors of Wilmington who served on the Board's Audit Committee during

the Class Period. The Audit Committee Defendants are each liable as control persons.

33. Defendant Carolyn S. Burger ("Burger") served as Director from 1991-2010. Burger served on several committees, including the Audit Committee (at least 2001-2004 and 2008-2011, Chair 2001-2004 and 2010-2011).

34. Defendant R. Keith Elliott ("Elliott") served as Director from 1997 until October 2010. Elliot served on several committees, including the Audit Committee (at least 2007-2008, Chair 2007).

35. Defendant Gailen Krug ("Krug") served as Director from 2004-2010. Krug served on several committees, including the Audit Committee (at least 2007-2010).

36. Defendant Stacey Mobley ("Mobley") served as Director from 1991 to 2010. Mobley served on several committees, including the Audit Committee (at least during 2009).

37. Defendant Michele M. Rollins ("Rollins") served as Director from 2007 to May 2010. Rollins served on several committees, including the Audit Committee (2009-2010).

38. Defendant David P. Roselle ("Roselle") served as Director from 1991 to 2009. Roselle served on several committees, including the Audit Committee (at least 2007-2009).

39. Defendant Oliver R. Sockwell ("Sockwell") served as Director from 2007 to 2010. Sockwell served on the Audit Committee (2008-2010).

40. Defendant Robert W. Tunnell, Jr. ("Tunnell") served as Director from 1992-2011. Tunnell served on several committees, including the Audit Committee (at least 2007-2008 and 2010-2011).

41. Defendant Susan D. Whiting ("Whiting") served as Director from 2005-2011. Whiting served on several committees, including the Audit Committee (2010-2011).

## III. BACKGROUND AND NATURE OF THE FRAUD AT WILMINGTON

42. Since its founding in 1903, Wilmington fostered a reputation for conservatism and

quality. Wilmington distinguished itself from financial institutions whose risky practices gave rise to the recent financial crisis, claiming in its 2009 Annual Report to Investors, for example, that "[o]ur strong capital position, 107 years of stability, and focus on client relationships stand in stark contrast to the struggles and distractions that many other financial institutions are facing." The Bank claimed in that same report that it had "succeeded across 105 years of economic cycles" because it "manage[d] risk conservatively." As a result, as *The News Journal* would later report, investors considered Wilmington to be "stodgy, conservative and risk-averse." Leonard Quill, former chairman of the Wilmington Board, termed the Bank the "Rock of Gibraltar."

43. During the Class Period, Wilmington publicly reported financial results that created the false impression that the Bank was weathering the financial crisis without any of the crippling credit losses suffered by other banks. Specifically, the Bank's Loan Loss Reserve – a key indicator of credit quality – remained steadily low throughout much of the Class Period. Moreover, because any increases to the Loan Loss Reserve would be charged dollar-for-dollar against the Bank's income, Wilmington reported stronger net income than many of its peers that were experiencing increased loan loss reserves throughout the Class Period. The Bank attributed this success to its purported "rigorous" underwriting and its "consistent" credit review and repeatedly emphasized that its loans consistently received the highest credit quality risk ratings. In reality, the Bank's underwriting practices were lax and essentially nonexistent, resulting in a portfolio comprised of loans with an extraordinarily high risk of default. The Bank concealed this fact for years by marginalizing its asset review functions and by under-reserving for loan losses (overstating the Bank's net income) throughout the Class Period.

44. The true facts regarding the quality of Wilmington's loan portfolio – and the

magnitude by which the Bank had overstated its net income every quarter of the Class Period – were only fully revealed to the public on November 1, 2010, when the Bank and M&T disclosed nearly $800 million in remaining credit losses in the Bank's portfolio. The stunning losses that M&T discovered in Wilmington's loan portfolio did not happen by accident, nor did they suddenly appear in the third quarter of 2010. As set forth below, numerous former Wilmington employees confirmed that the losses were the direct result of the Bank's longstanding abandonment of underwriting standards and disregard for adequate credit quality review.

### A. Wilmington Abandoned Prudent Underwriting

45. Underwriting refers to the due diligence process that banks perform prior to extending a loan to verify a borrower's creditworthiness. For banks with a concentration in commercial real estate like Wilmington, implementing and maintaining clear and strict underwriting standards are critical to protect against deteriorating credit quality and losses to the Bank. Numerous former Wilmington employees reported that – contrary to the Officer Defendants' statements during the Class Period that the Bank "consistently" employed "rigorous" underwriting standards to "mitigate" credit risk – the Bank's underwriting policies and practices were so "lax" that the Bank effectively had <u>no</u> standards. According to Confidential Witness ("CW") 1, a twenty-year banking veteran who was a Vice-President in Wilmington's Workout group from March 2008 to July 2011, the Bank's underwriting was "nonexistent" and, as a result, Wilmington entered into "deals a normal commercial bank should not have looked at."[1] These problems were so severe that, according to CW 1, who worked closely with federal regulators in 2010, the Federal Reserve became concerned about the "<u>future ability of the bank to survive, based on what they saw in the credit underwriting</u>" and effectively

[1] At Appendix B, Lead Plaintiffs provide the tenure and position of the former Wilmington employees cited throughout this Complaint as confidential witnesses.

took over the Bank's credit operations in the summer of 2010.

46. In an effort to generate new loans and drive revenues, loan officers frequently ignored even the few established underwriting processes that existed and originated loans without the proper documentation. For example, CW 3, who managed the unit that reviewed the Bank's commercial loan documentation from June 2008 through June 2010 (and who was a loan documentation reviewer for four years before that), stated that the Bank routinely extended loans that contained errors and deficiencies in their underwriting. According to CW 3, these deficiencies (both missing documentation and violations of the Bank's underwriting guidelines) were documented in monthly reports that were provided directly to Defendant North and made available to Defendants Cecala and Harra. While these reports were intended to alert senior management and the lenders of specific deficiencies that needed to be corrected and to track widespread underwriting problems that needed to be remedied, neither happened. In fact, not only did the Officer Defendants and the lenders ignore these reports (failing to correct the deficiencies), but North routinely ordered CW 3 to remove these deficiencies from the reports several times a month throughout the Class Period.

47. CW 3 further reported that the deficiencies in documentation included "a number of times" where the promissory note was signed and dated before the loan approval. This meant that the lender had booked the loan (legally obligating the Bank to loan the money) without waiting for the appropriate approvals. This problem was so consistent and severe that Wilmington's internal Sarbanes-Oxley compliance team identified the practice as a violation of the Bank's obligations under the Sarbanes-Oxley Act at least once during the Class Period, according to CW 3. Similarly, as set forth below, the FBI Affidavits described repeated instances where the Bank extended additional credit even though the borrower had not met the

basic terms of their loan agreements.

48. CW 1, who reviewed loan files going back to 2000, corroborated CW 3's report, stating that, in general, the Bank was "woefully deficient on loan documentation" and that it was common for there to be no documentation evidencing any underwriting in loan files. In fact, CW 4, who was a Construction Loan Administrator in Commercial Banking Credit Policy from 2009 through 2010, recalled that in the Spring of 2010, after the Federal Reserve instituted the MOU and demanded that the Bank correct its deficient underwriting practices, the Bank's credit personnel were forced to try to create numerous loan files from scratch. CW 4 described how employees were "breaking their necks to get those loan files together," a process that involved going back to the lenders to get signatures on documents that had not previously been signed or to get missing documentation.

49. As an example of the Bank's deliberate disregard for underwriting standards, CW 1 pointed to the underwriting decisions of Joseph Terranova, division head of the Bank's commercial real estate division and one of the Bank's top lenders with a $500 million loan portfolio (7% of the Bank's total commercial loan portfolio) and Brian Bailey, head of lending in Delaware. In fact, as discussed below in Section III.D, the FBI Affidavits particularly focused on Terranova's lending practices in connection with the Bank's lending relationship with a prominent Delaware real estate developer.[2] According to CW 1, Defendant Cecala instructed Terranova and Bailey "not to keep files" on the numerous loans they originated, essentially telling them to ignore the Bank's underwriting practices and simply extend the loans. Thus, Cecala's instruction alone – setting aside the other weaknesses discussed herein – meant that a

[2] Although the FBI Affidavits do not identify the relationship manager by name, Lead Counsel confirmed through its investigation that Terranova was the relationship manager described in the FBI Affidavits.

large percentage of the Bank's loan portfolio was originated without any meaningful underwriting.

50. Defendant Cecala's instruction led to Terranova's and Bailey's loan files being riddled with errors and exceptions, if the files existed at all. CW 1, who reviewed numerous large loan files originated by Terranova and Bailey, explained that many of these files did not have a "scrap" of documentation to support the Bank's underwriting decisions and that all of the files suffered from numerous documentation errors. CW 2, head of the Bank's Credit Risk Management Division from 2008 through 2010 (and Division Manager in Risk Management & Operations from 2000 through 2008), had a similar experience in reviewing the files of Terranova and Bailey. According to CW 2, a review by the Bank's credit risk department – which on information and belief is the Delaware Status Review described in the FBI Affidavits and discussed below at ¶¶89-91 – revealed that Terranova issued "dozens and dozens" of loans in 2007 without the required approvals, which were recorded on the Bank's 2007 balance sheet and, due to their multi-year payment and funding structure, remained on the books into and throughout the Class Period. Moreover, according to CW 2, when the credit risk department, including CW 2, raised concerns about the missing documentation in Terranova's loans to Harra and North, the missing data and approvals were often papered over with management's approval. CW 2 also confirmed that the credit risk department identified similar patterns of problems with loans initiated by Brian Bailey. As discussed below, the FBI Affidavits corroborate these accounts by CWs 1 and 2, describing multiple instances where a loan file contained no documentation, openly fraudulent documentation, or patently insufficient documentation (such as the request for funds to pay the borrower's "bar tab") to support the Bank's extension of credit.

51. The Bank's underwriting deficiencies – and the disastrous relationship with Zimmerman – arose out of policies instituted by Defendants Cecala, Harra, and Gibson that favored extending a high volume of loans to customers based on the clients' ongoing or potential relationships with the Bank, rather than on an evaluation of their creditworthiness. According to CW 2, the Bank operated with an internal annual goal of 10% growth from at least 1997 through March 2010. This ambitious growth goal required a constant Bank-wide focus on sales and business development, leading several former Wilmington employees, including CW 2, CW 5 (Vice President in Wilmington's loan Workout group from January 2008 through June 2010), and CW 1 to describe Wilmington as being "more of a sales culture than a credit culture." As discussed below, Wilmington's loan policies focused on loan volume at the expense of credit quality.

52. First, numerous former Wilmington employees described how Wilmington extended loans to favored clients without "scrutiny." For instance, CW 1 and CW 6, who worked in credit and risk assessment for the commercial loan portfolio from 2002 through April 2007, described how, for years, Wilmington operated on a "friends and family plan" where favored and potential clients got what they wanted. As an example, CW 1 cited numerous instances where the only documentation in a loan file was a statement that the borrower would be a "good referral" for the Bank's wealth advisory division. Similarly, according to CW 7, a former Wilmington paralegal from May 2007 to April 2009 who reviewed and processed the Bank's loan documentation, Wilmington "went to great lengths to get loans through" for favored clients and would "often re-write a loan that a client didn't qualify for" based on the Bank's relationship with the client.

53. Second, the Bank made its loan underwriters subordinate to the very people – the

Bank's sales staff – whose work they were purportedly examining. Former employees uniformly reported that the "underwriting" function at Wilmington was largely conducted and controlled by the lenders, who were incentivized to originate the loan. The underwriters reported to regional lending managers who were in charge of business development – the Bank's primary focus – as opposed to non-sales, credit-focused supervisors. According to CW 1 and CW 2, the Bank's underwriters were "lender wannabes" who considered the position just a stepping-stone to becoming a "well-compensated" loan officer. CW 1 explained that the underwriters were "told what to write on a piece of paper to make the numbers work" on a loan and "[t]hey weren't allowed to be independent." In other words, according to CW 1, the underwriters' approval was provided for form only and was just "putting lipstick on a pig." CW 4 described the lenders as controlling the process, stating "Whatever the lenders say is basically what it was …That's who we answered to – the lenders." As CW 3 commented, "whatever the lenders said, [the underwriters] did" and "[i]f the lender said jump, they'd say how high."

54. Third, in order to further marginalize the Bank's underwriting function, underwriters did not receive sufficient training (according to CWs 1, 2, and 4) or sufficient staffing (according to CW 2). According to CW 2, the underwriter function was chronically understaffed – the Bank never had more than twelve underwriters in total (out of roughly 3,000 employees), for all of the Bank's commercial lending, which amounted to a portfolio of $6.4 billion in 2008 and 2009. Yet, this handful of inexperienced, untrained underwriters was nominally responsible for underwriting hundreds of millions of dollars in loans every year.

55. Fourth, the Bank's policies exempted a large percentage of the Bank's loan portfolio from any review beyond that supposedly done by the underwriters. Specifically, only large loans exceeding $5 million were submitted to the "Loan Committee" for review after an

underwriter – under the lender's direction – had perfunctorily signed off on the loan. According to CW 2, North as Chief Credit Officer chaired the Loan Committee, and its members included CW 2; senior lending management, including Brian Bailey, the relationship manager mentioned above; and Cecala and Harra, both *ex officio* members of the Committee. According to the Bank's quarterly SEC filings during the Class Period, 50% of the Bank's loan portfolio was below $5 million, and these loans were accordingly exempted from any review beyond the decision made by the Bank's lenders (with the rubberstamp from the Bank's underwriters). Furthermore, as set forth below in Section III.D, even after the Loan Committee approved the terms of the loan, lenders commonly unilaterally changed those terms to accommodate the borrower.

56. Fifth, Wilmington's "10% rule authority" (the "10% Rule") allowed lenders to increase large loans by material amounts without scrutiny. Under the 10% Rule, after obtaining approval for a large loan from the Loan Committee, loan officers could then approve, by their own "signature authority," an additional loan of up to 10% of the original loan amount without seeking any further approval by the Loan Committee. This meant that lenders could extend loans that exceeded the amount approved by the Loan Committee, and did not conform to the Bank's purported underwriting standards, by first proposing the loan as a conforming loan and then, after obtaining approval, unilaterally increasing the loan amount by 10%. CW 1 and CW 2 stated that there was no underwriting done to justify 10% Rule loans.

57. The 10% Rule was widely used to extend larger loans without further credit analysis. According to CW 2, the Delaware real estate group, and in particular Joseph Terranova and Brian Bailey, frequently relied on the 10% Rule when granting loans. CW 1 confirmed "almost every loan [Workout] saw" had a 10% Rule loan (or two) attached to it. According to

CW 1, relationship manager Andrew Bianchino was the "Prince of the 10% Rule," and every loan he originated had one or more 10% Rule loans attached to it. According to CW 1, nobody in the Workout group had ever seen anything like the use and exploitation of the 10% Rule at Wilmington, and "any normal bank wouldn't allow it."

**B. Wilmington's Asset Review Process Was Inadequate And Ineffective**

58. After a bank underwrites and originates a commercial loan, it is critical that the bank monitor the loan on an ongoing basis in order to evaluate and ensure the borrower's continued ability to pay based on market shifts, collateral deterioration, and changes in borrowers' credit. At Wilmington, this critical function was supposedly performed by the Asset Review Group ("ARG"). According to the Bank's SEC filings, a key component of the ARG's review involved the analysis of the Bank's loan risk ratings, which the Bank's lenders assigned at origination with a risk rating of 1 (least risk) – 9 (highest risk). These risk ratings then fell into four categories of risk: Pass, Watchlisted, Substandard, and Doubtful. The purpose of the risk ratings was to indicate the likelihood that the Bank would "charge off" some portion of the loan amount because it did not expect the borrower to pay the full amount of the principal and to determine the amount of loan loss reserves to set aside for expected losses (which reserves were then charged dollar-for-dollar against the Bank's income).

59. Throughout the Class Period, Wilmington claimed that it "regularly reviewed" and "monitored" its loans to "mitigate" the Bank's credit risk. However, in reality, the Bank failed to conduct any review on an annual basis of 85-90% of its loan portfolio. As discussed below, Wilmington's purported asset review was a sham, which CW 1 termed "credit review in name only" causing its risk ratings to be "generally inaccurate." Instead, the Officer Defendants utterly ignored the Bank's asset review function in order to avoid necessary loan risk rating downgrades and increases to the Bank's Loan Loss Reserve. In fact, the Bank's Internal Audit

group, the Federal Reserve, and the Bank's outside auditor, KPMG, each repeatedly determined that the Bank's asset review function was inadequate.

### 1. The Officer Defendants Marginalized And Understaffed The Bank's Asset Review Function

60. Beginning before and continuing throughout the Class Period, the Bank failed to meet even the most basic standards of asset review and credit risk management. The Bank refused to staff the ARG or provide it with the resources necessary to meaningfully review the portfolio, and instead relied nearly exclusively on its loan officers – who were penalized for downgrading loans – to bring necessary loan downgrades to the Bank's attention.

61. Specifically, contrary to the Bank's consistent representation that it applied and reviewed its risk ratings "consistently," according to CW 2, the Bank had "no real standards" for how often loans were reviewed by the ARG until at least mid-2008. Problems were identified by random samplings, which CW 2 characterized as "review by exception." The Officer Defendants undermined the ARG by providing minimal staffing and resources, preventing the Group from adequately reviewing the portfolio for potential losses. In fact, the ARG did not even have a manager until mid-2008. According to CW 2 and CW 8 (a former Director of Internal Audit who left in June 2008), the ARG's manager left in 2006, and the Bank – including Cecala and Gibson – left that critical risk management position vacant until mid-2008. Moreover, according to CW 2, although Wilmington's commercial loan portfolio averaged $6.4 billion in 2008, the ARG only had 4-5 employees (out of 3,000 Bank employees) to review the entire loan portfolio, including residential and consumer loans, and determine the appropriate amount of loan loss reserves. According to CW 6 (and CW 2, who corroborated the substance of CW 6's report), the "lack of manpower" in the ARG "had been an ongoing issue forever," and it was a "standing joke" at Wilmington that the Bank stated it would increase the staff for the

Group, but never did. Year after year before the Class Period, according to CW 6, the ARG requested the budget to hire additional staff, but these requests were always rejected by senior management. CW 1 confirmed that this lack of staffing prevented the ARG from performing any verification of construction progress, including standard bank practices of visiting and inspecting construction sites to confirm that construction was ongoing before the Bank allowed a borrower to draw further on their loan. As discussed below in Section III.D, the Bank's abandonment of these standard asset review practices – driven (at least) in part by this lack of staffing – led the Bank to extend millions of dollars of credit where the borrower was actually siphoning off the funds for purposes other than construction.

62. CWs 1 and 2 confirmed that the vast majority of Wilmington's loans were not subject to review by the ARG. Specifically, CW 1 stated that there was "essentially no review" for loans of less than $15 million. Significantly, this meant that a substantial amount of Wilmington's loans were never reviewed by the ARG. According to the Bank's 2008 annual report, no less than 72% of the Bank's commercial loans were for amounts less than $10 million and thus received "essentially no review." Moreover, CW 1 stated that the ARG only reviewed a "very small" percentage – approximately 10% – of the loan portfolio on an annual basis until late in the Class Period. The fact that the ARG failed to review the overwhelming majority of the loan portfolio meant that no one monitored the Bank's loans to ensure that its borrower could continue to repay their loans or that borrowers were using the loan proceeds to fund continued construction.

63. As evidenced by the FBI Affidavits, even many of the larger relationships – like Zimmerman's $90 million relationship – received no ongoing review from the Bank beyond that provided by the lenders. Instead of providing adequate resources to the ARG, the Bank relied

almost exclusively upon the lenders, who originated the loans, to bring any recommended rating downgrades to senior management's attention. Accordingly, the responsibility for evaluating credit risk was left to many of the same major relationship managers who, as discussed above, disregarded underwriting standards in order to close more loans. In fact, according to CWs 1 and 2, not only did the Bank reward these lenders based on loan volume (encouraging them to jettison underwriting standards), the Bank actually penalized lenders for downgrading loan ratings. As CW 1 and CW 2 explained, if a loan rating was downgraded, then the bonus compensation for the loan officer responsible for originating that loan would be similarly downgraded. It was for this reason that, throughout CW 2's thirteen years with the Bank, CW 2 could not recall a loan officer ever voluntarily or independently downgrading a loan.

64. In fact, lenders were able to avoid loan downgrades on problem loans by simply claiming that the borrower was a "good guy." Specifically, at the Bank's quarterly meetings where the staff and management discussed large credit exposures and emerging problems (called "Credit Strategy Meetings"), lenders would simply tell Defendants Cecala, Harra, Gibson, and North that the borrower was a "good guy" to avoid any closer review of the assigned loan risk ratings, according to CW 1. CW 1 explained that the discussion of borrower creditworthiness at the Credit Strategy Meetings revolved around whether the borrower was a "good guy" and not questions regarding the borrower's cashflow, financial obligations, or other basic measures of the borrower's ability to repay the loan.

65. Wilmington's Internal Audit, KPMG, and the Federal Reserve each repeatedly criticized the Bank's failure to adequately review its loan portfolio and warned the Bank that its reliance on lenders to rate its loan portfolio was unacceptable. Specifically, according to CW 8, by no later than the Fall of 2007, Wilmington's Internal Audit group issued a report highlighting

that the Bank's ARG was understaffed, did not have a manager, and that the percentage of the portfolio reviewed (roughly 10-15% of the total portfolio) was inadequate to assess the risk of losses in the Bank's portfolio. This report was transmitted by email and hard copy to Cecala, Gibson, Harra, North, and Foley (as chair of the Board's Audit Committee). However, recognizing the futility of such warnings to the Officer Defendants, CW 8 described the Internal Audit function at Wilmington as "barking in the wind."

66. KPMG also criticized the Bank's inadequate asset review. According to CW 2, in connection with its 2007 audit of the Bank, KPMG issued a "Management Letter" identifying the Bank's lack of review of its loan portfolio as a material weakness in the Bank's internal controls. KPMG communicated its finding to the Bank's Audit Committee and senior management, including the Officer Defendants. The Officer Defendants ignored KPMG's warnings and, in connection with KPMG's 2008 audit, KPMG again criticized the Bank's inadequate asset review. According to CW 2, in connection with KPMG's 2008 audit, the audit team warned Cecala and Gibson that Wilmington had not addressed its dangerously inadequate portfolio review coverage.

67. The Federal Reserve also identified serious deficiencies in Wilmington's asset review. CW 2 reported that, in the Federal Reserve's 2007 review, the Bank's regulators concluded that Wilmington's ARG was understaffed and inadequate to provide a reasonable assessment of portfolio risk, highlighting these problems as "weaknesses in the control structure" at Wilmington. The Officer Defendants did not address these concerns, and, in 2008, the Federal Reserve issued the same criticisms.

### 2. The Officer Defendants Personally Intervened To Undermine The Bank's Credit Risk Personnel

68. For those few loans that the Bank's credit personnel reviewed, the Officer

Defendants actively undermined the review process by interfering with and vetoing loan risk downgrades and charge-offs. This meant that, even where the Officer Defendants took steps to give the outward appearance of strengthening the ARG, those steps were meaningless. Specifically, in late 2008, in response to the criticisms by the Federal Reserve, KPMG, and Internal Audit, CW 2 proposed to the Officer Defendants that Wilmington implement some internal controls over credit risk management. The Officer Defendants agreed to reorganize the department and place CW 2 – at least nominally – in charge of the Credit Risk Management Division, which encompassed the ARG. However, at the same time, the Officer Defendants escalated their interference in the Bank's credit review to continue their scheme to conceal the Bank's credit deterioration, manipulating the Bank's asset review (and resulting Loan Loss Reserve) in four primary ways.

69. First, according to CW 2, despite the fact that the reorganized department identified widespread deterioration in the Bank's borrowers' ability to repay their loans, the Officer Defendants vetoed attempts by the ARG to downgrade loans to reflect that deterioration. Indeed, notwithstanding CW 2's nominal control, all changes to loan ratings – and, in particular, all loan rating downgrades – had to be approved by Defendants Cecala, Harra, and Gibson, who were increasingly combative in rejecting proposals to downgrade loan ratings.

70. In particular, under CW 2's management, the ARG met monthly to discuss loan rating changes, charge off decisions, and to make recommendations for the Loan Loss Reserve. Gibson had always attended these meetings, because they were critical to his approval of the Bank's Loan Loss Reserve. According to CW 2, by the first quarter of 2009, Cecala and Harra also regularly "interjected themselves physically" into these meetings to "challenge the conclusions that were made" by the ARG – preventing the Bank from downgrading loans,

recognizing losses, and appropriately increasing the Bank's loan loss reserves.

71. CW 2 and CW 9 (a Vice President and Credit Officer in the Bank's Wealth Management & Private Banking division, which also originated commercial loans) explained that in response to proposals to downgrade problem loans, Cecala and Harra would routinely object on the grounds that "these are good guys" or "we are not going to get hurt by this client," without any discussion regarding the borrowers' ability to repay the loan and regardless of the significant credit risks identified by the ARG. In fact, Cecala and Harra routinely rejected ARG decisions to downgrade a loan, regardless of the delinquency of the loan. For example, CW 2 recounted a meeting in the second quarter of 2009 that addressed a group of loans totaling $79 million to Preston Schell, a prominent developer in southern Delaware. The ARG determined that the loans needed to be downgraded based on outdated appraisals – an ongoing and systemic problem at Wilmington (discussed below) – and that 80% of the loans should be placed on non-accruing status. After an "hour-plus" argument with Cecala, and with Harra and North in attendance, Cecala refused to allow the loan to be downgraded. CW 2 said that there was no choice but to "stand down" and acquiesce to Cecala's demands. Although Gibson was not present for this debate, CW 2 stated that the decision was conveyed to him later and the decision remained intact.

72. CW 1 confirmed that the Bank's loan risk ratings were manipulated and "generally inaccurate." According to CW 1, during the Class Period, the Workout group (which worked with troubled borrowers) "repeatedly" received loans that were rated Pass that the group recommended downgrading as much as four grades to Substandard. In CW 1's twenty years of commercial banking experience, a downgrade recommendation of four grades is "highly unusual" – but it was routine at Wilmington. According to CW 1, "when you see something like

that [a four-step downgrade], you know something artificial is being done to keep those loans like that." However, these downgrade recommendations were routinely rejected by the Officer Defendants. CW 1 further stated that it was not until late in the Class Period (after the MOU forced the Bank to reassess its loan review) that the Bank started attempting to correct its loan risk ratings.

73. Specifically, according to CW 9, when Wilmington brought in third party Treliant Risk Advisors in the second quarter of 2010 to update risk ratings in accordance with the MOU, Treliant's risk ratings were generally much worse. According to CW 9, "[i]f you look at the charges and how they trended and how quickly thereafter they fell apart, it was clear that the loans had not been graded properly."

74. Wilmington and the Officer Defendants refused to acknowledge loan rating downgrades even in the face of growing alarms regarding the repayment potential of some of the Bank's largest borrowers, which were widely known within the Bank. CW 10, a Vice President in commercial lending who left in October 2010 after thirty-four years with the Bank, explained that prior to the close of each quarter during the Class Period, North circulated a "Delinquency List" that listed loans past due, the number of days past due, and the lending officer for the loan. Cecala, Harra, and Gibson all received this list each quarter.

75. Second, the Officer Defendants blocked credit personnel's attempts to charge off, or write down, any of the Bank's loans. According to CW 1, Workout had "one big fight that was continuous" with Cecala regarding necessary charge offs. Cecala did not want – and did not allow – charge-offs to occur. In fact, as discussed below, according to CW 1, Cecala actually ordered Workout not to obtain updated appraisals, knowing that any collateral updates would force the Bank to downgrade and charge off all or part of the troubled loans. In the end, as a

result of Cecala's interference, the Bank rarely charged off even its most delinquent loans. Both CW 1 and CW 2 reported that, because the Bank refused to take appropriate and timely write-downs, its loan loss reserves and public financial statements were inaccurate and the Bank's financial situation appeared stronger than it actually was.

76. Third, the Officer Defendants refused to update the appraisals for Wilmington's portfolio of real estate construction loans. Accurate appraisal values are critical to commercial real estate asset review, especially those that are entirely collateral dependent, as declines in collateral value have an immediate impact on the possibility of repayment of the loan. Indeed, if the value of the collateral underlying a loan deteriorated substantially, then that fact alone could lead a bank to determine that the loan was impaired and that increased review of the borrower was necessary. Notably, CW 1 reported that Cecala directly ordered the Workout group to refrain from obtaining updated appraisals in order to avoid recognizing charge offs. Chick Pinto, Senior Vice President of Corporate Marketing and Communications at Wilmington, admitted to the *News Journal* in an April 17, 2011 article that going back to the borrower to ask for "more recent appraisals" was not the Bank's "preferred way of doing things . . . . it wasn't the nature of how we did things."

