**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| **IN RE WILMINGTON TRUST SECURITIES LITIGATION** | Master File No. 10-cv-00990-SLR |
| | (Securities Class Action) |
| | Hon. Sue L. Robinson |
| This document relates to: ALL ACTIONS | ELECTRONICALLY FILED |

**LEAD PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE THIRD AMENDED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Blair Nicholas
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Phone: (858) 793-0070
Fax: (858) 793-0323

-and-

Hannah Ross (*pro hac vice*)
Katherine M. Sinderson (*pro hac vice*)
Adam Hollander (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Phone: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*

**CHIMICLES & TIKELLIS LLP**

Pamela S. Tikellis (Bar No. 2172)
A. Zachary Naylor (Bar No. 4439)
222 Delaware Avenue, 11th Floor
P.O. Box 1035
Wilmington, DE 19899
Phone: (302) 656-2500
Fax: (302) 656-9053

*Liaison Counsel for the Class*

**SAXENA WHITE P.A.**

Maya S. Saxena (*pro hac vice*)
Joseph E. White III (*pro hac vice*)
Lester Hooker (*pro hac vice*)
Brandon Grzandziel (*pro hac vice*)
2424 North Federal Highway
Boca Raton, FL 33431
Phone: (561) 394-3399
Fax: (561) 394-3382

*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*

April 25, 2013

# TABLE OF CONTENTS

Page


I. PRELIMINARY STATEMENT ..... 1

II. FACTUAL BACKGROUND ..... 6

A. Wilmington's Underwriting Was "Nonexistent" ..... 6

B. Wilmington Ignored The Risks In Its Loan Portfolio ..... 8

C. The Federal Reserve Identified Fundamental Flaws In The Bank's Lending And Accounting Functions And Imposed The MOU ..... 10

D. The FBI Affidavits Confirm Wilmington's Reckless Underwriting And Asset Review Practices During The Class Period ..... 11

E. The Bank Inflated Its Net Income Throughout The Class Period ..... 14

F. The MOU Forced The Bank To Reveal Gradually The True Condition Of Its Loan Portfolio, But Defendants Continued To Mislead Investors ..... 15

III. THE THIRD AMENDED COMPLAINT FULLY COMPLIES WITH THE COURT'S ORDER OF MARCH 29, 2012 ..... 17

IV. PLAINTIFFS ADEQUATELY ALLEGE EXCHANGE ACT VIOLATIONS ..... 19

A. The TAC Meets The Standards Of The PSLRA And Rule 9(b) ..... 19

B. Plaintiffs Allege Materially False And Misleading Statements And Omissions ..... 20

1. False And Misleading Statements About Loan Underwriting ..... 21

a. Defendants' Underwriting Statements Were Material ..... 22

b. Defendants' Underwriting Statements Were False ..... 24

2. False And Misleading Statements About Asset Review ..... 28

3. Wilmington's Financial Statements Were Materially Misstated ..... 34

a. Wilmington's Accounting For Loan Loss Reserves And Net Income Did Not Comply With GAAP ..... 34

b. Defendants' GAAP Arguments Are Premature And Meritless ..... 37

c. A Restatement Is Not Required To Allege Falsity ..... 41

4. False And Misleading Statements About Internal Controls ..................... 42

5. Defendants' Additional False And Misleading Statements ...................... 43

C. The TAC Raises A Strong Inference Of The Officer Defendants' Scienter......... 45

1. Standard For Evaluating Scienter ........................................................ 45

2. The TAC Alleges Compelling Facts Evidencing The Officer Defendants' Knowledge And Recklessness............................................ 46

a. The Comprehensive Delaware Status Review And Delaware Review Memorandum Prepared At The Direction Of "Senior Management" Demonstrate The Officer Defendants' Scienter.................................................................. 46

b. The Bank's Relationship With Zimmerman, One Of The Bank's Largest And Most Important Borrowers, Supports A Strong Inference of Scienter .................................................. 48

c. The Magnitude And Timing Of Wilmington's Credit Losses Support A Strong Inference Of Scienter........................... 51

d. The Numerous Warnings From Regulators And Other Gatekeepers Support The Officer Defendants' Scienter............... 54

e. The Officer Defendants Knew, Or Should Have Known, Of Facts That Belied Their Public Statements.................................. 56

3. Defendants' Competing Inferences Should Be Rejected.......................... 62

D. Defendants' Statements Are Not Protected By The PSLRA Safe Harbor............ 65

E. Plaintiffs Have Pled Loss Causation................................................................... 67

V. PLAINTIFFS ADEQUATELY ALLEGE SECURITIES ACT VIOLATIONS............. 69

A. Materially False And Misleading Statements In The Offering Documents ......... 70

1. Wilmington's Financial Results And Reserve Methodology Are Not Opinions........................................................................... 70

2. KPMG Is Liable For Its False Certifications And Statements.................. 75

3. Statements In The Offering Documents Were False And Misleading At The Time Of The Offering............................................... 81

B. duPont Is Liable For False Statements In The Offering Documents .................... 83

VI. THE TAC STATES CONTROL PERSON CLAIMS ..................................................... 84

VII. CONCLUSION ..................................................................................................... 85

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*60223 Trust v. Goldman Sachs & Co.*,
540 F. Supp. 2d 449 (S.D.N.Y. 2007)....69

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008)....46

*Adams v. Kinder-Morgan, Inc.*,
40 F.3d 1083 (10th Cir. 2003)....41

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009)....70

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)....41, 43, 55

*Atlas v. Accredited Home Lenders Holding Co.*,
556 F. Supp. 2d 1142 (S.D. Cal. 2008).... *passim*

*Aviva Partners LLC v. Exide Techs.*,
2007 WL 789083 (D.N.J. Mar. 31, 2007)....47

*Bastian v. Petren Res. Corp.*,
892 F.2d 680 (7th Cir. 1990)....69

*Berson v. Applied Signal Tech. Inc.*,
527 F.3d 982 (9th Cir. 2008)....26, 48

*Bus. Fin. Servc., Inc. Sec. Litig.*,
2007 WL 81937 (E.D. Pa. Jan. 9, 2007)....24, 42, 84, 85

*Cal. Emp. Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004)....20, 21

*Cole v. Fed. Home Loan Mortg. Corp.*,
1991 WL 180295 (D.D.C. Aug. 27, 1991)....69

*CraftMatic Sec. Litig., v. Kraftsow*,
890 F.2d 628 (3d Cir. 1989)....25

*Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*,
454 F.3d 1168, 1174 (10th Cir. 2006)....79, 81

*Denny v. Barber*,
576 F.2d 465 (2d Cir. 1978)....................................................................................81

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ...........................................................................64, 81

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................................................67, 69

*Dutton v. Harris Stratex Networks*,
270 F.R.D. 171 (D. Del. 2010) ...............................................................................81

*Eastwood Enters. LLC v. Farha*,
2009 WL 3157668 (M.D. Fla. Sept. 28, 2009)........................................................62

*EP Medsystems, Inc. v. EchoCath, Inc.*,
235 F.3d 865 (3d Cir. 2000).....................................................................................66

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)................................................................................................74

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011)............................................................................. *passim*

*Fed. Hous. Fin. Agency v. UBS Ams., Inc.*,
858 F. Supp. 2d 306 (S.D.N.Y. 2010)................................................................71, 76

*FindWhat Investor Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ...............................................................................70

*First Nationwide Bank v. Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994)........................................................................................69

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) ...........................................................................52, 57

*Freed v. Universal Health Services, Inc.*,
2005 WL 1030195 (E.D. Pa. May 3, 2005).................................................................85

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................. *passim*

*Galati v. Commerce Bancorp, Inc.*,
2005 WL 3797764 (D.N.J. Nov. 7, 2005) ..................................................................25

*George v. China Auto. Sys. Inc.*,
2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012).............................................................68

*Glover v. DeLuca*,
2006 WL 2850448 (W.D. Pa. Sept. 29, 2006) ............................................................ 69

*Hall v. Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008) ............................................................ 60

*Harrell v. Primedia, Inc.*,
2003 WL 21804840 (S.D.N.Y. Aug. 6, 2003) ............................................................ 69

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) ............................................................ 70, 76

*Hinerfeld v. United Auto Grp.*,
1998 WL 397852 (S.D.N.Y. July 15, 1998) ............................................................ 41

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ............................................................ 42

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013) ............................................................ 29

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004) ............................................................ 23, 43, 66

*In re Adaptive Broadband Sec. Litig.*,
2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ............................................................ 60

*In re Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3d Cir. 1999) ............................................................ 24, 45

*In re Aetna, Inc. Sec. Litig.*,
617 F.3d 272 (3d Cir. 2010) ............................................................ 24

*In re Alpharma Inc. Sec. Litig.*,
372 F.3d 137 (3d Cir. 2004) ............................................................ 25

*In re Am. Int'l Grp. Inc. 2008 Sec. Litig.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010) ............................................................ 68

*In re Ambac Fin. Grp. Inc. Sec. Litig.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010) ............................................................ 22, 63, 68

*In re AOL Time Warner Sec. & "ERISA" Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004) ............................................................ 80

*In re Bear Stearns Cos., Inc. Sec., Deriv. & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011) ............................................................ 55, 63, 68

*In re Burlington Coat Factory*,
114 F.3d 1410 (3d Cir. 1997)............................................................................ *passim*

*In re Cabletron Sys. Inc.*,
311 F.3d 11 (1st Cir. 2002).............................................................................20, 33

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001) ......................................................................46

*In re Cendant Corp. Litig.*,
60 F. Supp. 2d 354 (D.N.J. 1999) .......................................................................79

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010)...........................................................63, 68

*In re Converium Holding AG Sec. Litig.*,
2007 WL 2684069 (S.D.N.Y. Sept. 14, 2007).....................................................54

*In re Countrywide Fin. Corp. Deriv. Litig.*, .........................................................22
554 F. Supp. 2d 1044 (C. D. Cal. 2008)

*In re Countrywide Fin. Corp. Deriv. Litig.*, .........................................................22
588 F. Supp. 2d 1132 (C. D. Cal. 2008)

*In re Daou Systems Inc.*,
411 F.3d 1006 (9th Cir. 2005) ..............................................................................61

*In re Donald J. Trump Casino Sec. Litig.*,
7 F.3d 357 (3d Cir. 1993) ...............................................................................23, 75

*In re Downey Sec. Litig.*,
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009).......................................................57

*In re DVI Sec. Litig.*,
2010 WL 3522086 (E. D. Pa. Sept. 3, 2010) .................................................54, 57, 61

*In re Dynex Capital, Inc. Sec. Litig.*,
2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ..........................................................70

*In re Eaton Vance Corp. Sec. Litig.*,
206 F. Supp. 2d 142 (D. Mass 2002) .....................................................................25

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) ...............................................................42, 84

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
469 F. Supp. 2d 88 (S.D.N.Y. 2006) .....................................................................66

*In re Fannie Mae 2008 Sec. Litig.*,
742 F. Supp. 2d 382 (S.D.N.Y. 2010)....................................................................68

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
352 F. Supp. 2d 429 (S.D.N.Y. 2005)....................................................................58

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
308 F. Supp. 2d 249 (S.D.N.Y. 2004)....................................................................24

*In re Gen. Elec. Sec. Litig.*,
856 F. Supp. 2d 645 (S.D.N.Y. 2012)....................................................................82

*In re Harley Davidson, Inc. Sec. Litig.*,
660 F. Supp. 2d 969 (E.D. Wisc. 2009)..................................................................24

*In re HealthSouth Corp. Sec. Litig.*,
2000 WL 34211319 (N.D. Ala. Dec. 13, 2000).......................................................20

*In re Homebanc Sec. Litig.*,
706 F. Supp. 2d 1336 (N.D. Ga. 2010)...................................................................68

*In re InterBank Funding Corp. Sec. Litig.*,
629 F.3d 213 (D.C. Cir. 2010)................................................................................78

*In re JP Morgan Chase Sec. Litig.*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005)....................................................................24

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008)..............................................................41, 54

*In re Lehman Bros. Sec. & ERISA Litig.*,
799 F. Supp. 2d 258 (S.D.N.Y. 2011)..................................................................79, 84

*In re Majesco Sec. Litig.*,
2006 WL 2846281 (D.N.J. Sept. 29, 2006)..........................................................37, 78

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000)...................................................................81

*In re Merck & Co., Inc. Sec. Deriv. & ERISA Litig.*,
543 F.3d 150 (3d Cir. 2008)....................................................................................75

*In re Merck & Co., Inc., Sec., Deriv. & ERISA Litig.*,
2011 WL 3444199 (D.N.J. Aug. 8, 2011).........................................................27, 30, 33

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
568 F. Supp. 2d 349 (S.D.N.Y. 2008)....................................................................69

*In re Midlantic S'holders Litig.*,
758 F. Supp. 226 (D.N.J. 1990) ....................40

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ....................22, 42, 63, 74

*In re Northfield Labs., Inc. Sec. Litig.*,
2008 U.S. Dist. LEXIS 76804 (N.D. Ill. Sept. 23, 2008) ....................47

*In re NUI Sec. Litig.*,
314 F. Supp. 2d 388 (D.N.J. 2004) ....................37, 38

*In re Oxford Health Plans, Inc. Sec. Litig.*,
187 F.R.D. 133 (S.D.N.Y. 1999) ....................36, 78

*In re Par Pharm. Sec. Litig.*,
2009 WL 3234273 (D.N.J. Sept. 30, 2009) ....................60

*In re PMA Capital Corp. Sec. Litig.*,
2005 WL 1806503 (E.D. Pa. July 27, 2005).................... *passim*

*In re Prudential Sec. Inc. P'ships. Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996)....................66

*In re RAIT Fin. Trust Sec. Litig.*,
2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) .................... *passim*

*In re Ravisent Techs., Inc. Sec. Litig.*,
2004 WL 1563024 (E.D. Pa. July 13, 2004)....................27

*In re Reliance Sec. Litig.*,
91 F. Supp. 2d 706 (D. Del. 2000)....................36, 57

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)....................37, 41, 57, 58

*In re Sears, Roebuck and Co. Sec. Litig.*,
291 F. Supp. 2d 722 (N.D. Ill. 2003) ....................49

*In re Sec. Cap. Ass. Ltd. Sec. Litig.*,
729 F. Supp. 2d 569 (S.D.N.Y. 2010)....................68

*In re SLM Corp. Sec. Litig.*,
740 F. Supp. 2d 542 (S.D.N.Y. 2010)....................35, 37, 67

*In re Stone & Webster, Inc., Sec. Litig.*,
414 F.3d 187 (1st Cir. 2005)....................79

*In re Sunbeam Sec. Litig.*,
89 F. Supp. 2d 1326 (S.D. Fla. 1999) ....................58

*In re Sunterra Corp. Sec. Litig.*,
199 F. Supp. 2d 1308 (M.D. Fla. 2002) ....................79

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006) ....................19, 70

*In re Tel-Save Sec. Litig.*,
1999 WL 999427 (E.D. Pa. Oct. 19, 1999) ....................49

*In re Thornburg Mortg. Sec. Litig.*,
695 F. Supp. 2d 1165 (D.N.M. 2010) ....................65

*In re Tyson Foods, Inc. Sec. Litig.*,
2004 WL 1396269 (D. Del. June 17, 2004) ....................67, 68

*In re Veritas Software Corp. Sec. Litig.*,
2006 WL 1431209 (D. Del. May 23, 2006) ....................20, 66

*In re Wash. Mut. Inc. Sec. Litig.*,
694 F. Supp. 2d 1192 (W.D. Wash. 2009) .................... *passim*

*In re Westinghouse Sec. Litig.*,
90 F.3d 696 (3d Cir. 1996) ....................37, 54, 83

*In re WorldCom, Inc. Sec. Litig.*,
352 F. Supp. 2d 472 (S.D.N.Y. 2005) ....................76

*Ind. State Dist. Council of Laborers v. Omnicare, Inc.*,
583 F.3d 935 (6th Cir. 2009) ....................78

*Inst'l Investors Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) .................... *passim*

*Jones v. Corus Bankshares, Inc.*,
701 F. Supp. 2d 1014 (N.D. Ill. 2010) .................... *passim*

*Kuriakose v. Fed. Home Loan Mortg.Co.*,
2011 WL 1158028 (S.D.N.Y. Mar. 30, 2011) ....................69

*Lerch v. Citizens First Bancorp., Inc.*,
805 F. Supp. 1142 (D.N.J. 1992) ....................65

*Lewis v. Straka*,
2006 WL 2927658 (E. D. Wis. Oct. 12, 2006) ....................55

*Local 703, I.B. of T. Grocery & Food Emps. v. Regions Fin. Corp.*,
2011 U.S. Dist. LEXIS 60761 (N.D. Ala. June 7, 2011)......................................29, 52, 63, 65

*Local 731 I.B. of T. v. Swanson*,
2011 WL 2444675 (D. Del. Jun. 14, 2011) ..................................................................23

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010)..........................................................................48

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
437 F.3d 588 (7th Cir. 2006),
*vacated in part on other grounds*, 551 U.S. 308 (2007) ................................................ *passim*

*Malin v. XL Capital Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007)..........................................................................24

*McCabe v. Ernst & Young, LLP*,
494 F.3d 418 (3d Cir. 2007)........................................................................................69

*Medtronic Ave, Inc. v. Boston Scientific Corp.*,
2001 WL 652016 (D. Del. Mar. 30, 2001) ...................................................................19

*Miss. Pub. Emps. Ret. Sys. v. Boston Scientific Corp.*,
523 F. 3d 75 (1st Cir. 2008)........................................................................................37

*N.Y.S. Teachers' Ret. Sys. v. Fremont Gen. Corp.*,
2009 WL 3112574 (C.D. Cal. Sept. 25, 2009) ..............................................................57

*National Jr. Baseball League v. PharmaNet Dev. Grp., Inc.*,
720 F. Supp. 2d 517 (D.N.J. 2010) ..............................................................................33

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012)........................................................................................74

*New Shah, Inc. v. Shah*,
2000 WL 1728251 (D. Del. June 20, 2000)...................................................................49

*No. 84 Emp.-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) .......................................................................................48

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
595 F.3d 86 (2d Cir. 2010)..........................................................................................27

*Phillips v. Cnty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008) ........................................................................................55

*Plumbers' Union v. Nomura Asset Acceptance Corp.*,
632 F.3d 762 (1st Cir. 2011)........................................................................................75

*Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*,
2013 WL 1431680 (D.N.J. Apr. 9, 2013) ....................22

*Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*,
2005 WL 1366025 (D.N.J. June 8, 2005) ....................79

*Santa Fe Indus., Inc. v. Green*,
430 U.S. 462 (1977)....................25

*Schleicher v. Wendt*,
618 F.3d 679 (7th Cir. 2010) ....................70

*Schoenhaut v. American Sensors, Inc.*,
986 F. Supp. 785 (S.D.N.Y. 1997)....................42

*SEC v. Okin*,
137 F.2d 862 (2d Cir. 1943)....................78

*Serabian v. Amoskeag Bank Shares, Inc.*,
24 F.3d 357 (1st Cir. 1994) ....................29, 32, 33

*Shapiro v. UJB Fin. Corp.*,
964 F.2d 272 (3d Cir. 1992).................... *passim*

*Shaw v. Digital Equip. Corp.*,
82 F.3d 1194 (1st Cir. 1996)....................83

*Snyder v. Pascack Valley Hospital*,
303 F.3d 271 (3d Cir. 2002)....................77

*Sonnenberg v. Prospect Park Fin. Corp.*,
1991 WL 329755 (D.N.J. Aug. 20, 1991) ....................40

*Stratte-McClure v. Morgan Stanley*,
784 F. Supp. 2d 373 (S.D.N.Y. 2011)....................55, 56

*TAAM Assocs., Inc. v. Housecall Med. Res., Inc.*,
1998 WL 1745361 (N.D. Ga. Mar. 30, 1998)....................38

*Underland v. Alter*,
2011 WL 4017908 (E.D. Pa. Sept. 09, 2011) ....................38, 72, 73

*Underland v. Alter*,
2012 WL 2912330 (E.D. Pa. July 16, 2012).................... *passim*

*Underland v. Alter*,
2012 WL 4108998 (E.D. Pa. Sept. 18, 2012) ....................72, 73, 75

*United States v. Huntress*,
956 F.2d 1309 (5th Cir. 1992) ....................................................................................31

*United States v. Thomas*,
315 F.3d 190 (3d Cir. 2002).........................................................................................31

*Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*,
2010 WL 1332574 (S.D. Fla. Mar. 30, 2010)...................................................57, 64

*Wilkof v. Caraco Pharm. Labs., Ltd.*,
2010 WL 4184465 (E.D. Mich. Oct. 21, 2010) ...........................................................65

*Winslow v. Bancorp South, Inc.*,
2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011).................................................52, 67

**STATUTES/RULES**

15 U.S.C. § 77k............................................................................................................ *passim*

17 C.F.R. § 229.512(a)(i-iii)(B).........................................................................................83

17 C.F.R. § 230.412(a)......................................................................................................82

17 C.F.R. § 230.412 and ...................................................................................................82

Fed. R. Civ. P. Rule 15(a)..................................................................................................85

PSLRA ...................................................................................................................19, 20, 65

**OTHER AUTHORITIES**

Black's Law Dictionary 138 (8th ed. 2004)........................................................................78

OCC, Policies & Procedures Manual § 5310-3 (2011)......................................................56

Stephen M. Davidoff, *Fairness Opinions*, 55 Am. U. L. Rev. 1557, 1616 (2006)........................81

## I. PRELIMINARY STATEMENT

For nearly three years, Wilmington Trust ("Wilmington" or the "Bank") lied to investors about the Bank's core commercial lending business, concealing nearly $800 million of losses on bad loans while telling investors that the Bank's "rigorous loan underwriting standards" and careful monitoring of the Bank's loan portfolio positioned the Bank to withstand the financial crisis. Those statements assured investors that Wilmington's credit review practices and sound portfolio distinguished it from other banks that failed during the crisis.

In reality, those statements were false because the Officer Defendants[1] instituted what former high-level Bank employees described as a "sales culture, not a credit culture," singularly focused on increasing loan volume in order to achieve the Bank's internal growth goals.[2] ¶51. According to these former employees, the Officer Defendants personally undermined the lending process by subverting the Bank's underwriting and asset review function, and doing "deals a normal commercial bank should not have looked at." ¶45. Examples of these practices include:

- Ignoring underwriting standards and simply extending loans at the direction of CEO Cecala (¶49);
- Incentivizing loan officers ("lenders" or "relationship managers") to extend loans (¶53);
- Penalizing those same loan officers for documenting when borrowers were unable to repay loans (¶¶60, 63);
- Vetoing decisions by the Asset Review Group (the "ARG") – credit specialists who were responsible for monitoring the performance of the Bank's loans – to downgrade loan risk ratings, which were a key factor in establishing the reserves for loan losses (the "Loan Loss Reserve" or "Reserve") (¶¶68-71); and
- Thwarting the ARG's review of 85-90% of the Bank's loan portfolio (¶¶61-62).

---

[1] The Officer Defendants are: Ted Cecala, Chief Executive Officer ("CEO") and Chairman of the Board; Donald E. Foley, Cecala's successor as CEO and Chairman; Robert Harra, President and Chief Operating Officer ("COO"); David Gibson, Chief Financial Officer ("CFO"); and Bill North, Chief Credit Officer.

[2] All "¶" citations refer to paragraphs in the Third Amended Consolidated Securities Class Action Complaint (the "TAC"), D.I. 120. All emphasis is added unless otherwise stated.

In sum, the Bank's underwriting was "nonexistent," its appraisals were "horribly inflated," and its credit review existed "in name only" with "no real standards." ¶¶45-46, 61, 77.

