**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| **IN RE WILMINGTON TRUST SECURITIES LITIGATION** | Master File No. 10-cv-00990-SLR |
| | (Securities Class Action) |
| | Hon. Sue L. Robinson |
| This document relates to: ALL ACTIONS | ELECTRONICALLY FILED |
| | <u>**JURY TRIAL DEMANDED**</u> |

<u>**FOURTH AMENDED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**</u>

## **TABLE OF CONTENTS**

I.  NATURE OF THE ACTION ......................................................................... 2

    A.  Overview Of The Case........................................................................ 2

    B.  The Claims Asserted In This Complaint............................................. 12

II. PARTIES ...................................................................................................... 13

    A.  Lead Plaintiffs.................................................................................... 13

    B.  Exchange Act Defendants................................................................... 14

        1.  The Officer Defendants............................................................ 15

        2.  The Audit Committee Defendants ........................................... 16

        3.  The Outside Auditor Defendant............................................... 17

III. BACKGROUND AND NATURE OF THE FRAUD AT WILMINGTON ................... 17

    A.  Wilmington's Top Executives Criminally Conspired To "Fraudulently
        Conceal The Bank's True Financial Condition In Many Ways"........................ 19

        1.  The Criminal Information Demonstrates That The Bank's Senior
            Executives Criminally And Fraudulently Concealed Hundreds Of
            Millions Of Dollars In Past Due And Nonperforming Loans.................. 20

        2.  The Criminal Information Demonstrates That The Bank's Senior
            Executives  Fraudulently "Mass Extended" $1.74 Billion Of
            Matured And Past Due Loans .................................................. 32

        3.  Wilmington's Former Employees Confirm The
            "Extend And Pretend" Conspiracy And Appraisal Fraud........................ 34

    B.  The Bank's Fraudulent Loan Underwriting Practices .......................... 38

        1.  The Criminal Information Demonstrates That Senior
            Bank Executives Criminally Defrauded Investors
            Through Violations Of The Bank's "10% Rule"...................................... 38

        2.  The Bank Regularly Ignored Its Own Underwriting Processes
            And Extended Loans To Favored Clients Without Scrutiny
            Or Proper Documentation ....................................................... 44

        3.  The Criminal Information And The FBI Affidavits Describe
            Multiple Violations Of The Bank's Underwriting Policies .................... 48

a.    The Bank Loaned Out Millions Of Dollars To Borrowers Who Did Not Meet The Basic Terms Of The Loan Agreement ............................................... 49

b.    Wilmington Paid Out Millions Of Dollars In Loan "Draws" Without Any Documentation Or Support ..................... 56

C.    The Officer Defendants Fraudulently Manipulated The Bank's Asset Review Process .................................................................. 60

1.    The Officer Defendants Fraudulently Marginalized And Understaffed The Bank's Asset Review Function ........................... 60

2.    The Officer Defendants Personally Intervened To Undermine The Bank's Credit Risk Personnel ........................................ 64

D.    In 2009, The Federal Reserve Issued An MOU Identifying Serious Failings In The Bank's Lending Practices, Risk Management, And Accounting .................................................. 67

E.    The Delaware Status Review Identified "Serious Concerns" With Wilmington's Commercial Loan Portfolio ................................. 70

F.    The Officer Defendants Manipulated Wilmington's Loan Loss Reserve ........... 72

IV.    THE TRUTH BEGINS TO EMERGE ........................................................... 79

A.    June 3, 2010: Cecala Abruptly Announces His Resignation ................................ 80

B.    June 23, 2010: The Bank Acknowledges That Its Statements The Prior Month Were Not Accurate................................... 81

C.    July 23, 2010: The Bank's Financial Results For The Second Quarter 2010 Stun Investors; Defendant Foley Blames "Weakness In The Economy" ............. 83

D.    November 1, 2010: The Bank Announces The Take-Under And Investors Learn About An $800 Million Loan Loss Reserve Increase......... 86

E.    Post-Class Period Events ................................................................. 89

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................... 92

A.    False Statements Regarding Past Due And Nonperforming Loans ..................... 92

1.    Serious Doubt Loans In 2007-2009 ....................................... 93

2.    Loans 90 Days+ Past Due In 2007-2009 ................................ 96

ii

3.      Additional False Statements Regarding Past Due
        Loans In The Fourth Quarter Of 2009 And 2010 ..................................... 99

4.      Additional False Statements in Forms 10-K Regarding The
        Bank's Methodology For Calculating Past Due Loans ......................... 100

B.      False Statements Regarding Loan Loss Reserve And Net Income..................... 101

C.      False Statements Regarding Underwriting ......................................... 107

D.      False Statements Regarding LTV Ratios ........................................... 110

E.      False Statements Regarding The Asset Review Process .................................. 111

F.      False Statements Regarding Internal Controls................................... 115

G.      Additional False Statements By The Officer Defendants.................................. 117

H.      Defendants Attempted To Cover Up The True Reasons For The Bank's
        Increased Reserve With Additional False And Misleading Statements ............. 128

VI.     SUMMARY OF SCIENTER ALLEGATIONS ............................................. 131

VII.    RELEVANT GAAP AND ACCOUNTING PROVISIONS .......................................... 144

VIII.   KPMG KNOWINGLY OR RECKLESSLY FALSELY
        CERTIFIED THAT WILMINGTON'S 2009 FINANCIAL
        STATEMENTS COMPLIED WITH GAAP................................................ 147

A.      Relevant GAAS Provisions Applicable To KPMG's 2009 Audit ...................... 149

B.      KPMG Acted With Scienter In Issuing Its Unqualified Auditor's Opinion....... 154

IX.     LOSS CAUSATION.................................................................... 159

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE:
        FRAUD-ON-THE-MARKET DOCTRINE ................................................. 161

XI.     INAPPLICABILITY OF STATUTORY SAFE HARBOR ......................................... 162

XII.    CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT ................................. 163

FIRST CLAIM FOR RELIEF ................................................................. 163

SECOND CLAIM FOR RELIEF ............................................................... 167

THIRD CLAIM FOR RELIEF ................................................................ 169

FOURTH CLAIM FOR RELIEF .............................................................. 172

iii

XIII.   SECURITIES ACT CLAIMS ....................................................................... 176

    A.   Securities Act Defendants .................................................................. 177

        1.   The Wilmington Defendants .................................................. 177

        2.   The Outside Auditor Defendant ............................................. 178

        3.   The Underwriter Defendants ................................................... 179

    B.   The Offering Documents Misstated Past Due And Nonperforming Loans ........ 179

        1.   Serious Doubt Loans In 2007-2009 ....................................... 180

        2.   Loans 90 Days+ Past Due In 2007-2009 ............................... 182

        3.   Additional False Statements In The Offering Documents
           Regarding Past Due Loans In The Fourth Quarter Of 2009 .................. 184

        4.   Additional False Statements In Forms 10-K Regarding
           The Bank's Methodology For Calculating Past Due Loans .................. 185

    C.   The Offering Documents Misstated Wilmington's
        Loan Loss Reserve And Net Income ................................................. 186

    D.   The Offering Documents Misstated The Bank's Underwriting ......................... 191

    E.   The Offering Documents Misstated The Bank's LTV Ratios ........................... 194

    F.   The Offering Documents Misstated The Asset Review Process ....................... 194

    G.   The Offering Documents Misstated The
        Effectiveness Of The Bank's Internal Controls .................................. 197

    H.   KPMG's Misstatements in the Offering Documents ......................... 199

FIFTH CLAIM FOR RELIEF ................................................................. 203

SIXTH CLAIM FOR RELIEF.................................................................. 206

SEVENTH CLAIM FOR RELIEF ........................................................... 208

XIV.   CLASS ACTION ALLEGATIONS ............................................... 210

XV.   JURISDICTION AND VENUE ...................................................... 212

XVI.   PRAYER FOR RELIEF ................................................................ 213

XVII. JURY DEMAND .......................................................................... 213

Lead Plaintiffs, the Merced County Employees' Retirement Association, the Coral Springs Police Pension Fund, the St. Petersburg Firefighters' Retirement System, the Pompano Beach General Employees Retirement System, and the Automotive Industries Pension Trust Fund, on behalf of themselves and all others similarly situated, allege the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based upon the ongoing investigation of counsel.  Many of the facts related to Lead Plaintiffs' allegations are known only by the Defendants, or are exclusively within their custody or control.  Lead Counsel's investigation included, among other things: (i) a review of public filings by Defendant Wilmington Trust Corporation ("Wilmington" or the "Bank") with the United States Securities and Exchange Commission ("SEC"); (ii) media and analyst reports about the Bank; (iii) publicly available data relating to Wilmington common stock; (iv) interviews with former Bank employees; (v) sworn affidavits by FBI Special Agents Kevin P. Shannon and Greg S. Mrozek, filed before Magistrate Judge Mary Pat Thynge of the United States District Court for the District of Delaware in October 2012 under the captions *In the Matter of the Search of The Second Floor of 144 Kings Hwy. SW, Dover, DE 19901*, No. 12-mj-00167, and *In the Matter of the Search of Information Associated with bbcprop@aol.com*, No. 12-mj-00164 ("FBI Affidavits"); and (vi) the May 8, 2013 guilty plea of Joseph Terranova, Wilmington's former division head of the Bank's Delaware commercial real estate division, to conspiracy to commit Bank Fraud as set forth in the April 10, 2013 criminal information ("Criminal Information") unsealed on May 7, 2013 in the action captioned *United States of America v. Joseph Terranova*, 1:13-cr-00039-GMS, pending before Chief Judge Gregory M. Sleet.  Lead Plaintiffs believe that substantial additional evidentiary support for their allegations will be developed after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

### A.     Overview Of The Case

1.       As has now been revealed, during the Class Period, Wilmington Trust engaged in a massive criminal conspiracy that "fraudulently conceal[ed] the Bank's true financial condition" and "deceive[d] regulators and the public."  On May 8, 2013, in the most recent development related to this egregious fraud, Joseph Terranova, Wilmington's former head of Delaware commercial real estate lending, pleaded guilty to criminal conspiracy to commit Bank Fraud, and admitted to conspiring with other senior executives at the Bank in order to "fraudulently conceal the Bank's true financial condition" from investors.  As set forth in the Criminal Information:

> It was a[n] . . . objective of the conspiracy for defendant and his co-conspirators to fraudulently conceal the Bank's true financial condition in many ways, including by extending new credit to clients to keep existing loan interest payments current and by causing the Bank to misrepresent its reporting of past due and nonperforming loans.

This fraud – which pervaded virtually every aspect of Wilmington's commercial lending practices and caused the Bank to issue admittedly fraudulent financial statements – ultimately destroyed Wilmington, a 107-year old Delaware banking and lending institution, and caused massive losses to the Bank's investors.

2.       Throughout the Class Period, Wilmington and the Officer Defendants – CEO Ted Cecala, Cecala's successor as CEO Donald Foley, CFO David Gibson, President Robert Harra, and Chief Credit Officer William North – portrayed the Bank as a conservative regional lender with a sound loan portfolio.  In its SEC filings, press releases, and quarterly conference calls, the Bank reported a relatively modest amount of past due and nonperforming commercial loans, a key credit metric relied on by investors and analysts because it directly communicated whether loans were being repaid on a timely basis.  The Bank also repeatedly represented to investors that

it "mitigate[d] credit risk" by "employ[ing] rigorous loan underwriting standards and apply[ing] them consistently," and by closely "monitor[ing] the [loan] portfolio to identify potential problems." These representations – all false – were critical to investors because they assured the market that Wilmington (unlike its competitors) was not exposed to high-risk loans and had a quality loan portfolio that would withstand the credit crisis.

3.    As Terranova admitted, one of the primary ways that the criminal conspirators "fraudulently concealed" the Bank's true financial condition was through an "extend and pretend" scheme that intentionally misrepresented the true amount of the Bank's past due and nonperforming loans. At all relevant times, Wilmington was required by the SEC to report its past due and nonperforming loans unless the Bank was in the process of "extending" or modifying a loan's terms such that repayment was no longer in jeopardy. Throughout the Class Period, in direct violation of these reporting obligations, Wilmington fraudulently manipulated the true number of the Bank's past due and nonperforming loans by internally classifying those loans as being "in the process of extension" – and thereby "waived" from reporting requirements – when, in fact, they were not. As a result, hundreds of millions of dollars of past due and nonperforming loans were fraudulently "waived," and thus deliberately excluded from the Bank's financial statements for months and, in some cases, years.

4.    As set forth in the Criminal Information, in 2009 alone, this criminal concealment of past due and nonperforming loans resulted in the Bank materially understating the past due loan amounts in its SEC filings by at least the following amounts: (i) $186 million, or 70%, during the first quarter; (ii) $234 million, or 69%, during the second quarter; (iii) $463 million, or 125%, during the third quarter; and (iv) $373 million, or 78%, during the fourth quarter. Terranova's admission thus established the material falsity of the Bank's 2009 Form 10-Qs and

its 2009 Form 10-K, which was used in connection with Wilmington's public offering of $274 million of common stock on February 23, 2010 (the "Offering").

5.      Terranova did not act alone.   The Criminal Information makes clear that numerous high-level Bank executives were involved in and knew about this criminal conspiracy. Indeed, in January 2009, the Bank's Credit Policy Manager, who reported directly to Defendant Cecala, sent an email to Defendant North and other Bank executives explicitly warning them that Wilmington had failed to report more than $100 million worth of matured past due loans in its 2008 financial statements, and that Wilmington had to "address[] the practice of waiving loans that are matured but current for interest from our past due reporting" in order to "report a true past due number."  Similarly, in September 2009, the Bank's Head of Credit Risk Management – who interacted regularly with Defendants Cecala, Harra, Gibson, and North – sent an email to Defendant North and other executives that further highlighted problems with the Bank's treatment of matured loans, and noted that "For now, I am explaining that an 'extension in process' [i]s a means to avoid unnecessary transfer to nonaccrual.  In this era of SOX and second-guessing, I do not think that this can continue for much longer."   The Officer Defendants' participation in the fraud is further corroborated by the accounts of high-level Bank employees.  According to these employees: (i) Defendant North approved the waiver of past due loan reporting requirements each month based on nothing more than a "checked box" indicating that a past due loan was "in the process of extension"; and (ii) Defendants North, Cecala, Gibson, and Harra attended regular meetings and received regular reports discussing the massive number of fraudulently "waived" loans.

6.      As set forth in the Criminal Information and admitted by Terranova, Wilmington never actually extended its past due and nonperforming loans because to do so would have

required the Bank to update its appraisals for the real estate underlying those loans, the values of which the Bank knew were "dropping substantially." Indeed, both federal law and Wilmington's own appraisal policy required the Bank to obtain updated appraisals for any loan extension. However, as Terranova acknowledged, the Bank refused to update appraisals in order to avoid charging off loans whose collateral had deteriorated in value, which in turn would have caused enormous increases to the Bank's Loan Loss Reserve (and concomitant changes to Wilmington's net income).

7.     Again, internal communications quoted in the Criminal Information demonstrate that the failure to update appraisals was well known to Wilmington's senior officers. For example, in an April 2009 email Terranova informed Brian Bailey, his supervisor and the Bank's Delaware Market Manager who reported directly to Defendant Harra, that Terranova had just had a "long conversation with [Defendant North] and [Senior Real Estate Credit Officer Terry Brewer] . . . regarding the <u>Appraisal problem</u>." As Bailey explained in response to Terranova's April 2009 email, the updating of appraisals for Terranova's loans alone – much less for the Bank's entire commercial loan portfolio – "ha[d] <u>the near term potential for catastrophic consequences</u>" on the Bank, including a dramatically negative impact on Wilmington's Loan Loss Reserve and net income.

8.     By the fall of 2009, Wilmington's fraud reached epic proportions. As the Criminal Information provides, by that time, the fraudulently concealed "waived" loans had become so problematic that Wilmington was forced to execute a "mass extension" of a staggering <u>$1.74 billion</u> of past due and matured loans. Remarkably, this "extension" of past due loans involved loans that constituted <u>25%</u> of the Bank's outstanding commercial loan portfolio. In essence, the Bank simply removed <u>more than 1,250</u> troubled loans from its list of past due

loans by pretending those loans were being "extended" when they were not.  Again, the Criminal Information makes clear that this "mass extension" was approved by Wilmington's most senior officers.  Specifically, the Criminal Information states that "[a]s part of the mass-extension process," the Bank's Loan Committee – which included Defendants North, Harra, and Cecala – approved the fraudulent extension of hundreds of millions of dollars in past due loans.  The Criminal Information also quotes internal communications that establish Defendants Cecala's, Harra's, and Gibson's direct knowledge of and participation in the criminally fraudulent "mass extension."  For example, on October 29, 2009, Rich Conway, the Bank's Chief Operating Officer ("COO") for the Mid-Atlantic Market, sent an urgent email to Defendant North and other high-level executives, which made clear that the Bank's most senior officers were well aware that they needed to make Wilmington's matured loans disappear from its financial statements.  As Conway wrote, "it is extremely important that we talk about matured loans and <u>how we can make them go away by 12/31</u>.  This cannot be a quick fix for 90 or 120 days as the problem will just return.  <u>This has the attention of all the wrong people: [Cecala, the CEO; Harra, the Bank President; Gibson, the CFO], Examiners, Auditors</u>."

9.    The Bank's criminal conspiracy was not limited to the reporting of past due loans and updating of appraisals.  Indeed, it began at the moment of a loan's origination.  In the Criminal Information, Terranova admitted to his and others' criminally fraudulent abuse of the "10% Rule," a lending policy at the Bank that permitted lenders to extend credit in an amount up to 10% of an underlying loan without further analysis or Loan Committee approval.  As Terranova acknowledged, senior Bank executives conspired to manipulate the 10% Rule to loan millions of additional dollars to struggling borrowers who did not qualify for those additional loan amounts, but who were given the money "to keep existing loan interest payments [owed to

the Bank] current."  By funneling money to troubled borrowers to keep their loans current, the criminal conspirators prevented troubled loans from becoming recorded as past due and further "conceal[ed] the Bank's true financial condition."  Former employees corroborate the Criminal Information, and further confirm that Defendants Cecala, Harra, Gibson, and North knew of and approved these 10% Rule abuses.

10.     Indeed, according to former high-level Bank employees, the Officer Defendants directed the Bank's improper underwriting and asset review practices.  For example, in order to achieve the Bank's internal goal of 10% annual growth, the Bank incentivized its lenders to close loans and penalized them for documenting that borrowers were unable to repay.  To further accomplish this goal, Defendant Cecala ordered the Bank's top loan officers (including Terranova) to ignore the Bank's underwriting policies when extending loans, and he also personally vetoed decisions by the Bank's Asset Review Group ("ARG") to downgrade internal loan risk ratings, recognize impaired loans, and record losses for worthless loans.  In fact, former high-level Bank employees report that the Officer Defendants personally intervened at every stage of the lending process to increase loan volume by undermining the underwriting and asset review process, doing "deals a normal commercial bank should not have looked at."  According to those witnesses, the Bank's underwriting was "nonexistent" and its credit risk management existed "in name only" with "no real standards."

11.     Significantly, the Officer Defendants knew by the start of the Class Period of the critical deficiencies in the Bank's lending and risk management practices.  Indeed, the Board of Governors of the Federal Reserve System ("Federal Reserve") – *i.e.*, the Bank's primary regulator – as well as KPMG LLP ("KPMG"), the Bank's outside audit firm, and Wilmington's own Internal Audit department all sharply criticized the Bank's risk-management procedures and

internal controls dating back to at least 2007. For example, in its 2007 review, the Federal Reserve determined that the Bank's failings in asset review were "weaknesses in [Wilmington's] control structure" that left the Bank unable to assess its credit risk and, thus, the adequacy of its Loan Loss Reserve. This finding was echoed by KPMG and the Bank's Internal Audit in 2007, and again in 2008 by the Federal Reserve and KPMG. Notwithstanding these repeated warnings, the Officer Defendants did nothing to remedy these problems.

12. Wilmington's lending and accounting practices were so deficient that, in late 2009, the Federal Reserve required the Bank to enter into a Memorandum of Understanding ("MOU"), one of the Federal Reserve's most serious enforcement tools, which forced the Bank to entirely restructure the way it originated, monitored, and accounted for its loans. The MOU identified extensive failings in the Bank's lending, risk management, and accounting functions, including that Wilmington lacked "a process to monitor compliance with [credit] policies and procedures." As a result of the MOU, Wilmington was required to, among other things, reevaluate the risk of its loan portfolio and obtain updated appraisals.

13. The MOU also forced the Bank to conduct a review of its lending practices. As set forth in the FBI Affidavits (defined above), in 2009, the Bank initiated a "comprehensive" analysis of its lending practices in Delaware, which comprised more than 50% of the Bank's commercial loan portfolio. This project, which was known internally at Wilmington as the "Delaware Commercial Real Estate Division Project Status Review" (hereafter, the "Delaware Status Review"), entailed a thorough evaluation of the Bank's underwriting and asset review practices in Delaware. As the FBI Affidavits provide, this review, which Wilmington concluded by no later than January/February 2010, documented "serious concerns with the past management of the Delaware Commercial Real Estate Division and with its loan portfolio."

14.     Wilmington summarized the results of the Delaware Status Review in a March 12, 2010 memorandum entitled the "Delaware Commercial Real Estate Division Concern" (hereafter, the "Delaware Review Memorandum").  The Delaware Review Memorandum made clear that the Bank was engaging in fraudulent practices.  These practices included: (i) the "unethical use of loan approval authority by relationship managers"; (ii) the Bank's "limited oversight of relationship managers"; and (iii) "a limited technical knowledge of commercial real estate lending" on the part of Wilmington's lenders.  The Delaware Review Memorandum also provided numerous specific examples of the gross deficiencies in the Bank's underwriting and asset review practices, including the Bank's repeated "lack of validation of construction budgets prior to loan closings," and the "frequent use of construction loan proceeds to return cash to borrowers or fund partner buyouts prior to construction completion or the property having reached operating stabilization."   In other words, the Bank's underwriting and asset review practices were so deficient that the Bank "frequently" made multi-million dollar loans to developers who had demonstrated no intention of actually developing the target projects.  Instead, with the Officer Defendants' knowledge or reckless disregard, these borrowers simply pocketed the money.

15.     Certain of the egregious practices cited by the Delaware Review Memorandum are illustrated by the Bank's longstanding relationship with Michael Zimmerman, a prominent Delaware developer and one of the Bank's largest borrowers, whose relationship manager was Terranova.  The Bank's loans to this single developer alone totaled $90.7 million in March 2010, constituting almost 6% of the Bank's entire "commercial real estate – construction" loan portfolio.  Despite the importance of Zimmerman's loans to Wilmington, the FBI Affidavits make clear that the Bank exercised virtually no oversight over this highly material lending

relationship between Zimmerman and Terranova.  Indeed, according to the Criminal Information and FBI Affidavits, Wilmington's lending practices were so inadequate that, in January 2008, Zimmerman was able to obtain a $1 million loan from the Bank simply on the basis of a faxed request to "send $ $1,000,000 ASAP I have to pay my bar tab."   In yet another example, Zimmerman obtained a $1 million equity payout from Terranova without satisfying any of the terms of the underlying loan agreement.   As Terranova expressly noted in his email to Zimmerman about the loan, "I went back through my notes and I saw executed lease and plan approval as the condition. However not wanting my reputation for reckless abandon to be in jeopardy, I guess we can fund the $1,000,000," even though Zimmerman did not have executed leases for that project.  When Zimmerman responded by asking "Where's the trust?," Terranova explained that "I have all the trust in the world in you – its [sic] the Federal Examiners who don't trust me I have a whole chapter in their upcoming manual – '9 ways to violate Federal Law.'" The Bank eventually wrote off nearly half of its loans to Zimmerman, costing over $43 million – or 10 times the Bank's net loss for all of 2009.   As detailed in the Criminal Information, Terranova admitted that his relationship with Zimmerman was part of the "overarching bank fraud conspiracy" to which he pleaded guilty.

16.     The truth about the quality of Wilmington's loan portfolio and its derelict lending practices only began to be revealed in early 2010 when the Bank started to increase its Loan Loss Reserve – albeit by *de minimis* amounts that were woefully inadequate.  Thereafter, in June 2010, Defendant Cecala announced his abrupt resignation after 31 years with the Bank.  When analysts asked Cecala about whether his resignation indicated "a mounting capital problem or credit problem that hadn't been reported," Cecala dismissed any such concerns, claiming "[n]one whatsoever."  This was an outright lie.

17.     Indeed, on November 1, 2010, the Bank shocked investors by announcing that, as a result of further credit losses, it would have to increase its Loan Loss Reserve by $280 million – an amount that was almost equal to the entire Loan Loss Reserve the Bank had been maintaining.  As a result, the Bank reported a third quarter 2010 loss of $365 million – or more than 90 times greater than the $4 million loss the Bank reported for all of 2009.

18.     That same day, Wilmington disclosed that, as a result of the catastrophic state of its loan portfolio, it could not survive as an independent bank and would have to be sold to M&T Bank ("M&T") at a fire sale price equal to only <u>half</u> the price at which Wilmington's shares were trading.  Remarkably, as M&T disclosed on November 1, even the $280 million increase in the Loan Loss Reserve that the Bank had announced was not sufficient to account for the condition of Wilmington's loan portfolio.  In connection with its due diligence of the Bank, M&T's team reviewed 50% of Wilmington's commercial loan portfolio to analyze losses.  M&T's analysis determined that the Bank would have to write off almost $1.5 billion – <u>or nearly 20%</u> – of the loan portfolio that existed between January 1, 2008 and September 2010.  Similarly, M&T determined that 40% of Wilmington's commercial construction portfolio was utterly worthless and had to be written off.  Based on this review, M&T announced that the Bank had incurred, but not publicly reported, additional losses of another <u>$500 million</u>.

19.     Faced with such massive loan losses, the Bank informed investors that it faced "significant regulatory actions in the near term," and that it was not a viable business and could no longer survive as an independent entity.  Thus, the Board had no choice but to recommend that shareholders approve the sale to M&T for half the Bank's market capitalization.

20.     On the news of the merger – which *The New York Times* termed "one of the biggest so-called take-unders in recent Wall Street memory" – the price of Wilmington's stock,

which had been propelled to a Class Period high of $36 per share in September 2008, collapsed 46%, causing massive losses to investors.

21.     The criminally fraudulent conduct of Wilmington and the Officer Defendants sparked a broad SEC inquiry into Wilmington's lending and accounting practices.  To date, a joint federal investigation conducted by the FBI, the IRS Criminal Investigation Division, the Office of the Inspector General, the Federal Reserve, and the Special Inspector General for the Troubled Asset Relief Program has resulted in Terranova's criminal conviction of conspiring to commit Bank Fraud along with other high-level Bank executives.  As explained by U.S. Attorney Charles Oberly, who is heading the criminal prosecutions, the government's criminal investigation is "ongoing and continuing" and Terranova's guilty plea is just one "important step in holding responsible those individuals whose criminal conduct contributed to the failure of Wilmington Trust."  On May 15, 2013, *The News Journal* reported that "[p]eople familiar with the case said prosecutors have other former Wilmington Trust bankers in their sights."  Indeed, in the days following Terranova's plea, Defendant Harra resigned from his position at M&T Bank and Brian Bailey, Terranova's former supervisor who reported directly to Defendant Harra, resigned from his position as Vice President and business lender at MidCoast Community Bank.

22.     In sum, as a result of the Officer Defendants' fraudulent misconduct, the Bank that had served Delaware's business community for over one hundred years imploded, causing massive harm to its investors and community.

> **B.     The Claims Asserted In This Complaint**

23.     Lead Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") against the Bank, the Officer Defendants, and KPMG on behalf of purchasers of Wilmington's common stock during the Class Period, January 18, 2008 up to November 1, 2010.  Lead Plaintiffs also assert control-person claims under Section 20(a) of the

Exchange Act against the Officer Defendants and the Audit Committee.

24.     The second set of claims asserts a series of strict-liability and negligence causes of action under the Securities Act of 1933 ("Securities Act") against those Defendants who are statutorily responsible under Sections 11 and 12(a)(2) of the Securities Act for materially untrue statements and misleading omissions made in connection with Wilmington's Offering.  The Securities Act claims are addressed in Section XIII of this Complaint.

## II.     PARTIES

### A.     Lead Plaintiffs

25.     Lead Plaintiff Merced County Employees' Retirement Association ("Merced") is a multiple-employer defined benefit plan established in 1950.  Merced administers retirement, death, disability, and survivor benefits for eligible employees.  As of June 30, 2011, Merced held $514 million in net assets.

26.     Lead Plaintiff Coral Springs Police Pension Fund ("Coral Springs") is a pension plan established in 1979 that provides defined benefit pension and disability benefits for the police officers of the city of Coral Springs, Florida.  As of May 16, 2011, Coral Springs held approximately $125 million in net assets.

27.     Lead Plaintiff St. Petersburg Firefighters' Retirement System ("St. Petersburg") is a benefit plan for the firefighters of the city of St. Petersburg, Florida.  St. Petersburg serves approximately 700 members and manages over $175 million in net assets.

28.     Lead Plaintiff Pompano Beach General Employees Retirement System ("Pompano GERS"), headquartered in Pompano Beach, Florida, is a single-employer defined benefit plan that has provided retirement benefits for Pompano Beach's city employees since 1972. Pompano GERS currently manages over $100 million in net assets and serves over 800 retirees.

13

29.     Lead Plaintiff Automotive Industries Pension Trust Fund ("Automotive Industries") is a defined benefit plan for individuals working in various trades surrounding automobile manufacturing, maintenance, and delivery industries throughout the Northern California area.  As of May 10, 2011, Automotive Industries held approximately $1.2 billion in net assets.

30.     Lead Plaintiffs purchased Wilmington common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws herein.  As set forth in Appendix A, Lead Plaintiffs purchased or acquired over 199,825 shares of Wilmington common stock during the Class Period, including 8,750 shares purchased in the Offering.

## B.     Exchange Act Defendants

31.     Defendant Wilmington was a Delaware corporation, with its executive headquarters located at 1100 North Market Street, Wilmington, Delaware 19890.  At all relevant times, Wilmington was a bank holding company, a thrift holding company, and a financial holding company with several subsidiaries, including Wilmington Trust Company ("WTC").  Wilmington was regulated by the Delaware Department of Banking and the Federal Reserve, among others.

32.     Wilmington had four business segments: Regional Banking, Corporate Client Services, Wealth Advisory Services, and Affiliate Money Managers. The Bank's Regional Banking segment, whose predominant business was the origination of commercial loans, is the primary focus of this Complaint.  Commercial loans constituted a significant portion of the Bank's assets.  According to the Bank's 2008 Form 10-K, as of December 31, 2008, the loan balance for commercial loans totaled over $6.7 billion, 70% of the Bank's total loan portfolio (which also included, *inter alia*, consumer loans and residential loans).  According to the Bank's 2009 Form 10-K, as of December 31, 2009, the loan balance for commercial loans totaled over

14

$6.6 billion, approximately 74% of the Bank's total loan portfolio (which also included, *inter alia*, consumer loans and residential loans).  Wilmington's commercial loans – all of which were originated by the Bank – consisted of three types of loans: (i) commercial real estate construction; (ii) commercial, financial, and agricultural loans; and (iii) commercial mortgages.  Wilmington was highly concentrated in Delaware commercial lending, with between at least 50% and 60% of its portfolio invested in the state throughout the Class Period.

33.    At all relevant times, Wilmington was listed on the New York Stock Exchange ("NYSE"), where its stock was publicly traded under the symbol "WL."  As of September 30, 2010, there were over 91 million shares of Wilmington common stock outstanding.

34.    On November 1, 2010, Wilmington announced that it was being acquired by M&T.   M&T, a bank holding company, is listed on the NYSE under the symbol "MTB."  According to the Agreement and Plan of Merger between Wilmington and M&T, M&T is the successor-in-interest to Wilmington.

### 1.    The Officer Defendants

35.    Defendant Ted T. Cecala ("Cecala") served as Wilmington's CEO from July 1996 until his abrupt resignation on June 3, 2010, and as Board Chairman from 1996 through July 19, 2010.  Cecala joined Wilmington as Controller in 1979 and served in various positions at the Bank, including CFO, COO, and Vice Chairman.

36.    Defendant Donald E. Foley ("Foley") served as Cecala's successor as CEO and Chairman of the Board for Wilmington.  Foley replaced Cecala as CEO in June 2010 and as Chairman of the Board in July 2010.  Before that, Foley served as a Director of the Bank starting in July of 2006, during which time he served as a member of the Audit and Compensation Committees, chairing the Audit Committee from 2008 to 2010.

37.    Defendant David R. Gibson ("Gibson") served as Wilmington's CFO since 1997

and as Wilmington's COO since November 2010.  He served as a Wilmington executive officer since 1992.

38.    Defendant Robert V.A. Harra Jr. ("Harra") served as Executive Vice President since 1992 and as President since 1996.  Harra also served as COO from 1996 to 2010 and as a Director since 1996.  Harra joined Wilmington in 1971.

39.    Defendant William North ("North") served as the Chief Credit Officer for Wilmington from 2004 until his abrupt resignation in July 2010.  Before joining the Bank in 1997, North spent eighteen years in various lending and credit positions at CoreStates Bank.

40.    Defendants Cecala, Foley, Gibson, Harra, and North are referred to herein collectively as the "Officer Defendants."

### 2.    The Audit Committee Defendants

41.    The following individuals (collectively referred to as the "Audit Committee Defendants") were Directors of Wilmington who served on the Board's Audit Committee during the Class Period.  The Audit Committee Defendants are each liable as control persons.

42.    Defendant Carolyn S. Burger ("Burger") served as Director from 1991 to 2010.  Burger served on several committees, including the Audit Committee (from at least 2001 to 2004 and 2008 to 2011; and as Chair from 2001 to 2004 and 2010 to 2011).

43.    Defendant R. Keith Elliott ("Elliott") served as Director from 1997 until October 2010.  Elliott served on several committees, including the Audit Committee (from at least 2007 to 2008; and as Chair in 2007).

44.    Defendant Gailen Krug ("Krug") served as Director from 2004 until 2010.  Krug served on several committees, including the Audit Committee (from at least 2007 to 2010).

45.    Defendant Stacey J. Mobley ("Mobley") served as Director from 1991 to 2010.  Mobley served on several committees, including the Audit Committee (at least during 2009).

46.     Defendant Michele M. Rollins ("Rollins") served as Director from 2007 to May 2010.   Rollins served on several committees, including the Audit Committee (from 2009 to 2010).

47.     Defendant David P. Roselle ("Roselle") served as Director from 1991 to 2009. Roselle served on several committees, including the Audit Committee (from at least 2007 to 2009).

48.     Defendant Oliver R. Sockwell ("Sockwell") served as Director from 2007 to 2010.  Sockwell served on the Audit Committee (from 2008 to 2010).

49.     Defendant Robert W. Tunnell, Jr. ("Tunnell") served as Director from 1992 to 2011.  Tunnell served on several committees, including the Audit Committee (from at least 2007 to 2008 and also from 2010 to 2011).

50.     Defendant Susan D. Whiting ("Whiting") served as Director from 2005 to 2011. Whiting served on several committees, including the Audit Committee (from 2010 to 2011).

### 3.     The Outside Auditor Defendant

51.     Defendant KPMG LLP ("KPMG") was Wilmington's outside auditor at all relevant times during the Class Period.  In its capacity as the Bank's outside auditor, KPMG issued unqualified audit opinions on the Bank's financial statements and internal controls for the years 2007, 2008, and 2009, including reports (i) dated February 29, 2008 for the year ended December 31, 2007, (ii) dated March 2, 2009 for the year ended December 31, 2008, and (iii) dated February 22, 2010 for the year ended December 31, 2009.  KPMG's headquarters are at 345 Park Avenue, New York, NY 10154.  Lead Plaintiffs' Exchange Act claims against KPMG arise out of KPMG's unqualified audit opinion for the year ended December 31, 2009.

## III.     BACKGROUND AND NATURE OF THE FRAUD AT WILMINGTON

52.     Since its founding in 1903, Wilmington fostered a reputation for conservatism and

quality.  Wilmington distinguished itself from financial institutions whose risky practices gave rise to the recent financial crisis, claiming in its 2009 Annual Report to Investors, for example, that "[o]ur strong capital position, 107 years of stability, and focus on client relationships stand in stark contrast to the struggles and distractions that many other financial institutions are facing."  Similarly, the Bank claimed in its 2008 Annual Report that it had "succeeded across 105 years of economic cycles" because it "manage[d] risk conservatively."  As a result, as *The News Journal* would later report, investors considered Wilmington to be "stodgy, conservative and risk-averse."  Leonard Quill, former chairman of the Wilmington Board, termed the Bank the "Rock of Gibraltar."  During the Class Period, Wilmington publicly reported financial results that created the false impression that the Bank was weathering the financial crisis without any of the crippling credit losses suffered by other financial institutions.

53.     Specifically, Wilmington publicly reported the amount of its past due and nonperforming loans each quarter during the Class Period.  These metrics were key indicators of the credit quality of the Bank's loans because they directly represented whether the Bank's loans were being repaid on time or not.  Of critical importance to investors and analysts following the Bank, Wilmington regularly reported only small numbers of past due and nonperforming loans, disclosing only modest increases to these loan amounts throughout each quarter of the Class Period.  Analysts who closely followed the Bank's loan performance during the Class Period specifically commented on how they were "encouraged" by the low levels of the Bank's past due and nonperforming loans.  For example, on February 13, 2008, SunTrust Robinson Humphrey wrote how "the average bank in our coverage universe saw NPAs [nonperforming loans] rise 36% in 4Q07, while WL's [Wilmington's] rose only 9.6%.  While we don't think the bank is immune to further credit deterioration, we do not think the 4Q07 credit performance was a

fluke."  Similarly, analysts from Morgan Stanley remarked on April 24, 2009 that they were "encouraged" by declines in the Bank's past due figures for the second quarter of 2009, noting: "We are encouraged by the q/q [quarter over quarter] decline in 90 day past dues (down 14%)."

**A.    Wilmington's Top Executives Criminally Conspired To "Fraudulently Conceal The Bank's True Financial Condition In Many Ways"**

54.    As set forth above, on May 8, 2013, Joseph Terranova, Wilmington's former head of Delaware commercial real estate lending and one of the Bank's top lenders with a $500 million loan portfolio (7% of the Bank's total commercial loan portfolio as of the end of 2008), admitted to criminally conspiring with other top executives at the Bank to "fraudulently conceal the Bank's true financial condition in many ways."  As detailed in the Criminal Information:

> It was a further objective of the conspiracy for defendant and his co-conspirators to fraudulently conceal the Bank's true financial condition in many ways, including by extending new credit to clients to keep existing loan interest payments current, and by causing the Bank to misrepresent its reporting of past due and nonperforming loans.

55.    The Criminal Information filed by the U.S. Attorney – the facts of which Terranova admitted – provides detailed information regarding the widespread and longstanding criminal conspiracy that existed at the Bank during the Class Period.  For example, the Criminal Information specifically describes internal Bank documents, policies, and communications, including direct communications with Defendant North, and about Defendants Cecala's, Harra's and Gibson's knowledge and "attention" to the Bank's fraudulent reporting of past due and nonperforming loans.   In addition, the Criminal Information relies on numerous email communications between Terranova and other senior Bank executives, including Rich Conway, the Bank's COO for the Mid-Atlantic Market; Brian Bailey, Terranova's direct supervisor and the Bank's Delaware Market Manager, who reported to Defendant Harra; Steve Cummings, the Bank's Credit Policy Manager, who reported to Defendant Cecala; and Terry Brewer, a Senior

Real Estate Credit Officer, who interacted regularly with Defendant North.[1] The Criminal Information also specifically relies on information provided by one of the Confidential Witnesses ("CW") relied on in this Complaint: CW 2, the Head of the Bank's Credit Risk Management Division from 2008 through 2010 (and Division Manager in Risk Management & Operations from 2000 through 2008), who interacted regularly with Defendants Cecala, Harra, Gibson, and North.[2]

56.     As set forth above, Terranova admitted to an "overarching bank fraud conspiracy" in which he conspired with other senior executives to fraudulently: (i) conceal the true amount of past due and nonperforming loans from the Bank's financial statements (*see* Section III.A, *infra*); (ii) violate federal regulations and the Bank's own appraisal policy by refusing to update outdated appraisals (*see id.*); (iii) violate the Bank's 10% Rule to extend credit to borrowers who did not qualify for the loans and who then used those loans to make payments to the Bank in order to avoid their primary loans becoming past due (*see* Section III.B); and (iv) funnel money to borrowers – including Zimmerman, one of the Bank's largest borrowers – to line their own pockets in violation of the loan terms (*see id.*).

### 1.     The Criminal Information Demonstrates That The Bank's Senior Executives Criminally And Fraudulently Concealed Hundreds Of Millions Of Dollars In Past Due And Nonperforming Loans

57.     The Criminal Information describes in detail how the Bank intentionally concealed and misrepresented the materially impaired state of the Bank's commercial loan portfolio by falsely reporting the amount of past due loans.  In 2009 alone, Wilmington

---

[1] While the Criminal Information identified these employees only by their title and job description, Lead Plaintiffs were able to identify the names of these employees through their investigation.

[2] At Appendix B, Lead Plaintiffs provide the tenure and position of the former Wilmington employees cited throughout this Complaint as confidential witnesses.

fraudulently understated its past due commercial loans by hundreds of millions of dollars, a misrepresentation that concealed from investors the true state of the Bank's loan portfolio. Throughout the Class Period, Defendants reassured investors that the Bank performed "rigorous" and "consistent" underwriting and asset review to ensure superior loan quality. While Defendant North represented to investors on an October 2009 conference call that Wilmington put its loans "under the microscope," and Defendant Cecala, during that same call, assured investors that the Bank did a "thorough and exhaustive analysis [of its loans] each and every quarter," in reality, the Bank hid hundreds of millions of dollars in delinquent loans by simply recording them internally as being "in the process of renewal" or in the "process of extension," and thereby erasing them from its reported past due and nonperforming loans.

58.     The means by which the Bank carried out this criminal enterprise was simple and blatantly fraudulent. For all relevant times, the Bank was obligated by law to recognize and report its total amount of matured past due and nonperforming loans in its quarterly Forms 10-Q and annual Forms 10-K.[3] A matured loan is a term loan in which the principal payment – which is due generally at the end of the term – is past due and must be either paid to the lender in full; reported as past due once a principal or an interest payment on the term loan remains unpaid for 30 days or more; or "extended," *i.e.*, modified in compliance with the Bank's Nonaccrual and Appraisal Policies (defined and discussed below). As described in the Criminal Information, all matured loans for which "interest or principal remains unpaid for 30 days or more" should have

---

[3] SEC Industry Guide 3 addresses "Statistical disclosure by bank holding companies" and requires that "nonaccrual, past due and restructured loans" must be accounted for "at the end of each reported period." SEC Industry Guide 3 also states specifically that "[n]o loans shall be excluded from the amounts presented." Each quarter, banks are also required to file with the Federal Financial Institutions Examination Council ("FFIEC") a Schedule RC-N, also known as a "Call Report," listing as past due all matured loans where "interest or principal remains unpaid for 30 days or more."

been reported as past due.  In each of its filings during the Class Period, the Bank reported the amount of commercial loans that were past due and placed them into one of three categories: (i) in "serious doubt," including loans that were 30-89 days past due; (ii) 90 days or more past due and still accruing interest income; and (iii) "nonperforming" or "nonaccruing" loans, including loans that were 90 days or more past due and not accruing interest income.

59.     Throughout the Class Period, the Bank and the Officer Defendants regularly reported on these metrics, reporting them in the Bank's SEC filings and press releases and highlighting them to investors during the Bank's earnings conference calls.  Analysts also consistently followed the Bank's past due loan amounts, often commenting on them in reports. As the Criminal Information makes clear, the Bank's past due loan amounts were critical metrics that directly represented the credit quality of the Bank's loans and its financial condition.

60.     Of relevance to the criminal conspiracy, the Bank's internal policies provided a mechanism by which matured past due and nonperforming loans could be exempt from the quarterly and annual reporting requirements under certain, limited circumstances.  Specifically, Wilmington's Commercial Loan Nonaccrual Policy (the "Nonaccrual Policy") provided that "all loans reported past due 90 days or more" had to be reviewed in order to determine whether they should be classified as nonperforming.  The Nonaccrual Policy further provided that "Loans that have matured but remain current for interest and are in the process of extension and/or modification generally will not be placed on nonaccrual [*i.e.*, will not be reported as past due or nonperforming] unless future repayment ability is in jeopardy."  In other words, if a lender was legitimately in the process of "extending" the terms of a matured loan (for which the entire principal was due immediately) so that the borrower could continue or resume making both principal and interest payments, the Bank did not require that loan to be reported as past due.

61.     As the Criminal Information provides, each quarter during the Class Period, Wilmington "waived" hundreds of millions of dollars of matured, past due loans by falsely claiming that they were "in the process of" extending those loans.  Thus, the Bank did not include those past due loans in its reported past due loan figures, waiving them for months and, in some instances, <u>years</u>.  In truth, however, the Bank had no basis to "waive" those past due loans because the Bank did not obtain and had no intention of obtaining updated appraisals for the loans, as required by federal law and the Bank's own policies.  Indeed, federal regulations required the Bank to update existing loan appraisals whenever it extended credit on a commercial real estate loan in excess of $250,000, unless there was "no obvious and material change in market conditions or physical aspects of the property that threaten[ed] the adequacy of the institution's real estate collateral protection after the transaction."  12 C.F.R. § 34.43(a)(7)(i). The Bank was well aware of these federal regulations because, as described in the Criminal Information, in November 2008, the Bank adopted an internal appraisal policy that tracked them, specifically requiring updated appraisals for any loan extensions unless there had been "no obvious and material change in market conditions" (the "Appraisal Policy").

62.     Despite these clear-cut federal regulations and the Bank's own internal Appraisal Policy, the Criminal Information and Terranova's guilty plea confirm that the Officer Defendants and other members of Wilmington's senior management intentionally failed to update loan appraisals in order to conceal the true credit quality of the Bank's commercial loan portfolio. The Bank did not obtain these updated appraisals for a single reason: the Bank's most senior executives, including the Officer Defendants, knew that the collateral underlying the loans had "dropp[ed] substantially" since the loans had been originated or last extended.  As a result, these Defendants knew that obtaining a new appraisal would require the Bank to take enormous write-

downs of its loan portfolio as reflected in its Loan Loss Reserve.  This, in turn, would have dramatically decreased the Bank's publicly reported net income.

63.     The Criminal Information and Terranova's guilty plea confirm that Terranova and his criminal co-conspirators – including Bailey, the Bank's Delaware Market Manager, who reported to Defendant Harra – knew that commercial real estate loan appraisal values were "dropping substantially" throughout 2008 and 2009, and that updating appraisals in order to extend loans in compliance with the Nonaccrual and Appraisal Policies would have had, according to an April 2009 email from Bailey to Terranova, "near term potential for catastrophic consequences" on the Bank.  Thus, the Bank refused to update the appraisals for hundreds of millions of dollars of matured past due loans because, if it had, the Bank would have been forced to acknowledge the deterioration of the collateral value of the subject property and the Bank's commercial loan portfolio and, as a result, write down the value of the loans and account for a high volume of nonperforming loans in its Loan Loss Reserve.  Indeed, the Criminal Information specifically states that "updated appraisals would have required [Wilmington] to recognize losses on the credits and would have had a negative impact on [Wilmington's Loan Loss Reserve]." When regulators ordered these updated appraisals to be performed in the second quarter of 2010, as discussed below, "the results devastated the bank's balance sheet, forcing it into the fire sale to M&T Corp."

64.     As Terranova admitted in the Criminal Information, at all times relevant throughout the Class Period, the Bank manipulated the extension provision of the Nonaccrual Policy by allowing lenders to represent that any matured past due loans were "in the process of extension" or "in the process of renewal" – without providing any appraisal, documentation or analyses – in order to conceal reporting the true amount of past due loans.  This fraudulent

scheme was easily carried out:  all it required was for a lender (also referred to as a "relationship manager") to say that he or she was in the process of extending a loan.  Specifically, at all relevant times, a monthly "Delinquency Report" (also known as the "Waived Loan Report") was compiled.  CW 12, a Vice President in the Workout group from 1996 until June 2010, compiled this report until the end of 2008.  Thereafter, from the end of 2008 until the end of the Class Period, Steve Cummings, the Bank's Credit Policy Officer who, according to the Bank's 2009 Form 10-K, reported to Cecala, compiled the Delinquency Report.  As described in the Criminal Information and confirmed by CW 12, to complete the report, Cummings contacted the Bank's lenders regarding whether matured loans under their control, which were current for interest, could be waived from the Delinquency Report as "in the process of extension."  If a lender responded that he or she was "working on" an extension, that would be sufficient to waive the loan from past due reporting.   No further analysis, review, documentation, or follow-up was performed or required.  No determination was made as to whether "future repayment ability [was] in jeopardy" as required by the Bank's Nonaccrual Policy.

65.    As CW 12 explained, all the Bank did was "check the box" that said "waived" on the Delinquency Report.  This "check the box" approach was directly contrary to the regulations set by the Bank's financial regulators, including the Federal Reserve, which state that banks should only "consider loan workouts after analyzing a borrower's repayment capacity, evaluating the support provided by [any] guarantors, and assessing the value of the collateral pledged on the debt" and after management has, *inter alia*, a "well-conceived and prudent workout plan" that "analyzes the current financial information on the borrower . . . and that supports the ultimate collection of principal and interest."  *See* Policy Statement on Prudent Commercial Real Estate

Loan Workouts promulgated by the Bank's financial regulators.[4]

66.     Defendant North approved all the "check the box" loan waivers.  According to CW 12, North completed a confirmation each month that he approved of all waivers granted to loans that were purportedly "in the process of extension."  North also made no determination as to whether "future repayment ability [was] in jeopardy" as required by the Bank's Nonaccrual Policy.  CW 10, a Vice President in commercial lending who left in October 2010 after 34 years with the Bank, confirmed that Defendants Cecala, Harra, and Gibson received these Delinquency Reports at least on a quarterly basis, circulated by Defendant North himself.

67.     Once all of the waived loans were approved, the Delinquency Reports were sent to the Bank's Finance Department – which was under Defendant Gibson's supervision – where employees removed all loans that had been listed as "waived" on the Delinquency Report in order to prepare the Past Due and Nonperforming Loan List ("Past Due List").  As detailed in the Criminal Information, matured loans remained on the Bank's Past Due List indefinitely.  The Past Due List was the document used for the Bank's publicly reported past due loan figures.

68.     Terranova described in the Criminal Information the extent to which the Bank kept past due loans from being reported.  Terranova admitted that, from approximately March 31, 2009 through November 20, 2009 alone, he represented to Cummings and the Credit Department that all of the past due and nonperforming loans in his portfolio – which, as described above, constituted 7% of the Bank's entire commercial loan portfolio (¶54) – were in the "process of extension," and, as a result, all of those loans were waived from the reported past due loan figures.  In actuality, however, Terranova had taken no action to extend the loans and a

---

[4] These "financial regulators" consist of the Federal Reserve, the Federal Deposit Insurance Corporation, the National Credit Union Administration, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, and the FFIEC State Liaison Committee.

number of his matured loans appeared for multiple months, and sometimes years, on the Delinquency Reports as "in the process of renewal."

69.     CW 12 confirmed that this practice was widespread at the Bank and in no way unique to Terranova.  Specifically, CW 12 confirmed that he would see the same loans and borrowers on the Delinquency Reports month after month as being "in the process of extension" and thereby waived.  CW 12 further stated that his direct supervisor, Anthony D'Imperio, the former head of Wilmington's Workout group, always expressed serious concerns about how the "waived loans were too big" and had become a "crutch" for how the Bank dealt with past due loans.  According to CW 1, D'Imperio reported to Defendant North and interacted regularly with Defendants Cecala, Harra, and Gibson.

70.     Indeed, the Criminal Information establishes that the Bank fraudulently misstated its past due and nonperforming loans by $105 million, or 35% of its total past due and nonperforming loans as of December 31, 2008.  The Criminal Information also establishes that the Bank fraudulently misstated its 2009 past due and nonperforming loan figures collectively by at least the following amounts: (i) $186 million, or 70%, of its total past due and nonperforming loans during the first quarter; (ii)  $234 million, or 69%, of its total past due and nonperforming loans during the second quarter; (iii) $463 million, or 125%, of its total past due and nonperforming loans during the third quarter; and (iv) $373 million, or 78%, of its total past due and nonperforming loans during the fourth quarter.

71.     The Criminal Information demonstrates that the Bank's concealment of its past due and nonperforming loans was widespread, and not limited to Terranova.  As set forth in the Criminal Information, the majority of these past due and nonperforming loans were reported "waived" by other lenders. For example, in the second quarter of 2009, Terranova's loans

constituted $78 million, or 34%, of the $234 million of past due and nonperforming loans that the Bank concealed. Similarly, in the third quarter of 2009, Terranova's loans constituted $110 million, or 24%, of the $463 million of past due and nonperforming loans that the Bank concealed. In other words, 66% and 76% of the Bank's loans that were "waived" as in the "process of extension" in the second and third quarters of 2009, respectively, were done so by lenders other than Terranova.

72.     The specific breakdown of the fraudulently misstated past due loans, as reported by the Bank in its financial statements as Serious Doubt Loans (30-89 Days Past Due), or Past Due Loans Accruing & Nonaccruing (90 Or More Days Past Due), are set forth below:

### Serious Doubt Loans (30-89 Days Past Due)

|  | Reported Total Commercial Serious Doubt Loans | Concealed Total Commercial Serious Doubt Loans | Commercial Serious Doubt Loans The Bank Should Have Reported | Percentage Of Understatement |
|---|---|---|---|---|
| 4Q08 | $106.3 | $34.0[5] | $140.3 | 31.98% |
| 1Q09 | $48.1 | $140.0 | $188.1 | 291.06% |
| 2Q09 | $52.7 | $46.0 | $98.7 | 87.29% |
| 3Q09 | $64.1 | $112.0 | $176.1 | 174.73% |
| 4Q09 | $51.1 | $43.0 | $94.1 | 84.15% |

### Past Due Loans Accruing & Nonaccruing (90 Or More Days Past Due)

|  | Reported Total Nonaccruing & Accruing Commercial Loans 90 days+ Past Due | Concealed Nonaccruing & Accruing Commercial Loans 90 days+ Past Due | Nonaccruing & Accruing Commercial Loans 90 days+ Past Due The Bank Should Have Reported | Percentage Of Understatement |
|---|---|---|---|---|
| 4Q08 | $190.4 | $71.0 | $261.4 | 37.2% |
| 1Q09 | $217.20 | $46.00 | $263.20 | 21.18% |
| 2Q09 | $284.40 | $188.00 | $472.40 | 66.1% |
| 3Q09 | $347.50 | $351.00 | $698.50 | 101.01% |
| 4Q09 | $425.60 | $330.00 | $755.60 | 77.54% |

73.     As the Criminal Information makes clear, by no later than January 2009, high-level executives, including Defendants North and Cecala (as direct supervisor of Steve

---

[5] The calculation for this figure is set forth below. *See* n.15.

28

Cummings, the Bank's Credit Policy Manager), knew that the Bank was not reporting its matured loans as past due, but was instead listing them indefinitely as "in the process of extension."   On January 16, 2009, Cummings sent an email to Defendant North, Terranova, Bailey (who reported directly to Defendant Harra, according to CW 13, who served as a Wilmington Vice President and Loan Committee member during the Class Period), and Rich Conway, the COO for the Mid-Atlantic Market, which stated that: (i)Wilmington had materially understated the past due and nonperforming loan amounts it had publicly reported in 2008 by more than $105 million; and (ii) Wilmington's "practice of waiving loans that are matured but current for interest from our past due reporting" concealed its "true past due number" and would likely "raise issues for [the Bank]" in the future:

> We would like to hold a brief meeting on Wednesday 1/21 immediately following Loan Committee to discuss addressing the practice of waiving loans that are matured but current for interest from our past due reporting.  I had thought that for the last few quarters that we were trying to only waive bank errors or loans that had made it through the approval process but were not booked in time to come off delinquency.  Apparently that has not exactly been reality.  At 12/31/08 the total of matured/waived stood at over $105 million and nearly 80 loans.

> With your input, we would like to set a reasonable goal/game plan for getting these loans renewed/extended and allowing the system to report a true past due number without a lot of adjustments that could raise issues for us at some point in the future.

74.     However, the Bank could not extend the loans without getting updated appraisals, which Wilmington's senior officers knew would have "catastrophic consequences" for the Bank. Thus, on April 8, 2009, Terranova sent Bailey, who reported to Defendant Harra, an email entitled "Residential Maturities," which attached a spreadsheet that listed the Bank's matured Delaware commercial real estate loan projects due to receive an updated appraisal that quarter – *i.e.*, the second quarter of 2009.  After receiving the spreadsheet, Terranova emailed Bailey about the Bank's "Appraisal problem," stating:

Let's discuss this list before you do anything with it.  I had a long conversation with [Defendant North] and [Senior Real Estate Credit Officer Terry Brewer] after loan committee regarding the Appraisal problem.

75.    In response, Bailey pointedly remarked that the data on the spreadsheet had the potential to devastate the Bank, even though it listed only the loan projects in Terranova's personal portfolio (which represented approximately 7% of the Bank's commercial real estate loans), without a "comprehensive" snapshot of the rest of the Bank's commercial real estate loan projects:

> Thanks for getting me this info so quickly.  We need to address asap.  As I suspected this list is not comprehensive of the bank just your portfolio and has the near term potential for catastrophic consequences. . . [.]  We need to not paint ourselves in a corner to make the regulators or examiners feel good about our process.

76.    Approximately one week later, the Bank's Head of Credit Risk Management, CW 2 – who interacted regularly with the Defendants Cecala, Harra, Gibson, and North – emailed Terranova and Bailey (who reported to Harra) to explain that "the regs are pretty clear on the need for reappraisals," even in situations where a loan is extended, renewed, refinanced, or restructured without the advancement of new funds.  But CW 2's warning went unheeded.  Following CW 2's email, Terranova sent an email to CW 2, Bailey, Brewer, and other Bank executives seeking to "reconvene the appraisal summit asap so we can all get on the same page and get some matured loans extended!"

77.    As described in the Criminal Information, the purpose of the "appraisal summit" was to make sure that the Bank's senior loan officers were all on the "same page" about not updating any appraisals for delinquent commercial real estate loans.  The result of the "appraisal summit" was that the Bank continued to refuse to order appraisals on matured loans due to be renewed and extended, resulting in those matured loans remaining past due but "waived" as "in the process of extension" indefinitely.

78.     As the Criminal Information and Wilmington's former employees make clear, this practice became so egregious that the Bank's most senior officers – including CEO Cecala, CFO Gibson, President Harra, and Chief Credit Officer North – were directly informed of and involved in the Bank's fraudulent reporting of past due loan figures.  For example, on September 16, 2009, CW 2, the head of Credit Risk Management, sent an email to numerous Bank executives, including Defendant North, Terranova, and Bailey, informing them that the Bank's treatment of loans purportedly in the process of extension violated Sarbanes-Oxley and that Wilmington's official explanation that those extensions were used to "avoid unnecessary transfers to nonaccrual[s]" could not "continue for much longer":

> The level of loans which have been matured 90+ days needs to be better managed. The list below reflects the accounts which had to be researched this month for potential movement to nonaccrual, based upon the delinquency associated with the account. (A maturity billing is a principal billing, and to the extent the maturity is not addressed, principal is delinquent. That delinquency grows until the loan is repaid or otherwise extended). <u>Several of these accounts have been the subject of conversations for multiple consecutive months. For now, I am explaining that an "extension is in process" [i]s a means to avoid unnecessary transfers to nonaccrual. In this era of SOX and second-guessing, I do not think that this can continue for much longer</u>.

79.     As a result, Defendants North, Cecala, Harra, and Gibson devised a way by which the Bank could "make" its problematic loans "go away" by the end of 2009.  On October 29, 2009, Rich Conway, COO for the Mid-Atlantic Market, sent an email to Defendant North and others in which he stated that "it is extremely important that we talk about matured loans and <u>how we can make them go away by 12/31</u>," explaining that "[t]his cannot be a quick fix for 90 or 120 days as the problem will just return" because the issue "<u>ha[d] the attention of all the wrong people:  [Cecala, the CEO; Harra, the Bank President; Gibson, the CFO], Examiners, Auditors</u>."

### 2. The Criminal Information Demonstrates That The Bank's Senior Executives Fraudulently "Mass Extended" $1.74 Billion Of Matured And Past Due Loans

80.     In the fall of 2009, the Bank and its senior officers devised a way to make the deteriorated loans "go away" – they simply wrote them off the books.  As the Criminal Information provides, in 2009, the Bank "mass extended" <u>$1.744 billion</u> of past due and soon-to-be past due loans, without any of the requisite documentation and updated appraisals necessary for the proper extension or modification of those loans.

81.     This "mass extension" resulted in the <u>extension of over 1,250 delinquent (or soon-to-be delinquent) loans totaling at least $1.744 billion</u> in just a few months – an amount that constituted 25% of the Bank's outstanding commercial loan balance.  As admitted by Terranova, the Bank committed to extending: (i) 803 matured or maturing loans by December 31, 2009 totaling $1.312 billion; and (ii) 450 matured or maturing loans between January 1, 2010 and April 20, 2010 totaling $432 million.  Like the waived loans discussed above, there were no appraisals or substantive review of the loans prior to their mass extension.  Significantly, the Loan Committee – which was chaired by Defendant North, and on which Defendants Cecala and Harra sat – approved the "mass extension" of the 1,250 loans.  Terranova admitted that his loan extension requests – which were submitted to Defendants North, Cecala, and Harra, among other Loan Committee members – were shams, seeking the extension of tens of millions of dollars of loans that had already been delinquent for many months, on the grounds that they were still in the process of extension.  Some of these loans were extended by the Loan Committee for an additional <u>year</u> without any proof of updated appraisals being submitted.

82.     Significantly, a number of these mass extensions occurred in the final days of 2009 specifically so that the Bank would not have to report its true past due loan figures in its year-end financial statements.  For example, on December 30, 2009, Terranova submitted a

request to the Loan Committee – including Defendants Cecala, Harra, and North – seeking approval to extend multiple loans from a single borrower with a loan balance of over $94 million. Many of the borrower's loans had already been removed from the Past Due List as having been "in the process of extension" for multiple months in 2009. The same day that Terranova made his request, the Loan Committee approved a three-month extension, and required that the borrower pay an interest rate of 4% on his matured loans as of December 1, 2009. When the borrower again did not pay, Terranova applied for another extension three months later – this time for an additional nine months running to the end of 2010 – providing no other reason than "[d]ue to timing issues, the extension documents were never executed by the principal of the [borrower]." Moreover, Terranova told the Loan Committee that the 4% interest rate surcharge that should have been implemented on December 30, 2009 had not been implemented, and Terranova asked that it not be implemented until June 1, 2010. The Loan Committee – including Defendants Cecala, Harra, and North – once again quickly acceded to Terranova's request without seeking any documentation or analysis of the collateral or the borrower's ability to repay the loan. For all of these "extensions" there is no evidence that the Loan Committee asked for any updated appraisal, documentation, credit analysis, or support to justify them. Nor is there any evidence that the Loan Committee ever sought or received an explanation as to why the borrower was not able to execute the loan extension documents over the course of three months, or why the applicable interest rate had not been implemented. There is also no evidence that the Loan Committee demanded an explanation as to why the borrower needed a total of twelve more months to extend the loan even though his loan had been on the Delinquency Report as "in the process of an extension" for months.

83.    Similarly, on December 22, 2009, Terranova submitted a request to extend

approximately $8.9 million in matured loans (out of a total amount due of approximately $11.7 million) to another borrower.   Once again, the Loan Committee summarily approved that request.  Once again, the borrower did not pay.  Thus, on April 7, 2010, another Bank employee submitted a request to the Loan Committee to extend those loans until August 1, 2010 in order to "have an opportunity to gather updated financial information and develop a long-term plan for the [borrower]."   Yet again, the Loan Committee approved that request.   There is no evidence that the Loan Committee asked for any updated appraisal, documentation, credit analysis, or support to justify the extensions of these loans; nor is there any evidence that the Loan Committee demanded an explanation as to why the borrower needed seven more months "to gather financial information," even though his loan had been on the Delinquency Report as "in the process of extension" for months.

84.     Ultimately, the Bank's fraudulent treatment of its past due loans failed to disclose to the public over one billion dollars in troubled and/or nonperforming assets.  In addition to the fraudulently false past due loan figures in 2009 and earlier that were not reported as past due or on nonaccrual status because they were listed on internal Bank documents as having been "waived," the "mass extension" of 1,250 past due and soon-to-be past due loans valued at $1.744 billion in the fall of 2009 was not reported in the Bank's SEC filings in any way.

### 3.     Wilmington's Former Employees Confirm The "Extend And Pretend" Conspiracy And Appraisal Fraud

85.     Former Bank employees have corroborated the Criminal Information and confirmed that the Officer Defendants fraudulently concealed past due and nonperforming loans. According to CW 1, a twenty-year banking veteran who was a Vice President in Wilmington's Workout group from March 2008 to July 2011, senior management, including Defendants Cecala, North, Gibson and Harra knew that the waiver extensions were a "joke" and that the

34

lenders were not actually working with troubled borrowers to facilitate repayments to the Bank. CW 1 also explained that it was common knowledge that the mass extensions were not real, and that Bank executives regularly laughed about it in the dining hall.  CW 1 further confirmed that Gibson, North, Cecala, and Harra were present at quarterly meetings where the staff and management discussed large credit exposures and emerging problems (called "Credit Strategy Meetings") and where extensions were regularly discussed.  CW 1 described how lenders at these Credit Strategy Meetings would simply state that they were "working on" extensions for delinquent past due loans, and those purported extensions were treated by these Officer Defendants with a "nod, nod, wink, wink," but without any meaningful discussion of loan terms or creditworthiness.  Further, as set forth below, CW 2 explained in detail how the Officer Defendants regularly vetoed recommendations and attempts by the ARG's credit specialists to downgrade and charge-off delinquent loans.  *See* Section III.C.2.  CW 1 also reported that the Bank rarely charged-off even its most delinquent loans.  As a result, according to both CW 1 and CW 2, the Bank's Loan Loss Reserve and related public statements were inaccurate and the Bank's financial situation appeared stronger than it actually was.

86.    Former high-ranking Bank employees also confirm that the Officer Defendants knew of the Bank's failure to update out-of-date appraisals.  For instance, according to CW 1, despite the Bank's November 2008 formalization of federal regulations regarding updated appraisals, it was common knowledge that the Bank never got any "real, meaningful updates on appraisals."  CW 1 further explained that although this issue was frequently discussed at the Bank's Credit Strategy Meetings – which Cecala, Harra, Gibson, and North attended – no meaningful action was ever taken.  Rather, when the need to obtain updated appraisals for specific loans was raised, these Defendants and the Bank's lenders would invariably respond that

the lender was a "good guy," and that an updated appraisal was not needed.

87.     According to CW 1 and CW 2 (who, as discussed above, was the Head of the Bank's Credit Risk Management Division from 2008 through 2010 and had direct contact with the Officer Defendants and other high-level executives), as a result of these failures to obtain updated appraisals, Wilmington's appraisals were "almost always outdated" and "horribly inflated" so that it was "not possible to have an accurate LTV."[6] CW 1, who reviewed loan files once they went into Workout, reported that "without a doubt 90% of the files in workout only had original appraisals and nothing else" and, in some cases, the appraisal would be a decade or more old.  Furthermore, these witnesses describe that even original appraisals were invariably unreliable.  Specifically, CW 1 reported that Wilmington used "stabilized" appraisals, or appraisals based on improvements to the property that did not exist at the time an appraisal was performed, rather than "at present market value appraisals."  CW 1 further explained that "at present market" appraisals were standard and necessary to evaluate the key LTV credit metric for the loan.  CW 1 stated that, once Workout obtained an updated appraisal, "the appraisals came in far lower than whatever was existing in the file" and forced the Bank to take large writedowns on the loans.  Thus, CW 1 stated emphatically that the Bank's appraisals were "worthless."

88.     Notably, CW 1 reported that Cecala expressly <u>ordered</u> the Workout group – a group over which Cecala had direct oversight – to refrain from obtaining updated appraisals in order to avoid recognizing charge-offs.  In addition, CW 2 described how the Bank's outdated "Appraisal problem" was frequently discussed at monthly ARG meetings and quarterly Credit Strategy Meetings, both of which Defendants Cecala, Harra, Gibson, and North attended.  In

---

[6] A Loan-To-Value, or LTV, ratio is a key measure of a loan's credit quality and risk profile.  It is calculated by dividing the amount of a loan by the appraised value of the property.  The higher the LTV ratio, the riskier the loan because there is less collateral to foreclose on in the event of default.

fact, outdated appraisals were such an issue for the ARG that, according to CW 2, one of the members of the ARG actually maintained a lengthy list of the outdated appraisals. The issue was so severe that, according to CW 2, the Federal Reserve raised repeated concerns regarding Wilmington's out-of-date appraisals during the Class Period.

89.     More specifically, CW 1 explained that the Bank retained an outside consultant to perform a "huge study" of market conditions in 2009 and again in 2010 in order to determine the value of the collateral, due to concerns over deteriorating property values. The results of the study were clear: the value of much of Wilmington's Delaware collateral was <u>far below the Bank's then-current appraisals</u>. Based on that study alone, Wilmington should have ordered new appraisals for all of its Delaware loans, but did not do so. As Chick Pinto, Wilmington's Senior Vice President of Corporate Marketing and Communications, admitted to *The News Journal* in an April 17, 2011 article, going back to borrowers to ask for "more recent appraisals" <u>was not the Bank's "preferred way of doing things. . . . [I]t wasn't the nature of how we did things</u>."

90.     Moreover, consistent with the Criminal Information's conclusion that "updated appraisals would have required [Wilmington] to recognize losses," when Wilmington brought in third party Treliant Risk Advisors in the second quarter of 2010 to help review the portfolio and update collateral values in accordance with the Bank's obligations under the MOU, the updated appraisals triggered massive write-downs. According to a November 2010 *Wall Street Journal* article, over the summer of 2010, "examiners from the Federal Reserve Bank of Philadelphia discovered that the [Bank] wasn't writing down the value of loans made to borrowers whose real-estate projects had stumbled . . . <u>Regulators ordered new appraisals on the properties and began evaluating how much they were worth. The results devastated the bank's balance sheet, forcing it into the fire sale to M&T Bank Corp.</u>"

**B.      The Bank's Fraudulent Loan Underwriting Practices**

91.      The Criminal Information describes a criminal conspiracy that was not limited to the fraudulent reporting of past due loans and the failure to account for the Bank's severely deteriorating loan collateral.  Indeed, the conspiracy began with the origination and underwriting of the loans that constituted the Bank's commercial loan portfolio.  Underwriting refers to the due diligence process that banks perform prior to extending a loan to verify a borrower's creditworthiness.  For banks with a concentration in commercial real estate like Wilmington, implementing and maintaining clear and strict underwriting standards are critical to protect against deteriorating credit quality and losses.  Numerous former Wilmington employees reported that – contrary to the Officer Defendants' statements during the Class Period that the Bank "consistently" employed "rigorous" underwriting standards to "mitigate" credit risk – the Bank's underwriting policies and practices were so "lax" that Wilmington effectively had <u>no</u> standards.  According to CW 1, the Bank's underwriting was "nonexistent" and, as a result, Wilmington entered into "deals a normal commercial bank should not have looked at."  These problems were so severe that, according to CW 1, who worked closely with federal regulators in 2010, the Federal Reserve became concerned about the "<u>future ability of the bank to survive, based on what they saw in the credit underwriting</u>," and effectively took over the Bank's credit operations in the summer of 2010.

**1.      The Criminal Information Demonstrates That Senior Bank Executives Criminally Defrauded Investors Through Violations Of The Bank's "10% Rule"**

92.      One of Wilmington's lending policies – the "10% Rule" – permitted loan officers to extend additional credit (and, after May 2009, renew existing loan terms) to certain borrowers in an amount up to 10% of their existing credit, with a cap of $1 million.  10% Rule loans did not

require Loan Committee approval, or any additional credit analysis or underwriting.[7]  In his guilty plea and in the Criminal Information, Terranova admitted to his and other senior executives' flagrant violations of the "10% Rule" so that the Bank could manipulate the underwriting process and conceal delinquent loans from default and disclosure.  In particular, the Criminal Information makes clear that 10% Rule loans were fraudulently granted to: (i) funnel cash to troubled borrowers who used that cash to make payments on loans that were otherwise delinquent; and (ii) increase loans by material amounts – often far greater than 10% – without scrutiny and with the effect of increasing the Bank's LTV exposure in violation of Wilmington's policy and federal law.  As the Criminal Information states, it was an objective of the conspiracy to conceal the Bank's "true financial condition in many ways, including by extending new credit to clients to keep existing loan payments current."

93.  <u>First</u>, as detailed in the Criminal Information, Terranova and his criminal co-conspirators fraudulently violated the 10% Rule to funnel cash to troubled borrowers who used that additional cash to make payments on loans that would otherwise have become past due.  For instance, Terranova admitted that senior executives at the Bank deliberately and fraudulently misused the 10% Rule to extend "interest reserve" loans, *i.e.*, loans issued solely to permit a borrower to pay interest on an existing loan's outstanding balance, with the interest then capitalized and added to the loan balance.  The Criminal Information also makes clear that Terranova and his criminal co-conspirators misused the 10% Rule to extend "working capital" loans, *i.e.*, revolving capital lines of credit that allow a business to fund operating expenses. Under Bank policy, such 10% Rule loans were supposed to be granted on the basis of a

---

[7] Until the end of 2008, all that was required for a 10% Rule loan was the approval of a relationship manager, like Terranova, and a division manager, like Bailey.  In 2009 and 2010, "10% Rule" credit extensions required the approval of Defendant North in his capacity as Chief Credit Officer or, alternatively, a different senior credit officer.

borrower's creditworthiness.  But, as Terranova admitted, these loans were fraudulently extended without any consideration of a borrower's creditworthiness.  Moreover, they were extended to borrowers that the criminal co-conspirators knew were having serious financial difficulties and who could not otherwise keep their loan payments current – including Zimmerman.

94.     The Criminal Information cites unequivocal evidence that establishes these facts.  This evidence confirms that, between 2006 and 2008, Terranova and Bailey extended more than $11 million in interest reserve and working capital loans solely to keep borrowers current on their payments and to prevent those loans from having to be reported as past due.  The Criminal Information provides specific examples of the Bank's fraudulent interest reserve and working capital loans, including the following:

- Seventeen 10% Rule loans in 2007 and 2008 worth approximately $4.1 million to Zimmerman, even though the Bank knew Zimmerman was having serious financial troubles by 2008.  These loans were extended solely so Zimmerman could stay current in his payments and the Bank could avoid reporting Zimmerman's loans as past due.

- Nine 10% Rule loans for $1.83 million in 2007 to "Borrower E," and another loan for $340,000 in 2008, all so that Borrower E could stay current on his payments and the Bank could avoid reporting Borrower E's loans as past due.

- Eight 10% Rule loans for $2.65 million to "Borrower F" between 2006 and 2008.  Remarkably, four of these loans (for a total of $750,000) were unsecured; three (for a total of $850,000) were used to fund existing loans that were never repaid; and the remaining loan (for $1,050,000) was secured by only second and third mortgages on real estate already financed by Wilmington.

- Four 10% Rule loans for approximately $217,000 to "Borrower D" in 2007, and another 12 loans in 2008 worth approximately $2.1 million.  These 10% Rule loans were extended solely to allow Borrower D to stay current on his loan payments and so the Bank could avoid reporting Borrower D's loans as past due.  Moreover, assuming that these 10% Rule loans were for equal amounts, they each constituted 35% of the original amount of the loan, which exceeded the 10% credit extension limit permitted under the 10% Rule's basic terms.

- In January 2008, a 10% Rule loan in the amount of $39,690 was made to "Borrower A," who had received an initial $3.96 million loan and simultaneous $140,000 10% Rule loan

in September 2005, so that Borrower A could continue to make payments on his initial loan and the Bank could avoid reporting Borrower A's loans as past due.

95.    The rampant violations of the 10% Rule so severely threatened the Bank's financial health that KPMG and the Federal Reserve repeatedly warned the Officer Defendants that violations of the 10% Rule with respect to interest reserve loans constituted a "significant deficiency" and a "problematic practice."  Indeed, in early 2009, KPMG sent a letter to the Bank's senior management that expressed serious issues with the use of supplemental interest reserve and other small loans to keep development projects afloat.  KPMG determined that this practice constituted a "significant deficiency" because it did not: (i) require "robust underwriting"; or (ii) establish any "standards for the acceptability of and limits on the use of interest reserves."  According to KPMG, this practice "mask[ed]" the true credit quality of borrowers and the viability of projects:

> [T]he Corporation's Commercial Real Estate Lending Policy does not address specific underwriting standards for the acceptability of and limits on the use of interest reserves.  The use of interest reserves to pay interest, without robust underwriting policies and timely, independent loan reviews, can potentially mask the deterioration of the creditworthiness of a borrower or the impaired viability of the underlying real estate project.

96.    Despite KPMG's warning, the Bank's misuse of the 10% Rule to provide interest rate reserve loans continued.  According to CW 2, in September 2009, when the Federal Reserve imposed the MOU, the Federal Reserve also warned the Officer Defendants about misusing interest rate reserves, identifying it as a "problematic practice" resulting in "substandard" loans.

97.    Second, as set forth in the Criminal Information, Wilmington fraudulently misused the 10% Rule to extend so much additional credit to borrowers, in amounts often greater than 10% of the underlying loan, that LTV ratios on 10% Rule loans frequently violated federal guidelines and increased the Bank's LTV "exposure beyond that . . . permitted by Bank policy" –

as well the Bank's public statements about LTVs, as set forth below in Section V.D.  While federal guidelines allow financial institutions to establish their own LTV limits for real estate loans, with regard to commercial real estate loans in particular, federal guidelines generally require a maximum LTV of 80%.  Significantly, in its annual 2007, 2008, and 2009 SEC filings, the Bank falsely represented to investors that it complied with the federally recommended 80% LTV limit.  *See* ¶246.  Despite these representations, however, the Criminal Information and Terranova's guilty plea make clear that the Bank's LTVs regularly exceeded the stated 80% limit.  For instance, as set forth in the Criminal Information, Terranova admitted to at least the following fraudulent acts, all of which substantially increased the LTV ratios in the Bank's commercial loan portfolio:

- On November 30, 2005, the 10% Rule was fraudulently invoked by Terranova and Bailey to extend $650,000 in additional credit on a $1.6 million loan – an amount equal to 40% of the underlying loan – which increased that loan's LTV ratio from 80% to 112.5%.  As a result, the total value of the loan exceeded the value of the property, the Bank was not secured in the full amount of the loan, and the extra money simply went to the borrower.  This occurred just one week after the borrower's loan was first originated.

- On July 25, 2007, the 10% Rule was fraudulently invoked by Terranova and Bailey to extend $70,000 in additional credit on a $255,000 loan – an amount equal to 40% of the underlying loan – which increased that loan's LTV ratio from 75% to 95%.  In approving the $255,000 loan, the Loan Committee had specifically instructed that the LTV would not exceed 75%.

- Also on July 25, 2007, the 10% Rule was fraudulently invoked by Terranova and Bailey to extend $20,000 in additional credit on a $240,000 loan, which increased that loan's LTV ratio from 80% to 86%.  In approving the $255,000 loan, the Loan Committee had specifically instructed that the LTV would not exceed 80%.

Due to the multi-year structure of the above-described loans, they remained on the Bank's books for years and, as set forth in the Criminal Information, the borrowers often received additional extensions of credit under the 10% Rule, including borrowers who could not otherwise make payments (as discussed in detail in Section III.B.1).

42

98.     <u>Third</u>, the Criminal Information details how Terranova and his criminal co-conspirators fraudulently misused the 10% Rule to circumvent the Loan Committee's specific mandates.  For instance, on September 14, 2005, after Terranova originally requested a $4.1 million commercial mortgage for "Borrower A," the Loan Committee approved only a $3.96 million loan.  However, on September 21, 2005, the same day that the loan officially closed and the funds were disbursed, Borrower A received a $140,000 10% Rule credit extension from Terranova, bringing the total loan value back up to $4.1 million – the precise amount rejected by the Loan Committee in the first instance.

99.     In addition, the Criminal Information makes clear that Terranova and Bailey (who reported directly to Harra) frequently extended 10% Rule loans before the borrower's primary loan was even approved by the Loan Committee, and also made 10% Rule loans to borrowers with less than $5 million in credit in violation of the Bank's policy.  In one egregious example cited in the Criminal Information, on December 13, 2006, Terranova executed a line of credit of $500,000, purportedly under the 10% Rule, on an outstanding loan of only $440,000.  One week later, the Loan Committee approved a loan increase of $820,000, unaware of the 10% Rule $500,000 credit extension, bringing the total loan amount to $1.76 million for a property worth only $1.35 million.

100.    The flagrant and fraudulent misuse of the 10% Rule described in the Criminal Information is also corroborated by former high-level Bank employees.  According to CW 2, the Delaware real estate group, and in particular Terranova and Bailey, frequently relied on the 10% Rule when granting loans.  According to CW 1, 10% Rule loan extensions were a "widely accepted practice" that was rampant at the Bank, such that the number and volume of 10% Rule loans were "totally ridiculous."  CW 1 explained that "almost every loan [the Workout group]

saw" had a 10% Rule loan (or two) attached to it.  According to CW 1, relationship manager Andrew Bianchino was the "Prince of the 10% Rule," and every loan he originated had one or more 10% Rule loans attached to it.  The existence – and exploitation – of the 10% Rule was never disclosed to investors and, according to CW 1, nobody in the Workout group had ever seen anything like the use and exploitation of the 10% Rule at Wilmington, as it was a practice that "any normal bank wouldn't allow."

101.    Fraudulent violations of the 10% Rule were known to the Bank's senior officers. The Criminal Information makes clear that Brian Bailey, the Delaware Market Manager, who was responsible for all of the Bank's loans in its primary Delaware market (among other things), approved the fraudulent 10% Rule loans described above.  Significantly, Bailey reported directly to Defendant Harra, Wilmington's President.  Moreover, CW 1 stated that this fraudulent use of the 10% Rule was known by senior Bank executives, including Defendants Cecala, Harra, Gibson, and North, who understood that these funds were extended for the sole purpose of avoiding having to report loans as past due.  Indeed, CW 1 explained that Defendants Harra, Cecala, Gibson, North, and other senior executives attended quarterly meetings where "standard write-ups" of loans were distributed and discussed.  These write-ups (and the loan information attached to them) included specific information detailing all of the Bank's 10% Rule loans, which rendered the improper use of the 10% Rule readily identifiable.

### 2.    The Bank Regularly Ignored Its Own Underwriting Processes And Extended Loans To Favored Clients Without Scrutiny Or Proper Documentation

102.    The Bank's incredible amount of past due loans and overvalued collateral existed because, in an effort to generate new loans and drive revenues, loan officers frequently ignored even the few established underwriting processes that existed and underwrote loans without the proper documentation.  For example, CW 3, who managed the unit that reviewed the Bank's

commercial loan documentation from June 2008 through June 2010 (and who was a loan documentation reviewer for four years before that), stated that the Bank routinely extended loans that contained errors and deficiencies in their underwriting.  According to CW 3, these deficiencies (namely, missing documentation and violations of the Bank's underwriting guidelines) were documented in monthly reports that were provided directly to Defendant North and made available to Defendants Cecala and Harra.  While these reports were intended to track widespread underwriting problems that needed to be remedied and to alert senior management and the lenders of specific deficiencies that needed to be corrected, neither happened.  In fact, not only did the Officer Defendants and the lenders ignore these reports (failing to correct the deficiencies), but North routinely ordered CW 3 to remove these deficiencies from the reports several times a month throughout the Class Period.

103.    CW 3 further reported that the deficiencies in documentation included "a number of times" where the promissory note was signed and dated before the loan approval.  This meant that the lender had booked the loan (legally obligating the Bank to loan the money) without waiting for the appropriate approvals.  This problem was so consistent and so severe that Wilmington's internal Sarbanes-Oxley compliance team identified the practice as a violation of the Bank's obligations under the Sarbanes-Oxley Act at least once during the Class Period, according to CW 3.  Similarly, as set forth below, the FBI Affidavits describe repeated instances where the Bank extended additional credit even though the borrower had not met the basic terms of its loan agreements.

104.    CW 1, who reviewed loan files going back to 2000, corroborated CW 3's report, stating that, in general, the Bank was "woefully deficient on loan documentation" and that it was common for there to be <u>no</u> documentation evidencing underwriting in loan files.  In fact, CW 4,

who was a Construction Loan Administrator in Commercial Banking Credit Policy from 2009 through 2010, recalled that, in the Spring of 2010, after the Federal Reserve instituted the MOU and demanded that the Bank correct its deficient underwriting practices, as described below (Section III.D), the Bank's credit personnel were forced to try to create loan files from scratch. CW 4 described how employees were "breaking their necks to get those loan files together," a process that involved going back to the lenders to get signatures on documents that had not previously been signed or to get other missing documentation.

105.    The Bank's underwriting deficiencies arose out of strategies instituted by Defendants Cecala, Harra, and Gibson that favored extending a high volume of loans to customers based on the clients' ongoing or potential relationships with the Bank, rather than on an evaluation of their creditworthiness.  According to CW 2, the Bank operated with an internal annual goal of 10% growth from at least 1997 through March 2010.  This ambitious growth goal required a constant Bank-wide focus on sales and business development, leading several former Wilmington employees, including CW 2, CW 5 (Vice President in Wilmington's loan Workout group from January 2008 through June 2010), and CW 1 to describe Wilmington as being "more of a sales culture than a credit culture."

106.    The reckless focus on growth over sound underwriting that was instilled by the Officer Defendants led to numerous other reckless underwriting practices.  For example, former Wilmington employees described how the Bank extended loans to favored clients without "scrutiny."  For instance, CW 1 and CW 6, who worked in credit and risk assessment for the commercial loan portfolio from 2002 through April 2007, described how Wilmington operated on a "friends and family plan" for years, whereby favored and potential clients got whatever they wanted.  As an example, CW 1 cited numerous instances where the <u>only</u> documentation in a loan

file was a statement that the borrower would be a "good referral" for the Bank's wealth advisory division. Similarly, according to CW 7, a former Wilmington paralegal from May 2007 to April 2009 who reviewed and processed the Bank's loan documentation, Wilmington "went to great lengths to get loans through" for favored clients and would "often re-write a loan that a client didn't qualify for" based on the Bank's relationship with the client.

107.    Moreover, the Bank made its loan underwriters subordinate to the very people – the Bank's sales staff – whose work they were supposed to examine. Former employees uniformly reported that the "underwriting" function at Wilmington was largely conducted and controlled by the lenders, who were incentivized to originate the loan. The underwriters reported to regional lending managers who were in charge of business development – the Bank's primary focus – as opposed to non-sales, credit-focused supervisors. According to CWs 1 and 2, the Bank's underwriters were "lender wannabes" who considered the position just a stepping-stone to becoming a "well-compensated" loan officer. CW 1 explained that the underwriters were "told what to write on a piece of paper to make the numbers work" on a loan and "[t]hey weren't allowed to be independent." In other words, according to CW 1, the underwriters' approval was provided for form only and was just "putting lipstick on a pig." CW 4 described the lenders as controlling the process, stating "Whatever the lenders say is basically what it was . . . That's who we answered to – the lenders." As CW 3 commented, "whatever the lenders said, [the underwriters] did" and "[i]f the lender said jump, they'd say how high."

108.    In order to further marginalize the Bank's underwriting function, underwriters did not receive sufficient training (according to CWs 1, 2, and 4) or sufficient staffing (according to CW 2). According to CW 2, the underwriter function was chronically understaffed – the Bank never had more than underwriters in total, for all of the Bank's commercial lending (out

of roughly 3,000 employees), which amounted to a portfolio of approximately $6.7 billion in 2008 and 2009.   Yet, this handful of inexperienced, untrained underwriters was nominally responsible for underwriting hundreds of millions of dollars in loans every year.

109.   Finally, the Bank's policies exempted a large percentage of Wilmington's loan portfolio from <u>any</u> review beyond that supposedly done by the underwriters.   Specifically, only large loans – generally those exceeding $5 million – were submitted to the Loan Committee for review after an underwriter (under the lender's direction) had perfunctorily signed off on the loan.   According to CW 2, Defendant North as Chief Credit Officer chaired the Loan Committee, and its members included CW 2; senior lending management, including Brian Bailey, to whom Terranova reported, as discussed above; and Cecala and Harra, both *ex officio* members of the Loan Committee.   As set forth above, according to the Bank's quarterly SEC filings during the Class Period, 50% of the Bank's loan portfolio was below $5 million, and these loans were accordingly exempt from any review beyond the decision made by the Bank's lenders (with the rubberstamp from the Bank's underwriters).   Furthermore, as set forth below in Section III.D, even after the Loan Committee approved the terms of the loan, lenders commonly changed those terms unilaterally to accommodate borrowers.

### 3.   The Criminal Information And The FBI Affidavits Describe Multiple Violations Of The Bank's Underwriting Policies

110.   On October 4, 2012, before the Criminal Information was made public, FBI Special Agents filed sworn affidavits under seal in this District (defined above as the "FBI Affidavits") in support of a search warrant for Zimmerman, the prominent Delaware developer discussed above, and his company, BBC Properties.   Those FBI Affidavits were filed as part of the government's ongoing investigation into the Bank and its borrowers, and were unsealed on October 18, 2012.   The information cited in the FBI Affidavits includes, among other things,

documents and internal e-mails provided by Wilmington and interviews with multiple senior witnesses, including Defendant North; Terry Brewer, the Senior Real Estate Credit Officer discussed above who replaced North as Chief Credit Officer; Anthony D'Imperio, the former head of Wilmington's Workout group; and Karl Vaillancourt, an employee in the Workout group from April 2009 through August 2011.[8]

### a. The Bank Loaned Out Millions Of Dollars To Borrowers Who Did Not Meet The Basic Terms Of The Loan Agreement

111.    Wilmington's admitted fraudulent lending practices are exemplified by its relationship with Zimmerman, who was one of the Bank's largest borrowers, with over 30 different Bank-funded development projects comprised of over 75 loans.  As of March 2010, these loans alone totaled $90.7 million – or almost <u>6% of the Bank's total commercial construction loan portfolio</u>.

112.    The Criminal Information and the FBI Affidavits detail numerous projects in which Wilmington provided funds to Zimmerman despite the fact that Zimmerman had not met the most basic conditions precedent to receiving those funds.  Rather, those loans were based solely on Zimmerman's informal requests, without any attempts by the Bank to obtain supporting documentation to confirm that Zimmerman had met the terms of the loan agreement. Brewer confirmed to the FBI that this was a consistent "problem" with the Zimmerman relationship, stating that Wilmington "operated under the impression" that Zimmerman's projects had a "large percentage of leases in place prior to construction, but in reality there were few such pre-construction leases."  Even after Wilmington provided millions of dollars in funding, and even after construction on the projects was supposed to have been underway for

---

[8] While the FBI Affidavits identified these employees only by their title and job description, Lead Plaintiffs were able to identify the names of these employees through their investigation.

years, some of them never proceeded past the demolition stage; Zimmerman simply pocketed the loan proceeds for his personal use.

113.    As the Criminal Information and the FBI Affidavits provide, Wilmington never performed the most basic credit risk management review of its loans, which would have been required to ensure that loan agreements matched the terms approved by the Loan Committee. For example, in December 2006, the Criminal Information and FBI Affidavits detail how Wilmington's Loan Committee approved a $10 million loan to Zimmerman to purchase and construct a development titled "Salt Pond Plaza, LLC" ("Salt Pond"), which was "a planned development of a commercial center adjacent to the Salt Pond Community and Golf Course in Ocean View, Delaware."  However, on January 10, 2007, shortly after the loan was approved, Terranova altered the basic terms of the loan agreement and, when Zimmerman failed to satisfy even those altered terms, Wilmington continued to simply give Zimmerman money whenever he requested it – facts that Terranova specifically admitted in his guilty plea.

114.    Indeed, as described in the Criminal Information and the FBI Affidavits, the Loan Committee approved a term in the loan that provided for Zimmerman to receive an equity payout of $1 million once tenants in the development began to pay their lease – a condition that was never met during the life of the Salt Pond project.  The Loan Committee imposed this requirement because equity payments are typically made only after a project has progressed sufficiently so that it can self-fund loan payments (through rent rolls or otherwise).  However, just two weeks after the Loan Committee approved this loan, the loan agreement Zimmerman signed with Wilmington was changed to provide for an equity payout of $2 million, payable as soon as Zimmerman obtained signed leases for the development – and not when the tenants actually began to pay rent.  These material changes to the loan agreement represented a 100%

<u>increase</u> in the approved equity payout, and meant that 20% of the $10 million would now go to Zimmerman personally – and at a much earlier stage when the property was not yet producing income.

115.    Significantly, according to the Criminal Information and FBI Affidavits, the terms of the Salt Pond loan could only be changed because Wilmington's risk management personnel were never required to compare the approved loan terms to the actual loan agreement before distributing funds.  Furthermore, according to CW 1, this was a "prevalent" and improper practice at Wilmington and, in fact, many times the lender (also referred to as a relationship manager) "pulled rank" on loan documentation personnel in order to change loan terms to make them more agreeable to clients without any further credit review or approval.

116.    With respect to the Salt Pond loan, even the loan agreement terms Terranova altered to accommodate Zimmerman were not met.  As detailed in the Criminal Information and the FBI Affidavits, due to the Bank's lax credit review policies, Zimmerman's failure to meet even these altered terms was not an obstacle to his receiving loan funds.  In fact, Zimmerman and Terranova ridiculed the Bank's apparent willingness to just hand out money without any regard to the Bank's lending obligations.

117.    For example, in May 2007 – in an email exchange maintained in Wilmington's official loan file with the subject line "$1,000,000 Clams" – Terranova informed Zimmerman that, although Zimmerman had not obtained any signed leases as required by the Salt Pond loan agreement, the Bank would make a large equity payout to Zimmerman.  Specifically, on May 16, 2007, Terranova wrote: "I went back through my notes and I saw executed lease and plan approval as the condition.  However <u>not wanting my reputation for reckless abandon to be in jeopardy, I guess we can fund the $1,000,000</u>.  Can you at least send me something that says the

plan has preliminary approval?"  Zimmerman responded to Terranova that day, stating "i[']ll do tonto."  According to a May 12, 2013 article in *The News Journal* titled, "Feds: Wilmington Trust hid bad loans," Zimmerman called Terranova "Tonto" in reference to The Lone Ranger's loyal sidekick.  Similarly, on May 17, 2007, when Terranova asked Zimmerman for supporting documentation so the Bank could "wire the [$1 million in] funds," Zimmerman responded, "Where's the trust?"  Terranova promptly answered, "<u>I have all the trust in the world in you – its the Federal Examiners who don't trust me [] I have a whole chapter in their upcoming manual – '9 ways to violate Federal Law</u>.'"

118.  Ultimately, within two business days of this email exchange, Wilmington funded the first $1 million equity payout to Zimmerman, even though there had been no progress on the project and Zimmerman did not even have a single executed lease in hand.  Indeed, when Zimmerman obtained the first signed lease for the development two months later – albeit one that made the tenant's rent payments contingent on Zimmerman obtaining additional tenants for the property, a contingency that was never met – Terranova emailed Zimmerman: "[o]ne less thing to worry about.  Maybe I will get some sleep tonight."

119.  Indeed, Wilmington's credit policies were so lax that its borrowers openly mocked the Bank's willingness to provide millions of dollars of bogus "loans."  In January 2008, in yet another document openly maintained in Wilmington's Salt Pond loan file, Zimmerman faxed Terranova the following demand for the remaining equity payout: "<u>Send $ $1,000,000 ASAP I have to pay my bar tab</u>."  The fax attached a "letter of intent" from another potential tenant – not an executed lease as required by the loan agreement, or evidence of payment as required by the Loan Committee.  Five days later – still without the requisite leases or rent-paying tenants – Wilmington wired the $1 million to Zimmerman as an equity payout to

Zimmerman and his business partner.

120.    In fact, as the Criminal Information and FBI Affidavits detail, in April 2009 –
almost two and a half years <u>after</u> the Loan Committee first approved the Salt Pond loan –
Zimmerman <u>still</u> had not met the basic requirements, as approved by the Loan Committee, that
he have an actual rent-paying tenant in place.  That month, the only tenant in the project formally
exercised its right to refuse to pay rent since Zimmerman had failed to obtain any additional
tenants or complete development of the project.  Remarkably, however, as Defendant North
confirmed to the FBI, Wilmington continued to extend loans to Zimmerman even though the
required leases did not exist.  In fact, as of January 2013, Zimmerman had still failed to obtain
additional tenants and had not received a single rent payment for the project.

121.    By May 2009, Zimmerman had fully exhausted the $10 million loan, but "the
only progress Zimmerman was able to show on the project was a <u>partially completed parking
lot</u>," as detailed in the FBI Affidavits.   Notwithstanding this fact, Wilmington granted
Zimmerman another $2 million loan to cover unspecified and unverified "cost overruns" and
finish the Salt Pond project.  Significantly, Workout employee Vaillancourt informed the FBI
that he "<u>suspected Zimmerman was diverting Wilmington Trust loan funds</u> from Salt Pond to
other purposes <u>when he compared the funds dispersed by Wilmington Trust against the actual
work completed</u>, and the need for additional funds to complete the work required."  In other
words, Zimmerman's misappropriation of Wilmington funds for his own personal use was
readily apparent to anyone who bothered to "compare the funds dispersed by [Wilmington]
against the actual work completed."  However, there is no evidence that anybody at Wilmington
asked a single question about how Zimmerman exhausted an entire $10 million loan to "partially
complete[]" a parking lot in Dover.  There is no evidence that anybody at Wilmington asked a

single question about why Zimmerman needed an <u>additional</u> $2 million even though, according to the original loan application set forth in the FBI Affidavits, the Bank originally expected <u>all</u> of the project's on- and off-site improvements to cost no more than $2 million.  Further, there is no evidence that Wilmington performed any inquiry into what Zimmerman's purported "cost overruns" constituted before extending the additional $2 million loan.  Wilmington's failure to perform any due diligence to justify this additional loan was particularly egregious, given that, as discussed below, by this time the Bank had already determined that Zimmerman constituted a serious credit risk due to the "continued poor financial condition" of his construction projects.

122.    Moreover, the Salt Pond debacle was not an isolated incident.  Rather, it was just one example of Wilmington's fraudulent relationship with Zimmerman.  Indeed, the FBI Affidavits detailed other Zimmerman projects where this occurred.  For example, in 2007, Wilmington's Loan Committee approved a $6 million loan to Zimmerman to develop office buildings in Dover in a project called "Compass Pointe."  This loan was represented to be the only loan necessary to complete the construction of the building and the purchase of the property.  In the documentation presented to the Loan Committee, Terranova represented that Zimmerman had pre-leased 48% – or two floors – of the building.  These leases included one lease for McGlynn's Restaurant and another lease for BBC Properties – Zimmerman's own company.  Notwithstanding the fact that one of the two purported pre-leases was for Zimmerman himself – which on its own should have warranted further review by the Bank's credit personnel – there is no evidence that any member of the Loan Committee or anyone else at the Bank ever confirmed that both of these leases existed.  As a result, Wilmington agreed to loan Zimmerman the requested funds.  However, as set forth in the FBI Affidavits, the McGlynn's Restaurant lease was the <u>only</u> lease that was referenced in the closing documents:  the BBC Properties lease was

excluded.  Ultimately, the FBI Affidavits confirm that Wilmington not only made the initial loan of $6 million, but also made numerous <u>additional</u> loans to Zimmerman in connection with this project in 2008 and 2009, for a total cost of $9.2 million.  Wilmington eventually wrote off all but 50% of the loan's value.    In sum, Wilmington's failure to verify Zimmerman's representations, or to perform the most basic comparison of the Loan Committee documentation and the loan closing documents, cost the Bank millions of dollars when it was forced to sell the Compass Pointe loan at a massive loss.

123.    The FBI Affidavits also identify several other examples of the Bank providing loans to Zimmerman without verifying the status of the development project at issue.   For example, after Wilmington had given Zimmerman $2.1 million in 2005 to develop a project named "Collegian Plaza" in downtown Dover, after two years "<u>no significant construction-related work had been completed</u> and some of the required loan paperwork had not been completed" and the underlying land "was not fully acquired."   By November 2009 – four years after Wilmington approved the loan – the "only physical activity associated with the project was the demolition of the existing structures."    The Bank eventually sold the Collegian Plaza property to a third party at a massive discount after the Class Period.   According to an August 2011 *News Journal* article titled "$400,000 Offered For Vacant Dover Lot," the site remained a "vacant" and "overgrown" lot – <u>six years</u> after the loan had been extended.

124.    Terranova's admittedly fraudulent lending practices were done with the approval and at the direction of the Officer Defendants.   Indeed, the Officer Defendants knew that Terranova and his supervisor Bailey regularly violated the Bank's lending policies and decisions in order to grow the Bank's business and report greater volume at a time when the rest of the market was bottoming out.   According to CW 1, Terranova and Bailey were treated as if they

55

"walked on water" and they "had the ear of the powers that be," including Defendants Cecala, Harra, Gibson and North.

125.    In fact, according to CW 1, Defendant Cecala himself instructed Terranova and Bailey "not to keep files" on the numerous loans they originated, essentially telling them to ignore the Bank's underwriting practices and simply extend the loans.  Thus, Cecala's instruction alone – setting aside the other weaknesses discussed herein – meant that a large percentage of the Bank's loan portfolio was originated without any meaningful underwriting.  Terranova and Bailey followed Defendant Cecala's orders.  CW 1, who reviewed numerous large loan files originated by Terranova and Bailey, explained that many of these files did not have a "scrap" of documentation to support the Bank's underwriting decisions and that all of the files suffered from numerous documentation errors.  CW 2 had a similar experience in reviewing the files of Terranova and Bailey.  According to CW 2, a review by the Bank's credit risk department – which on information and belief is the Delaware Status Review described in the FBI Affidavits and discussed below at Section III.D – revealed that Terranova issued "dozens and dozens" of loans in 2007 without the required approvals, which were recorded on the Bank's 2007 balance sheet and, due to their multi-year payment and funding structure, remained on the books into and throughout the Class Period.  Moreover, when the credit risk department, including CW 2, raised concerns about the missing documentation in Terranova's loans to Defendants Harra and North, the missing data and approvals were often just papered over with management's approval.  CW 2 also confirmed that the credit risk department identified similar patterns of problems with loans initiated by Brian Bailey.

### b.  Wilmington Paid Out Millions Of Dollars In Loan "Draws" Without Any Documentation Or Support

126.    Contrary to the Bank's repeated representations to investors that it sought to

"mitigate risk" through its lending practices, discussed below at Section V.C & V.E, the FBI Affidavits and other evidence demonstrate that Wilmington consistently extended loans and granted draw requests on already-existing loans without performing any due diligence on the borrower or the project, as is customary in the banking industry.   After Wilmington initially approved a construction loan, the borrower could request "draws" on that line of credit in order to pay specific construction-related expenses (generally enumerated in the loan agreement). While other commercial banks immediately order an inspection on a development project upon receiving a draw request to verify and document the status of the project before funding such draws, Wilmington did not.   According to CW 1, "it was common" for Wilmington to satisfy "huge draw requests" with absolutely "no due diligence" performed – a practice that CW 1 described as highly unusual and unique to Wilmington.   In the loans that CW 1 reviewed as part of the Workout group, s/he would commonly find that Wilmington had funded "millions upon millions of dollars" of draws with "not a scrap of proof" to support the draw.   While Wilmington "nominally" had a construction loan administration department that was supposed to review draw requests and verify project status, according to CW 1, the sum total of that department's due diligence on draw requests was to ask the lender "do you agree?" and to fund the request as long as the lender approved it.

127.   The FBI Affidavits describe myriad instances where Wilmington granted Zimmerman millions of dollars in "draws" on his line of credit in the Salt Pond project and other developments without obtaining any supporting documentation or evidence justifying the draws. Indeed, Wilmington Workout employee Vaillancourt told the FBI that Zimmerman's loan draw requests <u>never made any sense because the related work was never completed</u>."   According to the FBI Affidavits, these loans were part of Zimmerman's "pattern of using Wilmington Trust

funds for personal expenditures."

128.    For example, in July 2007, BBC Properties (Zimmerman's business) faxed a request to Wilmington for a draw of $357,500 for "reimbursement" of Salt Pond project expenses to date.   According to the FBI Affidavits, "[n]o other supporting documentation relating to the expenses claimed was provided."   Nevertheless, Wilmington immediately wired the requested amount later that day.   When the FBI inspected the path of these funds, they found that 90%, or $323,000, was immediately transferred to Zimmerman's personal and business accounts, and the balance went to Kevin Barrett, Zimmerman's partner in the project.

129.    Four months later, in November 2007, BBC Properties submitted another email request to Wilmington for a draw of $225,000, this time purportedly to pay a "real estate commission fee" and "arch/eng [architectural and engineering] fees."   Once again, however, according to the FBI Affidavits, "[n]o other documents to substantiate the expenses were found in the file."   Nevertheless, Wilmington again promptly wired the requested amount to the Salt Pond bank account.   Following the receipt of this draw, the Salt Pond bank account issued checks to Zimmerman's and Barrett's personal accounts totaling $150,000.   The FBI found no evidence that either Zimmerman or the Salt Pond bank account had paid any expenses that entitled Zimmerman or Barrett to "reimbursement."

130.    Five months later, in April 2008, BBC Properties submitted yet another email request to Wilmington for a draw of $150,000 for "reimbursement" of Salt Pond project expenses to date.   According to the FBI Affidavits, "[n]o other documents, such as invoices, to substantiate the expenses were found in the file."   However, as was the Bank's (improper) standard practice, Wilmington promptly wired the requested amount to the Salt Pond bank account.   That account then immediately issued a check for $150,000 to Zimmerman's personal

account.  The FBI found no evidence that either Zimmerman or the Salt Pond bank account had paid <u>any</u> expenses that entitled Zimmerman to this reimbursement.  In fact, according to the FBI Affidavits, Zimmerman used this money to purchase land for himself in the Bahamas.  As with the other draws, there is no evidence that anybody at Wilmington ever asked Zimmerman to confirm how these funds were used.

131.    Moreover, the FBI Affidavits explained that, in the rare instances when Zimmerman provided purported documentation of invoices to support his draw applications, he often used the identical invoice again and again – readily identifiable chicanery that would have been detected if Wilmington performed the most basic verification of documentation.  For example, in June 2008, a BBC Properties employee emailed a request to Wilmington stating "[a]ttached are current payables and Mike [Zimmerman] wants to draw 110K and wired to same account as previous wires."  According to the FBI Affidavits, the email attached a list of vendor invoices.  That day, Wilmington wired $110,000 to the Salt Pond bank account.  Four days later, Salt Pond issued a check for $97,900 to Zimmerman and a check for $12,100 to his partner, Barrett.  According to the FBI Affidavits, the loan proceeds received as a result of this draw request were not used to pay the invoices, but was simply pocketed.  Further, the FBI Affidavits specifically provide that "<u>[a]lmost all of these same invoices were found to have been included in subsequent draw requests submitted to Wilmington Trust</u>."

132.    Wilmington continued to extend poor quality loans to Zimmerman with minimal documentation even after Zimmerman began to encounter "significant difficulties in making payments" on his loans beginning in 2008.  Notwithstanding the Bank's knowledge of Zimmerman's financial difficulties, in 2008 and 2009 Wilmington approved an <u>additional $22 million in loans</u> to Zimmerman, according to the FBI Affidavits.

133.    Ultimately, the Zimmerman loans caused material financial harm to the Bank.  Of the $90.7 million in Zimmerman loans outstanding in 2010, Wilmington wrote off $43 million – or nearly 50% of the loans.  By November 2010, the Bank had placed the entire portfolio of Zimmerman loans for sale at a huge discount to third parties.  In total, the Bank suffered over $43 million in losses due to its reckless lending relationship with Zimmerman – ten times the $4 million loss the Bank recorded for all of 2009.

C.    **The Officer Defendants Fraudulently Manipulated The Bank's Asset Review Process**

134.    After a bank underwrites and originates a commercial loan, it is critical that the bank monitor the loan on an ongoing basis in order to evaluate and ensure the borrower's continued ability to pay based on market shifts, collateral deterioration, and changes in borrowers' credit.  At Wilmington, this critical function was supposedly performed by the Asset Review Group (defined above as the "ARG").

135.    Throughout the Class Period, Wilmington claimed that it "regularly reviewed" and "monitored" its loans to "mitigate" the Bank's credit risk.  However, in reality, the Bank failed to conduct any review on an annual basis of 85-90% of its loan portfolio.  As discussed below, Wilmington's purported asset review was a sham, which CW 1 termed "credit review in name only" causing its risk ratings – a key component of the Bank's risk management process (as discussed below) – to be "generally inaccurate."  Instead, the Officer Defendants utterly ignored the Bank's asset review function in order to fraudulently conceal the Bank's true financial condition.

1.    **The Officer Defendants Fraudulently Marginalized And Understaffed The Bank's Asset Review Function**

136.    Beginning before and continuing throughout the Class Period, the Bank failed to meet even the most basic standards of asset review and credit risk management.  The Bank

refused to sufficiently staff the ARG or provide it with the resources necessary to meaningfully review the portfolio, and instead relied nearly exclusively on its lenders (like Terranova) to review the Bank's loan portfolio.

137.     Specifically, according to the Bank's SEC filings, a key component of the Bank's risk mitigation practices involved the analysis of the Bank's loan risk ratings, which the Bank's lenders assigned at origination with a risk rating of 1 (least risk) – 9 (highest risk).  These risk ratings then fell into four categories of risk: Pass, Watchlisted, Substandard, and Doubtful.  The purpose of the risk ratings was to indicate the likelihood that the Bank would "charge off" some portion of the loan amount because it did not expect the borrower to pay the full amount of the principal and to determine the amount of Loan Loss Reserve to set aside for expected losses (which reserves were then charged dollar-for-dollar against the Bank's income).  Contrary to the Bank's repeated representations that it applied and reviewed its risk ratings "consistently," the Bank relied almost entirely on its lenders – who were penalized for downgrading loans – to bring necessary loan downgrades to the Bank's attention.  Indeed, according to CW 2, the Bank had "no real standards" for how often loans were reviewed by the ARG until at least mid-2008 and relied on lenders to perform this critical role.  Thus, problems were identified by random samplings, which CW 2 characterized as "review by exception."

138.     The Officer Defendants severely undermined the ARG by providing minimal staffing and resources, preventing the ARG from adequately reviewing the portfolio for potential losses.  In fact, the ARG did not even have a manager until mid-2008.  According to CW 2 and CW 8 (a former Director of Internal Audit who left in June 2008), the ARG's manager left in 2006 and the Bank – including Defendants Cecala and Gibson – left that critical risk management position vacant until mid-2008.  Moreover, according to CW 2, although

61

Wilmington's commercial loan portfolio averaged $6.7 billion in 2008, the ARG only had 4-5 employees (out of 3,000 Bank employees) to review the entire loan portfolio, including residential and consumer loans, and determine the appropriate amount of Loan Loss Reserve. According to CW 6 (and CW 2, who corroborated the substance of CW 6's report), the "lack of manpower" in the ARG "had been an ongoing issue forever," and it was a "standing joke" at Wilmington that the Bank stated it would increase the ARG's staff, but never did.   Year after year before the Class Period, according to CW 6, the ARG requested the budget to hire additional staff, but these requests were always rejected by senior management.

139.    CWs 1 and 2 confirmed that the vast majority of Wilmington's loans were not subject to review by the ARG.   Specifically, CW 1 stated that there was "essentially no review" for loans of less than $15 million.   Significantly, this meant that a substantial amount of Wilmington's loans were never reviewed by the credit specialists in the ARG.   According to the Bank's 2008 annual report, no less than 72% of the Bank's commercial loans were for amounts less than $10 million and thus received "essentially no review."   Moreover, CW 1 stated that the ARG only reviewed a "very small" percentage – approximately 10% – of the loan portfolio on an annual basis until late in the Class Period.   The fact that the ARG failed to review the overwhelming majority of the loan portfolio meant that no one monitored the Bank's loans to ensure that its borrower could continue to repay their loans or that borrowers were using the loan proceeds to fund continued construction.

140.    As evidenced by the FBI Affidavits, even many of the larger relationships – like Zimmerman's $90.7 million relationship – received no ongoing review from the Bank beyond that provided by the lenders.   Instead of providing adequate resources to the ARG, the Bank relied almost exclusively upon the lenders, who originated the loans, to bring any recommended

rating downgrades to senior management's attention.   Accordingly, the responsibility for evaluating credit risk was left to many of the same major relationship managers (like Terranova and Bailey) who, as discussed above, disregarded underwriting standards in order to close more loans.  In fact, according to CWs 1 and 2, not only did the Bank reward these lenders based on loan volume (encouraging them to jettison underwriting standards), but the Bank actually penalized these same lenders for downgrading loan ratings.  As CWs 1 and 2 explained, if a loan rating was downgraded, then the bonus compensation for the loan officer responsible for originating that loan would be similarly downgraded.  It was for this reason that, throughout CW 2's thirteen years with the Bank, CW 2 could not recall a loan officer ever voluntarily or independently downgrading a loan.

141.    In fact, lenders were able to avoid loan downgrades on problem loans by simply claiming that the borrower was a "good guy."   Specifically, at the Bank's quarterly Credit Strategy Meetings (discussed above) where the staff and management discussed large credit exposures and emerging problems, lenders would simply tell Defendants Cecala, Harra, Gibson, and North that the borrower was a "good guy" to avoid any closer review of the assigned loan risk ratings, according to CW 1.  The discussion of borrower creditworthiness at the Credit Strategy Meetings therefore did not at all address questions regarding the borrower's cash flow, financial obligations, or other basic measures of the borrower's ability to repay the loan.

142.    Specifically, Wilmington's Internal Audit, KPMG, and the Federal Reserve each repeatedly criticized the Bank's failure to adequately review its loan portfolio and warned the Bank that its reliance on lenders to rate its loan portfolio was unacceptable.   Specifically, according to CW 8, by no later than the fall of 2007, Wilmington's Internal Audit group issued a report highlighting that the ARG was understaffed, did not have a manager, and that the

percentage of the portfolio reviewed by the ARG (roughly 10-15% of the total portfolio) was inadequate to assess the risk of loss to the Bank.  This report was transmitted by email and hard copy to Defendants Cecala, Gibson, Harra, North, and Foley (as chair of the Board's Audit Committee).  However, recognizing the futility of such warnings to the Officer Defendants, CW 8 described the Internal Audit function at Wilmington as "barking into the wind."

143.    KPMG also criticized the Bank's inadequate asset review.  According to CW 2, in connection with its 2007 audit of the Bank, KPMG issued a "Management Letter" identifying the Bank's lack of review of its loan portfolio as a material weakness in Wilmington's internal controls.  KPMG communicated its finding to the Bank's Audit Committee, including Defendant Foley, and senior management, including the other Officer Defendants.  The Officer Defendants ignored KPMG's warnings and, in connection with KPMG's 2008 audit, KPMG <u>again</u> criticized the Bank's inadequate asset review.  According to CW 2, in connection with KPMG's 2008 audit, the engagement team warned Cecala and Gibson that Wilmington had not addressed its dangerously inadequate portfolio review coverage.

144.    The Federal Reserve also identified serious deficiencies in Wilmington's asset review.  CW 2 reported that, in the Federal Reserve's 2007 review, the Bank's regulators concluded that Wilmington's ARG was understaffed and inadequate to provide a reasonable assessment of portfolio risk, highlighting these problems as "<u>weaknesses in the control structure</u>" at Wilmington.  The Officer Defendants did not address these concerns and, in 2008, the Federal Reserve issued the same criticisms as KPMG.

### 2.    The Officer Defendants Personally Intervened To Undermine The Bank's Credit Risk Personnel

145.    For those few loans that the Bank's credit specialists reviewed, the Officer Defendants actively undermined the review process by interfering with and vetoing loan risk

downgrades and charge-offs. This meant that, even where the Officer Defendants took steps to give the outward appearance of strengthening the ARG, those steps were meaningless. Specifically, in late 2008, in response to the criticisms by the Federal Reserve, KPMG, and Internal Audit, CW 2 proposed to the Officer Defendants that Wilmington implement some internal controls over credit risk management. The Officer Defendants agreed to reorganize the department and place CW 2 – at least nominally – in charge of the Credit Risk Management Division, which encompassed the ARG. However, at the same time, the Officer Defendants escalated their interference in the Bank's credit review to continue their scheme to conceal the Bank's credit deterioration, manipulating the Bank's asset review (and resulting Loan Loss Reserve) in four primary ways.

146.    First, according to CW 2, despite the fact that the reorganized department identified widespread deterioration in the Bank's borrowers' ability to repay their loans, the Officer Defendants vetoed attempts by the ARG to downgrade loans to reflect that deterioration. Indeed, notwithstanding CW 2's nominal control, all changes to loan ratings and classifications – and, in particular, all loan rating downgrades – had to be approved by Defendants Cecala, Harra, and Gibson, who were increasingly combative in rejecting proposals to downgrade loan ratings.

147.    In particular, under CW 2's management, the ARG met monthly to discuss loan rating changes, charge off decisions, and to make recommendations for the Loan Loss Reserve. Gibson had always attended these meetings, because they were critical to his approval of the Bank's Loan Loss Reserve. According to CW 2, by the first quarter of 2009, Cecala and Harra also regularly "interjected themselves physically" into these meetings to "challenge the conclusions that were made" by the ARG – preventing the Bank from properly downgrading loans, recognizing losses, and appropriately increasing the Bank's Loan Loss Reserve.

148.    CW 2 and CW 9 (a Vice President and Credit Officer in the Bank's Wealth Management & Private Banking division, which also originated commercial loans) explained that in response to proposals to downgrade problem loans, Cecala and Harra would routinely object on the grounds that "these are good guys" or "we are not going to get hurt by this client," without any discussion regarding the borrowers' ability to repay the loan and regardless of the significant credit risks identified by the ARG.   In fact, Cecala and Harra routinely rejected ARG decisions to downgrade a loan, regardless of the delinquency of the loan.  For example, CW 2 recounted a meeting in the second quarter of 2009 that addressed a group of loans totaling $79 million to Preston Schell, a prominent developer in southern Delaware.  The ARG determined that the loans needed to be downgraded based on outdated appraisals – an ongoing and systemic problem at Wilmington as set forth in the Criminal Information (discussed above in Sections III.A & III.B) – and that 80% of the loans should be placed on nonaccruing status.  After an "hour-plus" argument with Cecala, and with Harra and North in attendance, Cecala refused to allow the loan to be downgraded.  CW 2 said that there was no choice but to "stand down" and acquiesce to Cecala's demands.  Although Gibson was not present for this debate, CW 2 stated that the decision was conveyed to him later.  Tellingly, the decision remained intact.

149.    CW 1 also confirmed that the Bank's loan risk ratings were manipulated and "generally inaccurate."  According to CW 1, during the Class Period, the Workout group (which worked with troubled borrowers and was under Defendant Cecala's supervision) "repeatedly" received loans that were rated "Pass" that the group recommended downgrading as much as four grades to "Substandard."   In CW 1's twenty years of commercial banking experience, a downgrade recommendation of four grades is "highly unusual" – but it was routine at Wilmington.   According to CW 1, "[w]hen you see something like that [*i.e.*, a four-step

downgrade], you know something artificial is being done to keep those loans like that." However, these downgrade recommendations were routinely rejected by the Officer Defendants. CW 1 further stated that it was not until late in the Class Period (after the MOU forced the Bank to reassess its loan review) that Wilmington started attempting to correct its loan risk ratings.

150.    Specifically, according to CW 9, when Wilmington brought in third party Treliant Risk Advisors in the second quarter of 2010 to update risk ratings in accordance with the MOU, Treliant's risk ratings were generally much worse.  According to CW 9, "[i]f you look at the charges and how they trended and how quickly thereafter they fell apart, it was clear that the loans had not been graded properly."

151.    Second, the Officer Defendants blocked credit personnel's attempts to charge off, or write down, any of the Bank's loans.  According to CW 1, Workout had "one big fight that was continuous" with Cecala regarding necessary charge-offs.  Cecala did not want – and did not allow – charge-offs to occur.  In fact, as discussed above, according to CW 1, Cecala actually ordered Workout – of which he was in charge – not to obtain updated appraisals, knowing that any collateral updates would force the Bank to downgrade and charge off all or part of the troubled loans.  In the end, as a result of Cecala's interference, the Bank rarely charged off even its most delinquent loans.  Both CW 1 and CW 2 reported (and as described by the Criminal Information discussed above) that, because the Bank refused to take appropriate and timely write-downs, its public financial statements were false and the Bank's financial situation appeared stronger than it actually was, including the quality of the Bank's loan portfolio and its Loan Loss Reserve.

### D.      In 2009, The Federal Reserve Issued An MOU Identifying Serious Failings In The Bank's Lending Practices, Risk Management, And Accounting

152.    In 2009, after discovering that the serious systemic flaws in Wilmington's risk

management function had not been corrected despite the Federal Reserve's warnings in 2007 and 2008, KPMG's Management Letter in 2007 and criticisms in 2008, and Internal Audit's criticisms in (at least) 2007, the Federal Reserve issued the Memorandum of Understanding to Wilmington in September 2009 (defined above as the "MOU").   According to the Federal Reserve's Commercial Bank Examination Manual, an MOU is one of the most serious weapons in the regulators' arsenal and is typically issued only when "other more routine measures such as formal discussions with a bank's principals or directors, and normal follow-up procedures, have failed to resolve supervisory concerns."   Although the Federal Reserve had issued regular and escalating warnings to Wilmington in the 2007 and 2008 exams, according to CW 2, the Federal Reserve finally issued the MOU because of "a significant volume of risk rating changes and process weakness in general."   According to CW 2, the Officer Defendants learned that the Federal Reserve would impose the MOU by no later than July 2009.   The MOU identified material deficiencies in the way the Bank did business and, in particular, with its risk management, underwriting, and accounting and control functions.

153.    The MOU Compliance Report detailed the sweeping changes required by the Federal Reserve in the MOU concerning, among other subjects, the Bank's "Loan Review, Credit Policy, Credit Analysis and Lending," "Capital Plan," "Asset Improvement," and "Allowance for Loan and Lease Losses" (*i.e.*, Loan Loss Reserve), as well as the Bank's proposed response(s) for each.   For each of these major areas, the Federal Reserve identified serious and systemic failings.   Therefore, the Federal Reserve required that for each of these areas Wilmington "establish [an] appropriate organization structure," "identify appropriate management and staffing levels," "describe responsibilities" of the respective function, and "ensure staff training."   In sum, the Federal Reserve demanded that Wilmington make extensive

changes to its underwriting, risk management, and accounting functions to bring them up to even basic standards – including, for example, requiring Wilmington to "<u>establish</u> a process to monitor compliance with [credit] policies and procedures."

154.    Further, the MOU demanded dramatic changes to the Bank's credit risk management organization.  According to CW 2, echoing past criticism by Internal Audit, the Federal Reserve objected to the fact that Wilmington's credit risk department reported to the CFO, Gibson, because they felt he was too tied into the profitability of the Bank.  Thus, the Federal Reserve required that the ARG report directly to the Board's Audit Committee. Similarly, the Federal Reserve demanded that underwriters – who, as discussed above, reported to lenders on the sales side of Wilmington – be segregated from the Bank's loan origination function.

155.    The MOU also called for the Bank to create coherent policies to govern the Bank's risk management process going forward.  Indeed, according to CW 2, the Bank's practices had been a "mishmash" of information and there was no "codification of the roles of credit risk management."  According to the MOU Compliance Report, the revised credit policies were to include such items as: "underwriting standards, guidelines and quantifiable limits for commercial real estate, commercial and industrial"; "standards for documentation exception tracking and monitoring system"; "lending authorities reflective of staff experience and commensurate with risk of the credit extension"; and "uniform standards for presenting loans to the loan committee."

156.    The MOU also made clear that the Bank's processes for establishing its reserves were materially deficient.  Under the MOU, Wilmington was charged with ensuring that the Loan Loss Reserve was fully funded and that the provision recommendations were directly

reported to the Audit Committee of the Board of Directors.  According to the MOU Compliance Report, going forward Wilmington would be required to "maintain an adequate [Loan Loss Reserve] consistent with GAAP and regulatory policy and regulatory policies and guidance" and to "[f]ully fund [the Loan Loss Reserve] considering additional adversely classified credits from the updated internal loan rating system."   The adequacy of the Loan Loss Reserve and its compliance with GAAP was to be reviewed each quarter going forward with the Board.

### E.   The Delaware Status Review Identified "Serious Concerns" With Wilmington's Commercial Loan Portfolio

157.    In 2009, after the Federal Reserve imposed the MOU, the Bank was forced to conduct a "comprehensive" analysis of its lending in Delaware, which was known internally as the "Delaware Commercial Real Estate Division Project Status Review" (defined above as the "Delaware Status Review").  This review, which Wilmington concluded by no later than January or February 2010, involved a thorough evaluation of the Bank's underwriting and asset review practices for its Delaware loans, which  constituted well over 50% of the Bank's total commercial loan portfolio.  As set forth in the FBI Affidavits, the review documented extensive deficiencies with both the management of the Delaware commercial real estate division and the quality of the loan portfolio; in the words of the FBI, the review showed "serious concerns with the past management of the Delaware Commercial Real Estate Division and with its loan portfolio."

158.    The Delaware Status Review was conducted by, among others, Senior Bank Real Estate Credit Officer Terry Brewer (who replaced Defendant North as Chief Credit Officer). According to CW 1, the Bank's senior management specifically tasked Brewer, a "real estate guru" who specialized in commercial real estate credit analysis, to review "the mess in Delaware."

159.    On March 12, 2010, Brewer finalized a written memorandum summarizing the results of the Delaware Status Review, which bore the subject line "Delaware Commercial Real Estate Division Concern" (defined above as the "Delaware Review Memorandum").    The Memorandum documented the fraudulent behavior at Wilmington, citing numerous "serious concerns" with the Bank's Delaware lending, including:  (i) the "unethical use of loan approval authority by relationship managers"; (ii) the Bank's "limited oversight of relationship managers"; and (iii) "a limited technical knowledge of commercial real estate lending."    The Zimmerman relationship, as detailed in the Criminal Information, highlighted in the FBI Affidavits, and discussed above at Section III.B.3(a), exemplifies these "serious concerns."

160.    The Delaware Review Memorandum enumerated numerous examples of the Bank's "questionable [and admittedly criminal] activities," including the Bank's repeated "lack of validation of construction budgets prior to loan closings," and the "frequent use of construction loan proceeds to return cash to borrowers or fund partner buyouts prior to construction completion or the property having reached operating stabilization."  As set forth above, the Officer Defendants knew, or recklessly disregarded, that these "questionable activities" resulted in third party developers siphoning off millions of dollars of loans for their own personal use.

161.    Even after the Delaware Status Review documented "serious concerns with the past management of the Delaware Commercial Real Estate Division and with its loan portfolio," Wilmington repeatedly denied that there were any issues with the Bank's lending practices or loan portfolio.  For example, on February 22, 2010, the Bank filed its 2009 Form 10-K with the SEC, in which the Bank falsely continued to assure investors that it "mitigated credit risk" through "rigorous" and "consistent" underwriting.  Similarly, during a call with analysts on April

71

23, 2010 – more than one month after the Delaware Review Memorandum was issued – Defendant Cecala expressly assured analysts that there were no hidden issues with the Bank's credit quality, stating that the Bank was "just trying to be cautious" when increasing its Loan Loss Reserve.  Similarly, on June 4, 2010, when Cecala announced his resignation and analysts asked whether his departure indicated any "mounting capital problem or credit problem that hadn't been reported," Cecala rejected any such implication, stating that there were "[n]one whatsoever."

F.    **The Officer Defendants Manipulated Wilmington's Loan Loss Reserve**

162.    As a result of the criminal conspiracy that fraudulently: (i) removed more than $1 billion in "waived" loans from the Bank's financial statements; (ii) failed to update out-of-date appraisals; and (iii) refused to acknowledge the deteriorating credit quality in the Bank's borrowers in its loan risk ratings and charge-offs, the Bank materially understated its Loan Loss Reserve, and thereby materially overstated its net income by hundreds of millions of dollars during the Class Period.   As the Criminal Information provides, "updated appraisals would have required [Wilmington] to recognize losses on the credits and would have had a negative impact on [Wilmington's] Allowance for Loan and Losses," also referred to as the Loan Loss Reserve.

163.    The Bank's accounting for its Loan Loss Reserve – which was grossly understated throughout the Class Period – violated fundamental principles of generally accepted accounting principles ("GAAP"), including Financial Accounting Standards No. 5, "Accounting for Contingencies" ("FAS 5").   Under GAAP, Wilmington and the Officer Defendants were required to establish the Loan Loss Reserve for probable and estimable credit losses resulting from the Bank's borrowers defaulting on their obligations.[9]   In establishing this reserve, pursuant

---

[9] The applicable GAAP and other accounting provisions are described in detail in Section VII below.

to SEC Staff Accounting Bulletin No. 102, "Selected Loan Loss Allowance Methodology and Documentation Issues" ("SAB 102"), the Bank was required to take into account "all known relevant internal and external factors that may affect loan collectability," including trends in loan losses, economic conditions, and the Bank's underwriting standards.  GAAP requires that such reserves be established in order to present an accurate picture of the lender's financial position and, in doing so, recognizes that lenders can reasonably predict the amount of losses that a loan portfolio will experience.  All other things being equal, a loan portfolio that is comprised of borrowers with riskier credit profiles will require a larger reserve to cover the cost of uncollectible debts.  Under GAAP, a provision for loan losses (*i.e.*, an increase to the Loan Loss Reserve) is recorded as an expense, which reduces pre-tax earnings on a dollar-for-dollar basis.

164.    The Bank represented in its financial statements that its Loan Loss Reserve was set in accordance with GAAP.  However, contrary to the Bank's representations that it complied with GAAP, the Criminal Information confirms that it did not.  In addition, witnesses confirmed that the Officer Defendants, and in particular Cecala and Gibson, who approved the Loan Loss Reserve each quarter, understated its Loan Loss Reserve in order to inflate its income and disguise the deterioration in its loan portfolio.  Indeed, as discussed below, after performing extensive due diligence and analysis of Wilmington's loan portfolio as of January 2008, M&T determined that Wilmington had understated its Loan Loss Reserve by nearly $800 million.

165.    Wilmington employed two distinct methodologies to calculate its Loan Loss Reserve, both of which violated GAAP and understated the Bank's reserves.  According to CW 2, from at least as early as 2007 and until late 2008, rather than taking into account the factors surrounding the probability of loans being repaid – including economic trends and borrowers' ability to repay loans – the Officer Defendants established the Loan Loss Reserve based entirely

73

on the Bank's criminal conspiracy to conceal past due and nonperforming loans to avoid updated appraisals and manipulated loan risk ratings.  As set forth above, the Bank blindly "waived" hundreds of millions of dollars of past due and nonperforming loans, and arbitrarily assigned percentage values to risk ratings in the Bank's loan portfolio.  For example, under the Bank's formula, loans with "Pass" ratings had 1% of the value of the loan allocated to the Bank's Loan Loss Reserve, and loans with "Watchlist" ratings received 2%.  Loans that were past due and nonperforming were assigned 15%, 50%, or even more of their value, depending on how past due and deteriorated the loans were.  The loans that were fraudulently "waived" or "extended" as discussed above should have been – but were not – assigned these higher percentages, which would have significantly increased the Bank's Loan Loss Reserve.

166.    This method was in direct violation of GAAP.  First, as set forth above, a staggering number of Wilmington's commercial loans that were past due or nonperforming throughout the Class Period were entirely removed from the Bank's past due and nonperforming loan figures to avoid obtaining updated appraisals and therefore had no negative impact on the Bank's Loan Loss Reserve.  The Criminal Information states that the Bank understood that updating its appraisals as required by law would have a "negative impact" on the Loan Loss Reserve.  Second, as the Officer Defendants knew or recklessly disregarded, the assigned risk ratings were "generally inaccurate," because they were not the product of a thorough and independent credit review by ARG, but rather based on: (i) ratings assigned by the Bank's lenders, who were financially penalized for downgrading loan risk ratings and, as evidenced by the Zimmerman relationship (among other things), given absolute discretion to monitor the credit status of the Bank's loans; (ii) ratings that were artificially inflated by senior management, including Defendants Cecala, Harra, Gibson, and North; and (iii) outdated and inaccurate

appraisals (as admitted by Terranova in his guilty plea).  Third, this method ignored the volatile environment facing the real estate industry and associated lenders during the Class Period. Fourth, the Bank failed to consider its improper underwriting.

167.     Thus, because the Bank's rudimentary method of provisioning did not account for all of the Bank's delinquent  loans or any of the drivers of default in the loan portfolio, CW 2 – who was responsible for recommending loan loss provisions to Cecala and Gibson during the Class Period – stated that this methodology was "not compliant" with GAAP.

168.     In late 2008, the Bank adjusted its reserving methodology in recognition of the clear inadequacy of its prior method for determining the Loan Loss Reserve.  Under the new method, the Bank still largely relied on its risk ratings to dictate reserves, but now added a small "qualitative" factor.  This new method, while slightly less mechanical than the previous method, was also in violation of GAAP, and caused the Bank to under-reserve for loan losses.

169.     First, like the old method, the new method failed to account for the criminally concealed past due and nonperforming loans, including the $1.7 billion mass extension in 2009 and 2010.  Second, also like the old method, according to CW 1, it over-relied on loan risk ratings that were "generally inaccurate" as set by the lenders, manipulated by the Officer Defendants, and based on outdated and inaccurate appraisals, and were not reflective of the actual risks in the portfolio.

170.     Third, according to CW 2, under the new method, the Bank relied almost entirely on its own  criminally manipulated loan loss history to dictate whether increased reserves were necessary.  This was problematic because, due to (i) the fraudulent concealment of the past due and nonperforming loans; (ii) the interference by Cecala, Harra, and Gibson; and (iii) the Bank's overreliance on lenders to evaluate credit risk and assign risk ratings, Wilmington's loss history

75

was an inadequate and unreliable measure of probable losses inherent in the loan portfolio.  As both CW 1 and CW 2 confirmed, because the Bank artificially refused to recognize losses it had already incurred, its loan loss history was an inadequate basis on which to timely record reserves.

171.    In addition, the new method also failed to adequately consider environmental factors existing at the time and continuing throughout the Class Period.  CW 2 explained that the Bank's methodology was based on an assumption that "qualitative" factors should not exceed a certain arbitrary and small percentage of the Bank's overall Loan Loss Reserve.  The Bank's refusal to adequately consider environmental trends violated GAAP's requirement that such conditions be considered, as well as the Bank's own representations.

172.    Demonstrating the fact that the Bank under-reserved for loan losses in its portfolio, Wilmington and the Officer Defendants actually dramatically <u>decreased</u> the Loan Loss Reserve as a percentage of nonaccruing and troubled restructured loans from 2007 to 2009.  But the Interagency Guidance on the Allowance for Loan and Lease Losses provides that a lender's Loan Loss Reserve should be "directionally consistent" with changes in the risk factors, so that if risk factors such as delinquencies or falling collateral values increase, the Loan Loss Reserve should increase as well.  Here, in direct contradiction to the principle of directional consistency (and common sense), as Wilmington's nonaccruing loans <u>increased</u>, the Loan Loss Reserve <u>decreased</u> as a percentage of nonaccruing and troubled restructured loans.  This occurred despite the fact that the Bank's lax underwriting standards, minimal asset review, failure to timely downgrade loans, and outdated appraisals in a climate of declining real estate values rendered the loan book riskier than ever before.  The chart below demonstrates the dramatic inconsistency between Wilmington's ratio of Loan Loss Reserve to nonaccruing loans and the amount of the Bank's total nonaccruing loans:



173.    Not surprisingly, when M&T itself analyzed Wilmington's reserve levels, it found them severely understated.  On November 1, 2010, Wilmington announced that it would be forced to increase its reserves by $280 million, and M&T disclosed that, even including this massive increase in reserves, Wilmington's Loan Loss Reserve was <u>still</u> understated by more than $500 million at the end of the Class Period.  M&T's analysis was based on the work of an M&T team that reviewed 50% of Wilmington's commercial portfolio (including 64% of Wilmington's real estate construction portfolio) from the beginning of 2008.

174.    Significantly, in its assessment, M&T Bank made clear that its calculation of expected losses dated back to January 1, 2008, and that these issues were not just limited to the third quarter of 2010.  Indeed, M&T's entire analysis was based on reviewing Wilmington's loan portfolio as of January 1, 2008 and calculating probable lifetime losses from that date.  As is apparent from M&T's analysis, these "lifetime losses" included losses that had been incurred, but not recorded, and that M&T expected to write off over the remaining life of the loan.  Under

FAS 5, the Bank was required to record these incurred losses in its Loan Loss Reserve, even if it did not think the loss was sufficiently definitive at the time to merit writing off the loan.

175.    If the Bank had timely disclosed these additional losses in prior quarters (when these losses were actually incurred), the losses would have had a devastating impact on the Bank's income statement.   M&T's contemporaneous analysis demonstrates that Wilmington understated its required reserves by over 130% each quarter of the Class Period.   As demonstrated by the chart below, had Wilmington performed sound assessments of its loan loss provision during the Class Period, its reported net income would have materially decreased:

| | Reported Net Income | Corrected Net Income Using M&T's Analysis | Percentage Of Net Income Inflation |
|---|---|---|---|
| 1Q 2008 | $41.4 | $28.1 | 32% |
| 2Q 2008 | ($19.5) | ($44.0) | 126% |
| 3Q 2008 | $22.9 | ($3.1) | 114% |
| 4Q 2008 | ($68.5) | ($157.9) | 131% |
| 1Q 2009 | $21.8 | ($17.3) | 179% |
| 2Q 2009 | ($9.1) | ($80.8) | 788% |
| 3Q 2009 | ($5.9) | ($57.3) | 871% |
| 4Q 2009 | ($11.2) | ($121.1) | 981% |
| 1Q 2010 | (29.2) | (131.9) | 352% |

176.    This analysis is derived by taking the additional necessary Loan Loss Reserve identified by M&T, along with Wilmington's additional "catch up" reserves recorded in the second and third quarters of 2010, and calculating what the reserves would have been had the Bank timely recorded these additional necessary reserves throughout the Class Period in proportion to the reserves actually recorded each quarter.   Had Wilmington added to its Loan Loss Reserve proportionately throughout the Class Period, its Loan Loss Reserve would have been at least 130% higher each quarter (with correspondingly decreased earnings).   This analysis is actually conservative, because it assumes that only the dramatic reserves recorded in the second and third quarter of 2010 were untimely, because, as discussed below, those reserves

were the result of the Bank finally bringing in a third party to perform a long-overdue assessment of its loan risk ratings and appraisals.

## IV.    THE TRUTH BEGINS TO EMERGE

177.    Beginning in the fourth quarter of 2009, the MOU forced the Bank to begin recognizing the true credit losses in its loan portfolio and in January 2010, Wilmington began to report significant (but still insufficient) reserve increases.   These announcements surprised investors because Wilmington's peers were reporting stronger credit and financial results as they emerged from the recession, while the Bank suddenly appeared to be in trouble.   However, in an attempt to quiet the market's growing concerns, Wilmington and the Officer Defendants repeatedly and emphatically denied that the Bank's increased reserves had anything to do with "mounting capital problem[s] or credit problem[s]."   Instead, at every turn, Wilmington and the Officer Defendants reassured investors that the Bank's reserve increases were due to market conditions in Delaware and the fact that the Bank was just "being cautious."

178.    Specifically, on January 29, 2010, Wilmington issued its fourth quarter and year-end 2009 earnings press release, surprising investors by reporting a quarterly loss of $11.2 million and an annual loss of $4.4 million.   This loss was driven by a quarterly loan loss provision of $82.8 million – a 114% increase from the prior quarter.   As a result, the Bank's stock price fell over 14% from a close of $15.26 on January 28 to close at $13.12 on January 29.  Analysts were dismayed by the Bank's results, with Boenning & Scattergood reporting on January 29 that the Bank's "provision expense [was] $60.6 million higher than [the firm] expected."   Similarly, Morgan Stanley issued a report that same day stating: "[d]eteriorating credit drove a higher than expected reserve build."

179.    On April 23, 2010, Wilmington again announced a bigger-than-expected loan loss provision.   In its first quarter 2010 earnings press release, the Bank reported a quarterly net loss

of $29.2 million, a loan loss provision of $77.4 million, and a Loan Loss Reserve of $299.8 million.  Analysts again noted their surprise with the Bank's results.  For example, Morgan Stanley, in a report issued that same day titled "Credit and Weaker Pre-Provision Earnings Drive 24c Miss," commented that the Bank's provision was "$18.9 million higher than expected."  In an April 26, 2010 report, RBC Capital Markets lowered its 2010 earnings per share estimate for Wilmington over 70%, from $0.60 to $0.17, stating "our concerns about the risk profile, in particular in the construction and CRE [commercial real estate] mortgage portfolios, remain elevated following first quarter results."

180.    In response, Defendants reassured investors that the Loan Loss Reserve did <u>not</u> indicate a problem with the Bank's loans.  On a conference call with investors that day, when analysts questioned whether there were larger problems that had yet to be disclosed, Cecala assured analysts there were no hidden issues with the Bank's credit quality, stating that "<u>We're just trying to be cautious</u>."

181.    The Bank's disclosures caused the price of Wilmington's stock price to fall over 8%, from a close of $20.16 on April 22 to close at $18.48 on April 23.

### A.    June 3, 2010: Cecala Abruptly Announces His Resignation

182.    After the close of the market on June 3, 2010, Wilmington announced that, after 31 years with the Bank, Cecala was immediately retiring as CEO and that Board member Foley, who had no prior banking experience, would take over as CEO.  In the aftermath of the Bank's announcement, analysts speculated that Cecala's abrupt departure indicated larger credit problems that the Bank had not yet disclosed.  For example, on June 7, 2010, RBC Capital Markets issued a report titled "Something Is Rotten in the State of Denmark (Delaware)" stating:

> We still remain hopeful that the credit tide has finally turned for the Company; however, the manner in which the recent change in management occurred has raised our concerns as to the factors that brought about the change. . . .  Could

another record level provisioning be in the queue along with further OTTI [other than temporary impairment] charges, and it was these factors that precipitated the recent events?  That is the $100 million question.

183.    To mitigate the concern that Cecala's abrupt departure caused investors and analysts, Cecala and Foley held a special conference call on June 4, 2010.  On the call, Cecala specifically denied that his sudden resignation had anything to do with "a mounting capital problem or credit problem that hadn't been reported," stating:

> **Analyst**: So as time scrolls forward here we won't find that the Company turned down an opportunity to make an acquisition, turned down the opportunity to sell, had a mounting capital problem or credit problem that hadn't been reported or the like? Not necessarily in the future, but during the recent past?

> **Defendant Cecala**: <u>None whatsoever</u>.

184.    Defendant Foley also reassured analysts that the Bank had the "right people" in place to make sure there "aren't any surprises this year" in the Bank's credit.  Specifically:

> **Analyst**: And following up on one of the other answers regarding no real future changes, have there been changes made in the credit area where you are comfortable that you have got the right people that can identify the problems to make sure that there aren't any surprises this year where credit – there is a blow up somehow?

> **Defendant Foley**: You are absolutely right, I do feel that comfort. Yes, we do have that confidence.

185.    Notwithstanding Cecala's and Foley's reassurances, Wilmington's stock price dropped almost 10% from a closing price of $14.99 per share on June 3, 2010 to a closing price of $13.52 per share on June 4, 2010.

186.    Shortly after Defendant Cecala resigned, Defendant North also quietly resigned from the Bank.

**B.    June 23, 2010: The Bank Acknowledges That Its Statements The Prior Month Were Not Accurate**

187.    Only three weeks after the Bank falsely assured the market that there were no credit surprises on the horizon, the Bank indicated to analysts that the Bank's loan quality and

credit position were worse than previously disclosed.  On June 22, 2010, Foley, Gibson, and North met with representatives from the research firm SunTrust Robinson Humphrey to discuss the Bank's credit quality.  During that meeting, these Defendants informed the analysts that the Bank expected to report "deteriorating credit metrics" and "negative asset quality."  As SunTrust reported the next day, Wilmington had hired consultants (made up of former bank examiners who were, as CW 9 reported, from Treliant Risk Advisors) in May 2010 to perform a detailed loan review in preparation for the Bank's upcoming regulatory exam, and that the review was primarily focused on the Bank's construction portfolio as well as its credit policy and credit administration functions.  According to SunTrust, "It appears the review will result in deteriorating credit metrics as the company attempts to more aggressively deal with its credit challenges."

188.    Further, SunTrust reported that Wilmington's "[m]anagement admitted to not being as proactive as they needed to be in the past in dealing with the bank's credit challenges." SunTrust further noted that the story they were now hearing was very different than the one they had heard just three weeks earlier, stating:

> We were surprised with the negative asset quality commentary, driven in part by third party consultants, given management's relatively positive/status-quo asset quality statements in its recent conference call on the company's CEO change. On this June 4th conference call, management indicated that its outlook on credit had not changed and that it was beginning to see some positive economic signs. In our meeting yesterday, we sensed management was considerably more negative on credit than on the conference call. We admit that the more conservative commentary could potentially be due, in part, to the company wanting to lower expectations so as not to disappoint.

189.    In response to the SunTrust report describing the meeting with Wilmington management, the price of Wilmington's stock dropped 11%, from a closing price of $12.99 per share on June 22, 2010 to close at $11.56 per share on June 23, 2010.  The price of Wilmington stock continued to trend downward, declining almost another 4% on June 24, 2010.

190.    On July 21, 2010, Wilmington announced that the Board elected Foley as Chairman of the Board, effective immediately.

### C.    July 23, 2010: The Bank's Financial Results For The Second Quarter 2010 Stun Investors; Defendant Foley Blames "Weakness In The Economy"

191.    On July 23, 2010, before the open of the market, Wilmington issued a press release reporting its financial results for the second quarter of 2010, which were even worse than analysts' negative predictions for the Bank's performance based on the June 4 and June 23 announcements.  These results included a net loss of $120.9 million, as well as deterioration in the Bank's key credit metrics, including that the provision for loan losses increased 165% to $205.2 million and Loan Loss Reserve increased 25% to $373.8 million.  In response, numerous analysts downgraded their ratings and/or earnings projections for Wilmington, citing concerns over the Bank's loss exposure and credit problems.

192.    Nevertheless, Defendants again denied that the Bank's losses were the result of problems in risk management and instead blamed the weakening Delaware economy.  Indeed, in a July 23 conference call to discuss these results, Foley falsely blamed the Bank's performance on the "lingering effects of a weak economy, and the housing market."  Specifically, he stated:

> But credit was the main factor [for the negative results]. As the provision for loan losses rose to $205 million. That's a significant increase from the $77 million we recorded last quarter.
>
> This was due to the economic pressures within our regional banking footprint. Particularly in Southern Delaware. We have seen some signs of improvement, but they are very tentative and not widespread. And conditions continue to stress some of our borrowers. In the second quarter, those pressures manifested themselves in the real estate appraisals that showed severe reductions in collateral valuations.

193.    At the same time that they blamed the Bank's poor financial results on supposed recent "economic pressures," Foley and Gibson stressed the strength of Wilmington's existing "methodology for evaluating credit risk," and assured investors that the Bank's asset review

procedures were "<u>state-of-the-art</u>."  Specifically, in response to an analyst question about how much of the increased reserve based on updated appraisals "was due to recent deterioration . . . versus poor credit administration, where this should have been a year ago, when it was obvious to many people that the credit – the commercial real estate markets having problem down in your neck of the woods," Gibson stated, "I would not ascribe this to poor administration."  In response to an analyst question about "what percentage of the portfolio your outside loan review completed," Gibson stated:

> Give you some numbers on that. The outside service that we used reviewed somewhere in the magnitude of $935 million of our loan portfolio, it was largely concentrated in the construction commercial real estate portfolio. We wanted to make sure that they were able to reaffirm the ratings that we had already put on that portfolio, and thankfully, they did do that.
>
> <u>They also reviewed our procedures and policies to make sure that they're in full compliance with state-of-the-art</u> procedures and basically they found that with very slight tweaking that we were in full compliance, and our policies and procedures were at <u>state-of-the-art</u>.

Foley also responded to this same analyst question, falsely blaming the reserve increase on purported recent "trends":

> I want to be very clear about what happened with credit in the second quarter. Our methodology for evaluating credit risk did not change in the second quarter. What changed were the data points supporting our evaluation.  We saw a substantial amount of negative data, like the magnitude of declines in collateral valuation, the negative trends in the financial conditions of some of our borrower[s], the lack of widespread economic improvement in Delaware, and the increases in loans past due 90 days or more, and nonaccruing loans.  In other words, the data points changed our conclusion.  It was not our methodology.

Further, in response to an analyst question regarding how investors could "get comfortable" with the idea that a large portion of the Bank's loan portfolio classified as substandard and watchlist would not become nonaccruing, Gibson stated:

> I think we, when you look at the breakdown, I think again, Delaware-based, <u>there is weakness in the economy, and we're just being very cautious about how we're</u>

<u>evaluating those credits given the economic environment</u>. And I think we are reserving appropriately given that risk.

194.    Notwithstanding Foley's and Gibson's attempts to conceal the Bank's credit deficiencies, the Bank's disclosures caused the price of Wilmington's stock to drop 9%, from a closing price of $10.88 on July 22, 2010 to close at $9.88 on July 23, 2010.

195.    On August 10, the same day that the Bank issued its Second Quarter 2010 10-Q, the Bank cancelled at the last minute a meeting with investors.  This abrupt cancellation "for no apparently meaningful reason" raised concerns among analysts.  RBC Capital Markets wrote in an August 10, 2010 report that it was "deeply concerned" that a "second 'shoe' [was] about to drop."  The firm wrote regarding the recent disclosures by the Bank:

> <u>Unwelcome Surprises</u>: The past few months have witnessed a series of concerning events. The abrupt retirement of WL's former CEO, Ted Cecala, in June was the first issue. At that time, WL's newly appointed CEO, Don Foley, and Mr. Cecala assured investors that the timing of his retirement was not unusual. Shortly thereafter, the new team disclosed the discovery of potentially significant 2Q10 write-offs which became official with the 2Q10 results in July. Management's cancellation of a planned visit to assess and answer our continued fundamental credit concerns was the final blow to our confidence in retaining an Outperform rating.

196.    On October 5, after the close of the market, Bloomberg reported that, according to sources familiar with the matter, Wilmington was seeking a capital infusion from a private equity firm.  According to the article, if Wilmington could not raise the necessary capital, it could be forced to try to sell itself.  On this rumor, the Bank's stock price dropped almost 12%, from a closing price of $8.73 on October 5, 2010 to close at $7.71 on October 6, 2010.

197.    In a series of letters beginning on October 14, Delaware State Senator George Bunting asked the Federal Reserve for an investigation into Wilmington's "very questionable commercial loan practices," with respect to loans made to individuals via Delaware limited liability corporations, and the fact that Wilmington was forced to "ride out or take pennies on the

dollar" for these loans, thereby "driv[ing] down the ultimate value of the stock."   Senator

Bunting asked the Federal Reserve to refer any findings of criminal wrongdoing to the FBI.

> **D.      November 1, 2010: The Bank Announces The Take-Under And Investors Learn About An $800 Million Loan Loss Reserve Increase**

198.      On Monday, November 1, 2010, Wilmington's investors finally learned the truth

about Wilmington's true financial condition and the full extent of the problems in the Bank's

loan portfolio.  Before the open of the market, Wilmington announced that, on October 31, it had

entered into a definitive merger agreement to sell itself to M&T in an all-stock deal for roughly

$3.84 per share – a "historic discount" of approximately 50% of the closing price of $7.11 per

share the prior trading day.

199.      That same day, also before the open of the market, Wilmington released its third

quarter 2010 results, reporting an enormous quarterly net loss of $365.3 million – an over 200%

increase from the loss reported in second quarter 2010.   The Bank reported that a "primary

cause" of this massive loss was a staggering loan loss provision of $281.5 million.

200.      As the Bank belatedly acknowledged, its loan portfolio was severely impaired.

Credit deterioration had spiraled out of control.  Total nonperforming assets increased 77% from

the prior quarter, to $988.6 million, while loans with substandard risk ratings increased 37%, to

$1.99 billion (nearly 25% of the Bank's entire loan portfolio).   This deterioration drove the

massive increase to the Loan Loss Reserve and the charge against net income.   The Bank's

losses in turn drove an income tax expense of $100.7 million, the other "primary factor" driving

the Bank's loss.   Once the Bank realized that it was not going to record any income for the

foreseeable future – the inevitable conclusion to be derived from the significant changes required

by the MOU – the Bank was forced to record a valuation allowance against a deferred tax asset it

had recorded in earlier quarters, resulting in the $100 million income tax expense.[10]

201.    As these losses made clear, the Bank was forced to admit it was no longer viable and could not survive as an independent entity.

202.    Later that day, representatives from M&T and Foley and Gibson held a conference call with analysts to discuss Wilmington's third quarter results and the acquisition. During the call, Foley admitted that "[c]redit quality clearly remains the big story," and that deteriorating trends in appraisal values and the financial conditions of the Bank's borrowers "gives us little assurance that our loan portfolio will strengthen significantly in the near term, and our capital position will not erode further."

203.    During this call, Rene Jones, M&T's CFO, explained that, through its due diligence, M&T had discovered more than half a billion dollars in additional undisclosed losses that the Bank had not yet accounted for in its Loan Loss Reserve, even after the massive increases to its reserves (totaling $560 million) that the Bank had already announced beginning in the fourth quarter of 2009.  As a result, M&T said Wilmington had underfunded its reserve by $500 million – an amount which almost doubled the Bank's existing reserves.  According to Jones, this conclusion was based on thorough due diligence that included "a 40-person team of M&T Corp. credit line and work out personnel examin[ing] the loan documents for some 450 borrowers . . . or about 50% of the overall commercial portfolio."  M&T based its review on its

---

[10] Under GAAP, a "deferred tax asset" is an asset recorded on an entity's balance sheet to recognize that the Company expects to reduce its tax burden in future years, thus increasing its reported income.  However, the value of this asset is tied directly to the tax obligations the entity expects to incur – through future income – in those future years.  If there is no tax obligation in future years – because, for example, there are no earnings – the DTA will be worthless.  Under GAAP, a company must record a "valuation allowance" on its balance sheet to reduce a DTA when it is more likely than not (*i.e.*, more than 50 % likely) that the company will not generate sufficient future earnings to make use of the DTA, the company must disclose that fact in the form of an allowance.

"extensive experience in southern Delaware markets to assess credit marks."

204.    Mr. Jones explained that M&T examined the loan portfolio and the losses already taken beginning at January 1, 2008.  M&T estimated "through-the-cycle losses" of almost $1.5 billion, or 17% of Wilmington's total loan portfolio.  Losses were particularly concentrated in the Bank's commercial construction portfolio, where M&T calculated that the Bank should have written off 40% of that entire portfolio.

205.    In total, investors learned that Wilmington had underfunded its Loan Loss Reserve by nearly $800 million, comprised of the $500 million identified by M&T and the $281.5 in additional reserves announced by the Bank.  In sum, in a single day Wilmington was forced to acknowledge that it was under-reserved in an amount that exceeded all of the Bank's profits going back to 2002.

206.    Significantly, M&T acknowledged that these losses had not recently appeared in the Bank's loan portfolio in the third quarter of 2010, and were not caused by a sudden and recent downturn in the economy.  To the contrary, M&T's entire analysis was based on reviewing Wilmington's loan portfolio as of January 1, 2008 and calculating probable lifetime losses from that date.  Moreover, the Bank did not dispute M&T's conclusions, and indeed acquiesced in them.  Wilmington's Board of Directors recommended that shareholders approve the merger, notwithstanding the fact that M&T had offered to pay only half the Bank's stock price because the Bank's loans and credit quality had deteriorated so significantly.

207.    The market reacted swiftly to this news, driving down Wilmington's stock price over 40% from $7.11, the closing price on the previous trading day, to $4.21 on November 1.

208.    Analysts were shocked by news of the merger and Wilmington's credit deterioration.  Janney Capital Markets observed in a report later that day that "Wilmington's

stunning third quarter loss and forced sale to M&T reflects the substantial deterioration in

construction and commercial business loans."  Boenning & Scattergood noted that the price paid

"points to M&T's uncertainty surrounding the potential for future losses from the credit

portfolio."  News reports were similarly stunned by this remarkable news, with *The Wall Street*

*Journal* noting that the "historic discount" M&T obtained on Wilmington's trading price made it

"one of the largest in the banking industry," only behind deals like JPMorgan's acquisition of

Bear Stearns.  *The New York Times* agreed, noting in response to the announcement:

> [T]he general impression was that while loan losses would hurt the bank for some
> time, Wilmington had taken its lumps at the end of the second quarter. No
> wonder, then, that its decision on Monday to sell to M&T for $351 million was
> shocking. The price, a 45 percent discount to Friday's close, makes it <u>one of the
> biggest so-called "take-unders" in recent Wall Street memory</u>.
>
> In reality, the valuation is not that bad given the bank's dismal third-quarter
> results. At around tangible book value, it is not that out of line with where
> healthier banks have been trading. <u>But until the deal was announced, investors
> thought Wilmington's tangible book was worth twice as much</u>.

Likewise, a November 1 *Philadelphia Inquirer* article reported that Wilmington "delayed the

recognition of loan losses" for risky construction loans made in 2008 and 2009.

209.   With the Bank's release of its third quarter 2010 financial results and the

announcement of its historic take-under by M&T, the market finally learned the truth about

Wilmington's financial condition and loss exposure.  As a result, at least in part, of the

disclosures set forth above, from January 29, 2010 until November 1, 2010, as the magnitude and

severity of the Bank's loss exposure caused by its improper lending and accounting practices and

deficient risk management was revealed piecemeal to the investing public, the Bank's stock price

dropped from $15.26 per share to $4.21 per share, a decline of more than 70%.

### E.    Post-Class Period Events

210.   On February 14, 2011, Wilmington and M&T issued a definitive proxy statement

to shareholders soliciting their vote in favor of the merger (the "Merger Proxy").  The Merger Proxy disclosed that the negative economic trends that emerged nationally in 2008 affected Wilmington just as much or more than its peers and, eventually, resulted in its fire sale to M&T. The Proxy also revealed for the first time that, without the sale, the Bank would have faced "significant regulatory action."  Wilmington's Board of Directors recommended the merger to shareholders based on:

- The credit deterioration in Wilmington Trust's loan portfolio, particularly in real estate construction loans, which deterioration resulted in a loan loss provision of $77.4 million in the first quarter of 2010, $205.2 million in the second quarter of 2010, and $281.5 million in the third quarter of 2010.

- Management's belief that, without a strategic transaction acceptable to its regulators, <u>Wilmington Trust would likely face significant regulatory actions in the near term</u>, which would likely result in a significant impairment of its business prospects.

            *        *        *

- The effects Wilmington Trust and its businesses likely would suffer if Wilmington Trust did not enter into a strategic transaction on or before the release of its third quarter results and the public availability of its call reports, including the likelihood of a material decline in the value of its common stock, a reduction in its credit ratings, a significant loss of clients, the potential termination of business relationships that are tied to Wilmington Trust's credit ratings and capital ratios, and significant regulatory actions.

211.    On May 16, 2011, M&T finalized its acquisition of Wilmington.

212.    In March 2011, in its annual report for fiscal year 2010, Wilmington disclosed that the SEC had opened an inquiry "relating to credit review, substandard and nonperforming loans, impaired loans, collateral values, goodwill, and our deferred tax asset valuation allowance."  According to a December 14, 2011 article from *The News Journal* titled "FBI, SEC probe Wilmington Trust," the SEC's investigation is ongoing.

213.    According to that same article, Wilmington is the subject of an FBI criminal

probe involving fraud related to real estate loans in Delaware.  A federal grand jury has been impaneled to hear evidence on the matter.

214.    Indeed, as discussed above, in October 2012, the FBI filed the FBI Affidavits as part of its ongoing investigation into Wilmington and its lending relationship with Michael Zimmerman.  On January 23, 2013, Zimmerman was indicted in Delaware District Court for conspiracy to commit Bank Fraud, and U.S. Attorney Charles Oberly stated that the government's investigation was "continuing," indicating that additional indictments would follow.

215.    Less than four months later, on May 8, 2013, the government's ongoing criminal investigation resulted in Terranova's guilty plea. ¶¶ 1, 54.  According to statements made by U.S. Attorney Oberly at a press conference that same day, "[b]y holding individuals like Mr. Terranova accountable for their roles in these offenses, we hope to deter similar conduct and to prevent similar conduct and failures in the future, which comes at a great cost not only to the people of Delaware, but to the people of the United States.  This investigation is ongoing and continuing."

216.    Accordingly, the FBI, the IRS Criminal Investigation Division, the Office of Inspector General, Special Inspector General for the Troubled Asset Relief Program, and the U.S. Attorneys' Office are all jointly continuing to investigate the ongoing case against Terranova and his criminal co-conspirators.  Indeed, on May 12, 2013, it was reported in *The News Journal* that "[p]eople familiar with the case said prosecutors have other former Wilmington Trust bankers in their sights."  As further noted above, the day after Terranova pleaded guilty, Bailey resigned from his position as Vice President and business lender at MidCoast Community Bank.  Two days after Terranova's guilty plea, Defendant Harra resigned

from M&T Bank, where he had continued to be employed.

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

217.    During the Class Period, as the credit market deteriorated and iconic financial institutions like Lehman Brothers and Washington Mutual collapsed, Wilmington and its senior executives carried out the criminal conspiracy to conceal the Bank's true financial condition and lending practices from the marketplace.  In regular press releases, conference calls, and filings with the SEC, Wilmington and the Officer Defendants repeatedly made materially false and misleading statements and omissions about the Bank's: (i) past due and nonperforming loans: (ii) Loan Loss Reserve, net income, and accounting practices; (iii) underwriting practices; (iv) LTV ratios; (v) asset review procedures; and (vi) internal controls.   These false and misleading statements created the false impression that the Bank was weathering the financial crisis without any of the crippling credit losses suffered by other banks, and artificially propped up the Bank's stock price.  Defendants' statements and omissions are set forth below, organized topically, along with explanations for their falsity.  The portions of each statement that Lead Plaintiffs allege are materially false and misleading are underlined or otherwise indicated and the relevant document is attached.[11]  When Lead Plaintiffs challenge an entire statement, rather than part of a statement, that is indicated.  Defendants Cecala, Harra, Gibson, and Foley signed each of the Bank's Forms 10-K; Defendants Cecala and Gibson also signed each of the Bank's Forms 10-Q; Defendant Foley signed the Bank's Form 10-Q for the second quarter of 2010.

### A.     False Statements Regarding Past Due And Nonperforming Loans

218.    On a quarterly and annual basis throughout the Class Period, Wilmington consistently highlighted information about the credit quality of the Bank's commercial loan

---

[11] *See* the Declaration of Hannah Ross, which attaches all source documents cited herein.

portfolio, including information about past due and nonperforming loans.  Specifically, as set forth below, in SEC filings and press releases during the Class Period, the Bank reported the amount of commercial loans that were: (i) in "serious doubt," including loans that were 30-89 days past due; (ii) 90 days or more past due and still accruing interest income for the Bank; and/or (iii) "nonperforming" or "nonaccruing" loans, including loans that were 90 days or more past due and not accruing interest income for the Bank.

219.    Defendants also highlighted information about the Bank's past due and nonperforming loans in its quarterly earnings conference calls during the Class Period.[12]  Each of the Officer Defendants participated in the Bank's earnings conference calls as follows: Defendant Gibson participated in each call; Defendants Cecala and Harra participated in each call except for the July 23, 2010 call; Defendant North participated in each call except for the January 18, 2008, April 18, 2008 and July 23, 2010 calls; and Defendant Foley participated in the Bank's July 23, 2010 call.

### 1.    Serious Doubt Loans In 2007-2009

220.    In each quarterly and annual SEC filing during the Class Period, as well as on its quarterly earnings calls from time to time, the Bank reported the amount of its serious doubt loans.  The Bank defined its serious doubt loans as "loans that were performing in accordance with contractual terms, or were fewer than 90 days past due, at the time of the classification, but which [the Bank] thinks have the potential to become nonperforming in the future."  During the Class Period, the Bank reported serious doubt loan figures that were each false and misleading when made because, as detailed in the Criminal Information, Wilmington failed to report the true

---

[12] Wilmington held quarterly earnings calls on January 18, 2008; April 18, 2008; July 18, 2008; October 17, 2008; January 30, 2009; April 24, 2009; July 24, 2009; October 23, 2009; January 29, 2010; April 23, 2010; and July 23, 2010.  In addition, Wilmington also held a special conference call on June 4, 2010.

amount of the Bank's commercial loans that were between 30-89 days past due – and thus in "serious doubt" – from the period starting on at least August 25, 2005 and continuing until at least March 31, 2010.

221.    Specifically, the Criminal Information quantifies the extent to which the Bank's serious doubt loan statements in the fourth quarter of 2008 and throughout 2009 were fraudulent. As detailed therein, the specific amounts by which Wilmington materially understated its commercial serious doubt loans at December 31, 2008 and on a quarterly basis during 2009 are set forth in the chart below (in millions):

| | Reported Total Commercial Serious Doubt Loans[13] | Concealed Total Commercial Serious Doubt Loans | Dollar Amount Of Commercial Serious Doubt Loans The Bank Should Have Reported | Percentage of Understatement |
|---|---|---|---|---|
| 4Q08 | $106.3[14] | $34.0[15] | $140.3 | 31.98% |
| 1Q09 | $48.1[16] | $140.0 | $188.1 | 291.06% |
| 2Q09 | $52.7[17] | $46.0 | $98.7 | 87.29% |
| 3Q09 | $64.1[18] | $112.0 | $176.1 | 174.73% |
| 4Q09 | $51.1[19] | $43.0 | $94.1 | 84.15% |

222.    In addition, the Bank reported the following Total Commercial Serious Doubt

Loans for the fourth quarter of 2007 and the first three quarters of 2008: $11.3 million (4Q07);[20]

$43.4 million (1Q08);[21] $16.4 million (2Q08);[22] and $35.4 million (3Q08).[23]  While the Criminal

---

[13] "Total Commercial Serious Doubt Loans" refers to the combined total of serious doubt loans in the Bank's commercial loan segments as reported in the Bank's SEC filings – Commercial Financial & Agriculture, Commercial Real Estate – Construction, and Commercial Mortgage – and excludes the Residential Mortgage and Consumer and Other Retail segments.

[14] Ex. 1 at 50 (Form 10-K for the year ending Dec. 31, 2008, dated Mar. 2, 2009 ("2008 10-K").

[15] On January 16, 2009, Steven Cummings, the Bank's Credit Policy Manager sent an email that quantified the amount of matured past due loans as of December 31, 2008:  80 loans worth $105 million. Lead Plaintiffs calculated what percentage of that $105 million should have been reported as Serious Doubt loans and what percentage should be Nonaccruing & Accruing Commercial Loans 90 days+ Past Due based on the percentage breakdown of the loan amounts in these classifications as reported in Wilmington's 2008 10-K.  Based on this analysis, Lead Plaintiffs calculated that of the $105 million discussed in Cummings' email, approximately 32.3% were Serious Doubt loans and approximately 67.7% were Nonaccruing & Accruing Commercial Loans 90 days+ Past Due.

[16] Ex. 2 at 71 (Form 10-Q for the first quarter of 2009, dated May 11, 2009 ("First Quarter 2009 10-Q")).

[17] Ex. 3 at 92 (Form 10-Q for the second quarter of 2009, dated Aug. 10, 2009 ("Second Quarter 2009 10-Q")).

[18] Ex. 4 at 146 (Form 10-Q for the third quarter of 2009, dated Nov. 9, 2009 ("Third Quarter 2009 10-Q")).

[19] Ex. 5 at 56 (Form 10-K for the year ending Dec. 31, 2009, dated Feb. 22, 2010 ("2009 10-K")).

[20] Ex. 6 at 49 (Form 10-K for the year ending December 31, 2007, dated Feb. 28, 2008 ("2007 10-K")).

[21] Ex. 7 at 54 (Form 10-Q for the first quarter of 2008, dated May 12, 2008 ("First Quarter 2008 10-Q")).

[22] Ex. 8 at 81 (Form 10-Q for the second quarter of 2008, dated Aug. 11, 2008 ("Second Quarter 2008 10-Q")).

Information does not specifically quantify the Bank's serious doubt loan misstatements in 2007

or for the first three quarters of 2008, it confirms that such amounts were materially understated

by the start of the Class Period.  Specifically, the Criminal Information provides the following

data about these time periods (using the quarters in 2009 as a starting point):

- As of March 31, 2009, the Bank failed to report approximately $46 million of loans that were between 30 days and 1,126 days past due.  Thus, the Bank failed to report certain of these loans as past due by between 30-89 days for the reporting periods starting no later than April 1, 2006.

- As of June 30, 2009, the Bank failed to report approximately $188 million of loans that were between 30 days and 699 days past due.  Thus, the Bank failed to report certain of these loans as past due by between 30-89 days for the reporting periods starting no later than September 1, 2007.

- As of September 30, 2009, the Bank failed to disclose approximately $351 million of loans that were between 30 days and 791 days past due.  Thus, the Bank failed to report certain of these loans as past due by between 30-89 days for the reporting periods starting no later than September 1, 2007.

- As of December 31, 2009, the Bank failed to disclose approximately $330 million of loans that were between 30 days and 1,280 days past due.  Thus, the Bank failed to report certain of these loans as past due by between 30-89 days for the reporting periods starting no later than September 30, 2006.

## 2. Loans 90 Days+ Past Due In 2007-2009

223.    In addition, in each quarterly and annual SEC filing during the Class Period, in

each quarterly press release announcing the Bank's financial results, and on quarterly earnings

calls from time to time, the Bank reported the amount of its commercial loans that were past due

by 90 days or more in two distinct categories: as nonaccruing loans (also referred to as

nonperforming) and accruing commercial loans.  The Bank defined "nonaccruing loans" as

"loans for which [the Bank] do[es] not expect to receive principal or interest payments according

to contractual terms," whereas "accruing loans past due 90 days or more" included loans that

were at least 90 days past due but which the Bank did not transfer to nonaccruing status or

---

[23] Ex. 9 at 84 (Form 10-Q for the third quarter of 2008, dated Nov. 10, 2008 ("Third Quarter 2008 10-Q")).

otherwise charge-off.  Nonaccruing loans represented approximately 95% of the loans past due 90 days or more reported by the Bank, with the remainder recorded as accruing.

224.    During the Class Period, the Bank reported nonaccruing and accruing commercial loans 90 days or more past due that were false and misleading when made because, as detailed in the Criminal Information and admitted by Terranova in his guilty plea, Wilmington failed to report the true amount of the Bank's nonaccruing and accruing commercial loans that were at least 90 days past due from the period starting on August 25, 2005 and continuing until at least March 31, 2010.

225.    Specifically, the Criminal Information quantifies the extent to which the Bank's statements regarding nonaccruing and accruing commercial loans past due 90 days or more in the fourth quarter of 2008 and throughout 2009 were fraudulent.  As detailed therein, the specific amounts by which Wilmington materially understated its nonaccruing and accruing commercial loans past due 90 days or more as of December 31, 2008 and on a quarterly basis during 2009 are set forth in the chart below (in millions):

| | Total Reported Nonaccruing & Accruing Commercial Loans 90 days+ Past Due[24] | Undisclosed Nonaccruing & Accruing Commercial Loans 90 days+ Past Due | Dollar Amount Of Nonaccruing & Accruing Commercial Loans 90 days+ Past Due The Bank Should Have Reported | Percentage Increase |
|---|---|---|---|---|
| 4Q08 | $190.4[25] | $71.0 | $261.4 | 37.2% |
| 1Q09 | $217.20[26] | $46.00 | $263.20 | 21.18% |
| 2Q09 | $284.40[27] | $188.00 | $472.40 | 66.1% |
| 3Q09 | $347.50[28] | $351.00 | $698.50 | 101.01% |
| 4Q09 | $425.60[29] | $330.00 | $755.60 | 77.54% |

226.   In addition, the Bank reported the following Total Nonaccruing & Accruing Commercial Loans 90 days+ Past Due for the fourth quarter of 2007 and the first three quarters of 2008: $40.1 million (4Q07);[30] $47.7 million (1Q08);[31] $65.7 million (2Q08); [32] and $91.8 million (3Q08).[33]   While the Criminal Information does not specifically quantify the Bank's statements about nonaccruing and accruing loans in 2007 or the first three quarters of 2008, it confirms that such amounts were materially understated by the start of the Class Period.

---

[24] "Total Reported Nonaccruing & Accruing Commercial Loans 90 days+ Past Due" refers to the combined total of reported nonaccruing loans past due 90 days or more and reported accruing loans past due 90 days or more in the Bank's commercial loan segments as reported in the Bank's SEC filings – Commercial Financial & Agriculture, Commercial Real Estate – Construction, and Commercial Mortgage – and excludes the Residential Mortgage and Consumer and Other Retail segments.

[25] Ex. 10 at 15 (Jan. 30, 2009 press release); Ex. 1 at 50 (2008 10-K).

[26] Ex. 11 at 11 (April 24, 2009 press release); Ex. 2 at 69-70 (First Quarter 2009 10-Q).

[27] Ex. 12 at 13-14 (July 24, 2009 press release); Ex. 3 at 91-92 (Second Quarter 2009 10-Q).

[28] Ex. 13 at 12 (Oct. 23, 2009 press release); Ex. 4 at 143-45 (Third Quarter 2009 10-Q).

[29] Ex. 14 at 12-13 (Jan. 29, 2010 press release); Ex. 5 at 55 (2009 10-K).

[30] Ex. 15 at 16 (Jan. 18, 2008 press release); Ex. 6 at 47-48 (2007 10-K).

[31] Ex. 16 at 13 (Apr. 18, 2008 press release); Ex. 7 at 53 (First Quarter 2008 10-Q).

[32] Ex. 17 at 15-16 (July 18, 2008 press release); Ex. 8 at 78-80 (Second Quarter 2008 10-Q).

[33] Ex. 18 at 13-14 (Oct. 17, 2008 press release); Ex. 9 at 81-83 (Third Quarter 2008 10-Q).

Specifically, the Criminal Information provides the following data about these time periods (using the quarters in 2009 as a starting point):

- As of March 31, 2009, the Bank failed to report approximately $46 million of loans that were at least 90 days and up to 1,126 days past due.  Thus, the Bank failed to report certain of these loans as past due by at least 90 days for the reporting periods starting no later than <u>June 1, 2006.</u>

- As of June 30, 2009, the Bank failed to report approximately $188 million of loans that were at least 90 days and up to 699 days past due.  Thus, the Bank failed to report certain of these loans as past due by at least 90 days for the reporting periods starting no later than <u>November 1, 2007</u>.

- As of September 30, 2009, the Bank failed to disclose approximately $351 million of loans that were at least 90 and up to 791 days past due.  Thus, the Bank failed to report certain of these loans as past due by at least 90 days for the reporting periods starting no later than <u>November 1, 2007.</u>

- As of December 31, 2009, the Bank failed to disclose approximately $330 million of loans that were at least 90 and up to 1,280 days past due.  Thus, the Bank failed to report certain of these loans as past due by at least 90 days for the reporting periods starting no later than <u>November 30, 2006</u>.

### 3.      Additional False Statements Regarding Past Due Loans In The Fourth Quarter Of 2009 And 2010

227.    In addition to the Bank's false and misleading statements about serious doubt, nonaccruing, and accruing loans past due 90 days or more in fiscal 2007, 2008, and 2009, the Bank also failed to disclose approximately $1.744 billion in past due or soon-to-be past due matured loans that were "mass extended" in the fourth quarter of 2009 and early 2010.  As the Criminal Information confirms, starting in the fall of 2009 and continuing through at least the first quarter of 2010, the Bank extended – without a sufficient basis to do so – more than 1,250 loans totaling at least <u>$1.744 billion</u> – an amount that totaled <u>25%</u> of the Bank's outstanding commercial loan balance as of December 31, 2009.  ¶81.  Specifically, in the fourth quarter of 2009, Wilmington extended 803 past due and imminently maturing loans worth approximately <u>$1.312 billion</u>.  The Bank's improper extension of loans continued with Wilmington extending 450 loans worth approximately <u>$432 million</u> that were due to mature by April 20, 2010.  ¶81.

The sole purpose of this "mass extension" was to fraudulently conceal past due and soon-to-be past due loans from being reported as serious doubt loans or otherwise accounted for as past due or nonperforming loans.  While the Criminal Information does not provide data sufficient to precisely apportion the amount of "mass extended" loans that should have been recorded as serious doubt loans, nonaccruing loans, or loans past due by 90 days or more, it is clear that a material portion of the "mass extended" loans should have been reported in one of those categories in the fourth quarter of 2009 and in the first and second quarters of 2010.  ¶¶80-90. Thus, in addition to the material falsity of the Bank's reported past due and nonperforming loans in the fourth quarter of 2009, the Bank's first and second quarter 2010 reported past due and nonperforming loans[34] were false and misleading.  Thus, the amounts reported for serious doubt loans and nonaccruing loans, or loans past due by 90 days or more during the fourth quarter of 2009 and the first and second quarters of 2010 were materially false and misleading for this reason as well.

### 4.    Additional False Statements in Forms 10-K Regarding The Bank's Methodology For Calculating Past Due Loans

228.    Furthermore, throughout the Class Period, the Bank falsely and misleadingly described its methodology for calculating nonaccruing loans and loans past due 90 days or more. In Wilmington's 2007 and 2008 10-Ks, the Bank falsely and misleadingly described its methodology for calculating nonaccruing loans and loans past due 90 days or more, stating: "We generally place loans, including those determined impaired under SFAS No. 114, "Accounting

---

[34] The Bank reported the following false and misleading amount of Serious Doubt loans and Total Nonaccruing & Accruing Commercial Loans 90 days+ Past Due for the first two quarters of 2010:  $522.5 million (1Q10) and $649.8 million (2Q10), respectively.  *See* Ex. 19 at 11 (Apr. 23, 2010 press release); Ex. 20 at 88-89, 91 (Form 10-Q for the first quarter of 2010 dated May 10, 2010 ("First Quarter 2010 10-Q")); Ex. 21 at 14 (July 23, 2010 press release); Ex. 22 at 97, 101 (Form 10-Q for the second quarter 2010 dated Aug. 9, 2010 ("Second Quarter 2010 10-Q")).

by Creditors for Impairment of a Loan," on nonaccrual status after they have become 90 days past due."[35]   Similarly, in Wilmington's 2009 10-K, the Bank falsely and misleadingly described its methodology for calculating nonaccruing loans and loans past due 90 days or more, stating: "We generally place commercial and residential mortgage loans, including those determined to be impaired under ASC 310, "Receivables," on nonaccrual status when they have become more than 90 days past due," and expressly noting that ASC 310 incorporated SFAS No. 114, "Accounting by Creditors for Impairment of a Loan."[36]   The preceding underlined statements were false and misleading because the Bank did not place loans on nonaccrual status after they became 90 days past due, as required by SFAS No. 114 and ASC 310.  Moreover, Regulation S-K Items 801 and 802, SEC Industry Guide 3, addresses "Statistical disclosure by bank holding companies," and requires that "nonaccrual, past due and restructured loans" must be accounted for "at the end of each reported period."  SEC Industry Guide 3 states specifically that "[n]o loans shall be excluded from the amounts presented."  However, as set forth above, the Bank improperly failed to report hundreds of millions of dollars of loans that were past due by more than 90 days – for years.

### B.    False Statements Regarding Loan Loss Reserve And Net Income

229.   On a quarterly and annual basis throughout the Class Period, the Bank reported its net income, loan loss provisions, and the Loan Loss Reserve.  The Bank and Defendants Cecala and Gibson certified the accuracy of these financial results and certified that the Bank had presented these results in compliance with GAAP.  However, each of these statements was false and misleading because the Bank's methodology for calculating its Loan Loss Reserve was not

---

[35] Ex. 6 at 80 (2007 10-K); Ex. 1 at 84 (2008 10-K).

[36] Ex. 5 at 52, 81 (2009 10-K).

in compliance with GAAP, leading the Bank to materially understate its Loan Loss Reserve and overstate its net income.  Although the Bank's reserving methodology changed slightly in the fourth quarter of 2008, the new methodology continued to violate GAAP, and the Bank continued to materially understate its reserve and overstate its income throughout the Class Period.   Indeed, M&T's independent review of Wilmington's commercial loan portfolio confirms that the Bank understated its reserve and overstated its earnings by tens of millions of dollars for at least the first quarter of 2008 and every quarter thereafter.

230.   In each quarterly and annual SEC filing during the Class Period, the Bank reported the following false and misleading financial results (in millions):

| | Reported Net Income | Reported Loan Loss Provision | Reported Loan Loss Reserve |
|---|---|---|---|
| **4Q07**[37] | $44.0 | $9.2 | $101.1 |
| **1Q08**[38] | $41.4 | $10.0 | $106.4 |
| **2Q08**[39] | ($19.5) | $18.5 | $113.1 |
| **3Q08**[40] | $22.9 | $19.6 | $122.2 |
| **4Q08**[41] | ($68.5) | $67.5 | $157.1 |
| **1Q09**[42] | $21.8 | $29.5 | $167.0 |
| **2Q09**[43] | ($9.1) | $54.0 | $184.9 |
| **3Q09**[44] | ($5.9) | $38.7 | $201.8 |
| **4Q09**[45] | ($11.2) | $82.8 | $251.5 |
| **1Q10**[46] | ($29.2) | $77.4 | $299.8 |

[37] Ex. 15 at 1, 8, 13 (Jan. 18, 2008 press release); Ex. 6 at 46, 70, 71 (2007 10-K).

[38] Ex. 16 at 1, 8, 10 (Apr. 18, 2008 press release); Ex. 7 at 1, 4-5 (First Quarter 2008 10-Q).

[39] Ex. 17 at 1-3 (July 18, 2008 press release); Ex. 8 at 1, 3-4 (Second Quarter 2008 10-Q).

[40] Ex. 18 at 1, 3 (Oct. 17, 2008 press release); Ex. 9 at 3, 4, 18 (Third Quarter 2008 10-Q).

[41] Ex. 10 at 1, 4 (Jan. 30, 2009 press release); Ex. 1 at 63, 72-73 (2008 10-K).

[42] Ex. 11 at 1, 2 (Apr. 24, 2009 press release); Ex. 2 at 1, 5 (First Quarter 2009 10-Q).

[43] Ex. 23 at 1 (July 17, 2009 press release); Ex. 12 at 1, 3 (July 24, 2009 press release); Ex. 3 at 1, 3, 4 (Second Quarter 2009 10-Q).

[44] Ex. 13 at 1, 2 (Oct. 23, 2009 press release); Ex. 4 at 1, 3, 4 (Third Quarter 2009 10-Q).

[45] Ex. 14 at 1, 2 (Jan. 29, 2010 press release); Ex. 5 at 66-67 (2009 10-K).

231.    The Bank's reported net income, loan loss provision, and Loan Loss Reserve during the Class Period were each false and misleading because, as set forth above, the Bank's accounting procedures did not comply with GAAP, which led the Bank to under-reserve for loan losses and overstate its net income.

232.    Specifically, as detailed in the Criminal Information, these financial results were false and misleading because throughout the Class Period the Bank fraudulently failed to include its true amount of past due and nonperforming loans in calculating its Loan Loss Reserve.  The Bank deliberately ignored hundreds of millions of dollars of delinquent past due and nonperforming loans in its financial statements on the fraudulent grounds that those loans were "in the process of extension" or were subject to an illegitimate "mass extension" (*see* ¶¶80-90; ¶¶162-76), and therefore did not consider these delinquent loans in calculating its Loan Loss Reserve.

233.    Indeed, as set forth above, the Bank failed to legitimately extend these loans because to do so required the Bank to obtain updated appraisals, which would have required Wilmington to account for then-current market conditions, which, per an April 2009 email from Bailey to Terranova, would have had the "near term potential for catastrophic consequences," including consequences on the Bank's Loan Loss Reserve.  In fact, as explained in the Criminal Information, "updated appraisals would have required [Wilmington] to recognize losses on the [loan] credits and would have had a negative impact on [the Bank's] Allowance for Loan and Lease Losses [(also referred to as its Reserve for Loan Losses)]."  Because the Bank did not update appraisals as required to legitimately extend its past due and nonperforming loans, the Reserve was materially misstated.

---

[46] Ex. 19 at 1, 2 (Apr. 23, 2010 press release); Ex. 20 at 1, 3, 4 (First Quarter 2010 10-Q).

234.    Indeed, M&T's independent review of Wilmington's commercial loan portfolio confirmed that the Bank materially understated its Loan Loss Reserve by hundreds of millions of dollars.    Specifically, as discussed in ¶¶18-19, 173-76, 202-06, M&T, which examined Wilmington's commercial loan portfolio dating back to January 1, 2008, determined that the Bank had materially understated its Loan Loss Reserve by nearly $800 million, and thereby overstated its net income, as set forth in the following chart (in millions):

|        | Reported Net Income | Corrected Net Income Using M&T's Analysis | Percentage Of Net Income Inflation |
|--------|--------|--------|--------|
| 1Q08 | $41.4 | $28.1 | 32% |
| 2Q08 | ($19.5) | ($44.0) | 126% |
| 3Q08 | $22.9 | ($3.1) | 114% |
| 4Q08 | ($68.5) | ($157.9) | 131% |
| 1Q09 | $21.8 | ($17.3) | 179% |
| 2Q09 | ($9.1) | ($80.8) | 788% |
| 3Q09 | ($5.9) | ($57.3) | 871% |
| 4Q09 | ($11.2) | ($121.1) | 981% |
| 1Q10 | (29.2) | (131.9) | 352% |

235.    In addition to reporting false and misleading financial results, throughout the Class Period, the Bank falsely and misleadingly described its methodology for reserving for loan losses.  First, in its 2007 10-K, the Bank described the Bank's Loan Loss Reserve methodology as follows:

> We establish a reserve for loan losses in accordance with GAAP by charging a provision for loan losses against income. . . . In calculating the reserve, we consider micro- and macro-economic factors, historical net loss experience, current delinquency trends, movements within internal risk rating classifications, and other factors.[47]

236.    The preceding underlined statement was false and misleading because the Bank's reserving methodology was not compliant with GAAP and the Bank did not consider micro- and macro-economic factors, historical net loss experience, current delinquency trends, movements within internal risk rating classifications, or other factors.    Specifically, as the Criminal

_____

[47] Ex. 6 at 80 (2007 10-K).

Information makes clear, the Bank's reserving methodology failed to account for the Bank's "historical net loss experience" and "current delinquency trends" because the Bank failed to consider the hundreds of millions of dollars of past due and nonperforming loans that had been concealed and wiped out of the Bank's financial statements, rendering the Bank's statements about its reserving methodology false and misleading.   Moreover, the Bank's reserving methodology at the time these statements were made was exclusively based on the Bank's inaccurate loan risk ratings, and did not take into account the factors required by GAAP, including economic trends and borrowers' current and projected ability to pay.  ¶163.  Thus, the Bank's simplistic methodology did not adequately assess the possibility of repayment or reflect the losses that the Bank had incurred.  According to the Bank's former head of the Credit Risk Management Division, who was in charge of setting the Loan Loss Reserve during the Class Period, this methodology was "not compliant" with GAAP.  ¶167.  Accordingly, the Bank's financial results reported pursuant to this methodology are presumed misleading.  *See* SEC Reg. S-X, 17 C.F.R. § 210.5-01(a)(1).

237.   After the Bank modified its loan loss methodology in the fourth quarter of 2008, the Bank began to describe its methodology in its SEC filings as follows:

> We establish a reserve for loan losses in accordance with GAAP by charging a provision for loan losses against income. . . . In calculating the reserve, we consider micro- and macro-economic factors, historical net loss experience, current delinquency trends, movements within internal risk rating classifications, and other factors.
>
> We made several enhancements to our reserve methodology in 2008:
>
> - We expanded the use of historical losses to determine appropriate reserve levels.
> - We added qualitative factors, such as general economic conditions, loan concentrations, and other factors, to the criteria we use to assign reserve levels.

> We reclassified a portion of the reserve to a separate liability account to create a reserve for unfunded loan commitments, mainly letters of credit.[48]

238.   This description of the Bank's modified loan loss methodology was false and misleading because, as described in the Criminal Information, the Bank had wiped out hundreds of millions of dollars of its past due and nonperforming loans from the Bank's financial statements.  Thus, the Bank's reserving methodology failed to account for the Bank's "historical net loss experience" and "current delinquency trends."   In addition, the Bank's reserving methodology did not otherwise comply with GAAP and, as a result, the Bank materially understated its Loan Loss Reserve.  Specifically:

a) The Bank's new methodology continued to rely almost exclusively on the Bank's inaccurate loan ratings – ratings that were (i) assigned by the Bank's lenders, who were financially penalized for downgrading loan risk ratings and had absolute discretion to monitor the creditworthiness of their clients, and (ii) artificially inflated by senior management.  Moreover, as set forth in the Criminal Information and as admitted by Terranova, the Bank's loan ratings were also based on outdated appraisals and on inaccurate Delinquency Reports and Past Due Lists that omitted hundreds of millions of dollars of past due and nonperforming loans from the Bank's commercial loan portfolio.  ¶¶56, 67, 135-37, 168-70.

b) The Bank failed to adequately consider the rapidly deteriorating state of the economy because its new method was based on an improper assumption that "qualitative" factors should not exceed a certain arbitrary and small percentage of the Bank's overall Loan Loss Reserve.  ¶171.

c) In September 2009, the Federal Reserve recognized the inadequacy of the Bank's reserve methodology when it issued the MOU to the Bank, requiring Wilmington to "fully fund [the Loan Loss Reserve] considering additional adversely classified credits from the updated internal loan rating system" and to "maintain an adequate ALLL [Loan Loss Reserve] consistent with GAAP and regulatory policies and guidance."  ¶¶153, 156.

239.   Finally, in the Bank's annual and quarterly SEC filings throughout the Class Period, the Bank stated that its financial reporting complied with GAAP:

> We maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles and reporting practices prescribed for the banking industry.[49]

---

[48] Ex. 1 at 84 (2008 10-K).

Similarly, in the Bank's annual and quarterly SEC filings throughout the Class Period, Defendants Cecala and Gibson each falsely certified that the Bank's financial statements were accurate and fairly presented the Bank's financial condition, certifying in pertinent part:

> 1. I have reviewed this annual report on Form 10-K of Wilmington Trust Corporation;
>
>         *      *      *
>
> 3. <u>Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report</u>[.][50]

240. These certifications of the Bank's GAAP compliance and financial statements were false and misleading because, as discussed immediately above at ¶¶235-38, the Bank's reserving methodologies did not comply with GAAP and led the Bank to materially understate its Loan Loss Reserve and overstate its net income.

### C. False Statements Regarding Underwriting

241. Throughout the Class Period, the Bank and the Officer Defendants regularly made statements about the purported "rigor" and "consistency" of Wilmington's underwriting to reassure investors about the Bank's credit quality and explain how the Bank was not significantly impacted by the widespread deterioration in the banking sector. In reality, however, the Criminal Information, Terranova's guilty plea, the FBI Affidavits, and Wilmington's former

---

[49] This statement was repeated in substantially identical form in Ex. 6 at 60 (2007 10-K); in Ex. 7 at 7 (First Quarter 2008 10-Q); Ex. 8 at 9 (Second Quarter 2008 10-Q); Ex. 9 at 9 (Third Quarter 2008 10-Q); Ex. 1 at 61 (2008 10-K); Ex. 2 at 6 (First Quarter 2009 10-Q); Ex. 3 at 8 (Second Quarter 2009 10-Q); Ex. 4 at 153 (Third Quarter 2009 10-Q); Ex. 5 at 60 (2009 10-K); and Ex. 20 at 8 (First Quarter 2010 10-Q).

[50] This certification was signed by Defendants Cecala and Gibson and was repeated in substantially identical form at the conclusion of:  Ex. 6 (2007 10-K); Ex. 7 (First Quarter 2008 10-Q); Ex. 8 (Second Quarter 2008 10-Q); Ex. 9 at 95 (Third Quarter 2008 10-Q); Ex. 1 (2008 10-K); Ex. 2 (First Quarter 2009 10-Q; Ex. 3 (Second Quarter 2009 10-Q); Ex. 4 (Third Quarter 2009 10-Q); Ex. 5 (2009 10-K); Ex. 20 (First Quarter 2010 10-Q).

employees all confirm that the Bank's underwriting was fraudulently inadequate and inconsistent throughout the Class Period.

242.    For each of the Bank's SEC filings during the Class Period, the Bank made the following representation in substantially identical form:

To mitigate credit risk, we:

- Employ rigorous loan underwriting standards and apply them consistently.[51]

243.    Similarly, in the quarterly filings for the first, second, and third quarters of 2008, as well as the first quarter of 2009, the Bank stated that "[w]e have a high degree of confidence in the integrity of our commercial construction portfolio, because . . . [w]e apply our underwriting standards consistently."[52]

244.    Each of the preceding underlined statements in ¶¶242-43 was false because, in reality, the Bank did not employ "rigorous" underwriting standards and did not apply any supposedly rigorous underwriting standards "consistently."   To the contrary, the Bank's underwriting was inadequate and inconsistent, and, in fact, increased the Bank's credit risk, rather than mitigated it.  Specifically, as the Criminal Information, FBI Affidavits and former Bank employees confirm that the Bank: (i) engaged in mass extensions of otherwise past due loans in 2009 and the first two quarters of 2010 without obtaining updated appraisals as required by federal law and the Bank's own appraisal policy (¶¶80-90); (ii) abused the 10% Rule by

---

[51] *See* Ex. 6 at 44 (2007 10-K).  The first two quarterly filings in 2008 referred to this discussion in the 2007 10-K, thereby effectively incorporating the statement by reference.  *See* Ex. 7 at 51 (First Quarter 2008 10-Q) and Ex. 8 at 76 (Second Quarter 2008 10-Q).  *See also* Ex. 9 at 80 (Third Quarter 2008 10-Q); Ex. 1 at 44 (2008 10-K); Ex. 2 at 68 (First Quarter 2009 10-Q); Ex. 3 at 88 (Second Quarter 2009 10-Q); Ex. 4 at 132 (Third Quarter 2009 10-Q); Ex. 5 at 50 (2009 10-K); and Ex. 20 at 81 (First Quarter 2010 10-Q).

[52] *See* Ex. 7 at 30 (First Quarter 2008 10-Q); Ex. 8 at 50 (Second Quarter 2008 10-Q); Ex. 9 at 52 (Third Quarter 2008 10-Q); and Ex. 2 at 42 (First Quarter 2009 10-Q).

extending loans beyond approved levels so that lenders could funnel money to troubled borrowers to use that money to make interest payments to keep loans current and, thus, "conceal the Bank's true financial condition" (¶¶92-101; *see also* ¶54); and (iii) KPMG and the Federal Reserve identified for the Officer Defendants that the Bank's use of the 10% Rule to provide interest reserve loans to borrowers who used those proceeds to keep current on other delinquent loans constituted "significant deficiencies" and was a "problematic practice" (¶¶95-96).

245.    The Bank's underwriting was inadequate and inconsistent in many other ways:

a)   As the FBI Affidavits provide, and as the Bank itself described in the Delaware Review Memorandum, there were pervasive and severe problems with Wilmington's underwriting practices throughout the Class Period. The FBI Affidavits detail numerous "serious concerns" with the management of the Delaware Commercial Real Estate Division – the geographic region that accounted for more than 50% of Wilmington's commercial loan portfolio – and the quality of its loan portfolio. These concerns included, among other things, the "<u>unethical use of loan approval authority by relationship managers</u>"; the "<u>limited oversight of relationship managers</u>" within that Division; and a "<u>limited technical knowledge of commercial real estate lending</u>." As the FBI Affidavits further provide, Wilmington routinely failed to verify and confirm that conditions precedent in loan agreements had been met before providing substantial loans. ¶¶157-160.

b)   The Bank had virtually no underwriting function, as its loan underwriting was not actually performed by the underwriters, but by lenders who were incentivized to make as many loans as possible. ¶107.

c)   Wilmington's lenders routinely ignored established underwriting policies and made exceptions to those policies based on personal relationships rather than on borrowers' ability to pay. ¶¶102-09.

d)   Cecala <u>instructed</u> Bailey and Terranova "not to keep files" on the numerous loans they originated. As a result, documentation for the Bank's loans was incomplete or "nonexistent," and rife with errors. These errors included numerous instances where the loan note was signed (obligating the Bank to lend money) before the loan was approved, a consistent problem the Bank identified as a violation of the Sarbanes-Oxley Act. ¶¶91, 102-04, 125.

e)   The Bank's policy was that only loans greater than $5 million were required to receive credit approval from the Loan Committee, which included senior risk management personnel. Thus, more than half of the Bank's commercial loan portfolio was exempted from review by credit specialists. ¶109.

f)  The Bank dangerously understaffed its underwriter position with, at most, only 12 analysts to review hundreds of millions of dollars in loans, and these analysts lacked training, reported to regional lending managers, and just wanted to be lenders themselves.  ¶108.

g)  According to Wilmington's former employees, each of these facts remained consistent throughout the Class Period, and the MOU confirmed these accounts, identifying serious and systemic deficiencies in the Bank's underwriting function and ordering the Bank to "establish [an] appropriate organization structure" for underwriting that included revised "underwriting standards," including for interest reserves, and uniform standards for Loan Committee review.  ¶¶153-55.

### D.   False Statements Regarding LTV Ratios

246.   In the Bank's annual SEC filings for fiscal 2007 and 2008, Wilmington stated: "We generally require collateral on all real estate exposure and a loan-to-value ratio of no more than 80% at the time of underwriting."[53]   Similarly, in the Bank's annual SEC filing for fiscal 2009, Wilmington stated: "For real estate-related loans, we generally require collateral and a loan-to-value ratio of no more than 80% at the time of underwriting."[54]   The preceding underlined statements were false and misleading when made during the Class Period because, as set forth above, the Bank's senior executives used the 10% Rule to make loans that far exceeded 80% LTV ratios and even allowed commercial loans in the Bank's portfolio to exceed 100% LTV ratios.  ¶97.   Thus, the Bank's LTV statements misrepresented the risks inherent in its commercial loan portfolio, which included loans with values that exceeded underlying property values.  ¶97.   Indeed, Terranova admitted in the Criminal Information that 10% Rule loans granted in the nature of a working capital line of credit or an interest reserve loan had the effect of supplying borrowers' equity in a project and/or increasing the Bank's LTV "exposure beyond that . . . permitted by Bank policy."  ¶97.   Moreover, Defendant Cecala's directive to refrain from updating appraisals – which the Workout group adhered to – affirmatively prevented the

---

[53] Ex. 6 at 88 (2007 10-K); Ex. 1 at 98 (2008 10-K).

[54] Ex. 5 at 94 (2009 10-K).

Bank from accurately assessing LTV ratios during the Class Period.  ¶¶87-88.   Indeed, as CW 1 explained, "at present market" appraisals – which the Bank did not perform – were necessary to evaluate LTV ratios for any loan.  ¶87.

### E.   False Statements Regarding The Asset Review Process

247.   Wilmington and the Officer Defendants repeatedly made false and misleading statements throughout the Class Period regarding the quality of the Bank's asset review, the consistency of its loan risk ratings, and the purported fact that the Bank's asset review had allowed it to reserve appropriately for loan losses.

248.   The Bank repeated certain false and misleading statements regarding its asset review in its annual and quarterly SEC filings.   Specifically, the Bank repeatedly made or incorporated by reference the following statement:

To mitigate credit risk, we:

\*              \*              \*

- monitor the portfolio to identify potential problems and to avoid disproportionately high concentrations in any single industry sector or to any one borrower.
- regularly review all past due loans, loans not being repaid according to contractual terms, and loans we doubt will be paid on a timely basis.[55]

249.   The preceding underlined statements were false and misleading because, throughout the Class Period, the Bank's asset review procedures were severely deficient and problematic because the Bank did not meaningfully monitor the Bank's portfolio and, in fact, concealed and failed to disclose hundreds of millions of dollars of its past due and nonperforming loans. In reality, the Bank's asset review practices increased the Bank's credit

---

[55] Ex. 6 at 44 (2007 10-K).  This statement was made or referred to, and thereby effectively incorporated by reference, in Ex. 7 at 51 (First Quarter 2008 10-Q); Ex. 8 at 76 (Second Quarter 2008 10-Q); Ex. 9 at 80 (Third Quarter 2008 10-Q); Ex. 1 at 45 (2008 10-K); Ex. 2 at 68 (First Quarter 2009 10-Q); Ex. 3 at 88 (Second Quarter 2009 10-Q); Ex. 4 at 132 (Third Quarter 2009 10-Q); Ex. 5 at 50 (2009 10-K); and Ex. 20 at 81 (First Quarter 2010 10-Q).

risk, rather than mitigated it.

250.    Specifically, as detailed in the Criminal Information and corroborated by former high-level Bank employees, in direct contrast to the Bank's statements that it "regularly reviewed all past due loans," senior executives at the Bank systematically manipulated Delinquency Reports and Past Due Lists during the Class Period in order to conceal hundreds of millions of dollars of serious doubt loans, nonaccruing loans, and loans past due 90 days or more from the Bank's loan portfolio – allowing these delinquent assets to sit on the Bank's books for months, and even <u>years</u>, without ever being disclosed or otherwise accounted for.

251.    As set forth in the Criminal Information, the Bank failed to properly classify and meaningfully review its past due loans to avoid performing updated appraisals.  The Bank's appraisals (a critical aspect to asset review) were completely outdated and fraudulently overvalued, in violation of federal regulations and the Bank's Appraisal Policy.  These outdated appraisals rendered the Bank's purported review and monitoring of loans meaningless and ineffective and did not mitigate the Bank's credit risk.  Indeed, in an April 2009 email, Bailey noted that the prospect of getting updated appraisals for Terranova's portfolio of commercial real estate loans alone had "<u>the near term potential for catastrophic consequences</u>."  As former employees explained, the Bank's appraisals were "almost always outdated," and problems with appraisals were a "widespread phenomenon," rendering a review of Wilmington's documents essentially "worthless."  Indeed, the use of outdated appraisals was a directive from the top because, according to CW 1, Defendant Cecala ordered the Workout group to refrain from updating appraisals to avoid charge-offs.

252.    Moreover:

a) In further contrast to the Bank's statements that it "monitored" the portfolio and "regularly reviewed all past due loans," the ARG in actuality did not review the vast

majority of the Bank's loan portfolio.  In fact, loans of less than $15 million, which constituted the overwhelming majority of the Bank's loan portfolio, received "essentially no review" by the ARG to determine their credit quality.  Moreover, on an annual basis, the ARG did not review 85-90% of the Bank's loans.  ¶¶135, 139.

b) As the FBI Affidavits provide and as the Bank itself found and described in the Delaware Review Memorandum, a "serious concern" with the Bank's credit practices was that it exercised "limited oversight of relationship managers," who were, in reality, responsible for monitoring the financial health of the Bank's borrowers.  As a result, relationship managers – who were financially penalized for documenting borrowers' inability to repay their loans – were free to ignore the deteriorating financial health of their borrowers and/or the deterioration in the collateral underlying their borrowers' loans.  ¶¶157-61.

c) As the FBI Affidavits provide and the Criminal Information confirms, the Bank's relationship with Zimmerman demonstrated that the Bank did not independently review its loans or confirm that borrowers met the requirements for receiving draws on their loans.  As a result, the Bank extended millions of dollars in additional credit even where the borrower displayed obvious deficiencies in his or her ability to repay the loan.  ¶¶91-133.

d) KPMG's 2007 audit confirmed that the ARG was insufficient to adequately review the Bank's loan portfolio, with KPMG issuing a Management Letter warning that the ARG's review was a serious control deficiency.  In connection with its 2008 audit, KPMG again criticized the ARG functions as insufficient to adequately review the Bank's loan portfolio, confirming that these problems persisted.  ¶143.

e) The Federal Reserve identified the ARG's inadequate staffing and review as "weaknesses in the control structure" in its 2007 review, which was issued to the Board and to senior management.  In its 2008 report, the Federal Reserve again warned that the ARG's inadequate staffing and review were control weaknesses at the Bank, confirming that these problems had remained unchanged since its 2007 review, when it made similar criticisms.  The Federal Reserve would again identify these problems in 2009, when it instituted the MOU.  ¶¶144, 153-55.

f) The Bank's Internal Audit group issued a report in late 2007 highlighting that the Bank's ARG was understaffed and lacked proper leadership and that its review was inadequate.  ¶142.

g) These criticisms corroborated reports from Wilmington's former employees, who: (i) reported that the Bank had "no real standards" for how often loans were reviewed by the ARG and that problems were identified through random samplings, which they characterized as "review by exception," until late 2008; and (ii) stated that the Bank practiced "credit review in name only."  ¶¶135, 137.

h) Beginning in the third quarter of 2008, after CW 2 was appointed head of the Credit Risk Management Division and attempted to impose some standards on the ARG, the Officer

Defendants escalated their interference in the ARG's operations, with Cecala and Harra actively undermining the asset review system and growing increasingly combative in rejecting ARG's efforts to downgrade risky loans.  ¶¶145-51.

i) By July 2009, the Officer Defendants knew that the Federal Reserve was instituting the MOU based on its findings of numerous serious and systemic concerns with the Bank's asset review function, and by September 2009, the MOU was imposed. The Federal Reserve's concerns were based on, *inter alia*, the fact that only a small percentage of loans were reviewed by the ARG and there were only a handful of independent credit employees responsible for reviewing the entire loan portfolio, and therefore that the Bank did not adequately assess the risk in its loan portfolio.  ¶¶152-56.

253.    In addition to these consistently false descriptions of the quality of the Bank's asset review, in its SEC filings during this time period the Bank also provided false descriptions of its loan rating process.  Specifically, in its SEC filings, the Bank described its internal risk rating system, stating:

We classify all loans outstanding in one of four categories of risk:

- Loans with no current or potential problems receive "pass" ratings.
- Potentially problematic loans are "watch listed."
- Problem credits with some probability of loss receive "substandard" ratings.
- Problem credits with a high probability of loss are rated "doubtful."

We apply these classifications consistently and we analyze migrations within the classifications quarterly.

This system has helped us develop adequate reserves for loan losses over the years.[56]

The Bank made this statement throughout the Class Period, either repeating or referring back to it in earlier filings, effectively incorporating it by reference.

254.    The underlined description of the Bank's loan risk rating system was materially

---

[56] Ex. 6 at 44 (2007 10-K); Ex. 1 at 45 (2008 10-K); and Ex. 5 at 50 (2009 10-K).  The Bank's quarterly filings contain substantially similar language or refer to the Annual Reports, thereby effectively incorporating the statement by reference.  *See* Ex. 7 at 53 (First Quarter 2008 10-Q); Ex. 8 at 80 (Second Quarter 2008 10-Q); Ex. 9 at 80 (Third Quarter 2008 10-Q); Ex. 2 at 68 (First Quarter 2009 10-Q); Ex. 3 at 88 (Second Quarter 2009 10-Q); Ex. 4 at 132 (Third Quarter 2009 10-Q); and Ex. 20 at 81 (First Quarter 2010 10-Q).

false and misleading because the Bank's risk ratings were fraudulently manipulated. Specifically, the Criminal Information sets forth how the Bank's statements that its loan risk ratings had "helped us develop adequate reserves for loan losses over the years" were false and misleading because, the Bank failed to recognize and classify past due and nonperforming loans. Thus, those "waived" past due and nonperforming loans were falsely classified throughout the Class Period and were not considered when setting the Bank's Loan Loss Reserve.

255.   This statement was also false because numerous former employees confirm that the Bank's risk ratings were inaccurate and therefore could not be used to develop "adequate" reserves.  Specifically:

a) Because the ARG reviewed only a small percentage – 10-15% – of Wilmington's loan portfolio annually, the Bank relied almost exclusively on its loan officers – who originated the loans, had absolute discretion to monitor the creditworthiness of their clients, and were financially penalized for downgrades – for the accuracy of its risk ratings for the remaining 85-90% of its loans.  ¶¶135, 139, 142.

b) As noted directly above, the Bank's appraisals were "almost always outdated," and were false from the outset because they were performed on the basis of projected construction development that had not been completed, which resulted in grossly inaccurate risk ratings.  ¶¶85-90, 149, 166, 169.

c) Beginning in the third quarter of 2008, after CW 2 was appointed head of the Credit Risk Management Division, Cecala and Harra undermined the asset review system, growing increasingly combative in rejecting the ARG's efforts to downgrade risky loans.  In combination with the minimal review provided by the ARG, this meant the risk ratings were "generally inaccurate."  ¶¶145, 149, 166, 169.

### F.   False Statements Regarding Internal Controls

256.   In each of the Bank's annual and quarterly SEC filings, Cecala and Gibson also certified to the effectiveness of the Bank's internal controls on financial reporting, stating in substantially identical language that:

The registrant's other certifying officer and I . . . have:

\*       \*       \*

115

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, <u>to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.</u>[57]

257.    The preceding underlined statements were false and misleading at the time they were made because, throughout the Class Period, Wilmington had <u>no</u> effective internal controls in place to prevent the massive and fraudulent manipulation of the Bank's reporting of past due and nonperforming loans, Loan Loss Reserve, underwriting and asset review.

258.    Specifically:

a) As the Criminal Information provides, the Bank abandoned any meaningful supervision over the reporting of past due and nonperforming loans.  This lack of supervision allowed senior executives to systematically manipulate Delinquency Reports and Past Due Lists in order to conceal hundreds of millions of dollars of past due and nonperforming assets that should have been written down and reserved against during the Class Period. Because lenders were able to simply represent that a past due loan was "in the process of extension" without any further documentation or analysis of that purported extension, hundreds of millions of dollars of loans that should have been reported as past due and/or nonperforming – and should have been reflected in the Loan Loss Reserve – were removed from the Bank's financial statements for months and even years.  Moreover, the Bank conducted a mass extension of $1.74 billion of past due and soon-to-be past due loans in 2009 that was able to occur because the Bank lacked any internal controls to assure that those loans had updated appraisals as required by federal regulations and the Bank's own Appraisal Policy, and were recorded in the financial statements.  ¶¶54-90.

b) As the Criminal Information provides, the Bank abandoned all supervision over enforcement of federal regulations and its own Appraisal Policy requiring updated appraisals for any loans sought to be extended or modified.  Because the Bank's loan portfolio's appraisals were so outdated and overvalued, the Bank's Loan Loss Reserve failed to account for the significant deterioration of the Bank's loan collateral.  ¶¶85-90.

c) As the Criminal Information and FBI Affidavits provide, the Bank's relationship with Zimmerman demonstrates that the Bank failed to exercise any supervision over its lenders, including by allowing lenders to change the terms of loan agreements without any independent credit review, lending millions of dollars in funds without requiring any

---

[57] These certifications can be found at the conclusion of: Ex. 6 (2007 10-K); Ex. 7 (First Quarter 2008 10-Q); Ex. 8 (Second Quarter 10-Q); Ex. 9 (Third Quarter 2008 10-Q); Ex. 1 (2008 10-K); Ex. 2 (First Quarter 2009 10-Q); Ex. 3 (Second Quarter 2009 10-Q); Ex. 4 (Third Quarter 2009 10-Q); Ex. 5 (2009 10-K); and Ex. 20 (First Quarter 2010 10-Q).

verification or documentation of borrower need, by failing to ensure that any project-related work was performed and by authorizing loan payments when the borrower had not satisfied the required terms of the loans.  ¶¶91-133.

d)  As the FBI Affidavits provide, the Delaware Review Memorandum raised "serious concerns" concerning the management of the Bank's Delaware commercial real estate division, including the Bank's lack of appropriate oversight over key individuals and failure to require appropriate documentation, demonstrating the Bank's overall lack of internal controls over these key functions.  ¶¶157-61.

e)  In 2007, KPMG, the Federal Reserve, and Internal Audit each determined that the Bank's asset review was an area of material and significant weaknesses in the Bank's internal controls.  ¶¶142-44.

f)  Consistent with these criticisms, in 2008, KPMG and the Federal Reserve again warned the Officer Defendants that the Bank's asset review was an area of material and significant control weakness.  ¶¶142-44.

g)  These internal control failures continued through 2009, when the Federal Reserve instituted the MOU as a result of these longstanding and systemic failings in the Bank's asset review and internal controls, among other areas.  ¶¶152-56.

## G.  Additional False Statements By The Officer Defendants

259.  Throughout the Class Period, the Officer Defendants communicated directly with investors and analysts in earnings conference calls held in connection with the Bank's quarterly financial results.  During those calls, the Officer Defendants repeated and expanded on the false statements contained in the Bank's SEC filings, including statements about the quality and extent of the Bank's loan review and credit practices.  Defendants Cecala, North, Foley, and Gibson each made the following additional false and misleading statements during earnings conference calls with investors throughout the Class Period.

260.  At the outset of the Class Period, on the January 18, 2008 conference call, Cecala attributed the Bank's supposed financial strength to, among other things, the quality of the Bank's loan portfolio and underwriting practices.  In particular, he addressed investor concerns regarding the Bank's exposure to real estate in the Delaware Valley, stating: "I would like to

point to <u>the quality of the loan portfolio and our underwriting and evaluation process</u>."[58]  This statement regarding the quality of the Bank's loan portfolio was false and misleading because the Bank concealed hundreds of millions of dollars of its past due and nonperforming loans, which, as set forth in the Criminal Information, was a longstanding problem at Wilmington ongoing at the time of this statement.  ¶¶54-90.  By concealing its past due loans, the Bank overstated the credit quality of its loan portfolio and gave the investing public the impression that Wilmington's loans were performing much better than they actually were.  Indeed, the Bank's "waiver" scheme hid from the investing public the true state of the Bank's loan portfolio and financial condition. ¶¶57-79.

261.    This statement was also false and misleading because, as Terranova admitted in his guilty plea and as former Bank employees confirm, lenders flagrantly abused the 10% Rule by extending loans to (i) funnel cash to troubled borrowers who used that cash to make payments on loans that were otherwise delinquent; and (ii) increase loans by material amounts – often far greater than 10% – without scrutiny and with the effect of increasing the Bank's LTV exposure in violation of Wilmington's policy and federal guidelines.  ¶¶92-101.  Cecala's January 18, 2008 statement was also false and misleading because, in reality, as set forth above, the Bank had virtually no underwriting function, as its loan underwriting was not actually performed by the underwriters, but by lenders who were incentivized to make as many loans as possible.  ¶107. Similarly, the Bank's loan evaluation process was not "quality."  In reality, the vast majority of the Bank's loan portfolio was not reviewed or evaluated.  As set forth above, loans of less than $15 million, which constituted the overwhelming majority of the Bank's loan portfolio, received "essentially <u>no</u> review" by the ARG to determine their credit quality.  ¶139.  Moreover, on an

---

[58] Ex. 24 at 2 (Jan. 18, 2008 conference call transcript).

annual basis, the ARG did not review 85-90% of the Bank's loans.  ¶135.  Further, this statement was false and misleading because, as exemplified by the Bank's relationship with Zimmerman, Wilmington did not exercise quality underwriting and therefore its Delaware loan portfolio was not "quality."  ¶¶91-133.

262.    On the April 24, 2009 conference call held in connection with the Bank's results for the first quarter of 2009, Defendant North falsely told investors that the Bank had not seen an "increase in problems" in its commercial real estate portfolio and that its "portfolio has held up well," stating the following in response to analyst questioning:

> **Analyst**:  Okay.  On the commercial, we've been seeing from some of the other banks around the country, even some in Pennsylvania for that matter, report an increase in problems in the non-resi[dential] commercial real estate in the strip malls, the retail as well as office.  Are you guys seeing any trends there that make you a little concerned that there's more – slower payments and stuff from some of those people?

> **Defendant North**: You know, Gerard, I'm going to knock on wood every time I talk about this.  <u>We haven't.  We haven't</u>.   And it doesn't mean we won't, <u>but we haven't</u>.  And I think clearly, we're focused on it because retail is what it is and that's soft.  And the overall economy is soft.  <u>But no, to answer you real simply, today we – that portfolio has held up well</u>.[59]

263.    Defendant North's underlined statement above was false and misleading because as discussed above, the Bank had experienced significant deterioration in its portfolio and was fraudulently concealing more than $186 million, or 70%, of its nonperforming and past due loans in the first quarter of 2009.  ¶¶4, 70.  By failing to disclose the true state of the Bank's nonperforming and past due loans, North's answer created the false impression that the Bank's commercial loan portfolio "held up well" and had not seen an "increase in problems."  North's statement was also false because contrary to his representation that the Bank was not "seeing any trends" or experiencing any "problems" in the commercial real estate market, in reality, the Bank

---

[59] Ex. 25 at 18 (Apr. 24, 2009 conference call transcript).

was suffering an "Appraisal problem." ¶¶7, 74, 88. Indeed, as set forth in the Criminal Information, the Bank concealed the true amount of its past due and nonperforming loans because the Bank knew that values for its delinquent commercial loan projects were "dropping substantially" such that updating the outdated appraisals for just 7% of the Bank's total commercial loan portfolio presented the Bank with a problem that had the "near term potential for catastrophic consequences." ¶¶63, 74-75. As a result, the Bank refused to update and obtain new appraisals, and concealed the true state of the loan portfolio through its "waiver" scheme. ¶¶57-79. Thus, in reality, the Bank was experiencing – but concealing severe negative trends. ¶193. Defendants Cecala, Gibson, and Harra were present on this conference call and did not correct Defendant North's misstatements.

264. On the July 24, 2009 conference call held in connection with the Bank's results for the second quarter of 2009, Defendant North assured investors that the Bank was not seeing "a marked increase in terms of losses" or "out-of-pattern" losses, stating the following in response to analyst questioning:

> **Analyst**: Okay. Basically I'm wondering if loss severity has gotten worse or if it's the same over the last several quarters? And where that -- how much are you writing down these loans that you're moving into nonperforming?
>
> **Defendant North**: Yeah, to-date, <u>while we have charged things down to right size values, we haven't seen any change, or what I say a marked increase in terms of the "losses" that we've realized. And nor do I think we've seen any pattern of things that fall into these categories and we charge it down, where we're going back and having to make big additional write-downs</u>. Doesn't mean that doesn't ever happen. <u>But we haven't seen any out-of-pattern behavior there</u>, if that answers your question.[60]

265. North's underlined statement above was false and misleading because, as discussed above, Wilmington was seeing a "marked increase" in its past due and nonperforming

---

[60] Ex. 26 at 7 (July 24, 2009 conference call transcript).

loans (and thus, losses) each quarter, yet failed to take the appropriate write-downs those losses required.  ¶¶62-63, 151.  As described in the Criminal Information, Wilmington was deliberately concealing its past due and nonperforming loans in order to avoid updating appraisals as required, and, consequently, to avoid reporting losses and write-downs.  ¶¶54-90.  Indeed, as of the second quarter of 2009, due to Wilmington's failure to report these loans, the Bank concealed more than $234 million, or 69%, of its loans that were past due or nonperforming, $188 million of which were at least 90 days past due and/or nonperforming.  ¶¶70-71.  These past due and nonperforming loans continued to increase for the Bank, to more than $463 million, or 125%, in the third quarter of 2009, $351 million of which were at least 90 days past due and/or nonperforming.  ¶¶70-72.  Accordingly, the Bank's failure to disclose hundreds of millions of dollars in past due loans, enabled the Bank to improperly avoid recognizing "marked increases" in nonperforming assets and "out-of-pattern" losses.  Defendants Cecala, Gibson, and Harra were present on this conference call and did not correct Defendant North's misstatements.

266.  In addition to the Bank's repeated false statements about asset review in its financial statements, on the October 23, 2009 conference call to discuss the Bank's third quarter 2009 results, North spoke at length about the Bank's level of reserves relative to nonperforming assets, stating that the Bank put its troubled loans "under the microscope" and obtained "new appraisal[s]."  Specifically, North stated the following in response to analyst questioning:

> **Analyst**: I guess the first question's on the reserve. I think you're at about 55% of nonperforming loans, and maybe like 23% of the loans that you've listed as substandard and doubtful.  So that's a pretty low level relative to where you've been historically and even during the last recession in the earlier part of the decade.  So how should we think about that?  Is this a reflection of greater confidence that you won't realize losses than what you had during the last downturn?  Or should we look for those percentages to sort of come back up towards their historical averages?
>
> **Defendant North**: Rob, it's Bill North.  I mean, look, when we have a situation that gets to that level of risk and all our impaired assets, as I think we've talked

about before.  <u>We do and we are required to do a thorough examination of either the future, the present value of the expected future cash flows or if it's a real collateral-oriented loan, obviously we're going out and getting a new appraisal. And obviously what we provisioned and what's in the reserve is a direct correlation to those today based on today's market conditions and the expectations, it's based on those values.</u>

So I'm not quite sure how that compares to maybe the other periods in different cycles, but <u>today, we're taken these loans and we're putting them under the microscope and we're doing the analysis and assessing the value at today's market and the expected cash flows based on today's performance.</u>  And our reserve levels and what we provision every quarter is a result of that.[61]

267.    Defendant North's underlined statements above were false and misleading because, as revealed in the Criminal Information, the Bank refused to update its appraisals to "assess[] the value [of its loans] at today's market."  ¶¶54-90.  As detailed in the Criminal Information, rather than "going out and getting a new appraisal," the Bank deliberately failed to update its appraisals for past due and nonperforming loans, violating both its own policy and federal law.  *See id.*  As a result, the Bank failed to account for its deteriorating loan quality in its Loan Loss Reserve.  As set forth above, the Criminal Information makes clear that the Bank's Loan Loss Reserve did not reflect – and was not a "direct correlation" – of the collateral underlying the Bank's loans.  ¶¶62-65, 85-90, 172-176.  Indeed, according to the Criminal Information, if the Bank's Loan Loss Reserve had reflected the updated value for that collateral, there "would have [been] a negative impact on the [Loan Loss Reserve]."  ¶166.  Further, according to former high-level employees, the Bank's appraisals (a critical aspect to asset review) were "almost always outdated," and problems with appraisals were a "widespread phenomenon," rendering a review of Wilmington's documents essentially "worthless."  ¶87.  Indeed, Defendant Cecala ordered the Workout group to refrain from updating appraisals to avoid charge-offs.  ¶87.  Moreover, Defendant North's underlined statements above were also

---

[61] Ex. 27 at 6 (Oct. 23, 2009 conference call transcript).

false and misleading because as revealed in the Criminal Information, the Bank simply wiped out hundreds of millions of dollars of past due and nonperforming loans from its financial statements. ¶¶54-90.  Indeed, North also failed to disclose that in the third quarter of 2009 alone, the Bank understated its past due and nonperforming commercial loans by more than $463 million, or 125%, including by approximately $351 million in loans that were at least 90 and up to 791 days past due.  ¶72.  Far from being put "under the microscope" these loans were waived from past due and serious doubt reporting based on an unsupported representation from a lender that he or she was "working on an extension" of these delinquent loans.  ¶¶54-90.  In addition, North's October 23, 2009 statements were false and misleading because, contrary to putting troubled loans "under the microscope," the Bank's asset review was so deficient that the Federal Reserve had imposed an MOU in order address the Bank's failings.  ¶¶152-56.  Defendants Cecala, Gibson, and Harra were present on this conference call and did not correct Defendant North's misstatements.

268.    On that same call, Cecala falsely stated that the Bank conducted a "thorough and exhaustive" analysis of its loans each quarter and took "immediate charges" for nonaccruing loans, stating that:

> Yes, when we look at the portfolios, Dave said, we take a look at what kind of reserves that we should have against the portfolio given the current economic conditions.  And then as – if a loan becomes a classified loan then we obviously add a lot more scrutiny to that particular credit and in some situations where a loan might go nonaccruing, there may not be a reserve associated with it, because the underlying collateral even in today's market is sufficient.  Or a loan goes nonaccruing and we take an immediate charge associated with that loan, because we believe that there is a loss that will be realized upon its resolution.  So there is no rule of thumb is what I'm trying to say.   We do a rather thorough and exhaustive analysis each and every quarter.[62]

269.    This statement was false and misleading because, as revealed in the Criminal

---

[62] *Id*. at 13.

Information, the Bank did not perform a "thorough and exhaustive" or even adequate analysis of its nonaccruing (or nonperforming) loans every quarter.  Rather, the Bank reclassified hundreds of millions of dollars' worth of nonperforming loans as "in the process of extension" and simply wiped out hundreds of millions of dollars of past due and nonperforming loans from its financial statements.  ¶54-90.  Indeed, as of the third quarter of 2009, the Bank understated its past due and nonperforming commercial loans by more than $463 million, or 125%, including by approximately $351 million in loans that were at least 90 and up to 791 days past due.  ¶70-72.  Thus, contrary to Cecala's statements that loans were "immediately" reflected in the Loan Loss Reserve, these "waived" loans were not reflected in the Bank's Loan Loss Reserve for months and, sometimes years, causing its Reserve to be materially understated and its net income to be materially overstated.  In addition, far from "adding a lot more scrutiny" to troubled loans, these loans remained indefinitely "waived" and off the Past Due List.  ¶67.  Indeed, the Bank performed a minimal review of its assets (troubled or otherwise) – not reviewing 85-90% of the portfolio each year.  ¶¶135, 139.  Further, the Officer Defendants knowingly or recklessly refused to allow the Bank's credit staff to take proper downgrades and write offs, rendering its risk ratings inaccurate and its Loan Loss Reserve inadequate.

270.    Also on the October 23, 2009 conference call held in connection with the Bank's results for the third quarter of 2009, Defendants North and Gibson assured investors that the Bank's "substandard" loans and nonperforming assets were "continually evaluated" as part of an "ongoing process" that required all such loans to be "put under a microscope," stating the following in response to analyst questioning:

> **Analyst**: Okay. And then just sort of one last question on credit.  I'm trying to get a sense of how you guys are looking at it, given sort of the internal numbers that you had, and the migration this quarter, which again was kind of weaker than – I guess if you look at it linked-quarter it was

weaker than the change in the second quarter, but the provision this quarter was lower. And I understand that there's a process, but from the outside, it looks like maybe you guys need to catch up given what's happening to the portfolio internally.  I just – how are you looking at it when you have penetrated loans keep moving down each quarter?  How do we get comfortable?

**Defendant North**: Yeah, Tom look, <u>it's an ongoing process, and not only looking at these things on a daily basis in terms of how they're performing</u>, but we're also looking at them relative to the source of payment, the collateral, et cetera.  <u>So it's a live and ongoing process</u>.  To the extent that you see some loans that slip into the nonperforming category, that doesn't always have a direct correlation on what you think you have to put away for a particular loan relative to a future ability to repay your loan.  <u>So I'm not sure what else to say about that other than, these are situations that every one is put under the microscope, if you will, and continually evaluated</u>.  And so you're going to see a little disparity on the nonperformers.  Historically because of who we lend to and how we do business and how we work with folks, as you know our nonperformance has, as long as I've been here, has always gone higher than our peers.  But at the end of the day, where rubber meets the road in terms of how much we get back or how much we don't get back, has always compared favorably to the folks that we measure up against. So I don't know if that's an answer to your question. I mean, <u>it's an ongoing process</u>.  <u>It's very active</u>, and there isn't always a direct correlation between a bump in somebody that we choose to put in nonperforming status relative to the ultimate collectability of the loan.

**Analyst**: Okay. Sort of just a following up on that.  Was there any sort of specific reserves this quarter that you allocated to the stuff that moved into substandard?

**Defendant Gibson**: Generally yeah, there's always, <u>anything that's going to go into substandard gets, as Bill said, a very close scrutiny.  And we will based on the facts and circumstances and size, will put specific reserves against those loans</u>.  And we've not disclosed exactly how much that is, but we certainly – anything that goes into those sub[standard] and below will get that level of review.[63]

271.    Defendant North's and Gibson's underlined statements above were false and

misleading because, as discussed above, the Bank did not closely scrutinize "substandard" loans,

but, instead, conducted reviews that were minimal and inadequate to assess the actual credit risk

---

[63] Ex. 27 at 9 (Oct. 23, 2009 conference call transcript).

inherent in these loans. *See, e.g.*, ¶96. Far from putting troubled loans "under the microscope," the Bank's asset review was so deficient that the Federal Reserve had issued the MOU in order to address the Bank's failings. ¶¶152-56. Moreover, in direct contrast to Defendant North's statement about the Bank's supposedly "very active" and "ongoing" loan review process, as detailed in the Criminal Information and admitted by Terranova in his guilty plea, senior executives at the Bank systematically manipulated Delinquency Reports and Past Due Lists during the Class Period in order to conceal hundreds of millions of dollars of nonperforming and past due loans from the Bank's financial statements. ¶¶54-79. By fraudulently failing to classify, report, and reserve for its past due and nonperforming loans, the Bank allowed nonperforming assets to sit on its books for <u>years</u> without ever being disclosed or otherwise accounted for. ¶68. This is the opposite of "very close scrutiny." Defendants Cecala and Harra were present on this conference call and did not correct Defendant North's or Defendant Gibson's misstatements.

272.    On the April 23, 2010 conference call held in connection with the Bank's results for the first quarter of 2010, Defendant Cecala spoke to investors about the Bank's 90 days past due metric, stating the following in response to analyst questioning:

**Analyst**: Just on the 90 day past due, I jumped off the call, but just the sequential increase in CRE construction, is that one or two projects or is that more granular? Thanks.

**Defendant Cecala**: Brock, it's a few, and really I'd just like to note, that basically almost everything in that category this quarter, relates to situations that are matured, but current for all payments. <u>And we just take it a little harder line on what we want to have in front of us, before we underwrite – re-underwrite the deal, and talk about an extension or renewal. So what's sitting out there, is all – it's there because of a maturity, but all payments are current. And we're going through the underwriting process as we speak.</u>

**Analyst**: Okay. And I don't know if you've tried to dimension this before, but as the overall level of NPAs [nonperforming assets] may not be dropping terribly

quickly, but the mix actually could change more dramatically, as the construction and development falls out.  What would the loss expectations be of what remains?  In other words, would it be safe to assume that the losses you're likely to see are going to be dramatically less, going forward as the C&D runs off?

**Defendant Cecala**: Well, Brock, that's a – you said dimensions.  That's a multi-dimensional question.  I think we, historically have seen the greatest loss content in, obviously, the construction and land development loans.  We're hopeful that we've seen the biggest bulk of those that are going to not be nonperforming, are sitting in nonperforming, <u>and we've reserved appropriately for them</u>.  Some of those are active projects, and we're hopeful that those reserves are not necessary.  <u>But should they – problems we could see charge-offs go up, but not provisioning, because they're pretty well reserved against</u>.[64]

273.    Defendant Cecala's underlined statement above was false and misleading because as discussed above, the Bank's Loan Loss Reserve was woefully understated and simply did not account for hundreds of millions of dollars of loans known by Defendants to be past due and nonperforming.  As revealed in the Criminal Information and discussed above, the Bank simply wiped out hundreds of millions of dollars of past due and nonperforming loans from its financial statements at the end of 2009 and in the first two quarters of 2010.  ¶¶80-90.  Indeed, Cecala failed to disclose that in the fourth quarter of 2009 alone, the Bank understated its past due and nonperforming commercial loans by more than $373 million, or 78%, including by approximately $330 million in loans that were at least 90 days past due.  ¶¶4, 70.  Cecala also failed to disclose the Bank engaged in a fraudulent "mass extension" process beginning in the fall of 2009, whereby the Bank granted extensions to 1,250 loans totaling at least $1.74 billion, none of which should have been extended because, as explained above, the Bank did not obtain the legally required appraisals.  Thus, contrary to Cecala's statement that the Bank "took a harder line" when evaluating loans for extension, in reality, the Bank deliberately avoided the required underwriting processes.  As a result, these loans should not have been extended, and should have

---

[64] Ex. 28 at 17 (April 23, 2010 conference call transcript).

therefore been reported as past due and nonperforming.   Indeed, as set forth in the Criminal Information, if the Bank had appraised and reported these loans as required, Wilmington's Loan Loss Reserve would have been negatively impacted.   ¶¶80-90.   Accordingly, in direct contrast to Cecala's statements, the Bank refused to assess whether Wilmington's reserves were "appropriate" during the Class Period, and thus the Bank's nonperforming assets were not "pretty well reserved against."   Defendants North, Gibson, and Harra were present on this conference call and did not correct Defendant Cecala's misstatements.

### H.   Defendants Attempted To Cover Up The True Reasons For The Bank's Increased Reserve With Additional False And Misleading Statements

274.   As noted above in Section IV, beginning with its results for the fourth quarter of 2009, the truth about Wilmington's true financial condition began to be revealed to the marketplace.   Nevertheless, Defendants continued to make materially false and misleading statements to the investing public.   Specifically, the Bank continued to conceal its true financial condition, even as it conducted the Delaware Status Review that confirmed the disastrous and fraudulent state of the Bank's lending practices in its primary Delaware market and loan portfolio, and as it began to implement the terms of the MOU that would eventually reveal the full extent of its losses.   In addition, the Officer Defendants made several additional false and misleading statements on several conference calls in 2010 that continued to mislead the public and delay recognition of the truth about Wilmington.   These statements are set forth below.

275.   On the special conference call on June 4, 2010 to announce Cecala's resignation discussed at ¶¶183-84, Cecala specifically denied that there were any "mounting . . . credit problem[s]" at the Bank, stating that there would be "none whatsoever."[65]   Similarly, Foley also denied that there would be any upcoming "surprises" or credit "blow ups" expected by the Bank.

---

[65] Ex. 29 at 5 (June 4, 2010 conference call transcript).

These statements were false and misleading because, as discussed at ¶¶ 191, 199-200, 178-79, in reality, the Bank was internally recognizing massive credit problems arising from its longstanding and fraudulent concealment of its past due loans and its refusal to obtain updated appraisals.  Indeed, these credit problems would cause the Bank, just over a month later, to report more than $200 million in additional reserves, and just five months later would cause the Bank to report nearly $800 million in additional necessary reserves.  ¶¶191, 205.  In fact, Defendants Cecala and Foley both knew at the time that the Federal Reserve was concerned about the "future ability of the bank to survive, based on what they saw in the credit underwriting and had taken over the Bank's credit practices."  ¶91.  Further, Defendants Cecala and Foley both also knew that the Bank's "comprehensive" Delaware Status Review had revealed "serious concerns" with the Bank's underwriting and asset review in regards to the Bank's largest portfolio, and that the myriad "questionable activities" detailed in the Delaware Review Memorandum directly contradicted the statements that there were no "mounting . . . credit problem[s]" at the Bank.  ¶¶157-61.

276.    On the July 23, 2010 conference call to discuss the Bank's second quarter 2010 results discussed, Gibson falsely stated that the third-party company that had reviewed the Bank's credit procedures and policies had found them to be "state-of-the-art."[66]  ¶¶192-93.  This statement was false and misleading because the Bank's credit procedures and policies were, in fact, entirely deficient.  In reality, the third-party company reviewing the Bank's portfolio did not find the Bank's credit procedures to be "state-of-the-art" and actually found that the Bank's loans were consistently mis-rated and its appraisals were far out of date – findings that are consistent with the criminal conduct described in the Criminal Information.  ¶¶90, 150.  Similarly, as

---

[66] Ex. 30 at 24 (July 23, 2010 conference call transcript).

documented in the Delaware Status Memorandum just a few short months before these statements were made, there were "serious concerns" with the Bank's many "questionable [lending] activities," including, among other practices, "limited oversight" of the Bank's relationship managers, the "unethical use of loan approval authority by relationship managers," the "lack of validation of construction budgets prior to loan closings" and the "<u>frequent</u> use of construction loan proceeds to return cash to borrowers."  ¶¶157-61.  These practices could not be termed "state-of-the-art."  Indeed, as discussed above at ¶¶198-209, just over three months later the Bank and M&T disclosed that the Bank had an additional nearly $800 million in credit losses that could not have resulted from "state-of-the-art" credit policies.

277.    Also on the July 23 conference call, Defendant Gibson's statement attributing the Bank's credit concerns to "weakness in the economy" and stating that "we're just being very cautious about how we're evaluating those credits given the economic environment"[67] (¶193) was false and misleading because he continued to mislead investors regarding the Bank's true lending and credit policies and practices – including: (i) the practices detailed in the Criminal Information; (ii) the practices that forced the Bank into the MOU; and (iii) the practices identified in the Delaware Review Memorandum – all of which led to the Bank's financial distress.  Similarly, Gibson's statement ascribing the Bank's Reserve increase to recent "negative trends," "declines in collateral value," and "increases in loans past due 90 days or more" was also false and misleading.  Contrary to Gibson's explanation, these were not "recent trends" that developed only in the second quarter of 2010.  Rather, as set forth above, the Bank knew that collateral values were "dropping substantially" by no later than early 2009.  Similarly, the Bank had been concealing hundreds of millions of dollars in past due loans for numerous quarters and

---

[67] *Id*. at 9.

even years at this time.  Thus, Gibson's claim that the Bank's increased credit metrics were the result of new "data points" was false and misleading.

## VI.    SUMMARY OF SCIENTER ALLEGATIONS

278.    Defendants Cecala, Gibson, Harra, North, and Foley each acted with scienter in that each knew or recklessly disregarded that the public statements regarding Wilmington's past due and nonperforming loans, financial results (Loan Loss Reserve and net income), underwriting, LTV ratios, asset review, and internal controls during the Class Period were materially false and misleading.  The information in this section is a summary of the allegations detailing the Officer Defendants' scienter that are set forth more fully above.

279.    The Criminal Information and Terranova's guilty plea establish the scienter of each of the Officer Defendants and Wilmington.  Indeed, the fraud at Wilmington is an admitted, massive "overarching" criminal conspiracy, which involved senior Bank executives, and was done to "fraudulently conceal the Bank's true financial condition in many ways."  Based on the Criminal Information and Terranova's admission, there can be no question that the Officer Defendants acted with scienter.

280.    First, the Criminal Information makes clear that Defendants Cecala, Harra, Gibson and North knew that the Bank fraudulently concealed its past due and nonperforming loans so that those loans would not be included in the Bank's 2009 financial statements (among other financial statements).  For example, the Criminal Information quotes an October 2009 internal email to Defendant North, among other senior executives, from Rich Conway, the Bank's COO for the Mid-Atlantic Market, that states "it is extremely important that we talk about matured loans and how we can make them go away by 12/31" – i.e., before the close of the year end 2009 financial reporting period – because "[t]his has the attention of all the wrong people:  [Cecala, the CEO; Harra, the Bank President; Gibson, the CFO], Examiners, Auditors."

131

As set forth in the Criminal Information, the Bank and its senior officers then devised the "mass extension" scheme that made $1.74 billion of troubled loans "go away" by the end of April 2010, with $1.3 billion of those before the close of the year.  This "mass extension" scheme – which deliberately excluded more than 800 troubled loans from being reported in the 2009 financial statements – was approved by the Bank's Loan Committee, including Defendant North (the Chair of the Committee) and Defendants Cecala and Harra (both members), which granted these sham extensions without any of the required appraisals.

281.   <u>Second</u>, the Criminal Information makes clear that the Bank's fraudulent "waiver" of past due and nonperforming loans was widely known, regularly discussed and documented in reports by the Bank's most senior executives, including by the Officer Defendants and the senior executives who reported directly to and interacted regularly with them.   Indeed, the Criminal Information cites to numerous internal emails to the Officer Defendants and/or their direct reports discussing the serious implications of the Bank's fraudulent concealment of its past due and nonperforming loans, including:

- A January 2009 email to Defendant North, among other senior executives, from Steve Cummings, the Credit Policy Manager, who reported directly to Defendant Cecala, calling for a meeting "to discuss addressing the practice of waiving loans that are matured but current for interest from our past due reporting," noting that "[a]t 12/31/08 the total of matured/waived stood at over $105 million and nearly 80 loans," and warning that the Bank's "practice of waiving loans . . . from our past due reporting" did not "allow[] the system to report a <u>true</u> past due [loan] number."

- An April 2009 email exchange between Terranova and Bailey, who reported directly to Defendant Harra, discussing "a long conversation with [Defendant North] and [Senior Credit Officer Terry Brewer] . . . regarding the <u>Appraisal problem</u>" and how updating appraisals as required when actually extending loan terms "<u>ha[d] the near term potential for catastrophic consequences</u>."

- A September 2009 email from CW 2, the  Head of Credit Risk Management, who interacted regularly with Defendants Cecala, Harra, Gibson and North, to Defendant North, Cummings, and Bailey, among other senior executives, warning

that the Bank's "extension is in process" waivers could not continue "[i]n this era of SOX [the Sarbanes Oxley Act] and second-guessing."

The Criminal Information also describes how the fraud was so widely known that it was the subject of both high-level meetings and reports.  For example, the Criminal Information discusses how Senior Real Estate Credit Officer Terry Brewer, who interacted regularly with Defendant North, was to reconvene the Bank's "appraisal summit" – which included at least Bailey, CW 2 and Terranova – in April 2009 "so [the Bank's executives] c[ould] all get on the same page and get some matured loans extended," meaning fraudulently concealed through sham "waivers."  The Criminal Information also describes how Defendant North, Defendant Cecala's direct report Steve Cummings and Defendant Gibson's Finance Department completed monthly reports (the Delinquency and Past Due Reports, respectively) that expressly dealt with the Bank's past due and nonperforming loans that were "waived," and that the same loans appeared as "waived" for months and, in some cases, years.  According to CW 10, the Delinquency Reports prepared by North were distributed to Defendants Cecala, Gibson, and Harra at least every quarter.  Given (i) the serious nature of these communications, including warnings that this conduct could constitute violations of federal law; (ii) the seniority, key positions and reporting structure of the executives involved in these communications; and (iii) the number of high level executives involved in these numerous communications, it is clear that this fraudulent conduct was apparent and understood by the highest levels of the Bank, including the Officer Defendants.

282.  Third, the actual facts and circumstances of the criminal conspiracy as set forth in the Criminal Information and admitted by Terranova further demonstrate the Officer Defendants' scienter.  For example, the criminal conspiracy erased more than 1,250 loans totaling at least $1.74 billion – or more than 25% of the Bank's entire commercial loan portfolio – from the Bank's financial statements.  Of those mass extended loans, over 800 of them (totaling $1.3

billion) were erased from the Bank's 2009 financial statements right before the close of the year end 2009 financial reporting period, including some as late as December 30.  The sheer volume and suspicious timing of this massive loan removal is evidence of scienter.  Similarly, the obvious duration and magnitude of the criminal conspiracy, which spanned nearly five years, encompassing more than eighteen consecutive quarters and involved the criminal concealment of highly material amounts of past due and nonperforming loans, including 35% for the fourth quarter of 2008, and 70%, 69%, 125%, and 78% of the Bank's total past due and nonperforming loans for each quarter during 2009, respectively, is further evidence of scienter.  Given the high-level, widespread discussions on this topic (as set forth above), there is <u>no</u> innocent or plausible explanation for the removal of such staggering amounts of past due and nonperforming loans from the Bank's financial statements right before the end of critical financial reporting periods.

283.  In addition to the Criminal Information and Terranova's guilty plea, these following additional facts also establish the Officer Defendants' scienter:

284.  <u>First</u>, the Delaware Status Review is compelling evidence of scienter.  As explained above, that Review was conducted in 2009 as a result of the MOU and analyzed the lending practices and loan portfolio of the Delaware Commercial Real Estate Division, the geographic market that accounted for more than 50% of the Bank's outstanding commercial loans.  That Review documented the Bank's fraudulent underwriting and asset review procedures, and determined that there were "serious concerns" with the management of the Delaware Commercial Real Estate Division and its loan portfolio.  Given the importance of the Delaware Commercial Real Estate Division and the nature of this Review, it is not plausible that the Officer Defendants were not aware of this Review and its findings.

285.  <u>Second</u>, the results of the Delaware Status Review were set forth in a formal

memorandum, prepared at the direction of senior management and written by Senior Real Estate Credit Officer Brewer, who finalized the Delaware Review Memorandum in early March 2010.  The Delaware Review Memorandum detailed the Bank's fraudulent practices, including (i) the "unethical use of loan approval authority by relationship managers"; (ii) the Bank's "limited oversight of relationship managers"; (iii) "a limited technical knowledge of commercial real estate lending"; (iv) the Bank's "lack of validation of construction budgets prior to loan closings"; and (v) the "frequent use of construction loan proceeds to return cash to borrowers or fund partner buyouts prior to construction completion or the property having reached operating stabilization."  Given the importance of the Delaware Status Review and severity of its findings, it is inconceivable that the Delaware Review Memorandum was not distributed to the Officer Defendants.  At minimum, as the Bank's "senior management," they were aware that the Delaware Review Memorandum had been prepared and that it was readily available to them.

286.  <u>Third</u>, the massive size of the Zimmerman relationship, which, as noted above, alone comprised almost 6% of the Bank's construction loan portfolio, further supports scienter. Given the magnitude and import of the Zimmerman relationship to the Bank, the Officer Defendants knew or should have known of the true circumstances of that relationship, including that (i) Terranova held absolute control over the credit review and administration of the Zimmerman loans; (ii) the Bank did not exercise any independent credit review in connection with that relationship; and (iii) the Bank extended Zimmerman money even though he did not meet basic loan conditions, failed to complete significant progress on construction projects, and openly mocked the Bank's nonexistent lending policies (including requesting and receiving one million dollars to "pay [his] bar tab").  The Officer Defendants also knew or should have known that the Bank recklessly continued to extend millions of dollars in loans to Zimmerman in 2008

and 2009, even after the Bank identified Zimmerman's serious financial difficulties in repaying loans it had already made.

287.   <u>Fourth</u>, the sheer magnitude and timing of the Bank's credit losses disclosed by M&T and the Bank on November 1, 2010 supports a strong inference of the Officer Defendants' scienter.  Indeed, the nearly $800 million in additional necessary reserves – an amount that nearly doubled the Bank's entire Loan Loss Reserve at the time and dwarfed the Bank's income for the prior decade – was so massive and severe that it forced the Bank to sell itself at a fire-sale price or face liquidation.  A sudden increase of this magnitude cannot be – and, as demonstrated by the Criminal Information and Terranova's guilty plea, was not – the innocent result of credit problems that emerged only in the third quarter of 2010.  In fact, M&T's findings that nearly 20% of the Bank's entire loan portfolio and 40% of the Bank's construction portfolio dating back to the beginning of 2008 were <u>worthless</u> and had to be written off entirely demonstrate the duration and severity of the Bank's criminal conspiracy and credit failings.

288.   <u>Fifth</u>, the fact that the Officer Defendants were informed year after year about material deficiencies in the Bank's critical asset review function and underwriting, but failed to correct those problems, supports a strong inference of scienter.  Specifically, the Federal Reserve (in 2007 and 2008), KPMG (in 2007 and 2008) and Internal Audit (in 2007) each determined – and communicated to the Officer Defendants – that the Bank's loan portfolio review was inadequate and constituted a material weakness in the Bank's internal controls.  In early 2009, KPMG also informed the Bank's senior management that the Bank's use of interest reserves to provide money to borrowers to keep their loans "afloat" – and thus avoid reporting those loans as past due – constituted a significant deficiency.  The Federal Reserve also identified this practice as "problematic" to the Officer Defendants when it imposed the MOU on the Bank.  Indeed, in

2009, after the Officer Defendants ignored these warnings for years and the problems persisted, the Federal Reserve imposed the MOU, which confirmed the widespread existence of deficiencies in all areas of the Bank's lending practices and made clear that the Bank lacked fundamental systems, policies, and procedures for its underwriting, asset review, accounting, and control functions. The longstanding duration of these critical failings at the Bank, in the face of repeated warnings by the Federal Reserve, KPMG, and the Internal Audit Group, demonstrates the Officer Defendants' scienter.

289.    <u>Finally</u>, the Officer Defendants' scienter is established by their own actions and direct involvement in the Bank's lending and accounting practices. Witnesses confirm that the Officer Defendants were actively involved in all aspects of the Bank's underwriting, risk management, asset review, appraisal, accounting, and internal control functions. These accounts make clear that the Officer Defendants – who, according to CW 11, were a tightly knit group of friends who operated as "one little clan" – were aware of and/or actively involved in making the operative decisions regarding (among others set forth above): (i) failing to report hundreds of millions of dollars of past due and nonperforming loans in the Bank's financial statements; (ii) establishing the Loan Loss Reserve; (iii) determining which loans would be charged off; (iv) deciding which loans should be downgraded to a lower risk rating category; (v) setting the Bank's underwriting policies and procedures; and (vi) failing to obtain updated appraisals.

290.    In addition to the foregoing, each of the Officer Defendants' scienter is also supported by the facts summarized below.

**Facts Supporting Defendant Cecala's Scienter**

291.    In addition to the facts summarized at ¶¶278-89 above, facts establishing that Cecala knew or recklessly disregarded that the statements about past due and nonperforming

loans, Loan Loss Reserve provisions and net income, underwriting, LTV ratios, asset review, and

internal controls were materially false and misleading when made include the following facts:

a)   By no later than October 29, 2009, Cecala was directly informed of and involved in the Bank's fraudulent reporting of past due loan figures, as confirmed by an email sent to Defendant North by Rich Conway, COO for the Mid-Atlantic Market, according to the Criminal Information.  ¶¶8, 79.

b)   Cecala received the "Delinquency Report" (approved and circulated by Defendant North and prepared by his direct report Cummings) regularly throughout the Class Period, which identified problems with the Bank's loan quality and the past due and nonperforming loans that were to be waived, *i.e.*, not reported in SEC filings, because they were purportedly "in the process of extension," according to the Criminal Information and CW 10.  ¶¶ 64, 66, 69.

c)   Cecala knew and approved of the "mass extension" of over $1.7 billion of past due and soon to be past due loans in Fall 2009 as a member of the Loan Committee, as discussed in the Criminal Information.  ¶81.  Cecala also knew and approved of the $1.3 billion of past due and soon to be past due loans that were erased from the Bank's 2009 financial statements right before the end of the financial reporting period as a member of the Loan Committee.  ¶¶81-84.

d)   Cecala directed Terranova and Bailey not to create and/or maintain loan files containing the documentation necessary to perform adequate underwriting, leading to rampant underwriting and documentation deficiencies in their commercial real estate loans, according to CW 1.  ¶¶91, 102-04, 125.

e)   Cecala ordered the Workout group – over which he had direct oversight – to refrain from obtaining updated appraisals in order to avoid recognizing charge-offs, according to CW 1.  ¶¶88, 151.

f)   Cecala attended quarterly Credit Strategy Meetings and monthly ARG meetings where the attendees repeatedly discussed: (i) emerging credit problems, including the Bank's past due and nonperforming loans that were "waived" as "in process of extension"; and (ii) the urgent need for updated appraisals, according to CW 1 and CW 2.  ¶¶85-90.

g)   Cecala attended monthly ARG meetings and had the final say (along with Harra and Gibson) on loan ratings, and regularly rejected loan risk rating downgrades and charge-offs for loans without any objective analysis or substantive explanation other than that the borrower or guarantor was a "good guy," according to CW1 and CW 2.  ¶¶85-90, 148.

h)   Cecala attended quarterly meetings where the attendees discussed detailed loan write-ups that provided specific information detailing all of the Bank's 10% Rule loans and which rendered the improper use of the 10% Rule readily identifiable, according to CW 1.  ¶101.

i)   Cecala knew about ARG insufficiencies and underwriting deficiencies through repeated warnings from the Bank's regulators and auditors, as well as annual budget presentations and because the problem was widely known within the Bank, according to CW 1, CW 2 and CW 8.  ¶¶134-51.  Cecala also knew about underwriting deficiencies and the Bank's improper use of 10% Rule interest rate reserve loans through warnings from the Bank's regulators and auditors, according to the FBI Affidavits and MOU Compliance Report. ¶¶92-133.

j)   Cecala was directly involved in lending decisions through the Loan Committee, according to CW 2 (¶109), and knew of technical deficiency reports detailing underwriting errors and deficiencies, according to CW 3.  ¶102.

k)   Cecala was responsible (along with Defendant Gibson) for approving the Bank's Loan Loss Reserve recommendation to the Board of Directors and thus knew or recklessly disregarded that it was woefully understated and not adequate for the losses inherent in the Bank's loan portfolio, according to CW 2.  ¶164.

l)   Cecala served as member of the Board's MOU compliance committee – which approved the remedial measures to the Bank's underwriting, asset review, and accounting policies – after September 2009.  ¶ 375.

m)  Cecala resigned abruptly from the Bank in June 2010 as the Bank was reporting deteriorating credit.  ¶¶182-86.

**Facts Supporting Defendant Gibson's Scienter**

292.   In addition to the facts summarized at ¶¶278-89 above, facts establishing that Gibson knew or recklessly disregarded that the statements about past due and nonperforming loans, Loan Loss Reserve provisions and net income, underwriting, LTV ratios, asset review, and internal controls were materially false and misleading when made include the following facts:

a)   By no later than October 29, 2009, Gibson was directly informed of and involved in the Bank's fraudulent reporting of past due loan figures, as confirmed by an email sent to Defendant North by Rich Conway, COO for the Mid-Atlantic Market, according to the Criminal Information.  ¶¶8, 79.

b)   Gibson received the "Delinquency Report" (approved and circulated by Defendant North) regularly throughout the Class Period, which identified problems with the Bank's loan quality and the past due and nonperforming loans that were to be waived, *i.e.*, not reported in SEC filings, because they were purportedly "in the process of extension," according to the Criminal Information and CW 10.  ¶¶ 64, 66.

c)   Gibson attended quarterly Credit Strategy Meetings and monthly ARG meetings where the attendees repeatedly discussed: (i) emerging credit problems, including the Bank's

139

past due and nonperforming loans that were "waived" as "in the process of extension"; and (ii) the urgent need for updated appraisals, according to CW 1 and CW 2. ¶¶85-90.

d) Gibson attended quarterly meetings where the attendees discussed detailed loan write-ups that provided specific information detailing all of the Bank's 10% Rule loans and which rendered the improper use of the 10% Rule readily identifiable, according to CW 1. ¶101.

e) Gibson knew about ARG insufficiencies and underwriting deficiencies through repeated warnings from the Bank's regulators and auditors, as well as annual budget presentations and because the problem was widely known within the Bank, according to CW 1, CW 2 and CW 8. ¶¶134-51. Gibson also knew about underwriting deficiencies and the Bank's improper use of 10% Rule interest rate reserves through warnings from the Bank's regulators and auditors, according to the FBI Affidavits and MOU Compliance Report. ¶¶92-133.

f) Gibson regularly attended and, by the first quarter of 2009, presided over ARG meetings where he had the final say (along with Harra and Cecala) on loan ratings, and regularly rejected loan risk rating downgrades and charge-offs for loans without any objective analysis or substantive explanation other than that the borrower or guarantor was a "good guy." ¶¶85-90, 148.

g) Gibson was responsible (along with Defendant Cecala) for approving the Bank's Loan Loss Reserve recommendation to the Board of Directors and thus knew or recklessly disregarded that it was woefully understated and not adequate for the losses inherent in the Bank's loan portfolio. ¶164.

h) Gibson was aware that the Federal Reserve (i) required the Bank to re-appraise the real estate underlying the Bank's loans as part of the MOU, which had a devastating impact on the Bank's loan portfolio and credit metrics, including the Loan Loss Reserve, and (ii) took over the Bank's credit operations in the summer of 2010. ¶¶91, 152-56.

## Facts Supporting Defendant Harra's Scienter

293.   In addition to the facts summarized at ¶¶278-89 above, facts establishing that Harra knew or recklessly disregarded that the statements about past due and nonperforming loans, Loan Loss Reserve provisions and net income, underwriting, LTV ratios, asset review, and internal controls were materially false and misleading when made include the following facts:

a) By no later than October 29, 2009, Harra was directly informed of and involved in the Bank's fraudulent reporting of past due loan figures, as confirmed by an email sent to Defendant North by Rich Conway, COO for the Mid-Atlantic Market, according to the Criminal Information. ¶¶8, 79.

b) Harra received the "Delinquency Report" (approved and circulated by Defendant North) regularly throughout the Class Period, which identified problems with the Bank's loan quality and the past due and nonperforming loans that were to be waived, *i.e.*, not reported in SEC filings, because they were purportedly "in the process of extension," according to the Criminal Information and CW 10.  ¶¶ 64, 66.

c) Harra knew and approved of the "mass extension" of over $1.7 billion of past due and soon to be past due loans in fall 2009 as a member of the Loan Committee, as discussed in the Criminal Information.  ¶81.  Harra also knew and approved of the $1.3 billion of past due and soon to be past due loans that were erased from the Bank's 2009 financial statements right before the end of the financial reporting period as a member of the Loan Committee.  ¶¶81-84.

d) Harra directly supervised Brian Bailey who was the Delaware Market Manager and Terranova's direct supervisor whose direct participation in the "overarching bank fraud conspiracy" is set forth in the Criminal Information.  ¶¶55-56, 63, 74-76, 99-101.

e) Harra attended quarterly Credit Strategy Meetings and monthly ARG meetings where the attendees repeatedly discussed: (i) emerging credit problems, including the Bank's past due and nonperforming loans that were "waived" as "in the process of extension"; and (ii) the urgent need for updated appraisals, according to CW 1 and CW 2.  ¶¶85-90.

f) Harra attended monthly ARG meetings and had the final say (along with Cecala and Gibson) on loan ratings, and regularly rejected loan risk rating downgrades and charge-offs for loans without any objective analysis or substantive explanation other than that the borrower or guarantor was a "good guy," according to CW1 and CW 2.  ¶¶86-90, 148.

g) Harra attended quarterly meetings where the attendees discussed detailed loan write-ups that provided specific information detailing all of the Bank's 10% Rule loans and which rendered the improper use of the 10% Rule readily identifiable, according to CW 1. ¶101.

h) Harra knew about ARG insufficiencies and underwriting deficiencies through repeated warnings from the Bank's regulators and auditors, as well as annual budget presentations and because the problem was widely known within the Bank, according to CW 1, CW 2 and CW 8.  ¶¶134-51.  Harra also knew about underwriting deficiencies and the Bank's improper use of 10% Rule interest rate reserve loans through warnings from the Bank's regulators and auditors, according to the FBI Affidavits and MOU Compliance Report. ¶¶92-156.

i) Harra was directly informed by the credit risk department, including by CW 2, that loan files originated by Terranova and Bailey were missing required documentation, but rather than correct these lenders' improper practices and require that they obtain the necessary documentation, the missing data and approvals were often just papered over with management's approval.  ¶125.

j) Harra was aware that the Federal Reserve: (i) required the Bank to re-appraise the real estate underlying the Bank's loans as part of the MOU, which had a devastating impact

on the Bank's loan portfolio and credit metrics, including the Loan Loss Reserve; and (ii) took over the Bank's credit operations in the summer of 2010.  ¶¶152-56.

k)  Harra was directly involved in lending decisions through the Loan Committee, according to CW 2 (¶109), and knew of technical deficiency reports detailing underwriting errors and deficiencies, according to CW 3.  ¶102.

l)  Harra resigned from M&T Bank – unexpectedly and quietly – just two days after Terranova's guilty plea was made public.  ¶¶21, 216.

## Facts Supporting Defendant North's Scienter

294.    In addition to the facts summarized at ¶¶278-89 above, facts establishing that North knew or recklessly disregarded that the statements about past due and nonperforming loans, Loan Loss Reserve provisions and net income, underwriting, asset review, LTV ratios, and internal controls were materially false and misleading when made include the following facts:

a)  By no later than October 29, 2009, North was directly informed of and involved in the Bank's fraudulent reporting of past due loan figures, as confirmed by an email that Defendant North received from Rich Conway, COO for the Mid-Atlantic Market, according to the Criminal Information.  ¶¶8, 79.

b)  North approved each month the fraudulent waiver of past due and nonperforming loans from the Bank's financial statements based on nothing more than a "check the box" form, according to CW 12.  ¶¶ 64-66.

c)  North circulated the "Delinquency Report" regularly throughout the Class Period, which identified problems with the Bank's loan quality and the past due and nonperforming loans that were to be waived, *i.e.*, not reported in SEC filings, because they were purportedly "in the process of extension," according to the Criminal Information, CW 10 and CW 12.  ¶¶ 64-66, 68-69.

d)  North received a January 16, 2009 email from Cummings explicitly warning that the Bank's practice of "waiving" past due and nonperforming loans resulted in the Bank "waiving" over 80 loans totaling $105 million at December 31, 2008, and did not allow the Bank to report a "<u>true</u> past due [loan] number," according to the Criminal Information. ¶73.

e)  North received a September 16, 2009 from CW 2 warning that the Bank's "extension in process" waivers of past due and nonperforming loans could not continue "in this era of SOX [the Sarbanes Oxley Act] and second-guessing," according to the Criminal Information. ¶78.

f)  North knew and approved of the "mass extension" of over $1.7 billion of past due and soon to be past due loans in Fall 2009 as a member and Chair of the Loan Committee, as

discussed in the Criminal Information.  ¶81.  North also knew and approved of the $1.3 billion of past due and soon to be past due loans that were erased from the Bank's 2009 financial statements right before the end of the financial reporting period as a member of the Loan Committee.  ¶¶81-84.

g) North attended quarterly Credit Strategy Meetings and monthly ARG meetings where the attendees repeatedly discussed: (i) emerging credit problems, including the Bank's past due and nonperforming loans that were "waived" as "in process of extension;" and (ii) the urgent need for updated appraisals, according to CW 1 and CW 2.  ¶¶85-90.

h) North attended quarterly meetings where the attendees discussed detailed loan write-ups that provided specific information detailing all of the Bank's 10% Rule loans and which rendered the improper use of the 10% Rule readily identifiable, according to CW 1. ¶101.

i) North ordered CW 3 to remove loan deficiencies from monthly reports intended to track widespread underwriting problems that needed to be remedied and to alert senior management and the lenders of specific deficiencies that needed to be corrected.  ¶102.

j) North knew about ARG insufficiencies and underwriting deficiencies through repeated warnings from the Bank's regulators and auditors, as well as annual budget presentations and because the problem was widely known within the Bank, according to CW 1, CW 2 and CW 8.  ¶¶134-51.  North also knew about underwriting deficiencies and the Bank's improper use of 10% Rule interest rate reserve loans through warnings from the Bank's regulators and auditors, according to the FBI Affidavits and MOU Compliance Report. ¶¶92-156.

k) North was directly informed by the credit risk department, including by CW 2, that loan files originated by Terranova and Bailey were missing required documentation, but rather than correct these lenders' improper practices and require that they obtain the necessary documentation, the missing data and approvals were often just papered over with management's approval.  ¶125.

l) North was directly involved in lending decisions through the Loan Committee, according to CW 2 (¶109), and received technical deficiency reports detailing underwriting errors and deficiencies, according to CW 3.  ¶102.

m) North resigned abruptly from the Bank in the summer of 2010 as Wilmington was reporting deteriorating credit quality in its loan portfolio.  ¶186.

**Facts Supporting Defendant Foley's Scienter**

295.    In addition to the facts summarized at ¶¶278-89 above, facts establishing that Foley knew or recklessly disregarded that the statements about underwriting, asset review, Loan Loss Reserve provisions and net income, and internal controls were materially false and

misleading when made include the following facts:

a) Foley approved the Bank's underwriting policies as a member of the Board, according to CW 2. Therefore, among other lax underwriting policies, Foley knew or recklessly disregarded the Bank's widespread abuse of the 10% Rule that allowed the Bank's lenders to extend additional money without any credit review.

b) Foley knew about ARG insufficiencies and underwriting deficiencies as Chairman of the Audit Committee through repeated warnings from the Bank's regulators and auditors according to CW 1, CW 2 and CW 8.  ¶¶134-51.  Foley also knew about underwriting deficiencies and the Bank's improper use of 10% Rule interest rate reserve loans through warnings from the Bank's regulators and auditors, according to the FBI Affidavits and MOU Compliance Report.  ¶¶92-156.

c) Foley was aware (as a member of the Board) in the summer of 2009 of the Federal Reserve's intention to impose the MOU due to the Bank's extensive and severe failings in its lending, credit review and accounting practices, which had persisted for years despite repeated warnings.  ¶¶152-56.

d) Foley served, after September 2009, as a member of the Board's MOU compliance committee, according to CW 2, which focused on fundamentally restructuring the Bank's underwriting, asset review, and accounting policies in response to Federal Reserve's findings.  In this position, Foley was aware that the Federal Reserve (i) required the Bank to re-appraise the real estate underlying the Bank's loans, which had a devastating impact on the Bank's loan portfolio and credit metrics, including the Loan Loss Reserve, and (ii) took over the Bank's credit operations in the summer of 2010.

e) As Chair of the Audit Committee and a member of the Board, Defendant Foley had direct responsibility for Wilmington's response to the MOU.  ¶¶36, 152-56.

f) Foley took over as CEO and Chairman of the Board in the summer of 2010 – after three years of being informed about serious asset review deficiencies from the regulators and auditors.  At this time, Foley was aware that the Federal Reserve had identified serious credit issues and Treliant Risk Advisors had identified significant credit deterioration, yet still knowingly or recklessly assured investors that there were no credit problems in the Bank's loan portfolio.  ¶¶36, 90, 150, 184.

g) Foley admitted on June 22, 2010 to "not being [] proactive" with the Bank's credit challenges.  ¶188.

## VII.   RELEVANT GAAP AND ACCOUNTING PROVISIONS

296.   GAAP refers to the framework of guidelines for financial accounting used by accountants to prepare financial statements. The SEC has the statutory authority to codify GAAP, and has delegated that authority to the Financial Standards Accounting Board ("FASB").

SEC Regulation S-X states that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

297.    GAAP provides a series of rules for how and when to set the Loan Loss Reserve. Chief among these is the Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies" (defined above as "FAS 5" or "ASC Topic 450"[68]), which requires that estimated losses from uncollectible loans should be included in a reserve when two criteria are met: (i) based on information available prior to the issuance of the financial statements, it is probable that the loans were impaired at the date of the financial statements, and (ii) the amount of the losses can be reasonably estimated.

298.    This first prong – probability of impairment – exists when, based on current information and events, it is probable that the entity will be unable to collect all amounts due (including both interest and principal payments) according to the contractual terms of the loan agreement, as set forth in Statement of Financial Accounting Standards No. 114, "Accounting By Creditors for Impairment of a Loan" ("SFAS 114" or "ASC Topic 310").

299.    The second prong – reasonable estimation – exists when information available indicates that the estimated amount of loss is within a range of amounts, as set forth in Financial Accounting Standards Board ("FASB") Interpretation No. 14 ("FIN 14," or "ASC Topic 450"). In other words, Wilmington was not allowed to delay a provision to the Loan Loss Reserve until only a definite amount could be reasonably estimated.

300.    In deciding the estimated amount of loss, SEC Staff Accounting Bulletin No. 102,

---

[68] In June 2009, the FASB issued Statement of Financial Accounting Standards No. 168, which changed the manner in which accounting literature is organized and referenced.   Both the originally issued standards and the new codification are referenced throughout this section.

"Selected Loan Loss Allowance Methodology and Documentation Issues" (defined above as "SAB 102"), provides that "[i]t is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process."[69]   SAB 102 further provides that a loan loss allowance methodology should "[c]onsider all known relevant internal and external factors that may affect loan collectability . . . [and] be based on current and reliable data[.]" "Factors that should be considered in developing loss measurements" include:

1. Levels of and trends in delinquencies and impaired loans;

2. Levels of and trends in charge-offs and recoveries;

3. Trends in volume and terms of loans;

4. Effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices;

5. Experience, ability, and depth of lending management and other relevant staff;

6. National and local economic conditions;

7. Industry conditions; and

8. Effect of changes in credit concentrations.

301.   If appropriate, a loss can be recognized immediately following origination of the loan.  As the American Institute of Certified Public Accountants' Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies" instructs: "if a faulty credit granting decision has been

---

[69] SAB 102 also approvingly references SEC Financial Reporting Release 28 §401.9 ("FRR 28"), "Accounting for Loan Losses by Registrants Engaged in Lending Activities" ("FRR 28"). This principle states that "because the allowance for loan and lease losses and the related provision are key elements of financial statements of registrants engaged in lending activities, it is critical that those judgment[s] be exercised in a disciplined manner that is based on and reflective of adequate detailed analysis of the loan portfolio."

made or loan credit review procedures are inadequate or overly aggressive . . . the loss should be recognized at the date of loan origination."

302.    The Interagency Guidance on the Allowance for Loan and Lease Losses provides the following:

> [C]hanges in the level of the [Loan Loss Reserve] should be directionally consistent with changes in the factors, taken as a whole, that evidence credit losses, keeping in mind the characteristics of an institution's loan portfolio. <u>For example, if declining credit quality trends relevant to the types of loans in an institution's portfolio are evident, the [Loan Loss Reserve] level as a percentage of the portfolio should generally increase, barring unusual charge-off activity</u>. Similarly, if improving credit quality trends are evident, the ALLL level as a percentage of the portfolio should generally decrease.

## VIII.   KPMG KNOWINGLY OR RECKLESSLY FALSELY CERTIFIED THAT WILMINGTON'S 2009 FINANCIAL STATEMENTS COMPLIED WITH GAAP

303.    KPMG was the Bank's "independent auditor" throughout the Class Period.  In accordance with Generally Accepted Auditing Standards ("GAAS"), KPMG was charged with the responsibility of opining as to whether Wilmington prepared its financial statements in accordance with GAAP.  KPMG issued an unqualified auditor's report and internal control certification for the year ending December 31, 2009 opining that Wilmington's financial statements "present fairly, in all material respects, the financial position of the [Bank]"; that KPMG conducted its audits in compliance with GAAS; and that the Bank "maintained, in all material respects, effective internal control over financial reporting."  These statements were false.

304.    Specifically, KPMG falsely stated in its unqualified auditor's report for the year ending December 31, 2009, that:

> We have audited the accompanying consolidated statements of condition of Wilmington Trust Corporation and subsidiaries (the Corporation) as of December 31, 2009 and 2008, and the related consolidated statements of income, changes in

stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2009. . . .

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. . . . An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Corporation as of December 31, 2009 and 2008, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2009, in conformity with U.S. generally accepted accounting principles.

305.    Similarly, in its internal control certification for the fiscal year ending December

31, 2009, KPMG falsely stated that:

We have audited the internal control over financial reporting of Wilmington Trust Corporation and subsidiaries (the Corporation) as of December 31, 2009, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Corporation's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over

financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; [and] (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles . . . .

In our opinion, the Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.

306.    These statements were false because KPMG made these statements despite knowing, or at least recklessly disregarding that the Bank concealed hundreds of millions of dollars of past due and nonperforming loans in its financial statements, and as a result, materially understated its Loan Loss Reserve and overstated its net income.  Moreover, KPMG certified the 2009 financial statements despite knowing or recklessly disregarding that the Bank fraudulently "extended" $1.74 billion of matured, past due loans at the end of 2009, none of which were recorded as past due or nonperforming, or were accounted for in the Bank's Loan Loss Reserves.

## A.    Relevant GAAS Provisions Applicable To KPMG's 2009 Audit

307.    KPMG issued an unqualified audit opinion on Wilmington's 2009 financial statements, which communicated KPMG's conclusions that (a) Wilmington's financial statements were fairly presented, in all material respects, in conformity with GAAP, and (b) its audits had been conducted in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB").[70]   When an auditor represents that a company's financial

---

[70]  The PCAOB is responsible for the establishment of auditing and related professional practice standards that must be followed by registered public accounting firms and by auditors when performing audits of the financial statements of public and registered filers.  On April 16, 2003, the PCAOB adopted, as its interim standards, the ten general, fieldwork, and reporting standards and related interpretations in existence on that date that had been previously approved by the membership of the Auditing Standards Board ("ASB") of the American Institute of Certified Public Accountants.  Since then, the PCAOB has implemented several authoritative standards meant to bolster, edit, amend, and/or replace existing guidance.  All references to "GAAS"

statements conform in all material respects with GAAP, the auditor "indicates [his] belief that the financial statements taken as a whole are not materially misstated." AU § 312.03. Indeed, "[f]inancial statements are materially misstated when they contain misstatements whose effect, individually or in the aggregate, is important enough to cause them not to be presented fairly, in all material respects, in conformity with [GAAP]." AU § 312.04. With regard to loan loss reserves, GAAS requires auditors to evaluate the reserves' reasonableness, in part by focusing on factors that are "[s]ubjective and susceptible to misstatement and bias," and by (a) "[r]eview[ing] and test[ing] the process used by management to develop" the reserves, (b) [d]evelop[ing] an independent expectation of the estimate to corroborate the reasonableness of management's estimate," and (c) "[o]btain[ing] an understanding of how management developed" the reserves. (AU § 342.09-.10).

308.   GAAS represent the rules and guidelines by which an audit must be planned, performed, and reported on, and are, therefore, a measure of audit quality and the objectives to be achieved in an audit. GAAS requires external auditors to (a) plan and perform their audit to obtain reasonable assurance about whether an entity's financial statements are free of material misstatement, whether caused by error or fraud (unintentionally or intentionally), and (b) express an opinion on "the fairness with which [such financial statements] present, in all material respects, financial position, results of operations, and its cash flows in conformity with [GAAP]." AU § 110.01-.02.

309.   GAAS also requires that, in all phases of an audit (including the planning and performance of an audit, as well as the preparation of the audit report), an auditor must adhere to

---

herein refer to the ten general, fieldwork, and reporting standards that were in existence prior to the establishment of the PCAOB (referred to by the prefix "AU"), and are also meant to encompass the standards issued by the PCAOB (referred to by the prefix ("AS").

the overarching obligations of exercising due professional care and professional skepticism.  AU § 230.01-.13.

310.    AU § 230 defines due professional care as "'the degree of skill commonly possessed' by other auditors" which requires an auditor to exercise "reasonable care and diligence" and "professional skepticism."  AU § 230.05, .07-.09.  Professional skepticism is defined as "an attitude that includes a questioning mind and a critical assessment of audit evidence."  AU § 230.07.  In exercising professional skepticism, "[t]he auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence."  AU § 230.07.  In doing so, the auditor should "consider the competency and sufficiency of the evidence," and "neither assume[] that management is dishonest nor assume[] unquestioned honesty.  In exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest."  AU § 230.08-09.

311.    The exercise of due professional care and professional skepticism underlies all phases of an auditor's process for carrying out his/her responsibilities of planning and performing an audit to obtain reasonable assurance about whether such financial statements are free of material misstatement, whether caused by error or fraud.  Due professional care and professional skepticism are particularly critical, because judgment is typically required in an auditor's efforts to (a) determine areas to be tested, as well as the nature, timing, and extent of such tests to be performed, (b) interpret the results of such audit testing, and (c) evaluate such audit evidence.  AU § 230.10-11.

312.    Auditors are obligated under GAAS (AU § 110.02 and AU § 316) to consider, and appropriately respond to, the risk of material misstatement of an entity's financial statements

due to fraud.  AU § 316 requires an auditor to use professional judgment in considering whether information obtained during the course of its audit indicates the presence of certain conditions, known as "fraud risk factors" or "red flags," which may suggest to the auditor the possibility that fraud may exist.  Fraud risk factors are events or conditions that indicate the existence of, among other things, incentives or pressures to perpetrate a fraud and opportunities to carry out a fraud.

313.    AU § 316.85 provides examples of risk factors relating to misstatements arising from fraudulent financial reporting, including that: (i) the company's financial stability or profitability is threatened by economic, industry or entity operating conditions, as indicated by "significant declines in customer demand and increasing business failures in either the industry or overall economy"; (ii) "[i]neffective communication, implementation, support, or enforcement of the entity's values or ethical standards by management or the communication of inappropriate values or ethical standards"; and (iii) "[m]anagement failing to correct known reportable conditions on a timely basis."

314.    Additionally, AU § 316 provides that the risk of fraudulent financial reporting is heightened when a company fails to maintain an adequate system of internal controls.  The absence of internal controls, ineffective internal controls, or the ability of management to override internal controls, all provide an opportunity for fraud to be perpetrated, and therefore represent fraud risk factors.  (AU § 316.07).

315.    The existence of fraud risk factors triggers heightened scrutiny on the part of the auditor.  Under AU § 316, an auditor should respond to the presence of fraud risk factors by, among other things, adjusting its audit procedures to address the risk of material misstatement due to fraud, or withdrawing from the engagement with communication to the appropriate parties if the auditor concludes that the risk of material misstatement due to fraud is so significant that it

would not be practicable to design auditing procedures to sufficiently address such risks.  (AU § 316.48-.50, .76, .78).

316.     In addition to the PCAOB, auditors are subject to the professional guidance of the American Institute of Certified Public Accountants ("AICPA"), which issues, among other publications, Audit Risk Alerts ("ARAs") to, as the AICPA website states, "provide auditors of financial statements with an overview of recent economic, industry, technical, regulatory, and professional developments that may affect the audits and other engagements they perform."  In 2007, the AICPA issued an ARA stating that "the auditor needs to assess the existence, valuation and ownership of the collateral supporting the client's receivables and to determine if the internal control systems have been properly designed and are effective."  (2007 AAM 8050.95).  The ARA warned that "the current downturn in the real estate market increases audit risk surrounding the valuation of receivables."  (2007 AAM 8050.97).

317.     The AICPA also issues Audit and Accounting Guides ("AAG"), which interpret GAAS and provide industry-specific guidance.  (AU § 150.05).  The AAG dealing with banks and other financial institutions warns auditors of fraud risks, including (a) deteriorating economic conditions, such as declining real estate prices, within geographic regions in which the bank has significant credit concentrations; and (b) rapid growth or unusual profitability, for example, unusually large growth in the loan portfolio without a commensurate increase in the size of the allowance for loan and lease losses.  (AAG Ch. 5).  The AAG also listed, as specific risk factors, (a) the existence of an MOU or other regulatory agreements concerning management's competence or control; and (b) repeated criticisms or apparent violations cited in regulatory examination reports, which management has ignored.  (*Id*.).  With regard to loan loss reserves, the AAG instructs auditors to obtain reasonable assurance that the bank's reserves are

sufficient to cover probable credit losses inherent in the loan portfolio at the balance-sheet date, that charge-offs are accurate, and that the related loan loss reserve disclosures are adequate. (AAG Ch. 9).

318.    Further, the AAG specifically instructs auditors to perform individual loan reviews, under certain circumstances, to evaluate the collectability of loans based upon the financial statements of the borrower and underlying collateral values.  (AAG Ch. 9).

### B.    KPMG Acted With Scienter In Issuing Its Unqualified Auditor's Opinion

319.    In conducting its 2009 audit of Wilmington, KPMG was required to comply with GAAS and thereby assess whether the Bank fairly and accurately reported its past due and nonperforming loans.  KPMG was also required under GAAS to evaluate the Bank's Loan Loss Reserves by focusing on the process and methodology used by the Bank in developing the Loan Loss Reserve, which included its calculation and reporting of past due loans.  AU § 342.09-.10. KPMG's audit did not comply with GAAS.  Indeed, KPMG had actual knowledge – or at least was on heightened alert and therefore acted with reckless disregard – that the Bank's reported past due loan figures were grossly understated by hundreds of millions of dollars and that, as a direct result, its Loan Loss Reserves and net income were likewise misstated.

320.    From the start of the Class Period, KPMG was on notice that Wilmington failed to adequately review and account for its commercial loan portfolio.  As discussed above, in connection with its 2007 audit of the Bank, KPMG issued a "Management Letter" that identified the Bank's failure to review its loan portfolio and properly assess its credit risk as a "material weakness" in Wilmington's internal controls.  In connection with KPMG's 2008 audit, KPMG again criticized the Bank's inadequate internal controls and asset review, and specifically warned Defendants Cecala and Gibson that Wilmington had not addressed its dangerously inadequate portfolio review coverage identified by KPMG in 2007.  ¶143.  Further, at the same time that

KPMG issued these serious criticisms of the Bank's inadequate review practices, KPMG knew that in both 2007 and 2008, the Federal Reserve and Wilmington's Internal Audit group had also issued serious criticisms of the Bank's insufficient asset review and credit risk management.

321.    Thus, by the end of its 2008 audit, KPMG knew that Wilmington had significant deficiencies in its ability to review its loan portfolio and assess its credit risk, and that the Bank and the Officer Defendants had ignored these deficiencies despite explicit warnings from KPMG, the Federal Reserve and the Bank's own Internal Audit group.

322.    Most significantly, the Criminal Information and the FBI Affidavits make clear that by the end of 2008 and beginning of 2009, KPMG <u>knew</u> that Wilmington had serious problems with its past due loans and as a result, similar problems with its Loan Loss Reserves and net income reported figures.

323.    As discussed above, the Criminal Information makes clear that by year-end 2008, Wilmington had "waived" 80 past due loans worth $105 million from being reported as past due, resulting in a 35% understatement of its reported 2008 Form 10-K past due loans.  Therefore, in conducting its 2008 audit, KPMG knew or was reckless in not knowing that the Bank regularly failed to report loans as past due on the pretense that they were being extended.

324.    As the Criminal Information provides, one of the ways in which Defendants "fraudulently concealed the Bank's true financial condition" was by "extending new credit to clients to keep existing loan interest payments current" and thus causing the Bank to misstate past due loans.  The FBI Affidavits confirm that KPMG knew of this practice by no later than early 2009.  Specifically, KPMG sent a letter in early 2009 to the Bank's senior management informing them that the Bank's use of supplemental interest reserve loans to extend credit to borrowers – who would then use that money to make interest payments on troubled loans to keep

those loans from being reported as past due – constituted a "significant deficiency" in the Bank's internal audit function that "mask[ed] the deterioration of the creditworthiness of a borrower or the impaired viability of the underlying real estate project."  ¶95.

325.    At the same time that KPMG issued its warning on interest reserve loans, it also knew, by no later than early 2009, that Wilmington's most senior lenders and relationship managers engaged in improper lending practices that included lending money to borrowers without proper documentation and without any analysis of their ability to pay.  These improper practices contributed directly to the landslide of past due loans that the Bank concealed from investors.  As detailed in the FBI Affidavits, on February 3, 2009, in response to a request from Zimmerman for an immediate payment of $200,000 in additional funding for an ongoing project, Terranova requested documentation prior to payment.  Zimmerman replied, "Doc's?  Who needs Doc's between friends?"  Terranova then answered, "My NEW friends at KPMG are getting a little sticky on things like this."  Although there was no evidence that Zimmerman ever supplied the requested documentation, Wilmington provided him the additional funding in June 2009.

326.    Thus, KPMG knew by early 2009 that: (i) Wilmington failed to report over one hundred million dollars of loans as past due; (ii) the Bank extended interest loans to delinquent borrowers to avoid recording loans as past due, which constituted a "significant deficiency" in its lending practices; and (iii) the Bank's most senior relationship managers were fraudulently lending millions of dollars to borrowers without the required documentation or analysis of their creditworthiness.  Pursuant to GAAS, these glaring "red flags" were powerful evidence that Wilmington's financial statements were materially misstated.

327.    These "red flags" became even more pronounced in September 2009, when the Federal Reserve imposed an MOU on Wilmington that found nearly every aspect of the Bank's

lending and accounting policies to be severely deficient, if not non-existent.  According to CW 2, KPMG not only received the MOU, but KPMG discussed it with senior management at the Bank.   The MOU unequivocally determined that the Bank's lending practices were highly problematic, including the Bank's underwriting, its use of interest reserve loans, asset review, internal control and accounting practices.   The MOU also concluded that the Bank's processes for establishing its reserves were materially deficient and inconsistent with GAAP.   ¶¶152-56. GAAS guidance specifically provides that the issuance of an MOU is a fraud risk factor requiring heightened scrutiny in the 2009 audit.  AAG Ch. 5.

328.    By no later than October 2009, internal Wilmington emails show that KPMG not only had <u>direct knowledge</u> of the Bank's serious problems with its past due loan reporting, but was well aware that the Bank needed to make its past due loans "go away" by year-end 2009.  As set forth above (*see e.g.*, ¶¶ 8, 79), on October 29, 2009, Rich Conway, Chief Operating Officer for the Mid-Atlantic market, sent an email to Defendant North and others in which he stated the issue of the Bank's unreported "waived" past due loans "<u>ha[d] the attention of all the "wrong people</u>:  Cecala [the Bank's CEO], Harra [the Bank's President], Gibson [the Bank's CFO], Examiners, <u>[KPMG]</u>" and that the Bank had to decide "<u>how we can make [the waived past due loans] go away by 12/31</u>."

329.    As set forth above in Section III.A, Defendants devised a way to make their past due loans "go away" in the fall of 2009, they executed a fraudulent "<u>mass extension</u>" of 1,250 <u>loans worth $1.74 billion</u>.  In the fourth quarter of 2009 alone, the Bank agreed to fraudulently extend over $1.3 billion of matured past due loans (approximately 20% of the Bank's commercial loan outstanding balance).   None of those "mass extensions" were supported by updated appraisals, which were required by federal law and the Bank's own internal Appraisal

Policy.   As explained above, Wilmington could not – and did not – obtain their appraisals because it knew that if it did obtain appraisals, it would be required to take massive charges to its Loan Loss Reserves.

330.    As part of its audit, GAAS required KPMG to review the loans subject to this mass extension and ensure that they were legitimately extended in accordance with federal law and the Bank's own policies.   Such an audit included a review of the underlying loan files to determine, among other things, whether the Bank had obtained updated appraisals, which were required in order for the loans to be extended.   Had KPMG conducted an audit in accordance with GAAS, and reviewed these loans files, it would have determined that the Bank had not obtained appraisals for these loans, and thus had no legitimate basis to extend these loans. KPMG's failure to perform even the most cursory review of these loans was a blatant dereliction of GAAS and its responsibilities to Wilmington's investors.

331.    The mass extension that occurred at the end of 2009 <u>alone</u> was an alarming red flag that unquestionably should have alerted KPMG to the possibility – if not probability – that Wilmington was engaging in fraud, and required it to review the loans subject to that extension. This mass extension involved 1,250 loans worth almost $2 billion, and constituted 25% of the Bank's total commercial loan portfolio.   Moreover, as emails provide, KPMG was well aware in the fall of 2009 that the Bank had a serious problem regarding its reporting of "matured loans," and needed to make that problem "go away" by year-end 2009.

332.    In addition, as set forth above, many of these 1,250 "extensions" were approved in the final days of 2009 – including as late as December 30 – for the sole purpose of avoiding their classification as past due loans.   *See, e.g.*, ¶¶81-82, 282.   Moreover, many of these extensions were approved by the Loan Committee on the same day they were submitted.   The

timing of these extensions – often granted the same day and right before the end of a critical financial reporting period – also should have put KPMG on notice that Wilmington's lending practices and treatment of its past due loans were not defensible.

333.    There is no plausible innocent explanation for KPMG's issuance of a clean, unqualified audit opinion in connection with Wilmington's 2009 financial statements.  There is no evidence that the Bank or the Officer Defendants withheld any information from KPMG and, in fact, the evidence says the opposite occurred.   KPMG failed to exercise professional skepticism and apply the heightened scrutiny required by GAAS to the issue of past due loans – an issue on which their "attention" was unquestionably focused by Fall 2009.   As a result, KPMG knowingly or recklessly failed to comply with GAAS, exhibiting, at best, an egregious refusal to see the obvious and to investigate the doubtful.  KPMG essentially performed no audit at all.

## IX.    LOSS CAUSATION

334.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class.   Throughout the Class Period, Wilmington's stock price was artificially inflated by materially false and misleading statements and omissions that created the false impression that the Bank was weathering the financial crisis without any of the crippling credit losses suffered by other banks.   As a result, the market price of Wilmington common stock was inflated by the materially false and misleading statements and omissions made by Wilmington and the Officer Defendants, as identified above, and Lead Plaintiffs and the Class purchased Wilmington common stock at artificially inflated prices during the Class Period.

335.    The Bank's ensuing disclosures on these topics, as described at Section IV.A-D, revealed to the market on a piecemeal basis the fraudulent nature of these statements and the

extent of the misrepresentations contained in Wilmington's financial statements that form the primary basis of this action. When the truth about Wilmington was revealed to the market, the price of Wilmington common stock declined in response, as the artificial inflation caused by Wilmington's and the Officer Defendants' material omissions and false and misleading statements was removed from the price of Wilmington common stock, thereby causing substantial damage to Lead Plaintiffs and other members of the Class.

336.    Indeed, during the Class Period, Wilmington common stock traded as high as $35.75 per share on September 19, 2008, and closed at $15.26 per share the day before the Bank's January 29, 2010 conference call and press release, when the first partial disclosures about Wilmington's true condition were made. Over the next nine months, in response to several additional partial disclosures that revealed more about the Bank's true financial condition, the market reacted, and Wilmington's stock price partially corrected as Wilmington's stock price was significantly driven downward. The Bank and the Officer Defendants mitigated the impact of those disclosures and prevented the full truth about Wilmington from being revealed by making contemporaneous false and misleading statements that minimized and denied the facts being revealed to the market. As the market finally learned the magnitude of the loss exposure facing Wilmington and the implications for Wilmington's financial condition and existence as an independent entity, the price of Wilmington's common stock plummeted to $4.21 per share on November 1, 2010. The truth emerging about the Bank's loan portfolio, improper lending practices, deficient risk management, and loss exposure, caused the market price of Wilmington common stock to fall more than $10 per share, from $15.26 on January 28, 2010 to $4.21 on November 1, 2010.

337.    It was entirely foreseeable to the Officer Defendants that concealing the Bank's

past due and nonperforming loans and, in turn, understating the Bank's Loan Loss Reserve and overstating its net income, as well as not disclosing the Bank's improper underwriting, inadequate asset review, and deficient internal controls, would artificially inflate the price of Wilmington common stock.  It was similarly foreseeable to the Officer Defendants that the revelation of that misconduct and the Bank's true financial condition would cause the price of Wilmington common stock to drop significantly as the inflation caused by their misstatements and omissions was corrected.  Accordingly, the conduct of the Bank and the Officer Defendants, as alleged herein, proximately caused foreseeable damages to Lead Plaintiffs and members of the Class.  Moreover, it was also foreseeable that the Bank's undisclosed practices were so ruinous to the Bank's financial condition that the Bank would have to sell itself in a fire-sale at a 50% discount to M&T.

338.    Thus, the stock price declines detailed herein were directly related to disclosure of the previously issued materially false and misleading statements and omissions.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

339.    At all relevant times, the market for Wilmington was an open, efficient and well-developed market for the following reasons, among others:

a)  Wilmington's stock met the requirements for listing and was listed and actively traded on the NYSE under the symbol WL, a highly efficient and automated market;

b)  As a public company, Wilmington filed periodic public reports with the SEC;

c)  The average daily trading volume for Wilmington common stock during the Class Period was 1.3 million shares. The average weekly turnover as a percentage of shares outstanding was 8.62% (median of 6.86%), well surpassing the higher 2% threshold level of average weekly trading volume necessary for an efficient market;

d)  Wilmington regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging

public disclosures, such as communications with the financial press and other similar reporting services;

e) Wilmington was followed by securities analysts employed by major brokerage firms, including Boenning & Scattergood, Inc., Calyon Securities (USA) Inc., Davenport & Company LLC, Keefe, Bruyette & Woods, Inc., Macquarie Capital (USA) Inc., Janney Capital Markets, SunTrust Robinson Murphy, RBC Capital Markets, and Morgan Stanley. Each of these reports was publicly-available and entered the public marketplace;

f) Institutional investors reported owning a majority of all Wilmington Common Stock during the Class Period. From the quarter end of March 31, 2008 to October 31, 2010, institutional holdings of Wilmington Common Stock ranged from 59% to 86% according to Thomson Reuters. This high level of institutional ownership of Wilmington common stock during the Class Period indicates that the market price was reflective of active trading by extremely sophisticated and knowledgeable investors; and

g) As a result of the foregoing, the market for Wilmington common stock promptly digested current information regarding Wilmington from all publicly-available sources and reflected such information in Wilmington's common stock price. Under these circumstances, all purchasers of Wilmington's common stock during the Class Period suffered similar injury through their purchase of Wilmington securities at artificially inflated prices and a presumption of reliance applies.

## XI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

340.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Wilmington and the Officer Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that

the particular forward-looking statement was materially false or misleading.

## XII.   CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### FIRST CLAIM FOR RELIEF
**For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5**
**(Against Defendants Wilmington Trust, Cecala, Foley, Gibson, Harra, And North)**

341.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

342.    During the Class Period, Defendants Wilmington, Cecala, Foley, Harra, Gibson, and North disseminated or approved the false statements specified herein, which they knew or recklessly disregarded were misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and they contained material misrepresentations.

343.    These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Wilmington common stock during the Class Period.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, these Defendants' public statements, concerned, among other things, the Bank's past due and nonperforming loans, Loan Loss Reserve and loan quality, underwriting, asset review, and internal controls.

344.    These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead

Plaintiffs and the Class; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a reckless disregard for the truth; and employed devices, and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, Wilmington's financial results, including but not limited to, Wilmington's past due and nonperforming loans, net income, and Loan Loss Reserve; (ii) artificially inflate and maintain the market price of Wilmington stock; and (iii) cause members of the Class to purchase Wilmington securities at artificially inflated prices.

345.    Defendant Wilmington is liable for all materially false and misleading statements made during the Class Period, as alleged above.

346.    Wilmington is further liable for the false and misleading statements made by Wilmington officers in press releases and during conference calls and at conferences with investors and analysts, as alleged above, as the makers of such statements and under the principle of *respondeat superior*.

347.    M&T is liable to the same extent as Wilmington as a successor in interest.  As set forth in the Agreement and Plan of Merger between Wilmington and M&T, filed on Form 8-K with the SEC on November 2, 2010, all of Wilmington's "claims, obligations, liabilities, debts and duties" shall become the "claims, obligations, liabilities, debts and duties" of the surviving bank.

348.    Defendants Cecala, Foley, Gibson, Harra, and North, as top executive officers of the Bank, are liable as direct participants in the wrongs complained of herein.  Through their

positions of control and authority as officers of the Bank, each of these Defendants was able to and did control the content of the public statements disseminated by Wilmington.   These Defendants had direct involvement in the daily business of the Bank and participated in the preparation and dissemination of the false and misleading statements, set forth in Section V above.

349.   In addition, Defendants Cecala, Foley, Gibson, Harra, and North are liable for, among other material omissions and false and misleading statements, the false and misleading statements they made and/or signed as follows:

i.   Cecala signed the following SEC filings: the 2007 10-K, the 2009 10-K; and certifications in Forms 10-K and Forms 10-Q (for the quarter ended March 31, 2008 through the quarter ended March 31, 2010, including for the years ended December 31, 2007 through 2009).   He also made statements in and was directly responsible for other statements made in Wilmington press releases filed with the SEC on Forms 8-K, including on the following dates: January 18, 2008; April 18, 2008; July 18, 2008; October 17, 2008; January 30, 2009; April 24, 2009; July 17, 2009; July 24, 2009; October 23, 2009; January 29, 2010; April 23, 2010; and June 3, 2010.   He also made statements during numerous conference calls and conferences during the Class Period, including on the following dates: January 18, 2008; October 23, 2009; April 23, 2010; and June 4, 2010.

ii.   Foley signed the following SEC filings: Forms 10-K (for the years ended December 31, 2007 through 2009) and certifications in the Form 10-Q (for the quarter ended June 30, 2010).   He also made statements and was directly responsible for other statements made during conference calls and conferences during the Class Period,

including on the following dates: June 4, 2010 and June 22, 2010.   He also made statements in and was directly responsible for other statements made in the July 23, 2010 Wilmington press release filed with the SEC on a Form 8-K.

iii.      Gibson signed the following SEC filings: Forms 10-K (for the years ended December 31, 2007 through 2009) and certifications in Forms 10-K and Forms 10-Q (for the quarter ended March 31, 2008 through the quarter ended June 30, 2010, including for the years ended December 31, 2007 through 2009).   He also made statements and was directly responsible for other statements made during several conference calls during the Class Period, including on the following dates: October 23, 2009; and July 23, 2010.

iv.      Harra signed the following SEC filings: Forms 10-K (for the years ended December 31, 2007 through 2009) and the Registration Statement (defined infra).

v.      North made statements and was directly responsible for statements made during several conference calls during the Class Period, including on the following dates: April 24, 2009; July 24, 2009; October 23, 2009.

350.   As described above, these Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

351.   Lead Plaintiffs and the Class have suffered damages in that they paid artificially inflated prices for Wilmington common stock.   Lead Plaintiffs and the Class would not have purchased Wilmington common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

352.     As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchases of Wilmington stock during the Class Period.

**SECOND CLAIM FOR RELIEF**
**For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5**
**(Against KPMG)**

353.     Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

354.     This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Lead Plaintiffs and members of the Class against Defendant KPMG.  During the Class Period, Defendant KPMG disseminated or approved false statements in connection with Wilmington's financial statements for the year ending December 31, 2009, including KPMG's unqualified auditor's report dated February 22, 2010, as filed with the SEC in Wilmington's 2009 10-K.

355.     KPMG violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that it: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Wilmington common stock during the Class Period.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, KPMG's public statements, and the financial statements for the Bank for the year ending December 31, 2009 that KPMG opined upon, concerned, among other things, the Bank's past due and nonperforming loans, Loan Loss Reserve, and internal controls.

167

356.     KPMG, individually and in concert with others, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, Wilmington's financial results, including but not limited to, Wilmington's past due and nonperforming loans, net income, and Loan Loss Reserve; (ii) artificially inflate and maintain the market price of Wilmington stock; and (iii) cause members of the Class to purchase Wilmington securities at artificially inflated prices.

357.     As described above, KPMG acted with scienter regarding its unqualified auditor's report in connection with Wilmington's 2009 financial statements.  Specifically, KPMG knew or recklessly disregarded that Wilmington's reported financial results for the year ending December 31, 2009, as filed with the SEC in Wilmington's 2009 10-K and disseminated to the investing public, were materially misstated and were not presented in accordance with GAAP; that KPMG's year-end audits for the year ending December 31, 2009 were not performed in accordance with GAAS; and, therefore, that KPMG's unqualified auditor's report, as included or incorporated by reference in Wilmington's 2009 10-K, were materially false and misleading.

358.     As described above, KPMG acted with scienter in the issuance of its unqualified auditor's report in connection with its audit of Wilmington's 2009 financial statements, in that

KPMG either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  KPMG's 2009 audit amounted to no audit at all because of KPMG's egregious refusal to see the obvious or to investigate the doubtful.

359.     Lead Plaintiffs and the Class have suffered damages in that they paid artificially inflated prices for Wilmington common stock.  Lead Plaintiffs and the Class would not have purchased Wilmington common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by KPMG's misleading statements.

360.     As a direct and proximate result of KPMG's wrongful conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchases of Wilmington Stock during the Class Period.

### THIRD CLAIM FOR RELIEF
**For Violations Of Section 20(a) Of The Exchange Act**
**(Against Defendants Cecala, Foley, Gibson, Harra, And North)**

361.     Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

362.     This Count is asserted against Defendants Cecala, Foley, Gibson, Harra, and North for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

363.     As alleged in detail above, Wilmington committed a primary violation of the federal securities laws through its knowing and/or reckless dissemination of materially false and misleading statements and omissions throughout the Class Period.

364.     During their tenures as officers and/or directors of Wilmington, each of these Defendants was a controlling person of Wilmington within the meaning of Section 20(a) of the

Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Wilmington, these Defendants had the power and authority to cause Wilmington to engage in the wrongful conduct complained of herein.  As set forth in detail above, the Defendants named in this Count were able to and did control, directly and indirectly, and exert control over Wilmington, including the content of the public statements made by Wilmington during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

365.    In their capacities as senior corporate officers of the Bank, and as more fully described above, Defendants Cecala, Foley, Gibson, Harra, and North had direct involvement in the day-to-day operations of the Bank and in Wilmington's financial reporting and accounting functions.  Each of these Defendants was also directly involved in providing false information and certifying and/or approving the false financial statements disseminated by Wilmington during the Class Period.  Further, as detailed above, Defendants Cecala, Foley, Gibson, Harra, and North had direct involvement in the presentation and/or manipulation of false financial reports included within the Bank's press releases and filings with the SEC.

366.    Defendant Cecala served as Wilmington's Chairman of the Board from 1996 until July 19, 2010.  In addition, Defendant Cecala served as Wilmington's CEO from 1996 until June 3, 2010.  In this dual capacity as the senior manager of the Bank and as the head of the Board, Defendant Cecala had ultimate control over the actions of Wilmington.

367.    Defendant Foley served as Wilmington's Chairman of the Board since July 19, 2010 and as CEO since June 3, 2010.  In addition, Defendant Foley served as a director of Wilmington since July 2006.  In this dual capacity as the senior manager of the Bank and as the head of the Board, Defendant Foley had ultimate control over the actions of Wilmington.

368.    Defendants Cecala, Foley, Gibson, Harra, and North all received various written and oral reports from different divisions of the Bank on a routine basis.  The Officer Defendants' knowledge of and participation in the Bank's affairs through the various reports they received and/or had access to are described in Sections III & VI above.

369.    By reason of their positions as officers of Wilmington, and more specifically as controlling officers – as can be seen by their corresponding ability to influence and control Wilmington – each of these Defendants is a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and activities of the Bank and its employees, and to cause the Bank to engage in the unlawful conduct complained of herein.  Because of their positions, these Defendants had access to adverse nonpublic financial information about the Bank and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.  Moreover, each of the Defendants was also involved in providing false information and certifying and/or approving the false financial statements disseminated by Wilmington during the Class Period. Each of these Defendants was provided with or had access to copies of the Bank's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

370.    As set forth above, Wilmington violated Section 10(b) of the Exchange Act by its acts and omissions alleged in this Complaint.  By virtue of their positions as controlling persons of Wilmington and as a result of their own aforementioned conduct, the Defendants named in this Count are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Bank is liable under Section 10(b) of the Exchange Act and Rule

10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class who purchased or otherwise acquired Wilmington securities.

371.  As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchase or acquisition of Wilmington stock.

## FOURTH CLAIM FOR RELIEF
### For Violations Of Section 20(a) Of The Exchange Act
### (Against Audit Committee Defendants)

372.  Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

373.  This Count is asserted against the Audit Committee for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

374.  During their tenure as directors of Wilmington, each of these Defendants was a controlling person of Wilmington within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as directors and Audit Committee members of Wilmington, these Defendants had the power and authority to cause Wilmington to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Wilmington during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

375.  Wilmington maintains an Audit Committee composed of certain Board members that reports to Wilmington's full Board of Directors.  As detailed in Section II.B.2 above, at some time during the Class Period, Defendants Burger, Elliott, Foley, Krug, Mobley, Rollins, Roselle, Sockwell, Tunnell and Whiting (the "Audit Committee Defendants") each participated as a member of the Audit Committee.

376.  As set forth below, each of these Defendants had the power to control and/or

172

influence the particular practices and conduct giving rise to the securities violations alleged herein, and exercised the same.  In their capacities as directors of Wilmington, during their tenure these Defendants each signed the Bank's Forms 10-K for the years ended December 31, 2007 through December 31, 2009, the Offering Documents (as defined below in ¶388) and/or the Registration Statement (as defined below in ¶388), and therefore had the power and authority to control the statements made in such filings.

377.    As a result, these Defendants, as a group and individually, were controlling persons within the meaning of Section 20(a) of the Exchange Act.

<u>The Audit Committee</u>

378.    According to Wilmington's Proxy Statements for 2007 through 2009, the Audit Committee performed the following functions: (i) monitored the quality and integrity of the Bank's accounting policies, financial statements, disclosure practices, and compliance with legal and regulatory requirements; (ii) oversaw the independence and performance of the Bank's internal auditor and independent registered public accounting firm; (iii) reviewed reports of governmental agencies; and (iv) prepared a report on audit matters and recommended that report be filed with the SEC.

379.    According to the Audit Committee Charter, the Audit Committee shall meet with management and the independent auditor to review and discuss the quarterly report on Form 10-Q and the annual report on Form 10-K, including: the Bank's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations," the annual financial statements and the report of the independent auditor thereon, any audit problems or difficulties and management's response, and significant financial reporting issues and judgments made in connection with the preparation of the of the Bank's financial statements.  The Audit Committee

shall also discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and ratings agencies.

380.    In addition, the Audit Committee Charter states that with regard to risk management, the Committee shall, among other things, meet periodically with management to review the Bank's major financial risk exposure and steps taken to monitor and control such exposure and discuss the Bank's policies with respect to risk assessment and risk management.

381.    As a result of their positions as Audit Committee members, over and above their positions as Board members, each of the Audit Committee Defendants is liable as a control person of Wilmington within the meaning of Section 20(a) of the Exchange Act.

382.    By reason of their positions as directors of Wilmington, and more specifically as members of the Audit Committee, each of the Audit Committee Defendants is a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and activities of the Bank and its employees, and to cause the Bank to engage in the unlawful conduct complained of herein.  Because of their positions, these Defendants had access to adverse nonpublic financial information about the Bank including, among others things, its risk management practices, and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.  Specifically, the Audit Committee Defendants received and acted to conceal, or knowingly or recklessly authorized and approved the concealment of, repeated criticisms by the Federal Reserve, Internal Audit function, and KPMG regarding the Bank's asset review and internal controls, including Internal Audit's 2007 annual reports, KPMG's 2007 management letter and 2008 audit report, and the Federal Reserve's 2007 and 2008 reports.  In light of the repeated warnings year after year of the Bank's inadequate asset review and internal control deficiencies, these Defendants were aware

that these critical failings continued unremedied.

383.   In the wake of the MOU and as of at least the fourth quarter of 2009, the Audit Committee received direct reports from the Credit Risk Management division, including in particular reports about the Loan Loss Reserve and loan loss provisioning, and acted to conceal this information, or knowingly or recklessly authorized and approved its concealment. Moreover, as members of the Board and, thus, self-appointed members of the compliance committee charged with enforcing compliance with the MOU, the Audit Committee Defendants exercised control over the Bank's scheme to conceal the serious deficiencies within the Bank's lending, risk management, and accounting functions in the aftermath of the MOU.

384.   As control persons of Wilmington, the Audit Committee had the power and influence to direct management to remedy these critical failings.  As demonstrated by the MOU, M&T's findings, and the fire-sale to M&T, the Audit Committee did not do so.  Rather, the Audit Committee allowed the Bank to engage in the unlawful conduct complained of herein.

385.   As set forth above, Wilmington violated Section 10(b) of the Exchange Act by its acts and omissions alleged in this Complaint.  By virtue of their positions as controlling persons of Wilmington and as a result of their own aforementioned conduct, the Audit Committee are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Bank is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Wilmington securities.  Moreover, for the time that each Defendant served as a director of Wilmington, each of these Defendants is culpable for the material misstatements and omissions made by Wilmington, including such misstatements in the Bank press releases, Forms 10-K, Forms 10-Q, and the Offering Documents.

386.     As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchase or acquisition of Wilmington stock.

## XIII.   SECURITIES ACT CLAIMS

387.     In this part of the Complaint, Lead Plaintiffs assert a series of strict liability and negligence claims based on the Securities Act on behalf of the Class (as defined in ¶476 below, except that Lead Plaintiffs explicitly disclaim subparts [d] and [e] of ¶478 from these Securities Act allegations).   Lead Plaintiffs expressly disclaim any allegations of knowing or reckless misconduct, and to avoid an (unfounded) argument by Defendants that the claims below somehow "sound in fraud," it is necessary to state or summarize facts also stated above.

388.     On February 23, 2010, the Bank conducted an offering to the public of 21,706,250 shares of common stock at an offering price of $13.25 per share, raising $273.9 million (the "Offering").

389.     The Offering was conducted pursuant to a Form S-3ASR  Registration Statement filed with the SEC on November 29, 2007 (Registration No. 333-147694), which was later amended by, *inter alia*, Post-Effective Amendment No. 2 to Registration No. 333-147694 filed with the SEC on January 12, 2009 (collectively, the "Registration Statement"); a Prospectus filed with the SEC on a Form 424B3 dated January 12, 2009 (the "Prospectus"); and a Prospectus Supplement filed with the SEC on a Form 424B5 dated February 23, 2010 (the "Prospectus Supplement," together with the Registration Statement and Prospectus, the "Offering Documents").[71]

390.     The Offering Documents incorporated by reference the Bank's 2007 10-K, the

---

[71] *See* Ex. 31 (Shelf Registration Statement filed on Form S-3ASR dated Nov. 29, 2007); Ex. 32 (Post-Effective Amendment No. 2 to Automatic Shelf Registration Statement filed on Form POSASR dated Jan. 12, 2009); Ex. 33 (Prospectus Supplement (to Prospectus dated Jan. 12, 2009) dated Feb. 23, 2010).

First Quarter 2008 10-Q, the Second Quarter 2008 10-Q, the Third Quarter 2008 10-Q, the 2008 10-K, the First Quarter 2009 10-Q, the Second Quarter 2009 10-Q, the Third Quarter 2009 10-Q, and the 2009 10-K.[72]

391.    As a result, the Offering Documents contained untrue statements of material fact and omitted to state material facts required to make the statements therein not misleading.

### A.    Securities Act Defendants

392.    Each of the following Defendants is statutorily liable under Sections 11, 12 and/or 15 of the Securities Act for the materially untrue statements contained in and incorporated in the Offering Documents.  These Defendants are termed the "Securities Act Defendants."

### 1.    The Wilmington Defendants

393.    Defendant Wilmington (described above at ¶¶31-34) was the issuer of the common stock offered pursuant to the Offering.

394.    Defendants Cecala, Foley, Harra, and Gibson (described above at ¶¶ 35-40) were each officers of Wilmington and signed the Bank's Registration Statement, as well as the 2007, 2008, and 2009 Forms 10-K, which were incorporated into the Offering Documents. Defendants Cecala and Gibson also signed each of the Bank's Forms 10-Q, which were incorporated into the Offering Documents. Defendants Cecala, Foley, and Harra were also members of the Board at the time of the filing of the Offering Documents.

395.    Defendant Kevyn N. Rakowski ("Rakowski") served as Senior Vice President and Controller of the Bank since 2006 and signed the Bank's Registration Statement, as well as the

---

[72] In addition to enumerating by name certain of these SEC filings as having been "incorporated by reference," the Registration Statement also expressly represented that "[a]ll documents [Wilmington] file[s] pursuant to Section 13(a), 13(c), 14, or 15(d) of the Exchange Act after the date of this [Registration Statement] and before all of the securities offered by this prospectus are sold are incorporated by reference."  Here, all of the Bank's Forms 10-Q and Forms 10-K were filed pursuant to either Section 13 or Section 15(d) of the Exchange Act.

2007, 2008, and 2009 Forms 10-K, which were then incorporated into the Offering Documents.

396.    Defendants Burger, Elliott, Krug, Mobley, Rollins, Sockwell, Tunnell, and Whiting (described above at ¶¶42-50), were each Directors of Wilmington at the time of the filing of the Offering Documents and signed the Bank's Registration Statement, as well as the 2007, 2008, and 2009 Forms 10-K, which were then incorporated into the Offering Documents.

397.    Defendant Rex L. Mears ("Mears") was a director of the Bank since 1992 and was a member of the Board at the time of the filing of the Offering Documents.  Mears also signed the Bank's Registration Statement and its two Amendments, as well as the 2007, 2008, and 2009 10-Ks, which were then incorporated into the Offering Documents.

398.    Defendant Thomas DuPont ("DuPont"), who was a Director from 2006 through October 2009, and Roselle (described above at ¶47), former Wilmington Directors, signed the Bank's Registration Statement and the Bank's 2007 and 2008 10-Ks, both of which were then incorporated into the Offering Documents.  The Registration Statement was effective when Defendant DuPont resigned as a Wilmington Director in October 2009 and he did not disavow his liability as a signatory of the Registration Statement when he left the Bank, as required by Section 11(b) of the Securities Act, by advising the SEC and Wilmington "in writing" that "he would not be responsible for . . . the registration statement" following his resignation.

399.    Defendant Louis Freeh ("Freeh") served as a Director of the Bank beginning in 2009.  Freeh signed the 2009 10-K which was incorporated into the Offering Documents and was also a member of the Board at the time of the filing of the Prospectus.

## 2.    The Outside Auditor Defendant

400.    Defendant KPMG (described above in ¶51), was Wilmington's outside auditor during the Class Period.  Of particular relevance to the Securities Act claims, under the caption "Experts" in the Offering Documents, the Bank stated that its "consolidated financial statements

as of December 31, 2009 and 2008, and for each of the years in the three-year period ended

December 31, 2009, and management's assessment of the effectiveness of internal control over

financial reporting as of December 31, 2009," were "incorporated by reference herein in reliance

upon the reports of KPMG LLP, an independent registered public accounting firm, and upon the

authority of said firm as experts in accounting and auditing."

### 3.     The Underwriter Defendants

401.    J.P. Morgan Securities ("J.P. Morgan") is an investment bank and acted as a joint

book-running manager and underwriter for the Offering.  J.P. Morgan sold and distributed a total

of 13,457,875 shares to the investing public.  J.P. Morgan was paid at least $8.46 million for its

underwriting services.  Its headquarters are located at 270 Park Avenue, New York, NY 10017.

402.    Keefe, Bruyette & Woods, Inc. ("KBW") is an investment bank and acted as a

joint book-running manager and underwriter for the Offering.   KBW sold and distributed

8,248,375 shares to the investing public.  KBW was paid at least $5.1 million for its underwriting

services.  Its headquarters are located at 787 Seventh Avenue, New York, NY 10019.

### B.     The Offering Documents Misstated Past Due And Nonperforming Loans

403.    The Offering Documents misstated the Bank's past due and nonperforming loans.

Specifically, the Bank's 2007 10-K, the First Quarter 2008 10-Q, the Second Quarter 2008 10-Q,

the Third Quarter 2008 10-Q, the 2008 10-K, the First Quarter 2009 10-Q, the Second Quarter

2009 10-Q, the Third Quarter 2009 10-Q, and the 2009 10-K – all of which were incorporated by

reference into the Offering Documents – each contained representations about the Bank's

commercial loans that were: (i) in "serious doubt," including loans that were 30-89 days past

due; (ii) 90 days or more past due and still accruing interest income for the Bank; and/or (iii)

"nonperforming" or "nonaccruing" loans, including loans that were 90 days or more past due and

not accruing interest income for the Bank.  As set forth in the Criminal Information, the Bank

failed to report the true amount of its past due loans during the Class Period.   The Criminal Information specifically confirms that the Bank's 2009 10-K, which was incorporated into the Proxy Statement for the Offering did not include the Bank's true past due number and was therefore false, stating:

> The total amount of past due loans not reported as of December 31, 2009, because they were listed on internal Bank documents as having been "waived," were in excess of $373,000.000.   This total included loan values in excess of $43,000,000 that were 30-89 days past due [serious doubt loans], and approximately $330,000,000 in loans that were at least 90 days – and up to 1,280 days – past due.  . . .The Bank utilized the December 31, 2009 past due loan figures in its 2009 Form 10-K, filed with the SEC in February 2010.   That Form 10-K was the basis for the Bank's proxy statement submitted in connection with [the Offering].

### 1.   Serious Doubt Loans In 2007-2009

404.   The specific amounts by which Wilmington materially understated its commercial serious doubt loans at December 31, 2008 and on a quarterly basis during 2009 are set forth in the chart below (in millions):

|  | Reported Total Commercial Serious Doubt Loans[73] | Concealed Total Commercial Serious Doubt Loans | Dollar Amount Of Commercial Serious Doubt Loans The Bank Should Have Reported | Percentage of Understatement |
|---|---|---|---|---|
| 4Q08 | $106.3[74] | $34.0[75] | $140.3 | 31.98% |
| 1Q09 | $48.1[76] | $140.0 | $188.1 | 291.06% |
| 2Q09 | $52.7[77] | $46.0 | $98.7 | 87.29% |
| 3Q09 | $64.1[78] | $112.0 | $176.1 | 174.73% |
| 4Q09 | $51.1[79] | $43.0 | $94.1 | 84.15% |

405.    In addition, the Bank reported the following Total Commercial Serious Doubt Loans for the fourth quarter of 2007 and the first three quarters of 2008: $11.3 million (4Q07);[80] $43.4 million (1Q08);[81] $16.4 million (2Q08);[82] and $35.4 million (3Q08).[83]   The Criminal Information confirms that amounts were materially understated by the start of the Class Period and provides the following information about these time periods (using the quarters in 2009 as a starting point):

---

[73] "Total Commercial Serious Doubt Loans" refers to the combined total of serious doubt loans in the Bank's commercial loan segments as reported in the Bank's SEC filings – Commercial Financial & Agriculture, Commercial Real Estate – Construction, and Commercial Mortgage – and excludes the Residential Mortgage and Consumer and Other Retail segments.

[74] Ex. 1 at 50 (Form 10-K for the year ending Dec. 31, 2008, dated Mar. 2, 2009 ("2008 10-K").

[75] *See* n.15 *supra*.

[76] Ex. 2 at 71 (First Quarter 2009 10-Q).

[77] Ex. 3 at 92 (Second Quarter 2009 10-Q).

[78] Ex. 4 at 146 (Third Quarter 2009 10-Q).

[79] Ex. 5 at 56 (2009 10-K).

[80] Ex. 6 at 49 (2007 10-K).

[81] Ex. 7 at 54 (First Quarter 2008 10-Q).

[82] Ex. 8 at 81 (Second Quarter 2008 10-Q).

[83] Ex. 9 at 84 (Third Quarter 2008 10-Q).

- As of March 31, 2009, the Bank failed to report approximately $46 million of loans that were between 30 days and 1,126 days past due.  Thus, the Bank failed to report certain of these loans as past due by between 30-89 days for the reporting periods starting no later than <u>April 1, 2006.</u>

- As of June 30, 2009, the Bank failed to report approximately $188 million of loans that were between 30 days and 699 days past due.  Thus, the Bank failed to report certain of these loans as past due by between 30-89 days for the reporting periods starting no later than <u>September 1, 2007</u>.

- As of September 30, 2009, the Bank failed to disclose approximately $351 million of loans that were between 30 days and 791 days past due.  Thus, the Bank failed to report certain of these loans as past due by between 30-89 days for the reporting periods starting no later than <u>September 1, 2007.</u>

- As of December 31, 2009, the Bank failed to disclose approximately $330 million of loans that were between 30 days and 1,280 days past due.  Thus, the Bank failed to report certain of these loans as past due by between 30-89 days for the reporting periods starting no later than <u>September 30, 2006</u>.

### 2.       Loans 90 Days+ Past Due In 2007-2009

406.    In addition, the Offering Documents misstated the Bank's reported amount of commercial loans that were past due by 90 days or more, as reported in two distinct categories: nonaccruing loans (also referred to as nonperforming) and accruing commercial loans. Specifically, the  Criminal Information quantifies the extent to which the Bank's fourth quarter 2008 and 2009 nonaccruing and accruing commercial loans past due 90 days or more statements were materially misstated.  The specific amounts are set forth in the chart below (in millions):

| | Total Reported Nonaccruing & Accruing Commercial Loans 90 days+ Past Due[84] | Undisclosed Nonaccruing & Accruing Commercial Loans 90 days+ Past Due | Dollar Amount Of Nonaccruing & Accruing Commercial Loans 90 days+ Past Due The Bank Should Have Reported | Percentage Of Understatement |
|---|---|---|---|---|
| 4Q08 | $190.4[85] | $71.0 | $261.4 | 37.2% |
| 1Q09 | $217.20[86] | $46.00 | $263.20 | 21.18% |
| 2Q09 | $284.40[87] | $188.00 | $472.40 | 66.1% |
| 3Q09 | $347.50[88] | $351.00 | $698.50 | 101.01% |
| 4Q09 | $425.60[89] | $330.00 | $755.60 | 77.54% |

407.    In addition, the Bank reported the following Total Nonaccruing & Accruing Commercial Loans 90 days+ Past Due for the fourth quarter of 2007 and the first three quarters of 2008: $40.1 million (4Q07);[90] $47.7 million (1Q08);[91] $65.7 million (2Q08);[92] and $91.8 million (3Q08).[93]   The Criminal Information confirms that these amounts were materially understated by the start of the Class Period and provides the following information about these time periods (using the quarters in 2009 as a starting point):

---

[84] "Total Reported Nonaccruing & Accruing Commercial Loans 90 days+ Past Due" refers to the combined total of reported nonaccruing loans past due 90 days or more and reported accruing loans past due 90 days or more in the Bank's commercial loan segments as reported in the Bank's SEC filings – Commercial Financial & Agriculture, Commercial Real Estate – Construction, and Commercial Mortgage – and excludes the Residential Mortgage and Consumer and Other Retail segments.

[85] Ex. 10 at 15 (Jan. 30, 2009 press release); Ex. 1 at 50 (2008 10-K).

[86] Ex. 11 at 11 (Apr. 24, 2009 press release); Ex. 2 at 69-70 (First Quarter 2009 10-Q).

[87] Ex. 12 at 13-14 (July 24, 2009 press release); Ex. 3 at 91-92 (Second Quarter 2009 10-Q).

[88] Ex. 13 at 12 (Oct. 23, 2009 press release); Ex. 4 at 143-45 (Third Quarter 2009 10-Q).

[89] Ex. 14 at 12-13 (Jan. 29, 2010 press release); Ex. 5 at 55 (2009 10-K).

[90] Ex. 15 at 16 (Jan. 18, 2008 press release); Ex. 6 at 47-48 (2007 10-K).

[91] Ex. 16 at 13 (Apr. 18, 2008 press release); Ex. 7 at 53 (First Quarter 2008 10-Q).

[92] Ex. 17 at 15-16 (July 18, 2008 press release); Ex. 8 at 78-80 (Second Quarter 2008 10-Q).

[93] Ex. 18 at 13-14 (Oct. 17, 2008 press release); Ex. 9 at 81-83 (Third Quarter 2008 10-Q).

- As of March 31, 2009, the Bank failed to report approximately $46 million of loans that were at least 90 days past due and up to 1,126 days past due. Thus, the Bank failed to report certain of these loans as past due by at least 90 days for the reporting periods starting no later than <u>June 1, 2006.</u>

- As of June 30, 2009, the Bank failed to report approximately $188 million of loans that were at least 90 days past due and up to 699 days past due. Thus, the Bank failed to report certain of these loans as past due by at least 90 days for the reporting periods starting no later than <u>November 1, 2007</u>.

- As of September 30, 2009, the Bank failed to disclose approximately $351 million of loans that were at least 90 and up to 791 days past due. Thus, the Bank failed to report certain of these loans as past due by at least 90 days for the reporting periods starting no later than <u>November 1, 2007.</u>

- As of December 31, 2009, the Bank failed to disclose approximately $330 million of loans that were at least 90 and up to 1,280 days past due. Thus, the Bank failed to report certain of these loans as past due by at least 90 days for the reporting periods starting no later than <u>November 30, 2006</u>.

### 3. Additional False Statements In The Offering Documents Regarding The Bank's Past Due Loans In The Fourth Quarter Of 2009

408. The Offering Documents were also false because the Bank failed to disclose approximately $1.744 billion in past due or soon-to-be past due matured loans that were "mass extended" in the fourth quarter of 2009 (and into early 2010). As set forth in the Criminal Information, starting in the fall of 2009 and continuing through at least the first quarter of 2010, the Bank extended – without obtaining appraisals as required by federal regulations and the Bank's internal Appraisal Policy – more than 1,250 loans totaling at least <u>$1.744 billion</u> – an amount that totaled <u>25%</u> of the Bank's outstanding commercial loan balance as of December 31, 2009. Specifically, in the fourth quarter of 2009, Wilmington extended 803 past due and soon-to-be past due loans worth approximately <u>$1.312 billion</u>. The Criminal Information confirms that the "mass extension" excluded these past due and soon-to-be past due loans from being reported or otherwise accounted for as past due or nonperforming loans, when these loans should have been. While the Criminal Information does not provide data sufficient to precisely apportion the amount of "mass extended" loans that should have been recorded as serious doubt

184

loans, nonaccruing loans, or loans past due by 90 days or more, the Criminal Information makes clear that a material portion of the "mass extended" loans should have been reported in one of those categories in the fourth quarter of 2009, and thus in the 2009 10-K.  Accordingly, the amounts reported in the fourth quarter of 2009 for serious doubt loans and nonaccruing loans, or loans past due by 90 days or more during the fourth quarter of 2009 were materially false for this reason as well.

### 4. Additional False Statements In Forms 10-K Regarding The Bank's Methodology For Calculating Past Due Loans

409.   Furthermore, the Offering Documents falsely described the Bank's methodology for calculating nonaccruing loans and loans past due 90 days or more.  In Wilmington's 2007 and 2008 10-Ks, the Bank falsely described its methodology for calculating nonaccruing loans and loans past due 90 days or more, stating: "We generally place loans, including those determined impaired under SFAS No. 114, "Accounting by Creditors for Impairment of a Loan," on nonaccrual status after they have become 90 days past due."[94]   Similarly, in Wilmington's 2009 10-K, the Bank falsely described its methodology for calculating nonaccruing loans and loans past due 90 days or more, stating: "We generally place commercial and residential mortgage loans, including those determined to be impaired under ASC 310, "Receivables," on nonaccrual status when they have become more than 90 days past due," and expressly noting that ASC 310 incorporated SFAS No. 114, "Accounting by Creditors for Impairment of a Loan."[95] The preceding underlined statements were false because, as set forth in the Criminal Information, the Bank did not place loans on nonaccrual status after they became 90 days past due, as required

---

[94] Ex 6 at 80 (2007 10-K); Ex 1 at 84 (2008 10-K).

[95] Ex 5 at 52, 81 (2009 10-K).

by SFAS No. 114 and ASC 310.  Moreover, Regulation S-K Items 801 and 802, SEC Industry Guide 3, addresses "Statistical disclosure by bank holding companies," and requires that "nonaccrual, past due and restructured loans" must be accounted for "at the end of each reported period."  SEC Industry Guide 3 states specifically that "[n]o loans shall be excluded from the amounts presented."  However, as set forth above, the Bank failed to report hundreds of millions of loans that were past due by more than 90 days for months (and even years).

### C.   The Offering Documents Misstated Wilmington's Loan Loss Reserve And Net Income

410.    The Offering Documents materially misstated the Bank's net income, Loan Loss Reserve, and provision for loan losses.  The SEC filings incorporated by reference into the Offering Documents reported the following:

| | Reported Net Income | Reported Loan Loss Provision | Reported Loan Loss Reserve |
|---|---|---|---|
| **4Q07**[96] | $44.0 | $9.2 | $101.1 |
| **1Q08**[97] | $41.4 | $10.0 | $106.4 |
| **2Q08**[98] | ($19.5) | $18.5 | $113.1 |
| **3Q08**[99] | $22.9 | $19.6 | $122.2 |
| **4Q08**[100] | ($68.5) | $67.5 | $157.1 |
| **1Q09**[101] | $21.8 | $29.5 | $167.0 |
| **2Q09**[102] | ($9.1) | $54.0 | $184.9 |
| **3Q09**[103] | ($5.9) | $38.7 | $201.8 |
| **4Q09**[104] | ($11.2) | $82.8 | $251.5 |
| **1Q10**[105] | ($29.2) | $77.4 | $299.8 |

411.    These figures were materially false because, as set forth above, the Bank's accounting procedures did not comply with GAAP, which led the Bank to under-reserve for loan losses and overstate its net income.

412.    Specifically, as detailed in the Criminal Information, these financial results were materially false because, in violation of GAAP, the Bank's Loan Loss Reserve did not reflect the true state of the Bank's past due and nonperforming loans.   Indeed, according to the Criminal Information, the Bank did not properly classify or report hundreds of millions of dollars in past

[96] Ex. 15 at 1, 8, 13 (Jan. 18, 2008 press release); Ex. 6 at 46, 70, 71 (2007 10-K).

[97] Ex. 16 at 1, 8, 10 (Apr. 18, 2008 press release); Ex. 7 at 1, 4-5 (First Quarter 2008 10-Q).

[98] Ex. 17  at 1-3 (July 18, 2008 press release); Ex. 8 at 1, 3-4 (Second Quarter 2008 10-Q).

[99] Ex. 18  at 1, 3 (Oct. 17, 2008 press release); Ex. 9 at 3, 4, 18 (Third Quarter 2008 10-Q).

[100] Ex. 10 at 1, 4 (Jan. 30, 2009 press release); Ex. 1 at 63, 72-73 (2008 10-K).

[101] Ex. 11 at 1, 2 (Apr. 24, 2009 press release); Ex. 2 at 1, 5 (First Quarter 2009 10-Q).

[102] Ex. 23 at 1 (July 17, 2009 press release); Ex. 12 at 1, 3 (July 24, 2009 press release); Ex. 3 at 1, 3, 4 (Second Quarter 2009 10-Q).

[103] Ex. 13 at 1, 2 (Oct. 23, 2009 press release); Ex. 4 at 1, 3, 4 (Third Quarter 2009 10-Q).

[104] Ex. 14 at 1, 2 (Jan. 29, 2010 press release); Ex. 5 at 66-67 (2009 10-K).

[105] Ex. 19 at 1, 2 (Apr. 23, 2010 press release); Ex. 20 at 1, 3, 4 (First Quarter 2010 10-Q).

due and nonperforming loans in order to avoid updating its appraisals to account for then-current market conditions, which were "dropping substantially" and, as set forth in an April 8, 2009 internal Bank email, would have had the "near term potential for catastrophic consequences," including consequences on the Bank's Loan Loss Reserve.

413.    In fact, as explained in the Criminal Information, "updated appraisals would have required [Wilmington] to recognize losses on the [loan] credits and would have had a negative impact on [the Bank's] Allowance for Loan and Lease Losses [(also referred to as its Reserve for Loan Losses)]." Thus, because the Bank failed to obtain required appraisals and reflect the true amount of its past due and nonperforming loans in calculating its Loan Loss Reserve – factors required to be considered by GAAP when setting loan loss reserves – the Bank's Loan Loss Reserve was materially understated and its net income was materially overstated.

414.    Indeed, M&T's independent review of Wilmington's commercial loan portfolio confirmed that the Bank materially understated its reserve by hundreds of millions of dollars. Specifically, as discussed at ¶¶163-76, M&T, which examined Wilmington's commercial loan portfolio dating back to January 1, 2008, determined that the Bank had materially understated its Loan Loss Reserve by nearly $800 million, and thereby overstated its net income, as set forth in the following chart (in millions):

|  | Reported Net Income | Corrected Net Income Using M&T's Analysis | Percentage Of Net Income Inflation |
|---|---|---|---|
| 1Q08 | $41.4 | $28.1 | 32% |
| 2Q08 | ($19.5) | ($44.0) | 126% |
| 3Q08 | $22.9 | ($3.1) | 114% |
| 4Q08 | ($68.5) | ($157.9) | 131% |
| 1Q09 | $21.8 | ($17.3) | 179% |
| 2Q09 | ($9.1) | ($80.8) | 788% |
| 3Q09 | ($5.9) | ($57.3) | 871% |
| 4Q09 | ($11.2) | ($121.1) | 981% |
| 1Q10 | (29.2) | (131.9) | 352% |

415.    In addition to reporting these false financial results, throughout the Class Period,

the Offering Documents also falsely described the Bank's methodology for reserving for loan losses.  First, in its 2007 10-K, the Bank described the Bank's Loan Loss Reserve methodology as follows:

> We establish a reserve for loan losses in accordance with GAAP by charging a provision for loan losses against income. . . .  In calculating the reserve, we consider micro- and macro-economic factors, historical net loss experience, current delinquency trends, movements within internal risk rating classifications, and other factors.[106]

416.   The preceding underlined statement was false and misleading because the Bank's reserving methodology was not compliant with GAAP and the Bank did not consider micro- and macro-economic factors, historical net loss experience, current delinquency trends, movements within internal risk rating classifications, or other factors.  Specifically, as discussed in the Criminal Information, the Bank's reserving methodology failed to account for the Bank's "historical net loss experience" and "current delinquency trends" because the Bank failed to consider the hundreds of millions of dollars of past due and nonperforming loans that had been removed from the Bank's financial statements, rendering the Bank's statements about its reserving methodology false and misleading.  Moreover, the Bank's reserving methodology at the time these statements were made was based exclusively on the Bank's inaccurate loan risk ratings, and did not take into account the factors required by GAAP, including economic trends and borrowers' current and projected ability to pay.  ¶163.   Thus, the Bank's simplistic methodology did not adequately assess the possibility of repayment or reflect the losses that the Bank had incurred.  According to the former head of the Bank's Credit Risk Management Division, who was in charge of setting the Loan Loss Reserve during the Class Period, this methodology was "not compliant" with GAAP.  ¶167.

---

[106] Ex. 6 at 80 (2007 10-K).

417.    After the Bank modified its loan loss methodology in the fourth quarter of 2008, the Bank began to describe its methodology in its SEC filings as follows:

> We establish a reserve for loan losses in accordance with GAAP by charging a provision for loan losses against income. . . . In calculating the reserve, we consider micro- and macro-economic factors, historical net loss experience, current delinquency trends, movements within internal risk rating classifications, and other factors.
>
> We made several enhancements to our reserve methodology in 2008:
>
> - We expanded the use of historical losses to determine appropriate reserve levels.
> - We added qualitative factors, such as general economic conditions, loan concentrations, and other factors, to the criteria we use to assign reserve levels.
>
> We reclassified a portion of the reserve to a separate liability account to create a reserve for unfunded loan commitments, mainly letters of credit.[107]

418.    This description of the Bank's modified loan loss methodology was false because, as described in the Criminal Information, the Bank had removed hundreds of millions of dollars of its past due and nonperforming loans from its financial statements.  In addition, the Bank's reserving methodology did not comply with GAAP because:

a)   According to CW 1, the Bank's new methodology continued to rely almost exclusively on the Bank's inaccurate loan ratings – ratings that were assigned by the Bank's lenders, who were financially penalized for downgrading loan risk and had absolute discretion to monitor the creditworthiness of their clients as opposed to the Bank's credit specialists.

b)   According to CW 2, the Bank failed to adequately consider the rapidly deteriorating state of the economy because its new method was based on an improper assumption that "qualitative" factors should not exceed a certain arbitrary and small percentage of the Bank's overall Loan Loss Reserve.

c)   In September 2009, the Federal Reserve recognized the inadequacy of the Bank's reserve methodology when it issued the MOU to the Bank, requiring Wilmington to "fully fund [the Loan Loss Reserve] considering additional adversely classified credits from the updated internal loan rating system" and to "maintain an adequate ALLL [Loan Loss Reserve] consistent with GAAP and regulatory policies and guidance."

---

[107] Ex. 1 at 84 (2008 10-K).

419.    Finally, in the Bank's annual and quarterly SEC filings throughout the Class Period, the Bank stated that its financial reporting complied with GAAP:

> We maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles and reporting practices prescribed for the banking industry.[108]

Similarly, in the Bank's annual and quarterly SEC filings throughout the Class Period, Defendants Cecala and Gibson each falsely certified that the Bank's financial statements were accurate and fairly presented the Bank's financial condition, certifying in pertinent part:

> 1. I have reviewed this annual report on Form 10-K of Wilmington Trust Corporation;
>
> *          *          *
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.][109]

420.    These certifications of the Bank's GAAP compliance and financial statements were false because, as discussed immediately above at ¶¶415-18 the Bank's reserving methodologies did not comply with GAAP and led the Bank to materially understate its Loan Loss Reserve and overstate its net income.

## D.    The Offering Documents Misstated The Bank's Underwriting

421.    The Offering Documents also made false statements about the Bank's

---

[108] This statement was repeated in substantially identical form in Ex. 6 at 60 (2007 10-K); in Ex. 7 at 7 (First Quarter 2008 10-Q); Ex. 8 at 9 (Second Quarter 2008 10-Q); Ex. 9 at 9 (Third Quarter 2008 10-Q); Ex. 1 at 61 (2008 10-K); Ex. 2 at 6 (First Quarter 2009 10-Q); Ex. 3 at 8 (Second Quarter 2009 10-Q); Ex. 4 at 153 (Third Quarter 2009 10-Q); Ex. 5 at 60 (2009 10-K); and Ex. 20 at 8 (First Quarter 2010 10-Q).

[109] This certification was signed by Defendants Cecala and Gibson and was repeated in substantially identical form at the conclusion of: Ex. 6 (2007 10-K); Ex. 7 at 63 (First Quarter 2008 10-Q); Ex. 8 at 92 (Second Quarter 2008 10-Q); Ex. 9 at 95 (Third Quarter 2008 10-Q); Ex. 1 (2008 10-K); Ex. 2 (First Quarter 2009 10-Q; Ex. 3 (Second Quarter 2009 10-Q); Ex. 4 (Third Quarter 2009 10-Q); Ex. 5 (2009 10-K); Ex. 20 (First Quarter 2010 10-Q).

underwriting practices.

422.    For each of the Bank's SEC filings during the Class Period, the Bank made the following representation in substantially identical form:

To mitigate credit risk, we:

- Employ rigorous loan underwriting standards and apply them consistently.[110]

423.    Similarly, in the quarterly filings for the first, second, and third quarters of 2008, as well as the first quarter of 2009, the Bank stated that "[w]e have a high degree of confidence in the integrity of our commercial construction portfolio, because . . . [w]e apply our underwriting standards consistently."[111]

424.    The above underlined statements were false because the Bank did not employ "rigorous" underwriting standards and did not apply any supposedly rigorous underwriting standards "consistently."   To the contrary, the Bank's underwriting was lax and inconsistent, and, in fact, increased the Bank's credit risk, rather than mitigated it.   As the Criminal Information, FBI Affidavits and former Bank employees confirm, the Bank: (i) engaged in mass extensions of otherwise past due loans in 2009 and the first two quarters of 2010, without obtaining updated appraisals as required by federal regulations and the Bank's own Appraisal Policy; and (ii) abused the 10% Rule by extending loans beyond approved levels so that lenders could provide money to troubled borrowers to use that money to make interest payments to keep

---

[110] *See* Ex. 6 at 44 (2007 10-K).  The first two quarterly filings in 2008 referred to this discussion in the 2007 10-K, thereby effectively incorporating the statement by reference.  *See* Ex. 7 at 51 (First Quarter 2008 10-Q) and Ex. 8 at 76 (Second Quarter 2008 10-Q).  *See also* Ex. 9 at 80 (Third Quarter 2008 10-Q); Ex. 1 at 44 (2008 10-K); Ex. 2 at 68 (First Quarter 2009 10-Q); Ex. 3 at 88 (Second Quarter 2009 10-Q); Ex. 4 at 132 (Third Quarter 2009 10-Q); Ex. 5 at 50 (2009 10-K); and Ex. 20 at 81 (First Quarter 2010 10-Q).

[111] *See* Ex. 7 at 30 (First Quarter 2008 10-Q); Ex. 8 at 50 (Second Quarter 2008 10-Q); Ex. 9 at 52 (Third Quarter 2008 10-Q); and Ex. 2 at 42 (First Quarter 2009 10-Q).

loans current.  In addition, KPMG and the Federal Reserve identified that the Bank's use of the 10% Rule to provide interest reserve loans to borrowers who used those proceeds to keep current on other delinquent loans constituted a "significant deficiency" and was a "problematic practice" because the Bank did not use "robust underwriting" or have "specific underwriting standards" for those loans.

425.    The Bank's underwriting was inadequate and inconsistent in many other ways:

a) As the FBI Affidavits provide, and as the Bank itself described in the Delaware Review Memorandum, there were serious deficiencies with Wilmington's underwriting practices throughout the Class Period.

b) CWs 1 and 2 stated that the Bank's loan underwriting was not actually performed by the underwriters, but by lenders who were incentivized to make as many loans as possible.

c) CWs 1, 2, 3, and 4 recalled how Wilmington's lenders routinely ignored established underwriting policies and made exceptions to those policies based on personal relationships rather than on borrowers' ability to pay.

d) According to CW 1, Cecala instructed Bailey and Terranova "not to keep files" on the numerous loans they originated.  As a result, documentation for the Bank's loans was incomplete or "nonexistent," and rife with errors.

e) According to CW 2, the Bank's policy was that only loans greater than $5 million were required to receive credit approval from the Loan Committee, which included senior risk management personnel.  Thus, more than half of the Bank's commercial loan portfolio was exempted from review by credit specialists.

f) According to CW 2, the Bank dangerously understaffed its underwriter position with, at most, only 12 analysts to review hundreds of millions of dollars in loans, and these analysts lacked training, reported to regional lending managers, and just wanted to be lenders themselves.

g) According to former employees, each of the above facts remained consistent throughout the Class Period, and the MOU confirmed these accounts, identifying serious deficiencies in the Bank's underwriting function and ordering the Bank to "establish [an] appropriate organization structure" for underwriting that included revised "underwriting standards," including for interest reserves, and uniform standards for Loan Committee review.  Then, in 2010, the Federal Reserve became concerned about the "future ability of the bank to survive, based on what they saw in the credit underwriting" and effectively took over the Bank's credit operations in the summer of 2010.

**E.    The Offering Documents Misstated The Bank's LTV Ratios**

426.    In the Bank's 2007 10-K and 2008 10-K, Wilmington stated: "We generally require collateral on all real estate exposure and a loan-to-value ratio of no more than 80% at the time of underwriting."[112]   Similarly, in the Bank's 2009 10-K, Wilmington stated: "For real estate-related loans, we generally require collateral and a loan-to-value ratio of no more than 80% at the time of underwriting."[113]   The preceding underlined statements were false because, as set forth above, the Bank's senior executives used the 10% Rule to make loans that far exceeded 80% LTV ratios and even allowed commercial loans in the Bank's portfolio to exceed 100% LTV ratios.    Thus, the Bank's LTV guidelines misrepresented the risks inherent in its commercial loan portfolio, which included loans with values that exceeded underlying property values and, due to the multi-year structure of these loans, such high risk loans remained in the Bank's loan portfolio for years.   The Criminal Information confirms that 10% Rule loans granted in the nature of a working capital line of credit or an interest reserve loan had the effect of supplying borrowers' equity in a project and/or increasing the Bank's LTV "exposure beyond that permitted by Bank policy."   Moreover, according to CW 1, Defendant Cecala's directive to refrain from updating appraisals – which the Workout group adhered to – affirmatively prevented the Bank from accurately assessing LTV ratios during the Class Period.

**F.    The Offering Documents Misstated The Asset Review Process**

427.    The Offering Documents misstated the Bank's asset review practices.   For each of the Bank's SEC filings incorporated in the Offering Documents, the Bank made the following representation in substantially identical form:

---

[112] Ex. 6 at 49 (2007 10-K); Ex. 1 at 98 (2008 10-K).

[113] Ex. 5 at 94 (2009 10-K).

To mitigate credit risk, we:

*          *          *

- monitor the portfolio to identify potential problems and to avoid disproportionately high concentrations in any single industry sector or to any one borrower.
- regularly review all past due loans, loans not being repaid according to contractual terms, and loans we doubt will be paid on a timely basis.[114]

428.   The preceding underlined statements were false because, throughout the Class Period, the Bank's asset review procedures were deficient and problematic because the Bank did not meaningfully monitor the Bank's portfolio and, in fact, failed to disclose hundreds of millions of dollars of its past due and nonperforming loans. In reality, the Bank's asset review practices increased the Bank's credit risk, rather than mitigated it.

429.   As set forth in the Criminal Information, the Bank failed to meaningfully review its past due loans to avoid performing updated appraisals.  The Bank's appraisals (a critical aspect to asset review) were outdated and overvalued, in violation of federal regulations and the Bank's Appraisal Policy.  These outdated appraisals rendered the Bank's purported review and monitoring of loans meaningless and ineffective.  As former employees explained, the Bank's appraisals were "almost always outdated," and problems with appraisals were a "widespread phenomenon," rendering a review of Wilmington's documents essentially "worthless."  Outdated appraisals remained on the Bank's books throughout the Class Period.  Indeed, when the Bank finally started to update its appraisals in 2010, after the Offering, the new appraisals triggered enormous write-downs.

---

[114] Ex. 6 at 44 (2007 10-K).  This statement was made or referred to, and thereby effectively incorporated by reference, in Ex. 7 at 51 (First Quarter 2008 10-Q); Ex. 8 at 76 (Second Quarter 2008 10-Q); Ex. 9 at 80 (Third Quarter 2008 10-Q); Ex. 1 at 45 (2008 10-K); Ex. 2 at 68 (First Quarter 2009 10-Q); Ex. 3 at 88 (Second Quarter 2009 10-Q); Ex. 4 at 132 (Third Quarter 2009 10-Q); Ex. 5 at 50 (2009 10-K); and Ex. 20 at 81 (First Quarter 2010 10-Q).

430.    Moreover, in addition:

a) In further contrast to the Bank's statements that it "monitored" the portfolio and "regularly reviewed all past due loans," CWs 1 and 2 confirm that the ARG in actuality did not review the vast majority of the Bank's loan portfolio.  In fact, loans of less than $15 million, which constituted the overwhelming majority of the Bank's loan portfolio, received "essentially <u>no</u> review" by the ARG to determine their credit quality. Moreover, on an annual basis, the ARG did not review 85-90% of the Bank's loans.

b) As the FBI Affidavits provide and as the Bank itself described in the Delaware Review Memorandum, a "serious concern" with the Bank's credit practices was that it exercised "limited oversight of relationship managers," who were responsible for monitoring the financial health of the Bank's borrowers.  As a result, relationship managers – who were financially penalized for documenting borrowers' inability to repay their loans – were free to ignore the deteriorating financial health of their borrowers and/or the deterioration in the collateral underlying their borrowers' loans.

c) As the FBI Affidavits provide and the Criminal Information confirm, the Bank's relationship with Zimmerman demonstrated that the Bank did not independently review its loans or confirm that borrowers met the requirements for receiving draws on their loans.  As a result, the Bank extended millions of dollars in additional credit even where the borrower displayed obvious deficiencies in his or her ability to repay the loan.

d) KPMG's 2007 audit confirmed that the ARG was insufficient to adequately review the Bank's loan portfolio, with KPMG issuing a Management Letter stating that the ARG's review was a serious control deficiency, according to CW 2.  Likewise, in connection with its 2008 audit, KPMG again identified the ARG functions as insufficient to adequately review the Bank's loan portfolio, confirming that these problems persisted.

e) According to CW 2, the Federal Reserve identified the ARG's inadequate staffing and review as "weaknesses in the control structure" in its 2007 review.  In its 2008 report, the Federal Reserve again identified that the ARG's inadequate staffing and review were control weaknesses at the Bank, confirming that these problems had remained.  The Federal Reserve again identified these problems in 2009, when it instituted the MOU.

f) The Bank's Internal Audit group issued a report in late 2007 stating that the Bank's ARG was understaffed and lacked proper leadership and that its review was inadequate, according to CW 8.

g) These criticisms corroborated reports from Wilmington's former employees, who: (i) reported that the Bank had "no real standards" for how often loans were reviewed by the ARG and that problems were identified through random samplings, which they characterized it as "review by exception," until late 2008; and (ii) stated that the Bank practiced "credit review in name only."

h) By July 2009, the Federal Reserve determined to impose the MOU based on its findings of numerous serious concerns with the Bank's asset review function, and imposed it in

196

September 2009, according to CW 2. The Federal Reserve's concerns were based on, *inter alia*, the fact that only a small percentage of loans were reviewed by the ARG and there were only a handful of independent credit employees responsible for reviewing the entire loan portfolio, and thus the Bank did not adequately assess the risk in its loan portfolio.  ¶¶152-56.

431.   In its SEC filings incorporated into the Offering Documents, the Bank also described its internal risk rating system (Pass, Watchlisted, Substandard and Doubtful), stating:

> <u>We apply these classifications consistently</u> and we analyze migrations within the classifications quarterly.
>
> <u>This system has helped us develop adequate reserves for loan losses over the years</u>.[115]

432.   The underlined description of the Bank's loan risk rating system was false. Specifically, the Criminal Information sets forth how the Bank's statements that its loan risk ratings had "helped us develop adequate reserves for loan losses over the years" were false because, the Bank failed to recognize and classify past due and nonperforming loans.  Thus, those "waived" past due and nonperforming loans were falsely classified throughout the Class Period and were not considered when setting the Bank's Loan Loss Reserve.

433.   This statement was also false because numerous former employees confirm that the Bank's risk ratings were inaccurate and therefore could not be used to develop "adequate" reserves.

### G.   The Offering Documents Misstated The Effectiveness Of The Bank's Internal Controls

434.   The Offering Documents also contained false statements regarding the effectiveness of Wilmington's internal controls over financial reporting.  Specifically, with

---

[115] Ex. 6 at 44 (2007 10-K); Ex. 1 at 45 (2008 10-K); and Ex. 5 at 50 (2009 10-K).  The Bank's quarterly filings contain substantially similar language or refer to the Annual Reports, thereby effectively incorporating the statement by reference.  *See* Ex. 7 at 53 (First Quarter 2008 10-Q); Ex. 8 at 80 (Second Quarter 2008 10-Q); Ex. 9 at 80 (Third Quarter 2008 10-Q); Ex. 2 at 68 (First Quarter 2009 10-Q); Ex. 3 at 88 (Second Quarter 2009 10-Q); Ex. 4 at 132 (Third Quarter 2009 10-Q); and Ex. 20 at 81 (First Quarter 2010 10-Q).

regard to the Bank's internal controls over financial reporting, the Bank's 2007 10-K, 2008 10-K, and 2009 10-K, all falsely represented that Wilmington maintained effective internal controls over financial reporting.  Specifically, in the 2007, 2008 and 2009 10-Ks, management certified that the Bank "[m]aintain[ed] a strong internal control environment," "[e]ngag[ed] strong and effective corporate governance," and "[p]resent[ed] financial results that are complete, transparent, and understandable," and thus the Bank maintained effective internal controls over financial reporting.[116]  Management's attestations regarding the strength of internal controls over financial reporting were critical to investors because they (falsely) assured the public that the Bank's financial statements were reliable and in compliance with applicable laws.

435.    The preceding underlined statements were false at the time they were made because, throughout the Class Period, Wilmington's had no effective internal controls in place to prevent the misstatement of the Bank's reporting of past due and nonperforming loans, Loan Loss Reserve provisions, underwriting and asset review.

436.    Specifically:

a) The Criminal Information describes how the Bank abandoned meaningful supervision over the reporting of past due and nonperforming loans.  This lack of supervision allowed senior executives to remove past due and nonperforming loans from the Delinquency Reports and Past Due Lists without justification in order to not report hundreds of millions of dollars of past due and nonperforming assets that should have been written down and reserved against during the Class Period.

b) As the Criminal Information provides, the Bank did not supervise the enforcement of federal regulations and its own Appraisal Policy requiring updated appraisal for any loans sought to be extended or modified.  Because the Bank's loan portfolio's appraisals were so outdated and overvalued, the Bank's Loan Loss Reserve failed to account for the significant deterioration of the Bank's loan collateral.

c) As the Criminal Information and FBI Affidavits provide, the Bank's relationship with Zimmerman demonstrates that the Bank failed to exercise any supervision over its lenders, including by allowing lenders to change the terms of loan agreements without

---

[116] Ex. 6 at 112 (2007 10-K); Ex. 5 at 134 (2009 10-K).

any independent credit review, lending millions of dollars in funds without requiring any verification or documentation of borrower need, by failing to ensure that any project-related work was performed and by authorizing loan payments when the borrower had not satisfied the required terms of the loans.

d) As the FBI Affidavits provide, the Delaware Review Memorandum raised "serious concerns" concerning the management of the Bank's Delaware commercial real estate division, including the Bank's lack of appropriate oversight over key individuals and failure to require appropriate documentation, demonstrating the Bank's overall lack of internal controls over these key functions.

e) In 2007, KPMG, the Federal Reserve, and Internal Audit each determined that the Bank's asset review was an area of material and significant weaknesses in the Bank's internal controls.

f) Consistent with these criticisms, in 2008, KPMG and the Federal Reserve again warned the Officer Defendants that the Bank's asset review was an area of material and significant control weakness.

g) These internal control failures continued through 2009, when the Federal Reserve instituted the MOU as a result of these longstanding and systemic failings in the Bank's asset review and internal controls, among other areas.

### H.      KPMG's Misstatements in the Offering Documents

437.    KPMG, Wilmington's auditor, also issued materially untrue reports in the 2007, 2008 and 2009 10-Ks.  Specifically, KPMG audited the Bank's year-end financial statements contained in the 2007, 2008 and 2009 10-Ks and issued unqualified auditor's reports on Wilmington's consolidated statement of financial condition as of December 31, 2007, December 31, 2008, and December 31, 2009, and the related consolidated statements of income.  KPMG's auditor's reports certified that, after conducting an audit "in accordance with the standards of the Public Company Accounting Oversight Board (United States)," it "believe[d] that our audits provide a reasonable basis for our opinion" that:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Corporation as of December 31, 2007 and 2006 [and December 31, 2008 and 2007] [and December 31, 2009 and 2008], and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2007 [and

December 31, 2008] [and December 31, 2009], in conformity with U.S. generally accepted accounting principles.[117]

438.    KPMG's unqualified auditor's reports included in the Bank's 2007, 2008, and 2009 10-Ks were false because, as explained above in Sections XIII B & C, the Bank's consolidated financial statements did not fairly present the Bank's financial condition and were not prepared in accordance with GAAP.  In particular, the Bank's calculation of past due and nonperforming loans, Loan Loss Reserves and net income in 2007, 2008 and 2009 violated GAAP as they did not account for hundreds of millions of dollars in past due and nonperforming loans.  As a result, the Bank's publicly reported financial statements, including its reported past due and nonperforming loans, net income, provision for loan losses and the Loan Loss Reserve did not fairly present the Bank's financial position and were false.

439.    Moreover, in certifying Wilmington's 2009 financial statements, KPMG falsely represented that its audits were conducted in accordance with GAAS.  KPMG did not have a reasonable basis for its certifications.  In issuing unqualified audit opinions on Wilmington's financial statements, KPMG failed to comply with the professional standards dictated by GAAS, including GAAS General Standard Nos. 2 and 3 – which required KPMG to exercise due professional care in the performance of the audit and to obtain competent sufficient evidentiary matter to form a basis for its opinion – and the relevant GAAS provisions identified in Section VIII.A.  In conducting its audits for the fiscal year ended December 31, 2009, KPMG had access to the files and key employees of the Bank, including loan files, at all relevant times.  As Wilmington's auditor, KPMG had continual access to and knowledge of the Bank's confidential internal, corporate, financial, operating, and business information, and had the opportunity to observe and review the Bank's business and accounting practices, and to test the Company's

---

[117] Ex. 6 at 113 (2007 10-K); Ex. 5 at 132 (2009 10-K).

internal accounting information and publicly reported financial statements as well as the Bank's internal controls and structures.

440.    Had KPMG conducted a GAAS-compliant audit, it would have incorporated into its audit: (i) its own past criticisms of the Bank's underwriting and asset review; (ii) the Bank's Internal Audit criticisms of the Bank's asset review function; (iii) the repeat criticisms by regulators regarding the Bank's credit exposure; and (iv) the MOU's extensive findings regarding the Bank's deficient underwriting, asset review, and accounting practices.   Each of these criticisms indicated that the Bank's credit exposure was much worse than publicly presented.   Thus, had KPMG complied with GAAS, it would have determined that there was a material understatement of Wilmington's past due loans and Loan Loss Reserve, and an overstatement of net income.

441.    Further, when conducting its 2009 audit, KPMG focused its "attention" on the Bank's failure to report its past due loans.   Specifically, on October 29, 2009, an internal Wilmington email (discussed in the Criminal Information) noted that KPMG's "attention" was focused on the issue of matured past due loans and the need to make them "go away" by year-end 2009.   The Bank made these loans "go away" by executing a "mass extension" of over 1,250 delinquent (or soon to be delinquent) loans totaling at least $1.744 billion in just a few months – an amount that constituted 25% of the Bank's outstanding commercial loan balance.   Specifically, the Bank "mass extended" over 800 loans totaling $1.3 billion before the end of the 2009 fiscal year.   Had KPMG conducted a GAAS-compliant audit and asked basic questions regarding the Bank's accounting for matured past due loans, it would have determined that there was a material understatement of Wilmington's past due loans and Loan Loss Reserve, and overstatement of net income.   Had KPMG conducted a GAAS-compliant audit and reviewed the

loan files for these 800 loans, KPMG would have learned that these loans were extended without the legally required appraisals and thus were not legitimate extensions.

442.     Further, had KPMG conducted a GAAS-compliant audit and asked basic questions regarding the Bank's Delaware lending, it would have learned about the Delaware Status Review and its findings.  Thus, had KPMG performed a GAAS-compliant audit, it would have incorporated into its audit the findings of the Delaware Status Review, which cast serious doubt on the credit quality of the Bank's loan portfolio, a key component in evaluating the adequacy of the Bank's Loan Loss Reserve.  Even if KPMG was not made aware of the Delaware Status Review (which they should have been), had KPMG performed a GAAS-compliant audit and obtained competent sufficient evidentiary matter regarding the Bank's lending practices and loan portfolio in its primary market, Delaware, KPMG would have identified the same "serious concerns" with the Bank's "past management and loan portfolio" that the Bank identified in the Delaware Status review.  By failing to do so, KPMG failed to properly consider that the Bank's financial statements were not accurate or reliable.  In fact, had KPMG complied with GAAS, they would have reached the same conclusions as M&T and the Bank that the Bank had suffered nearly $800 million in undisclosed credit losses arising out of loans originated during the Class Period.

443.     The 2007 10-K included an unqualified auditor's report by Defendant KPMG opining on the effectiveness of Wilmington's internal controls over financial reporting.  This report, dated February 29, 2008, stated that KPMG had audited Wilmington's internal controls:

> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Corporation's internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated

February 29, 2008 expressed an unqualified opinion on the effectiveness of the Corporation's internal control over financial reporting.[118]

444.    Similarly, the 2008 and 2009 10-Ks also included an unqualified auditor's report by KPMG opining on the effectiveness of Wilmington's internal control over financial reporting. These reports, dated March 2, 2009 and February 22, 2010, respectively, stated that KPMG had audited Wilmington's internal controls "in accordance with the standards of the Public Company Accounting Oversight Board (United States)," and concluded that:

> In our opinion, the Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2008 [and December 31, 2009], based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.[119]

445.    KPMG's reports on Wilmington's internal controls were false. Contrary to these internal control certifications, the Bank was operating without adequate controls to ensure compliance with the Bank's reporting of past due and nonperforming loans, Loan Loss Reserve provisions, underwriting and asset review. The Bank's improper "waiver" and "mass extension" of past due loans, its deficient underwriting, its failure to update its appraisal values as required by law and the Bank's own policy, and its failure to monitor its loan portfolio for increasing credit risk demonstrate that the Bank's internal controls were materially deficient.

## FIFTH CLAIM FOR RELIEF
### For Violations Of Section 11 Of The Securities Act In Connection With The Offering Against The Securities Act Defendants

446.    Lead Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein. Defendants' liability under this Claim for Relief is predicated on the participation of each Defendant in conducting the Offering pursuant to the

---

[118] Ex. 6 at 113 (2007 10-K).

[119] Ex. 5 at 135 (2009 10-K).

Registration Statement, which contained untrue statements and omissions of material fact.  This Claim for Relief does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded.  For purposes of asserting this and their other claims under the Securities Act, Lead Plaintiffs do not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent.

447.   This claim is brought pursuant to Section 11 of the Securities Act against the Securities Act Defendants on behalf of members of the Class who purchased or otherwise acquired the securities issued pursuant and/or traceable to the Offering and were damaged by the acts alleged herein.  This claim is based solely in strict liability and negligence.  Defendant Wilmington was the issuer, within the meaning of Section 11 of the Securities Act, pursuant to the Offering Documents (defined in ¶389 above) of the registered securities set forth below. M&T is liable to the same extent as Wilmington as a successor in interest.  As set forth in the Agreement and Plan of Merger between Wilmington and M&T, filed on Form 8-K with the SEC on November 2, 2010, all of Wilmington's "claims, obligations, liabilities, debts and duties" shall become the "claims, obligations, liabilities, debts and duties" of the surviving bank.

448.   As discussed above, in February 2010, Wilmington issued and sold to investors 21,706,250 shares of common stock.   Defendants J.P. Morgan and KBW were statutory underwriters for these registered securities, as admitted in the Offering Documents.

449.   Defendants Foley, Cecala, Gibson, Harra, Rakowski, Burger, DuPont, Elliott, Krug, Mears, Mobley, Rollins, Sockwell, Roselle, Tunnell, and Whiting each signed the Registration Statement – which formed the Offering Documents – as a senior officer and/or director of Wilmington within the meaning of Section 11 of the Securities Act.  Defendant Freeh was a director at Wilmington at the time of the filing of the Offering Documents.

450.     KPMG consented to the incorporation of its unqualified auditor's report regarding Wilmington's financial statements into the Offering Documents, including the Registration Statement.  Specifically, KPMG consented to the incorporation into the Offering Documents of its unqualified auditor's report on Wilmington's financial statements included in the Bank's 2007, 2008, and 2009 Forms 10-K.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, the Offering Documents included, but were not limited to, the facts that: (i) the financial statements that KPMG certified as being presented in conformity with GAAP were not presented in conformity with GAAP; and (ii) KPMG's audits, which it attested were conducted in accordance with GAAS, were not conducted in accordance with GAAS.

451.     The common stock described in this Count was issued and sold pursuant to the Offering Documents.  All purchases of the registered securities after the issuance of the Offering Documents are traceable to the Offering Documents.

452.     The Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

453.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Offering Documents, which misrepresented or failed to disclose the material adverse facts alleged in connection with Lead Plaintiffs' Securities Act claims, as set forth above.

454.     In connection with offering the registered securities to the public and the sale of those securities, the Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities

exchange.

455.    As the issuer of the registered securities, Wilmington is strictly liable for the untrue statements of material fact and material omissions described herein.

456.    None of the other Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

457.    Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the registered securities.

458.    As a direct and proximate result of the Securities Act Defendants' acts and omissions in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of the common stock pursuant to the February 2010 Offering Documents.

459.    By reason of the foregoing, the Section 11 Defendants are liable to the members of the Class who acquired registered securities pursuant to or traceable to the Offering Documents.

460.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the issuance of the Offering Documents.

### SIXTH CLAIM FOR RELIEF
**For Violations Of Section 12(a)(2) Of The Securities Act In Connection With The Offerings Against Defendants Wilmington, J.P. Morgan, And KBW**

461.    Lead Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.  For the purposes of this Count, Lead Plaintiffs assert only strict liability and negligence claims, and expressly exclude from this Count any

allegations of fraud or reckless or intentional misconduct.

462.     This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77k, against Defendants Wilmington and Defendants J.P. Morgan and KBW (defined above as the "Underwriter Defendants") on behalf of members of the Class who purchased or otherwise acquired Wilmington common stock pursuant and/or traceable to the Offering Documents, and were damaged by acts alleged herein.

463.     By means of the Offering Documents and by using the means and instruments of transportation and communication in interstate commerce and of the mails, Defendant Wilmington and the Underwriter Defendants, through public offerings, solicited and sold Wilmington securities to members of the Class.

464.     The Offering Documents were materially misstated, omitted to state facts necessary to make the statements made not misleading, and concealed or failed to adequately disclose material facts as alleged herein.

465.     Neither of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents, including the February 2010 Prospectus, were accurate and complete in all material respects.   Had they exercised reasonable care, these Defendants would have known of the material misstatements and omissions alleged herein.

466.     Members of the Class purchased Wilmington securities by means of the materially misstated Offering Documents.  At the time they purchased shares in the Offerings, no member of the Class knew, or by the reasonable exercise of care could have known, of the material misstatements in and omissions from the Offering Documents, including the February 2010 Prospectus.

467.    By virtue of the conduct alleged herein, Wilmington and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.

468.    Accordingly, members of the Class who purchased or otherwise acquired Wilmington securities have a right to rescind and recover the consideration paid for their securities and hereby elect to rescind and tender their securities to Wilmington and the Underwriter Defendants.   Members of the Class who have sold their Wilmington securities issued in or traceable to the Offering are entitled to recissory damages.

469.    This claim is brought within one year after the discovery of the misstatements and omissions contained in the Offering Documents and within three years after the Offering.

### SEVENTH CLAIM FOR RELIEF
**For Violations Of Section 15 Of The Securities Act In Connection With The Offering Against Defendants Foley, Cecala, Gibson, Harra, Rakowski, Burger, DuPont, Elliott, Freeh, Krug, Mears, Mobley, Rollins, Roselle, Sockwell, Tunnell, and Whiting**

470.    Lead Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein, and expressly exclude from this Count any allegations of fraud or intentional misconduct.

471.    This claim is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against Defendants Foley, Cecala, Gibson, Harra, Rakowski, Burger, DuPont, Elliott, Freeh, Krug, Mears, Mobley, Rollins, Roselle, Sockwell, Tunnell, and Whiting, on behalf of members of the Class who purchased or otherwise acquired Wilmington securities pursuant and/or traceable to the Offering Documents and were damaged by acts alleged herein.  For the purposes of this Count, Lead Plaintiffs assert only strict liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct.

472.    At all relevant times, Defendants Foley, Cecala, Gibson, Harra, Rakowski, Burger, DuPont, Elliott, Freeh, Krug, Mears, Mobley, Rollins, Roselle, Sockwell, Tunnell, and

Whiting were controlling persons of the Bank within the meaning of Section 15 of the Securities Act. As set forth herein, because of their positions in the Bank and/or because of their positions on the Wilmington Board, Defendants Foley, Cecala, Gibson, Harra, Rakowski, Burger, DuPont, Elliott, Freeh, Krug, Mears, Mobley, Rollins, Roselle, Sockwell, Tunnell, and Whiting had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the unlawful acts and conduct alleged herein.

473. Specifically, Defendants Foley, Cecala, Gibson, Harra and Rakowski each served as an executive officer of Wilmington. Defendants Foley and Cecala each served as Wilmington's Chief Executive Officer and Chairman of its Board; Defendant Gibson served as its CFO and COO; Defendant Harra served as its President and COO; and Defendant Rakowski served as its Senior Vice President and Controller. As such, at all times relevant, Defendants Foley, Cecala, Gibson, Harra and Rakowski each participated in the operation and management of the Bank, conducted and participated, directly and indirectly, in Wilmington's business affairs and mortgage-lending operations. These Defendants also participated in the preparation and dissemination of the Offering Documents, certain of the financial statements incorporated by reference therein and/or otherwise participated in the process necessary to conduct the Offering. Because of their positions of control and authority as senior officers of Wilmington, each of these Defendants was able to, and did, control the contents of certain or all the Offering Documents and the financial statements incorporated by reference therein, which contained materially false financial information.

474. Similarly, Defendants Burger, DuPont, Elliott, Freeh, Krug, Mears, Mobley, Rollins, Roselle, Sockwell, Tunnell, and Whiting, served as Directors on Wilmington's Board at the time the Offering was conducted and/or at the time that the Registration Statement was

signed.  As directors of a publicly owned company, these Defendants had a duty to disseminate accurate and truthful information with respect to Wilmington's financial condition and results of operations.  These Defendants each signed the Registration Statement; signed the 2009 10-K which was incorporated by reference into the Offering Documents; and/or were Directors at the time the Offering was conducted, the Offering Documents were disseminated to the investing public and the Registration Statement became effective.  Thus, these Defendants controlled the contents and dissemination of the Offering Documents.

475.    By reason of the aforementioned conduct and by virtue of their positions as controlling persons of Defendant Wilmington, each of these Defendants are liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Bank is liable under Sections 11 and 12(a)(2) of the Securities Act, to members of the Class who purchased or otherwise acquired Wilmington securities pursuant to or traceable to the Offering Documents. As a direct and proximate result of the conduct of these Defendants, members of the Class suffered damages in connection with their purchase or acquisition of the securities.

## XIV.   CLASS ACTION ALLEGATIONS

476.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Wilmington's common stock during the Class Period, January 18, 2008, up to November 1, 2010 and were damaged thereby (the "Class").  Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of Wilmington, the Auditor Defendant, or any of the Underwriter Defendants during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged herein; and (vi) the legal representatives, agents, affiliates, heirs, beneficiaries,

successors-in-interest, or assigns of any such excluded party.

477.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Wilmington's common stock was actively traded on the NYSE, an efficient market.  As of September 31, 2010, Wilmington had more than 91 million shares of common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds of thousands of members in the Class.

478.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members, including:

a)  Whether Defendants violated the federal securities laws;

b)  Whether Defendants misrepresented material facts concerning Wilmington;

c)  Whether Defendants' statements omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made;

d)  Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e)  Whether Defendants engaged in perpetrating a manipulative and deceptive device and/or scheme and/or otherwise engaged in a fraudulent course of conduct;

f)  Whether the Offering Documents contained material misstatements or omissions;

g)  Whether the Wilmington SEC filings issued during the Class Period which contained financial information (*i.e.*, its Forms 10-K, 10-Q, 8-K, and S-3) contained untrue or materially misleading statements;

h)  Whether the prices of Wilmington's common stock were artificially inflated; and

i)  The extent of damage sustained by Class members and the appropriate measure of damages.

479.     The claims of Lead Plaintiffs are typical of those of the Class.

480.     Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Lead Plaintiffs have no interests that conflict with those of the Class.

481.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XV.     JURISDICTION AND VENUE

482.     The claims asserted herein arise under (i) Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), 78t-1), and the rules and regulations promulgated thereunder, including Rule 10b-5 (17 C.F.R. §240.10b-5); and (ii) Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

483.     This Court has jurisdiction of the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and Section 22 of the Securities Act (15 U.S.C. § 77v); and 28 U.S.C. § 1331 and 1337.

484.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, Section 22 of the Securities Act, and 28 U.S.C. § 1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.  In addition, Wilmington maintained its corporate headquarters and principal executive offices in this District throughout the Class Period.

485.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities market.

## XVI.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment individually and on behalf of the Class, as follows:

a)  Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b)  Awarding Lead Plaintiffs and the class members damages, including interest;

c)  Awarding Lead Plaintiffs reasonable costs, including attorneys' and experts' fees; and

d)  Awarding such equitable/injunctive or other relief for the benefit of the Class as the court may deem just and proper.

## XVII.  JURY DEMAND

Lead Plaintiffs demand a trial by jury for all issues so triable.

Dated: June 7, 2013                     **CHIMICLES & TIKELLIS LLP**

*/s/ A. Zachary Naylor*
Pamela S. Tikellis (Bar No. 2172)
A. Zachary Naylor (Bar No. 4439)
222 Delaware Avenue, 11th Floor
P.O. Box 1035
Wilmington, DE 19899
Phone: (302) 656-2500
Fax: (302) 656-9053

*Liaison Counsel For The Class*

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

Blair Nicholas
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323

-and-

Steven B. Singer (*pro hac vice* pending)
Hannah Ross (*pro hac vice*)
Lauren McMillen Ormsbee (*pro hac vice* pending)
Stefanie J. Sundel (*pro hac vice* pending)
Adam Hollander (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Phone: (212) 554-1400
Fax: (212) 554-1444

SAXENA WHITE P.A.

Maya S. Saxena (*pro hac vice*)
Joseph E. White III (*pro hac vice*)
Lester Hooker (*pro hac vice*)
Brandon Grzandziel (*pro hac vice*)
2424 North Federal Highway
Boca Raton, FL 33431
Phone: (561) 394-3399
Fax: (561) 394-3382

*Counsel For Lead Plaintiffs And Co-Lead Counsel For The Class*

# APPENDIX A

# Merced County Employees' Retirement Association

# Certification

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Maria L. Arevalo, on behalf of Merced County Employees' Retirement Association ("MCERA") hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Plan Administrator of MCERA. I have reviewed a complaint filed in this matter. MCERA has authorized the filing of this complaint.

2. MCERA did not purchase Wilmington Trust Corporation common stock at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. MCERA is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. MCERA's transactions in Wilmington Trust Corporation common stock are set forth in the chart attached hereto.

5. MCERA has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. MCERA will not accept any payment for serving as a representative party on behalf of the Class beyond MCERA's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this $\underline{11}$ day of May, 2011.

_____
Maria L. Arevalo
Plan Administrator
*Merced County Employees' Retirement*
*Association*

## Merced County Employees' Retirement Association
## Transactions in Wilmington Trust Corporation (WL)

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 7/1/2010 | 5,200 | 11.1183 |
| Purchase | 7/1/2010 | 1,900 | 11.0971 |
| Purchase | 7/2/2010 | 7,000 | 11.2493 |
| Purchase | 7/2/2010 | 200 | 11.2750 |
| Purchase | 7/2/2010 | 9,100 | 11.2291 |
| Purchase | 7/6/2010 | 3,500 | 11.7203 |
| Purchase | 7/6/2010 | 3,100 | 11.7483 |
| Purchase | 7/16/2010 | 700 | 11.3970 |
| Purchase | 7/16/2010 | 1,300 | 11.3997 |
| Purchase | 7/28/2010 | 2,000 | 10.3280 |
| Purchase | 9/27/2010 | 3,000 | 9.0700 |
| Purchase | 9/29/2010 | 800 | 8.7250 |
| Purchase | 9/29/2010 | 2,200 | 8.8948 |
| Purchase | 10/6/2010 | 5,000 | 7.7868 |
| Purchase | 10/7/2010 | 5,000 | 7.6579 |

# Coral Springs Police Pension Fund

# Certification

## CERTIFICATION OF CORAL SPRINGS POLICE PENSION FUND

I, Robert A. Feigenbaum, Chairman, on behalf of the Coral Springs Police Pension Fund ("Fund"), certify that:

1. I am authorized by the Board of Trustees of the Fund to execute this Certification.

2. I have reviewed the Consolidated Securities Class Action Complaint and I authorize to file this complaint.

3. The Fund did not acquire the security that is the subject of this action at the direction of counsel, or in order to participate in this private action, or any other litigation under the federal securities laws.

4. The Fund is willing to serve as a Lead Plaintiff or Class Representative, either individually or as part of a group. The Fund understands that a Lead Plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include providing testimony at deposition and trial, if necessary.

5. The Fund will not accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

6. The Fund understands that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by the Fund's decision to serve as a representative party or Lead Plaintiff.

7. Listed below are all the transactions in the securities of Wilmington Trust Corporation in the class period:

### SEE ATTACHED SCHEDULE A

8. The Fund has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Executed this _16_ day of May 2011.

Robert A. Feigenbaum, Chairman

05/18/2011 09:58 FAX  5613930446          UBS Financial Svc Inc                          ☑003/003

SCHEDULE A TO CERTIFICATION OF CORAL SPRINGS POLICE PENSION FUND
WILMINGTON TRUST CORPORATION

**PURCHASES:**

| DATE | SHARES | PRICE/SHARE |
|------|--------|-------------|
| 03/05/2008 | 2,825 | $30.55 |
| 03/06/2008 | 2,825 | $29.99 |
| 03/07/2008 | 2,750 | $29.78 |
| 05/15/2008 | 550 | $34.49 |
| 05/16/2008 | 1,000 | $34.37 |
| 05/19/2008 | 825 | $34.75 |
| 06/04/2008 | 3,750 | $32.36 |
| 07/03/2008 | 2,775 | $24.93 |
| 07/15/2008 | 1,950 | $22.18 |
| 08/19/2008 | 2,675 | $22.89 |
| 08/20/2008 | 500 | $22.87 |
| 08/21/2008 | 250 | $22.75 |
| 08/25/2008 | 1,100 | $22.38 |
| 08/26/2008 | 1,500 | $22.01 |
| 08/20/2009 | 250 | $11.53 |
| 08/27/2009 | 2,110 | $13.54 |
| 09/01/2009 | 2,200 | $13.42 |
| 09/04/2009 | 3,400 | $12.98 |
| 09/29/2009 | 1,410 | $13.99 |
| 09/30/2009 | 250 | $14.00 |
| 10/01/2009 | 3,040 | $13.78 |
| 10/02/2009 | 1,450 | $13.38 |
| 10/30/2009 | 3,425 | $12.49 |
| 12/17/2009 | 1,055 | $12.00 |
| 01/11/2010 | 1,225 | $13.67 |
| 01/12/2010 | 1,025 | $13.44 |
| 02/23/2010 | 3,230 | $13.25 |
| 05/26/2010 | 1,580 | $15.54 |
| 07/16/2010 | 560 | $11.62 |

**SALES:**

| DATE | SHARES | PRICE/SHARE |
|------|--------|-------------|
| 09/15/2008 | 2,600 | $25.75 |
| 10/10/2008 | 500 | $26.08 |
| 10/13/2008 | 950 | $26.13 |
| 10/14/2008 | 4,850 | $27.87 |

# St. Petersburg Firefighters' Retirement System

# Certification

## CERTIFICATION OF THE ST. PETERSBURG FIREFIGHTERS' RETIREMENT SYSTEM

I, Alan Rosetti, on behalf of the St. Petersburg Firefighters' Retirement System ("Retirement System") certify that:

1. I am authorized by the Board of Trustees of the Retirement System to execute this Certification.

2. I have reviewed the Consolidated Securities Class Action Complaint and I authorize Counsel to file this complaint.

3. The Retirement System did not acquire the security that is the subject of this action at the direction of counsel, or in order to participate in this private action, or any other litigation under the federal securities laws.

4. The Retirement System is willing to serve as a Lead Plaintiff, either individually or as part of a group. The Retirement System understands that a Lead Plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include providing testimony at deposition and trial, if necessary.

5. The Retirement System will not accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

6. The Retirement System understands that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by the Retirement System's decision to serve as a representative party or Lead Plaintiff.

7. I have listed below all the transactions in the securities of Wilmington Trust Corporation in the class period, as provided by the Retirement System's custodian bank:

### SEE ATTACHED SCHEDULE A

8. During the three years prior to the date of this Certification, the Retirement System has not sought or served as a representative party for a class in an action filed under the Private Securities Litigation Reform Act.

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Executed this / 2 day of May, 2011.

Alan Rosetti, Chairman

SCHEDULE A TO CERTIFICATION OF ST. PETERSBURG FIREFIGHTERS RETIREMENT SYSTEM
WILMINGTON TRUST CORPORATION

| PURCHASES: | | | | SALES: | | |
|---|---|---|---|---|---|---|
| DATE | SHARES | PRICE/SHARE | | DATE | SHARES | PRICE/SHARE |
| 3/5/2008 | 1,525 | $30.55 | | 9/15/2008 | 1,500 | $25.75 |
| 3/6/2008 | 1,525 | $29.99 | | 10/10/2008 | 250 | $26.08 |
| 3/7/2008 | 1,475 | $29.78 | | 10/13/2008 | 500 | $26.13 |
| 5/15/2008 | 300 | $34.49 | | 10/14/2008 | 2,575 | $27.87 |
| 5/16/2008 | 525 | $34.37 | | | | |
| 5/19/2008 | 425 | $34.75 | | | | |
| 6/4/2008 | 2,075 | $32.36 | | | | |
| 7/3/2008 | 1,500 | $24.93 | | | | |
| 7/15/2008 | 1,050 | $22.18 | | | | |
| 8/19/2008 | 1,425 | $22.89 | | | | |
| 8/21/2008 | 425 | $22.75 | | | | |
| 8/25/2008 | 600 | $22.38 | | | | |
| 8/26/2008 | 800 | $22.01 | | | | |
| 5/22/2009 | 1,150 | $13.65 | | | | |
| 8/27/2009 | 1,210 | $13.54 | | | | |
| 8/31/2009 | 1,115 | $14.02 | | | | |
| 9/1/2009 | 1,450 | $13.42 | | | | |
| 9/4/2009 | 2,225 | $12.98 | | | | |
| 9/29/2009 | 920 | $13.99 | | | | |
| 10/1/2009 | 2,060 | $13.78 | | | | |
| 10/2/2009 | 975 | $13.38 | | | | |
| 10/30/2009 | 2,250 | $12.49 | | | | |
| 12/17/2009 | 685 | $12.00 | | | | |
| 1/11/2010 | 790 | $13.67 | | | | |
| 1/12/2010 | 675 | $13.44 | | | | |
| 2/23/2010 | 2,100 | $13.25 | | | | |
| 5/26/2010 | 1,100 | $15.54 | | | | |

# Pompano Beach General Employees Retirement System Certification

## CERTIFICATION OF POMPANO BEACH GENERAL EMPLOYEES RETIREMENT SYSTEM

I, Reginald W. Watkins, on behalf of the Pompano Beach General Employees Retirement System ("Retirement System") certify that:

1. I am authorized by the Board of Trustees of the Retirement System to execute this Certification.

2. I have reviewed the Consolidated Securities Class Action Complaint and I authorize Counsel to file this complaint

3. The Retirement System did not acquire the security that is the subject of this action at the direction of counsel, or in order to participate in this private action, or any other litigation under the federal securities laws.

4. The Retirement System is willing to serve as a Lead Plaintiff or Class Representative, either individually or as part of a group. The Retirement System understands that a Lead Plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include providing testimony at deposition and trial, if necessary.

5. The Retirement System will not accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

6. The Retirement System understands that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by the Retirement System's decision to serve as a representative party or Lead Plaintiff.

7. I have listed below all the transactions in the securities of Wilmington Trust Corporation in the class period:

### SEE ATTACHED SCHEDULE A

8. During the three years prior to the date of this Certification, the Retirement System has not sought to serve or served as a representative party for a class in an action filed under the Private Securities Litigation Reform except as follows:

*Synovus Financial Corp.*, NDGA, Case No.: 09-1811, (July 6, 2009)(named plaintiff).

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Executed this *13*ᵗʰ day of May, 2011.

Reginald W. Watkins

SCHEDULE A TO CERTIFICATION OF POMPANO BEACH GENERAL EMPLOYEES RETIREMENT SYSTEM
WILMINGTON TRUST CORPORATION

| PURCHASES: | | | SALES: | | |
|---|---|---|---|---|---|
| DATE | SHARES | PRICE/SHARE | DATE | SHARES | PRICE/SHARE |
| 3/5/2008 | 1,050 | $30.58 | 9/15/2008 | 1,050 | $25.70 |
| 3/6/2008 | 1,050 | $30.02 | 9/19/2008 | 100 | $42.49 |
| 3/7/2008 | 1,050 | $29.81 | 10/10/2008 | 250 | $26.03 |
| 3/24/2008 | 1,700 | $32.46 | 10/13/2008 | 325 | $26.08 |
| 5/15/2008 | 225 | $34.50 | 10/14/2008 | 1,750 | $27.81 |
| 5/16/2008 | 375 | $34.38 | 10/20/2008 | 500 | $27.84 |
| 5/19/2008 | 300 | $34.76 | 10/21/2008 | 400 | $27.20 |
| 6/4/2008 | 1,425 | $32.41 | 11/6/2008 | 1,400 | $25.54 |
| 7/3/2008 | 1,050 | $24.98 | 11/12/2008 | 200 | $24.59 |
| 7/15/2008 | 725 | $22.19 | 11/14/2008 | 1,300 | $24.72 |
| 8/5/2008 | 600 | $24.38 | 11/19/2008 | 725 | $21.93 |
| 8/6/2008 | 500 | $25.16 | 11/19/2008 | 75 | $21.93 |
| 8/7/2008 | 300 | $25.80 | 1/21/2009 | 400 | $15.48 |
| 8/19/2008 | 1,000 | $22.94 | 2/24/2010 | 500 | $14.37 |
| 8/20/2008 | 700 | $23.02 | 4/22/2010 | 300 | $19.68 |
| 8/21/2008 | 300 | $22.77 | 7/12/2010 | 700 | $12.03 |
| 8/25/2008 | 425 | $22.39 | | | |
| 8/26/2008 | 550 | $22.03 | | | |
| 8/29/2008 | 300 | $23.43 | | | |
| 9/2/2008 | 200 | $24.53 | | | |
| 8/27/2009 | 800 | $13.59 | | | |
| 9/1/2009 | 825 | $13.43 | | | |
| 9/4/2009 | 1,275 | $13.03 | | | |
| 9/29/2009 | 520 | $14.02 | | | |
| 10/1/2009 | 1,180 | $13.83 | | | |
| 10/2/2009 | 575 | $13.43 | | | |
| 10/30/2009 | 1,275 | $12.54 | | | |
| 12/17/2009 | 395 | $12.03 | | | |
| 1/11/2010 | 460 | $13.70 | | | |
| 1/12/2010 | 400 | $13.47 | | | |
| 2/23/2010 | 1,200 | $13.25 | | | |
| 5/26/2010 | 660 | $15.55 | | | |

# Automotive Industries Pension Trust Fund

# Certification

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Bill Brunelli, on behalf of Automotive Industries Pension Trust Fund ("Automotive Industries"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of Automotive Industries. I have reviewed a complaint filed in this matter. Automotive Industries has authorized the filing of this complaint.

2. Automotive Industries did not purchase Wilmington Trust Corporation common stock at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Automotive Industries is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Automotive Industries' transactions in Wilmington Trust Corporation common stock are set forth in the chart attached hereto.

5. Automotive Industries has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *City of Roseville Employees' Retirement System v. Textron Inc. et al.,*
   Case No. 09-cv-367 (D.R.I.)

6. Automotive Industries will not accept any payment for serving as a representative party on behalf of the Class beyond Automotive Industries' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _13_ day of May, 2011.

Bill Brunelli
Chairman
*Automotive Industries Pension Trust Fund*

**Automotive Industries Pension Trust Fund**
**Transactions in Wilmington Trust Corporation (WL)**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 3/5/2008 | 2,450 | 30.5520 |
| Purchase | 3/6/2008 | 2,450 | 29.9860 |
| Purchase | 3/7/2008 | 2,400 | 29.7840 |
| Purchase | 5/15/2008 | 500 | 34.4860 |
| Purchase | 5/16/2008 | 875 | 34.3670 |
| Purchase | 5/19/2008 | 700 | 34.7450 |
| Purchase | 6/4/2008 | 3,300 | 32.3610 |
| Purchase | 7/3/2008 | 2,450 | 24.9250 |
| Purchase | 7/15/2008 | 1,700 | 22.1780 |
| Purchase | 8/19/2008 | 2,300 | 22.8890 |
| Purchase | 8/20/2008 | 500 | 22.8700 |
| Purchase | 8/21/2008 | 150 | 22.7540 |
| Purchase | 8/25/2008 | 975 | 22.3760 |
| Purchase | 8/26/2008 | 1,300 | 22.0130 |
| Purchase | 8/27/2009 | 1,790 | 13.5430 |
| Purchase | 9/1/2009 | 1,875 | 13.4220 |
| Purchase | 9/4/2009 | 2,925 | 12.9840 |
| Purchase | 9/29/2009 | 1,210 | 13.9930 |
| Purchase | 9/30/2009 | 250 | 14.0000 |
| Purchase | 10/1/2009 | 2,570 | 13.7810 |
| Purchase | 10/2/2009 | 1,225 | 13.3820 |
| Purchase | 10/30/2009 | 2,950 | 12.4940 |
| Purchase | 12/17/2009 | 740 | 11.9980 |
| Purchase | 1/11/2010 | 855 | 13.6730 |
| Purchase | 1/12/2010 | 725 | 13.4410 |
| Purchase | 2/23/2010 | 2,220 | 13.2500 |
| Purchase | 5/26/2010 | 1,210 | 15.5410 |
| | | | |
| Sale | 9/15/2008 | (2,425) | 25.7500 |
| Sale | 10/10/2008 | (250) | 26.0780 |
| Sale | 10/13/2008 | (875) | 26.1260 |
| Sale | 10/14/2008 | (4,275) | 27.8620 |
| Sale | 12/9/2009 | (5,100) | 11.6140 |
| Sale | 8/19/2010 | (2,470) | 8.7980 |

# APPENDIX B

## <u>Confidential Witness Key</u>

| CW | Tenure | Relevant Position(s) |
|---|---|---|
| **1** | 3/2008 – 7/2011 | Vice President, Section Manager, Commercial Loan Recovery |
| **2** | 1997 – 3/2010 | Vice President, Credit Risk Management Division |
| **3** | 4/2003 – 8/2011 | Manager, Documentation Review (June 2008 – July 2010)<br><br>Loan Documentation Reviewer (2004-2008) |
| **4** | 2007 – 2010 | Construction Loan Administrator / Commercial Banking Credit Policy (2009 – 2010)<br><br>Client Sales Representative (2007 – 2009) |
| **5** | 1/2008 – 6/2010 | Vice President, Loan Workout Group |
| **6** | 11/2002 – 4/2007 | Credit and Risk Assessment, Commercial Loan Portfolio |
| **7** | 5/2007 – 4/2009 | Paralegal |
| **8** | 1997 – 6/2008 | Director, Internal Audit |
| **9** | 2005 – 5/2011<br>11/1998 – 2003 | Vice President, Credit Officer, Wealth Management & Private Banking |
| **10** | 1976 – 10/2010 | Vice President, Commercial Lending |
| **11** | 2004 – 2009 | Director, Tax |
| **12** | 1996 – 6/2010 | Vice President, Workout Group |
| **13** | 1992-2000<br>2005-5/2008 | Vice President, Loan Committee Member, Commercial Banking |