**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| **IN RE WILMINGTON TRUST SECURITIES LITIGATION** | Master File No. 10-cv-00990-SLR |
| | (Securities Class Action) |
| | Hon. Sue L. Robinson |
| This document relates to: ALL ACTIONS | ELECTRONICALLY FILED |

**LEAD PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE FOURTH AMENDED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Blair Nicholas
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (858) 793-0070
Fax: (858) 793-0323

-and-

Steven B. Singer (*pro hac vice*)
Hannah Ross (*pro hac vice*)
John Rizio-Hamilton (*pro hac vice*)
Lauren McMillen Ormsbee (*pro hac vice*)
Stefanie J. Sundel (*pro hac vice*)
Adam Hollander (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Phone: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*

**CHIMICLES & TIKELLIS LLP**

Pamela S. Tikellis (Bar No. 2172)
A. Zachary Naylor (Bar No. 4439)
222 Delaware Avenue, 11th Floor
P.O. Box 1035
Wilmington, DE 19899
Phone: (302) 656-2500
Fax: (302) 656-9053

*Liaison Counsel for the Class*

**SAXENA WHITE P.A.**

Maya S. Saxena (*pro hac vice*)
Joseph E. White III (*pro hac vice*)
Lester Hooker (*pro hac vice*)
Brandon Grzandziel (*pro hac vice*)
2424 North Federal Highway
Boca Raton, FL 33431
Phone: (561) 394-3399
Fax: (561) 394-3382

*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*

## TABLE OF CONTENTS


I. PRELIMINARY STATEMENT ....1

II. FACTUAL BACKGROUND ....6

A. The Scheme To Fraudulently Conceal Billions Of Dollars Worth Of Past Due Loans At Wilmington ....6

B. The Officer Defendants Knew Of The Past Due Loan Fraud ....10

C. The Officer Defendants Engaged In A Fraudulent $1.74 Billion Mass Extension Of Past Due Loans To Eliminate Them From The Bank's Financial Statements ....12

D. The Officer Defendants Were Informed Of The Past Due Loan Fraud Through Internal Reports, And Discussed The Fraud At Meetings ....14

E. The Officer Defendants Made Misrepresentations Concerning Wilmington's Supposedly "Rigorous" Underwriting And Asset Review Practices ....16

F. The Fraudulent Use Of The 10% Rule Further Exemplifies The Bank's Underwriting And Asset Review Practices ....21

G. Defendants Are Forced To Reveal The Bank's True Financial Condition ....22

H. The Government's Ongoing Criminal Investigation ....23

III. PLAINTIFFS HAVE ALLEGED VIOLATIONS OF THE EXCHANGE ACT ....24

A. The Complaint Meets The Standards Of The PSLRA And Rule 9(b) ....24

B. The Complaint Adequately Alleges Materially False And Misleading Statements And Omissions ....25

1. False Statements Regarding Past Due And Nonperforming Loans ....25

2. False Statements Regarding Loan Loss Reserves And Net Income ....29

3. False Statements Regarding Credit Risk Mitigation Practices ....34

4. False Statements Regarding LTV Ratios ....40

5. False Statements Regarding Internal Controls ....42

6. The Officer Defendants' Additional False Statements ....43

C. The Complaint Raises A Strong Inference Of The Officer Defendants' Scienter ....48

1. Internal Emails, The Criminal Information, And Other Documentary Evidence Established That The Officer Defendants Knew That The Bank Was Misreporting Its Past Due Loans ........................................49

2. The Criminal Information And Other Evidence Established That The Officer Defendants Knowingly Understated The Bank's Reserve .........56

3. The Officer Defendants Knew Of The Bank's Severely Reckless Underwriting And Asset Review Practices ..................................................58

4. Foley's Assurance That There Was Not Going To Be A "Blow Up" At The Bank Was Severely Reckless At Minimum ......................................64

D. KPMG Acted With Scienter In Issuing Its Materially False Clean Audit Opinion On The Bank's 2009 Financial Statements ............................................................65

E. Defendants' Statements Are Not Protected By The PSLRA Safe Harbor ................74

F. Plaintiffs Have Adequately Pleaded Loss Causation ................................................75

IV. PLAINTIFFS HAVE ALLEGED VIOLATIONS OF THE SECURITIES ACT ................80

A. The Offering Documents For The February 2010 Offering Contained Materially Untrue Statements And Omissions .......................................80

B. Plaintiffs' Securities Act Claims Do Not Sound In Fraud .......................................82

C. The Offering Documents Were False At The Time Of The Offering.......................84

D. The Bank's False Statements About Financial Results And Reserve Were Misstatements Of Fact ..........................................................................................85

E. Plaintiffs Have Pleaded Securities Act Claims Against KPMG ...............................89

F. duPont Is Liable For False Statements In The Offering Documents .........................92

V. THE COMPLAINT STATES CONTROL PERSON CLAIMS...........................................93

VI. CONCLUSION ..................................................................................................................94

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008) .......... 48, 49, 50

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) .......... 43

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) .......... 79

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009) .......... 80

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) .......... 43

*Argent Classic Convertible Arbitrage Fund v. Rite Aid Corp.*,
315 F. Supp. 2d 666 (E.D. Pa. 2004) .......... 69

*Atlas v. Accredited Home Lenders Holding Co.*,
556 F. Supp. 2d 1142 (S.D. Cal. 2008) .......... 4, 35, 60

*Aviva Partners LLC v. Exide Techs.*,
2007 WL 789083 (D.N.J. March 13, 2007) .......... 51

*Bartesch v. Cook*,
2013 WL 1750455 (D. Del. Apr. 23, 2013) .......... 78

*Bastian v. Petren Res. Corp.*,
892 F.2d 680 (7th Cir. 1990) .......... 78

*Craftmatic Sec. Litig. v. Kraftsow*,
890 F.2d 628 (3d Cir. 1990) .......... 27

*Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*,
454 F.3d 1168 (10th Cir. 2006) .......... 90, 91

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) .......... 75, 78

*EP Medsystems, Inc. v. EchoCath, Inc.*,
235 F.3d 865 (3d Cir. 2000) .......... 74

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) .......... 87

*Fait v. Regions Financial Corp.*,
655 F.3d 105 (2d Cir. 2011) .......... *passim*

*FHFA v. JP Morgan Chase & Co.*,
902 F. Supp. 2d 476 (S.D.N.Y. 2012) .......... 29

*FHFA v. UBS Americas, Inc.*,
858 F. Supp. 2d 306 (S.D.N.Y. 2010) .......... 89

*First Nationwide Bank v. Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994) .......... 78

*Freed v. Universal Health Servs., Inc.*,
2005 WL 1030195 (E.D. Pa. May 3, 2005) .......... 93

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) .......... 35, 77, 79

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) .......... 29

*George v. China Auto. Sys. Inc.*,
2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) .......... 78

*Glover v. DeLuca*,
2006 WL 2850448 (W.D. Pa. Sept. 29, 2006) .......... 78

*Hall v. Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008) .......... 64

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) .......... 80, 81, 90

*Illinois Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*,
653 F.3d 225 (3d Cir. 2011) .......... 84

*In re Able Labs. Sec. Litig.*,
2008 WL 1967509 (D.N.J. Mar. 24, 2008) .......... 94

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004) .......... 80, 81

*In re Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3d Cir. 1999) .......... 37

*In re Aetna, Inc. Sec. Litig.*,
617 F.3d 272 (3d Cir. 2010) .......... 37

*In re Alpharma Inc. Sec. Litig.*,
372 F.3d 137 (3d Cir. 2004) ........ 63

*In re Am. Bus. Fin. Serv., Inc. Sec. Litig.*,
2007 WL 81937 (E.D. Pa. Jan. 9, 2007) ........ 42, 93

*In re Am. Bus. Fin. Servs., Inc. Noteholders Litig.*,
2008 WL 3405580 (E.D. Pa. Aug. 11, 2008) ........ 26, 67, 72, 73

*In re Am. Int'l Grp. Inc. 2008 Sec. Litig.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010) ........ 78

*In re Ambac, Fin. Grp., Inc. Sec. Litig.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010) ........ 35, 78

*In re Bear Stearns Cos., Inc. Sec., Deriv. & ERISA Litig*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011) ........ 78

*In re BP plc Sec. Litig.*,
2013 WL 487011(S.D. Tex. Feb. 6, 2013) ........ 79

*In re Burlington Coat Factory*,
114 F.3d 1410 (3d Cir. 1997) ........ *passim*

*In re Campbell Soup Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001) ........ 51

*In re Cendant Corp. Litig.*,
60 F. Supp. 2d 354 (D.N.J.1999) ........ 68, 91

*In re CIT Grp. Inc. Sec. Litig.*,
2010 WL 2365846 (S.D.N.Y. June 10, 2010) ........ 26

*In re Citigroup, Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010) ........ 78

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ........ 60

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ........ 42, 77

*In re Diebold Sec. Litig.*,
2008 WL 3927467 (N.D. Ohio Aug. 22, 2008) ........ 56

*In re Donald J. Trump Casino Sec. Litig.*,
7 F.3d 357 (3d Cir. 1993) ........ 75, 86

*In re Downey Sec. Litig.*,
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ........ 61

*In re DVI, Inc. Sec. Litig.*,
2010 WL 3522086 (E.D. Pa. Sept. 3, 2010) ........ 65

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) ........ 42, 93

*In re Fannie Mae 2008 Sec. Litig.*,
742 F. Supp. 2d 382 (S.D.N.Y. 2010) ........ 78

*In re Ferro Corp.*,
2007 WL 1691358 (N.D. Ohio June 11, 2007) ........ 56

*In re Friedman's Inc., Sec. Litig.*,
385 F. Supp. 2d 1345 (N.D. Ga. 2005) ........ 83

*In re Harley-Davidson, Inc. Sec. Litig.*,
660 F. Supp. 2d 969 (E.D. Wis. 2009) ........ 32

*In re IKON Office Solutions, Inc.*,
277 F.3d 658 (3d Cir. 2002) ........ 71, 72

*In re IMAX Sec. Litig.*,
587 F. Supp. 2d 471 (S.D.N.Y. 2008) ........ 71

*In re Lehman Bros. Sec. & ERISA Litig.*,
799 F. Supp. 2d 258 (S.D.N.Y. 2011) ........ 92

*In re Lucent Techs., Inc. Sec. Litig.*,
217 F. Supp. 2d 529 (D.N.J. 2002) ........ 51

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ........ 91

*In re Merck & Co., Inc. Sec. Deriv. & ERISA Litig.*,
2011 WL 3444199 (D.N.J. Aug. 8, 2011) ........ 79

*In re Merck & Co., Inc. Sec. Deriv. & ERISA Litig.*,
543 F.3d 150 (3d Cir. 2008) ........ 88

*In re Netbank, Inc. Sec. Litig.*,
2009 WL 2432359 (N.D. Ga. Jan. 29, 2009) ........ 64

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ........ 42, 88

*In re NUI Sec. Litig.*,
314 F. Supp. 2d 388 (D.N.J. 2004) ........ 56

*In re Oxford Health Plans, Inc.*,
187 F.R.D. 133 (S.D.N.Y 1999) ........ 90

*In re Par Pharms. Sec. Litig.*,
2009 WL 3234273 (D.N.J. Sept. 30, 2009) .......... 63

*In re PMA Capital Corp. Sec. Litig.*,
2005 WL 1806503 (E.D. Pa. July 27, 2005) .......... 42, 57, 74

*In re RAIT Fin. Trust Sec. Litig.*,
2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) .......... 33, 35, 91

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007) .......... 83

*In re Reliance Sec. Litig.*,
91 F. Supp. 2d 706 (D. Del. 2000) .......... 30, 72

*In re Rent-Way Sec. Litig.*,
209 F. Supp. 2d 493 (W.D. Pa. 2002) .......... 56, 68, 71

*In re Res. Am. Sec. Litig.*,
2000 WL 1053861 (E.D. Pa. July 26, 2000) .......... 73

*In re Sec. Capital Assurance Ltd. Sec. Litig.*,
729 F. Supp. 2d 569 (S.D.N.Y. 2010) .......... 78

*In re SLM Corp. Sec. Litig.*,
740 F. Supp. 2d 542 (S.D.N.Y. 2010) .......... 30, 77

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006) .......... *passim*

*In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*,
941 F. Supp. 326 (S.D.N.Y. 1996) .......... 41

*In re Tellium, Inc. Sec. Litig.*,
2005 WL 1677467 (D.N.J. June 30, 2005) .......... 79

*In re Tyson Foods, Inc. Sec. Litig.*,
2004 WL 1396269 (D. Del. June 17, 2004) .......... 76, 77

*In re United Am. Healthcare Corp. Sec. Litig.*,
2007 WL 313491 (E.D. Mich. Jan. 30, 2007) .......... 32

*In re Veritas Software Corp. Sec. Litig.*,
2006 WL 1431209 (D. Del. May 23, 2006) .......... 24, 74, 75

*In re Wash. Mut., Inc. Sec. Derivative & ERISA Litig.*,
694 F. Supp. 2d 1192 (W.D. Wash. 2009) .......... *passim*

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
712 F. Supp. 2d 958 (N.D. Cal. 2010) .......... 41

*In re Westinghouse Sec. Litig.*,
90 F.3d 696 (3d Cir. 1996) .......... 30

*In re Williams Sec. Litig.-WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009) .......... 79

*In re WorldCom, Inc., Sec. Litig.*,
352 F. Supp. 2d 472 (S.D.N.Y. 2005) .......... 90

*Indiana State Dist. Council of Laborers v. Omnicare Inc.*,
719 F.3d 498 (6th Cir. 2013) .......... 83, 87

*Indiana State Dist. Council of Laborers v. Omnicare, Inc.*,
583 F.3d 935 (6th Cir. 2009) .......... 90

*Institutional Investors Grp. v. Avaya Inc.*,
564 F.3d 242 (3d Cir. 2009) .......... 48, 74, 75

*Israeli v. Team Telecom Int'l Ltd.*,
2006 WL 2883237 (D.N.J. Oct. 10, 2006) .......... 55

*Jones v. Corus Bankshares, Inc.*,
701 F. Supp. 2d 1014 (N.D. Ill. 2010) .......... 57

*Kuriakose v. Federal Home Loan Mortg. Co.*,
2011 WL 1158028 (S.D.N.Y. Mar. 30, 2011) .......... 78

*Lerch v. Citizens First Bancorp. Inc.*,
805 F. Supp. 1142 (D.N.J. 1992) .......... 28

*Lewis v. Straka*,
535 F. Supp. 2d 926 (E.D. Wis. 2008) .......... 26, 30

*Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Swanson*,
2011 WL 2444675 (D. Del. Jun. 14, 2011) .......... 36

*Mass. Mut. Life. Ins. Co. v. Residential Funding Co.*,
843 F. Supp. 2d 191 (D. Mass. 2012) .......... 41

*McCabe v. Ernst & Young, LLP*,
494 F.3d 418 (3d Cir. 2007) .......... 80

*McIntire v. China MediaExpress Holdings, Inc.*,
2013 WL 752954 (S.D.N.Y. Feb. 28, 2013) .......... 71

*Medtronic Ave, Inc. v. Bos. Scientific Corp.*,
2001 WL 652016 (D. Del. Mar. 30, 2001) .......... 24

*N.Y.S. Teachers' Ret. Sys. v. Fremont Gen. Corp.*,
2009 WL 3112574 (C.D. Cal. Sept. 25, 2009) .......... 61

*No. 84 Emp.-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ........ 64

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ........ 55

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
142 F. Supp. 2d 589 (D.N.J. 2001) ........ 68

*Pathfinder Mgmt., Inc. v. Mayne Pharma, Inc.*,
2009 WL 4250061 (D.N.J. Nov. 25, 2009) ........ 55

*Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*,
2013 WL 1431680 (D.N.J. Apr. 9, 2013) ........ 34, 41

*Reiger v. PriceWaterhouseCoopers LLP*,
117 F. Supp. 2d 1003 (S.D. Cal. 2000) ........ 71

*Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) ........ 25, 83

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ........ 75

*Schoenhaut v. Am. Sensors, Inc.*,
986 F. Supp. 785 (S.D.N.Y. 1997) ........ 42

*SEC v. Okin*,
137 F.2d 862 (2d Cir. 1943) ........ 90

*Serabian v. Amoskeag Bank Shares, Inc.*,
24 F.3d 357 (1st Cir. 1994) ........ 35

*Shapiro v. UJB Fin. Corp.*,
964 F.2d 272 (3d Cir. 1992) ........ *passim*

*Steamfitters Local 449 Pension Fund v. Alter*,
2011 WL 4528385 (E.D. Pa. Sept. 30, 2011) ........ *passim*

*Steiner v. MedQuist Inc.*,
2006 WL 2827740 (D.N.J. Sept. 29, 2006) ........ 69

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
551 U.S. 308 (2007) ........ 48, 64

*Underland v. Alter*,
2011 WL 4017908 (E.D. Pa. Sept. 9, 2011) ........ 86

*Underland v. Alter*,
2012 WL 2912330 (E.D. Pa. July 16, 2012) ........ 33, 86, 90

*Underland v. Alter*,
2012 WL 4108998 (E.D. Pa. Sept. 18, 2012) .......... 86, 88

*United States ex rel. Atkinson v. Pa. Shipbuilding Co.*,
2000 WL 1207162 (E.D. Pa. Aug. 24, 2000) .......... 32

*United States ex rel. Wilkins v. United Health Grp., Inc.*,
659 F.3d 295 (3d Cir. 2011) .......... 42

*Virginia Bankshares v. Sandberg*,
501 U.S. 1083 (1991) .......... 87

*Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*,
2010 WL 1332574 (S.D. Fla. Mar. 30, 2010) .......... 61

*Weiner v. Quaker Oats Co.*,
129 F.3d 310 (3d Cir. 1997) .......... 26, 27

*West Run Student Hous. Assocs. LLC v. Huntington Nat'l Bank*
712 F.3d 165 (3d Cir. 2013) .......... 73

*Winslow v. BancorpSouth, Inc.*,
2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011) .......... 26, 30

**STATUTES/RULES**

15 U.S.C. § 77k(a)(4) .......... 89, 91

15 U.S.C. § 77k(b)(1)(B) .......... 92

15 U.S.C. § 77k(b)(3)(B)(i) .......... 91

15 U.S.C. § 78u-4(b)(1) .......... 24

15 U.S.C. § 78u-5(b)(2)(A) .......... 74

15 U.S.C. § 7262 .......... 90

17 C.F.R. § 230.412(a) .......... 85

Fed. R. Civ. P. 15(a) .......... 94

**OTHER AUTHORITIES**

Black's Law Dictionary 138 (8th ed. 2004) .......... 90

OCC, Policies & Procedures Manual § 5310-3 (2011), *available* at
http://www.occ/gov/static/publications/ppm-5310-3.pdf. .......... 58

Stephen M. Davidoff, *Fairness Opinions*, 55 Am. U. L. Rev. 1557, 1616 (2006) .......... 91

Lead Plaintiffs, the Merced County Employees' Retirement Association, the Coral Springs Police Pension Fund, the St. Petersburg Firefighters' Retirement System, the Pompano Beach General Employees Retirement System, and the Automotive Industries Pension Trust Fund (collectively, "Plaintiffs"), respectfully submit this memorandum of law in opposition to Defendants' motions to dismiss the Fourth Amended Consolidated Securities Class Action Complaint (the "Complaint").[1]

## I. PRELIMINARY STATEMENT

Throughout the Class Period, Wilmington Trust Corporation ("Wilmington" or the "Bank") portrayed itself as a stable and conservative bank with a sound loan portfolio that could withstand the credit crisis. ¶52. In particular, Wilmington reported low amounts of past due loans in its quarterly and annual SEC filings, a key credit metric that communicated to investors that the Bank's loans were being repaid on time, and the credit quality of its loan portfolio was strong. ¶53. The Bank attributed the quality of its portfolio to its purportedly "rigorous" loan underwriting standards and its "regular[] review of all past due loans" to "mitigate credit risk." ¶¶91, 135. All of these statements were false.

As has now been admitted in a detailed Criminal Information to which the Bank's former Head of Delaware Commercial Real Estate Lending, Joseph Terranova, recently pleaded guilty, Wilmington's most senior officers engaged in a massive criminal conspiracy designed to "fraudulently conceal the Bank's true financial condition in many ways," including by "causing the Bank to misrepresent its reporting of past due and nonperforming loans." ¶54. Specifically, for nearly five full years, the Bank and its senior officers materially misstated the amount of Wilmington's past due loans reported in its financial statements by hundreds of millions of dollars

[1] All citations to "¶_" are to the Complaint. All citations to "Ross Ex. _" refer to the Declaration of Hannah Ross filed in support of the Complaint. All capitalized terms are defined in the Complaint, unless otherwise defined herein. All emphasis is added unless otherwise stated.

each quarter. ¶¶70-72, 220-27.

Wilmington perpetrated the fraud by falsely claiming that hundreds of past due loans were "in the process of extension," when in reality they had been delinquent for months, and even years. ¶61. Federal law and the Bank's own policies provided that Wilmington could extend a past due loan, and thus avoid reporting it as past due, only if the Bank first obtained an updated appraisal of the loan collateral. *Id*. However, Wilmington had what the Bank's own officers internally called an "appraisal problem." ¶74. Because the value of the collateral underlying so many of Wilmington's loans had declined substantially in recent years, Defendants understood that updating the appraisals would force the Bank to recognize enormous losses on its loans – which would have, in their own words, "catastrophic consequences" for the Bank. *Id*. Accordingly, in direct violation of federal law, Wilmington simply categorized its past due loans as being "in the process of extension" without ever obtaining updated appraisals, or taking any other steps to verify the borrower's ability to pay. By doing so, Defendants not only concealed the disastrous state of Wilmington's loan portfolio, but also dramatically understated the Bank's reserve for losses inherent in the loan portfolio (the "Loan Loss Reserve" or "Reserve") and materially overstated its net income. ¶62.

Numerous internal emails revealed that the Bank's most senior officers – CEO Ted Cecala, President Robert Harra, CFO David Gibson, and Chief Credit Officer Bill North – knew that the Bank was misstating its past due loans throughout the Class Period. *E.g.*, ¶¶73-79. Indeed, in these emails, the Officer Defendants repeatedly discussed the fact that the Bank's past due loan reporting had "not exactly been reality," did not reflect a "true past due [loan] number," and violated federal law. ¶¶73, 76. By the fall of 2009, the Officer Defendants recognized that the Bank's fraudulent reporting of its past due loans had become so egregious that it could "not continue for much longer," and thus they focused their "attention" on devising a plan to make these past due loans "go away" permanently. ¶79. Accordingly, in the fall of 2009, they decided to execute a sham mass

extension of 1,250 past due loans worth $1.7 billion, which amounted to 25% of the Bank's commercial loan portfolio, without obtaining a single updated appraisal, in violation of federal law. ¶¶80-81. By executing this mass extension, the Officer Defendants simply eliminated these troubled loans from the Bank's financial statements. ¶¶79-81. Indeed, the Officer Defendants personally approved hundreds of these extensions, worth $1.3 billion, in the final days of 2009, precisely to ensure that those past due loans were not reported in the Bank's 2009 financial statements. ¶¶81-82.

When the truth about Wilmington's fraud was revealed, the Bank collapsed. Specifically, on November 1, 2010, it was revealed that Wilmington had failed to report approximately $800 million in losses in its loan portfolio, that the Bank's financial condition was so impaired that it could no longer survive as an independent entity, and that it would be sold to M&T Bank ("M&T") at a fire sale price equal to only half the price at which Wilmington shares were trading the prior day. ¶¶198, 202-05. The Bank's stock price immediately collapsed on this news, causing massive losses to investors. ¶¶205-09. This news also sparked a host of criminal investigations into the Bank's fraudulent financial reporting. As explained by the U.S. Attorney for the District of Delaware, who is heading the criminal prosecutions, the criminal investigation is "ongoing and continuing" and Terranova's guilty plea was just one "important step in holding responsible those individuals whose criminal conduct contributed to the failure of Wilmington Trust." ¶214.

There can be no serious question that the detailed allegations of this admitted criminal conspiracy to "fraudulently conceal the Bank's true financial condition" state a claim under Section 10(b) of the Securities Exchange Act. In response, Defendants raise arguments that contradict the admitted facts in the Complaint and Criminal Information, contravene established Third Circuit law, and at best raise factual issues that cannot be resolved at this stage of the proceedings. These arguments should be swiftly rejected.

First, Defendants ask this Court to conclude, as a matter of law, that none of their admittedly false statements were material to investors. *See, e.g.*, WT Br. 16-17, 25-28; UW Br. 20-21. Defendants go so far as to contend that Wilmington's fraudulent concealment of hundreds of millions of dollars worth in past due loans from its financial statements was immaterial as a matter of law because investors purportedly paid more attention to the Bank's other disclosures. *See* WT Br. 16-17; UW Br. 20-21. This is nonsense. SEC regulations required the Bank to report its past due loans on a quarterly basis precisely because this financial metric was material (¶58 n.3) and, for the same reason, the Bank often highlighted its low number of past due loans in its quarterly press releases and conference calls. Indeed, Defendants' argument contravenes well-settled Third Circuit law, which explicitly recognizes that "a reasonable investor would be influenced significantly by knowledge that a bank has knowingly or recklessly hidden its true financial status by deliberately misstating its level of non-performing loans." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992). Similarly, Defendants contend that their statements concerning the Bank's "rigorous" and "consistent" credit risk management practices were nothing more than immaterial "puffery." WT Br. 25-28; UW Br. 16-18; North Br. 19-20. Defendants' argument once again contradicts well-established law in this Circuit and nationwide, which makes clear that representations regarding a bank's loan underwriting and asset review are not only material, but are "among the most important information looked to by investors." *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1150-52, 1154-55 (S.D. Cal. 2008); *see also Shapiro*, 964 F.2d at 282 ("By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.").

