IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE WILMINGTON TRUST     )
SECURITIES LITIGATION      )
                            )
                            )

Master Civ. No. 10-990-SLR
(Consolidated Securities Class Action)

---

Pamela S. Tikellis, Esquire and A. Zachary Naylor, Esquire of Chimicles & Tikellis LLP, Wilmington, Delaware. Liaison Counsel for the Class. Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class: Blair Nicholas, Esquire, Steven B. Singer, Esquire, Hannah Ross, Esquire, John Rizio-Hamilton, Esquire, Lauren McMillen Ormsbee, Esquire, Stefanie J. Sundel, Esquire, Adam Hollander, Esquire of Bernstein Litowitz Berger & Grossmann LLP and Maya S. Saxena, Esquire, Joseph E. White III, Esquire, Lester Hooker, Esquire, and Brandon Grzandziel, Esquire of Saxena White P.A.

Virginia A. Gibson, Esquire of Hogan Lovells US LLP, Philadelphia, Pennsylvania. Counsel for Defendant KMPG LLP. Of Counsel: George A. Salter, Esquire of Hogan Lovell US LLP.

Laura Davis Jones, Esquire and James O'Neill, Esquire of Pachulski Stang Ziehl & Jones LLP of Wilmington Delaware. Counsel for Defendant Thomas duPont. Of Counsel: J. Douglass Baldridge, Esquire and George Kostolampros, Esquire of Venable LLP.

Stephen C. Norman, Esquire and Matthew D. Stachel, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Defendants J.P. Morgan Securities LLC and Keefe Bruyette & Woods, Inc. Of Counsel: Thomas C. Rice, Esquire, Alexandra C. Pitney, Esquire and Erin E. Rota, Esquire of Simpson Thacher & Bartlett LLP.

Thomas J. Allingham II, Esquire, Robert S. Saunders, Esquire, Stephen D. Dargitz, Esquire and Daniel R. Ciarrocki, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware. Counsel for Defendants Wilmington Trust Corporation, Ted Cecala, Donald Foley, David Gibson, Robert Harra, Jr., Kevyn Rakowski, Carolyn Burger, R. Keith Elliott, Gailen Krug, Stacey Mobley, Michelle Rollins, David Roselle, Oliver Sockwell, Robert Tunnell, Jr., Susan Whiting, Rex Mears and Louis Freeh.

David E. Wilks, Esquire, Andrea S. Brooks, Esquire and Douglas J. Cummings, Jr.,

Esquire of Wilks, Lukoff & Bracegridle, LLC of Wilmington, Delaware.  Counsel for Defendant William North.

---

**MEMORANDUM OPINION**

Dated: March 20, 2014
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

By an order dated March 7, 2011, the court consolidated a series of securities

fraud class action lawsuits filed against the Wilmington Trust Corporation ("WTC") and

related defendants. (D. I. 26) A consolidated class action complaint was filed on May

16, 2011.[1] (D.I. 39) On March 29, 2012, the court granted defendants' motions to

dismiss without prejudice. (D.I. 85, D.I. 86) Plaintiffs filed a second amended

complaint on May 10, 2012. (D.I. 88) Before briefing was completed on defendants'

motions to dismiss, by stipulation and order, plaintiffs filed a third amended complaint

adding information into their pleading obtained from unsealed FBI affidavits in

connection with a criminal investigation into Michael Zimmerman ("Zimmerman"), a

prominent Delaware real estate developer. (D.I. 115; D.I. 116; D.I. 120) Again before

briefing was completed on defendants' motions to dismiss the third amended complaint,

by stipulation and order, plaintiffs supplemented their pleading and filed the fourth

amended complaint ("FAC"), incorporating information obtained from an unsealed

Criminal Information ("C.I.") and Plea against Joseph Terranova ("Terranova"), a former

Vice President/Division Manager of the Delaware Commercial Real Estate Division and

a senior Relationship Manager at the WTC. (D.I. 143; D.I. 144; D.I. 149) The FAC

contains seven counts, four under the Securities Exchange Act of 1934, 15 U.S.C. §

---

[1] Defendants are KMPG LLP ("KPMG"), J.P. Morgan Securities LLC ("JP Morgan"), Keefe Bruyette & Woods, Inc. ("KBW"), Thomas duPont ("duPont"), Ted Cecala ("Cecala"), Donald Foley ("Foley"), David Gibson ("Gibson"), Robert Harra, Jr. ("Harra"), Kevyn Rakowski ("Rakowski"), Carolyn Burger ("Burger"), R. Keith Elliott ("Elliott"), Gailen Krug ("Krug"), Stacey Mobley ("Mobley"), Michelle Rollins ("Rollins"), David Roselle ("Roselle"), Oliver Sockwell ("Sockwell"), Robert Tunnell, Jr. ("Tunnell"), Susan Whiting ("Whiting"), Rex Mears ("Mears"), Louis Freeh ("Freeh"), and William North ("North").

