fraudulent mass extension of hundreds of past due loans in the fourth quarter of 2009 for the purpose of erasing those loans from WTC's financial statements. (*Id.* at ¶¶ 81-84) The senders and recipients of internal emails,[9] along with the contents of those, evidence that some of the officer defendants knew of and discussed the past due loans misrepresentation. (*Id.* at ¶¶ 73-84) The past due loans appeared on delinquency reports for months or years. (*Id.* at ¶¶ 64-67) WTC did not update the appraisals for the matured past due loans, as it would then have been forced to acknowledge the deterioration of the commercial loan portfolio, which would in turn have a negative impact on WTC's reserve. (*Id.* at ¶ 63) Following Cecala's departure, Cecala and Foley held a conference call and Foley specifically reassured the market that WTC was stable and there would not be a "blow up" related to credit. (*Id.* at ¶¶ 184, 275) Under a totality of the circumstances review, the court concludes that plaintiffs have evidenced a strong inference of scienter on the part of WTC and the officer defendants.

As to KPMG, plaintiffs must show "either [a] lack[ of] a genuine belief that its representations were supported by adequate information or [that KPMG] engaged in auditing practices so shoddy that they amounted at best to a 'pretended audit' . . . , even in the face of assertions of good faith." *In re Suprema Specialties, Inc. Securities Litigation*, 438 F.3d 256, 279 (3rd Cir. 2006) (citing *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir.1979)), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, L.T.D.*, 551 U.S. 308, 322-23 (2007). "At the pleading stage, courts have

---

[9]Including Cummings, North, Terranova, Brian Bailey (Terranova's direct supervisor and the Bank's Delaware Market Manager, who reported to Harra), and Rich Conway (the COO for the Mid-Atlantic Market).

recognized that allegations of GAAS violations, coupled with allegations that significant 'red flags' were ignored, can suffice to withstand a motion to dismiss." *Id.*

The FAC alleges several red flags and allegations regarding KPMG's scienter. In connection with its 2007 and 2008 audit of WTC, KPMG issued letters to management identifying WTC's "lack of review of its loan portfolio as a material weakness in [WTC]'s internal controls" and criticizing WTC's "inadequate asset review." (D.I. 149 at ¶ 143) In early 2009, KPMG sent a letter to WTC stating in part:

> [T]he Corporation's Commercial Real Estate Lending Policy does not address specific underwriting standards for the acceptability of and limits on the use of interest reserves. The use of interest reserves to pay interest, without robust underwriting policies and timely, independent loan reviews, can potentially mask the deterioration of the creditworthiness of a borrower or the impaired viability of the underlying real estate project.

(*Id.* at ¶¶ 82-84) In September 2009, the Federal Reserve issued its MOU regarding "extensive failings in [WTC]'s lending, risk management, and accounting functions, including that [WTC] lacked 'a process to monitor compliance with [credit] policies and procedures.'" (*Id.* at ¶¶ 12, 152) An October 29, 2009 email referred to the need to resolve the issue of "matured loans" because these "ha[d] the attention of all the wrong people: [Cecala, the CEO; Harra, the Bank President; Gibson, the CFO], Examiners, Auditors." (*Id.* at ¶ 79) WTC extended a number of loans in the final days of 2009, without supporting appraisals or documentation. (*Id.* at ¶¶ 82-84).

Moreover, plaintiffs allege that KPMG was not prevented from examining any documentation, nor is there evidence that falsified records were provided to it. KPMG represented that WTC's financial statements conformed with GAAP, which would

require an auditor to evaluate the loan reserves' reasonableness and review the process used by management to develop the reserves. However, KPMG did not request updated appraisals or any other required documentation for the extended loans. (*Id.* at ¶¶ 82-84) At the pleading stage, the court must view all factual allegations in the light most favorable to the plaintiffs. The court concludes that the allegations and red flags discussed above, along with the magnitude of the fraud, creates a strong and reasonable inference of KPMG's scienter. *See e.g., Suprema*, 438 F.3d at 281 (finding that despite the protestations of the auditor, "[in] the face of the numerous and not insignificant alleged accounting violations, we cannot rule out, as a matter of law, a strong and reasonable inference of [the auditor]'s scienter."); *In re Am. Bus. Fin. Servs., Inc. Noteholders Litig.*, 2008 WL 3405580, at *1, *9 (E.D. Pa. Aug. 11, 2008) (holding that at the motion to dismiss stage, plaintiffs alleged scienter in view of their "allegations of numerous, significant and specific auditing violations and repeated decisions not to investigate multiple red flags.").

