# EXHIBIT  C

— *MdL*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Criminal Action No. 14-05-RGA |
| | ) | |
| BRIAN D. BAILEY, | ) | |
| | ) | |
| Defendant. | ) | |

## **INFORMATION**

The United States Attorney for the District of Delaware charges that:

## **COUNT 1**

### ***Common Individuals and Entities***

At all times material to this Information

1.      Wilmington Trust Corporation ("WL"), headquartered in Wilmington, Delaware, was a Bank Holding Company whose securities were traded on the New York Stock Exchange under the trading symbol "WL."

2.      Wilmington Trust Company ("WTC" or the "Bank") comprised WL's Delaware-based, wholly-owned retail and commercial banking subsidiary.   The Bank was a financial institution as defined by Title 18, United States Code, Section 20, with deposits insured by the Federal Deposit Insurance Corporation.   Beginning in or around December 2008, the Bank participated in the Department of the Treasury's Capital Purchase Program ("CPP"), which was a subset of the Troubled Asset Relief Program ("TARP").

3.      BRIAN D. BAILEY ("Bailey" or "Defendant") was employed by WTC in various capacities during the relevant time period of October 2006 through May 2010, including as a Relationship Manager ("RM"), or loan officer; Vice President/Division Manager of the Delaware

1

Commercial Real Estate Division; and Vice President/Delaware Market Manager. Bailey resigned from WTC in May 2010.

4.     In his capacity as Division Manager and Market Manager, Defendant was responsible for supervising numerous RMs in the origination and maintenance of a large commercial loan portfolio, as set forth in greater detail below.

5.     JOSEPH TERRANOVA ("Terranova") was employed by WTC as a Relationship Manager ("RM") until his promotion on January 22, 2008, to Vice President/Division Manager of the Delaware Commercial Real Estate Division.

## THE CONSPIRACY

6.     From on or about March 2007, through on or about February 1, 2010, in the District of Delaware, Defendant Brian D. Bailey knowingly and intentionally combined, conspired, confederated and agreed with Joseph Terranova and others known and unknown to the United States Attorney to defraud the United States or any agency thereof and to commit an offense against the United States, to wit, causing the Bank and others to make false entries in a book, report, or statement of a bank with intent to deceive the Federal Deposit Insurance Corporation ("FDIC"), any agent or examiner appointed to examine the affairs of a bank, and the Board of Governors of the Federal Reserve System ("Board of Governors"), in violation of Title 18, United States Code, Sections 1005 and 2.

### Manner and Means of the Conspiracy

7.     It was a part of the conspiracy that Defendant and his co-conspirators would by deceit, craft, trickery and dishonest means, defraud the United States by interfering with and obstructing the lawful governmental functions of the FDIC, the Board of Governors, and the Federal Reserve Bank of Philadelphia (the "Reserve Bank"), in that Defendant and his co-conspirators fraudulently concealed the Bank's true financial condition, including by extending credit to clients to keep existing loan interest payments current and then failing to report that

2

such loans and others to the same clients were in fact past due and nonperforming; and by causing the Bank to make false entries in its public reporting to the FDIC, the Board of Governors, the Reserve Bank, and others relating to the Bank's portfolio of past due and nonperforming loans.

## FACTS COMMON TO THE INFORMATION

### Federal Regulatory Supervision of Wilmington Trust Co.

8.      The Bank was a "State Member Bank" of the Federal Reserve System, as defined by Title 12, United States Code, Section 1813(d).  The Board of Governors was the primary federal banking agency charged with supervising and regulating the Bank to ensure that the Bank engaged in safe and sound banking practices and complied with federal banking laws.   The Federal Reserve Bank of Philadelphia (hereinafter the "Reserve Bank"), carried out the day-to-day supervisory functions of the Board of Governors with respect to WL and WTC, under authority delegated to it by the Board of Governors.

9.      The Bank was required to file, and did file, a "Consolidated Report of Condition and Income for a Bank with Domestic Offices Only – FFIEC 041," commonly known as a "Call Report," with the Reserve Bank on a quarterly basis.  The Call Report set forth detailed financial data about the Bank's financial position and the results of its operations for that quarter.

Case 1:10-cv-00990-SLR-SRF   Document 298-3   Filed 10/10/14   Page 5 of 16 PageID #:
22718
Case 1:14-cr-00005-RGA   Document 22   Filed 08/04/14   Page 4 of 15 PageID #: 68

10.     The Call Report was divided into a number of schedules, among them, income statements, balance sheets, and schedules of past due and nonaccrual loans.[1]  Schedule RC-N of the Call Report required disclosure of the full outstanding loan balances, the payments on which were past due for between 30 and 89 days, as well as those loans that were past due for 90 days or more, for the quarter just ended.

