UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

IN RE WILMINGTON TRUST
SECURITIES LITIGATION

This document relates to: ALL ACTIONS

Master File No. 10-cv-00990-SLR-SRF

(Securities Class Action)

Hon. Sue Robinson

ELECTRONICALLY FILED

# MEMORANDUM OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM IN OPPOSITION TO LEAD PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF BANK EXAMINATION INFORMATION, AND ASSERTING BANK EXAMINATION PRIVILEGE

Katherine H. Wheatley
Associate General Counsel

Yvonne F. Mizusawa
Senior Counsel
Board of Governors of the
Federal Reserve System
20th & C Streets N.W.
Washington, D.C. 20551
(PH) (202) 452-3436
(FAX) (202) 736-5615
Yvonne.f.mizusawa@frb.gov

Filed: October 24, 2014

TABLE OF CONTENTS

TABLE OF CITATIONS ..... ii

BACKGROUND ..... 1

ARGUMENT ..... 7

A. WTC and KPMG Properly Withheld the Confidential Information on Grounds of Bank Examination Privilege ..... 7

1. The Confidential Information Falls Within the Bank Examination Privilege ..... 7

2. Plaintiffs Have Not Shown Good Cause to Override the Bank Examination Privilege ..... 14

a. Plaintiffs Do Not Meet the First Factor Because the Information They Seek is Not Relevant ..... 14

b. The Court Should Not Overrule the Privilege Because Evidence is Available to Plaintiffs From Other Sources ..... 24

c. The Remaining Three Factors Militate Against Disclosure of the Confidential Information ..... 26

CONCLUSION ..... 29

# TABLE OF CITATIONS

**Cases**

*Fairfield v. Houston Bus. Journal, Inc.*,
No. H-93-1794, 1993 U.S. Dist. LEXIS 20365, (S.D. Tex. Sept. 8, 1993),
*aff'd*, 35 F.3d 562 (5th Cir. 1994) ........ 27

*Forstmann Leff Assoc. v. American Brands*,
1991 WL 168002 (S.D.N.Y., Aug. 16, 2001) ........ 28

*Gregory v. FDIC*,
631 F.3d 896 (D.C. Cir. 1980) ........ 29

*In re Bank One Securities Litigation*,
209 F.R.D. 418 (N.D. Ill. 2002) ........ 10, 11, 26, 28

*In re Bankers Trust Co.*,
61 F.3d 465 (6th Cir. 1995) ........ passim

*In re DVI, Inc. Sec. Litig.*,
639 F.3d 623 (3d Cir. 2011) ........ 16

*In re Franklin National Bank*,
478 F. Supp. 577 (E.D.N.Y. 1979) ........ 14, 15

*In re Grand Jury*,
821 F.2d 946 (3d Cir. 1987) ........ 10

*In re Providian Fin. Corp. Sec. Litig.*,
222 F.R.D. 22 (D.D.C. 2004) ........ 27

*In re Subpoena Served Upon the Comptroller of the Currency*,
967 F.2d 630 (D.C. Cir. 1992) ........ 7, 8, 13, 14, 28

*In re Vescio*,
208 B.R. 122 (Bankr. D. Vt. 1997) ........ 13

*In re Wilmington Trust Securities Litig.*,
2014 WL 1151988 (D. Del., Mar. 20, 2014) ........ passim

*Inst. Investors Group v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ........ 17, 23

*Linde v. Arab Bank, PLC*,
No. CV-04-2799 (NG)(VVP), 2009 U.S. Dist. LEXIS 86021 (E.D.N.Y. Sept. 21, 2009) .... 7, 9

*Local 703, I.B. of T. Grocery and Food Employees Welfare Fund v. Regions Financial Corp.*,
No. CV 10-J2847-S (N.D. Ala.) ........................................................................................ 12

*NLRB v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975)........................................................................................................ 13

*Raffa* v. *Wachovia Corp.*,
2003 WL 21517778 (M.D. Fla., May 15, 2003)............................................................ 19, 26

*Redland Soccer Club v. Dep't of the Army*,
55 F.3d 827 (3d Cir. 1995).............................................................................................. 13

*Shirk v. Fifth Third Bancorp*,
No. 1:05-cv-049, 2008 U.S. Dist. LEXIS 111425 (S.D. Ohio, July 2, 2008).................... passim

**Statutes**

12 U.S.C. § 248(a) .............................................................................................................. 1

12 U.S.C. § 325..................................................................................................................... 1

12 U.S.C. § 1821(t) ............................................................................................................... 4

12 U.S.C. § 1844................................................................................................................... 1

15 U.S.C. § 77a ..................................................................................................................... 2

15 U.S.C. § 78j(b) ................................................................................................................. 1

15 U.S.C. §78t(a) .................................................................................................................. 1

**Legislative Material**

H.R. Rep. No. 101-54(I) (1989), *reprinted in* 1989 U.S.C.C.A.N. 86 .......................................... 3

**Regulations**

12 C.F.R. § 261.2(c)............................................................................................................... 2

12 C.F.R. § 261.2(c)(1)(iii).................................................................................................... 9

Pursuant to the Court's September 16, 2014 oral Order, intervenor the Board of Governors of the Federal Reserve System (the "Board") respectfully files this Opposition to the lead plaintiffs' Motion to Compel Production of Documents Withheld by Defendants Based on the Bank Examination Privilege, filed August 5, 2014 (Dkt # 233) ("Motion"). As set forth below, the documents and portions of documents plaintiffs have moved to compel from defendants WTC and KPMG, for which the Board has received and reviewed prototypes, privilege logs, and representative samples, are protected from discovery by the bank examination privilege. As shown below, the Court should not override the privilege because the documents are irrelevant and cumulative, and other factors counsel against overriding the privilege.

## BACKGROUND

As described in the Board's Memorandum of Law in Support of its Motion to Intervene, filed August 20, 2014 (Dkt #247) ("Board Mem."), the Board is a federal agency authorized by law to regulate and examine or inspect bank holding companies and state-chartered banks that are members of the Federal Reserve System, 12 U.S.C. §§ 1844, 248(a), 325, and was the primary federal banking regulator for defendants Wilmington Trust Corporation and Wilmington Trust Company (collectively "WTC"). Wilmington Trust Company ("Bank") was also regulated by the State of Delaware, Office of the State Bank Commissioner ("OSBC"). WTC was acquired by M&T Bank Corporation ("M&T") under a merger announced November 1, 2010.

Following announcement of the merger, plaintiffs filed suit against WTC, some former officers and directors, and others asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) (the "Exchange Act"), and Sections 11 and 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. § 77a (the "Securities

Act"). On June 13, 2013, plaintiffs filed their Fourth Amended Consolidated Securities Class Action Complaint (Dkt. # 149) ("Complaint"). On March 20, 2014, the Court granted in part and denied in part Defendants' Motion to Dismiss the Complaint. *See In re Wilmington Trust Securities Litig.*, 2014 WL 1151988 (D. Del., Mar. 20, 2014) ("*Wilmington Trust II*"). By Order of May 1, 2014 (Dkt. # 197), the Court required WTC to produce to the plaintiffs "documents produced to any Governmental Entities, to the extent not subject to any objection." *Id.* at ¶ 3(c).

