## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| **IN RE WILMINGTON TRUST SECURITIES LITIGATION** | Master File No. 10-cv-00990-ER |
| | (Securities Class Action) |
| | Hon. Eduardo Robreno |
| This document relates to: ALL ACTIONS | ELECTRONICALLY FILED |

## BRIEF IN SUPPORT OF LEAD PLAINTIFFS' UNOPPOSED MOTION FOR (I) PRELIMINARY APPROVAL OF SETTLEMENTS AND (II) APPROVAL OF NOTICE TO THE CLASS

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Hannah Ross (*pro hac vice*)
Katherine M. Sinderson (*pro hac vice*)
Lauren McMillen Ormsbee (*pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*

**CHIMICLES & TIKELLIS LLP**

Robert J. Kriner, Jr. (Bar No. 2546)
Vera G. Belger (Bar No. 5676)
222 Delaware Avenue, 11th Floor
P.O. Box 1035
Wilmington, DE 19899
Phone: (302) 656-2500
Fax: (302) 656-9053

*Liaison Counsel for the Class*

**SAXENA WHITE P.A.**

Maya S. Saxena (*pro hac vice*)
Joseph E. White, III (*pro hac vice*)
Brandon T. Grzandziel (*pro hac vice*)
150 E. Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Phone: (561) 394-3399
Fax: (561) 394-3382

-and-

Steven B. Singer (*pro hac vice*)
10 Bank Street, 8th Floor
White Plains, NY 10606
T: (914) 437-8551
F: (888) 631-3611

*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ............................................................................... 1

II.   BACKGROUND OF THE ACTION ...................................................................... 3

    A.    The Court Appoints Lead Plaintiffs and Lead Counsel, and Denies the Defendants' Multiple Motions to Dismiss ........................................................................ 3

    B.    Discovery Begins and Lead Plaintiffs Move to Compel the Production of Millions of Pages of Documents ...................................................................... 6

    C.    Lead Plaintiffs Fight to Advance the Class's Case in the Face of the Government's Multiple Requests to Stay the Action ............................................................ 7

    D.    The Court Lifts the Stay and Lead Plaintiffs Complete Discovery ............................. 10

    E.    Lead Plaintiffs and Defendants Reach a Settlement .................................................... 11

III.  ARGUMENT ......................................................................................................... 12

    A.    The Proposed Settlements Warrant Preliminary Approval........................................... 12

        1.    The Third Circuit Favors Settlement................................................................ 12

        2.    The Settlements are the Result of Good Faith, Arm's-Length Negotiations Conducted by Well-Informed and Experienced Counsel ................................. 13

        3.    The Substantial Benefits for the Class, Weighed Against Litigation Risks, Support Preliminary Approval ......................................................................... 14

    B.    Notice to the Class Should Be Approved.................................................................... 18

    C.    Proposed Schedule of Settlement Events .................................................................... 20

IV.   CONCLUSION ...................................................................................................... 20

# TABLE OF AUTHORITIES

<u>Cases</u>

*Alves v. Main*, 2012 WL 6043272 (D.N.J. Dec. 4, 2012),
    2012 WL 6043272 ........................................................................................................... 14

*Bernhard*,
    2009 WL 3233541 ........................................................................................................... 20

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) ....................................................................................... 14

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ........................................................................................... 19

*Ehrheart v. Verizon Wireless*,
    609 F.3d 590 (3d Cir. 2010) ........................................................................................... 12

*Girsh v. Jepson*,
    521 F.2d 153 (3d Cir. 1975) ........................................................................................... 15

*Henderson v. Volvo Cars of N. Am., LLC*,
    2013 WL 1192479 (D.N.J. Mar. 22, 2013) ................................................................... 18

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995) ....................................................................................... 12, 15

*In re Merck & Co., Inc. Vytorin ERISA Litig.*,
    2010 WL 547613 (D.N.J. Feb. 9, 2010) ....................................................................... 15

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
    962 F. Supp. 450 (D.N.J. 1997) .................................................................................... 14

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
    148 F.3d 283 (3d. Cir. 1998) ............................................................................. 14, 18, 20

*In re Schering-Plough/Merck Merger Litig.*,
    2010 WL 1257722 (D.N.J. Mar. 26, 2010) ................................................................... 17

*In re Warfarin Sodium Antitrust Litig.*,
    212 F.R.D. 231 (D. Del. Aug. 30, 2002) ...................................................................... 18

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) ........................................................................................... 12

*Jones v. Commerce Bancorp, Inc.*,
    2007 WL 2085357 (D.N.J. July 16, 2007) .................................................................... 12

*Mehling v. New York Life Ins. Co.*,
    246 F.R.D. 467 (E.D. Pa. 2007) .................................................................................... 13

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) ................................................................................................ 18

*Nichols v. Smithkline Beecham Corp.*,
   2005 WL 950616 (E.D. Pa. Apr. 22, 2005) .................................................................. 17

*Schuler v. Medicines Co.*,
   2016 WL 3457218 (D.N.J. Jun. 23, 2016) ................................................................... 13

*Singleton v. First Student Mgmt. LLC*,
   2014 WL 3865853 (D.N.J. Aug. 6, 2014) ............................................................. 14, 16

*Smith v. Prof'l Billing & Mgmt. Servs., Inc.*,
   2007 WL 4191749 (D.N.J. Nov. 21, 2007) .................................................................. 13

*Varacallo v. Mass. Mut. Life Ins. Co.*,
   226 F.R.D. 207 (D.N.J. 2005) ................................................................................ 14, 18

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ......................................................................................... 19

Statutes

15 U.S.C. § 77z-1 ........................................................................................................... 19

15 U.S.C. § 78u-4 ........................................................................................................... 19

Rules

Fed. R. Civ. P. 23 ................................................................................................... *passim*

Other Authorities

Cornerstone Research, *Securities Class Action Settlements: 2017 Review and Analysis* (2018) ..... 1, 17

MANUAL FOR COMPLEX LITIGATION, FOURTH  (2004) ........................................................ 12

MANUAL FOR COMPLEX LITIGATION, FOURTH  (2015) ........................................................ 13

## I.      PRELIMINARY STATEMENT

Lead Plaintiffs and the Defendants have negotiated, at arm's-length, proposed cash settlements of all claims against the Defendants in this Action for a total of $210,000,000.[1] Comprised of a $200 million recovery from Wilmington Trust, and a $10 million recovery from KPMG, these Settlements would resolve all claims against all Defendants in this Action.  Approving the Settlements here provides the Class with a substantial, immediate concrete benefit and avoids the protracted risks and uncertainties inherent in this long-running case.

