# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

IN RE WILMINGTON TRUST
SECURITIES LITIGATION

_____

This document relates to: ALL ACTIONS

Master File No. 10-cv-00990-ER

(Securities Class Action)

Hon. Eduardo Robreno

ELECTRONICALLY FILED

## DECLARATION OF HANNAH ROSS AND JOSEPH E WHITE, III
## IN SUPPORT OF (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
## CLASS ACTION SETTLEMENTS AND PLAN OF ALLOCATION AND (II) LEAD
## COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES
## AND REIMBURSEMENT OF LITIGATION EXPENSES

**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
Hannah Ross (*pro hac vice*)
Katherine M. Sinderson (*pro hac vice*)
Lauren McMillen Ormsbee (*pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1400
Fax: (212) 554-1444
*Counsel for Lead Plaintiffs and Co-Lead
Counsel for the Class*

**CHIMICLES & TIKELLIS LLP**
Robert J. Kriner, Jr. (Bar No. 2546)
Vera G. Belger (Bar No. 5676)
222 Delaware Avenue, 11th Floor
P.O. Box 1035
Wilmington, DE 19899
Phone: (302) 656-2500
Fax: (302) 656-9053
*Liaison Counsel for the Class*

**SAXENA WHITE P.A.**
Maya S. Saxena (*pro hac vice*)
Joseph E. White, III (*pro hac vice*)
Brandon T. Grzandziel (*pro hac vice*)
150 E. Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Phone: (561) 394-3399
Fax: (561) 394-3382

-and-

Steven B. Singer (*pro hac vice*)
10 Bank Street, 8th Floor
White Plains, NY 10606
T: (914) 437-8551
F: (888) 631-3611
*Counsel for Lead Plaintiffs and Co-Lead
Counsel for the Class*

Dated: September 17, 2018

i

## TABLE OF CONTENTS

**Page**

I.     THE OUTSTANDING RECOVERY RECEIVED ........................................................... 1

II.    LEAD PLAINTIFFS' AND CO-LEAD COUNSEL'S PROSECUTION OF THE
       ACTION ........................................................................................................................ 3

       A.     Factual Background of the Action ...................................................................... 3

III.   APPOINTMENT OF LEAD PLAINTIFFS AND LEAD COUNSEL, LEAD
       COUNSEL'S EXTENSIVE INVESTIGATION, AND DEFEATING
       DEFENDANTS' MOTION TO DISMISS ....................................................................... 6

       A.     The Consolidated Securities Class Action Complaint and Related Motion to
              Dismiss Briefing. ............................................................................................... 8

       B.     The Second Amended Consolidated Securities Class Action Complaint and
              Related Motion to Dismiss Briefing. ................................................................ 10

       C.     Third Amended Consolidated Securities Class Action Complaint and Related
              Motion to Dismiss Briefing. ............................................................................. 10

       D.     The Operative Fourth Amended Complaint and Related Motion to Dismiss
              Briefing. ............................................................................................................ 11

IV.    LEAD PLAINTIFFS SUCCESSFULLY CERTIFY THE CLASS ................................ 13

V.     DISCOVERY ................................................................................................................ 18

       A.     Document Discovery ......................................................................................... 20

              1.     Document Requests ................................................................................. 21

              2.     Discovery Disputes ................................................................................. 22

                     a.     Bank Examination Privilege ....................................................... 23

                     b.     Plaintiffs' motion to compel agreed-upon search terms. .............. 25

                     c.     Plaintiffs' Pursuit of 500,000 Unreviewed Documents ............... 26

              3.     Document Review .................................................................................... 27

       B.     Discovery Stays And Delays Imposed As A Result Of The Criminal Action ...... 30

       C.     Depositions ...................................................................................................... 32

|   |   | 1. | The Development and Evolution of Lead Counsel's Deposition Strategy | 32 |

|   |   | 2. | Lead Counsel Fights Defendants' Obstructionism On Depositions | 34 |

|   |   | 3. | Lead Counsel's Preparation for Depositions | 35 |

|   | D. | | Interrogatories And Requests For Admission | 37 |

|   |   | 1. | Lead Plaintiffs' Interrogatories and Requests for Admission. | 37 |

|   |   | 2. | Lead Plaintiffs' Responses to Defendants' Interrogatories | 38 |

| VI. | | | THE COMPLEXITY OF LEAD PLAINTIFFS' CLAIMS NECESSITATED THE EXTENSIVE USE OF EXPERTS AND CONSULTANTS | 39 |

|   |   | 1. | Professor S.P. Kothari | 41 |

|   |   | 2. | Chad W. Coffman | 44 |

|   |   | 3. | Harris L. Devor, CPA | 47 |

|   |   | 4. | Michael J. Clabby | 49 |

|   |   | 5. | James Miller | 52 |

|   |   | 6. | Dr. Charles D. Cowan, Ph.D | 53 |

|   |   | 7. | Patrick Rohan | 54 |

|   |   | 8. | Colliers/Kidder Matthews | 55 |

|   |   | 9. | Other Consulting Experts | 56 |

| VII. | | | SUMMARY JUDGMENT | 57 |

| VIII. | | | THE CRIMINAL TRIAL AGAINST WILMINGTON TRUST AND CERTAIN INDIVIDUAL DEFENDANTS | 58 |

| IX. | | | SETTLEMENT DISCUSSIONS AND AGREEMENT | 60 |

| X. | | | PRELIMINARY APPROVAL | 61 |

|   | A. | | The Court's Request Concerning the Calculation of Maximum Damages | 61 |

| XI. | | | THE SIGNIFICANT RISKS FACED BY LEAD PLAINTIFFS AND LEAD COUNSEL | 62 |

|   |   | 1. | General Risks In Contingency Securities Class Actions | 62 |

| | | 2. | Specific Risks In Prosecuting The Action ................................................ 64 |
| | | | a. | The Difficulty Of Proving Defendants' Liability. ........................ 64 |
| | | | b. | Risks In Proving And Collecting Damages .................................. 65 |
| | | | c. | The Risk And Uncertainty Created By The Criminal Action ....... 67 |
| | | 3. | Given The Risks Facing Lead Plaintiff And Lead Counsel, Settlement Was The Best Result For The Class ....................................................... 68 |
| **XII.** | FEE AND EXPENSE APPLICATION ................................................................... 69 |
| | A. | The Requested Fee is Fair and Reasonable ........................................................... 69 |
| | | 1. | Lead Plaintiffs Have Authorized and Support the Fee Application ......... 69 |
| | | 2. | The Significant Time and Labor Devoted to this Action by Lead Counsel ..................................................................................... 71 |
| | | 3. | The Preeminent Standing and Caliber of Defense Counsel ..................... 72 |
| | | 4. | The Unique Risks and Complexities of Litigating this Action ................ 73 |
| | | 5. | Fee Awards in Similar Cases ................................................................... 76 |
| | | 6. | Reaction of the Class ............................................................................... 76 |
| | B. | Referral Fees ....................................................................................................... 77 |
| | C. | Reimbursement of the Requested Expenses is Fair and Reasonable ................... 77 |
| | D. | Lead Plaintiff Reimbursement ............................................................................ 80 |
| **XIII.** | CONCLUSION ................................................................................................... 82 |

## I.      THE OUTSTANDING RECOVERY RECEIVED

1.      After eight years of hard-fought litigation, Lead Plaintiffs and Lead Counsel have secured an outstanding recovery of $210,000,000.  The Settlements will resolve all claims in this Action against all Defendants, on behalf of those investors who purchased Wilmington Trust common stock between January 18, 2008 up to November 1, 2010, and who were damaged thereby.

2.      If approved, the proposed Settlements will be the second largest securities class action recovery ever obtained in Delaware and will rank among the Third Circuit's top-10 securities fraud class action recoveries.  The $210 million accounts for nearly 40% of the Class's maximum likely recoverable damages, which is eight times greater than the 5% median recovery in the Third Circuit.

3.      This remarkable recovery is the product of eight years of unrelenting effort and advocacy on behalf of the Class by Lead Plaintiffs and Lead Counsel.  After Wilmington Trust announced its acquisition by M&T on November 1, 2010, Lead Counsel began an extensive investigation into the Bank, which further intensified after Lead Plaintiffs were appointed by this Court pursuant to the PSLRA.  This investigation involved contacting more than 80 potential witnesses, and uncovered evidence of fraud relating to issues such as the Bank's underwriting and asset review practices, including the 10% Rule and the systemic waiver of past due loans, its materially understated ALLL, and KPMG's knowledge of the Bank's fraudulent practices.  The misconduct uncovered in this investigation were instrumental in meeting the PSLRA's exacting pleading standards and, notably, were uncovered independently of the Government's Criminal Action.  Indeed, one of the witnesses that Lead Plaintiffs and Lead Counsel identified later turned out to be a key witness for the Government.

4.       Once past the Defendants' motion to dismiss briefing (which collectively totaled nearly 700 pages), Lead Plaintiffs and Lead Counsel continued their relentless work on behalf of the Class.  During the course of discovery, Lead Counsel reviewed nearly 13 million pages of highly complex and technical documents including loan files, financial statements, audit worksheets, and accounting papers.  After nearly two-and-a-half years of motion practice, status conferences, and supplemental submissions, Lead Counsel successfully compelled Defendants to produce 360,822 pages of documents they had withheld on the basis of the Federal Reserve's and other regulators' assertion of the bank examination privilege.  These documents included reports of examinations performed by the regulators that were critical evidence in the prosecution of this Action.  Indeed, Lead Counsel relied heavily on these (and other) documents over the course of the 39 depositions we took, defended, or participated in.  These depositions generated nearly 11,000 pages of testimony and almost 900 exhibits.  Notably, as the Court recognized during the July 2, 2018 Hearing on preliminary approval of the Settlements, the vast bulk of this work was done independently of the Government's work in the Criminal Action.

5.       These diligent and exhaustive efforts were undertaken against a background of significant risks and vigorous opposition.  Indeed, Lead Plaintiffs' First Amended Complaint was dismissed in its entirety for failure to plead falsity.  In fact, throughout the entire litigation, Defendants and their counsel asserted numerous credible arguments on liability and damages, including that the allegedly illicit practices at issue were in fact widely known and "blessed" by KPMG, the Federal Reserve, and the Bank's other regulators.  Defendants and their counsel—a who's who of the country's largest and most well-respected defense firms—fought Lead Plaintiffs and Lead Counsel every step of the way.  At one point, Wilmington Trust alone had 125 attorneys working on the case, to say nothing of the other Defendants.  Nevertheless, Lead

Counsel remained steadfast in pursuit of their claims: between October 2014 and December 2016, Lead Counsel continually fought to lift the multiple stays requested by the Government to complete discovery, take depositions, and resolve this Action on terms favorable to the Class.

6.     The $210 million recovery achieved here is the result of extensive, arm's-length negotiations.  Significantly, Lead Plaintiffs and Lead Counsel rejected an opportunity to settle the Action in June 2012—after the First Amended Complaint was dismissed in its entirety and with no assurances that the Second Amended Complaint would also not be dismissed—and instead pressed on with their litigation efforts.  These efforts resulted in the exceptional result here.  And while the deadline for objections has not yet passed, no members of the Class (which consists of approximately 80% of seasoned institutional investors) have objected at this juncture.

7.     For all of the reasons discussed in this Declaration, its attached exhibits and in the accompanying memoranda, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable, and adequate and should be approved. In addition, Lead Counsel respectfully submit that their request for attorneys' fees and reimbursement of Litigation Expenses is also fair and reasonable and should be approved.

## II.     LEAD PLAINTIFFS' AND CO-LEAD COUNSEL'S PROSECUTION OF THE ACTION

### A.     Factual Background of the Action

8.     This case asserts securities claims against Wilmington Trust, its top officers and Board of Directors, its auditor KPMG, and the two underwriters of its February 2010 offering, arising from years of fraudulent loan underwriting, risk management and accounting.

9.     Throughout the Class Period (January 18, 2008 through November 1, 2010)— while iconic financial institutions collapsed during the "Great Recession"—Wilmington Trust assured investors that it was a conservative regional lender with a "strong capital position," a

track record consisting of "107 years of stability," and traditional business practices that "stood "in stark contrast to the struggles that many other financial institutions" were experiencing during the Great Recession.  Consistent with these assurances, the Bank reported comparatively strong financial metrics, including low amounts of past due loans and modest increases to its Allowance for Loan Loss Reserves, the amount of money that Wilmington Trust set aside each quarter to cover probable losses in its loan portfolio (the "ALLL" or "Loan Loss Reserve").

10.      In reality, as alleged in the Fourth Amended Consolidated Securities Class Action Complaint ("FAC") (D.I. 149), during that time, Defendants materially misstated the Bank's loan underwriting and asset review practices and fraudulently concealed billions of dollars of past due and maturing loans by waiving their contractual terms and extending their maturities so that the loans were no longer considered past due. The FAC alleges that the Bank was forced to waive these loans because of its deficient loan underwriting and asset review practices, which failed to properly assess and monitor the risk that these loans posed to the Bank. Then, when borrowers fell behind in their payments, the Bank would often improperly extend interest reserves or other forms of supplemental financing—essentially, a loan to cover the loan payments that were not being paid. Also, as a result of these and other alleged practices, the FAC alleges that the Bank materially understated its ALLL.  Because the ALLL is inversely related to the Bank's net income on a dollar-for-dollar basis, Lead Plaintiffs alleged that Wilmington's materially understated ALLL also resulted in materially overstated net income.

11.      Pursuant to their scheme, the FAC alleges that throughout the Class Period Wilmington Trust and its senior executives consistently made false and misleading statements to investors concerning: (i) the credit quality of the Bank's commercial loan portfolio, including information about past due and nonperforming loans, and the methodology for calculating non-

accruing loans and loans past due 90 days or more; (ii) the Bank's compliance with generally accepted accounting principles ("GAAP") in calculating its ALLL and net income; (iii) the purported "rigor" and "consistency" of the Bank's loan underwriting to reassure investors about the Bank's credit quality; (iv) the quality of the Bank's asset review function and consistency of its loan risk ratings; (v) loan-to-value ("LTV") ratios for commercial real estate loans; and (vi) the effectiveness of the Bank's internal controls over financial reporting.

12.     These false and misleading statements concealed from investors the true financial state of the Bank, and in particular, the Bank's commercial real estate portfolio, which by the end of 2008 comprised 70% (or approximately $6.7 billion) of the Bank's total loan portfolio.  This information was critical to investors, and Defendants' fraud artificially propped up the Bank's stock price by creating the false impression that the Bank was weathering the largest financial crisis since the Great Depression without any of the crippling credit losses suffered by other banks.

13.     In fact, as alleged in the FAC, Defendants' active concealment of the Bank's deficient underwriting, asset review, and risk management practices so severely threatened Wilmington Trust that, in September 2009, the Federal Reserve placed the Bank under a Memorandum of Understanding (the "MOU").

14.     By the end of 2009—within months after the MOU had been issued—the amount of past due loans held by Wilmington Trust (but concealed from investors) reached such substantial levels that Defendants executed a massive sham "extension" of over 1,000 delinquent loans worth more than $1.5 billion—***25%*** of the Bank's loan portfolio.  With their public financial statements now purged of reporting delinquencies relating to the Bank's most troubled

loans, the Bank raised nearly $274 million from unsuspecting investors pursuant to a public offering of common stock conducted in February 2010.

15.     Though changes imposed by the Federal Reserve in connection with the MOU forced the Bank to begin to report increases in its ALLL, Defendants nonetheless reassured investors that these increases related to market-wide problems impacting all financial institutions, rather than any credit problems with the Bank's loan portfolio.  Pressure within the Bank continued to mount when, on June 3, 2010, Wilmington Trust suddenly and unexpectedly announced the immediate resignation of Defendant Cecala—the Bank's CEO and Chairman who had been with the Bank for 31 years—and that Donald Foley, a Board member with no banking experience, would take over as CEO.

16.     Less than five months later, Wilmington Trust imploded: on November 1, 2010, the Bank shocked the market by revealing the full extent of Defendants' dramatic overstatement of the quality of the Bank's loan portfolio, and that, consequentially, the Bank could no longer survive as an independent entity and was instead being purchased by M&T for half of the preceding day's share price.

## III.     APPOINTMENT OF LEAD PLAINTIFFS AND LEAD COUNSEL, LEAD COUNSEL'S EXTENSIVE INVESTIGATION, AND DEFEATING DEFENDANTS' MOTION TO DISMISS

17.     This Action began on November 18, 2010, with a complaint styled *Pipefitters Local 537 Annuity Fund v. Wilmington Trust Corp., et al.*, No. 10-cv-990. Shortly thereafter, three related complaints against Wilmington Trust and several of its executive officers were also filed. On January 18, 2011, Lead Plaintiffs filed their motion for consolidation of the cases and for the appointment of lead plaintiff and lead counsel pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). D.I. 12. As part of their motion, Lead Plaintiffs filed a Joint Declaration describing the "important public policy considerations implicated by the alleged

misconduct," and "recognizing the importance of cooperation among sophisticated members of the institutional investor community to promote prompt, truthful, and accurate public disclosures." D.I. 13-5 at 7-9. Lead Plaintiffs further described the steps they had taken and would take to oversee the prosecution of the Action consistent with the mandates of the PSLRA. *Id*. at 37-38.

18. Three other prospective plaintiffs moved for appointment as lead plaintiff.[1] D.I. 3, 5, 8. Following this briefing and pursuant to the PSLRA, on March 7, 2011 the Court granted Lead Plaintiffs' motion, consolidated the various actions under the caption *In re Wilmington Trust Securities Litigation*, and appointed Merced County Employees' Retirement Association, the Coral Springs Police Pension Fund, the St. Petersburg Firefighters' Retirement System, the Pompano Beach General Employees Retirement System, and the Automotive Industries Pension Trust Fund as Lead Plaintiffs and Bernstein Litowitz Berger & Grossmann LLP and Saxena White P.A. as Lead Counsel. D.I. 26.

