# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| **IN RE WILMINGTON TRUST SECURITIES LITIGATION**<br><br>This document relates to: ALL ACTIONS | Master File No. 10-cv-00990-ECR<br><br>(Securities Class Action)<br><br>Hon. Eduardo C. Robreno |

I, S.P. Kothari, declare as follows:

## INTRODUCTION

1. I was retained on behalf of Lead Plaintiffs as a testifying expert on damages, loss causation and market efficiency.

2. Accordingly, as part of my assignments during the course of this litigation, I was asked by Lead Counsel to develop an estimate of the per-share damages throughout the period January 18, 2008 to November 1, 2010, inclusive (the "Class Period").

3. The details of my analysis, methodology, and estimate of the per-share damages are set forth in the declaration.

## QUALIFICATIONS

4. I am the Gordon Y Billard Professor of Accounting and Finance at the Sloan School of Management, Massachusetts Institute of Technology ("MIT"). I have been at MIT since 1999. During this period, I served as the Deputy Dean of the Sloan School of Management from 2007-2008 and 2010-2015. In 2008-2009, I was with Barclays Global Investors ("BGI"), a unit of Barclays Bank, for one-and-a-half years as Global Head of Equity Research. From 1986 to 1999, I served on the faculty of the University of Rochester, first as an Assistant Professor, then as an Associate Professor, and finally as Professor and Accounting Area Coordinator. During my academic career, I have also held visiting positions at Harvard Business School, MIT, the University of Technology in Sydney, Australia, Baruch College of the City University of New York, and the City University Business School in London.

5. I have published numerous academic articles in the areas of accounting, finance, and economics and co-edited two books titled *Financial Statement Analysis*, published by

McGraw-Hill, and *Contemporary Accounting Research*, published by North-Holland Publishing. My research has primarily focused on the informational efficiency of stock prices, valuation of equities and bonds, the relation between accounting accruals and cash flows, the effect of institutions on the properties of accounting numbers internationally, and corporate uses of financial derivatives, among other topics. I am currently an Editor of the *Journal of Accounting & Economics*, a leading academic journal in the field of accounting, and have been an editor of this journal since 1997. I have also served as an associate editor for other professional journals, including the *Journal of Accounting & Economics* and *The Accounting Review*, and as a referee for professional journals such as the *Journal of Finance*, the *Journal of Financial Economics*, the *Journal of Accounting Research*, *Contemporary Accounting Research*, and the *British Accounting Review*.

6. Through my extensive, rigorous research, my practical experience as the Global Head of Equity Research at BGI, and through my teaching financial analysis for more than two decades to graduate students, I have developed deep expertise in assessing the impact of financial information and financial disclosures on investors' assessment of the value of shares and on their trading decisions, which, in turn, manifest in the impact on share prices. This expertise in financial analysis and valuation is directly relevant to rendering my opinions in this matter.

## METHODOLOGY AND ANALYSIS

7. Based on my understanding of the factual evidence provided to me by Lead Counsel and my understanding of the legal theories of the alleged securities laws violations, I conducted an analysis of the economic evidence in this case to measure the aggregate per share damages that security holders suffered due to the alleged material misrepresentations that defendants made throughout the Class Period.

8. In brief, I understand that Plaintiffs allege that, during the Class Period, Defendants made materially false and misleading statements regarding its (i) underwriting practices, (ii) asset review procedures, (iii) internal controls and (iv) lending and risk management practices. Plaintiffs also allege that Wilmington's financial reports contained misrepresentations regarding: (i) past due and nonperforming loans, (ii) loan loss reserve, (iii) LTV ratios, and (iv) the allowance for loan losses. These misrepresentations "created the false impression that the Bank was weathering the financial crisis without any of the crippling credit losses suffered by other banks."[1] Plaintiffs also allege that these losses were revealed to market participants in a series of disclosures made throughout the Class Period, which I will refer to as the "Corrective Disclosures" as described in Exhibit 1.

