# EXHIBIT B

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE WILMINGTON TRUST SECURITIES LITIGATION | Mater File No. 10-cv-00990-ER<br><br>(Securities Class Action)<br><br>Hon. Eduardo C. Robreno |

### DECLARATION OF CHAD COFFMAN REGARDING LEAD PLAINTIFFS' CALCULATION OF DAMAGES

I, Chad Coffman, submit this declaration pursuant to 28 U.S.C §1746 and declare as follows:

**I.     INTRODUCTION**

1.     I have been retained as a consulting expert on behalf of Lead Plaintiffs in this action. I submit this Declaration regarding Lead Plaintiffs' motion for final approval.

2.     The details of my analysis are provided in the section of this declaration immediately following my qualifications.

**II.    QUALIFICATIONS**

3.     I am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation.

4.     I hold a Bachelor's Degree in Economics with Honors from Knox College and a Master's of Public Policy from the University of Chicago. I am also a CFA charter-holder. The CFA, or Chartered Financial Analyst designation, is awarded to those who have sufficient practical

1

experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

5. I, along with several others, founded Global Economics Group in March 2008. (Prior to March 16, 2011, Global Economics Group was known as Winnemac Consulting, LLC.) Prior to starting Global Economics Group, I was employed by Chicago Partners, LLC for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination, and antitrust. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers, and a prominent mediator (Retired Judge Daniel Weinstein) to provide economic analysis and opinions in dozens of securities class actions as well as other matters.

### III. OPINIONS

6. Among other assignments, my work for Lead Plaintiffs in this Action included the calculation of maximum recoverable damages, as well as assistance in the design of the plan to allocate the settlement proceeds (the "Plan of Allocation" or "Plan") among Class Members who submit valid Proof of Claim forms that are approved for payment by the Court ("Authorized Claimants"). To complete both of these assignments, I implemented a methodology commonly used by experts in this context after being provided with estimates of artificial inflation prepared by Lead Plaintiffs' testifying expert in this matter, S.P. Kothari, and asked to assume that those estimates were fair and reasonable.

7. For losses to be compensable damages under the federal securities laws, the disclosure of the allegedly misrepresented information must be the cause of the decline in the price of the relevant security. Thus, to suffer damages or share in the distribution of the Net Settlement

Funds, an Authorized Claimant must have purchased or otherwise acquired Wilmington Trust Common Stock during the Class Period and must have suffered a loss resulting from the alleged fraud on his/her/its investments in Wilmington Trust Common Stock. In other words, a Wilmington Trust investor must have purchased or otherwise acquired the stock during the Class Period and then held the stock until after a corrective disclosure occurred and some measure of artificial inflation has been removed. For example, every Class Period purchase was made with some artificial inflation in the stock. For shares sold with the same amount of artificial inflation as existed at purchase, the investor cannot claim harm from the alleged fraud. However, after a corrective disclosure, some of the artificial inflation has been removed, and therefore the shares have lost value and the investor has been harmed due to the fraud rather than market or industry factors.

8. The first step in the calculation of maximum recoverable damages is to prepare a model to estimate the trading behavior of investors during the Class Period, through which I can track shares traded over the Class Period. Ideally, if I had access to the actual trading records of all Wilmington Trust investors, I could calculate damages and damaged shares precisely. However, typically, as in this case, experts calculating aggregate damages do not have access to the detailed trading records of Class Members.

9. As a result, experts estimate trading activity based on publicly available information. Each calendar quarter, institutional investment managers that exercise discretion over $100 million or more in publicly traded equity securities are required to report their holdings to the U.S. Securities and Exchange Commission on Schedule 13-F. I have obtained a summary of this holdings data for Wilmington Trust from S&P CapitalIQ. During the Class Period, reporting institutions held at least 50% of the public float of Wilmington Trust.