77. As a result, according to CWs 1 and 2, Wilmington's appraisals were "almost always outdated" and "horribly inflated." CW 1, who reviewed loan files once they went into Workout, reported that "without a doubt 90% of the files in workout only had original appraisals and nothing else" and in some cases, the appraisal would be a decade or more old. The longstanding nature of Wilmington's appraisal problem was confirmed by CW 6, who stated that it was "always a battle" to get current financial information and that, because Wilmington's appraisals (and other financial documents) were purposefully outdated, the documents that

Wilmington maintained – to the extent there were any – were "worthless."

78. Furthermore, even the original appraisal was invariably not the right appraisal. Specifically, CW 1 reported that Wilmington used "stabilized" appraisals, or appraisals based on improvements to the property that did not exist at the time the appraisal was performed, rather than "at present market value appraisal." CW 1 said that "at present market" appraisals were standard and necessary to evaluate the loan-to-value ratio (a key credit metric) for the loan. CW 1 stated that, once Workout obtained an updated appraisal, "the appraisals came in far lower than whatever was existing in the file" and forced the Bank to take large writedowns on the loans. Thus, CW 1, echoing CW 6's opinion of the Bank's appraisals, stated emphatically that the Bank's appraisals were "worthless."

79. This was a "common issue" that was widely known within the Bank. According to CW 2, the issue of outdated appraisals was frequently discussed at the monthly ARG meetings and the quarterly Credit Strategy Meetings, both of which Cecala, Harra, Gibson, and North attended. In fact, outdated appraisals were such an issue for the ARG that, according to CW 2, one of the members of the ARG actually maintained a lengthy list of the outdated appraisals. The issue was so severe that, according to CW 2, the Federal Reserve raised repeated concerns regarding Wilmington's out-of-date appraisals during the Class Period.

80. Moreover, Wilmington conducted major collateral studies in 2009 and 2010 that demonstrated that the Bank's appraisals were inflated. Specifically, CW 1 reported that the Bank retained a large national third party company to perform a "huge study" of market conditions in 2009 and again in 2010 to determine the value of the collateral due to concerns over deteriorating property values. The results of the study were clear – the value of much of Wilmington's Delaware collateral was, at best, farmland, the value of which was far below the Bank's then-

current appraisals. CW 1 stated that, based on that study alone, Wilmington should have ordered new appraisals for all of its Delaware loans, but did not do so.

81. According to CW 1 and CW 2, when Wilmington obtained updated appraisals for its impaired loans, this generally triggered large write-downs on those loans. In fact, when Wilmington brought in third party Treliant Risk Advisors in the second quarter of 2010 to help review the portfolio and update collateral values in accordance with its obligations under the MOU, these updated appraisals triggered massive write-downs. According to a November 2010 *Wall Street Journal* article, over the summer of 2010 "examiners from the Federal Reserve Bank of Philadelphia discovered that the [Bank] wasn't writing down the value of loans made to borrowers whose real-estate projects had stumbled . . . Regulators ordered new appraisals on the properties and began evaluating how much they were worth. The results devastated the bank's balance sheet, forcing it into the fire sale to M&T Bank Corp."

82. Fourth, Cecala, Gibson, and Harra further undermined the ARG and other credit risk functions by restricting the information that could be reported to the Board of Directors and to investors regarding the credit quality of Wilmington's loan portfolio. According to CW 2, all reports CW 2 made to the Board had to be reviewed by Harra and would invariably be "sanitized" before the Board received them to prevent CW 2 from raising red flags to the Board. The fact that the Bank's risk management officers did not directly report to the Board was a longstanding flaw in the Bank's control structures. CW 8 reported that, before CW 8's departure in June 2008, Internal Audit repeatedly criticized the reporting hierarchy of the Credit Risk Management Division because the Division reported directly to Gibson, who was focused on generating sales and profits rather than managing credit risk. CW 8 stated that, when Internal Audit raised these concerns to Gibson, he merely responded, "that's how it's always been," and

refused to change the reporting structure. This did not change until the Federal Reserve instituted the MOU and forced the Bank to have its risk officers report directly to the Bank.

**C. In 2009, The Federal Reserve Issued A Memorandum Of Understanding Identifying Serious Failings In The Bank's Lending Practices, Risk Management, And Accounting**

83. In 2009, after discovering that the serious systemic flaws in Wilmington's risk management function had not been corrected despite the Federal Reserve's warnings in 2007 and 2008, KPMG's Management Letter in 2007 and criticisms in 2008, and Internal Audit's criticisms in (at least) 2007, the Federal Reserve issued the Memorandum of Understanding to Wilmington in September 2009 (defined above as the "MOU"). According to the Federal Reserve's Commercial Bank Examination Manual, an MOU is one of the most serious weapons in the regulators' arsenal and are typically issued only when "other more routine measures such as formal discussions with a bank's principals or directors, and normal follow-up procedures, have failed to resolve supervisory concerns." Although the Federal Reserve had issued regular and escalating warnings to Wilmington in the 2007 and 2008 exams, according to CW 2, the Federal Reserve finally issued the MOU because of "a significant volume of risk rating changes and process weakness in general." According to CW 2, the Officer Defendants learned that the Federal Reserve would impose the MOU by no later than July 2009. The MOU identified material deficiencies in the way the Bank did business and, in particular, with its risk management, underwriting, and accounting and control functions.

84. The MOU Compliance Report detailed the sweeping changes required by the Federal Reserve in the MOU concerning, among other subjects, the Bank's "Loan Review, Credit Policy, Credit Analysis and Lending," "Capital Plan," "Asset Improvement," and "Allowance for Loan and Lease Losses" (*i.e.*, Loan Loss Reserve), as well as the Bank's proposed response(s) for each. For each of these major areas, the Federal Reserve identified

serious and systemic failings. Therefore, the Federal Reserve required that for each of these areas, Wilmington "establish [an] appropriate organization structure," "identify appropriate management and staffing levels," "describe responsibilities" of the respective function, and "ensure staff training." In sum, the Federal Reserve demanded that Wilmington make extensive changes to its underwriting, risk management, and accounting functions to bring them up to even basic standards – including, for example, requiring Wilmington to "establish a process to monitor compliance with [credit] policies and procedures."

85. Further, the MOU demanded dramatic changes to the Bank's credit risk management organization. According to CW 2, echoing past criticism by Internal Audit, the Federal Reserve objected to the fact that Wilmington's credit risk department reported to the CFO, Gibson, because they felt he was too tied into the profitability of the company. Thus, the Federal Reserve required that the ARG report directly to the Audit Committee of the Board of Directors. Similarly, the Federal Reserve demanded that underwriters – who, as discussed above, reported to lenders on the sales side of Wilmington – be segregated from the Bank's loan origination function.

86. The MOU also called for the Bank to create coherent policies to govern the Bank's risk management process going forward. Indeed, according to CW 2, the Bank's practices had been a "mishmash" of information and there was no "codification of the roles of credit risk management." According to the MOU Compliance Report, the revised credit policies were to include such items as: "underwriting standards, guidelines and quantifiable limits for commercial real estate, commercial and industrial"; "standards for documentation exception tracking and monitoring system"; "lending authorities reflective of staff experience and commensurate with risk of the credit extension"; and "uniform standards for presenting loans to

the loan committee."

87. The MOU also made clear that the Bank's processes for establishing its reserves were materially deficient. Under the MOU, Wilmington was charged with ensuring that the Loan Loss Reserve was fully funded and that the provision recommendations were directly reported to the Audit Committee of the Board of Directors. According to the MOU Compliance Report, going forward, Wilmington would be required to "maintain an adequate [Loan Loss Reserve] consistent with GAAP and regulatory policy and regulatory policies and guidance" and to "[f]ully fund [the Loan Loss Reserve] considering additional adversely classified credits from the updated internal loan rating system." The adequacy of the Loan Loss Reserve and its compliance with GAAP was to be reviewed each quarter going forward with the Board.

**D. Recently Unsealed FBI Affidavits Confirm Wilmington's Fraud**

88. The federal government's ongoing investigation into Wilmington's relationships with its borrowers has recently provided significant additional particularized evidence of Wilmington's grossly deficient underwriting and asset review practices, and directly corroborates and confirms the accuracy of the reports provided by the numerous CWs cited above. Specifically, as described above, on October 4, 2012, FBI Special Agents filed sworn affidavits under seal in this District (defined above as the "FBI Affidavits") in support of a search warrant for the premises of prominent Delaware developer Michael A. Zimmerman ("Zimmerman") and Zimmerman's business, BBC Properties. The FBI Affidavits were filed as part of an ongoing FBI investigation into the Bank's longstanding relationship with Zimmerman and his business partners and were based on, among other things, the FBI's review of documents and internal e-mails provided by Wilmington and interviews with multiple senior witnesses, including Defendant North; Terry Brewer, a Real Estate Credit Officer who replaced North as Chief Credit Officer; Anthony D'Imperio, the former head of Wilmington's Workout group; and

Karl Vaillancourt, an employee in Wilmington's Workout group from April 2009 through August 2011.[3]

89. The FBI Affidavits described internal Bank documents that expressly confirmed the "serious concerns" that existed with the Bank's underwriting and asset review practices, and its internal controls throughout the Class Period. Specifically, in 2009, after the Bank was forced to enter into the MOU with the Federal Reserve, the Bank initiated a "comprehensive" analysis of its lending in Delaware, which was known internally as the "Delaware Commercial Real Estate Division Project Status Review." This review, which Wilmington concluded by no later than January or February 2010, involved a thorough evaluation of the Bank's underwriting and asset review practices for its Delaware loans, which constituted well over 50% of the Bank's total commercial loan portfolio. As set forth in the FBI Affidavits, the review documented extensive deficiencies with both the management of the Delaware commercial real estate division and the quality of the loan portfolio; in the words of the FBI, the review showed "serious concerns with the past management of the Delaware Commercial Real Estate Division and with its loan portfolio."

90. The Delaware Status Review was conducted by, among others, Delaware Real Estate Credit Officer Terry Brewer. According to CW 1, the Bank's senior management specifically tasked Brewer, a "real estate guru" who specialized in commercial real estate credit analysis, to review "the mess in Delaware." Based on CW 1's numerous conversations with Brewer at the time, CW 1 recalled that Brewer was "totally appalled" and "pretty enraged" by the Bank's lending practices.

[3] While the FBI Affidavits, which were unsealed on October 18, 2012, identified these employees only by their title and job description, Lead Plaintiffs were able to identify the names of these employees through their investigation.

91. On March 12, 2010, Brewer finalized a written memorandum summarizing the results of the Delaware Status Review, which bore the subject line "Delaware Commercial Real Estate Division Concern" (defined above as the "Delaware Review Memorandum"). The Memorandum cited numerous "serious concerns" with the Bank's Delaware lending, including: (i) the "unethical use of loan approval authority by relationship managers," (ii) the Bank's "limited oversight of relationship managers," and (iii) "a limited technical knowledge of commercial real estate lending." The Delaware Review Memorandum enumerated numerous examples of the Bank's "questionable activities," including the Bank's repeated "lack of validation of construction budgets prior to loan closings," and the "frequent use of loan proceeds to provide cash to borrowers or fund partner buyouts prior to construction completion or the property having reached operating stabilization." As discussed below, the Officer Defendants knew, or recklessly disregarded, that these "questionable activities" resulted in third party developers siphoning off millions of dollars of loans for their own personal use.

92. According to the FBI Affidavits, the Delaware Review Memorandum described several of the Zimmerman projects that had been initiated and continued to be funded throughout the Class Period as prime examples of the Bank's reckless lending policies and complete lack of oversight over its relationship managers. Indeed, as detailed in the FBI Affidavits and below, Wilmington's relationship with Zimmerman was emblematic of the lax underwriting, asset review, and deficient internal controls that were rampant at the Bank throughout the Class Period, and that are discussed above at ¶¶45-87.

93. Zimmerman was one of the Bank's largest borrowers, with over 30 different Bank-funded development projects comprised of over 75 loans. As of March 2010, these loans alone totaled $90.7 million – or almost 6% of the Bank's total commercial construction loan

portfolio. Reflecting Zimmerman's importance to the Bank, the relationship was overseen by Joseph Terranova, the Bank's division head of commercial real estate lending and one of Wilmington's two most significant relationship managers, who was responsible for 7% of Wilmington's entire commercial loan portfolio (*see supra* at ¶¶49-50). As the FBI Affidavits make clear, Wilmington repeatedly extended loans to Zimmerman with no documentation, no verification of representations, and no verification that he was even developing the properties. Indeed, in one instance, the Bank extended a million dollar payout to Zimmerman because he told the Bank that he needed the money in order to "pay [his] bar tab." According to Vaillancourt (the Workout employee who later reviewed Zimmerman's loan files), many of the loans extended to Zimmerman were "poorly managed, had weak administrative controls, and were over budget."

94. As a result of the Bank's deficient controls, according to Vaillancourt's statement to the FBI, Wilmington "approved numerous loans which [it] never should have approved" to Zimmerman. As set forth below, Wilmington failed to exercise any oversight over these loans and failed to conduct any inquiry to determine that the loans were actually being used to complete the relevant projects. The Bank also continued to originate new loans to Zimmerman even after being put on notice of Zimmerman's deep financial difficulties in 2008. In fact, the Bank lent Zimmerman an additional $22 million in 2008 and 2009 alone. These practices eventually resulted in an over $40 million loss to the Bank on this single relationship.

95. Even after the Delaware Status Review documented "serious concerns with the past management of the Delaware Commercial Real Estate Division and with its loan portfolio," Wilmington repeatedly denied that there were any issues with the Bank's lending practices or loan portfolio. For example, on February 22, 2010, the Bank filed its 2009 Form 10-K with the

SEC, in which the Bank falsely continued to assure investors that it "mitigated credit risk" through "rigorous" and "consistent" underwriting. Similarly, during a call with analysts on April 23, 2010 – more than one month after the Delaware Status Review Memorandum was issued – Defendant Cecala expressly assured analysts that there were no hidden issues with the Bank's credit quality, stating that the Bank was "just trying to be cautious" when increasing its Loan Loss Reserve. Similarly, on June 4, 2010, when Cecala announced his resignation and analysts asked whether his departure indicated any "mounting credit problems that hadn't been reported," Cecala rejected any such implication, stating that there were "none whatsoever."

**1. The Bank's Deficient Underwriting And Asset Review Caused Wilmington To Pay Out Millions Of Dollars To Borrowers Even When They Did Not Meet The Basic Terms Of The Loan Agreement**

96. Notwithstanding the Bank's claims to "mitigate credit risk" through "consistent" application of its "rigorous underwriting standards," the Bank's loans to Zimmerman made it clear that there were no such standards and, in reality, credit review was left to the absolute discretion of the relationship manager – who was financially incentivized to close loans. The FBI Affidavits detailed several Zimmerman projects in which Wilmington provided funds to Zimmerman despite the fact that Zimmerman had not met the most basic conditions precedent to receiving those funds. Rather, those loans were based solely on Zimmerman's informal requests, without any attempts by the Bank to obtain any supporting documentation or to confirm that Zimmerman had met the terms of the loan agreement. Brewer confirmed to the FBI that this was a consistent "problem" with the Zimmerman relationship, stating that Wilmington "operated under the impression" that Zimmerman's projects had a "large percentage of leases in place prior to construction, but in reality there were few such pre-construction leases." Even after Wilmington provided millions of dollars in funding and the construction on the projects was supposed to have been underway for years, some of them <u>never proceeded past the demolition</u>

stage; Zimmerman simply pocketed the loan proceeds for his personal use.

97. As the FBI Affidavits provide, Wilmington never performed the most basic credit risk management review of its loans to ensure that its loan agreements matched the terms approved by the Loan Committee. For example, in December 2006, Wilmington's Loan Committee approved a $10 million loan to Zimmerman to purchase and construct a development titled "Salt Pond Plaza, LLC" ("Salt Pond"), which was "a planned development of a commercial center adjacent to the Salt Pond Community and Golf Course in Ocean View, Delaware." However, on January 10, 2007, shortly after the loan was approved, Terranova blatantly altered the basic terms of the loan agreement and, when Zimmerman failed to satisfy even those altered terms, Wilmington continued to simply give Zimmerman money whenever he requested it.

98. Specifically, the Loan Committee approved a term in the loan that provided for Zimmerman to receive an equity payout of $1 million once tenants in the development began to pay their lease – a condition that was never met during the life of the Salt Pond project. The Loan Committee imposed this requirement because equity payments are typically made once a project has progressed sufficiently so that it can fund loan payments itself (through its rent rolls or otherwise). However, just two weeks after the Loan Committee approved this loan, the loan agreement Zimmerman signed with Wilmington was changed to provide for an equity payout of $2 million, which would be payable once Zimmerman obtained signed leases for the development – and not when the tenants actually began to pay rent. These material changes to the loan agreement represented a 100% increase in the approved equity payout and meant that 20% of the $10 million would now go to Zimmerman personally – and at a much earlier stage, when the property was not yet producing income.

99. Significantly, the terms of the Salt Pond loan could only be changed because

Wilmington's risk management personnel were never required to compare the approved loan terms to the actual loan agreement before the funds were distributed. According to CW 1, this was a "prevalent" and improper practice at Wilmington and, in fact, many times the relationship manager "pulled rank" on loan documentation personnel to change loan terms to make them more agreeable to clients without any further credit review or approval. Indeed, the FBI Affidavits detailed other Zimmerman projects where this occurred. For example, in 2007, Wilmington's Loan Committee approved a $6 million loan to Zimmerman to develop office buildings in Dover in a project called "Compass Pointe." This loan was represented to be the only loan necessary to complete the construction of the building and the purchase of the property. In the documentation presented to the Loan Committee, Terranova represented that Zimmerman had pre-leased 48% – or two floors – of the building. These leases included one lease for McGlynn's Restaurant and another lease for BBC Properties – Zimmerman's own company. Notwithstanding the fact that one of the two purported preleases was for Zimmerman's own company – which on its own should have warranted further review by the Bank's credit personnel – there is no evidence that any member of the Loan Committee, or anyone else at the Bank, confirmed that both of these leases existed. As a result, Wilmington agreed to loan Zimmerman the requested funds. However, as set forth in the FBI Affidavits, the McGlynn's lease was the <u>only</u> lease that was referenced in the closing documents, and the BBC Properties lease was excluded. Ultimately, Wilmington not only made the initial loan of $6 million, but also made numerous <u>additional</u> loans to Zimmerman in connection with this project in 2008 and 2009, for a total cost of $9.2 million. Wilmington eventually wrote off all but 50% of the loan's value. In sum, Wilmington's failure to verify Zimmerman's representations, or to perform the most basic comparison of the Loan Committee documentation and the loan closing

documents, cost the Bank millions of dollars when it was forced to sell the Compass Pointe loan at a massive loss.

100. With respect to the Salt Pond loan, even the loan agreement terms Terranova altered to accommodate Zimmerman were not sufficient. In May 2007 – in an email openly maintained in Wilmington's official loan file – Terranova informed Zimmerman that, although Zimmerman had not obtained any signed leases as required by the loan agreement, the Bank would make a large equity payout to Zimmerman. Specifically, Terranova wrote: "I went back through my notes and I saw executed lease and plan approval as the condition. However not wanting my reputation for reckless abandon to be in jeopardy, I guess we can fund the $1,000,000." Accordingly, Wilmington immediately funded the first $1 million equity payout to Zimmerman, although there had been no progress on the project, and Zimmerman did not even have a single executed lease in hand. Indeed, when Zimmerman obtained the first signed lease for the development two months later – albeit one that made the tenant's rent payments contingent on Zimmerman obtaining additional tenants for the property – Terranova emailed Zimmerman: "[o]ne less thing to worry about. Maybe I will get some sleep tonight."

101. Wilmington's credit policies were so lax that its borrowers openly mocked the Bank's willingness to provide millions of dollars of bogus "loans." In January 2008, in yet another document openly maintained in Wilmington's Salt Pond loan file, Zimmerman faxed Terranova the following demand for the remaining equity payout: "Send $1,000,000 ASAP I have to pay my bar tab." The fax attached a "letter of interest" from another potential tenant – not an executed lease as required by the loan agreement, or evidence of payment as required by the Loan Committee. Five days later – still without the requisite leases or rent-paying tenants – Wilmington wired the $1 million to Zimmerman as an equity payout to Zimmerman and his

business partner.

102. In April 2009 – almost two and a half years after the Loan Committee had approved the Salt Pond loan – Zimmerman still had not met the basic requirements, as approved by the Loan Committee, that he have an actual rent-paying tenant in place. That month, the only tenant in the project formally exercised its right to refuse to pay rent, since Zimmerman had failed to obtain any additional tenants or completed development of the project. Remarkably, however, as Defendant North confirmed to the FBI, Wilmington continued to extend loans to Zimmerman, notwithstanding the fact that the required leases did not exist.

103. By May 2009, Zimmerman had fully exhausted the $10 million loan, but "the only progress Zimmerman was able to show on the project was a partially completed parking lot." Notwithstanding this fact, Wilmington granted Zimmerman another $2 million loan to cover "cost overruns" and finish the Salt Pond project. Significantly, Workout employee Vaillancourt informed the FBI that he "suspected Zimmerman was diverting Wilmington Trust loan funds from Salt Pond to other purposes when he compared the funds dispersed by Wilmington Trust against the actual work completed, and the need for additional funds to complete the work required." In other words, Zimmerman's misappropriation of Wilmington funds for his own personal use was readily apparent to anyone who bothered to "compare the funds dispersed against the actual work completed." However, there is no evidence that anybody at Wilmington asked a single question regarding how Zimmerman exhausted an entire $10 million loan to "partially complete" a parking lot in Dover. There is no evidence that anybody at Wilmington asked a single question about why Zimmerman needed an additional $2 million, even though, according to the original loan application set forth in the FBI Affidavits, the Bank originally expected all of the project's "on and offsite improvements" to cost no more than $2

million. Further, there is no evidence that Wilmington performed any inquiry into what Zimmerman's purported "cost overruns" constituted before extending the additional $2 million loan. Wilmington's failure to perform any due diligence to justify this additional loan was particularly egregious, given that, as discussed below, by this time the Bank had already determined that Zimmerman constituted a serious credit risk due to the "continued poor financial condition" of the Zimmerman projects.

104. Indeed, the FBI Affidavits identify several other examples of the Bank providing loans to Zimmerman without verifying the status of the development project at issue. For example, after Wilmington had given Zimmerman $2.1 million in 2005 to develop a project named "Collegian Plaza" in downtown Dover, after two years "no significant construction-related work had been completed and some of the required loan paperwork had not been completed" and the underlying land "was not fully acquired." By November 2009 – four years after Wilmington approved the loan – the "only physical activity associated with the project was the demolition of the existing structures." The Bank eventually sold the Collegian Plaza property to a third party at a massive discount after the Class Period. According to an August 2011 *News Journal* article titled "$400,000 Offered For Vacant Dover Lot," the site remained a "vacant" and "overgrown" lot – six years after the loan had been extended.

**2. Wilmington Continued To Pay Out Millions Of Dollars In Loan "Draws" Without Any Documentation Or Support**

105. Contrary to the Bank's repeated representations to investors that it sought to "mitigate risk" through its asset review practices, the FBI Affidavits and other evidence demonstrates that Wilmington consistently extended loans and granted draw requests on already-existing loans without performing any due diligence on the borrower or the project, as is customary in the banking industry. After Wilmington initially approved a construction loan, the

borrower could request "draws" on that line of credit in order to pay specific construction-related expenses (generally enumerated in the loan agreement). While other commercial banks immediately order an inspection on a development project upon receiving a draw request to verify and document the status of the project before funding such draws, Wilmington did not. According to CW 1, "it was common" for Wilmington to satisfy "huge draw requests" with "absolutely no due diligence" performed – a practice that CW 1 described as highly unusual and unique to Wilmington. In the loans that CW 1 reviewed as part of the Workout Group, s/he would commonly find that Wilmington had funded "million upon millions of dollars" of draws with "not a scrap of backup" to support the draw. While Wilmington "nominally" had a construction loan administration department that was supposed to review draw requests and verify project status, according to CW 1, the sum total of that department's due diligence on draw requests was to ask the lender "do you agree?" and to fund the request as long as the lender approved it.

106. The FBI Affidavits describe myriad instances where Wilmington granted Zimmerman millions of dollars in "draws" on his line of credit in the Salt Pond project and other developments without obtaining any supporting documentation or evidence justifying the draws. Indeed, Wilmington Workout employee Vaillancourt told the FBI that Zimmerman's loan draw requests "<u>never made any sense because the related work was never completed</u>." According to the FBI Affidavits, these loans were part of Zimmerman's "pattern of using Wilmington Trust funds for personal expenditures."

107. For example, in July 2007, BBC Properties faxed a request to Wilmington for a draw of $357,500 for "reimbursement" of Salt Pond project expenses to date. According to the FBI Affidavits, "[n]o other supporting documentation relating to the expenses claimed was

provided." Nevertheless, Wilmington immediately wired the requested amount later that day. When the FBI inspected the path of these funds, they found that 90%, or $323,000, was immediately transferred to Zimmerman's personal and business accounts, and the balance went to Kevin Barrett, Zimmerman's partner in the project.

108. Four months later, in November 2007, BBC Properties submitted another email request to Wilmington for a draw of $225,000, this time purportedly to pay "a real estate commission fee" and "arch/eng [architectural and engineering] fees." Once again, however, according to the FBI Affidavits, "[n]o other documents to substantiate these expenses were found in the file." Nevertheless, Wilmington again promptly wired the requested amount to the Salt Pond bank account. Following the receipt of this draw, the Salt Pond bank account issued checks to Zimmerman's and Barrett's personal accounts totaling $150,000. The FBI found no evidence that either Zimmerman or the Salt Pond bank account had paid any expenses that entitled Zimmerman or Barrett to "reimbursement."

109. Five months later, in April 2008, BBC Properties submitted yet another email request to Wilmington for a draw of $150,000 for "reimbursement" of Salt Pond project expenses to date. According to the FBI Affidavits, "[n]o other documents, such as invoices, to substantiate the expenses were found in the file." However, as was the Bank's standard practice, Wilmington promptly wired the requested amount to the Salt Pond bank account. That account then immediately issued a check for $150,000 to Zimmerman's personal account. The FBI found no evidence that either Zimmerman or the Salt Pond bank account had paid any expenses that entitled Zimmerman to reimbursement. In fact, according to the FBI Affidavits, Zimmerman used this money to purchase land for himself in the Bahamas. As with the other draws, there is no evidence that anybody at Wilmington ever asked Zimmerman to confirm how

these funds were used.

110. Moreover, the FBI Affidavits explained that in the rare instances that Zimmerman provided any purported documentation of invoices to support his draw applications, he often simply used the identical invoice again and again – readily identifiable chicanery that would have been detected if Wilmington performed the most basic verification of documentation. For example, in June 2008, a BBC Properties employee emailed a request to Wilmington stating "[a]ttached are current payables and Mike [Zimmerman] wants to draw 110K and wired to same account as previous wires." According to the FBI Affidavits, the email attached a list of vendor invoices. That day, Wilmington wired $110,000 to the Salt Pond bank account. Four days later, Salt Pond issued a check for $97,900 to Zimmerman and a check for $12,100 to his partner, Barrett. According to the FBI, the loan proceeds received as a result of this draw request were not used to pay the invoices, but was simply pocketed. Further, the FBI Affidavits specifically provide that "[a]lmost all of these same invoices were found to have been included in subsequent draw requests submitted to Wilmington Trust."

111. Wilmington continued to extend poor quality loans to Zimmerman with minimal documentation even after Zimmerman began to encounter "significant difficulties in making payments" on his loans beginning in 2008. Notwithstanding the Bank's knowledge of Zimmerman's financial difficulties, in 2008 and 2009 Wilmington approved an additional $22 million in loans to Zimmerman, according to the FBI Affidavits.

112. Ultimately, the Zimmerman loans caused material financial harm to the Bank. Of the $90 million in Zimmerman loans outstanding in 2010, Wilmington wrote off $43 million – or nearly 50% of the loans. By November 2010, the Bank had placed the entire portfolio of Zimmerman loans for sale at a huge discount to third parties. In total, the Bank suffered over

$43 million in losses due to its reckless lending relationship with Zimmerman – 10 times the $4 million loss the Bank recorded for all of 2009.