Wilmington's reckless lending practices are exemplified by the Bank's relationship with Michael Zimmerman, a significant Delaware developer and one of the Bank's most important borrowers, whose $90 million in loans constituted almost 6% of the Bank's construction loan portfolio and were personally managed by the head of Wilmington's commercial real estate division. ¶92-93. Despite Zimmerman's significance to Wilmington's financial health, the Bank repeatedly extended him loans based on informal requests without documentation, verification of his representations, or even confirmation that he was actually developing properties (which he was not). ¶¶93, 96-97, 99. For example, Zimmerman was able to obtain $1 million from the Bank simply by faxing a request to "send $$1,000,000 ASAP I have to pay my bar tab." ¶¶7, 93. The Bank also extended Zimmerman $22 million even after it knew he was having deep financial problems and "significant difficulties in making payments." ¶111.

The deficiencies that existed in the Bank's lending practices, including in the Zimmerman loans, were well known to the Officer Defendants. For instance, in 2009, after the Bank failed to address numerous repeated warnings from its auditor KPMG LLP and its regulator the Federal Reserve regarding the Bank's inability to adequately assess the credit risk in its loan portfolio, the Federal Reserve forced Wilmington to enter into a Memorandum of Understanding (the "MOU"), requiring Wilmington to entirely restructure the way it originated, monitored, and accounted for its loans. ¶¶48, 66-67.

Following the imposition of the MOU, the Bank initiated its own "comprehensive" review into its lending practices in Delaware, which included more than 50% of the Bank's commercial loan portfolio. ¶89. This review, known as the Delaware Commercial Real Estate

Division Project Status Review (the "Delaware Status Review" or "Review"), entailed a thorough evaluation of the Bank's underwriting and asset review practices. ¶89. As detailed in sworn affidavits filed by the Federal Bureau of Investigation in connection with the federal government's ongoing investigation into Wilmington's relationships with its borrowers (the "FBI Affidavits"), the Review revealed "serious concerns with the past management of the Delaware Commercial Real Estate Division and with its loan portfolio." ¶¶88-91. Those "serious concerns," formally documented in the Delaware Commercial Real Estate Division Concern Memorandum (the "Delaware Review Memorandum" or "Memorandum"), included: (i) the "unethical use of loan approval authority by relationship managers"; (ii) the Bank's "limited oversight of relationship managers"; and (iii) "a limited technical knowledge of commercial real estate lending" on the part of Wilmington's lenders. ¶91. The Delaware Review Memorandum also documented numerous specific examples of these gross deficiencies and "questionable activities" in the Bank's underwriting and asset review practices, leading to the conclusion that the Bank "approved numerous loans that [it] never should have approved." ¶¶91, 94.

While the Officer Defendants were aware of the Bank's true lending practices and their harmful impact on the Bank's financial condition, they did not reveal the full truth until November 1, 2010, the last day of the Class Period. On that day, investors learned that the Bank had suffered a third quarter 2010 loss of $365 million – 90 times greater than the $4 million loss the Bank had reported for all of 2009. ¶¶10, 151. Investors also learned that the Bank's loan portfolio included nearly $800 million more in credit losses than previously disclosed, and that nearly 20% of the Bank's loan portfolio – including 40% of its construction loan portfolio – was worthless and had to be written off. ¶¶155-57. Due to the catastrophic state of its loan portfolio, the Bank could no longer survive as an independent entity and had to be sold to M&T

Bank at a fire sale price of $3.84 per share – just half the Bank's then-market price. ¶¶150, 157.

Despite these detailed allegations, Defendants ask this Court to conclude as a matter of law that the TAC fails to state a claim against any Defendant. To start, Defendants argue that the TAC fails to allege any actionable statements, in part because their assurances to investors that the Bank's underwriting and asset review were strict and conservative constitute "mere puffery," and are therefore immaterial. This is contrary to well-established law in the Third Circuit and nationwide, which makes clear that representations regarding a bank's loan underwriting and asset review are not only material, but are "among the most important information looked to by investors." *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1150-52, 1154-55 (S.D. Cal. 2008); *see also Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281-82 (3d Cir. 1992). These statements reassured investors that they did not have to worry about the Bank weathering the financial crisis precisely because of its "rigorous" and "regular" risk mitigation practices.

Recognizing the fallacy of this argument, Defendants also contend that the TAC fails to allege any facts demonstrating the falsity of Defendants' underwriting and asset review statements. Defendants are again wrong. For example, Defendants argue that the FBI Affidavits do not demonstrate falsity because they document a "single instance" of "fraud" perpetrated against the Bank by "a single client." This is nonsense. Zimmerman was one of the Bank's most significant borrowers in its most important market. It is black-letter law that a defendant may be charged with knowledge of such a critical relationship. *Inst'l Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 268-69 (3d Cir. 2009). Moreover, the FBI Affidavits make clear that rather than being deceived by Zimmerman, the Bank repeatedly handed him millions of dollars knowing that they lacked any "supporting documentation" for loans related to projects that he failed to develop.

¶¶103, 107-09. Defendants also ignore that the FBI Affidavits go beyond the Zimmerman relationship to detail Wilmington's own findings of "serious concerns" with lending practices in general. Those findings are corroborated by former high-level Bank employees. ¶ 282.

The Officer Defendants also argue that Plaintiffs' allegations do not establish a strong inference of scienter. That argument would require the Court to conclude that Wilmington's most senior executives were not aware of the Delaware Status Review or Memorandum, which was ordered by "senior management" to examine problems in the Bank's core market and conducted by a senior credit officer. ¶¶90-91. The Court would also need to conclude that the repeated warnings these Officer Defendants received from the Federal Reserve, KPMG, and others about the Bank's inability to assess credit risk were not "severe" enough to put them on notice that the Bank's asset review was deficient. ¶¶66-67. These arguments defy credulity.

Finally, Defendants argue that their efforts to "examine and adapt" the Bank's business practices in 2009, including conducting the Delaware Status Review and incrementally increasing the Reserve, preclude a finding of scienter. But the fact that the Officer Defendants took limited remedial steps under duress from the Federal Reserve, while continuing to conceal the deficiencies that triggered the Federal Reserve's scrutiny, does not exonerate them. This is particularly true here, where the changes to the Reserve were insufficient to address the problems in the Bank's portfolio, but the Officer Defendants assured investors that the Reserve adjustments were only necessary because the Bank was being "cautious" in response to economic developments rather than remedial measures to account for deficient lending practices. ¶¶95, 129, 132. The TAC explains in specific detail that the massive losses in the portfolio resulted from the Officer Defendants' interference with the Bank's underwriting and asset review, not from economic conditions in Delaware. Accordingly, it was the Officer Defendants'

conduct that ultimately led to the Bank's demise as an independent entity.

## II. FACTUAL BACKGROUND

The Officer Defendants materially misrepresented the true state of the Bank's commercial lending, which constituted 70% of the Bank's total loans and 80% of the Bank's total assets. ¶23. The Bank engaged in systemic misconduct at the critical phases of its lending process, from origination of loans to the subsequent review and accounting for its loan portfolio.

### A. Wilmington's Underwriting Was "Nonexistent"

Loan underwriting refers to the due diligence that banks perform to verify a borrower's creditworthiness prior to extending a loan. ¶45. Throughout the Class Period, Wilmington and the Officer Defendants repeatedly represented that they "mitigate[d] credit risk" through the use of "rigorous" underwriting standards. ¶¶169-70. In truth, the Officer Defendants instituted policies and practices to increase loan volume and meet internal growth goals at the expense of credit quality. ¶51. Indeed, the Bank operated on a "friends and family plan," often granting loans without scrutiny to favored clients solely on the basis that the borrower would be a "good referral" for the Bank's wealth advisory division. ¶52. As a result, the Bank's loan origination practices were so "lax" that its underwriting was effectively "nonexistent." ¶45.

For example, in an effort to generate new loans and drive revenues, lenders frequently ignored the most basic aspects of underwriting, and originated loans without any documentation of borrowers' ability to repay. ¶46. Former employees report that the Bank was "woefully deficient on loan documentation," and that it was common to have not a "scrap" of underwriting documentation in loan files. ¶¶48, 50. Remarkably, Cecala himself instructed Wilmington's top lenders (including Terranova) "not to keep files" on the numerous loans they originated, causing their loan files – to the extent they existed at all – to be riddled with errors and exceptions, and resulting in a large percentage of the Bank's portfolio being originated without proper

documentation. ¶49. Similarly, Defendant North ordered employees to alter internal reports of underwriting deficiencies, which detailed problems – including both missing documentation and violations of underwriting guidelines – that needed to be remedied. As a result, it appeared that underwriting deficiencies had been corrected and files were complete when, in reality, they were not. ¶46. The documentation deficiencies also included many occasions when a loan's promissory note was signed and dated before the loan was actually approved, meaning that the Bank was obligated to fund the loan even though the loan had not received underwriting approval. ¶47. Wilmington's Sarbanes-Oxley Act ("SOX") compliance team internally identified that practice as a violation of the Bank's SOX obligations. *Id*. In sum, the vast majority of the Bank's loans were originated without documentation, and the few loan files that did exist were fraught with errors and exceptions.

The Officer Defendants also made the Bank's underwriters subordinate to lenders – the very people whose work they should have been examining. As a result, the lenders essentially controlled underwriting. ¶53. According to witnesses, "whatever the lenders said, [the underwriters] did." *Id*. This structure was particularly risky because the lenders were incentivized to close loans and the Bank's policies did not provide for any subsequent review of loans less than $5 million, essentially giving lenders sole discretion over half the Bank's loan portfolio. ¶¶53, 55.

Further, the Bank's "10% Rule" gave lenders unilateral authority to extend millions of dollars in additional credit to borrowers without further credit review, resulting in loans that far exceeded the Bank's purported underwriting limits. ¶56. "[A]lmost every loan" seen by the Bank's Workout group (which worked with troubled borrowers) had one or more 10% Rule loans attached – a practice that a former Bank Vice President with twenty years' banking

experience said "any normal bank wouldn't allow." ¶57. Wilmington's underwriting deficiencies were so severe that the Federal Reserve became concerned about the "future ability of the bank to survive, based on what they saw in the credit underwriting." ¶45.

### B. Wilmington Ignored The Risks In Its Loan Portfolio

The Bank repeatedly stated that it "mitigate[d] credit risk" by "monitor[ing] the [loan] portfolio to identify potential problems" and "regularly review[ing]" loans (¶173), meaning that it ensured that customers remained creditworthy and the Reserve was adequate. Wilmington also represented that its loan "risk ratings" – supposedly used to assess likely losses – were applied "consistently" and had "helped us develop adequate reserves for loan losses over the years." ¶175. In reality, however, the Officer Defendants undermined the Bank's asset review, causing "credit review [to be] in name only" and not performed by credit specialists. ¶¶59, 171.

Wilmington failed to monitor the vast majority of its loans for potential losses. As the Bank's Credit Risk Division Head explained, the Bank failed to review 85-90% of its portfolio annually, with loans less than $15 million – *i.e.*, the overwhelming majority of the portfolio – receiving essentially no review. ¶¶2, 59, 62, 188, 291. Further, until mid-way through the Class Period, the Bank had "no real standards" for how often loans were reviewed, and problems were identified through random samplings or "review by exception." ¶61.

The Officer Defendants also undermined the ARG by refusing to provide it with necessary staff and resources to perform standard credit review practices. ¶61. Indeed, rather than relying on credit specialists in the ARG, the Bank relied almost exclusively on its lenders to monitor its portfolio. ¶60. But those lenders, who had been incentivized to originate the problem loans in the first place, were also financially penalized for reporting probable loan risk rating downgrades. ¶63. As a result, those ratings – even though they were critical to the Bank's evaluation of credit risk and loan loss reserving – were manipulated and "generally inaccurate."

¶¶59, 72. These inaccurate risk ratings led the Bank to consistently report inflated credit quality, understate probable credit losses, and under-reserve for those losses. *E.g.*, ¶¶117-21.

The Bank's loan risk ratings became increasingly inaccurate throughout the Class Period. Beginning in the third quarter of 2008, the Officer Defendants "interjected themselves physically" into ARG meetings to veto loan risk rating downgrades for even the most delinquent loans, basing those vetoes on personal relationships rather than any risk management-based justifications, reasoning that "these are good guys." ¶¶70-71. When the Bank, under pressure from regulators, brought in third-party consultant Treliant Risk Advisors ("Treliant") to update Wilmington's risk ratings in May 2010, Treliant's ratings revealed much higher risk. ¶73. The Bank conceded the inaccuracy of its previous ratings by accepting Treliant's new ratings. ¶139.

The Officer Defendants also sabotaged the ARG function by refusing to update appraisals – a critical aspect of loan review and risk ratings. ¶76. Incredibly, Cecala directly ordered the Workout group to refrain from obtaining updated appraisals to avoid recognizing charge-offs. As the Senior Vice President of Corporate Marketing and Communications later admitted, going back to the borrower to ask for "more recent appraisals" was not the Bank's "preferred way of doing things." ¶76. Further, even the appraisals that Wilmington had did not accurately measure underlying collateral, as they reflected theoretical property improvements that were contemplated but did not actually exist – rather than standard "at present market value" appraisals. ¶78. These serious problems rendered any credit review conducted effectively "worthless," as appraisals were "almost always outdated," and problems with appraisals were a "wide-spread phenomenon." ¶¶77, 192. According to Bank executives and media reports, when Wilmington did belatedly update appraisals, it triggered enormous write-downs. ¶81.

The Officer Defendants received specific warnings that asset review was inadequate. As

part of its 2007 audit, KPMG issued a Management Letter warning that the Bank's failure to monitor its loan portfolio was a serious control deficiency. ¶66. Similarly, the Bank's Internal Audit group issued a report in late 2007 warning that asset review was inadequate to assess the Bank's risk of loss. ¶65. In 2007, the Federal Reserve also warned that the ARG's staffing and loan review was inadequate to provide a reasonable assessment of portfolio risk and constituted a "weakness[] in the [Bank's] control structure." ¶67. The Bank and the Officer Defendants ignored these serious warnings, leading KPMG and the Federal Reserve to warn the Bank again about its inability to assess the risk in its portfolio in 2008. ¶¶66-67.

### C. The Federal Reserve Identified Fundamental Flaws In The Bank's Lending And Accounting Functions And Imposed The MOU

In September 2009, the Federal Reserve forced the Bank into the MOU to address these longstanding deficiencies. ¶83. The MOU confirmed the fundamental, systemic failings in Wilmington's core lending functions, and required extensive changes to bring these functions up to even basic standards. ¶¶84-85. The MOU also made clear that the Bank's process for establishing its reserves was materially deficient, and required that Wilmington maintain an adequate Reserve consistent with GAAP and regulatory policies and guidance, and the Board review the Reserve each quarter. ¶87. The MOU further required the Bank to reorganize and create coherent policies and processes to govern its credit risk management. ¶86.

In the summer of 2010, the Federal Reserve took over the Bank's credit operations. Regulators focused heavily on the Bank's outdated appraisals – about which they had previously expressed concerns – and had Treliant perform new ones. As *The Wall Street Journal* reported, after the Federal Reserve "discovered that the [Bank] wasn't writing down the value of loans made to borrowers whose real-estate projects had stumbled," it demanded new appraisals, which "devastated the bank's balance sheet, forcing it into the fire sale to M&T Bank Corp." ¶81.

**D. <u>The FBI Affidavits Confirm Wilmington's Reckless Underwriting And Asset Review Practices During The Class Period</u>**

As set forth above, the federal government's ongoing investigation into Wilmington's lending relationships has yielded additional evidence regarding the Bank's deficient underwriting and asset review. The FBI investigation revealed that, in late 2009, the Bank ordered a "comprehensive" investigation of its lending practices in its primary Delaware market, referred to as the "Delaware Status Review." ¶¶89-90. The results of the Review were documented in the March 12, 2010 Delaware Review Memorandum, drafted by senior credit officer Terry Brewer (North's successor as Chief Credit Officer), who was specifically tasked by senior management to review "the mess in Delaware." ¶¶89-91. This Memorandum described "<u>serious concerns with the past management of the Delaware Commercial Real Estate Division and with its loan portfolio</u>," including: (i) the "unethical use of loan approval authority by relationship managers"; (ii) the Bank's "limited oversight of relationship managers"; and (iii) "a limited technical knowledge of commercial real estate lending." ¶¶89, 91. It also documented additional "questionable activities" in the Bank's lending practices, including the "lack of validation of construction budgets prior to loan closings" and the "<u>frequent</u> use of loan proceeds to provide cash to borrowers or fund partner buyouts prior to construction completion or the property having reached operating stabilization." ¶91.

The Memorandum cited the Bank's relationship with prominent Delaware developer Zimmerman as a prime example of the Bank's reckless practices. ¶92. With loans totaling nearly 6% of the Bank's construction loan portfolio, Zimmerman was one of the Bank's most important borrowers and, as such, his loans were handled by Terranova, the Bank's head of commercial lending and one of, if not, the Bank's most important lenders. ¶93. The FBI Affidavits detail Wilmington's long-standing relationship with Zimmerman, describing the

Bank's reckless practices through all critical phases of the lending process, including underwriting and ongoing loan credit reviews. ¶¶92-112. As the FBI Affidavits describe, many of the Zimmerman loans were "poorly managed [and] had weak administrative controls." ¶93.

Wilmington's loans to Zimmerman to develop the Salt Pond Plaza in Ocean View, Delaware, are striking examples of the Bank's critical underwriting, credit review, and oversight failures. In December 2006, the Loan Committee approved a $10 million loan to Zimmerman to develop a commercial center. ¶97. Shortly thereafter, in January 2007, Terranova unilaterally altered the terms of the loan agreement. *Id*. Specifically, the Loan Committee approved a loan term whereby Zimmerman would receive a $1 million equity payout once tenants at the site began paying rent (*i.e.*, the site produced income). ¶98. Just two weeks later, however, the loan agreement was changed to provide for a $2 million equity payout – a 100% increase – once Zimmerman obtained signed leases, not when tenants actually began to pay rent. *Id*. Tellingly, former employees explain that it was a "prevalent" and improper practice for lenders to unilaterally change loan terms set by the Loan Committee without further credit review. ¶99.

Shockingly, Wilmington paid out $2 million in equity to Zimmerman even though he failed to meet even the altered terms of his loan agreement. In an email openly maintained in Wilmington's loan files, Terranova authorized a $1 million payment to Zimmerman, although Zimmerman had not obtained any signed leases. Specifically, Terranova wrote that "not wanting my reputation for reckless abandon to be in jeopardy, I guess we can fund the $1,000,000." ¶100. By January 2008, although Zimmerman still did not have the requisite leases or rent-paying tenants, Wilmington wired Zimmerman an additional $1 million equity payout, based only on his faxed demand to Terranova to "Send $$1,000,000 ASAP I have to pay my bar tab." ¶101. By May 2009, not only had Zimmerman failed to secure rent-paying tenants, but he had

exhausted the entire $10 million loan having constructed only a "partially completed parking lot." ¶103. Despite that utter lack of progress, and despite knowing by then that Zimmerman was having "significant difficulties in making payments" on his loans, the Bank extended him an additional $2 million to cover "cost overruns." ¶¶103, 111. There is no evidence that anybody at Wilmington ever asked how Zimmerman had ostensibly spent $10 million to "partially complete" a parking lot, or why he needed an additional $2 million when that was his estimate for the entire project. ¶103. These allegations show Zimmerman did not dupe the Bank, which facilitated his loans in keeping with their "friends and family" philosophy.

The FBI Affidavits detail other instances where the Bank loaned Zimmerman huge sums of money even though Zimmerman failed to complete any "significant construction." ¶104. Indeed, Wilmington continued to loan Zimmerman money throughout the Class Period despite these and other similarly evident discrepancies. For instance, the Bank repeatedly allowed Zimmerman to draw on his loans to cover purported construction expenses without requiring "a scrap of backup." ¶¶105-07. Even in the few cases where Zimmerman actually did provide documents to support loan requests, he used the same invoices over and over, and simply pocketed the money rather than use it for legitimate business expenses. ¶110. A Wilmington employee told the FBI that, at the time, Zimmerman's draw requests "never made any sense because the related work was never completed." ¶106.

Remarkably, after the Bank internally identified Zimmerman's "significant difficulties" in 2008, Wilmington continued to extend him over $22 million in additional loans. ¶¶94, 111. Ultimately, the Zimmerman loans caused financial harm to the Bank. By November 2010, the Bank had placed his entire portfolio for sale at a huge discount, and the Bank eventually wrote off nearly half of its loans to Zimmerman, costing the bank over $43 million – 10 times the $4

million loss the Bank recorded for all of 2009. ¶112.

### E. The Bank Inflated Its Net Income Throughout The Class Period

By deliberately understating probable credit losses and refusing to acknowledge the deteriorating credit quality of its loan portfolio, the Bank inflated its net income for every quarter of the Class Period and avoided reporting the true extent of its credit losses. Generally Accepted Accounting Principles ("GAAP") required Wilmington to fund its Reserve for loans that were unlikely to be repaid in full, taking into account current credit quality trends. ¶¶214-20. The Bank represented that it accounted for its Reserve in accordance with GAAP and that it was "adequate" to address any losses in the Bank's loan portfolio. ¶¶115, 184. Wilmington's quarterly loan loss provision decreased its quarterly net income on a dollar-for-dollar basis. ¶114. Although the Bank incrementally increased provisions, those increases were inadequate and failed to account for the Bank's true lending and accounting practices. Indeed, the Officer Defendants' refusal to acknowledge the Bank's deteriorating credit caused GAAP violations, resulting in a massive understatement of the Loan Loss Reserve and a corresponding overstatement of net income by hundreds of millions of dollars. ¶¶113-22.

When M&T performed due diligence on the Bank in late 2010, its extensive analysis revealed that, even with the Bank's belated increases to its Reserve starting in 2010 – including a $280 million increase on the last day of the Class Period – the Bank still had $500 million of additional losses inherent in its portfolio. ¶125. Significantly, M&T acknowledged that these losses were not caused by a sudden recent downturn in the economy. ¶158. To the contrary, M&T's analysis was based on reviewing Wilmington's loan portfolio and calculating probable lifetime losses as of January 1, 2008. ¶¶126, 158. M&T's findings alone demonstrate that Wilmington manipulated its reported reserves and overstated its net income.

Senior employees' reports corroborate M&T's conclusions and explain how the Bank's

reserving methodology violated GAAP and understated probable losses. ¶¶116, 118, 120-22. Specifically, former executives, including CW 2, who was responsible for calculating and recommending the Loan Loss Reserve to Cecala and Gibson, explained that the Reserve relied entirely on the Bank's "generally inaccurate" risk ratings until late 2008 – not taking into account the factors required by GAAP, including economic trends and borrowers' current and projected ability to pay. ¶116. Thus, the Bank's methodology was "not compliant" with GAAP (¶118) and did not adequately reflect the losses that the Bank had incurred. ¶181.

In late 2008, the Bank adjusted its reserving methodology to include, in addition to its risk ratings, a small "qualitative" factor. ¶¶119, 182. This new method still violated GAAP, as it was largely based on the Bank's manipulated loan risk ratings and loan loss history, which was too unreliable to serve as an adequate basis for calculating reserves. ¶¶120-22. As CW 1 and CW 2 explained, the Bank's loan loss history was artificially positive because the Officer Defendants refused to recognize charge-offs on delinquent loans. ¶121. Moreover, because this new methodology was based on the improper assumption that "qualitative" factors should not exceed a certain arbitrary small percentage of the Bank's overall reserves, the Bank failed adequately to consider the deteriorating state of the economy. ¶122.