The Officer Defendants also argue that Plaintiffs' allegations do not establish a strong inference of scienter. WT Br. 38-60; North Br. 21-28. Defendants' primary argument is that the massive fraud at Wilmington was perpetrated by a single rogue employee – Terranova. WT Br. 1-2,

38, 56; North Br. 4. This argument directly contradicts the Criminal Information, which established that senior Bank employees engaged in a criminal "conspiracy" to misstate the Bank's reported past due loans, and that the majority of the unreported past due loans were originated by lenders other than Terranova. ¶76. This argument also ignores the internal emails described above and reports by key confidential witnesses (including at least one such witness who is cited extensively in the Criminal Information), which demonstrated that the Officer Defendants clearly knew of and participated in the fraud. *E.g.*, ¶¶64-67, 73-79. Indeed, the Complaint alleges and the Criminal Information revealed that the Bank's Loan Committee, which included Defendants Cecala, Harra, and North, approved the fraudulent mass extension of hundreds of past due loans in the fourth quarter of 2009 for the purpose of erasing those loans from the Bank's financial statements. ¶¶81-84. In sum, the notion that Terranova single-handedly duped the Officer Defendants into misstating the Bank's past due loans by hundreds of millions of dollars for 18 consecutive quarters, and then orchestrated the $1.7 billion mass extension without the Officer Defendants' knowledge, is absurd.

Defendants also contend that the Complaint fails to allege their scienter for misstating the Bank's Reserve by hundreds of millions of dollars each quarter. WT Br. 47-51. Again, however, this argument directly contradicts the Criminal Information, which established that a central objective of the criminal conspiracy among Wilmington's senior officers was to misstate the Reserve. ¶63. Specifically, as admitted in the Criminal Information, the Bank failed to obtain updated appraisals because doing so "would have required WTC to recognize losses on the credits and would have had a negative impact on WTC's [Reserve]." *Id*. Given that the Officer Defendants deliberately failed to obtain legally required appraisals in order to understate the Reserve, scienter is plainly established.

For the reasons set forth herein, Defendants' motions to dismiss should be denied.

## II. FACTUAL BACKGROUND

### A. The Scheme To Fraudulently Conceal Billions Of Dollars Worth Of Past Due Loans At Wilmington

Throughout the Class Period, Wilmington assured investors that it was a conservative regional lender with a "strong capital position," "107 years of stability," and business practices that "st[oo]d in stark contrast to the struggles and distractions that many other financial institutions" were experiencing during the financial crisis. ¶52. Consistent with these assurances, each quarter during the Class Period, Wilmington reported very low amounts of past due loans in its quarterly and annual SEC filings.[2] ¶53. The Bank's reported amount of past due loans was a critical financial metric understood by investors to directly represent the credit quality of the Bank's loan portfolio. ¶¶53, 59. The amount of reported past due loans directly impacted the Bank's reported Reserve, *i.e.*, the amount of money the Bank set aside each quarter to cover probable losses in its loan portfolio, and its income. ¶¶62-63. Specifically, as past due loans increased, Wilmington's Reserve increased, and its income decreased on a dollar-for-dollar basis. ¶¶58, 62-63. Based on the small number of past due loans that the Bank publicly reported, investors concluded that Wilmington's loan portfolio was sound, and analysts "comment[ed] on how they were 'encouraged' by the low levels of the Bank's past due and nonperforming loans." ¶¶53, 58-59.

In reality, as has now been admitted, throughout the Class Period, senior Bank executives engaged in an "overarching bank fraud conspiracy" that "fraudulently conceal[ed] the Bank's true financial condition in many ways," including by dramatically understating the true amount of the Bank's publicly reported past due loans. ¶¶54-90. As set forth in the Criminal Information:

> It was a[n] . . . <u>objective of the conspiracy for defendant and his co-conspirators to fraudulently conceal the Bank's true financial condition in many ways</u>, including by

[2] Wilmington reported its past due loans in three categories: (i) "Serious Doubt" loans, including loans that were 30-89 days past due; (ii) loans that were "90 Days or More Past Due" and still accruing interest income; and (iii) "Nonperforming" or "Nonaccruing" loans, including loans that were 90 days or more past due but not accruing interest income. ¶58. These past due and nonperforming loans are collectively referred to as "past due loans."

> extending new credit to clients to keep existing loan interest payments current and by causing the Bank to misrepresent its reporting of past due and nonperforming loans.

*Id*.

The Complaint and the Criminal Information detailed how Wilmington and the Officer Defendants deliberately failed to report hundreds of millions of dollars worth of past due loans in the Bank's quarterly financial statements for 18 consecutive quarters – or four and a half years – in violation of federal law and the Bank's own policies. ¶¶60-62, 70-72, 218-27, 403-08. Federal guidelines generally require that a loan must be publicly reported as past due once "interest or principal remains unpaid for 30 days or more." ¶58 n.3. Wilmington's Nonaccrual Policy provided that loans that were otherwise past due could be "waived" from public reporting as long as (i) the loan was legitimately "in the process of extension and/or modification," (ii) the borrower remained current on interest payments, and (iii) the borrower's ability to repay the loan was not in jeopardy. ¶60.

Both federal law and the Bank's own Appraisal Policy further provided that the Bank could extend or modify a loan only if it obtained an updated appraisal of the value of the loan collateral. ¶61. As detailed in the Criminal Information and further below, the Bank's senior officers understood that this requirement created what they referred to as an "appraisal problem" for the Bank. ¶74. Specifically, if the Bank obtained updated appraisals for the collateral securing the past due loans it wished to extend, the updated appraisals would have revealed that the collateral had plummeted in value. ¶62. The severe decline in the value of the loan collateral, in turn, would have required the Bank to recognize large losses on its past due loans, significantly increase its Reserve, and thus report much lower net income. *Id*.

As a result, as set forth in the Criminal Information, Wilmington's senior executives solved this "appraisal problem" by violating federal law. Specifically, they improperly waived hundreds of past due loans from public reporting by falsely claiming that these loans were "in the process of"

extension, when in fact they were not. ¶¶61, 63. Significantly, pursuant to this practice, no updated appraisals were ever obtained for the loans that were designated as being "in the process of extension," and no determination was made as to whether the borrower had the ability to repay the loan. ¶¶64-66. As described in the Criminal Information and the Complaint, the Officer Defendants knew that Wilmington's senior executives, including but not limited to Terranova, falsely represented that hundreds of millions of dollars worth of past due loans were "in the process of extension" for months, and sometimes years, in order to remove those loans from the Bank's reported past due loan amounts. ¶¶64-70, 73-79.

Through this past due loan fraud, the Bank fraudulently purged more than one billion dollars worth of past due loans from its financial statements. ¶¶68, 70-72. As admitted in the Criminal Information, from as early as 2005 until at least March 31, 2010, Wilmington fraudulently understated the critical past due loan metrics it reported to investors by hundreds of millions of dollars each quarter. *Id*. Specifically, past due loans were understated by at least the following amounts: (i) $105 million, or 35%, as of December 31, 2008; (ii) $186 million, or 70%, as of the first quarter of 2009; (iii) $234 million, or 69%, as of the second quarter of 2009; (iv) $463 million, or 125%, as of the third quarter of 2009; and (v) $373 million, or 78%, as of the fourth quarter of 2009. ¶¶70, 72, 221, 225. The Bank's understatements of its past due loans from year-end 2008 through 2009 are set forth in the chart below (¶¶71-72):

| | **Total Reported Past Due Loans** | **Total Concealed Past Due Loans** | **Total Past Due Loans The Bank Should Have Reported** | **Percentage Of Understatement** |
|---|---|---|---|---|
| **4Q08** | $296.70 | $105.00 | $401.70 | 35% |
| **1Q09** | $265.30 | $186.00 | $451.30 | 70% |
| **2Q09** | $337.10 | $234.00 | $571.10 | 69% |
| **3Q09** | $411.60 | $463.00 | $874.60 | 125 % |
| **4Q09** | $476.70 | $373.00 | $849.70 | 78% |

As set forth in the Criminal Information, the amount of loans that Wilmington had that were past due – but not disclosed to investors – had reached such substantial levels that, by the fall of 2009, the Officer Defendants were internally discussing "how we can make them go away by 12/31." ¶79. Accordingly, in the fourth quarter of 2009, the Officer Defendants executed a massive sham "extension" of 1,250 delinquent loans worth more than $1.74 billion – an amount which accounted for 25% of the Bank's loan portfolio. ¶¶80-83. The Criminal Information described how this sham extension was approved by the Bank's Loan Committee, which included, among others, Defendants Cecala, Harra, and North. ¶¶81-83. Shortly after purging hundreds of the Bank's most troubled loans from its 2009 financial statements, the Officer Defendants used those financial statements in the offering materials for a public offering of common stock conducted in February 2010, pursuant to which the Bank raised nearly $274 million from unsuspecting investors (the "February 2010 Offering"). ¶403.

The failure to report these past due loans caused the Bank's publicly reported financial statements to be materially false in numerous ways. Had the Bank reported the true amount of its past due loans, it would have revealed to the market that its loan portfolio was in extremely poor condition. Further, because any increase in past due loans required the Bank to increase its Reserve, by understating the amount of past due loans, the Bank was able to report an artificially low Reserve. ¶¶162, 166-67. In turn, because an increase in the Reserve would have resulted in a concomitant decrease in net income, the Bank was able to report artificially inflated net income to investors. ¶¶1, 54, 162, 166-67. Finally, as confirmed by the Criminal Information, by fraudulently categorizing loans as "in the process" of extension, the Bank avoided obtaining updated appraisals, which were required to legitimately extend a loan under federal law and the Bank's own Appraisal Policy. ¶61. Had the Bank updated its appraisals as required, the "updated appraisals would have

required [Wilmington] to recognize losses . . . and would have had a negative impact on [Wilmington's Reserve]." ¶63.

## B. The Officer Defendants Knew Of The Past Due Loan Fraud

As set forth in documents detailed in the Criminal Information, the Officer Defendants were well aware that the Bank was fraudulently understating the amount of its past due loans. In early January 2009, Credit Policy Manager Steve Cummings, who reported to Cecala, sent an email to North and Delaware Market Manager Brian Bailey, who reported to Harra, stating that Cummings wanted to discuss the Bank's "practice of waiving loans . . . from our past due reporting." Cummings pointedly noted that the Bank's past due reporting "has not exactly been reality" and that the Bank had understated its "true past due number" as of year-end 2008 by "over $105 million" – or by 35% – and that this would likely "raise issues for [the Bank]" in the future. ¶73. As a result, Cummings requested a meeting with North and Bailey immediately after the next meeting of the Loan Committee – which included Defendants Cecala, Harra, and North – to get North's "input" on this issue:

> We would like to hold a brief meeting on Wednesday 1/21 immediately following Loan Committee to discuss addressing the practice of waiving loans that are matured but current for interest from our past due reporting. I had thought that for the last few quarters that we were trying to only waive bank errors or loans that had made it through the approval process but were not booked in time to come off delinquency. Apparently that has not exactly been reality. At 12/31/08 the total of matured/waived stood at over $105 million and nearly 80 loans.
>
> With your input, we would like to set a reasonable goal/game plan for getting these loans renewed/extended and allowing the system to report a true past due number without a lot of adjustments that could raise issues for us at some point in the future.

*Id.*

However, as noted above, the Officer Defendants knew that if Wilmington had obtained the updated appraisals required to legitimately extend its past due loans, this would force the Bank to recognize large losses. ¶74. Following a Loan Committee meeting in April 2009, Defendant North,

Terranova, and Senior Real Estate Credit Officer Terry Brewer had a "long conversation" about this "appraisal problem." *Id*. Soon thereafter, on April 8, 2009, Terranova emailed Bailey a spreadsheet of the Delaware Commercial Real Estate Division's Residential Construction projects that were due to receive an updated appraisal in the second quarter of 2009. *Id*. Terranova explicitly warned Bailey not to obtain any updated appraisals, because he had recently "had a long conversation with [Defendant North and Brewer] after loan committee regarding the [a]ppraisal problem." *Id*.

After reviewing the Delaware loans that required new appraisals, Bailey confirmed the seriousness of the "appraisal problem." ¶74. Although Terranova's portfolio represented only 7% of the Bank's commercial real estate loans, Bailey responded that, if the Bank were to obtain the required appraisals, it would bring about immediate and "catastrophic consequences" for the Bank:

> We need to address asap. As I suspected this list is not comprehensive of the bank just your portfolio and has the near term potential for catastrophic consequences.

¶¶74-75. Senior Bank executives were well aware that their failure to obtain appraisals violated federal law. Indeed, in mid-April 2009, CW 2, the Bank's Head of Credit Risk Management and one of the former Bank employees the Criminal Information specifically relies on, sent an email to Bailey and Terranova, in which CW 2 stated that "the regs [federal regulations] are pretty clear on the need for reappraisals" when loans are being extended. ¶76.

In September 2009, CW 2 again raised the Bank's failure to properly record past due loans with the Bank's senior officers. ¶78. On September 16, 2009, CW 2 emailed Defendant North, Bailey and Terranova that, despite having "been the subject of conversations for multiple consecutive months," the Bank was still improperly designating numerous loans as "extension is in process" as a means to avoid "transfer to nonaccrual [*i.e.*, past due]." *Id*. CW 2 also stated that this practice violated the Sarbanes-Oxley Act ("SOX") and could "not continue for much longer:"

> The level of loans which have been matured 90+ days needs to be better managed. The list below reflects the accounts which had to be researched this month for potential movement to nonaccrual, based upon the delinquency associated with

> the account. (A maturity billing is a principal billing, and to the extent the maturity is not addressed, principal is delinquent. That delinquency grows until the loan is repaid or otherwise extended). Several of these accounts have been the subject of conversations for multiple consecutive months. For now, I am explaining that an "extension is in process" [i]s a means to avoid unnecessary transfers to nonaccrual. In this era of SOX and second-guessing, I do not think that this can continue for much longer.

¶78.

As a result, the Officer Defendants devised a plan by which the Bank could "make" its problem loans "go away." ¶79. On October 29, 2009, the Chief Operating Officer for the Mid-Atlantic Market, Rich Conway, sent an email to Defendant North, Bailey and Cummings with the subject line "Discuss process and strategy to eliminate matured loans by 12/31." *Id*. In the email, Conway wrote that "it is extremely important that we talk about matured loans and how we can make them go away by 12/31. . . . This cannot be a quick fix for 90 or 120 days as the problem will just return." *Id*. Conway pointedly noted that the issue of Wilmington's past due loan reporting was so significant that the Bank's most senior officers and KPMG were intimately involved in these discussions: this "has the attention of all the wrong people: [Cecala, the CEO; Harra, the Bank President; Gibson, the CFO], Examiners, Auditors." *Id*.

### C. The Officer Defendants Engaged In A Fraudulent $1.74 Billion Mass Extension Of Past Due Loans To Eliminate Them From The Bank's Financial Statements

In the fourth quarter of 2009, the Officer Defendants indeed came up with a scheme to make the Bank's problem loans "go away" by year-end. ¶¶79-81. Specifically, Wilmington fraudulently "mass extended" 1,250 past due loans worth $1.74 billion in the fall of 2009 and early 2010. ¶¶80-83. These 1,250 past due loans – which represented a staggering 25% of the Bank's total outstanding commercial loans – were "extended" in direct violation of federal regulations and Bank policy, and lacked the requisite updated appraisals, credit analysis, or other documentation necessary for proper extension or modification. *Id*. Significantly, this "mass extension" of past due loans was approved by the Bank's Loan Committee, which Defendant North chaired, and which

included Defendants Cecala and Harra. ¶¶81-83.

As the Complaint and the Criminal Information demonstrate, Defendants Cecala, Harra, Gibson, and North devised this mass extension specifically so that the Bank would not have to report its true past due loan figures in its year-end financial statements. Indeed, 803 of the loans that were extended, with a value of $1.3 billion – or nearly 20% of the Bank's commercial loan portfolio – were fraudulently "mass extended" before the close of Wilmington's 2009 financial reporting period. ¶¶80-81. As detailed in the Criminal Information, Defendants Cecala, Harra, and North extended hundreds of these loans in the final days of the 2009 fiscal year, and often on the same day that the purported extension was first requested – without any consideration required to determine whether the extension was legitimate. ¶82. For example, on December 30, 2009, Terranova requested that the Loan Committee extend until April 2010 multiple loans from a single borrower with an outstanding balance of $94 million. *Id*. Many of these loans had been delinquent and "in the process of extension" for months in 2009. *Id*. Cecala, Harra, and North approved this requested "extension" on the same day Terranova submitted it, without requiring updated appraisals and despite the fact that the borrower had never executed the extension documents that formed the basis of the request. *Id*. Similarly, on December 22, 2009, Terranova requested that the Loan Committee extend approximately $9 million in loans relating to another borrower. ¶¶82-83. On December 30, Cecala, Harra, and North summarily approved the request, again without requiring updated appraisals. *Id*.

This fraudulent mass extension allowed Wilmington to steal hundreds of millions of dollars from the investing public. ¶71. As confirmed by the Criminal Information, the "mass extension" allowed "[t]he Bank [to] utilize[] the [artificially low] December 31, 2009 past due loan figures in its 2009 Form 10-K, filed with the SEC in February 2010 [which] was the basis for the Bank's proxy statement submitted in connection with [the Bank's February 2010 Offering] that resulted in

the sale of approximately $274,000,000 in [Wilmington] stock." ¶403.

The Officer Defendants' fraudulent extension of troubled loans continued in the first and second quarters of 2010. ¶¶80-81. During those reporting periods, the Officer Defendants improperly extended an additional approximately 450 troubled loans worth in excess of $430 million. ¶81. Again, as detailed in the Criminal Information, the Officer Defendants "extended" many of these loans in the final days of these reporting periods, specifically so that they would not have to be publicly reported. For example, as noted above, the Loan Committee had previously granted Terranova's request to extend $94 million worth of delinquent loans from a single borrower until April 2010. ¶82. When this borrower again did not repay the loans, Terranova requested on March 31, 2010 that the Loan Committee "reaffirm" this extension until December 31, 2010. *Id*. Terranova offered no reason for the "reaffirmed" extension other than "[d]ue to timing issues, the extension documents were never executed by the . . . borrower." *Id*. The same day that Terranova submitted this request, the Loan Committee approved the extension, again without requesting any updated appraisals for these loans or any other required information. *Id.*

Similarly, on April 7, 2010, another bank employee requested that the Loan Committee re-extend the $9 million loan referenced above, which had originally been extended on December 30, 2009. ¶83. By this point, these loans were 100 days past due the extended date. *Id*. On April 23, the Loan Committee approved the request – again without requiring any updated appraisals or any other required documentation, thereby eliminating these delinquent loans from the Bank's second quarter financial statements. *Id*.

### D. <u>**The Officer Defendants Were Informed Of The Past Due Loan Fraud Through Internal Reports, And Discussed The Fraud At Meetings**</u>

In addition to the facts detailed above, numerous other facts further establish that the Officer Defendants were well aware that the Bank understated its past due loans by hundreds of millions of dollars each quarter. As set forth in the Criminal Information, the Bank documented its past due

loans – and specifically noted whether they were waived from public reporting as supposedly being "in the process of extension" – in internal Delinquency Reports that were compiled on a monthly basis. ¶¶64-66. High-ranking former Bank employees confirmed that these monthly Delinquency Reports were provided directly to Defendant North, who personally approved all loan waivers set forth in the reports. ¶66. After approving these improper waivers – many showing up without any required documentation month after month, and sometimes for years – North then circulated these Delinquency Reports on at least a quarterly basis to Cecala, Harra, and Gibson. *Id.* These Delinquency Reports were also sent to the Bank's Finance Department, where, under Gibson's direction, the "waived" loans were removed to prepare the Past Due List, which was the document used for the Bank's publicly reported past due loan figures. ¶67.

Moreover, former high-ranking Bank employees confirmed that the Officer Defendants attended quarterly Credit Strategy Meetings where they regularly discussed the improper past due loan waivers and the Bank's failure to obtain updated appraisals. ¶85. CW 2 and CW 1 (a Vice President in Wilmington's Workout Group from 2008 through July 2011) reported that, when the need to obtain updated appraisals was raised to Cecala, Harra, Gibson, and North at the Bank's Credit Strategy Meetings, these Defendants invariably refused to authorize such updated appraisals. ¶¶86-87. Notably, Cecala specifically ordered the Bank's Workout Group not to obtain updated appraisals, knowing that any collateral updates would force the Bank to downgrade and charge off all or part of its troubled loans. ¶¶87, 151.

CW 1 further described how the Officer Defendants knew that the waiver extensions were a "joke" and how, when the past due loan waivers were discussed at Credit Strategy Meetings, the Officer Defendants treated the waivers with a "nod, nod, wink, wink," thereby granting the waivers without any meaningful discussion of the terms of the purported extensions that were supposedly "in process." ¶85. Moreover, CW 1 explained that it was common knowledge at the Bank that the

late 2009 "mass extensions" were not real extensions and that the Bank's executives openly laughed about them. *Id.*

### E. **The Officer Defendants Made Misrepresentations Concerning Wilmington's Supposedly "Rigorous" Underwriting And Asset Review Practices**

Throughout the Class Period, Wilmington stated in its SEC filings that one of the Bank's "primary risks [was] credit risk," *i.e.*, "the risk that borrowers will be unable to repay their loans," causing the Bank's loans to become past due. *See, e.g.*, Ross Ex. 1 (2008 10-K) at 44; Ross Ex. 5 (2009 10-K) at 50. Wilmington repeatedly reassured investors that it mitigated this crucial credit risk by engaging in "rigorous" underwriting and "regularly" reviewing the assets in its loan portfolio, including all past due loans. In particular, in a separate "Credit Risk" section of its SEC filings, Wilmington stated that:

> One of our primary risks is credit risk (the risk that borrowers will be unable to repay their loans). To mitigate this risk, we:
>
> - Employ rigorous loan underwriting standards and apply them consistently.
> - Monitor the portfolio to identify potential problems . . . .
> - Regularly review all past-due loans, loans not being repaid according to contractual terms, and loans we doubt will be paid on a timely basis.

*Id*. (emphasis in original); ¶¶91, 161, 242, 248, 422. The Bank similarly claimed that it "consistently" rated its loans according to credit risk, which supposedly helped the Bank adequately reserve for loan losses. *Id*.

These statements were false. Contrary to the Bank's representations, the Criminal Information and FBI Affidavits confirmed that Wilmington routinely extended loans to borrowers without any consideration of the borrowers' ability to repay loans. ¶¶92-110. Indeed, as the Criminal Information provided, the Bank fraudulently concealed its financial condition by "extending new credit to clients to keep existing loan interest payments current." ¶¶54, 92. Moreover, contrary to the Bank's statements that it "regularly review[ed] all past due loans" and

"consistently" rated its loans by credit risk in order to adequately establish the Reserve, the Criminal Information and former high level employees confirmed that the Bank: (i) reported materially false amounts of past due loans throughout the Class Period, and (ii) under-reserved for these loans by hundreds of millions of dollars. ¶¶134-51, 220-27, 230-34.

The Bank's practice of extending loans without considering the borrower's ability to repay, and its failure to rate its loans according to credit risk, is illustrated by the Bank's relationship with Michael Zimmerman, a prominent Delaware real estate developer who was one of the Bank's largest and most important borrowers. As of March 2010, Zimmerman had 75 loans outstanding from the Bank totaling nearly $100 million – an amount that constituted almost 6% of the Bank's total construction loan portfolio. ¶111. The Zimmerman relationship was managed by Terranova, one of the Bank's most senior and significant Relationship Managers, who was responsible for $500 million, or 7%, of the Bank's commercial loan portfolio. ¶54. As the Complaint alleges, many of the Bank's loans to Zimmerman were based solely on informal, undocumented requests, and the Bank continued to extend loans to Zimmerman even when he (i) had not met the terms of his loan agreements, (ii) had difficulty making payments on his existing loans and needed additional loans to prevent defaults, and (iii) failed to show progress on his development projects, as ostensibly required by his loan agreements. ¶112.

Wilmington's loans to Zimmerman to develop a commercial center called the Salt Pond Plaza in Ocean View, Delaware, provide a striking example of the Bank's grossly reckless underwriting practices. ¶¶113-21. After the Loan Committee (including Cecala, Harra, and North) approved a $10 million loan to Zimmerman to develop Salt Pond in December 2006, Terranova altered the loan terms in January 2007 to allow Zimmerman to obtain part of the loan at an earlier stage. ¶113. The Criminal Information and the FBI Affidavits confirmed that Terranova was able to alter the loan terms because Wilmington lacked adequate underwriting controls, as risk

management personnel were never required to compare the approved loan terms to the actual loan agreement before distributing funds. ¶115. Indeed, according to CW 1, a lender's ability to alter loan terms post-approval was a "prevalent" practice at Wilmington. *Id.*

Five months after the loan was approved, Zimmerman still had no signed leases for the property, a prerequisite to qualifying for a $1 million payout from the loan. ¶117. Nevertheless, Zimmerman asked Terranova to send him that money in an email with the subject line "$1,000,000 Clams." *Id*. Terranova's response, which was kept in the Bank's loan files, stated that he would send the money because he did "not want[] my reputation for reckless abandon to be in jeopardy." *Id*. When Terranova then asked Zimmerman for documentation before wiring the $1 million, Zimmerman responded, "Where's the trust?" Terranova responded as follows: "I have all the trust in the world in you – its [sic] the Federal Examiners who don't trust me [] I have a whole chapter in their upcoming manual – '9 ways to violate Federal Law.'" *Id*. The $1 million was sent to Zimmerman within two business days of his request. ¶118.

By January 2008, or one year after Wilmington "underwrote" Zimmerman's Salt Pond loan, Zimmerman still had no signed leases or rent-paying tenants at Salt Pond, as required by the loan agreements. However, rather than call the loan, or report it as past due, Wilmington continued to give Zimmerman cash. In fact, in January 2008, Zimmerman faxed a demand to the Bank stating "Send $ $1,000,000 ASAP I have to pay my bar tab." ¶119. Wilmington immediately wired him the $1 million. By May 2009, two years after the loan had been approved, Zimmerman had not only still failed to secure any rent-paying tenants at Salt Pond, but had also exhausted the entire $10 million loan on nothing more than a "partially completed parking lot." ¶121. Despite that utter lack of progress, and despite knowing that Zimmerman was having "significant difficulties in making payments" on his loans, the Bank extended yet another $2 million to Zimmerman to cover "cost overruns." ¶¶121, 132. There is no evidence that anyone at Wilmington ever asked how

Zimmerman had ostensibly spent $10 million to "partially complete" a parking lot. ¶121.