78a ("the Exchange Act"), and three under the Securities Act of 1933, 15 U.S.C. § 77a ("the Securities Act"). (D.I. 149) Presently before the court are defendants' motions to dismiss the FAC. (D.I. 158; D.I. 160; D.I. 162; D.I. 164; D.I. 166) The court has jurisdiction pursuant to 15 U.S.C. §§ 77v and 78aa and 28 U.S.C. §§ 1331 and 1337.

## II. BACKGROUND

### A. The Parties

Lead plaintiffs in this suit are institutional investors ("plaintiffs") that purchased WTC common stock between January 18, 2008 and November 1, 2010 ("the class period"). (D.I. 149 at ¶¶ 25-30) Plaintiffs brought Exchange Act claims against WTC, a bank headquartered in Wilmington, Delaware during the class period[2] (id. at ¶¶ 31-34), and defendant KPMG, WTC's outside auditor since 2003 (id. at ¶ 51). Plaintiffs also brought suit against the "officer defendants" who signed WTC's registration statement and documents incorporated into the offering documents,[3] as well as the "audit committee defendants" who signed WTC's registration statement and documents incorporated into the offering documents.

Plaintiffs brought Securities Act claims against WTC, KPMG, certain officer defendants (Cecala, Foley, Harra, and Gibson) and the audit committee defendants. (Id. at ¶¶ 392-402) Also named as defendants were non-audit committee board members. Rakowski served as senior vice president and the controller of WTC from 2006 through the class period. (Id. at ¶ 395) Rakowski signed the WTC's registration

---

[2] WTC became a part of M&T Bank Corporation ("M&T") in 2011 and is no longer doing business as "Wilmington Trust Company," as discussed infra.

[3] The registration statement and offering documents are defined below.

statement, as well as the 2007, 2008, and 2009 10-Ks, which were then incorporated into the offering documents. (*Id.*) Mears served as a director of WTC since 1992 and was a member of the board at the time of the filing of the offering documents. (*Id.* at ¶ 397) Mears also signed the WTC's registration statement and its two amendments, as well as the 2007, 2008, and 2009 10-Ks, which were then incorporated into the offering documents. (*Id.*) DuPont served as a director from 2006 through October 2009 and signed WTC's registration statement[4] and 2007 and 2008 10-Ks, which were incorporated into the offering documents. (*Id.* at ¶ 398) Freeh served as a director beginning in 2009 and signed the 2009 10-K which was incorporated into the offering documents. (*Id.* at ¶ 399) J.P. Morgan Securities LLC ("JP Morgan") and Keefe Bruyette & Woods, Inc. ("KBW"), joint underwriters for the offering, were also named as defendants. (*Id.* at ¶¶ 401-402)

### 1. Officer defendants

The officer defendants include Cecala, Foley, Gibson, Harra, and North. (*Id.* at ¶¶ 35-40) Cecala served as WTC's chief executive officer ("CEO") from July 1996 until June 3, 2010; he was also the chairman of the board from 1996 until July 19, 2010. (*Id.* at ¶ 35) Foley replaced Cecala as CEO and chairman of the board. (*Id.* at ¶ 36) Gibson served as WTC's chief financial officer from 1997 until November of 2010. (*Id.* at ¶ 37) Harra served as the executive vice president of WTC from 1992 until 1996 and as president from 1996 through the class period; he also served as the chief operating officer from 1996 until 2010. (*Id.* at ¶ 38) North served as the chief credit officer at

---

[4]As discussed below, duPont disputes that he signed the registration statement.

3

WTC from 2004 until July 2010. (*Id.* at ¶ 39)

## 2. Audit committee defendants

The audit committee defendants include Burger, Elliott, Krug, Mobley, Rollins, Roselle, Sockwell, Tunnell, and Whiting. (*Id.* at ¶¶ 41-50) Burger served as a director on WTC's board from 1991 through the class period. (*Id.* at ¶ 42) Burger served on the audit committee from 2001 to 2004 and 2008 through the class period (chair from 2001 to 2004 and 2010). (*Id.*) Elliott was a director from 1997 until 2010 and he served on the audit committee during 2007 and 2008 (2007 chair). (*Id.* at ¶ 43) Krug was a director from 2004 through the class period and served on the audit committee from 2007 until 2010. (*Id.* at ¶ 44) Mobley served as a director from 1991 until 2010 and was on the audit committee in 2009. (*Id.* at ¶ 45) Rollins served as a director from 2007 until May of 2010; she was a member of the audit committee from 2007 to 2009. (*Id.* at ¶ 46) Roselle was a director from 1991 until 2009 and worked on the audit committee from 2007-2009. (*Id.* at ¶ 47) Sockwell was a director from 2007 to 2010 and served on the audit committee from 2008-2010. (*Id.* at ¶ 48) Tunnell was a director from 1992 through the class period and was a member of the audit committee from 2007 until 2008 and in 2010. (*Id.* at ¶ 49) Whiting was a director from 2005 through the class period and a member of the audit committee in 2010. (*Id.* at ¶ 50)