### c. Loss causation

Loss causation requires plaintiffs to show that "the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 430 (3d Cir. 2007). Plaintiff may adequately plead loss causation by alleging either a corrective disclosure of a previously undisclosed truth that causes a decline in the stock price or the materialization of a concealed risk that causes a stock price decline. *In re Am. Intern. Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 533 (S.D.N.Y. 2010) (citing *Leykin v.*

*AT & T Corp.*, 423 F. Supp. 2d 229, 240 (S.D.N.Y. 2006), aff'd, 216 Fed. Appx. 14 (2d Cir. 2007)). With respect to the latter, "where some or all of the risk is concealed by the defendant's misrepresentation or omission, courts have found loss causation sufficiently pled." *Id.* (citing *Nathel v. Siegal*, 592 F. Supp. 2d 452, 467 (S.D.N.Y. 2008).

In the case at bar, plaintiffs have alleged corrective disclosures, e.g., on January 29, 2010, after issuing its 2009 earnings press release revealing a large quarterly loss, WTC's stock price fell over 14%. Morgan Stanley issued a report that same day stating: "[d]eteriorating credit drove a higher than expected reserve build." (D.I. 149 at ¶ 178) Similarly, the stock price fell after another ""bigger-than-expected loan loss provision" on April 23, 2010 and after Cecala's departure on June 3, 2010 (*Id.* at 179-183) In response to the WTC and M&T's disclosure of crippling losses, on November 1, 2010, the stock price collapsed. While defendants attribute these decreases to the "challenging economic environment" and "broader economic decline," plaintiffs have offered sufficient evidence to show that the misrepresentations were plausibly reasons for the decline in value. *Robbins v. Kroger Properties, Inc.*, 116 F.3d 1441, 1447 n. 5 (11th Cir.1997) ("To satisfy the loss causation element, a plaintiff need not show that a misrepresentation was the sole reason for the investment's decline in value. Ultimately, however, a plaintiff will be allowed to recover only damages actually caused by the misrepresentation."). Third Circuit precedent instructs that loss causation is a fact intensive inquiry which is best resolved by the trier of fact. *See EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3rd Cir. 2000).

### d. Safe harbor provision

North moves to dismiss plaintiffs' claims based on his statements made during earnings calls, arguing that each of these calls began with a "forward-looking statement disclaimer," the statements were immaterial, and North had no knowledge that the statements were false. North does not provide the court with the text of the disclaimer. Without more, the court declines to find that the disclaimer was a "meaningful cautionary statement[] identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Avaya*, 564 F.3d at 256. The court concluded above that North's statements were material and made with scienter. North's motion to dismiss is denied on this issue.

The case at bar presents numerous complex factual issues. Defendants' arguments go to the merit and plaintiffs' claims are not appropriately dismissed at this stage. Plaintiffs have sufficiently pled their claims with particularity. Defendants' motions to dismiss the Exchange Act claims are denied.

### B. Securities Act Claims

#### 1. Standards

Plaintiffs allege violations of sections 11 and 12(a)(2) of the Securities Act in connection with the offering. These claims are not subject to the heightened pleading standards set forth in the PSLRA. *In re Adams Golf, Inc. Sec. Litig.*, 176 F. Supp. 2d 216, 230 (D. Del. 2001). "To state a claim under section 11, plaintiffs must allege that they purchased securities pursuant to a materially false or misleading registration statement.[10] To state a claim under section 12(a)(2), plaintiffs must allege that they

---

[10]Section 11 permits a purchaser to sue when "any part of the registration statement, when such part became effective, contained an untrue statement of a

purchased securities pursuant to a materially false or misleading 'prospectus or oral communication.'"[11] *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273-74 (3d Cir. 2004) (internal citations and quotations omitted). "Fraud is not a necessary element to establish a prima facie claim under Section 11 or Section 12(a)(2). But claims under those provisions can be, and often are, predicated on allegations of fraud. . . . [If] plaintiff grounds these Securities Act claims in allegations of fraud—and the claims thus "sound in fraud"—the heightened pleading requirements of Rule 9(b) apply." *In re Suprema*, 438 F.3d at 269 (citing *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 160-63 (3d Cir. 2004) ("*CALPERS*")). However, if the allegations are pled separately and plaintiffs expressly premise the Securities Act claims on negligence rather than fraud, Rule 9(b) is held inapplicable. *Id.* at 272.

### 2. Analysis

#### a. Materially false or misleading allegations

The basis for the Security Act claims is that the offering documents contained materially untrue statements and omissions set forth in WTC's 10-Ks and registration statement, which were incorporated by reference. Plaintiffs carefully separate the

---

material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k.

[11]Section 12(a)(2) provides that any defendant who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable . . . to the person purchasing such security from him." 15 U.S.C. § 77l.