11.     The Call Report further required the Bank to report past due loans by specific loan categories. Line items 1A1 and 1A2 of Schedule RC-N required the Bank to report as past due loans that were "Secured by real estate" and "Construction, land development, and other land loans," respectively.

12.     The Reserve Bank relied on, collected, and stored the Call Reports.  The Call Reports were also made publicly available on the Federal Financial Institutions Examination Council website for use by state and federal bank regulatory agencies, other government institutions, and the public.

**The Growth of the Wilmington Trust Commercial Real Estate Loan Portfolio**

13.     In the mid- to late-2000s, WTC adopted a loan growth strategy that led to a marked increase in the Bank's overall loan balances.  Between the years 2004 to 2008, WTC's loan volume increased from $6.7 billion dollars to $9.6 billion dollars, or by nearly $3 billion dollars.

14.     The growth was driven significantly by an increase in commercial real estate loans.  Between the years 2004 to 2009, commercial real estate-construction lending at WTC

---

[1] A loan is considered to be in nonaccrual status if principal or interest has been in default for a period of 90 days or more unless the loan is both well-secured and in the process of collection. As a general rule, banks shall not accrue interest, amortize deferred net loan fees, or costs, or accrete discount on any asset which is on nonaccrual status.  Banks are further required to reverse all previously accrued but uncollected interest applicable to assets placed in nonaccrual status against appropriate income and balance sheet accounts.  See INSTRUCTIONS FOR PREPARATION OF CONSOLIDATED REPORTS OF CONDITION AND INCOME, GLOSSARY.

increased from $735 million dollars to $1.95 billion dollars, or by nearly $1.215 billion dollars. Defendant had supervisory responsibilities over the Delaware Commercial Real Estate Division during that time period.

15.     Many commercial real estate loans were made to real estate developers to acquire and develop land for residential home building and shopping center developments.  The Bank generally financed new construction projects as two- to three-year term loans.  The end date of the term loans was the maturity date, the date upon which the borrower was obligated to repay the loan in full.

16.     The rapid loan growth at WTC described above increased the overall volume of commercial real estate loans reaching their maturity dates.

### The Waiving of Past Due and Matured Loans at WTC

17.     A "matured loan" is a term loan in which the principal payment is past due and must be repaid to the lender in full, unless the Bank extends the loan through a new legal agreement with the borrower.

18.     The Bank's internal accounting system, known as the SHAW system, considered all matured loans as past due.

19.     The Bank's lending policy required that extensions of matured loans be accompanied by a signed change in terms agreement executed by the Bank and the borrower. Matured loans could only be removed from past due status on the SHAW system if such an agreement was entered into with the borrower.

20.     As set forth more fully below, Defendant, Terranova, and others known and unknown to the United States Attorney engaged in a practice of "waiving" – i.e., failing to report to the Reserve Bank and others as past due – matured loans that were past due for principal repayment, if such loans were current for interest payment and considered to be in the "process

of extension." This practice resulted in the Bank not reporting to the Reserve Bank and others the full extent of past due loans on the SHAW internal accounting system.

21.      Defendant was aware as early as Fall 2006 of the Bank's waiver practice and the increasing number of matured and maturing loans within the Delaware Commercial Real Estate portfolio, which caused the Bank not to report to the Reserve Bank and others a large portion of past due loans on the SHAW system.

22.      By 2007, Defendant recognized that the volume of matured loans at the Bank "that needs to be addressed is becoming unmanageable." Despite an awareness of the magnitude of matured loans by Defendant and others, the Bank continued to waive a high volume of matured loans for multiple consecutive months pursuant to the established practice through 2009.

### The Bank's Process of Compiling Past Due Loan Data in 2009

23.      During the 2009 time period, a Bank employee would download data from the SHAW system to create a monthly report of past due loans (the "Delinquency Report"), crafted in the form of an Excel spreadsheet. The Delinquency Report contained information about the past due status of specific loans, including, among other items, the outstanding loan commitment, the number of days the loan was past due, the maturity date, and whether the loan was past due for the payment of interest.

24.      The final two columns of the Delinquency Report were labeled "Waive" and "Comments." For each loan, the "Waive" column was either left blank, signifying that the loan was not waived from the Delinquency Report, or marked "Y," signifying that the loan was waived from the Delinquency Report. The default presumption was that matured loans which were current for interest would be waived from the Delinquency Report as in the "process of extension," absent additional information provided by a lender for a specific project.