By letter dated June 4, 2014, plaintiffs sought the Board's authorization for WTC to produce to the plaintiffs certain privileged and confidential supervisory documents, in particular, (1) documents and testimony defendants have produced and continue to produce to various Government Entities … investigating WTC's lending and accounting practices; (2) documents related to an alleged Memorandum of Understanding between the Federal Reserve and WTC entered into in late 2009 (the "MOU");[1] and (3) documents related to "significant regulatory action" that WTC cited in its February 14, 2011 Definitive Proxy Statement. *See* Declaration of Hannah G. Ross in Support of Lead Plaintiffs' Motion to Compel, executed August 5, 2014 ("Ross Decl.") (Dkt # 235), Exh. L at 1 (the "June 4 letter").

[1] An MOU is a non-public supervisory document between a financial institution and its supervising Federal Reserve Bank and/or state supervisors that details supervisory expectations and the institution's plans to fulfill them. In connection with an MOU, a supervised financial institution will often submit periodic reports to its regulators describing steps taken to meet the supervisory expectations, and regulators will often respond in writing providing the regulators' opinions and reactions to steps taken by the financial institution and their expectations with regard to additional steps needed for compliance with the MOU. An MOU and related documents are confidential supervisory information under the Board's Rules. 12 C.F.R. § 261.2(c). Because the existence of an MOU is itself confidential, the Board neither confirms nor denies the existence of an MOU nor documents relating to an MOU in this case.

On June 27, 2014, the Board's Associate General Counsel denied plaintiffs' administrative request. Ross Decl., Exh. M (Dkt # 235-2) ("June 27 letter"). Relying in part on the Court's opinion in *Wilmington Trust II*, the Associate General Counsel found that the plaintiffs had not shown that the documents were "'directly relevant to the well-pleaded facts of the Complaint, including the Individual Defendants' scienter and the falsity of their statements.'" *Id.* at 3 (quoting June 4 letter). The letter stated "it is plain from the Court's opinion that [the plaintiffs] are able to meet [their] burden of proof on the issue of scienter without access to the privileged regulatory communications that you seek," *id.* at 4, and cited the "strong policy[2] interest in maintaining confidentiality of MOUs and supporting documents." *Id.*

On August 5, 2014, plaintiffs filed their Motion seeking a broad array of confidential bank examination documents as well as an injunction against *any future assertion* of bank examination privilege for documents or testimony in this in this case, regardless of the content of the document or testimony or its relevance. *See* [Proposed] Order Granting Lead Plaintiffs' Motion to Compel the Production of Documents Withheld by Defendants Based on the Bank Examination Privilege (Dkt # 233-1) ("Proposed Order") at 1-2.

On August 12, 2014, WTC filed its Response to plaintiffs' Motion, stating that it was in the process of reviewing for regulatory privileges "over three million pages" of documents that it

---

[2] An MOU is designed to facilitate the open exchange of information between a bank and its regulators, short of formal enforcement action, which is the hallmark of the bank examination process. *See, infra*, p. 7. Congress recognized the need for confidentiality in informal supervisory orders when it enacted 12 U.S.C. § 1818(u)(A)(1), which provides a presumption of disclosure for *formal* written agreements, stating in the legislative history that "[i]nformal supervisory orders [such as MOUs] *would not have to be disclosed*." H.R. Rep. No. 101-54(I), at 395 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 191 (emphasis supplied).

had previously produced to Governmental Entities with the permission of the Board and other regulators.[3] (Dkt # 242) ("Def. Resp."), at ¶ 2.

On August 20, 2014, the Board moved to intervene for the limited purpose of opposing plaintiffs' Motion to Compel and asserting bank examination privilege. Board Mem. at 3. The Court granted this unopposed Motion by oral Order of August 22, 2014.

On September 5, 2014, the parties filed a joint letter summarizing their agreement regarding regulatory privilege. (Dkt # 252) (the "Joint Letter"). To facilitate the Banking Agencies'[4] review, WTC provided the Agencies with prototypical privileged documents, described in Exh. 1 to the Joint Letter, representing "a cross-section of documents currently withheld by the Wilmington Trust Defendants on the ground of Regulatory Privilege." *Id.* at 2. By letter dated September 23, 2014, the Board informed the defendants that it would not claim bank examination privilege for a small number of the prototypes for reasons stated in the letter, but that its review of the remaining prototypes was ongoing. Supplemental Declaration of Yvonne F. Mizusawa, executed October 24, 2014 ("Supp. Mizusawa Decl."), ¶ 3 and Exh. 1.

On October 3, 2014, WTC provided a final Privilege Log and a final Redaction Log to the Banking Agencies. Supp. Mizusawa Decl., ¶¶ 4-5. The Privilege Log lists approximately

---

[3] By statute, a federal banking agency such as the Board may transfer or permit the use of confidential bank examination information and other privileged information to other federal agencies without waiving applicable privileges. 12 U.S.C. § 1821(t).

[4] As explained in the Joint Letter, in addition to the Board, regulators whose privilege is implicated by production of Governmental Entity documents to the plaintiffs include the OSBC, Office of the Comptroller of the Currency ("OCC"), Federal Deposit Insurance Corp., and New Jersey Department of Banking and Insurance Regulation. *Id.* at 1-2 and n. 1. Subsequently, the Pennsylvania Department of Banking and Securities was added to this list (collectively, the "Banking Agencies"). Many of these Agencies have intervened for purposes of asserting federal or state bank examination privileges.

9516 Banking Agency documents withheld in full on grounds of bank examination privilege. Of these 9516 documents, roughly 7225 are listed as confidential supervisory information of the Board, either alone or jointly with another Banking Agency. *Id.*, ¶ 4. The final Redaction Log lists approximately 6927 Banking Agency documents that were withheld in part on grounds of bank examination privilege. Of these 6927 documents, roughly 2529 are described on the Log as containing confidential supervisory information of the Board, either alone or jointly. *Id.*, ¶ 5. In addition to the Logs, WTC provided the Board with access to an electronic database housing the privileged documents, and hard drives containing those documents. *Id.*, ¶ 6.

Also on October 3, 2014, the Board received a 15-page log from defendant KPMG, listing approximately 308 documents withheld on grounds of bank examination privilege (the "KPMG Log") and, thereafter, a disc containing privileged documents. Of those, approximately 261 are listed as confidential supervisory information of the Board, either alone or jointly. *Id.*, ¶ 7.