By any measure, the $210 million recovery represents an excellent result and if approved, will provide substantial relief for the Class.  This relief is particularly noteworthy because it accounts for nearly 40% of the Class's maximum likely recoverable damages, an amount that dwarfs the median recovery in the Third Circuit of 2.4% of damages.[2]  Lead Plaintiffs were able to secure these remarkable Settlements due to their relentless efforts over the course of nearly eight years of hard-fought litigation. These efforts included deposing over two dozen fact witnesses across the country, the review and analysis of millions of lengthy and highly complex documents, years of motion practice – including successfully compelling the Federal Reserve and the Office of Thrift Supervision to produce documents subject to the regulatory and bank examination privileges – and closely consulting with some of the nation's most highly sought-after and respected academics and experts on a range of highly complex topics.

Notably, Lead Plaintiffs secured these Settlements independently from the verdicts rendered in

---

[1] The Settlements are embodied in two Stipulations: the May 15, 2018 Stipulation and Agreement of Settlement with Wilmington Trust Defendants and Underwriter Defendants, setting forth an agreement to settle claims against the Wilmington Trust Defendants and Underwriter Defendants for $200 million (attached as Ex. 1 to Lead Plaintiffs' Motion), and the May 25, 2018 Stipulation and Agreement of Settlement with KPMG, setting forth an agreement to settle claims against KPMG for $10 million (attached as Ex. 2). All capitalized terms used herein that are not otherwise defined herein shall have the meanings provided in these Stipulations.
[2] Cornerstone Research, *Securities Class Action Settlements: 2017 Review and Analysis*, at 19-20 (2018) (median recovery of damages in Third Circuit from 2008-2017 was 2.4% while median recovery of damages against financial institutions was 2.0%).

*United States v. Wilmington Trust Corp.*, No. 15-cr-23 (D. Del.) (the "Criminal Action"), for alleged wrongdoing occurring over a far longer time span and encompassing a significantly larger number of issues and defendants than the Criminal Action.  For example, the Class Period in this Action begins in January 2008 – nearly two years prior to the conduct charged in the Criminal Action. Moreover, throughout this significantly longer period, Lead Plaintiffs alleged a course of fraudulent conduct based not just on the Bank's practice of waiving past due loans that was the focus of the Government's case, but also principally on the Bank's materially understated allowance for loan and lease losses ("ALLL"), outdated appraisals, and illicit use of the ten percent rule and other forms of supplemental financing to inflate loan risk ratings and disguise the true health of the Bank's commercial loan portfolio.  Much of the Criminal Trial was not relevant to these issues.

Based upon their experience, their evaluation of the facts and the applicable law, their recognition of the substantial amount of the Settlement, and of the risk and expense of protracted litigation against Defendants, Lead Counsel and Lead Plaintiffs submit that the proposed Settlements are an excellent result and in the best interests of the Class, and ask that the Court enter the proposed Preliminary Approval Order attached to Lead Plaintiffs' Motion (Ex. 3).  Entry of the Preliminary Approval Order will cause a notice of the Settlement's terms and conditions to be sent to investors who are believed to be members of the Class. A final approval hearing (the "Settlement Fairness Hearing") will then be conducted so that the Settling Parties may present arguments and evidence for final approval of the proposed Settlements upon a more complete record. The Court will then make a final determination as to whether the Settlements are fair, reasonable, and adequate. The proposed Preliminary Approval Order will, among other things:

(i)     preliminarily approve the terms of the Settlements set forth in the Stipulations;

(ii)    approve the form and content of the Settlement Notice, Claim Form, and Summary Settlement Notice attached as Exhibits 1, 2, and 3 to the Preliminary Approval Order;

(iii)   find that the procedures established for distribution of the Settlement Notice and Claim

Form and publication of the Summary Settlement Notice constitute the best notice practicable under the circumstances, and comply with the requirements of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and all other applicable law and rules; and

(iv)    schedule the Settlement Fairness Hearing and set a schedule and procedures for: disseminating the Settlement Notice and Claim Form and publishing the Summary Settlement Notice; submitting papers in support of final approval of the Settlements and Plan of Allocation and Lead Counsel's application for attorneys' fees and Litigation Expenses; and objecting to the Settlement, Plan of Allocation, and/or Lead Counsel's fee and expense application.

## II.    BACKGROUND OF THE ACTION

### A.    The Court Appoints Lead Plaintiffs and Lead Counsel, and Denies the Defendants' Multiple Motions to Dismiss

This Action began on November 18, 2010, with a complaint styled *Pipefitters Local 537 Annuity Fund v. Wilmington Trust Corp., et al.*, No. 10-cv-990. Following briefing and pursuant to the PSLRA, the Court consolidated the various actions under the caption *In re Wilmington Trust Securities Litigation*, appointed Merced County Employees' Retirement Association, the Coral Springs Police Pension Fund, the St. Petersburg Firefighters' Retirement System, the Pompano Beach General Employees Retirement System, and the Automotive Industries Pension Trust Fund as Lead Plaintiffs and Bernstein Litowitz Berger & Grossmann LLP and Saxena White P.A. as Lead Counsel. D.I. 26.