19. Even before the Court appointed Lead Plaintiffs, Lead Counsel had already begun an investigation into Defendants' misconduct. Following their appointment, Lead Counsel continued and increased its efforts in conducting a thorough investigation for their forthcoming amended complaint that included, among other things, a review and analysis of: (i) Wilmington Trust's public filings with the SEC; (ii) research reports by securities and financial analysts; (iii) transcripts of the Bank's earnings conference calls; and (iii) an economic analysis of the price movement in Wilmington Trust common stock. In addition, Lead Counsel interviewed over 85

---

[1] These actions were *Pipefitters Local 537 Annuity Fund v. Wilmington Trust Corp., et al.*, No. 10-cv-990 (D. Del.); *Rooney v. Wilmington Trust Corp., et al.*, No. 10-cv-995 (D. Del.); *Elzagha v. Wilmington Trust Corp., et al.*, 10-cv-1020 (D. Del.); and *Lynch v. Wilmington Trust Corp., et al.*, No. 10-cv-1086 (D. Del.).

former Wilmington Trust employees, including in-person interviews and multiple telephonic interviews.  In investigating Defendants' misconduct and drafting the consolidated complaint, Lead Counsel also worked with numerous experts, including: (i) accounting experts who helped Lead Plaintiffs assess the impact of the understated ALLL on net income and quantify/analyze M&T's disclosures about the Bank's loan portfolio; (ii) damages and loss causation experts; and (iii) experts on the real estate market and, specifically, the Delaware commercial real estate market during the Class Period.

20.     Indeed, before the Government's criminal investigations had even begun (to Lead Counsel's knowledge), Lead Plaintiffs identified rampant misconduct relating to Wilmington Trust's loan-underwriting practices, including misuse of the so-called ten percent rule—a lending policy at the Bank that permitted lenders to extend credit in an amount up to 10% of an underlying loan without further analysis or Loan Committee approval—and manipulation of the Bank's asset review process. Lead Plaintiffs also identified numerous violations of GAAP with respect to the methodology and calculation of the Bank's ALLL. Importantly, Lead Plaintiffs independently discovered that the Federal Reserve (as well as KPMG and Wilmington Trust's internal audit group) had repeatedly criticized the Bank's practices for years, leading to the Federal Reserve's imposition of a Memorandum of Understanding ("MOU") on the Bank in late 2009.

**A.      The Consolidated Securities Class Action Complaint and Related Motion to Dismiss Briefing.**

21.     On May 16, 2011, Lead Plaintiffs filed their 179-page Consolidated Securities Class Action Complaint (the "CAC"). D.I. 39. The CAC alleged varying claims under the Securities Act and the Securities Exchange Act against Wilmington Trust, its senior executives, Board of Directors, the Underwriters, and KPMG.  Specifically, the CAC alleged a wide-ranging

fraud perpetrated by the Bank and its most senior officers concerning the Bank's deficient underwriting, asset review, and appraisal policies and practices that were in direct conflict with Defendants' repeated assurances that the Bank was a stable, conservative lender that maintained "stable credit quality" and employed "rigorous underwriting." The CAC alleged that, in reality, Defendants' claims were false and the Bank's underwriting, asset review, appraisal, and accounting practices were so egregiously deficient and risky that the Federal Reserve Board placed the Bank under the MOU in late 2009, which forced the Bank to entirely restructure the way it originated, monitored and accounted for its loans.

22.     The CAC unveiled entirely new details surrounding the Bank's fraudulent underwriting and asset review. For example, several Bank policies that encouraged high-risk underwriting and credit extension, such as the 10% Rule discussed above all led to millions of dollars of loans that were outside of the Bank's stated guidelines.  Moreover, the CAC revealed that officers of Wilmington Trust prevented the Bank's Asset Review Group from scrutinizing the Bank's portfolio and manipulated loan "risk ratings" to conceal the Bank's exposure to high-risk loans.

23.     On July 27, 28, and 29, 2011, motions to dismiss were filed by several different sets of Defendants.  In 160 pages of briefing and 50 exhibits (totaling 2,448 pages), Defendants sought the dismissal of the complaint in its entirety.  Plaintiffs responded in a 96-page omnibus brief on September 12, 2011. D.I. 66.  Defendants filed five separate briefs totaling 78 pages in response. D.I. 68, 69, 70, 75, 82.

24.     On March 29, 2012, the Court dismissed the complaint without prejudice for failure to plead falsity. D.I. 86. The Court gave Lead Plaintiffs leave to replead. *Id.*

**B.      The Second Amended Consolidated Securities Class Action Complaint and Related Motion to Dismiss Briefing.**

25.      Following the Court's order on the CAC, Lead Plaintiffs renewed their investigative efforts, including interviewing additional potential witnesses, and filed their Second Amended Consolidated Securities Class Action Complaint ("SAC") on May 10, 2012. D.I. 88. The SAC added new relevant information, including statements from former employees regarding the Bank's deficient underwriting and documentation practices, inaccurate and outdated appraisals, and manipulation of the Loan Loss Reserves.

26.      After the CAC was dismissed and after Lead Plaintiffs filed the SAC in June 2012, the parties attempted to mediate the case before the Honorable Daniel Weinstein (Ret.). Judge Weinstein is a nationally recognized and highly respected mediator who has mediated hundreds of securities fraud and other highly complex cases. The parties exchanged lengthy mediation submissions.  This mediation was unsuccessful, however, because there was no proposed resolution of the claims at that time that could compensate the Class and be in the Class's best interests.

27.      Soon after the failed mediation, Defendants filed their motions to dismiss the SAC.  In five briefs totaling 138 pages and with an additional 35 exhibits totaling 1,753 pages, Defendants moved on July 27, 2012 to dismiss the SAC in its entirety. D.I. 93, 95, 96, 99, 100, 101, 103, 104, 106, 107.  Plaintiffs responded in one 85-page omnibus brief on October 1, 2012. D.I. 112.

**C.      Third Amended Consolidated Securities Class Action Complaint and Related Motion to Dismiss Briefing.**

28.      Before briefing on the SAC was complete, two affidavits executed by FBI Special Agents in connection with the FBI's investigation into Wilmington Trust and one of its largest customers were unsealed. The facts in these affidavits corroborated and further supported the

allegations detailed in the SAC, which Plaintiffs developed through their own investigation. On this basis, Lead Plaintiffs moved to amend the SAC on December 7, 2012. D.I. 116, 117. The Court granted Lead Plaintiffs' motion, and the Third Amended Consolidated Securities Class Action Complaint ("TAC") was filed on January 9, 2013. D.I. 120.

29.     Once again, on February 28, 2013, in a total of 181 pages of briefing and 36 exhibits (totaling 2,056 pages), Defendants moved to dismiss the TAC in full. D.I. 127, 130, 131, 134, 136. Lead Plaintiffs opposed the motions to dismiss in an omnibus brief filed on April 25, 2013. D.I. 139.

30.     Before briefing on the motions was complete, a criminal information against a senior Bank employee and his subsequent guilty plea were unsealed in *United States v. Joseph Terranova*, 13-cr-39 (D. Del.). Lead Plaintiffs found that Terranova's guilty plea further corroborated the facts developed by Lead Plaintiffs' investigation, including abuses of the 10% Rule and other systemic loan underwriting deficiencies. The criminal information also described in detail how the Bank concealed and misrepresented the materially impaired state of the Bank's commercial loan portfolio by falsely reporting the amount of the Bank's past due loans. Moreover, the criminal information also included new facts related to KPMG's knowledge of the fraudulent activity. Lead Plaintiffs moved to amend the TAC on June 7, 2013. D.I. 144. The Court granted this motion.

**D.     The Operative Fourth Amended Complaint and Related Motion to Dismiss Briefing.**

31.     On June 13, 2013, Lead Plaintiffs filed the FAC. The FAC is the operative complaint. The FAC states claims for violations of Sections 10(b) and 20(a) of the Exchange Act, and Sections 11, 12(a)(2), and 15 of the Securities Act against Wilmington Trust, its senior

officers, Board of Directors, outside auditor KPMG, and the two underwriters of its February 2010 secondary offering, J.P. Morgan Securities and Keefe, Bruyette & Woods.

32.     The FAC included the same allegations that Lead Plaintiffs previously alleged concerning the Bank's underwriting and asset review practices and understated ALLL.  It also further corroborated those allegations by alleging a scheme whereby the Wilmington Trust Defendants fraudulently concealed billions of dollars of past due and maturing loans by waiving their maturities so that the loans were no longer considered past due (the "Waiver Practice"). The FAC alleges that the Bank was forced to waive these loans because of its deficient loan underwriting and asset review practices, which failed to properly assess and monitor the risk that these loans posed to the Bank. Then, when borrowers fell behind in their payments, the FAC alleges that the Bank would often improperly extend interest reserves or other forms of supplemental financing – essentially, a loan to cover the loan payments that were not being paid. In connection with this allegation, Plaintiffs worked with an expert to quantify the misstatement of the past due loans by reviewing all available information, including the information contained within the criminal information and guilty plea as well as SEC filings and Consolidated Reports of Condition and Income (or "Call Reports") provided by the Bank to the Federal Reserve.

33.     As a result of these practices, Wilmington Trust also materially understated its ALLL, which materially overstated its net income. As discussed above, Plaintiffs worked with an expert to quantify the misstatement of the ALLL and its impact on the Bank's net income.

34.     The FAC also stated for the first time in the Action a claim for violations of Section 10(b) of the Exchange Act against KPMG. In connection with this claim, Plaintiffs worked with an expert to analyze the relevant GAAP and Generally Accepted Auditing Standards ("GAAS") applicable to KPMG.

35. Defendants filed five separate motions to dismiss the FAC on July 17, 2013. D.I. 158, 160, 162, 164, 166. Defendants' motion to dismiss briefing consisted of 199 total pages and 26 exhibits (totaling 1,967 pages). Plaintiffs responded in one 106-page omnibus brief on August 15, 2013. D.I. 169. On September 12 and 13, 2013, Defendants served separate reply papers which consisted of a combined 114 pages of additional briefing. D.I. 172, 173, 176, 177, 178.

36. On March 20, 2014, the Court largely denied the Defendants' multiple motions to dismiss the FAC. D.I. 184, 185. Following this decision, Plaintiffs promptly proceeded with both class certification and fact and expert discovery, as discussed further below in Sections IV, V and VI, respectively.

*     *     *     *

## IV.    LEAD PLAINTIFFS SUCCESSFULLY CERTIFY THE CLASS

37. On May 19, 2014, the Court so-ordered a Stipulation and Proposed Scheduling Order (D.I. 197) setting, among other matters, the schedule for class certification briefing.

38. The motion for class certification was vigorously contested and entailed extensive discovery, which was complicated by the intervention of the Federal Reserve and other bank examiners in the Action to assert privilege. On June 24, 2014, Defendants Wilmington Trust, Cecala, Gibson, Harra, and Rakowski served their first set of document requests on Lead Plaintiffs. Numbering 42 separate requests to each of the Lead Plaintiffs, Defendants sought wide-ranging information regarding Lead Plaintiffs' purchases and sales of Wilmington Trust securities (not just the common stock that is the subject of this Action), trading and investment philosophies, prior litigation experience, and communications with a broad swath of individuals and entities.

39.     Lead Plaintiffs objected to a number of the document requests on various grounds on July 28, 2014.  Following a series of meet-and-confers with Defendants' counsel that took place over the course of more than a month, Lead Counsel successfully limited the scope of the documents that Defendants were requesting.  Lead Plaintiffs nevertheless collectively produced over 55,000 pages in response to these requests.  Specifically, under the direction and with the assistance of Lead Counsel, each Lead Plaintiff collected, reviewed, and produced:

      (a)     Coral Springs Police Pension Fund: 4,117 pages

      (b)     Pompano Beach General Employees Retirement System: 21,161 pages

      (c)     St. Petersburg Firefighters' Retirement System: 13,001 pages

      (d)     Merced County Employees' Retirement Association: 3,395 pages

      (e)     Automotive Industries Pension Trust Fund: 403 pages

      (f)     Common documents:[2] 13,465 pages

40.     The documents that Lead Plaintiffs produced included both hard copy and electronic files.  With respect to hard copy files, Lead Plaintiffs and Lead Counsel had to review, page-by-page, dozens of file cabinets and bankers' boxes to locate relevant information.  Indeed, to locate potentially responsive documents maintained by one of the Lead Plaintiffs, Lead Counsel assembled a team of six attorneys to search over 60 bankers' boxes in an unairconditioned warehouse in Florida in the middle of the summer over the course of two-and-a-half days.

41.     With respect to electronic files, Lead Plaintiffs and Lead Counsel had to search the emails, computers, and network file servers maintained by Lead Plaintiffs.  This included, for

---

[2] This category consists of documents common to all Lead Plaintiffs, for example, news articles and analyst reports that were relied upon and cited in the FAC.

certain Lead Plaintiffs, a forensic imaging of these locations.   Following meet-and-confers regarding search parameters and protocols for ESI (which included custodian and search term proposals supplemented by "hit counts"), each of Lead Plaintiffs agreed to run twenty-five Boolean search strings across their electronic files to locate potentially responsive documents.

42.     The Underwriter Defendants also served a subpoena on Buckhead Capital Management, LLC, an outside investment manager for certain Lead Plaintiffs, on November 4, 2014. D.I. 340.

43.     On August 25, 2014, all Defendants served a common interrogatory on Lead Plaintiffs.  Lead Plaintiffs objected to certain instructions and aspects of the interrogatory, and substantively responded on September 22, 2014.

44.     On September 12, 2014, Lead Plaintiffs moved to certify a class of damaged investors, be appointed as Class Representatives, and appoint Lead Counsel as Class Counsel. D.I. 259.  Along with the motion, each of Lead Plaintiffs submitted a Declaration setting forth their decision to seek Class Representative status, their acknowledgment of their fiduciary obligations, and reaffirming their commitment to the continued vigorous prosecution of the Action.  D.I. 261-1, 261-2.  Lead Plaintiffs also submitted the Expert Report of Prof. S.P. Kothari, the Gordon Y Billard Professor of Accounting and Finance at the MIT Sloan School of Business, which concluded that Wilmington Trust's stock traded in an efficient market, thereby allowing Lead Plaintiffs to invoke the fraud on the market presumption under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  The motion for class certification was vigorously contested and entailed extensive deposition discovery, in addition to the document and written discovery set forth above.

45.     On September 23, 2014, Defendants served Rule 30(b)(6) deposition notices on each of Lead Plaintiffs, each setting forth eight deposition topics.  *See* D.I. 270, 272, 273, 275, 276.  Lead Plaintiffs objected to the listed deposition topics and, after a series of meet-and-confers between Lead Counsel and Defendants' counsel, were deposed on October 16, 2014 (in St. Petersburg, Florida); October 20, 2014 (two depositions in Boca Raton, Florida); October 21, 2014 (in Merced, California); and October 23, 2014 (in San Francisco, California).

46.     On September 24, 2014, Defendants served a deposition subpoena on Prof. Kothari. D.I. 274.  In advance of his deposition, Plaintiffs produced over 500 documents related to Prof. Kothari's report and engagement.  Prof. Kothari was then deposed on November 11, 2014, in New York.

47.     On September 24, 2014, the Wilmington Trust Defendants surprised Lead Counsel by serving a Rule 30(b)(6) deposition subpoena on BLB&G, which set forth eight deposition topics.  D.I. 271.  In Lead Counsel's collective experience, subpoenaing PSLRA-appointed lead counsel is nearly unprecedented.  The subpoena sought information concerning Lead Counsel's  pre-complaint investigation, information that was clearly protected by the attorney-client privilege and work product doctrine.  After meeting and conferring with counsel for Wilmington Trust, BLB&G moved for a protective order quashing the subpoena as improper and harassing on October 2, 2014.  D.I. 282.  Defendants subsequently withdrew the subpoena on December 9, 2014.  D.I. 357.

48.     On November 24, 2014, the Wilmington Trust Defendants filed their opposition papers to the class certification motion under seal, which the other Defendants joined.  D.I. 347, 349, 350, 352, 353.  Their opposition was generally based on two arguments: (i) that Lead Plaintiffs did not carry their burden of establishing that damages were capable of measurement

on a class-wide basis under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013); and (ii) that Lead Plaintiffs were not adequate because they granted authority to purchase and sell securities to investment managers such as Buckhead, who did not purchase shares on the dates of the allegedly false statements.

49.     On January 23, 2015, Lead Plaintiffs filed their reply in further support of their class certification motion under seal.  D.I. 360.  Along with their reply, Lead Plaintiffs submitted a Supplemental Expert Report by Prof. Kothari.  D.I. 362-1.  Among other opinions, Dr. Kothari opined that that a common model of damages would apply Class-wide.

50.     Just seven days later, on January 30, 2015, Defendants Wilmington Trust, Cecala, Gibson, Harra, and Rakowski moved to strike portions of Lead Plaintiffs' reply and all of Prof. Kothari's supplemental Expert Report. D.I. 366.  Lead Plaintiffs opposed this motion on February 13, 2015 (D.I. 368), and the Defendants replied on February 20, 2015 (D.I. 369).

51.     On June 29, 2015, the Court heard oral argument on the class certification motion. Following the oral argument, Lead Plaintiffs submitted two separate letters to Judge Robinson with supplemental authority in support of class certification, which helped clarify the impact of *Comcast* on class certification in securities class actions.  *See* D.I. 401.

52.     On September 3, 2015, the Court issued a Memorandum and Order granting the class certification motion in its entirety, certifying a Class, appointing Lead Plaintiffs as Class Representatives, and appointing Lead Counsel as Class Counsel.  D.I. 405, 406.

53.     In connection with the Court's certification of the Class, on January 14, 2016, Lead Plaintiffs filed a motion to approve the Notice and Summary Notice of Pendency of Class Action.  D.I. 427.  The Court approved the form and content of the Notices and granted this motion on January 15, 2016.  D.I. 429.  The Class Notice was mailed to thousands of potential

Class Members beginning on March 11, 2016. The Class Notice notified potential Class Members of, among other things: (i) the Action pending against the Defendants; (ii) the Court's certification of the Action to proceed as a class action on behalf of the Court-certified Class; and (iii) their right to request to be excluded from the Class, the effect of remaining in the Class or requesting exclusion, and the requirements for requesting exclusion. In response, as set forth on Appendix 1 to the Stipulations, just eight individuals requested exclusion from the Class.