9. For purchasers of Wilmington common stock with §10(b) claims, the relevant loss occurred when the alleged truth concealed by the misrepresentations and/or omissions was disclosed and as a result the stock price declined. Thus, my ultimate goal is to establish a price per share for Wilmington stock for each day of the Class Period had all misrepresentations

---

[1] Complaint at ¶¶52, 217, 334.

been properly and timely revealed to the market. The difference between this 'but for' price and the traded price is referred to as the artificial inflation in the stock price.

10. This price inflation is ultimately corrected by the Corrective Disclosures, which reveal the truth previously concealed by the alleged fraud. Class members' losses associated with this fraud-related price inflation can be calculated as the portion of Wilmington's stock price decline which is attributable to the disclosure of the alleged truth.

11. I identify seven events in which information about Wilmington's misrepresentations was revealed to the market, which are set forth in greater detail in Exhibit 1. In brief:

| Date | Corrective Disclosure |
| --- | --- |
| January 29, 2010 | Wilmington Trust's 2009 Q4 earnings disclosed unexpected loan losses. |
| April 23, 2010 | Wilmington Trust's 2010 Q1 earnings disclosed unexpected loan losses. |
| June 3, 2010 | Wilmington Trust disclosed Defendant Cecala's surprise resignation, which the market suspected was due to a deteriorating loan portfolio. |
| June 23, 2010 | Wilmington Trust's management indicated that there were more loan losses coming and that the Bank had hired an independent appraiser to review its loan portfolio. |
| June 24, 2010 | Wilmington Trust's management indicated that they were expecting additional loan losses on the loan portfolio. |
| July 23, 2010 | Wilmington Trust's 2010 Q2 earnings disclosed unexpected loan losses. |
| November 1, 2010 | Wilmington Trust's 2010 Q3 earnings disclosed unexpected loan losses, and the market learned that the Bank's loan loss reserve was short more than $500 million. |

12. Based on the above, I conducted an event study to measure the effect of each Corrective Disclosure on Wilmington's stock price. I described event studies, including the event study I conducted here, in greater detail in my September 12, 2014 report submitted in support of Lead Plaintiffs' motion for class certification. *See* D.E. 261-3.

13. Generally speaking, event studies are a commonly used scientific methodology for examining the impact of firm-specific events on the stock price. Academic studies have used the event study methodology to assess the impact of a variety of firm-specific disclosures, including earnings announcements, press releases, and SEC filings, as well as to assess the impact of corporate decisions, such as dividend payments, stock splits, mergers, etc.[2] As discussed in the classic study by Brown and Warner (1980):

---

[2] For a review of this literature, see SP Kothari, 2001, "Capital markets research in accounting," *Journal of Accounting and Economics* 31, 105–231 and Chapter 1 titled "Econometrics of Event Studies" by SP Kothari and Jerold Warner in Handbook of Empirical Corporate Finance by Espen Eckbo, Elsevier/North-Holland, 2007.

3

> "To the extent that the event is unanticipated, the magnitude of abnormal performance at the time the event actually occurs is a measure of the impact of that type of event on the wealth of the firms' claimholders... such abnormal performance is consistent with market efficiency."[3]

In other words, event studies allow one to measure the impact of unanticipated corporate events on the stock.

14. To conduct my event study, I first determine the date(s) and time of each Corrective Disclosure event. The date and timestamp of each Corrective Disclosure event is included in Exhibit 1. For one corrective disclosure (June 3, 2010), the time stamp indicates that the disclosure occurred after the market close, so I use the following day (June 4, 2010) as the event date, as that is when the price would begin to reflect the market's reaction to the news. Otherwise, all of the remaining corrective disclosures were made either before the market opened or during the day while there was active trading.