10. From this data, I constructed a trading model for institutions ("institutional model"). Using this quarterly data to pro-rate each institution's holdings between quarter ends (weighted by total trading volume of the stock on each day), and using a first-in, first-out ("FIFO") inventory assumption, I model the timing of each Class Period purchase and its corresponding sale (if the purchased shares were sold during the relevant time period). In my experience, this is the most widely utilized method for modeling institutional trading and has often been used by experts retained by defendants in other securities class actions.[1] Based on the implied daily trading activity, I can calculate damages for each institution applying the methodology described above.

11. I also estimated damages for the remaining shares that are not reflected in the quarterly holdings discussed above (the "non-institutional model"). This group is made up of non-reporting institutions and individual investors. To estimate damages for this group of Class Period purchasers, experts in cases such as this often apply a standard methodology commonly referred to as the 80/20 Proportional Two-Trader Model.[2] Because no investor-specific holdings information is available for non-institutions, the only observable trading input for non-institutional holders is the total trading volume. For the volume of shares available to trade not held by reporting institutions, this non-institutional model assumes that 80% of the volume is accounted for by "fast" traders that hold 20% of the non-institutional shares. The remaining 20% of volume is accounted for by "slow" traders that hold 80% of the non-institutional shares. Within each group of "fast"

---

[1] For example, this model is outlined in Mayer, Marcia Kramer, "Best-Fit Estimation of Damaged Volume in Shareholder Class Actions: The Multi-Sector, Multi-Trader Model of Investor Behavior," *National Economic Research Associates (NERA)*, Third Edition, October 2000. NERA is a firm that often represents Defendants in class action securities matters.

[2] *See,* Fischel, Daniel R., Keable, Michael A., and Ross, David J., "The Use of Trading Models to Estimate Aggregate Damages in Securities Fraud Litigation: An Update," *The National Legal Center for Public Interest*, Vol. 10, Number 3, March 2006. Mayer, Marcia Kramer, "Best-Fit Estimation of Damaged Volume in Shareholder Class Actions: The Multi-Sector, Multi-Trader Model of Investor Behavior," *National Economic Research Associates (NERA)*, Third Edition, October 2000.

and "slow" traders, each share is equally likely to trade on any given day, regardless of how long it was held. Based on these assumptions, the algorithm identifies the number of shares purchased on each day and when those shares were ultimately sold (if at all).

12. Using these trading models, I determined that approximately 130 million shares were traded and damaged during the Class Period, including approximately 80 million shares specifically connected to and following Wilmington Trust's secondary common stock offering that occurred on or about February 23, 2010 (the "Offering").[3] I then calculated the economic loss, or damages, for any given share purchased during the Class Period. This amount is the artificial inflation in the market price of the security at the time of purchase less the artificial inflation in the market price of the security at time of sale. The formulas in the Plan of Allocation are designed so that the Recognized Loss Amounts are determined based upon this well-settled damages formula, and limit recovery to the nominal loss suffered (*i.e.*, the purchase price minus the sale price).

13. For example, with regard to the Wilmington Trust/Underwriter Settlement and in accordance with the inflation tables A-1 and A-2 in the Plan of Allocation, shares purchased during the period January 18, 2008 to January 28, 2010 and sold prior to the first corrective disclosure would not have a Recognized Loss Amount because artificial inflation at time of purchase was $8.83 and artificial inflation at time of sale was also $8.83, as no corrective information had been released prior to the sale. By contrast, shares purchased when the artificial inflation embedded in the stock was $8.83 and sold on February 1, 2010, soon after the January 29, 2010 disclosure, would have a Recognized Loss Amount of $1.86 per share ($8.83 artificial inflation at purchase - $6.97 artificial inflation at sale). I understand that the $1.86 per share of artificial

---

[3] Of those 80 million shares, approximately 21.7 million shares were specifically connected to the Offering itself.

inflation was determined from a detailed analysis of how the stock price reacted upon the release of information that partially corrected the alleged fraud.