**E. The Officer Defendants Manipulated Wilmington's Loan Loss Reserve**

113. As a result of the Officer Defendants' refusal to acknowledge the deteriorating credit quality in the Bank's borrowers in its loan risk ratings and charge offs, the Bank materially understated its reserve for loan losses, and thereby materially overstated its net income by hundreds of millions of dollars during the Class Period.

114. The Bank's accounting for its Loan Loss Reserve – which was grossly understated throughout the Class Period – violated fundamental principles of generally accepted accounting principles ("GAAP"), including Financial Accounting Standards No. 5, "Accounting for Contingencies" ("FAS 5"). Under GAAP, Wilmington and the Officer Defendants were required to establish the Loan Loss Reserve for probable and estimable credit losses resulting from the Bank's borrowers defaulting on their obligations.[4] In establishing this reserve, pursuant to SEC Staff Accounting Bulletin No. 102, "Selected Loan Loss Allowance Methodology and Documentation Issues" ("SAB 102"), the Bank was required to take into account "all known relevant internal and external factors that may affect loan collectability," including trends in loan losses, economic conditions, and the Bank's underwriting standards. GAAP requires that such reserves be established in order to present an accurate picture of the lender's financial position and, in doing so, recognizes that lenders can reasonably predict the amount of losses that a loan portfolio will experience. All other things being equal, a loan portfolio that is comprised of borrowers with riskier credit profiles will require a larger reserve to cover the cost of uncollectible debts. Under GAAP, a provision for loan losses (i.e., an increase to the Loan Loss

[4] The applicable GAAP and other accounting provisions are described in detail in Section VII below.

Reserve) is recorded as an expense, which reduces pre-tax earnings on a dollar-for-dollar basis.

115. The Bank represented in its financial statements that its Loan Loss Reserve was set in accordance with GAAP. However, contrary to the Bank's representations that it complied with GAAP, witnesses confirmed that the Officer Defendants, and in particular Cecala and Gibson, who approved the Loan Loss Reserve each quarter, understated its Loan Loss Reserve in order to inflate its income and disguise the deterioration in its loan portfolio. Indeed, as discussed below, after performing extensive due diligence and analysis of Wilmington's loan portfolio as of January 2008, M&T determined that Wilmington had understated its Loan Loss Reserve by nearly $800 million.

116. Wilmington employed two distinct methodologies to calculate its Loan Loss Reserve, both of which violated GAAP and understated the Bank's reserves. According to CW 2, from at least as early as 2007 and until late 2008, rather than taking into account the factors surrounding the probability of loans being repaid – including economic trends and borrowers' ability to repay loans – the Officer Defendants established the loan loss reserve based entirely on the Bank's internally manipulated loan risk ratings. They did so by arbitrarily assigning percentage values to risk ratings in the Bank's loan portfolio. For example, for those loans with "Pass" ratings, Wilmington assigned 1% of the value of the loans to the Loan Loss Reserve and those loans with "Watchlist" ratings received 2% of their value.

117. This method was in direct violation of GAAP. First, as the Officer Defendants knew or recklessly disregarded, the assigned risk ratings were "generally inaccurate," because they were not the product of a thorough and independent credit review by ARG, but rather based on: (i) ratings assigned by the Bank's lenders, who were financially penalized for downgrading loan risk ratings and, as evidenced by the Zimmerman relationship (among other things), given

absolute discretion to monitor the credit status of the Bank's loans; (ii) ratings that were artificially inflated by senior management, including Defendants Cecala, Harra, Gibson, and North; and (iii) outdated and inaccurate appraisals. Second, this method ignored the volatile environment facing the real estate industry and associated lenders during the Class Period. Third, the Bank failed to consider its improper underwriting.

118. Thus, because the Bank's rudimentary method of provisioning did not account for any of the drivers of default in the loan portfolio, CW 2 – who was responsible for recommending loan loss provisions to Cecala and Gibson during the Class Period – stated that this methodology was "not compliant" with GAAP.

119. In late 2008, the Bank adjusted its reserving methodology in recognition of the clear inadequacy of its prior method for determining the Loan Loss Reserve. Under the new method, the Bank still largely relied on its risk ratings to dictate reserves, but now added a small "qualitative" factor. This new method, while slightly less mechanical than the previous method, was also in violation of GAAP, and caused the Bank to under-reserve for loan losses.

120. First, like the old method, according to CW 1, it over-relied on loan risk ratings that were "generally inaccurate" as set by the lenders, manipulated by the Officer Defendants, and based on outdated and inaccurate appraisals, and were not reflective of the actual risks in the portfolio.

121. Second, according to CW 2, under the new method, the Bank relied almost entirely on its own loan loss history to dictate whether increased reserves were necessary, instead of relying on then-current factors and trends. This was problematic because, due to the interference by Cecala, Harra, and Gibson, as well as the Bank's overreliance on lenders to evaluate credit risk and assign risk ratings, Wilmington's loss history was an inadequate and

unreliable measure of probable losses inherent in the loan portfolio. As both CW 1 and CW 2 confirmed, because the Bank artificially refused to recognize losses it had already incurred, its loan loss history was an inadequate basis on which to timely record reserves.

122. In addition, the new method also failed to adequately consider environmental factors existing at the time and continuing throughout the Class Period. CW 2 explained that the Bank's methodology was based on an assumption that "qualitative" factors should not exceed a certain arbitrary and small percentage of the Bank's overall Loan Loss Reserve. The Bank's refusal to adequately consider environmental trends violated GAAP's requirement that such conditions be considered, as well as the Bank's own representations.

123. Demonstrating the fact that the Bank under-reserved for loan losses in its portfolio, Wilmington and the Officer Defendants actually dramatically decreased the Loan Loss Reserve as a percentage of "nonaccruing" and troubled restructured loans from 2007 to 2009. Nonaccruing loans are those loans where the Bank stops recording interest as income on the loans because it doubts that it will be able to collect interest or principal. These loans thus remained on Wilmington's books, but were extremely likely to result in losses.

124. The Interagency Guidance on the Allowance for Loan and Lease Losses provides that a lender's loan loss reserve should be "directionally consistent" with changes in the risk factors so that if risk factors such as delinquencies or falling collateral values increase, the Loan Loss Reserve should increase as well. Here, in direct contradiction to the principle of directional consistency (and common sense), as Wilmington's nonaccruing loans increased, the Loan Loss Reserve decreased as a percentage of nonaccrual and troubled restructured loans. This occurred despite the fact that the Bank's lax underwriting standards, minimal asset review, failure to timely downgrade loans, and outdated appraisals in a climate of declining real estate values

rendered the loan book riskier than ever before. The chart below demonstrates the dramatic inconsistency between Wilmington's ratio of Loan Loss Reserve to nonaccruing loans and the amount of the Bank's total nonaccruing loans:




125. Not surprisingly, when M&T itself analyzed Wilmington's reserve levels, it found them severely understated. On November 1, 2010, Wilmington announced that it would be forced to increase its reserves by $280 million, and M&T disclosed that, even including this massive increase in reserves, Wilmington's Loan Loss Reserve was <u>still</u> understated by more than $500 million at the end of the Class Period. M&T's analysis was based on the work of an M&T team that reviewed 50% of Wilmington's commercial portfolio (including 64% of Wilmington's real estate construction portfolio) from the beginning of 2008.

126. Significantly, in its assessment, M&T Bank made clear that its calculation of expected losses dated back to January 1, 2008, and that these issues were not just limited to the third quarter of 2010. Indeed, M&T's entire analysis was based on reviewing Wilmington's loan

portfolio as of January 1, 2008 and calculating probable lifetime losses from that date. As is apparent from M&T's analysis, these "lifetime losses" included losses that had been incurred, but not recorded, and that M&T expected to write off over the remaining life of the loan. Under FAS 5, the Bank was required to record these incurred losses in its Loan Loss Reserve, even if it did not think the loss was sufficiently definitive at the time to merit writing off the loan.

127. If the Bank had timely disclosed these additional losses in prior quarters (when these losses were actually incurred), the losses would have had a devastating impact on the Bank's income statement. M&T's contemporaneous analysis demonstrates that Wilmington understated its required reserves by over 130% each quarter of the Class Period. As demonstrated by the chart below, had Wilmington performed sound assessments of its loan loss provision during the Class Period, its reported net income would have materially decreased:

| | **Reported Net Income** | **Corrected Net Income Using M&T's Analysis** | **Percentage Of Net Income Inflation** |
|---|---|---|---|
| 1Q 2008 | $41.4 | $28.1 | 32% |
| 2Q 2008 | ($19.5) | ($44.0) | 126% |
| 3Q 2008 | $22.9 | ($3.1) | 114% |
| 4Q 2008 | ($68.5) | ($157.9) | 131% |
| 1Q 2009 | $21.8 | ($17.3) | 179% |
| 2Q 2009 | ($9.1) | ($80.8) | 788% |
| 3Q 2009 | ($5.9) | ($57.3) | 871% |
| 4Q 2009 | ($11.2) | ($121.1) | 981% |
| 1Q 2010 | (29.2) | (131.9) | 352% |

128. This analysis is derived by taking the additional necessary Loan Loss Reserve identified by M&T, along with Wilmington's additional "catch up" reserves recorded in the second and third quarters of 2010, and calculating what the reserves would have been had the Bank timely recorded these additional necessary reserves throughout the Class Period in proportion to the reserves actually recorded each quarter. Had Wilmington added to its Loan Loss Reserve proportionately throughout the Class Period, its Loan Loss Reserve would have

been at least 130% higher each quarter (with correspondingly decreased earnings). This analysis is actually conservative, because it assumes that only the dramatic reserves recorded in the second and third quarter of 2010 were untimely, because, as discussed below, those reserves were the result of the Bank finally bringing in a third party to perform a long-overdue assessment of its loan risk ratings and appraisals.

## IV. THE TRUTH BEGINS TO EMERGE

129. Beginning in the fourth quarter of 2009, the MOU forced the Bank to begin recognizing the true credit losses in its loan portfolio and in January 2010, Wilmington began to report significant (but still insufficient) reserve increases. These announcements surprised investors because Wilmington's peers were reporting stronger credit and financial results as they emerged from the recession, while the Bank suddenly appeared to be in trouble. However, in an attempt to quiet the market's growing concerns, Wilmington and the Officer Defendants repeatedly and emphatically denied that the Bank's increased reserves had anything to do with "mounting credit problems." Instead, at every turn, Wilmington and the Officer Defendants reassured investors that the Bank's reserve increases were due to market conditions in Delaware and the fact that the Bank was just "being cautious."

130. Specifically, on January 29, 2010, Wilmington issued its fourth quarter and year-end 2009 earnings press release, surprising investors by reporting a quarterly loss of $11.2 million and an annual loss of $4.4 million. This loss was driven by a quarterly loan loss provision of $82.8 million – a 114% million increase from the prior quarter. As a result, the Bank's stock price fell over 14% from a close of $15.26 on January 28 to close at $13.12 on January 29. Analysts were dismayed by the Bank's results, with Boenning & Scattergood reporting on January 29 that the Bank's "provision expense [was] <u>$60.6 million</u> higher than [the firm] expected." Similarly, Morgan Stanley issued a report that same day stating:

"[d]eteriorating credit drove a higher than expected reserve build."

131. On April 23, 2010, Wilmington again announced a bigger-than-expected loan loss provision. In its first quarter 2010 earnings press release, the Bank reported a quarterly net loss of $29.2 million, a loan loss provision of $77.4 million, and a Loan Loss Reserve of $299.8 million. Analysts again noted their surprise with the Bank's results. For example, Morgan Stanley, in a report issued that same day titled "Credit and Weaker Pre-Provision Earnings Drive 24c Miss," commented that the Bank's provision was "$18.9 million higher than expected." In an April 26, 2010 report, RBC Capital Markets lowered its 2010 earnings per share estimate for Wilmington over 70%, from $0.60 to $0.17, stating "our concerns about the risk profile, in particular in the construction and CRE [commercial real estate] mortgage portfolios, remain elevated following first quarter results."

132. In response, Defendants reassured investors that the Loan Loss Reserve did not indicate a problem with the Bank's loans. On a conference call with investors that day, when analysts questioned whether there were larger problems that had yet to be disclosed, Cecala assured analysts there were no hidden issues with the Bank's credit quality, stating that "<u>We're just trying to be cautious</u>."

133. The Bank's disclosures caused the price of Wilmington's stock price to fall over 8%, from a close of $20.16 on April 22 to close at $18.48 on April 23.

**A. June 3, 2010: Cecala Abruptly Announces His Resignation**

134. After the close of the market on June 3, 2010, Wilmington announced that, after 31 years with the Bank, Cecala was immediately retiring as CEO and that Board member Foley, who had no prior banking experience, would take over as CEO. In the aftermath of the Bank's announcement, analysts speculated that Cecala's abrupt departure indicated larger credit problems that the Bank had not yet disclosed. For example, on June 7, 2010, RBC Capital

Markets issued a report titled "Something Is Rotten in the State of Denmark (Delaware)" stating:

> We still remain hopeful that the credit tide has finally turned for the Company; however, the manner in which the recent change in management occurred has raised our concerns as to the factors that brought about the change. . . Could another record level provisioning be in the queue along with further OTTI [other than temporary impairment] charges, and it was these factors that precipitated the recent events? That is the $100 million question.

135. To mitigate the concern that Cecala's abrupt departure caused investors and analysts, Cecala and Foley held a special conference call on June 4, 2010. On the call, Cecala specifically denied that his sudden resignation had anything to do with "a mounting capital problem or credit problem that hadn't been reported," stating:

> **Analyst**: So as time scrolls forward here we won't find that the Company turned down an opportunity to make an acquisition, turned down the opportunity to sell, had a mounting capital problem or credit problem that hadn't been reported or the like? Not necessarily in the future, but during the recent past?
>
> **Defendant Cecala**: <u>None whatsoever</u>.

136. Defendant Foley also reassured analysts that the Bank had the "right people" in place to make sure there "aren't any surprises this year" in the Bank's credit. Specifically:

> **Analyst**: And following up on one of the other answers regarding no real future changes, have there been changes made in the credit area where you are comfortable that you have got the right people that can identify the problems to make sure that there aren't any surprises this year where credit – there is a blow up somehow?
>
> **Defendant Foley**: You are absolutely right, I do feel that comfort. Yes, we do have that confidence.

137. Notwithstanding Cecala's and Foley's reassurances, Wilmington's stock price dropped almost 10% from a closing price of $14.99 per share on June 3, 2010 to a closing price of $13.52 per share on June 4, 2010.

138. Shortly after Defendant Cecala resigned, Defendant North quietly resigned from the Bank.

### B. June 23, 2010: The Bank Acknowledges That Its Statements The Prior Month Were Not Accurate

139. Only three weeks after the Bank falsely assured the market that there were no credit surprises on the horizon, the Bank indicated to analysts that the Bank's loan quality and credit position were worse than previously disclosed. On June 22, 2010, Foley, Gibson, and North met with representatives from the research firm SunTrust Robinson Humphrey to discuss the Bank's credit quality. During that meeting, these Defendants informed the analysts that the Bank expected to report "deteriorating credit metrics" and "negative asset quality." As SunTrust reported the next day, Wilmington had hired consultants (made up of former bank examiners who were, as CW 9 reported, from Treliant Risk Advisors) in May 2010 to perform a detailed loan review in preparation for the Bank's upcoming regulatory exam, and that the review was primarily focused on the Bank's construction portfolio as well as its credit policy and credit administration functions. According to SunTrust, "It appears the review will result in deteriorating credit metrics as the company attempts to more aggressively deal with its credit challenges."

140. Further, SunTrust reported that Wilmington's "[m]anagement admitted to not being as proactive as they needed to be in the past in dealing with the bank's credit challenges." SunTrust further noted that the story they were now hearing was very different than the one they had heard just three weeks earlier, stating:

> We were surprised with the negative asset quality commentary, driven in part by third party consultants, given management's relatively positive/status-quo asset quality statements in its recent conference call on the company's CEO change. On this June 4th conference call, management indicated that its outlook on credit had not changed and that it was beginning to see some positive economic signs. In our meeting yesterday, we sensed management was considerably more negative on credit than on the conference call. We admit that the more conservative commentary could potentially be due, in part, to the company wanting to lower expectations so as not to disappoint.

141. In response to the SunTrust report describing the meeting with Wilmington management, the price of Wilmington's stock dropped 11%, from a closing price of $12.99 per share on June 22, 2010 to close at $11.56 per share on June 23, 2010. The price of Wilmington stock continued to trend downward, declining almost another 4% on June 24, 2010.

142. On July 21, 2010, Wilmington announced that the Board elected Foley as Chairman of the Board, effective immediately.

**C. July 23, 2010: The Bank's Financial Results For The Second Quarter 2010 Stun Investors; Defendant Foley Blames "Weakness In The Economy"**

143. On July 23, 2010, before the open of the market, Wilmington issued a press release reporting its financial results for the second quarter 2010, which were even worse than analysts' negative predictions for the Bank's performance based on the June 4 and June 23 announcements. These results included a net loss of $120.9 million, as well as deterioration in the Bank's key credit metrics, including that the provision for loan losses increased 165% to $205.2 million and Loan Loss Reserve increased 25% to $373.8 million. In response, numerous analysts downgraded their ratings and/or earnings projections for Wilmington, citing concerns over the Bank's loss exposure and credit problems.

144. Nevertheless, Defendants <u>again</u> denied that the Bank's losses were the result of problems in risk management and instead blamed the weakening Delaware economy. Indeed, in a July 23 conference call to discuss these results, Foley falsely blamed the Bank's performance on the "lingering effects of a weak economy, and the housing market." Specifically, he stated:

> But credit was the main factor [for the negative results]. As the provision for loan losses rose to $205 million. That's a significant increase from the $77 million we recorded last quarter.
>
> This was due to the economic pressures within our regional banking footprint. Particularly in Southern Delaware. We have seen some signs of improvement, but they are very tentative and not widespread. And conditions continue to stress some of our borrowers. In the second quarter, those pressures manifested

> themselves in the real estate appraisals that showed severe reductions in collateral valuations.

145. At the same time that they blamed the Bank's poor financial results on supposed recent "economic pressures," Foley and Gibson stressed the strength of Wilmington's existing "methodology for evaluating credit risk," and assured investors that the Bank's asset review procedures were "state of the art." Specifically, in response to an analyst question about how much of the increased reserve based on updated appraisals "was due to recent deterioration . . . versus poor credit administration, where this should have been a year ago, when it was obvious to many people that the credit – the commercial real estate markets having problem down in your neck of the woods," Gibson stated, "I would not ascribe this to poor administration." In response to an analyst question about "what percentage of the portfolio your outside loan review completed," Gibson stated:

> Give you some numbers on that. The outside service that we used reviewed somewhere in the magnitude of $935 million of our loan portfolio, it was largely concentrated in the construction commercial real estate portfolio. We wanted to make sure that they were able to reaffirm the ratings that we had already put on that portfolio, and thankfully, they did do that.
>
> They also reviewed our procedures and policies to make sure that they're in full compliance with state-of-the-art procedures and basically they found that with very slight tweaking that we were in full compliance, and our policies and procedures were at state-of-the-art.

Foley also responded to this same analyst question, falsely blaming the reserve increase on purported recent "trends":

> I want to be very clear about what happened with credit in the second quarter. Our methodology for evaluating credit risk did not change in the second quarter. What changed were the data points supporting our evaluation. We saw a substantial amount of negative data, like the magnitude of declines in collateral valuation, the negative trends in the financial conditions of some of our borrowers, the lack of widespread economic improvement in Delaware, and the increases in loans past due 90 days or more, and non-accruing loans. In other words, the data points changed our conclusion. It was not our methodology.

Further, in response to an analyst question regarding how investors could "get comfortable" with the idea that a large portion of the Bank's loan portfolio classified as substandard and watchlist would not become non-accruing, Gibson stated:

> I think we, when you look at the breakdown, I think again, Delaware-based, <u>there is weakness in the economy, and we're just being very cautious about how we're evaluating those credits given the economic environment</u>. And I think we are reserving appropriately given that risk.

146. Notwithstanding Foley's and Gibson's attempts to conceal the Bank's credit deficiencies, the Bank's disclosures caused the price of Wilmington's stock to drop 9%, from a closing price of $10.88 on July 22, 2010 to close at $9.88 on July 23, 2010.

147. On August 10, the same day that the Bank issued its Second Quarter 2010 10-Q, the Bank cancelled at the last minute a meeting with investors. This abrupt cancellation "for no apparently meaningful reason" raised concerns among analysts. RBC Capital Markets wrote in an August 10, 2010 report that it was "deeply concerned" that a "second 'shoe' [was] about to drop." The firm wrote regarding the recent disclosures by the company:

> **Unwelcome Surprises**: The past few months have witnessed a series of concerning events. The abrupt retirement of WL's former CEO, Ted Cecala, in June was the first issue. At that time, WL's newly appointed CEO, Don Foley, and Mr. Cecala assured investors that the timing of his retirement was not unusual. Shortly thereafter, the new team disclosed the discovery of potentially significant 2Q10 write-offs which became official with the 2Q10 results in July. Management's cancellation of a planned visit to assess and answer our continued fundamental credit concerns was the final blow to our confidence in retaining an Outperform rating.

148. On October 5, after the close of the market, Bloomberg reported that, according to sources familiar with the matter, Wilmington was seeking a capital infusion from a private equity firm. According to the article, if Wilmington could not raise the necessary capital, it could be forced to try to sell itself. On this rumor, the Bank's stock price dropped almost 12%, from a closing price of $8.73 on October 5, 2010 to close at $7.71 on October 6, 2010.

149. In a series of letters beginning on October 14, Delaware State Senator George Bunting asked the Federal Reserve for an investigation into Wilmington's "very questionable commercial loan practices," with respect to loans made to individuals via Delaware limited liability corporations, and the fact that Wilmington was forced to "ride out or take pennies on the dollar" for these loans, thereby "driv[ing] down the ultimate value of the stock." Senator Bunting asked the Federal Reserve to refer any findings of criminal wrongdoing to the FBI.

### D. November 1, 2010: The Bank Announces The Take-Under And Investors Learn About $800 Million In Additional Loan Loss Reserves

150. On Monday, November 1, 2010, Wilmington's investors finally learned the truth about Wilmington's true financial condition and the full extent of the problems in the Bank's loan portfolio. Before the open of the market, Wilmington announced that, on October 31, it had entered into a definitive merger agreement to sell itself to M&T in an all-stock deal for roughly $3.84 per share – a "historic discount" of approximately 50% of the closing price of $7.11 per share the prior trading day.

151. That same day, also before the open of the market, Wilmington released its third quarter 2010 results, reporting an enormous quarterly net loss of $365.3 million – an over 200% increase from the loss reported in second quarter 2010. The Bank reported that a "primary cause" of this massive loss was a staggering loan loss provision of $281.5 million.

152. As the Bank belatedly acknowledged, its loan portfolio was severely impaired. Credit deterioration had spiraled out of control. Total nonperforming assets increased 77% from the prior quarter, to $988.6 million, while loans with substandard risk ratings increased 37%, to $1.99 billion (nearly 25% of the Bank's entire loan portfolio). This deterioration drove the massive increase to the Loan Loss Reserve and the charge against net income. The Bank's losses in turn drove an income tax expense of $100.7 million, the other "primary factor" driving

the Bank's loss. Once the Bank realized that it was not going to record any income for the foreseeable future – the inevitable conclusion to be derived from the significant changes required by the MOU – the Bank was forced to record a valuation allowance against a deferred tax asset it had recorded in earlier quarters, resulting in the $100 million income tax expense.[5]

153. As these losses made clear, the Bank was forced to admit it was no longer viable and could not survive as an independent entity.

154. Later that day, representatives from M&T and Foley and Gibson held a conference call with analysts to discuss Wilmington's third quarter results and the acquisition. During the call, Foley admitted that "[c]redit quality clearly remains the big story," and that deteriorating trends in appraisal values and the financial conditions of the Bank's borrowers "gives us little assurance that our loan portfolio will strengthen significantly in the near term, and our capital position will not erode further."

155. During this call, Rene Jones, M&T's CFO, explained that, through its due diligence, <u>M&T had discovered more than half a billion dollars in additional undisclosed losses that the Bank had not yet accounted for in its Loan Loss Reserve</u>, even after the massive increases to its reserves (totaling $560 million) that the Bank had already announced beginning in the fourth quarter of 2009. As a result, M&T said Wilmington had underfunded its reserve by $500 million – an amount which almost <u>doubled</u> the Bank's existing reserves. According to

[5] Under GAAP, a "deferred tax asset" is an asset recorded on an entity's balance sheet to recognize that the Company expects to reduce its tax burden in future years, thus increasing its reported income. However, the value of this asset is tied directly to the tax obligations the entity expects to incur – through future income – in those future years. If there is no tax obligation in future years – because, for example, there are no earnings – the DTA will be worthless. Under GAAP, a company must record a "valuation allowance" on its balance sheet to reduce a DTA when it is more likely than not (i.e., more than 50 percent likely) that the company will not generate sufficient future earnings to make use of the DTA, the company must disclose that fact in the form of an allowance.

Jones, this conclusion was based on thorough due diligence that included "a 40-person team of M&T Corp. credit line and work out personnel examining the loan documents for some 450 borrowers . . . or about 50% of the overall commercial portfolio." M&T based its review on its "extensive experience in southern Delaware markets to assess credit marks."

156. Mr. Jones explained that M&T examined the loan portfolio and the losses already taken beginning at January 1, 2008. M&T estimated "through-the-cycle losses" of almost $1.5 billion, or 17% of Wilmington's total loan portfolio. Losses were particularly concentrated in the Bank's commercial construction portfolio, where M&T calculated that the Bank should have written off 40% of that entire portfolio.

157. In total, investors learned that Wilmington had underfunded its Loan Loss Reserve by nearly $800 million, comprised of the $500 million identified by M&T and the $281.5 in additional reserves announced by the Bank. In sum, in a single day Wilmington was forced to acknowledge that it was under-reserved in an amount that exceeded all of the Bank's profits going back to 2002.

158. Significantly, M&T acknowledged that these losses had not recently appeared in the Bank's loan portfolio in the third quarter of 2010, and were not caused by a sudden and recent downturn in the economy. To the contrary, M&T's entire analysis was based on reviewing Wilmington's loan portfolio as of January 1, 2008 and calculating probable lifetime losses from that date. Moreover, the Bank did not dispute M&T's conclusions, and indeed acquiesced in them. Wilmington's Board of Directors recommended that shareholders approve the merger, notwithstanding the fact that M&T had offered to pay only half the Bank's stock price because the Bank's loans and credit quality had deteriorated so significantly.

159. The market reacted swiftly to this news, driving down Wilmington's stock price

over 40% from $7.11, the closing price on the previous trading day, to $4.21 on November 1.

160. Analysts were shocked by news of the merger and Wilmington's credit deterioration. Janney Capital Markets observed in a report later that day that "Wilmington's stunning third quarter loss and forced sale to M&T reflects the substantial deterioration in construction and commercial business loans." Boenning & Scattergood noted that the price paid "points to M&T's uncertainty surrounding the potential for future losses from the credit portfolio." News reports were similarly stunned by this remarkable news, with *The Wall Street Journal* noting that the "historic discount" M&T obtained on Wilmington's trading price made it "one of the largest in the banking industry," only behind deals like JPMorgan's acquisition of Bear Stearns. *The New York Times* agreed, noting in response to the announcement:

> [T]he general impression was that while loan losses would hurt the bank for some time, Wilmington had taken its lumps at the end of the second quarter. No wonder, then, that its decision on Monday to sell to M&T for $351 million was shocking. The price, a 45 percent discount to Friday's close, makes it one of the biggest so-called "take-unders" in recent Wall Street memory.
>
> In reality, the valuation is not that bad given the bank's dismal third-quarter results. At around tangible book value, it is not that out of line with where healthier banks have been trading. But until the deal was announced, investors thought Wilmington's tangible book was worth twice as much.

Likewise, a November 1 *Philadelphia Inquirer* article reported that Wilmington "delayed the recognition of loan losses" for risky construction loans made in 2008 and 2009.

161. With the Bank's release of its third quarter 2010 financial results and the announcement of its historic take-under by M&T, the market finally learned the truth about Wilmington's financial condition and loss exposure. As a result, at least in part, of the disclosures set forth above, from January 29, 2010 until November 1, 2010, as the magnitude and severity of the Company's loss exposure caused by its improper lending and accounting practices and deficient risk management was revealed piecemeal to the investing public, the Bank's stock

price dropped from $15.26 per share to $4.21 per share, a decline of more than 70%.