### F. The MOU Forced The Bank To Reveal Gradually The True Condition Of Its Loan Portfolio, But Defendants Continued To Mislead Investors

The implementation of the MOU forced Wilmington to start reporting dramatic credit losses, beginning in January 2010 with an $11.2 million loss for the fourth quarter of 2009, driven by a 114% increase in the Bank's loan loss provision from the prior quarter. ¶130. The Bank reiterated its false statements regarding, among other things, underwriting and asset review, and failed to disclose that these losses were the result of the Bank's own reckless practices. ¶¶129, 132, 169-70. That same day, Wilmington raised $273.9 million through an

issuance of 18,875,000 shares of common stock at $14.51 per share (the "February 2010 Offering").[3] ¶267.

The Bank's piecemeal revelations continued with the release of its first quarter 2010 results on April 23, 2010, reporting a loss of nearly $30 million. ¶131. Even as these growing losses began to reveal the Bank's true financial condition, Wilmington continued to conceal the extent of its problems, and the Officer Defendants denied that the increases were the result of the Bank's own lending practices. ¶129. Instead, they reassured investors that the reserve increases were due only to market conditions and that the Bank was just "being cautious." ¶¶129, 132.

Then, on June 3, 2010, the Bank stunned the market by announcing that Bank veteran Cecala was immediately resigning and Foley, a Board member with no banking experience, would take over as CEO. ¶134. Cecala assured investors that his departure did not indicate "a mounting capital problem or credit problem that hadn't been reported," and Foley claimed that there would be no "surprises this year where credit – there is a blowup somehow." ¶¶135-36.

Three weeks later, Wilmington reversed course, informing analysts that the Bank's credit position was much worse than previously disclosed. On June 22, 2010, Foley, Gibson, and North informed analysts that the Bank expected to report "deteriorating credit metrics." ¶139. These analysts reported that "[m]anagement admitted to not being as proactive as they needed to be in the past in dealing with the bank's credit challenges." ¶140.

One month later, on July 23, 2010, Wilmington reported its second quarter results, which made clear that Foley and Cecala had misled investors when they said there were no "mounting credit problems." Those results included a stunning 165% increase in the Bank's loan loss

[3] Plaintiffs' strict liability and negligence-based Securities Act claims arise in connection with the February 2010 Offering. The Securities Act Defendants are KPMG, the Underwriter Defendants, the Bank, its Officers, and the Bank's Directors.

provision (to $205.2 million), and a 25% increase in its reserves (to $373.8 million). ¶143. Nevertheless, Foley again denied risk management problems and instead blamed the weakening Delaware economy. ¶144.

Then, on November 1, 2010, Wilmington shocked investors by announcing it had agreed to sell itself to M&T for just 50% of the price at which Wilmington stock was trading the prior day. ¶150. That same day, the Bank released its third quarter 2010 results, reporting a quarterly loss of $365.3 million and a Loan Loss Reserve of $510.4 million. ¶151. M&T estimated that the Bank's loan portfolio contained over $500 million in still-undisclosed losses, and 40% of the Bank's entire portfolio of construction loans was worthless and would have to be written off. ¶204. The Bank did not dispute M&T's conclusions. ¶158. Remarkably, investors learned of nearly $800 million in previously undisclosed losses in a single day, which exceeded the Bank's collective reported net income since 2002. ¶157. As Wilmington later disclosed, the Bank was forced to accept this deal or face "significant regulatory action." ¶162.

In total, from January 2010 to November 1, 2010, Wilmington's share price declined over 70%, from $15.26 to just $4.21 per share. ¶161.

## III. THE THIRD AMENDED COMPLAINT FULLY COMPLIES WITH THE COURT'S ORDER OF MARCH 29, 2012

On March 29, 2012, this Court dismissed Plaintiffs' First Consolidated Class Action Complaint (the "FAC") without prejudice, because it did not sufficiently identify Defendants' false and misleading statements on which Plaintiffs base their claims, and did not adequately explain why those statements were false and misleading. *See* D.I. 85 at 18-23 (the "Order").

Plaintiffs have fully complied with the Order. To start, Plaintiffs streamlined and clarified the allegations regarding Defendants' false statements to focus on the most pertinent misrepresentations. The TAC clearly identifies Defendants' false and misleading statements,

the speaker of each particular statement, and the context in which each statement was made. Plaintiffs supplement those allegations by providing the relevant source documents as exhibits to the TAC for the Court's review. *See* Order at 18-20; TAC §§ V & XII(B) - (E) & Declaration of Hannah Ross (D.I. 89). The TAC organizes the alleged misstatements into the following categories: financial results (¶¶178-84), loan underwriting (¶¶168-71), asset review (¶¶172-77), internal controls (¶¶185-86), statements regarding loan underwriting and asset review made by the Officer Defendants during conference calls with investors (¶¶187-94), and statements made in 2010 to conceal the true reasons for the Bank's increased reserves (¶¶195-198). *See* Order at 18 & n.8 (citing *The Winer Family Trust v. Queen*, 2004 WL 2203709, at *6 n.7 (E.D. Pa. Sept. 27, 2004) (citing with approval organization of false and misleading statements by category)). In addition, the TAC specifically identifies the reasons each statement was false and misleading. *See* ¶¶178-84 (financial results); ¶¶168-71 (underwriting); ¶¶172-77 (asset review); and ¶185-86 (internal controls). Accordingly, the TAC now sufficiently identifies the statements on which Plaintiffs base their claims and the reasons each statement is actionable under the Exchange Act and/or the Securities Act. *See* Order at 19.

Defendants do not dispute that the TAC adequately identifies each false statement, its speaker(s), and the context for each statement. Instead, Defendants argue that the TAC does not adequately allege the falsity of each statement because it provides a "laundry list" of non-specific reasons why the statements were false or misleading. *See* WT Br. 17-18. Defendants are wrong. Plaintiffs' explanations of falsity are specific and tailored to each statement at issue, and are based on the extensive factual allegations set forth in the TAC. The multiple reasons that a given statement is false reflect the broad scope and complex nature of Defendants' fraud. Referring to those reasons as a "laundry list" does not undermine the strength of Plaintiffs' allegations; to the

contrary, the numerous reasons further support Plaintiffs' claims. For example, Defendants claim that the TAC provides only "catch-all" allegations to explain why Defendants' statements concerning the Bank's post-third quarter 2008 loan loss methodology were false and misleading (*see id.* at 18 (citing ¶183). But, the TAC actually identifies four specific ways in which the Bank failed to comply with GAAP at that time. ¶183.

In addition to the changes made to comply with the Court's Order, Plaintiffs added numerous contemporaneous facts to bolster their claims against Defendants. Specifically, Plaintiffs added detailed facts newly gathered through their own investigation, as well as detailed information revealed in sworn FBI Affidavits that were made public only after the filing of the FAC. Those facts further strengthen and clarify the allegations in the TAC.

## IV. PLAINTIFFS ADEQUATELY ALLEGE EXCHANGE ACT VIOLATIONS

### A. The TAC Meets The Standards Of The PSLRA And Rule 9(b)

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006). The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]" 15 U.S.C. § 78u-4(b)(1). Federal Rule of Civil Procedure 9(b)'s particularity requirement does not call for an "exhaustive cataloging of facts," but only allegations that "provide assurance that plaintiff has investigated the alleged fraud and reasonably believes that a wrong has occurred." *Medtronic Ave, Inc. v. Boston Scientific Corp.*, 2001 WL 652016, at *2 (D. Del. Mar. 30, 2001) (Robinson, J.) (internal citations omitted). Particularity rules are "relaxed in situations where the factual information is peculiarly within a defendant's knowledge or control." *In re Veritas Software Corp. Sec. Litig.*, 2006 WL 1431209, at *6 (D. Del. May 23,

2006) (Robinson, J.) (*citing In re Burlington Coat Factory*, 114 F.3d 1410, 1418 (3d Cir. 1997)).

In the Third Circuit, a complaint may rely upon unnamed witnesses so long as the witnesses are described with sufficient particularity. Courts evaluate the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Avaya*, 564 F.3d at 263 (citing *Cal. Emp. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004)). The TAC's confidential witnesses – many of whom were high-level, long-standing Bank employees who worked directly for the Officer Defendants – are each described by position, responsibilities, tenure and reporting structure (*see* ¶¶45-46, 48, 50-52, 61, 71, 74, 207), and provide accounts that, while sufficient on their own, are corroborated by the statements of other witnesses, the Bank's findings, the FBI Affidavits, and actions of the Federal Reserve. These "consistent accounts reinforce one another and undermine any argument that the complaint relies unduly on the stories of just one or two former employees." *In re Cabletron Sys. Inc.*, 311 F.3d 11, 30 (1st Cir. 2002).[4]

**B. Plaintiffs Allege Materially False And Misleading Statements And Omissions**

Under the PSLRA, a complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Chubb*, 394 F.3d at 147. Here,

---

[4] Defendants' challenges to the TAC's confidential witnesses should be rejected. While they suggest that to be relied upon a witness must set forth the exact date, time, and location where a defendant actually admits to fraud, that is not the law. *See Avaya*, 564 F.3d at 263. Defendants' cases are not to the contrary. In *Chubb*, the complaint cited to former employees who worked for separate businesses or not for Chubb at all, without suggesting how these employees had access to information. 394 F.3d at 154-155. In *In re HealthSouth Corp. Sec. Litig.*, 2000 WL 34211319, at *22, *33 (N.D. Ala. Dec. 13, 2000), plaintiffs said only that their allegations were based on the investigation of counsel that included, *inter alia*, discussions with "percipient witnesses" with "no supporting details." Defendants' remaining authorities involved allegations far less detailed than here, including without dates of employment, corroborating allegations, or any connection to defendants. *See* WT Br. 15-16. Finally, although Wilmington claims the TAC does not adequately link its allegations to its sources (WT Br. 15-16), a cursory review of the TAC demonstrates that this is untrue. *See, e.g.*, ¶¶45-57, 61-64, 283-85.

the TAC adequately alleges Defendants' false and misleading statements and omissions.[5]

**1. <u>False And Misleading Statements About Loan Underwriting</u>**

Throughout the Class Period, Wilmington and the Officer Defendants represented that the Bank "mitigate[d] credit risk" through the use of "rigorous loan underwriting standards" that the Bank "consistently" applied, thereby giving the Bank confidence in the "integrity" of its commercial construction loan portfolio. ¶¶169-70, 280-81. Those statements were false. *See* ¶¶45-57, 89-112, 168-71, 282-86. In reality, the Bank's underwriting practices were so lax and inconsistent that underwriting was effectively "nonexistent," leading the Federal Reserve to impose the MOU in 2009 and express concerns in 2010 about the "<u>future ability of the bank to survive, based on . . . [its] credit underwriting</u>." ¶¶45, 196, 284. In its 2009 Review, the Bank itself identified widespread "serious concerns" with the underwriting and loan portfolio in Delaware, including the "unethical use of loan approval authority" and "limited technical knowledge of commercial real estate lending." ¶¶89-91, 171, 282. Detailed accounts of former high-level Bank employees confirm that these deficient practices existed throughout the Class Period and, as set forth in the FBI Affidavits, were exemplified by the Zimmerman loans. *See, e.g.*, ¶¶53, 88-112, 171, 283 (underwriting controlled by incentivized lenders); ¶¶43, 45-50, 171, 284 (loan documentation "woefully deficient" or "nonexistent"); ¶¶50-52, 171, 188, 283, 285 (underwriting disregarded for relationships); ¶¶56-57, 171, 188, 285 (abuse of 10% Rule). The Bank's underwriting practices were the opposite of "rigorous" and "consistent."

In response, Defendants argue that their statements are not actionable. This is wrong. Courts consistently hold that false and misleading statements about underwriting, like those at

[5] For the convenience of the Court, Plaintiffs address in this section the false statements that are alleged in both the Securities Act and the Exchange Act counts. False statements that are alleged only in the Securities Act counts are discussed *infra* at V.A.

issue here, are actionable. *See, e.g.*, *Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*, 2013 WL 1431680, at *7 (D.N.J. Apr. 9, 2013) (sustaining claim based on allegation that "high percentage" of loans in pools "did not comply with the underwriting standards disclosed"); *In re Wash. Mut. Inc. Sec. Litig.*, 694 F. Supp. 2d 1192, 1208, 1211 (W.D. Wash. 2009) (alleged departures from underwriting guidelines rendered defendants' claims to be "disciplined and vigilant in [their] underwriting standards" actionable).[6] As the Third Circuit explained in *Shapiro v. UJB Financial Corp.*, 964 F. 2d 272, 282 (3d Cir. 1992):

> [I]f a defendant represents that its lending practices are "conservative" and that its collateralization is "adequate," the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations. . . . by addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.

**a. Defendants' Underwriting Statements Were Material**

Defendants ask this Court to conclude as a matter of law at the pleading stage that their underwriting statements are immaterial puffery. *See* WT Br. 19-23; UW Br. 11-12. However, courts recognize that positive statements about a bank's underwriting, like those here, are "among the most important information looked to by investors." *Accredited*, 556 F. Supp. 2d at 1154-55; *see also In re RAIT Fin. Trust Sec. Litig.*, 2008 WL 5378164, at *5-6 n.12 (E.D. Pa. Dec. 22, 2008) (statements regarding "disciplined underwriting process and recurring credit analysis" not puffery); *In re Ambac Fin. Grp. Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 270-71 (S.D.N.Y. 2010) (statements describing underwriting standards are "critical to investors"); *In re PMA Capital Corp. Sec. Litig.*, 2005 WL 1806503, at *17 (E.D. Pa. July 27, 2005) (statements regarding "disciplined underwriting" not puffery); *Countrywide*, 554 F. Supp. 2d at 1058;

[6] *See also In re New Century*, 588 F. Supp. 2d 1206, 1215 (C.D. Cal. 2008) (allegations of loosening underwriting standards rendered statements about "strict," "improving," and "strong" underwriting standards false); *Countrywide*, 588 F. Supp. 2d at 1153 (same).

*WaMu*, 694 F. Supp. 2d at 1192, 1211. This is particularly true in light of the financial crisis. *Local 731 I.B. of T. v. Swanson*, 2011 WL 2444675, at *10-11 (D. Del. Jun. 14, 2011) (false statements material in context of industry decline). The Bank reassured investors that it would survive the crisis precisely because of its "rigorous" and "consistent" underwriting, in a way that other banks, with ostensibly less rigorous underwriting (like Washington Mutual) would not.

The Bank highlighted these statements by placing them in a separate section of its SEC Filings and Annual Reports entitled "Credit Risk." *See, e.g.*, 2008 10-K at 44; 2009, 2010 10-K at 50; ¶169. That section in the Wilmington's 2008 Form 10-K, for example, emphasized the Bank's underwriting and asset review practices as principal risk mitigation tools, stating:

> **One of our primary risks is credit risk (the risk that borrowers will be unable to repay their loans).** To mitigate this risk, we:
>
> - Employ rigorous loan underwriting standards and apply them consistently.
> - Monitor the portfolio to identify potential problems and to avoid disproportionately high concentrations in any single industry sector or anyone borrower.
> - Regularly review all past-due loans, loans not being repaid according to contractual terms, and loans we doubt will be paid on a timely basis.

(Emphasis in original.) Having highlighted that description of the Bank's underwriting practices, Defendants cannot now claim that no reasonable investor would have relied on those statements.

Given that the Bank itself had "serious concerns" with its underwriting practices, there is no question that such deficiencies would have been material to investors. *See In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 369 (3d Cir. 1993) ("materiality is a relative concept, so . . . a court must appraise a misrepresentation or omission in the complete context in which the author conveys it."). In any event, materiality determinations are fact-intensive and should be resolved at this stage only when "reasonable minds cannot differ on the question of materiality." *Shapiro*, 964 F.2d at 280 n.11; *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 (3d Cir.

2004).

Defendants' further contention that these statements are immaterial in light of Wilmington's technical representations regarding its loan underwriting and the value of its long-term relationships also fails. WT Br. 20-21. No language in the Bank's disclosure of technical loan terms, such as maximum duration or loan size, revealed the "serious concerns" or underwriting deficiencies described in the TAC. Similarly, although the Bank disclosed its relationship-based approach to repayment problems, it never informed investors that it thereby compromised its purportedly "rigorous" underwriting. *See, e.g.*, ¶190.

*In re Aetna, Inc. Securities Litigation*, 617 F.3d 272, 284 (3d Cir. 2010), is not to the contrary. WT. Br. 21. There, defendants discussed differences in customer markets (*i.e.*, geography, customer type, and premium levels), as well as the difficulties of predicting costs in those markets. *Id.* at 284. Given those disclosures, the court held that investors could not have understood "disciplined pricing" to mean a "static, across-the-board formula." *Id.* Here, instead of disclosing the risks created by Wilmington's abandonment of basic underwriting, Defendants reassured investors about the Bank's underwriting practices.[7]

**b. Defendants' Underwriting Statements Were False**

Defendants' argument that the TAC does not allege the falsity of their underwriting statements also fails. First, Defendants mischaracterize the allegations as mere

[7] Defendants' other cases are inapposite. *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538-39 (3d Cir. 1999) (defendants accurately reported past successes and expressed future optimism that did not "significantly alter[] the 'total mix' of information."); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005) (company did not describe organization's actual policies, only general "integrity"); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 144 (D. Conn. 2007) (not decided on puffery grounds); *In re Harley Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 975 n.3, 991 (E.D. Wis. 2009) (complaint did not identify which statements in thirty single-spaced pages of challenged statements constituted puffery); *Bus. Fin. Servc., Inc. Sec. Litig.*, 2007 WL 81937, at *8 (E.D. Pa. Jan. 9, 2007) (general statements qualitatively different from Defendants' specific representations here); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 255 (S.D.N.Y. 2004) (unlike here, prospectus warned of the very risks associated with "state of the art technology" complained of).

"mismanagement," and argue that Plaintiffs simply "disagree" with the Bank's business model. WT Br. 19; UW Br. 14. This argument ignores detailed allegations regarding widespread underwriting deficiencies that were directly contrary to Defendants' public representations. Moreover, while Defendants' conduct may constitute mismanagement, "[t]he mere fact that the conduct . . . arguably constitutes mismanagement will not preclude a claim . . . if the defendant made a statement of material fact wholly inconsistent with known existing mismanagement or failed to disclose a specific material fact resulting from that mismanagement." *Freudenberg*, 712 F. Supp. 2d at 192. Regardless of whether the Bank's underwriting failures constitute poor management, no interpretation of "consistent" or "rigorous" can be reconciled with the TAC's allegations.[8]

Second, Defendants incorrectly contend that the FBI Affidavits do not "challenge [the Bank's] underwriting generally." WT Br. 22. This argument is both absurd in light of the "serious" findings discussed in the FBI Affidavits, *(see, e.g.*, ¶¶91, 94, 96, 101, 103, 105-10, 282), and is irrelevant given the purpose of those affidavits – to obtain search warrants.

Third, Defendants' transparent attempt to take credit for the Delaware Status Review should be rejected. WT Br. 23. The Bank ordered the Review only <u>after</u> it was forced into the MOU. ¶¶48, 83-96, 282, 286. Even then, Wilmington failed to take sufficient corrective action or make full disclosures, as evidenced by the remaining threat of "regulatory action" in 2010 and the market reaction to the revelation of the true state of Wilmington's loan portfolio. ¶¶95, 162.

---

[8] Defendants' cited cases do not even involve underwriting or misrepresentations in a primary business area, as here. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977); *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 151 (3d Cir. 2004); *CraftMatic Sec. Litig., v. Kraftsow*, 890 F.2d 628, 638 (3d Cir. 1989); *Galati v. Commerce Bancorp, Inc.*, 2005 WL 3797764, at *8 (D.N.J. Nov. 7, 2005); *In re Eaton Vance Corp. Sec. Litig.*, 206 F. Supp. 2d 142, 152 (D. Mass 2002). Similarly, *Santa Fe* and *Craftmatic* involved breach of fiduciary duty claims, not claims for public misrepresentations. Finally, *Eaton Vance* dismissed allegations about an accounting methodology because plaintiffs rested falsity allegations on only "vague allusions" to the fact that defendants ignored the Asian financial crisis.

Fourth, Defendants' efforts to minimize the FBI's findings regarding Zimmerman and Terranova should be rejected. WT Br. 22-23. Even if the Bank's relationship with Zimmerman were the TAC's only allegation of deficient underwriting – which it is not – the fact that Zimmerman's loans comprised such a significant portion of the Bank's portfolio (¶¶93, 283) would be more than sufficient to establish falsity. Similarly, while Defendants dismiss Terranova as "one loan manager" (WT Br. 23), given his important role at the Bank and the fact that he was responsible for 7% of the Bank's total commercial loan portfolio (¶¶49, 284), the FBI's allegations about Terranova alone – even without former employees' corroboration of widespread underwriting deficiencies – would be more than sufficient to establish falsity. Moreover, given the TAC's allegations that (i) Cecala directed Terranova and others "not to keep" underwriting files, and (ii) the credit risk department specifically raised concerns about Terranova to Harra and North, which were just "papered over," Defendants distort the TAC by claiming that Terranova was the "only employee" who disregarded underwriting standards. ¶¶49-50. The only plausible conclusions are that Terranova was not a rogue employee, and that these underwriting deficiencies were widespread. *See, e.g.*, ¶¶46-54, 283-86.

Fifth, Defendants incorrectly contend that CWs 1, 2, and 5 were not in positions to comment on underwriting deficiencies. WT Br. 17, 31, 54-55. As credit personnel who routinely reviewed loan documentation and performance, they are the ideal witnesses to comment on whether underwriting was consistent with the Bank's representations. ¶¶45, 48-51, 53-56, 283-85; *Berson v. Applied Signal Tech. Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (question is whether the witness "would be in a position to infer" the relevant facts).[9]

[9] CW 1, a twenty-year banking veteran and Vice-President in Wilmington's Workout Group from March 2008 to July 2011, reviewed loan files going back to 2000, including numerous loan files created by Terranova. ¶¶45, 48-50. CW 2, head of the Bank's Credit Risk Management Division from 2008 through 2010 and Division Manager in Risk Management & Operations from 2000 to 2008, was a central participant in and was

Finally, the Underwriters contend that the Bank's statements were not false because "underwriting standards" refers only to the technical criteria for construction loans disclosed in the 2009 Form 10-K. UW Br. 12-13. This argument ignores that the Bank devoted a section of its 2009 Form 10-K to addressing how its underwriting mitigated credit risk. It also nonsensically suggests that the Bank had no underwriting standards for non-construction loans (including general commercial and residential loans) since the Bank did not disclose those standards. In fact, the Bank later clarified that these criteria were not exhaustive.[10] Regardless, the Bank's tolerance of loan documentation failures and underwriting exceptions rendered whatever "standards" Wilmington may formally have had false. ¶¶168-171, 283-286; *see In re Ravisent Techs., Inc. Sec. Litig.*, 2004 WL 1563024, at *6 (E.D. Pa. July 13, 2004) (violation of revenue recognition policy rendered public statements about revenue recognition misleading) (citing *In re Westinghouse*, 90 F.3d 696, 709-10 (3d Cir. 1996)).[11]

In any event, Defendants' arguments ignore that the securities laws forbid statements that are misleading by omission as well as outright falsehoods. *See Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010). When it disseminated statements about its "rigorous" and "consistent" practices, the Bank introduced the subject of underwriting, and then violated its duty to speak fully and truthfully on that subject. *See Shapiro*, 964 F.2d at 282; *Merck*, 2011 WL 3444199, at *9.

---

well-situated to assess the adequacy of underwriting at the Bank, and also reviewed Terranova's loan files. ¶¶50-51, 53-56. CW 5, a Vice President in the Workout group from January 2009 through 2010, was intimately familiar with the Bank's underwriting practices and policies. ¶51.

[10] *See* 2010 Form 10-K at 69 (*available* at http://www.sec.gov/Archives/edgar/data/872821/0000950123110204267w80859e10vk.htm#W80859tocpage).