The Officer Defendants were well aware that the Zimmerman loans were significantly past due. As noted above, Zimmerman was one of the Bank's largest and most important borrowers, and the Officer Defendants personally approved many of the loans to Zimmerman that were made with no review of his ability to repay. ¶¶82-84, 114-24. By no later than 2008, the Bank had internally identified Zimmerman's "significant difficulties in making payments." ¶132. Notably, however, Wilmington loaned him an additional $22 million over the next two years, millions of dollars of which was provided solely so that Zimmerman could make interest payments on his existing loans. ¶¶94, 132. Through this fraudulent scheme, the Bank reported that Zimmerman's loans were current, when in fact they were past due.

The Officer Defendants also deliberately "waived" Zimmerman's past due loans from the Bank's publicly reported financial statements. When Zimmerman's loans became past due, they were "waived" on the false grounds that they were "in the process of extension" (as were all of the past due loans in Terranova's portfolio (¶¶68, 81)), and Defendant North approved the "waiver" of these delinquent loans from public reporting. Zimmerman's waivers were also recorded in internal reports distributed to and discussed by Defendants Cecala, Harra, and Gibson. ¶¶64-67.[3]

Former senior Wilmington employees further confirmed that the Officer Defendants were well aware that the Bank failed to "consistently" rate its loans according to credit risk. Specifically, CW 2 confirmed that the Officer Defendants deliberately prevented the credit specialists in the Bank's Asset Review Group (the "ARG") from downgrading risk ratings for delinquent loans. ¶¶146-48, 151. For example, when the ARG identified risky loans and recommended rating downgrades that would force the Bank to recognize losses and increase the Reserve, Defendants

[3] The severe impairments in the Bank's loans to Zimmerman were not revealed until after the Class Period. Specifically, in November 2010, the Bank was forced to sell all of the Zimmerman loans to a third party at deep discounts. In connection with that sale, the Bank had to write off nearly half of the loans made to Zimmerman, costing the Bank over $43 million – or 10 times the $4 million loss that Wilmington recorded for all of 2009. ¶¶15, 133.

Cecala and Harra – who had to approve each risk rating downgrade – vetoed these recommendations without any consideration of the borrower's ability to repay loans. ¶¶147, 151. CW 2 and CW 1 also reported that the Officer Defendants relied almost exclusively on the Bank's lenders for loan rating downgrades, who were financially penalized for downgrading loans. ¶140.

Wilmington's failure to adequately mitigate credit risk was repeatedly brought to the Officer Defendants' attention by regulators and auditors. Dating back to at least 2007, the Federal Reserve, KPMG, and the Bank's Internal Audit Group all sharply criticized Wilmington's risk management and internal controls, stating that the Bank's asset review did not adequately assess the credit risk in its loan portfolio. ¶¶142-44. Further, in September 2009, the Federal Reserve forced the Bank to enter into an MOU, which confirmed the significant deficiencies in Wilmington's core lending functions. ¶¶152-56.

To comply with the MOU, in 2009, Wilmington's senior management ordered a "comprehensive" investigation of the Bank's lending practices in its primary Delaware market, referred to internally as the Delaware Status Review. ¶¶157-58. The results of this Review were documented in the March 12, 2010 Delaware Review Memo, drafted by senior credit officer Brewer, who was specifically tasked by senior management to review "the mess in Delaware." ¶¶158-59. This Review documented "serious concerns with the past management of the Delaware Commercial Real Estate Division and with its loan portfolio" – which encompassed over 50% of the Bank's total commercial loan portfolio. ¶¶157-60.

These "serious concerns" included a number of the practices that were the subject of the Criminal Information, including (i) the "unethical use of loan approval authority by relationship managers," (ii) the Bank's "limited oversight of relationship managers," and (iii) "a limited technical knowledge of commercial real estate lending." ¶¶157, 159. The Delaware Review Memo also specifically identified the Bank's relationship with Zimmerman as being problematic, and

further identified numerous "questionable activities" in the Bank's lending practices. ¶160. These practices included the Bank's repeated "lack of validation of construction budgets prior to loan closings" and the "frequent use of construction loan proceeds to return cash to borrowers." *Id*.

Notwithstanding the findings of the Delaware Status Review, the Bank took no action to address these alarming issues. ¶161. To the contrary, as set forth in the Criminal Information, weeks after the Delaware Review and Memo were completed, Wilmington failed to include almost $200 million worth of past due loans in its first quarter 2010 financials and continued to fraudulently report past due loans until the end of the Class Period. ¶¶81, 161.

### F. The Fraudulent Use Of The 10% Rule Further Exemplifies The Bank's Underwriting And Asset Review Practices

The Criminal Information detailed additional ways in which Wilmington fraudulently extended loans and failed to report them as past due. For example, as set forth in the Criminal Information, Wilmington internally maintained a "10% Rule," which permitted loan officers to extend additional credit to borrowers in an amount up to 10% of their existing loan, so long as the additional 10% loan was based on the borrower's ability to repay (known as "interest reserve loans"). ¶92. However, contrary to Defendants' representation that the Bank's underwriting was "rigorous," 10% Rule loans were regularly abused to extend credit without any consideration of a borrower's creditworthiness. ¶¶92-96; *see also* ¶¶97-101. As confirmed in the Criminal Information, the Bank fraudulently used 10% Rule loans to "extend new credit" to troubled borrowers, including Zimmerman, who used those funds solely "to keep existing loan payments current" that would otherwise be delinquent. *Id*. The Criminal Information detailed at least 39 examples of fraudulent 10% Rule loan extensions, pursuant to which the Bank funneled money to delinquent borrowers so those borrowers could turn around and make interest payments on their delinquent loans. ¶¶93-94.

The Officer Defendants were well aware of this practice, and were warned at least twice in

2009 alone about the Bank's "problematic" and "deficient" use of the 10% Rule. In early 2009, KPMG warned the Officer Defendants that such 10% Rule loans constituted a "significant deficiency" because they did not reflect "robust underwriting" and "mask[ed]" the true credit quality of borrowers. ¶95. The Federal Reserve also warned the Bank about misusing interest reserve loans, identifying it as a "problematic practice" resulting in "substandard" loans in the September 2009 MOU. ¶96. Witnesses confirm that the 10% Rule was regularly exploited, such that "almost every loan" seen by the Workout Group had one or more 10% Rule loans attached, which "any normal bank wouldn't allow." ¶100. Moreover, Defendants Cecala, Harra, Gibson, North, and other executives attended quarterly meetings where "standard write-ups" detailing all of the Bank's 10% Rule loans were distributed and discussed, making the fraudulent 10% Rule loans readily apparent. ¶101.

### G. Defendants Are Forced To Reveal The Bank's True Financial Condition

Beginning in early 2010, the Bank began to report increases in its Reserve, which were the result of changes forced on the Bank by the Federal Reserve's September 2009 MOU. ¶¶152-56, 177. Each time it reported these increases, however, the Bank emphasized that the increases were not due to any credit problems with the Bank's loan portfolio, but to market-wide problems impacting all financial institutions. ¶¶178-80.

Then, on June 3, 2010, Wilmington suddenly announced that its CEO and Chairman, Defendant Cecala, who had been with the Bank for 31 years, was resigning effective immediately. The Bank further announced that Foley, a Board member with no banking experience, would take over as CEO. ¶182. Cecala falsely assured investors that his departure did not indicate "a mounting capital problem or credit problem that hadn't been reported," and Foley falsely reassured investors that there would be no "surprises this year where credit – there is a blowup somehow." ¶¶183-84.

Less than five months later, Wilmington "blew up." On November 1, 2010, Wilmington

shocked the market by revealing that it had dramatically overstated the quality of its loan portfolio and that, in reality, the credit quality of its loan portfolio was so poor that the Bank could no longer survive as an independent entity and would have to be acquired in a "fire sale" by M&T. ¶¶198-209. On that day, the Bank released its third quarter 2010 results, in which it reported a quarterly loss of $365.3 million, due in large part to a massive increase in its Reserve of $281.5 million, and further announced that Wilmington would be sold to M&T at a per-share price equal to just half of the price at which the Bank's shares had been trading a day earlier – an extraordinary sale known as a "takeunder." ¶¶198-99. Remarkably, notwithstanding Wilmington's $281.5 million loan loss provision, M&T estimated that the Bank's loan portfolio contained an additional $500 million in still-undisclosed losses – for a total of approximately $800 million in previously unreported losses. M&T further determined that 40% of the Bank's portfolio of construction loans was worthless and would have to be written off. ¶¶203-05.

Analysts and the financial press reacted with astonishment to these disclosures, and reported that the fire sale to M&T revealed that the Bank's true financial condition was a far cry from what the Bank had represented. ¶208. For example, *The New York Times* noted that the fire sale to M&T was "one of the biggest so-called 'take-unders' in history," and that prior to the November 1, 2010 disclosures, the market had been led to believe that "Wilmington's tangible book was worth twice as much." *Id*. In response to these stunning disclosures, Wilmington's stock price immediately collapsed. In a single day, on November 1, Wilmington's stock price plummeted from $7.11 per share to $4.21 per share – a decline of over 40% – on extremely high trading volume. ¶¶206-07.

### H. The Government's Ongoing Criminal Investigation

The fraudulent conduct described above triggered a host of regulatory and criminal investigations into Wilmington's lending and accounting practices. ¶¶21, 212-16. A joint criminal federal investigation by the FBI, the IRS Criminal Investigation Division, the Office of the

Inspector General, the Federal Reserve, and the Special Inspector General for the Troubled Asset Relief Program is underway. ¶216. In October 2012, the FBI filed the FBI Affidavits as part of this ongoing investigation. ¶¶21, 214. Less than four months later, on May 8, 2013, the criminal investigation resulted in Terranova's guilty plea and admission to the Criminal Information which detailed the "overarching bank fraud conspiracy" to conceal Wilmington's financial condition. ¶¶1, 15, 54-56, 215. On that day, the U.S. Attorney for Delaware, Charles Oberly, announced that the investigation is "ongoing and continuing," and that Terranova's guilty plea is just one "important step in holding responsible those individuals whose criminal conduct contributed to the failure of Wilmington Trust." ¶¶21, 215. The day after Terranova pleaded guilty, Bailey resigned from his position as Vice President at MidCoast Community Bank, and one day later Harra resigned from M&T. ¶216. Recently, *The News Journal* reported that "[p]eople familiar with the case said prosecutors have other former Wilmington Trust bankers in their sights." ¶¶215-16.

## III. PLAINTIFFS HAVE ALLEGED VIOLATIONS OF THE EXCHANGE ACT

### A. The Complaint Meets The Standards Of The PSLRA And Rule 9(b)

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006). The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]" 15 U.S.C. § 78u-4(b)(1). Federal Rule of Civil Procedure 9(b)'s particularity requirement does not call for an "exhaustive cataloging of facts," but only allegations that "provide assurance that plaintiff has investigated the alleged fraud and reasonably believes that a wrong has occurred." *Medtronic Ave, Inc. v. Bos. Scientific Corp*., 2001 WL 652016, at *2 (D. Del. Mar. 30, 2001) (Robinson, J.) (internal citations omitted). Particularity rules are "relaxed in situations where

the factual information is peculiarly within a defendant's knowledge or control." *In re Veritas Software Corp. Sec. Litig.*, 2006 WL 1431209, at *6 (D. Del. May 23, 2006) (Robinson, J.) (citing *In re Burlington Coat Factory*, 114 F.3d 1410, 1418 (3d Cir. 1997)). As set forth below, Plaintiffs have satisfied the pleading standards for their Exchange Act claims.

**B. The Complaint Adequately Alleges Materially False And Misleading Statements And Omissions**

Under the PSLRA, a complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004) (citation omitted). Here, the Complaint adequately alleges Defendants' false and misleading statements and omissions.[4]

**1. False Statements Regarding Past Due And Nonperforming Loans**

As summarized above, the Complaint's principal allegation is that, at each reporting period during the Class Period, Wilmington fraudulently understated the true amount of its past due loans in its SEC filings by hundreds of millions of dollars in order to conceal the devastating impact of these loans on the Bank's financial condition. ¶¶70, 80-81, 221-22, 225-26, 404-07. Indeed, as a result of the "mass extension" of troubled loans, Defendants understated the amount of past due loans by $1.74 billion – an amount equal to 25% of the Bank's outstanding commercial loans – during the fourth quarter of 2009 and the first two quarters of 2010 alone. ¶¶80-81, 227, 408. Significantly, Defendants concede that Wilmington's publicly reported amounts of past due loans were false. The sole argument they make as to these misstatements is that they were supposedly immaterial as a matter of law because: (i) the Complaint purportedly "never explain[s] how the allegedly concealed loans impacted earnings;" and (ii) Wilmington purportedly "repeatedly disclosed the deterioration in its loan portfolio throughout the class period in detailed narratives."

[4] For the convenience of the Court, Plaintiffs address in this section the false statements that are alleged in both the Securities Act and the Exchange Act counts. Arguments unique to the Securities Act are discussed *infra* IV.

WT Br. 16-17. Defendants are wrong.

First, Defendants' argument contradicts well-settled Third Circuit law. The Third Circuit and courts across the country widely hold that the very same false statements about past due loans alleged here are material. *See Shapiro*, 964 F.2d at 281 ("a reasonable investor would be influenced significantly by knowledge that a bank has knowingly or recklessly hidden its true financial status by deliberately misstating its level of [past due and] non-performing loans, failing to provide adequate reserves, and indulging its problem loan customers"); *Steamfitters Local 449 Pension Fund v. Alter*, 2011 WL 4528385, at *2 (E.D. Pa. Sept. 30, 2011) (finding misstatements of past due loans to be material and noting that "falsely positive reports" of "receivables, loss reserves, and charge-offs" are "calculated directly from delinquency rates"); *In re Am. Bus. Fin. Servs., Inc. Noteholders Litig.*, 2008 WL 3405580, at *1, *9 (E.D. Pa. Aug. 11, 2008) (materiality pleaded where defendant misstated "delinquent loans" and engaged in "techniques such as forbearance and deferment agreements in order to keep loans from being counted as delinquent"); *Lewis v. Straka*, 535 F. Supp. 2d 926, 930 (E.D. Wis. 2008) (materiality pleaded for misstatements concerning "the volume of nonperforming loans," where bank "often extended rather than wrote off large nonperforming loans").[5] Notably, Defendants have not cited a single case holding that significant understatements of problem loans are not material.

Moreover, materiality is a question of fact that can rarely be decided as a matter of law on a motion to dismiss. *See, e.g., Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997) (holding that "the emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings" and that the issue of materiality is "for the trier of fact") (internal quotation marks

[5] *See also In re CIT Grp. Inc. Sec. Litig.*, 2010 WL 2365846, at *3 (S.D.N.Y. June 10, 2010) (materiality pleaded where misstatements indicated that "non-performing assets [were] insignificant" when, in reality, the lender was seeing "abnormally high delinquency" rates); *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *3 n.4, *5 (M.D. Tenn. Apr. 26, 2011) (material misstatements where allegations describe "failure to disclose tens of millions of dollars in nonperforming and risky loans;" "failure to reappraise collateral; and having loan-funded interest reserves which paid the interest even if the project faltered, thereby making it appear that what was a troubled loan was actually current").

omitted). Nevertheless, the Complaint alleges numerous facts that easily establish the materiality of the Bank's past due loan misstatements. As the cases cited above make clear, the amount of past due loans is a key financial metric that reflects whether loans are being repaid, which directly impacts the credit quality of the Bank's loan portfolio and its financial condition. ¶¶2, 53, 59. Indeed, Wilmington specifically stated in its SEC filings that the Bank's "primary risk" to its credit quality was "the risk that borrowers will be unable to repay their loans," the very information purportedly communicated through the reported past due loan amounts. *See, e.g.*, Ross Ex. 1 (2008 10-K) at 44; Ross Ex. 5 (2009 10-K) at 50 (emphasis in original). Having repeatedly informed investors that the most important risk to the Bank's credit quality was the nonpayment of loans, Defendants cannot turn around and seriously argue that the Bank's admitted misstatement of its past due loan amounts was immaterial as a matter of law. Further, given the critical nature of this information, the Bank was required by law to report its total amount of past due loans in its SEC filings each quarter. ¶58 & n.3. As the Third Circuit has made clear, "disclosures mandated by law are presumably material." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 641 n.17 (3d Cir. 1990).

Moreover, Wilmington repeatedly highlighted the materiality of this information by regularly emphasizing the Bank's past due loan amounts to investors in press releases and earnings conference calls. ¶¶59, 219, 225. *See Weiner*, 129 F.3d at 317 (fact that company repeatedly reported on a financial metric "created the reasonable understanding among investors that the [metric] was a number to which Quaker attached considerable significance"). In addition, analysts closely followed and reported on the Bank's past due loan amounts, asking questions about those metrics, and specifically commenting on how they were "encouraged" by the (artificially) low levels of past due and nonperforming loans. ¶¶53, 59. All these facts demonstrate that the Bank's past due loans were critical to investors.

Defendants' argument that the fraudulently concealed past due loans were not material because they supposedly did not "impact[] earnings" is nonsense. WT Br. 16. Although the materiality of this information does not depend on its earnings impact (as *Shapiro* makes clear), the Complaint explains in detail, based on information provided in the Criminal Information, how the Bank's concealment of past due loans caused its earnings to be artificially inflated. ¶¶54, 62-63, 162-70, 412-13, 416. Specifically, by concealing enormous amounts of past due loans, the Bank avoided massive (and required) increases to its Reserve, which would have been charged dollar-for-dollar against the Bank's pre-tax income. ¶¶61-62; *see Alter*, 2011 WL 4528385, at *2 (loan loss reserves calculated directly from past due and nonperforming loan amounts); *Lerch v. Citizens First Bancorp. Inc.*, 805 F. Supp. 1142, 1150 (D.N.J. 1992) (setting loan loss reserves "is intimately related to the bank's analysis of the state of its existing loans, particularly its nonperforming loans"). Indeed, Defendants' argument that the failure to report past due loans does not impact earnings directly contradicts the admission in the Criminal Information that, had the Bank accurately reported its past due loans, it "would have required [Wilmington] to <u>recognize losses</u> on the credits and would have had a <u>negative impact</u> on [Wilmington's loan loss reserve]." ¶¶63, 413.[6]

Defendants' argument that other supposedly "detailed narratives" in Wilmington's SEC filings rendered their misstatements immaterial as a matter of law by somehow "provid[ing] a much better picture of the quality and performance of Wilmington's loan portfolio than intermediate classification of loans as 'serious doubt' or 'nonperforming,'" is absurd. WT Br. 17. Defendants fail to identify what narratives supposedly revealed that they were misstating their past due loans, and their argument ignores the fact that the Bank was specifically required to report its past due loan

---

[6] Defendants' argument that Plaintiffs do not allege that the Bank misstated its charged off loans and loan income (WT Br. 17) is a red herring, as such allegations are not required to establish materiality. Moreover, this assertion is inaccurate. Because the Bank was not even increasing its Reserve to reflect over a billion dollars of past due loans, it clearly was not charging off those loans (including ones that had been past due for <u>years</u>) when they should have been charged off. Accordingly, the Bank was dramatically overstating the value and performance of its loan portfolio.

amounts in its SEC filings precisely because that is highly material – indeed, critical – information that investors rely on when assessing the soundness of a financial institution. Defendants' argument is also in direct conflict with the admissions of the Criminal Information that the Bank failed to report its past due loans in order to "fraudulently conceal the Bank's true financial condition" from investors. ¶54. At best, this speculative argument raises factual issues that cannot be resolved at this stage.[7]

Indeed, Defendants' argument is merely an attempt to assert the truth-on-the-market defense, which "is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Here, Defendants have fallen woefully short of carrying their burden to demonstrate that the market was aware of Wilmington's massive criminal fraud. As noted above, none of the disclosures on which Wilmington relies revealed to investors that hundreds of millions of dollars of past due loans were fraudulently erased from the Bank's financial statements each quarter. Indeed, far from revealing these facts to investors, the few generic narratives described by Wilmington inaccurately claim that any deterioration in the loan portfolio was due to the general "economic environment" and the Bank's focus on longstanding "client relationships and desire to work with borrowers to resolve repayment problems." WT Br. 8. Such so-called disclosures obviously "cannot absolve the defendants of their duty to avoid making fraudulent representations." *FHFA v. JP Morgan Chase & Co.*, 902 F. Supp. 2d 476, 497 (S.D.N.Y. 2012).

### 2. False Statements Regarding Loan Loss Reserves And Net Income

As detailed in the Complaint, Wilmington materially understated its Reserve and materially

[7] The Underwriter Defendants similarly argue that the Bank's misstatements of its past due loan amounts were not material because the Bank made certain disclosures representing that "loans could be renegotiated or restructured," the Bank "preferred to work with the borrower" if a loan could return to performing status, and the Bank had "a number of options it could pursue" with respect to past due loans. UW Br. 20-21. This argument is absurd. None of these disclosures revealed the fact that the Bank materially misstated its past due loan amounts by falsely categorizing its loans as in the process of extension and mass extending them in violation of federal law and the Bank's own policies.

overstated its reported net income in violation of numerous GAAP provisions. Specifically, Wilmington failed to account for its admittedly concealed past due loans, including the more than $1.74 billion of loans that were fraudulently "mass extended" in late 2009 and early 2010. ¶¶80-81, 163-65, 169-71, 229-39, 415-19. As discussed above, the Criminal Information made clear that the conspiracy at Wilmington was deliberately orchestrated to avoid updating appraisals, which "would have required [Wilmington] to recognize losses on the credits and would have had a negative impact on [Wilmington's] Allowance for Loan and Losses." ¶¶54, 63, 162, 166, 232-33, 413. Courts in this District and elsewhere routinely hold that statements about loan loss reserves are materially false when, like here, a company fails to adequately account for its past due loans when setting its reserve. *See, e.g., Alter*, 2011 WL 4528385, at *2 (finding false statements about loan loss reserves actionable where company failed to consider true delinquency rates, and noting that the "most past due accounts were most significantly distorted, so that the loans would not be 'charged off' and would not deplete the company's loss reserves"); *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 722-24 (D. Del. 2000) (finding false statements where company failed to disclose that loan loss reserves did not account for "sharp increase in [loan] loss rate[s]").[8]

In response to the Complaint's detailed allegations demonstrating the falsity of the Bank's representations about its Reserve and net income, Defendants make a series of arguments that contradict the Criminal Information, ignore the Complaint's allegations, misconstrue the law and, at best, raise factual issues about GAAP's requirements that are inappropriate at the pleading stage. *Burlington*, 114 F.3d at 1421 ("it is a factual question whether [defendant's] accounting practices are consistent with GAAP"); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709, n.9 (3d Cir. 1996)

[8] *See also Winslow*, 2011 WL 7090820, at *1, *5, *14-17 (finding "understated loan loss reserves" due to the "failure to disclose tens of millions of dollars in nonperforming" loans); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 550, 555 (S.D.N.Y. 2010) (finding "loan loss reserves" false where they "did not account for increased defaults," noting that "default rates" are "integral to calculating loan loss reserves under GAAP"); *Lewis*, 535 F. Supp. 2d at 929-31 (loan loss reserve statements actionable where "company failed to adjust its loan loss reserves to reflect the high number of problem loans and, instead of writing off bad loans, extended them or rolled them into new loans").

(Alito, J.) (district court "appropriately instructed defendants to raise their GAAP arguments, if at all, on a motion for summary judgment").

First, relying principally on an out-of-circuit case concerning Section 11 claims, *Fait v. Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011), Defendants contend that the Complaint fails to adequately allege the falsity of the Reserve because: (i) reserves are "opinions" that are not actionable unless Defendants misstated the reserves with "scienter;" and (ii) the Complaint fails to allege Defendants' scienter in connection with the misstatements of the Reserve. WT Br. 17-20; UW Br. 15-16. This argument is irrelevant with respect to the Exchange Act because, as further detailed in Section III.C, *infra*, the Complaint amply alleges that the Section 10(b) Defendants acted with scienter, given that they knew of the "mass extension" and waived hundreds of loans purposefully to "conceal the Bank's true financial condition," including by materially understating the Reserve. *See Alter*, 2011 WL 4528385, at *2 (loan loss reserves statements false where defendants deliberately "distorted" past due loan amounts).[9]

Second, Defendants argue that the Bank's Reserve and income statements are not false because the Complaint does not allege that Wilmington "violated any particular GAAP provisions." WT Br. 20-21. This is nonsense. The Criminal Information made clear that the Reserve was fraudulently understated because the Bank falsified reported past due loan amounts and refused to obtain updated appraisals to properly extend past due loans,WT which would have forced the Bank to increase its Reserve. ¶162.[10] There is no GAAP provision that allows a Bank to fraudulently

[9] With respect to Plaintiffs' Section 11 claims, as explained below in Sections IV.A & IV.B, scienter is not an element of a Section 11 claim and, to the extent *Fait* holds otherwise, it is contrary to the Circuit's controlling precedent. Moreover, even if *Fait* applied to Plaintiffs' Section 11 claims, the Complaint easily satisfies its requirements. *See supra* Section III.

[10] Given the fact that Wilmington based its Reserve on falsified past due loan amounts (¶¶412-13), the Underwriter Defendants' argument that Plaintiffs' allegations of GAAP violations "are nothing more than assertions that Wilmington was unskilled in setting reserves" is preposterous. UW Br. 11-12.

manipulate its Reserve.[11] Moreover, the Complaint specifically identifies and explains the controlling GAAP and accounting provisions, and the various ways in which Defendants violated them. ¶¶163, 409, 416; *see also* ¶¶297-300 (explaining FAS 5, FAS 114, and SAB 102). For example, the Complaint alleges that Defendants violated SAB 102 because, in setting the Reserve, the Bank failed to consider "all known relevant internal and external factors that may affect loan collectability" including the Bank's: (i) fraudulently concealed past due loans; (ii) criminally outdated and overvalued appraisals; and (iii) "inaccurate" risk ratings. ¶¶163-71, 232-33, 236, 238.[12] Such allegations easily state a claim.[13]

Third, Defendants contend that they complied with GAAP because the Bank used "a different [loan] classification system" in setting its Reserve than the system it used to report Wilmington's past due loans. WT Br. 24-25. Not only does this raise a factual issue that cannot be resolved on this motion, but it directly contradicts the Criminal Information, which unequivocally stated that the Bank concealed hundreds of millions of dollars of past due loans specifically to avoid the "negative impact" on the Reserve. ¶¶162, 166, 232-33, 413.