## 3. WTC background

WTC had four primary business segments: regional banking; corporate client services; wealth advisory services; and affiliate money managers. (*Id.* at ¶ 32) WTC's regional banking segment, whose predominant business was the origination of

4

commercial loans, is the focus of plaintiffs' complaint. (*Id.*) WTC's commercial loans fell into three categories: commercial real estate construction; commercial, financial and agricultural loans; and commercial mortgages. (*Id.*) As of December 31, 2008, the commercial loan balance was 70% of WTC's total loan portfolio and as of December 31, 2009, it was 74%. (*Id.*)

According to plaintiffs' complaint, "since its founding in 1903," WTC distinguished itself from other financial institutions as a "conservative" regional lender. (*Id.* at ¶ 52) With the emergence of the financial crisis in 2008, WTC continued to highlight its conservatism, claiming in its 2008 annual report that "it had 'succeeded across 105 years of economic cycles' because it 'manage[d] risk conservatively.'" (*Id.*) WTC did this by using "rigorous" and "consistent" underwriting procedures and asset review, leading investors to describe it as risk adverse. (*Id.* at ¶¶ 52, 57) While this may have been the public persona WTC created and attempted to maintain, plaintiffs claim that WTC's lending practices were actually part of a "massive criminal conspiracy that 'fraudulently conceal[ed] the Bank's true financial condition' and 'deceive[d] regulators and the public.'" (*Id.* at ¶ 1)

On November, 1, 2010, WTC announced that it was being acquired by M&T for approximately $3.84 per share, only half its trading price of the previous day, $7.11 per share. WTC released its third quarter 2010 results, reporting a quarterly net loss of $365.3 million (more than a 200% increase from the loss reported in the second quarter of 2010). (*Id.* at ¶¶ 34, 198-200) The market reaction was swift, with WTC stock prices dropping to $4.21 on November 1, 2010, causing losses to investors. (*Id.* at ¶¶ 205-

5

209)

## B. The Claims

As to the Exchange Act, plaintiffs allege violations of Section 10(b) against WTC, Cecala, Foley, Gibson, Harra, and North; violations of Section 10(b) and Rule 10b-5 against KPMG; violations of Section 20(a) against Cecala, Foley, Gibson, Harra, and North; and violations of Section 20(a) against the audit committee defendants. (*Id.* at ¶¶ 341-86) As to the Securities Act, plaintiffs allege violations of Section 11 against WTC, Cecala, Foley, Gibson, Harra, Rakowski, Burger, Elliott, Krug, Mobley, Rollins, Sockwell, Tunnell, Whiting, Mears, duPont, Roselle, Freeh, KPMG, J.P. Morgan and KBW; violations of Section 12(a)(2) against WTC, J.P. Morgan and KBW; and violations of Section 15 against Foley, Cecala, Gibson, Harra, Rakowski, Burger, duPont, Elliott, Freeh, Krug, Mears, Mobley, Rollins, Roselle, Sockwell, Tunnell, and Whiting. (*Id.* at ¶¶ 387-477)

## C. Factual Background

Plaintiffs allege that the CI evidences that WTC's most senior officers engaged in an "overarching bank fraud conspiracy" that was designed to "fraudulently conceal the [WTC]'s true financial condition in many ways," including by "causing [WTC] to misrepresent its reporting of past due and nonperforming loans." (*Id.* at ¶ 54) WTC misstated its past due and nonperforming loans by $105 million, or 35% of its total past due and nonperforming loans as of December 31, 2008.[5] (*Id.* at ¶¶ 70-72, 220-27) WTC "waived" matured, past due loans by falsely claiming that it was "in the process of"

---

[5]The FAC sets out a specific breakdown of the fraudulently misstated past due loans. (*Id.* at ¶ 72)