Security Act claims, specifically stating:

> In this part of the Complaint, Lead Plaintiffs assert a series of strict liability and negligence claims based on the Securities Act on behalf of the Class (as defined in ¶476 below, except that Lead Plaintiffs explicitly disclaim subparts [d] and [e] of ¶478 from these Securities Act allegations). Lead Plaintiffs expressly disclaim any allegations of knowing or reckless misconduct, and to avoid an (unfounded) argument by Defendants that the claims below somehow "sound in fraud," it is necessary to state or summarize facts also stated above.

(D.I. 149 at ¶ 387) Plaintiffs then describe the facts underlying the material misstatements and omissions in the offering documents and registration statement (id. at ¶¶ 403-44) and allege that these claims are based on a failure to "conduct a reasonable investigation or possess reasonable grounds" for such statements (id. at ¶ 456). The Third Circuit in *In re Suprema* explained that although plaintiff "described its suit as arising out of a 'massive fraud' at Suprema," plaintiff made clear that its claims under the Securities Act were based in negligence. *In re Suprema*, 438 F.3d at 269. The Court distinguished *CALPERS*, where the Court found that "[t]he one-sentence disavowment of fraud contained within Plaintiffs' section 11 Count ... does not require us to infer that the claims are strict liability or negligence claims, and in this case is insufficient to divorce the claims from their fraudulent underpinnings." *CALPERS*, 394 F.3d at 160. The court concludes that the pleading at bar more closely resembles the one set out in *In re Suprema*, therefore, plaintiffs' claims do not sound in fraud. As discussed more fully above for the Exchange Act claims, the 2009 10-K filing materially understated WTC's past due loan amounts and the reserve. WTC misrepresented its underwriting and asset review practices. These are sufficient allegations of materially

false and misleading statements to survive a motion to dismiss.

### b. Loan reserves

The Third Circuit has stated that "[t]here appears to be no single method of evaluating and setting loan loss reserves," however, all methods "require quantitative and qualitative analyses of the past and present status of loans. . . . There is nothing unique about representations and omissions regarding loan loss reserves that removes them from the purview of the antifraud provisions of the federal securities laws." *Shapiro*, 964 F.2d at 281; *Underland v. Alter*, 2012 WL 2912330, at 5 (E.D. Pa. 2012) (citing *Shapiro*, 964 F.2d at 281). "[S]tatements of 'soft' information may be actionable misrepresentations [under Section 11] [only] if the speaker does not genuinely and reasonably believe them." *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368-69 (3d Cir. 1993). Defendants argue that this court should adopt the similar reasoning of *Fait v. Regions Fin. Corp.*, 655 F.3d 105, (2d Cir. 2011), that loan reserves are "not a matter of objective fact. Instead, loan loss reserves reflect management's opinion or judgment about what, if any, portion of amounts due on the loans ultimately might not be collectible" and, therefore, require allegations that "defendant's opinions were both false and not honestly believed when they were made."[12] *Id.* at 112-13.

Contrary to the plaintiff in *Fait*, which did not "point to an objective standard for setting loan loss reserves," in the case at bar, WTC alleged adequate reserves,

---

[12]This reasoning is the subject of a granted writ of certiorari. *Indiana State Dist. Council of Laborers v. Omnicare Inc.*, 719 F.3d 498, 503-06 (6th Cir. 2013) ("Section 11 provides for strict liability, and does not require a plaintiff to plead a defendant's state of mind"), *cert granted, Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 2014 WL 801097, 82 USLW 3242 (U.S. Mar. 03, 2014).

calculated using an objective and consistent standard, in part based on credit risk and loan classifications. Plaintiffs allege these "two distinct methodologies [used] to calculate [WTC's] Loan Loss Reserve, both . . . violated GAAP and understated [WTC]'s reserves." *Fait*, 655 F.3d at 113; (D.I. 149 at ¶ 165) WTC "blindly 'waived' hundreds of millions of dollars of past due and nonperforming loans, and arbitrarily assigned percentage values to risk ratings in the . . . loan portfolio." (D.I. 149 at ¶ 165) Plaintiffs' allegations suffice to allege that WTC was inconsistently and arbitrarily applying the standards it claimed to use to calculate its loan reserve. Therefore, plaintiffs have adequately pled their Securities Act claims against WTC and the individual defendants.

Similarly, KPMG argues that the loan reserves and statements regarding the same are actionable only if they are knowingly or recklessly false. KPMG's reliance on *Shapiro* is misplaced, as the Third Circuit has made clear that plaintiffs' allegations which were not premised on the fact that "defendants possessed or made affirmative forecasts regarding the[] possible outcomes," were properly dismissed. *Shapiro*, 964 F.2d at 283. As discussed above, plaintiffs in the case at bar allege that the loan reserves were calculated using methodologies which violated the GAAP. KPMG then certified these statements including the loan reserves. The court concludes that plaintiffs' allegations are sufficient to survive a motion to dismiss and permit discovery.