25.     The Bank's Credit Policy Manager was responsible for marking loans as waived from the Delinquency Report.  To accomplish this task, the Credit Policy Manager circulated an early warning version of the Delinquency Report to Defendant and other members of the lending staff, so that lending staff members could review the report and communicate updates to the Credit Policy Manager concerning whether matured loans should remain waived on the list as in the "process of extension."

26.     Defendant repeatedly communicated to his lending staff the importance of limiting the Bank's portfolio of past due loans.  Defendant was further aware that a significant portion of the matured construction loans that were waived from the Delinquency Report as in the "process of extension" were not being worked on for an extension by the Delaware lending staff.

### The Bank's Reporting of Past Due Loans

27.     Loan information in the Delinquency Report could be coded and sorted by different metrics, including, among others, by delinquency category ("30-89," "over 90," and "nonaccrual"), ledger category ("commercial," "construction," "mortgage," "collateral" and "consumer"), and the Call Report code for each loan ("1A1" – "9A").  Defendant supervised Delaware Commercial Real Estate loans that were categorized in the Delinquency Report under Call Report Code categories "1A1" and "1A2."

28.     The coded loan information was used by the Bank to create tabs labeled "Balance Sheet" and "FRB" within the Delinquency Report spreadsheet.  The "Balance Sheet" tab sorted past due loan information in a format to be reported in public filings with the Securities and Exchange Commission (the "SEC").  The "FRB" tab sorted past due loan information in a format to be reported in Schedule RC-N of the quarterly Call Reports.

29.     The finalized Delinquency Report was forwarded by the Bank's Office of the Chief Credit Officer to the Office of the Controller to prepare a quarterly Past Due and Nonperforming Loan Report (the "Past Due Report"). The Past Due Report, which was also in the form of an Excel spreadsheet, set forth the final loan figures used by the Bank for financial reporting purposes. One of the tabs within the Past Due Report was labeled "FRB," and the past due loan information therein corresponded to the same tab contained in the Delinquency Report; that is, the loans marked as "waived" on the Delinquency Report were not included in the total amount of past due loans set forth in the Past Due Report.

30.     The Bank utilized the financial data in the FRB tab to prepare and file Schedule RC-N of the quarterly Call Reports.

### The Bank's Waiver of Matured Loans in 2009

31.     Throughout 2008 and 2009, the economy declined precipitously, impacting in particular the areas of residential home building and commercial real estate. The declining economy, combined with the Bank's use of a lending facility known as the Ten Percent Rule, caused a marked increase in the number of matured loans that were waived from past due reporting in 2009.

#### A.     The Bank's Revised Appraisal Policy and Declining Real Estate Values

32.     In November 2008, the Bank revised its appraisal policy to require that a new valuation be performed on all loans secured by real estate in the amount of $250,000.00 or more, including maturing credits where there was an "obvious and material deterioration in market conditions."

33.     Defendant recognized the negative impact that the new policy and declining real estate values would have on matured and maturing residential construction projects. On April 8,

8

2009, Terranova sent Defendant an email entitled "Residential Maturities," in which Terranova

wrote, "Let's discuss this list before you do anything with it.  I had a long conversation with

[Bank Employees] after loan committee regarding the Appraisal process."  Terranova attached to

the email a spreadsheet of the Delaware Commercial Real Estate Division's Residential

Construction projects that had received or were due to receive an updated appraisal in the Second

Quarter of 2009.  The spreadsheet revealed that the values for projects which had received

appraisals had declined substantially.  Defendant responded, "Thanks for getting me this info so

quickly.  We need to address asap.  As I suspected this list is not comprehensive of the bank just

your portfolio and has the near term potential for catastrophic consequences. . . We need to not

paint ourselves in a corner to make the regulators or examiners feel good about our process."

34.     Defendant forwarded the email and the attached spreadsheet to his supervisor,

writing:

> You will undoubtedly hear some noise about this in the next week.  I realize we
> put in place a reappraisal policy to address the "current market conditions" of the
> CRE [Commercial Real Estate] portfolio as defined by our friendly
> KPMG/Fed/State examiners.  My concern all along has been the long term effects
> on us as, surprise surprise, the values are coming back lower.  Its mark to market
> when there is no market.  Like OTTI, we will paint ourselves into a corner if we
> revalue every real estate project at renewal time.  Looking only at the first volley
> of these (list attached under separate cover) it's over $327 million in deals that
> would qualify for reappraisal.  Assuming none of them came back at similar
> values, all would go into the exception bucket.  That bucket today has roughly
> $275 million in capacity.