Because of the large number of Federal Reserve documents listed on the three Logs, and the short timetable for review, Board staff elected to review representative samples of these documents. *Id.*, ¶ 8. Of the 7269 full Board documents on the Privilege Log, Board staff reviewed a random, representative sample of approximately 111 documents. *Id*. Of the 2529 redacted Board documents listed on the Redaction Log, the Board reviewed a random, representative sample of approximately 40 documents. *Id.* Of the 261 Board documents on the KPMG Log, Board staff reviewed a random, representative sample of approximately 20 documents. *Id*. Board staff found the random representative samples to be by and large covered by the bank examination privilege and consistent with the types of confidential supervisory

information contained in the prototypes. *Id.*, ¶ 9. Of the random, representative samples, Board staff determined that a small subset of documents or portions of documents were not subject to a claim of bank examination privilege. Board staff will notify defendants WTC and KPMG in the near future which of the random representative samples are not subject to a claim of privilege, the reasons for the Board's determination, and will instruct the defendants to produce those documents, and documents containing similar information to the plaintiffs, if no other privileges apply. *Id.* Board staff also completed its review of the prototypes and determined that, apart from those listed in the September 23, 2014 letter, the prototypes were covered by bank examination privilege. *Id.*, ¶ 3.

By Notice filed October 17, 2014 (Dkt. # 307), the Board informed the Court and the parties that it would assert bank examination privilege for the Board documents listed on the Privilege Log, the Redaction Log, and the KPMG Log, with the exception of the small subset of documents described above and determined to be non-privileged (collectively, the "Confidential Information").

As described below, the Confidential Information is protected from disclosure by the bank examination privilege and no good cause exists in this case to override the privilege. Accordingly, plaintiffs' Motion to Compel should be denied.

## ARGUMENT

### A. WTC and KPMG Properly Withheld the Confidential Information on Grounds of Bank Examination Privilege

#### 1. The Confidential Information Falls Within the Bank Examination Privilege

As discussed in the Board Mem. at 9-10, and contrary to plaintiffs' claims that regulatory documents are "routinely ordered produced,"[5] federal courts have long recognized a qualified privilege for communications between a bank and its regulators. *In re Subpoena Served Upon the Comptroller of the Currency*, 967 F.2d 630, 634 (D.C. Cir. 1992); *In re Bankers Trust Co.*, 61 F.3d 465, 471 (6th Cir. 1995). "[T]he bank examination privilege is a qualified privilege that protects communications between banks and their examiners in order to preserve absolute candor essential to the effective supervision of banks." *Linde v. Arab Bank, PLC*, No. CV-04-2799 (NG)(VVP), 2009 U.S. Dist. LEXIS 86021 at *7 (E.D.N.Y. Sept. 21, 2009); *see also Bankers Trust*, 61 F.3d at 471. The privilege is "firmly grounded in practical necessity." *Shirk v. Fifth Third Bancorp*, No. 1:05-cv-049, 2008 U.S. Dist. LEXIS 111425, at *7 (S.D. Ohio, July 2, 2008). The D.C. Circuit has held:

> Because bank supervision is relatively informal and more or less continuous, so too must be the flow of communication between the bank and the regulatory agency. Bank management must be open and forthcoming in response to the inquiries of bank examiners, and the examiners must in turn be frank in expressing their concerns about the bank. These conditions simply could not be met as well if communications between the bank and its regulators were not privileged.

*In re Subpoena*, 967 F.2d at 634.

The privilege belongs to the government agencies that conduct bank examinations.

---

[5] Lead Plaintiffs' Brief in Support of Their Motion to Compel Production of Documents Withheld by Defendants Based on "the Bank Examination" Privilege, filed August 5, 2014 (Dkt # 234) ("Pl. Mem.") at 14.

*Bankers Trust,* 61 F.3d at 472. The privilege "accords agency opinions and recommendations and banks' responses thereto protection from disclosure." *Id.*, at 471. The privilege is limited, and "may be overridden as to its protection of deliberative material if good cause is shown." *Id.* Good cause has been found where disclosure is necessary "to promote 'the paramount interest of the Government in having justice done between litigants,' … to 'shed light on alleged government malfeasance,' … or in other circumstances 'when the public's interest in effective government would be furthered by disclosure.'" *In re Subpoena*, 967 F.2d at 634 (internal citations omitted). Because the necessary good cause is absent here, the Confidential Information should remain subject to the Board's privilege.

Based on the prototype documents, Logs, and representative samples, the Confidential Information falls broadly into five categories[6]: (1) bank examination reports and examiner workpapers; (2) formal correspondence between bank regulators and WTC relating to bank examination and supervisory matters; (3) an alleged MOU and related documents and correspondence; (4) internal WTC[7] documents (or portions of documents) created in response to regulators' requests or summarizing or describing specific examination or supervisory requests, findings, or matters; (5) internal WTC emails (or portions of emails) and attachments, and informal emails and attachments (or other communications) between WTC and its regulators, discussing or responding to specific examination or supervisory requests, findings, or matters.

[6] Because the Board and OSBC jointly supervised the Bank, while the Board supervised Wilmington Trust Corporation, many of the Board's documents are covered by Federal bank examination privilege as well as Delaware state privilege.

[7] In addition to the internal WTC documents described above, one representative sample from the KPMG Log was an internal KPMG document, a small portion of which described specific Federal Reserve examination findings or supervisory matters.

Supp. Mizusawa Decl., ¶ 9. These documents precisely describe or reveal areas of regulatory concern regarding WTC's operations, examiners' specific examination findings, the methodology used to reach these findings, WTC's responses to the regulators' findings, and steps WTC took and agreed to take to respond to requests or correct problems identified by the regulators, among other supervisory matters, and are protected from disclosure by the bank examination privilege. *See Bankers Trust*, 61 F.3d at 471 (privilege protects "agency opinions and recommendations and banks' responses thereto"); *Linde*, 2009 U.S. Dist. LEXIS 86021 at *9 ("[t]he plaintiffs are not entitled to know … the content of any of the requests – written or oral – made by the OCC in the course of their review …").

Plaintiffs argue that the Confidential Information should be made available because documents prepared by WTC for its own business purposes and stored in WTC's files do not become privileged by virtue of the fact that they are later sent to the Federal Reserve. Pl. Mem. at 11-12; *see, e.g.*, 12 C.F.R. § 261.2(c)(1)(iii). Although plaintiffs are right on the law, they are wrong on the facts – the withheld documents are not ordinary business documents that happened to have been obtained by the Banking Agencies during an examination. Rather, the withheld material relates directly to the supervisory dealings between WTC and its regulators, and is covered by the privilege.