On behalf of Lead Plaintiffs and the then-putative Class, Lead Counsel immediately began conducting a thorough investigation for their forthcoming amended complaint that included, among other things, a review and analysis of: (i) Wilmington Trust's public filings with the SEC; (ii) research reports by securities and financial analysts; (iii) transcripts of the Bank's earnings conference calls; (iii) economic analysis of the price movement in Wilmington Trust common stock; and (iv) interviews with dozens of potential witnesses. Before the Government's criminal investigations had even begun (to Lead Plaintiffs' knowledge), Lead Plaintiffs identified facts that they believed showed rampant misconduct relating to Wilmington Trust's loan-underwriting practices, including misuse of the so-

called ten percent rule and manipulation of the Bank's asset review process. Lead Plaintiffs also identified what they allege to be numerous violations of GAAP with respect to the methodology and calculation of the Bank's ALLL. Importantly, Lead Plaintiffs also independently discovered that the Federal Reserve (as well as KPMG and Wilmington Trust's internal audit group) had repeatedly criticized the Bank's practices for years, leading to the Federal Reserve imposing a Memorandum of Understanding ("MOU") on the Bank in late 2009.

On May 16, 2011, Lead Plaintiffs filed their Consolidated Securities Class Action Complaint. D.I. 39. Briefing ensued on Defendants' motions to dismiss and, on March 29, 2012, the Court dismissed the complaint for failure to plead falsity. D.I. 85. Lead Plaintiffs renewed their investigative efforts, including interviewing additional potential witnesses, and filed their Second Amended Consolidated Securities Class Action Complaint ("SAC") on May 10, 2012. D.I. 88. With the Consolidated Complaint dismissed and no guarantee that SAC would survive the inevitable motions to dismiss, the parties agreed to mediate in June 2012 before the Hon. Daniel Weinstein (Ret.). Judge Weinstein is a retired judge and a nationally recognized and highly respected mediator who has mediated hundreds of securities fraud and other highly complex cases. This mediation was unsuccessful, however, because there was no proposed resolution of the claims at that time that could compensate the Class and be in the Class's best interests.

In the wake of the failed mediation, Defendants moved to dismiss the SAC, which Lead Plaintiffs opposed. Before briefing was complete, two affidavits executed by FBI Special Agents in connection with the FBI's investigation into Wilmington Trust and one of its largest customers were unsealed. Lead Plaintiffs believed that the facts in these affidavits corroborated the allegations detailed in the SAC, and Lead Plaintiffs moved to amend the SAC on December 7, 2012. D.I. 117.

The Court granted Lead Plaintiffs' motion, and the Third Amended Consolidated Securities Class Action Complaint ("TAC") was filed on January 9, 2013. D.I. 120. Once again, Defendants

moved to dismiss and Lead Plaintiffs opposed. This time, before briefing on the motions was complete, a criminal information against a senior Bank employee and his subsequent guilty plea were unsealed in the case *United States v. Joseph Terranova*, 13-cr-39 (D. Del.). Lead Plaintiffs believed that Terranova's guilty plea further corroborated the facts gleaned from Lead Plaintiffs' investigation, including abuses of the ten percent rule and other systemic loan underwriting deficiencies. Lead Plaintiffs moved to amend the TAC on June 7, 2013. The Court granted this motion, and Lead Plaintiffs filed their Fourth Amended Consolidated Securities Class Action Complaint ("FAC") on June 13, 2013. D.I. 149. The FAC is the operative complaint.

The FAC alleged claims for violations of Sections 10(b) and 20(a) of the Exchange Act, and Sections 11, 12(a)(2), and 15 of the Securities Act against Wilmington Trust, its senior officers, Board of Directors, outside auditor KPMG, and the two underwriters of its February 2010 secondary offering, J.P. Morgan Securities and Keefe, Bruyette & Woods. The FAC alleged a scheme whereby the Wilmington Trust Defendants allegedly fraudulently concealed billions of dollars of past due and maturing loans by waiving their contractual terms and extending their maturities so that the loans were no longer considered past due (the "Waiver Practice"). The FAC alleges that the Bank was forced to waive these loans because of its deficient loan underwriting and asset review practices, which failed to properly assess and monitor the risk that these loans posed to the Bank. Then, when borrowers fell behind in their payments, Plaintiffs allege that the Bank would often improperly extend interest reserves or other forms of supplemental financing – essentially, a loan to cover the loan payments that were not being paid. As a result of these practices, the FAC alleges that the Bank also materially understated its ALLL.  The ALLL is an important financial metric that was supposed to absorb losses from loans that the Bank had written off. Because the ALLL is inversely related to the Bank's net income on a dollar-for-dollar basis, Lead Plaintiffs alleged that Wilmington's materially understated reserve also resulted in materially overstated net income.

The FAC alleges that on November 1, 2010, Wilmington shocked the market by revealing that it had dramatically overstated the quality of its loan portfolio, that the Bank could no longer survive as an independent entity, and, as a result, would have to be sold to M&T for half of the preceding day's share price. After extensive briefing, on March 20, 2014, the Court largely denied the Defendants' multiple motions to dismiss the FAC. D.I. 184, 185.

**B.     Discovery Begins and Lead Plaintiffs Move to Compel the Production of Millions of Pages of Documents**

After the Court sustained the FAC on March 20, 2014, Lead Plaintiffs immediately sought a schedule that would allow a speedy discovery process and resolution of the Action. On May 19, 2014, the Court entered the joint Scheduling Order (the "May 19 Order"), which required the substantial completion of document discovery by October 17, 2014, allowed fact witness depositions to begin on September 8, 2014, and set December 19, 2014 as the deadline for fact discovery. D.I. 197.

Lead Plaintiffs served document requests on all Defendants in mid-April (D.I. 192, 193, 194, 195), and Defendants responded in kind. The May 19 Order also required Defendants to produce documents previously produced to any government entities by May 12, 2014. However, Defendants subsequently informed Lead Plaintiffs that Defendants would withhold documents potentially subject to the bank examination privilege pending approval of their production by the Federal Reserve and three other Federal and State regulators. In June and July of 2014, Lead Plaintiffs submitted formal administrative requests to the regulators to waive the bank examination privilege, all of which were denied. Lead Plaintiffs then moved to compel production of all documents subject to the bank examination privilege on August 5, 2014 (D.I. 233), and oral argument was held on November 4, 2014. Subsequent to oral argument, Magistrate Judge Fallon held a series of status conferences and status update submissions that occurred over the course of over two years, and included the *in camera* review of a number of purportedly privileged documents by the Court. On August 16, 2016, Magistrate Judge Fallon issued a sealed Report and Recommendation largely granting Lead Plaintiffs' motion to compel

(D.I. 459), which Judge Robinson adopted in whole (D.I. 460). Lead Plaintiffs successfully moved to unseal the Report and Recommendation on June 7, 2017. D.I. 670. The documents produced as a result of Lead Plaintiffs' motion provided critical evidence in support of their claims.