## V.   DISCOVERY

54.   Lead Counsel began pursuing discovery as soon as the Court sustained the Complaint and lifted the PSLRA stay in March 2014. As set forth further below, Lead Counsel's hard-fought discovery efforts included:

(a)   drafting and issuing multiple sets of document requests containing hundreds of requests, as well as preparing responses and objections to dozens of requests from Defendants, as well as pursuing discovery from 8 third-parties;

(b)   producing and/or reviewing more than 12.7 million pages of documents that included emails, memoranda, spreadsheets, workpapers, and loan review documentation, and that ranged from over a decade-long time period;

(c)   exchanging voluminous correspondence and engaging in dozens of meet-and-confers with counsel from twelve leading defense firms,

(d)   filing and arguing multiple motions to compel and/or for a protective order, to ensure the completeness and accuracy of Defendants' responses to Plaintiffs' document requests;

(e)   successfully pursuing through both administrative means and extensive litigation tens of thousands of pages of materials that were withheld by Defendants on the basis of regulatory privilege at the instruction of several federal and state regulators, including (among others) the Federal Reserve, Office of Thrift Supervision, and Delaware Office of State Bank Commissioner ("OSBC"; all regulators collectively, the "Regulators"), over the course of 3 years, which included multiple regulatory submissions, full briefing, an extensive hearing, and multiple subsequent updates and submissions to the Court; and

(f)   taking, defending, or otherwise participating in 39 depositions of witnesses including the Individual Defendants, key Wilmington Trust employees, KPMG auditors, Plaintiffs' class certification expert, and representatives from the Underwriter Defendants.

55.     Throughout its discovery efforts, Lead Counsel litigated against aggressive and well-funded adversaries, including many of the best defense firms in the country: Skadden Arps, Williams & Connolly, Venable, Simpson Thatcher, Morgan Lewis, Hogan Lovells, Paul Hastings, McCarter & English, Pepper Hamilton, Dalton & Associates P.A., Krovatin Klingeman LLC, and Wilks Lukoff & Bracegirdle LLC.

56.     Notably, when discovery commenced in this Action, the Government had not yet filed or unsealed criminal charges against the Bank or any of its employees. Even after the Government filed charges—over a year after discovery began, and more than three years after Plaintiffs first brought this action—the Criminal Action allegations concerned much narrower conduct, over a far shorter time span and by far fewer defendants, than Lead Plaintiffs' allegations. Accordingly, Lead Plaintiffs and Lead Counsel could not simply rely on the Criminal Action, but instead had to develop the evidence necessary to prove their case from the ground up.  Lead Counsel's independent approach to discovery required that Lead Plaintiffs pursue an aggressive schedule that was not dependent on the success of the Criminal Trial. Indeed, when the Government settled with Defendant Wilmington Trust on the eve of the Criminal Trial in October 2017, Lead Counsel was prepared to file expert reports prior to the start of the rescheduled Criminal Trial against the Individual Defendants, and to file summary judgment motions shortly after the close of the Criminal Trial. Lead Plaintiffs could not have successfully prosecuted the Action in this manner without being fully familiar with the documents, evidence, and issues relating to the underlying fraud.

### A.      Document Discovery

57.      Developing the substantial body of evidence needed to prove the alleged violations of the federal securities laws against the Bank and its executives, directors, auditor, and underwriters required Plaintiffs to undertake exhaustive document discovery efforts, which included briefing and arguing numerous discovery motions and reviewing nearly 13 million pages of documents, many of which were highly technical and complex loan origination, accounting, and auditing documents.

58.      For example, to prove Plaintiffs' allegations that Defendants had concealed the deterioration in the Bank's loan portfolio through improper ALLL accounting—a claim not at issue the Criminal Action—Plaintiffs needed to obtain and review the Bank's myriad changing policies and procedures with respect to its accounting for ALLL, the accounting work done by the Company in preparing its financial reporting, and further underlying details about the Company's loan portfolio (which typically consisted of hundreds or thousands of pages of documents for each of the Company's hundreds of loans) to determine precisely when the risk profile for the Bank's massive loan portfolio increased and how this should have impacted the Bank's reserve. In addition, Plaintiffs had to review the work done by the Bank's auditor to address Defendants' arguments that the accounting had been blessed by the auditor.

59.      As another example, to prove Plaintiffs' allegations that Defendants fraudulently claimed that the Bank's lending and underwriting practices were "rigorous" (another allegation not directly at issue in the Criminal Action), Lead Counsel needed to exhaustively comb through the Bank's production to find evidence of hundreds of millions in dollars in new loans or extensions on existing loans that Defendants wrongly or recklessly granted during the Class Period. This documentary record included thousands of voluminous loan origination and extension files, as well as countless contemporaneous correspondence and emails.

### 1.      Document Requests

60.      In April 2014, promptly after the Court denied Defendants' motions to dismiss and lifted the PSLRA stay, Lead Plaintiffs issued their first sets of document requests to Defendants, consisting of a total of over 150 requests concerning all aspects of Plaintiffs' allegations in the Action. One month later, Defendants served their responses and objections to the first set of document requests. Defendants raised numerous objections to Lead Plaintiffs' requests, refused to produce documents on certain subjects, and agreed to produce only limited documents on certain other subjects. Plaintiffs thereafter engaged in numerous meet-and-confers and motion practice (discussed further below) before Defendants gradually began to produce documents in June 2014.

61.      Also, as part of their document discovery efforts, Lead Plaintiffs subpoenaed eight third parties that Lead Counsel knew or had reason to believe had critical documents in their possession. These third-parties included Treliant Risk Advisors ("Treliant"), a company retained by the Bank to review its loan portfolio in 2010. Lead Plaintiffs served a subpoena on Treliant on May 13, 2014, seeking documents relating to Treliant's evaluation and review of the Bank's loan portfolio in the second quarter of 2010, which resulted in massive wholesale changes to the Bank's ratings and ALLL that ultimately forced the Bank's fire sale to M&T Bank. D.I. 212. Ultimately, after considerable efforts (discussed further below (¶71)), Treliant produced over 30,000 documents, totaling nearly 115,000 pages. As another example, on June 4, 2014, Lead Plaintiffs served a document subpoena on Ardmore Banking Advisors, Inc. ("Ardmore"), another company retained by the Bank to review its loan portfolio just prior to the start of the Class Period. The Ardmore subpoena requested documents relating to its evaluation and review of the Bank's loan portfolio in 2006 and 2007. D.I. 212. Ardmore ultimately

produced over 1500 pages of documents. In total, third parties produced over 600,000 pages, in over 170,000 documents, in response to Lead Plaintiffs' subpoenas.

62.     As discovery progressed and Plaintiffs' understanding of the facts grew, Plaintiffs continuously evaluated the sufficiency of Defendants' document collection, and, on numerous occasions, requested additional documents that appeared relevant but were not included. On August 12, 2014, Plaintiffs issued their second set of document requests on Defendants, containing an additional four, narrowly tailored requests concerning documents related to damages and Defendants' affirmative defenses. In addition, on November 26, 2014, Plaintiffs served an additional document request on KPMG, seeking documents concerning KPMG's relevant policies and procedures.

63.     In total, Lead Plaintiffs received over 1.8 million documents, totaling nearly 13 million pages, in response to their requests, produced over the course of several years. Approximately 500,000 documents were produced in 2014; 235,000 in 2015; 69,000 in 2016; and over 1 million in 2017, with the final production in this Action occurring on December 7, 2017.

64.     Finally, in addition to issuing its own requests for documents, Lead Plaintiffs responded to several sets of document requests that Defendants served on each Lead Plaintiff beginning in June 2014. *See* ¶¶38-39, above.

## 2.     Discovery Disputes

65.     Lead Counsel's work to obtain the necessary documents involved numerous additional discovery disputes that were resolved after considerable time and effort, significant negotiations, and—at times—court intervention. In total, Lead Counsel briefed or otherwise argued ten motions to compel or for protective orders throughout discovery, requiring dozens of

submissions to the Court. This section summarizes some of the major discovery disputes between the Parties.

### a.      Bank Examination Privilege

66.      From the start, Plaintiffs' document discovery efforts were hindered by the assertion of privilege over thousands of documents that described and/or reflected criticisms of the Bank made by the Regulators in connection with their examinations, as well as the Bank's responses thereto.

67.      Defendants and certain third parties refused to produce these documents due to the Regulators' assertion of the Bank Examination Privilege, which refers to various privileges created by federal and state statutory and common law that allow the Regulators to severely limit the disclosure of any analysis contained in or ascertained from any examination or investigation made by relevant regulatory agencies. Plaintiffs first learned from Defendants that the Regulators intended to assert this privilege in May 2014. Through subsequent formal administrative submissions, Plaintiffs promptly requested that the Regulators waive the privilege. The Federal Reserve rejected Plaintiffs' requests on June 27, 2014.

68.      On August 5, 2014, Plaintiffs moved to compel the production of these documents. D.I. 233. The Regulators moved to intervene in this Action, and then opposed Plaintiffs' motion to compel, leading to multiple submissions to Magistrate Judge Fallon, to whom Judge Robinson had referred the motion. D.I. 246, 293, 310, 318.

69.      On November 4, 2014, Magistrate Judge Fallon held oral argument, but deferred ruling from the bench. Plaintiffs' battle to overcome the Bank Examination Privilege continued for nearly the next two years. During that time, Plaintiffs made additional numerous submissions, participated in at least six subsequent conferences with the Court, and engaged in numerous

meet-and-confers and exchanged multiple discovery letters on the issue of the withheld documents.

70.     On February 19, 2016, Magistrate Judge Fallon issued an order requesting the production of a sampling of certain categories of documents that Regulators claimed were covered by the Bank Examination Privilege for *in camera* review. D.I 432. After conducting an in camera review of over 150 purportedly privileged documents and reviewing the numerous submissions by Plaintiffs and the intervening Regulators, on August 16, 2016, Magistrate Judge Fallon issued a Report and Recommendation granting virtually all of Plaintiffs' motion to compel (the "Report"). D.I. 459. There were no objections to the Report and, on September 12, 2016, Judge Robinson adopted the Report. D.I. 460. Defendants subsequently produced the nearly 35,000 documents they had been withholding from production, totaling approximately 360,000 pages.  In addition, Defendants later produced, largely in 2017, an additional over 800,000 documents that were produced in connection with the Criminal Action, totaling approximately 5.9 million pages.

71.     Nonetheless, third party Treliant still refused to produce a significant number of documents in its possession because the Report was filed under seal. After the Regulators refused to consent to unsealing the Report, on November 29, 2016, Plaintiffs moved to unseal the Report, which the Regulators again opposed. D.I. 484. Ultimately, on June 7, 2017, Magistrate Judge Fallon issued a Report and Recommendation unsealing the report, and Treliant finally agreed to produce the over 30,000 responsive documents in its possession. D.I. 670.

72.     Even then, the Bank Examination Privilege presented one last hurdle for Plaintiffs. Plaintiffs sought documents produced in connection with a lawsuit between Defendant North and the Bank that had been filed in Delaware State Superior Court, captioned *North v.*

*Wilmington Trust Co. et al.* (the "North Action"). Though documents in the North Action were responsive to Plaintiffs' document requests, including the court's opinion resolving the parties' cross-motions for summary judgment in the North Action, they had been under seal since December 2015 due to the Regulators' assertion of the Bank Examination Privilege in this Action. After contacting the Regulators, Plaintiffs sent a letter to the Delaware State Superior Court on October 19, 2017 requesting access to the sealed documents, which was granted on November 20, 2017.

**b.      Plaintiffs' motion to compel agreed-upon search terms.**

73.     Beginning on May 30, 2014, Lead Counsel and counsel for Defendants engaged in extensive negotiations concerning search terms sufficient to address Plaintiffs' document requests. However, after June 11, 2014, when Plaintiffs sent Defendants additional search terms in an attempt to capture documents both relevant and responsive, Defendants refused to respond for months. During an August 6, 2014, hearing before the Court, Lead Plaintiffs raised their concerns regarding the status of Defendants' document production, at which time the Court ordered Defendants to start rolling productions of documents in this Action and to avoid a "document dump" on or before October 17, 2014. D.I. 237.

74.     Thereafter, Defendants finally responded to Plaintiffs' attempt to negotiate search terms, proposing revised sets of terms to reduce the number of documents to be reviewed for production. Lead Plaintiffs agreed to the vast majority of Defendants' revisions in both instances. On September 9, 2014, Defendants confirmed that they would apply the agreed-upon terms, but just ten days later informed Plaintiffs that they had unilaterally and without any discussion eliminated one-third of the agreed-upon search terms. After Defendants refused to discuss this modification further and rejected Plaintiffs' proposal, on October 2, 2014, Plaintiffs filed a letter-motion to compel the use of these search terms. D.I. 280.

75.     After Defendants filed a response, the Court heard argument concerning the issue during a hearing on October 7, 2014. At that time, the Court agreed with Plaintiffs, and compelled Defendants to use the search terms submitted by Plaintiffs.

### c.     Plaintiffs' Pursuit of 500,000 Unreviewed Documents

76.     Consistent with the Court's initial Scheduling Order in this Action, Defendants had represented to Plaintiffs that they had substantially completed document production by October 17, 2014. However, in April 2015—nearly six months after Wilmington Trust purportedly completed its document production and after Plaintiffs had pressed Defendants on numerous apparent gaps and missing custodial files in Defendants' production—the Bank notified Plaintiffs that it had somehow failed to review approximately 500,000 documents, all of which were potentially responsive in this Action (the "500,000 Missing Documents").[3]

77.     On April 13, 2015, Wilmington Trust proposed to the Court that it have until August 17, 2015, to review and produce the 500,000 Missing Documents. D.I. 381. However, on August 24, 2015—after Defendants' own deadline had passed—Defendants claimed that the Court's July 2, 2015 limited stay of discovery due to the Criminal Action (as discussed further below (¶86)) absolved the Bank of its obligation to produce any remaining responsive documents. After an unsuccessful meet-and-confer, on August 28, 2015, Lead Plaintiffs filed a motion requesting clarification that the Court's July 2, 2015 Order did not impact Defendants' obligations with respect to the 500,000 Missing Documents, which the Court granted on September 3, 2015. D.I. 404.

78.     In total, Lead Counsel's diligent pursuit of the 500,000 Unreviewed Documents led to the Bank's production of over 1.3 million additional pages, constituting 202,178

---

[3] As discussed below, deposition discovery in this Action was stayed beginning in October 2014.

documents. For perspective, these belated productions increased the Bank's document production by over 30% at the time they were produced.

### 3.      Document Review

79.      As Lead Counsel received documents in response to Plaintiffs' requests, it needed to review and analyze those documents. The magnitude and complexity of the documents was substantial—totaling nearly 13 million pages from a far-ranging period of time, and including, *e.g.*, emails, loan documentation, accounting memoranda, financial statements, and interview summaries.   At all times, Lead Counsel endeavored to conduct the document review (and subsequent deposition preparation) as efficiently as possible.  While a large number of attorneys were responsible for this review and preparation, at all times Lead Counsel collectively had less attorneys assigned to this case than Wilmington Trust, whose counsel informed the Court during the September 16, 2014 status conference that it had 125 attorney reviewers assigned to review and analyze documents that the Bank has produced.  Significantly, this number does not include attorneys from Williams & Connolly LLP and Venable LLP, two additional firms that Wilmington Trust retained to represent it in this action; the firms retained by the Individual Defendants who were brought on to represent them; or the firms representing KPMG and the Underwriter Defendants.

80.      Throughout, Lead Counsel constantly looked for ways to keep costs to a minimum, as well as to streamline their review and analysis. At the very outset, Lead Counsel solicited proposals from discovery vendors to provide cost-effective, but powerful, document-management services. After receiving bids from three firms, Lead Counsel ultimately selected the e-discovery vendor Recommind (later renamed to "Opentext"), a vendor that had worked with the SEC and several other plaintiffs' firms. At a price that matched the lowest bid received, Recommind provided unique document review capabilities, including cutting-edge, algorithm-

based "technology assisted review" ("TAR") (also known as "predictive coding"). The TAR software enabled Lead Counsel to efficiently and cost-effectively streamline their review by 'learning' the coding of documents as they were reviewed, and then using an algorithm to apply that 'learning' and assign a ranking to the other documents in the production. This permitted Lead Counsel to prioritize its review by focusing on those documents identified as the most likely to be relevant by the TAR software.

81.     Using the TAR predictive coding to narrow down to those documents most likely to provide meaningful information, attorneys from Lead Counsel reviewed, analyzed, and categorized the documents in Recommind's electronic database. Before beginning, Lead Counsel developed a search protocol, issue "tags," and guidelines for identifying "hot" documents, as well as a manual and guidelines for the review and "coding" of documents. Using these tools, Lead Counsel tasked its attorneys to begin reviewing documents as soon as they were produced, which involved making several substantive analytical determinations as to the importance and relevance of each document—including whether each document was "hot," "highly relevant," "relevant," or "irrelevant." For documents identified as "hot," the attorneys typically documented their substantive analysis of the document's importance by making electronic notations on the document review system, explaining what portions of the documents were hot, how they related to the issues in the case, and why the attorney believed that information to be significant. These attorneys also "tagged" the specific issues that documents related to, such as whether the documents concerned the treatment of past due loans, the calculation of the ALLL, or communications with governmental authorities. In addition, the attorneys "tagged" which deponents the documents related to, enabling the effective and efficient collection of documents in preparation for depositions. Similarly, the attorneys tagged and foldered documents related to

different categories of substantive issues and separately tagged documents that were relevant to expert analyses. Given the dynamic, evolving nature of discovery, Lead Counsel frequently revised and refined its tools, techniques, and "tags" as it developed its understanding of the issues.

82.     Throughout their review, the attorneys also analyzed the documents for several other issues related to the adequacy and scope of the document productions. For example, the attorneys reviewed all privilege redactions and Defendants' numerous privilege logs to assess whether Defendants redacted or withheld potentially non-privileged information. The attorneys also reviewed the productions to determine whether they substantively tracked what had been agreed to be produced in response to document requests.

83.     In addition to regular communications that occurred throughout the review process, the attorneys focused on the document review participated in weekly meetings with the rest of the litigation team. In advance of these meetings, the most significant, "hot" documents that had recently been discovered and analyzed were compiled and circulated. At the meetings, the attorneys who analyzed the documents explained their importance, and other attorneys asked questions and discussed similar documents that had been discovered. In connection with these meetings, the attorneys would prepare a memorandum summarizing the key documents discussed. These efforts ensured that the entire litigation team learned of and understood the important documentary evidence being developed, provided an opportunity for Lead Counsel to further refine their legal and factual theories, and focused the document review teams on developing other supporting evidence. Lead Counsel also often asked for follow up research into and memoranda concerning topics of interest that arose at these meetings.

84.     In addition, as they conducted their review, Lead Counsel prepared chronologies of events and maintained a central repository of key documents organized by issue, which they continually updated and refined as the team's knowledge of issues expanded. This step enabled attorneys to quickly and efficiently access critical documents necessary for the preparation for depositions and drafting of evidentiary submissions to the Court. In addition, as discussed further below (¶¶112-13), Lead Counsel's thoughtful and planned approach to document discovery proved to be critical in responding to the Wilmington Trust Defendants' far-reaching Second Set of Interrogatories, enabling Plaintiffs to quickly distill down their review of millions of pages of documents by issue and relevance.