15. A central issue in an event study is to assess the extent to which security price performance around the time of the event is abnormal. I estimate a regression model that uses the daily stock returns, obtained from the CRSP database, for Wilmington Trust as the dependent variable. I include the returns of the S&P 500 Index as an independent variable to control for the market return associated with large publicly traded corporations, and the returns of the KBW 50 Regional Banking Index (with Wilmington being removed from the index) as another independent variable to control for the industry return associated with the financial sector.[4] I also control for any earnings announcement and/or corrective disclosure that occurred during the estimation window because they are also likely to affect Wilmington's stock price. For each corrective disclosure, I estimate this model over a 120-trading-day window ending one day prior to the corrective disclosure date. I refer to this process as estimating "120-day rolling regressions." One benefit of rolling regressions is that the parameters of the model used to estimate expected returns are allowed to vary for each corrective disclosure.

16. I obtain the intercept and slope coefficient parameters from this regression model, and calculate the expected return on each corrective disclosure date k as $\hat{\alpha} + \hat{\beta}_k \times RET_{SP500_k} + \hat{\gamma}_K \times RET_{KBW_k}$, where $\hat{\alpha}$ is the estimated intercept, $\hat{\beta}$ and $\hat{\gamma}$ are the estimated slope coefficients for the return on the S&P 500 Index and the KBW 50 Regional Banking Index, respectively. The expected return measures what the stock price would have been if there were no corrective disclosure or any firm specific news released on that day. I then deduct the expected return from Wilmington's realized return to obtain a measure of the abnormal return, that is, $ABRET_k = RET_{WT_k} - (\hat{\alpha} + \hat{\beta}_k \times RET_{SP500_k} + \hat{\gamma}_K \times RET_{KBW_k})$.

---

[3] Stephen Brown and Jerold Warner, 1980, "Measuring Security Price Performance," *Journal of Financial Economics* 8, p. 205.

[4] This regression model is slightly different from the one I used in the market efficiency report. In the market efficiency report I include only the KBW 50 Regional Banking Index in the event study because the objective was to test market efficiency. Because the objective of this report is to estimate damages, I take a more conservative approach and include both the S&P 500 Index and the KBW 50 Regional Banking Index.

The abnormal return measures the effect of firm-specific news on Wilmington's stock price on the corrective disclosure date k.

17. Abnormal returns on the seven corrective disclosure events are reported in Exhibit 2. The abnormal returns range from a -3.33% on the day of CEO Cecala'a resignation on June 4, 2010 to -37.5% on the date of the announcement of the merger with M&T on November 1, 2010. The abnormal returns on the other five corrective disclosure events ranged between -9% and -12%.

18. I conduct a statistical test to assess whether the abnormal returns are statistically significant. The p-values associated with these tests are disclosed in Exhibit 2. A p-value measures the probability that an abnormal return of a given magnitude would be observed on a day randomly chosen from the 120-day estimation window. The results tabulated in Exhibit 2 indicate that the abnormal returns are negative and statistically significant, at the 5% level, for all seven corrective disclosure events. In economic terms, the abnormal returns sum up to an accumulated decline in the stock price of $9.71 per share.

19. Finally, I examined the news disclosed on each corrective disclosure date to parse out and measure any firm-specific information unrelated to the misrepresentations ("confounding" information). I then removed the amount attributable to confounding information. The outcome of this analysis is a measure of the impact that each corrective disclosure had on Wilmington's stock price. In other words, it captures the amount of artificial inflation in Wilmington's stock price that is attributable to each misrepresentation.

20. For each of the seven corrective disclosure events, I first read through the Motion Record to identify the alleged news articles that form the basis for the alleged corrective disclosures. I then supplemented these articles with a search of the Factiva database to identify all of the news articles on Wilmington that were disclosed over a two-day window beginning on the date before the corrective disclosure date and ending on the corrective disclosure date.[5] I also reviewed all of the analyst reports, press releases, and SEC filings that were disclosed during the two-week period after the corrective disclosure to determine if analysts commented on any additional news disclosed on the corrective disclosure date.

## MY OPINION

21. In my opinion, the corrective disclosures released on January 29, 2010, July 23, 2010, and November 1, 2010 did not have significant confounding news, and the entire market reaction on these dates can be attributed to the corrective disclosure.

22. In my opinion, the April 23, 2010, June 3, 2010, and June 23 and 24, 2010 corrective disclosures contained some confounding news that the market reacted to. I disaggregated the extent of the impact of the confounding news on Wilmington's share price on each of these dates.