14. Further, for a share purchased during the Class Period and simply held through all of the alleged corrective disclosures, the recoverable damages are equal to the artificial inflation at time of purchase. For instance, a share purchased at the start of the Class Period with artificial inflation of $8.83 and still held past October 31, 2010, the final alleged corrective disclosure date, would have a Recognized Loss Amount equal to the full artificial inflation of $8.83 per share ($8.83 of artificial inflation at purchase – $0.00 of artificial inflation at sale). I understand this $8.83 per share was determined by aggregating the changes in the market price of Wilmington Trust Common Stock on each of the alleged partial corrective disclosures. Similarly, shares purchased on June 4, 2010, when artificial inflation was $5.29 per share (as some of the corrective information had already been disclosed and the related artificial inflation removed from the stock) and held past the end of the Class Period would have a Recognized Loss Amount of $5.29 per share ($5.29 of artificial inflation at purchase – $0.00 of artificial inflation at sale).

15. The calculation of recoverable damages must also incorporate a statutory limitation on recovery. In particular, the Private Securities Litigation Reform Act specifies that recoverable damages cannot exceed the purchase price less the average closing price over the 90 days following the corrective disclosure.[4] I have incorporated this limitation in my calculation of damages and it is also reflected in the formulas for determining the Recognized Loss Amounts in the Plan of Allocation.

---

[4] As required by the statute, if the share is sold within the 90-day "lookback" period, then the average closing price up to that day is used.

16. Under these assumptions, I find aggregate damages over the 130 million shares damaged during the Class Period (¶12) equal to $590 million.[5] Note that under the trading models, the same physical "share" can be damaged more than once. For example, if Trader 1 purchases a share, holds it over the first corrective disclosure, sells the share and suffers a loss, the share is counted as damaged. If the same share later suffers damages as well, it is counted as a damaged share again. In addition, I understand that these aggregate damages must be reduced by the amount that the Government has already recovered on behalf of Wilmington Trust investors, which would at a minimum include the $44 million forfeited by Wilmington Trust in connection with its settlement of the criminal charges against it. This offset reduces the total aggregate uncompensated damages to $546 million. This total may be even further reduced if some or all of the additional $16 million paid by Wilmington Trust to settle the SEC's action is distributed to shareholders.

17. The KPMG Settlement is simply a subset of the Wilmington Trust/Underwriter Settlement, and damages are calculated the same way applying the same inflation tables, but only for purchases made on February 22, 2010 or later. Following the same methodology and assumptions described above, I find aggregate damages of $285 million from February 22, 2010, on which the 2009 Form 10-K was filed (in which I understand KPMG is alleged to have made false and materially misleading statements) to the end of the Class Period. Again, the damages on these shares are a subset of the larger aggregate damages of $590 million applicable to the other Defendants. As with the larger aggregate damages, this damages amount must also be offset by the amount recovered by the Government.[6] It is important to note that this figure does not apportion

---

[5] Damages related to shares purchased in the Offering pursuant to the statutory framework set forth in the Securities Act are approximately $80 million and overlap entirely with the overall maximum damages of $590 million relating to secondary market purchases.

[6] My damages estimates do not attempt to apportion KPMG's liability relative to that of the other Defendants, which I understand that Lead Plaintiffs would be required to do under the PSLRA's judgment reduction provisions had KPMG not settled.

7

the amount of damages for which KPMG, Wilmington Trust, or any other Defendant is liable, which I understand Plaintiffs would be required to do at trial.

18. In my opinion, the Plan of Allocation treats Class Members who purchased Wilmington Trust common stock at different times within the Class Period in an equitable manner, and the Plan of Allocation will appropriately distribute the settlements in proportion to each Claimant's Recognized Claims. The artificial inflation and calculations specified in the Plan of Allocation are based upon methodologies and formulas that reasonably reflect the economic harm caused by the alleged fraud. Therefore, in my opinion, the Plan of Allocation is fair and reasonable to Class Members and is consistent with my understanding of recoverable losses under Section 10(b) of the Exchange Act as a result of the alleged misrepresentations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: September 17, 2018
Chicago, Illinois

*Chad Coffman*