### E. Post Class Period Events

162. On February 14, 2011, Wilmington and M&T issued a definitive proxy statement to shareholders soliciting their vote in favor of the merger (the "Merger Proxy"). The Merger Proxy disclosed that the negative economic trends that emerged nationally in 2008 affected Wilmington just as much or more than its peers and, eventually, resulted in its fire sale to M&T. The Proxy also revealed for the first time that, without the sale, the Bank would have faced "significant regulatory action." Wilmington's Board of Directors recommended the merger to shareholders based on:

- The credit deterioration in Wilmington Trust's loan portfolio, particularly in real estate construction loans, which deterioration resulted in a loan loss provision of $77.4 million in the first quarter of 2010, $205.2 million in the second quarter of 2010, and $281.5 million in the third quarter of 2010.

- Management's belief that, without a strategic transaction acceptable to its regulators, <u>Wilmington Trust would likely face significant regulatory actions in the near term</u>, which would likely result in a significant impairment of its business prospects.

* * *

- The effects Wilmington Trust and its businesses likely would suffer if Wilmington Trust did not enter into a strategic transaction on or before the release of its third quarter results and the public availability of its call reports, including the likelihood of a material decline in the value of its common stock, a reduction in its credit ratings, a significant loss of clients, the potential termination of business relationships that are tied to Wilmington Trust's credit ratings and capital ratios, and significant regulatory actions.

163. On May 16, 2011, M&T finalized its acquisition of Wilmington.

164. In March 2011, in its annual report for fiscal year 2010, Wilmington disclosed that the SEC had opened an inquiry "relating to credit review, substandard and nonperforming loans, impaired loans, collateral values, goodwill, and our deferred tax asset valuation

allowance." According to a December 14, 2011 article from *The News Journal* titled "FBI, SEC probe Wilmington Trust," the SEC's investigation is ongoing.

165. According to that same article, Wilmington is the subject of an FBI criminal probe involving fraud related to real estate loans in Delaware. A federal grand jury has been impaneled to hear evidence on the matter.

166. As discussed above, in October 2012, the FBI filed the FBI Affidavits as part of its ongoing investigation into Wilmington's relationship with Michael Zimmerman. That investigation is ongoing.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

167. During the Class Period, as the credit market deteriorated and iconic financial institutions like Lehman Brothers and Washington Mutual collapsed, Wilmington and the Officer Defendants carried out a scheme to conceal the Bank's true financial position and lending practices from the marketplace. In regular press releases, conference calls and filings with the SEC, Wilmington and the Officer Defendants repeatedly made materially false and misleading statements and omissions about the Bank's: (i) underwriting practices; (ii) asset review procedures; (iii) financial results and accounting practices; and (iv) internal controls. These false and misleading statements created the false impression that the Bank was weathering the financial crisis without any of the crippling credit losses suffered by other banks and artificially propped up the Bank's stock price. Defendants' statements and omissions are set forth below, organized topically, along with explanations for their falsity. The portions of each statement that Lead Plaintiffs allege are materially false and misleading are underlined and the relevant document is attached.[6] When Plaintiffs challenge an entire statement, rather than part of a

[6] *See* the Declaration of Hannah Ross, which attaches the source documents cited in this section.

statement, that is indicated. Defendants Cecala, Harra, and Gibson signed each of the Bank's Forms 10-K discussed herein; Defendants Cecala and Gibson also signed each of the Bank's Forms 10-Q discussed herein.

**A. False Statements Regarding Underwriting**

168. Throughout the Class Period, the Bank and the Officer Defendants regularly made statements about the purported "rigor" and "consistency" of Wilmington's underwriting to reassure investors about the Bank's credit quality and explain how the Bank was not significantly impacted by the widespread deterioration in the banking sector. In reality, however, Wilmington's former employees explained and the FBI Affidavits confirm that the Bank's underwriting was lax and inconsistent throughout the Class Period.

169. For each of the Bank's SEC filings during the Class Period, the Bank made the following representation in substantially identical form:

> <u>To mitigate credit risk</u>, we:
>
> - <u>Employ rigorous loan underwriting standards and apply them consistently</u>.[7]

170. Similarly, in the quarterly filings for the first, second, and third quarters of 2008, as well as the first quarter of 2009, the Bank stated that "[w]e have a high degree of confidence in the integrity of our commercial construction portfolio, because . . . <u>[w]e apply our</u>

[7] *See* Ex. 2 at 44 (2007 10-K and Annual Report). The first two quarterly filings in 2008 referred to this discussion in the 2007 10-K and Annual Report, thereby effectively incorporating the statement by reference. *See* Ex. 4 at 51 (First Quarter 2008 10-Q) and Ex. 6 at 76 (Second Quarter 2008 10-Q). *See also* Ex. 8 at 80 (Third Quarter 2008 10-Q); Ex. 10 at 44 (2008 10-K); Ex. 12 at 68 (First Quarter 2009 10-Q); Ex. 15 at 88 (Second Quarter 2009 10-Q); Ex. 17 at 132 (Third Quarter 2009 10-Q); Ex. 19 at 50 (2009 10-K); and Ex. 21 at 81 (First Quarter 2010 10-Q).

underwriting standards consistently."[8]

171. Each of the preceding underlined statements in ¶¶169-170 was false because, in reality, the Bank did not employ "rigorous" underwriting standards and did not apply any supposedly rigorous underwriting standards "consistently." To the contrary, the Bank's underwriting was lax and inconsistent, and, in fact, increased the Bank's credit risk, rather than mitigated it. Specifically:

a) The Bank had virtually no underwriting function, as its loan underwriting was not actually performed by the underwriters, but by lenders who were incentivized to make as many loans as possible. ¶53.

b) Wilmington's lenders routinely ignored established underwriting policies and made exceptions to those policies based on personal relationships rather than on borrowers' ability to pay. ¶¶50-52.

c) As the FBI Affidavits provide, and as the Bank itself described in the Delaware Review Memorandum, there were pervasive and severe problems with Wilmington's underwriting practices throughout the Class Period. The FBI Affidavits detail numerous "serious concerns" with the management of the Delaware Commercial Real Estate Division – the geographic region that accounted for more than 50% of Wilmington's commercial loan portfolio – and the quality of its loan portfolio. These concerns included, among other things, the "unethical use of loan approval authority by relationship managers," the "limited oversight of relationship managers" within that Division, and a "limited technical knowledge of commercial real estate lending." As the FBI Affidavits further provide, Wilmington routinely failed to verify and confirm that conditions precedent in loan agreements had been met before providing substantial loans. For example, Wilmington regularly failed to validate construction budgets prior to loan closings, and "frequent[ly]" used construction loan proceeds to return cash to borrowers prior to construction completion or the property having reached operating stabilization. ¶¶89-91.

d) Cecala instructed major relationship managers "not to keep files" on the numerous loans they originated. As a result, documentation for the Bank's loans was incomplete or "nonexistent," and rife with errors. These errors included numerous instances where the loan note was signed (obligating the Bank to lend money) before the loan was approved, a consistent problem the Bank identified as a violation of the Sarbanes-Oxley Act. ¶¶46-50.

e) As described in the FBI Affidavits, the Bank's relationship with Zimmerman – one of

[8] *See* Ex. 4 at 30 (First Quarter 2008 10-Q); Ex. 6 at 50 (Second Quarter 2008 10-Q); Ex. 8 at 52 (Third Quarter 2008 10-Q); and Ex. 12 at 42 (First Quarter 2009 10-Q).

its largest borrowers – demonstrated the deficiencies in the Bank's underwriting controls, in that relationship managers were permitted to dictate the terms of loan agreements with borrowers without any credit review, including by overriding decisions by the Loan Committee. As the FBI Affidavits provide and CW 1 confirmed, the Bank failed to exercise the most basic of underwriting controls, including confirming that the Bank's loan agreements actually matched the terms approved by the Loan Committee. ¶¶92-112.

f) The Bank's policy was that only loans greater than $5 million were required to receive credit approval from the Loan Committee, who included senior risk management personnel. Thus, more than half of the Bank's commercial loan portfolio was exempted from review by credit specialists. ¶55.

g) The Bank's 10% Rule allowed egregious and routine violations of the Bank's underwriting standards, because loan officers exploited their authority to automatically grant 10% increases on large loans without any further credit review, and "almost every loan [Workout] saw" had a 10% Rule loan (or two) attached to it. ¶¶56-57.

h) The Bank dangerously understaffed its underwriter position, with, at most, only 12 analysts to review hundreds of millions of dollars in loans, and these analysts lacked training, reported to regional lending managers, and just wanted to be lenders themselves. ¶52.

According to Wilmington's former employees, each of these facts remained consistent throughout the Class Period, and the MOU confirmed these accounts, identifying serious and systemic deficiencies in the Bank's underwriting function and ordering the Bank to "establish [an] appropriate organization structure" for underwriting that included revised "underwriting standards" and uniform standards for loan committee review. ¶¶84, 86.

**B. False Statements Regarding Asset Review Process**

172. Wilmington and the Officer Defendants repeatedly made false and misleading statements throughout the Class Period regarding the quality of the Bank's asset review, the consistency of its loan risk ratings, and the purported fact that the Bank's asset review had allowed it to reserve appropriately for loan losses.

173. The Bank repeated certain false and misleading statements regarding its asset review in its annual and quarterly SEC filings. Specifically, the Bank repeatedly made or

incorporated by reference the following statement:

To mitigate credit risk, we:

* * *

- monitor the portfolio to identify potential problems and to avoid disproportionately high concentrations in any single industry sector or to any one borrower.
- regularly review all past-due loans, loans not being repaid according to contractual terms, and loans we doubt will be paid on a timely basis.[9]

174. The preceding underlined statements were false and misleading because, throughout the Class Period, the Bank's asset review procedures were low quality and the Bank did not meaningfully monitor the Bank's portfolio or regularly review all troubled loans. In reality, the vast majority of the portfolio received no review, thus the Bank's asset review practices increased the Bank's credit risk, rather than mitigated it. Specifically:

a) In direct contrast to the Bank's statements that it "monitored" the portfolio and "regularly reviewed all past-due loans," in actuality, the ARG did not review the vast majority of the Bank's loan portfolio. In fact, loans of less than $15 million, which constituted the overwhelming majority of the Bank's loan portfolio, received "essentially no review" by the ARG to determine their credit quality. Moreover, on an annual basis, the ARG did not review 85-90% of the Bank's loans. ¶¶61-62.

b) As the FBI Affidavits provide and as the Bank itself found and described in the Delaware Review Memorandum, a "serious concern" with the Bank's credit practices was that it exercised "limited oversight of relationship managers," who were, in reality, responsible for monitoring the financial health of the Bank's borrowers. As result, relationship managers – who were financially penalized for documenting borrowers' inability to repay their loans – were free to ignore the deteriorating financial health of their borrowers and/or the deterioration in the collateral underlying their borrowers' loans. ¶¶89-91

c) As the FBI Affidavits provide, the Zimmerman relationship demonstrated that the Bank did not independently review its loans or confirm that borrowers met the requirements

[9] Ex. 2 at 44 (2007 10-K and Annual Report). This statement was made or referred to, and thereby effectively incorporated by reference, in Ex. 4 at 51 (First Quarter 2008 10-Q); Ex. 6 at 76 (Second Quarter 2008 10-Q); Ex. 8 at 80 (Third Quarter 2008 10-Q); Ex. 10 at 45 (2008 10-K); Ex. 12 at 68 (First Quarter 2009 10-Q); Ex. 15 at 88 (Second Quarter 2009 10-Q); Ex. 17 at 132 (Third Quarter 2009 10-Q); Ex. 19 at 50 (2009 10-K); and Ex. 21 at 81 (First Quarter 2010 10-Q).

for receiving draws on their loans, extending millions of dollars in additional credit even where the borrower displayed obvious deficiencies in their ability to repay the loan. ¶¶92-112

d) KPMG's 2007 audit confirmed that the ARG was insufficient to adequately review the Bank's loan portfolio, with KPMG issuing a Management Letter warning that the ARG's review was a serious control deficiency. In connection with its 2008 audit, KPMG again criticized the ARG functions as insufficient to adequately review the Bank's loan portfolio, confirming that these problems persisted. ¶66.

e) The Federal Reserve identified the ARG's inadequate staffing and review as "weaknesses in the control structure" in its 2007 review, which was issued to the Board and to senior management. In its 2008 report, the Federal Reserve again warned that the ARG's inadequate staffing and review were control weaknesses at the Bank, confirming that these problems had remained unchanged since its 2007 review, when it made similar criticisms. The Federal Reserve would again identify these problems in 2009, when it instituted the MOU. ¶¶67, 84-86.

f) The Bank's Internal Audit group issued a report in late 2007 highlighting that the Bank's ARG was understaffed and lacked proper leadership and that its review was inadequate. ¶65.

g) These criticisms corroborated reports from Wilmington's former employees, who (i) reported that the Bank had "no real standards" for how often loans were reviewed by the ARG and that problems were identified through random samplings, which they characterized it as "review by exception," until late 2008; and (ii) stated that the Bank practiced "credit review in name only." ¶¶59, 61.

h) The Bank's appraisals (a critical aspect to asset review) were "almost always outdated," and problems with appraisals were a "wide-spread phenomenon," rendering a review of Wilmington's documents essentially "worthless." Cecala ordered the Workout Group to refrain from updating these appraisals to avoid charge-offs. According to a Bank senior vice president, going back to the borrower to ask for "more recent appraisals" was not the Bank's "preferred way of doing things" These outdated appraisals rendered the Bank's purported review and monitoring of loans meaningless and ineffective. ¶¶76-81.

i) Beginning in the third quarter of 2008, after CW 2 was appointed head of the Credit Risk Management Division and attempted to impose some standards on the ARG, the Officer Defendants escalated their interference in the ARG's operations, with Cecala and Harra actively undermining the asset review system and growing increasingly combative in rejecting ARG's efforts to downgrade risky loans. ¶¶68-74.

j) By July 2009, the Officer Defendants knew that the Federal Reserve was instituting the MOU based on its findings of numerous serious and systemic concerns with the Bank's asset review function, and by September 2009, the MOU was imposed. The Federal Reserve's concerns were based on, *inter alia*, the fact that only a small percentage of loans were reviewed by the ARG and there were only a handful of independent credit

employees responsible for reviewing the entire loan portfolio, and therefore that the Bank did not adequately assess the risk in its loan portfolio. ¶¶83-86.

175. In addition to these consistently false descriptions of the quality of the Bank's asset review, in its SEC filings during this time period the Bank also provided false descriptions of its loan rating process. Specifically, in its SEC filings, the Bank described its internal risk rating system, stating:

> We classify all loans outstanding in one of four categories of risk:
>
> - Loans with no current or potential problems receive "pass" ratings.
> - Potentially problematic loans are "watch listed."
> - Problem credits with some probability of loss receive "substandard" ratings.
> - Problem credits with a high probability of loss are rated "doubtful."
>
> We apply these classifications consistently and we analyze migrations within the classifications quarterly.
>
> This system has helped us develop adequate reserves for loan losses over the years.[10]

The Bank made this statement throughout the Class Period, either repeating or referring back to it in earlier filings, effectively incorporating it by reference.

176. The underlined description of the Bank's loan risk rating system was materially false and misleading because the Bank's risk ratings were applied inconsistently and were "generally inaccurate" leading the Bank to under-reserve for loan losses. Specifically:

a) Because the ARG reviewed only a small percentage – 10-15% – of Wilmington's loan portfolio annually, the Bank relied almost exclusively on its loan officers – who originated the loans, had absolute discretion to monitor the creditworthiness of their clients, and were financially penalized for downgrades – for the accuracy of its risk

---

[10] Ex. 2 at 44 (2007 10-K and Annual Report); Ex. 10 at 45 (2008 10-K); and Ex. 19 at 50 (2009 10-K). The Bank's quarterly filings contain substantially similar language or refer to the Annual Reports, thereby effectively incorporating the statement by reference. *See* Ex. 4 at 53 (First Quarter 2008 10-Q); Ex. 6 at 80 (Second Quarter 2008 10-Q); Ex. 8 at 80 (Third Quarter 2008 10-Q); Ex. 12 at 68 (First Quarter 2009 10-Q); Ex. 15 at 88 (Second Quarter 2009 10-Q); Ex. 17 at 132 (Third Quarter 2009 10-Q); and Ex. 21 at 81 (First Quarter 2010 10-Q).

ratings for the remaining 85-90% of its loans. ¶¶61-62.

b) As noted directly above, the Bank's appraisals were "almost always outdated," which resulted in grossly inaccurate risk ratings. ¶¶76-81.

c) Beginning in the third quarter of 2008, after CW 2 was appointed head of the Credit Risk Management Division, Cecala and Harra undermined the asset review system, growing increasingly combative in rejecting ARG's efforts to downgrade risky loans. In combination with the minimal review provided by the ARG, this meant the risk ratings were "generally inaccurate." ¶¶69-74.

177. In addition, the Bank's statements that the Bank's loan risk ratings had "helped us develop adequate reserves for loan losses over the years" were false and misleading because the Bank's loan risk ratings were manipulated and inaccurate, and did not help the Bank develop adequate reserves.

**C. False Statements Regarding Financial Results**

178. On a quarterly and annual basis throughout the Class Period, the Bank reported financial results including net income, loan loss provisions, and the Loan Loss Reserve. The Bank and Defendants Cecala and Gibson certified the accuracy of these financial results and certified that the Bank had presented these results in compliance with GAAP. However, each of these statements was false and misleading because the Bank's methodology for calculating its Loan Loss Reserve was not in compliance with GAAP, leading the Bank to materially understate its Loan Loss Reserve and overstate its net income. Although the Bank's reserving methodology changed slightly in the fourth quarter of 2008, the new methodology continued to violate GAAP, and the Bank continued to understate its reserve and overstate its income throughout the Class Period. Indeed, M&T's independent review of Wilmington's commercial loan portfolio confirms that the Bank understated its reserve and overstated its earnings by tens of millions of dollars for at least the first quarter of 2008 and every quarter thereafter.

179. In each quarterly and annual SEC filing during the Class Period, the Bank

reported the following false and misleading financial results (in millions):

| | Reported Net Income | Reported Loan Loss Provision | Reported Loan Loss Reserve |
|---|---|---|---|
| **4Q07**[11] | $44 | $9.2 | $101.1 |
| **1Q08**[12] | $41.4 | $10.0 | $106.4 |
| **2Q08**[13] | ($19.5) | $18.5 | $113.1 |
| **3Q08**[14] | $22.9 | $19.6 | $122.2 |
| **4Q08**[15] | ($68.5) | $67.5 | $157.1 |
| **1Q09**[16] | $21.8 | $29.5 | $167.0 |
| **2Q09**[17] | ($9.1) | $54.0 | $184.9 |
| **3Q09**[18] | ($5.9) | $38.7 | $201.8 |
| **4Q09**[19] | ($11.2) | $82.8 | $251.5 |
| **1Q10**[20] | ($29.2) | $77.4 | $299.8 |

180. The Bank's reported net income, loan loss provision, and Loan Loss Reserve during the Class Period were each false and misleading because, as set forth above at ¶¶114-128,

---

[11] January 18, 2008 press release, attached as Exhibit 1 ("Ex.") to the Declaration of Hannah Ross, at 1, 8, 13; Ex. 2 at 46, 70, 71 (Form 10-K for the year ending Dec. 31, 2007, dated Feb. 28, 2008 ("2007 10-K and Annual Report")).

[12] Ex. 3 at 1, 8, 10 (April 18, 2008 press release); Ex. 4 at 1, 4-5 (Form 10-Q for the first quarter of 2008, dated May 12, 2008 ("First Quarter 2008 10-Q")).

[13] Ex. 5 at 1-3 (July 18, 2008 press release); Ex. 6 at 1, 3-4 (Form 10-Q for the second quarter of 2008, dated Aug. 11, 2008 ("Second Quarter 2008 10-Q")).

[14] Ex. 7 at 1, 3 (October 17, 2008 press release); Ex. 8 at 3, 4, 18 (Form 10-Q for the third quarter of 2008, dated Nov. 10, 2008 ("Third Quarter 2008 10-Q")).

[15] Ex. 9 at 1, 4 (January 30, 2009 press release); Ex. 10 at 63, 72-73 (Form 10-K for the year ending Dec. 31, 2008, dated March 2, 2009 ("2008 10-K").

[16] Ex. 11 at 1, 2 (April 24, 2009 press release); Ex. 12 at 1, 5 (Form 10-Q for the first quarter of 2009, dated May 11, 2009 ("First Quarter 2009 10-Q")).

[17] Ex. 13 at 1 (July 17, 2009 press release); Ex. 14 at 1, 3 (July 24, 2009 press release); Ex. 15 at 1, 3, 4 (Form 10-Q for the second quarter of 2009, dated Aug. 10, 2009 ("Second Quarter 2009 10-Q")).

[18] Ex. 16 at 1, 2 (October 23, 2009 press release); Ex. 17 at 1, 3, 4 (Form 10-Q for the third quarter of 2009, dated Nov. 9, 2009 ("Third Quarter 2009 10-Q")).

[19] Ex. 18 at 1, 2 (January 29, 2010 press release); Ex. 19 at 66-67 (Form 10-K for the year ending Dec. 31, 2009, dated Feb, 22, 2010 ("2009 10-K")).

[20] Ex. 20 at 1, 2 (April 23, 2010 press release); Ex. 21 at 1, 3, 4 (Form 10-Q for the first quarter of 2010, dated May 10, 2010 ("First Quarter 2010 10-Q")).

the Bank's accounting procedures did not comply with GAAP, which led the Bank to under-reserve for loan losses and overstate its net income. Indeed, M&T's independent review of Wilmington's commercial loan portfolio confirmed that the Bank materially understated its reserve by hundreds of millions of dollars. Specifically, as discussed at ¶¶125-128, M&T, which examined Wilmington's commercial loan portfolio dating back to January 1, 2008, determined that the Bank had materially understated its Loan Loss Reserve by nearly $800 million, and thereby overstated its net income, as set forth in the following chart (in millions):

| | **Reported Net Income** | **Corrected Net Income Using M&T's Analysis** | **Percentage Of Net Income Inflation** |
|---|---|---|---|
| 1Q 2008 | $41.4 million | $28.1 million | 32% |
| 2Q 2008 | ($19.5) million | ($44.0) million | 126% |
| 3Q 2008 | $22.9 million | ($3.1) million | 114% |
| 4Q 2008 | ($68.5) million | ($157.9) million | 131% |
| 1Q 2009 | $21.8 million | ($17.3) million | 179% |
| 2Q 2009 | ($9.1) million | ($80.8) million | 788% |
| 3Q 2009 | ($5.9) million | ($57.3) million | 871% |
| 4Q 2009 | ($11.2) million | ($121.1) million | 981% |
| 1Q 2010 | (29.2) million | (131.9) million | 352% |

181. In addition to reporting false and misleading financial results, throughout the Class Period, the Bank falsely and misleadingly described its methodology for reserving for loan losses. First, in its 2007 10-K, the Bank described the Bank's Loan Loss Reserve methodology as follows:

> We establish a reserve for loan losses in accordance with GAAP by charging a provision for loan losses against income. . . . In calculating the reserve, we consider micro- and macro-economic factors, historical net loss experience, current delinquency trends, movements within internal risk rating classifications, and other factors.[21]

The preceding underlined statement was false and misleading because the Bank's reserving methodology was not compliant with GAAP and the Bank did not consider micro- and macro-

[21] Ex. 2 at 80 (2007 10-K and Annual Report).

economic factors, historical net loss experience, current delinquency trends, movements within internal risk rating classifications, or other factors. Specifically, the Bank's reserving methodology at the time these statements were made was exclusively based on the Bank's inaccurate loan risk ratings, and did not take into account the factors required by GAAP, including economic trends and borrowers' current and projected ability to pay. ¶114. Thus, the Bank's simplistic methodology did not adequately assess the possibility of repayment or reflect the losses that the Bank had incurred. According to the Bank's former head of the Credit Risk Management Division, who was in charge of setting the Loan Loss Reserve during the Class Period, this methodology was "not compliant" with GAAP. ¶118. Accordingly, the Bank's financial results reported pursuant to this methodology are presumed misleading.

182. After the Bank modified its loan loss methodology in the fourth quarter of 2008, the Bank began to describe its methodology in its SEC filings as follows:

> We establish a reserve for loan losses in accordance with GAAP by charging a provision for loan losses against income. . . . In calculating the reserve, we consider micro- and macro-economic factors, historical net loss experience, current delinquency trends, movements within internal risk rating classifications, and other factors.
>
> We made several enhancements to our reserve methodology in 2008:
>
> - We expanded the use of historical losses to determine appropriate reserve levels.
> - We added qualitative factors, such as general economic conditions, loan concentrations, and other factors, to the criteria we use to assign reserve levels.
>
> We reclassified a portion of the reserve to a separate liability account to create a reserve for unfunded loan commitments, mainly letters of credit.[22]

183. This description of the Bank's modified loan loss methodology was false and misleading because the Bank's new reserving methodology did not comply with GAAP and, as a

[22] Ex. 10 at 85 (2008 10-K).

result, the Bank materially understated its Loan Loss Reserve. Specifically:

a) The Bank's new methodology continued to rely almost exclusively on the Bank's inaccurate loan ratings – ratings that were (i) assigned by the Bank's lenders, who were financially penalized for downgrading loan risk ratings and had absolute discretion to monitor the creditworthiness of their clients; (ii) artificially inflated by senior management; and (iii) based on outdated and inaccurate appraisals. ¶¶119-121.

b) Furthermore, in violation of GAAP, the Bank also over-relied on the Bank's manipulated and unreliable loss history. Wilmington's former head of Credit Risk Management, who was responsible for setting the Loan Loss Reserve, and former Vice-President of Workout both stated that the Bank's loan history was too unreliable to serve as an adequate basis for calculating the Loan Loss Reserve. Because the Officer Defendants refused to recognize charge-offs on its delinquent loans, its loan loss history was artificially positive, leading the Bank to delay recognizing timely increases to its Loan Loss Reserve. ¶¶75, 121.

c) The Bank failed to adequately consider the rapidly deteriorating state of the economy because its new method was based on an improper assumption that "qualitative" factors should not exceed a certain arbitrary and small percentage of the Bank's overall Loan Loss Reserve. ¶122.

d) In September 2009, the Federal Reserve recognized the inadequacy of the Bank's reserve methodology when it issued the MOU to the Bank, requiring Wilmington to "fully fund [the Loan Loss Reserve] considering additional adversely classified credits from the updated internal loan rating system" and to "maintain an adequate ALLL [Loan Loss Reserve] consistent with GAAP and regulatory policies and guidance." ¶¶84, 87.

184. Finally, in the Bank's annual and quarterly SEC filings throughout the Class Period, the Bank stated that its financial reporting complied with GAAP:

> We maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles and reporting practices prescribed for the banking industry.[23]

Similarly, in the Bank's annual and quarterly SEC filings throughout the Class Period, Defendants Cecala and Gibson each falsely certified that the Bank's financial statements were accurate and fairly presented the Bank's financial condition, certifying in pertinent part:

[23] This statement was repeated in substantially identical form in Ex. 2 at 60 (2007 10-K and Annual Report); in Ex. 4 at 7 (First Quarter 2008 10-Q); Ex. 6 at 9 (Second Quarter 2008 10-Q); Ex. 8 at 9 (Third Quarter 2008 10-Q); Ex. 10 at 61 (2008 10-K); Ex. 12 at 6 (First Quarter 2009 10-Q); Ex. 15 at 8 (Second Quarter 2009 10-Q); Ex. 17 at 153 (Third Quarter 2009 10-Q); Ex. 19 at 60 (2009 10-K); and Ex. 21 at 8 (First Quarter 2010 10-Q).

> 1. I have reviewed this annual report on Form 10-K of Wilmington Trust Corporation;
>
> * * *
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.][24]

These certifications of GAAP compliance were false and misleading because, as discussed immediately above at ¶¶181, 183, the Bank's reserving methodologies did not comply with GAAP and led the Bank to under-state its Loan Loss Reserve and overstate its net income.