[11] The Underwriters also argue that the Bank's underwriting and asset review statements were not false because the Bank's SEC filings disclosed that lenders played a role in credit review. *See* UW Br. 14, 18. However, Plaintiffs do not allege that the Bank's underwriting and asset review statements were false merely because lenders were involved. Rather, Plaintiffs allege that the Bank failed to disclose the true role that lenders played in these functions. *E.g.*, ¶291.

### 2. False And Misleading Statements About Asset Review

Wilmington repeatedly stated that the Bank "mitigate[d] credit risk" by "monitor[ing] the portfolio to identify potential problems" and "regularly review[ing]" its loans. ¶¶173, 287. In reality, the Bank did not monitor its portfolio or regularly review loans to identify problems or to mitigate credit risk. The ARG did not review 85-90% of the Bank's loans annually, and loans of less than $15 million – the overwhelming majority of the portfolio – received "essentially no review." ¶¶61-62, 174, 291. As explained by the Vice President and Senior Manager of the Bank's Commercial Loan Recovery Group, asset review functioned "in name only." ¶¶59, 61, 174. For example, instead of having independent credit specialists review loans, the Bank relied on incented lenders (like Terranova) – a practice the Bank identified as a "serious concern" in the Delaware Review Memorandum. ¶¶60, 63, 91, 291. As a result, the Bank continued to extend money to borrowers such as Zimmerman, even when they clearly could not repay those funds. ¶¶64, 69, 71, 174, 290. These practices actually <u>increased</u> the Bank's credit risk, rather than mitigating it. ¶¶58-59, 291-293.

In addition, Wilmington repeatedly described its internal loan risk rating classifications and reassured investors that it "appl[ied] these classifications consistently." ¶175, 288. That description was also false and misleading. The risk ratings were applied inconsistently and, due to the Bank's wholesale reliance on its lenders, were "generally inaccurate," leading the Bank to under-reserve for losses. ¶¶59, 72, 117, 176, 291. These ratings grew even more inaccurate in 2009 as the Officer Defendants regularly vetoed downgrade recommendations from the ARG without considering creditworthiness. ¶¶69-71. Indeed, throughout the Class Period, the Federal Reserve, KPMG, and Internal Audit each repeatedly determined that asset review was inadequate to provide a reasonable assessment of loan portfolio risk and was a serious weakness in internal controls. ¶¶66-67, 295. The Bank failed to address those warnings, leading to further regulatory

actions. ¶¶45, 83.

It is well established that false and misleading statements regarding risk management and loan review are actionable. *See RAIT*, 2008 WL 5378164, at *5 n.12 ("recurring credit analysis" statements actionable); *WaMu*, 694 F. Supp. 2d at 1208-09 (statement that "risk management efforts are on track" was false in light of allegation that bank weakened risk management to increase loan volume); *Countrywide*, 588 F. Supp. 2d at 1153 (claims of "extensive post-funding quality control process" actionable); *Accredited*, 556 F. Supp. 2d at 1149-50 (same). Nevertheless, Defendants argue that these statements are not actionable.

First, Defendants wrongly contend that their asset review statements are not material. WT Br. 23; UW Br. 17. However, courts uniformly hold that statements that positively characterize banks' efforts to manage credit risks in loan portfolios, like those here, are material. *See RAIT*, 2008 WL 5378164, at *5-6 n.12 (statements that company has "recurring credit analysis" are not mere puffery); *Local 703, I.B. of T. Grocery & Food Emps. v. Regions Fin. Corp.*, 2011 U.S. Dist. LEXIS 60761, at *24 (N.D. Ala. June 7, 2011) (same); *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 1223844, at *13-14 (S.D.N.Y. Mar. 27, 2013) (same); *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 364 (1st Cir. 1994) (false statements that bank's loan review was "strong" were material). Wilmington's asset review statements were so important that the Bank specifically highlighted its asset review practices as key risk mitigation tools in its "Credit Risk" section of its public filings. *See supra* p. 23. Moreover, as with the underwriting statements above, when considered in light of the financial crisis, there can be no question that investors relied on the Bank's assurances that its asset review would allow the Bank to weather the crisis. *Id.*

Second, Defendants argue that their asset review statements were literally true. WT Br.

24-26; UW Br. 17-21. For example, Defendants contend that as long as the Bank reviewed a handful of loans each quarter – out of the Bank's $6.4 billion commercial portfolio – their statements that they "regularly" and "consistently" reviewed loans are true. WT Br. 24, UW Br. 18. This is wrong. Defendants may not repeatedly reassure investors regarding the quality of their asset review and the adequacy of their reserves, and then claim that investors should have understood the limitations of that review. As noted above, the securities laws forbid misleading statements as well as outright falsehoods. *See In re Merck*, 2011 WL 3444199, at *9. These statements misleadingly represented that the Bank was actively monitoring its portfolio to mitigate credit risk; reviewing a sufficient percentage of its loans to set appropriate reserves; taking into account relevant loan repayment factors; and making decisions based on creditworthiness when it was not meaningfully doing any of those things. ¶¶60-67, 291-295.

Third, Defendants contend that the warnings from regulators, KPMG, and Internal Audit do not support falsity. WT Br. 24. This is nonsense. Outside experts concluded three years in a row that the Bank's asset review function was inadequate, constituted a weakness in internal controls, and was unable reasonably to assess credit risk. ¶¶66-67, 173, 295. Those findings cannot be reconciled with the Bank's statements assuring investors that it "mitigated" such risk by "regularly" reviewing the loan portfolio, or with the fact that Defendants escaped "significant regulatory action" by agreeing to sell the Bank at half of its trading price.[12] ¶¶12, 83-87, 162.

Fourth, Defendants contend that the FBI Affidavits do not establish falsity because they detail a "single instance" of "fraud." WT Br. 26. This argument fails. As set forth in the TAC, the FBI Affidavits confirm that there was effectively no oversight of potentially problematic

[12] The allegations regarding monthly Working Groups where loans were discussed are not contradictory. At these meetings the Officer Defendants disregarded, without considerations of creditworthiness, recommendations made by the credit specialists, causing asset review to be inadequate. ¶¶69, 292.

loans or of the Bank's relationships with its borrowers, even for highly material ones like Zimmerman. ¶¶91-93, 96, 98-100, 290, 292. The FBI Affidavits are not limited to the Zimmerman–Terranova relationship. Rather, they document that the Review identified a litany of "serious concerns" with Wilmington's lending practices, including its asset review. ¶¶7, 89, 91.

Moreover, rather than a covert fraudulent scheme of which the Bank was a victim, the FBI Affidavits detail a system with "limited" oversight designed to facilitate loans to favored clients. ¶¶91, 171, 291. All of Zimmerman's conduct – from exhausting loans without developing projects, to making loan draws with no documentation, to re-using the same invoices for numerous loan requests – was open and apparent.[13] ¶¶96, 99-103, 106-110. If the Bank had in place the asset review function it described to investors, Zimmerman would never have received those funds, particularly the $22 million he received after the Bank determined he had severe financial difficulties. ¶¶94, 96, 103, 292. Moreover, the failures detailed in the FBI Affidavits confirm the numerous accounts of asset review failures by former Bank employees, further demonstrating that Zimmerman is not an exception. ¶¶88-112, 291-94; *see also infra* § IV.C.2.b (witness accounts confirming Zimmerman loans typified Bank's lending failures).

Fifth, Defendants argue that appraisals are relevant only to the extent they impacted the Reserve for loans that were already impaired. WT Br. 34. This is wrong. To start, the Bank's original <u>and</u> updated appraisals were unreliable because they improperly accounted for property

---

[13] Plaintiffs do not dispute that Zimmerman was indicted and charged with, among other things, conspiring to defraud and making false statements to Wilmington. *See United States v. Zimmerman*, No. 1:13-cr-00010-GMS (D. Del.) (D.I. 23). The allegations in the indictment, as well as the FBI Affidavits, provide evidence regarding Zimmerman's violation of federal banking laws. Those documents are clear, however, that Zimmerman's conduct was overt, consistent with, and a product of the lending failures discussed in the TAC. Further, Zimmerman's criminal liability does not depend on whether the Bank relied on his false statements, nor is it precluded by Terranova's complicity. *See, e.g.*, *United States v. Thomas*, 315 F.3d 190, 195-98 (3d Cir. 2002) (discussing elements of bank fraud); *United States v. Huntress*, 956 F.2d 1309, 1319 (5th Cir. 1992) (discussing elements of false statement to a bank).

improvements that did not exist. ¶78. Moreover, the Bank used appraisals to determine which loans were impaired in the first place. *See*, *e.g.*, ¶76. Thus, the Bank's inflated appraisals fundamentally affected the Bank's ability to review its portfolio accurately and identify impaired loans. As numerous former Bank employees explained, the appraisals were "worthless," "horribly inflated," and "90% of the files in workout only had the original appraisal and nothing else." ¶¶2, 77, 293. These allegations are confirmed by the fact that once the Federal Reserve required Treliant to review the Bank's portfolio and update its collateral values in the summer of 2010, the updated appraisals triggered massive write-downs. ¶81. The TAC's allegations of pervasive appraisal problems show that impaired loans suffered from outdated appraisals, particularly given that nearly all of the loans in Workout – which by definition includes only problematic loans – were out-of-date.[14] ¶197.

The First Circuit's decision in *Serabian v. Amoskeag Bank Shares, Inc.*, is on point. 24 F.3d 357, 363 (1st Cir. 1994). There, the court sustained plaintiffs' fraud claims where the defendant bank claimed to have "strong" "loan review capabilities" and a "conservative" approach to its loan loss reserve, when in fact the bank's loan staff could not "stay[] on top of problem loans," and the Bank was forced to hire a consultant to assist with reviews. *Id.* Here, as in *Serabian*, the Bank was forced to bring in Treliant to review its portfolio and update its collateral values. ¶81. Also as in *Serabian*, Treliant's conclusions – which included significant downgrades in loan risk ratings and collateral values due to updated appraisals – contradicted the Bank's public statements to investors about its asset review. *Serabian*, 24 F.3d at 364. ¶¶73, 81.

---

[14] Similarly, the Underwriter Defendants argue that Wilmington Vice-President Chick Pinto's admission that the Bank "preferred" not to obtain updated appraisals is irrelevant. UW Br. 20 n. 19. This admission corroborates the TAC by confirming that "it wasn't the nature of how we did things" to "go back [to borrowers] and ask for more collateral, more financial statements, more appraisals." UW Br. 20 n.19. *See* ¶¶76, 192; D.I. 102-1, at 25.

Sixth, Defendants make a series of challenges to the CW accounts. WT Br. 25-26; UW Br. 21-22. Defendants imply that the account from CW 2 – the head of the Bank's Credit Risk Management Division – that the Bank had "no real standards" for how often loans were reviewed and adhered to a policy of "review by exception" (¶61) is somehow inadequate, but they fail to state a single reason why.[15] Further, Defendants claim that CW 1's account that Cecala ordered the Workout group – in which CW 1 was Vice President and would have been privy to a direct order from the CEO – to avoid charging off loans by not updating appraisals is inadequate because, as set forth above, it did not identify the precise "date" and verbatim language of the order.[16] WT Br. 25. But Plaintiffs are not required to provide such specific details in order to allege Defendants' misconduct, particularly where, as here, CW 1's account is mutually-corroborating with the TAC's other allegations. See *Avaya*, 564 F.3d at 263.

Similarly, the Underwriters criticize CW 8 for failing to cite specific examples in alleging that "time and time again" Wilmington "would ride with a customer longer than they should have." UW Br. 21-22. This is wrong. The law does not require Plaintiffs to provide specific examples of bad loans, especially where, as here, there are numerous corroborating sources, including other former employees, the FBI Affidavits, and the MOU. *See Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1021 (N.D. Ill. 2010) (rejecting argument that specific examples of bad loans necessary to demonstrate falsity even under Rule 9(b)). Moreover,

---

[15] The fact that CW 6 left Wilmington before the start of the Class Period (WT Br. 35) is irrelevant to this allegation (which is not based on a statement by CW 6) and to the statements that CW 6 actually did provide. ¶¶52, 61, 77-78. It is well settled that information pre- and post- class period may be properly used to draw inferences about conditions during the class period. *Merck*, 432 F.3d at 272 (pre-class period information relevant if it "'sheds light on whether class period statements were false or materially misleading'") (internal citation omitted).

[16] CW 1's high-level position is very different from the low- or mid-level employees in *National Jr. Baseball League v. PharmaNet Development Group, Inc.*, 720 F. Supp. 2d 517, 538 (D.N.J. 2010) (WT Br. 16). This conclusion is supported by CW 1's comprehensive and consistent account of the Bank's practices. *See Cabletron*, 311 F.3d at 30 (approving CW allegations where "the accumulated amount of detail the sources provide tends to be self-verifying").

Defendants cannot – and do not – dispute that CW 8, former director of Wilmington's Internal Audit in June 2008, was in a position to know of such failures (¶¶61, 291). Nor can they dispute CW 2's account that, after CW 8's departure, Cecala and Harra increasingly interfered with the ARG, further weakening this function. ¶82.

Finally, Defendants try to evade liability by misconstruing the TAC to claim that the Bank's relationship managers were not responsible for reviewing the Bank's loans. WT Br. 26. The TAC alleges just the opposite: the Bank inappropriately delegated near-total responsibility for asset review to its relationship managers (like Terranova). ¶¶63, 291. Defendants also claim that the TAC fails to allege that relationship managers were financially penalized for loan downgrades (WT Br. 26), although it explicitly makes that allegation. ¶¶63, 291. Defendants' related contention – that those financial penalties did not result in harm – similarly fails. UW Br. 18. Both CW 1 and CW 2 confirm that this incentive structure resulted in needed downgrades not being made, with CW 2 unable to recall a lender ever independently downgrading a loan in fourteen years, and CW 1 reporting that risk ratings were "generally inaccurate." ¶¶59, 72, 120, 176, 291. *Cf. Corus*, 701 F. Supp. 2d at 1023 (allegations that incentive structure encouraged lending without consideration of risks supported securities claims).

### 3. Wilmington's Financial Statements Were Materially Misstated

#### a. <u>Wilmington's Accounting For Loan Loss Reserves And Net Income Did Not Comply With GAAP</u>

Throughout the Class Period, Wilmington represented to investors that its financial statements – including its Loan Loss Reserve and reported net income – complied with GAAP and that its Reserve adequately accounted for current information and trends in the Bank's loan portfolio. ¶¶114-16, 121-22, 178-84, 298-304. In reality, the Bank violated GAAP and failed to comply with its own stated methodology for setting reserves. *Id.* As a result, its Loan Loss

Reserve was grossly understated and its net income was substantially inflated, rendering these publicly reported results and the Bank's representations that it complied with GAAP materially false and misleading. ¶¶114-20, 298-304. Indeed, M&T's independent analysis, and the Bank's Reserve increase disclosed on November 1, demonstrated that the Bank understated its loan losses by more than $800 million from the beginning of 2008, or double the amount of the Bank's then-existing reserves. ¶¶157-180, 196-97, 204, 297. As set forth in the TAC, Wilmington under-reserved by over 130% each quarter of the Class Period, in violation of GAAP. ¶¶127-28.[17]

GAAP requires that, when setting loss reserves, banks consider "through a disciplined and consistently applied process" current economic and loss trends, external economic factors, and delinquencies and charge-offs in the portfolio. ¶218, 299; *see also In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 550 (S.D.N.Y. 2010) (summarizing these GAAP requirements). Wilmington represented that it considered these factors in setting its Loan Loss Reserve by stating repeatedly that it complied with GAAP and that its reserve adequately took into account "micro- and macro-economic factors, historical net loss experience, current delinquency trends, movements within internal risk rating classifications, and other factors." ¶¶181-82.

However, until late-2008, the Bank's reserving methodology was exclusively based on its inaccurate loan risk ratings, and ignored economic trends and borrowers' current and projected ability to pay. ¶121, 300. For these reasons, CW 2 expressly stated that the Bank's reserving methodology was "<u>not compliant</u>" with GAAP – an allegation that Defendants simply ignore. ¶¶118, 300.[18] Moreover, after late 2008, the Bank's reserving methodology still principally

---

[17] The TAC's quantification of the financial misstatements supports the allegations of falsity. *See WaMu*, 694 F. Supp. 2d at 1212 (analysis quantifying reserve understatement supports falsity.)

[18] While Defendants attempt to minimize CW 2's statements generally by stating that CW 2 "is not alleged to

relied on those inaccurate risk ratings and an artificially understated loan loss history. ¶¶119-23, 301.

Courts in this District and elsewhere routinely sustain allegations of understated loss reserves where, as here, defendants fail to comply with GAAP and their own stated methodology. *See, e.g., In re RAIT Fin. Trust Sec. Litig.*, 2008 WL 5378164, at *7 (E.D. Pa. Dec. 22, 2008) (loan loss reserve understated as a result of failure to take appropriate impairment charges) (citing *Burlington*, 114 F.3d at 1421)); *In re PMA Capital Corp. Sec. Litig.*, 2005 WL 1806503, at *10 (E.D. Pa. July 27, 2005) ("[a]n allegation that a company misrepresents whether loss reserves were set in accordance with GAAP is actionable under the Exchange Act"); *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 721-22 (D. Del. 2000) (same).[19]

The falsity of Defendants' financial statements is further evinced by the fact that they were based on unreliable and inaccurate data. Former Bank employees confirmed that the Bank could not have complied with GAAP, because the Bank failed to collect the data necessary to adequately assess probable losses in its portfolio as FAS 5 and SAB 102 required. *See, e.g.*, ¶116 (Bank failed to maintain loan documentation); ¶209 (North ordered employees to alter internal reports of underwriting deficiencies without remedying the deficiencies); ¶¶46-50 (Bank reviewed a small fraction of its loans); ¶¶277-93 (Bank failed to update "horribly inflated" appraisals). *See In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (sustaining claim where defendants used "inherently unreliable" data in financial statements); *SLM*, 740 F. Supp. 2d at 555 (sustaining claim where inaccurate default rates led to

---

be an accountant" (WT Br. 31, 35), they ignore the fact that CW 2 was in charge of recommending reserve provisions to Defendants Cecala and Gibson and was thus in a position to understand GAAP requirements and the Bank's GAAP violations. ¶¶50, 116-118.

[19] *See also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 188 (S.D.N.Y. 2010) (sustaining GAAP allegations based on misstated loan loss reserves); *In re Wash. Mut., Inc. Sec. Litig.*, 694 F. Supp. 2d 1192, 1212, 1220 (W.D. Wash. 2009) (same); *Accredited*, 556 F. Supp. 2d at 1150-52, 1154-55, 1159.

inaccurate loan loss reserves); *see also In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 401-02 (D.N.J. 2004) (sustaining GAAP allegations where earnings statements were based on distorted data).

Finally, the Bank's and M&T's disclosure of $800 million of additional losses at the end of the Class Period strongly supports Plaintiffs' claim that reserves were not properly calculated throughout the Class Period. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 68 (2d Cir. 2001) (large losses at end of class period create inference of earlier problems); *Miss. Pub. Emps. Ret. Sys. v. Boston Scientific Corp.*, 523 F. 3d 75, 90 (1st Cir. 2008) ("at the pleadings stage, a bad outcome truly is relevant to the likelihood of fraud") (citations omitted); *PMA*, 2005 WL 1806503, at *15 ("increase [of] loss reserves by over $300 million . . . is evidence that they may have been understated or incorrect").

### b. <u>Defendants' GAAP Arguments Are Premature And Meritless</u>

Defendants ask the Court to parse GAAP's requirements and conclude as a matter of law that the Bank's reserving practices complied with GAAP. WT Br. 31-36. That request should be rejected. Defendants' arguments are inappropriate at the pleading stage. *See Burlington*, 114 F.3d at 1421 ("it is a factual question whether [the defendant's] accounting practices were consistent with GAAP"); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709, n.9 (3d Cir. 1996) (Alito, J.) (district court "appropriately instructed defendants to raise their GAAP arguments, if at all, on a motion for summary judgment"); *In re Majesco Sec. Litig.*, 2006 WL 2846281, at *5 (D.N.J. Sept. 29, 2006) ("The Third Circuit has held that 'whether a defendants' accounting practices were consistent with GAAP [is] a question of fact, thereby rendering it inappropriate to grant a motion to dismiss a securities fraud claim based on that ground.'") (citation omitted).[20]

---

[20] Wilmington's contention that loss reserves are statements of opinion that can only be false if subjectively disbelieved (WT Br. 28-31) is relevant only to the Securities Act claims, because Plaintiffs have established scienter for their Section 10(b) claims. *See infra* V.C. As discussed below in Section VI.A, Defendants' claim that loan loss reserves are statements of opinion is contrary to the law of this Circuit and should be rejected.

In addition, contrary to Defendants' suggestion (WT Br. 28), Plaintiffs are not required to allege a secret record of "true" reserves. *See, e.g.*, *NUI*, 314 F. Supp. 2d at 403 n.8 (rejecting argument that plaintiffs must allege an "allegedly 'true' level of bad debt") (internal citations omitted). Defendants' reliance on *TAAM Assocs., Inc. v. Housecall Med. Res., Inc.*, 1998 WL 1745361 (N.D. Ga. Mar. 30, 1998), for support fails. The *TAAM* court actually determined that statements relating to bad debt reserves were actionable because plaintiffs alleged that the financial statements were not GAAP-compliant. *Id*. at *9 (citing *Westinghouse*, 90 F.3d at 710).

Next, Defendants contend that the TAC does not allege that Wilmington "violated any particular GAAP provisions." WT Br. 31; KPMG Br. 22-25. Defendants are wrong. The TAC identifies and explains the controlling GAAP and accounting provisions. ¶¶114, 214-20, 299 (explaining, *e.g.*, FAS 5, FAS 114, and SAB 102).[21] The TAC also describes how the Bank's reserving methodology "was not compliant with GAAP" because it "did not take into account the factors required by GAAP, including economic trends and borrowers' current and projected ability to pay" but rather relied almost exclusively on the Bank's inaccurate loss history and loan ratings. ¶¶114, 181, 299-300. These are far from "conclusory" allegations. *See* KPMG Br. 22.

Defendants further attack Plaintiffs' allegations regarding Defendants' noncompliance with the Interagency Guidance on the Allowance for Loan and Lease Losses (¶¶124, 220), because the Guidance supposedly does not constitute a GAAP pronouncement or, even if it does, Plaintiffs have purportedly not demonstrated Defendants' violation of the Guidance. WT Br. 32-33. Defendants are again wrong. First, Defendants ignore that Plaintiffs' accounting allegations do not depend on violations of the Interagency Guidance, but rather on clear GAAP standards

---

*See, e.g., Shapiro*, 964 F.2d 272; *Underland v. Alter*, 2011 WL 4017908, at *9 (E.D. Pa. September 09, 2011) ("*Underland I*").

[21] The "Relevant GAAP and Accounting Provisions" section of the TAC applies equally to the Exchange Act and Securities Act portions of the TAC. ¶¶214-220.

such as FAS 5, FAS 114, and SAB 102. ¶¶114, 218. Second, factual disputes over GAAP's requirements – including what accounting guidance is considered part of GAAP – may not be resolved on a motion to dismiss. *See Burlington*, 114 F.3d at 1421 (rejecting argument as premature that plaintiffs only alleged violations of "accounting concepts" that were not GAAP).