Fourth, Defendants' argument that the concealed past due loans did not impact the Reserve because such loans do not become part of Wilmington's loss history until they are charged off (WT

[11] It is for this very reason that Defendants' challenge to Plaintiffs' allegations regarding Defendants' noncompliance with the Interagency Guidance fails. WT Br. 21-22. Plaintiffs' allegations are based on Defendants' criminal failure to account for the Bank's past due loans and outdated appraisals when setting the Bank's Reserve. Neither GAAP nor the Guidance permits the Reserve to be established in this manner. Moreover, the Complaint's Reserve and accounting allegations do not depend on violations of the Guidance. The Complaint simply points to the Guidance's requirement of "directional consistency" to further illustrate that the Bank under-reserved for its loan losses. ¶302.

[12] Defendants also ignore that Wilmington's GAAP violations were confirmed by the independent analysis disclosed by M&T at the end of the Class Period, which demonstrates that the Bank understated its loan losses by more than $800 million from the beginning of 2008, or by over 130% each quarter. ¶¶173-76.

[13] Defendants' cited authorities (WT Br. 21) are inapposite because the complaints in those cases made "no mention" of which "particular provisions of GAAP were violated." *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 2000 WL 1207162, at *13 (E.D. Pa. Aug. 24, 2000). *See also In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 990 (E.D. Wis. 2009) (complaint did "not articulate the accounting principle applicable"); *In re United Am. Healthcare Corp. Sec. Litig.*, 2007 WL 313491, at *19 (E.D. Mich. Jan. 30, 2007) (complaint did "not point out any specific violations of GAAP" or "identify any inaccuracies").

Br. 25) again contradicts the detailed admissions of the Criminal Information. ¶162. Moreover, this argument is based on the unsupported and implausible premise that, even though the Bank was fraudulently concealing past due loans, it properly charged-off the worthless loans when appropriate. Given that many of these past due loans had been delinquent and "in the process of extension" for as long as three years (¶¶222, 226, 405, 407) and that updating appraisals to reflect the deteriorated collateral values underlying these loans would have had the "near term potential for catastrophic consequences" on the Bank, there is no question that many of the concealed past due loans should have been – but were not – charged off, causing the Bank's loss history to be manipulated. ¶¶170, 236, 238. Indeed, the Bank's failure to appropriately charge off past due loans (and consequently understate its Reserve) was confirmed by M&T, which determined that 17% of Wilmington's loan portfolio and 40% of its commercial construction portfolio was worthless and needed to be charged off. ¶¶174-75, 203-4.

Fifth, Defendants argue that reserving for loan losses is subject to management judgment, and that Plaintiffs' so-called "disagreement" with "how" the Bank reserved for its loans cannot provide a basis for liability. WT Br. 23, 25. However, such an argument ignores that the Criminal Information detailed how the Bank and its senior officers deliberately (and fraudulently) understated the Reserve. Thus, contrary to Defendants' contention, there is no accounting rule that supports the view that reserves calculated without any consideration of over one billion dollars of past due loans, and in reliance upon inaccurate and manipulated risk ratings, conform with GAAP. *See, e.g.*, *Underland v. Alter*, 2012 WL 2912330, at *5 (E.D. Pa. July 16, 2012) ("*Underland II*") (sustaining allegations that understated loan loss reserves violated FAS 5 because they "failed to consider all material factors" and failed to use "accurate source data").[14]

[14] In any event, courts in this Circuit reject such claims of mismanagement. *See, e.g.*, *In re RAIT Fin. Trust Sec. Litig.*, 2008 WL 5378164, at *8 (E.D. Pa. Dec. 22, 2008) (rejecting similar "mismanagement" defense).

Finally, Defendants' reliance on Wilmington's incremental increases to the Reserve throughout the Class Period has no relevance to Defendants' liability. WT Br. 19-20. The fact that Wilmington incrementally and insufficiently increased its Reserve during the Class Period does not in any way negate Plaintiffs' allegation that the Bank materially under-reserved for loan losses inherent in its portfolio. *E.g.*, ¶¶172, 414. Indeed, the fact that the Bank was forced to recognize $800 million in loan-related losses at the end of the Class Period leaves no question that its Reserve was massively understated throughout the Class Period.[15]

**3. False Statements Regarding Credit Risk Mitigation Practices**

Wilmington assured investors throughout the Class Period that it "mitigate[d] credit risk" and maintained the "integrity" of the Bank's commercial loan portfolio through the use of "rigorous" underwriting standards and by "regularly reviewing all past due loans." ¶¶242-43, 248, 422-23, 427, 431. Wilmington also assured investors that the Bank classified loans according to "internal risk rating classifications," and that it applied these ratings "consistently" in order to adequately calculate Wilmington's Reserve. ¶¶235, 237, 253, 415. These statements were materially false and misleading. Instead of employing "rigorous" underwriting and reviewing all past due loans to "mitigate credit risk," the Bank's senior officers did the exact opposite: they fraudulently made loans to borrowers they knew were delinquent, and fraudulently extended hundreds of past due loans in violation of federal law and the Bank's own policies. ¶¶57-81, 244-45, 249-55, 424-25, 429-30.

In response to these admitted facts, Defendants principally contend that their credit risk

---

[15] As Wilmington's own exhibit demonstrates, from the start of the Class Period until the third quarter of 2009 (*i.e.*, the quarter immediately before the truth started to emerge), the Bank's Reserve as a percentage of its loan portfolio went from only 1.21% to 2.22%. WT Br. Ex. 17. Thus, the Bank only minimally increased its Reserve during this time period. In fact, the Bank did not start to meaningfully (yet still insufficiently) increase its Reserve until after the Federal Reserve imposed the MOU and the truth started to emerge with the disclosure of the Bank's fourth quarter 2009 financial results. ¶177. It was during this disclosure period, which ended on November 1, 2010, that the Bank's Reserve as a percentage of its loan portfolio went from 2.22% to 6.14% – a nearly 300% increase. WT Br. Ex. 17

mitigation statements are inactionable "puffery." WT Br. 25-28; UW Br. 16-18. However, it is well established that false statements about credit risk mitigation practices are actionable. *See, e.g.*, *Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*, 2013 WL 1431680, at *7 (D.N.J. Apr. 9, 2013) (representations about mitigating "credit risk" actionable where underwriting standards and credit quality requirements were violated); *RAIT*, 2008 WL 5378164, at *5 n.12 (false statements regarding "recurring credit analysis" actionable); *In re Wash. Mut., Inc. Sec. Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1208, 1211 (W.D. Wash. 2009) ("*WaMu*") (false statements about "risk management efforts" and "disciplined" underwriting actionable). Courts in this Circuit and beyond regularly recognize that statements positively characterizing a bank's underwriting and asset review practices, like those here, are not puffery and are in fact "among the <u>most important</u> information looked to by investors." *Accredited*, 556 F. Supp. 2d at 1154-55. *See also Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357 (1st Cir. 1994) (statements about strong "loan review capabilities" material); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 189 (S.D.N.Y. 2010) ("misstatements regarding risk management, discipline, monitoring and credit quality are not puffery") (internal quotation marks omitted); *In re Ambac, Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 271 (S.D.N.Y. 2010) (false representations of "rigorous" underwriting actionable).

Indeed, Defendants' arguments contravene well-established Third Circuit law. In the Third Circuit, "by addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully." *Shapiro*, 964 F.2d at 282. In *Shapiro*, the Third Circuit explained:

> [W]here a defendant affirmatively characterizes management practices as "adequate," "conservative," "cautious," and the like, the subject is "in play." For example, <u>if a defendant represents that its lending practices are "conservative"</u> and that its collateralization is "adequate," <u>the securities laws are clearly implicated</u> if it nevertheless intentionally or recklessly omits certain facts contradicting these representations.

*Id.* at 282.

Here, as in *Shapiro*, the Defendants affirmatively "addresse[d] the quality" of the Bank's underwriting and past due loan review practices, and thus those statements are "material." *Id*. In fact, Wilmington specifically highlighted its credit risk mitigation statements by placing them in a separate section of its SEC Filings entitled "Credit Risk." ¶¶91, 161, 242, 248, 422. As noted above, that section emphasized the Bank's underwriting and loan review practices as principal tools used to mitigate the "primary risk" facing the bank – the risk that a loan would not be repaid. *See, e.g.*, Ross Ex. 1 (2008 10-K) at 44; Ross Ex. 5 (2009 10-K) at 50. The fact that the Bank identified its loan underwriting and asset review practices as essential to mitigating the chief credit risk faced by its business establishes that these statements were highly material and cannot be considered mere puffery.

Moreover, the Bank reassured investors that it would survive the ongoing financial crisis precisely because of its "rigorous" underwriting and "regular" past due loan reviews, in a way that other banks, with ostensibly less rigorous credit risk management (like Washington Mutual), would not. ¶242. *See Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Swanson*, 2011 WL 2444675, at *10-11 (D. Del. Jun. 14, 2011) (false statements material in context of industry decline). Having highlighted those descriptions of the Bank's underwriting and asset review practices during a grave economic crisis, Defendants cannot credibly claim that reasonable investors would have found Wilmington's statements about mitigating credit risk to be unimportant as a matter of law. *See Shapiro*, 964 F.2d at 282.

For these same reasons, Defendants' contention that these statements are immaterial in light of Wilmington's technical "risk disclosures" also fails. WT Br. 26-27. No language in the Bank's disclosure of technical loan terms – such as maximum duration or loan size – revealed the fraudulent concealment of material amounts of past due loans (¶¶64-72), fraudulent 10% Rule loans (¶¶92-101), or the complete abandonment of sound underwriting and asset review practices, as

exemplified by Zimmerman's loans (¶¶102-33). Similarly, although the Bank disclosed its relationship-based approach to repayment problems (*see* WT Br. 3, 25-26), that obviously was intended to assure investors that the Bank fostered a close relationship with its borrowers and thus was very familiar with their creditworthiness. It did not mean that the Bank would compromise its purportedly "rigorous" underwriting and past due loan reviews by extending money to troubled borrowers to avoid having to report their loans as past due. *See, e.g.*, ¶¶94, 424.[16]

The Wilmington Defendants also advance a series of arguments contending that the Complaint fails to alleges the falsity of their statements that Wilmington "mitigated credit risk" by "regularly reviewing all past due loans" and "consistently" applying risk ratings. WT Br. 28-29, 30.[17] Each of these arguments fails.

First, Defendants argue that the Criminal Information does not "support the falsity" of the Bank's statements about "regularly review[ing] all past due loans" in order to "mitigate credit risk." WT Br. 31-32; *see also* UW Br. 13. This is wrong. The admitted facts in the Criminal Information established that, instead of legitimately reviewing all past due loans by updating real estate appraisals and analyzing borrower creditworthiness to "mitigate credit risk," the Bank's senior officers refused to update appraisals and fraudulently extended more than 1,250 past due loans in violation of federal law and the Bank's own policies. ¶¶250-52, 429-30. It is impossible to

[16] Defendants' cases are inapposite. WT Br. 26-27, UW Br. 16-17. *See, e.g.*, *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 284 (3d Cir. 2010) (specific differences in customer markets (*i.e.*, geography, customer type, and premiums) were disclosed such that investors could not have understood "disciplined pricing" to mean a "static, across-the-board formula"); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538-39 (3d Cir. 1999) (accurate reports of past success and expressions of optimism did not alter the total mix of information).

[17] The Underwriter Defendants alone argue that Wilmington's underwriting statements were not false because the Offering Documents disclosed that the Bank "divide[d] credit risk-related responsibilities among different groups of staff members, including lending, loan recovery, credit policy and administration, appraisal, and credit review staff members." UW Br. 9-10 (quoting Ross Ex. 5 at 50). Like Wilmington's other generic disclosures, however, this statement did not disclose that the Bank would conceal loans and compromise its purportedly "rigorous" underwriting by extending money to troubled borrowers to avoid having to report their loans as past due. *E.g.*, ¶¶94, 424-25. Moreover, the Complaint alleges further that this statement in the Offering Documents was false because the Bank failed to disclose the true role lenders played – *i.e.*, that lenders were incentivized to close more loans without adhering to underwriting standards, avoid ratings downgrades, and conceal borrowers' inability to repay loans. *Id.*

reconcile the fraudulent concealment of past due loans with Wilmington's statement that it "regularly reviewed" all such loans to "mitigate credit risk."

Second, Defendants argue that the facts set forth in the FBI Affidavits do not "support the falsity" of the Bank's statements about "mitigat[ing] credit risk" because the FBI Affidavits center around Zimmerman, and the Bank's "failure to discover outright fraud in this single instance has nothing to do with the consistency of its loan risk ratings or how often it reviewed past due and nonperforming loans." WT Br. 31. This too is incorrect. To start, far from being a "single instance of fraud," Zimmerman was one of the Bank's largest customers with 75 loans totaling nearly $100 million – or 6% of the Bank's total commercial construction loan portfolio. ¶111. Moreover, Defendants' argument ignores that the Criminal Information, the FBI Affidavits, and the Complaint all detailed a pervasive fraud at the Bank that went well beyond Zimmerman and culminated in the mass extension of 1,250 loans in order to fraudulently conceal the Bank's true, deteriorated financial condition. ¶¶64-72, 125.

Third, Defendants argue that the Bank's failure to obtain updated appraisals does not establish that the Bank's asset review practices were deficient. WT Br. 29. Defendants claim that "appraisals only inform the loan loss reserve with respect to loans that have been specifically identified as impaired," and the Complaint does not allege that "the appraisal of collateral for an <u>impaired</u> loan was outdated." *Id.* (emphasis in original). Again, this argument raises factual issues and is directly contradicted by the Criminal Information, which confirmed that the massive "extend and pretend" scheme was implemented because Wilmington knew that its loans were impaired, and that obtaining updated appraisals would reveal that impairment. ¶¶63, 166, 233, 412, 429-30. The Criminal Information further established that, if the Bank had updated appraisals on its past due loans to legitimately extend the terms of those loans, those appraisals would have had a negative

impact on the Reserve. ¶¶63, 166, 233, 412, 429-30.[18] Moreover, even if updated appraisals "only informed impaired loans" (WT Br. 29), the Complaint specifically alleges that Wilmington failed to update appraisals for impaired loans too. ¶¶87-88.[19]

Fourth, Defendants assert that just because Wilmington "reviewed only a small percentage [*i.e.* 10-15%] of all loans in the portfolio does not mean that asset review was not 'regular' or 'consistent.'" WT Br. 28-29. This misconstrues the central allegation of the Complaint. Put simply, Wilmington did not review past due loans to mitigate credit risk but instead conducted a criminally fraudulent review of past due loans to conceal the Bank's true financial condition.[20]

Fifth, Defendants argue that the "Complaint never alleges that KPMG, the Federal Reserve, or the Internal Audit Group ever said [Wilmington] failed to monitor the portfolio or that it did not review problem loans." WT Br. 28-29. This is nonsense. The Complaint clearly alleges that KPMG, the Federal Reserve, and the Internal Audit Group concluded three years in a row that the Bank's asset review function was inadequate, constituted a weakness in internal controls, and was unable to adequately mitigate credit risk. ¶¶142-44, 152-55, 430.[21]

---

[18] The Court should swiftly reject Defendants' attacks on the Complaint's confidential sources addressing the Bank's "appraisal problem." WT Br. 29-30; UW Br. 5. This argument is remarkable given that one of the primary witnesses cited in the Complaint, CW 2, the Head of Risk Management, is a key source in the Criminal Information. If anything, the Criminal Information's extensive reliance on CW 2 serves to establish the trustworthiness and veracity of the Complaint's confidential witnesses. Moreover, Defendants' argument ignores that the appraisal allegations are not based on CW 6's statements, and CW 8, an Internal Audit Group director who left in June 2008, was in a position to know of appraisal failures while at the Bank.

[19] Defendants contend that Cecala's order not to update appraisals to avoid charge-offs is irrelevant because the Complaint does not allege the falsity of "charge-offs." WT Br. 30. However, as detailed in the Criminal Information and the Complaint, the Bank "waived" past due loans from reporting, and mass extended loans that had been delinquent for months and years, specifically to avoid charging them off. *See, e.g.*, ¶¶174-75. Defendants also seek to "discount" Cecala's order because CW 1 did not provide the "date" or "what was said and to whom." WT Br. 30. But Plaintiffs are not required to provide those details where, as here, CW 1's account is well corroborated. Indeed, the Criminal Information made clear that Defendants deliberately did not obtain updated appraisals.

[20] The Underwriter Defendants also argue that statements about mitigating credit risk by regularly reviewing past due loans were true, because the ARG identified problem loans by "random samplings." UW Br. 10. This argument, however, fails for the same reasons set forth above.

[21] Defendants also argue that their statements were true because the Bank held ARG and Credit Strategy Meetings at which delinquent and "impaired loans were identified and discussed." WT Br. 29. But the Complaint makes clear that, at these meetings, the Officer Defendants discussed the fraudulent waiver of past due loans as "in the process of

Finally, Defendants argue that the Bank's statement that it "consistently" applied loan risk ratings is not false. WT Br. 30; UW Br. 14. Specifically, they contend that "allegations of internal disagreement about one or two risk ratings" do not show that the Bank "did not consistently apply its risk ratings." *Id*. Defendants are wrong. The Criminal Information made clear that the Bank did not properly rate its past due loans, but rather fraudulently waived them from public reporting. The Complaint further corroborates this fact by alleging that, far from applying risk ratings consistently, the Bank's senior officers – including Cecala, Harra, and Gibson – routinely manipulated risk ratings by vetoing attempts to downgrade the ratings assigned to troubled loans. ¶¶146-48. As CW 2 confirmed, the Bank's fraudulently concealed past due loans should have been, <u>but were not</u>, downgraded to "substandard" or "doubtful" ratings, which would have increased the Reserve and decreased net income. ¶¶165, 254-56, 432. As a result, the Bank's risk ratings were "generally inaccurate" during the Class Period. ¶¶137-49, 151, 253-55, 431-33.

### 4. <u>False Statements Regarding LTV Ratios</u>

Wilmington represented throughout the Class Period that, consistent with federal guidelines, the Bank "generally require[d] collateral and a loan-to-value ratio of no more than 80% at the time of underwriting." ¶¶97, 246, 426. In reality, senior Bank executives regularly used Wilmington's 10% Rule to make loans that far exceeded 80% LTV ratios, and even exceeded 100%. ¶¶97, 246, 426. Indeed, the Criminal Information established that 10% Rule loans regularly increased Wilmington's LTV exposure beyond the 80% limit at the time of underwriting. ¶¶97-99, 246, 426 (describing 10% Rule loan extensions on the same day or week as initial loans). Former employees also confirm the rampant use of the 10% Rule at the time of underwriting. ¶100. Further, appraisals used to assess LTVs at the outset of the loan origination process understated true LTV ratios because Wilmington deviated from standard industry practice by using "stabilized" appraisals

---

extension." ¶¶141, 147-48.

based on property improvements that did not yet exist, instead of "at present market value" appraisals, which were necessary to determine a true LTV. As a result, Wilmington's appraisals (*i.e.*, the "value" component of LTVs) were overstated, and prevented the Bank from accurately assessing LTVs when underwriting loans. ¶¶87, 426. Moreover, Cecala's direct order to the Workout Group to refrain from updating appraisals on loans that were "extended" or "renewed" – and thus subject to the underwriting process – also resulted in understated LTV ratios. ¶¶88, 272.[22]

In response, Defendants make two arguments. First, they argue that statements about LTVs being "generally" capped at 80% are immaterial because what the Bank "generally require[s] is vague on its face, and no reasonable investor would rely on it." WT Br. 27; UW Br. 18. Defendants are wrong. Even broad reassuring statements such as "we continue to have good loan to value ratios" are material and actionable. *See Shapiro*, 964 F.2d at 276 n.6, 283.[23] Consistent with this well-established law, courts regularly find statements about LTVs actionable and, indeed, have even held that virtually identical statements about LTVs that include the word "generally" are material. *See*, *e.g.*, *In re Wells Fargo Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 972 (N.D. Cal. 2010) (sustaining statement that "loans will not generally have had at origination an [LTV] in excess of 95%" where "true [LTVs] frequently exceeded 100%"); *Mass. Mut. Life. Ins. Co. v. Residential Funding Co.*, 843 F. Supp. 2d 191, 203-04 (D. Mass. 2012); *Prudential*, 2013 WL 1431680, at *2, *7.

Second, Defendants argue that Wilmington's public LTV statements were not false because Plaintiffs provided only "three examples" of LTV violations (none of which they dispute). WT Br.

---

[22] Contrary to Defendants' contention that "whether the value of a property decreases after underwriting has no bearing on the LTV ratio at the time of underwriting" (WT Br. 28), Wilmington was obligated to re-underwrite loans that were "extended" or "renewed." ¶¶76, 272.

[23] Defendants' citation to *In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp. 326, 338 (S.D.N.Y. 1996), for the proposition that "general . . . statements . . . are not actionable" (UW Br. 18), is inapposite. The court in that case was addressing a "[f]orward-looking statement[] which d[id] not make a promise to investors, but rather only state[d] [the fund's] objectives." *Id.*

27-28; UW Br. 10. Defendants are wrong. The Complaint makes clear that such violations were not occasional, but rather the result of a regular, systemic practice that routinely resulted in LTVs exceeding the 80% limit. ¶¶87, 97, 426. The use of "representative examples" to demonstrate a systemic fraud is sufficient to satisfy the "pleading standards of Rule 9(b)." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 308 (3d Cir. 2011).

### 5. False Statements Regarding Internal Controls

Contrary to the SOX certifications signed by Cecala and Gibson, the Bank's internal controls over financial reporting were inadequate. ¶¶256, 434. Indeed, the Bank's internal controls were so weak that they failed to prevent a conspiracy that involved more than a billion dollars of fraudulently waived loans. In addition, the Bank failed to address the repeated warnings about "weaknesses in [Wilmington's] control structure" from the Federal Reserve, KPMG, and its Internal Audit Group. ¶¶144, 151, 170, 258.

Defendants raise several arguments, all of which fail. First, Defendants argue that internal controls misstatements in SOX certifications are not material. WT Br. 32; UW Br. 17. That is incorrect. *See In re PMA Capital Corp. Sec. Litig.*, 2005 WL 1806503, at *10 (E.D. Pa. July 27, 2005); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 588 n.7 (S.D. Tex. 2003) (Congress intended SOX certifications to provide investors with assurances of "a materially accurate and complete picture of an issuer's financial condition").[24] Second, they argue that the Complaint fails to establish that Cecala and Gibson were aware of facts inconsistent with these certifications. WT Br. 32-33. That is also incorrect. Cecala and Gibson were on the Loan Committee and knew that Wilmington had hundreds of past due loans on its books that it was not

---

[24] *In re New Century*, 588 F. Supp. 2d 1206, 1226-27 (C.D. Cal. 2008); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1178 (C.D. Cal. 2008). The cases cited by the Underwriter Defendants (UW Br. 23) support materiality (*see In re Am. Bus. Fin. Serv., Inc. Sec. Litig.*, 2007 WL 81937, at *8 (E.D. Pa. Jan. 9, 2007) (internal controls statements actionable)) or are inapposite (*see Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 791 (S.D.N.Y. 1997) (statement did not involve controls)).

reporting properly. Indeed, Cecala and Gibson obviously understood that they were subverting the Bank's control systems when they executed the sham mass extension. Further, they (among others) received the above-described warnings about "weaknesses in [Wilmington's] financial reporting controls" throughout the Class Period. ¶¶142-44.[25] Third, Defendants argue that any warnings about "weaknesses in [Wilmington's] financial reporting controls" were raised "from a banking regulatory perspective," rather than a "controls" perspective. WT Br. 33. This makes no sense and, at most, raises a factual issue inappropriate for resolution at this stage.[26]

### 6. <u>The Officer Defendants' Additional False Statements</u>

The Officer Defendants made additional false statements similar to those discussed above during Wilmington's quarterly conference calls. ¶¶180, 183-84, 192-93, 202-04, 259-77. These statements communicated principally the same message as the false statements in the Bank's SEC filings by touting the quality of Wilmington's underwriting and asset review practices and denying "credit problems" in the commercial loan portfolio. *Id*. These statements were materially false and misleading when made.[27]

For instance, on the Bank's April 24, 2009 call, Defendant North represented to investors

---

[25] Wilmington further argues that KPMG's audit reports never identified material weaknesses in internal controls. WT Br. 33. But the Complaint alleges that, in connection with its 2007 audit, KPMG issued a Management Letter warning of weaknesses in financial reporting and that KPMG repeated those criticisms the next year. ¶¶143, 430. KPMG and Wilmington cannot escape liability based on KPMG's failure to disclose these control weaknesses to the public. *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1090 (10th Cir. 2003).

[26] In addition, the Underwriter Defendants incorrectly assert that Plaintiffs' internal control allegations are inactionable because they are "derivative" of other claims. UW Br. 23-24. This is not the law. *See WaMu*, 694 F. Supp. 2d at 1212-13 (internal controls certifications actionable when based on failure to adequately reserve for loan losses). Here, Plaintiffs' claims are predicated on the false representations of internal controls including loan reserving failures. *See, e.g.*, ¶¶434-36.