6

extending the loans. However, WTC did not obtain updated appraisals for the loans, as required by federal law[6] and its own policies. (*Id.* at ¶¶ 61, 64-66) WTC knew that it could not extend the loans without these updated appraisals, which its officers knew would have "catastrophic consequences" for WTC. (*Id.* at ¶¶ 74-75) WTC thus reported low amounts of past due loans in its quarterly and annual SEC filings, a key credit metric that indicated to inventors that the credit quality of the portfolio was strong. (*Id.* at ¶¶ 53, 59) The amount of reported past due loans directly impacted WTC's reported reserve, i.e., the amount of money it set aside each quarter to cover probable losses in its loan portfolio, and its income. (*Id.* at ¶¶ 62-63) Therefore, as past due loans increased, the reserve increased, and WTC's income decreased on a dollar-for-dollar basis. (*Id.* at ¶¶ 58, 62-63)

Many of the extensions occurred in the final days of 2009, so that WTC would not have to report its true past due loan figures in its year-end financial statements. (*Id.* at ¶ 82) For example, on December 30, 2009, Terranova requested that the loan committee (which included Cecala, Harra, and North) extend multiple loans, with an outstanding balance of $94 million, from a single borrower, until April 2010. (*Id.*) Many of these loans had been delinquent and "in the process of extension" for months. (*Id.*) Cecala, Harra, and North approved the requested extension on the same day, without requiring updated appraisals and despite the fact that the borrower had never executed the extension documents that formed the basis of the request. (*Id.*) When the loans

---

[6]SEC regulations required WTC to report its past due loans on a quarterly basis because this financial metric was material and, for the same reason, WTC often highlighted its low number of past due loans in its quarterly press releases and conference calls. (*Id.* at ¶¶ 58 n.3, 59)

were not repaid, Terranova requested on March 31, 2010 that the loan committee "reaffirm" this extension until December 31, 2010. (*Id.*) Terranova offered no reason for the "reaffirmed" extension other than to state, "[d]ue to timing issues, the extension documents were never executed by the . . . borrower." (*Id.*) Again, the loan committee approved the extension, without requesting updated appraisals for these loans or any other required information. (*Id.*)

In 2009, WTC "mass extended" $1,744 billion of past due and soon-to-be-past due loans, without obtaining the necessary appraisals. This mass extension, approved by WTC's loan committee (chaired by North), served to eliminate the loans from WTC's financial statements. (*Id.* at ¶¶ 80-83) The failure to report the past due loans rendered WTC's publicly reported financial statements to be materially false. (*Id.* at ¶¶ 162-67) For example, WTC's "2009 Form 10-K, [filed with the SEC in February 2010], which was incorporated into the Proxy Statement for [WTC's] Offering did not include [WTC's] true past due number and was therefore false . . . ." (*Id.* at ¶ 403) Specifically, this false reporting led the market to believe WTC's loan portfolio was in good condition and that WTC had adequate reserves. (*Id.* at ¶¶ 162-67)

Plaintiffs allege certain emails evidence that senior officers (including Cecala, Harra, Gibson, and North) knew that WTC was misstating its past due loans through the class period. (*Id.* at ¶¶ 73-79) Further, officer defendants were well aware of the underreporting, as internal delinquency reports were compiled on a monthly basis, provided to North, and circulated to Cecala, Harra, and Gibson. Under Gibson's direction, the "waived" loans were removed from the delinquency reports and then the

past due list (used for WTC's publicly reported past due loan figures) was prepared.

(*Id.* at ¶¶ 64-67)

WTC emphasized in SEC filings its "rigorous" underwriting standards and its

"regular[] review of all past due loans" to "mitigate credit risk." (*Id.* at ¶¶ 91, 135, 161)

In the SEC filings, WTC stated:

> One of our primary risks is credit risk (the risk that borrowers
> will be unable to repay their loans). To mitigate this risk, we:
> • Employ rigorous loan underwriting standards and apply
> them consistently.
> . . .
> • Monitor the portfolio to identify potential problems and to
> avoid disproportionately high concentrations in any single
> industry sector or to any one borrower.
> • Regularly review all past-due loans, loans not being repaid
> according to contractual terms, and loans we doubt will be
> paid on a timely basis.

(D.I. 150, ex. 1 at 44-45 (2008 10-K) (emphasis omitted); D.I. 150, ex. 5 at 49-50 (2009

10-K) Contrary to this portrayal, WTC extended loans to borrowers without any

consideration of borrower's ability to repay loans. (D.I. 149 at ¶¶ 92-110) The 10%

rule, a WTC policy, allowed loan officers to extend additional credit to certain borrowers

in an amount up to 10% of their existing credit, which policy Terranova and his co-

conspirators fraudulently violated by "extending new credit to clients to keep existing

loan interest payments current."[7] (*Id.* at ¶¶ 54, 92)