### c. Incorporated documents

DuPont moves for dismissal of the Section 11 claims as he did not sign the offering documents and, having resigned in October 2009, was not a director at the

time of the February 23, 2010 offering. For support that the offering documents are a "new registration statement," duPont points to 17 C.F.R. § 229.512(a)(2), which states that for purposes of liability, "each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof." Roselle joins this motion. DuPont and Roselle signed the form registration statement and the 2007 and 2008 10-Ks, each of which were incorporated by reference into the offering documents.

Plaintiffs do not dispute that duPont was not a director at the time of the offering but, rather, base liability on the fact that the offering documents incorporate by reference the registration statement, as well as the 2007 and 2008 10-Ks, which duPont did sign. Plaintiffs argue that duPont is not released from liability even after his resignation as he did not "advise the Commission and the issuer in writing that . . . he would not be responsible for such part of the registration statement." 15 U.S.C. § 77k(b)(1)(B); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 596, 642 (S.D. Tex. 2003) (pre-offering resignation did not sever Section 11 liability, when director signed statements before resignation). Defendants' cases are inapposite as they analyze situations where a director did not sign any statements. The parties have offered no cases that involve signed registrations statements (and other SEC filings) being incorporated into a post-resignation offering.

The court focuses its attention on whether the documents signed by duPont and Roselle allegedly contained misstatements and whether the individuals allegedly had knowledge thereof. Plaintiffs assert that WTC misstated its past due and

32

nonperforming loans as of December 31, 2008 (D.I. 149 at ¶ 70) and waived past due loans during each quarter of the class period (January 18, 2008-November 1, 2010). (*Id.* at ¶ 61) The Federal Reserve issued escalating warnings to WTC during 2007 and 2008.[13] These allegations of knowledge generally directed to WTC are insufficient as asserted against duPont and Roselle, who resigned their positions as directors prior to the offering. Moreover, the signed form registration statement was amended at least once (on January 12, 2009), before becoming part of the offering documents. For these reasons, the motion to dismiss is granted with prejudice as to defendants duPont and Roselle.

**C. Violations of Section 20(a) of the Exchange Act and Section 15 of the Securities Act**

Section 20(a) imposes joint and several liability on any person who "directly or indirectly controls any person liable" under any provision of the Exchange Act, "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a); *In re Suprema*, 438 F.3d at 284 (citing 15 U.S.C. § 78t(a)). Section 15 of the Securities Act provides for joint and several liability on the part of one who controls a violator of Section 11 or Section 12. 15 U.S.C. § 77o; *In re Suprema*, 438 F.3d at 284. Plaintiffs "must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws." *In re Suprema*, 438 F.3d at 284 (citation omitted). Accordingly, liability under Section 20(a) and Section 15 is

---

[13]The complaint does not elaborate on the content of the warnings.

derivative of an underlying violation of those sections by the controlled person.

The court has found that plaintiffs have adequately alleged primary violations of Section 10(b) and Section 11 (excluding duPont and Roselle) by the various defendants. As to the control element, plaintiffs allege the officer defendants had control, as these defendants signed documents, sent emails, and/or made the allegedly false statements. (D.I. 149 at ¶¶ 217, 239, 349, 395, 449) The audit committee monitored the quality and integrity of WTC's policies, financial statements and practices, as well as its compliance with legal and regulatory requirements. The audit committee members thus controlled the content of the public statements made by WTC. Moreover, these defendants signed WTC's 10-K forms from 2007-2009, the offering documents, and/or the registration statement. (D.I. 149 at ¶¶ 372-86) The court concludes that plaintiffs have adequately pled "actual control," sufficient to comply with the PSLRA.

As to duPont and Roselle, the court granted dismissal of the Section 11 claims, thereby negating a derivative claim pursuant to Section 15. Plaintiffs support their Section 20(a) claim against Roselle by virtue of his participation in the audit committee and his signature on incorporated documents. However, as discussed above in the analysis of the Section 11 claim, Roselle did not sign the offering documents as a whole. Moreover, unlike the other audit committee members who were either directors or members of the audit committee through the date of the offering, Roselle's tenure as director and audit committee member terminated in 2009. Plaintiffs have not proffered any specific allegations that Roselle had any "actual control" over the 10(b) violations. Therefore, the court grants the motion to dismiss with prejudice as to duPont and

Roselle.

## V. CONCLUSION

For the above reasons, defendants' motions to dismiss are denied. An appropriate order shall issue.