35.     The substantial decrease in real estate valuations made it difficult for the Bank to

extend or restructure many lending relationships in 2009 without suffering negative economic

consequences, including, but not limited to, placing loans on nonaccrual status, taking additional

reserves against loan losses, and/or charging off losses relating to particular loans.

Case 1:10-cv-00990-SLR-SRF  Document 298-3  Filed 10/10/14  Page 11 of 16 PageID #:
122724
Case 1:14-cr-00005-RGA  Document 22  Filed 08/04/14  Page 10 of 15 PageID #: 74

**B.      The Bank's Use of the Ten Percent Rule**

36.      The "Ten Percent Rule" was a WTC Lending Policy that permitted an RM to extend credit up to ten percent (10%) of the total commitment of a customer relationship without approval of the WTC Loan Committee.  The Ten Percent Rule applied to the extension of new credit, up to the total amount of $1,000,000.00.  The Ten Percent Rule could be utilized only if the customer relationship had $5,000,000.00 or more in total credit, and the relationship had been approved by the Bank's Loan Committee for new or renewed credit within the past twelve months.

37.      Prior to December 2008, extensions of credit under the Ten Percent Rule required only the approval of an RM and a Division or Market Manager, such as Defendant.

38.      A "working capital line of credit" is a revolving credit facility typically extended to an established business to fund operating expenses and is granted on the strength of the borrower's cash flow and accounts receivable.  Working capital lines of credit generally have no restrictions on the purpose(s) for which funds may be used.

39.      An "interest reserve" loan is a lending facility that permits loan funds to be advanced to a borrower to pay interest charges on the outstanding balance of the loan.  The interest is capitalized and added to the loan balance.  Such lending facilities are typically underwritten at the outset of a commercial real estate project, and listed as a line item in the project budget.  Interest reserve loans permit borrowers to make interest payments while properties are being stabilized.

40.      A "supplemental interest reserve" is an additional loan provided to a borrower for the purpose of making interest payments.  Supplemental interest reserves may mask the

borrower's inability to make timely interest payments and may result in the effect of a bank
paying itself to keep a loan current for interest.

41.     Between 2007 and 2008, and during a period of a declining economy, Defendant
approved multiple funding requests from Terranova and other RMs under the Ten Percent Rule
to extend additional working capital lines of credit to Delaware Commercial Real Estate
borrowers.  Although such working capital lines could be used for any purpose, Defendant and
others knew that many borrowers would use the funds to make timely interest payments on
construction loans.  In this respect, the working capital lines of credit funded by the Ten Percent
Rule acted as supplemental interest reserves for otherwise nonperforming projects.

42.     Defendant was further aware that, pursuant to the waiver practice, the Bank would
not report as past due those loans that had matured, but remained current for interest, regardless
of whether such loans remained current for interest because the Bank had provided supplemental
financing through the use of the Ten Percent Rule or otherwise.

43.     In December 2008, the Bank revised the Ten Percent Rule to require that all
extensions of credit under the Rule also be approved by a Credit Officer, a Senior Credit Officer,
or the Bank's Chief Credit Officer.

44.     As a result of the policy change, the Bank's use of the Ten Percent Rule decreased
significantly.  The use of the Ten Percent Rule and other funding mechanisms in 2007 and 2008,
however, permitted multiple large loans to remain current for interest through 2009, thereby
allowing the Bank to claim that they were "current for interest" and to thus waive such loans
from past due reporting.

11

C.      **The Substantial Increase in Waived Loans**

45.      The volume of matured loans that were waived from past due reporting because those loans were current for interest and in "the process of extension," through the conduct of Defendant, Terranova, and others known and unknown to the United States Attorney, increased substantially in 2009, and the waiver practice had the following impact with respect to the Bank's public financial reporting in 2009:

A.      First Quarter 2009

1.      As of March 31, 2009, the total amount of matured loans that were not reported to the Reserve Bank and others as past due or on nonaccrual status because they were listed on internal Bank documents as having been "waived," was in excess of $186,000,000.00. This total included loan values in excess of $140,000,000.00 that were 30-89 days past due, and approximately $46,000,000.00 in loans that were at least 90 days – and up to 1126 days – past due.

2.      As of March 31, 2009, the total amount of Delaware Commercial Real Estate loans with an FRB Category of 1A1 and 1A2 that the Bank waived from past due reporting totaled in excess of $116,000,000.00. This total included loan values in excess of $93,000,000.00 that were 30-89 days past due, and loan values in excess of $23,000,000.00 that were at least 90 days past due.