Having reviewed the prototypes, Logs, and representative samples, the Confidential Information includes internal WTC documents prepared in response to regulators' requests or summarizing examination findings or regulatory concerns, as well as internal WTC emails and emails between WTC and regulators discussing the regulators' concerns. Some of these documents are withheld in full and others are lightly redacted to remove only those portions of a

memorandum or email specifically describing the regulators' concerns and WTC's response. Not only do these internal WTC documents and emails discuss specific concerns articulated by the regulators, but they contain WTC's assessment of feasible means of correcting problems identified by the regulators. Although these documents or portions are internal to WTC, review of them would reveal what areas of WTC's operations were the subject of the regulators' concerns and what steps WTC had taken, or planned to take, in response to the regulators' criticisms. Thus, plaintiffs are simply incorrect when they argue "by virtue of the fact that they are internal communications between Bank personnel, these document simply cannot constitute 'agency opinions, recommendations or advice.'" Pl. Mem. at 13 (quoting *In re Grand Jury*, 821 F.2d 946, 959 (3d Cir. 1987)).[8] These documents reveal precisely the type of "iterative process of comment … and response" that the bank examination privilege was designed to protect. *In re Subpoena*, 967 F.2d at 633.

Moreover, the Confidential Information is different in kind from internal "analyses performed by a bank [for its own business purposes] relating to its financial condition," which are "factual in nature," Pl. Mem. at 12, and to which plaintiffs have access in discovery. *See In re Bank One Securities Litigation*, 209 F.R.D. 418, 428 (N.D. Ill. 2002) ("[p]laintiffs have been provided with the raw factual materials underlying these [examiner] opinions" and therefore are

---

[8] Plaintiffs' reliance on the quoted language from *In re Grand Jury* is misplaced. The quoted language concerns the deliberative process privilege, which protects the quality of an agency's decisionmaking process. *See*, *infra*, pp. 13-14. By contrast, the bank examination privilege protects the quality of communications between a bank and its regulators. *Id.* It would make no sense to say that the bank examination privilege is confined to documents created by banking agencies (such as examination reports or workpapers), or direct communications between a bank and its regulators, when the content of these communications is just as surely revealed by internal *bank* documents describing or discussing regulatory communications.

not entitled to production of bank examination information). Far from being "factual" material prepared in the ordinary course of WTC's business, the Confidential Information shows the regulators' selection of specific areas of WTC's operations to review, and their specific concerns and analyses in reviewing these operations, and are the essence of "agency opinions and recommendations and banks' responses thereto" protected by the bank examination privilege. *Bankers Trust,* 61 F.3d at 471; *see Shirk,* 2008 U.S. Dist. LEXIS 111425 at **5-6, 11 ("examination reports and communications leading up to the Written Agreement, and plans, reports, and recommendations that Fifth Third was required to prepared pursuant to the Written Agreement" are not purely factual and are protected by bank examination privilege).

In addition to internal WTC documents and emails, the Confidential Information includes bank examination reports, workpapers, and correspondence between WTC and FRB Philadelphia or the OSBC making reference to various areas of concern; articulating the rationale for the regulators' determinations; and responding to various requests and requirements of the regulators. There can be no doubt that these documents embody "agency opinions and recommendations" protected from disclosure by the bank examination privilege. *Bankers Trust,* 61 F.3d at 471; *see In re Bank One,* 209 F.R.D. at 427 (determining, upon *in camera* review, that bank examination reports and memorandum created by the OCC "predominantly contain opinions and or recommendations as opposed to facts … [and that] factual and deliberative components are demonstrably intertwined" in the documents). Indeed, a number of the withheld examination reports state on their face that they are "prepared by an examiner selected or

approved by the Board … [are] furnished to directors and management for their confidential use … [and are] strictly privileged and confidential under applicable law."

Thus, as several courts have found, factual information is inextricably intertwined with opinion in the Confidential Information, and purely factual information cannot be segregated. That was the conclusion of a district court in Ohio when confronted with a similar demand for confidential bank regulatory documents. In *Shirk*, following *in camera* inspection, the court found that the 1528 pages of bank regulatory documents were "not purely factual in nature. Indeed, factual and deliberative information is largely inextricably intertwined in the documents. And the mixture of facts and deliberative indications is not amenable to being segregated." *Shirk*, 2008 U.S. Dist. LEXIS 111425, at *4, *11.

In a recent, similar securities class action filed under sections 10(b) and 20(a) of the Exchange Act, a district court in Alabama, upon *in camera* inspection of 3,189 pages of confidential Federal Reserve supervisory documents, rejected a similar claim that the documents were "purely factual." *Local 703, I.B. of T. Grocery and Food Employees Welfare Fund v. Regions Financial Corp.*, No. CV 10-J2847-S, Order dated June 13, 2012 at 2 (N.D. Ala.) (Supp. Mizusawa Decl., Exh. 2). To the contrary, the court found "that the majority of the documents are privileged for the reasons set forth by the Alabama State Banking Department and the Board of Governors of the Federal Reserve" and that "the remaining documents … are entirely irrelevant to the plaintiffs' claims before the court." *Id.* at 3. Similarly, here, any factual elements cannot meaningfully be separated from opinion in the Confidential Information, and the plaintiffs have access to the raw factual information needed for their case.

The bankruptcy court's opinion in *In re Vescio,* 208 B.R. 122, 128 (Bankr. D. Vt. 1997), cited by the plaintiffs, does not warrant a different result. *See* Pl. Mem. at 13, 14. In that case, the bankruptcy court found that Federal Reserve Bank examination ratings, inspection findings, and a bank's current status and history of compliance with Federal Reserve requirements (including an MOU) are matters of "fact" and not opinion. 208 B.R. at 128-29. The Board respectfully suggests that that court's finding is contrary to the weight of authority in this area. *See, supra,* pp. 7-8. The court's findings that regulatory reports, ratings, and a bank's responses are factual essentially vitiates the privilege, which has been widely recognized by the courts. *Id*. Moreover, it cannot seriously be argued that in assigning an examination rating or identifying a matter of concern, a bank examiner is not expressing his or her "opinion" rather than stating a fact. To the extent that the *Vescio* case ignores this, its result is not logical or well-reasoned, and the Board respectfully suggests that the *Vescio* opinion is not controlling here.

Plaintiffs are also incorrect in arguing that the bank examination privilege "'does not protect 'communications made subsequent to an agency decision.'" Pl. Mem. at 14 (quoting *Redland Soccer Club v. Dep't of the Army,* 55 F.3d 827, 854 (3d Cir. 1995)). *Redland* concerned the deliberative process privilege, which "'prevent[s] injury to the quality of agency decisions.'" *Id.*, 55 F.3d at 854 (quoting *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 151 (1975)). By contrast, the bank examination privilege protects "the flow of communication between the bank and the regulatory agency" which the courts have recognized is "relatively informal and more or less continuous." *In re Subpoena*, 967 F.2d at 634; *see also Bankers Trust*, 61 F.3d at 471 ("the primary purpose of the privilege is to preserve candor in communications between bankers and examiners, which those parties consider essential to the effective supervision of banking

institutions."). As a result, the bank examination privilege protects documents (and testimony) that reveal the iterative process of comment and response between a bank and its regulators, regardless of their temporal relationship to an agency decision.