In addition, Lead Plaintiffs' document requests resulted in a series of extensive meet-and-confers with all Defendants regarding the scope, timing, and manner of production of documents not withheld subject to the asserted bank examination privilege. These meet-and-confers (along with others arising from assertions of the bank examination privilege) led to a series of discovery status conferences with the Court. Ultimately, Lead Plaintiffs secured Defendants' agreement to search the files of dozens of custodians for responsive documents. Additionally, as part of this discovery process, Lead Plaintiffs also conducted a Rule 30(b)(6) deposition on October 8, 2014, of a witness from M&T who was responsible for integrating Wilmington Trust's email systems after the acquisition.

Lead Plaintiffs immediately began to review and analyze the millions of pages of documents that Defendants produced. Lead Plaintiffs worked thoroughly and efficiently to identify a list of potential deponents, and consulted with their experts on the highly technical and complex issues including GAAP accounting and ALLL, loan underwriting and risk ratings, GAAS, and causation and damages. In September 2014, Lead Plaintiffs sent Defendants a list of twenty-three fact witnesses that Lead Plaintiffs intended to begin deposing in October 2014. On October 6, 2014 and October 24, 2014, Lead Plaintiffs filed Notices of Deposition with the Court (D.I. 290, 328).

### C.      Lead Plaintiffs Fight to Advance the Class's Case in the Face of the Government's Multiple Requests to Stay the Action

Before Lead Plaintiffs could begin depositions, on October 10, 2014, the Government moved to intervene and stay this Action due to its ongoing criminal investigation. D.I. 297. Lead Plaintiffs opposed the stay (D.I. 331), but the Government's motion remained pending until April 8, 2015, when it was terminated as moot. By operation of Local Rule 30.2, Lead Plaintiffs were not able to depose any fact witnesses during this period (or any period during which a motion to stay Lead Plaintiffs' discovery

was pending).

Despite being unable to depose witnesses, Lead Plaintiffs continued to prosecute their case. First, Defendants continued to produce documents responsive to Lead Plaintiffs' requests long after the October 2014 cutoff for substantial completion of document discovery under the May 19 Order. Lead Plaintiffs continued to analyze these incoming productions and consult with their experts, which raised additional issues concerning the scope and timing of Wilmington Trust's productions and necessitated additional meet-and-confers with the Bank. As a result of Lead Plaintiffs' persistence, Wilmington Trust identified and acknowledged a significant error in its document production and between May 2015 and October 2015 (*i.e.*, eight months after the original deadline for the substantial completion of document production), produced an additional 1.4 million pages of documents to Lead Plaintiffs. D.I. 408. Lead Plaintiffs immediately began analyzing these documents as they were produced.

Second, Lead Plaintiffs moved for class certification on September 14, 2014. D.I. 259. In conjunction with their motion, Lead Plaintiffs submitted the Expert Report of Professor S.P. Kothari on issues of market efficiency, reliance, and damages. Professor Kothari is the Gordon Y Billard Professor of Accounting and Finance at the MIT Sloan School of Management, and is a nationally recognized and widely respected academic and expert. Lead Plaintiffs collectively produced thousands of pages of documents in response to Defendants' document requests, which Lead Counsel also had to closely review and analyze. Lead Counsel defended the Rule 30(b)(6) depositions of each Lead Plaintiff, as well as the expert deposition of Prof. Kothari in connection with class certification proceedings.

Shortly after Lead Plaintiffs filed their reply papers in support of class certification, Defendants moved to strike portions of the reply and the entirety of Prof. Kothari's supplemental report submitted alongside the reply (D.I. 366), which Lead Plaintiffs opposed (D.I. 368). Judge Robinson held oral argument on the class certification motion and motion to strike on June 29, 2015. On September 3, 2015, the Court granted Lead Plaintiffs' class certification motion in full, certified a class of damaged

investors, Lead Plaintiffs as Class Representatives, and Lead Counsel as Class Counsel. D.I. 405, 406.

On January 15, 2016, the Court approved the form and dissemination of the Notice of Pendency of Class Action (the "Class Notice") to notify potential Class Members of, among other things: (i) the Action pending against Defendants; (ii) the Court's certification of the Action to proceed as a class action on behalf of the Class; and (iii) Class Members' right to request to be excluded from the Class, the effect of remaining in the Class or requesting exclusion, and the requirements for requesting exclusion. D.I. 429. The Class Notice provided Class Members with the opportunity to request exclusion from the Class and set forth procedures for doing so. The Class Notice informed Class Members that if they chose to remain in the Class, they would "be bound by all past, present and future orders and judgments in the Action, whether favorable or unfavorable." *Id.*[3] The deadline for mailing any requests for exclusion from the Class was June 13, 2016, and 8 requests for exclusion from the Class were received in connection with the dissemination of the Class Notice. *Id.* Those persons and entities who requested exclusion from the Class are listed on Appendix 1 to the Stipulation.

When the Government's motion to stay the case was terminated as moot on April 8, 2015, Lead Plaintiffs again attempted to schedule depositions. On May 6, 2015, however, the Government indicted Defendants North and Rakowski. In light of these indictments and the Government's ongoing criminal investigation, the Court again stayed the case before Lead Plaintiffs were able to take any depositions. D.I. 397. The Government then indicted Defendants Harra and Gibson on August 5, 2015.