**B.      Discovery Stays And Delays Imposed As A Result Of The Criminal Action**

85.     Beginning in October 2014, the United States sought to stay deposition discovery in this Action in light of the Criminal Action. D.I. 297. Specifically, after Plaintiffs noticed the depositions of 23 individuals, including several of the Individual Defendants, to take place between October 20, 2014 and December 19, 2014, the Government moved to intervene in this Action and stay all depositions, interrogatories, and requests for admission in this Action until March 2015 to avoid potential prejudice to the Government's investigation. D.I. 298.

86.     Although the Court did not rule on the Government's motion for a stay, the case was effectively stayed by operation of Local Rule 30.2.  The Government's request for a discovery stay expired on March 1, 2015, whereupon Plaintiffs immediately sought to schedule depositions, and filed a letter request with the Court to set a schedule. Despite Plaintiffs' efforts, on July 2, 2015, the Court issued an Order staying discovery until further Order and requiring that the parties file status reports on or before September 30, 2015. D.I. 397.

87.     Pursuant to the Court's July 2, 2015 Order, on September 30, 2015, Plaintiffs submitted a status report, stating Plaintiffs' position that depositions of witnesses other than the

Criminal Defendants should be permitted to move forward. D.I. 408. On October 13, 2015, Judge Robinson issued an Order in effect granting Plaintiffs' request and lifting the limited stay of discovery, except for the depositions of the Criminal Defendants, and ordering that fact deposition discovery re-commence no later than November 1, 2015. D.I. 409.

88.     However, two weeks later, on October 27, 2015, the United States again moved for a limited stay. D.I. 415. Within three days, Lead Counsel filed an opposition to the United States' motion. D.I. 422. On November 3, 2015, the Court again issued an Order staying discovery but requiring the Parties to file status reports on March 3, 2016.  D.I. 423.

89.     In accordance with the Court's November 3, 2015 Order, on March 3, 2016, the Lead Plaintiffs, Defendants, and the Government each filed a status report. D.I. 436-440. While Defendants and the Government asserted that the case should continue to be stayed, Plaintiffs requested that depositions be allowed to proceed. On March 7, 2016, Plaintiffs filed a letter responding to certain of the assertions made in the Government's status report concerning the necessity of a stay in this Action. D.I. 443.

90.     On April 13, 2016, the Court ordered that the stay of fact discovery would continue "pending completion of the Criminal Trial."  D.I. 454.  However, on September 9, 2016, the Criminal Trial was again delayed.  This delay marked the second postponement of the Criminal Trial, this time for over a year. In light of this delay, on September 19, 2016, Plaintiffs moved to lift the stay. D.I. 461. Defendants filed briefs in opposition to Plaintiffs' motion. D.I. 463-68. On October 21, 2016, Plaintiffs filed a reply brief addressing their arguments. D.I. 478. Plaintiffs' arguments prevailed, and, on December 19, 2016, the Court lifted the Stay in its entirety, allowing discovery to resume. D.I. 488.

### C.     Depositions

91.     Depositions provided a critical component of Lead Plaintiffs' efforts to develop the evidentiary record, in terms of both fact-gathering and solidifying Plaintiffs' legal arguments. Beginning largely (except for six class certification-related depositions) after the Court lifted the stay of discovery, by the end of fact and class discovery, the Parties had taken 39 depositions at locations across the country, including Delaware, New York, Pennsylvania, New Mexico, and Utah. For Lead Counsel, these depositions required tens of thousands of hours of attorney team across the entire litigation teams of both firms.

92.     As it did through discovery generally, Lead Counsel strove for the upmost efficiency and to avoid unnecessary expense. For example, Lead Counsel made every effort to minimize the number of depositions, noticing only those depositions that Lead Counsel believed were critical. Of the 39 depositions, only 28 were noticed by Lead Plaintiffs. In our experience, this number is not unusual in comparably sized cases, particularly given the large number (16) of Defendants here. Further, Lead Counsel staffed each of the 39 depositions as efficiently as possible, with generally no more than two (and in a few cases, three) Lead Counsel attorneys in attendance. In contrast, at least a dozen, and sometimes more than 20, attorneys typically attended for Defendants, with each Defendant having at least 1 or 2 attorneys present.

### 1.     The Development and Evolution of Lead Counsel's Deposition Strategy

93.     Lead Counsel's deposition-related work began in 2014, when Lead Plaintiffs began receiving documents produced in response to their requests and in anticipation that depositions would have to conclude before December 2014 pursuant to the then-operative scheduling order. Lead Counsel's team constructed "key players" lists compiled from: (i) their investigation in connection with the complaints; (ii) document searches, including an analysis of

hot documents; and (iii) corporate organization charts produced by Defendants. This process involved considerable effort given the volume of Defendants' productions and the expansive nature of the alleged fraud.

94.     During this process, Lead Counsel met multiple times to discuss potential candidates for depositions, reviewing memoranda and samples of relevant documents, and debating the relative merits of each. Through this process, dozens of potential deponents were considered and analyzed. The existence of the Criminal Action meant that this process required more legal research and analysis than typical, as many key witnesses were expected to assert their right under the Fifth Amendment rather than testify.

95.     As soon as a meaningful number of documents had been reviewed using these criteria, Lead Counsel analyzed the results of their review of those documents to begin finalizing the identities of key witnesses and other potential deponents. As the list of potential deponents narrowed, Lead Counsel ranked the witnesses by reference to their role in the events at issue and the anticipated value of their testimony.

96.     Attorneys also reviewed the documents extensively and drafted numerous memorandum to assist in discovery, including: (i) memorandum in preparation for each deposition; (ii) memorandum concerning numerous subjects, such as appraisal, interest reserves, and risk ratings; (iii) and memorandum discussing certain of Wilmington Trust's largest customer relationships.

97.     Lead Plaintiffs served their first Notices of Deposition on October 6, 2014, seeking the deposition of each Individual Defendant as well as several Bank employees whom discovery had confirmed had critical knowledge concerning Plaintiffs' allegations.  However, as described further above (¶¶85-90), the Government's seriatim motions to stay discovery

prevented any merits depositions from being taken until 2017. Nevertheless, after each time the stay was lifted or expired, Lead Plaintiffs sought to take depositions, only to be stayed again until 2017.

### 2.    Lead Counsel Fights Defendants' Obstructionism On Depositions

98.    Even after Plaintiffs' successful motion to lift the Stay enabled Lead Counsel to begin depositions in 2017, within weeks, the Individual Criminal Defendants sought to prevent their depositions claiming they intended to assert their Fifth Amendment right to avoid self-incrimination during their depositions.

99.    Specifically, on January 13, 2017, the parties submitted competing proposals for a discovery schedule and for a protective order. At the heart of the dispute between the two proposed schedules was the timing of the Individual Defendants' depositions: Lead Plaintiffs insisted that the depositions take place by April 21, 2017 (which was prior to the trial in the Criminal Action), in accordance with the December 19 Order, while the Criminal Defendants again sought to delay their depositions until after their criminal trial. D.I. 498. On January 19, 2017, the Court heard over two hours of oral argument on the competing proposals, and, on January 24, 2017, Judge Robinson issued an Order that, among other things, ruled in Plaintiffs' favor in rejecting the attempts to stay the Individual Criminal Defendants' depositions, and ordered that all fact discovery—including that of the Individual Criminal Defendants—must end by June 1, 2017. D.I. 509.

100.    The Criminal Defendants thereafter began a multi-pronged attack on the Court's January 24, 2017 Order, simultaneously filing a Notice of Appeal with the Third Circuit and motions for interlocutory appeal and to stay pending appeal in this Court. D.I. 513, 514, 515. Plaintiffs opposed both motions in this Court and moved to dismiss the Notice filed in the Third Circuit for lack of jurisdiction.  Lead Counsel's arguments prevailed; on June 14, 2017, the Third

Circuit dismissed the Individual Defendants' appeal, and, on June 26, 2017, this Court denied Defendants' motions for interlocutory appeal and for a stay of their depositions.

101.     The Criminal Defendants simultaneously moved the Court for reconsideration of its June 26, 2017 Order, which Lead Plaintiffs opposed on July 7, 2017, and also for *en banc* review of the Third Circuit's June 14 dismissal.

102.     Throughout the drawn-out appeals process, Lead Plaintiffs continually sought deposition dates from the Individual Defendants. However, the Individual Defendants refused to schedule their depositions—even after losing twice at the Third Circuit—taking the position that District of Delaware Local Rule 30.2 prevented their depositions even as they mulled a long-shot petition for certiorari to the Supreme Court. In an effort to overcome this pure dilatory practice, on July 27, 2017, Plaintiffs moved this Court for relief from Local Rule 30.2. D.I. 748. Before the Court ruled on Plaintiffs' motion, however, the Court denied Defendants' motion for reconsideration. D.I. 750. This Order finally allowed Lead Plaintiffs to immediately confirm and notice the final remaining fact depositions in this Action. D.I. 754-57.

### 3.     Lead Counsel's Preparation for Depositions

103.     Effectively preparing for, conducting, and participating in depositions required that Lead Counsel devote substantial time, effort, and resources. One of Lead Counsel's most significant projects in preparation for the depositions—both in terms of time and effort as well as substantive importance—was the preparation of detailed "deposition kits." These kits typically consisted of approximately 100-200 documents with an index summary, as well as a detailed memorandum analyzing those documents and proposing areas of examination. Lead Counsel needed to prepare these kits not just for witnesses whose depositions Lead Plaintiffs noticed, but also for those witnesses noticed by Defendants, including both nonparties and Plaintiffs themselves. Lead Counsel prepared a deposition kit for each of the 28 witnesses whose

deposition was taken by Lead Counsel, as well as kits for the 5 merits witnesses whose depositions were noticed by Defendants.[4]

104.    The preparation of these kits was an iterative process that required the synthesis and analysis of an enormous amount of information. Though Lead Counsel had developed a preliminary sense of the deposition witnesses in preparing the Deposition Plan, the preparation of the deposition kits required a comprehensive, deep dive into the witnesses, including their: (i) custodial documents, *i.e.*, documents the deponent drafted, received, or maintained in their files; (ii) role in the events at issue; (iii) prior relevant testimony or interviews; and (iv) information gleaned from public searches. The preparation of each kit required the analysis of myriad documents in the particular context of each witness, as well as the exercise of professional judgment in narrowing down which documents to present to that deponent. As the kits were prepared and refined, the attorneys taking the deposition worked closely with the reviewing attorneys.

105.    Finally, as a result of the pending Criminal Action, at their depositions in this Action numerous witnesses asserted their Fifth Amendment right rather than provide actual testimony. Lead Counsel exhaustively researched the implications of this refusal to testify and any adverse inference that could be drawn from it, and prepared for such depositions accordingly.

106.    The affirmative depositions taken during the course of discovery lasted one to two days, and frequently involved dozens of exhibits totaling hundreds of pages per deposition. Even for those depositions noticed by Defendants, Lead Counsel frequently prepared a full deposition

---

[4] Lead Counsel had prepared full deposition kits in 2014 for the noticed witnesses, but those kits had to be materially updated and re-analyzed in light of the significant additional document discovery and other events that took place over 2015-2016.

kit and examined the witness at length. This was particularly necessary because the depositions noticed by Defendants typically concerned Defendants' primary defense—that auditors or government regulators had known of and condoned the allegedly fraudulent conduct.

### D. Interrogatories And Requests For Admission

107. Finally, in addition to the comprehensive document and deposition discovery just described, Lead Counsel sought to develop the evidence required to prove Plaintiffs' allegations through informed and targeted interrogatories and requests for admission. Lead Counsel also spent considerable time and effort responding to far-reaching interrogatories served on Plaintiffs by Defendants.

### 1. Lead Plaintiffs' Interrogatories and Requests for Admission.

108. Lead Plaintiffs issued a total of 52 interrogatories during the litigation. On March 2, 2017, Lead Plaintiffs issued their first set of interrogatories to the Wilmington Trust Defendants. On June 15, 2017, Lead Plaintiffs issued their first set of interrogatories to the Director Defendants, KPMG, Defendant North, and the Underwriter Defendants, and their second set of interrogatories to the Wilmington Trust Defendants. In each instance, Lead Counsel reviewed and analyzed Defendants' responses to these interrogatories as they came in, and at times had to engage in extensive meet-and-confers with Defendants to satisfactorily obtain the requested information.

109. In addition, on July 14, 2017, Lead Plaintiffs served a total of 148 Requests for Admission on all Defendants. Drafting these Requests required Lead Counsel to distill the entirety of the knowledge that they had gained in discovery into carefully crafted questions, strategically crafted for maximum effect in the remainder of the litigation (including summary judgment, *Daubert* motions, and even submission to a jury).

### 2.    Lead Plaintiffs' Responses to Defendants' Interrogatories

110.    Lead Counsel also prepared responses and objections to the three sets of interrogatories (totaling 36 interrogatories) served on Plaintiffs by Defendants. Responding to these far-ranging interrogatories required a significant amount of work by each Lead Plaintiff and by Lead Counsel, including several meet-and-confers and motion practice.

111.    On August 25, 2014, Defendants served Plaintiffs with Defendants' First Common Interrogatory Directed to Lead Plaintiffs, seeking information concerning the confidential witnesses cited in the Complaint. On September 25, 2014, Plaintiffs served their Answers and Objections to this Interrogatory.

112.    On March 1, 2017, the Wilmington Trust Defendants served their Second Set of Interrogatories to Plaintiffs, which largely consisted of contention interrogatories seeking specific factual responses concerning Plaintiffs' best evidence. On March 31, 2017, after conducting in-depth legal research, Plaintiffs served their responses to the interrogatories, objecting entirely to the interrogatories as untimely, overbroad, and improperly seeking attorney communications. After an unsuccessful meet-and-confer, on April 11, 2017, Defendants moved to compel Plaintiffs to respond to its Second Set of Interrogatories, which Plaintiffs opposed on April 25, 2017. D.I. 613. On May 17, 2017, after oral argument, Magistrate Judge Fallon granted in part and denied in part Defendants' motion to compel, and Plaintiffs thereafter began the considerable work of preparing responses to the Wilmington Trust Defendants' Second Set of Interrogatories.

113.    In order to provide adequate responses to Defendants' Second Set of Interrogatories, Lead Counsel had to distill down its review and analysis of tens of thousands of pages of public statements and SEC filings, as well as millions of pages of deposition testimony, deposition exhibits, and Defendants' document productions. On June 19, 2017, Plaintiffs served

their Supplemental Answers and Objections to Defendants' Second Set of Interrogatories, which included hundreds of specific citations exhaustively cataloging the documentary evidence that Plaintiffs had collected to date from Defendants' SEC filings, conference calls and other public statements, document productions in the litigation, and deposition transcripts and exhibits. For example, in response to Defendants' interrogatory number 7, Lead Plaintiffs provided an extensive 50-page appendix setting forth more than 100 alleged false and misleading statements, detailed citations to deposition testimony from Defendants and the Bank's executives, and quotes from a multitude of emails and presentations sent to and by Defendants and Defendants' officials.

114.    On July 14, 2017, Defendants Wilmington Trust and Cecala served their Third Set of Interrogatories on Plaintiffs, containing 11 further contention interrogatories seeking the basis of Plaintiffs' claims. The same day, the Underwriter Defendants served their First Set of Interrogatories on Plaintiffs, containing six interrogatories that principally sought information concerning Plaintiffs' reliance on experts and Plaintiffs' contentions concerning "red flags" brought to the attention of the Underwriter Defendants. On August 28, 2017, Lead Plaintiffs responded and objected to both sets of interrogatories. As with Defendants' prior interrogatories, responding to these Interrogatories required considerable work by Lead Plaintiffs and Lead Counsel, including verification by Lead Plaintiffs themselves.

## VI.    THE COMPLEXITY OF LEAD PLAINTIFFS' CLAIMS NECESSITATED THE EXTENSIVE USE OF EXPERTS AND CONSULTANTS

115.    The prosecution of this Action was extremely difficult because of the complexity and highly specialized and technical nature of the subject matter, as well as the number of Defendants involved in the Action.   Lead Plaintiffs' allegations challenged Defendants' statements relating to the core of Wilmington Trust's lending operations, one of its primary

segments that included the Bank's loan underwriting, appraisals, asset review, risk management, ALLL, and reported financial statements. Moreover, Plaintiffs' allegations—and Defendants' defenses—involved non-Bank parties, including the Underwriters and KPMG, as well as non-parties such as the regulators and third party lending consultants. The prosecution of this Action against all Defendants on multiple fronts was further complicated because the conduct at issue took place during the Great Recession and its aftermath. This required the retention of several expert witnesses and consultants. Lead Counsel further knew that the army of highly skilled and well-respected defense counsel would hire preeminent experts in their fields, and it was therefore in the Class's best interests to respond in kind. Given these facts, Lead Counsel believe that the experts and consultants Lead Plaintiffs retained were both reasonable and necessary. Unlike defense counsel, however, Lead Counsel undertook this case on a contingency basis, fronted all payments to the experts, and assumed all of the risk that they might not compensated if they did not secure a judgment or reach a settlement.

116. Lead Counsel took several steps to ensure that their experts and consultants were working efficiently and without duplication of efforts. Lead Counsel closely monitored the experts' work progress and regularly reviewed their invoices to ensure that work was being done efficiently and delegated appropriately among the experts' team, much like how legal work is divided between junior attorneys, senior attorneys, and professional support staff.

117. Lead Counsel performed a first pass review and analysis of all categories of documents and documents requested by the experts, to avoid having the expert's staff charge for this work. Relatedly, Lead Counsel were often able to pull publicly available documents that the experts needed (such as regulatory filings or analyst reports) to avoid the time and expense of having the expert's team pull them. Because multiple experts would sometimes need to review

the same documents, this allowed Lead Counsel to leverage the cost-saving efficiencies by searching for or reviewing a document once, rather than having each expert do it separately.

118.    Lead Counsel also set up regular, periodic calls with their experts and their teams. These calls would serve to ensure that the experts were on track and focused on deliverables and work product.  The calls also served as a centralized way for Lead Counsel and the experts to jointly resolve any questions or outstanding issues as they arose. To further conserve resources, many of the calls dealing with regular, customary matters were handled by the experts' staff (billing at lower hourly rates).