---

[5] When searching Factiva, I limited my search to firms with the company identifier "Wilmington Trust Corporation." I searched all sources, all authors, all industries, and all regions.

23. On April 23, 2010 the defendants issued a press release announcing first quarter earnings and I find a negative abnormal return of 9.26%. Based on my reading of the news articles and analyst reports, I determined that part of the market's reaction was related to the disclosures of losses on the loan portfolio, and thus the revelation of misrepresentations, and part of the market's reaction was related to other poor earnings news. I use the analyst reports to measure the analyst expectations of losses on the loan portfolio to estimate the extent to which the market's reaction is related to unexpected losses on the loan portfolio. The mean of expectations of loan losses was $54.2 million, which relative to the actual loan loss of $77.4 million implies an unexpected loan loss provision was $23.23 million. Compared to the unexpected earnings of $35.33 million, the unexpected loan loss accounts for 65.8% of the earnings surprise. In my analysis of the market's reaction to the alleged corrective disclosures, I find an abnormal price movement of $1.87 on April 23, 2010. Based on my analysis above, I determine that a price decline of $1.23 (65.8% of the total decline) was attributable to the misrepresentations.

24. On the evening of June 3, 2010 (after the stock market closed), Wilmington announced the resignation of their CEO, and I find a negative market reaction of 3.33%. As academic literature indicates that CEO turnover generally prompts a positive market reaction, I determined based on my analysis of news articles and analyst reports, among other things, that this negative market reaction related to the market's interpretation that the resignation signaled additional impending losses on the Bank's the loan portfolio (and thus the revelation of misrepresentations) and losses on pooled trust-preferred securities investment portfolio (unrelated to the misrepresentations). As analysts did not explicitly update their models for either asset, I allocate the negative market reaction using an analysis of the relative proportion of the size of these two assets, and consequentially allocate 90.8% to the loan portfolio.[6] In my analysis of the market's reaction to the alleged corrective disclosures, I find an abnormal price movement of $0.50 on June 4, 2010. Based on my analysis above, I determine that a price decline of $0.45 (90.8% of the total decline) was attributable to the misrepresentations.

25. On June 23-24, 2010, the market learned that Wilmington had disclosed to analysts that, among other things, there would be additional loan losses and that it had hired a third party to appraise its loan portfolio, and I find a negative market reaction of 12.29%. The market first learned this information through Suntrust's analyst report issued June 23, 2010, in which Suntrust reduced its 2010 earnings forecast by $15.5 million and revised its loan loss provision by $4.1 million. The corrective disclosure continued through RBC's analyst report issued the following day, in which RBC reduced its 2010 earnings forecast by $182.4 million and revised its loan loss provision by $240.3 million. Considered together, this implies a mean forecast revision of $99 million and a mean loan loss provision revision of $122.2 million. Since the loan loss provision revision is larger, the earnings revisions seem to be driven by analysts' expectations of future loan portfolio losses. Because the analysts highlight that their revisions relate to both the Bank's loan portfolio, its investment portfolio, and a slight adjustment for personnel costs, I use a rationale similar to the one I

---

[6] See Wilmington SEC Form 10-Q for 2010Q1, p. 6.

used for the June 4, 2010 decline, and attribute 88% of the decline in the stock price to losses on the loan portfolio.[7] (¶24) Specifically, in my analysis of the market's reaction to the alleged corrective disclosures, I find an abnormal price movement of $1.60 on June 23-24, 2010. Based on my analysis above, I determine that a price decline of $1.41 (91% of the total decline) was attributable to the misrepresentations.

26. In conclusion, the results tabulated in Exhibit 3 provide the artificial inflation present per share after taking into account confounding events.