### D. False Statements Regarding Internal Controls

185. In each of the Bank's annual and quarterly SEC filings, Cecala and Gibson also certified to the effectiveness of the Bank's internal controls on financial reporting, stating in substantially identical language that:

> The registrant's other certifying officer and I . . . have:
>
> * * *
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.[25]

186. The preceding underlined statements were false and misleading at the time they were made because, throughout the Class Period, Wilmington's internal controls suffered from

[24] This certification was signed by Defendants Cecala and Gibson and was repeated in substantially identical form at the conclusion of: Ex. 2 (2007 10-K and Annual Report); Ex. 4 at 63 (First Quarter 2008 10-Q); Ex. 6 at 92 (Second Quarter 2008 10-Q); Ex. 8 at 95 (Third Quarter 2008 10-Q); Ex. 10 (2008 10-K); Ex. 12 (First Quarter 2009 10-Q; Ex. 15 (Second Quarter 2009 10-Q); Ex. 17 (Third Quarter 2009 10-Q); Ex. 19 (2009 10-K); Ex. 21 (First Quarter 2010 10-Q).

[25] These certifications can be found at the conclusion of: Ex. 2 (2007 10-K and Annual Report); Ex. 4 (First Quarter 2008 10-Q); Ex. 6 (Second Quarter 10-Q); Ex. 8 (Third Quarter 2008 10-Q); Ex. 10 (2008 10-K); Ex. 12 (First Quarter 2009); Ex. 15 (Second Quarter 2009 10-Q); Ex. 17 (Third Quarter 2009 10-Q); Ex. 19 (2009 10-K); and Ex. 21 (First Quarter 2010 10-Q).

significant deficiencies. Among other things, the Bank's asset review – which was how the Bank determined the amount of reserves to set aside – was inadequate to determine the Bank's credit risk, as discussed above at ¶174. Specifically:

a) In 2007, KPMG, the Federal Reserve, and Internal Audit each determined that the Bank's asset review was an area of material and significant weaknesses in the Bank's internal controls. ¶¶65-67.

b) Consistent with these criticisms, in 2008, KPMG and the Federal Reserve again warned the Officer Defendants that the Bank's asset review was an area of material and significant control weakness. ¶¶65-67.

c) These internal control failures continued through 2009, when the Federal Reserve instituted the MOU as result of these longstanding and systemic failings in the Bank's asset review and internal controls, among other areas. ¶¶83-87.

d) As the FBI Affidavits provide, the Bank's relationship with Zimmerman demonstrates that the Bank failed to exercise any supervision over one of its most prominent lenders, including by allowing the lender to change the terms of loan agreements without any independent credit review, lending millions of dollars in funds without requiring any verification or documentation of lender need, by failing to ensure that any project-related work was performed and by authorizing loan payments when the borrower had not satisfied the required terms of the loans. ¶¶92-112.

e) As the FBI Affidavits provide, the Delaware Review Memorandum raised "serious concerns" concerning the management of the Bank's Delaware commercial real estate division, including the Bank's lack of appropriate oversight over key individuals and failure to require appropriate documentation, demonstrating the Bank's overall lack of internal controls over these key functions. ¶¶89-91

### E. Additional False Statements By The Officer Defendants

187. In addition to the Bank's false statements in its SEC filings, Defendants Cecala, North, Foley, and Gibson each made additional false and misleading statements during earnings conference calls with investors throughout the Class Period.

188. At the outset of the Class Period, on the January 18, 2008 conference call, Cecala attributed the Bank's supposed financial strength to, among other things, the quality of the Bank's underwriting practices. In particular, he addressed investor concerns regarding the Bank's exposure to real estate in the Delaware Valley, stating: "I would like to point to <u>the</u>

quality of the loan portfolio and our underwriting and evaluation process."[26] This statement was false and misleading because, as discussed at ¶171, the Bank's underwriting and loan evaluation processes were of poor "quality." In reality, as set forth above, the Bank had virtually no underwriting function, as its loan underwriting was not actually performed by the underwriters, but by lenders who were incentivized to make as many loans as possible. Further, Wilmington's lenders routinely ignored established underwriting policies and made exceptions to those policies based on personal relationships rather than on borrowers' ability to pay, and also exploited their authority under the 10% Rule to automatically grant 10% increases on large loans without any further credit review. Similarly, the Bank's loan evaluation process was not "quality." In reality, the vast majority of the Bank's loan portfolio was not reviewed or evaluated. As set forth above, loans of less than $15 million, which constituted the overwhelming majority of the Bank's loan portfolio, received "essentially no review" by the ARG to determine their credit quality. Moreover, on an annual basis, the ARG did not review 85-90% of the Bank's loans.

189. The falsity of Cecala's statement regarding the "quality" of the Bank's underwriting, loan evaluation process, and asset review is highlighted by the Bank's failure to oversee Joseph Terranova's relationship with Zimmerman, providing Terranova with complete discretion to (i) determine the terms of Zimmerman's loans (including by overriding the Loan Committee's approval) and (ii) approve the distribution of millions of dollars of Wilmington funds without requiring Zimmerman to meet the basic terms of his loan agreements. Indeed, on January 16, 2008 – two days before Cecala's claim that the Bank had "quality" underwriting, asset review, and loan portfolio – Wilmington issued a $1 million check to Zimmerman based solely on his request for the money to "pay [his] bar tab." Defendants Gibson and Harra were

[26] Ex. 22 at 2 (transcript to January 18, 2008 conference call).

present on this conference call and did not correct Defendant Cecala's misstatement.

190. Similarly, on the January 30, 2009 conference call to discuss year-end 2008 results, North spoke to investors about the quality and selectivity of the Bank's underwriting practices, stating the following in response to analyst questioning:

> **Analyst**: Are you taking an excess of risk by growing the commercial portfolio in this kind of environment – or the desire to grow faster, where we could run into some problems a year from now, where the growth is too excessive in this kind of an environment?
>
> **Defendant North**: [A]s we've seen in downward trends in the past, we get presented some nice opportunities from businesses that want to come to a bank that has our type of relationship – a long term, people-oriented approach. And we're obviously being very, very selective. We're here for our clients.[27]

North's underlined statement was false and misleading because as discussed at ¶171 above, in reality, the Bank's underwriting was: (i) not at all selective; (ii) controlled by its lenders; and (iii) allowed the Bank to regularly extend credit without any regard for the borrower's ability to repay the loan. Defendants Cecala and Gibson were present on this conference call and did not correct Defendant North's misstatement.

191. In addition to the Bank's repeated false statements about asset review in its SEC filings, on the October 23, 2009 conference call to discuss the Bank's third quarter 2009 results, North spoke at length about the Bank's level of reserves relative to nonperforming assets, stating that the Bank put its troubled loans "under the microscope." Specifically, North stated the following in response to analyst questioning:

> **Analyst**: I guess the first question's on the reserve. I think you're at about 55% of non-performing loans, and maybe like 23% of the loans that you've listed as substandard and doubtful. So that's a pretty low level relative to where you've been historically, and even during the last recession in the earlier part of the decade. So how should we think about that? Is this a reflection of greater confidence that you won't realize losses than what you had during the last

[27] Ex. 23 at 12-13 (transcript to January 30, 2009 conference call).

> downturn? Or should we look for those percentages to sort of come back up towards their historical averages?
>
> **Defendant North**: Rob, it's Bill North. I mean, look, when we have a situation that gets to that level of risk and all our impaired assets, as I think we've talked about before. We do and we are required to do a thorough examination of either the future, the present value of the expected future cash flows or if it's a real collateral-oriented loan, obviously we're going out and getting a new appraisal. And obviously what we provisioned and what's in the reserve is a direct correlation to those today based on today's market conditions and the expectations, it's based on those values.
>
> So I'm not quite sure how that compares to maybe the other periods in different cycles, but today, we're taken these loans and we're putting them under the microscope and we're doing the analysis and assessing the value at today's market and the expected cash flows based on today's performance. And our reserve levels and what we provision every quarter is a result of that.[28]

192. North's underlined statements above were false and misleading because as discussed above at ¶174, the Bank's review of these loans was minimal and inadequate to assess the actual credit risk inherent in these loans. Far from putting troubled loans "under the microscope," the Bank's asset review was so deficient that the Federal Reserve had issued the MOU in order address the Bank's failings. Moreover, North's statement that the Bank obtained "new appraisals" for its impaired loans was false and misleading, because he failed to disclose that the Bank refused to update and obtain new appraisals. The Bank's appraisals (a critical aspect to asset review) were "almost always outdated," and problems with appraisals were a "wide-spread phenomenon," rendering a review of Wilmington's documents essentially "worthless." As the Senior Vice President of Corporate Marketing and Communications at Wilmington admitted, going back to the borrower to ask for "more recent appraisals" was not the Bank's "preferred way of doing things . . . . it wasn't the nature of how we did things." In this regard, Cecala ordered the Workout Group to refrain from updating appraisals to avoid charge-

[28] Ex. 24 at 6 (transcript to October 23, 2009 conference call).

offs. In fact, even as of July 2011 (well after the date of this conference call), the Bank was still working to obtain updated appraisals for loans that were years old. Defendants Cecala, Gibson, and Harra were present on this conference call and did not correct Defendant North's misstatements.

193. On that same call, Cecala falsely stated that the Bank conducted a "thorough and exhaustive" analysis of its loans each quarter, stating that:

> Yes, when we look at the portfolios, Dave said, we take a look at what kind of reserves that we should have against the portfolio given the current economic conditions. And then as – if a loan becomes a classified loan then we obviously add a lot more scrutiny to that particular credit and in some situations where a loan might go non-accruing, there may not be a reserve associated with it, because the underlying collateral even in today's market is sufficient. Or a loan goes non-accruing and we take an immediate charge associated with that loan, because we believe that there is a loss that will be realized upon its resolution. So there is no rule of thumb is what I'm trying to say. <u>We do a rather thorough and exhaustive analysis each and every quarter</u>.[29]

194. This statement was false and misleading because, in reality, the Bank performed a minimal review of its assets (troubled or otherwise) – not reviewing 85-90% of the portfolio each year. Further, the Officer Defendants knowingly or recklessly refused to allow the Bank's credit staff to take proper downgrades and write offs, rendering its risk ratings inaccurate and its Loan Loss Reserve inadequate.

**F. Defendants Attempted To Cover Up The True Reasons For The Bank's Increased Reserves With Additional False And Misleading Statements**

195. As noted above in Section IV, beginning with its fourth quarter 2009 results, the truth about Wilmington's true financial condition began to be revealed to the marketplace. Nevertheless, Defendants continued to make materially false and misleading statements to the investing public. Specifically, the Bank continued to conceal its true financial condition, even as it conducted the Delaware Status Review that fully exposed the disastrous state of the Bank's

[29] *Id*. at 13.

lending practices in its primary Delaware market and loan portfolio, and as it began to implement the terms of the MOU that would eventually reveal the full extent of its losses. In addition, the Officer Defendants made several additional false and misleading statements on several conference calls in 2010 that continued to mislead the public and delay recognition of the truth about Wilmington. These statements are set forth below.

196. On the special conference call on June 4, 2010 to announce Cecala's resignation discussed at ¶¶135-136, Cecala specifically denied that there were any "mounting credit problems" at the Bank, stating that there would be "none whatsoever."[30] Similarly, Foley also denied that there would be any upcoming "surprises" or credit "blow ups" expected by the Bank. These statements were false and misleading because, in reality, the Bank was internally recognizing massive credit problems that, just over a month later, would cause it to report over $200 million in additional reserves, and just five months later would cause it to report nearly $800 million in additional necessary reserves. In fact, Defendants Cecala and Foley both knew at the time that the Federal Reserve was concerned about the "future ability of the bank to survive, based on what they saw in the credit underwriting and had taken over the Bank's credit practices." Further, Defendants Cecala and Foley both also knew that the Bank's "comprehensive" Delaware Status Review had revealed "serious concerns" with the Bank's underwriting and asset review in regards to the Bank's largest portfolio, and that the myriad "questionable activities" detailed in the Delaware Review Memorandum directly contradicted the statements that there were no "mounting credit problems" at the Bank.

197. On the July 23, 2010 conference call to discuss the Bank's second quarter 2010 results discussed at ¶144, Gibson falsely stated that the third-party company that had reviewed

[30] Ex. 25 at 5 (transcript to the June 4, 2010 conference call).

the Bank's credit procedures and policies had found them to be "state of the art."[31] This statement was false and misleading because the Bank's credit procedures and polies were, in fact, entirely deficient. In reality, the third-party company reviewing the Bank's portfolio did not find the Bank's credit procedures to be "state of the art" and actually found that the Bank's loans were consistently mis-rated and its appraisals were far out of date. Similarly, as documented in the Delaware Status Memorandum just a few short months before these statements were made, there were "serious concerns" with the Bank's many "questionable [lending] activities," including, among other practices, "limited oversight" of the Bank's relationship managers, the "unethical use of loan approval authority by relationship managers," the "lack of validation of constriction budgets prior to loan closings" and the "<u>frequent</u> use of construction loan proceeds to return cash to borrowers." These practices could not be termed "state of the art." Indeed, just over three months later the Bank and M&T disclosed that the Bank had an additional nearly $800 million in credit losses that could not have resulted from "state of the art" credit policies.

198. Also on the July 23 conference call, Defendant Gibson's statement attributing the Bank's credit concerns to "weakness in the economy" and stating that "we're just being very cautious about how we're evaluating those credits given the economic environment"[32] was false and misleading because he continued to mislead investors regarding the true credit policies and practices – including those practices that forced the Bank into the MOU and that the Delaware Review Memorandum identified – that led to the Bank's financial distress.

## VI. SUMMARY OF SCIENTER ALLEGATIONS

199. As set forth more fully above, Defendants Cecala, Gibson, Harra, North, and Foley each acted with scienter in that each knew or recklessly disregarded that the public

[31] Ex. 26 at 24 (transcript to the July 23, 2010 conference call).

[32] *Id*. at 9.

statements regarding Wilmington's financial results (earnings and net income), underwriting, asset review, accounting practices, and internal controls during the Class Period were materially false and misleading. Among other things, the following facts establish these Defendants' scienter.

200. First, the Delaware Status Review is compelling evidence of scienter for each of the Officer Defendants and Wilmington. As explained above, that Review was conducted in 2009 and analyzed the lending practices and loan portfolio of the Delaware Commercial Real Estate Division, the geographic market that accounted for more than 50% of the Company's outstanding commercial loans. That Review determined that Wilmington's underwriting and asset review procedures were grossly deficient, and that there were "serious concerns" with the management of the Delaware Commercial Real Estate Division and its loan portfolio. Given the importance of the Delaware Commercial Real Estate Division and the nature of this Review, it is inconceivable that the Officer Defendants were not aware of this Review and its findings.

201. Second, the results of the Delaware Status Review were set forth in a written memorandum prepared by a senior credit risk officer (the Delaware Review Memorandum discussed above), who finalized the Delaware Review Memorandum in early March 2010 and shortly thereafter became Chief Credit Officer. The Delaware Review Memorandum detailed numerous improprieties and failings in Wilmington's underwriting and asset review practices, including (i) the "unethical use of loan approval authority by relationship managers"; (ii) the Bank's "limited oversight of relationship managers"; (iii) "a limited technical knowledge of commercial real estate lending"; (iv) the Bank's "lack of validation of construction budgets prior to loan closings"; and (v) the "frequent use of loan proceeds to provide cash to borrowers or fund partner buyouts prior to construction completion or the property having reached operating

stabilization." Given the importance of the Delaware Status Review, it is inconceivable that the Delaware Review Memorandum was not distributed to the Officer Defendants. At minimum, they were aware that the Delaware Review Memorandum had been prepared and that it was readily available to them.

202. Third, many of the specific improprieties detailed in the Delaware Review Memorandum (and by Wilmington's former employees, *see supra* ¶¶49-50, 57) involved one of, if not the, most important relationship managers in the entire Bank – Joseph Terranova, who was the head of the Bank's commercial real estate lending and who was responsible for a portfolio of $500 million, which represented 7% of the Bank's portfolio. Terranova interacted directly and frequently with the Officer Defendants, and they were intimately familiar with his lending practices.

203. Fourth, the massive size of the Zimmerman relationship, which, as noted above, alone comprised almost 6% of the Bank's construction loan portfolio, further supports scienter. Given the magnitude and import of the Zimmerman relationship to the Bank, the Officer Defendants had an obligation to closely monitor that relationship, and were involved in the review and approval of the Zimmerman loans through the Loan Committee. As a result, the Officer Defendants knew, or were reckless in not knowing, that Terranova held absolute control over the credit review and administration of the Zimmerman loans, and that the Bank did not exercise any independent credit review in connection with the relationship. The Officer Defendants also knew or should have known that the Bank recklessly continued to extend millions of dollars in loans to Zimmerman in 2008 and 2009, even after the Bank identified Zimmerman's serious financial difficulties in repaying loans it had already made.

204. Fifth, the sheer magnitude and timing of the Bank's credit losses disclosed by

M&T and the Bank on November 1, 2010 supports a strong inference of the Officer Defendants' scienter. Indeed, the nearly $800 million in additional necessary reserves – an amount which nearly doubled the Bank's entire Loan Loss Reserve at the time and dwarfed the Bank's income for the prior decade – was so massive and severe that it forced the Bank to sell itself at a fire-sale price or face liquidation. A sudden increase of this magnitude cannot be the innocent result of credit problems that only emerged in the third quarter of 2010. In fact, M&T's findings that nearly 20% of the Bank's entire loan portfolio and 40% of the construction portfolio from the beginning of 2008 were worthless and had to be written off entirely demonstrates the duration and severity of the Bank's credit failings.

205. Sixth, the fact that the Officer Defendants were warned year after year about material deficiencies in its critical asset review function, but failed to correct these problems, supports a strong inference of scienter. Specifically, the Federal Reserve (in 2007 and 2008), KPMG (in 2007 and 2008) and Internal Audit (in 2007) each determined – and communicated to the Officer Defendants – that the Bank's loan portfolio review was inadequate and constituted material weaknesses in the Bank's internal controls. Then, in 2009, after the Officer Defendants ignored these warnings for years and the problems persisted, the Federal Reserve imposed the MOU, which confirmed the widespread existence of deficiencies in all areas of the Bank's lending practices and made clear that the Bank lacked fundamental systems, policies, and procedures for its underwriting, asset review, accounting, and control functions. The longstanding duration of these critical failings at the Bank, in the face of repeated warnings by the Federal Reserve, KPMG, and the Internal Audit Group, demonstrates the Officer Defendants' scienter.

206. Seventh, the Officer Defendants' own admission supports a finding of scienter.

Specifically, in June 2010, Defendants Foley, Gibson, and North "admitted to not being as proactive as they needed to be in the past in dealing with the bank's credit challenges." This admission demonstrates that the Officer Defendants knew of, or recklessly disregarded, the existence of serious and significant losses in the Bank's loan portfolio significantly in advance of the November 1, 2010 announcement, but failed to take the necessary steps – including remedying basic failures in the critical asset review function – to protect the Bank.

207. Finally, the Officer Defendants' scienter is established through their own actions and direct involvement in the Bank's lending and accounting practices. Witnesses confirm that the Officer Defendants were actively involved in all aspects of the Bank's underwriting, risk management, asset review, appraisal, accounting, and internal control functions. These accounts make clear that the Officer Defendants – who according to CW 11 were a tightly knit group of friends who operated as "one little clan" – were aware of and/or actively involved in making the operative decisions regarding (1) establishing the Loan Loss Reserve, (2) determining which loans would be charged off, (3) deciding which loans should be downgraded to a lower risk rating category, (4) setting the Bank's underwriting policies and procedures, (5) instructing lenders to approve loans without analyzing borrower creditworthiness, and (6) failing to obtain updated appraisals.

208. In addition to the foregoing, each of the Officer Defendants' scienter is also supported by the facts summarized below:

**Facts Supporting Defendant Cecala's Scienter**

209. In addition to the facts summarized at ¶¶199-207 above, facts establishing that Cecala knew or recklessly disregarded that the statements about underwriting, asset review, financial results, and internal controls were materially false and misleading when made include

the fact that Cecala:

a) Was directly involved in lending decisions through the Loan Review Committee. ¶55.

b) Directed top lenders Joseph Terranova (the head of the Bank's commercial real estate division) and Brian Bailey (the head of the Bank's Delaware lending) not to create or maintain loan files containing the documentation necessary to perform adequate underwriting, leading to rampant underwriting and documentation deficiencies in their loans. ¶¶49-50.

c) Received quarterly "Delinquency List" reports evidencing problems with the Bank's loan quality and underwriting circulated by Defendant North. ¶74.

d) Knew of technical deficiency reports detailing underwriting errors and deficiencies. ¶46.

e) Knew about ARG insufficiencies through repeat warnings from regulators and auditors, as well as annual budget presentations and because the problem was widely known within the Bank. ¶61.

f) Instructed the Workout group to delay obtaining updated appraisals (a critical factor in the accuracy of loan risk ratings and adequacy of reserves) before the end of the quarter to avoid taking additional charge-offs, rendering risk ratings and reserves based on these appraisals inaccurate. ¶76.

g) Regularly attended ARG meetings and had the final say (along with Harra and Gibson) on loan ratings, and regularly rejected loan risk rating downgrades and charge-offs for loans without any objective analysis or substantive explanation other than that the borrower or guarantor was a "good guy." ¶¶69-75.

h) Attended quarterly Credit Strategy Meetings at which emerging credit problems and the urgent need for updated appraisals were repeatedly discussed. ¶¶64, 79.

i) According to CW 2, approved the Bank's underwriting policies as a member of the Board. Therefore, among other lax underwriting policies, Cecala knew or recklessly disregarded the improper and widely used 10% Rule that allowed the Bank's lenders to extend additional money without any credit review.

j) Was responsible (along with Defendant Gibson) for approving the Bank's Loan Loss Reserve recommendation to the Board of Directors and thus knew or recklessly disregarded that it was woefully understated and not adequate for the losses inherent in the Bank's loan portfolio. ¶115.

k) According to CW 2, after September 2009 served as member of the Board's MOU compliance committee which approved the remedial measures to the Bank's underwriting, asset review, and accounting policies.

l) Abruptly resigned from the Bank in June 2010 as the Bank was reporting deteriorating credit. ¶¶134-137.

**Facts Supporting Defendant Gibson's Scienter**

210. In addition to the facts summarized at ¶¶199-207 above, facts establishing that Gibson knew or recklessly disregarded that the statements about underwriting, asset review, financial results, and internal controls were materially false and misleading when made include the fact that Gibson:

a) Oversaw monthly ARG meetings that discussed loan rating changes, charge off decisions, credit risk review, and loan loss reserves. ¶¶69-75.

b) Approved rating downgrades and charge-off decisions and thus saw the impacts of lax, inconsistent underwriting on the Bank's portfolio. ¶¶69.

c) By the first quarter of 2009, presided over ARG meetings where Cecala and Harra regularly rejected downgrade and charge-off recommendations without any credit analysis. ¶¶69-75.

d) Knew about ARG insufficiencies through repeat warnings from regulators and auditors, as well as annual budget presentations and because the problem was widely known within the Bank. ¶61.

e) Attended quarterly Credit Strategy Meetings at which emerging credit problems and the urgent need for updated appraisals were repeatedly discussed. ¶¶64, 79.

f) Received quarterly "Delinquency List" reports evidencing problems with the Bank's loan quality and underwriting circulated by Defendant North. ¶74.

g) Was responsible (along with Defendant Cecala) for approving the Bank's Loan Loss Reserve recommendation to the Board of Directors and thus knew or recklessly disregarded that it was woefully understated and not adequate for the losses inherent in the Bank's loan portfolio. ¶115.

**Facts Supporting Defendant Harra's Scienter**

211. In addition to the facts summarized at ¶¶199-207 above, facts establishing that Harra knew or recklessly disregarded that the statements about underwriting, asset review, financial results, and internal controls were materially false and misleading when made include the fact that Harra:

a) Was directly involved in lending decisions through the Loan Review Committee. ¶55

b) Knew about ARG insufficiencies through repeat warnings from regulators and auditors, as well as annual budget presentations and because the problem was widely known within the Bank. ¶61.

c) Attended quarterly Credit Strategy Meetings at which emerging credit problems and the urgent need for updated appraisals were repeatedly discussed. ¶¶64, 79.

d) Received quarterly "Delinquency List" reports evidencing problems with the Bank's loan quality and underwriting circulated by Defendant North. ¶74.

e) Knew of technical deficiency reports detailing underwriting errors and deficiencies. ¶46.

f) By the first quarter of 2009, regularly attended ARG meetings and had the final say (along with Cecala and Gibson) on loan ratings, and regularly rejected loan risk rating downgrades and charge-offs for loans without any objective analysis or substantive explanation other than that the borrower or guarantor was a "good guy." ¶¶69-75.

**Facts Supporting Defendant North's Scienter**

212. In addition to the facts summarized at ¶¶199-207 above, facts establishing that North knew or recklessly disregarded that the statements about underwriting, asset review, financial results, and internal controls were materially false and misleading when made include the fact that North:

a) Served as Chief Credit Officer and head of the Loan Committee, and was thus aware of the Bank's lax underwriting policies and practices, including the use of the 10% Rule. ¶¶55.

b) Knew or recklessly disregarded that the underwriting function was controlled by the Bank's lenders who were incentivized to grow loan volume as opposed to independent underwriters. Therefore, knew or recklessly disregarded that there was virtually no underwriting performed. ¶¶53-54.

c) Attended quarterly Credit Strategy Meetings at which emerging credit problems and the urgent need for updated appraisals were repeatedly discussed. ¶¶64, 79.

d) Circulated quarterly "Delinquency List" reports evidencing problems with the Bank's loan quality and underwriting. ¶74.

e) Admitted to the FBI that the Bank extended loans to Zimmerman based only on his representations that he had the necessary documentation in hand, when in fact he had no such documentation. ¶102.

f) Received technical deficiency reports detailing underwriting errors and deficiencies. ¶46.

g) Attended the ARG meetings where other Officer Defendants personally interfered with loan downgrade decisions. ¶¶69-75.

h) Abruptly resigned from the Bank in Summer 2010 as the Bank was reporting deteriorating credit. ¶138.

**Facts Supporting Defendant Foley's Scienter**

213. In addition to the facts summarized at ¶¶199-207 above, facts establishing that Foley knew or recklessly disregarded that the statements about underwriting, asset review, financial results, and internal controls were materially false and misleading when made include the fact that Foley:

a) According to CW 2, approved the Bank's underwriting policies as a member of the Board. Therefore, among other lax underwriting policies, Cecala knew or recklessly disregarded the improper and widely used 10% Rule that allowed the Bank's lenders to extend additional money without any credit review.

b) According to CW 2, after September 2009 served as member of the Board's MOU compliance committee which approved the remedial measures to the Bank's underwriting, asset review, and accounting policies.

c) As Chair of the Audit Committee and a member of the Board, had direct responsibility for Wilmington's response to the MOU. ¶¶83-87.

d) Took over as CEO and Chairman of the Board in the summer of 2010 – after three years of being warned about serious asset review deficiencies from the regulators and auditors. At this time, Foley was aware that the Federal Reserve had identified serious credit issues and Treliant Risk Advisors had identified significant credit deterioration, yet still knowingly or recklessly assured investors that there were no credit problems in the Bank's loan portfolio. ¶¶83-87, 134-136.

## VII. RELEVANT GAAP AND ACCOUNTING PROVISIONS

214. GAAP refers to the framework of guidelines for financial accounting used by accountants to prepare financial statements. The SEC has the statutory authority to codify GAAP, and has delegated that authority to the Financial Standards Accounting Board ("FASB"). SEC Regulation S-X states that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other

disclosures.

215. GAAP provides a series of rules for how and when to set the Loan Loss Reserve. Chief among these is the Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies" (defined above as "FAS 5" or "ASC Topic 450"[33]), which requires that estimated losses from uncollectible loans should be included in a reserve when two criteria are met: (1) based on information available prior to the issuance of the financial statements, it is probable that the loans were impaired at the date of the financial statements, and (2) the amount of the losses can be reasonably estimated.

216. This first prong – probability of impairment – exists when, based on current information and events, it is probable that the entity will be unable to collect all amounts due (including both interest and principal payments) according to the contractual terms of the loan agreement, as set forth in Statement of Financial Accounting Standards No. 114, "Accounting By Creditors for Impairment of a Loan" ("FAS 114" or "ASC Topic 310").

217. The second prong – reasonable estimation – exists when information available indicates that the estimated amount of loss is within a range of amounts, as set forth in Financial Accounting Standards Board ("FASB") Interpretation No. 14 ("FIN 14," or "ASC Topic 450"). In other words, Wilmington was not allowed to delay a provision to the Loan Loss Reserve until only a definite amount could be reasonably estimated.