Third, Wilmington violated the Interagency Guidance's requirement of "directional consistency" because the ratio of the Bank's Reserve to its non-accruing loans plummeted even as total non-accruing loans skyrocketed. ¶124 (setting forth the comparison in chart form).[22] Defendants' suggestion that the directional consistency requirement applies only to consistency between the Reserve and the entire portfolio (WT Br. 32-33) is belied by the text of the Guidance, which makes clear that the reserve should be "directionally consistent" with all factors in the portfolio that "evidence credit losses," including specific loan subgroups. ¶220 (quoting Interagency Guidance at 9). Thus, a comparison of the Loan Loss Reserve against the subset of non-accruing loans – the loan group most clearly indicative of credit problems – is necessary to show directional inconsistency.[23] The TAC itself emphasizes that the quoted portion of the Interagency Guidance on which Defendants rely simply provides a comparison with the entire portfolio as an "example" of directional consistency. ¶220. At the very least, the Bank's failure to adhere to the Interagency Guidance is probative of a violation of SAB 102 (a provision that they do not dispute is a part of GAAP), which requires that the "[e]ffect of changes in credit

---

[22] Defendants' observation that "[a]s nonperforming loans are charged off, the reserve associated with them is removed from the ALLL" is irrelevant. WT Br. 33. Such loans are also dropped from the pool of non-accruing loans. Thus, because the loans are removed from both subsets – *i.e.*, from both the numerator and the denominator – this cannot explain why Wilmington's reserve ratio plunged even as non-accruing loans ballooned. ¶124.

[23] The Loan Loss Reserve must be compared to the subset of non-accruing loans, as opposed to the broader portfolio. If the portfolio size stayed the same while the number of non-accruing loans doubled, this would be indicative of underlying credit problems and that the reserve should increase. But if the principle of directional consistency were only considered at the portfolio level, Defendants could maintain the same reserve without violating the Interagency Guidance. This is plainly not the result intended.

concentrations" be "considered in developing loss measurements." ¶¶218, 220.[24]

Finally, Defendants argue that, contrary to the TAC's well-pled facts, the Bank's reserve methodology complied with GAAP. WT Br. 34-36, KPMG Br. 22-25. Once again, this sort of factual consideration is inappropriate at this stage, and will be subject to expert reports later in the litigation. *See Burlington*, 114 F.3d at 1421. In essence, Defendants argue that because reserving for loan losses is subject to management judgment, it cannot provide a basis for liability. Courts in this Circuit reject such claims. *See RAIT*, 2008 WL 5378164, at *8 (rejecting similar "mismanagement" defense); *Sonnenberg v. Prospect Park Fin. Corp.*, 1991 WL 329755, at *13 (D.N.J. Aug. 20, 1991) (same); *In re Midlantic S'holders Litig.*, 758 F. Supp. 226, 234-35 (D.N.J. 1990) (same). This argument also ignores the TAC's allegations that Defendants' methodology depended on risk ratings that were manipulated and failed to account for the economic environment, as GAAP requires. ¶¶116, 122, 296, 300-01. Although Defendants argue that the Bank's use of fixed percentages based on those risk ratings was consistent with FAS 5 (WT Br. 35), neither FAS 5, FAS 114, SAB 102, nor any other accounting rule supports the view that reserves calculated in this manner conform with GAAP. *See, e.g.*, *Underland II*, 2012 WL 2912330, at *5 (sustaining allegations that understated loan loss reserves violated FAS 5 because they "failed to consider all material factors" and failed to "use[] accurate source data").[25]

---

[24] This consistency belies Defendants' claim of tension between the Interagency Guidance and GAAP. WT Br. 36. The FASB Accounting Standards Codification – the authoritative source on what constitutes GAAP – specifically provides that "[p]ronouncements of . . . regulatory agencies," such as the Interagency Guidance, "shall" be considered in the event guidance for a transaction or event is not otherwise specified within a source of authoritative GAAP. *See* ASC 105-10-05-2, 105-10-05-3(e).

[25] Defendants falsely claim that Plaintiffs "merely disagree" with their method for reserving. WT Br. 35. The TAC establishes that the Bank both violated GAAP and misrepresented its specific reserving methods – allegations that go beyond a mere disagreement. *See Contra Hinerfeld v. United Auto Grp.*, 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) (WT Br. 35) ("no facts alleged" support understated reserves due to "anything but inaccurate forecasting or unforeseen circumstances").

Defendants also contend that the TAC cites "only one specific instance" of Wilmington's ARG changing a rating (WT Br. 36). That claim fails to address numerous allegations making it clear that manipulation of the loan risk ratings was routine at Wilmington. *See* ¶¶59, 72, 117, 120, 176, 291 (risk ratings were "generally inaccurate" and the Workout group "repeatedly" received loans that were rated as much as four grades higher than they should have been); ¶¶568-70 (Cecala and Harra regularly "interjected themselves physically" into ARG meetings to veto downgrade attempts); and ¶¶59 (Defendants "avoid[ed] necessary loan risk rating downgrades" and reserve increases by "utterly ignor[ing] the Bank's asset review function.").

**c. A Restatement Is Not Required To Allege Falsity**

Contrary to Defendants' suggestion (WT Br. 9, 49), the absence of a restatement is irrelevant. First, courts do not require a restatement to sustain allegations of accounting fraud. *See, e.g.*, *Scholastic*, 252 F.3d at 73-74; *Atlas*, 556 F. Supp. 2d at 1154-55. To do so "would shift to accountants the responsibility that belongs to the courts. It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002); *see In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1246 (N.D. Cal. 2008) (lack of restatement irrelevant). Second, fraud may be inferred even in the absence of a misstatement when, as alleged here, auditors internally disagree with management over accounting policies. ¶¶65-70; *see Adams v. Kinder-Morgan*, Inc., 340 F.3d 1083 at 1090 (10th Cir. 2003); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057 at 1064 (9th Cir. 2000). Finally, given that Defendants escaped "significant regulatory action" by agreeing to sell the Bank at half of its trading price, Defendants cannot now argue that the absence of a restatement negates the falsity of their statements. ¶¶115, 157, 180, 196, 197, 204.

### 4. False And Misleading Statements About Internal Controls

Contrary to the certifications signed by Cecala and Gibson, the Bank's internal controls over financial reporting were inadequate. *E.g.*, ¶¶58-60, 65-67, 121, 174, 184. Wilmington's internal controls suffered because, among other things, the Bank failed to address underwriting and asset review failures (including the Officer Defendants' interference and understaffing in key areas) and significant flaws in financial reporting (including its reserves and net income). ¶¶68, 75, 121, 174, 301.[26] Defendants argue without support that misstatements in SOX certifications of internal controls are not actionable. WT Br. 27; UW Br. 22-23.[27] That is incorrect. *See PMA*, 2005 WL 1806503, at *10.[28]

Second, Wilmington asserts that the TAC fails to establish that Cecala and Gibson were aware of facts inconsistent with these certifications. WT Br. 27. This is also wrong. In 2007, 2008 and 2009, Internal Audit, KPMG, and the Federal Reserve all provided Cecala and Gibson (among others) with warnings detailing inadequate practices and "weaknesses in the control structure." ¶¶67, 174, 294.[29] Defendants' characterization of these findings as weaknesses "from a banking regulatory perspective," rather than internal controls (WT Br. 27), is contrary to

---

[26] Allegations regarding the Delaware Review Memorandum and the Bank's relationship with Zimmerman also demonstrate the falsity of Defendants' SOX certifications.

[27] The Underwriters' cases are inapposite. UW Br. 23. *Am. Bus. Fin. Serv.*, 2007 WL 81937, at actually held internal controls statements actionable, and the statement at issue in *Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 791 (S.D.N.Y. 1997), has nothing to do with internal controls.

[28] *See also New Century*, 588 F. Supp. 2d at 1226-27; *Countrywide*, 588 F. Supp. 2d at 1178. Indeed, SOX certifications are vital to investors; Congress intended SOX certifications to provide investors with assurances of "a materially accurate and complete picture of an issuer's financial condition." *In re Enron*, 258 F. Supp. 2d at 588 n.7.

[29] Wilmington argues that KPMG's annual audit reports never identified material weaknesses in internal controls. WT Br. 27. But the TAC alleges that in 2007 and 2008, KPMG issued Management Letters warning of weaknesses in the Bank's financial reporting. ¶¶66, 313. Neither KPMG nor the Wilmington Defendants can now escape liability based on KPMG's failure to alert the public of their findings. *Aldridge*, 284 F.3d at 83; *Adams*, 340 F.3d at 1090.

the TAC and, at most, raises a fact issue not appropriate for resolution at this stage.[30]

### 5. Defendants' Additional False And Misleading Statements

Cecala, North, Foley, and Gibson made additional false statements during conference calls, reassuring analysts and investors about underwriting and asset review, such as:

- Cecala touting "the quality of the loan portfolio and our underwriting and evaluation process." ¶¶188-89.
- North stating that the Bank had "taken these loans and we're putting them under the microscope." ¶¶191-92.
- North stating that "we're obviously being very, very selective" with the Bank's lending. ¶190.[31]
- Cecala stating that the Bank conducted a "rather thorough and exhaustive" analysis of its loans each and every quarter. ¶¶193-94.
- In response to analysts' questions in June 2010 whether Wilmington had any "mounting credit problem," Cecala stating "None whatsoever" and Foley failing to correct him and assuring there would not be a credit "blow-up". ¶¶135-6, 196.
- In response to an analyst's question regarding the extent of Treliant's review of the Bank's loan portfolio, Gibson stating that it found the Bank's credit procedures and policies to be "state of the art." ¶¶145, 197.

Contrary to these statements, underwriting was low-quality, lending was not selective, and asset review was superficial and manipulated by the Officer Defendants. These statements were also material. Not only did they positively characterize the Bank's critical lending functions (*see supra* § IV.B), they were also made in response to specific analyst questions, further demonstrating that investors considered this information meaningful. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597-98 (7th Cir. 2006), vacated in part on other

[30] In addition, the Underwriters incorrectly assert that Plaintiffs' internal control allegations are inactionable because they are "derivative" of other claims. UW Br. 23-24. This is not the law. *See WaMu*, 694 F. Supp.2d at 1212-13 (internal controls certifications actionable when based on failure to adequately reserve for loan losses). Here, Plaintiffs' claims are predicated on the false representations of internal controls including loan reserving failures. *See, e.g.*, ¶¶65-68, 83-87, 89-112, 307-18.

[31] North's claim that this statement was not false ignores the TAC's allegations. North Br. 8-10.

grounds, 551 U.S. 308 (2007) (misrepresentations made in direct response to an analyst's inquiry are actionable and go "well beyond puffery.").

Nevertheless, Defendants raise factual disputes that are inappropriate at this stage. For example, Defendants contend that North's statement that the Bank put its loans "under the microscope" concerned only "troubled" loans, which the Bank thoroughly reviewed.[32] This is false. Instead of addressing only troubled loans, North responded to a question about the Bank's portfolio historically and looking forward, and represented that the Bank's reserve levels reflected its thorough analysis. ¶191. Moreover, North's statement that the Bank obtained new appraisals for impaired loans was false because the Officer Defendants prevented the Bank from formally recognizing that many loans were impaired, including by preventing updated appraisals (contrary to North's answer). ¶¶75-77, 191-92.[33]

In addition, Cecala's statement that there were no "mounting credit problems" was not "made in the context of . . . having just increased [] loss reserves" (WT Br. 39). Instead, he responded to analysts asking whether his sudden departure reflected serious credit problems "as time scrolls forward." ¶135. Three weeks after his flat denial (and Foley's (¶136)), the Bank admitted that its credit situation was worse than previously disclosed. ¶139. Moreover, Cecala's and Foley's statements came in the wake of the MOU, the Bank's Review, and after the Federal Reserve had taken over the Bank's credit functions – all of which identified and warned of serious credit problems. ¶196. Finally, Defendants contend that Gibson's statement that credit practices were "state of the art" was true when made, as the Bank had just updated them. ¶145. That unsubstantiated claim – which would not absolve the misleading statement – raises fact

[32] North also claims that his statement could have referred to reviews done by "others" at the Bank, not the ARG. North Br. 9. Such vague conjecture may not serve as a basis for dismissal.

[33] Defendants' unfounded assertions that updated appraisals were relevant only to those loans that the Bank had already categorized as "impaired" (WT Br. 38) is addressed *supra* at § IV.B.2.

issues that may not be accepted on this record and are contradicted by later events, including Defendants' admission that Wilmington would face "significant regulatory action" absent the merger.

### C. The TAC Raises A Strong Inference Of The Officer Defendants' Scienter

#### 1. Standard For Evaluating Scienter

A complaint alleging securities fraud must give rise to a strong inference of scienter. *Avaya*, 564 F.3d at 251. Scienter is a "mental state embracing intent to deceive, manipulate, or defraud, and requires a knowing or reckless state of mind." *Id*. at 252 (quotations omitted). Reckless behavior is "an extreme departure from the standards of ordinary care which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it." *Advanta*, 180 F.3d at 539.[34] A court must "accept all factual allegations in the complaint as true" and determine "whether <u>all</u> of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original); *see also Avaya*, 564 F.3d at 272-73 ("It is the composite picture, not the isolated components, that judges must evaluate in the last instance."). The inference "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (quotations omitted). Instead, an inference of scienter is "strong" when it is at least as likely as any other inference. *Id.*; *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008) ("where there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff"). Thus, Defendants must show that the TAC's allegations give rise to an inference of innocent behavior that is <u>stronger</u> than the inference of recklessness.

---

[34] The Third Circuit does not require proof of "intentional fraud." WT Br. 41; *see Avaya*, 564 F.3d at 269.

The TAC sets forth powerful facts that raise a strong inference of the Officer Defendants' scienter.[35] *See* ¶209 (Cecala); ¶210 (Gibson); ¶211 (Harra); ¶212 (North); ¶213 (Foley).[36] In response, Defendants offer competing inferences that can be swiftly rejected. WT Br. 3, 41-43; North Br. 2, 17-19. Each excuse ignores the totality of Plaintiffs' allegations and asks the Court to review selected allegations in isolation, raising fact questions inappropriate for resolution at this stage. "In assessing the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *Avaya*, 564 F.3d at 272-73 (internal quotations omitted). Viewed "holistically" and from a "common-sense perspective," the inference of scienter far outweighs – or, at minimum, is equally compelling as – any competing inferences.

### 2. The TAC Alleges Compelling Facts Evidencing The Officer Defendants' Knowledge And Recklessness

#### a. The Comprehensive Delaware Status Review And Delaware Review Memorandum Prepared At The Direction of "Senior Management" Demonstrate The Officer Defendants' Scienter

The Delaware Status Review and the Delaware Review Memorandum strongly support a finding that the Officer Defendants and Wilmington acted with scienter. As discussed above, after the MOU, the Bank's senior management assigned Terry Brewer, one of its most senior credit officers, to review its commercial lending practices in Delaware. ¶¶89-90, 200. This Review and the Memorandum identified "serious concerns with the past management of the Delaware Commercial Real Estate Division and its loan portfolio." ¶¶5, 89, 95, 282.

Remarkably, the Officer Defendants ask the Court to infer that they were not aware of the

---

[35] The TAC's allegations of the Officer Defendants' scienter are imputed to Wilmington. *See In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 597 (D.N.J. 2001).

[36] Defendants' contention that the TAC engages in inadequate "group pleading" is wrong. WT Br. 42; North Br. 15. In fact, Defendants' claim is contradicted by their attempt to factually dispute Plaintiffs' Defendant-specific scienter allegations. *See* WT Br. 53-56.

Review and did not read the Memorandum. WT Br. 43-44.[37] It defies credulity – and ignores Defendants' own claims that they sought to address problems throughout the Class Period (WT Br. at 10-11) – to suggest that none of the Officer Defendants was aware of them. Considering Brewer's seniority, the only plausible inference is that the Officer Defendants were the "senior management" who ordered the review. It is also inconceivable that the Officer Defendants were not aware of the Review and Memorandum given that they identified "serious concerns" with the past management and loan portfolio of the Bank's most critical market, which accounted for over 50% of its commercial loans. ¶89. *See Avaya*, 564 F.3d at 268-69 (scienter established where "it strains reason to suggest that [defendants] did not know about the" alleged misconduct given its importance to the business); *Aviva Partners LLC v. Exide Techs.*, 2007 WL 789083, at *19 (D.N.J. Mar. 31, 2007) (scienter established where plaintiffs alleged "a long list of difficulties [] encountered during the class period, which were either brought to the individual defendants' attention or such that persons in their positions would have been aware of them"); *In re Northfield Labs., Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 76804, at *22 (N.D. Ill. Sept. 23, 2008) ("[o]ne could easily infer" CEOs knew results of an analysis of the company's core product).[38]

It is absurd to suggest that the Officer Defendants did not know of a review of the Bank's primary market requested by "senior management" and documented in a formal memorandum. *Berson*, 527 F.3d at 998 ("hard to believe" that senior managers "would not have known about"

[37] While Defendants note that the Memorandum was not memorialized until March 2010, over two-thirds through the Class Period, Defendants do not – and cannot – claim that this timing mitigates against a finding of their scienter. WT Br. 44. The TAC alleges: (i) the Review was initiated in 2009 (¶89); (ii) Defendants continued to make false and misleading statements after the Review was completed by no later than February 2010 (*see, e.g.*, ¶¶95, 195-198); and (iii) numerous facts that establish the Officer Defendants acted with scienter throughout the entire Class Period, as set forth herein and at ¶¶199-213.

[38] Defendants' reliance on *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 462 (S.D.N.Y. 2010), is misplaced. The allegations in that case were based on low-level employees and contractors who provided only general information about the type of data they themselves had access to, and one employee who was not able to identify any specific reports but speculated as to the data the defendants typically "would have reviewed." *Id.* Here, there is no question that the Review involved senior management and a key business area.

documents impacting significant business); *No. 84 Emp.-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003) (it was "patently incredible" and "absurd to suggest" that concerns about regulatory investigation were unknown to senior management). The fact that Brewer documented his findings in a formal memorandum compels the conclusion that he informed the Officer Defendants of his findings and provided them with the Memorandum.

**b. The Bank's Relationship With Zimmerman, One Of The Bank's Largest And Most Important Borrowers, Supports A Strong Inference Of Scienter**

The Bank's relationship with Zimmerman supports a strong inference of the Officer Defendants' scienter. Zimmerman was one of the Bank's most important borrowers, with loans totaling nearly 6% of the Bank's construction loan portfolio, concentrated in its primary market, and managed by the head of its commercial lending division. ¶203. Based on the magnitude and importance of this lending relationship to the Bank's business, the Officer Defendants are charged with scienter regarding the facts of the Zimmerman loans, including the deficient lending practices underlying those loans. *See Avaya*, 564 F.3d at 268-69 (scienter established where "it strains reason to suggest that [defendants] did not know about the" alleged misconduct, given its importance to the business); *New Shah, Inc. v. Shah*, 2000 WL 1728251, at *3 (D. Del. June 20, 2000) (scienter supported by failure "to disclose [information about] the Company's largest customer"); *In re Tel-Save Sec. Litig.*, 1999 WL 999427, at *5 (E.D. Pa. Oct. 19, 1999) (scienter established because "[k]nowledge concerning a company's key transactions may be attributable to the company, its officers and directors"); *see also In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (finding scienter and holding that "officers of a company can be assumed to know facts critical to . . . an important transaction that would affect a company's performance.") (internal quotation omitted).

While the significance of the Zimmerman relationship to the Bank's business alone is sufficient to demonstrate the Officer Defendants' scienter, the TAC specifically alleges the Bank's awareness of the deficiencies that permeated Zimmerman's loans. Specifically, starting in 2008 – in the midst of the financial crisis – the Bank learned that Zimmerman was experiencing deep financial problems and having "significant difficulties in making payments" on his more than 75 loans. ¶¶93, 111, 292. Given the real and severe threat that a default by Zimmerman would have posed to the Bank's core commercial construction loan portfolio and its overall business – which was already (secretly) suffering credit losses from the Bank's deficient lending practices – by the start of the Class Period, the Officer Defendants knew, or recklessly disregarded, the risks presented by the Zimmerman loans and the lending practices that created those risks.

Indeed, as of that time, these known warning signs compelled the Officer Defendants to verify Zimmerman's loan files, the status of his construction projects, and the loan agreement terms. In other words, the Officer Defendants should have "mitigate[d] credit risk" as they repeatedly told investors they did by "monitor[ing] [Zimmerman's] portfolio," "regularly review[ing]" his loans, and ensuring that the Bank's underwriting standards had been "consistently" applied. Any of these actions would have easily confirmed that the Bank "approved numerous loans which [it] never should have approved," essentially handing out money without any basis. ¶94. For example, the Bank extended Zimmerman money even though he did not meet basic loan conditions, failed to construct projects (including a "partially completed parking lot" after exhausting a $10 million loan when the entire project was projected to cost only $2 million), and openly mocked the Bank's non-existent lending policies (including requesting and receiving one million dollars to "pay his bar tab"), all of which allowed Zimmerman to siphon off millions of dollars for his own use. ¶¶93, 101, 103.

However, instead of protecting the Bank and its shareholders, the Officer Defendants allowed the Bank to extend Zimmerman an additional $22 million in 2008 and 2009. ¶¶94, 111. The Officer Defendants also continued to tout the Bank's lending practices in 2010 even after the Delaware Status Review detailed the deficiencies in the Zimmerman loans.

Finally, the inference of the Officer Defendants' scienter is especially compelling because the failures that permeated the Zimmerman loans were the direct result of practices and policies that the Officer Defendants implemented. *In re Dynex Capital, Inc. Sec. Litig,* 2009 WL 3380621, at *12 (S.D.N.Y. Oct. 19, 2009) (scienter where complaint alleged that "disregard for underwriting standards was a top-down directive from senior management.") For example, Cecala himself instructed Terranova to ignore the Bank's underwriting practices and simply extend loans, which Terranova did for Zimmerman. ¶¶49, 202. Harra and North disregarded and "papered over" direct concerns raised by ARG about misgiving data and approval in Terranova's loans files. ¶50. Similarly, the Officer Defendants relegated asset review to incented relationship managers (like Terranova), as opposed to credit specialists. ¶¶59-63, 99. This allowed Terranova to unilaterally extend Zimmerman money, alter Zimmerman's formal loan terms without any credit review and to extend money to Zimmerman even when he failed to meet these altered terms. ¶¶49, 93, 97, 99-104.

In response, Defendants raise fact issues that cannot be resolved at this stage and are, in any event, wrong. The Officer Defendants contend that the Bank was a victim of "one borrower's" fraud. WT Br. 43. But Wilmington and the Officer Defendants were not "victims" because Zimmerman did not conceal his misconduct from them. *See* ¶23. Moreover, as one of the Bank's most important borrowers, Zimmerman cannot be dismissed as simply a "single borrower." WT Br. 44. High-level former employees and the Delaware Review Memorandum

confirm that the Zimmerman relationship was representative of the Bank's lending failures. *See* ¶¶62-63 (vast majority of loans reviewed by relationship managers); ¶¶46-50 (loan files suffered from insufficient documentation); ¶99 ("prevalent" for relationship managers to change loan terms without credit review); ¶105 ("common" to satisfy huge draw requests with "absolutely no due diligence"); ¶61 (failure to perform any verification of construction progress before loan draws); ¶¶50, 57 (common issues with Terranova).

**c. The Magnitude And Timing Of Wilmington's Credit Losses Support A Strong Inference Of Scienter**

The sheer magnitude and abrupt timing of the credit losses disclosed on November 1 support a strong inference of scienter. In one day, investors learned that that the Bank had nearly $800 million in additional credit losses in its portfolio – nearly double the Bank's reserves at the time and greater than its income for the prior decade. ¶¶125-26, 157, 204. Such a sudden and massive increase could not have been the innocent result of poor business judgment or of credit problems that emerged only in the third quarter of 2010. These additional losses – more than 200% greater than what Wilmington disclosed less than four months earlier – compel the inference that Defendants "had some awareness that the problem was brewing." *RAIT*, 2008 WL 5378164, at *13; *see also Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001) (sheer size of write-down adds to inference that "defendants must have been aware the problem was brewing"); *Freudenberg*, 712 F. Supp. 2d at 200 n.10 ("drastic increase in reserves is 'suggestive' of scienter, 'especially given that riskier loans may require greater reserves'").[39] To suggest that this massive increase was the unexpected result of "an atypically broad and deep recession that reached Delaware later" (WT. Br. at 41) defies common sense,

[39] *See Regions Fin.*, 2011 U.S. Dist. LEXIS 60761, at *29-30 ("significant and sudden increase in loan loss reserves . . . supports a strong inference of scienter"); *Winslow v. Bancorp South, Inc.*, 2011 WL 7090820, at *22 (D. Tenn. Apr. 26, 2011(same).

ignores the TAC's allegations, and calls for factual determinations inappropriate at this stage.