[27] To the extent Defendants rehash arguments about the Officer Defendants' conference call statements being "vague puffery," "subjective characterizations," or mere "opinions" (WT Br. 35-37; North Br. 16), they are wrong for the reasons set forth more fully in Sections III.B.1-5. For example, Defendants' sole challenge to Cecala's statements on the Bank's January 18, 2008 call – which "point[ed] to quality of the [Bank's] loan portfolio and [its] underwriting and evaluation process" – is that they are "vague puffery." WT Br. 33-34. However, as discussed above, it is well established in the Third Circuit that, "by addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully." *Shapiro*, 964 F.2d at 282 (when a "defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play.'").

that Wilmington had not seen any "increase in problems" in the Bank's "non-residential commercial" portfolio, which he further represented had "held up well." ¶262. This statement was materially false because, as discussed above, the Bank had experienced significant deterioration in its commercial loan portfolio and was fraudulently concealing significant amounts of past due loans from public disclosure. ¶¶70-71, 263, 408. In response, Defendants argue that this statement was not false because it related only to "strip malls" and the Complaint supposedly does "not discuss this [non-residential] segment of the commercial loan portfolio." WT Br. 34; North Br. 13-14. This is wrong. North's statement was not limited to "strip malls," but instead referred to the Bank's entire non-residential commercial loan portfolio. ¶262. The Complaint is replete with allegations about this segment of the Bank's portfolio, which included all of the Bank's loans to Zimmerman to construct commercial centers like Salt Pond. ¶¶113-23. Moreover, the Criminal Information confirmed that if Wilmington had not fraudulently concealed $186 million of past due loans in the first quarter of 2009, it would have reported a <u>70% increase</u> to its past due loan figures (¶¶4, 70, 263), which would have unquestionably demonstrated that the portfolio had <u>not</u> "held up well." In any event, at best, Defendants' argument raises fact questions that are not appropriate at this stage.

On the Bank's July 24, 2009 call, Defendant North assured investors that the Bank had not seen "a marked increase in terms of the losses" nor "any out of pattern behavior of things that fall into [past due loan] categories." ¶264. This statement was materially false because, as discussed above, the Criminal Information established that Wilmington was deliberately concealing its past due loans to avoid updating appraisals and, consequently, to avoid reporting losses and charge-offs. ¶¶54-90, 265, 408. Indeed, the Bank concealed more than $234 million, or 69%, of its past due loans in the second quarter of 2009. ¶¶70-71, 265. In response, Defendants argue that this statement was not false because it related to "charge-offs" instead of "nonperforming loans." WT Br. 34. This is wrong. The Criminal Information confirmed that the hundreds of millions of dollars

of fraudulently "waived" loans clearly would have "increased" losses (and thus "charge-offs") had the Bank obtained the requisite appraisals. ¶¶63, 265, 408. Moreover, this argument ignores that North was responding to an analyst question that specifically concerned the Bank's "nonperforming" loans. ¶264; Ross Ex. 26 at 7.

On the Bank's October 23, 2009 call, North stated that Wilmington obtained "new appraisal[s]" on troubled loans to assess "value at today's market . . . based on today's performance," and that the Bank put troubled loans "under the microscope" and even evaluated loans "on a daily basis in terms of how they're performing." ¶¶57, 266, 270. This statement was materially false because, as discussed above, the Criminal Information confirmed that, rather than "going out and getting a new appraisal," the Bank deliberately failed to update appraisals for past due loans, violating both federal law and its own policies. ¶¶54-90, 267, 271, 429-30. In response, North argues that his statements were not false because he was unaware that the Bank failed to update appraisals on Terranova's past due loans, and that the failure to obtain new appraisals on Terranova's loans "does not mean that the Bank did not order appraisals on <u>other</u> troubled loans that were not in his portfolio." North Br. 16-17. But North was well aware of the Bank's significant "appraisal problem" when he made this statement. Specifically, the Criminal Information detailed how North was notified in January 2009 that the Bank was not reporting a "true past due number" (which, as set forth in the Criminal Information, was a widespread practice at the Bank that affected loans well beyond those in Terranova's portfolio), and in April 2009 he was intimately involved in discussions with other senior Bank executives about the "catastrophic consequences" of the Bank's "appraisal problem." ¶¶63, 69-78, 88, 251, 263, 412. These discussions continued in September 2009 and through the fall. *Id.* Such extraordinary facts easily establish the falsity of North's October statements.

Additionally, Defendants argue that North never claimed that Wilmington "obtained new

appraisals for all troubled loans, only collateral-oriented loans." WT Br. 35 (emphasis in original). The Criminal Information, however, specifically confirmed that North refused to update appraisals on collateral-oriented loans, which are, by definition, the only loans for which appraisals were required. ¶¶74-78, 267, 429-30. North also argues that his October 23, 2009 statement about putting troubled loans "under the microscope" was "fair" and "true" since Wilmington was "under greater scrutiny than ever before" because of the MOU (which was never mentioned on the call). North Br. 17. This argument fails. As discussed above, Wilmington did not review past due loans "under the microscope" to mitigate credit risk but instead conducted a criminally fraudulent review of past due loans to conceal the Bank's true financial condition.

On the same October 23, 2009 call, Gibson represented to investors that the Bank applied "very close scrutiny" to "substandard" loans and nonperforming assets, which were "continually evaluated" as part of an "ongoing process" in order to "put specific reserves against those [substandard] loans." ¶270. This statement was materially false because, as discussed above, instead of applying "very close scrutiny" of "substandard" loans, the Bank reclassified hundreds of millions of dollars of those loans as "in the process of extension" and simply erased them from its financial statements. ¶¶54-90, 271, 432. Further, instead of putting "specific reserves against [substandard] loans," the Bank's senior officers did the exact opposite: they misreported hundreds of millions of dollars of past due loans which had the direct effect of understating the Bank's Reserve. In response, Defendants argue that Gibson's statement is "hardly capable of contradiction." WT Br. 35-36. This contention, however, is simply not credible, as Gibson's statement is directly contradicted by the admitted facts in the Criminal Information and the Complaint's allegations.

Also on the October 23, 2009 call, Cecala stated that Wilmington did a "thorough and exhaustive analysis" of troubled loans "each and every quarter," and that Wilmington took

"immediate charges" when a "loan goes nonaccruing." ¶¶57, 268. This statement was materially false because, as discussed above, instead of taking "immediate charges" for nonaccruing loans, the Bank misreported hundreds of millions of dollars of those loans. In response, Defendants argue that Cecala's October 23, 2009 statement about taking "immediate charge[s] on nonaccruing loans was not false because he said the Bank took Reserves only "in some situations." WT Br. 35. As Cecala said on the call, however, that caveat depended on whether "the underlying collateral" was "sufficient" in "today's market." ¶268. Given that the Bank failed to obtain updated appraisals to determine the sufficiency of the underlying collateral for its troubled loans, Cecala's statements were plainly false. ¶¶74-78, 429-30, 432.

On the Bank's June 4, 2010 call announcing Cecala's sudden resignation, Cecala denied the existence of "mounting . . . credit problem[s]," and Foley falsely reassured investors that there would not be any upcoming "surprises" or credit "blow ups." ¶¶161, 177, 275, 183-84. These statements were materially false because, as discussed above, both Cecala and Foley knew that the Bank was internally recognizing massive credit problems arising from its fraudulent concealment of past due loans and refusal to update appraisals, the Federal Reserve was concerned about the "future ability of the bank to survive," and the Delaware Status Review had revealed "serious concerns" with the bank's credit risk mitigation practices. ¶¶91, 157-61, 178-79, 191, 199-200, 205, 275, 425, 430.[28] In response, Defendants contend that Cecala's and Foley's responses were not false because they were made in the context of a question regarding a potential acquisition. WT Br. 36-37. But

[28] Further, on July 23, 2010, Gibson stated that Treliant "reviewed [the Bank's] procedures and policies" and concluded they "were state-of-the-art," when, in reality, Treliant had concluded that Wilmington's loans were consistently mis-rated and appraisals were far out of date. ¶¶90, 150. While Defendants assert that this statement was not false because the Complaint alleges only that Treliant reviewed appraisals (WT Br. 37), the Complaint clearly alleges that Treliant "helped review the portfolio" generally, including both "risk ratings" (which Treliant downgraded to be "much worse") and appraisals. ¶¶90, 150. During the July 23, 2010 call, Foley also falsely attributed the Bank's Reserve increase to "negative trends" occurring in the second quarter (¶193), when this increase was attributable to past due loans that the Bank had failed to report from the beginning of the Class Period. While Defendants contend that Foley did not attribute the Reserve increase to "recent" trends, Foley specifically stated that the "negative trends" at issue supposedly occurred in the "second quarter of 2010." WT Br. 37-38.

that is not true. These remarks were made in direct response to an analyst who was "trying to understand" whether Cecala's resignation was due to "a mounting capital problem or credit problem that hadn't been reported." ¶275. *See also* Ross Ex. 29 at 5. Accordingly, Cecala's and Foley's false assurances related directly to the purported accuracy of the Bank's financial reporting.

### C. <u>The Complaint Raises A Strong Inference Of The Officer Defendants' Scienter</u>

A complaint alleging securities fraud must give rise to a strong inference of scienter. *See Institutional Investors Grp. v. Avaya Inc.*, 564 F.3d 242, 251 (3d Cir. 2009). The Third Circuit does not require proof of "intentional fraud" to establish scienter. *Id*. at 269. Rather, recklessness satisfies the scienter requirement. *Id*. at 252. A court must "accept all factual allegations in the complaint as true" and determine "whether <u>all</u> of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in original). "It is the composite picture, not the isolated components, that judges must evaluate in the last instance." *Avaya*, 564 F.3d at 272-73. "In assessing the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *Id*. at 272-73 (citation omitted).

The Supreme Court has further held that the inference of scienter "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (quotations omitted). Instead, an inference of scienter is "strong" when it is <u>as likely</u> as any other inference. *Id. See also ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008) ("*Tellabs* now awards the draw to the plaintiff"). Thus, to obtain dismissal of Plaintiffs' claims, Defendants must show that the Complaint's allegations give rise to an inference of innocent behavior that is <u>stronger</u> than the inference of recklessness.

As set forth below, the facts alleged in the Complaint establish that the Officer Defendants either knew of or recklessly disregarded the massive fraud at the Bank.[29]

### 1. **Internal Emails, The Criminal Information, And Other Documentary Evidence Established That The Officer Defendants Knew That The Bank Was Misreporting Its Past Due Loans**

The Complaint sets forth detailed facts establishing that the Officer Defendants knew that the Bank was misreporting its past due loans, including numerous internal emails which show that the Bank's understatement of past due loans was repeatedly discussed at the highest levels of the Bank. For instance, in a January 2009 email to Defendant North and other senior executives, the Bank's Credit Policy Manager explicitly stated that Wilmington's past due loan reporting "has not exactly been reality," and that Wilmington had understated its "true past due number" by more than $100 million as of year-end 2008. ¶73. As reflected in these emails, senior Bank executives continued to discuss the past due loan fraud throughout 2009. Indeed, in April 2009, Defendant North, Terranova, and Senior Real Estate Credit Officer Terry Brewer had a "long conversation" about the Bank's "appraisal problem," during which they discussed the fact that, if the Bank were to properly account for its past due loans, it would have "catastrophic consequences" for the Bank's financial performance. ¶¶73-77. That same month, the Bank's highest-ranking risk officer – CW 2, the Head of Credit Risk Management – confirmed in an email to other senior Bank executives that the Bank's failure to obtain updated appraisals "clearly" violated federal law. ¶78. As reflected in yet another email from CW 2 to Defendant North and other executives, by no later than September 2009, many of the Bank's unreported past due loans had "been the subject of conversations for multiple consecutive months" among senior Wilmington officers, yet the Bank was still falsely categorizing them as "in the process of extension" solely to avoid "transfer[ring them] to

[29] Defendants' contention that the Complaint engages in inadequate "group pleading" is wrong. WT Br. 40; North Br. 22. The Complaint alleges scienter with respect to each Officer Defendant. *See* ¶¶280-90 (all Defendants); ¶291 (Cecala); ¶292 (Gibson); ¶293 (Harra); ¶294 (North); ¶295 (Foley). In fact, Defendants' claim is contradicted by their attempt to factually dispute Plaintiffs' Defendant-specific scienter allegations. *See* WT Br. 55-60; North Br. 21-28.

nonaccrual," *i.e.*, to avoid reporting them as past due. *Id*.

The internal emails cited in the Complaint further show that, by no later than October 2009, the Bank's underreporting of past due loans had become so egregious that it had the full "attention" of the Bank's most senior officers – including CEO and Chairman Cecala, President Harra, and CFO Gibson – and that these senior officers had determined that they needed to "make" the Bank's problem loans "go away" by year-end. ¶79. Accordingly, beginning in the fourth quarter of 2009, Defendants Cecala, Harra, Gibson, and North engaged in a sham "mass extension" of 1,250 past due loans valued at more than $1.7 billion – or 25% of the Bank's commercial loan portfolio. ¶¶79-81. These mass extensions were specifically approved by the Loan Committee, which included Defendants Cecala, Harra, and North, and were granted without obtaining the requisite updated appraisals or other required documentation. ¶¶81-84. Indeed, the Complaint provides numerous examples of extensions that the Loan Committee granted in the final days of 2009 without updated appraisals, specifically so that the Bank could erase delinquent loans from Wilmington's year-end financial statements – which the Bank then used to raise $274 million from unsuspecting investors in the February 2010 Offering. ¶¶81-84, 403.

In addition to these extraordinary facts, as detailed in the Criminal Information and corroborated by former Bank employees, the Bank's fraudulent classification of past due loans as "in the process of extension" was documented in internal Delinquency Reports that the Officer Defendants received on at least a quarterly basis. ¶¶64-67. As the Criminal Information made clear, many of these "waived" loans appeared on the Delinquency Reports for months and even years as "in the process of extension," making the unlawful nature of these "waivers" readily apparent. *Id.* The Criminal Information also established that these reports were used by Gibson and the Finance Department to publicly report the Bank's past due loan amounts. *Id*. Former high-ranking employees, including CW 2, have further confirmed that the Bank's practice of "waiving"

past due loans without any legitimate basis and without obtaining required appraisals was also regularly discussed at monthly ARG meetings and quarterly Credit Strategy Meetings attended by Cecala, Harra, Gibson, and North. ¶88. In sum, such detailed allegations easily give rise to a strong inference of the Officer Defendants' scienter. *See, e.g.*, *Alter*, 2011 WL 4528385, at *9 (scienter established where defendants "directly approved" the fraudulent scheme); *Aviva Partners LLC v. Exide Techs.*, 2007 WL 789083, at *19 (D.N.J. March 13, 2007) (scienter established where fraudulent activity was brought to the defendants' "attention"); *In re Campbell Soup Sec. Litig.*, 145 F. Supp. 2d 574, 597 (D.N.J. 2001) (scienter established where complaint set forth "a detailed picture of the improper practices in which Defendants knowingly engaged"); *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 555 (D.N.J. 2002) (scienter established by "a meticulous account of the allegedly unlawful practices in which . . . Defendants knowingly or recklessly engaged").

In response to these compelling allegations, Defendants make a host of arguments that contradict the Complaint and the Criminal Information, require the Court to draw implausible inferences, and – at best – raise factual issues that cannot be decided at this stage of the litigation. Their arguments should be rejected. Defendants first contend that "Terranova misled the Loan Committee" in connection with the mass extension. WT Br. 43 n.10, 56; North Br. 4-5. However, this is wishful thinking on the part of Defendants, as there is no evidence whatsoever that Terranova prepared false appraisals or falsified other required documents in connection with the mass extension. Rather, based on the Criminal Information, the Complaint made clear that the Loan Committee knowingly approved the extensions without obtaining updated appraisals as required by federal law and the Bank's own policy, and without obtaining other required documentation, such as an analysis of the borrower's ability to repay the loan. ¶¶81-84. Further, Terranova's loans constituted only a small portion of the loans that the Officer Defendants mass extended. Even

assuming that Terranova's entire $500 million loan portfolio was included in the mass extension, his loans represented only 28% of the $1.74 billion of mass extended loans, meaning that at the very least, 75% of the mass extended loans were originated by persons other than Terranova. Thus, the notion that Terranova somehow falsified appraisals for more than 1,200 past due loans is not plausible and is contradicted by the documentary evidence.[30]

Similarly, Defendants argue that Terranova was a rogue actor who, without their knowledge, caused the Bank to underreport its past due loans throughout the Class Period by fraudulently asserting that his loans were "in the process of extension" when they were not. WT Br. 2, 32, 38; North Br. 4. This contention ignores the detailed emails that unequivocally demonstrate that many other Bank executives – including CEO Cecala, President Harra, CFO Gibson and CCO North – were well aware that the Bank was misreporting its past due loans and, in violation of federal law, was not obtaining the appraisals necessary to extend them. This argument further contradicts the Criminal Information, which established that Terranova was not a rogue actor, but was part of a Bank-wide "conspiracy" among senior Wilmington officers to fraudulently conceal the Bank's financial condition by causing it to understate past due loans by hundreds of millions of dollars over 18 consecutive quarters. Indeed, it defies credulity to believe that one loan officer could single-handedly cause Wilmington to fraudulently conceal more than $1 billion worth of past due loans for a period of 18 consecutive quarters. Moreover, as discussed above, the fraud involved far more than Terranova's loans; nearly three-quarters of the past due loans that were fraudulently extended were from lenders other than Terranova. ¶71.[31]

---

[30] Defendants' assertion that "the C.I. . . . describes efforts made by Terranova and his co-conspirators to circumvent WTC's policies" does not exculpate them. WT Br. 32. The Criminal Information nowhere stated that Terranova misled the Officer Defendants into approving the fraudulent waivers of past due loans or the mass extension. To the contrary, the evidence detailed in the Criminal Information established these Defendants' knowledge of the fraud, as explained above.

[31] These same facts completely discredit North's related argument that the fraud was confined exclusively to the Bank's other unidentified "Relationship Managers," and hidden from everyone else. North Br. 4-5, 27. In short, there is simply

Defendants also contend that their role in approving the mass extension cannot support an inference of scienter because "mere" membership on the Loan Committee does not establish knowledge of the fraud. WT Br. 42-43; North Br. 23-24. This argument ignores the highly detailed allegations of the Complaint, which do not rest on Defendants' "mere" membership on the Loan Committee. Rather, as discussed, the Complaint and the Criminal Information made clear that Cecala, Harra, and North were responsible for approving, and indeed did directly approve, the mass extension of past due loans. ¶¶81-84.

Defendants Cecala, Harra, and Gibson next contend that the emails set forth in the Complaint cannot support an inference of scienter because they did not receive or send them. WT Br. 43. However, the emails specifically refer to these Defendants and make clear that they knew that the Bank was understating its past due loans, were intimately involved with the fraud, and, indeed, were actively discussing it. ¶79. For example, the October 29, 2009 email specifically stated that Defendants Cecala, Harra, and Gibson had their "attention" on the fact that the Bank was misreporting its past due loans, and the Bank's most senior executives needed to figure out a way to make the loans "go away" by year-end, which these Defendants accomplished through the mass extension. *Id*.[32]

Defendants Cecala, Harra, and Gibson next assert that the October 2009 email noted above cannot support an inference of scienter because they are "included with 'Examiners' and 'Auditors,' as persons with 'attention' to the issue [of past due loans], and Plaintiffs do not allege that bank examiners were part of the conspiracy to commit fraud." WT Br. 42; North Br. 25. This argument

---

no basis to conclude – certainly not at this stage of the proceedings – that this massive, longstanding criminal conspiracy occurring at the heart of the Bank's business was the work of one or two "Relationship Managers."

[32] While Gibson argues that the only allegation unique to him concerns his knowledge of the Federal Reserve's regulatory actions in the summer of 2010 (WT Br. 58), this argument ignores the Complaint's allegations that, as reflected in the October 2009 email, Gibson had detailed knowledge of the fact that the Bank was misreporting its past due loans. This argument also ignores the allegation that Gibson, as head of the Bank's Finance Department, directed the removal of "waived" past due loans from the Delinquency Reports in order to prepare the Bank's Past Due Lists, which were used to publicly report the Bank's past due loans. ¶67.

is specious. The fact that the Complaint does not allege that federal bank examiners were part of the criminal conspiracy obviously has no bearing on the scienter of the Officer Defendants. Moreover, as established by the Criminal Information, after this email was sent, the Officer Defendants specifically concealed the fraud from the Bank's examiners (and investors) by engaging in the mass extension – a fact highly indicative of scienter.

Remarkably, even though North received many of these emails, he nevertheless argues that they supposedly "exonerate" him. North Br. 3, 23. Specifically, he argues that the January 2009 email he received from Cummings stating that the Bank's past due loan reporting has "not exactly been reality" purportedly "establishes the Bank's desire[] to report its past due figure appropriately." *Id.* North's argument is "not exactly reality." Indeed, it directly contradicts the Criminal Information and the Complaint, both of which established that, after North received this email, the Bank continued for more than a year to fraudulently report its true past due loans.

North also argues that certain of the emails are "chronologically irrelevant" because he received them after he made certain of his false statements. North Br. 22-23. This argument again contradicts the Criminal Information, which established that the criminal conspiracy at Wilmington existed from on or about August 22, 2005, long before North made his false statements. Further, North's receipt of the January 16, 2009 email stating that the Bank's past due reporting "has not exactly been reality" pre-dates all the statements on which he focuses, and the subsequent emails he received, including the October 29, 2009 email, reflect his continued participation in a fraud of which he was unquestionably aware. ¶73.[33]

[33] North also argues that the September 2009 email from CW 2 stating that the Bank was misreporting its past due loans (¶78) cannot establish scienter for his October 23, 2009 statements because those statements concerned only appraisals, and not the Bank's past due loans. North Br. 23. North is wrong. North's October 23 statements directly addressed the treatment of the Bank's "nonaccruing" loans. ¶¶266-67, 270-71. Specifically, North represented that Wilmington put all "nonperforming" loans "under the microscope," obtained "new appraisals" when required to do so, and accounted for updated appraisals "based on today's market conditions" in Wilmington's Loan Loss Reserve – all of which were false because of the past due loan fraud. ¶121.

Defendants next contend that the allegations concerning their receipt of Delinquency Reports cannot support scienter because the reports are supposedly "undated," were compiled by "low-level" employees, and did not specifically say that the "waivers were fraudulent." WT Br. 44. This argument contradicts the Criminal Information and the Complaint's allegations, which demonstrated that these reports were compiled every month during the Class Period by the Bank's Credit Policy Officer and approved by Defendant North, who distributed them to Cecala, Harra, and Gibson every quarter. ¶¶64-66. Moreover, while the reports did not specifically state that the "waivers were fraudulent," the fraudulent nature of the waivers was readily apparent given that there was no stated justification for the waivers, and the same loans appeared on the reports as "in the process of extension" for many months and even years. *Id*. Even if these facts did not establish that the fraudulent nature of the waivers was obvious (which they do), at minimum, Defendants were under a duty to investigate whether the loans listed on the Delinquency Reports were legitimately in the process of extension before reporting their past due loan amounts to investors.[34]

Finally, Defendants contend that the reports of CW 2 and other former high-ranking Bank employees supposedly amount to nothing more than "water cooler gossip." WT Br. 45. Again, this argument contradicts the Criminal Information. As noted above, the Government relied extensively on CW 2 in the Criminal Information. CW 2 was the Bank's most senior risk officer and, as reflected in the Criminal Information, CW 2's reports are based on his/her direct communications with Defendants and first-hand knowledge of the Bank's fraudulent waiver of its past due loans.

[34] Plaintiffs' detailed allegations are far stronger than the "generalized allegations" in the cases relied on by Defendants. WT Br. 44; North Br. 24. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (complaint did not specifically identify reports sent to defendants); *Pathfinder Mgmt., Inc. v. Mayne Pharma, Inc.*, 2009 WL 4250061, at *10 (D.N.J. Nov. 25, 2009) (scienter was not imputed to defendant based on the "generalized allegation" that he "may have received a memo"); *Israeli v. Team Telecom Int'l Ltd.*, 2006 WL 2883237, at *5 (D.N.J. Oct. 10, 2006) (complaint contained no suggestion of particular reports or their contents, author, or recipients).

*See, e.g.*, ¶¶88, 100, 109, 125. Such confidential witness reports are plainly reliable and further support an inference of scienter.[35]

### 2. **<u>The Criminal Information And Other Evidence Established That The Officer Defendants Knowingly Understated The Bank's Reserve</u>**

The Complaint amply alleges that the Officer Defendants acted with scienter in misstating the Bank's Reserve throughout the Class Period. As discussed above, the Officer Defendants knowingly misstated the Bank's past due loans by hundreds of millions of dollars each quarter. As established by the Criminal Information, they clearly understood that their understatements of past due loans had a dramatic impact on the Reserve. Indeed, according to the Criminal Information, a central objective of the conspiracy was to avoid reporting required increases to the Reserve. ¶162. Specifically, senior Bank officers falsified the Bank's reported past due loans in order to avoid obtaining updated appraisals because they were aware that updated appraisals "would have required [Wilmington] to recognize losses on the credits and would have had a negative impact on [Wilmington's] Allowance for Loan and Losses." *Id*. Such facts plainly establish scienter. *See, e.g., Alter*, 2011 WL 4528385, at *2 (scienter pleaded where "past due accounts were [] significantly distorted, so that the loans . . . would not deplete the company's loss reserves"); *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 519 (W.D. Pa. 2002) (scienter established where complaint alleged "detailed fraudulent scheme" to overstate earnings); *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 412-13 (D.N.J. 2004) (scienter established where defendant "knew that bad debt was being improperly characterized . . . and thus that NUI's income was being overstated").

In response to these allegations, Defendants again raise several arguments that contradict the

[35] Defendants' cases are inapposite. WT Br. 45 (citing *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1349-50, 1358-59 (N.D. Ga. 2010) (CW accounts "adequate" but complaint contained no allegations that "company violated accounting standards," or "that a corrective disclosure was made"); *In re Diebold Sec. Litig.*, 2008 WL 3927467, at *7 (N.D. Ohio Aug. 22, 2008) (complaint failed to provide "key data such as details about the CWs' position of employment"); *In re Ferro Corp.*, 2007 WL 1691358, at *12 (N.D. Ohio June 11, 2007) (statements of CWs were not based on "personal knowledge," just "speculation").