As of March 2010, Zimmerman, a prominent Delaware real estate developer and

one of WTC's largest and most important borrowers, had 75 loans outstanding, totaling

nearly $100 million – an amount that constituted almost 6% of the WTC's total

---

[7]The CI detailed 39 examples of fraudulent 10% rule extensions. (*Id.* at ¶¶ 93-94)

9

construction loan portfolio. (*Id.* at ¶ 111) Terranova managed Zimmerman's relationship with WTC. (*Id.* at ¶ 54) Many of WTC's loans to Zimmerman were made "on Zimmerman's informal requests" without "supporting documentation to confirm that Zimmerman had met the terms of the loan agreement." (*Id.* at ¶ 112) The loan committee "approved a $10 million loan to Zimmerman to purchase and construct a development . . . [with] a term in the loan that provided for Zimmerman to receive an equity payout of $1 million once tenants in the development began to pay their lease . . . ." (*Id.* at ¶¶ 113-114) Even though this term was never met, WTC continued to provide payouts to Zimmerman. (*Id.* at ¶ 114) Terranova was able to change the loan terms and approve the payouts because WTC lacked adequate underwriting controls. (*Id.* at ¶ 115)

The Federal Reserve issued escalating warnings to WTC during the 2007 and 2008 exams and, in September 2009, it issued a Memorandum of Understanding ("MOU") to WTC, because of "a significant volume of risk rating changes and process weakness in general." (*Id.* at ¶ 152) After the issuance of the MOU, WTC's senior management ordered a comprehensive review of its banking practices, the Delaware Status Review ("review"), which documented "serious concerns with the past management of the Delaware Commercial Real Estate Division and with its loan portfolio." (*Id.* at ¶¶ 157-60) The review "documented the fraudulent behavior at [WTC], citing numerous 'serious concerns' with [WTC's] lending, including: (i) the 'unethical use of loan approval authority by relationship managers;' (ii) [WTC]'s 'limited oversight of relationship managers;' and (iii) 'a limited technical knowledge of

commercial real estate lending.'" (*Id.* at ¶ 159)

On February 23, 2010, WTC conducted a public offering ("the offering") of shares of common stock. The offering relied on a form S-3ASR registration statement filed with the SEC on November 29, 2007 ("form registration statement"), which was later amended by, inter alia, an amendment filed with the SEC on January 12, 2009 (collectively, the "registration statement"); a prospectus filed with the SEC on January 12, 2009; and a prospectus supplement filed with the SEC on February 23, 2010. These documents are collectively the "offering documents." (*Id.* at ¶¶ 388-89) The offering documents incorporated by reference WTC's 2007 and 2009 10-Ks, as well as the 2008 and 2009 quarterly 10-Qs. (*Id.* at ¶ 390) The registration statement also represented that it incorporated by reference all documents filed pursuant to Sections 13 and 15(d) of the Exchange Act after the date of the registration statement, which would include WTC's 10-Q and 10-K forms. (*Id.* at ¶ 390 n.72)

WTC began to report significant increases in its reserve in early 2010, as a result of the changes implemented after the issuance of the MOU. (*Id.* at ¶¶ 152-156, 177) To calm investors, WTC "repeatedly and emphatically denied that [WTC]'s increased reserves had anything to do with 'mounting capital problem[s] or credit problem[s], [i]nstead . . . reassur[ing] investors that [WTC]'s reserve increases were due to market conditions in Delaware and the fact that [WTC] was just 'being cautious.'" (*Id.* at ¶¶ 177-80) On June 3, 2010, WTC "announced that, after 31 years . . . Cecala was immediately retiring as CEO and that [b]oard member Foley, who had no prior banking experience, would take over as CEO." (*Id.* at ¶ 182) On a special conference call,

11

Cecala answered "[n]one whatsoever," to an analyst inquiry regarding whether WTC
"turned down an opportunity to make an acquisition, turned down the opportunity to sell,
had a mounting capital problem or credit problem that hadn't been reported or the
like." (*Id.* at ¶ 183) On November 1, 2010, WTC announced its acquisition by M&T.
(*Id.* at ¶¶ 198-209)

A criminal investigation was launched in October 2012 and remains ongoing.
(*Id.* at ¶¶ 21, 215-16) The joint federal investigation conducted by the FBI, the IRS
Criminal Investigation Division, the Office of the Inspector General, the Federal
Reserve, and the Special Inspector General for the Troubled Asset Relief Program
resulted in Terranova's criminal conviction for conspiring to commit bank fraud along
with other high-level WTC executives. (*Id.* at ¶¶ 21, 214)