3.      On or about April 30, 2009, the Bank falsely underreported the Bank's past due and nonaccrual loans on Items 1A1 and 1A2 of Schedule RC-N of the First Quarter 2009 Call Report submitted by the Bank to the FFIEC through the Board of Governors and the Reserve Bank.

B.     Second Quarter 2009

1.     As of June 30, 2009, the total amount of matured loans that was not reported to the Reserve Bank and others as past due or on nonaccrual status because they were listed on internal Bank documents as having been "waived," was in excess of $234,000,000.00. This total included loan values in excess of $46,000,000.00 that were 30-89 days past due, and approximately $188,000,000.00 in loans that were at least 90 days – and up to 699 days – past due.

2.     As of June 30, 2009, the total amount of Delaware Commercial Real Estate loans with an FRB Category of 1A1 or 1A2 that the Bank waived from past due reporting totaled in excess of $117,000,000.00. This total included loan values in excess of $11,000,000.00 that were 30-89 days past due, and loan values in excess of $106,000,000.00 that were at least 90 days past due.

3.     On or about July 30, 2009, the Bank falsely underreported the Bank's past due and nonaccrual loans on Items 1A1 and 1A2 of Schedule RC-N of the Second Quarter 2009 Call Report submitted by the Bank to the FFIEC through the Board of Governors and the Reserve Bank.

C.     Third Quarter 2009

1.     As of September 30, 2009, the total amount of matured loans that were not reported to the Reserve Bank and others as past due or on nonaccrual status because they were listed on internal Bank documents as having been "waived," was in excess of $463,000,000.00. This total included loan values in excess of $112,000,000.00 that were 30-89 days past due, and approximately $351,000,000.00 in loans that were at least 90 days – and up to 791 days – past due.

13

2.      As of September 30, 2009, the total amount of Delaware Commercial Real Estate loans with an FRB Category of 1A1 or 1A2 that the Bank waived from past due reporting totaled in excess of $256,000,000.00. This total included loan values in excess of $50,000,000.00 that were 30-89 days past due, and loan values in excess of $206,000,000.00 that were at least 90 days past due.

3.      On or about October 30, 2009, the Bank falsely underreported the Bank's past due and nonaccrual loans on Items 1A1 and 1A2 of Schedule RC-N of the Third Quarter 2009 Call Report submitted by the Bank to the FFIEC through the Board of Governors and the Reserve Bank.

## The Bank's Temporary Extension Process

46.      In Fall 2009, Defendant was tasked to be part of a group to "eliminate matured loans" by December 31, 2009. The group developed a process to extend temporarily, on a mass basis, over $1.3 billion dollars of matured and maturing loans. The temporary extension process did not involve a full underwriting process, but instead was designed to provide the Bank with additional time, until March 2010, to obtain updated collateral valuations and other information from borrowers to with matured or maturing loans to potentially extend those loans for a longer period.

47.      Although the Bank approved multiple temporary extensions internally by the end of 2009, the Bank did not execute extension agreements with a number of large commercial real estate borrowers. Thus, matured loans that had been identified as part of the temporary extension program remained listed as past due on the SHAW system. Defendant was aware that the Bank continued with its practice of waiving such loans from past due reporting to the Reserve Bank and others.

48.     As of December 31, 2009, the total amount of matured loans that were not reported to the Reserve Bank and others as past due or on nonaccrual status because they were listed on internal Bank documents as having been "waived," was in excess of $373,000,000.00. This total included loan values in excess of $43,000,000.00 that were 30-89 days past due, and approximately $330,000,000.00 in loans that were at least 90 days – and up to 1,280 days – past due.

49.     As of December 31, 2009, the total amount of Delaware Commercial Real Estate loans with an FRB Category of 1A1 or 1A2 that the Bank waived from past due reporting totaled in excess of $233,000,000.00.  This total included loan values in excess of $26,000,000.00 that were 30-89 days past due, and loan values in excess of $207,000,000.00 that were at least 90 days past due.

50.     On or about February 1, 2010, the Bank falsely underreported the Bank's past due and nonaccrual loans on Items 1A1 and 1A2 of Schedule RC-N of the Fourth Quarter 2009 Call Report submitted by the Bank to the FFIEC through the Board of Governors and the Reserve Bank.

All in violation of Title 18, United States Code, Section 371.

CHARLES M. OBERLY, III
United States Attorney

By: _____
Robert F. Kravetz
Assistant United States Attorney

_____
Lesley F. Wolf
Assistant United States Attorney

Dated:  August 4, 2014

15