### 2. Plaintiffs Have Not Shown Good Cause to Override the Bank Examination Privilege

In balancing the competing interests of a litigant and the government in production of bank examination materials subject to the federal bank examination privilege, the courts have traditionally taken five factors into account: (1) the relevance of the evidence sought to be protected; (2) the availability of other evidence; (3) the "seriousness" of the litigation and the issues involved; (4) the role of the government in the litigation; and (5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable. *Bankers Trust*, 61 F.3d at 472; *In re Subpoena*, 967 F.2d at 634. As shown below, an analysis of the five factors in this case weighs strongly against production of the Confidential Information to the plaintiffs.

#### a. Plaintiffs Do Not Meet the First Factor Because the Information They Seek is Not Relevant

Here, plaintiffs cannot meet the first factor -- relevance -- because the Confidential Information has little if anything to do with the issues in their lawsuit. Plaintiffs provide little in the way of argument on the important issue of relevance, asserting instead that "[u]nder circumstances like those here, involving the collapse of large financial institutions, the public interest strongly favors disclosure."[9] Pl. Mem. at 15-16. They devote just one sentence to

[9] Plaintiffs' citation to *In re Franklin National Bank,* 478 F. Supp. 577, 587 (E.D.N.Y. 1979) for the proposition that "the public interest" favors disclosure is inapposite. Pl. Mem. at 16. In that case, the court ordered disclosure of withheld sections of OCC examination reports after finding

relevance, stating "the Complaint[10] alleges that the Federal Reserve's (and other regulators') role in examining the Bank, issuing the MOU, and forcing the M&T acquisition was pivotal to Defendants' knowledge, the falsity of their statements, and the eventual disclosure of the truth." Pl. Mem. at 16. Plaintiffs conclude from this cursory analysis that there is "no dispute" that the withheld documents are "highly likely" to contain facts that relate to these subjects. *Id.*

However, an examination of plaintiffs' Complaint reveals no basis for their relevance claims. The plaintiffs have brought a securities fraud claim against WTC, the gravamen of which is that during the class period, which runs from January 18, 2008 through November 1, 2010, defendants made a series of materially false and misleading statements regarding WTC's commercial real estate lending, accounting, and underwriting practices. Compl., ¶ 217. In particular, plaintiffs allege that, during the class period, defendants "reported a relatively modest amount of past due and nonperforming commercial loans" and "repeatedly represented to investors that it 'mitigate[d] credit risk' by 'employ[ing] rigorous loan underwriting standards and applying them consistently,' and by closely 'monitor[ing] the [loan] portfolio to identify

---

that these materials were relevant to plaintiffs' claims that the OCC negligently regulated the bank, which put "the knowledge of OCC officials of the financial condition of the bank … directly in issue." *Id.* at 587. This case does not present a similar issue of governmental negligence in the regulation of WTC. Moreover, that case was decided under the "official information privilege" for intergovernmental communications, not the bank examination privilege. *Id.* at 583.

[10] As described in the Supp. Mizusawa Decl., ¶¶ 11-13, apart from the plaintiffs' June 4 letter, no person or entity has sought the Board's prior written approval to use its confidential supervisory information regarding WTC in this litigation, as required by the Board's rules, and no such approval has been granted. Nonetheless, some paragraphs of the Complaint reference the Board's confidential supervisory information. *Id.*, ¶ 11. Because the necessary authorizations were neither requested nor received, as a policy matter, the Board urges the Court not to permit the plaintiffs to bootstrap these allegations in the Complaint into a finding of relevance for purposes of the bank examination privilege.

potential problems,'" Compl., ¶ 2 (internal citations not specified), but that those and other statements were knowingly false and misleading.

As this Court has found, plaintiffs' claims under sections 11 and 12(a)(2) of the Securities Act sound in strict liability and negligence. *See Wilmington Trust II*, 2014 WL 1151988 at *12 (""[i]n this part of the Complaint, Lead Plaintiffs assert a series of strict liability and negligence claims based on the Securities Act on behalf of the Class …. Lead Plaintiffs expressly disclaim any allegations of knowing or reckless misconduct ….'") (quoting Compl., ¶ 387). Section 15 of the Securities Act "provides for joint and several liability on the part of one who controls a violator of Section 11 or Section 12," *Id.* at *14. Accordingly, scienter is not a required element of plaintiffs' claims under sections 11, 12(a)(2), and 15 the Securities Act. So plaintiffs' argument that the Confidential Information is "pivotal to Defendants' knowledge, the falsity of their statements, and the eventual disclosure of the truth," Pl. Mem. at 16, simply provides no support for their requested relief, because plaintiffs do not need the Confidential Information to prove scienter with regard to the Securities Act claims.

Turning to plaintiffs' claims under sections 10(b) and Rule 10(b)(5), the Court has recognized that, to state a claim for a violation of section 10(b), plaintiffs must show: "'(1) a material misrepresentation or omission by the defendant [i.e., falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *In re Wilmington Trust*, 2014 WL 1151988 at *6 (quoting *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630-31 (3d Cir. 2011)). To demonstrate scienter, the Court has held plaintiffs must "'allege facts

giving rise to a 'strong inference' of 'either reckless or conscious behavior.'" *Id* at *9 (quoting *Inst. Investors Group v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009)).

The allegations in the Complaint stem from the deterioration of WTC's commercial loan portfolio and its alleged failure to disclose its growing pool of past due and nonperforming loans and deficiencies in its accounting and underwriting practices and internal controls. Compl., ¶¶ 217 -258. Plaintiffs allege that WTC misreported its "serious doubt" loans in SEC filings and earnings conferences calls from January 2008 through November 1, 2010 and materially understated its past due and nonperforming loans in SEC filings during that period. *Id*., ¶¶ 218-226. In addition, the Complaint alleges "the Bank also failed to disclose approximately $1.744 billion in past due or soon-to-be past due matured loans that were "mass extended" in the fourth quarter of 2009 and early 2010." *Id*., ¶ 227. Plaintiffs allege that WTC made additional false statements in its 2007, 2008 and 2009 10-K filings regarding its methodology for calculating past due and nonperforming loans, *id*., ¶ 228, and other false statements leading the Bank to materially understate its loan loss reserves and overstate its net income during that period. *Id*., ¶¶ 229-240. Plaintiffs allege that WTC made additional false statements regarding its underwriting practices, loan-to-value ("LTV") ratios, asset review procedures, and internal controls, and that individual officer defendants made additional false statements. *Id*., ¶¶ 241-273.