In a September 30, 2015 Status Report, Lead Plaintiffs requested that the stay be lifted and that all depositions commence by November 1, 2015. D.I. 408. On October 13, 2015, the Court lifted the stay, except as to depositions of the Criminal Defendants and former Wilmington Trust employees

---

[3] The Court-approved Notice Administrator, Epiq Class Action & Claims Solutions, Inc. ("Epiq"), ultimately mailed over 65,600 copies of the Class Notice to potential Class Members, beginning on March 1, 2016.  D.I. 457.  In addition, Epiq made the Class Notice available on a website developed for the Action and arranged for the publication the Summary Notice of Pendency of Class Action in the *Investor's Business Daily* and over the *PR Newswire*.  D.I. 453.

Joseph Terranova and Brian Bailey, who had pled guilty and were awaiting sentencing. D.I. 409. Lead Plaintiffs again reminded Defendants of the fact witnesses they intended to depose. But before Lead Plaintiffs could depose a single witness, the Government moved to stay the case yet again. D.I. 415. Lead Plaintiffs opposed this motion (D.I. 422) but the Court stayed the case (D.I. 423).

On January 6, 2016, the Government indicted Wilmington Trust and filed a Third Superseding Indictment naming Harra, Gibson, North, Rakowski, and Wilmington Trust itself. Focusing on the Waiver Practice, the Third Superseding Indictment charged a series of offenses beginning in the third quarter of 2009. Following Court-ordered status reports and supplemental status reports submitted in March and April 2016, and Lead Plaintiffs' vigorous attempts to lift the stay, the Court stayed the case pending the resolution of the criminal action. D.I. 454.

### D.      The Court Lifts the Stay and Lead Plaintiffs Complete Discovery

On September 19, 2016, Lead Plaintiffs moved to partially lift the stay, except as to the six individuals under criminal indictment. D.I. 461. The basis for doing so was that the trial in the criminal action was delayed for a second time and for a period of nearly 10 months, and that the delay would prejudice the certified Class in this Action. *Id*. Following extensive briefing and fierce opposition from Defendants, on December 19, 2016, the Court lifted the stay "in its entirety." D.I. 488 (the "Lift Stay Order"). The parties were unable to agree on a discovery schedule going forward and, on January 19, 2017, the Court heard over two hours of oral argument on competing scheduling motions. On January 24, 2017, the Court denied Defendants' protective order motions as moot, and ordered that all fact discovery, including that of the Criminal Defendants, must end by June 1, 2016. D.I. 509.

Lead Plaintiffs immediately noticed depositions on February 21 and 22, 2017. D.I. 522, 526. The Criminal Defendants, however, attempted to invoke the Fifth Amendment's privilege against self-incrimination to avoid being deposed by simultaneously filing a Notice of Appeal with the Third Circuit and motions for interlocutory appeal and to stay pending appeal in this Court. D.I. 513, 514, 515. Lead

Plaintiffs opposed both motions in this Court, and moved to dismiss the Notice filed in the Third Circuit for lack of jurisdiction. On June 14, 2017, the Third Circuit dismissed the Notice (D.I. 692), while this Court denied the motion for interlocutory appeal and the motion to stay on June 26, 2017 (D.I. 706). The Criminal Defendants then moved for reconsideration of this Court's June 26, 2017 Order, which Lead Plaintiffs opposed, and also for *en banc* review of the Third Circuit's June 14 dismissal. The Third Circuit denied the Criminal Defendants' request on July 11, 2017, and while the Criminal Defendants' reconsideration motion was pending in this Court, Lead Plaintiffs moved for relief from Local Rule 30.2, which the Criminal Defendants had argued prevented their depositions from occurring while their motion was pending.  D.I. 747.  On July 28, 2017, the Court denied the Criminal Defendants' motion. D.I. 750. While Lead Plaintiffs had been seeking deposition dates from the Criminal Defendants throughout this drawn-out process, the Court's Order denying their motion allowed Lead Plaintiffs to immediately confirm and notice their depositions. D.I. 754, 755, 756, 757.

Including the Criminal Defendants, Lead Plaintiffs deposed 28 important fact witnesses, generating tens of thousands of pages of testimony and hundreds of pages of exhibits. These depositions took place in six states and required an enormous outlay of time and expenses on the part of Lead Counsel to successfully complete. In addition to taking these depositions, Lead Plaintiffs engaged in extensive questioning of the witnesses noticed by Defendants (including the depositions of Lead Plaintiffs' investment advisors). Throughout the deposition process, Lead Plaintiffs worked closely with their experts to gather the highly technical evidence needed to prevail on their claims.  Moreover, Lead Plaintiffs worked diligently with their experts on the drafts of several detailed and fact-intensive expert reports, each of which were scheduled to be served in January 2018, a date that was extended in December 2017 to May 2018 to account for the postponed Criminal Trial.

### E.    Lead Plaintiffs and Defendants Reach a Settlement

Under the terms of the operative Scheduling Order (D.I. 805), no deadlines occurred in this

Action during the trial in the Criminal Action (which commenced on March 12, 2018) or in the period immediately preceding it. During this time, in the fall of 2017, Lead Plaintiffs, the Wilmington Trust Defendants, and the Underwriter Defendants began discussing terms upon which they could mutually agree to settle this Action. These discussions resulted in a settlement whereby Wilmington Trust would pay $200,000,000 in cash to resolve all claims against the Wilmington Trust and Underwriter Defendants. A Term Sheet outlining the basic components of the settlement was signed on April 9, 2018, and after additional negotiations, the parties signed a Stipulation on May 15, 2018.

At the time that the Term Sheet and Stipulation were signed, KPMG was not part of the settlement, and Lead Plaintiffs were preparing to begin expert discovery against the auditor. After extensive additional negotiations, Lead Plaintiffs and KPMG reached an agreement on May 21, 2018 whereby KPMG would pay $10,000,000 to resolve all claims against it.  Lead Plaintiffs and KPMG executed a Stipulation on May 25, 2018.

With the two executed Stipulations, Lead Plaintiffs have agreed to settle all claims against all Defendants in this Action, subject to this Court's approval.

## III.    ARGUMENT

### A.    The Proposed Settlements Warrant Preliminary Approval

#### 1.    The Third Circuit Favors Settlement

The Third Circuit has long favored the settlement of class action litigation. *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010) ("Settlement agreements are to be encouraged because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts"); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004).