119.    Lead Plaintiffs and Lead Counsel worked with the following experts and consultants during the prosecution of this Action:

### 1.    Professor S.P. Kothari

120.    Lead Plaintiffs retained Prof. S.P. Kothari as their testifying expert in the fields of market efficiency, causation, and damages.  Prof. Kothari is the Gordon Y Billard Professor of Accounting and Finance at the MIT Sloan School of Business, has been an editor of the *Journal of Accounting and Economics* for 17 years, and has published dozens of peer reviewed articles during his career.  Both BLB&G and Saxena White have retained Prof. Kothari and his team on several prior and ongoing securities fraud litigations.  Knowing that his analysis would involve many complex issues, Lead Plaintiffs retained Prof. Kothari because of their prior experience with him and his sterling reputation and standing within the academic community. Further, Lead Counsel was able to use their strong relationship with Prof. Kothari to maximize efficiencies and avoid any duplication of efforts between Prof. Kothari, other experts, and Lead Counsel.

121.    At the time that the Settlements were reached, Prof. Kothari had (i) submitted his initial expert report with Lead Plaintiffs' class certification motion on September 12, 2014 (D.I. 261-3), (ii) been deposed on November 11, 2014, in New York; (iii) submitted a supplemental

expert report in support of Lead Plaintiffs' class certification motion on January 23, 2015 (D.I. 362); (iv) completed a substantial amount of work towards finishing an expert report on damages and causation that Lead Plaintiffs would have submitted had the Settlements not been reached; and (v) consulted with Lead Counsel during the course of deposition discovery.

122.    Lead Plaintiffs retained Prof. Kothari in connection with class certification proceedings to establish the existence of an efficient market and thereby invoke the fraud on the market presumption to satisfy the predominance element of Fed. R. Civ. P. 23(b).  Professor Kothari's initial report, deposition, and supplemental report concerning market efficiency were integral to Lead Plaintiffs' successful class certification motion.

123.    Lead Plaintiffs also retained Prof. Kothari as their damages and causation expert. Establishing damages in a securities fraud class action is always fraught with risk, even if a jury were to accept Professor Kothari's analysis.  *In re BankAtlantic Bancorp, Inc.*, 2011 WL 1585605, at *17-19 (S.D. Fla. Apr. 25, 2011) (reversing jury verdict in favor of plaintiff class and granting judgment as a matter of law to defendants on the basis of "incomplete" testimony by plaintiff's expert).  In this regard, Prof. Kothari did a significant amount of work and prepared numerous drafts of his anticipated report by the time the Parties agreed to settle, which occurred weeks before expert reports were to be exchanged.

124.    As part of his damages and causation analysis, Prof. Kothari analyzed the numerous false statements over the nearly three-year long class period, the corrective disclosures, and ascertained which Class Period events caused inflationary movement in the Bank's share price and the amount of inflation introduced or removed throughout the Class Period.  Prof. Kothari also identified and disaggregated movement in the Bank's share price caused by disclosures relating to Lead Plaintiffs' allegations of fraud from share price

movements caused by unrelated company or industry news.  Disaggregation was especially important in this action because Defendants were likely to argue that a significant portion of the losses in Wilmington Trust securities was due to the Great Recession rather than Defendants' own fraudulent conduct.  A significant challenge addressed by Prof. Kothari was linking Lead Plaintiffs' allegations of underwriting and asset review violations, inadequate ALLL, and grossly understated past due loans to Wilmington Trust's actual announcements made on each of the corrective disclosure dates.  For example, the Bank did not ever specifically correct the amount of Wilmington Trust's past due loans or admit that their underwriting and asset review practices were deficient, and instead made more general announcements about increased ALLL and Defendant Cecala's resignation, among other things.  Prof. Kothari also needed to demonstrate that the Bank's ALLL was misstated throughout the entire Class Period and that the increases at the end of the Class Period were not timely (a defense raised throughout the litigation), but were belated increases that should have been taken months and years earlier.

125.    Also, Defendants made the argument in the Criminal Action—and Lead Counsel expected them to make a similar argument here—that the final November 1, 2010 disclosure did not reveal the falsity of the Bank' statements concerning underwriting, asset review or past due loans.  As a result, Prof. Kothari analyzed evidence from documents, deposition testimony, and other expert analysis by the experts retained by Lead Plaintiffs in order to link the misstated past due loans and underwriting and asset review deficiencies to the corrective disclosures in this Action.  Prof. Kothari was able to do this by demonstrating that the failure to accurately record loans as past due led to inflated risk ratings that, in turn, resulted in materially understated ALLL.

126.    Prof. Kothari worked with Lead Counsel on implementing his event study and the damages per share calculated in connection with his unsubmitted expert report for use in the Plan of Allocation.  Prof. Kothari was asked by Lead Counsel to develop an estimate of the per share damages throughout the Class Period.  Based on the factual evidence provided to Prof. Kothari by Lead Counsel and his understanding of the legal theories of the alleged securities laws violations, Prof. Kothari conducted an analysis of the economic evidence in this case to measure the aggregate per share damages that security holders suffered due to the alleged material misrepresentations that defendants made throughout the Class Period. *See* Ex. A at ¶¶7-10.

127.    Considering these challenges and risks, and taken together with the likely recovery in this case, Lead Counsel determined that Prof. Kothari's $1,100 hourly rate was reasonable, necessary, and in-line with other experts of his caliber and stature.[5]  The rates of Prof. Kothari's support team (which includes two MIT Sloan School Professors and ranges from $150 to $900 per hour), were also reasonable and in proportion to their level of expertise. Lead Counsel chose to take on the risk that absent a settlement or judgment, they might not be reimbursed for the significant amount of fees payable to Prof. Kothari and his team.

### 2.    Chad W. Coffman

128.    Lead Plaintiffs retained Chad W. Coffman ("Coffman"), the founder and President of Global Economics Group, as a consulting expert in the fields of damages, causation, and market efficiency.  Coffman has testified as an expert in these areas in several high-profile securities fraud cases, including *In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, No. 08-

---

[5] For example, Saxena White previously retained Prof. Kothari as an expert in *City Pension Fund for Firefighters and Police Officers in the City of Miami Beach v. Aracruz Celulose S.A.*, No. 08-cv-23317 (S.D. Fla.) At that time (in 2012), Defendants' opposing expert, Prof. Robert Glenn Hubbard of the Graduate School of Business at Columbia University charged $1,200 per hour—above Prof. Kothari's hourly rate here.  Ex. H at p. 5.

md-2058 (S.D.N.Y.) ($2.4 billion settlement) and *In re Schering-Plough Corp./Enhance Sec. Litig.*, No. 08-cv-397 (D.N.J.) ($473 million settlement). Both BLB&G and Saxena White have retained Coffman and Global Economics on several prior and ongoing securities fraud litigations. As such, Lead Counsel were highly familiar with Coffman's work and used their relationship to maximize efficiencies and avoid any duplication of efforts between Coffman, other experts, and Lead Counsel.

129.    Lead Plaintiffs retained Coffman in the early stages of this Action, during Lead Counsel's investigation into the CAC, and subsequent amended complaints, including the FAC. At that time, Coffman analyzed the Bank's share price movement to identify inflationary events and corrective disclosure dates. Based on Coffman's analysis, Lead Plaintiffs were able to confirm the proper start date for the Class Period, and the appropriate corrective disclosure dates to plead in the complaint.[6]

130.    Coffman also prepared a detailed damages analysis in advance of June 2012 mediation.

131.    While Plaintiffs retained Prof. Kothari as the testifying expert in this Action, Lead Counsel determined that Coffman's valuable years of knowledge of the case allowed him and his team at Global Economics to provide valuable feedback concerning the highly complex issues relating to market efficiency, damages, and causation arising in this case. For example, Lead Counsel utilized Coffman as a mock defense expert to anticipate challenges that Defendants would likely make to Prof. Kothari's analyses, methodologies, and conclusions, and to ensure that Prof. Kothari's testimony would be admissible under *Daubert*. Coffman was also able to

---

[6] The initial complaints identified in ¶¶17-18, *supra*, alleged class periods with beginning dates ranging from April 18, 2008 to October 23, 2009. *See* D.I. 14 at 1.

translate Prof. Kothari's estimated damages per share into a classwide damages number to be used during the course of settlement negotiations in late 2017 and early 2018.

132.    Finally, Lead Counsel worked with Coffman to devise the Plan of Allocation. As Lead Counsel have previously worked with Coffman on several plans of allocation that have been accepted by courts, Lead Counsel had confidence that Coffman would be efficient and effective. Here, Coffman devised the Plan of Allocation using the estimates calculated by Prof. Kothari of the artificial inflation present in each share of Wilmington Trust throughout the Class Period. With these estimates, Coffman formulated the Plan of Allocation to treat Class Members who purchased and sold Wilmington Trust common stock at different times within the Class Period in an equitable manner consistent with recoverable losses under the federal securities laws, by capturing the artificial inflation in the purchase price minus the artificial inflation present in the sale price. Based on his work on this case and his prior experience, Coffman opined that the Plan of Allocation is fair and reasonable in his accompanying declaration. *See* Ex. B at ¶18.

133.    Based on their prior experience with Coffman, along with the challenges, risks, and likely recovery in this Action, Lead Counsel determined that Coffman's $575 hourly rate was reasonable, necessary, and less than other experts of his caliber and stature.[7]   The rates of Coffman's support team at Global Economics – ranging from $175 to $450 per hour were also reasonable and in proportion to their level of expertise. Lead Counsel chose to take on the risk

---

[7] For example, in 2011 in the *Bank of Am.* litigation, (*see* ¶128, *supra*), in opposition to a report submitted by Coffman, the defendants submitted an expert report by Prof. Allen Ferrell, the Greenfield Professor of Securities Law at Harvard Law School.  Prof. Ferrell's hourly rate at that time was $850.  Ex. H at 57.

that absent a settlement or judgment, they might not be reimbursed for what they paid to Coffman.

### 3. Harris L. Devor, CPA

134. Lead Plaintiffs retained Harris L. Devor ("Devor") as their consulting and testifying expert in the areas of accounting, GAAP, and Generally Accepted Auditing Standards ("GAAS"). Devor is a Certified Public Accountant with nearly 40 years of experience, and is the Philadelphia Partner in charge of Forensic Accounting, Litigation, Support and Valuation Service at Friedman LLP. Devor has testified in several high-profile cases, including *Bank of America, In re Petrobras Sec. Litig.*, No. 14-cv-9662 (S.D.N.Y.), and *In re WorldCom Sec. Litig.*, No. 02-cv-3288 (S.D.N.Y.). Lead Counsel have retained Devor on several prior and ongoing securities fraud litigations. As such, Lead Counsel was highly familiar with Devor's work and used their relationship with Devor to maximize efficiencies and avoid any duplication of efforts between Devor, other experts, and Lead Counsel.

135. A significant portion of this Action centers on Defendants' improper accounting for Wilmington Trust's ALLL and KPMG's audit work thereon. Lead Counsel retained Devor during the course of their investigation leading up to the first amended complaint filed by Lead Plaintiffs in this Action. In particular, Lead Counsel worked with Devor on developing GAAP allegations concerning Wilmington Trust's ALLL, as well as Wilmington Trust's deferred tax asset and fair value disclosures concerning its loan portfolio.

136. Lead Counsel once again worked with Devor after the FAC was sustained, closely consulting with Devor and his team throughout document and deposition discovery. Devor provided crucial insight into GAAP to determine whether the Wilmington Trust's financial statements were properly prepared. This insight included an analysis of (i) the impact of improperly rated loans on the Bank's financial statements and ALLL calculations (which

involved working closely with Lead Plaintiffs' expert Michael Clabby), ¶¶140-43, infra); (ii) accounting issues implicated by the alleged Waiver Practice and Mass Extension, including the impact of the unreported past due loans on the ALLL; (iii) the impact of Wilmington Trust's underwriting violations, included the alleged misuse of the 10% Rule, interest reserves, and other forms of supplemental financing on the Bank's financial results; and (iv) whether the above and other violations led to a material understatement of the Bank's ALLL.

137.    Devor and his team also provided Lead Counsel with crucial insight into whether KPMG's audits and audit methodology were consistent with GAAS and other applicable standards.  This included an analysis of (i) KPMG's audit planning, staffing, and budgeting; (ii) KPMG's testing procedures (including loan sampling and identified deficiencies, significant deficiencies, and material weaknesses); and (iii) regulatory guidance and findings—including the MOU and the Federal Reserve's 2009 Examination Report.

138.    At the time the Settlements were reached, Devor and his team had closely and extensively consulted with Lead Counsel on the topics listed above (and others)—including during numerous conference calls between various members of the Lead Counsel team and members of Devor's team, including an in-person, day-long meeting in New York between Lead Counsel, Devor, and his team.  Throughout discovery, Devor and his team provided valuable assistance to Lead Counsel.  For example, Devor and his team assisted Lead Counsel in preparing for depositions, both in 2014 prior to the first stay on discovery imposed in this case, and again in 2017, after the stay was lifted.  Devor and his team worked closely with Lead Counsel in preparation for the highly complex and technical depositions of KPMG witnesses and Wilmington Trust witnesses who were involved in accounting for the Bank's ALLL.  At Lead Counsel's request, members of Devor's team (who billed at substantially lower rates than Devor)

attended several depositions that particularly related to auditing issues, including the depositions of certain KPMG audit personnel.  In addition, Devor and his team had completed a substantial amount of work towards finishing a lengthy and detailed expert report concerning the Bank's and KPMG's violations of the securities laws that Lead Plaintiffs would have submitted had the Settlements not been reached.

139.    Based on their prior experience with Devor, along with the challenges, risks, and likely recovery in this Action, Lead Counsel determined that Devor's hourly rate of $650 was reasonable, necessary, and in line with other experts of his caliber and stature.[8]  The rates of Devor's support team—ranging from $195 to $415 per hour were also reasonable and in proportion to their level of expertise. Lead Counsel chose to take on the risk that absent a settlement or judgment, they might not be reimbursed for what they paid to Devor.

### 4.    Michael J. Clabby

140.    Lead Plaintiffs retained Michael J. Clabby ("Clabby") as their testifying expert in the areas of loan underwriting, asset review, and risk ratings.  Clabby is a commercial banker with over 35 years of active lending experience that includes active commercial and commercial real estate lending, extensive portfolio management, credit and problem loan work-out, and corporate governance and compliance, in all areas of lending. Clabby's lending background encompasses the credit administration of large commercial and industrial, commercial real estate, asset-backed and personal/private banking loan portfolios, including large scale land acquisition/development loans, development/construction projects, and master-planned communities.  Clabby also has extensive experience in both large and small banks in commercial

---

[8] For example, the hourly rate defendants' accounting experts in the *Petrobras* litigation (in which Devor testified on behalf of the plaintiffs) was $655 in 2013.  Ex. H at 127, 131.

real estate loan underwriting standards and approvals, the creation of and implementation of credit policy, regulatory compliance as well as a broad understanding of banking industry lending standards and practices.  In his role as an expert witness, Clabby has testified in high-profile cases, including for the Government in *FDIC v. Van Dellen*, No. 10-cv-4915 (C.D. Cal.), arising from the IndyMac bank collapse.

141.    Lead Counsel retained Clabby to provide crucial insight into the Bank's commercial real estate loan underwriting and asset review practices that form a core portion of Lead Plaintiffs' claims and relate directly to the understated ALLL.  If his report had been submitted, Clabby would have demonstrated how the Bank's fraudulent underwriting and asset review practices were part of the alleged widespread pattern of fraudulent conduct and how Defendants misrepresented the nature of those practices to investors.  As part of this process, Clabby analyzed: (i) the Bank's written underwriting and asset review practices; (ii) conflicts of interest between lenders and customers within the Bank's loan underwriting department; (iii) the existence of Wilmington Trust's waiver practice and Mass Extension and its impact on the Bank's asset review and risk rating practices; (iv) systematic deficiencies in the Bank's loan files that prevented the Bank from properly underwriting and reviewing commercial real estate loans; (v) abuses of non-standard practices such as the 10% Rule, which resulted in incorrect LTV ratios; (vi) illicit uses of interest reserves and other forms of supplemental financing extended to struggling borrowers in order to keep loans current for interest; and (vii) improperly risk rated loans and the improper delay in risk rating downgrades.

142.    In addition to his analysis and expert opinions on the above topics, which were all part of a draft report prepared by Clabby, Lead Counsel requested that Clabby review and re-rate, if necessary, the Bank's loan risk ratings for selected loans as of year-end 2007, 2008 and

2009.   The loans assigned for review related to five major Wilmington Trust borrower relationships (a "relationship" being a group of loans related to certain common principals, makers, co-makers and/or guarantors or as that term is used in commercial banking).   As part of the process to re-risk rate the loans, Clabby and Lead Counsel worked together to rebuild certain significant borrower loan files for the entire life of loan relationship, including origination and tax returns.   In total, Clabby and his team (comprised in large part of former regulators with extensive experience in assigning risk ratings to loans) reviewed over 300 loans and re-rated each of those loans up to three times as of year-end 2007, 2008 and 2009.   The results of Clabby's risk ratings analysis were a crucial component not only of Clabby's assessment of Wilmington Trust's asset review practices and procedures, but were used by accounting expert Devor in assessing whether the Bank's inflated risk ratings led to a material and fraudulent understatement of the ALLL, and by damages and loss causation expert Prof. Kothari in assessing whether the decline in share prices was due to revelations concerning Defendants' fraudulent misrepresentations.

143.   Based on their review of Clabby's prior expert engagements, credentials, and several interviews conducted by Lead Counsel, Lead Counsel determined that Clabby's hourly rate of $600 was reasonable and necessary.[9] The rates of Clabby's support team—ranging from $385 to $500 per hour were also reasonable and in proportion to their level of expertise. After he

---

[9] Clabby's hourly rate is in line with that of Devor's (whose analysis built on Clabby's work), and lower than several other of Lead Plaintiffs' experts.  Of note, Lead Counsel identified several other potential experts before retaining Clabby. Additionally, Lead Counsel determined that Clabby's hourly rate of $600 was reasonable, necessary, and in line with other experts of his caliber and stature. For example, the hourly rate of plaintiffs' mortgage loan underwriting expert in the *IndyMac* litigation was $825 for its principals in 2013.  Ex. H at 339-340.

was retained, Lead Counsel worked with Clabby and his team to ensure that all work was performed efficiently and without duplication.