27. In brief, I found that a total of $8.83 of artificial inflation dissipated from each share of Wilmington Trust as follows:

- January 29, 2010:     $1.86
- April 23, 2010:       $1.23
- June 4, 2010:         $0.45
- June 23 & 24, 2010:   $1.41
- July 23, 2010:        $1.21
- November 1, 2010:     $2.67

28. As detailed herein, my expert opinion addressed per-share damages estimates. This is based on my understanding that, with respect to damages, the jury in this matter would only receive per-share damages estimates, rather than a Class-wide aggregate damages estimate. Accordingly, I did not develop a full Class-wide trading model necessary to calculate aggregate damages. I understand that Lead Counsel provided the per-share damages estimates that I prepared to another consultant, Mr. Chad Coffman, who created a trading model necessary to calculate aggregate damages for use during settlement discussions and for the plan of allocation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

[signature]

Executed on: September 14, 2018 in Cambridge Massachusetts

---

[7] I note that compared to the June 4 analysis, I slightly decreased the amount of the stock price decline attributed to the misrepresentations. This adjustment is due to one analysts indicating that they "slightly" adjusted their forecast to reflect increases in personnel costs but did not disclose the magnitude of the adjustment. I noted that their estimate of forecasted non-interest expense increased by $2 million, which is approximately 2.8% of their expected losses and 2% of their expected losses on their loan portfolio. To be conservative, I attribute 2.8% of the market's reaction to unexpected personnel costs.

7

## Exhibit 1
## Summary of Wilmington's Corrective Disclosures

| Date | Time (EST) | Corrective Disclosures | Source of News |
|---|---|---|---|
| January 29, 2010 | 8:00 am | Earnings announcement of 2009 Q4 – Wilmington Trust reported a quarterly loan loss provision of 82.8 million, a 114% increase from the prior quarter. | "Wilmington Trust Announces 2009 Fourth Quarter Results." Business Wire. |
| April 23, 2010 | 8:00 am | Earnings announcement of 2010 Q1 – Wilmington Trust reported a bigger-than-expected quarterly loan loss provision of 77.4 million. | "Wilmington Trust Announces 2010 First Quarter Results." Business Wire. |
| June 3, 2010 | 5:44 pm | CEO resignation – Market suspected that the resignation was due to deteriorating loan portfolio and more loss to come. | "Wilmington Trust Chairman and CEO Ted T. Cecala Retires After 31 Years of Service; Board Elects Donald E. Foley as CEO." Business Wire. |
| June 23, 2010 | 10:16 am | Analyst downgrade – In an analyst meeting, Wilmington Trust's management indicated more loan losses coming in Q2 and Wilmington hired an independent appraiser to review its loan portfolio. | "Wilmington Trust Cut to Neutral from Buy by SunTrust." Dow Jones Newswires. |
| June 24, 2010 |  | Analyst - In an analyst meeting, Wilmington Trust's management indicated that they were expecting additional loan losses on the loan portfolio. | "Expect Significantly Higher Credit Costs - Lowering EPS Estimates." RBC Capital Markets. |
| July 23, 2010 | 6:00 am | Earnings announcement of 2010 Q2 – Wilmington Trust's quarterly loan loss provision increased by 165% to $205.2 million and Loan Loss Reserve increased by 25% to $373.8 million relative to Q1. | "Wilmington Trust Announces 2010 Second Quarter Results." Business Wire. |
| November 1, 2010 | 8:00 am | Earnings announcement of 2010 Q3 – Wilmington Trust reported a quarterly loan loss provision of 281.5 million. Joint conference call with M&T – M&T revealed that Wilmington Trust's Loan Loss Reserve was still underfunded by more than $500 million. | "Wilmington Trust Announces 2010 Third Quarter Results." Business Wire. "UPDATE 6-M&T Bank snapping up bargain-priced Wilmington." Reuters News. |

8

## Exhibit 2
## Rolling Regression Results of the Market Reaction to Wilmington Trust's Seven Corrective Disclosure Events

I perform an event study using rolling regressions. Specifically, for each of the seven corrective disclosure dates, I estimate the following regression model using a 120-trading-day window prior to the corrective disclosures:

$$RET_{k,t} = \alpha_k + \beta_k \times RET_{SP500_{k,t}} + \gamma_k \times RET_{KBW_{k,t}} + \sum (\delta_k \times Corporate\ Event_{k-1\ to\ 5}) + \varepsilon_{k,t},$$
$$t = -120, -119..., -1, k = 1, 2,..., 7$$