218. In deciding the estimated amount of loss, SEC Staff Accounting Bulletin No. 102, "Selected Loan Loss Allowance Methodology and Documentation Issues" (defined above as "SAB 102"), provides that "[i]t is critical that loan loss allowance methodologies incorporate

---

[33] In June 2009, the FASB issued Statement of Financial Accounting Standards No. 168, which changed the manner in which accounting literature is organized and referenced. Both the originally issued standards and the new codification are referenced throughout this section.

management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process."[34] SAB 102 further provides that a loan loss allowance methodology should "[c]onsider all known relevant internal and external factors that may affect loan collectibility . . . [and] be based on current and reliable data[.]" "Factors that should be considered in developing loss measurements" include:

1. Levels of and trends in delinquencies and impaired loans;
2. Levels of and trends in charge-offs and recoveries;
3. Trends in volume and terms of loans;
4. Effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices;
5. Experience, ability, and depth of lending management and other relevant staff;
6. National and local economic conditions;
7. Industry conditions; and
8. Effect of changes in credit concentrations.

219. If appropriate, a loss can be recognized immediately following origination of the loan. As the American Institute of Certified Public Accountants' Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies" instructs: "if a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive . . . the loss should be recognized at the date of loan origination."

[34] SAB 102 also approvingly references SEC Financial Reporting Release 28 §401.9 ("FRR 28"), "Accounting for Loan Losses by Registrants Engaged in Lending Activities" ("FRR 28"). This principle states that "because the allowance for loan and lease losses and the related provision are key elements of financial statements of registrants engaged in lending activities, it is critical that those judgment[s] be exercised in a disciplined manner that is based on and reflective of adequate detailed analysis of the loan portfolio."

220. The Interagency Guidance on the Allowance for Loan and Lease Losses provides the following:

> [C]hanges in the level of the [Loan Loss Reserve] should be directionally consistent with changes in the factors, taken as a whole, that evidence credit losses, keeping in mind the characteristics of an institution's loan portfolio. <u>For example, if declining credit quality trends relevant to the types of loans in an institution's portfolio are evident, the [Loan Loss Reserve] level as a percentage of the portfolio should generally increase, barring unusual charge-off activity.</u> Similarly, if improving credit quality trends are evident, the ALLL level as a percentage of the portfolio should generally decrease.

## VIII. LOSS CAUSATION

221. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class. Throughout the Class Period, Wilmington's stock price was artificially inflated by materially false and misleading statements and omissions that created the false impression that the Bank was weathering the financial crisis without any of the crippling credit losses suffered by other banks. As a result, the market price of Wilmington common stock was inflated by the materially false and misleading statements and omissions made by Wilmington and the Officer Defendants, as identified above, and Lead Plaintiffs and the Class purchased Wilmington common stock at artificially inflated prices during the Class Period.

222. The Bank's ensuing disclosures on these topics, as described at ¶¶129-161, revealed to the market on a piecemeal basis the fraudulent nature of these statements and the extent of the misrepresentations contained in Wilmington's financial statements that form the primary basis of this action. When the truth about Wilmington was revealed to the market, the price of Wilmington common stock declined in response, as the artificial inflation caused by Wilmington's and the Officer Defendants' material omissions and false and misleading statements was removed from the price of Wilmington common stock, thereby causing

substantial damage to Lead Plaintiffs and other members of the Class.

223. Indeed, during the Class Period, Wilmington common stock traded as high as $35.75 per share on September 19, 2008, and closed at $15.26 per share the day before the Bank's January 29, 2010 conference call and press release, when the first partial disclosures about Wilmington's true condition were made. Over the next nine months, in response to several additional partial disclosures that revealed more about the Bank's true financial condition, the market reacted, and Wilmington's stock price partially corrected as Wilmington's stock price was significantly driven downward. The Bank and the Officer Defendants mitigated the impact of those disclosures and prevented the full truth about Wilmington from being revealed by making contemporaneous false and misleading statements that minimized and denied the facts being revealed to the market. As the market finally learned the magnitude of the loss exposure facing Wilmington and the implications for Wilmington's financial condition and existence as an independent entity, the price of Wilmington's common stock plummeted to $4.21 per share on November 1, 2010. The truth emerging about the Bank's improper lending practices, poor quality loans, deficient risk management, and loss exposure, caused the market price of Wilmington common stock to fall more than $10 per share, from $15.26 on January 28, 2010 to $4.21 on November 1, 2010.

224. It was entirely foreseeable to the Officer Defendants that concealing the Bank's improper underwriting, asset review, accounting practices, and deficient internal controls would artificially inflate the price of Wilmington common stock. It was similarly foreseeable to the Officer Defendants that the revelation of that misconduct and the Bank's true financial condition would cause the price of Wilmington common stock to drop significantly as the inflation caused by their misstatements and omissions was corrected. Accordingly, the conduct of the Bank and

the Officer Defendants, as alleged herein, proximately caused foreseeable damages to Lead Plaintiffs and members of the Class. Moreover, it was also foreseeable that the Bank's undisclosed practices were so ruinous to the Bank's financial condition that the Bank would have to sell itself in a firesale at a 50% discount to M&T.

225. Thus, the stock price declines detailed herein were directly related to disclosure of the previously issued materially false and misleading statements and omissions.

## IX. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE- MARKET DOCTRINE

226. At all relevant times, the market for Wilmington was an open, efficient and well-developed market for the following reasons, among others:

a) Wilmington's stock met the requirements for listing and was listed and actively traded on the NYSE under the symbol WL, a highly efficient and automated market;

b) As a public company, Wilmington filed periodic public reports with the SEC;

c) The average daily trading volume for Wilmington common stock during the Class Period was 1.3 million shares. The average weekly turnover as a percentage of shares outstanding was 8.62% (median of 6.86%), well surpassing the higher 2% threshold level of average weekly trading volume necessary for an efficient market;

d) Wilmington regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e) Wilmington was followed by securities analysts employed by major brokerage firms, including Boenning & Scattergood, Inc., Calyon Securities (USA) Inc., Davenport & Company LLC, Keefe, Bruyette & Woods, Macquarie Capital (USA) Inc., Janney Capital Markets, Suntrust Robinson Murphy, RBC Capital Markets, and Morgan Stanley. Each of these reports was publicly-available and entered the public marketplace;

f) Institutional investors reported owning a majority of all Wilmington Common Stock during the Class Period. From the quarter end of March 31, 2008 to October 31, 2010, institutional holdings of Wilmington Common Stock ranged from 59% to 86% according to Thomson Reuters. This high level of institutional ownership of Wilmington common stock during the Class Period indicates that the market price was reflective of active trading by extremely sophisticated and knowledgeable investors; and

g) As a result of the foregoing, the market for Wilmington common stock promptly digested current information regarding Wilmington from all publicly-available sources and reflected such information in Wilmington's common stock price. Under these circumstances, all purchasers of Wilmington's common stock during the Class Period suffered similar injury through their purchase of Wilmington securities at artificially inflated prices and a presumption of reliance applies.

## X. INAPPLICABILITY OF STATUTORY SAFE HARBOR

227. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Wilmington and the Officer Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading.

## XI. CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### FIRST CLAIM FOR RELIEF
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Defendants Wilmington Trust, Cecala, Foley, Gibson, Harra, and North)

228. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

229. During the Class Period, Defendants Wilmington, Cecala, Foley, Harra, Gibson, and North disseminated or approved the false statements specified herein, which they knew or

recklessly disregarded were misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and they contained material misrepresentations.

230. These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Wilmington common stock during the Class Period. As detailed herein, the misrepresentations contained in, or the material facts omitted from, these Defendants' public statements, concerned, among other things, the Bank's loan quality, underwriting, asset review, accounting practices, financial results, and internal controls.

231. These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a reckless disregard for the truth; and employed devices, and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, Wilmington's financial results, including but not limited to Wilmington's net income and loan

loss reserves; as well as Wilmington's improper lending and accounting practices, and deficient asset review; (ii) artificially inflate and maintain the market price of Wilmington stock; and (iii) cause members of the Class to purchase Wilmington securities at artificially inflated prices.

232. Defendant Wilmington is liable for all materially false and misleading statements made during the Class Period, as alleged above.

233. Wilmington is further liable for the false and misleading statements made by Wilmington officers in press releases and during conference calls and at conferences with investors and analysts, as alleged above, as the makers of such statements and under the principle of *respondeat superior*.

234. M&T is liable to the same extent as Wilmington as a successor in interest. As set forth in the Agreement and Plan of Merger between Wilmington and M&T, filed on Form 8-K with the SEC on November 2, 2010, all of Wilmington's "claims, obligations, liabilities, debts and duties" shall become the "claims, obligations, liabilities, debts and duties" of the surviving bank.

235. Defendants Cecala, Foley, Gibson, Harra, and North, as top executive officers of the Bank, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers of the Bank, each of these Defendants was able to and did control the content of the public statements disseminated by Wilmington. These Defendants had direct involvement in the daily business of the Bank and participated in the preparation and dissemination of the false and misleading statements, set forth in ¶¶179-197 above.

236. In addition, Defendants Cecala, Foley, Gibson, Harra, and North are liable for, among other material omissions and false and misleading statements, the false and misleading

statements they made and/or signed as follows:

i. Cecala signed the following SEC filings: Forms 10-K (for the years ended December 31, 2007 through 2009); and certifications in Forms 10-K and Forms 10-Q (for the quarter ended March 31, 2008 through the quarter ended March 31, 2010, including for the years ended December 31, 2007 through 2009). He also made statements in and was directly responsible for other statements made in Wilmington press releases filed with the SEC as Form 8-Ks, including on the following dates: January 18, 2008; April 18, 2008; July 18, 2008; October 17, 2008; January 30, 2009; April 24, 2009; July 17, 2009; July 24, 2009; October 23, 2009; January 29, 2010; April 23, 2010; and June 3, 2010. He also made statements and was directly responsible for other statements made during numerous conference calls and conferences during the Class Period on the following dates: January 18, 2008; January 30, 2009 (which he attended without correcting the false statement of Defendant North); October 23, 2009; and June 4, 2010.

ii. Foley signed the following SEC filings: Forms 10-K (for the years ended December 31, 2007 through 2009) and certifications in the Form 10-Q (for the quarter ended June 30, 2010). He also made statements and was directly responsible for other statements made during conference calls and conferences during the Class Period, including on the following dates: June 4, 2010; June 22, 2010; and July 23, 2010. He also made statements in and was directly responsible for other statements made in the July 23, 2010 Wilmington press release filed with the SEC as Form 8-K.

iii. Gibson signed the following SEC filings: Forms 10-K (for the years ended December 31, 2007 through 2009) and certifications in Forms 10-K and Forms 10-Q (for the quarter ended March 31, 2008 through the quarter ended June 30, 2010, including for

the years ended December 31, 2007 through 2009). He also made statements and was directly responsible for other statements made during several conference calls during the Class Period, including on the following dates: January 18, 2008 (which he attended without correcting the false statement of Defendant Cecala); January 30, 2009 (which he attended without correcting the false statement of Defendant North); October 23, 2009 (which he attended without correcting the false statements of Defendants Cecala and North); April 23, 2010; June 22, 2010; July 23, 2010.

iv. Harra signed the following SEC filings: Forms 10-K (for the years ended December 31, 2007 through 2009) and the Registration Statement filed with the SEC on Form S-3AR on November 29, 2007. He also was directly responsible for other statements made during several conference calls during the Class Period, including on the following dates: January 18, 2008 (which he attended without correcting the false statement of Defendant Cecala) and October 23, 2009 (which he attended without correcting the false statements of Defendants Cecala and North).

v. North made statements and was directly responsible for statements made during several conference calls during the Class Period, including on the following dates: January 30, 2009; October 23, 2009; and June 22, 2010.

237. As described above, these Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

238. Lead Plaintiffs and the Class have suffered damages in that they paid artificially inflated prices for Wilmington common stock. Lead Plaintiffs and the Class would not have

purchased Wilmington common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

239. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchases of Wilmington stock during the Class Period.

**SECOND CLAIM FOR RELIEF**
**For Violations of Section 20(a) of the Exchange Act**
**(Against Defendants Cecala, Foley, Gibson, Harra, and North)**

240. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

241. This Count is asserted against Defendants Cecala, Foley, Gibson, Harra, and North for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

242. As alleged in detail above, Wilmington committed a primary violation of the federal securities laws through its knowing and/or reckless dissemination of materially false and misleading statements and omissions throughout the Class Period.

243. During their tenures as officers and/or directors of Wilmington, each of these Defendants was a controlling person of Wilmington within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Wilmington, these Defendants had the power and authority to cause Wilmington to engage in the wrongful conduct complained of herein. As set forth in detail above, the Defendants named in this Count were able to and did control, directly and indirectly, and exert control over Wilmington, including the content of the public statements made by Wilmington during the Class Period, thereby causing the dissemination of the false and misleading statements and

omissions of material facts as alleged herein.

244. In their capacities as senior corporate officers of the Bank, and as more fully described above, Defendants Cecala, Foley, Gibson, Harra, and North had direct involvement in the day-to-day operations of the Bank and in Wilmington's financial reporting and accounting functions. Each of these Defendants was also directly involved in providing false information and certifying and/or approving the false financial statements disseminated by Wilmington during the Class Period. Further, as detailed above, Defendants Cecala, Foley, Gibson, Harra, and North had direct involvement in the presentation and/or manipulation of false financial reports included within the Bank's press releases and filings with the SEC.

245. Defendant Cecala served as Wilmington's Chairman of the Board from 1996 until July 19, 2010. In addition, Defendant Cecala served as Wilmington's CEO from 1996 until June 3, 2010. In this dual capacity as the senior manager of the Bank and as the head of the Board, Defendant Cecala had ultimate control over the actions of Wilmington.

246. Defendant Foley served as Wilmington's Chairman of the Board since July 19, 2010 and as CEO since June 3, 2010. In addition, Defendant Foley served as a director of Wilmington since July 2006. In this dual capacity as the senior manager of the Bank and as the head of the Board, Defendant Foley had ultimate control over the actions of Wilmington.

247. Defendants Cecala, Foley, Gibson, Harra, and North all received various written and oral reports from different divisions of the Bank on a routine basis. The Officer Defendants' knowledge of and participation in the Bank's affairs through the various reports they received and/or had access to are described in Section VI above.

248. By reason of their positions as officers of Wilmington, and more specifically as controlling officers – as can be seen by their corresponding ability to influence and control

Wilmington – each of these Defendants is a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and activities of the Bank and its employees, and to cause the Bank to engage in the unlawful conduct complained of herein. Because of their positions, these Defendants had access to adverse nonpublic financial information about the Bank and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same. Moreover, each of the Defendants was also involved in providing false information and certifying and/or approving the false financial statements disseminated by Wilmington during the Class Period. Each of these Defendants was provided with or had access to copies of the Bank's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and the ability to prevent the issuance of the statements or cause the statements to be corrected.

249. As set forth above, Wilmington violated Section 10(b) of the Exchange Act by its acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons of Wilmington and as a result of their own aforementioned conduct, the Defendants named in this Count are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Bank is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class who purchased or otherwise acquired Wilmington securities.

250. As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchase or acquisition of Wilmington stock.

## THIRD CLAIM FOR RELIEF
## For Violations of Section 20(a) of the Exchange Act
## (Against Audit Committee Defendants)

251. Plaintiffs repeat and re-allege each and every allegation contained above as if

fully set forth herein.

252. This Count is asserted against the Audit Committee for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

253. During their tenure as directors of Wilmington, each of these Defendants was a controlling person of Wilmington within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as directors and Audit Committee members of Wilmington, these Defendants had the power and authority to cause Wilmington to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Wilmington during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

254. Wilmington maintains an Audit Committee composed of certain Board members that reports to Wilmington's full Board of Directors. As detailed in Section II.B.2 above, at some time during the Class Period, Defendants Burger, Elliot, Foley, Krug, Mobley, Rollins, Roselle, Sockwell, Tunnell and Whiting (the "Audit Committee Defendants") each participated as a member of the Audit Committee.

255. As set forth below, each of these Defendants had the power to control and/or influence the particular practices and conduct giving rise to the securities violations alleged herein, and exercised the same. In their capacities as directors of Wilmington, during their tenure these Defendants each signed the Bank's Forms 10-K for the years ended December 31, 2007 through December 31, 2009, the Offering Documents (as defined below in ¶267) and/or the Registration Statement (as defined below in ¶267), and therefore had the power and authority to control the statements made in such filings.

256. As a result, these Defendants, as a group and individually, were controlling persons within the meaning of Section 20(a) of the Exchange Act.

The Audit Committee

257. According to Wilmington's Proxy Statements for 2007 through 2009, the Audit Committee performed the following functions: (1) monitored the quality and integrity of the Bank's accounting policies, financial statements, disclosure practices, and compliance with legal and regulatory requirements, (2) oversaw the independence and performance of the Bank's internal auditor and independent registered public accounting firm, (3) reviewed reports of governmental agencies, and (4) prepared a report on audit matters and recommending that that report be filed with the Securities and Exchange Commission (the "SEC").

258. According to the Audit Committee Charter, the Audit Committee shall meet with management and the independent auditor to review and discuss the quarterly report on Form 10-Q and the annual report on Form 10-K, including: the Bank's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations," the annual financial statements and the report of the independent auditor thereon, any audit problems or difficulties and management's response, and significant financial reporting issues and judgments made in connection with the preparation of the of the Bank's financial statements. The Audit Committee shall also discuss earnings press releases, as well as financial information and earnings guidance provided analysts and ratings agencies.

259. In addition, the Audit Committee Charter states that with regard to risk management, the Committee shall, among other things, meet periodically with management to review the Bank's major financial risk exposure and steps taken to monitor and control such exposure and discuss the Bank's policies with respect to risk assessment and risk management.

260. As a result of their positions as Audit Committee members, over and above their positions as Board members, each of the Audit Committee Defendants is liable as a control person of Wilmington within the meaning of Section 20(a) of the Exchange Act.

261. By reason of their positions as directors of Wilmington, and more specifically as members of the Audit Committee, each of the Audit Committee Defendants is a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and activities of the Bank and its employees, and to cause the Bank to engage in the unlawful conduct complained of herein. Because of their positions, these Defendants had access to adverse nonpublic financial information about the Bank including, among others things, its risk management practices, and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same. Specifically, the Audit Committee Defendants received and acted to conceal, or knowingly or recklessly authorized and approved the concealment of, repeated criticisms by the Federal Reserve, Internal Audit function, and KPMG, regarding the Bank's asset review, and internal controls including Internal Audit's 2007 annual reports, KPMG's 2007 management letter and 2008 audit report, and Federal Reserve's 2007 and 2008 reports. In light of the repeated warnings year after year of the Bank's inadequate asset review and internal control deficiencies, these Defendants were aware that these critical failings continued unremedied.

262. In the wake of the MOU and as of at least the fourth quarter of 2009, the Audit Committee received direct reports from the Credit Risk Management division, including in particular reports about the Loan Loss Reserve and loan loss provisioning, and acted to conceal this information, or knowingly or recklessly authorized and approved its concealment. Moreover, as members of the Board and, thus, self-appointed members of the compliance

committee charged with enforcing compliance with the MOU, the Audit Committee Defendants exercised control over the Bank's scheme to conceal the serious deficiencies within the Bank's lending, risk management, and accounting functions in the aftermath of the MOU.

263. As control persons of Wilmington, the Audit Committee had the power and influence to direct management to remedy these critical failings. As demonstrated by the MOU, M&T's findings, and the fire-sale to M&T, the Audit Committee did not do so. Rather, the Audit Committee allowed the Bank to engage in the unlawful conduct complained of herein.

264. As set forth above, Wilmington violated Section 10(b) of the Exchange Act by its acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons of Wilmington and as a result of their own aforementioned conduct, the Audit Committee are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Bank is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Wilmington securities. Moreover, for the time that each Defendant served as a director of Wilmington, each of these Defendants is culpable for the material misstatements and omissions made by Wilmington, including such misstatements in the Bank press releases, Forms 10-K, Forms 10-Q, and the Offering Documents.

265. As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchase or acquisition of Wilmington stock.

## XII. SECURITIES ACT CLAIMS

266. In this part of the Complaint, Lead Plaintiffs assert a series of strict liability and negligence claims based on the Securities Act on behalf of the Class (as defined in ¶349 below, except that Lead Plaintiffs explicitly disclaim subparts [d] and [e] of ¶351 from these Securities Act allegations). These Securities Act claims are not based on any allegations of knowing or

reckless misconduct, and to avoid an (unfounded) argument by Defendants that the claims below somehow "sound in fraud," it is necessary to state or summarize facts also stated above.

267. On February 23, 2010, the Bank conducted an offering to the public of 18,875,000 shares of common stock, raising $273.9 million (the "Offering"). The Offering was conducted pursuant to a prospectus and shelf registration statement, filed with the SEC on Form S-3 on November 29, 2007, along with a subsequent amendment filed on January 12, 2009 (the "Registration Statement"), and a prospectus supplement dated February 23, 2010 (the "Prospectus" and together with the Registration Statement, the "Offering Documents").[35] The Offering Documents explicitly incorporated by reference the Bank's 2007 10-K, the First Quarter 2008 10-Q, the Second Quarter 2008 10-Q, the Third Quarter 2008 10-Q, and the Bank's 2009 10-K.

268. The Offering Documents contained untrue statements of material fact and omitted to state material facts required to make the statements therein not misleading.

**A. Securities Act Defendants**

269. Each of the following Defendants is statutorily liable under Sections 11, 12 and/or 15 of the Securities Act for the materially untrue statements contained in and incorporated in the Offering Documents. These Defendants are termed the "Securities Act Defendants."

**1. The Wilmington Defendants**

270. Defendant Wilmington (described above at ¶¶22-24) was the issuer of the common stock offered pursuant to the Offering.

271. Defendants Cecala, Foley, Harra, and Gibson (described above at ¶¶26-29) were

[35] *See* Ex. 27 (Shelf Registration Statement filed on Form S-3ASR dated November 29, 2007); Ex. 28 (Post-Effective Amendment to Automatic Shelf Registration Statement filed on Form POSASR dated January 12, 2009); Ex. 29 (Prospectus Supplement (to Prospectus date January 12, 2009) dated February 23, 2010).

each officers of Wilmington and signed the Bank's Registration Statement, as well as the 2007 and 2009 10-Ks, which were incorporated into the Offering Documents. Defendants Cecala, Foley, and Harra were also members of the Board at the time of the filing of the Offering Documents.

272. Defendant Kevyn N. Rakowski ("Rakowski") served as Senior Vice President and Controller of the Bank since 2006 and signed the Bank's Registration Statement, as well as the 2007 and 2009 10-Ks, which were then incorporated into the Offering Documents.

273. Defendants Burger, Elliot, Krug, Mobley, Rollins, Sockwell, Tunnell, and Whiting (described above at ¶¶33-37, 39-41), were each Directors of Wilmington at the time of the filing of the Offering Documents and signed the Bank's Registration Statement, as well as the 2007 and 2009 10-Ks, which were then incorporated into the Offering Documents.

274. Defendant Rex L. Mears ("Mears") was a director of the Company since 1992 and was a member of the Board at the time of the filing of the Offering Documents. Mears also signed the Company's Registration Statement and its two Amendments, as well as the 2009 10-K, which was then incorporated into the Offering Documents.

275. Defendant Thomas DuPont ("DuPont"), who was a Director from 2006 through October 2009, and Roselle (described above at ¶38), former Wilmington Directors, signed the Bank's Registration Statement, which was then incorporated into the Offering Documents.

276. Defendant Louis Freeh ("Freeh") served as a Director of the Company beginning in 2009. Freeh signed the 2009 10-K which was incorporated into the Offering Documents and was also a member of the Board at the time of the filing of the Prospectus.

**2. The Outside Auditor Defendant**

277. KPMG was Wilmington's outside auditor at all relevant times and issued unqualified opinions on the Bank's financial statements and management's assessment of

internal controls throughout the Class Period and, of particular relevance to the Securities Act claims, for the years 2007 and 2009. KPMG consented to the incorporation by reference into the Offering Documents of its unqualified auditor's reports, dated February 29, 2008 for the year ended December 31, 2007 and dated February 22, 2010, for the year ended December 31, 2009. Specifically, under the caption "Experts" in the Prospectus, the Bank stated that its consolidated financial statements as of December 31, 2009 and 2008, and for each of the years in the three-year period ended December 31, 2009, and management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2009, were "incorporated by reference herein in reliance upon the reports of KPMG LLP, an independent registered public accounting firm, and upon the authority of said firm as experts in accounting and auditing." KPMG's headquarters are at 345 Park Avenue, New York, New York 10154.

**3. The Underwriter Defendants**

278. J.P. Morgan Securities ("J.P. Morgan") is an investment bank and acted as a joint book-running manager and underwriter for the Offering. J.P. Morgan sold and distributed a total of 13,457,875 shares to the investing public. J.P. Morgan was paid at least $8.46 million for its underwriting services. Its headquarters are located at 270 Park Avenue, New York, New York 10017.

279. Keefe, Bruyette & Woods, Inc. ("KBW") is an investment bank and acted as a joint book-running manager and underwriter for the Offering. KBW sold and distributed 8,248,375 shares to the investing public. KBW was paid at least $5.1 million for its underwriting services. Its headquarters are located at 787 Seventh Avenue, New York, New York 10019.

**B. The Offering Documents Misstated The Bank's Underwriting Practices**

280. The Offering Documents misstated the Bank's underwriting practices. Specifically, with regard to the Bank's underwriting of loans, the Bank's 2007 10-K, First

Quarter 2008 10-Q, Second Quarter 2008 10-Q and Third Quarter 2008 10-Q, and 2009 10-K all represented the following in substantially similar form:

> To mitigate credit risk, we:
>
> - Employ rigorous loan underwriting standards and apply them consistently.[36]

281. The First Quarter 2008 10-Q, Second Quarter 2008 10-Q and Third Quarter 2008 10-Q stated, in substantially identical form:

> We have a high degree of confidence in the integrity of our commercial construction portfolio, because . . . . We apply our underwriting standards consistently.[37]

282. The above underlined statements regarding the Bank's underwriting were false because the Bank's underwriting standards were not rigorous and were not applied consistently. The Bank's underwriting was instead lax, inconsistent, and exacerbated the Bank's credit risk, rather than mitigated it. First, as the FBI Affidavits provide, by the time of the Offering, the Bank had nearly concluded (or had concluded) the Delaware Status Review, which documented "serious concerns with the past management of the Delaware Commercial Real Estate Division and with its loan portfolio." The Delaware Review documented the following deficiencies and "questionable activities" in the Bank's lending: (i) the "unethical use of loan approval authority by relationship managers," (ii) the Bank's "limited oversight of relationship managers"; (iii) "a limited technical knowledge of commercial real estate lending"; (iv) the Bank's "lack of validation of construction budgets prior to loan closings"; and (v) the "frequent use of loan

[36] Ex. 2 at 44 (2007 10-K and Annual Report) and Ex. 19 at 50 (2009 10-K). Ex. 4 at 51 (First Quarter 2008 10-Q) and Ex. 6 at 76 (Second Quarter 2008 10-Q) refer to the 2007 10-K and Annual Report, thereby effectively incorporating the statement by reference. Ex. 8 at 80 (Third Quarter 2008 10-Q) has substantially similar language.

[37] Ex. 4 at 31 (First Quarter 2008 10-Q); Ex. 6 at 50 (Second Quarter 2008 10-Q); and Ex. 8 at 52 (Third Quarter 2008 10-Q).

proceeds to provide cash to borrowers or fund partner buyouts prior to construction completion or the property having reached operating stabilization."

283. Second, the Bank had virtually no underwriting function, as its loan underwriting was not actually performed by the underwriters, but by lenders who were incentivized to make as many loans as possible. As explained by CW 1, CW 2 and CW 4, the general underwriting function was performed by sales staff, who were financially incentivized to grow loan volume and reach the Bank's 10% annual growth target. As set forth in the FBI Affidavits, major Wilmington lender Joseph Terranova's administration of the Bank's relationship with Zimmerman, in which Terranova had absolute discretion to underwrite the loan and to override the Loan Committee's determination, offers a quintessential example of the Bank's policies in this regard. As documented in the FBI Affidavits, the Bank's longstanding lending relationship with Zimmerman, one of the Bank's largest borrowers, establish that the Bank routinely approved loans without requiring any documentation to support the loan application, without verifying borrower representations, and/or while ignoring obvious flaws in documentation. The Bank's underwriters lacked training and merely did what the Bank's lenders – to whom they reported – told them to do to get the loans closed.