The TAC details the severity and duration of the Bank's credit failings that directly impacted the Bank's financial condition. ¶¶124-27. Further, the TAC quantifies the extent to which the Reserve was understated, and to which the Bank's net income was correspondingly overstated. *See* ¶127. Such grossly overstated net income further supports an inference that the Officer Defendants acted with scienter. *See*, *e.g.*, *Avaya*, 564 F.3d at 271 (magnitude of alleged widespread discounting strengthened inference of scienter).

In response, the Officer Defendants attempt to characterize M&T's independent analysis of Wilmington's loan portfolio as merely an uncertain estimate "of future losses" with no relevance to Wilmington's Loan Loss Reserve. WT. Br. 47. This argument is nonsense.

First, M&T unambiguously stated that it marked down Wilmington's loan portfolio by an additional $500 million, on top of the $280 million that Wilmington had just announced, to reflect its assessment of credit losses inherent in the portfolio. M&T did not qualify this number or inform investors that it should not be relied on. Rather, M&T's CFO Rene Jones made clear that it was the result of a comprehensive analysis by "a 40-person team of M&T Corp credit line and work out personnel" who examined 50% of the Bank's commercial portfolio, as well as "[M&T's] consumer lending team" who "assess[ed] documentation standards, underwriting quality and compliance with regulatory requirements." As a result, M&T concluded that:

> After deducting the current Wilmington Trust loan loss allowance [including the $280 million reserve increase that Wilmington announced that same day], M&T's credit mark comes to just under – excuse me – over $500 million.

Z. Naylor Decl. Ex. 2 at 5.

Second, M&T made clear it was focused on probable and estimable losses in the portfolio that should have been recorded in the Bank's Loan Loss Reserve under GAAP – not uncertain,

future losses. M&T stated that it "projected remaining losses and net-charge-offs from year-end 2007 through 9/30/10." Naylor Decl. Ex. 1 at 9 (Nov. 1, 2010 M&T Slideshow). If M&T's analysis referred to future losses as Defendants contend, this discrete time period would make no sense. Instead, M&T's dire assessment was consistent with its conclusion that nearly 20% of the Bank's entire loan portfolio was worthless and had to be charged off, including 40% of the Bank's construction loan portfolio – a conclusion Wilmington did not dispute. ¶¶156, 158.

M&T's analysis also subtracted Wilmington's Loan Loss Reserve figure from its own estimate of credit losses, indicating that the two figures represented an apples-to-apples comparison. ¶156; Naylor Decl. Ex. 1 at 9; Ex. 2 at 5 (Wilmington Q32010 Tr.). Jones confirmed that M&T's analysis incorporated "a review of the losses already taken on the portfolio by Wilmington Trust, looking back to the beginning of 2008." *See* D.I. 105-5, at 16. Thus, M&T's calculation was established "on [the same] basis" Wilmington used to assess its loan losses. *Id.*[40]

Defendants' reliance on KPMG's 2010 audit opinion as "proof" that the M&T figures do not establish that the Bank's reported Loan Loss Reserve were misstated is misplaced. WT Br. 48-49. KPMG's audit opinion does not – and did not at the time – change M&T's findings. Moreover, courts consistently conclude that clean audit opinions by auditors are irrelevant to whether loan loss reserves comply with GAAP. *See Westinghouse*, 90 F.3d at 709-10 (reversing dismissal of loan loss reserve claims as "improper," notwithstanding unqualified audit opinions; *RAIT*, 2008 WL 5378164, at *7, *13 (sustaining § 10(b) claims alleging "understatement of loan

[40] Defendants rely on Jones' discussion of "maturity risks" to suggest that M&T's analysis included not-yet-incurred losses. WT Br. 47 (citing D.I. 105-5 at 17). This is a red herring and raises inappropriate fact questions as to what impact, if any, such maturity risks had on the valuation. Moreover, the passage Defendants cite is out of context, and relates to a discussion of the different maturity risks in the Bank's portfolio. Jones pointed out that large portions of the portfolio – the investor real estate side (primarily at issue here) – would mature in the near future (including some as soon as 2011) and, because of the limited remaining time, those loans were subject to minimal additional risk of loss. *Id*.

loss reserves" notwithstanding clean audit opinions); *DVI*, 2005 WL 1307959, at *2-3, *13 (same). Courts also routinely conclude that a "clean" audit opinion does not negate an inference of scienter. *See LDK Solar*, 584 F. Supp. 2d at 1246 (unqualified audit opinion did not exonerate issuer); *In re Converium Holding AG Sec. Litig.*, 2007 WL 2684069, at *3 (S.D.N.Y. Sept. 14, 2007) (clean audit opinion did not negate scienter).

The Officer Defendants also argue that M&T would not have proceeded with the acquisition if it did not find "everything in order" after its due diligence. WT Br. 48-49. This is absurd. M&T bought the Bank at a 50% discount, and understood exactly what it was getting for that price. Plaintiffs do not suggest that M&T, like investors, was lied to or based its valuation on the Bank's prior public representations. ¶48. M&T clearly believed that any litigation risk associated with the Bank's prior misstatements – the only risk M&T took on as a result of Defendants' fraud – was worth the price it paid. Defendants' suggestion that M&T would have "walked away" from this sweetheart deal is implausible.

In any event, Defendants' challenges to M&T's findings raise fact issues that are not appropriate for resolution at this stage. *Phillips*, 515 F.3d at 233.

#### d. The Numerous Warnings From Regulators And Other Gatekeepers Support The Officer Defendants' Scienter

KPMG, the Federal Reserve, and Internal Audit repeatedly told the Officer Defendants that the Bank's asset review and internal controls were inadequate and exposed the Bank to undue risk. *See* ¶¶58-60, 65-67, 121, 174. These direct and repeated warnings are compelling evidence of scienter. *See, e.g.*, *Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d 373, 388-89 (S.D.N.Y. 2011) (scienter where "SEC raised detailed questions" that "creat[ed] the inference that [defendant] was aware of regulatory concerns"); *In re Bear Stearns Cos., Inc. Sec., Deriv., ERISA Litig.*, 763 F. Supp. 2d 423, 503-04 (S.D.N.Y. 2011) (scienter where defendants

disregarded SEC warnings about risk and valuation models); *Lewis. v. Straka*, 2006 WL 2927658, at *6 (E.D. Wis. Oct. 12, 2006) (awareness "of the bank regulators' warnings regarding problems in [issuer's] loan portfolio and with its lending practices" gave "rise to a strong inference" of scienter).

Defendants' arguments in response are unavailing. As an initial matter, they do not challenge that allegations of the internally reported findings of the Bank's Internal Audit support an inference of scienter. But with respect to KPMG's repeated warnings, they contend that the fact that KPMG did not force the Bank to restate its financials undermines an inference of scienter. WT Br. 49. As noted above, however, the absence of a restatement does not detract from scienter, particularly when Wilmington was so suddenly acquired by M&T, obviating the need for further review. *See Aldridge*, 284 F.3d at 83 (lack of restatement does not negate evidence of scienter).[41]

In addition, Defendants argue that the MOU undermines scienter because it is supposedly an "informal" measure and if the Federal Reserve had suspected fraud, it would have taken "more severe measures." WT Br. 50.[42] This argument lacks merit. First, what measures the Federal Reserve might have taken is a (hypothetical) fact question not appropriate for resolution at this stage. Second, as Defendants themselves recognize (WT Br. 27), the Federal Reserve is a

[41] Wilmington wrongly contends that it responded to these warnings by reorganizing the ARG. WT Br. 49. That argument ignores the TAC's detailed allegations that any changes made in late-2008 to the ARG were "nominal" and meaningless. *See, e.g.*, ¶¶68-71. In fact, the Officer Defendants' superficial changes in conjunction with their escalated interference further supports a strong inference of scienter.

[42] Defendants' arguments about how to characterize the severity of an MOU (WT Br. 50) are beside the point. However characterized, the MOU set forth serious warnings and required the Bank to undergo fundamental restructuring. In any event, while it is true that regulators have enforcement mechanism that are more severe than an MOU (*e.g.*, a cease and desist order), it is also indisputable that regulators can take enforcement actions that are less severe than an MOU (*e.g.*, oral criticisms). Courts have concluded significantly less formal actions are indicative of scienter. *See, e.g.*, *Stratte-McClure*, 784 F. Supp. 2d at 388-89 (scienter where SEC's letter "raised detailed questions").

bank regulator whose role is not to detect fraud, but to "identif[y] and communicate" "problems or weaknesses" that may "adversely affect a bank's performance and viability." OCC, Policies & Procedures Manual § 5310-3 (2011), *available* at http://www.occ/gov/static/publications/ppm-5310-3.pdf. Consistent with this duty, the Federal Reserve assessed the Bank's health, identified problems that threatened the Bank's ability to operate, and prescribed corrective measures. Tellingly, the Federal Reserve concluded – and warned Wilmington – that, contrary to Defendants' public statements, the Bank's asset review was so inadequate that the Bank could not adequately assess credit risk. ¶¶45, 59, 65, 67-68, 79, 205, 213, 205.

Third, the MOU confirmed for each Officer Defendant the material deficiencies in the Bank's credit risk management, lending, reserves, and accounting functions – the areas leading to its ultimate demise. ¶¶48, 81, 83, 85-86. Notably, months after the MOU was issued, as regulators discovered the true extent of the deterioration in the Bank's loan portfolio, they issued Defendants an ultimatum: do an acquisition, or "face significant regulatory actions in the near term." ¶162.[43] This further supports the Officer Defendants' scienter.

#### e. The Officer Defendants Knew, Or Should Have Known, Of Facts That Belied Their Public Statements

The TAC also sets forth myriad particularized allegations regarding the Officer Defendants' knowledge of and access to facts that contradicted their public statements, further

---

[43] The cases on which Defendants rely do not support their argument. Unlike here – where Defendants received repeated regulatory warnings <u>throughout</u> the Class Period, including the MOU over a year before the end of the Class Period – Defendants' cited authorities all concern regulatory actions on the last day of, or long after, the class period. *See Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*, 2010 WL 1332574, at *12 (S.D. Fla. Mar. 30, 2010) (involving "post-class period conclusion"); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *6 n.5 (C.D. Cal. Aug. 21, 2009) (same); *N.Y.S. Teachers' Ret. Sys. v. Fremont Gen. Corp*., 2009 WL 3112574, at *13 (C.D. Cal. Sept. 25, 2009) (defendant's consent to FDIC cease-and-desist order on last day of class period did "not support determination that the challenged statements were false when they were made" <u>during</u> the class period.). Moreover, these cases addressed regulatory actions in the context of falsity (not scienter), concluding that "last day" or post-Class Period criticisms could not support the falsity of statements at the time they were made.

supporting an inference of scienter. *Green Tree*, 270 F.3d at 665 (scienter established where "defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate"); *RAIT*, 2008 WL 5378164, at *13 (inferring scienter where "the Officer Defendants had access to both inside and public information" contrary to public statements); *Reliance*, 91 F. Supp. 2d at 724 (inferring scienter where defendants repeatedly stated that loan loss reserves were sufficient but allegedly knew of loan portfolio's deteriorating condition). Such facts include:

- The Officer Defendants were the primary decision makers behind the Bank's reckless practices. ¶¶209-12. Their direct involvement in practices that rendered their statements false and misleading is strong evidence of scienter. *See Scholastic*, 252 F.3d at 76-77; *Corus* 701 F. Supp. 2d at 1029.

- Cecala, Harra, Gibson, and North attended regular meetings where they were informed that their practices exposed the Bank to undue risk and directly contradicted their statements. ¶¶209-12. *See Freudenberg*, 712 F. Supp. 2d at 198 ("[M]eetings, where the problems at issue were directly discussed with Defendants, evidence scienter"); *DVI*, 2010 WL 3522086, at *7 (scienter where "Defendant's status as a dominant member of the Credit Committee gave him access to information about DVI's loan portfolio and the financial background of DVI's potential customers and largest obligors").

- The Officer Defendants received regular reports informing them that their practices exposed the Bank to undue risk, directly contradicting their public statements. ¶¶209-12. *See Scholastic*, 252 F.3d at 72-73, 76-77 (scienter alleged by specifying internal reports containing undisclosed information); *PMA*, 2005 WL 1806503, at *11 (audit report identifying deficiencies supports scienter).

- Wilmington's failure to staff the ARG was such common knowledge that it was a "standing joke" within the Bank. ¶¶209-12; *see In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 467 (S.D.N.Y. 2005) (scienter inferred where improper practice is "common knowledge"); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) (scienter inferred where improper practice is "common knowledge" and "joked about").

In addition to the above:

**Cecala.** The TAC specifically connects Cecala to every aspect of the fraud and demonstrates his knowledge of and access to information contradicting his public statements.

For example, Cecala knew or recklessly disregarded that his statements regarding underwriting were false and misleading. Among other facts, he directed top lenders not to create or maintain underwriting documentation, leading to rampant underwriting deficiencies (¶¶92, 209); he received quarterly "Delinquency List" reports of loan quality and underwriting problems (¶209); and he knew of, had access and ignored technical deficiency reports detailing underwriting errors and deficiencies (¶¶46, 209). *See also* ¶199-207 (approved underwriting policies). Further, Cecala made his statements regarding asset review with scienter. Among other facts, he instructed the Workout group to delay obtaining updated appraisals, rendering risk ratings and reserves inaccurate, and he routinely attended ARG meetings and rejected risk rating downgrades without any objective analysis or substantive explanation. ¶209; *see also* ¶¶64, 79 (attended quarterly Credit Strategy Meetings where emerging credit problems were repeatedly discussed, but not corrected). Further, Cecala was responsible for approving the Bank's Loan Loss Reserve recommendation to the Board of Directors. ¶209.[44] Finally, Cecala abruptly resigned just as the Bank was reporting deteriorating credit. ¶¶135, 209.

In response, Cecala raises boilerplate arguments that the TAC's allegations amount only to his "membership on certain committees," "receipt of certain reports," and "attendance at certain meetings" that do not call into question the "accuracy" of his public statements. WT Br. 53. Those attempts to cherry pick allegations fail. As discussed above, those reports and meetings apprised Cecala of significant underwriting and asset review deficiencies. Considered alongside the numerous other indicia of scienter, the TAC establishes that Cecala knew or recklessly disregarded that his statements were false and misleading.

---

[44] Defendants contend that Cecala's and Gibson's personal involvement in reviewing and approving the Loan Loss Reserve does not evince scienter. WT Br. 52, 54-55. They are wrong. In part because of this review, Cecala and Gibson knew that the reserves were based on the Bank's inaccurate and manipulated loan risk ratings, and that the Bank was not adequately taking into account other vital credit trends.

Cecala further contends, without support, that only a "fevered imagination" could find scienter in his review of the Bank's forced remedial measures in response to the MOU. WT Br. 53. This is nonsense. The Federal Reserve demanded immediate action to remedy longstanding serious deficiencies at the Bank. The only plausible conclusion is that Cecala's forced response – after years of inaction – supports scienter, especially because these problems persisted.

Cecala next argues that vigorous opposition from credit review personnel (including CW 2) to his direct interference in the risk rating process does not show scienter.[45] WT Br. 53-54. His claim that these disputes were simple disagreements that were "ventilated fully" both raises a fact issue inappropriate to resolve at this stage and is not plausible, given that these disputes were ongoing and unresolved. *See* ¶¶61, 66-71, 79. Similarly, his superficial modifications to asset review do not mitigate scienter, particularly in light of his increased personal interference, which prevented those improvements from improving risk management. WT Br. 53-54; ¶¶66-69, 73-74, 77.

Further, contrary to Defendants' contention, Cecala's abrupt departure, just as the Bank implemented the MOU and started recognizing its true credit losses, supports scienter. WT Br. 54-55; ¶¶107-111, 176, 179; *see In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *10 (D.N.J. Sept. 30, 2009) (sudden resignation before fraud revealed contributed to inference of scienter); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (same); *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) (same).

Finally, Cecala's claim that his order to delay charge-offs by avoiding updating appraisals "would only have kept that quarter's reserve higher" (WT Br. 54) is wrong. Increased charge-offs due to widespread collateral deterioration would have caused an <u>increase</u> in reserves,

---

[45] Cecala's claim that the TAC identifies "only one" instance where the Credit Risk Division manipulated loan risk ratings at Cecala's direction is wrong, as explained above at page 30.

to account for significant negative credit trends. ¶¶74, 79, 81, 145 (FAS 5 and SAB 102).[46] Cecala's complicity in delaying formal recognition that collateral had materially deteriorated in value – thus delaying increased reserves and charge-offs – is powerful evidence of his scienter.[47]

**Gibson.** The TAC sets forth numerous specific allegations of Gibson's scienter. *See* ¶210. For example, Gibson oversaw monthly ARG meetings where Cecala and Harra overrode credit decisions regarding loan rating changes, charge-offs, credit risk review, and loan loss reserves. ¶¶69-70, 210. Defendants suggest that CW 2's attendance at those meetings renders this fact irrelevant. WT Br. 55. In essence, Defendants argue that a defendant's presence at relevant meetings cannot support scienter where – as will always be the case – others are present. This is obviously not the law. Further, as discussed above, Gibson's attendance at regular meetings where material deficiencies were discussed is probative of scienter. WT Br. 54-55; s*ee DVI*, 2010 WL 3522086, at *7. Finally, Gibson's admission (along with Foley's and North's) in June 2010 that the Bank was "not being as proactive as they needed to be in the past in dealing with the bank's credit challenges" also supports scienter, as it demonstrates that he knew of, or recklessly disregarded, the significant losses in the Bank's loan portfolio before the November 1 announcement despite the Bank's steadfast public denials. ¶206. *See In re Daou Systems Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) (scienter inferred from "specific admissions from top executives that they monitored portions of the company's database").[48]

**Harra.** The TAC's particularized allegations of Harra's scienter are summarized at ¶211.

---

[46] Defendants imply that Cecala's order is irrelevant because the TAC purportedly fails to allege that the Bank's charge-offs were understated. WT Br. 34. To the contrary, the TAC specifically alleges that Cecala did not allow "necessary" charge-offs to occur. ¶75.

[47] To the extent Defendants apply any of these arguments to negate the scienter of the other Officer Defendants, these responses apply equally to those arguments.

[48] Defendants contend that this allegation is mere "fraud by hindsight." WT Br. 55. But this admission came months before the end of the Class Period and the disclosure of the truth.

These facts include, *e.g.*, that Harra acted with Cecala in overriding the Bank's credit personnel and manipulating the Bank's internal loan risk ratings and disregarded ARG concerns about Terranova. ¶¶70-71, 174, 176, 210. Defendants do not separately dispute Harra's scienter.

**North.** Among other things, as Chief Credit Officer and head of the Loan Committee, North was aware of the Bank's lax underwriting policies and practices, including the 10% Rule (¶212). Moreover, North disregarded ARG's concerns about Terranova and received technical deficiency reports detailing underwriting errors and deficiencies, which he regularly ordered be altered to remove deficiencies without any remedial actions. ¶¶50, 212. North's June 2010 admission (¶206) and his abrupt resignation as the Bank reported deteriorating credit in the summer of 2010 in response to the MOU, as set forth above, further supports scienter. ¶138. *See also* ¶212 (summary of North's scienter). In response, North contends, *ipse dixit*, that he believed his statements to be true. North Br. 16-17. The Court cannot simply take North's word given the allegations to the contrary here. *Tellabs*, 551 U.S. at 322.

**Foley.** Defendants argue that allegations regarding Foley are inadequate "status" pleading based solely on his position on the Board and what he "must have known." WT Br. 56. They are wrong. Foley was provided with specific information that supports his scienter. For example, Foley: (1) approved underwriting policies as a member of the Board and therefore knew of, among other lax policies, the Bank's reckless 10% Rule (¶213); (2) served on the Board's MOU compliance committee that reviewed remedial measures to underwriting, asset review, and accounting policies, and thus would have learned (if he did not already know) of the full scope and depth of the Bank's deficiencies in those areas (¶213); and (3) took over as CEO and Chairman of the Board in the summer of 2010, after three years of warnings about serious asset review deficiencies by regulators and auditors. ¶¶27, 134. By the time Foley falsely

assured the market on June 4 that there were no credit problems (and failed to correct Cecala), he was well aware that those statements were materially misleading. ¶136. Indeed, three weeks later, he admitted to "not being [] proactive" with the Bank's credit challenges, further demonstrating his scienter. ¶206.[49]

### 3. Defendants' Competing Inferences Should Be Rejected

Defendants' primary competing inference is that its risk management and reserving practices were reasonable, but that the financial crisis took them by surprise. WT Br. 40; North Br. 16. Defendants were not innocent victims of the crisis. By the beginning of the Class Period in January 2008, the financial downturn was underway and should have been taken into account. But the Bank failed to do so when underwriting, reviewing its loans, and setting its reserves. ¶¶116, 121-22. Moreover, the fact that the Officer Defendants ignored repeated warnings in the precise areas at issue belies their claim that the increased losses were the result of an unexpected crisis.

Courts have uniformly rejected this precise argument in the wake of the recent financial crisis. *See, e.g.*, *In re Bear Stearns*, 763 F. Supp. 2d at 505 (rejecting "competing inference of market implosion"); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 237 (S.D.N.Y. 2010) (rejecting inference of the "'severity and speed'" of market downturn); *E*TRADE*, 712 F. Supp. 2d at 192 (same); *Corus*, 701 F. Supp. 2d at 1019-21 (rejecting inference that company could not have known the magnitude of its losses following the "worst recession since the Great Depression"); *Regions Fin.*, 2011 U.S. Dist. LEXIS 60761, at *25 (same); *New Century*, 588 F. Supp. 2d at 1230 (same).

---

[49] The FBI and SEC investigations, and the empaneling of a grand jury, provide additional circumstantial evidence of the Officer Defendants' scienter. ¶¶88, 149, 164, 166; *see Eastwood Enters. LLC v. Farha*, 2009 WL 3157668, at *4 (M.D. Fla. Sept. 28, 2009) ("pendency of an investigation . . . suggest[s] that a fraud may have occurred").

As the court in *In re Ambac Financial Group, Inc. Securities Litigation* stated in rejecting this argument and finding a strong inference of scienter:

> It is possible that defendants, faced with an unprecedented and uncertain situation, lacked the internal mechanisms to calculate accurately the scale of losses in their CDO portfolio. However, taking the facts in the light most favorable to the plaintiffs, this does not amount to a more compelling inference than that proffered by plaintiffs based on the facts alleged. Viewing the allegations collectively, there is a vast gap between the picture that Ambac presented to investors – of an insurance company that maintained its conservative approach over the years – and the alleged practices within the company, namely the undisclosed lowering of underwriting standards to drive short-term profits.

693 F. Supp. 2d 241, 269-70 (S.D.N.Y. 2010); *see also id.* ("The conduct that plaintiffs allege, if true, would make Ambac an active participant in the collapse of their own business").