Criminal Information and the Complaint, and should be rejected. The Officer Defendants principally contend that scienter does not exist because Wilmington incrementally increased the Reserve during the Class Period, which they claim shows that they acted in good faith. WT Br. 47-49. However, the Criminal Information established that, far from acting in good faith, the Bank's senior officers engaged in a criminal conspiracy specifically to manipulate Wilmington's Reserve. ¶162. Moreover, regardless of any meager increases made to the Reserve, Defendants continued to materially understate the Reserve throughout the entire Class Period, as confirmed by both the Criminal Information and the $800 million in additional credit losses exposed on November 1, 2010. ¶¶164, 205. *See, e.g., Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1025 (N.D. Ill. 2010) (concluding that "Corus's fraud consisted largely in concealing the full extent of its financial difficulties" and any small increases in the reserve "do[] not necessarily negate an inference of scienter"). Further, contrary to Defendants' argument, the Bank did not meaningfully increase the Reserve until the fourth quarter of 2009, when they were <u>forced</u> to do so as a result of the MOU (and even then the Reserve remained woefully understated). ¶200. Such forced and inadequate increases cannot negate the inference of scienter. *See PMA*, 2005 WL 1806503, at *11.

Defendants also assert that they attempted to accurately and honestly report the Reserve, but simply "failed to predict the severity and duration of the recession," which supposedly "reached Delaware later." WT Br. 38-39. This argument is baseless, and flatly contradicts the Criminal Information. Defendants next argue that scienter does not exist because neither KPMG, the Federal Reserve, nor Treliant concluded that management misstated the Reserve. WT Br. 20. Again, whether or not the Federal Reserve or a third party caught the fraud is irrelevant: as the Criminal Information made clear, Wilmington deliberately "deceive[d] [its] regulators and the public." ¶54.[36]

---

[36] Defendants similarly point to KPMG's clean audit opinion in 2010 as proof that the Bank's Reserve was not misstated. WT Br. 50-51. However, the Criminal Information established that the Bank's Reserve was materially

Moreover, as Defendants themselves recognize (WT Br. 52), the Federal Reserve is a bank regulator whose role is not to detect fraud, but to "identif[y] and communicate" "problems or weaknesses" that may "adversely affect a bank's performance and viability." OCC, Policies & Procedures Manual § 5310-3 (2011), *available* at http://www.occ/gov/static/publications/ppm-5310-3.pdf.

Defendants next contend that M&T's independent analysis of Wilmington's loan portfolio – which revealed that the Reserve was understated by an additional $500 million as of the end of the Class Period – cannot support an inference of scienter because it was an estimate of "future losses" with no relevance to the Reserve. WT Br. 49-50. This argument is nonsense. M&T unambiguously stated that its analysis reflected its assessment of credit losses inherent in the portfolio from as far back as 2007 – which is precisely what the Reserve was supposed to include. ¶156.

Finally, the Officer Defendants speculate that, because M&T consummated the merger, there is an inference that M&T "did not find any evidence of fraud" at Wilmington. WT Br. 50-51. Regardless of Defendants' speculation about what M&T may have found in its due diligence, the fact remains that the Criminal Information established that there was a criminal conspiracy at the Bank to misstate the Reserve. Moreover, M&T bought the Bank in an historic "take under" – *i.e.*, at a 50% discount to its trading price just one day before the sale was announced – precisely because the Bank's key financial metrics, including the Reserve, had been grossly misstated during the Class Period. ¶198.

### 3. <u>The Officer Defendants Knew Of The Bank's Severely Reckless Underwriting And Asset Review Practices</u>

The Complaint is replete with facts establishing that the Officer Defendants knew of the Bank's severely deficient underwriting and asset review practices. As set forth in detail above, the

---

understated throughout the Class Period. Given that KPMG issued a clean audit opinion on admittedly false financial statements in 2009, this argument hardly constitutes a defense.

Criminal Information and the Complaint demonstrate that the Bank made hundreds of millions of dollars in loans – many of which were approved by the Loan Committee – without any consideration of the borrower's ability to repay. ¶¶71-84. The Officer Defendants were well aware that these loans were delinquent throughout the Class Period. Indeed, when these loans became delinquent, the Officer Defendants deliberately waived them from public reporting as "in the process of extension" for months and even years – thus allowing the Bank to continue making loans without considering the borrowers' creditworthiness. *Id.* When this practice of waiving the loans from public reporting could no longer continue, the Officer Defendants granted a fraudulent mass extension to 1,250 of the Bank's most troubled loans – a fact which demonstrates that they were plainly aware of the deficiencies in the Bank's underwriting and asset review practices. ¶¶80-81.

Corroborating the conspiracy set forth in the Criminal Information, CW 2 and other former senior Bank employees reported that the Officer Defendants personally directed many of the improper underwriting and asset review practices at issue. For example, the Officer Defendants regularly vetoed recommendations by Wilmington's ARG to downgrade or charge off past due loans, and instead fraudulently categorized them as "in the process of extension" indefinitely. ¶85. Similarly, the Bank's CEO, Cecala, ordered Bailey and Terranova "not to keep files" on numerous loans. ¶125. The Complaint further alleges that the Officer Defendants were repeatedly made aware of the Bank's woefully deficient underwriting and asset review practices by among other things: (i) KPMG, which stated in early 2009 that the Bank engaged in "deficient" underwriting practices that "mask[ed]" the Bank's true credit risk (¶95); (ii) the Federal Reserve, which found in the September 2009 MOU that the Bank's underwriting was "problematic" and resulted in "substandard" loans (¶96); and (iii) the Delaware Status Review and Memo, which in March 2010 identified a host of "questionable activities" in the Bank's underwriting and asset review practices that raised "serious concerns with the past management of the Delaware Commercial Real Estate

Division and with its loan portfolio" (¶¶159-61). These facts are more than sufficient to give rise to a strong inference that the Officer Defendants knew of (or recklessly disregarded) the Bank's widespread failure to consider its borrowers' ability to repay their loans, and to properly review and account for the quality of the Bank's loan portfolio. *See, e.g.*, *Alter*, 2011 WL 4528385, at *9 (scienter established where defendants approved and knew of deficient credit quality practices); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058 (C.D. Cal. 2008) (scienter established where complaint alleged that "significant deviations in underwriting were permitted even when it was clear that borrowers might not be able to pay"); *Accredited*, 556 F. Supp. 2d at 1156 (scienter pleaded "[i]n light of Defendants' alleged awareness that the company had begun to deviate from its own underwriting policies and that the quality of the company's loan portfolio would begin to decrease").

In response to these allegations, Defendants again raise a host of arguments that ignore and contradict the Criminal Information and the Complaint, and can be swiftly rejected. First, Defendants argue that allegations regarding the Bank's loans to Zimmerman cannot support an inference of scienter because they merely establish that the Bank was a victim of "one borrower's" fraud. WT Br. 46-47. The Criminal Information and the Complaint make clear that the Bank's fraudulent lending practices were systemic, and in no way limited to Zimmerman. Indeed, the Complaint includes numerous specific examples of fraudulent loans to borrowers other than Zimmerman, including the over $100 million of delinquent loans that the Bank fraudulently mass extended for two borrowers in late December 2009 and the dozens of improper 10% Rule loans that went to borrowers other than Zimmerman. ¶¶82-83, 94, 97. Moreover, Zimmerman cannot be dismissed as simply a "single borrower" who flew "under the radar." As noted above, Zimmerman was one of the Bank's most important borrowers, and the Bank made nearly $100 million in loans to him – which constituted approximately 6% of its entire commercial real estate construction loan

portfolio – many of which were approved by Defendants Cecala, Harra, and North, as members of the Loan Committee. ¶111. Thus, the Officer Defendants were obviously aware of Zimmerman's loans and deliberately waived them from being reported as past due.

Second, Defendants argue that the MOU "undermines" scienter because it is supposedly a "common, informal" measure, and if the Federal Reserve had suspected fraud, it would have taken "more severe measures." WT Br. 52-53.[37] This argument fails because it fundamentally misconstrues the role of the Federal Reserve. As noted above, the role of the Federal Reserve is not to detect fraud, but to "identif[y] and communicate" "problems or weaknesses" that may "adversely affect a bank's performance and viability." Consistent with this duty, the Federal Reserve identified serious problems in the Bank's underwriting and asset review practices that threatened the Bank's ability to operate, including that the Bank had: (i) failed to establish proper "underwriting standards, guidelines and quantifiable limits for commercial real estate," (ii) lacked "standards for documentation exception tracking and monitoring," and (iii) had failed to "monitor compliance with [credit] policies and procedures." ¶¶152-56. These findings were communicated to the Officer Defendants through the MOU, and clearly establish their knowledge of the Bank's underwriting and asset review failures.[38]

Third, Defendants argue that the purported "remedial measures" the Bank adopted following the MOU demonstrate their good faith. WT Br. 56-57. This argument should be swiftly rejected. Far more telling than any supposed "remedial measures" adopted by the Bank after the MOU is the

[37] Defendants' arguments about how to characterize the severity of an MOU (WT Br. 52-53) are beside the point. However characterized, the MOU set forth serious findings about the deficiencies in the Bank's underwriting and asset review practices and required the Bank to undergo fundamental restructuring, which further supports an inference of scienter.

[38] The cases on which Defendants rely do not support their argument. Unlike here – where Defendants received repeated regulatory warnings <u>throughout</u> the Class Period, including the MOU over a year before the end of the Class Period – Defendants' cited authorities concern regulatory actions taken on the last day of, or after, the class period. *See Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*, 2010 WL 1332574, at *12 (S.D. Fla. Mar. 30, 2010) ("post-class period conclusion"); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *6 n.5 (C.D. Cal. Aug. 21, 2009) (same); *N.Y.S. Teachers' Ret. Sys. v. Fremont Gen. Corp.*, 2009 WL 3112574, at *13 (C.D. Cal. Sept. 25, 2009) (same).

fact that, three months after receiving the MOU, the Officer Defendants engaged in the sham mass extension in order to conceal the past due loan fraud from regulators and investors, and deliberately filed a materially false and misleading 2009 Form 10-K with the SEC. ¶¶81-84.[39]

Fourth, Defendants contend that the Delaware Status Review and Memo cannot support scienter because the Memo was not memorialized until March 2010, over two-thirds through the Class Period. WT Br. 47. However, the Review and Memo did not merely identify deficiencies that came into existence in March 2010. Rather, based on a detailed analysis of over 50% of the Bank's commercial loan portfolio, the Review and Memo detailed significant deficiencies that existed throughout the Class Period, which raised "serious concerns" about the Bank's underwriting and asset review practices. ¶¶157-60. Moreover, Defendants' actions after receiving the Memo in March 2010 provide extremely compelling evidence of scienter. Significantly, rather than taking steps to remedy the "serious concerns" identified in the Memo, the Officer Defendants continued to engage in sham mass extensions of past due loans to erase them from the Bank's financial statements, fraudulently extending approximately 450 loans worth more than $400 million in the first and second quarters of 2010. ¶¶80-81.[40]

Defendants' remaining arguments need not delay the Court long. While Defendants contend that the allegations concerning the widespread abuse of the 10% Rule amount to merely "a charge of mismanagement" (WT Br. 56), the Criminal Information explicitly stated that these practices were part of the criminal conspiracy at Wilmington. ¶¶92-94. Similarly, contrary to Defendants'

[39] Defendants also argue that the inference of scienter is undermined by the fact that they "hired Treliant" to review the Bank's loan portfolio and that those "conspiring to commit fraud do not invite [such] scrutiny." WT Br. 54. However, the Federal Reserve required the Bank to bring in Treliant pursuant to the terms of the MOU, and Defendants engaged in the mass extension after Treliant reviewed the portfolio. ¶¶90, 150, 210.

[40] Defendants also ask the Court to infer that they were not aware of the Review and did not read the Memo. WT Br. 47. There is no basis for such an inference as it is utterly implausible to believe that senior officers were not aware of the Review and its findings. Further, this argument ignores the Complaint's allegations that senior management ordered the review to be undertaken in response to the Federal Reserve's MOU, and Defendants Cecala and Foley were specifically tasked with responding to the MOU.

contention that the Complaint fails to identify when "CW 2 raised concerns [to them] about the missing documentation in Terranova's loan" files (WT Br. 59), the Complaint states that CW 2 raised this concern "in connection with the Delaware Status Review" between September 2009 and February 2010. ¶125. Although Defendants contend that the Court cannot credit CW 1's report that Cecala ordered Bailey and Terranova not to document their loans because CW 1 was not involved in lending or underwriting (WT Br. 57), this is wrong. CW 1 was a Vice President in the Loan Workout Group, and in this position reviewed numerous loan files, attended numerous meetings with the Officer Defendants and Terranova, and interacted regularly with the Bank's lenders and executives. ¶125. Similarly, Defendants' assertion that the allegation that North and Harra "papered over" deficiencies in Terranova's and Bailey's loan files when concerns were raised is "nothing more than a disagreement with the business decisions of management" (North Br. 25) is groundless. Concealment of underwriting violations cannot be a valid business decision.[41] North's assertion that the allegations that he altered Deficiency Reports are merely "a confidential witness's vague conjecture" also fails. North Br. 24. These allegations come from the manager of the unit that reviewed the Bank's commercial loan documentation, and who North directly ordered to alter these reports. ¶102.

Likewise, contrary to Defendants' contentions (WT Br. 58-59; North Br. 26), Cecala's and North's abrupt departures in July 2010, just as the Federal Reserve took over the Bank's credit operations and started recognizing its true credit losses, support scienter. Similarly, the fact that Harra's departure from M&T coincided with the release of the Criminal Information and Terranova's guilty plea (¶21), also supports scienter. *See In re Par Pharms. Sec. Litig.*, 2009 WL

---

[41] Defendants' reliance on *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 151 (3d Cir. 2004) is misguided. WT Br. 56, 59; North Br. 25-26. *Alpharma* involved allegations of improper accounting by a low-level employee at a foreign subsidiary that represented "slightly more than one half of one percent of the company's total revenue," with no factual support that any officer defendant was aware of the misconduct, or even should have been. Here, by contrast and as discussed above, the Officer Defendants directly participated in the fraudulent misconduct at Wilmington.

3234273, at *10 (D.N.J. Sept. 30, 2009) (sudden resignation before fraud revealed contributed to inference of scienter); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (same). Finally, Defendants' suggestion that the 2008 restructuring of the ARG undermines scienter (WT Br. 52, 54, 57-58) is belied by the fact that, in late 2009, Defendants engaged in the sham mass extension of hundreds of loans. ¶146.[42]

### 4. <u>Foley's Assurance That There Was Not Going To Be A "Blow Up" At The Bank Was Severely Reckless At Minimum</u>

On June 3, 2010, Foley, the Chairman of the Bank's Audit Committee, took over as Wilmington's CEO following Cecala's abrupt departure. ¶182. To mitigate the market's concern that Cecala's sudden departure indicated credit problems at the Bank, Foley and Cecala held a special conference call where Foley specifically reassured the market that the Bank was stable and that there "aren't any surprises this year where credit" was concerned, and there was not going to be a "blow up somehow" at the Bank. ¶¶184, 275. These statements were plainly false, as less than five months later, the Bank revealed that its loan portfolio was so impaired that it could not survive as a standalone entity. At the time, Foley knew or had access to facts that contradicted his statements, including:

- As Chair of the Audit Committee, Foley received the Management Letters that KPMG issued in 2007 and 2008, the warnings that the Federal Reserve issued in 2007 and 2008, and the Internal Audit Group's 2007 report, all of which concluded that there were significant, widespread deficiencies in the Bank's underwriting, asset review practices, and material weakness in internal controls. ¶¶142-44.

- In early 2009, Foley also received warnings from KPMG that Wilmington's use of interest reserve loans solely to keep borrowers "afloat" – and avoid reporting those loans

[42] The Officer Defendants also argue that since they did not sell stock, and Harra and Cecala acquired some, an inference of scienter is negated. WT Br. 55. It is well established that scienter does not depend on allegations of insider selling, especially where, as here, the complaint alleges that Defendants knew their statements were false. *See Tellabs*, 551 U.S. at 325 (motive allegations unnecessary); *No. 84 Emp.-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period."); *In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at *12-13 (N.D. Ga. Jan. 29, 2009) (scienter pleaded where defendants acquired stock during class period).

as past due – constituted a significant underwriting deficiency and "mask[ed]" borrowers' creditworthiness. ¶¶95-96.

- Foley was one of the individuals responsible for the Bank's response to the MOU and therefore knew by no later than September 2009 of significant deficiencies in the Bank's core underwriting and asset review functions. ¶¶295, 375.

- As part of the MOU, the Bank was forced to bring in Treliant to update risk ratings, which revealed significant credit deterioration. ¶¶90, 150.

- Foley knew that the Delaware Status Review, which was undertaken as a result of the MOU, revealed "serious concerns" with more than 50% of the Bank's loan portfolio due to "questionable activities" in Wilmington's underwriting and asset review functions. ¶¶157-61.

- By the time of the June 4 conference call, Foley was aware that the Federal Reserve had effectively taken over the Bank's credit operations and was concerned about the "future ability of the bank to survive[] based on what they saw in the credit underwriting." ¶¶91, 152-56.

These facts plainly establish that Foley's statements were reckless at a minimum. *See, e.g.*, *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522086, at *10 (E.D. Pa. Sept. 3, 2010) (defendant's receipt of information contradicting public statements establishes strong inference of scienter).

In response, Defendants argue that the Complaint's scienter allegations against Foley are mere "status" allegations based on his position "on the board, its compliance committee, and its audit committee." WT Br. 60. Defendants are wrong. As discussed above, the Complaint's scienter allegations as to Foley are not based on his mere "status," but rather are based on specific information he received during the Class Period that demonstrated the Bank's massive credit deficiencies.[43]

**D. <u>KPMG Acted With Scienter In Issuing Its Materially False Clean Audit Opinion On The Bank's 2009 Financial Statements</u>**

In connection with the Bank's financial statements for the year ended December 31, 2009,

[43] Defendants further argue that Plaintiffs' scienter allegations against Foley plead only impermissible fraud by hindsight based on his June 23, 2010 admission that Wilmington had not been "proactive . . . in dealing with the bank's credit challenges." WT Br. 60. To the contrary, as set forth above, there are numerous facts demonstrating Foley's knowledge or reckless disregard of the Bank's true credit position at the time he made his false statement.

KPMG issued an unqualified auditor's report attesting that it had conducted an audit of Wilmington's 2009 financial statements in accordance with Generally Accepted Auditing Standards ("GAAS"), that those financial statements complied with GAAP, and that the Bank's internal controls were effective. ¶¶304-05. KPMG does not dispute that Wilmington failed to report over $1.3 billion of past due loans in the Bank's 2009 financial statements and, thus, KPMG's assertion that the Bank's 2009 financial statements were prepared in accordance with GAAP was materially false and misleading. KPMG Br. 8. However, KPMG argues that, despite this massive fraud, Plaintiffs' Section 10(b) claim does not give rise to a strong inference of KPMG's scienter. KPMG Br. 5-18. KPMG is wrong.

To establish scienter for an auditor in the Third Circuit, it is sufficient to show that "an auditor either lacked a genuine belief that its representations were supported by adequate information or engaged in auditing practices so shoddy that they amounted at best to a pretended audit . . . even in the face of assertions of good faith." *Suprema*, 438 F.3d at 279 (citation and internal quotations omitted) (reversing dismissal of Section 10(b) claims against an auditor even where the district court found that the auditor "was in effect a victim of the fraud" and "had done all it was required to do").[44] "[A]llegations of GAAS violations, coupled with allegations that significant 'red flags' were ignored," are sufficient to "withstand a motion to dismiss." *Id*. "[T]he most plausible means to prevail on a [S]ection 10(b) claim against an auditor without that ever-elusive smoking gun document or admission will be to show how specific and not insignificant accounting violations collectively raise an inference of scienter." *Id.* at 281 (quoting *In re IKON Office Solutions, Inc.*, 277 F.3d 658, 377 n.26 (3d Cir. 2002)). *See also, e.g., In re Am. Bus. Fin.*

[44] KPMG's contention that scienter may be alleged only by allegations supporting "an inference that when it expressed the opinion [the auditor] had no genuine belief that it had the information on which it could predicate that opinion" (KPMG Br. 7 (citation omitted)) inaccurately eliminates the alternative means to allege scienter established in *Suprema*, 438 F.3d at 279 (auditor "engaged in auditing practices so shoddy that they amounted at best to a pretended audit") (internal quotations omitted).

*Servs., Inc. Noteholders Litig.*, 2008 WL 3405580, at *7 (E.D. Pa. Aug. 11, 2008) (GAAP and GAAS violations, coupled with ignoring red flags, are sufficient to state securities fraud claim).

The facts set forth in the Criminal Information and the Complaint easily meet this standard. As the Criminal Information provided, by no later than the fall of 2009, KPMG was well aware that the Bank had an enormous issue with failing to report past due loans. Specifically, the October 29, 2009 email described in the Criminal Information and discussed above provides "smoking gun" evidence that KPMG was fully aware that Wilmington was failing to report hundreds of millions of dollars in past due loans, and that KPMG had its "attention" focused squarely on the issue. ¶¶79, 328. As the Criminal Information and Complaint further detailed, the Bank made this "problem" "go away" by mass extending more than eight hundred loans worth over $1.3 billion – nearly one-fifth of the Bank's past due construction loan portfolio – by year-end 2009. ¶¶79-81. Notably, many of these loans were extended in the final days of 2009, a clear red flag that they were being extended so that they could be erased from the Bank's year-end financial statements. ¶¶82-84. Significantly, as KPMG acknowledges, the Criminal Information and the Complaint established that the Bank had no legitimate basis to extend these past due loans – and, indeed, not one of those more than 800 loan extensions was supported by an updated appraisal or any other documentation required by law or Bank policy. KPMG Br. 4-5, 7-10.

These facts are indisputably sufficient to establish KPMG's scienter. They show that, at the same time KPMG was conducting the 2009 audit, it was well aware of – and in fact concerned by – the Bank's failure to accurately report its past due loans in its financial documents. They also show that Wilmington solved this problem by mass extending over 800 past due loans in the fourth quarter of 2009 without obtaining supporting documentation, as required by law. Had KPMG conducted a GAAS-compliant audit, it would have reviewed the loans that were mass extended in December 2009 in order to determine whether the extensions were appropriate, which would have

included obtaining from the Bank the information necessary to establish that these loans were appropriately extended. Indeed, professional auditor accounting guidance specifically required KPMG to perform individual reviews of the extended loans to evaluate whether those loans were likely to be repaid based upon borrowers' financial health and the underlying appraised collateral value, information that should have been included in the loan file supporting each extension. ¶318 (citing AAG Ch. 9); *see also* ¶¶307, 317.

KPMG's complete failure to undertake these basic steps on a matter that it itself recognized was a serious issue is the definition of performing an audit so shoddy it amounts to no audit at all. Indeed, courts have uniformly concluded that an auditor's failure to obtain documentary support for its audit in similar situations violates GAAS and is compelling evidence of scienter. *See, e.g.*, *Suprema*, 438 F.3d at 280 (scienter established where auditor failed to verify reported revenue sources); *Rent-Way*, 209 F. Supp. 2d at 507 (allegations that auditor conducted its "audits without obtaining adequate detail and documentation in violation of GAAS and consequently failed to detect non-standard journal entries" sufficient to demonstrate scienter).[45]

In response to these facts, KPMG argues that it was a victim of a fraud that "was just as likely hidden from the auditors" as it was from regulators. KPMG Br. 9-11. This is nonsense, and is the same argument rejected by the Third Circuit in *Suprema*:

> We have not overlooked BDO's protestations that it, too, was a victim of the fraud at Suprema, that the fraud conspirators hid information from and lied to BDO about Suprema's finances, and that BDO performed its audits in good faith under the circumstances. . . . At the pleading stage, however, plaintiffs are entitled to the benefit of all reasonable inferences based on the detailed and specific allegations in their complaints. In the face of the numerous and not insignificant alleged accounting violations, we cannot rule out, as a matter of law, a strong and reasonable inference of BDO's scienter.

[45] *See also P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 609 (D.N.J. 2001) (sustaining Section 10(b) claims where auditor was "charged with reckless disregard of numerous – even hundreds – of unsupported entries"); *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 373 (D.N.J. 1999) (allegations that auditor "failed to obtain direct evidence to support" financials and, instead, relied on management representations "evidences recklessness").

*Suprema*, 438 F.3d at 281.

Here, as in *Suprema*, there is no evidence that KPMG was prevented in any way from examining documentation supporting the mass extended loans, or that falsified records were provided to the auditor.[46] Moreover, Plaintiffs do not allege a complex financial scheme using "'secret' codes, which left no 'paper trail'" (*e.g.*, *Steiner v. MedQuist Inc.*, 2006 WL 2827740, at *23 (D.N.J. Sept. 29, 2006) (cited in KPMG Br. 11)). To the contrary, "the evidence of [Wilmington's] financial foul play was hiding in plain sight" (*Suprema*, 483 F.3d at 280) and KPMG simply failed to ask for documents that were required to support the mass extensions.[47]

Notably, KPMG concedes that the October 29, 2009 email, read "in the light most favorable to Plaintiffs," as the Court must do, demonstrates that KPMG was "attuned to the possibility of some issues relating to 'matured loans,'" but argues that the email "suggests that the alleged fraud was undertaken by Bank executives precisely to prevent KPMG . . . from detecting the matured loan 'problem.'" KPMG Br. 9-10. KPMG's argument that the email "suggests" that Bank executives sought to prevent KPMG from detecting the fraud ignores the fact that, as noted above, there is no evidence that the Bank hid the fraud from KPMG, provided KPMG with falsified information, or failed to provide KPMG with any information it requested. Moreover, KPMG had an independent obligation to review the documentation supporting the highly suspicious mass extension of hundreds of loans at the end of 2009 – especially given that KPMG was admittedly "attuned" to the

[46] KPMG does not dispute that "[neither] the Bank [n]or the Officer Defendants withheld any information from [it]." ¶333; KPMG Br. 12. While KPMG contends that this fact standing alone does not establish scienter, the law is clear that KPMG's unfettered access to Wilmington's documents and employees is probative of scienter when considered collectively with the other facts alleged. Even Defendants' cited authorities do not hold otherwise.