## III. STANDARD OF REVIEW

A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the
sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S.
544, 555; *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A complaint must
contain "a short and plain statement of the claim showing that the pleader is entitled to
relief, in order to give the defendant fair notice of what the . . . claim is and the grounds
upon which it rests." *Twombly*, 550 U.S. at 545 (internal quotation marks omitted)
(interpreting Fed. R. Civ. P. 8(a)). Consistent with the Supreme Court's rulings in
*Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Third Circuit requires a two-
part analysis when reviewing a Rule 12(b)(6) motion. *Edwards v. A.H. Cornell & Son,
Inc.*, 610 F.3d 217, 219 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210

12

(3d Cir. 2009). First, a court should separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions. *Fowler*, 578 F.3d. at 210-11. Second, a court should determine whether the remaining well-pled facts sufficiently show that the plaintiff "has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). As part of the analysis, a court must accept all well-pleaded factual allegations in the complaint as true, and view them in the light most favorable to the plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). In this regard, a court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994).

The court's determination is not whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

**IV. DISCUSSION**

13

## A. Exchange Act Claims

### 1. Section 10(b) and Rule 10b-5

According to Section 10(b) of the Exchange Act, it is unlawful:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C.A. § 78j(b). Rule 10b-5, promulgated by the Securities and Exchange

Commission to implement Section 10(b), makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In order to state a claim for securities fraud under Section 10(b) and Rule 10b-5,

a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant

[i.e., falsity]; (2) scienter; (3) a connection between the misrepresentation or omission

and the purchase or sale of a security; (4) reliance upon the misrepresentation or

omission; (5) economic loss; and (6) loss causation." *In re DVI, Inc. Sec. Litig.*, 639

14

F.3d 623, 630-31 (3d. Cir. 2011). A statement or omission is material if there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d. Cir 2010) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "A material misrepresentation or omission is actionable if it significantly altered the total mix of information made available." *Id.* (citations and quotations omitted). Material misstatements are contrasted with subjective analyses and general or vague statements of intention or optimism which constitute no more than mere corporate puffery. *Id.*; *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 390 (D. Del. 2010). "Scienter is a mental state embracing intent to deceive, manipulate, or defraud, and requires a knowing or reckless state of mind." *Inst. Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (citations and quotations omitted).

## 2. Heightened pleading standard

Shareholders filing a securities fraud lawsuit under the Exchange Act are subject to the significantly heightened pleading standard codified by the Private Securities Litigation Reform Act ("PSLRA"). *Avaya, Inc.*, 564 F.3d at 253; *Horizon Lines*, 686 F. Supp. 2d 404, 414 (D. Del 2009) ("The PSLRA imposes a dramatically higher standard on a plaintiff drafting a complaint than that of traditional notice pleading."); *Brashears v. 1717 Capital Mgmt., Nationwide Mut. Ins. Co.*, 2004 WL 1196896, at *4 (D. Del. 2004) ("[B]y enacting the current version of the [PSLRA], Congress expressly intended to

15

substantially heighten the existing pleading requirements.")[8] (internal quotations

omitted). "The PSLRA provides two distinct pleading requirements, both of which must

be met in order for a complaint to survive a motion to dismiss." *Avaya, Inc.*, 564 F.3d at

252. First, the complaint must "specify each allegedly misleading statement, the reason

or reasons why the statement is misleading, and, if an allegation is made on information

and belief, all facts supporting that belief with particularity." *Id.* at 259 (citing 15 U.S.C.

§ 78u–4(b)(1)). This is the falsity requirement. Second, "with respect to each act or

omission alleged to violate [§ 10(b)]," a plaintiff is required to "state with particularity

facts giving rise to a strong inference that the defendant acted with the required state of

mind." *Id.* (citing 15 U.S.C. § 78u–4(b)(2)). This is the scienter requirement.

Both of these provisions require that facts be pled "with particularity." With

respect to the falsity requirement,

> the particularity standard echoes Rule 9(b) of the Federal
> Rule[s] of Civil Procedure, which is comparable to and
> effectively subsumed by the requirements of ... the PSLRA.
> Like Rule 9(b), the PSLRA requires plaintiffs to plead the
> who, what, when, where and how: the first paragraph of any
> newspaper story. Additionally, if an allegation regarding [a]
> statement or omission is made on information and belief, a
> plaintiff must state with particularity all facts on which that
> belief is formed.