The Complaint alleges that "*beginning with its results for the fourth quarter of 2009,* the truth about [WTC's] true financial condition *began to be revealed* to the marketplace." *Id*., ¶ 274 (emphasis added). Nevertheless, plaintiffs allege "[d]efendants continued to make materially false and misleading statements to the investing public" and "[o]fficer [d]efendants

made several additional false and misleading statements on several conference calls in 2010." *Id.; see also id.*, ¶¶ 275-77. "On ***Monday, November 1, 2010***, Wilmington's investors ***finally learned the truth*** about [WTC's] true financial condition and the full extent of the problems in the Bank's loan portfolio." *Id.*, ¶ 198 (emphasis added). On that date, WTC announced the definitive merger agreement with M&T at "a 'historic discount' of approximately 50% of the closing price of $7.11 per share the prior trading day," *id.*, and "released its third quarter 2010 results, reporting an enormous quarterly net loss of $365.3 million – an over 200% increase from the loss reported in second quarter 2010." *Id.*, ¶ 199 (emphasis in original). "The market reacted swiftly to this news, driving down Wilmington's stock price over 40% from $7.11, the closing price the previous trading day, to $4.21 on November 1." *Id.*, ¶ 207 (emphasis in original).

Here, roughly 1028 of the Federal Reserve documents on the Privilege Log, 443 on the Redaction Log, and 88 on the KPMG Log are dated after WTC's November 1, 2010 disclosure of its own financial problems, which coincides with the end of the class period.[11] Compl., ¶ 23; Supp. Mizusawa Decl., ¶¶ 4, 5, 7. This post-class period Confidential Information has no bearing on whether defendants made materially false and misleading statements *during* the class period, which runs from January 18, 2008 through November 1, 2010, militating against a finding of relevance for this information. *Shirk,* 2008 U.S. Dist. LEXIS 11425 at *9 (bank examination information found not relevant where "the regulatory documents that plaintiffs are

[11] The Complaint describes certain "post-class period events" including WTC's issuance of a definitive proxy statement on February 14, 2011 which "revealed for the first time that, without the sale, the Bank would have faced 'significant regulatory action.'" Compl., ¶ 210 (quoting proxy statement). However, any such "significant regulatory action" necessarily would have been communicated to WTC before the merger was announced on November 1, 2010. The date of the proxy statement therefore does not make post-class period events relevant.

seeking were all initiated and prepared *after* Fifth Third had already disclosed its accounting problems, which [gave] rise to this lawsuit"); *Raffa* v. *Wachovia Corp.*, 2003 WL 21517778 at *4 (M.D. Fla., May 15, 2003) (plaintiff's relevance showing found "speculative and not strong," where OCC supervisory letter "analyzes activities that occurred after the closing of the merger [in question] and does not reveal what Defendant [bank] knew shortly before or at the time ….").

Even for Confidential Information within the class period, it is plain from the Complaint that supervisory communications are not "pivotal" to proof of scienter, as plaintiffs claim. Pl. Mem. at 16. To the contrary, in the Complaints' summary of scienter allegations, plaintiffs rely almost exclusively on internal WTC emails, reports, meetings and activities to show that defendants acted with reckless or conscious disregard. For example, plaintiffs cite an October 2009 internal email among senior WTC executives discussing "'how we can make [matured loans] go away by 12/31[/09]'" as evidence of scienter. Compl., ¶ 280. The Complaint cites "numerous internal emails" documenting "that the Bank's fraudulent 'waiver' of past due and nonperforming loans was widely known, regularly discussed and documented in reports by the Bank's most senior executives," and cites January 2009, April 2009 and September 2009 internal WTC emails warning of WTC's inability "'to report a <u>true</u> past due [loan] number'" and "catastrophic consequences," among other things. *Id.*, ¶ 281 (quoting emails) (emphasis in original).

The Complaint goes on to allege that "the fraud was so widely known that it was the subject of both high-level meetings and reports," including an April 2009 internal WTC "appraisal summit" convened to "fraudulently conceal[] [matured loans] through sham 'waivers'" and monthly internal "Delinquency and Past Due Reports" that "expressly dealt with

the Bank's past due and nonperforming loans that were 'waived.'" *Id.* Relying on these internal WTC business documents, the Complaint alleges "it is clear that this fraudulent conduct was apparent and understood by the highest levels of the Bank." *Id.* Plaintiffs also cite the "sheer volume and suspicious timing of [WTC's] massive loan removal," including the mass extension of over 800 loans (totaling $1.3 billion) before the close of its 2009 financial reporting period as evidence of scienter. *Id.*, ¶ 282. Plaintiffs cite WTC's internal Delaware Status Review "detailing the Bank's fraudulent underwriting and asset review procedures," *id.*, ¶ 284, and an internal memorandum prepared at the direction of the Bank's senior management summarizing the results of that Review as further evidence of scienter. *Id.*, ¶ 285. Plaintiff's cite the "massive size" of WTC's relationship with a particular borrower to whom "the Bank recklessly continued to extend millions of dollars in loans … in 2008 and 2009," as additional evidence of scienter, *id*., ¶ 286, as well as "the sheer magnitude and timing of the Bank's credit losses disclosed … November 1, 2010." *Id.* The Complaint further alleges that "the Officer Defendants' scienter is established by their own actions and direct involvement in the Bank's lending and accounting practices." *Id*., ¶ 289.

In the scattered instances in which the Complaint mentions communications with the Federal Reserve as possible additional evidence of scienter[12], those communications are not nearly of the level of specificity of the internal WTC communications, and are always described in tandem with warnings from KPMG, the Bank's outside auditors, or its Internal Audit Group. Pl. Mem. at 16. For example, plaintiffs allege as evidence of scienter that "the Federal Reserve

---

[12] As discussed *supra*, p. 15, n. 10, because the plaintiffs neither sought nor obtained Board's prior approval to use this information in the Complaint, the Board urges the Court, as a policy matter, not to base its relevance determination on these allegations.

(in 2007 and 2008), KPMG (in 2007 and 2008) and Internal Audit (in 2007) each determined – and communicated to the Officer Defendants – that the Bank's loan portfolio review was inadequate and constituted a material weakness in the Bank's internal controls." Compl., ¶ 288. Plaintiffs also allege that "[t]he Federal Reserve identified this practice as 'problematic' … when it imposed the MOU" which they allege "confirmed the widespread existence of deficiencies in all areas of the Bank's lending practices." *Id.* Even assuming for the sake of argument that these regulatory communications provide some additional evidence of scienter, they are far more generic than the voluminous, specific internal Bank communications which plaintiffs can presumably link to specific defendants who sent or received the emails or who were present at the meetings described in the Complaint. Moreover, an MOU, which is a written contract between a financial institution and its supervising Federal Reserve Bank and/or state supervisors that details supervisory expectations and an institution's plans to fulfil them, is by its very nature forward-looking and would not generally contain detailed findings of past deficiencies which might bear on the issue of scienter. Finally, the Federal Reserve communications are duplicated by similar warnings from the Bank's outside auditor, KPMG, and WTC's own Internal Audit Group, to which plaintiffs presumably have ready access in discovery. As described, *infra*, pp. 24-26, the fact that copious other evidence on the issue of scienter is available to the plaintiffs from other sources weighs heavily against overriding the privilege here.