Federal Rule of Civil Procedure 23(e) requires judicial approval for the compromise of class actions. Approval of a class action settlement involves a two-step process. First, the Court reviews the proposed terms of the settlement for a preliminary fairness evaluation. *See* MANUAL FOR COMPLEX

LITIGATION, FOURTH § 21.632 (2004). The second step is to conduct a formal fairness and final approval hearing after notice has been disseminated to Class members. *Id.*; *see also Jones v. Commerce Bancorp, Inc.*, 2007 WL 2085357, at *2 (D.N.J. July 16, 2007) ("Review of a proposed class action settlement is a two-step process: preliminary approval and a subsequent fairness hearing.").

A court's review for preliminary approval is less stringent than for final approval. *See Mehling v. New York Life Ins. Co.*, 246 F.R.D. 467, 472 (E.D. Pa. 2007); David F. Herr, ANNOTATED MANUAL FOR COMPLEX LITIGATION, FOURTH § 21.662 (2015) ("At the stage of preliminary approval, the questions are simpler, and the court is not expected to, and probably should not, engage in analysis as rigorous as is appropriate for final approval"). Indeed, "[p]reliminary approval is appropriate where the proposed settlement is the result of the parties' good faith negotiations, there are no obvious deficiencies and the settlement falls within the range of reason." *Smith v. Prof'l Billing & Mgmt. Servs., Inc.*, 2007 WL 4191749, at *1 (D.N.J. Nov. 21, 2007).

Lead Plaintiffs respectfully request that the Court take the first step in the settlement approval process and grant preliminary approval of the Settlements so that notice of the Settlements can be given to the Class. As summarized below, and as will be set forth in detail in a subsequent motion for final approval of the Settlements, the Settlements are the product of arm's-length negotiations and provide a substantial benefit to the Class. Thus, Lead Plaintiffs respectfully submit that the Settlements satisfy the requirements for preliminary approval.

> **2.      The Settlements are the Result of Good Faith, Arm's-Length Negotiations Conducted by Well-Informed and Experienced Counsel**

The Settlements are the product of arm's-length negotiations between well-informed and experienced counsel that was agreed to only after extensive fact and expert discovery, which was detailed above. *See Schuler v. Medicines Co.*, 2016 WL 3457218, at *7 (D.N.J. Jun. 23, 2016) (noting that "Lead Counsel had ample information to evaluate the prospects for the Class and to assess the fairness of the Settlement" where it had reviewed publicly-available information, conducted an

extensive investigation, consulted with an expert, drafted the initial and amended complaints, briefed an opposition to defendants' motion to dismiss, and engaged in mediation). Accordingly, Lead Plaintiffs had a more than adequate basis for assessing the strengths and weaknesses of the Class's claims and Defendants' defenses when they entered into the Settlements.

Lead Counsel here, Bernstein Litowitz Berger & Grossmann and Saxena White, are each highly experienced securities litigation firms with attorneys who have served as lead class counsel in numerous complex actions and collectively recovered billions of dollars for investors during their respective careers. As Lead Counsel, their judgment that the settlements are fair and reasonable is entitled to considerable weight. *See Alves v. Main*, 2012 WL 6043272, at *22 (D.N.J. Dec. 4, 2012) ("[C]ourts in this Circuit traditionally attribute significant weight to the belief of experienced counsel that settlement is in the best interest of the class.") (internal quotations omitted).[4]

### 3. The Substantial Benefits for the Class, Weighed Against Litigation Risks, Support Preliminary Approval

The proposed Settlements create a cash recovery of $210 million that provides a substantial benefit to the Class in light of the risks posed by continued litigation. While consideration of the requirements for final approval is not required at this stage, "it is important to consider the final approval factors [at the preliminary approval] stage in order to identify any issues that could impede [final approval]." *Singleton v. First Student Mgmt. LLC*, 2014 WL 3865853, at *5 (D.N.J. Aug. 6, 2014). Those factors are:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

---

[4] *See also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 543 (D.N.J. 1997); *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 240 (D.N.J. 2005) ("Class Counsel's approval of the Settlement also weighs in favor of the Settlement's fairness."); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 543 (D.N.J. 1997) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (court is "entitled to rely upon the judgment of experienced counsel for the parties")), *aff'd*, 148 F.3d 283 (3d. Cir. 1998).

(3) stage of the proceedings and the amount of discovery completed;

(4) risks of establishing liability;

(5) risks of establishing damages;

(6) risks of maintaining the class action through the trial;

(7) ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975). All of the relevant factors here strongly favor approval of the Settlements.

The first *Girsh* factor, the complexity, expense and likely duration of the litigation, strongly supports approval. This case is extraordinarily complex and turns on highly technical banking and accounting issues. Having been already litigated for nearly eight years, it would undoubtedly require at least another year of hard-fought litigation (including expert discovery and summary judgment) before trial, to say nothing of the inevitable post-verdict motions and appeals. Indeed, absent settlement, this case is unlikely to conclude for at least several more years.

Because the Settlements have not yet been presented to the Class, the second *Girsh* factor (the reaction of the Class), is not yet ripe. Plaintiffs note, however, that the five institutional investor Lead Plaintiffs and Class Representatives believe the Settlements are an excellent result for the Class.

The third *Girsh* factor requires the Court to "consider the 'degree of case development that Class Counsel have accomplished prior to Settlement,' including the type and amount of discovery already undertaken." *In re Merck & Co., Inc. Vytorin ERISA Litig.*, 2010 WL 547613, at *7 (D.N.J. Feb. 9, 2010) (quoting *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995)). "[U]nder this factor the Court considers whether the amount of discovery completed in the case has permitted 'counsel [to have] an adequate appreciation of the merits of the case before negotiating.'"

*Id.* at *29 (alteration in original). This factor weighs heavily in favor of approval here. As described above, Lead Plaintiffs and Lead Counsel engaged in extensive briefing on the pleadings (including four amended complaints) and other motion practice, as well as fact and expert discovery over nearly eight years. This unparalleled understanding assisted Lead Plaintiffs and Lead Counsel in evaluating the proposed Settlements in light of the relative strengths and weaknesses of the case.