### 5. James Miller

144. Lead Plaintiffs retained James Miller as their testifying rebuttal expert on the topic of investment banking and due diligence in connection with the February 2010 Offering. Miller is a seasoned Wall Street investment banker with considerable experience in equity offerings. He has worked as a senior equity capital markets investment banker at Merrill Lynch, the head of U.S. Equity Capital Markets at Deutsche Bank Securities, Co-Head of U.S. Equity Capital Markets at Lehman Brothers, and Global Co-Head of Equity Capital Markets at Dresdner Kleinwort Wasserstein. Miller has previously testified in high-profile cases such as *In re MF Global Holdings Ltd. Sec. Litig.*, No. 11-cv-7866 (S.D.N.Y.), *In re Lehman Bros. Equity/Debt Sec. Litig.*, No. 08-cv-5523 (S.D.N.Y.), and *WorldCom*.

145. At the time the Settlements were reached, Miller had closely consulted with Lead Counsel regarding events surrounding the Offering. Miller performed a thorough analysis of targeted documentary and testimonial evidence related to the Offering to form his opinion, and based on his extensive experience, laid out anticipated areas and topics that the Underwriter Defendants' expert would likely have addressed. Lead Counsel would have submitted an expert report authored by Miller to rebut the Underwriter Defendants' affirmative due diligence defense.

146. Lead Counsel has worked with Miller on prior securities fraud cases and enjoy an excellent working relationship with him. Based on their prior experience with Miller, along with the challenges, risks, and likely recovery in this Action, Lead Counsel determined that Miller's

hourly rate of $975 hourly rate was reasonable, necessary, and in line with other experts of his caliber and stature.[10]

### 6.    Dr. Charles D. Cowan, Ph.D

147.    Lead Plaintiffs retained Dr. Charles D. Cowan to perform a statistical analysis on Wilmington Trust's commercial loan portfolio in order to assist Plaintiffs in determining a statistically relevant sample of loans to review for the purposes of this litigation. Dr. Cowan is the Chief Executive Officer and Co-Managing Member of Analytic Focus, LLC, a firm that specializes in financial, economic, demographic, and statistical research. Dr. Cowan, a nationally recognized expert in statistical applications and economic investigations, has over 40 years of experience in statistical research and design applied to issues in finance and economics.  Dr. Cowan has been retained as an expert witness and consultant in connection with litigation involving statistical sampling.  For example, he was retained as a sampling expert in *MBIA v. Countrywide*, No. 602825/08 (Sup. Ct. N.Y. Cty.). a case that involved allegations of material misrepresentations and omissions regarding loan characteristics similar to the allegations in this Action.

148.    In order to quantify the amount by which the ALLL was understated, Lead Plaintiffs needed to re-rate a subset of commercial real estate loans originated before and during the Class Period.  Cowan would have reviewed the new risk ratings determined by Clabby for the selected loans in question, and then applied a statistical analysis to determine the number of other loans that should have been re-rated based on similar criteria.  Lead Plaintiffs engaged Cowan to increase cost savings and efficiency in the expert discovery process; his statistical

---

[10] Of note, Miller's hourly rate is lower than that of that of Kothari's, another financial expert, and his rates were approved in *MF Global*, *Lehman*, and *WorldCom* discussed above.

analysis would have supplanted hundreds or thousands of additional hours of time for Clabby and his team reviewing and re-rating additional loans in Wilmington Trust's portfolio.

149.    Lead Counsel retained Cowan based on Lead Counsel's extensive interviews with him and other potential experts.  Based on these own interviews, along with the challenges, risks, and likely recovery in this Action, Lead Counsel determined that Cowan's hourly rate of $695 was reasonable, necessary, and in line with other experts of his caliber and stature.[11]  The rates of Dr. Cowan's support team – ranging from $150 to $550 per hour were also reasonable and in proportion to their level of expertise.

### 7.    Patrick Rohan

150.    Lead Plaintiffs consulted with Patrick Rohan, who would have been their testifying expert in the areas of banking rules, regulations, and standards, and issues related to regulatory examinations, findings, and enforcement.  Rohan is a respected expert with significant experience in bank examination and supervision.  He worked at the FDIC for 32 years, during which time he was promoted to Regional Director for a six-state region in the Northeast.  In that capacity, Rohan was responsible for all aspects of financial examination activities and supervised a staff of over 300 people.  He has testified as an expert in several significant cases, including *VIP Mortg. Corp. v. TD Bank N.A.*, No. 08-cv-10562 (D. Mass.) and *Everbank v. Lefta Enterprises LLC*, No. CACE-09-050156 (Fla. Cir.).  Lead Counsel consulted with Rohan to provide crucial insight into issues related to the regulators' examinations of Wilmington Trust and the Federal Reserve's 2009 imposition of the MOU.  While the Settlements were achieved

---

[11] Cowan's hourly rate is in line with Clabby's (upon whose work he would have based his analysis), and less than other of Lead Plaintiffs' experts.  Lead Counsel were also able to negotiate terms to Cowan's retainer that were advantageous to the Class.

before Lead Plaintiffs formally retained Rohan, Lead Counsel would have submitted his expert report had litigation continued.

### 8. Colliers/Kidder Matthews

151. Lead Plaintiffs consulted with experts from Kidder Matthews (and formerly with Colliers International) on issues relating to historical real estate appraisals. The Kidder Matthews team are respected experts with significant experience in commercial real estate valuation and advisory services. For example, Robert Dietrich and Derrick Sinclair, currently vice presidents at Kidder Matthews, have a collective 70 years of expertise in the appraisal industry, and have been designated as experts in real estate valuation issues in court, testifying in that capacity on more than 70 occasions. Lead Counsel retained the Kidder Matthews team based on Lead Counsel's extensive interviews with them and other potential experts. Based on these interviews, along with the challenges, risks, and likely recovery in this Action, Lead Counsel determined that their hourly rate of $400-$500 was reasonable, necessary, and in line with other experts of their caliber and stature.[12]

152. The Kidder Matthews team provided information relating to Wilmington Trust's appraisal practices, and how those practices compared to industry standard practices. In addition, Lead Counsel consulted with the Kidder Matthews team during the discovery phase of the Action in order to understand Wilmington Trust's appraisal policies and to craft questions to be used in depositions that addressed the Bank's grossly deficient appraisal practices and policies.

---

[12] Their hourly rates are lower than other of Lead Plaintiffs' experts. Lead Counsel were also able to negotiate terms to the Kidder Matthews retainer that were advantageous to the Class.

### 9.    Other Consulting Experts

153.    Lead Plaintiffs retained additional consulting experts during the early stages of the litigation to assist with drafting the complaints and opposing the multiple motions to dismiss. These consulting experts include:

(a)    Sharon Fierstein.   Lead Counsel consulted with Fierstein on certain discrete accounting issues with respect to the earlier complaints and the FAC related to the calculation of Wilmington Trust's allegedly misstated ALLL.  Fierstein is a CPA who has testified as an expert witness in securities fraud cases against Fannie Mae and Washington Mutual.  Lead Counsel has worked with Fierstein in previous securities fraud class actions.  Based on their prior experience with Fierstein, along with the challenges, risks, and likely recovery in this Action, Lead Counsel determined that her hourly rate of $400 was reasonable, necessary, and in line with other experts of her caliber and stature.

(b)    John Finnerty, Ph.D.  Lead Counsel consulted with Dr. Finnerty on certain limited causation and damages issues with respect to the Amended Complaint.  Finnerty is the founder of Finnerty Economic Consulting, a Professor of Finance and Fordham University's Gabelli School of Business, and has published 15 books and over 100 articles and peer-reviewed papers.  Dr. Finnerty has testified on behalf of both plaintiffs and defendants, and Lead Counsel has worked with him in previous securities fraud class actions.  Based on their prior experience with Finnerty, along with the challenges, risks, and likely recovery in this Action, Lead Counsel determined that his hourly rate of $695 was reasonable, necessary, and in line with other experts of his caliber and stature.

(c)    Peter Nigro and Carey Collins. Lead Counsel consulted with Profs. Nigro and Collins on issues relating to trends and developments in the commercial real estate industry and, in particular, the Delaware commercial real estate industry, in connection

with their investigation into the allegations in the FAC and earlier complaints.  Prof. Nigro is the Sarkisian Chair in Financial Services at Bryant University and Prof. Collins is an Associate Professor of Finance and Bryant University; they have worked as expert witnesses in securities fraud cases against major banks such as Washington Mutual.  Lead Counsel has worked with Profs. Nigro and Collins in previous securities fraud class actions, and based on their prior experience, along with the challenges, risks, and likely recovery in this Action, Lead Counsel determined that the Professors' hourly rates of $450 per hour reasonable, necessary, and in line with other experts of their caliber and stature.

## VII.   SUMMARY JUDGMENT

154.   Under the April 27, 2017 Joint Stipulation to Extend Discovery Dates (D.I. 645), the deadline for parties to file summary judgment motions was to be January 31, 2018. Accordingly, Lead Plaintiffs ended fact discovery in August 2017 and soon began preparing for the summary judgment stage of the litigation.  Lead Plaintiffs and Lead Counsel would have been prepared to file a summary judgment motion based on, at the very least, the waiver practice and past due loan fraud on that date.  Lead Plaintiffs and Lead Counsel believed that a partial summary judgment verdict in advance of trial would strengthen their position and move the Class forward expeditiously to their day in court. Indeed, Lead Counsel had prepared a draft of a motion for summary judgment and an extensive draft statement of undisputed facts to be used in connection with this motion.  Given the significant amount of work completed by the end of 2017, Lead Plaintiffs proposed to Defendants that the deadline for summary judgment motions should be moved up to December 15, 2017.  Defendants opposed this schedule.

155.   Lead Plaintiffs and Lead Counsel were also prepared to respond to the intensive summary judgment motions that they expected Defendants to file.  Email exchanges with

Defendants' counsel in late November and early December 2017 indicated that, at that time, Defendants intended to collectively file 450 pages of opening summary judgment briefs *and* 450 pages in opposition to Lead Plaintiffs' summary judgment briefing.

156.    On December 18, 2017, the Court entered an Order extending the deadline to file summary judgment motions to August 31, 2018.  D.I. 805.  Lead Counsel continued to prepare for summary judgment until the Parties agreed to settle the Action.

## VIII.   THE CRIMINAL TRIAL AGAINST WILMINGTON TRUST AND CERTAIN INDIVIDUAL DEFENDANTS

157.    On May 6, 2015, while discovery in this Action was stayed, the United States Attorney's Office for the District of Delaware ("USAO") unsealed an Indictment, styled *United States v. North, et al.*, No. 15-cr-23 (D. Del.) (the "Criminal Action") asserting four counts of criminal conduct against North and Rakowski arising from their actions at the Bank.  Three months later, on August 5, 2015, the U.S. Attorney unsealed a Superseding Indictment, restyled *United States v. Gibson, et al.*, which added allegations of criminal conduct against Gibson and Harra, and which also expanded the scope of the charged conduct to 19 counts.  On January 6, 2016, a Second Superseding Indictment was unsealed, again restyled *United States v. Wilmington Trust, et al.*  This indictment named Wilmington Trust itself as a criminal defendant. Finally, on August 2, 2016, a federal grand jury returned a 19-count Third Superseding Indictment charging Wilmington Trust, Gibson, Harra, North, and Rakowski with an overarching conspiracy offense, as well as additional fraud, false statements, and false entries offenses.

158.    Jury selection for the Criminal Trial began in early October 2017.  The trial was set to begin on October 10, 2017.  However, on the morning that opening statements were scheduled to begin, the USAO announced that it had reached a resolution with Wilmington Trust.  Through that resolution, criminal charges against Wilmington Trust were dropped and the

USAO filed a Civil Forfeiture Complaint through which Wilmington Trust and the USAO agreed to a total settlement amount of $60,000,000, which credited Wilmington with its prior payment to the SEC in the amount of $16,000,000 and requires an additional forfeiture payment of $44,000,000.  After the Wilmington Trust settlement was announced, the Criminal Trial for remaining defendants Gibson, Harra, North, and Rakowski was rescheduled to begin on March 12, 2018.  Following 31 trial days, on May 3, 2018, a jury unanimously convicted Gibson, Harra, North, and Rakowski on all counts.

159.    Notably, as the Court observed (and as Wilmington Trust's counsel conceded) at the July 2, 2018 Preliminary Approval Hearing, Lead Plaintiffs and Lead Counsel prosecuted this Action such that it "was pretty well underway" where "virtually all of the document discovery had been completed" by the time the Criminal Action was filed.  Hr'g. Tr. 30:6-16.

160.    Indeed, while this Action and the Criminal Action overlapped to a limited degree, this Action covers a far longer time span, names a larger number of defendants, and encompasses a significantly larger number of issues than the Government's case.  For example, the Class Period in this Action begins in January 2008 and covers fraudulent conduct that occurred throughout 2007—nearly two years prior to the conduct charged in the Criminal Action. Moreover, throughout this significantly longer period, Lead Plaintiffs alleged a course of fraudulent conduct based not just on the Bank's practice of waiving past due loans that was the focus of the Government's case, but also principally on the Bank's materially understated ALLL, outdated appraisals, and illicit use of the 10% Rule and other forms of supplemental financing to inflate loan risk ratings and disguise the true health of the Bank's commercial loan portfolio. Much of the Criminal Trial was not relevant to these issues.

## IX.    SETTLEMENT DISCUSSIONS AND AGREEMENT

161.    As mentioned above, the parties engaged in an unsuccessful formal mediation in June 2012. During active discovery in 2014 through 2016, the parties would occasionally and informally discuss resolution of the Class's claims, but the conversations were never substantive or fruitful. In late 2017, following Wilmington Trust's exit through civil settlement from the Criminal Action, the Plaintiffs and the Wilmington Trust Defendants began to engage in serious settlement discussions.

162.    Over the course of several months, Plaintiffs and the Wilmington Trust Defendants participated in several meetings during which they engaged in substantive discussions of the merits of the case, the risks of litigation, and the amount of recoverable damages, in an effort to reach a resolution of the Class's claims. Following these extensive arm's-length negotiations over the course of several months, Lead Plaintiffs, the Wilmington Trust Defendants, M&T Bank, and the Underwriter Defendants reached an agreement in principle to settle the Class's claims for $200,000,000 in cash (the "Wilmington Trust Settlement"). This agreement was memorialized in a settlement Term Sheet executed on April 9, 2018. On May 15, 2018, the Wilmington Trust settling parties executed the Wilmington Trust Stipulation, which set forth the final terms and conditions of the Wilmington Trust Settlement.

163.    Lead Plaintiffs and KPMG commenced settlement negotiations in April 2018. Lead Plaintiffs and KPMG participated in several meetings during which they engaged in substantive discussions of the merits of the case, the risks of litigation, and the amount of recoverable damages, in an effort to reach a resolution of the Class's claims. Following these extensive arm's-length negotiations, on May 21, 2018, Lead Plaintiffs and KPMG reached an agreement in principle to settle for $10,000,000 in cash. Lead Plaintiffs and KPMG executed the KPMG Stipulation on May 25, 2018.

## X.   PRELIMINARY APPROVAL

164.   On May 25, 2018, Lead Plaintiffs filed their Unopposed Motion for (I) Preliminary Approval of Settlements and (II) Approval of Notice to the Class. D.I. 821.

165.   The Parties appeared before the Court on July 2, 2018 for oral argument on Lead Plaintiffs' motion. Following oral argument, on July 10, 2018, the Court issued its Preliminary Approval Order, granting Lead Plaintiffs' motion and finding the settlements to be "fair, reasonable, and adequate to the Class subject to further consideration at the Settlement Fairness Hearing[.]" D.I. 825. The Court set the Settlement Fairness Hearing for Monday, November 5, 2018.

### A.   The Court's Request Concerning the Calculation of Maximum Damages

166.   In its July 10, 2018 memorandum concerning Lead Plaintiffs' motion for Preliminary Approval, the Court requested that, "[a]s part of the preparation for the final fairness hearing, Counsel will submit an expert report regarding, inter alia, how they calculated the maximum damages that could have been recovered." D.I. 824 at 8 n. 7.

167.   In response to the Court's request, Lead Plaintiffs attach hereto two declarations. The first declaration is from Professor S.P. Kothari, whom (as discussed further below) Lead Counsel retained as Lead Plaintiffs' testifying expert in the fields of market efficiency, causation, and damages. (¶¶120-27) Prof. Kothari's declaration explains how he applied an accepted technique known as an "event study" to calculate the amount of artificial inflation present in each share of Wilmington Trust stock throughout the Class Period based on an analysis of disclosures corrective of Defendants' alleged misrepresentations. Ex. A at ¶¶12-20.

168.   The second declaration is from Chad Coffman, whom (as discussed further below) Lead Counsel retained as a consulting expert in the fields of damages, causation, and market efficiency, and to prepare the Plan of Allocation. (¶¶128-133) Mr. Coffman's declaration

explains that he applied the estimate of artificial inflation prepared by Mr. Kothari to trading models Mr. Coffman constructed to estimate the number of damaged shares during the Class Period. By doing so, Mr. Coffman found that there were aggregate damages of $590 million. Ex. B at ¶16. After reducing this amount by the $44 million forfeited by Wilmington Trust in connection with its settlement of the criminal charges against it, the maximum recoverable damages becomes $546 million. *Id.*

## XI. THE SIGNIFICANT RISKS FACED BY LEAD PLAINTIFFS AND LEAD COUNSEL

169.    As a result of the substantial discovery, legal research, and analysis conducted by Lead Counsel, Lead Plaintiffs and Lead Counsel had a thorough understanding of the strengths and weaknesses of the claims against the Defendants at the time the Settlements were reached. As summarized below, Lead Counsel assumed significant risk in prosecuting the Action on an entirely contingent basis. Indeed, the fact that the Court dismissed Plaintiffs' CAC in its entirety demonstrates the reality of the risk faced by Lead Counsel in prosecuting this Action. Even after Plaintiffs' subsequent Complaint survived Defendants' motions to dismiss, settlement was by no means inevitable, and certainly not at the high dollar amount—representing approximately one-third of recoverable damages—Lead Counsel ultimately achieved.