$RET_{k,t}$ is Wilmington's stock return on day t. $RET_{SP500_{k,t}}$ is the return of the market portfolio on day t, as proxied by the S&P 500 Index, while $RET_{KBW_{k,t}}$ is the return of the industry portfolio on day t, as proxied by the KBW 50 Reginal Banking Index (with Wilmington being removed from the index). In addition, I control for any prior corporate events that occur during the estimation window. Specifically, I define the indicator variable *Corporate Event*$_{k,t \text{to} 5}$ to be one if an earnings announcements or corrective disclosure occurs during the estimation window. I then compute abnormal return (*ABRET*) on each earnings announcement date as:

$$ABRET_k = RET_k - (\hat{\alpha} + \hat{\beta}_k \times RET_{SP500_k} + \hat{\gamma} \times RET_{KBW_k}),\ k=1, 2, ..., 7$$

where $\hat{\alpha}$, $\hat{\beta}$ and $\hat{\gamma}$ are estimated parameters obtained from the 120-trading-day rolling regression. For one-day corrective disclosures, this exhibit presents *ABRET* for each of the corrective disclosure dates and the t-statistic computed as *ABRET* divided by the root mean squared error of the 120-trading-day estimation window. I use the appropriate degrees of freedom from the 120-day rolling regression to derive the p-value and consider two-tailed p-value of less than or equal to 5% to be statistically significant. For the two-day corrective disclosure (i.e., June 23-24, 2010), this exhibit presents the sum of *ABRET* over two days and t-statistic and p-value from a bootstrap analysis. To implement the bootstrap approach, I randomly select two days, one from each of the 120-day window used to estimate the market model for each given event date. I then sum up the abnormal returns for these two observations. I repeat this process 1,000 times to derive an empirical distribution of summed returns. I then assess the statistical significance of the two-day cumulative abnormal return by comparing it to the distribution of the 1,000 summed returns.

| Date | Abnormal Return | Abnormal Return T-statistic | Abnormal Return p-value | Significant at 95% Confidence Level | Abnormal Dollar Movement in Price |
|---|---|---|---|---|---|
| January 29, 2010 | -12.18% | -5.13 | 0.0000 | ✓ | -$1.86 |
| April 23, 2010 | -9.26% | -5.04 | 0.0000 | ✓ | -$1.87 |
| June 4, 2010 | -3.33% | -2.03 | 0.0447 | ✓ | -$0.50 |
| June 23 & 24, 2010 | -12.29% | -5.69 | 0.0000 | ✓ | -$1.60 |
| July 23, 2010 | -11.13% | -7.17 | 0.0000 | ✓ | -$1.21 |
| November 1, 2010 | -37.50% | -16.59 | 0.0000 | ✓ | -$2.67 |
| Total | | | | | -$9.71 |

## Exhibit 3
## Artificial Loss Estimate Attributable to Corrective Disclosures

This exhibit reports the abnormal price change attributable to the seven corrective disclosure events. Abnormal price change is calculated as *ABRET* multiplied with the closing stock price on the prior trading day. Adjusted loss estimate is abnormal price change multiplied with the adjustment ratio for confounding news based on the analysis of Section VIII.

| Date | Abnormal Dollar Movement in Price (1) | Adjustment Ratio for Confounding News [2] | Adjusted Loss Estimate [3]=[1]x[2] |
|---|---|---|---|
| January 29, 2010 | -$1.86 | 100% | -$1.86 |
| April 23, 2010 | -$1.87 | 66% | -$1.23 |
| June 4, 2010 | -$0.50 | 90.8% | -$0.45 |
| June 23 & 24, 2010 | -$1.60 | 88% | -$1.41 |
| July 23, 2010 | -$1.21 | 100% | -$1.21 |
| November 1, 2010 | -$2.67 | 100% | -$2.67 |
| Total | -$9.71 | | -$8.83 |