284. Third, contrary to being "rigorous" and "consistently applied," the Bank's internal policies allowed loans to be extended with minimal to no underwriting by its underwriters. CW 1, CW 2, and CW 3 each confirmed that the documentation for the Bank's loans was incomplete or "nonexistent" and rife with errors. CW 1 explained that Cecala directed certain top lenders, including Joseph Terranova (division head of the Bank's commercial real estate lending) and Brain Bailey (head of Delaware lending), not to maintain complete loan files. As a result, according to CW 1 and CW 2, loan files were incomplete (to the extent they existed) and often in

violation of the Bank's standards. Specifically, according to CW 2, an internal review of Wilmington's loans in 2007 demonstrated that substantial numbers of the Bank's loans were not in compliance with the Bank's procedures, including by failing to include proper documentation and the required loan approvals. CW 2 explained that the review revealed that "dozens and dozens" of loans issued by Joseph Terranova, who maintained a half billion dollar loan portfolio constituting almost 10% of the Bank's total commercial loans and who was head of commercial real estate lending, were issued without the required approvals in 2007. CW 2 further explained that once these failures were raised to management, the missing data and approvals were papered over with management's approval.

285. Fourth, the Bank's policy was that only loans greater than $5 million were required to receive credit approval from the Loan Committee, who included senior risk management personnel. Thus, more than half of the Bank's commercial loan portfolio was exempted from review by credit specialists. As the Terranova/Zimmerman relationship makes clear, for even those loans that were reviewed by the Loan Committee, the lender could override the Loan Committee's determinations. Furthermore, for the loans that were required to have Loan Committee approval, Wilmington's heavy reliance on the 10% Rule – which was not disclosed in the Offering Documents or the SEC filings incorporated therein – allowed loan officers to increase the amount of the loan by 10% without any credit analysis or additional Loan Committee approval, according to CW 2. According to CW 1, almost every Wilmington loan had a 10% Rule loan attached to it.

286. These deficiencies – all of which rendered the Bank's claims of "employing rigorous underwriting standards" on a "consistent" basis materially untrue and misleading – were confirmed in the MOU. Specifically, according to the MOU Compliance Report, the MOU

required Wilmington to fundamentally change its loan review and lending functions because, among other things, the Bank lacked: (i) "underwriting standards, guidelines, and quantifiable limits for commercial real estate"; (ii) "uniform standards for presenting loans to the loan committee"; (iii) "standards for documenting exception tracking and monitoring system"; (iv) and "lending authorities reflective of staff experience and commensurate with risk of credit extension." The MOU also recognized the problems inherent in having the underwriting function report to the sales-side of the Bank, and required that the reporting structure be changed so that there was independence in the loan origination process.

### C. The Offering Documents Misstated The Bank's Asset Review Practices

287. The Offering Documents misstated the Bank's asset review practices. Specifically, with regard to the Bank's asset review function, the Bank's 2007 10-K, First Quarter 2008 10-Q, Second Quarter 2008 10-Q, Third Quarter 2008 10-Q, and 2009 10-K each made the following representation in substantially similar form:

<u>To mitigate credit risk</u>, we:

* * *

- <u>Monitor the portfolio to identify potential problems</u> and to avoid disproportionately high concentrations in any single industry sector or to any one borrower.

- <u>Regularly review all past-due loans, loans not being repaid according to contractual terms, and loans we doubt will be paid on a timely basis</u>.[38]

288. Further, in the Bank's 2007 10-K, First Quarter 2008 10-Q, Second Quarter 2008 10-Q, Third Quarter 2008 10-Q, and 2009 10-K, the Bank made the following representation regarding its loan risk rating system (Pass, Watchlisted, Substandard, Doubtful) in substantially

---

[38] Ex. 2 at 44 (2007 10-K and 2007 Annual Report). This statement was made or referred to, and thereby effectively incorporated by reference, in Ex. 4 at 51 (First Quarter 2008 10-Q); Ex. 6 at 76 (Second Quarter 2008 10-Q); Ex. 8 at 80 (Third Quarter 2008 10-Q); and Ex. 19 at 50 (2009 10-K).

identical form:

> We apply these classifications consistently and we analyze migrations within the classifications quarterly.
>
> This system has helped us develop adequate reserves for loan losses over the years.[39]

289. These above underlined statements regarding the Bank's asset review practices and risk rating classifications were false. In reality, the Bank did not monitor its portfolio for credit risk in any meaningful way and its risk ratings were assigned inconsistently and without regard to the creditworthiness of the borrower. The following facts demonstrate that the Bank's representations regarding asset review were untrue and misleading.

290. First, as the FBI Affidavits provide, the Zimmerman relationship demonstrated that the Bank did not independently review its loans or confirm that borrowers met the requirements for receiving draws on their loans, extending millions of dollars in additional credit even where the borrower displayed obvious deficiencies in their ability to repay the loan.

291. Second, in direct contrast to the Bank's statements that it "monitored" the portfolio and "regularly reviewed all past-due loans," in actuality, the ARG did not review the vast majority of the Bank's loan portfolio. According to CW 1, the ARG did not review loans that were less than $15 million. Thus, nearly 75% of the Bank's loans received "essentially no review" from the ARG, according to CW 1. In addition, 85-90% of the Bank's loan received no review on an annual basis. CW 2, former head of Wilmington's Credit Risk Management Division, reported that the ARG was comprised of only 4-5 employees but was tasked with reviewing the Bank's $6.4 billion commercial loan portfolio. As a result, CW 2, CW 8 (the

[39] Ex. 2 at 44 (2007 10-K and Annual Report) and Ex. 19 at 50 (2009 10-K). This statement was made or referred to, and thereby effectively incorporated by reference, in Ex. 4 at 53 (First Quarter 2008 10-Q); Ex. 6 at 80 (Second Quarter 2008 10-Q); and Ex. 8 at 80 (Third Quarter 2008 10-Q).

former Director of Internal Audit), and CW 1 (former Vice President in Commercial Loan Recovery) agreed that only a small percentage of the portfolio was reviewed and evaluated by credit risk specialists. Instead of having credit specialists rate the loans, the Bank relied on the same lenders who originated the loans to monitor them. The FBI Affidavits illustrate how the Bank allowed lenders to operate with absolute discretion, including by altering loan agreements after Loan Committee approval, by approving the distribution of funds without documentation or verification, and without requiring borrowers to demonstrate any ongoing progress on their projects. Indeed, as the Bank described in the Delaware Review Memorandum, a "serious concern" with the Bank's credit practices was that it exercised "limited oversight of relationship managers." According to CW 1 and CW 2, the Bank's reliance on its lenders to monitor its loans was not effective because the Bank's incentive compensation system penalized the lenders for downgrading loans, as a downgrade would lead to a corresponding decline in the lender's compensation. For this reason, CW 2 could not recall a loan officer ever once independently downgrading a loan during CW 2's entire fourteen year tenure at the Bank, and CW 1 reported that the risk ratings were "generally inaccurate." Thus, the Bank did not "regularly" meaningfully review its loans, and its risk ratings did not accurately reflect the Bank's risk.

292. Third, the Bank failed to downgrade and charge-off delinquent and impaired loans. According to CW 2, despite monthly Working Group meetings where the delinquent and impaired loans were identified and discussed, the Bank failed to downgrade and/or charge off the loans as recommended by the credit risk specialists. CW 8 confirmed the Bank's failure to take necessary risk management action, stating "I saw time and time again where they would ride with a customer longer than they should have." This practice is demonstrated in the Bank's lending relationship with Zimmerman, in which the Bank continued to lend Zimmerman millions

of dollars in additional loans after the Bank identified that Zimmerman was experiencing "significant difficulties in making payments" in 2008. CW 1 further confirmed that the Bank failed to charge off loans as recommended by the Bank's Workout specialists. These facts also rendered the Bank's statements that it mitigated credit risk with its asset review, and its assigned loan risk ratings, inaccurate.

293. Fourth, Wilmington failed to update the appraisals (a critical aspect of asset review) for its portfolio of commercial loans, even when housing values plummeted and Delaware construction dried up. According to CW 2, Wilmington's appraisals were "almost always outdated," and one of the ARG members maintained a lengthy list of outdated appraisals. CW 1 confirmed that the problem of "horribly inflated" and outdated appraisals was widespread at the Bank. Ultimately, when the Bank finally started to update its appraisals in 2010, after the Offering, the new appraisals triggered enormous write-downs. According to a Bank senior vice president, going back to the borrower to ask for "more recent appraisals" was not the Bank's "preferred way of doing things" These facts also rendered the Bank's statements that it mitigated credit risk with its asset review inaccurate.

294. These deficiencies – none of which were disclosed in the Offering Documents and all of which rendered the Bank's statements set forth in ¶¶287-288 above materially untrue and misleading – were confirmed by KPMG in a "Management Letter" sent in connection with the 2007 annual audit; Wilmington's Internal Audit at the end of 2007; and by the Federal Reserve in its 2007 and 2008 reviews of Wilmington, according to CW 2 and CW 8. Each of these reports identified that the ARG was insufficient to adequately review the Bank's loan portfolio and determined that it was an internal control deficiency, according to CW 2. In fact, in the 2007 report, the Federal Reserve described these issues as "weaknesses in the control structure"

at Wilmington. According to CW 2, the Federal Reserve was also concerned by the lack of timely appraisals at Wilmington.

295. These deficiencies were also confirmed in the MOU. According to the MOU Compliance Report, the MOU required Wilmington to fundamentally change its credit policy, underwriting and asset review functions because for these functions, the Bank lacked and would need to "establish," among other things: "an appropriate organization structure"; "a process to monitor compliance with policies and procedures"; and "appropriate management and staffing levels." The MOU further recognized that Wilmington lacked, but needed to immediately implement, a "board-approved loan review policy that specifically defines, identifies and categorizes problem assets and sufficiently assesses the overall quality of the loan portfolio."

**D. The Offering Documents Contained Untrue Financial Results**

296. The Offering Documents contained false financial results for Wilmington because the Bank's net income and earnings per share were each materially overstated. These false figures were a result of material understatements of the Bank's Loan Loss Reserve and provision for loan losses that were a direct consequence of the Bank's undisclosed lending practices, inaccurate risk ratings, and deterioration in the quality of the Wilmington's loans. The SEC filings incorporated by reference into the Offering Documents reported the following:

| **Filing** | **Net Income** | **Provision for loan losses** | **Loan Loss Reserve** |
|---|---|---|---|
| 2007 10-K* | $182.0 million | $28.2 million | $101.1 million |
| First Quarter 2008 10-Q | $41.4 million | $10.0 million | $106.4 million |
| Second Quarter 2008 10-Q | ($19.5 million) | $18.5 million | $113.1 million |
| Third Quarter 2008 10-Q | $22.9 million | $19.6 million | $122.2 million |
| 2009 10-K* | ($4.4 million) | $205.0 million | $251.5 million |

* *Full year results*[40]

[40] Ex. 2 at 70, 71 (2007 10-K and Annual Report, signed by Defendants Cecala, Foley, Harra, Gibson, Rakowski, Burger, Elliot, Krug, Mobley, Rollins, Roselle, Sockwell, Tunnell, and Whiting); Ex. 4 at 27, 55 (First Quarter 2008 10-Q); Ex. 6 at 28, 82 (Second Quarter 2008 10-Q); Ex. 8 at 18, 29 (Third Quarter 2008 10-Q); and Ex. 19 at 18-19 (2009 10-K, signed by

297. The Bank's reported net income, provision for loan losses, and Loan Loss Reserve set forth above were each false and misleading because, as set forth above at ¶¶114-128, the Bank's accounting procedures did not comply with GAAP, which led the Bank to under-reserve for loan losses and overstate its net income. Indeed, M&T Bank's independent review of Wilmington's commercial loan portfolio confirmed that the Bank materially understated its reserve by hundreds of millions of dollars. Specifically, as discussed at ¶¶125-128, M&T, which examined Wilmington's commercial loan portfolio dating back to January 1, 2008, determined that the Bank had materially understated its Loan Loss Reserve by nearly $800 million, and thereby overstated its net income, as set forth in the following chart (in millions):

| **Filing** | **Reported Net Income** | **Corrected Net Income Using M&T's Analysis** | **Percentage Of Net Income Inflation** |
|---|---|---|---|
| First Quarter 2008 10-Q | $41.4 million | $28.1 million | 32% |
| Second Quarter 2008 10-Q | ($19.5 million) | ($44.0 million) | 126% |
| Third Quarter 2008 10-Q | $22.9 million | ($3.1 million) | 114% |
| 2009 10-K | ($11.2 million) | ($121.1) | 981% |

298. In addition to reporting false and misleading financial results, the Bank falsely stated that its Loan Loss Reserve methodology complied with GAAP. Specifically, the Bank stated in both its 2007 and 2009 10-Ks that it "establish[ed] a reserve for loan losses in accordance with GAAP."[41] Each of these SEC filings also certified that the Bank "maintain[ed] our accounting records and prepare[d] our financial statements in accordance with U.S. generally accepted accounting principles ["GAAP"] and reporting practices prescribed for the banking

---

Defendants Cecala, Foley, Harra, Gibson, Rakowski, Burger, Elliot, Krug, Mears, Mobley, Rollins, Sockwell, Tunnell, and Whiting).

[41] Ex. 2 at 80 (2007 10-K and Annual Report) and Ex. 19 at 81 (2009 10-K). Throughout Section XI, the portions of the Bank's statements that Lead Plaintiffs allege are untrue are underlined.

industry."[42]

299. The Bank's statements of compliance with GAAP were materially untrue and misleading. As set forth at ¶¶114, 214-220 above, GAAP and other applicable accounting standards established clear rules governing how Wilmington should have reserved for its loan losses. Throughout the Class Period and in the financial statements incorporated into the Offering Documents, the Securities Act Defendants' method for accounting for probable losses and impairment within Wilmington's loan portfolio was not compliant with GAAP and materially understated Wilmington's reserve for loan losses, and thereby overstating Wilmington's net income and earnings per share.

300. Specifically, until late 2008, the Bank operated under a method of calculating its Loan Loss Reserve that was not compliant with regulators' or GAAP standards, according to CW 2. Rather than considering qualitative factors affecting the probability of loan repayments, including economic trends and borrowers' current and projected ability to pay, the Bank simply assigned percentage values to risk ratings. This method was insufficient for two reasons. First, the methodology relied on risk ratings that were not accurate, according to CW 1 and CW 2, because they were not assigned by the independent credit review specialists and were based on inaccurate appraisals. Second, this method failed to account for the dynamic real estate market during the Class Period, and it failed to comply with GAAP because it did not consider all available evidence reflecting past events and current conditions, including "environmental" factors related to the collectability of the loan, as required by SAB 102, FAS 114 and other accounting provisions. *See* ¶¶216-218. In particular, the Bank's method of provisioning did not

[42] Ex. 2 at 60 (2007 10-K and Annual Report); Ex. 4 at 7 (First Quarter 2008 10-Q); Ex. 6 at 9 (Second Quarter 2008 10-Q); Ex. 8 at 9 (Third Quarter 2008 10-Q); and Ex. 19 at 60 (2009 10-K).

account for any of the factors likely to drive defaults in the loan portfolio, including the Bank's deficient underwriting and risk management (as documented by regulators and the Bank in the Delaware Review Memorandum), and the declining values of the collateral, and thus caused the Bank to under-provision for loan losses. Thus, the financial results reported in the 2007 10-K, the First Quarter 2008 10-Q, the Second Quarter 2008 10-Q, and the Third Quarter 2008 10-Q were not reported in compliance with GAAP and were thus presumed misleading.

301. In the fourth quarter of 2008, the Bank updated its methodology for calculating the Loan Loss Reserve, relying almost exclusively on the Bank's loss history, which was problematic because (i) it failed to adequately consider critical "environmental" and other qualitative factors relating to the declining market and borrower's ability to pay; (ii) the Bank had a minimal and unreliable loss history as it was based on manipulated risk ratings and loan loss recognition. In particular, the Bank limited its "qualitative" analysis to a certain percentage of the Bank's overall Loan Loss Reserve and over-relied on inaccurate loan risk ratings and the Bank's minimal loss history. The Bank's Loan Loss Reserve did not take into account critical considerations like downward trends in the real estate market or the ability of Wilmington's customers to repay their loans or the extent of losses inherent in the loan portfolio. According to CW 2, under the new method, the Bank relied almost entirely on the Bank's minimal loan loss history to dictate whether increased reserves were necessary. Because its loss history was inaccurate (due to the Bank's failure to timely recognize downgrades and writeoffs), according to CW 1 and CW 2, the Bank's financial statements were inaccurate. Thus, the financial results reported in the 2009 Form 10-K were not reported in compliance with GAAP.

302. In the MOU Compliance Report, Wilmington's regulators recognized the inadequacy of the Bank's reserve methodology. Thus, the MOU required Wilmington to "fully

fund [the Loan Loss Reserve] considering additional adversely classified credits from the updated internal loan rating system" and to "maintain an adequate ALLL consistent with GAAP and regulatory policy…and guidance."

303. KPMG, Wilmington's auditor, also issued materially untrue and misleading reports in the 2007 and 2009 Forms 10-K. Specifically, KPMG audited the Bank's year-end financial statements contained in the 2007 and 2009 10-Ks and issued unqualified auditor's reports on Wilmington's consolidated statement of financial condition as of December 31, 2007 and December 31, 2009, and the related consolidated statements of income. KPMG's auditor's reports certified that, after conducting an audit "in accordance with the standards of the Public Company Accounting Oversight Board (United States)," it "believe[d] that our audits provide a reasonable basis for our opinion" that:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Corporation as of December 31, 2007 and 2006 [and December 31, 2008 and 2009], and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2007 [and December 31, 2009], in conformity with U.S. generally accepted accounting principles.[43]

304. KPMG's unqualified auditor's reports, as included in the 2007 and 2009 10-Ks, were false because, as explained above, the Bank's consolidated financial statements did not fairly present the Bank's financial condition and were not prepared in accordance with GAAP. In particular, the Bank's reserving methodologies in both 2007 and 2009 violated GAAP and, as a result, the Bank's publicly reported financial statements, including its net income, provision for loan losses and the Loan Loss Reserve did not fairly present the Bank's financial position.

305. Moreover, in certifying Wilmington's 2009 financial statements, KPMG falsely represented that its audits were conducted in accordance with GAAS. KPMG did not have a

[43] Ex. 2 at 113 (2007 10-K and Annual Report) and Ex. 19 at 132 (2009 10-K).

reasonable basis for its certifications. In issuing unqualified audit opinions on Wilmington's financial statements, KPMG failed to comply with the professional standards dictated by GAAS, including GAAS General Standard Nos. 2 and 3, which required KPMG to exercise due professional care in the performance of the audit and to obtain competent sufficient evidentiary matter to form a basis for its opinion. In conducting its audits for the fiscal years ended December 31, 2009, KPMG had access to the files and key employees of the Bank at all relevant times. As Wilmington's auditor, KPMG had continual access to and knowledge of the Bank's confidential internal, corporate, financial, operating, and business information, and had the opportunity to observe and review the Bank's business and accounting practices, and to test the Company's internal accounting information and publicly reported financial statements as well as the Bank's internal controls and structures. Had KPMG conducted a GAAS-compliant audit, it would have incorporated into its audit its own past criticisms of the Bank's asset review, the Bank's Internal Audit function's criticisms of the Bank's asset review function, the repeat criticisms by regulators regarding the Bank's credit exposure, and the MOU's extensive findings regarding the Bank's deficient underwriting, asset review, and accounting practices. Each of these criticisms and warnings indicated that the Bank's credit exposure was much worse than previously indicated. Thus, had KPMG complied with GAAS, it would have determined that there was a material understatement of Wilmington's Loan Loss Reserve and overstatement of net income.

306. Further, had KPMG conducted a GAAS-compliant audit and asked basic questions regarding the Bank's Delaware lending, it would have learned about the Delaware Status Review and its findings. Thus, had KPMG performed a GAAS-compliant audit, it would have incorporated into its audit the findings of the Delaware Status Review, which cast serious

doubt on the credit quality of the Bank's loan portfolio, a key component in evaluating the adequacy of the Bank's Loan Loss Reserve. Even if KPMG was not made aware of the Delaware Status Review (which they should have been), had KPMG performed a GAAS-compliant audit and obtained competent sufficient evidentiary matter regarding the Bank's lending practices and loan portfolio in its primary market, Delaware, KPMG would have identified the same "serious concerns" with the Bank's "past management and loan portfolio" that the Bank identified in the Delaware Status review. By failing to do so, KPMG failed to properly consider that the Bank's financial statements were not accurate or reliable. In fact, had KPMG complied with GAAS, they would have reached the same conclusions as M&T and the Bank that the Bank had suffered nearly $800 million in undisclosed credit losses arising out of loans originated during the Class Period.

**E. The Offering Documents Contained Untrue Statements Regarding the Effectiveness of Wilmington's Internal Controls**

307. The Offering Documents also contained false statements regarding the effectiveness of Wilmington's internal controls over financial reporting. Specifically, with regard to the Bank's internal controls over financial reporting, the Bank's 2007 10-K, First Quarter 2008 10-Q, Second Quarter 2008 10-Q, Third Quarter 2008 10-Q, and 2009 10-K, all falsely represented that Wilmington maintained effective internal controls over financial reporting. Specifically, in the 2007 and 2009 10-Ks, management certified that the Bank "[m]aintain[ed] a strong internal control environment," "[e]ngag[ed] strong and effective corporate governance," and "[p]resent[ed] financial results that are complete, transparent, and understandable," and thus the Bank maintained effective internal controls over financial reporting.[44] The quarterly SEC filings also represented that the Bank's control environment

[44] Ex. 2 at 112 (2007 10-K and Annual Report) and Ex. 19 at 134 (2009 10-K).

continued to be effective.[45] Management's attestations regarding the strength of internal controls over financial reporting were critical to investors because they (falsely) assured the public that the Bank's financial statements were reliable and in compliance with applicable laws.

308. The 2007 10-K included an unqualified auditor's report by Defendant KPMG opining on the effectiveness of Wilmington's internal controls over financial reporting. This report, dated February 29, 2008, stated that KPMG had audited Wilmington's internal controls:

> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Corporation's internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 29, 2008 expressed an unqualified opinion on the effectiveness of the Corporation's internal control over financial reporting.[46]

309. Similarly, the 2009 10-K also included an unqualified auditor's report by KPMG opining on the effectiveness of Wilmington's internal control over financial reporting. This report, dated February 22, 2010, stated that KPMG had audited Wilmington's internal controls "in accordance with the standards of the Public Company Accounting Oversight Board (United States)," and concluded that:

> In our opinion, the Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.[47]

310. Both managements' certifications and KPMG's report on Wilmington's internal controls were false. Contrary to these internal control certifications, the Bank was operating without adequate controls in place to ensure compliance with the Bank's underwriting, appraisal,

---

[45] *See* Ex. 4 (First Quarter 2008 10-Q); Ex. 6 (Second Quarter 2008 10-Q); and Ex. 8 (Third Quarter 2008 10-Q).

[46] Ex. 2 at 113 (2007 10-K and Annual Report).

[47] Ex. 19 at 135 (2009 10-K).

and asset review standards. The Bank's deficient underwriting, its failure to consistently update its appraisal values as collateral values were in decline, and its failure to monitor its loan portfolio for increasing credit risk demonstrate that the Bank's internal controls were materially deficient.

311. According to CW 1, the Bank did not keep files on numerous commercial loans that it originated. CW 3 stated that the Bank extended loans that contained errors and technical deficiencies in their underwriting and documentation. CW 3 recalled "a number of times" where the promissory note was dated prior to the loan approval, which meant that the lender had booked the loan (thereby legally obligating the Bank to loan the money) without waiting for the appropriate approvals, which was according to CW 3 "the opposite of what should happen."

312. The Bank's underwriting function was also understaffed and left the Bank's underwriting to its lenders. Wilmington never had more than twelve underwriters, out of roughly 3,000 total employees, for a commercial loan portfolio amounting to $6.4 billion in 2008 and 2009. Even with this understaffing, Wilmington's policies exempted a large percentage of the Bank's loan portfolio from any subsequent review beyond that supposedly performed by the underwriters. Only loans exceeding $5 million were submitted to the Loan Committee for review. Nearly 50% of the Bank's loan portfolio was below $5 million and thus exempt from any further review.

313. In 2007 KPMG issued a "Management Letter" identifying inadequate coverage and review of the Bank's loan portfolio as material weaknesses in the Bank's internal controls. The Bank reviewed only 10-15% of its loan portfolio annually, and nearly 75% of its loan portfolio was almost never reviewed by the ARG.

314. The numerous failings in Wilmington's control environment were confirmed by

the Federal Reserve in its 2007 and 2008 annual exams and in the MOU in late 2009. Indeed, in 2007 the Federal Reserve specifically described them as "weaknesses in [Wilmington's] control structure." The October 9, 2009 MOU Compliance Report, which provided the Bank's remedial plan in response to the MOU, details fundamental flaws in the Bank's asset review function that existed throughout the Class Period. Specifically, the MOU sought to revamp all loan review policies and to ensure all of the loans were reclassified in accordance with those policies and that the Board of Directors received reports on what portion of the loan portfolio was in distress. According to the MOU Compliance Report, Wilmington was required to impose a "board-approved loan review policy that specifically defines, identifies and categorizes problem assets and sufficiently assesses the overall quality of the loan portfolio," as well as to "reclassify loan relationships in accordance with revised loan review policy."

315. Further, Wilmington was operating without policies and appropriate methodology in place to ensure the soundness of its valuation of its assets and its Loan Loss Reserve, which, as set forth above at ¶¶296-302, was materially understated at the time of the Offering and during the Class Period. These failures demonstrate serious deficiencies in the Bank's internal controls and contributed to material distortions in the Bank's reporting of financial data.

316. As the FBI Affidavits provide, the Bank's relationship with Zimmerman demonstrates that the Bank failed to exercise any supervision over one of its most prominent lenders and the division head of the Bank's commercial real estate lending, including by allowing the lender to change the terms of loan agreements without any independent credit review, lending millions of dollars in funds without requiring any verification or documentation of lender need, and by failing to ensure that any project-related work was performed. Indeed, as Wilmington Workout employee Vaillancourt told the FBI, Zimmerman's loan draw requests

"never made any sense because the related work was never completed." Had the Bank exercised appropriate internal controls, it would never have made these loans.

317. As the FBI Affidavits provide, the Delaware Review Memorandum raised "serious concerns" concerning the management of the Bank's Delaware commercial real estate division, including the Bank's lack of appropriate oversight over key individuals and failure to require appropriate documentation, demonstrating the Bank's overall lack of internal controls over these key functions.

318. Had KPMG conducted its audit in compliance with GAAS, the only reasonable professional conclusion it could have drawn was that Wilmington's internal controls over financial reporting were so ineffective that the Bank's financial statements were not fairly presented in accordance with GAAS. KPMG violated GAAS because it failed to consider that the Bank had grossly deficient internal controls and procedures with respect to the granting of credit and the impact of this process on the Loan Loss Reserve, including, as the FBI Affidavits provide, that Wilmington regularly issued loans without any documentation or verification of borrower representations, that the Bank failed to exercise any supervision or credit controls over its largest lenders, and that the Bank's practices allowed one of its largest borrowers to easily misappropriate funds from the Bank. Had KPMG conducted a GAAS-compliant audit, it would have considered the ramifications that these deficiencies had on the reliability of Wilmington's financial statements, would not have issued unqualified audit opinions, and would not have opined that Wilmington's internal controls were "effective."

## FOURTH CLAIM FOR RELIEF
**For Violations of Section 11 of the Securities Act In Connection With The Offering Against The Securities Act Defendants**

319. Lead Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein. Defendants' liability under this Claim for Relief

is predicated on the participation of each Defendant in conducting the Offering pursuant to the Registration Statement, which contained untrue statements and omissions of material fact. This Claim for Relief does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded. For purposes of asserting this and their other claims under the Securities Act, Lead Plaintiffs do not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent.

320. This claim is brought pursuant to Section 11 of the Securities Act against the Securities Act Defendants on behalf of members of the Class who purchased or otherwise acquired the securities issued pursuant and/or traceable to the Offering and were damaged by the acts alleged herein. This claim is based solely in strict liability and negligence. Defendant Wilmington was the issuer, within the meaning of Section 11 of the Securities Act, pursuant to the Offering Documents (defined in ¶267 above) of the registered securities set forth below. M&T is liable to the same extent as Wilmington as a successor in interest. As set forth in the Agreement and Plan of Merger between Wilmington and M&T, filed on Form 8-K with the SEC on November 2, 2010, all of Wilmington's "claims, obligations, liabilities, debts and duties" shall become the "claims, obligations, liabilities, debts and duties" of the surviving bank.