Second, Wilmington argues that the Officer Defendants' scienter is negated because Wilmington incrementally increased reserves during the Class Period. WT Br. 42-44. This is wrong. Any increases were woefully insufficient, as confirmed by the $800 million in additional credit losses exposed at the end of the Class Period. Wilmington was required to set its reserves in anticipation of probable losses inherent in the Bank's existing loans. ¶114. The fact that it took time for those losses to materialize is hardly surprising, especially given Defendants' manipulation of Wilmington's Reserve and the data upon which it was based. ¶¶113-28.

This exact argument was rejected in *Corus*. Defendants there argued that any inference of scienter was undermined by an increase in reserves, and "the frankness of some of its statements," during the class period. *Id.* at 1024. The Court rejected that argument:

> Plaintiff does not contend that Corus sought to pull the wool over the public's eyes by claiming that it would pass the recession entirely unscathed. Instead . . . Corus's fraud consisted largely in concealing the full extent of its financial difficulties. Thus, the fact that Corus disclosed certain of its difficulties during the class period does not necessarily negate an inference of scienter, for Corus's statements may still have been intended to conceal the fact that its condition was substantially worse than its statements suggested.

*Id*. at 1024-25. Here, as in *Corus*, Defendants sought to conceal that Wilmington's "condition was substantially worse than its statements suggested," and that it could weather the financial crisis. ¶¶42-43. Further, the (insufficient) reserve increases at the end of the Class Period came about only because of demands from the Federal Reserve. However, the Officer Defendants told investors that they were just being "cautious" and responding to the Delaware economy rather than remedial measures to account for their deficient lending practices ¶¶95, 129, 132.[50] Where, as here, defendants fail to reveal the extent and magnitude of a company's problems and misrepresent the cause, courts routinely infer scienter even where there are (insufficient) disclosures or (inadequate) increases in reserves.[51]

Third, Defendants' claim is wrong that Treliant's failure to "report[] fraud to anyone" undermines scienter. WT Br. 52. Not only is this a fact issue as to what Treliant informed the Federal Reserve, which was running the Bank's credit practices at the time (¶45), but Defendants also seek to place responsibility for the accuracy of the Bank's disclosures on third parties. This contradicts the law and relevant facts. *Wilkof v. Caraco Pharm. Labs., Ltd.*, 2010 WL 4184465, at *7 (E.D. Mich. Oct. 21, 2010) ("various courts have rejected [the] argument" that the "use of

---

[50] Defendants wrongly rely on *Waterford*, 2010 WL 1332574 (WT Br. 43). Unlike here, the court in *Waterford* highlighted that the plaintiffs did not allege the defendants were contemporaneously warned of the problems in their portfolio and risk management practices. *See id*. at *14, *16. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990), is also inapplicable since Plaintiffs' allegations are that if Defendants' risk management statements were true the Bank would have recognized bad loans, not merely "recklessness or fraud in making loans."

[51] *See, e.g.*, *Lerch v. Citizens First Bancorp., Inc.*, 805 F. Supp. 1142, 1153 (D.N.J. 1992) ("the sudden dramatic escalations of loan loss reserves," along with "assurances about [the company's] conservatism and risk-averse policies," could "lead one to believe that fraud has taken place"); *PMA*, 2005 WL 1806503, at *3, *6 (sustaining loan loss reserve claims notwithstanding reserve increases announced halfway through class period); *Regions Fin.*, 2012 WL 2318105, at *14 (rejecting argument that "increased loan loss reserves" rendered reserve misrepresentations immaterial, because such disclosures were "not tantamount to knowledge that [defendant] was intentionally and falsely overstating its position to appear more financially secure than was in fact true."); *Countrywide*, 2009 WL 943271, at *3 (sustaining loan loss reserve claims against all defendants, including KPMG, despite argument that corporation increased loan loss reserves "each quarter during 2006 to reflect market conditions").

outside consultants negates any inference that they acted with fraudulent intent") (citing, *inter alia*, *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *8, 30 (D.N.J. 2008)). Here, Treliant's review actually exposed that the Bank's loans had been drastically over-rated. ¶¶73, 81.

Lastly, the Officer Defendants argue that since they did not sell stock, and Harra and Cecala acquired some, an inference of scienter is negated. WT Br. 51-52. But insider purchases of stock, or the absence of any insider selling, is not determinative of scienter. *See Tellabs*, 551 U.S. at 325 (motive allegations unnecessary); *In re Thornburg Mortg. Sec. Litig.*, 695 F. Supp. 2d 1165, 1194-95 (D.N.M. 2010) (in light of financial crisis, motive of "survival" is as compelling as insider selling to establish scienter).

**D. Defendants' Statements Are Not Protected By The PSLRA Safe Harbor**

The PSLRA and the "bespeaks caution" doctrine provide a limited safe harbor for certain "forward-looking" statements if they are accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially. 15 U.S.C. § 78u-5(c)(1); *Adams Golf*, 381 F.3d at 280. "The safe harbor provision does not afford . . . a free pass to lie to investors." *Veritas*, 2006 WL 1431209, at *7. Further, the doctrine protects only representations regarding the future, not statements concerning the company's current financial condition. *See EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 876 (3d Cir. 2000). Only North and the Underwriters argue that these doctrines protect their statements. North Br. 12-14; UW Br. 10-11. The other Defendants concede that the statements deserve no such protection.

Here, the statements that North identifies fail to qualify for safe harbor protection. First, they are not accompanied by meaningful cautionary language. Each conference call in which North made false and misleading statements was preceded by generic warnings so vague in

nature that they could have applied to any bank.[52] As a matter of law, such boilerplate language does not warn investors of the risks of the Bank's reckless underwriting, failure to update appraisals, and failure to review and downgrade assets appropriately (among other improper practices). There is "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. P'ships. Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996); *see also In re EVCI Colleges Holding Corp. Sec. Litig*, 469 F. Supp. 2d 88, 102-103 (S.D.N.Y. 2006). The "cautionary language" North identifies was insufficient to offset the false impressions left by his statements.[53]

The Underwriters contend that Wilmington's Loan Loss Reserve is entitled to protection under the safe harbor doctrine. UW Br. 10-11. However, statements that appear in financial statements purporting to comply with GAAP do not receive safe harbor protection as a matter of law. *See* 15 U.S.C. § 78u-5(b)(2)(A); 15 U.S.C. § 77u-2(b)(2)(A).[54] Additionally, as numerous cases have recognized, reserves are not forward-looking statements. *See, e.g.*, *PMA*, 2005 WL 180653, at *6; *Winslow*, 2011 WL 7090820, at *18; *SLM*, 740 F. Supp. 2d at 556; *Freudenberg*, 712 F. Supp. 2d at 194. Notably, the Underwriters do not cite a single case in which reserve calculations received protection under the bespeaks caution doctrine.[55] In fact, Wilmington

---

[52] *See* Ross Decl. Ex. 23 at 1 (D.I. 89.23) ("Our ability to achieve the results reflected in these statements could be affected adversely by changes in national or regional economic conditions, changes in market interest rates, fluctuations in equity or fixed income markets, higher than expected credit losses . . . "); Ex. 24 at 1 (D.I. 89.24) (similar).

[53] North's statements are also not protected because, as described in Section V.D, he knew that the statements were false at the time they were made. *Veritas*, 2006 WL 1431209, at *7.

[54] The Underwriters' arguments that the Offering Documents generally warned of the possibility of losses due to economic slowdown (UW Br. 11) fail for the same reasons as North's: the "cautionary language" Wilmington offered was insufficient to offset the false impressions left by its statements.

[55] Nor do the Underwriters cite any cases holding that reserves are forward-looking statements. Neither *Shapiro*, 964 F.2d at 281, nor *Fait*, 655 F.3d at 113 (UW Br. 9), addresses the bespeaks caution doctrine, and neither case holds reserves to be forward-looking.

admits that its reserves were based solely on "losses that have already occurred." WT Br. 47.

### E. Plaintiffs Have Pled Loss Causation

A complaint need only provide a "short and plain statement provid[ing] the defendant with fair notice" of plaintiffs' loss causation theory. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (applying Rule 8(a)) (quotation omitted). "[A] plaintiff need not show that a misrepresentation was the sole reason for the investment's decline in value," only that a "defendant's wrongful conduct was a substantial factor" in that decline. *In re Tyson Foods, Inc. Sec. Litig.*, 2004 WL 1396269, *12-13 (D. Del. June 17, 2004) (Robinson, J.) (citation omitted). Loss causation is fact-intensive and "best resolved by the trier of fact." *Id.* at *13.

Plaintiffs have surpassed these standards. Throughout the Class Period, Wilmington's stock price was inflated by material misstatements and omissions that created the false impression that the Bank was weathering the financial crisis. ¶221. Wilmington's piecemeal corrective statements disclosed over time the extent of Wilmington's misrepresentations and omissions, causing significant stock price declines. ¶¶129-61, 222; *see also supra* § II.F. Those partial corrective disclosures included dramatic quarterly increases to the Reserve (¶¶130-33), Cecala's departure (¶¶134-38), and Defendants' admissions about deteriorating credit (¶¶139-49), culminating in the November 1 disclosure about the M&T acquisition and the massive losses inherent in the Bank's loans, causing a stock drop of over 40%. ¶159. In total, from January 28 to November 1, Wilmington's stock price declined over 70%, dropping from $15.26 to just $4.21. ¶161.

In response, Defendants wrongly contend the TAC fails to allege loss causation because macroeconomic events caused investors' losses. WT Br. 56. This is a fact question inappropriate for resolution at this time. *Tyson Foods*, 2004 WL 1396269, at *12. Further, courts consistently reject the argument that the "financial crisis" and "broad macroeconomic

factors" caused plaintiffs' losses. See *Countrywide*, 588 F. Supp. 2d at 1174(rejecting argument that financial downturn negates loss causation and stating "the court will not be distracted by . . . other macroeconomic arguments").[56]

Wilmington's cases are inapposite. Those complaints failed to plead loss causation on their own, regardless of an economic crisis. *In re Sec. Cap. Ass. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 599 (S.D.N.Y. 2010) (plaintiffs failed "to demonstrate a correlation between 'revealed' facts and a decline in [defendant's] stock price," and noting a rise in stock price following corrective disclosures); *In re Homebanc Sec. Litig.*, 706 F. Supp. 2d 1336, 1361 (N.D. Ga. 2010) (plaintiffs failed to allege the corrective disclosures caused a stock drop); *Cole v. Fed. Home Loan Mortg. Corp.*, 1991 WL 180295, at *6 (D.D.C. Aug. 27, 1991) (same); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) (no loss causation in non-class action RICO claim where a five year gap separated misrepresentations and plaintiff's losses).[57]

Wilmington's attempt to blame Plaintiffs' losses on the "Great Recession" ignores that, by the date of the first disclosure in January 2010, the economy was recovering and the Bank's peers were "reporting stronger credit and financial results as they emerged from the recession, while the Bank suddenly appeared to be in trouble." ¶129. In contrast, investors' losses in *Kuriakose v. Federal Home Loan Mortgage Company*, 2011 WL 1158028 (S.D.N.Y. Mar. 30,

---

[56] *See, e.g.*, *George v. China Automotive Sys. Inc.*, 2012 WL 3205062, at *11-12 (S.D.N.Y. Aug. 8, 2012) (rejecting argument that financial downturn negates loss causation); *In re Bear Stearns*, 763 F. Supp. 2d 423, 484, 506-08 (S.D.N.Y. 2011) (rejecting argument that a "market-wide downturn" caused losses, finding that stock price drop was directly related to disclosure of defendants' misrepresentations, and ruling that competing theories would be addressed by trier of fact); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 414 (S.D.N.Y. 2010) (same); *In re Am. Int'l Grp. Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010) (same); *In re Citigroup*, 753 F. Supp. 2d at 237-38 (same); *Ambac*, 693 F. Supp. 2d at 273-74 (same).

[57] Defendants' reliance on *60223 Trust v. Goldman Sachs & Co.*, 540 F. Supp. 2d 449 (S.D.N.Y. 2007), and *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp.2d 349 (S.D.N.Y. 2008), is also misplaced. Those cases addressed allegations of false and misleading analysts' reports and involved substantial stock declines that predated alleged corrective disclosures. *See also Glover v. DeLuca*, 2006 WL 2850448, at *33-34 (W.D. Pa. Sept. 29, 2006) (no loss causation because the full extent of the fraud was not made known to the market until two months after the company's stock price declined).

2011) ("Freddie Mac") (WT Br. 58), occurred contemporaneously with the collapse of the credit markets beginning in late 2007, and culminated with Freddie Mac's seizure by the government in September 2009.[58] Here, unlike there, the "marketwide phenomenon" ended before the corrective disclosures.

Finally, Wilmington's argument that its stock price had declined prior to the alleged corrective disclosures (WT Br. 57-58) has no bearing on loss causation. Whether a particular false statement had a measurable effect on stock prices relates only to the transaction causation element of a Section 10(b) claim, and is properly addressed later by experts and the trier of fact. *See McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 430 (3d Cir. 2007) ("We have never suggested that the loss causation inquiry may 'effectively merge' with the transaction causation inquiry."). Moreover, the relevant inquiry is whether the stock price declined in response to a corrective disclosure, not whether it moved in response to an allegedly false statement. *See Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009); *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1317 (11th Cir. 2011) ("Defendants whose fraud <u>prevents</u> preexisting inflation in a stock price from dissipating are just as liable as defendants whose fraud introduces inflation into the stock price in the first instance."); *Schleicher v. Wendt*, 618 F.3d 679, 683-84 (7th Cir. 2010) (loss causation alleged regardless of whether false statements "propel the stock's price upward . . . [or] were designed to slow the rate of fall.").

## V. <u>PLAINTIFFS ADEQUATELY ALLEGE SECURITIES ACT VIOLATIONS</u>

Counts Four, Five, and Six of the Complaint allege violations of the Securities Act in connection with the February 2010 Offering. *See* ¶¶266-348. Specifically, Plaintiffs allege that

---

[58] Defendants' remaining cases also fail. WT Br. 58. Each pre-dates the Supreme Court's decision in *Dura*, and none addresses the governing loss causation requirements at issue in this type of securities fraud action. *See Bastian v. Petren Res. Corp.*, 892 F.2d 680, 684 (7th Cir. 1990) (pre-*Dura* dismissal where plaintiffs "suggested no reason why their investment was wiped out"); *Harrell v. Primedia, Inc.*, 2003 WL 21804840 (S.D.N.Y. Aug. 6, 2003) (dismissing RICO claims without discussing causation).

the registration statement and prospectus supplements issued in connection with the Offering (the "Offering Documents," *see* ¶267) contained false and misleading statements, because they incorporated by reference many of the Bank's Class Period quarterly and annual SEC filings.

Section 11 imposes a "stringent standard of liability" that "places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). A plaintiff "need only show a material misstatement or omission [in a prospectus or oral communication] to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Suprema*, 438 F.3d at 269-70. Defendants do not dispute that Plaintiff's Securities Act claims are not grounded in allegations of fraud and, thus, that "the liberal notice pleading requirements of Rule 8 apply." *Id.* at 270. Accordingly, the TAC need only "say enough to give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Tellabs*, 551 U.S. at 319 (quoting *Dura*, 544 U.S. at 336).

### A. Materially False And Misleading Statements in the Offering Documents

As set forth above at Sections IV.B.1-4, the TAC contains ample allegations that statements in the Offering Documents concerning the Bank's underwriting, asset review, financial statements, and internal controls were materially false and misleading when made.

#### 1. Wilmington's Financial Results And Reserve Methodology Are Not Opinions

Defendants rely on the Second Circuit's opinion in *Fait v. Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011), to argue that, as a matter of law, reserves are statements of opinion that can be false only if the speaker "did not honestly believe that the reserves were accurate." WT Br. 28-31, KPMG Br. 13-18, UW Br. 7-9. Defendants are wrong.

First and most obviously, whatever standard applies, Plaintiffs have unquestionably pled that Wilmington did not honestly believe the Reserve was accurate, for the reasons discussed

above. Thus, there is no question that Plaintiffs have pled a Section 11 claim against the Bank. Moreover, because Wilmington was the "speaker," its disbelief in its own reserve accounting rendered the statements false. As a result, the Underwriters are liable under Section 11 regardless of what they themselves subjectively believed because Section 11 imposes liability on underwriters for false registration statements, 15 U.S.C. § 77k(a)(5), and *Fait* does not require a defendant-specific showing of subjective disbelief. *See Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 326-27 (S.D.N.Y. 2010) ("the 'subjective falsity' that *Fait* requires . . . is falsity on the part of the originator of the opinion"; a registration statement is rendered false so long as it misrepresents the belief of opinion's originator; liability is imposed on other defendants for association with a false registration statement, regardless of what they individually believed).

In any event, *Fait* conflicts with well-established and controlling Third Circuit law. In the Third Circuit, whether financial statements complied with GAAP or the issuers' own stated accounting policies are questions of fact, not opinion. *See Burlington*, 114 F.3d at 1421 (GAAP compliance is a fact question); *Shapiro*, 964 F.2d at 281 ("[t]here is nothing unique about representations and omissions regarding loan loss reserves that removes them from the purview of the antifraud provisions of the federal securities laws"); *accord WaMu*, 694 F. Supp. 2d at 1224 (GAAP compliance "is an actionable statement of fact," not opinion). A district court within this Circuit recently reaffirmed – multiple times – that statements regarding reserves like those here are actionable statements of fact and not, as a matter of law, opinions. *See Underland I*, 2011 WL 4017908, at *9 (Third Circuit law does not provide that "all statements pertaining to loan loss reserves are opinions") (citing *Shapiro*, 964 F.2d at 282); *Underland II*, 2012 WL 2912330, at *5 & n.47 (rejecting that loss reserves are pure subjective measures and noting all

loan loss methodologies possess objective elements) (*citing Shapiro*, 964 F.2d at 281).

The *Underland* decisions are instructive. Plaintiffs there alleged that defendants (Advanta Corporation and its auditor KPMG) did not properly follow GAAP or their own disclosed method for calculating the loan loss reserve, and consequently misled investors regarding the adequacy of the company's loan loss reserve and net income. *See Underland II*, at *4. In response, relying on *Fait* and *Shapiro* (as do Defendants here), Advanta and KPMG contended that statements concerning loan loss reserves are always opinions, the falsity of which can be established only with allegations that defendants "subjectively disbelieved" their reserve estimates. *Underland I*, 2011 WL 4017308, at *9. The *Underland* court rejected these arguments <u>three</u> times – including when KPMG moved for reconsideration of the Court's *Underland II* decision. *See Underland v. Alter*, 2012 WL 4108998 (E.D. Pa. Sept. 18, 2012) ("*Underland III*"). Each time, the court held that Section 11 claims alleging that defendants "failed to consider all material factors" under GAAP in setting reserves (when their public representations were to the contrary) set forth actionable false statements, regardless of a defendant's subjective beliefs. *Underland II*, at *5; *see also Underland I*, at *9 ("Unlike a subjective evaluation that a loan reserve is adequate or not, nonconformance to a stated methodology to arrive at a loan loss reserve amount is a measurable objective fact").[59] The court determined that plaintiff adequately claimed the falsity of KPMG's certifications, based on the allegation that KPMG "should have been aware" of Advanta's GAAP violations regardless of whether its certifications were fact or opinion. *Underland III*, 2012 WL 4108998, at *3 (noting

[59] Indeed, *Fait* itself recognizes that reported loan loss reserves may be factual misstatements and not opinions. 655 F.3d at 113 (plaintiffs' claims failed in part because they did not "point to an objective standard for setting loan loss reserves"). Here, the TAC alleges objective standards against which Wilmington's loan loss reserve could be measured, including specific GAAP provisions and the Bank's own stated methodology for calculating loan loss reserves. ¶¶299-300, 303; *see supra* §IV.B.3. Thus, even under *Fait*, Defendants' statements would not constitute opinions.

that distinction between fact and opinion was not controlling question in *Underland II*).[60]

Here, as in *Underland*, Defendants falsely represented that the Bank's reserves were established in accordance with GAAP and with Wilmington's own methodology. ¶¶298-99. Further, as in *Underland*, KPMG certified Wilmington's financial statements "without certifying that [the Bank] had considered all relevant internal and external factors and risks." *Underland II*, 2012 WL 2912330, at *5; ¶¶303-06. Accordingly, those are actionable statements.[61]

The Third Circuit rule treating GAAP issues as fact questions is in accord with Section 11 itself, because Section 11 imposes liability for *negligent*, as well as intentional, misstatements. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 (1976). Loss reserves directly impact net income, the most critical measure of a company's health. *See Burlington*, 114 F.3d at 1420 n.9. It is inconceivable that Congress enacted Section 11 with a negligence standard, and yet expected that liability for the most critical information in the financial statement would be imposed only for <u>intentionally</u> false statements. Indeed, to hold that all statements of reserves must be subjectively false because they result from "judgment" would apply to any financial statement because, like reserves, all of GAAP is a matter of judgment.

---

[60] KPMG's attempt to distinguish the *Underland* decisions fails. KPMG Br. 17, n. 16. The claims in *Underland I* were dismissed against KPMG because plaintiffs there failed to "allege[] that the statements did not conform to GAAP." *Underland I*, 2011 WL 4017908, at *10. Conversely, the claims against KPMG in *Underland II and III* were sustained because plaintiffs corrected that oversight and alleged a GAAP violation. *Underland II*, 2012 WL 4108998, at *5. In fact, the court rejected KPMG's argument (the same one it makes here) that the complaint failed to identify specific GAAP allegations, finding that the allegation that the loss reserve "failed to incorporate past and present adverse credit trends and thus did not comply with" GAAP was sufficient. *Id at *5.* Thus, the *Underland* court did <u>not</u> apply a "standard akin to subjective falsity." The claims at issue here more than satisfy the *Underland* court's standard.

[61] KPMG incorrectly argues that *Shapiro* held that all statements on loan loss reserves are pure matters of opinion. KPMG Br. 15-16. *Shapiro* instead <u>supports</u> Plaintiffs' position that Defendants' representations regarding their reserves were verifiable issues of fact. *See Underland II*, 2012 WL 2912330, at *5. As *Shapiro* notes, there are known methodological requirements for the proper calculation of loan loss reserves, and compliance with those requirements is a verifiable issue of fact, not opinion. 964 F.2d at 281. *Shapiro* did not hold, as KPMG argues, that reserves are false only when defendants acted "knowingly or recklessly," KPMG Br. 16; rather, those terms were used because the claim in *Shapiro* was brought under Section 10(b), rather than Section 11, where intentional or reckless conduct is an element.

*Burlington*, 114 F.3d at 1421 n.10. Congress could not have intended this when it enacted Section 11 with a negligence standard.[62] Tellingly, even the Second Circuit, in an opinion authored by *Fait*'s author, recently reaffirmed the "minimal burden" of Section 11. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 145 (2d Cir. 2012) ("Sections 11 . . . impose[s] essentially strict liability for material misstatements contained in registered securities offerings").