[47] KPMG argues that the Complaint's allegations do not support an inference that it had a "motive and opportunity to commit fraud" because it would not jeopardize its reputation in exchange for fees. KPMG Br. 9 n.5. First, motive is not required to establish KPMG's scienter. *See Suprema*, 438 F.3d at 279. Even Defendants' pre-PSLRA authorities recognize as much. *See* KPMG Br. 9 n.5 (citing, *e.g.*, *DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990) (dismissing "boilerplate" allegations based on "rote conclusions," and noting allegations that auditor "knew that particular loans had gone bad" would have been sufficient)). In any event, here, "KPMG, as [Wilmington's] auditor, had the opportunity to make the fraudulent representations about [Wilmington's] compliance with GAAP, and it had the motive to make those misrepresentations to conceal its negligent – if not reckless – conduct in previous fiscal years." *Argent Classic Convertible Arbitrage Fund v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 685 (E.D. Pa. 2004).

"issues" concerning the Bank's misreporting of its past due loans at the time it conducted its 2009 audit – yet KPMG completely failed to satisfy this obligation, in violation of GAAS.

KPMG next argues that Plaintiffs fail to allege how KPMG violated GAAS and therefore cannot demonstrate scienter. KPMG Br. 12-15. Contrary to what KPMG contends (KPMG Br. 14), the Complaint clearly alleges that GAAS required KPMG to obtain and review competent evidential matter supporting the loan extensions, and KPMG failed to do so, as noted above. Indeed, GAAS required KPMG to gather and objectively evaluate evidence supporting the Bank's extensions; to "consider the competency and sufficiency of the evidence;" to "obtain reasonable assurance that" the Bank's "financial statements are free of material misstatement;" and to exercise "reasonable care and diligence" and "professional skepticism" in conducting its audit. ¶¶307-18. The Complaint further alleges that guidance issued by the American Institute of Certified Public Accountants specifically stated that "the auditor needs to assess the existence, valuation, and ownership of the collateral supporting the client's receivables" (¶316), and perform individual loan reviews of the loans that were extended (¶318). KPMG's failure to ask the Bank for updated appraisals or any other required documentation supporting the loan extensions violated all of these standards.[48] Notably, KPMG offers no innocent plausible explanation for how these hundreds of troubled past due loans simply vanished from the Bank's 2009 financials, or why KPMG did not attempt to make sure that these extensions were lawful. This is particularly true given that KPMG was obviously focused and concerned about this issue in the fall of 2009, and that the mass extensions, on their face, were done under highly suspicious circumstances.

Finally, KPMG argues that the fraud was not large enough to support an inference of scienter. KPMG Br. at 11-12. This argument defies reality. By itself, the sham mass extension was

[48] KPMG also argues that even if it misapplied accounting principles in certifying the Bank's Reserve, it did not act with scienter. KPMG Br. 17 n.7. This argument ignores the clear allegations that KPMG knew (or recklessly ignored) that the Bank's past due loans were grossly misstated, and that, as a direct result, so was its Reserve. ¶¶319-33.

enormous. This mass extension caused the Bank to understate its past due loans by over $1 billion at the end of 2009. The fraud also caused the Bank to overstate its net income by hundreds of millions of dollars throughout the Class Period, and overstate its net income for 2009 by over $110 million, or nearly 1000%. ¶175. The sheer magnitude of the fraud therefore strongly supports an inference of scienter. Indeed, courts routinely hold that "[a]llegations of particularly large frauds" "go far toward creating a compelling inference of auditor scienter based on recklessness even where" (as opposed to here) "actual knowledge of the fraud by the defendant auditor is not alleged." *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 484-85 (S.D.N.Y. 2008). *See also Suprema*, 438 F.3d at 280; *McIntire v. China MediaExpress Holdings, Inc.*, 2013 WL 752954, at *24 (S.D.N.Y. Feb. 28, 2013) ("In the face of this alleged immense fraud, the Court finds it somewhat implausible for [the auditor] to maintain that it conducted a rigorous audit of [the] 2009 financial statements and was unable to uncover any evidence of fraud"); *Rent-Way*, 209 F. Supp. 2d at 507.[49]

While the facts summarized above are sufficient to allege KPMG's scienter, the Complaint pleads much more. For example, in early 2009, KPMG sent a letter to the Bank's senior management informing them that Wilmington's use of 10% Rule supplemental interest loans constituted a "significant deficiency" in underwriting that "mask[ed]" the Bank's true credit quality. ¶95. Thus, by no later than early 2009, KPMG knew that Wilmington extended millions of dollars of new credit to delinquent borrowers "to keep existing loan payments current" and off the Past Due Lists, which the Criminal Information acknowledged misrepresented the Bank's true financial condition. ¶324. Contrary to KPMG's argument that Plaintiffs fail to allege that KPMG "ignored" the impact of this improper practice (KPMG Br. 17), the Complaint alleges that KPMG knew that

[49] Defendants' cited cases (KPMG Br. 11) are readily distinguishable from the facts in this case. *See IKON*, 277 F.3d at 668 (a summary judgment decision that did not address "magnitude" allegations); *Reiger v. PriceWaterhouseCoopers LLP*, 117 F. Supp. 2d 1003, 1008, 1013-14 (S.D. Cal. 2000), *aff'd, DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002) (inference from "magnitude of fraud" limited where revenue was incorrectly recorded on just "two separate transactions" resulting in only a $4.8 million restatement).

this fraudulent practice continued throughout 2009, yet took no action. ¶327. Indeed, the Federal Reserve identified the extension of supplemental 10% Rule interest loans as a "problematic process" resulting in "substandard" loans in its September 2009 MOU, which KPMG received and specifically discussed with senior management. ¶¶96, 327. Where, as here, "red flags . . . raise[d] questions about the integrity of . . . financial statements," an auditor's "repeated failures to investigate" demonstrate scienter. *In re Am. Bus.*, 2008 WL 3405580, at *8.[50]

In addition, KPMG knew that the Bank was lending key clients millions of dollars without proper documentation and without any analysis of the client's ability to repay the loan, and was well aware of the Bank's fraudulent relationship with Zimmerman. ¶¶324-26. As the Complaint alleges, on February 3, 2009, when Zimmerman asked Terranova why he needed to document a loan of $200,000 "between friends," Terranova responded "<u>My NEW friends at KPMG are getting a little sticky on things like this</u>." ¶325. While KPMG contends that this email shows that Wilmington knew that KPMG would look for documentation sufficient to support Zimmerman's requests (KPMG Br. 10), the facts establish just the opposite. For one thing, many of the emails described herein that were exchanged between Zimmerman and Terranova were openly maintained in the Bank's official loan files and were readily available to KPMG to review if it had wanted to. ¶¶117, 330. Moreover, only three months after Terranova sent the above email to Zimmerman, in May 2009, Wilmington loaned him another $2 million for the Salt Pond project, again without any documentation and even though Zimmerman had exhausted a previous $10 million loan with no construction progress to date. ¶121. Had KPMG truly been "looking" for documentation to support

[50] KPMG contends that the MOU (and the earlier Federal Reserve warnings), without more, is not sufficient to allege scienter. KPMG Br. 12, 17. To the contrary, the MOU and the deficiencies it identified were "red flags" that raised an inference of scienter. ¶317 (existence of MOU an AICPA audit risk factor). *See also Reliance*, 91 F. Supp. 2d at 722 (sustaining Section 10(b) claims where auditor "knew that" "loan loss reserves" were inadequate "particularly in light of the 1995 Federal Reserve Board report stating that the portfolio was deteriorating"). Defendants' citation to *IKON*, 277 F.3d at 674-75, is inapposite because plaintiffs there alleged only the auditor's "awareness of discrete inventory problems," not the detailed concerns raised here.

these loans, as it contends, it would have obviously discovered that no such documentation existed.[51]

The Complaint also describes how KPMG's suspicions concerning Wilmington's fraudulent lending and accounting practices began years before its 2009 audit when, at the end of its 2007 and 2008 audits, KPMG issued "Management Letters" identifying the Bank's failure to review loans and properly assess credit risk as a "material weakness" in the Bank's internal controls. ¶¶143, 320. KPMG also knew that in 2007 and 2008, the Federal Reserve "had issued regular and escalating warnings to Wilmington" concerning, among other things, the Bank's materially deficient asset review and credit risk management, which were inadequate to reasonably assess the risk in the Bank's loan portfolio. ¶¶144, 152, 320. KPMG knew that these assessments of Wilmington's failure to adequately review and account for its loan portfolio were corroborated by Wilmington's own Internal Audit Group, which issued a report in late 2007 highlighting that the Bank's ARG was understaffed and lacked proper leadership, and that its review of the Bank's loan portfolio was inadequate. ¶¶142, 320-21. In sum, all these red flags, taken together with the evidence showing KPMG's knowledge of the past due loan fraud, sufficiently allege KPMG's scienter. *See In re Am. Bus.*, 2008 WL 3405580, at *3, *8 (sustaining Section 10(b) claims where auditor disregarded a series of red flags, including regulator comment letters and "unresolved audit issues"); *In re Resource Am. Sec. Litig.*, 2000 WL 1053861, at *8-9 (E.D. Pa. July 26, 2000) (sustaining Section 10(b) claims against auditor based on "several red flags" that should have revealed improper accounting practices, including loan portfolio "inconsistencies," "highly subjective appraisals to

[51] KPMG attempts to revive certain allegations from the first-filed amended complaint concerning KPMG's 2008 audit work. KPMG Br. 4 n.3. While "[i]t is well established that an amended pleading supersedes the original pleading [and that] facts not incorporated into the amended pleading are considered *functus officio*," in other words, have no further legal authority (*West Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 172 (3d Cir. 2013) (citation and internal quotations omitted)), the Complaint's allegations are entirely consistent with these allegations. Indeed, KPMG's professed "deep dive" review in 2008 should have confirmed for them the lack of any documentation supporting Wilmington's loans.

recognize materially false gains," and third-party reports describing credit quality problems).

**E. <u>Defendants' Statements Are Not Protected By The PSLRA Safe Harbor</u>**

Defendant North alone argues that "many" of his false statements qualify for the "Safe Harbor exception." North Br. 20-21. He is wrong. The "safe harbor provision does not afford . . . a free pass to lie to investors." *Veritas*, 2006 WL 1431209, at *7 (citing *Advanta*, 180 F.3d at 536). None of North's statements qualify for safe harbor protection. North nowhere identifies which of his false statements qualify for the safe harbor exception, and it is irrefutable that the safe harbor exception does not apply to North's statements about the Bank's then-current financial condition or then-existing practices, which constitute virtually all of North's statements.[52] *See EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 876 (3d Cir. 2000) (the "doctrine applies only to forward-looking statements. . . . [W]e cannot say as a matter of law that the representation was not a present statement of fact.").[53]

Further, none of the elements required to establish the safe harbor are satisfied here. North's contention that boilerplate "forward-looking statement disclaimer[s]" read prior to each conference call insulate him from liability (North Br. 21) must be rejected because it is well-settled Third Circuit law that a "vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *Id*. (quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3d Cir. 1993)). *See also Avaya*, 564 F.3d at 256 ("[c]autionary language must be 'extensive and specific'") (quoting *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004)). Here, the Bank's "forward-looking statement

---

[52] *See* ¶262 (North stating the Bank had not seen any "increase in problems" in its "non-residential commercial" portfolio, which "held up well"); ¶264 (North stating the Bank had not seen "a marked increase in terms of the 'losses' . . . nor . . . any pattern of things that fall into these [*i.e.*, past due and nonperforming loan] categories"); ¶266 (North stating the Bank obtained "new appraisal[s]" on troubled loans to assess "value at today's market . . . based on today's performance" and put troubled loans "under the microscope").

[53] To the extent the Underwriter Defendants tacitly imply that statements about the Bank's Loan Loss Reserve are forward-looking and qualify for the safe harbor exception, they are wrong. UW Br. 19-21. The safe harbor does not apply to GAAP financial statements as a matter of law. *See* 15 U.S.C. § 78u-5(b)(2)(A); *PMA*, 2005 WL 180653, at *6.

disclaimer" is precisely the kind of generic warning the Third Circuit found insufficient in *Trump* and *Avaya*.[54] Thus, the Bank's "cautionary language" was insufficient to insulate North from liability for his false statements.

North next contends that the "second element" of the safe harbor exception is met because his statements were "immaterial . . . and general." North Br. 21. This is wrong for the same reasons set forth above in Section III.B. North further contends that the "third element" of the safe harbor exception is met because "Plaintiffs have failed to plead facts establishing that [he] made . . . statements with knowledge that they were false." *Id*. North is wrong again. As discussed above in Section III.C, North's statements were made with scienter. *See Veritas*, 2006 WL 1431209, at *7 ("The safe harbor will not apply if the statement was made with the actual knowledge that it was false or misleading") (citing *Advanta*, 180 F.3d at 536).

Indeed, where a defendant is aware that the purported risks warned of have already transpired, warnings that such risks are "possible" do not render false statements immaterial. *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (cautionary language about risks that have already transpired is akin to "someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away") (citation and internal quotations omitted). There, the "forward-looking statement disclaimer" did not disclose any of the then-existing, known facts that contributed to the Bank's demise.

### F. Plaintiffs Have Adequately Pleaded Loss Causation

A complaint need only allege a "short and plain statement provid[ing] the defendant with fair notice" of plaintiffs' loss causation theory. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346

[54] *See* Ross Ex. 25 at 2 ("Our ability to achieve the results reflected in these statements could be affected adversely by changes in national or regional economic conditions; changes in market interest rates; fluctuations in equity or fixed income markets; higher than expected credit losses . . ."); Ross Ex. 26 at 1-2 (similar); Ross Ex. 27 at 2 (similar).

(2005) (applying Rule 8(a)) (citation and internal quotation marks omitted). "[P]laintiff[s] need not show that a misrepresentation was the sole reason for the investment's decline in value," only that a "defendant's wrongful conduct was a substantial factor" in that decline. *In re Tyson Foods, Inc. Sec. Litig.*, 2004 WL 1396269, *12-13 (D. Del. June 17, 2004) (Robinson, J.) (citation omitted). Loss causation is a fact-intensive issue that is "best resolved by the trier of fact." *Id.* at *13 (citation omitted).

Plaintiffs easily allege loss causation under these standards. The Complaint alleges that Wilmington's stock price was inflated by material misstatements and omissions concerning the Bank's true financial condition, including the amount of its past due loans, its Reserve and net income, the quality of its loan portfolio, and its underwriting and asset review practices. The Complaint further alleges that Wilmington's stock price declined through a series of partial disclosures that revealed the Bank's true financial condition. ¶¶177-209, 334-38.

For example, on November 1, 2010, Wilmington and M&T disclosed that the Bank had suffered crippling losses due to large increases to past due loans and the Reserve such that the Bank was being acquired at a fraction of its prior day's stock price, which revealed that the Bank had not properly accounted for its past due loans and had understated its Reserve during the Class Period. Specifically, the Bank announced that its "<u>total nonperforming assets increased 77% . . . while loans with substandard risk ratings increased 37%</u>, to $1.99 billion," both of which drove an enormous quarterly loss of $365.3 million and a staggering Reserve increase of $281.5 million. ¶¶198-209. M&T further revealed that: (i) Wilmington had another half a billion dollars in loan losses that still had not been reported or accounted for in its Reserve; and (ii) 17% of the Bank's loan portfolio was worthless, including 40% of the commercial construction loan portfolio, and had to be charged off. ¶¶203-04. Significantly, M&T explained these losses had not recently appeared, since it calculated probable lifetime losses based on the Bank's portfolio as of January 2008. ¶¶203-06. In response

to this disclosure, the Bank's stock price collapsed, falling 40%, from $7.11 per share to $4.21 per share, in a single day, on high volume. ¶¶207, 336. Such facts plainly allege loss causation. *See, e.g.*, *Freudenberg*, 712 F. Supp. 2d at 202-03 (loss causation pleaded for similar alleged misstatements where company disclosed increased loan loss provision and revealed $450 million of additional losses in portfolio, and "share price fell significantly after the truth became known") (quoting *Dura*, 544 U.S. at 347); *In re SLM*, 740 F. Supp. 2d at 561 (holding that 21% stock drop after company disclosed increase to loan loss reserve was "sufficient for the modest showing required under Rule 8").

While these facts alone plead loss causation, the Complaint adequately alleges loss causation for the other corrective disclosures, which occurred between January 29 and October 5, 2010. *See* ¶¶177-96, 209. Each of these disclosures revealed facts concerning the Bank's failure to establish an adequate Reserve, properly account for its past due loans, and/or maintain the credit quality of its loan portfolio, and caused the Bank's stock price to significantly and immediately decline. *Id*. As noted above, such facts are more than sufficient to plead loss causation.

In response to these detailed facts, Defendants argue that loss causation does not exist because macroeconomic factors supposedly caused investors' losses. WT Br. 60-61. They are wrong. First, whether investors' losses were caused by general macroeconomic factors or the admitted criminal conspiracy to conceal the Bank's financial condition is a factual question inappropriate for resolution at this time. *See Tyson Foods*, 2004 WL 1396269, at *12. Second, courts routinely reject arguments about broad macroeconomic factors causing plaintiffs' losses at the motion to dismiss stage. *Countrywide*, 588 F. Supp. 2d at 1174 (rejecting argument that financial downturn negates loss causation, stating "this court will not be distracted by . . .

macroeconomic arguments.”).[55] Third, Wilmington’s cited cases about the “Great Recession” are inapposite because loss causation was not established in those cases regardless of any economic crisis. WT Br. 60-61.[56] Fourth, Defendants’ “Great Recession” argument ignores that the economy was recovering by the date of the first corrective disclosure here in June 2010, and the Bank’s peers were already reporting stronger results as they emerged from the recession by that time. ¶177. By contrast, losses in *Kuriakose v. Federal Home Loan Mortgage Co.*, 2011 WL 1158028 (S.D.N.Y. Mar. 30, 2011), on which Defendants rely (WT Br. 63-64), occurred contemporaneously with the credit crisis in late 2007 and culminated in September 2009.[57]

Defendants next argue that loss causation does not exist because the Complaint fails to allege “any corrective disclosures regarding [Wilmington’s] alleged failure to properly report past due and nonperforming loans.” WT Br. 62. According to Defendants, “nothing on the topic was ever revealed to the public.” *Id*. This argument is without merit. To start, contrary to Defendants’ assertions, there is no requirement that corrective disclosures “match” or be a “mirror image” of their false statements, tantamount to a confession of fraud. *See Dura*, 544 U.S. at 342. Requiring a disclosure to be a fact-by-fact recounting of fraudulent conduct would “essentially allow

[55] *See, e.g.*, *George v. China Auto. Sys. Inc.*, 2012 WL 3205062, at *11-12 (S.D.N.Y. Aug. 8, 2012) (financial downturn does not negate loss causation); *In re Bear Stearns Cos., Inc. Sec., Deriv. & ERISA Litig*, 763 F. Supp. 2d 423, 484, 506-08 (S.D.N.Y. 2011) (rejecting argument that “market-wide downturn” caused losses because competing theories are for the fact-trier); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 414 (S.D.N.Y. 2010) (same); *In re Am. Int’l Grp. Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010) (same); *In re Citigroup, Inc. Sec. Litig.*, 753 F. Supp. 2d 206 (S.D.N.Y. 2010) (same); *In re Ambac*, 693 F. Supp. 2d at 273-74 (same).

[56] *See, e.g.*, *In re Sec. Capital Assurance Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 599 (S.D.N.Y. 2010) (allegations did not “demonstrate a correlation between revealed facts and a decline” in stock price); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) (five-year gap between statements and losses); *Glover v. DeLuca*, 2006 WL 2850448, at *33-34 (W.D. Pa. Sept. 29, 2006) (disclosure two months after stock decline); *Bartesch v. Cook*, 2013 WL 1750455, at *10 (D. Del. Apr. 23, 2013) (stock declined over 98% before disclosure).

[57] Defendants’ reliance on *Bastian v. Petren Resource Corp.*, 892 F.2d 680, 684 (7th Cir. 1990) is also misplaced. *Bastian* pre-dates *Dura* and the complaint there “suggested no reason why [the class’s] investment was wiped out.” (emphasis in original).

wrongdoers to immunize themselves." *In re Merck & Co., Inc. Sec. Deriv. & ERISA Litig.*, 2011 WL 3444199, at *31 (D.N.J. Aug. 8, 2011) (internal citation and quotations omitted).[58]

Further, as set forth above, the numerous corrective disclosures revealed information indicating that Wilmington had materially misrepresented its past due loans, including the disclosures on November 1, 2010 that non-performing assets had increased approximately 80%, and 40% of the Bank's commercial construction loan portfolio was worthless. ¶204. Similarly, the Bank's July 23, 2010 partial disclosure revealed a "significant increase" to its "provision for loan losses" and the Reserve, which Foley attributed to "increases in loans past due 90 days or more, and nonaccruing loans." ¶¶191-93. Given the close connection between the Reserve and past due loans, there is no question that these corrective disclosures addressed the Bank's failure to properly report past due loans.

Defendants similarly argue that none of the Complaint's corrective disclosures "related to underwriting, asset review, or internal controls." WT Br. 62. This is also incorrect. Corrective disclosures about the poor quality of the Bank's commercial loan portfolio – including inflated "substandard" risk ratings – clearly concern the effectiveness of the Bank's underwriting, asset review, and internal controls.

Finally, Defendants' argument that the Bank's stock price declined before the alleged corrective disclosures is irrelevant. WT Br. 61-63. Whether a particular false statement had a measurable effect on stock prices relates only to the transaction causation element of a Section

---

[58] *See also, e.g., Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) ("if a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements.") (citation omitted); *In re BP plc Sec. Litig.*, 2013 WL 487011, at *32 (S.D. Tex. Feb. 6, 2013) (same); *Freudenberg*, 712 F. Supp. 2d at 202 (same). Defendants' cases are inapposite. Unlike here, where the corrective disclosures directly relate to Defendants' false statements, no such connection was found even after expert discovery at the summary judgment stage in *In re Williams Securities Litigation-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009). *See also In re Tellium, Inc. Sec. Litig.*, 2005 WL 1677467, at *26 (D.N.J. June 30, 2005), *aff'd on reconsideration*, 2005 WL 2090254, at *3 (D.N.J. Aug. 26, 2005) (plaintiffs alleged no causal connection between corrective disclosure and false statement, and instead relied on the inflation of the stock price on the date of purchase).

10(b) claim, and is properly addressed later by experts and the trier of fact. *See McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 430 (3d Cir. 2007) ("We have never suggested that the loss causation inquiry may 'effectively merge' with the transaction causation inquiry."). Moreover, the relevant inquiry is whether the stock price declined in response to a corrective disclosure, not whether it moved in response to an allegedly false statement. *See Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009).

## IV. PLAINTIFFS HAVE ALLEGED VIOLATIONS OF THE SECURITIES ACT

### A. <u>The Offering Documents For The February 2010 Offering Contained Materially Untrue Statements And Omissions</u>

Counts Five, Six, and Seven of the Complaint allege violations of Sections 11, 12, and 15 of the Securities Act. ¶¶446-75. The basis of these claims is that the Offering Documents the Bank used to conduct the February 2010 Offering, through which it raised nearly $274 million from investors, contained materially untrue statements and omissions set forth in the Bank's 2009 Form 10-K, among other SEC filings. ¶¶389-91. Among other things, the Complaint alleges that the 2009 Form 10-K contained: (i) material understatements of the Bank's past due loan amounts for 2009, including the failure to report $1.3 billion of past due loans that were mass extended in the fourth quarter of 2009; (ii) material understatements of the Bank's Reserve for 2009; (iii) material overstatements of income for 2009; and (iv) materially untrue statements that the Bank supposedly "mitigated" its key credit risk that loans would not be repaid by employing "rigorous" underwriting standards and consistent asset review practices. ¶¶408, 414, 421-25, 427-33.

The standards for pleading a Section 11 claim are well established. In the Third Circuit, "[t]he requirements under section 11 stand in stark contrast to those of the [Exchange] Act." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273 n.5 (3d Cir. 2004) (citations omitted). Section 11 imposes a "stringent standard of liability" that "places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). Specifically, a plaintiff "need

only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Id.* at 382. A plaintiff need not allege scienter, loss causation, or reliance under Section 11. *Id.* Moreover, Section 11 claims are subject only to Rule 8(a)'s relaxed pleading requirements. *See Adams Golf*, 381 F.3d at 273 n.5.

Here, there is no question that Plaintiffs have satisfied these "relatively minimal" requirements. Indeed, the Criminal Information confirmed that the Bank's 2009 Form 10-K materially understated the Bank's past due loan amounts and Reserve, materially overstated income, and misrepresented the Bank's underwriting and asset review practices. As detailed in the Criminal Information, the Bank's past due loan amounts were materially misstated as of year-end 2009 by more than $370 million. ¶¶404-08. The "mass extension" of past due loans executed by the Bank in the fourth quarter of 2009 caused the Bank to misleadingly omit hundreds of troubled loans from its 2009 Form 10-K totaling $1.3 billion. ¶408. Nevertheless, as set forth in the Criminal Information:

> The Bank utilized the [understated] December 31, 2009 past due loan figures in its 2009 Form 10-K, filed with the SEC in February 2010 [which] was the basis for the Bank's proxy statement submitted in connection with [the February 2010 Offering].

¶403. As further confirmed by the Criminal Information, the Reserve set forth in the 2009 Form 10-K was also materially understated because, among other reasons, it failed to account for the "negative impact" of the past due loans that were "mass extended" without obtaining the required appraisals. ¶¶408, 414. Given that the Reserve was understated, the Bank's income reported in the 2009 Form 10-K was materially overstated. ¶414. In addition, the Criminal Information confirmed that the Bank's statements that it "mitigate[d] credit risk" through rigorous underwriting and consistent monitoring of all past due loans were materially false because: (i) the Bank routinely made loans to borrowers without considering their creditworthiness; and (ii) the Bank waived

hundreds of past due loans from its financial statements, and improperly extended hundreds of loans in the fourth quarter of 2009, without obtaining the required appraisals or other necessary documentation. ¶¶421-25, 427-33. Such detailed facts are easily sufficient to allege the existence of a materially misleading statement or omissions in the Offering Materials under Rule 8(a)'s pleading standard, and therefore state a claim under the Securities Act.