*Horizon Lines*, 686 F. Supp. 2d at 414 (citing *Avaya, Inc.*, 564 F.3d at 253) (internal

---

[8]"The PSLRA's heightened pleading requirements were constructed in order to
restrict abuses in securities class-action litigation, including: (1) the practice of filing
lawsuits against issuers of securities in response to any significant change in stock
price, regardless of defendants' culpability; (2) the targeting of 'deep pocket'
defendants; (3) the abuse of the discovery process to coerce settlement; and (4)
manipulation of clients by class action attorneys." *Horizon Lines*, 686 F. Supp. 2d at
414.

quotations and citations omitted).  The scienter requirement, on the other hand, "marks a sharp break from Rule 9(b)."  *Avaya*, 564 F.3d at 253.  "Unlike Rule 9(b), under which a defendant could plead scienter generally, § 78u–4(b)(2) requires any private securities complaint alleging that the defendant made a false or misleading statement ... [to] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Horizon Lines*, 686 F. Supp. 2d at 414 (citations and quotations omitted).

Aside from these two requirements, the PSLRA imposes additional burdens with respect to allegations involving forward-looking statements.  The PSLRA's Safe Harbor provision, 15 U.S.C. § 78u–5(c), "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood."  *Avaya*, 564 F.3d at 254.

### 3. Analysis

#### a. Material misrepresentation or omission

Plaintiffs allege the following material misstatements or omissions.  WTC fraudulently understated the true amount of its past due loans in its SEC filings, which emphasized that "one of [WTC]'s primary risks is credit risk (the risk that borrowers will be unable to repay their loans)."  (*See, e.g.*, D.I. 150, ex. 1 at 44 (2008 10-K); ex. 5 at 50 (2009 10-K))  The amount of past due loans is a key financial metric, reflecting whether loans are being repaid and impacting the credit quality of WTC's loan portfolio and its financial condition.  Further, the reported amount of past due loans directly

17

impacted WTC's reported reserve, i.e., if past due loans increased, the reserve increased, and WTC's income decreased on a dollar-for-dollar basis. WTC also improperly "waived" a substantial amount of past due loans by falsely claiming that the loans were being extended, without obtaining updated loan appraisals. These misstatements are material. *See e.g., Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992) (stating that "[i]n our view a reasonable investor would be influenced significantly by knowledge that a bank has knowingly or recklessly hidden its true financial status by deliberately misstating its level of non-performing loans, failing to provide adequate reserves, and indulging its problem loan customers"); *Lewis v. Straka*, 535 F. Supp. 2d 926, 930 (E.D. Wis. 2008) (citing material facts including misstating "the volume of nonperforming loans, the inadequacy of loan loss reserves, the inefficiency of internal lending controls and safeguards, [and] that [the bank] often extended rather than wrote off large nonperforming loans").

WTC misrepresented in its financial statements that its reserve was set in accordance with generally accepted accounting principles ("GAAP"). (D.I. 149 at ¶ 164) The FAC identifies the Financial Accounting Standards No. 5, "Accounting for Contingencies" ("FAS 5") and SEC Staff Accounting Bulletin No. 102, "Selected Loan Loss Allowance Methodology and Documentation Issues" ("SAB 102"), explaining how defendants violated these by, for example, not taking "into account 'all known relevant internal and external factors that may affect loan collectability,' including trends in loan losses, economic conditions, and [WTC]'s underwriting standards." (*Id*. at ¶¶ 163-72) Defendants' argument that they complied with GAAP because WTC used a different loan classification system to set the reserve than the one used to report WTC's past

due loans does not pass muster, when the CI evidences that WTC concealed the past

due loans to avoid a negative impact on the reserve. Further, "after performing

extensive due diligence and analysis of [WTC]'s loan portfolio as of January 2008, M&T

determined that [WTC] had understated its Loan Loss Reserve by nearly $800 million."

(*Id.* at ¶¶ 162, 164, 166, 232-33, 413)

Defendants argue that WTC adequately disclosed credit quality throughout the

class period and "no reasonable investor would have relied on loan classifications in

this context." However, the examples of these disclosures provided by plaintiffs are

immediately followed by reassurances.

> Due to the economic environment, non[]accruing loans,
> past-due loans, . . . increased significantly from their 2007
> levels. . . . The 2007 levels were moderately higher than the
> 2006 levels, as the regional economy began to soften.
> On a percentage basis, the composition of the loan portfolio
> remained well diversified and relatively unchanged. There
> are discussions of our commercial real estate. . . elsewhere
> in this section.
> We maintain an internal risk rating system that classifies all
> loans . . .
> We apply these classifications consistently and we analyze
> migrations within the classifications quarterly.
> This system has helped us develop adequate reserves for
> loan losses for many years.