Indeed, the Court's own findings in *Wilmington Trust II* refute plaintiffs' claims that the Confidential Information is "pivotal" to scienter. Pl. Mem. at 16. In holding that the plaintiffs had sufficiently alleged scienter to survive defendants' motion to dismiss, the Court listed a number of allegations which, if proven, would satisfy the scienter requirement. *None* of those

allegations involved regulatory communications. In particular, the Court found "that the WTC's loan committee … approved the fraudulent mass extension of hundreds of past due loans in the fourth quarter of 2009 *for the purpose of* erasing those loans from WTC's financial statements." *In re Wilmington Trust*, 2014 WL 1151988 at *10 (emphasis supplied). The Court found "[t]he senders and recipients of internal emails, along with the contents of those, evidence that some of the officer defendants knew of and discussed the past due loans misrepresentation." *Id.* The Court stated "[t]he past due loans appeared on delinquency reports for months or years." *Id.* "WTC did not update the appraisals for the matured past due loans, as it would then have been forced to acknowledge the deterioration of the commercial loan portfolio, which would in turn have a negative impact on WTC's reserve." *Id.* The Court cited a conference call in which individual defendants "specifically reassured the market that WTC was stable and that there would not be a 'blow up' related to credit." *Id.* From these allegations, the Court concluded "[u]nder a totality of the circumstances review, the court concludes that plaintiffs have evidenced a *strong* inference of scienter on the part of WTC and the officer defendants." *Id.* (emphasis supplied). It is significant that the Court concluded that plaintiffs had evidenced a *strong* inference of scienter without citing to *any* of the regulatory communications that plaintiffs now claim are pivotal to their case.

Moreover, plaintiffs do not need access to Confidential Information to prove the "falsity" of defendants' alleged misstatements under section 10(b) and Rule 10(b)(5). *See* Pl. Mem. at 16. As the Court has held, the Exchange Act, as amended by the Private Securities Litigation Reform Act ("PSLRA"), requires the Complaint to "'specify each allegedly misleading statement, the reason or reasons why the statement is misleading, and, if an allegation is made on information

and belief, all facts supporting that belief with particularity,'" which is the so-called "falsity" requirement. *Wilmington Trust II*, 2014 WL 1151988 at *6 (quoting *Avaya,* 564 F.3d at 259). Here, proof that a particular statement in an SEC filing was false and misleading necessarily resides in WTC's non-privileged internal business records and the records of its external auditor, KPMG, and the testimony of former officers, directors and employees of WTC and KPMG. For example, with respect to plaintiffs' claim that WTC materially understated the amount of its non-performing and past-due loans in SEC filings, plaintiffs must compare the amount of these loans as shown in WTC's internal books and records with those disclosed in SEC filings. The opinions of WTC's regulators are not relevant to this element of plaintiffs' claims.

Finally, the sheer breadth of plaintiffs' document request militates against a finding of relevance. Plaintiffs do not seek regulatory communications confined to defendants' past due and non-performing loans during the class period, or the adequacy of WTC's underwriting, but rather seek regulatory communications *simply because* they were produced to some six separate Governmental Entities in the course of their own investigations. These governmental investigations, however, might have had nothing at all to do with plaintiffs' securities class action lawsuit, nor have plaintiffs articulated any connection. Although the Governmental Entity productions may have enabled the parties to streamline discovery because they were pre-assembled and covered a broad range of information, the convenience of the parties is not sufficient grounds for overruling a claim of bank examination privilege, especially in light of plaintiffs' inability to articulate any meaningful connection between the Confidential Information and the issues in this lawsuit.

**b. The Court Should Not Overrule the Privilege Because Evidence is Available to Plaintiffs From Other Sources**

The second factor -- the availability of evidence from another source – strongly counsels against overriding the privilege because evidence plaintiffs need to support or refute their claims *is* available from other sources, namely, WTC's own internal business records and those of KPMG. Plaintiffs argue "there are no available substitutes" for regulatory communications, "which [they argue] include a host of analyses and communications concerning the central issues in this case." Pl. Mem. at 16-17. This is a red herring. While it is generally true that regulatory documents are only available from the regulators, the second factor asks whether evidence *needed to prove plaintiffs' claims* is available from some source other that privileged regulatory communications. *Shirk*, 2008 U.S. Dist. LEXIS 111425 at *9 (asking whether "other evidence is available to support or refute plaintiffs' claims").

Contrary to plaintiffs' claim that there are no available substitutes, Pl. Mem. at 16, WTC has represented that it has produced approximately *three million* pages of information, less documents withheld on grounds of regulatory privilege, to plaintiffs in this case. *See* Def. Resp., ¶¶ 2, 5. Moreover, as is plain from the Complaint, plaintiffs have access not only to WTC's own internal records, but to former WTC employees providing non-privileged information in their capacity as confidential witnesses. *See, e.g.*, Compl., ¶¶ 55, 64-66, 69, 76. In addition, the plaintiffs have access to documents and testimony of KPMG, WTC's former external auditors, who are alleged to have played a central role in informing the defendants of deficiencies in WTC's operations. *See, e.g.,* Compl., ¶ 11 ("Officer Defendants knew by the start of the Class Period of the critical deficiencies in the Bank's lending and risk management practices" because the Federal Reserve "*as well as* KPMG … *and* [WTC's] own Internal Audit department all

sharply criticized the Bank's risk-management procedures") (emphasis supplied); *id.*, ¶ 95 (alleging that *both* KPMG and the Federal Reserve repeatedly warned the officer defendants of violations of the 10% rule and that KPMG sent the Bank a detailed letter on the subject). Not only does the availability of this other evidence militate against disclose of privileged regulatory communications, it is readily available to the plaintiffs in discovery because WTC and KPMG are defendants.

Moreover, in connection with the merger announcement, the Complaint alleges that, during a November 1, 2010 conference call with analysts, the CFO of M&T announced that "M&T had discovered more than half a billion dollars in additional undisclosed losses that the Bank had not yet accounted for in its Loan Loss Reserve, even after the massive increases to its reserves (totaling $560 million) that the Bank had already announced beginning in the fourth quarter of 2009." Compl., ¶ 203 (emphasis in original). The Complaint alleges that M&T performed a "thorough due diligence that included 'a 40-person team of M&T Corp. credit line and work out personnel examin[ing] the loan documents for some 450 borrowers … or about 50% of the overall commercial portfolio.'"[13] Compl., ¶ 203. Plaintiffs should have ready access in discovery to members of M&T's workout team, and the highly relevant documents underlying M&T's due diligence, as M&T is the successor in interest to WTC.