The fourth, fifth, and sixth *Girsh* factors (risks of establishing liability, damages, and maintaining the class action through trial) are appropriately considered together for purposes of preliminary approval. *Singleton*, 2014 WL 3865853, at *6. While Lead Plaintiffs believe the case is strong, there are significant risks to the Class, including by way of likely dispositive motions, possible pitfalls at trial, risk of appeal, and risks associated with the continued delay of a case that has been pending for nearly eight years. For example, while Lead Plaintiffs believe that convictions in the Criminal Action are helpful, they are not dispositive because this Action is far broader in scope than the Criminal Action and covers a much larger time period. The Class Period here begins on January 18, 2008 – nearly two years earlier than the charged conduct in the Criminal Action – and the FAC includes a host of alleged misstatements and detailed allegations concerning the Bank's ALLL, GAAP accounting, GAAS, loan risk ratings, outdated appraisals, illicit use of the ten percent rule and other supplemental financing, and loan underwriting standards that were not charged in the Criminal Action. This Action also asserts claims against KPMG, whose auditors testified for the Government in its criminal case against the Criminal Defendants.   The majority of damages allegedly suffered by the Class are attributable to the alleged conduct that occurred before the period of time encompassed by the Criminal Action. Accordingly, Lead Plaintiffs and Lead Counsel could not simply rely on guilty verdicts, even if such verdicts were returned before the Settlements were secured. Moreover, the fact that the Government chose not to charge this conduct for this period (or to charge other Defendants) suggests that it could not prove the criminal conduct at trial; the risk exists that a civil jury could

16

similarly conclude that Lead Plaintiffs could not establish fraudulent conduct in 2008 and 2009. Moreover, Lead Plaintiffs secured the settlement against the Wilmington Trust and Underwriter Defendants at the outset of the Criminal Trial, during which time a very real risk existed that the jury could have returned verdicts of not guilty for the criminal defendants.

In addition, Lead Plaintiffs faced substantial risks to establishing causation and damages. Defendants would have argued, as they have done since the pleading stage, that the Bank's share price decline was caused by the Great Recession and its lingering effects, not by disclosures correcting the false statements regarding the topics and issues referenced above. Additionally, KPMG argued that its own liability for both Section 10(b) and 11 claims should have been offset by the proportion of fault of the convicted executives (and the other Defendants). While Lead Plaintiffs believe that they would have ultimately prevailed on their causation and damages arguments, the Settlements eliminate the risks that the Class could have recovered substantially less.

Notwithstanding these significant risks, Lead Plaintiffs recovered nearly 40% of the Class's maximum likely recoverable damages.[5] As courts in this Circuit have explained, "courts approving settlements should determine a range of reasonable settlements in light of the best possible recovery (the eighth *Girsh* factor) and a range in light of all the attendant risks of litigation (the ninth factor)." *In re Schering-Plough/Merck Merger Litig.*, 2010 WL 1257722, at *12 (D.N.J. Mar. 26, 2010). As a percentage of maximum provable damages, this recovery far outstrips the range of approved settlements. *See Nichols v. Smithkline Beecham Corp.,* 2005 WL 950616, at *20 (E.D. Pa. Apr. 22, 2005) (approving settlement between 9.3% and 13.9% of alleged damages as consistent with those approved in other complex class action cases); *see also* Cornerstone Research, *Securities Class Action Settlements: 2017 Review and Analysis*, at 19-20 (2018) (median recovery of damages in Third Circuit from 2008-2017 was 2.4% while median recovery of damages against financial institutions nationwide

---

[5] The Class's maximum possible damages were offset by the Government's $44 million recovery from Wilmington Trust, which Lead Plaintiffs expect the Government to distribute to Bank shareholders.

was 2.0%).

In sum, these Settlements achieve for the Class a dollar value higher than what Plaintiffs believe are the most closely analogous securities fraud cases involving comparable facts, and similarly sized defendants. When weighed against the time, expense and potential risk of further litigation, including an adverse ruling on summary judgment or *Daubert*, or losing at trial, the Settlements are a reasonable resolution that gives Class members certain recovery.[6]

## B.    Notice to the Class Should Be Approved

"The court must direct notice in a reasonable manner to all class members who would be bound by the [proposed settlement]." Fed. R. Civ. P. 23(e)(1). "[W]ithin the limits of practicability notice must be such as is reasonably calculated to reach interested parties." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 318 (1950). With respect to a notice's form and content, courts have held that notice requires only a general summary of the case and not detailed specifics. *Varacallo*, 226 F.R.D. at 227 (notice requires only a general summary of the case, not detailed specifics); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 253 (D. Del. Aug. 30, 2002) (notice must only describe the case in general terms and is not expected to be a complete source of information). Thus, the class notice must simply inform class members "of the existence of the class action, the requirements for opting out of the class and/or entering an appearance with the court, and the applicability of any final judgment to all members who do not opt out of the class." *Prudential Ins. Co.*, 148 F.3d at 326.

The proposed Settlement Notice is the second official notice that potential Class Members will have received concerning the Action. The Settlement Notice will be mailed to all Class Members who

---

[6] As to the last remaining *Girsh* factor, whether the Defendants could pay more does not make these extraordinary Settlements otherwise unreasonable.  *See Henderson v. Volvo Cars of N. Am., LLC*, 2013 WL 1192479, at *11 (D.N.J. Mar. 22, 2013) ("Plaintiffs acknowledge that 'there is currently no indication that Volvo here would be unable to withstand a more significant judgment,' but 'to withhold approval of a settlement of this size because it could withstand a greater judgment would make little sense where the [settlement agreement] is within the range of reasonableness and provides substantial benefits to the Class.'") (citing cases).

can be identified through reasonable effort, including through using the mailing list for the Class Notice, and includes all of the information required by the PSLRA, as well as additional information.[7] The Settlement Notice advises Class Members of the essential terms of the Settlements and Plan of Allocation and provides information regarding Lead Counsel's motion for attorneys' fees and reimbursement of Litigation Expenses. The Settlement Notice will also provide specifics on the date, time, and place of the Settlement Fairness Hearing and set forth the procedures, as well as deadlines, for objecting to the Settlements, the proposed Plan of Allocation and/or the motion for attorneys' fees and reimbursement of Litigation Expenses, and for submitting a Claim Form. The Preliminary Approval Order will also require Epiq to cause the Summary Notice to be published once in *Investor's Business Daily* and to be transmitted once over *PR Newswire*. Lead Counsel will also cause a copy of the Settlement Notice and Claim Form to be available for downloading from the website for this Action, www.WilmingtonTrustSecuritiesLitigation.com.