### 1.    General Risks In Contingency Securities Class Actions

170.    Data indicates that securities class actions as a group have become riskier in recent years, even just in the years since this Action was first initiated. For example, data from Cornerstone Research shows that, in each year between 2008 and 2017, a majority of the securities class actions filed were dismissed—and the percentage of dismissals was as high as

58% in 2013 and 54% in 2015.[13] Well-known economic consulting firm NERA found that, out of securities class actions in which a motion to dismiss was decided from January 2000 through December 2017, 45% were dismissed.[14]

171.   Even when they have survived motions to dismiss, securities class actions are increasingly dismissed in connection with Daubert motions, or at summary judgement. Multiple securities class actions also recently have been dismissed at the summary judgment stage. *See, e.g.*, *In re Barclays Bank PLC Sec. Litig.*, No. 09-01989, (S.D.N.Y.) (summary judgment granted on September 13, 2017 after eight years of litigation); *Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd* 597 F.3d 501 (2d Cir. 2010) (summary judgment granted after six years of litigation and millions of dollars spent by plaintiffs' counsel); *see also In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 496 (D. Conn. 2013), *aff'd* 766 F.3d 172 (2d Cir. 2014). Further, cases are frequently dismissed prior to trial in connection with *Daubert* motions. *See, e.g.*, *Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd* 752 F.752 F2d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of defendants after finding that plaintiffs' expert was unreliable).

172.   Even when securities class action plaintiffs are successful in getting a class certified, have prevailed at summary judgment, overcome *Daubert* motions, and have gone to trial, there are still very real risks that there will be no recovery or substantially less recovery for class members. For example, in *In re BankAtlantic Bancorp, Inc.* (S.D. Fla. 2010), a jury rendered a verdict in plaintiffs' favor on liability in 2010. In 2011, the district court granted

---

[13] *See* Cornerstone Research, *Securities Class Action Filings, 2017 Year In Review* (2018) at 15.

[14] *See* Stefan Boettrich and Svetlana Starykh, "Recent Trends in Securities Class Action Litigation: 2017 Full-Year Review" (NERA 2018 at p. 19, Figure 14).

defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims. 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011). In 2012, the Eleventh Circuit affirmed the district court's ruling, finding that there was insufficient evidence to support a finding of loss causation. *In re BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012).

173.    In sum, Lead Counsel respectfully submit that securities class actions face serious risks of dismissal and non-recovery at all stages of litigation, and this Action is no different.

## 2.    Specific Risks In Prosecuting The Action

174.    Facts specific to this Action created particularly significant risks that created the very real possibility that, even after nearly a decade protracted litigation, Lead Plaintiff and the Settlement Class could achieve no recovery at all, or a significantly lesser recovery than the Settlement Amount. Some of the most meaningful of these risks are discussed below.

### a.    The Difficulty Of Proving Defendants' Liability.

175.    While Plaintiffs and Lead Counsel believe that they advanced strong claims on the merits, Defendants vigorously contested their liability throughout the litigation, and there was a substantial risk that the Court or a jury would find that Plaintiffs failed to establish liability.

176.    For example, Plaintiffs' core allegations relating to Wilmington Trust's understated ALLL were, and would continue to be, the subject of strong challenges by Defendants.  Indeed, as Defendants repeatedly argued, there was no restatement of Wilmington Trust's financial statements—including its reserve—and its auditor signed off on the Bank's ALLL throughout the Class Period.  As such, the complicated, technical, and judgment-driven nature of the accounting standards at issue governing the setting of the Bank's ALLL could prevent a finding of objective falsity. Thus, the Parties' respective positions are based on fundamental disagreements about highly technical and judgment-driven accounting standards, and the resolution would turn on dueling testimony offered by experts—issues which courts

observe are particularly difficult for plaintiffs to litigate.  *See, e.g.*, *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 162 n.9 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016) ("Financial accounting is not a science. It addresses many questions as to which the answers are uncertain and is a 'process [that] involves continuous judgments and estimates.'"); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 579-80 (S.D.N.Y. 2008) (in a "battle of experts, it is virtually impossible to predict with any certainty which testimony would be credited").

177.    As another example, Plaintiffs would have to establish the element of scienter—*i.e.*, that Defendants acted intentionally or recklessly misled Wilmington Trust investors. Even a jury finding of gross negligence by Defendants would be insufficient to support Plaintiffs' fraud-based claims under the Exchange Act. Here, Defendants had made compelling arguments that they had no intent to mislead investors because Defendants believed the practices at issue were known of (and implicitly condoned by) the Bank's regulators and auditors.

178.    The eventual (and at the time of Settlement, uncertain) guilty verdict in the Criminal Action did not substantially eliminate any of the above risks relating to Defendants' liability.  Lead Plaintiffs still needed to prove the elements of falsity, materiality, scienter and, as discussed below, damages, for each category of false statements for a Class Period that exceeded the time period covered by the Criminal Action by two years and for Defendants that included not only the Criminal Defendants, but the Bank, other individuals, and KPMG.

### b.    Risks In Proving And Collecting Damages

179.    Even assuming that Plaintiffs would successfully overcome the above risks and established liability, Plaintiffs faced serious risks in proving and collecting damages.

180.    First, while Plaintiffs' damages expert estimated that the Settlement Class suffered approximately $590 million in recoverable damages, that amount would be offset by the money recovered by the Government on behalf of investors.  In order to prove damages,

Plaintiffs bear the burden of establishing "loss causation," *i.e.*, that Defendants' false and misleading statements caused their alleged loss. To establish loss causation, plaintiffs must demonstrate a sufficient connection between the alleged fraudulent conduct and the losses suffered. Plaintiffs attempted to meet this burden through their allegations that Defendants' fraud was gradually revealed to the investing public through a series of partial corrective disclosures principally occurring during 2010.

181.    In response, however, Defendants would have made credible arguments that Plaintiffs could not establish (either in whole or in part) that their losses were attributable to the revelation of the Bank's fraud. Instead, Defendants would have argued that much if not all of the decline in Wilmington Trust's stock price were collateral consequences of the ongoing global financial crisis, a broad macroeconomic event that wreaked particular havoc on the real estate lending industry—precisely the subject of many of Plaintiffs' allegations here. Indeed, Defendants would undoubtedly argue that many of the corrective disclosures alleged in the FAC—increases to the reserve—were timely, prudent, and necessary in light of economic circumstances at the time.

182.    Moreover, Defendants would argue—as they had in the context of the Criminal Action—that the massive decline in the price of Wilmington Trust securities at the end of the Class Period related solely to the fire sale purchase of Wilmington Trust by M&T Bank at half the Bank's trading price, not any disclosure of alleged fraud.

183.    These arguments posed a significant risk, because if Defendants had succeeded Plaintiffs could have established liability but nevertheless have been unable to establish that the Class was entitled to the full amount (or any) of its damages. Accordingly, to meet their burden on loss causation and overcome this argument, Plaintiffs had to engage multiple experts in a

66

variety of fields making clear the direct connection between the alleged corrective disclosures and disaggregating any confounding effects from the deteriorating economic conditions from the global financial crisis and other events. Further, because several of the alleged corrective disclosures related to the Bank's announcement of significant increases to its ALLL, Plaintiffs worked with sophisticated experts in different fields – including underwriting, accounting, and damages – to analyze Wilmington Trust's actual loan portfolio to establish that the Bank should have increased its ALLL months or years earlier than Defendants actually did. Only by doing so could Plaintiffs meet their burden of showing that the stock declines accompanying Wilmington Trust's announcements of those increases to its ALLL were in fact caused by Defendants' fraudulent understatement of their ALLL during the Class Period.

### c.    The Risk And Uncertainty Created By The Criminal Action

184.    Even though the Government did not file the Criminal Action until years after Plaintiffs initiated this Action—and in fact did not even did not indict the Criminal Defendants until discovery had begun—the Criminal Action created considerable risk and uncertainty in prosecuting this Action.

185.    The Wilmington Trust Settlement was agreed to shortly after the Criminal Trial commenced, and weeks prior to the delivery of the jury verdict against the Criminal Action Individual Defendants.  Wilmington Trust and the Criminal Defendants had spent years and considerable resources building a credible defense that the Bank's past due practices were longstanding and known to its regulators and auditors, and therefore the Criminal Defendants had no intent to commit fraud. While a not-guilty jury verdict in the Criminal Action would not have been fatal to Plaintiffs' claims in this Action—due to, among other things, the higher standard of proof required in the Criminal Action, as well as the far broader conduct at issue in

this Action—the Defendants would have looked to gain every strategic advantage possible from such a verdict.

186.    In addition, the prospect that the Defendants would pay a settlement or monetary judgment in connection with the Criminal Action – which eventually occurred in October 2017 when the Government settled with Wilmington Trust – created additional risk in prosecuting this Action, because that recovery in the Criminal Action would be offset against the Class's possible recovery here. This is because the applicable securities law precludes any recovery in excess of actual damages.

187.    Finally, the guilty verdicts created risks with respect to recoverability from certain Defendants.  The PSLRA requires a finder of fact to assign proportionate liability, and contains provisions for judgment reduction based on that proportionate liability.  Even if Lead Plaintiffs and Lead Counsel were able to secure a verdict against the non-Wilmington Trust Defendants (such as KPMG), they faced a very real risk that a jury would significantly reduce the convicted defendants' liability in light of the criminal convictions.

### 3.    Given The Risks Facing Lead Plaintiff And Lead Counsel, Settlement Was The Best Result For The Class

188.    This Action, while highly meritorious, presented the real possibility that the class would be unable to obtain a meaningful recovery against Defendants.  Moreover, the Class has already waited eight years for a recovery here. Even if Lead Plaintiffs had completely prevailed at trial on both liability and damages, post-verdict motions and appeals would have been almost inevitable, raising the risk of additional months (and likely years) of delay in finally resolving the class's claims.  Settlement at this time, and for such a substantial percentage of the Class's recoverable damages, presented the best result for the Class.   The Settlements provide a

substantial cash recovery for the benefit of the Settlement Class and eliminate the risks attendant to continued litigation against the Defendants.

## XII.   FEE AND EXPENSE APPLICATION

189.   In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying to the Court for an award of attorneys' fees of 28% of the combined Settlement Funds, or $58.8 million, plus interest earned at the same rate as the Settlement Fund (the "Fee Application").  As discussed below, the requested fee represents a multiplier of 0.74 on Lead Counsel's lodestar.  Lead Counsel also request reimbursement of litigation expenses that they incurred in connection with the prosecution of this Action in the amount of $6,790,044.82.  Lead Counsel further request reimbursement to Lead Plaintiffs of a total of $55,456.06 in costs and reimbursement of time that Lead Plaintiffs incurred directly related to their representation of the Class, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4).  The legal authorities supporting the requested fees and expenses are discussed in Lead Counsel's Fee memorandum.  The primary factual bases for the requested fee and expenses are set forth below.

### A.      The Requested Fee is Fair and Reasonable

#### 1.      Lead Plaintiffs Have Authorized and Support the Fee Application

190.   Each of the five Lead Plaintiffs – sophisticated institutional investors of the type favored by Congress in passing the PSLRA – have evaluated Lead Counsel's Fee Application, as well as the Expense Application discussed in Section XII below, fully support it, believe it to be fair and reasonable, and warranting consideration and approval by the Court.[15]  *See* Declaration

---

[15] In addition to their responsibilities as Lead Plaintiffs and certified Class Representatives under the PSLRA and Rule 23, as public pension funds, each of the Lead Plaintiffs has a duty and obligation to their respective constituents to ensure that they are acting in their best interests and that they are appropriately reviewing Co-Lead Counsel's Fee and Expense Application.

of Scott Myers on behalf of the Coral Springs Police Pension Fund (the "Myers Decl.") (attached as Ex. C-1), at ¶¶7-8; Declaration of George Mitchell on behalf of the Pompano Beach General Employees Retirement System (the "Mitchell Decl.") (attached as Ex. C-2), at ¶¶10-11; Declaration of Brett Ciskoski on behalf of the St. Petersburg Firefighters' Retirement System (the "Ciskoski Decl.") (attached as Ex. C-3), at ¶¶7-8; Declaration of Kristen Santos on behalf of the Merced County Employees' Retirement Association (the "Santos Decl.") (attached as Ex. C-4), at ¶¶7-8; Declaration of James Beno on behalf of the Automotive Industries Pension Trust Fund (the "Beno Decl.) (attached as Ex. C-5), at ¶¶7-8.

191.    As a result, Lead Plaintiffs collectively endorse Lead Counsel's application for an award of attorneys' fees constituting 28% of the Settlement Fund net of Plaintiffs' Counsel's expenses, an amount in accordance with or below the amount set forth in each of Lead Plaintiffs' respective retainer agreements entered into by the Lead Plaintiffs and our respective firms at the outset of this Action.   Under the retainer agreements, Lead Counsel agreed to undertake the litigation on an entirely contingent basis.  Each of the retainer agreements sets forth a cap on the fee percentage that each Lead Plaintiff has authorized our respective firms to make, and each retainer agreement discloses that any fee award is subject to the Court's approval.

192.    For purposes of determining an appropriate fee request, the lowest fee percentage among the retainer agreements that each of Lead Plaintiffs had negotiated with our respective firms would be utilized to calculate the percentage of attorneys' fees that Lead Counsel would be permitted to apply for.  Based on these provisions, Lead Counsel are applying for a fee award of 28% of the Settlement Amounts.

### 2.      The Significant Time and Labor Devoted to this Action by Lead Counsel

193.    As detailed in Sections III-VI, *supra*, the work undertaken by Lead Counsel in investigating and prosecuting this Action to arrive at the present Settlements in the face of substantial risks has been time-consuming and challenging.   At all times throughout the pendency of this Action, Lead Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the Class, whether through settlement or trial.

194.    Attached as Exhibits D-1, D-2, and D-3, respectively, are the Declarations of Hannah Ross, on behalf of BLB&G; Joseph E. White, III on behalf of Saxena White; and Robert J. Kriner, Jr., on behalf of Chimicles, in support of Counsel's motion for an award of attorneys' fees and reimbursement of litigation expenses (the "Fee and Expense Declarations").   The Fee and Expense Declarations include schedules summarizing the lodestar of each firm and the expenses incurred by each firm, broken out by category.

195.    Plaintiffs' Counsel have expended a total of 195,075.13 hours in the investigation, prosecution, and resolution of this Action.[16]   The resulting lodestar is $79,976,223.50, resulting in a blended hourly rate for Plaintiffs' Counsel of $409.97.   Under the lodestar approach, the requested fee yields a substantial negative multiplier of 0.74.   Moreover, this multiplier is far below the range of multipliers awarded in actions where similar settlements have been achieved.

---

[16] No time spent in preparing the application for the Fee Application is included.  Lead Counsel will continue to perform legal work on behalf of the Class should the Court approve the proposed Settlement.  Additional resources will be expended assisting Class Members with their Proof of Claim Forms and related inquiries and working with the Claims Administrator to ensure the smooth progression of claims processing.

*See* Fee Brief at 15.  Appendix A to this declaration sets forth a breakdown and description of the work performed by Plaintiffs' Counsel.

196.    As demonstrated by the Firm Resumes of Saxena White and BLB&G (attached to their respective Fee and Expense Declarations), Lead Counsel are experienced and skilled practitioners in the area of securities fraud class actions, and each firm has a long and distinguished track record of success.  Lead Counsel worked diligently and efficiently while prosecuting this Action together, avoiding duplication of effort throughout the course of the litigation.  At the outset of the Action, Saxena White and BLB&G entered into a Joint Prosecution Agreement to ensure that the Class's claims would be vigorously and efficiently prosecuted without unnecessary delay or duplication of work.

### 3.    The Preeminent Standing and Caliber of Defense Counsel

197.    The quality of work performed by Lead Counsel in attaining the Settlements should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented by no less than 15 law firms, which included many of the nation's most elite firms and litigators.  Defendants' counsel included: Skadden, Arps, Slate, Meagher & Flom LLP, Venable LLP, and Williams & Connolly LLP (who represented Wilmington Trust); Hogan Lovells US LLP (who represented KPMG); Pepper Hamilton LLP (who represented the Independent Director Defendants); Simpson Thacher & Bartlett LLP and Potter Anderson & Corroon LLP (who represented the Underwriter Defendants); Morgan, Lewis & Bockius LLP (who represented Cecala); Paul Hastings LLP and the Law Office of John S. Malik (who represented Gibson); McCarter & English, LLP and Andrew M Lawler, P.C. (who represented Harra); Wilks Lukoff & Bracegirdle, LLC (who represented North); and Krovatin Klingeman LLC and Dalton & Associates, P.A. (who represented Rakowski).

198.    In addition to Defendants' counsel, Lead Counsel also faced off against the intervenor U.S. Attorney's Office when opposing the Government's multiple efforts to stay discovery and the significant advancement of this Action between 2014 and 2016.  *See, supra*, ¶¶85-90.  Moreover, Lead Counsel was in an adversarial position against the intervenor Federal Reserve, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, the Delaware Office of the State Bank Commissioner, and the Pennsylvania Department of Banking and Securities, who lodged an ultimately unsuccessful two-year campaign against Lead Plaintiffs' efforts compel the production of documents purportedly subject to the bank examination privilege.  *See, supra*, ¶¶66-72.

199.    These firms and Government attorneys vigorously and aggressively litigated the action and spared no effort in the defense of their clients.  In the fact of this experienced, formidable, and well-financed opposition, Lead Counsel was nonetheless able to efficiently develop a case that was sufficiently strong to persuade Defendants to settle on terms that are highly favorable to the Class.

### 4.    The Unique Risks and Complexities of Litigating this Action

200.    This Action presented novel procedural and substantive legal challenges from the outset.  In particular, as described above, there were substantial risks to establishing liability and damages that were unique to this Action.  ¶¶174-87, *supra*.  For example, Lead Counsel had to continually contend with the Government's attempts to stay this Action, which impacted our ability to push the litigation forward.  As discussed earlier, in and around October 2014, the Government intervened in this Action and moved for a stay of discovery, arguing that discovery in this Action might impact its ongoing criminal investigation. Consequentially, discovery in this Action was effectively stayed from October 2014 until December 2016, a delay of over two years that threatened Plaintiffs' ability to secure the evidence necessary to prove their

allegations. Even after the stay was lifted, prosecution of the Action was postponed once again after Wilmington Trust unexpectedly settled with the Government on the eve of the scheduled October 2017 Criminal Trial. Indeed, by the time the Parties agreed to settle this Action, nearly a decade had passed since much of the underlying conduct had occurred.

201.    Not being able to prosecute our case for periods of time, Lead Counsel also thus ran the risk that issues would be decided in the Criminal Action that would adversely impact this Action.  And while convictions in the Criminal Action would have been helpful, they would not have been dispositive because this Action is far broader in scope than the Criminal Action and covers a much larger time period.  Moreover, the majority of damages allegedly suffered by the Class are attributable to the conduct that occurred before the time period encompassed by the Criminal Action.