321. As discussed above, in February 2010, Wilmington issued and sold to investors 18,875,00 shares of common stock. Defendants J.P. Morgan and KBW were statutory underwriters for these registered securities, as admitted in the Offering Documents.

322. Defendants Foley, Cecala, Gibson, Harra, Rakowski, Burger, DuPont, Elliot, Krug, Mears, Mobley, Rollins, Sockwell, Roselle, Tunnell, and Whiting each signed the Registration Statement, which was then updated and incorporated into the Offering Documents, as a senior officer and/or director of Wilmington within the meaning of Section 11 of the

Securities Act. Defendant Freeh was a director at Wilmington at the time of the filing of the Offering Documents.

323. KPMG consented to the incorporation of its unqualified auditor's report regarding Wilmington's financial statements into the Offering Documents, including the Registration Statement. Specifically, KPMG consented to the incorporation into the Offering Documents of its unqualified auditor's report on Wilmington's financial statements included in the Bank's 2009 10-K. As detailed herein, the misrepresentations contained in, or the material facts omitted from, the Offering Documents included, but were not limited to, the facts that: (i) the financial statements that KPMG certified as being presented in conformity with GAAP were not presented in conformity with GAAP, and (ii) KPMG's audits, which it attested were conducted in accordance with GAAS, were not conducted in accordance with GAAS.

324. The common stock described in this Count was issued and sold pursuant to the Offering Documents. All purchases of the registered securities after the issuance of the Offering Documents are traceable to the Offering Documents.

325. The Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

326. Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Offering Documents, which misrepresented or failed to disclose the material adverse facts alleged in connection with Lead Plaintiffs' Securities Act claims, as set forth above.

327. In connection with offering the registered securities to the public and the sale of

those securities, the Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

328. As the issuer of the registered securities, Wilmington is strictly liable for the untrue statements of material fact and material omissions described herein.

329. None of the other Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

330. Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the registered securities.

331. As a direct and proximate result of the Securities Act Defendants' acts and omissions in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of the common stock pursuant to the February 2010 Offering Documents.

332. By reason of the foregoing, the Section 11 Defendants are liable to the members of the Class who acquired registered securities pursuant to or traceable to the Offering Documents.

333. This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the issuance of the Offering Documents.

## FIFTH CLAIM FOR RELIEF

**For Violations of Section 12(a)(2) of the Securities Act In Connection With The Offerings Against Defendants Wilmington, J.P. Morgan, and KBW**

334. Lead Plaintiffs repeat and reallege each and every allegation above relating to the

Securities Act claims as if fully set forth herein. For the purposes of this Count, Lead Plaintiffs assert only strict liability and negligence claims, and expressly exclude from this Count any allegations of fraud or reckless or intentional misconduct.

335. This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77k, against Defendants Wilmington and Defendants J.P. Morgan and KBW (defined above as the "Underwriter Defendants") on behalf of members of the Class who purchased or otherwise acquired Wilmington common stock pursuant and/or traceable to the Offering Documents, and were damaged by acts alleged herein.

336. By means of the Offering Documents and by using the means and instruments of transportation and communication in interstate commerce and of the mails, Defendant Wilmington and the Underwriter Defendants, through public offerings, solicited and sold Wilmington securities to members of the Class.

337. The Offering Documents were materially misstated, omitted to state facts necessary to make the statements made not misleading, and concealed or failed to adequately disclose material facts as alleged herein.

338. Neither of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents, including the February 2010 Prospectus, were accurate and complete in all material respects. Had they exercised reasonable care, these Defendants would have known of the material misstatements and omissions alleged herein.

339. Members of the Class purchased Wilmington securities by means of the materially misstated Offering Documents. At the time they purchased shares in the Offerings, no member of the Class knew, or by the reasonable exercise of care could have known, of the

material misstatements in and omissions from the Offering Documents, including the February 2010 Prospectus.

340. By virtue of the conduct alleged herein, Wilmington and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.

341. Accordingly, members of the Class who purchased or otherwise acquired Wilmington securities have a right to rescind and recover the consideration paid for their securities and hereby elect to rescind and tender their securities to Wilmington and the Underwriter Defendants. Members of the Class who have sold their Wilmington securities issued in or traceable to the Offering are entitled to recissory damages.

342. This claim is brought within one year after the discovery of the misstatements and omissions contained in the Offering Documents and within three years after the Offering.

## SIXTH CLAIM FOR RELIEF

**For Violations of Section 15 of the Securities Act In Connection With The Offerings Against Defendants Foley, Cecala, Gibson, Harra, Rakowski, Burger, DuPont, Elliot, Freeh, Krug, Mears, Mobley, Rollins, Roselle, Sockwell, Tunnell, and Whiting**

343. Lead Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein, and expressly exclude from this Count any allegations of fraud or intentional misconduct.

344. This claim is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against Defendants Foley, Cecala, Gibson, Harra, Rakowski, Burger, DuPont, Elliot, Freeh, Krug, Mears, Mobley, Rollins, Roselle, Sockwell, Tunnell, and Whiting, on behalf of members of the Class who purchased or otherwise acquired Wilmington securities pursuant and/or traceable to the Offering Documents and were damaged by acts alleged herein. For the purposes of this Count, Lead Plaintiffs assert only strict liability and negligence claims and expressly disclaims any allegation of fraud or intentional misconduct.

345. At all relevant times, Defendants Foley, Cecala, Gibson, Harra, Rakowski, Burger, DuPont, Elliot, Freeh, Krug, Mears, Mobley, Rollins, Roselle, Sockwell, Tunnell, and Whiting were controlling persons of the Bank within the meaning of Section 15 of the Securities Act. As set forth herein, because of their positions in the Bank and/or because of their positions on the Wilmington Board, Defendants Foley, Cecala, Gibson, Harra, Rakowski, Burger, DuPont, Elliot, Freeh, Krug, Mears, Mobley, Rollins, Roselle, Sockwell, Tunnell, and Whiting had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the unlawful acts and conduct alleged herein.

346. Specifically, Defendants Foley, Cecala, Gibson, Harra and Rakowski each served as an executive officer of Wilmington. Defendants Foley and Cecala each served as Wilmington's Chief Executive Officer and Chairman of its Board; Defendant Gibson served as its Chief Financial Officer and Chief Operating Officer; Defendant Harra served as its President and Chief Operating Officer; and Defendant Rakowski served as its Senior Vice President and Controller. As such, at all times relevant, Defendants Foley, Cecala, Gibson, Harra and Rakowski each participated in the operation and management of the Bank, conducted and participated, directly and indirectly, in Wilmington's business affairs and mortgage-lending operations. These Defendants also participated in the preparation and dissemination of the Offering Documents, certain of the financial statements incorporated by reference therein and/or otherwise participated in the process necessary to conduct the Offering. Because of their positions of control and authority as senior officers of Wilmington, each of these Defendants were able to, and did, control the contents of certain or all the Offering Documents and the financial statements incorporated by reference therein, which contained materially false financial information.

347. Similarly, Defendants Burger, DuPont, Elliot, Freeh, Krug, Mears, Mobley, Rollins, Roselle, Sockwell, Tunnell, and Whiting, served as Directors on Wilmington's Board at the time the Offering were conducted and/or at the time that the Registration Statement was signed. As directors of a publicly-owned company, these Defendants had a duty to disseminate accurate and truthful information with respect to Wilmington's financial condition and results of operations. These Defendants each signed the Registration Statement; signed the 2009 10-K which was incorporated by reference into the Offering Documents; and/or were Directors at the time the Offering was conducted, the Offering Documents were disseminated to the investing public and the Registration Statement became effective. Thus, these Defendants controlled the contents and dissemination of the Offering Documents.

348. By reason of the aforementioned conduct and by virtue of their positions as controlling persons of Defendant Wilmington, each of these Defendants are liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Bank is liable under Sections 11 and 12(a)(2) of the Securities Act, to members of the Class who purchased or otherwise acquired Wilmington securities pursuant to or traceable to the Offering Documents. As a direct and proximate result of the conduct of these Defendants, members of the Class suffered damages in connection with their purchase or acquisition of the securities.

## XIII. CLASS ACTION ALLEGATIONS

349. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Wilmington's common stock during the Class Period, January 18, 2008, up to November 1, 2010 and were damaged thereby (the "Class"). Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of Wilmington, the Auditor Defendant, or any of the Underwriter Defendants

during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged herein; and (vi) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any such excluded party.

350. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, Wilmington's common stock was actively traded on the NYSE, an efficient market. As of September 31, 2010, Wilmington had more than 91 million shares of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds of thousands of members in the Class.

351. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members, including:

a) Whether Defendants violated the federal securities laws;

b) Whether Defendants misrepresented material facts concerning Wilmington;

c) Whether Defendants' statements omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made;

d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e) Whether Defendants engaged in perpetrating a manipulative and deceptive device and/or scheme and/or otherwise engaged in a fraudulent course of conduct;

f) Whether the Offering Materials contained material misstatements or omissions;

g) Whether the Wilmington SEC filings issued during the Class Period which contained financial information (i.e., its Forms 10-K, 10-Q, 8-K, and S-3) contained untrue or materially misleading statements;

h) Whether the prices of Wilmington's common stock were artificially inflated; and

i) The extent of damage sustained by Class members and the appropriate measure of damages.

352. The claims of Lead Plaintiffs are typical of those of the Class.

353. Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Lead Plaintiffs have no interests that conflict with those of the Class.

354. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**XIV. JURISDICTION AND VENUE**

355. The claims asserted herein arise under (i) Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), 78t-1), and the rules and regulations promulgated thereunder, including Rule 10b-5 (17 C.F.R. §240.10b-5); and (ii) Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

356. This Court has jurisdiction of the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and Section 22 of the Securities Act (15 U.S.C. § 77v); and 28 U.S.C. § 1331 and 1337.

357. Venue is proper in this District pursuant to Section 27 of the Exchange Act, Section 22 of the Securities Act, and 28 U.S.C. § 1391(b). Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District. In addition, Wilmington maintained its corporate headquarters and principal executive offices in this District throughout the Class Period.

358. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities market.

## XV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment individually and on behalf of the Class, as follows:

a) Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b) Awarding Lead Plaintiffs and the class members damages, including interest;

c) Awarding Lead Plaintiffs reasonable costs, including attorneys' and experts' fees; and

d) Awarding such equitable/injunctive or other relief for the benefit of the Class as the court may deem just and proper.

## XVI. JURY DEMAND

Lead Plaintiffs demand a trial by jury for all issues so triable.

Dated: January 9, 2013

**CHIMICLES & TIKELLIS LLP**

*/s/ A. Zachary Naylor*
Pamela S. Tikellis (Bar No. 2172)
A. Zachary Naylor (Bar No. 4439)
222 Delaware Avenue, 11th Floor
P.O. Box 1035
Wilmington, DE 19899
Phone: (302) 656-2500
Fax: (302) 656-9053

*Liaison Counsel for the Class*

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

Blair Nicholas
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (858) 793-0070
Fax: (858) 793-0323

-and-

Hannah Ross (*pro hac vice*)
Katherine M. Sinderson (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Phone: (212) 554-1400
Fax: (212) 554-1444

SAXENA WHITE P.A.

Maya S. Saxena (*pro hac vice*)
Joseph E. White III (*pro hac vice*)
Lester Hooker (*pro hac vice*)
Brandon Grzandziel (*pro hac vice*)
2424 North Federal Highway
Boca Raton, FL 33431
Phone: (561) 394-3399
Fax: (561) 394-3382

*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*

# APPENDIX A

# Merced County Employees' Retirement Association

# Certification

**CERTIFICATION PURSUANT TO**
**THE FEDERAL SECURITIES LAWS**

I, Maria L. Arevalo, on behalf of Merced County Employees' Retirement Association ("MCERA") hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Plan Administrator of MCERA. I have reviewed a complaint filed in this matter. MCERA has authorized the filing of this complaint.

2. MCERA did not purchase Wilmington Trust Corporation common stock at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. MCERA is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. MCERA's transactions in Wilmington Trust Corporation common stock are set forth in the chart attached hereto.

5. MCERA has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. MCERA will not accept any payment for serving as a representative party on behalf of the Class beyond MCERA's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11 day of May, 2011.

Maria L. Arevalo
Plan Administrator
*Merced County Employees' Retirement Association*

**Merced County Employees' Retirement Association**
**Transactions in Wilmington Trust Corporation (WL)**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 7/1/2010 | 5,200 | 11.1183 |
| Purchase | 7/1/2010 | 1,900 | 11.0971 |
| Purchase | 7/2/2010 | 7,000 | 11.2493 |
| Purchase | 7/2/2010 | 200 | 11.2750 |
| Purchase | 7/2/2010 | 9,100 | 11.2291 |
| Purchase | 7/6/2010 | 3,500 | 11.7203 |
| Purchase | 7/6/2010 | 3,100 | 11.7483 |
| Purchase | 7/16/2010 | 700 | 11.3970 |
| Purchase | 7/16/2010 | 1,300 | 11.3997 |
| Purchase | 7/28/2010 | 2,000 | 10.3280 |
| Purchase | 9/27/2010 | 3,000 | 9.0700 |
| Purchase | 9/29/2010 | 800 | 8.7250 |
| Purchase | 9/29/2010 | 2,200 | 8.8948 |
| Purchase | 10/6/2010 | 5,000 | 7.7868 |
| Purchase | 10/7/2010 | 5,000 | 7.6579 |

# Coral Springs Police Pension Fund

# Certification

**CERTIFICATION OF CORAL SPRINGS POLICE PENSION FUND**

I, Robert A. Feigenbaum, Chairman, on behalf of the Coral Springs Police Pension Fund ("Fund"), certify that:

1. I am authorized by the Board of Trustees of the Fund to execute this Certification.
2. I have reviewed the Consolidated Securities Class Action Complaint and I authorize to file this complaint.
3. The Fund did not acquire the security that is the subject of this action at the direction of counsel, or in order to participate in this private action, or any other litigation under the federal securities laws.
4. The Fund is willing to serve as a Lead Plaintiff or Class Representative, either individually or as part of a group. The Fund understands that a Lead Plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include providing testimony at deposition and trial, if necessary.
5. The Fund will not accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.
6. The Fund understands that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by the Fund's decision to serve as a representative party or Lead Plaintiff.
7. Listed below are all the transactions in the securities of Wilmington Trust Corporation in the class period:

**SEE ATTACHED SCHEDULE A**

8. The Fund has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Executed this 16 day of May 2011.

[signature]

Robert A. Feigenbaum, Chairman

SCHEDULE A TO CERTIFICATION OF CORAL SPRINGS POLICE PENSION FUND
WILMINGTON TRUST CORPORATION

PURCHASES:

| DATE | SHARES | PRICE/SHARE |
|---|---|---|
| 03/05/2008 | 2,825 | $30.55 |
| 03/06/2008 | 2,825 | $29.99 |
| 03/07/2008 | 2,750 | $29.78 |
| 05/15/2008 | 550 | $34.49 |
| 05/16/2008 | 1,000 | $34.37 |
| 05/19/2008 | 825 | $34.75 |
| 06/04/2008 | 3,750 | $32.36 |
| 07/03/2008 | 2,775 | $24.93 |
| 07/15/2008 | 1,950 | $22.18 |
| 08/19/2008 | 2,675 | $22.89 |
| 08/20/2008 | 500 | $22.87 |
| 08/21/2008 | 250 | $22.75 |
| 08/25/2008 | 1,100 | $22.38 |
| 08/26/2008 | 1,500 | $22.01 |
| 08/20/2009 | 250 | $11.53 |
| 08/27/2009 | 2,110 | $13.54 |
| 09/01/2009 | 2,200 | $13.42 |
| 09/04/2009 | 3,400 | $12.98 |
| 09/29/2009 | 1,410 | $13.99 |
| 09/30/2009 | 250 | $14.00 |
| 10/01/2009 | 3,040 | $13.78 |
| 10/02/2009 | 1,450 | $13.38 |
| 10/30/2009 | 3,425 | $12.49 |
| 12/17/2009 | 1,055 | $12.00 |
| 01/11/2010 | 1,225 | $13.67 |
| 01/12/2010 | 1,025 | $13.44 |
| 02/23/2010 | 3,230 | $13.25 |
| 05/26/2010 | 1,580 | $15.54 |
| 07/16/2010 | 560 | $11.62 |

SALES:

| DATE | SHARES | PRICE/SHARE |
|---|---|---|
| 09/15/2008 | 2,600 | $25.75 |
| 10/10/2008 | 500 | $26.08 |
| 10/13/2008 | 950 | $26.13 |
| 10/14/2008 | 4,850 | $27.87 |

# St. Petersburg Firefighters' Retirement System

# Certification

CERTIFICATION OF THE ST. PETERSBURG FIREFIGHTERS' RETIREMENT SYSTEM

I, Alan Rosetti, on behalf of the St. Petersburg Firefighters' Retirement System ("Retirement System") certify that:

1. I am authorized by the Board of Trustees of the Retirement System to execute this Certification.
2. I have reviewed the Consolidated Securities Class Action Complaint and I authorize Counsel to file this complaint.
3. The Retirement System did not acquire the security that is the subject of this action at the direction of counsel, or in order to participate in this private action, or any other litigation under the federal securities laws.
4. The Retirement System is willing to serve as a Lead Plaintiff, either individually or as part of a group. The Retirement System understands that a Lead Plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include providing testimony at deposition and trial, if necessary.
5. The Retirement System will not accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.
6. The Retirement System understands that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by the Retirement System's decision to serve as a representative party or Lead Plaintiff.
7. I have listed below all the transactions in the securities of Wilmington Trust Corporation in the class period, as provided by the Retirement System's custodian bank:

**SEE ATTACHED SCHEDULE A**

8. During the three years prior to the date of this Certification, the Retirement System has not sought or served as a representative party for a class in an action filed under the Private Securities Litigation Reform Act.

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Executed this 12 day of May, 2011.

[signature]

Alan Rosetti, Chairman

SCHEDULE A TO CERTIFICATION OF ST. PETERSBURG FIREFIGHTERS RETIREMENT SYSTEM
WILMINGTON TRUST CORPORATION

PURCHASES:

| DATE | SHARES | PRICE/SHARE |
|---|---|---|
| 3/5/2008 | 1,525 | $30.55 |
| 3/6/2008 | 1,525 | $29.99 |
| 3/7/2008 | 1,475 | $29.78 |
| 5/15/2008 | 300 | $34.49 |
| 5/16/2008 | 525 | $34.37 |
| 5/19/2008 | 425 | $34.75 |
| 6/4/2008 | 2,075 | $32.36 |
| 7/3/2008 | 1,500 | $24.93 |
| 7/15/2008 | 1,050 | $22.18 |
| 8/19/2008 | 1,425 | $22.89 |
| 8/21/2008 | 425 | $22.75 |
| 8/25/2008 | 600 | $22.38 |
| 8/26/2008 | 800 | $22.01 |
| 5/22/2009 | 1,150 | $13.65 |
| 8/27/2009 | 1,210 | $13.54 |
| 8/31/2009 | 1,115 | $14.02 |
| 9/1/2009 | 1,450 | $13.42 |
| 9/4/2009 | 2,225 | $12.98 |
| 9/29/2009 | 920 | $13.99 |
| 10/1/2009 | 2,060 | $13.78 |
| 10/2/2009 | 975 | $13.38 |
| 10/30/2009 | 2,250 | $12.49 |
| 12/17/2009 | 685 | $12.00 |
| 1/11/2010 | 790 | $13.67 |
| 1/12/2010 | 675 | $13.44 |
| 2/23/2010 | 2,100 | $13.25 |
| 5/26/2010 | 1,100 | $15.54 |

SALES:

| DATE | SHARES | PRICE/SHARE |
|---|---|---|
| 9/15/2008 | 1,500 | $25.75 |
| 10/10/2008 | 250 | $26.08 |
| 10/13/2008 | 500 | $26.13 |
| 10/14/2008 | 2,575 | $27.87 |

# Pompano Beach General Employees Retirement System Certification

## CERTIFICATION OF POMPANO BEACH GENERAL EMPLOYEES RETIREMENT SYSTEM

I, Reginald W. Watkins, on behalf of the Pompano Beach General Employees Retirement System ("Retirement System") certify that:

1. I am authorized by the Board of Trustees of the Retirement System to execute this Certification.
2. I have reviewed the Consolidated Securities Class Action Complaint and I authorize Counsel to file this complaint
3. The Retirement System did not acquire the security that is the subject of this action at the direction of counsel, or in order to participate in this private action, or any other litigation under the federal securities laws.
4. The Retirement System is willing to serve as a Lead Plaintiff or Class Representative, either individually or as part of a group. The Retirement System understands that a Lead Plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include providing testimony at deposition and trial, if necessary.
5. The Retirement System will not accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.
6. The Retirement System understands that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by the Retirement System's decision to serve as a representative party or Lead Plaintiff.
7. I have listed below all the transactions in the securities of Wilmington Trust Corporation in the class period:

**SEE ATTACHED SCHEDULE A**

8. During the three years prior to the date of this Certification, the Retirement System has not sought to serve or served as a representative party for a class in an action filed under the Private Securities Litigation Reform except as follows:

*Synovus Financial Corp.*, NDGA, Case No.: 09-1811, (July 6, 2009)(named plaintiff).

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Executed this 13th day of May, 2011.

[signature]

Reginald W. Watkins

SCHEDULE A TO CERTIFICATION OF POMPANO BEACH GENERAL EMPLOYEES RETIREMENT SYSTEM
WILMINGTON TRUST CORPORATION

PURCHASES:

| DATE | SHARES | PRICE/SHARE |
|---|---|---|
| 3/5/2008 | 1,050 | $30.58 |
| 3/6/2008 | 1,050 | $30.02 |
| 3/7/2008 | 1,050 | $29.81 |
| 3/24/2008 | 1,700 | $32.46 |
| 5/15/2008 | 225 | $34.50 |
| 5/16/2008 | 375 | $34.38 |
| 5/19/2008 | 300 | $34.76 |
| 6/4/2008 | 1,425 | $32.41 |
| 7/3/2008 | 1,050 | $24.98 |
| 7/15/2008 | 725 | $22.19 |
| 8/5/2008 | 600 | $24.38 |
| 8/6/2008 | 500 | $25.16 |
| 8/7/2008 | 300 | $25.80 |
| 8/19/2008 | 1,000 | $22.94 |
| 8/20/2008 | 700 | $23.02 |
| 8/21/2008 | 300 | $22.77 |
| 8/25/2008 | 425 | $22.39 |
| 8/26/2008 | 550 | $22.03 |
| 8/29/2008 | 300 | $23.43 |
| 9/2/2008 | 200 | $24.53 |
| 8/27/2009 | 800 | $13.59 |
| 9/1/2009 | 825 | $13.43 |
| 9/4/2009 | 1,275 | $13.03 |
| 9/29/2009 | 520 | $14.02 |
| 10/1/2009 | 1,180 | $13.83 |
| 10/2/2009 | 575 | $13.43 |
| 10/30/2009 | 1,275 | $12.54 |
| 12/17/2009 | 395 | $12.03 |
| 1/11/2010 | 460 | $13.70 |
| 1/12/2010 | 400 | $13.47 |
| **2/23/2010** | **1,200** | **$13.25** |
| 5/26/2010 | 660 | $15.55 |

SALES:

| DATE | SHARES | PRICE/SHARE |
|---|---|---|
| 9/15/2008 | 1,050 | $25.70 |
| 9/19/2008 | 100 | $42.49 |
| 10/10/2008 | 250 | $26.03 |
| 10/13/2008 | 325 | $26.08 |
| 10/14/2008 | 1,750 | $27.81 |
| 10/20/2008 | 500 | $27.84 |
| 10/21/2008 | 400 | $27.20 |
| 11/6/2008 | 1,400 | $25.54 |
| 11/12/2008 | 200 | $24.59 |
| 11/14/2008 | 1,300 | $24.72 |
| 11/19/2008 | 725 | $21.93 |
| 11/19/2008 | 75 | $21.93 |
| 1/21/2009 | 400 | $15.48 |
| 2/24/2010 | 500 | $14.37 |
| 4/22/2010 | 300 | $19.68 |
| 7/12/2010 | 700 | $12.03 |

# Automotive Industries Pension Trust Fund

# Certification

**CERTIFICATION PURSUANT TO**
**THE FEDERAL SECURITIES LAWS**

I, Bill Brunelli, on behalf of Automotive Industries Pension Trust Fund ("Automotive Industries"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of Automotive Industries. I have reviewed a complaint filed in this matter. Automotive Industries has authorized the filing of this complaint.

2. Automotive Industries did not purchase Wilmington Trust Corporation common stock at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Automotive Industries is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Automotive Industries' transactions in Wilmington Trust Corporation common stock are set forth in the chart attached hereto.

5. Automotive Industries has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *City of Roseville Employees' Retirement System v. Textron Inc. et al.*, Case No. 09-cv-367 (D.R.I.)

6. Automotive Industries will not accept any payment for serving as a representative party on behalf of the Class beyond Automotive Industries' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13 day of May, 2011.

Bill Brunelli
Chairman
*Automotive Industries Pension Trust Fund*

**Automotive Industries Pension Trust Fund**
**Transactions in Wilmington Trust Corporation (WL)**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 3/5/2008 | 2,450 | 30.5520 |
| Purchase | 3/6/2008 | 2,450 | 29.9860 |
| Purchase | 3/7/2008 | 2,400 | 29.7840 |
| Purchase | 5/15/2008 | 500 | 34.4860 |
| Purchase | 5/16/2008 | 875 | 34.3670 |
| Purchase | 5/19/2008 | 700 | 34.7450 |
| Purchase | 6/4/2008 | 3,300 | 32.3610 |
| Purchase | 7/3/2008 | 2,450 | 24.9250 |
| Purchase | 7/15/2008 | 1,700 | 22.1780 |
| Purchase | 8/19/2008 | 2,300 | 22.8890 |
| Purchase | 8/20/2008 | 500 | 22.8700 |
| Purchase | 8/21/2008 | 150 | 22.7540 |
| Purchase | 8/25/2008 | 975 | 22.3760 |
| Purchase | 8/26/2008 | 1,300 | 22.0130 |
| Purchase | 8/27/2009 | 1,790 | 13.5430 |
| Purchase | 9/1/2009 | 1,875 | 13.4220 |
| Purchase | 9/4/2009 | 2,925 | 12.9840 |
| Purchase | 9/29/2009 | 1,210 | 13.9930 |
| Purchase | 9/30/2009 | 250 | 14.0000 |
| Purchase | 10/1/2009 | 2,570 | 13.7810 |
| Purchase | 10/2/2009 | 1,225 | 13.3820 |
| Purchase | 10/30/2009 | 2,950 | 12.4940 |
| Purchase | 12/17/2009 | 740 | 11.9980 |
| Purchase | 1/11/2010 | 855 | 13.6730 |
| Purchase | 1/12/2010 | 725 | 13.4410 |
| Purchase | 2/23/2010 | 2,220 | 13.2500 |
| Purchase | 5/26/2010 | 1,210 | 15.5410 |
| | | | |
| Sale | 9/15/2008 | (2,425) | 25.7500 |
| Sale | 10/10/2008 | (250) | 26.0780 |
| Sale | 10/13/2008 | (875) | 26.1260 |
| Sale | 10/14/2008 | (4,275) | 27.8620 |
| Sale | 12/9/2009 | (5,100) | 11.6140 |
| Sale | 8/19/2010 | (2,470) | 8.7980 |

# APPENDIX B

**APPENDIX B**

**Confidential Witness Key**

| CW | Tenure | Relevant Position(s) |
|---|---|---|
| **1** | 3/2008 – 7/2011 | Vice President, Section Manager, Commercial Loan Recovery |
| **2** | 1997 – 3/2010 | Vice President, Credit Risk Management Division |
| **3** | 4/2003 – 8/2011 | Manager, Documentation Review (June 2008 – July 2010)<br>Loan Documentation Reviewer (2004-2008) |
| **4** | 2007 – 2010 | Construction Loan Administrator / Commercial Banking Credit Policy (2009 – 2010)<br>Client Sales Representative (2007 – 2009) |
| **5** | 1/2008 – 6/2010 | Vice President, Loan Workout Group |
| **6** | 11/2002 – 4/2007 | Credit and Risk Assessment, Commercial Loan Portfolio |
| **7** | 5/2007 – 4/2009 | Paralegal |
| **8** | 1997 – 6/2008 | Director, Internal Audit |
| **9** | 2005 – 5/2011<br>11/1998 – 2003 | Vice President, Credit Officer, Wealth Management & Private Banking |
| **10** | 1976 – 10/2010 | Vice President, Commercial Lending |
| **11** | 2004 – 2009 | Director, Tax |