Moreover, even if the Court accepts Defendants' contention that their false loan loss reserve statements are "opinions," Plaintiffs have satisfied their burden. In the Third Circuit, even pure statements of opinion are actionable if they are made without a reasonable basis. *See, e.g.*, *Burlington*, 114 F.3d at 1428 ("The Supreme Court has held that statements of opinion by top corporate officials may be actionable if they are made without a reasonable basis."); *Trump*, 7 F.3d at 368 (opinions are actionable misstatements if they are not "genuinely and reasonably" believed); *In re Merck & Co., Inc. Sec. Deriv. & ERISA Litig.*, 543 F.3d 150, 166 (3d Cir. 2008) (opinions actionable if made without "a reasonable basis"); *Underland III*, 2012 WL 4108998, at *2 n.10 ("the Third Circuit has held that statements of opinion set forth in registration statements are actionable under § 11 if the company lacks a reasonable basis for that statement") (internal citations omitted). Significantly, even out of circuit precedent cited by Defendants agrees that opinions are false when they lack a reasonable basis. *See Plumbers' Union v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011) (KPMG Br. 15). Critically, Defendants are wrong to argue that *Fait* requires proof that Defendants acted "knowingly or recklessly." WT Br. 40-43; UW Br. 6-8; KPMG Br. 15-16. *See Fait*, 655 F.3d at 112 n.5 (subjective falsity is not

[62] Courts routinely recognize that actionable reserve misstatements may be made negligently as well as intentionally, and thus distinguish the issue of falsity from the separate issue of scienter. *See, e.g*; *New Century*, 588 F. Supp. 2d at 1229-32, 1238-39 (sustaining reserves claim under Section 11 negligence standard).

scienter).[63]

Plaintiffs here allege that Wilmington's Loan Loss Reserve was set without a reasonable basis. The fact that Wilmington's management exercised discretion when provisioning for reserves does not excuse the Bank from exercising that discretion reasonably within the confines of GAAP and the company's own stated practices.[64] KPMG Br. 23. Likewise, the TAC alleges that KPMG lacked any reasonable basis for accepting the Bank's reserve methodology or results, as demonstrated by, among other things, KPMG's repeated warnings that the Bank's asset review was inadequate, and its failure to verify that the reserves took into account this inadequacy as well as all other credit trends. *See* ¶¶65-66, 305-06. Therefore, under the Third Circuit standards for opinion-falsity, Plaintiffs have pled the Bank's Reserves were false.

### 2. <u>KPMG Is Liable For Its False Certifications And Statements</u>

KPMG is liable under Section 11 for false statements or omissions "with respect to the statement in such registration statement . . . which purports to have been . . . certified by [it]." 15 U.S.C. § 77k(a)(4).[65] After identifying critical deficiencies in the Bank's asset review and internal controls in 2007 and 2008, and after the Federal Reserve's similar criticisms in 2007, 2008 and 2009, KPMG nonetheless: (i) certified the Bank's 2007 and 2009 financial statements

---

[63] *Fait* expressly held that "the standard [of subjective falsity] applied here does not amount to a requirement of scienter," and noted that a plaintiff could demonstrate subjective falsity by showing "'that the favorable opinions were without a basis in fact.'" 655 F.3d at 112 (internal quotations omitted). Accordingly, even if subjective falsity were required, Plaintiffs have not "pled themselves out of a claim" by expressly disclaiming fraud. WT Br. 31. *Fait* also reaffirmed that Section 11 claims alleging the "subjective falsity" of reserve accounting need only be pled "plausibly," *i.e.*, in accordance with Rule 8. *Fait*, 655 F.3d at 112 n.5, 113.

[64] Defendants incorrectly contend that the reserve allegations constitute "hindsight" pleading. WT Br. 29; KPMG Br. 3, 20, 22. "Fraud by hindsight" refers to allegations based <u>solely</u> on the fact that conditions worsened from previous statements. *Avaya*, 564 F.3d at 269. Here, Plaintiffs base their allegations on contemporaneous practices at the time the statements were made. ¶¶305-06; *see RAIT*, 2008 WL 5378164, at *5 (not "fraud by hindsight" to allege that defendants "misrepresented the credit underwriting and monitoring process at the time of filing"). As *Fait* itself makes clear, false statement liability may lie when a plaintiff identifies a particular objective standard against which management's accounting judgment can be measured. *See* 655 F.3d at 113.

[65] In addition, KPMG is liable for false statements by Wilmington. *FHFA*, 858 F. Supp. 2d at 326-27.

as GAAP-compliant; (ii) certified that the Bank's internal controls were effective; and (iii) stated it had conducted its audit in accordance with Generally Accepted Auditing Standards ("GAAS").

As set forth above, the TAC pleads that the Bank's financial statements (in particular, its Loan Loss Reserve and net income) did not comply with GAAP and its internal controls were not effective, yet KPMG certified that they were. Thus, Plaintiffs have stated a claim against KPMG. *See Huddleston*, 459 U.S. at 381 n.11 (auditors are liable for "matters which purport to have been . . . certified by them"); *Underland II*, at *5 (KPMG's certification of financial statements, including loan loss reserves, violated § 11 where issuer's reserving methodology violated GAAP); *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 492 (S.D.N.Y. 2005).

KPMG also misstated its own compliance with GAAS and other auditing standards. In its 2007 and 2009 audit reports, KPMG stated that it performed its audit "in accordance with the standards of the Public Company Accounting Oversight Board." ¶¶303, 308-09. That purported compliance is a factual representation "that is material to those relying on its certification." *WaMu*, 694 F. Supp. 2d at 1224; *see also Underland II*, 2012 WL 2912330, at *3 (holding actionable KPMG's certification of compliance with PCAOB standards). KPMG failed, as required by the PCAOB and GAAS General Standard Nos. 2 and 3, to exercise due professional care and to obtain competent sufficient evidentiary matter to form a basis for its opinion. ¶¶305-306. Had it done so, it would have concluded (as did M&T and the Federal Reserve) that the Bank's financials violated GAAP and its internal controls were ineffective. Further, had KPMG conducted a GAAS-compliant audit, it would have learned about the Delaware Status Review and the "serious concerns" with the Bank's Delaware lending. This would have alerted KPMG to the severe credit risk in the Bank's portfolio and the fact that the Bank's financials violated

GAAP, and that its internal controls were ineffective. ¶¶305-306.[66]

KPMG's failures are further demonstrated by its repeated warnings to the Bank. After warning the Bank about serious asset review and internal controls deficiencies in 2007 and 2008, KPMG nonetheless issued unqualified audit opinions even though the Bank repeatedly disregarded these warnings, and the problems continued unresolved throughout the Class Period. ¶¶277, 303-06, 308-09. Given the Bank's failure to adequately address these (and other) warnings, KPMG's unqualified audit opinions lacked a reasonable basis and its warnings cannot absolve it of liability. The TAC's allegations are adequate to plead a violation of Section 11 under Rule 8(a). *See Majesco*, 2006 WL 2846281, at *4 (falsity of GAAS compliance statements cannot be decided on a motion to dismiss).[67]

In response, KPMG wrongly contends that – regardless of whether the Bank's underlying misrepresentations about its Loan Loss Reserves were opinions (which they are not) – KPMG's certifications, audit reports, and statements that its audit complied with GAAS are opinions that are subject to a higher pleading standard than other misstatements under Section 11. KPMG Br. 9-11. First, KPMG's characterization of its statements as "opinions" lacks merit. The statute requires auditors and management to "attest to" the quality of a company's internal controls. 15

[66] KPMG incorrectly contends that the allegations against it are an "afterthought." KPMG Br. 1. The fact that the bulk of the TAC's allegations focus on Wilmington, rather than KPMG, is a natural result of respective pleading standards for claims under the Exchange Act and the Securities Act. Likewise, KPMG's suggestion that Plaintiffs seek to "erase" certain allegations in the FAC by omitting them from the TAC is incorrect. KPMG Br. 6 n.8. The TAC's allegations are entirely consistent with those in the FAC, but Plaintiffs omitted certain contextual allegations to streamline the TAC in accordance with the Court's Order. In fact, the FAC's allegations that KPMG conducted a "deep dive review" of Wilmington's portfolio support claims against KPMG by demonstrating that KPMG had contemporaneous knowledge of Wilmington's serious accounting issues, but still issued unqualified audit opinions. *See, e.g.*, FAC ¶90. In any event, "[a]n amended complaint supersedes the original version in providing the blueprint for the future course of a lawsuit." *Snyder v. Pascack Valley Hospital*, 303 F.3d 271, 276 (3d Cir. 2002).

[67] KPMG's reliance on another FBI affidavit (No. 12-mj-00164, D.I. 2) UW. Br. 2, n4, to suggest its audit work was "positive" fails. All the affidavit shows is that KPMG again identified and warned the Bank about serious failings (this time related to interest rate reserves), but did not take any other remedial actions. Moreover, this affidavits is consistent with and bolsters the claims in the TAC.

U.S.C. § 7262. To "attest" means "[t]o affirm to be true or genuine." Black's Law Dictionary 138 (8th ed. 2004). The very phrasing indicates a factual assertion. KPMG cannot transform its factual assertions of GAAP compliance into statements of "belief" simply by calling them "opinions." *See Oxford*, 187 F.R.D. at 141 (it is disingenuous to suggest that factual assertions are "opinions" simply because a defendant later claims to have stated only "that it believes in their truth"); *cf. SEC v. Okin*, 137 F.2d 862, 864-65 (2d Cir. 1943) (inserting "in my opinion" into a statement of fact does not alter the statement's factual nature).[68] Finally, KPMG does not represent that its certification of GAAS compliance was an opinion. ¶¶303, 308.

Second, certifications of GAAP compliance are factual representations, not opinions, because GAAP compliance is a factual question. *See Burlington*, 114 F.3d at 1421; *Underland II*, 2012 WL 2912330, at *5; *RAIT*, 2008 WL 5378164, at *7; *WaMu*, 694 F. Supp. 2d at 1223-24. Notably, even for claims under Sections 10(b) of the Exchange Act – which, unlike Section 11, imposes liability for the speaker's own statements and not for certifying the statements of others – courts routinely evaluate auditor certifications as facts, not as opinions.[69] This is consistent with the long-standing principle that auditors' Section 11 liability is coextensive with the falsity of the underlying statements certified, without a separate inquiry into whether the certification itself is false. *See, e.g., In re Cendant*, 60 F. Supp. 2d 354, 364 (D.N.J. 1999) (sustaining § 11 claim against auditor based on material misstatement or omission by issuer).

Notably, KPMG fails to cite a single pure Section 11 action against an auditor in which

[68] Although auditor certifications are now called "opinions" in the accounting literature (KPMG Br. 10), the audit profession's semantic changes cannot confer immunity, and courts continue to refer to them as "certifications." *See, e.g., In re InterBank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215, 221 (D.C. Cir. 2010); *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 945 (6th Cir. 2009).

[69] *See, e.g., In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187 at 214 (1st Cir. 2005); *Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*, 2005 WL 1366025, at *6 (D.N.J. June 8, 2005); *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1331-32 (M.D. Fla. 2002).

the auditor's certification was evaluated as a statement of opinion, rather than fact.[70] None of the cases cited by KPMG support its argument that courts must look to the subjective falsity of the auditor's certification itself, rather than to the underlying false statement. *See* KPMG Br. 10. *Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.* involved claims against an auditor brought under § 18 of the Exchange Act, which imposes liability for a defendant's own false statements, not for certifications of false statements by others – a distinction that the court itself drew. 454 F.3d 1168, 1174 n.6 (10th Cir. 2006). Likewise, Defendants' cases involving investment bankers' fairness opinions, equity analysts' "buy" opinions, rating agencies' credit ratings, and issuers' future business prospects do not involve "certifications" of someone else's (false) statement. *See* WT Br. 10-11. Rather, those claims were brought under the portion of Section 11 that imposes liability on individuals who prepare a section of the offering documents. As the statute makes clear, the truth or falsity of prepared statements is evaluated directly. *See* 15 U.S.C. §77k(a)(4); s*ee In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 237 (S.D.N.Y. 2004) (evaluating investment bank's fairness opinion for falsity (including whether the opinion was subjectively believed) but evaluating auditor's liability under § 11 based solely on the falsity of financial statements it had certified).

Third, as stated above, KPMG's representations that its audits complied with GAAS (¶303) and that it determined Wilmington's internal controls to be effective (¶¶308-309) are

[70] KPMG's cited cases are inapposite, as the analysis in each of these cases was subject to the higher Section 10(b) pleading standard. KPMG Br. 10; *see In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 302 (S.D.N.Y. 2011) (citing numerous 10(b) cases against auditors where courts considered claims based on auditor certifications "without regard to the significance of the fact that such statements have been couched as opinions and thus without regard to the fact-opinion distinction") (collecting cases). Moreover, in *Lehman*, the Court concluded that an auditor's issuance of a clean audit opinion following the receipt of information showing non-compliance with GAAP – such as the information provided to KPMG that prompted it to criticize the Bank's risk management, procedures and internal controls beginning in 2007 – could be sufficient to demonstrate opinion falsity. *Lehman*, 799 F. Supp. 2d at 302. Even under the 10(b) analysis applied in *Lehman*, KPMG's certifications are actionable.

statements of fact, not opinion, because they are representations about specific procedures KPMG followed. GAAS has verifiable procedural requirements that Plaintiffs allege KPMG failed to follow. ¶¶305-06. Moreover, Plaintiffs allege that "KPMG did not have a reasonable basis for its certifications," and had it complied with GAAS KPMG would have uncovered the nearly $800 million in undisclosed credit losses incurred by the Bank and the Bank's severe lending and control deficiencies in Delaware. ¶306. Similarly, KPMG stated that its internal controls certification was based on certain established criteria, and represented that, under PCAOB standards, "[o]ur audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk[.]" *See* ¶309; 2009 Form 10-K (Ross Decl. Ex.20 at 135, D.I. 89.20). Indeed, KPMG attested that "[o]ur responsibility is to express an opinion on the Corporation's internal control over financial reporting <u>based on our audit</u>." *Id*. These representations are factual assertions about the verifiable procedures KPMG purportedly followed. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248 at 1266 (N.D. Cal. 2000) ("any purely factual assertions in [a] fairness opinion, such as [the author's] statements that it reviewed certain materials during its due diligence inquiry, would be held to a negligence standard"); *WaMu*, 694 F. Supp. 2d at 1223 (compliance with standards is a "verifiable factual statement.").[71] KPMG's statement was a factual assertion that internal controls were as good as could be detected by an audit that followed proper procedures. *Deephaven*, 454 F.3d at 1175.[72]

---

[71] The procedural requirements for GAAS and PCAOB-compliant audits are quite different from the procedures involved in fairness opinions, buy recommendations, and projections of future results of the sort involved in the cases relied upon by Defendants. KPMG Br. 12-15; UW Br. 8. *See* Stephen M. Davidoff, *Fairness Opinions*, 55 Am. U. L. Rev. 1557, 1616 (2006) (fairness opinions, <u>unlike auditing standards</u>, do not have standardized methodologies).

[72] The cases cited by KPMG for the proposition that Plaintiffs have failed to allege objective falsity are

Finally, KPMG's argument is inconsistent with § 11, which grants experts an affirmative defense if they can show both good faith and due diligence. 15 U.S.C. § 77k(b)(3)(B)(i). Treating auditor statements as "opinions" would reverse the statutory burden of proof.

### 3. <u>Statements In The Offering Documents Were False And Misleading At The Time Of The Offering</u>

The Underwriters argue that Plaintiffs fail to plead any actionable misstatements because the Offering took place after the MOU and, thus, after the Bank's deficient lending and reserving practices were already corrected. UW Br. 2, 15, 21, 24. This is nonsense. The TAC makes clear that the Bank's deficient lending practices continued after the MOU. In fact, the problems were so severe that in the summer of 2010 – after the MOU and after the Offering – the Federal Reserve: (i) took over the Bank's credit function; (ii) became concerned about the "future ability of the [B]ank to survive, based on what they saw in the credit underwriting;" and (iii) had Treliant review the Bank's risk ratings and appraisals, triggering enormous write-downs. ¶293.

It is also not plausible to suggest (as Defendants do) that the "serious" problems identified in the Delaware Status Review and Delaware Review Memorandum were in the "past" by the time of the Offering. UW Br. 25. Not only does this argument fail temporally as the Review was completed right around the time of the Offering and the Memorandum was not finalized until weeks after the Offering, but it does not make sense. ¶282. If the Bank's problems had been resolved after the MOU as the Underwriters claim, there would have been <u>no</u> need to have one of the Bank's most senior credit officers conduct the Review and memorialize

---

inapposite. KPMG Br. 18-19. The "threadbare" allegations in *Dutton v. Harris Stratex Networks*, 270 F.R.D. 171, 177-78 (D. Del. 2010), are readily distinguishable from the TAC, in which Plaintiffs identified the specific GAAS standards that KPMG violated, deficiencies in the audit, and the false portions of the audit report. ¶305 (identifying violations of GAAS General Standards Nos. 2 and 3, that required KPMG to, *inter alia*, obtain competent sufficient evidentiary matter to form a basis for its opinion); *see also* ¶¶300-01 (reserving methodology failed to consider all available evidence). Likewise, *DiLeo*, 901 F.2d at 626-27, and *Denny v. Barber*, 576 F.2d 465, 469 (2d Cir. 1978), are inapposite because they applied the standards of Fed. R. Civ. P. 9(b) to claims arising under <u>§10(b)</u>, not §11.

such "serious" findings months later.

In addition, the Underwriters are simply wrong to argue that Wilmington's 2009 Form 10-K somehow replaced the false statements in the Bank's earlier-filed financial statements that were incorporated by reference into the Offering Documents. UW Br. 16. The regulation they cite, 17 C.F.R. § 230.412, and the language contained in the Offering Documents, applies only when newer information actually contains language that somehow changes the prior language. *See* 17 C.F.R. § 230.412(a) (newer language supersedes prior language only when the newer language "modifies or replaces" the older statements); *see also In re Gen. Elec. Sec. Litig.*, 856 F. Supp. 2d 645, 655-56 (S.D.N.Y. 2012) (language in a prospectus supplement modified earlier language that had been incorporated by reference into a registration statement, because of a clear contradiction between the subsequently-filed language and the earlier language on the same subject).

Here, Wilmington simply incorporated its financial statements from prior years into the Offering Documents, with no indication to investors that anything in those earlier financial statements was in any way unreliable or had ever been modified. While the Bank filed newer financial information – namely, the 2009 10-K – that financial information did not replace Wilmington's reported results from prior years, which investors were still encouraged to rely upon as a truthful representation of Wilmington's financial status during those years. Indeed, the 2009 10-K itself contained the information about Wilmington's prior years' financial results. Ross Decl. Ex.20 at 135 (D.I. 89.20) (WT 2009 10-K, including 2007, 2008, and 2009 results unchanged from previous filings).

Indeed, if the Underwriters are correct, there would be no point at all to incorporating by reference. This is transparently not the law. *See, e.g.*, 15 USC § 77b(a)(8) (defining a

registration statement to include information incorporated by reference); *see also In re Westinghouse Sec. Litig.*, 90 F.3d 696 (3d Cir. 1996) (permitting Section 11 claim for false reserves based on financial information incorporated by reference into registration statements); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) (same).

### B. duPont Is Liable For False Statements In The Offering Documents

Thomas duPont signed Wilmington's shelf registration statement, which was filed on Form S-3 with the SEC on November 29, 2007. ¶322. duPont also signed, pursuant to Sections 13 or 15(d) of the Exchange Act, Wilmington's Form 10-K for the period ending December 31, 2007, which Plaintiffs allege contained false statements. The Offering Documents incorporated by reference the 2007 Form 10-K (¶¶275, 322) in order to satisfy Section 10(a)(3) of the Securities Act, which requires issuers to update a prospectus with current information. *See* 17 C.F.R. § 229.512(a)(i-iii)(B). Under SEC regulations, signatories of SEC filings that are incorporated by reference to satisfy Section 10(a)(3) are deemed to subject themselves to liability. SEC Release No. 33-8591. Because duPont signed the 2007 Form 10-K, which contained false statements and was later incorporated into the Offering Documents pursuant to Section 10(a)(3), he is liable under Section 11 as if he signed the February 23, 2010 prospectus supplement itself. *See In re Lehman Bros. Sec. ERISA Litig.*, 799 F. Supp. 2d 258, 317 n.399 (S.D.N.Y. 2011).

While duPont selectively quotes the first clause of § 11(b)(1)(a) for the proposition that he should be excused from liability because he resigned before the Offering (duPont Br. 5), he ignores the fact that §11(b)(1)(b) specifically contemplates liability for statements in offering documents issued after a defendant's departure unless that defendant informed the SEC and issuer in writing that "he would not be responsible for such part of the registration statement." 15 U.S.C. § 77k(b)(1)(B). *See In re Enron Corp. Sec., Deriv., & ERISA Litig.*, 258 F. Supp. 2d

576, 596, 642 (S.D. Tex. 2003) (resignation of named defendant before offering did not protect defendant from § 11 liability). There is no evidence of any such disavowal here.

## VI. THE TAC STATES CONTROL PERSON CLAIMS

Section 20(a) of the Exchange Act and Section 15 of the Securities Act impose liability on persons who "directly or indirectly, control[] any person liable" under Section 11 and 10(b), respectively. Plaintiffs need only allege a violation of Section 10(b) or Section 11 by the controlled entity (Wilmington) and control of the entity by the defendant. *See In re Am. Bus. Fin'l Servs., Inc. Sec. Litig.*, 2007 WL 81937, at *12 (E.D. Pa. Jun. 30, 2007). Control person claims are not subject to the heightened pleading requirements of Rule 9(b). *See id*. at *12.

Because Plaintiffs have pled Wilmington's primary violations, the first element of a control person claim is satisfied. Additionally, the Officer Defendants and Rakowski (the Bank's Controller) had control over Wilmington by virtue of their day-to-day responsibilities within the corporation; indeed, these Defendants signed, or personally made, many of the statements alleged to be false. ¶¶272, 296, 322. Moreover, the TAC allegations regarding the Audit Committee establish that its members had control over Wilmington. ¶¶251-65. Defendant duPont alone challenges his status as a control person. duPont Br. 8-10. duPont was a Director from 2006 through October 2009 (¶275) and signed the Bank's Registration Statement, which was incorporated into the Offering Documents. ¶275. At this stage of the litigation, nothing more is required. *Am. Bus.*, 2007 WL 81937, at *12 ("Allegations that a director signed a fraudulent SEC filing and was in a position to exercise control over the primary violator are sufficient.").

Defendants argue that Plaintiffs must plead the additional element of "culpable participation" for their §20(a) claims. WT Br. 59. Even assuming that Plaintiffs have this

burden,[73] the TAC describes how the Officer Defendants directly participated in the fraudulent conduct; Rakowski, as Controller, also necessarily was directly involved in the Bank's financial reporting and internal controls. ¶¶272, 345-46. Similarly, the Audit Committee Defendants permitted the Bank to continue to issue false financial statements despite directly receiving reports demonstrating the inadequacy of the Bank's internal controls and the insufficiency of its reserves. ¶¶261-63. This is sufficient to meet whatever pleading requirement exists.

## VII. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully submit that Defendants' Motions to Dismiss the TAC should be denied in their entirety. If the Court dismisses any of Plaintiffs' claims, Plaintiffs request the opportunity to replead. Fed. R. Civ. P. Rule 15(a).

---

[73] In fact, "the overwhelming trend in this circuit is that culpable participation" need not be pled. *Freed v. Universal Health Services, Inc.*, 2005 WL 1030195, at *11 n.6 (E.D. Pa. May 3, 2005).

Dated: April 25, 2013

**CHIMICLES & TIKELLIS LLP**

/s/ A. Zachary Naylor
Pamela S. Tikellis (Bar No. 2172)
A. Zachary Naylor (Bar No. 4439)
222 Delaware Avenue, 11th Floor
P.O. Box 1035
Wilmington, DE 19899
Phone: (302) 656-2500
Fax: (302) 656-9053

*Liaison Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Blair Nicholas
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Phone: (858) 793-0070
Fax: (858) 793-0323

-and-

Hannah Ross (*pro hac vice*)
Katherine M. Sinderson (*pro hac vice*)
Adam Hollander (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Phone: (212) 554-1400
Fax: (212) 554-1444

**SAXENA WHITE P.A.**

Maya S. Saxena (*pro hac vice*)
Joseph E. White III (*pro hac vice*)
Lester Hooker (*pro hac vice*)
Brandon T. Grzandziel (*pro hac vice*)
2424 North Federal Highway
Boca Raton, FL 33431
Phone: (561) 394-3399
Fax: (561) 394-3382

*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*