In response, Defendants make a series of arguments that contradict the Criminal Information and the Complaint, and ignore the law governing Section 11 claims. As set forth below, these arguments should be rejected.[59]

**B. <u>Plaintiffs' Securities Act Claims Do Not Sound In Fraud</u>**

Defendants contend that Plaintiffs' Securities Act claims sound in fraud and therefore must satisfy the heightened pleading requirements of Rule 9(b), which they supposedly fail to do. WT Br. 20; UW Br. 23-24; KPMG Br. 25 n.13. Defendants are wrong on both scores.

It is well settled in the Third Circuit that when "defendants are accused in separate claims of the same complaint of having violated Section 11, Section 12(a)(2), and Section 10(b), the Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims." *Suprema*, 438 F.3d at 272 (reversing dismissal of Securities Act claims and applying Rule 8(a) where plaintiffs expressly pleaded negligence with respect to the Securities Act claims and disavowed fraud allegations). The Complaint in this case satisfies this standard by carefully distinguishing between the Securities Act and Exchange Act claims. ¶¶24, 387, 447, 461, 471. The facts underlying the Securities Act claims are set out separately, as are the reasons for falsity. ¶¶403-44. The Securities Act claims are not based on fraud, but instead on a failure to "conduct a reasonable investigation or possess reasonable grounds" that the statements in the

[59] Defendants' arguments challenging the falsity of the statements in the Offering Documents are addressed below. *See* Section III.B.

Offering Documents were true. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) ("[P]laintiffs have done more than disclaim fraud; they have specifically pled alternate theories of fraud and negligence."). Accordingly, Plaintiffs' Section 11 claims do not sound in fraud.

Defendants' reliance on *Chubb* is unavailing. WT Br. 20. The Third Circuit has rejected such *Chubb*-based arguments where, as here, "plaintiffs have expressly pled negligence in connection with their Section 11 and 12(a)(2) claims" because "the fraud allegations cannot be said to 'contaminate' the Section 11 and Section 12(a)(2) claims if the allegations are pled separately." *Suprema*, 438 F.3d at 272-73. Indeed, the Third Circuit held that even in cases like this one involving a "massive fraud" that results in criminal guilty pleas, "where the plaintiff has exercised care in differentiating asserted negligence claims from fraud claims and in delineating the allegations that support the negligence cause of action as distinct from the fraud, the [sounds in fraud] determination is straightforward." *Id.* Accordingly, under well-settled Third Circuit law, Rule 8(a) standards apply to Plaintiffs' Securities Act claims.

Moreover, even assuming *arguendo* that Rule 9(b)'s pleading standard were to apply to Plaintiffs' strict liability Securities Act claims, the Complaint sufficiently alleges Defendants' violations of the Securities Act pursuant to Rule 9(b). An application of Rule 9(b) would merely mean that the elements of Section 11 would need to be pleaded with particularity, not that Plaintiffs are required to allege scienter – which is not an element of a Securities Act claim. *See In re Friedman's Inc., Sec. Litig.*, 385 F. Supp. 2d 1345, 1367 (N.D. Ga. 2005) (holding that "while Rule 9(b) requires the circumstances of the fraud be pleaded with particularity, it does not require scienter to plead Section 11 and 12 claims against the Underwriter Defendants"); *see also Indiana State Dist. Council of Laborers v. Omnicare Inc.*, 719 F.3d 498, 503-06 (6th Cir. 2013) ("Section 11 provides for strict liability, and does not require a plaintiff to plead a defendant's state of mind").

Rule 9(b) requires only that Plaintiffs identify "the who, what, when, where, and how" of the alleged false statements "to insure adequate notice so that defendants can intelligently respond." *Illinois Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 232-33 (3d Cir. 2011) (internal citations and quotations omitted). Here, there is no question that the Complaint contains detailed allegations concerning who made the alleged false statements, what they concerned, where they were contained, when they were made, and how they were false. ¶¶403-45. Nothing more is required to satisfy Rule 9(b).

### C. The Offering Documents Were False At The Time Of The Offering

Notwithstanding the facts set forth in the Criminal Information, the Underwriter Defendants remarkably contend that the alleged misstatements in the Bank's 2009 Form 10-K were not false at the time of the February 2010 Offering. UW Br. 4-8. Specifically, the Underwriter Defendants assert that the Offering took place after the MOU and Delaware Status Review, by which time Wilmington's deficient lending and accounting practices were purportedly corrected. *Id*. The Underwriter Defendants are wrong.

This argument flatly contradicts the Criminal Information, which specifically stated that the Bank's 2009 Form 10-K was materially false and misleading at the time of the February 2010 Offering. As explained above, the Criminal Information established that the Bank improperly mass extended $1.3 billion in past due loans in the fourth quarter of 2009, and thus, the Bank's 2009 Form 10-K materially misstated Wilmington's amount of past due loans, Reserve, and net income – none of which were corrected at the time of the Offering. ¶¶408, 414. Indeed, the Bank continued to misstate these metrics for several months after the Offering occurred, as it improperly mass extended more than 450 past due loans worth in excess of $430 million in the first and second quarters of 2009. ¶408.

Contrary to what the Underwriter Defendants contend, Wilmington's statements that it "mitigated credit risk" through "rigorous" underwriting and asset review were also false at the time of the Offering. Given that the Bank continued to improperly mass extend delinquent loans through the second quarter of 2010, there can be no credible dispute that the Bank did not "mitigate credit risk" through its asset review practices at the time of the Offering. Further, Wilmington's underwriting deficiencies continued to be so severe that, in the summer of 2010, the Federal Reserve became concerned about the "future ability of the Bank to survive[] based on what they saw in the credit underwriting" and effectively took over Wilmington's credit operations. ¶425.

Defendants also make a hyper-technical argument, contending that the 2009 Form 10-K somehow replaced the false statements in Wilmington's earlier-filed reports that were incorporated by reference into the Offering Documents. UW Br. 7-8. This argument is of no moment. It ignores that the 2009 Form 10-K itself contained false information (including the material understatement of past due loans). *E.g.*, ¶¶221-22, 225. Moreover, the regulation Defendants rely on (SEC Rule 230) applies only when the newer-filed information contains language that "modifies or replaces" prior language. *See* 17 C.F.R. § 230.412(a). Here, the 2009 Form 10-K simply regurgitated prior results without "modifying" or "replacing" anything. *See* Ross Ex. 5 at 135.

### D. <u>**The Bank's False Statements About Financial Results And Reserve Were Misstatements Of Fact**</u>

Defendants next rely on the Second Circuit's opinion in *Fait v. Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011), to argue that, as a matter of law, reserves are statements of opinion that can be false only if the complaint alleges that the speaker "did not honestly believe that the reserves were accurate." WT Br. 28-31; KPMG Br. 13-18; UW Br. 7-9. Defendants are wrong for numerous reasons.

First, *Fait* conflicts with controlling Third Circuit law. The Third Circuit has repeatedly held that reserves, as well as statements concerning compliance with GAAP, are statements of fact,

not opinion. *See Burlington*, 114 F.3d at 1421 (GAAP compliance is a fact question); *Shapiro*, 964 F.2d at 281 ("[t]here is nothing unique about . . . loan loss reserves that removes them from the purview of the antifraud provisions of the federal securities laws"); *accord WaMu*, 694 F. Supp. 2d at 1224 (GAAP compliance "is an actionable statement of fact," not opinion). Indeed, in express reliance on *Shapiro*, a district court in this Circuit recently held on no less than three occasions that statements about reserves are not opinions. *See Underland v. Alter*, 2011 WL 4017908, at *9 (E.D. Pa. Sept. 9, 2011) ("*Underland I*") (citing *Shapiro*, 964 F.2d at 282); *Underland II*, 2012 WL 2912330, at *5 & n.47 (citing *Shapiro*, 964 F.2d at 281); *Underland v. Alter*, 2012 WL 4108998 (E.D. Pa. Sept. 18, 2012) ("*Underland III*").[60]

The *Underland* decisions are instructive. Plaintiffs there alleged that defendants (Advanta Corporation and its auditor KPMG) did not properly follow GAAP or their own disclosed method for calculating the loan loss reserve, and consequently misled investors regarding the adequacy of the company's loan loss reserve and net income. *See Underland II*, at *4. In response, relying on *Fait* and *Shapiro* (as do Defendants here), Advanta and KPMG contended that statements concerning loan loss reserves were opinions, the falsity of which can be established only with allegations that defendants "subjectively disbelieved" their reserve estimates. *Underland I*, 2011 WL 4017908, at *9. The *Underland* court rejected these arguments and held that, under Section 11, misstatements related to reserves are actionable as "objective facts" where the plaintiff alleges that defendants "failed to consider all material factors" under GAAP in setting reserves. *Underland II*, at *5; *see also Underland I*, at *9 ("Unlike a subjective evaluation that a loan reserve is adequate or not, nonconformance to a stated methodology to arrive at a loan loss reserve amount is a measurable objective fact"). Here, as in *Underland*, Defendants represented that the Bank's reserves were

[60] Contrary to what KPMG suggests (KPMG Br. 21-24), neither *Shapiro* nor *Trump* held that reserves are statements of opinion that require a showing of subjective falsity for the purposes of Section 11. Indeed, KPMG's assertion that *Shapiro* supports their argument completely ignores the *Underland* decisions, which is curious given that KPMG was a defendant in the *Underland* cases (and made the same losing arguments there).

established in accordance with GAAP and with Wilmington's own methodology, when, in reality, the Bank violated GAAP and its own methodology by failing to account for more than a billion dollars of past due loans. ¶¶412-13, 418. Accordingly, those are actionable misstatements of fact.

Second, Defendants' argument not only contravenes Third Circuit law, but also was resoundingly rejected by the Sixth Circuit's recent decision in *Omnicare*, 719 F.3d at 503-07. In *Omnicare*, the Sixth Circuit squarely repudiated *Fait* and held that "Section 11 provides for strict liability, and does not require a plaintiff to plead a defendant's state of mind" in order to allege the falsity of a company's financial statements or statements of GAAP compliance. *Id*. at *4; *see id.* at *6 ("No matter the framing, once a false statement has been made, a defendant's knowledge is not relevant to a strict liability claim."); *id*. at *9 ("Plaintiffs' allegation is that Defendants' hard [accounting] numbers were incorrect. These are allegations of hard facts and do not require pleading knowledge of falsity under any standard."). In so holding, the Sixth Circuit explained that *Fait* "was based on little more than a tea leaf reading [of] a Section 14(a) case," *Virginia Bankshares v. Sandberg*, 501 U.S. 1083 (1991), and flatly contradicted the plain language of Section 11. *Id*. at *6, 8. Ultimately, the Sixth Circuit held that "it would be unwise" and "most dangerous" for the court "to add an element to Section 11 claims" that was not set forth in the statute. *Id*. at *8. The same reasoning applies here.[61]

Third, as the Sixth Circuit recognized, *Fait's* holding contradicts Section 11 and threatens to render it a nullity with respect to the vast majority of claims based on misstatements of financial metrics. Section 11 imposes strict liability for misstatements, and contains no exception for reserves. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 (1976). Notably, loss reserves also directly impact net income, the most critical measure of a company's health. *See Burlington*, 114

[61] KPMG's reliance on *Virginia Bankshares* is misplaced. KPMG Br. 21-24. As the Sixth Circuit held in *Omnicare*, *Virginia Bankshares* is inapposite because it did not concern a Section 11 claim, and did not address misstatements concerning reserves or GAAP compliance.

F.3d at 1420 n.9. It is inconceivable that Congress enacted Section 11 with a strict liability standard, and yet expected that liability for the most critical information in the financial statement would be imposed only for intentionally false statements. Moreover, to hold that all statements of reserves are actionable only if made with scienter because they result from "judgment" would exempt the overwhelming majority of financial metrics from Section 11's strict liability standard because, like reserves, numerous GAAP provisions provide for some degree of estimation. *Burlington*, 114 F.3d at 1421 n.10.[62]

Fourth, even if the Court accepts Defendants' contention that their false Loan Loss Reserve statements are "opinions," Plaintiffs have satisfied their burden of alleging falsity under Third Circuit law. In the Third Circuit, even pure statements of opinion are actionable if they are made without a reasonable basis. *See, e.g.*, *Burlington*, 114 F.3d at 1428 ("The Supreme Court has held that statements of opinion by top corporate officials may be actionable if they are made without a reasonable basis."); *In re Merck & Co., Inc. Sec. Deriv. & ERISA Litig.*, 543 F.3d 150, 166 (3d Cir. 2008) (opinions actionable if made without a "reasonable basis"); *Underland III*, 2012 WL 4108998, at *2 n.10 ("the Third Circuit has held that statements of opinion set forth in registration statements are actionable under § 11 if the company lacks a reasonable basis for that statement") (internal citations omitted).

Plaintiffs here allege that Wilmington's Loan Loss Reserve was set without a reasonable basis. In particular, the Bank calculated the Reserve without accounting for billions of dollars of past due loans. Likewise, KPMG lacked any reasonable basis for accepting the Bank's reserve methodology or results, as demonstrated by, among other things, KPMG's failure to verify that the Reserve took into account the loans that were mass extended in the fourth quarter of 2009.

[62] Courts routinely recognize that reserve misstatements may be made negligently as well as intentionally, and thus distinguish the issue of falsity from the separate issue of scienter. *See, e.g.*, *New Century*, 588 F. Supp. 2d at 1229-32, 1238-39 (sustaining reserves claim under Section 11 negligence standard).

Therefore, under the Third Circuit standards for opinion-falsity, Plaintiffs have pled that the Bank's Reserve was false.

Finally, even if *Fait's* standard for pleading opinion-falsity applied notwithstanding the Third Circuit law to the contrary, Plaintiffs have unquestionably pleaded that Wilmington did not honestly believe the Reserve was accurate, as discussed above in Section III.C.2. Moreover, because Wilmington was the "speaker" with respect to its Reserve misstatements, its disbelief in its own Reserve accounting rendered the statements false for the purposes of Section 11 liability as to all Section 11 Defendants. Indeed, the law is clear that *Fait* requires only that the speaker disbelieve its statement to trigger liability as to all defendants, and does not require a defendant-specific showing of subjective disbelief. *See FHFA v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 326-27 (S.D.N.Y. 2010) ("the 'subjective falsity' that *Fait* requires . . . is falsity on the part of the originator of the opinion" and liability is imposed on other defendants for association with a false registration statement, regardless of what they individually believed). As a result, the Underwriter Defendants are liable under Section 11 regardless of what they themselves claim to have subjectively believed.[63]

### E. Plaintiffs Have Pleaded Securities Act Claims Against KPMG

Under Section 11, KPMG is liable for false statements in a registration statement that it "certifies." 15 U.S.C. § 77k(a)(4).[64] Here, after identifying deficiencies in the Bank's accounting for its past due loans, asset review and internal controls, KPMG nonetheless certified the Bank's 2009 financial statements as accurate and GAAP-compliant, further certified that the Bank's internal controls were effective, and stated that it had conducted its audit in accordance with GAAS.

---

[63] Defendants are wrong to argue that *Fait* requires proof that they acted "knowingly or recklessly." WT Br. 38-41; UW Br. 15-16; KPMG Br. 19-25. *Fait* expressly held that "the standard [of subjective falsity] applied here does not amount to a requirement of scienter," and noted that a plaintiff could demonstrate subjective falsity by showing "'that the favorable opinions were without a basis in fact.'" 655 F.3d at 112. Accordingly, even if subjective falsity were required, Plaintiffs have not "pled themselves out of a claim" by expressly disclaiming fraud. WT Br. 20.

[64] In addition, KPMG is liable for false statements by Wilmington. *See FHFA*, 858 F. Supp. 2d at 326-27.

KPMG is liable under Section 11 for these material misstatements because, as set forth above, the Bank's 2009 financial statements were inaccurate and did not comply with GAAP, the Bank's internal controls were not effective, and KPMG's audit did not comply with GAAS. Thus, Plaintiffs have stated a claim against KPMG. *See Huddleston*, 459 U.S. at 381 n.11 (auditors are liable for matters "certified by them"); *Underland II*, at *3, *5 (KPMG certification violated Section 11 where reserve methodology violated GAAP); *In re WorldCom, Inc., Sec. Litig.*, 352 F. Supp. 2d 472, 492 (S.D.N.Y. 2005); *WaMu*, 694 F. Supp. 2d at 1224.

KPMG argues that its certifications, audit reports, and statements about GAAS compliance are opinions that are not actionable under Section 11 unless KPMG did not believe them. KPMG Br. 19-21. KPMG is wrong because there were false statements of fact, not opinion. First, the statute requires auditors to "attest to" the quality of internal controls. 15 U.S.C. § 7262. To "attest" means "[t]o affirm to be true or genuine." Black's Law Dictionary 138 (8th ed. 2004). The very phrasing indicates a factual assertion. KPMG cannot transform its factual assertions into statements of "belief" simply by calling them "opinions." *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y 1999); *cf. SEC v. Okin*, 137 F.2d 862, 864-65 (2d Cir. 1943) (inserting "in my opinion" into a fact statement does not alter the statement's factual nature). KPMG's statement was a factual assertion that internal controls were as good as could be detected by an audit that followed proper procedures. *See Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168, 1175 (10th Cir. 2006).[65]

Second, certifications of financial results and GAAP compliance are factual representations, not opinions, because the accuracy of financial results and compliance with GAAP are issues of fact, as discussed above. *See Burlington*, 114 F.3d at 1421; *Underland II*, 2012 WL 2912330, at *5;

---

[65] Although auditor certifications are now called "opinions" in the accounting literature (KPMG Br. 19-20), the audit profession's semantic changes cannot confer immunity, and courts continue to refer to them as "certifications." *See, e.g., Indiana State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 945 (6th Cir. 2009).

*RAIT*, 2008 WL 5378164, at *7; *WaMu*, 694 F. Supp. 2d at 1223-24. This is consistent with the long-standing principle that auditors' Section 11 liability is coextensive with the falsity of the underlying statements certified, without a separate inquiry into whether the certification itself is false. *See, e.g.*, *In re Cendant*, 60 F. Supp. 2d 354, 364 (D.N.J. 1999) (sustaining Section 11 claim against auditor based on issuer misstatements).[66]

Third, KPMG's representations that its audits complied with GAAS (¶¶437, 443) and that Wilmington's internal controls were effective (¶¶443-44) are also statements of fact, not opinion, because they are judged according to objective standards. GAAS has verifiable procedural requirements that KPMG failed to follow. ¶¶438-42.[67] Similarly, KPMG stated that its internal controls certification was based on established criteria, which KPMG failed to follow. ¶305; Ross Ex. 5 (2009 Form 10-K) at 135. These representations are factual assertions. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248 at 1266 (N.D. Cal. 2000) ("purely factual assertions" in fairness opinions are "held to a negligence standard"); *WaMu*, 694 F. Supp. 2d at 1223 (compliance with standards is a "verifiable factual statement").

Fourth, KPMG's "opinion" argument is inconsistent with Section 11, which grants experts an affirmative defense if they can show both good faith and due diligence. 15 U.S.C. § 77k(b)(3)(B)(i). Treating auditor statements as "opinions," which require a showing equivalent to scienter, would improperly shift the statutory burden of proof from KPMG to Plaintiffs.

[66] None of KPMG's cases support the argument that courts must look to the subjective falsity of the auditor's certification itself rather than the underlying false statement. KPMG Br. 19-20. Indeed, *Deephaven* involved claims under § 18 of the Exchange Act, which imposes liability for a defendant's <u>own</u> statements, not <u>certifications</u> of statements by others – a critical distinction. *Id*. at 1174 n.6. Those claims were brought under the portion of Section 11 that imposes liability on individuals who prepare a section of the offering documents. Here, as the statute makes clear, falsity is evaluated directly. *See* 15 U.S.C. § 77k(a)(4).

[67] The requirements for GAAS and PCAOB-compliant audits are quite different from the procedures involved in fairness opinions, buy recommendations, and projections of future results of the sort involved in the cases relied upon by Defendants. KPMG Br. 13-17; UW Br. 11-14. *See* Stephen M. Davidoff, *Fairness Opinions*, 55 Am. U. L. Rev. 1557, 1616 (2006) (fairness opinions, <u>unlike auditing standards</u>, do not have standardized methodologies).

Finally, even if KPMG's certification were an opinion, contrary to KPMG's assertions, Plaintiffs have adequately alleged "subjective" falsity. KPMG Br. 25. Indeed, as set forth above, KPMG acted with scienter when certifying the Bank's 2009 financial statements. *See* Section III.D.[68]

**F. duPont Is Liable For False Statements In The Offering Documents**

Defendant duPont signed the Shelf Registration Statement used to conduct the February 2010 Offering. ¶449. He also signed Wilmington's 2007 and 2008 Forms 10-K, which contained false statements. These SEC filings were incorporated by reference into the Offering Documents. ¶¶398, 449. Signatories of SEC filings that are incorporated into offering documents are subject to liability. *See* SEC Release No. 33-8591. Accordingly, because duPont signed the 2007 and 2008 Forms 10-K – which contained false statements and were incorporated into the Offering Documents – he is liable under Section 11. *See In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 317 n.399 (S.D.N.Y. 2011) ("those who sign documents, like a 10-K, that are incorporated by reference . . . are deemed to be persons who signed the registration statement within the meaning of Section 11").

While duPont selectively quotes the first clause of Section 11(b)(1)(a) for the proposition that he should be excused from liability because he resigned before the Offering (duPont Br. 6-7), he ignores that Section 11(b)(1)(b) specifically contemplates liability for statements in offering documents issued after a signatory's departure unless the signatory informed the SEC and issuer in writing that he or she "would not be responsible for such part of the registration statement." 15

[68] In a footnote, KPMG contends without citation that "the Offering Documents did not incorporate the 2008 10-K or KPMG's 2008 audit reports." KPMG Br. 18 n.10. That is wrong. The language in the Offering Documents plainly states: "The consolidated financial statements of Wilmington Trust Corporation as of December 31, 2009 and 2008, and for each of the years in the three year period ended December 31, 2009 . . . have been incorporated by reference herein in reliance upon the reports of KPMG LLP." Ross Ex. 33 at S-21. In any event, KPMG's attempt to read 2008 out of the Registration Statement is of no moment. The falsity of just one of KPMG's unqualified audit reports satisfies the strict liability standards of Section 11, and there is no dispute that KPMG's 2009 unqualified audit report was incorporated into the Offering Documents.

U.S.C. § 77k(b)(1)(B); *see also* ¶398; *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 596, 642 (S.D. Tex. 2003) (pre-offering resignation did not sever Section 11 liability). There is no evidence of any such disavowal here. Thus, duPont is liable under Section 11.[69]

## V. THE COMPLAINT STATES CONTROL PERSON CLAIMS

Section 20(a) of the Exchange Act and Section 15 of the Securities Act impose liability on persons who "directly or indirectly, control[] any person liable" under Sections 11 and 10(b), respectively. Plaintiffs need only allege a violation of Section 10(b) or Section 11 by the controlled entity (Wilmington) and control of the entity by the defendant. *See In re Am. Bus.*, 2007 WL 81937, at *12. Control person claims are not subject to Rule 9(b). *See id.* at *12.

Because Plaintiffs have pleaded Wilmington's primary violations, the first element of a control person claim is satisfied. Additionally, the Officer Defendants had control over Wilmington by virtue of their day-to-day responsibilities; indeed, these Defendants signed, or personally made, many of the statements alleged to be false. ¶¶217, 239, 349, 395, 449. Moreover, allegations regarding the Audit Committee establish that its members had control over the Bank. ¶¶372-86. duPont challenges his status as a control person (duPont Br. 10-12), but he was a Director from 2006 through October 2009 and signed the Bank's Registration Statement, which was incorporated into the Offering Documents. ¶398. At this stage of the litigation, nothing more is required. *See In re Am. Bus.*, 2007 WL 81937, at *12 ("Allegations that a director signed a fraudulent SEC filing and was in a position to exercise control over the primary violator are sufficient.").

Defendants argue that Plaintiffs must plead the additional element of "culpable participation" for their Section 20(a) claims. WT Br. 65. That is not the law. *See Freed v. Universal Health Servs., Inc.*, 2005 WL 1030195, at *11 n.6 (E.D. Pa. May 3, 2005) ("the

[69] Defendant Roselle, who signed the Registration Statement and 2007 and 2008 Forms 10-K (¶398), joins in the arguments made by DuPont (WT Br. 1). Thus, all arguments addressing duPont are applicable to Roselle.

overwhelming trend in this circuit is that culpable participation" need not be pleaded) (internal quotations omitted); *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *29 (D.N.J. Mar. 24, 2008) (same). Even assuming that Plaintiffs have this burden, which they do not, the Complaint describes how the Officer Defendants directly participated in the fraudulent conduct. Similarly, the Audit Committee Defendants permitted the Bank to continue to issue false financial statements despite directly receiving reports demonstrating the inadequacy of the Bank's internal controls and the insufficiency of its Reserve. ¶¶382-84. This is sufficient to allege culpable participation.

## VI. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully submit that Defendants' Motions to Dismiss the Complaint should be denied in their entirety. If the Court dismisses any of Plaintiffs' claims, Plaintiffs request the opportunity to replead. *See* Fed. R. Civ. P. 15(a).

Dated: August 15, 2013

**CHIMICLES & TIKELLIS LLP**

*/s/ A. Zachary Naylor*
Pamela S. Tikellis (Bar No. 2172)
A. Zachary Naylor (Bar No. 4439)
222 Delaware Avenue, 11th Floor
P.O. Box 1035
Wilmington, DE 19899
Phone: (302) 656-2500
Fax: (302) 656-9053

*Liaison Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Blair Nicholas
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Phone: (858) 793-0070
Fax: (858) 793-0323

-and-

Steven B. Singer (*pro hac vice*)
Hannah Ross (*pro hac vice*)
John Rizio-Hamilton (*pro hac vice*)
Lauren McMillen Ormsbee (*pro hac vice*)
Stefanie J. Sundel (*pro hac vice*)
Adam Hollander (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Phone: (212) 554-1400
Fax: (212) 554-1444

**SAXENA WHITE P.A.**

Maya S. Saxena (*pro hac vice*)
Joseph E. White III (*pro hac vice*)
Lester Hooker (*pro hac vice*)
Brandon T. Grzandziel (*pro hac vice*)
2424 North Federal Highway
Boca Raton, FL 33431
Phone: (561) 394-3399
Fax: (561) 394-3382

*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*