(D.I. 168, ex. 2 at 45 (2008 Annual Report)) Reading the statements in context as

defendants suggest does not lead to a conclusion of adequate disclosures. As

discussed above, WTC made clear to investors that it mitigated credit ristk. Moreover,

investors were not receiving all of the available information as WTC was concealing its

true financial position. *Cf. In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 413 F. Supp. 2d

378, 401 (E.D. Pa. 2005) (finding that defendant's optimistic statements are typical of

19

puffery and "[r]ead in context with all of the information available to investors, defendants' alleged misleading statements are immaterial, . . .. [as] the company's publications also alerted investors to the fact that the company faced challenges in maintaining its low delinquency rates due to changes in economic conditions"); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1121 (10th Cir. 1997) (finding that in context, "statements [would be] considered immaterial because they are only vague statements of corporate optimism . . . [or] because other documents available to the investing public 'bespoke caution' about the subject matter of the alleged misstatement at issue.").

Similarly, statements by WTC regarding its "rigorous" and "consistent" credit risk management practices are reflected not only in WTC's self-characterization, but in SEC filings. In discussing mitigating credit risk, WTC stated that it employed and "consistently" applied "rigorous loan underwriting standards." (D.I. 168, ex. 2 at 44 (2008 Annual Report)) These statements are not properly characterized as mere "puffery." Instead,

> where a defendant affirmatively characterizes management practices as "adequate," "conservative," "cautious," and the like, the subject is "in play." For example, if a defendant represents that its lending practices are "conservative" and that its collateralization is "adequate," the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations. Likewise, if a defendant characterizes loan loss reserves as "adequate" or "solid" even though it knows they are inadequate or unstable, it exposes itself to possible liability for securities fraud. By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.

20

*Shapiro*, 964 F.2d at 282.

Plaintiffs also allege other false statements, including officer defendants' use of the 10% rule to make loans that far exceeded the 80% loan-to-value ratio generally required by federal and WTC guidelines. (D.I. 149 at ¶¶ 97, 100, 246, 426) Contrary to the SOX certifications signed by Cecala and Gibson and despite repeated warnings from the Federal Reserve, KPMG and the Internal Audit Group, WTC's internal controls were inadequate to prevent more than a billion dollars of fraudulently waived loans through the conspiracy. (*Id.* at ¶¶ 144, 151, 170, 256, 258, 434) The officer defendants misrepresented the quality of WTC's underwriting and asset review practices and denied credit problems in the commercial loan portfolio on various quarterly conference calls. (*Id.* at ¶¶ 180, 183-84, 192-93, 202-04, 259-77)

Contrary to North's contentions, plaintiffs' allegations concerning North include his receipt of certain emails (*id.* at ¶¶ 73-84); his position as chair of the loan committee (*id.* at ¶¶ 81-84); approval of certain of Terranova's requested extensions (*id.* at ¶ 82); and approval of the loan waivers set forth in the delinquency reports (*id.* at ¶ 66). North dissects his imprecise responses to general questions on earnings calls, seeking to limit them to very contained matters, while at the same time arguing that his statements were immaterial, "because they were too vague and subjective." (D.I. 177 at 1-6) For example, when asked whether WTC was "seeing any trends . . . . slower payments and stuff" on "the non-resi[dential] commercial real estate in the strip malls, the retail as well as office," North responded that "[w]e haven't" and "that portfolio has held up well." North explains that the question related specifically to WTC's non-residential

commercial portfolio, and his answer was not false as it was limited thereto. Also, North

alleges the FAC does not establish a negative trend in that particular portfolio. Plaintiffs

allege that the commercial portfolio was experiencing significant deterioration and

North's answer created the false impression that the commercial loan portfolio was

"holding up well." In the context of plaintiffs' allegations, North's statements

misrepresent the financial health of WTC, thus are material misstatements and

omissions. The court concludes that plaintiffs have sufficiently alleged that defendants

made false and misleading statements.

### b. Scienter

To establish scienter, plaintiffs must "allege facts giving rise to a 'strong

inference' of 'either reckless or conscious behavior.'" *Avaya*, 564 F.3d at 267 (citing *In*

*re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534-35 (3d Cir. 1999)). Courts are obliged

> to weigh the 'plausible nonculpable explanations for the
> defendant's conduct' against the 'inferences favoring the
> plaintiff.' A 'strong inference' of scienter is one that is
> 'cogent and at least as compelling as any opposing
> inference of nonfraudulent intent.' The pertinent question is
> 'whether all of the facts alleged, taken collectively, give rise
> to a strong inference of scienter, not whether any individual
> allegation, scrutinized in isolation, meets that standard.'
> Omissions and ambiguities 'count against inferring scienter.'

*Id.* at 267-68 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 2504-05,

2509-11 (2007)). Terranova pled to criminal conspiracy, indicating that he did not act

alone, but that other WTC officers knew of and participated in the fraudulent loan

activities. (D.I. 149 at ¶¶ 64-67, 73-79) The FAC alleges (and the CI supports) that the

WTC's loan committee, which included Cecala, Harra, and North, approved the

22