Similarly, in its opinion, although the Court described the alleged MOU as one of several "red flags" creating an inference that KPMG acted with scienter, it also listed KPMG's own

[13] The Complaint further alleges that "M&T's entire analysis was based on reviewing Wilmington's loan portfolio as of January 1, 2008," which coincides with the start of the class period, and "calculating probable lifeline losses from that date," and that WTC "did not dispute M&T's conclusions, and indeed acquiesced in them," augmenting the possible relevance of this evidence to plaintiffs' case. *Id.*, ¶ 206.

letters to WTC management, internal emails, KPMG's unfettered access to WTC's records, and the lack of evidence that KPMG was given falsified records, as additional "red flags." *Wilmington Trust II*, 2014 WL 1151988 at *10. Given the ready availability of this other evidence to the plaintiffs on the issue of KPMG's scienter, and the strong policy interest in non-disclosure of an MOU and related documents, *see, supra*, p. 3, n. 2, good cause does not exist to override the privilege with regard to these documents.

As a result, there is simply no good reason why plaintiffs must glean information from regulatory communications when the underlying factual information has already been produced, or is being produced, to them by WTC and KPMG, and the second factor weighs against disclosure. *See Shirk,* 2008 U.S. Dist. LEXIS 111425 at *10-11 (second factor not met where plaintiffs have access to bank's "own internal business records"); *accord Bank One*, 209 F.R.D. at 427 (second factor not met where plaintiffs have access to "raw factual materials underlying [examiners'] opinions"); *Raffa*, 2003 WL 21517778 at *4 (second factor weighs against disclosure where "by examining documents concerning Defendant's banking operations, Plaintiff should have access to the same type of information utilized by bank examiners").

**c. The Remaining Three Factors Militate Against Disclosure of the Confidential Information**

The third factor, which looks to the "seriousness of the litigation," is also not met here. Although this action is undoubtedly "serious" to plaintiffs and defendants, a securities class action lawsuit between private litigants, for which money damages are the remedy, does not rise to the level of seriousness which would require production of confidential bank examination materials. *See*, *e.g*., *Bankers Trust*, 61 F.3d at 634 n.7 (noting that disclosure of bank examination materials might be warranted in cases seeking to expose "'government

malfeasance,'" or where "the government seeks justice between litigants") (internal citations omitted); *see also Fairfield v. Houston Bus. Journal, Inc*., No. H-93-1794, 1993 U.S. Dist. LEXIS 20365, at *4-5 (S.D. Tex. Sept. 8, 1993), *aff'd*, 35 F.3d 562 (5th Cir. 1994) (state court libel action does not rise to the level of seriousness required to produce bank examination materials). For example, in *Shirk*, the district court found "although this action is undoubtedly 'serious,' an ERISA action between private litigants, where money damages are the remedy, does not rise to the level of seriousness which would require production of confidential bank examination materials." 2008 U.S. Dist. LEXIS 111425 at *10. Likewise, a district court applying the bank examination privilege in a similar case under the securities laws found that the seriousness factor was not met because "[w]hile the importance of the policies underlying the federal securities laws cannot be overstated, those policies do not presumptively preempt the policies underlying the bank examination privilege." *In re Providian Fin. Corp. Sec. Litig.*, 222 F.R.D. 22, 29 (D.D.C. 2004).

Fourth, as plaintiffs concede, the Board is not a party to this action and does not have a direct interest in its outcome. Pl. Mem. at 17. Plaintiffs' argument that "the Government is deeply involved in the events giving rise of Lead Plaintiffs' claims" is unpersuasive. *Id.* The "events giving rise" to this litigation are WTC's alleged misstatements in SEC filings regarding its commercial real estate portfolio and accounting and underwriting practices. Plaintiffs have not shown that the Confidential Information has anything to do with these alleged misstatements, and it would not, since the Board has no involvement with a company's securities disclosures. Accordingly, the fourth factor is not met. *Providian*, 222 F.R.D. at 29 (fourth factor relates to whether information would "shed light on alleged government malfeasance" and is not met in

private securities litigation); *Bank One*, 209 F.R.D. at 428 (fourth prong not met where OCC was a non-party).

Fifth, disclosure of confidential bank examination documents, such as communications between WTC and its regulators relating to non-public supervisory information, raises "the possibility of timidity by government employees who will be forced to recognize that their secrets are violable." *Bankers Trust*, 61 F.3d at 472. The fact that there is a protective order in place in this case is unlikely to diminish this chilling effect, as plaintiffs claim. Pl. Mem. at 18. A regulator who believes that his comments may be used, perhaps out of context, against a bank in a future private lawsuit may be less candid in his assessments than one who believes that his comments will be used strictly to improve the safe and sound operations of the bank. Likewise, a bank officer or director who believes that his communications with regulators could be used against the bank in a future lawsuit may be less forthcoming than one who is not concerned about the possibility of third-party litigation. The fact that "'bank officials are legally obligated to cooperate with bank examiners,'" also does not dim the chilling effect, as plaintiffs claim. *Id.* (quoting *Forstmann Leff Assoc. v. American Brands*, 1991 WL 168002 (S.D.N.Y., Aug. 16, 2001). While "cooperative" on the surface, bank officials and regulators may be far more circumscribed in their comments if they believe that their communications will be used against the bank in future, third-party litigation, diminishing the free flow of information on which effective bank supervision depends. *In re Subpoena*, 967 F.2d at 633-34.

Finally, the fact that "the Bank no longer exists as an independent entity" does not diminish the chilling effect, as plaintiffs claim. Pl. Mem. at 18. Officers, directors, and regulators of operating financial institutions exchange information on the understanding that

their communications will not be used in private commercial litigation, and may be far less forthcoming in exchanging information if they believe that their communications will be disclosed upon merger or failure of the bank. *See, e.g.*, *Gregory v. FDIC,* 631 F.3d 896, 898 (D.C. Cir. 1980) (protecting examination records of a failed bank under the Freedom of Information Act because "exemption [8] was drawn to protect not simply each individual bank but the integrity of financial institutions as an industry").

Accordingly, all five factors weigh in favor of the Board in this case and the Confidential Information is protected under the bank examination privilege.

**CONCLUSION**

For the foregoing reasons, plaintiffs' Motion to Compel production of the Confidential Information should be denied on grounds of bank examination privilege.

Dated: October 24, 2014

Respectfully submitted,

Katherine H. Wheatley
Associate General Counsel
Board of Governors of the Federal Reserve System

Yvonne F. Mizusawa
Senior Counsel
Board of Governors of the Federal Reserve System
20th & C Streets N.W.
Washington, D.C. 20551
(PH) (202) 452-3436
(FAX) (202) 736-5615