In light of the extensive Class Notice previously provided, and the ample opportunity provided to Class Members to request exclusion from the Class at that time, Lead Plaintiffs respectfully submit that no second opportunity should be provided for Class Members to request exclusion, and the proposed Settlement Notice does not provide for a second opportunity. *See, e.g., Denney v. Deutsche Bank AG*, 443 F.3d 253, 271 (2d Cir. 2006) (holding that the Court is "under no obligation" to grant a second opt-out period pursuant to Rule 23(e)(4) and that decision is "confided to the [district] court's discretion"); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114-15 (2d Cir. 2005). As

---

[7] The Settlement Notice satisfies the PSLRA's disclosure requirements by, *inter alia*, stating*: (i) the amount of the Settlements determined in the aggregate and on an average per share basis; (ii) that the Settling Parties do not agree on the average amount of damages per share that would be recoverable in the event Lead Plaintiffs prevailed, and stating the issues on which the Settling Parties disagree; (iii) the name, telephone number, and address of Lead Counsel who will be available to answer questions concerning any matter contained in the Settlement Notice; (iv) the reasons why the Settling Parties are proposing the Settlements; and (v) that Lead Counsel intend to make an application for an award of attorneys' fees and expenses (including the amount of such fees and expenses determined on an average per share basis). *See* 15 U.S.C. §§ 77z-1 (a)(7)(A)-(F), 78u-4(a)(7).

discussed above, pursuant to the Court's January 15, 2016 Order, the Class Notice provided Class Members with the opportunity to request exclusion, explained that right, and set forth the deadlines and procedures for doing so. The Class Notice also informed Class Members that if they chose to remain a member of the Class, they would "be bound by all past, present and future orders and judgments in the Action, whether favorable or unfavorable."

The form and manner of providing notice to the Class satisfy the requirements of due process, Rule 23, and the PSLRA. The Settlement Notice and Summary Settlement Notice "provide[] all of the required information concerning the class members' right[s] and obligations under the settlement." *Prudential*, 148 F.3d at 328. The manner of providing notice, which includes individual notice by mail to all Class Members who can be reasonably identified, represents the best notice practicable under the circumstances and satisfies the requirements of due process and Rule 23. *See Bernhard*, 2009 WL 3233541, at *5 ("the proposed distribution of notice to class members by first class mail is reasonable because no alternative method of distribution is more likely to notify class members").

## C.  Proposed Schedule of Settlement Events

Lead Plaintiffs propose the schedule set forth in Appendix A for Settlement-related events, determined by the date of the Preliminary Approval Order and the Settlement Fairness Hearing. Lead Plaintiffs request that the Court schedule the Settlement Fairness Hearing 110 calendar days after entry of the Preliminary Approval Order, or at the Court's earliest convenience thereafter.

## IV.  CONCLUSION

For all of these reasons, Lead Plaintiffs respectfully request that the Court enter the proposed Preliminary Approval Order, attached as Exhibit 3 to Lead Plaintiffs' Motion, which will: (i) preliminarily approve the proposed Settlements; (ii) approve the proposed form and manner of notice to Class Members; and (iii) schedule a date and time for the Settlement Fairness Hearing.

Dated: May 25, 2018

Respectfully submitted,

**CHIMICLES & TIKELLIS LLP**

*/s/ Robert J. Kriner, Jr.*
Robert J. Kriner, Jr. (Bar No. 2546)
Vera G. Belger (Bar No. 5676)
222 Delaware Avenue, 11th Floor
P.O. Box 1035
Wilmington, DE 19899
Phone: (302) 656-2500
Fax: (302) 656-9053

*Liaison Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Hannah Ross
Katherine M. Sinderson
Lauren McMillen Ormsbee
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1400
Fax: (212) 554-1444

**SAXENA WHITE P.A.**

Maya S. Saxena
Joseph E. White, III
Brandon T. Grzandziel
Kathryn W. Weidner
150 E. Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone:  (561) 394-3399
Fax: (561) 394-3382

-and –

Steven B. Singer
4 West Red Oak Lane, Suite 312
White Plains, NY 10604
Telephone: (914) 437-8551
Fax: (888) 631-3611

*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*

Appendix A

| Event | Proposed Timing |
|---|---|
| Deadline for mailing the Settlement Notice and Claim Form (Preliminary Approval Order ¶4(a)) | 20 business days after entry of Preliminary Approval Order |
| Deadline for publishing the Summary Settlement Notice (Preliminary Approval Order ¶4(c)) | 10 business days after the Notice Date |
| Deadline for filing of papers in support of final approval of the Settlements and Plan of Allocation and Lead Counsel's application for attorneys' fees and expenses (Preliminary Approval Order ¶22) | 35 calendar days prior to the Settlement Fairness Hearing |
| Deadline for receipt of objections (Preliminary Approval Order ¶13) | 21 calendar days prior to the Settlement Fairness Hearing |
| Deadline for filing reply papers (Preliminary Approval Order ¶22) | 7 calendar days prior to the Settlement Fairness Hearing |
| Settlement Fairness Hearing (Preliminary Approval Order ¶2) | 110 calendar days after entry of the Preliminary Approval Order, or at the Court's earliest convenience thereafter |
| Deadline for submitting Claim Forms (Preliminary Approval Order ¶8) | 120 calendar days after the Notice Date |