202.    These novel risks are in addition to the more typical risks accompanying litigation, such as the fact that the prosecution of this Action was undertaken by Lead Counsel entirely on a contingent basis.  As a general matter, it should be observed that there are numerous cases in which plaintiffs' counsel in contingent fee cases such as this have expended thousands of hours – indeed, litigating to a favorable jury verdict – only to receive no compensation whatsoever.  *See, e.g., In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (reversing jury verdict and granting judgment to defendants on all remaining counts as a matter of law).

203.    From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and the outlay of significant expenses that the vigorous prosecution of this Action would require.  In undertaking that responsibility, Lead Counsel were

obligated to ensure that sufficient resources were dedicated to the litigation, and that Lead Counsel would further advance all of the costs necessary to pursue the case vigorously, including funds to compensate vendors, experts, and consultants, and to cover the other considerable out-of-pocket costs that a case such as this typically demands. Because complex shareholder litigation generally proceeds for several years before reaching a conclusion – and this case, in particular, lasted eight – the financial burden on contingent-fee counsel is far greater than on a firm (such as those representing Defendants) that is being paid on an ongoing basis. Indeed, Lead Counsel have received no compensation during the course of this Action and no reimbursement of out-of-pocket expenses, yet they have incurred more than $6,790,044.82 in expenses in prosecuting this Action for the benefit of Wilmington Trust investors.

204.  Lead Counsel also bore the risk that no recovery would be achieved. As described herein, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever.

205.  Moreover, for decades the United States Supreme Court (and countless lower courts) have repeatedly and consistently recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. Indeed, as recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

206.    These risks assumed by Lead Counsel in connection with this Action, and the time and expenses incurred without any payment, were extensive and are relevant to an award of attorneys' fees.   Lead Counsel's persistent efforts in the face of these substantial risks and uncertainties have resulted in a significant and immediate recovery for the benefit of the Class. In circumstances such as these, and in consideration of Lead Counsel's hard work and the extraordinary result achieved, the requested fee of 28% of the Settlement Funds net of Plaintiffs' Counsel's expenses and reimbursement of $6,790,044.82 in expenses (as detailed below), is reasonable and should be approved.

### 5.    Fee Awards in Similar Cases

207.    Awards of attorneys' fees that have been approved in other large securities class actions have been compiled and are discussed in the accompanying Fee Brief.   *See* Fee Brief at 13-14.   For the reasons set forth therein, Lead Counsel's 28% fee request is well within the range of fee awards that have been approved in other large actions.

### 6.    Reaction of the Class

208.    In accordance with the Preliminary Approval Order, more than 92,330 Notice Packets have been mailed to potential Class Members and nominees advising them that Lead Counsel would seek an award of attorneys' fees in the amount of 28% of the Settlement Fund and reimbursement of expenses in an amount not to exceed $7.5 million.   *See* Ex. G, ¶7. Additionally, on August 6, 2018, the Court-approved Summary Notice was published in Investors' Business Daily and transmitted over the internet via PR Newswire.   *Id*. at 11.   All important documents related to this Action and the Settlement, including the Stipulation, have also been posted to the website for this Action, www.wilmingtontrustsecuritieslitigation.com.   *Id*. at 16.   As noted above, the deadline set by the Court for Class Members to object to the amount of attorneys' fees and expenses set forth in the Notice has not yet passed.   To date, however,

Lead Counsel are aware of no objections.  Lead Counsel will address all objections received in their reply papers to be filed with the Court on October 31, 2018.

### B.    Referral Fees

209.    As stated during the Preliminary Hearing, Lead Counsel Saxena White entered into agreements to pay referral fees with Ronald J. Cohen, Esq., Board Counsel to Pompano Beach General Employees Retirement System, and Stephen H. Cypen, Esq., General Counsel to Coral Springs Police Pension Fund.  These referral fees were entered into pursuant to Rule 4-1.5(g)(2) of the Rules Regulating the Florida Bar.  *See* Exhibits 4 and 5 to the White Declaration.

210.    Subsequent to the Preliminary Approval hearing, Cohen and Cypen each agreed to reduce the amount of the referral fee they are seeking to 4.5% each.  Each of these referral fees, if approved by the Court, will be wholly paid out of Saxena White's share of attorneys' fees; they are not in addition to any fee award made to Plaintiffs' Counsel.  The efforts expended by counsel to Pompano Beach General Employees Retirement System and Coral Springs Police Pension Fund during the course of this Action are detailed in the Declaration of Ronald J. Cohen (White Decl. Ex. 4) and Stephen H. Cypen (White Decl. Ex. 5), respectively.

### C.    Reimbursement of the Requested Expenses is Fair and Reasonable

211.    Lead Counsel also seek reimbursement from the Settlement Funds for $6,790,044.82 for expenses that were reasonably incurred by Plaintiffs' Counsel in connection with the prosecution of this Action, as well as $55,456.06 for the costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Class (the "Expense Application").

212.    From the outset of the Action, Lead Counsel have been cognizant of the fact that they might not recover any of their expenses, and, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years.  Lead Counsel also understood that, even if the case were ultimately successful,

reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action. Consequently, Lead Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

213.    As set forth in the Breakdown of Plaintiffs' Counsel's Litigation Expenses by Category (provided in Exhibit E), Plaintiffs' Counsel have incurred a total of $6,790,044.82 in unreimbursed litigation expenses in connection with the prosecution of this Action for which they are seeking reimbursement. As attested to, these expenses are reflected on the books and records maintained by respective Plaintiffs' Counsel. These books and records are prepared from expense vouchers, check records and other source materials, and are an accurate record of the expenses incurred. Plaintiffs' Counsel's expenses are set forth in detail in their firm's respective declaration, each of which identifies the specific category of expense, e.g., online legal and factual research, experts' fees, out-of-town travel costs, the costs of document management and litigation support, photocopying, telephone, fax and postage expenses, and other costs actually incurred for which Lead Counsel seek reimbursement. These expense items are billed separately, and such charges are not duplicated in the respective firms' billing rates; thus, no amount for general overhead is included in the expense amounts. Additionally, with respect to reimbursement for expenses incurred to outside vendors, the amounts requested reflect the actual amounts billed by the providers. A summary chart of Plaintiffs' Counsel's expenses is attached hereto as Exhibit E.

214.    Lead Counsel maintained strict control over the litigation expenses. Indeed, many of the litigation expenses were paid out of a litigation fund created by Lead Counsel and maintained by BLB&G (the "Litigation Fund"). In accordance with the Joint Prosecution

Agreement entered into between Saxena White and BLB&G at the outset of the Action, Lead Counsel collectively contributed $4,440,000.00 to the Litigation Fund. A description of payments from the Litigation Fund by category is set forth in the Ross Declaration. Ex. D-1. Currently, a balance of $36,345.62 remains in the Litigation Fund.

215. Of the total amount of expenses, $4,673,493.31, or approximately 68.8%, was expended on experts and consultants, broken down as follows:

      (a)     Prof. S.P. Kothari: $1,008,330.00

      (b)     Chad Coffman: $267,138.43

      (c)     Harris Devor: $1,685,316.80

      (d)     Michael Clabby: $1,462,491.35

      (e)     James Miller: $87,750.00

      (f)     Charles Cowan: $40,707.50

      (g)     Kidder Matthews: $38,022.50

      (h)     Other consulting experts: $83,736.73

216. As detailed more fully in Section VI *supra*, the expertise and assistance provided by these experts was critical to the prosecution and successful resolution of this highly technical and complex Action. Lead Counsel's use of these experts and consults was therefore both essential, and reasonable under the circumstances.

217. Another large component of the expenses for which reimbursement is sought relates to document management costs, which amounts to $1,148,997.99, or approximately 16.9% of the total expenses. As detailed more fully in ¶¶80-81, *supra*, Lead Counsel had to retain the services of vendors to, among other things (i) maintain the electronic database through which the millions of pages of documents produced by Defendants were reviewed and analyzed;

(ii) have documents processed so that they would be in a searchable format; and (iii) convert and upload hard copy documents so that they would be electronically searchable.  Notably, Lead Counsel minimized the document management costs during some periods that the Action was stayed by hibernating the database, thereby avoiding paying active management fees.

218.    Finally, another large component of the litigation expenses was for deposition transcription and discovery and out of town travel, which amounts to $348,173.37, or approximately 5.1% of the total expenses.  As detailed more fully in ¶¶45, 91, *supra*, discovery in this case was a nationwide process, requiring Lead Counsel to frequently travel to take or defend depositions across the country and to attend Court hearings.  For example, Lead Counsel traveled to, among other places, San Francisco, California; Santa Fe, New Mexico; Park City, Utah; Atlanta, Georgia; Sarasota and Buffalo, New York; and Orlando, Florida for depositions; Monterey and St. Petersburg, Florida for client meetings; and to Wilmington and Philadelphia for depositions and court appearances.

219.    The other expenses for which Plaintiffs' Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, court fees, costs of out-of-town travel, copying costs, long distance telephone and facsimile charges and postage and delivery expenses, and court reporters for depositions.

220.    All of the litigation expenses incurred by Plaintiffs' Counsel were reasonable and necessary to the successful investigation, prosecution, and resolution of this Action.

### D.    Lead Plaintiff Reimbursement

221.    Additionally, pursuant to 15 U.S.C. § 78u-4(a)(4), Lead Plaintiffs seek reimbursement of their reasonable costs and expenses incurred directly in connection with their representation of the Class in the following amounts:

(a)     Coral Springs Police Pension Fund:  $7,556.00

(b)     Pompano Beach General Employees Retirement System: $11,538.24

(c)     St. Petersburg Firefighters' Retirement System: $22,109.00

(d)     Merced County Employees' Retirement Association: $14,252.82.

222.     The amount of time and effort devoted to this Action by the Lead Plaintiffs is detailed in the accompanying declarations of their respective representatives, attached as Exhibits C-1 through C-5. *See* Ex. C-1, Myers Decl. ¶¶11-12; Ex. C-2, Mitchell Decl. ¶¶14-15; Ex. C-3, Ciskoski Decl. ¶¶11-12; Ex. C-4, Santos Decl. ¶¶11-13; Ex. C-5, Beno Decl. ¶4.  Lead Counsel respectfully submit that these requested amounts are fully consistent with Congress' intent, as expressed in the PSLRA, of encouraging institutional investors to take an active role in bringing and supervising actions of this type.[17]

223.     As set forth in the Fee Brief and in the supporting declarations submitted on behalf of Lead Plaintiffs, Lead Plaintiffs have been fully committed to pursuing the Class's claims for eight years.  These institutions have actively and effectively fulfilled their obligations as representatives of the Class, complying with all of the many demands placed upon them during the litigation and settlement of this Action, and providing valuable assistance to Co-Lead Counsel.  The efforts expended by the representatives for the Lead Plaintiffs during the course of this Action are precisely the types of activities Courts have found to support reimbursement to

_____

[17] Lead Plaintiff Automotive is not seeking reimbursement under the PSLRA for the time it expended in representing the Class in this Action.  However, Automotive's fund counsel, the law firm of Saltzman & Johnson, devoted 100.6 hours to the prosecution of this Action on behalf of Automotive and the Class.  Specifically, Saltzman & Johnson oversaw Automotive's production of documents, assisted Automotive's Chairman in preparation for his deposition, and reviewed case updates and discovery responses with Lead Counsel, among other things.  *See* Declaration of Anne Bevington Decl. ¶¶3-5 (attached as Exhibit F).  Lead Counsel BLB&G will reimburse Saltzman & Johnson for its time and expenses as set forth in the Bevington Declaration directly from the attorneys' fees awarded in this Action.

class representatives under the PSLRA, and fully support Lead Plaintiffs' requests for reimbursement of costs and expenses. *See* Fee Brief at 18-19. The reimbursement sought is for actual time and expenses spent to represent the Class. This is not an incentive fee.

224. The Notice informed potential Class Members that Lead Counsel would be seeking reimbursement of expenses in an amount not to exceed $7,500,000.00 and that the costs and expenses of the Class Representatives could be sought as part of the request for reimbursement of Litigation Expenses. The total amount sought by the Lead Plaintiffs (*i.e.*, $55,456.06), when added to the request of Plaintiffs' Counsel (*i.e.*, $6,790,044.82), is still significantly below the $7,500,000.00 million that Class Members were advised could be sought. To date, no objection has been raised as to the maximum amount of Litigation Expenses set forth in the Notice, including the amount sought to be reimbursed to the Lead Plaintiffs.

225. In view of the complex nature of the Action, as well as the fact that this Action was vigorously prosecuted, the expenses incurred by Plaintiffs' Counsel were reasonable and necessary to pursue the interests of the Class and achieve the present Settlement. Accordingly, Lead Counsel respectfully submit that the expenses incurred by Plaintiffs' Counsel and Lead Plaintiffs are fair and reasonable and should be reimbursed in full.

## XIII. CONCLUSION

226. In view of the significant recovery to the Class and the very substantial risks of this litigation, as described above and in the accompanying Settlement Memorandum, Lead Counsel respectfully submit that the Settlements should be approved as fair, reasonable and adequate, and that the proposed Plan of Allocation should be approved as fair and reasonable. In addition, based on the significant recovery in the face of substantial risks, the efforts of Lead Counsel, the quality of the work performed, the contingent nature of the fee, the complexity of the case, and the standing and experience of Lead Counsel as described above and in the

accompanying Fee Memorandum, Lead Counsel respectfully submit that a fee in the amount of 28% of the Settlements be awarded, that their expenses of $6,790,044.82 be reimbursed in full, and the Lead Plaintiffs' costs and expenses in the amount of $55,456.06 be reimbursed in full.

227.    We each declare, under penalty of perjury, that the foregoing facts are true and correct.

Executed on September 17, 2018


/s/ *Joseph E. White, III*                    /s/ *Hannah Ross*
Joseph E. White, III                          Hannah Ross

84

**DRAFT**
**ATTORNEY WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

**Appendix A**

**Approximate[18] Breakdown of Lead Counsel BLB&G & Saxena White's Time Worked and Lodestar throughout the Action**

| Time | Phase | Description | Hours Worked / Lodestar (% of total) |
|---|---|---|---|
| Early 2011 – March 20, 2014 | Pleadings | During this time, Plaintiffs moved for appointment as Lead Plaintiffs. We also conducted a comprehensive investigation into our claims, including speaking with former employees and consulting with experts; filed four amended complaints and opposed multiple rounds of motions to dismiss, totaling nearly 700 pages (collectively). | Hours Worked: 15,126.25 (7.86%)<br><br>Lodestar: $8,407,628.69 (10.67%) |

---

[18] Counsel prepared this table based on the time worked during each period.

**DRAFT**
**ATTORNEY WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

| Time | Phase | Description | Hours Worked / Lodestar (% of total) |
|------|-------|-------------|--------------------------------------|
| March 21, 2014 – July 2, 2015 | Document Discovery | After the Court sustained the Fourth Amended Complaint, Plaintiffs immediately engaged in extensive document discovery, including producing and reviewing over 13 million pages of documents.  As part of these document discovery efforts, Plaintiffs engaged in active motion practice, including an intense fight to obtain key materials related to the regulatory examinations of Wilmington Trust. *See* Section V *supra*.<br><br>Additionally, during this time, Plaintiffs prepared for deposition discovery.  As depositions were about to begin, the United States Attorney's Office for the District of Delaware intervened in and moved to stay in the action, which we opposed. | Hours Worked: 112,586.00 (58.47%)<br><br>Lodestar: $44,059,782.21 (55.92%) |

**DRAFT**
**ATTORNEY WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

| Time | Phase | Description | Hours Worked / Lodestar (% of total) |
|---|---|---|---|
| July 3, 2015 – December 19, 2016 | Class Certification; Ongoing Document Discovery; and Opposing the Government's Stay | On July 2, 2015, the Court granted the United States Attorney's request for a stay of discovery. Though Plaintiffs could not pursue deposition discovery, Counsel continued to pursue document discovery, both reviewing the millions of pages that had already been produced as well as conferring with Defendants and moving to compel withheld documents so Plaintiffs would be ready to swiftly proceed once the stay was lifted.<br><br>Also during this time, Plaintiffs successfully moved to certify the Class, which included the production of Plaintiffs' documents and the depositions of all the Plaintiffs, their investment advisors, and Plaintiffs' market efficiency expert.<br><br>Plaintiffs also requested that the Court lift the discovery stay several times during this eighteenth month period as appropriate based on case developments. | Hours Worked: 21,729.00 (11.28%)<br><br>Lodestar: $8,486,690.63 (10.77%) |

DRAFT
ATTORNEY WORK PRODUCT
PRIVILEGED AND CONFIDENTIAL

| Time | Phase | Description | Hours Worked / Lodestar (% of total) |
|------|-------|-------------|--------------------------------------|
| December 20, 2016 – August 31, 2017 | Deposition Discovery | On December 20, 2016, the Court granted Plaintiffs' request and lifted the discovery stay, and Plaintiffs promptly began working to complete discovery. All told, Plaintiffs took, defended, and/or otherwise participated in 39 depositions in numerous locations throughout the country, including Delaware, New York, Pennsylvania, Florida, and Utah. Depositions ultimately concluded in August 2017, after Plaintiffs fought and defeated the Criminal Defendants' tenacious efforts to avoid their depositions, including with an appeal to the Third Circuit.<br><br>Also during this time, Plaintiffs finished their review of nearly 13 million pages of documents, prepared and/or responded to hundreds of pages of written discovery, and litigated several discovery motions. | Hours Worked: 36,646.25 (19.03%)<br><br>Lodestar: $14,868,714.80 (18.87%) |
| September 1, 2017 – May 25, 2018 | Expert Reports; Pretrial Work; and Negotiating the Settlements | After depositions concluded, Plaintiffs worked around the clock to complete expert reports on an aggressive timeline. The scale of Plaintiffs' case required that they work with several experts, and Plaintiffs had substantially prepared their reports by the time the parties settled.<br><br>During this time, Plaintiffs had also made great strides in preparing a partial summary judgment motion to be filed following the criminal trial. | Hours Worked: 6,466.50 (3.36%)<br><br>Lodestar: $2,974,459.92 (3.77%) |

**DRAFT**
**ATTORNEY WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

| Time | Phase | Description | Hours Worked / Lodestar (% of total) |
|------|-------|-------------|--------------------------------------|
| **TOTAL** | | | Hours Worked: 192,554.00 (100%) <br><br> Lodestar: $78,797,276.25 (100%) |